# EXHIBIT A



**INVESTIGATION REPORT**

**FOR NEW HAVEN PUBLIC SCHOOLS**

***RE: Complaint by Jessica Light against Margaret-Mary Gethings and Jenny Clarino***

By:  Rebecca Goldberg, Esq.

Berchem Moses PC

{01563140.DOCX Ver. 1}

I.    <u>Introduction</u>

On or about April 30, 2021, Jessica Light, then a third-grade teacher at Worthington Hooker School filed a complaint alleging retaliation by Principal Margaret-Mary Gethings and Assistant Principal Jenny Clarino. She states that she engaged in various forms of protected speech related to covid, for which Ms. Gethings and Ms. Clarino took various retaliatory actions culminating in Ms. Light being reassigned to teach first grade. Ms. Light was formally notified of her teaching assignment for the upcoming school year on April 27, 2021.

Ms. Gethings and Ms. Clarino received written notification of the complaint on May 24, 2021. A cross complaint by Ms. Gethings and Ms. Clarino was filed thereafter. In addition, teacher Hilarie Alden filed a complaint regarding Ms. Light in May 2021. These complaints were investigated by Paul Testa and Chris Henderson, respectively, of Berchem Moses PC.

During the pendency of this investigation, various other allegations arose based on new events. These were included within the present investigation.

This investigation included a review of documents and recordings submitted by the witnesses and Human Resources, as well as interviews with:

- Jessica Light
- Judith Cavanaugh
- Douglas Jones
- Hilarie Alden
- Paul Salem
- Phyllis Maffuid
- Deborah DiPietro
- Laura Tortora
- Ann Raymond
- Timothy Shortt
- Katherine Paine
- Jenny Clarino
- Margaret-Mary Gethings

II.    <u>Claimed Protected Activity</u>

A.  Specific Activities

Ms. Light spoke to the Board of Education on multiple occasions regarding her opinions as to how the District should address matters related to covid, from July 21, 2020 forward. She also spoke through Facebook comments, car caravans, talking with newspaper reporters, and petitions. Ms. Gethings and Ms. Clarino were aware of Ms. Light's activities in general and were specifically aware of her Board meeting comments and a particular Facebook post, discussed below. She typically identified herself as a teacher and sometimes identified herself as a parent and/or resident as well. In her comments to the Board in January 2021, she indicated her disagreement with the upcoming return to in-person instruction when the vaccine would be available so soon. In that meeting and others, she asked specific questions about how to maintain

safety under the circumstances. On February 22, 2021, she asked for a unified policy, and said she wanted to work together. On March 22, 2021, she asked the Board as "my employer" about consistency of rules and how to enforce safety protocols when students could now be closer than 6 feet apart, while still being expected to eat in the classroom. Her comments reflected fear that she or others would contract covid and die and a belief that the District was gambling with teachers' lives. Others conveyed similar concerns, although nobody from Worthington-Hooker School did so to the same extent as Ms. Light. She sought a unified policy from the Board to address covid concerns, as she believed decisions could not or should not be handled at the school level.

The Facebook post at issue is from March 9, 2021. Another teacher, Melody Gallagher (from another New Haven public school) posted case data for New Haven schools from a state website. Although the source is not shown, it appears to be from https://data.ct.gov/stories/s/COVID-19-in-PK-12-Public-and-Private-Schools/mpdc-p8wg/. The data listed Worthington Hooker as having <6 cases. There has been much discussion as to whether "<6" can include zero, or whether it means at least one. The site linked here includes the note, "If no cases were reported, 0 cases are displayed. If a school reported 1-5 cases, <6 is displayed. If 6 or more cases were reported, the exact number is displayed." Therefore, it appears that Worthington Hooker was reported as having at least one case in the state data. Ms. Light commented on the post, "I don't think letters were sent" and in response to the question, "For your school?" stated, "Hooker never sent a letter." It is true that the school had not sent a notification letter, but Ms. Gethings and Ms. Clarino have explained that the data include cases of individuals who were not necessarily in school at the time, and so this would not trigger a letter. This post (hereinafter "the Facebook post") was the subject of discussion, as described below.

Ms. Light's comments to the Board on March 22, 2021, where she asked questions about how to enforce safety protocols with the distance between students decreasing, must be understood in the context that she had emailed Ms. Gethings questions on this topic that morning. Ms. Gethings had responded that they were awaiting full details from the District and would share as soon as she knew them and that they would only make changes once they have the directions and approval. Following Ms. Light's comments to the Board, Ms. Gethings emailed Ms. Light that evening stating, "I am sorry if you didn't get my prompt response to your morning email, I responded very quickly. I assured you that I would seek an answer regarding snacks and lunch distancing which I have done. I said we need to remain patient for a response and that in the meantime we would be following the existing guidelines, I am sorry you felt the need to bring the same question to the board. We all must be patient as changes are being considered in response to the CDC new guidelines, then reviewed by Dr. Tracey and our health department will advise. All this information will be forthcoming."

B. Alleged Disruption

Ms. Gethings and Ms. Clarino have suggested that Ms. Light's comments caused disruption in the school environment and that parents became concerned because of her comments. While her comments clearly displayed fear, there was no evidence that they actually caused any meaningful disruption in the school environment.

Ms. Clarino stated that several staff members told her that they are not in agreement with

Ms. Light's public statements. Ms. Light also asked some teachers to speak up at the Board meetings and some did not want to engage in discussion with her on this topic. For example, when Ms. Light spoke out against school reopening in January 2021, Mr. Shortt felt that school should be in-person so he did not want to speak. Simply disagreeing with Ms. Light's beliefs and/or being asked to speak up at a Board meeting does not amount to disruption. In addition, others felt that Ms. Light was sharing concerns that they also held, but they were unwilling to be as vocal as she was.

In their written response to Ms. Light's complaint, Ms. Gethings and Ms. Clarino included a copy of the Facebook post and an annotation stating that parents became concerned and interpreted the comment as suggesting negligence and thus the comment built a lack of trust amongst the community. In support of this, they attached an email from a parent, Matt Rodenheffer, to a teacher in the school that asked, "Have there been any teachers/staff in the wh [Worthington Hooker] school out with covid in the past few week? Evies (sic) mom is being told now that there are many cases there currently and is now changing her mind about sending evie (sic) back in person." Not only does the email lack any reference to Ms. Light or her public comments or a social media post, the email was from March 2, 2021, a week before the Facebook post that Ms. Gethings and Ms. Clarino claim led to this email. Ms. Gethings stated in her interview that a few people came to her regarding the Facebook post, including another principal and including Ms. Clarino, but that no parents came to her about it.

On May 26, 2021, another parent, Vicki Grubaugh, emailed Ms. Gethings and Ms. Clarino regarding her views on Ms. Light's comments to the Board and how it was unfair for students and parents to be with a teacher who felt strongly that she did not want to be at school. Ms. Grubaugh did not have a child in Ms. Light's class, but was expressing how it must feel for parents who did. She also discussed her views on Ms. Light's approach to certain PTA matters. Ms. Gethings denied asking Ms. Grubaugh to put these comments in an email. Yet, it is unclear why Ms. Grubaugh would send this email more than two months after Ms. Light's last public comments at the Board of Education, within two days of receiving written notice of the investigation by HR into Ms. Light's retaliation complaint, and within one day of Ms. Gethings seeking confirmation from Mr. Jones regarding his recollection of events related to the gardening club in connection with the investigation (see below). While these facts give rise to a suspicion that the email was solicited, even if it was not, a single email would not reflect a level of disturbance, particularly when it came months after the speech at issue and after many of the events cited by Ms. Light as retaliatory had already taken place.

Ms. Clarino also stated that Ms. Grubaugh and a parent named Dominique would mention Ms. Light's comments to her after Board meetings and seek comfort or confirmation that sending their children to school was safe. She stated that Ms. Grubaugh and Dominique commented to her a total of 3-5 times.

Ms. Gethings and Ms. Clarino also cited an example of Wolfgang Fink, the president of the PTA, inquiring about matters such as how many desks fit in classrooms and wanting to visit in person to see certain covid-related measures firsthand. This was also attributed to Ms. Light, as she is friendly with Mr. Fink. They suggested that Mr. Fink's request demonstrated knowledge only available to those in the school, so that Ms. Light would likely have been the source of the information. Yet, they offered no information to show what knowledge Mr. Fink possessed that could only be obtained from an insider. In addition, Mr. Fink, as president of the

PTA, was an involved parent who would have knowledge about school operations and would be motivated to ask questions of his own initiative.

In view of the total circumstances, the extent of the disruption attributable to Ms. Light's public comments was two parents making a total of 3-5 comments to building administrators and one of those parents sending an email well after the fact. Other claims of disruption from Ms. Light's comments were not clearly attributable to her, such as the email from Mr. Rodenheffer supposedly occasioned by a Facebook post that had not yet occurred. C. Responses to Claimed Protected Activity

On November 2, 2020, a meeting was held with Ms. Gethings, Ms. Clarino, and Ms. Light. This meeting was recorded by Ms. Light. At a meeting about the hybrid model the prior week, Ms. Light had stated that the school was telling her to seek direction from the District and that the District was telling her to seek direction about the school. Ms. Clarino stated that in response to comments by Ms. Light at the meeting about the hybrid model, Dr. Tracey told them not to tell teachers or parents to refer to the District for answers when she should be providing it at the school level. Ms. Gethings stated it felt that Dr. Tracey was saying they were leaving people uninformed and that it was embarrassing and uncomfortable for them. They would provide the specifics of their school-level plan as soon as they had them, but they did not want parents to ask specific questions about their school to the District. Ms. Gethings conveyed that it was perceived that they did not know what they were doing because a parent/teacher (Ms. Light) brought these questions to the meeting. Ms. Light indicated that she believed they were doing the best they could and being as transparent as possible in the context of a situation with moving parts. The discussion on this topic lasted about 30 minutes on November 2nd and was followed by a lengthy discussion about an issue involving Ms. Light's son, as to which Ms. Gethings and Ms. Clarino were supportive and accepted her concerns. Both Ms. Gethings and Ms. Clarino stated they could not recall this meeting. Based on the recording, Ms. Gethings did not, as claimed by Ms. Light in her complaint, state that not all of Ms. Light's speech was protected by the First Amendment and that she was creating a false narrative about the school. This meeting was an effort by Ms. Gethings and Ms. Clarino to share their perspective and concerns. Ms. Light was not told not to speak publicly, but she was made aware of some of the impact of her statements. This was not retaliation, but an effort to address concerns and minimize disruption.

On March 12, 2021, in apparent response to the Facebook post, Ms. Gethings sent a schoolwide email stating, "It has been brought to our attention from several community members including staff and parents that WHS is being mentioned with inaccurate information which also includes social media. We ask that if you are aware of any negative talk or postings, to please help protect and preserve our school. We hope that people will refrain from making their own inferences and/or misrepresenting our school. We must always keep in mind that we are working together and not against each other."

Ms. Clarino stated that the email was not specifically related to Ms. Light, as there were other teachers who expressed nervousness about returning to school and that they wanted to decrease anxieties held by these teachers. She noted that districtwide, there was a split regarding in-person schooling. Ms. Gethings acknowledged in her interview that the email was a response to the Facebook post and the Teacher X situation, discussed below.

The email does not name Ms. Light and under the circumstances appears to be an effort by school administration to prevent disruption caused by negative inferences being shared in the community. The evidence shows that this email was a means of countering a potentially damaging message (the implication that the school was not meeting its notification responsibilities) rather than retaliating against Ms. Light.

III.    "Teacher X" Situation

A teacher identified in Ms. Light's complaint as "Teacher X" had covid in February/March 2021. Claire Rowe, a friend of Ms. Light's and a member of the PTA executive board, asked a teacher, Kate Paine, if the ███████ had covid. According to Ms. Paine, she and Ms. Rowe were discussing matters relating to the PTA afterschool program, which Ms. Paine directed, and related covid protocols when Ms. Rowe told her that she had heard that the ██ ███████ had covid, and attributed her knowledge to an inside source. Ms. Rowe stated she had heard that the school was not following covid protocols. Ms. Paine felt uncomfortable with the discussion and told Ms. Clarino about it. There was no discussion between Ms. Rowe and Ms. Paine as to who the inside source was. Ms. Light's name was not mentioned. When Ms. Paine discussed the matter with Ms. Clarino, Ms. Clarino asked if Ms. Paine knew who the person was who had shared information with Ms. Rowe, and Ms. Paine did not have that information. Ms. Light was not referenced specifically during that discussion. Ms. Paine stated that the only person she heard this from at the time was Ms. Rowe. Ms. Clarino's description of the events to that point matched Ms. Paine's.

Ms. Clarino then spoke with the ███████████, Teacher X, and told her what was being said. Ms. Clarino then called Ms. Rowe to assure her that the District had done its due diligence and reported that the teacher had covid, but there was no need for any quarantine because the teacher had not been in school at the time. Ms. Clarino stated during her interview that Ms. Light's name did not come up on the call and that the purpose was to give her the correct information.

Ms. Clarino stated during her interview that Ms. Light was confirmed to her to be the "inside source," but could not recall who told her that. She struggled to recall this information during her interview, but stated she believed it came from Ms. Paine after the fact. Ms. Clarino stated that it is human nature to believe that the source was someone who had been very vocal, i.e., Ms. Light.

Several days after her interview, Ms. Clarino contacted the investigator stating, "Kate Paine is the individual that confirmed to me that J. Light shared confidential information about a staff member with parents." Asked how she confirmed this information, Ms. Clarino wrote, "I could not locate the information in my notes but am confident that it was confirmed that Ms. Light shared this confidential information. As a result, I had a conversation with Ms. Paine who is a second grade teacher. Ms. Paine's sister is the mother of 3 students who attend WHS. Ms. Paine's sister, Abigail Piane (sic), informed her sister that Ms. Light told parents in the community that [Teacher X] had Covid and administration did not conduct contact tracing or send a letter to families."

Ms. Paine stated during her interview that Ms. Clarino contacted her regarding the matter and stated she wanted to confirm she was sharing accurate information. Ms. Paine did not feel

Ms. Clarino was trying to influence any statement she would give.  However, Ms. Paine's version of her sister's involvement differed in a material respect from how Ms. Clarino represented it in her email communication.  Specifically, Ms. Paine stated that her sister asked her whether it was true that Ms. Light had shared the information regarding Teacher X, not that the sister informed Ms. Paine that Ms. Light was sharing this information with parents in the community, and that this is what she conveyed to Ms. Clarino.

It should be noted that Ms. Clarino, like all interviewees, was instructed in writing and during the interview by the investigator not to discuss the subject matter while the investigation was pending.  It was inappropriate for her to contact Ms. Paine.  Moreover, based on Ms. Paine's description of her sister's communications with her and how that information was conveyed to Ms. Clarino, Ms. Clarino erroneously informed this investigator that Ms. Paine's sister told (rather than asked) Ms. Paine that the source of the information was Ms. Light.

Ms. Gethings was not directly involved at this point, but stated that she believed that someone had told Ms. Clarino that parents were informed about Teacher X having covid by Ms. Light.

Teacher X suspected Ms. Light based on her social media activity, but understood she did not have any proof that Ms. Light was the source of the information.  Teacher X was very offended that her covid status was being discussed in the community.

Ms. Light stated that a meeting occurred on March 9, 2021, during which she was asked by Ms. Gethings and Ms. Clarino about the Teacher X situation and after denying that she was the source, was pressed to explain the source of the leak.  Ms. Light stated the meeting lasted ninety minutes.   It is clear that there was discussion about this question with Ms. Light prior to March 31, 2021, but the specifics of timing or the length of the meeting could not be confirmed.

In her midyear TEVAL meeting on March 26, 2021, Ms. Light was told that Teacher X might be planning to file a complaint.  Ultimately, Teacher X did not do so because she lacked proof that Ms. Light was the source.  Teacher X, Ms. Clarino, and Ms. Gethings all denied that building administrators encouraged Teacher X to file a complaint.

Without any proof or even a claim by anyone with knowledge that Ms. Light was the source of the information, a meeting was held on March 31, 2021 with Ms. Light, Teacher X, union representative Kathleen Morrison (at Teacher X's request), Ms. Gethings, and Ms. Clarino.  That meeting was recorded by Ms. Light.

At the meeting, Teacher X asked Ms. Light if it was true that she had gone to parents about why she was out of school, and Ms. Light stated that it was not true.  Ms. Light stated that she had been asked about Teacher X's absence and she stated she thought it was a planned absence.  When it was clarified that Ms. Rowe had spoken to a staff member who had spoken to Ms. Clarino who went to Teacher X, Ms. Light stated it was a long chain and was starting to feel like a rumor.  Ms. Gethings stated it was not a rumor because there was also a social media posting about it.  However, the social media posting Ms. Gethings was referencing was the Facebook post, which concerned state data, not any particular person.  While the timing of the social media post was close, the content was not about Teacher X in particular and related only to general data.

Ms. Light stated that it was "not truthful" that she had shared the information.  Ms. Gethings then stated, "Can I stop you for one minute there?  I don't know who you're saying is not truthful but I encourage you to have a little sensitivity to the fact that anyone that said anything is a colleague of yours, and a colleague of [Teacher X's], and a colleague of Jenny's and mine and they may not want to be compromised or feel that they will come under attack by you publicly, have things being said about them if they come forward, so I don't think you should….maybe it's not your truth, but you shouldn't say it's not truthful."

Ms. Light stated it is not the truth that she told Ms. Rowe.  Then, Ms. Gethings asked Teacher X whether there was anything she wanted to say about how it made her feel, which appears to show that she did not accept Ms. Light's explanation.  (In her interview, Ms. Gethings stated that she did not believe Ms. Light.  She stated, "I have no real evidence outside of it was confusing to me that the people that knew were people that she knows socially and as friends and that she seemed very defensive in both meetings.")

Ms. Light stated in the meeting that she did not think it was true that Teacher X had covid until Teacher X said so in an email.  Teacher X stated, "I would not have put that in writing to you" since they are not friendly.  Ms. Light screen shared showing the email, to which Teacher X responded, "My mistake, I am sorry."  Ms. Gethings then stated, "I don't even see it as a mistake. The mistake is how did families know and unfortunately in addition to you not feeling well you had to inherit this experience."  Ms. Gethings was apparently unwilling to allow for a simple apology to Ms. Light for what was shown to be an inaccurate statement by Teacher X that she had not emailed Ms. Light about her covid status.

Ms. Gethings went on to state, "We can respect some people do not want their names mentioned and they certainly deserve that respect.  Not one person has said anyone besides you as being the source.  We hear that you are saying it wasn't you but I need to you to know that every person said you were the source."  Ms. Light asked, "Who is every person?"  Ms. Gethings responded, "I am not saying because I know what you will do and go right to them and they do not want to be dragged into this, but I told you a week ago this is not an easy conversation for us, we are very concerned but I do not have to tell you their names and I promised them that I would not, but I can tell you that even though it is not a proven.  I am not giving you a name I am giving you my truth that there is not another person in our community whether it is a parent or a teacher that has not said that you were how they found out."  Ms. Light stated she acknowledged there was a rumor that she had shared the information.  Ms. Clarino stated they have "some major concerns" about the situation and that they would discuss with Ms. Light in the future.

In her interview, Ms. Gethings denied stating that the information had come to her through a colleague, that Ms. Light should not say that it was not truthful that she had shared the information, or that Teacher X should not acknowledge her mistake regarding the email. However, the recording shows that Ms. Gethings is not correct on these points.  Ms. Gethings still believed that any leak must have come from Ms. Light, noting that it would be difficult under the hybrid model for parents to simply notice that a specials teacher was out for a long time and guess she had covid, which was what Ms. Light was proposing as an alternative explanation.  Ms. Gethings stated Teacher X was only out about two weeks.  Further, even if it did come from an inside source, it does not appear it was ever considered that it might be someone in the school other than Ms. Light.  Teacher X, however, stated that it could have been possible for someone outside the school to notice her absence.  She stated she was out from

February 6th through March 5th.  Ms. Gethings stated in the interview that she did not know if anyone had conveyed to her or Ms. Clarino that the information had originated with Ms. Light. She stated that Ms. Morrison and Hilarie Alden had shared that people were talking about Teacher X being absent and they thought it had to be coming from Ms. Light (without citing the basis for their belief).  Ms. Gethings denied saying that Ms. Light would go to these sources and drag them in, but this is contradicted by the recording.  Ms. Gethings stated during her interview that there were no parents who indicated to her that Ms. Light was the source of the information and that she was not aware of any parents indicating to anyone else that Ms. Light was the source of the information.

While this investigation does not make any conclusion about whether Ms. Light was or was not the source of information being shared in the community regarding Teacher X, the manner in which it was addressed was unfair to Ms. Light in several respects.  Ms. Light was brought into what was essentially a restorative justice meeting to make peace with Teacher X for conduct she denied doing.  Her statements that she did not share the information were given no serious consideration and she was told not to say that it was not truthful that she shared the information.  It was insinuated that if Ms. Light denied the conduct, she was castigating her colleagues for coming forward.  However, no colleague had claimed to have any knowledge (rather than speculation) that Ms. Light was the source.  Ms. Gethings claimed that "every person" said she was the source, whether it was a parent or a teacher, when this was simply not true.  When called upon to identify who "every person" was, Ms. Gethings refused to do so claiming that Ms. Light would drag them into the matter, when it appears more likely that it is because there were no actual sources claiming to have any knowledge that Ms. Light had shared the information.  This incident continues to impact the relationship between Ms. Light and Teacher X and Ms. Light states it has further strained an already difficult relationship with Ms. Morrison.

Based on the multiple references to the Facebook post regarding general data as a basis for believing Ms. Light was the source, given the lack of any specific claim that Ms. Light was the source, and given the false claims that there were witnesses who stated she was the source, this incident is concluded to be retaliation for Ms. Light's Facebook post.  Again, this investigator does not have sufficient information to determine whether Ms. Light was or was not the source of any information being shared, but Ms. Light was accused based only upon speculation in connection with her prior public statements and she was falsely informed that there were multiple individuals claiming she was the source.  Even if it was reasonable to suspect Ms. Light, the declarations that multiple individuals had named her as the source of the information were untrue and made without justification.

IV.    TEVAL

Ms. Light's midyear conference was held on March 26, 2021.  Most midyear meetings were approximately 15-45 minutes long.  Ms. Light's meeting, which was recorded by Ms. Light, was approximately 1 hour and 13 minutes long.  At the meeting, Ms. Light was told that Ms. Gethings and Ms. Clarino were anticipating a written complaint from Teacher X (which ultimately never came to fruition).  There was also an extensive discussion regarding Ms. Light having asked questions at the Board of Education meeting regarding covid protocols on March 22, 2021, rather than waiting for Ms. Gethings and Ms. Clarino to provide answers once they were available.  Ms. Clarino stated that it was uncomfortable for them because it showed they

were failing her by not providing answers.  Ms. Light offered to provide comments ahead of speaking at Board meetings to reduce their discomfort.  Ms. Gethings stated, "The night that you're speaking, my phone goes off like I don't even know."  She felt she was being scrutinized regarding what instructions she had and had not given to staff.  She stated the Facebook post was "not your place."  She also referenced "other staff people who feel it's very hard to work with you" based on how she had been outspoken and how she was representing the school.  Ms. Clarino stated that Ms. Light was speaking negatively about the school and that they were trying to change the narrative about the school.  Ms. Light was somewhat distressed during the meeting, which was noted by Ms. Gethings and Ms. Clarino.  However, Ms. Light did not ask to leave the meeting or suggest she did not want to continue.

Within the TEVAL document, dated April 2, 2021, the section on feedback from the instructional management contains praise from Ms. Gethings to Ms. Light.  Within that paragraph, Ms. Gethings included the note, "As we discussed in your mid year please consider asking any time you have a concern, if we do not have the answer we will do our best to attain the answer."  Ms. Light perceives this comment as a warning flag regarding her public comments.  Ms. Gethings stated it was not meant as a warning flag, but as important feedback.  Ms. Gethings stated that since the Board does not provide answers at meetings during public comment, this would be a more effective way for Ms. Light to get the information she wanted.  She also stated that people would feel uneasy about a teacher who would be asking so many questions on a regular basis at Board meetings, rather than starting with her own building administration.

Ms. Light's TEVAL from the 2020-2021 school year was not completed given the difficulty of finalizing an evaluation under the circumstances of the complaint, although there is disagreement as to whether HR advised Ms. Gethings not to complete the final steps.

Ms. Light stated that on September 21, 2021, Ms. Clarino observed her class, but that she had not yet given feedback, while other teachers had received feedback after their observations.  Ms. Clarino stated in her interview that she had not conducted an observation yet for Ms. Light and that she could have been in her class for other reasons.  She stated that once the observation is done, Ms. Light will receive feedback.

The actions in the TEVAL process, including the comment in the document, do not constitute retaliation.  The meeting was difficult, but all attendees were discussing their beliefs extensively and there is no reason to believe that it was established as extremely long meeting in order to retaliate.  The comment in the document suggests asking questions of administration and does not tell Ms. Light not to pursue answers in other forums.

V.    Comments to Co-workers/Others/Claims of Solicited Complaints

A. Hilarie Alden

An incident occurred in September, 2020, where Ms. Alden was planning an outdoor event for second graders during lunch.  She sent an invitation to the class and was told that afternoon by Ms. Clarino that she could not do that event because Ms. Gethings had been informed by Ms. Light about it and that it had to be done outside of school hours.  Ms. Clarino had, in error, approved the event.  Ms. Alden reported that she asked Ms. Clarino who had

{01563140.DOCX Ver. 1}

complained and that Ms. Clarino informed her that Ms. Light had asked Ms. Gethings and was asking why Ms. Alden was allowed to do the event under these circumstances and not her. Ms. Alden believed that Ms. Light brought it up with Ms. Gethings to ask why Ms. Alden was allowed and not her, or to ask if Ms. Gethings knew she was doing it. Ms. Alden felt that Ms. Light was tattling on her and there was no reason Ms. Light could not have come to her first. Ms. Alden changed the event to comport with the rules. Ms. Alden stated that Ms. Clarino did not frame Ms. Light's discussion with Ms. Gethings as a complaint, but she perceived it as tattling. Ms. Clarino also stated that she did not view it as a complaint, but an inquiry. Ms. Gethings was very clear in her interview that Ms. Light was not trying to get Ms. Alden in trouble but legitimately wanted to know if the rules had changed because she wanted to hold her own events during school hours. Ms. Gethings stated that Ms. Light was not complaining of inconsistent application of the rules (i.e. allowing Ms. Alden to do something she could not), but was asking about whether they had changed.

Ms. Alden filed a complaint regarding Ms. Light in May 2021. Ms. Alden's complaint regarding Ms. Light begins with a complaint about this situation, noting that after receiving the invitation for the event, "Jessica immediately and without any communication whatsoever sought out the school's administration to formally complain that I was planning this during school hours." This overstates what occurred, as certainly no formal complaint was filed. Ms. Light and Ms. Gethings, the parties to the conversation, agree that it was not presented as any kind of complaint. Ms. Alden acknowledged that Ms. Clarino did not present it to her as such, but she perceived Ms. Light's actions as tattling. Ms. Alden's framing of the issue as a complaint contributed to Ms. Light's belief that Ms. Gethings and Ms. Clarino were setting her peers against her. The relationship between Ms. Alden and Ms. Light further deteriorated and it appears that this incident set the relationship off in a negative direction, with many subsequent events playing a role, culminating in the May 2021 complaint. Ms. Light stated that she believes Ms. Gethings and Ms. Clarino encouraged Ms. Alden to file this complaint. She stated she believed the complaint was coached, and questioned why the complaint was filed in May when the most recent specific event complained of occurred in December 2020. Ms. Alden stated that the rest of the year was "horrible" and she tried to put in the complaint before spring break because she was worried about what would happen when Ms. Light's son returned to in-person learning, in her class. Ms. Gethings, Ms. Clarino, and Ms. Alden all denied any discussion of the complaint by Ms. Alden against Ms. Light prior to its filing. Ms. Alden stated that she filed her complaint because she was highly concerned that with possible grade movements, Ms. Light could be made her grade-level partner, which would be extremely difficult following the difficulties they had had that year. There were delays in the complaint actually being initiated given attempts to resolve matters informally.

After Ms. Light's son returned to in-person learning, on one occasion he wore a shirt that said, "My mom is my hero." Ms. Light stated that Ms. Alden said the shirt was funny and Ms. Clarino laughed at him. Both denied this, although both remembered the shirt and Ms. Alden said she might have stated, "I like your shirt." Given that the only other witness was a 7-yearold, the allegations cannot be corroborated.

Ultimately, there is no evidence that Ms. Gethings or Ms. Clarino misstated Ms. Light's actions when communicating with Ms. Alden, encouraged Ms. Alden to file a complaint, or coached her in writing one. The evidence shows that Ms. Alden was the first to describe Ms.

11

Light's inquiry to Ms. Gethings about her event as a "complaint."

### B. Laura Tortora

Ms. Light reported that Ms. Tortora, currently a kindergarten teacher, came into her classroom on or about May 26, 2021 and told her that Ms. Gethings had asked her why she was friends with Ms. Light and stated that she needed to be careful. She said that Ms. Tortora stated, "I want to speak with you some time when you don't have kids, but I need to be quick, because if Gethings knows I'm friendly with you, it might cost me politically. I want you to know you have allies and if you need anything, you can always count on me." Ms. Light stated that Ms. Tortora is not a close friend, so she was surprised by this.

Ms. Tortora reported that she had difficulties with Ms. Gethings and Ms. Clarino during the 2020-2021 school year as she was returning from maternity leave. She cited multiple concerns that are beyond the scope of this investigation, but that bore some similarity to Ms. Light's allegations. She stated that things have been better this year and that she is trying to move forward in a positive way with both building administrators.

Ms. Tortora also had prior difficulties with Ms. Light, when Ms. Tortora was Ms. Light's son's teacher for first grade. However, they have gotten to know each other better recently and Ms. Tortora states that they now have a friendship.

Ms. Tortora denied that Ms. Gethings or Ms. Clarino had spoken to her about her friendship with Ms. Light, as alleged. She stated that she told Ms. Light last year when she heard what she was going through with Ms. Gethings and Ms. Clarino that she was also having a tough time with them and told her that if she needs someone else to speak about how they had been treating staff, she had also been mistreated. She stated that she did not say that if Ms. Gethings knew they were friends, it might cost her politically. She did not feel that there would be any negative fallout from a friendship with Ms. Light. Therefore, this allegation cannot be substantiated.

### C. Phyllis Maffuid

Ms. Maffuid is a special education paraprofessional. She works under Ann Raymond, the special education teacher. She described her relationship with Ms. Gethings as good and with Ms. Clarino as distant, as Ms. Maffuid had only worked in the lower school[1] for a few weeks. She only got to know Ms. Light recently as Ms. Maffuid works in her classroom in the mornings serving a child in her classroom, but previously knew her only slightly.

On or about May 26, 2021, Ms. Light used the bathroom around dismissal time. She stated that she asked Kyle Miller, the math coach, to watch her class so she could use the bathroom, but then saw Ms. Maffuid who agreed or volunteered to watch her class. After using the bathroom, Ms. Light switched her shirt because she had running club. Ms. Gethings emailed her afterward stating that she should not change her clothes during dismissal time. Ms. Light said that she did not leave the class to change her clothes, but did so while she was using the

---

[1] Worthington Hooker is divided into a lower school (k-2) and an upper school (3-8). Ms. Clarino generally leads the lower school while Ms. Gethings generally leads the upper school, although they are both involved with both schools.

{01563140.DOCX Ver. 1}

bathroom anyway. It does not appear that Ms. Gethings pressed the issue further with Ms. Light. Ms. Maffuid stated it took less than a minute.

Ms. Maffuid reported that although it is extremely common to watch a teacher's class for a short period, the following day, Ms. Gethings called her into the office and shut her door and asked why Ms. Maffuid would cover for Ms. Light and stated that teachers cannot leave the class. Ms. Maffuid stated she asked Mr. Miller if he had been called in to discuss this and he said no. (Ms. Gethings was unaware of Mr. Miller's involvement, if any.) She stated that Ms.

Gethings made a "really big deal" about the situation and that the conversation lasted about five minutes. She stated Ms. Gethings' tone was "reprimanding," but she was confused as to why because she did not believe she had done anything wrong. Ms. Maffuid promptly told Ms. Light about the conversation, which Ms. Light includes as part of the pattern of alleged retaliation against her, namely that Ms. Gethings reprimanded Ms. Maffuid for helping Ms. Light in a manner that was not out of the ordinary.

Ms. Gethings stated that she only spoke with Ms. Maffuid about the situation as it was occurring, when she saw her outside the school with Ms. Light's class. She stated that she asked where Ms. Light was and Ms. Maffuid said she was getting changed for running club. Ms. Gethings admits sending the email to Ms. Light regarding not changing clothes during dismissal, but denies that she ever discussed the matter with Ms. Maffuid again. She stated that Ms. Maffuid's actions in covering the class were not out of the ordinary, but that Ms. Light should not have asked her to cover dismissal where avoidable.

Ms. Light reported this to Human Resources on May 28, 2021, stating, "Phyllis, who covered my class with Mr. Miller so I could go to the bathroom Tuesday, sought me out of (sic) the end of the day yesterday, Thursday telling me she had been forced into a closed-door meeting with administration. She reported she was admonished and asked 'Why are you helping Mrs. Light out?' and 'What is Jessica up to, what is she planning with you?' As if helping me was something nefarious, even though she explained she often watches teachers classrooms for a min so they can go to the restroom. She also told me she was worried she might get in more trouble if she was seen being friendly and talking to me so had to cut the conversation short."

Ms. Gethings named Ms. Maffuid (along with Mr. Shortt) when asked during her interview whether anyone would be untruthful. She stated that Ms. Maffuid has constant drama and gossiping and that she would prefer neither Ms. Clarino nor Ms. Gethings be in the positions they are in. She stated that Ms. Maffuid fails to tell her important details and gets facts wrong. She stated that Ms. Maffuid has misrepresented facts on other occasions and gives inconsistent reports.

There was no evidence to support that Ms. Gethings asked what Ms. Light was planning with her or anything to that effect. The allegation that there was an admonishing closed-door meeting was conveyed to Ms. Light by Ms. Maffuid shortly after it is alleged to have occurred and those aspects were corroborated by Ms. Maffuid. The only question is whether Ms. Maffuid fabricated this incident, as suggested by Ms. Gethings' identification of her as someone who might be untruthful. Ms. Maffuid did not appear to have any motive to fabricate this episode and convey it to Ms. Light (which is uncontroverted) at a time when Ms. Maffuid and Ms. Light did not know each other well. By contrast, Ms. Gethings would have a motive to deny it. It should

13

{01563140.DOCX Ver. 1}

also be noted that this occurred at a time of high tension between Ms. Light and building administration, two days after Ms. Gethings received written notice from HR of Ms. Light's complaint. Therefore, the credibility assessment supports that Ms. Gethings did reprimand Ms. Maffuid for providing ordinary support to Ms. Light.

Another incident involving Ms. Maffuid arose on September 21, 2021, relating to a meeting following an incident where a student under Ms. Maffuid's watch ran out of the building. The meeting included Ms. Maffuid, Ms. Gethings, and Ms. Clarino. Ms. Light was not invited because the meeting pertained to matters not directly involving her, and Ms. Raymond was invited but saw the invitation too late. At that meeting, there was some discussion about Ms.

Maffuid photographing the student to demonstrate that she was telling the truth about the student's behavior because she might otherwise not be believed. This apparently stemmed from Ms. Raymond expressing some doubt to Ms. Light about whether Ms. Maffuid was accurately reporting the student's behaviors, not because Ms. Maffuid was viewed as dishonest, but because the behaviors were extreme and did not match Ms. Raymond's observations of the student in other settings. Ms. Light told Ms. Maffuid that Ms. Raymond had asked her this question. At the meeting, there was a statement by Ms. Gethings to the effect that Ms. Maffuid had worked with Ms. Raymond for a long time, suggesting that Ms. Maffuid should not believe that Ms. Raymond would really say she did not believe her. According to all present at the meeting, the focus was not on Ms. Light and whether she was interfering with the relationship between Ms. Maffuid and Ms. Raymond, but Ms. Light presented this as her concern following Ms. Maffuid's report of the meeting. Ultimately, Ms. Raymond, Ms. Maffuid, and Ms. Light reached an understanding about the inquiry Ms. Raymond had made to Ms. Light about the accuracy of Ms. Maffuid's reporting, and all experienced some discomfort related to that incident. However, the evidence does not support Ms. Light's claim that Ms. Maffuid told her, "I thought this was going to be a meeting about strategies to help the Student, but really Ms. Clarino and Ms. Gethings were just asking me if I thought you (Ms. Light) were trying to get in between Ms. Raymond and me (Ms. Maffuid)." Ms. Maffuid denied that she was asked anything about Ms. Light soiling her relationship with Ms. Raymond or anything to that effect. Ms. Maffuid did state that the question about why she thought she would not be believed was asked early in the meeting, but at that time, she had not yet identified Ms. Light as having any involvement, and even once Ms. Light was identified, the discussion did not turn to focus on Ms. Light.

Therefore, the allegation that Ms. Gethings admonished Ms. Maffuid for helping Ms. Light is substantiated, but the allegation that Ms. Gethings and Ms. Clarino discussed whether Ms. Light was trying to get in between Ms. Raymond and Ms. Maffuid could not be substantiated.

### D. Paul Salem

Mr. Salem, a third-grade teacher, was Ms. Light's grade-level partner. They had a good working relationship. On or about August 24, 2021, around the time Chris Henderson from Berchem Moses was interviewing Ms. Gethings and Ms. Clarino regarding the complaint brought by Ms. Alden against Ms. Light, documents appeared on Mr. Salem's printer. The documents were emails from Ms. Light's husband, David Bianchine, to Ms. Gethings and Ms. Clarino. The subject matter pertained to Mr. Bianchine and Ms. Light's child and Ms. Alden, his

14

teacher. The documents arguably could show Ms. Light and her husband as people who criticize their sons' teachers.

Mr. Salem contacted Ms. Light about the documents, assuming that she had printed them since they concerned her child. Ms. Light was surprised, as she had not printed them. Mr. Salem stated that they were sitting on the printer as though they had just been printed and did not appear to have been placed there, given their position and the neatness of the stack of paper. Although Mr. Salem's printer is not connected to the wireless network, Mr. Salem stated that it is possible to print to his printer from a different computer, as another teacher had recently done so.

Ms. Gethings acknowledged printing the emails in connection with her interview with Chris Henderson. She stated that she has the copy she printed, so she does not have any idea how it could have ended up on his printer. Ms. Gethings stated she was not aware whether Mr.

Salem has a printer. She stated she printed it in the main office and that she did not have recall having any printer problems that might have caused her to print multiple copies or that might indicate the document was inadvertently sent to the wrong printer. She suggested that perhaps she inadvertently printed a second copy in the main office and someone picked it up and brought it to Ms. Light. However, she could not explain how or why a copy printed in the main office would have been placed on Mr. Salem's printer. The IT department was not able to provide information that would clarify the events leading to Mr. Salem's discovery of the documents.

There is no dispute that the documents were printed by Ms. Gethings and no reason to doubt Mr. Salem's discovery of the documents on his printer. It is difficult to fathom why if somebody discovered an extra copy of the documents on the main office printer, that person would have placed them in a neat stack on Mr. Salem's printer. The preponderance of the evidence indicates that Ms. Gethings placed the documents there or printed them directly to Mr. Salem's printer, whether from his classroom or elsewhere. Given that there is no legitimate reason for Mr. Salem to have been given these documents, this suggests retaliation against Ms. Light.

E. Debbie DiPietro

Ms. Light reported that on September 22, 2021, Debbie DiPietro, a paraprofessional, told Ms. Light, "I'm not the type of person to say anybody's names, but I've been told repeatedly to please come and let anyone know if things are going wrong with you or if anything's going wrong in your classroom." Ms. DiPietro was interviewed and stated that when Ms. Light was first coming to the lower school for the 2021-2022 school year, somebody told her, "Make sure she treats you right," and Ms. DiPietro did not understand why. Ms. DiPietro stated that the person did not elaborate. She stated that she believes she mentioned this comment to Ms. Light as they were talking one morning, in the context of Ms. DiPietro stating she enjoys working with Ms. Light. While Ms. DiPietro could not recall who made this comment, when asked whether it was Ms. Gethings, Ms. Clarino, Ms. Raymond, Ms. Maffuid, Mr. Shortt, Ms. Alden, or Mr. Salem, she said she did not believe it was one of them.

Ms. DiPietro stated that she believed this was the only comment, but that it was possible somebody else said something along similar lines as well. She was clear that nobody told her to report information to that person or suggested any concern that there would be problems in Ms. Light's classroom.

15

Ms. DiPietro reported positive relationships with Ms. Gethings, Ms. Clarino, and Ms. Light. There was no apparent motive for her to be untruthful. Per Chris Henderson, Ms. Clarino called him on October 7, 2021, and reported that Ms. Light gave Ms. DiPietro a gift card. Ms. DiPietro acknowledged receiving a gift card recently as a token of appreciation, which she stated teachers have done in the past. When Ms. Clarino was interviewed, she answered no to an inquiry about whether she was aware of any attempts to influence investigation responses.

The evidence does not support the claim made by Ms. Light in this instance. Ms. DiPietro denies both the underlying claim and telling Ms. Light anything other than that someone told her one time to make sure Ms. Light treats her right. While the circumstances of that interaction are unclear, it does not rise to the level of a claim that Ms. DiPietro was told repeatedly to report on actions in Ms. Light's classroom.

F. Timothy Shortt

Mr. Shortt, who had previously served as a union steward, recently ran against Ms. Morrison for that role. He reported that he won the election by a wide margin (16:7).

Ms. Light reported on October 7, 2021, "Today I went to East Rock park to pick up my son . . . from running club. Tim Short[t] is the teacher who leads running club and was recently elected our school's union steward. While there he told me he recently had his first meeting with administration as union steward and administration told him they were concerned that the only reason he had run for union steward was because he was in 'cahoots with me' and wanted to 'take down the administration.' He was warned that I was decisive and his motives for being friendly with me were questioned."

When interviewed, Mr. Shortt confirmed that in a meeting, Ms. Gethings and Ms. Clarino told him that a couple of teachers were concerned that he had run for union steward to team up with Ms. Light to throw them under the bus and push them out. He stated that multiple people had asked him if he was interested in becoming steward because they felt Ms. Morrison was becoming very close with Ms. Gethings. According to Mr. Shortt, during this first monthly meeting in his capacity as union steward with Ms. Gethings and Ms. Clarino, they stated that a few teachers thought he might be in cahoots with Ms. Light and they did not elaborate. They did not identify any teachers specifically. While he could not recall if the terms "in cahoots" or "out to get them" were used, that was the tone of the suggestion. He stated that Ms. Clarino asked if more than one person wanted him to run for steward, suggesting it was only Ms. Light. Mr. Shortt stated about 5 people approached him and the vote was decisive, so Ms. Light was not his only supporter. He stated Ms. Light did ask him to run, but there was nothing more to that.

Mr. Shortt stated he was upset by the conversation and did not want the drama, as he is not trying to undermine anybody. He did not recall them discussing any friendship with Ms. Light, and noted that they are not particularly close. He did not think they were trying to warn him about her or create discord between him and Ms. Light. He stated he reported this to Ms. Light because as the union steward, he felt she should know that her name was brought up in that fashion.

When interviewed, Ms. Gethings stated that she had said in the meeting that she thought it was unfortunate that people suggested that "they" were teaming up to take down the

administration.  She stated she did not know who "they" referred to and that she did not refer to Ms. Light.

When asked whether anyone involved in this investigation might give untruthful information, Ms. Clarino was not aware of anyone.  Ms. Gethings, however, immediately responded to the same question naming Mr. Shortt (as well as Ms. Maffuid).  She stated that Mr. Shortt has a more difficult time with her as an administrator, citing a prior sensitive matter from a few years ago, where Mr. Shortt felt wronged by Ms. Gethings.  This matter predated Ms. Clarino's time at Worthington Hooker and she may not have been aware of it.  When asked about his relationship with Ms. Gethings, Mr. Shortt stated that the relationship was good now, but that there was a prior incident that was all resolved.

Prior to this question for Ms. Gethings at the very end of a lengthy interview, there was no indication throughout this process that Mr. Shortt was ever untruthful.  This was the case even when both Ms. Gethings and Ms. Clarino were asked about the meeting at issue.  Although both administrators denied discussing Ms. Light, Mr. Shortt's recounting is more credible.  Specifically, given the passage of time following the difficult situation between Mr. Shortt and Ms. Gethings without other instances cited of him fabricating any other matters, it is difficult to comprehend why Mr. Shortt would fabricate this episode to support Ms. Light.  This is especially so because, although they are friendly, they are not close personal friends.  Mr. Shortt previously told administration he disagreed with her on covid-related issues and Ms. Gethings stated he previously told her that he avoided Ms. Light at all costs because she wanted him to speak at Board meetings against reopening school, while he felt differently.  He also stated in his interview that he disagreed with Ms. Light's interpretation that various decisions by administration were being made to punish her for speaking out regarding covid issues.  If Mr. Shortt were trying to undermine administration by fabricating this comment, it is likely he would have supported Ms. Light's claims on other incidents.  Further, if Mr. Shortt were fabricating this episode, it stands to reason he would be more certain about the precise words used in order to solidify the point he was making.

Given the many layers of negativity in the relationship between building administrators and Ms. Light at this time, it is not possible to identify the precise motive and whether it relates to any protected activity on Ms. Light's part.  However, the preponderance of the evidence supports that Ms. Clarino and Ms. Gethings made negative commentary regarding Ms. Light in the meeting with Mr. Shortt, suggesting they were working together to undermine building administration.  It should be noted that this occurred while this investigation was underway.

VI.    Change to First Grade

Ms. Light has taught, at various times, third, fourth, fifth, and sixth grades.  When she came to Worthington Hooker, she was assigned to third grade and served in that role for four years.  While Ms. Light understands that teachers can be moved to different grades to meet school needs, she feels that the decision to move her to first grade is retaliatory, given the timing and the fact that she strongly disfavors teaching at that level.  She states that she disfavors teaching at that level due to "severe dyslexia" that makes it difficult to teach phonics, and because she has not attended training geared toward the younger grades in some time.

The rationale offered for needing to move Ms. Light's assignment was that her son was entering third grade and there were concerns about having a parent teaching the same grade level

17

{01563140.DOCX Ver. 1}

her child was in, even if the child would not be in her class.  There are no other examples of a teacher having a child in Worthington Hooker School for comparison.  While there is not a districtwide policy against having a parent teaching the same grade level as her child, it is reasonable that Ms. Gethings and Ms. Clarino, in their discretion, sought to avoid it.

Teachers were told that some teaching assignments would be changed for the next year going back to approximately December 2020.  At the March 26, 2021 TEVAL meeting, Ms. Light was told specifically that her assignment was going to be changed.   She explained her reasons for not wanting first grade and indicated a preference for a higher grade if she needed to be moved.

Ms. Gethings and Ms. Clarino stated that they gave consideration to not placing Ms. Light in first grade, but other suitable options did not exist.  She could not be moved to second grade because she could not be placed with Ms. Alden given their animosity toward one another.

Fourth grade was not ideal because there was a well-functioning team in place that would be disrupted by a move and because Ms. Light would have to be moved again after the year because her child would then be in fourth grade.  Fifth and sixth grades were taught departmentally by a team and there was a strong team in place as well.   Therefore, first grade was the only option they felt could work.  They explained the situation to Ms. Light and Dave Cicarella in the spring of 2021.

Recognizing that the first grade placement was not ideal given Ms. Light's concerns, Ms. Gethings and Ms. Clarino offered support to help with phonics instruction. Ms. Gethings indicated that all teachers in grades 1-3 are supported with professional development and coteaching.  She also noted that Ms. Light has not indicated any struggles this year while teaching first grade.

There were some aspects of the explanations provided by Ms. Gethings and Ms. Clarino that were not consistent.  Ms. Clarino stated that Ms. Light had previously caused difficulty with other teachers for her children by virtue of being in the building, citing an example of Ms. Light waiting for Ms. Morrison by the doors to the building to talk to her about an issue involving her son.  Ms. Clarino stated that they wanted to have a safer environment for teachers by putting her at the lower school, so that teachers would not have to worry about being confronted without warning.  By contrast, Ms. Gethings provided the explanation above regarding why moves to the various grades would not be suitable.  She expressly denied that the first grade placement had to do with Ms. Light's relationships with other teachers and/or an effort to create space by having her work in the lower school.

Ms. Gethings and Ms. Clarino both cited a request from Paul Salem, Ms. Light's gradelevel partner, not to have Ms. Light's child in his class.  Ms. Gethings stated that on April 2, 2021, Mr. Salem stated that he and Ms. Light worked really well together and he did not want to hurt her, so he would rather teach fourth grade because having her child in his class would disturb the friendship.  She said he did not explain how it would disturb the friendship, but that it was about not wanting to change the positive relationship they had.  This conversation occurred after the TEVAL meeting in March when Ms. Light was told her grade would be changed because of her son being in third grade, so it is not clear how Mr. Salem's comments factored into the decision at all.  Further, Mr. Salem stated that he only asked how to navigate the

{01563140.DOCX Ver. 1}

relationship if he had Ms. Light's son in class, but that he did not request any assignment changes. He also stated that he never spoke to Ms. Clarino about the subject, while Ms. Clarino stated that she discussed the request he had made to Ms. Gethings and asked him to put it in writing. Neither school administration nor Human Resources received such a written request.

While Ms. Gethings and Ms. Clarino offered different explanations for the move to first grade, the consistent factor was that it was viewed as problematic to have Ms. Light teaching the same grade that her child would be in, even if he was in a different class. Mr. Salem's comment about any concerns he may have had was expressly not a negative comment about Ms. Light, but rather an effort to preserve positive relations. Given Ms. Gethings' timeline, however, Mr. Salem's comment came only after a decision had already been made to move Ms. Light. Once it was clear that Ms. Light would be reassigned, there was no evidence to suggest that first grade was not the best placement in view of all the circumstances. While it was far from Ms. Light's preference, she has not expressed an inability to perform the role. She stated that she would have been open to the grade change, were it not retaliatory.

In view of the fact that a grade change was a reasonable measure in light of the parent/teacher role and in view of the reasons offered for why first grade was the only suitable placement, the evidence does not support a conclusion that the placement was retaliatory.

VII.    Committees/Workshops

Ms. Light complained that Ms. Gethings and Ms. Clarino failed to select her for multiple committees and workshops and sidelined her from committees with which she was already involved, as acts of retaliation. As detailed below, each decision has an explanation that does not suggest retaliation for protected activity.

A.    Summer Play-Based Learning Workshop

Ms. Light stated that she volunteered but was not given the opportunity to attend a summer play-based learning workshop in summer 2020.

The opportunity was presented to Ms. Gethings by the Early Childhood Administrator and the Director of Early Learning Programs on May 13, 2020, and was stated to be an opportunity for professional development for pre-k through Grade 1 teachers. Ms. Gethings forwarded the announcement that day to staff members working with those grades. Ms. Alden, a second grade teacher, was included, because of a prior specific role in play-based learning. Ms. Light stated that she was instrumental in securing a grant for play-based materials, so she felt she should also have been given the opportunity. Ms. Light stated that this was paid professional development.

The facts show that Ms. Light was not excluded from this opportunity in retaliation for protected speech. At the time of the May 13, 2020 email, Ms. Light had not yet engaged in any of the activity she identifies as protected. Ms. Light stated there was not significant tension in the relationship with Ms. Gethings at this point (and it pre-dated Ms. Clarino's arrival). Ms. Light acknowledged that non-selection for this opportunity was less clearly retaliatory under the circumstances. It should also be noted that others stated that this opportunity was not paid. In addition, other purposeful play resources were provided to all teachers.

B.    Scheduling Committee

Ms. Light stated that she volunteered to be on the Scheduling Committee and that subsequently, she was informed that two other teachers would lead the committee and her input was never considered.

Ms. Light stated that she was told not to attend the first meeting because there would be more focus on grades 4-8. Ms. Gethings stated that the first meeting of the scheduling committee focused on the upper grades, so while she did not recall telling Ms. Light not to attend, it seemed accurate. She stated that the scheduling committee involves 2-3 people making most of the arrangements with other members contributing thoughts. Ms. Gethings stated that Ms. Light's input was considered in that her request not to start the school day off with a special was granted, but Ms. Light denied making that request.

Ms. Gethings and Ms. Light were in agreement that Ms. Light was on the committee and that her role was relatively minimal. However, it appears this is a matter of how the committee functions, with most of the members playing a minor role by contributing suggestions on a schedule built by the committee leaders.

C. Signage Committee

Ms. Light stated that she volunteered in the summer of 2020 to lead the Signage Committee, but Ms. Raymond was assigned to lead instead. She described the committee's role as meeting to decide on signs for things like handwashing, social distancing floor stickers, etc. related to covid measures. Ms. Light stated that when she went to the first meeting she was invited to, in November 2020 (in anticipation of a reopening that was later delayed), all of the mental work had already been done and they were just putting stickers on the floor, meaning that her role was relegated to manual labor rather than mental input. There is no Signage Committee this year because the function is not needed.

Ms. Raymond, when interviewed, did not believe that she was chosen to lead the committee. The role was so minimal that she did not realize she was taking on a different role from anyone else, other than that she selected times for the group to meet to place the signs. She described it as a "no brainer committee," whose function was sticking arrows on the wall and similar tasks. According to Ms. Gethings, the signs were pre-made and it was simply a matter of placing them.

Given the extreme insignificance of the signage committee "leader" role, it does not appear that Ms. Light was being sidelined when Ms. Raymond was given the role instead. She may have felt that way because the remaining tasks were manual in nature, but this was so for everyone else on the committee and Ms. Raymond's additional role was so trivial that she didn't even recognize that she had been selected to lead. Ms. Light may not have been aware of how little there was to do other than simply placing the signs.

D. Gardening Committee

Ms. Light led the Gardening Committee in the 2020-2021 school year. She states that Ms. Gethings announced in a staff meeting on March 8, 2021, that she chose to have the Boys Club run the Gardening Committee and have another teacher, Douglas Jones, take over the work. Ms. Light stated that Ms. Gethings retaliated against her by leaving her outside the loop and essentially removing her from the Gardening Committee by having Mr. Jones take over the work.

Mr. Jones needed to lead a project for his 092 program that would involve engaging the community.  Mr. Jones runs a Boys Club that has engaged in various activities, including cleanup projects.  When Mr. Jones discussed possibilities with Ms. Gethings for his 092 project, she suggested working with Ms. Light on gardening clean-up days on two Saturdays in the spring. He stated that the idea was developed organically.  Ms. Light was the only person on the Gardening Committee at the time and was seeking assistance with her efforts.

Ms. Light states that on March 9th, she told Ms. Gethings and Ms. Clarino that her feelings were hurt that she was not included in the planning of the clean-up days.  The following morning, Ms. Gethings emailed Mr. Jones, copying Ms. Clarino and Ms. Light, asking Mr. Jones to work with Ms. Light to create a Sign-up Genius form.  Ms. Gethings and Ms. Clarino attributed Ms. Light's statement of hurt feelings to later meetings, rather than March 9th.

Mr. Jones worked with Ms. Light to share ideas, and Ms. Light came to one of the two clean-up days.  Mr. Jones took on a larger role, seeking community involvement, such as support from Lowe's.  Mr. Jones was unaware of Ms. Light's role on the Gardening Committee and assumed that Ms. Gethings was asking him to work with her in connection with her role on the PTA.  Mr. Jones realized Ms. Light seemed upset when he spoke with her about the project, but he did not know why.

Ms. Gethings sent Mr. Jones an email on May 25, 2021, after Ms. Light had filed her complaint, asking Mr. Jones to confirm his recollection of events related to this matter.  Mr. Jones confirmed her recollection, but stated he was confirming that it was for 092 purposes and not taking over the Gardening Committee.  He did not agree with the complete description, specifically that he did not recall her mentioning the Gardening Committee in the original meeting and he did not recall her stating that Ms. Light was looking for help.  He did not identify these discrepancies in his email response, but did so during his interview.

Ms. Gethings and Mr. Jones were in agreement that there was never any discussion of Mr. Jones or the Boys Club taking over the Gardening Committee, as opposed to working on a specific project with Ms. Light.  Further, both agreed that Ms. Gethings told Mr. Jones at the outset to work with Ms. Light.  Since the clean-up days in the spring, the Boys Club has not performed any gardening-related tasks.  Ms. Light decided not to sign up for Gardening Committee this year.

E.   Social-Emotional Learning (SEL) Ambassador

Ms. Light stated that she volunteered for this role in March 2021 but was not selected. She stated that Rachel Forsa and Meghan Rose were chosen instead and that this was a paid position.  Ms. Light stated that Ms. Gethings explained this choice as wanting to spread out responsibilities, but that Ms. Rose and Ms. Forsa were also chosen to be after-school coordinators, which is also a paid role, which Ms. Light felt negated Ms. Gethings' explanation.

The SEL ambassador role is not a paid opportunity.  Ms. Gethings and Ms. Clarino felt that Ms. Rose demonstrated a passion for social-emotional learning and would be a good fit because she worked with ESL students.  They felt this would be a good opportunity for Ms. Forsa, a new staff member, to get to know other staff.

Multiple staff members, including Ms. Alden, applied for this role and were not chosen. There was no evidence that Ms. Light was singled out in any way.

F.    School Planning and Management Team (SPMT)

Ms. Light volunteered to chair SPMT for the 2020-2021 school year.  She stated that Ms. Gethings stated in a meeting in April 2021 that the school had not started the SPMT committee that year because no one was willing to chair it.  Ms. Light again expressed interest in serving as chair for the 2021-2022 school year.  She currently serves on the committee, but is not chair.

The SPMT chair role involves working with many stakeholders and having strong interpersonal skills to work with those stakeholders.  Based on her observations of Ms. Light's interpersonal and leadership skills and relationships with staff, Ms. Gethings did not feel this would be a suitable role for Ms. Light.   Ms. Gethings stated that she said in a meeting that SPMT was not running because there was not a chair, rather than because no one was willing to chair it.  It also never got running because of the unusual format of the school year with remote instruction.  Recognizing the difficulty of stating that the reason there was no chair was because Ms. Gethings was unwilling to have Ms. Light serve as chair, it appears Ms. Gethings did not at that time explain why there was no chair notwithstanding Ms. Light's willingness to serve.  The reasons articulated in Ms. Gethings' interview did not pertain to any protected activity, but rather a general ability to lead multiple stakeholders.  Therefore, this is not found to be an act of retaliation pursuant to the complaint.

G.    PTA

Ms. Light was the only teacher at Worthington Hooker School who was also the parent of children in the school.  The position of parent/teacher representative was created for her at the PTA and she served on the executive board for a two-year term.  In a Hooker Happenings newsletter on March 28, 2021, the administration included the language, "PTA: Please let us know if you are interested in being the teacher representative for next year."  Ms. Light stated that with nominations being in May, the timing of this announcement seemed particularly early, such that it appeared to be timed to come out at a time when tensions were high between Ms. Light and administration regarding her public comments.  The announcement came two days after the TEVAL meeting at which her public comments were discussed.  There was also an incident during a PTA meeting where Ms. Light indicated that a parent wished to nominate Mr. Shortt and Ms. Gethings stated that it was inappropriate for her to inform people of nominations because it should be done by the school leadership team, which Ms. Light states is at odds with the bylaws.  Ms. Light stated that Ms. Gethings said in response, "We have met about this already and that nomination could not come from a parent but will be dealt with at the school level."  Ms. Light ultimately decided to step down from the executive board and remain a regular member of the PTA.

The invitation in Hooker Happenings is innocuous and does not appear to be designed to encourage others to run against Ms. Light, rather than simply apprising them of the opportunity. The timing of the announcement at the end of March seems appropriate in terms of presenting time for teachers to consider their interest prior to nominations in May.  Presently, three teachers serve as teacher representatives: Meghan Rose, Tim Shortt, and Hilarie Alden.  There was no indication that these teachers were persuaded to take on the position by Ms. Gethings or Ms.

Clarino.  Regarding the comment about Mr. Shortt's nomination, Ms. Gethings stated that the "we" she was referencing was building administration and the PTA, not Ms. Light specifically.  It does not appear that this comment was designed to paint Ms. Light negatively or that it was retaliatory for her public comments.  VIII. <u>Miscellaneous</u>

Ms. Light alleged various miscellaneous actions that she believes are retaliatory.

For example, Ms. Light said she was spoken to about allowing parents to contact her on her personal cell phone.  She stated that since her children attend the school, it was not possible to avoid sharing her personal cell phone.  She stated Ms. Gethings was trying to isolate her from other parents out of a fear that Ms. Light would spread hysteria.  However, Ms. Gethings showed a slide from an open house presentation where Ms. Light shared her cell phone number and invited parents to call or text her.  Ms. Gethings stated her discussion with Ms. Light about this was a very short conversation where she shared a compliment regarding Ms. Light's presentation and then mentioned not sharing her cell phone number for her own protection.  Ms. Gethings shared a copy of the slide with the investigator, supporting her explanation regarding the context.  This does not appear to be retaliatory in any respect or an effort to isolate Ms. Light.

When she moved to the lower school, Ms. Light moved her own belongings.  She stated that Ms. Gethings told her to move her belongings to Ms. Raymond's classroom, but then provided movers for Julie Villanueva, who was also moving between schools.  Ms. Gethings stated that Ms. Light began moving her belongings and asked where she could place her belongings, and Ms. Gethings told her she could put them in Ms. Raymond's classroom or Ms. Rose's classroom.  Ms. Light stated that the email announcing movers came more than a month after she moved her belongings.  The evidence was not sufficient to show that Ms. Gethings told Ms. Light to move the belongings on her own while holding back the knowledge that movers would be provided.

Ms. Light stated that standard wooden furniture was not present in her new classroom when she moved to the lower school.  She was told by the custodian that there was an email saying supplies and furniture were available and that teachers could take what they needed.  Ms. Light felt slighted by this.  An email was produced dated 8/6/21 that was sent to Hooker-ElemAll and Hooker-Middle-All which included, "In the front hallway of each building there are several boxes of books and materials, everyone is welcome to help themselves."  This was the only email identified that might relate to the subject.  Given that it was sent to the full staff, it does not appear Ms. Light was omitted from the communication.

Ms. Light stated that she ordered supplies last school year and had not received them by the date of our interview in late September.  Ms. Light stated she printed her W.B. Mason cart and gave it to Ms. Gethings.  However, the secretaries typically handle the supply orders and Ms. Gethings does not recall receiving a printout from Ms. Light.  It does appear that Ms. Light created a shopping cart in June, as was the protocol, and it is not clear why the secretary apparently did not see her order.  Upon the issue being raised, Ms. Gethings worked to ensure the supplies would be ordered.  This appears to be a miscommunication.

IX.    <u>Findings of Retaliatory Conduct</u>

The following findings of retaliatory conduct are supported by the factual findings above:

{01563140.DOCX Ver. 1}

- Ms. Light was accused of leaking confidential information regarding Teacher X based on speculation brought on by her protected speech and the view that she was vocal. Ms. Gethings criticized Ms. Light for defending herself by denying the actions, told Teacher X not to apologize when it was clear she had misstated whether she had told Ms. Light that she had covid, and falsely stated that "every person" pointed to her as the source when, in fact, nobody had named her as the source.  Ms. Clarino echoed Ms. Gethings' sentiments, stating they had "major concerns" regarding Ms. Light's actions.  This occurred in front of Teacher X as well as Ms. Morrison, with whom Ms. Light already had a strained relationship, thus damaging her relationships with colleagues.  Ms. Clarino further spoke with Ms. Paine regarding the subject during the pendency of this investigation after being instructed during her interview and in writing not to discuss the investigation while it was pending.  She then told this investigator that Ms. Paine's sister was the source of information that Ms. Light had shared the information, when this was not an accurate reflection of what she had been told by Ms. Paine.

- Ms. Gethings reprimanded Ms. Maffuid for assisting Ms. Light in providing ordinary support provided by a paraprofessional at a time when tensions were high due to Ms. Light's filing of a complaint against Ms. Gethings and Ms. Clarino.  Such a reprimand would tend to cause an individual to hesitate to offer assistance to Ms. Light in the future.

- Ms. Gethings caused documents to appear on Mr. Salem's printer.  The documents were emails from Ms. Light's husband that could paint Ms. Light and/or her husband in a negative light.  This was done during the pendency of the overlapping investigations.

- In their first meeting with Mr. Shortt, the new union steward, Ms. Gethings and Ms. Clarino told him that a few teachers thought he might be in cahoots with Ms. Light to take down administration and suggested that only Ms. Light wanted him to run for steward.  They thus set the tone of their relationship with the new union steward in a manner suggesting that he should not support or ally himself with Ms. Light.

## X.    Conclusions

While Ms. Light's complaints detailed numerous actions of perceived retaliation, this investigation resulted in four findings of retaliatory conduct, noted above.  Throughout the investigation, different parties stated that they felt things they had said or done were being twisted, misinterpreted, or blown out of proportion.  This resulted in Ms. Light fearing what Ms. Gethings and Ms. Clarino would do next, and vice versa.  All were extremely upset and anxious about the situation and the investigation.

Ms. Light may have viewed many innocent actions as retaliatory, but this is understandable in light of the climate.  In the Teacher X situation, she was treated as guilty without any proof and hauled into a meeting to hear how the actions attributed to her had harmed Teacher X.  She was told not to state that the allegations were not truthful and was falsely told that multiple people – who would not be identified lest Ms. Light attack them publicly – had identified her as the source of the information.  While the situation with Ms. Maffuid was relatively minor, it formed part of a pattern of attempting to separate Ms. Light from the support

24

of her colleagues.  The papers left on Mr. Salem's printer that arguably could present Ms. Light and her husband as difficult parents and the comment to Mr. Shortt suggesting that an alliance with Ms. Light is indicative of an effort to take down administration continued this pattern.

Ms. Light stated that in isolation, she would not have complained about many of the actions in her complaint, and she noted that many could have innocent explanations.  Indeed, that was found to be the case.  In particular, Ms. Light noted that she had not complained about grade changes at her previous school, but she felt this one was retaliatory.  While the facts ultimately did not bear that out, it is understandable why in such a tense climate, Ms. Light being moved to a grade she had expressly stated would be a very undesirable assignment for her, especially given her dyslexia, would appear retaliatory.  Ms. Gethings and Ms. Clarino claimed that Ms. Light's complaint was retaliation for the change to first grade.  It does appear that the change to her teaching assignment was the final straw prompting the filing of a formal complaint, but any implication that Ms. Light falsified the complaint as retaliation for it is not borne out.  It is true that not all of Ms. Light's allegations could be corroborated, but it did not appear that she was falsifying her claims.

Ms. Light was very vocal on topics related to covid and at times her statements were controversial and had the potential to present the school in a negative light, despite her stated intentions not to do so.  However, Ms. Gethings and Ms. Clarino used Ms. Light's public comments to jump to a conclusion that virtually any question or comment on the subject of covid to Ms. Light.  It is obvious that parents, teachers, and others in the community would have strong opinions, fears, and questions about covid irrespective of any statements by Ms. Light.  While it is conceivable and perhaps likely that Ms. Light increased some of these concerns with her statements, the fact that a parent asks questions about covid safety is not evidence that Ms. Light is funneling information to him.  And even if only somebody in the school could have noted that Teacher X was absent for weeks (which is not necessarily the case), it is a significant leap to suggest that any inside source must be Ms. Light.

Please contact me to discuss recommendations.