### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JESSICA LIGHT,** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **3:22-cv-00425 (JAM)** |
| | : | |
| **v.** | : | |
| | : | |
| **NEW HAVEN BOARD OF EDUCATION,** | : | |
| **MARGARET-MARY GETHINGS in her** | : | |
| **individual capacity** | : | |
| **Defendants.** | : | **JULY 17, 2023** |

### MEMORANDUM OF LAW IN SUPPORT
### OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Since 2010, plaintiff Jessica Light has been a teacher employed by defendant the New Haven Board of Education (the "Board"). She remains employed as a teacher at this time, and she has never been disciplined, suspended, or had any other adverse employment action taken against her. Nevertheless, Plaintiff brings this lawsuit against the Board and Margaret-Mary Gethings, the Principal of Worthington Hooker School, claiming that she was retaliated against for exercising her free speech rights when speaking at Board meetings and in a Facebook post, and she was defamed and placed in a false light. As set forth below and in the attached Statement of Undisputed Facts ("SOF"), there is no merit to any of these claims.

In the 2020-2021 school year, Plaintiff was very concerned by COVID-19 and the students' planned return to the building from remote learning in early 2021. She took many steps in response to her concerns about COVID—including creating a learning pod with two other families, wherein the adults would share teaching and supervision of the children while they remained in remote learning (even after the date students could return to the building).

Plaintiff also spoke at the Board's public meetings in January, February, and March of 2021 about her concerns, and posted school COVID information in a union-related Facebook group.

In the same 2020-2021 school year, Plaintiff's youngest child also attended Worthington Hooker. Plaintiff had difficulty with her children's teachers in prior years, with the youngest child's teacher in the 2020-2021 school year. Because Plaintiffs son was moving into third grade for the 2021-2022 school year, the same grade Plaintiff taught, Ms. Gethings decided to move Plaintiff to first grade, along with making several other grade changes for teachers. In April 2021, after learning that her grade would be changed, Plaintiff filed a complaint with the Board's human resources department, alleging the grade change and numerous other perceived slights were retaliation for her prior speech at the Board meetings and in the Facebook post. She then filed this lawsuit making the same claims, as well as claiming that Ms. Gethings defamed her and placed her in a false light.  Ms. Gethings and Ms. Clarino then filed a response and counter complaint against, and the child's second grade teacher also filed a complaint against Plaintiff.

As set forth below and in the attached Statement of Undisputed Facts, Plaintiff's claims have no merit, as Plaintiff was addressed appropriately at all times by Ms. Gethings and Assistant Principal Jenny Clarino during the 2020-2021 school year. Indeed, an outside law firm hired by the Board to investigate (1) Plaintiff's complaint, (2) Ms. Gethings and Ms. Clarino's response and counter-complaint, and (2) the other teacher's complaint about Plaintiff found that almost all of Plaintiff's alleged instances of retaliation could not be substantiated, including the grade change. Although the firm found a few instances of what they classified as retaliatory conduct, none of these *de minimis* issues rise to the level of an adverse employment

action under state or federal law. Even if they could be found to be adverse employment actions, there is no evidence suggesting that they were in retaliation for any protected speech.

Although Plaintiff also alleges that Ms. Gethings made statements that were defamatory and placed her in a false light, Plaintiff has not provided the specifics of those statements or proven them to the level required by the applicable legal standards. Moreover, the alleged statements by Ms. Gethings are either true or substantially true, statements of opinion, or statements that are protected by the intracorporate communications privilege. For all of these reasons, therefore, the Board and Ms. Gethings (collectively "Defendants") move pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56 for judgment as a matter of law on the Complaint in its entirety.

## I.    FACTUAL BACKGROUND.

Without repeating each and every fact set forth in Defendants' 56(a)(1) statement, the Defendants set forth this brief summary of the factual background of this case. Plaintiff Jessica Light is a teacher for the New Haven Board of Education. (SOF ¶ 1) In the 2020-2021 school year, she taught third grade at Worthington Hooker elementary school. (SOF ¶ 11) Margaret-Mary Gethings is the Principal, and Jenny Clarino is the Assistant Principal. (SOF ¶ 3) In March 2020, the school went to remote learning due to COVID. (SOF ¶ 5) Plaintiff's children attended Worthington Hooker, and one son was in second grade in 2020-2021. (SOF ¶ 31) While receiving remote instruction, Plaintiff's children attended a learning pod with several other families, and Plaintiff and other members of that pod were hypervigilant about limiting socialization. (SOF ¶ 15)

Plaintiff spoke at a car caravan in July 2020, which was televised, and at a parents' meeting in November 2020. (SOF ¶ 6) At that same time, all teachers were given a form printed by her union, which explained that not all statements by teachers constitute protected speech. (SOF ¶ 8) Plaintiff submitted comments and spoke at the Board's January, February, and March meetings. (SOF ¶ 10; 14; 28) Plaintiff's comments addressed district-wide issues. (Id.) In March 2021, Plaintiff also responded to a Facebook post about COVID cases within the New Haven Public Schools, stating that Worthington Hooker did not send a notification letter—and implying that it should have. (SOF ¶ 21) That was false, as the school had not needed to send out any such letter. (SOF ¶ 23) Following that Facebook post, teachers Kathleen Morrison, Megan Rose, Hilarie Alden, and Teacher X all reported to Ms. Gethings and Ms. Clarino that they were concerned about Plaintiff's posts, which were misrepresenting the school. (SOF ¶ 25)

Parents Vickie Grubaugh and Dominique O'Connnel raised concerns about Plaintiff's comments. (SOF ¶ 12; 13) Staff member Timothy Short stated that he avoids Plaintiff, as he doesn't agree with her on COVID issues and she wanted him to speak to the Board against reopening. (SOF ¶ 13) In February and March 2021, Plaintiff texted her friend, Sarah Miller, who does not work at or have children at Worthington Hooker, stating: "There are two teachers positive at Hooker I heard through the grapevine only but then confirmed with actual teachers." (SOF ¶ 17) After hearing about those two cases "through the grapevine," Plaintiff saw one teacher confirmed her status on Facebook, and then Plaintiff emailed the other

teacher, Teacher X,[1] to confirm, as she had not received any notice through the school. (SOF ¶ 18) In Spring 2021, another parent in Plaintiff's self-contained learning pod, Claire Rowe, raised questions about a teacher having COVID, but no notice being sent out, to a teacher, which indicated that she had information from inside the school. (SOF ¶ 19) Wolfgang Fink, another member of the pod, asked to walk through the school to see if proper distancing was in place and also seemed knowledgeable of school-based decisions. (Id.) On March 2, 2022, a parent Matt Rodeheffer, whose ex-wife is a good friend of Plaintiff, emailed his daughter's teacher asking if there have been any teachers/staff out with COVID, as his ex-wife "is being told now that there are many cases currently . . . ." (SOF ¶ 20)

On March 12, 2021, Ms. Gethings sent a schoolwide email reminding all staff about the need to provide accurate information in social meeting and to all work together. (SOF ¶ 24) On the early morning of March 22, 2021, Plaintiff emailed Ms. Gethings asking for clarification about the distance students should maintain between themselves while eating. (SOF ¶ 26) Ms. Gethings replied less than 10 minutes later, stating that she was awaiting full details from the district, which she would share as soon as she knew them. (Id.) That same night, Plaintiff spoke at the Board meeting on a similar topic, without waiting for a response from Ms. Gethings—who, at that time, was meeting weekly with other principals and an Assistant Superintendent on COVID issues. (SOF ¶ 27)

In March 2021, Teacher X had COVID, and her condition was disclosed. (SOF ¶ 32) Teacher X was considering filing a complaint against Plaintiff related to that disclosure, so on

---

[1] Throughout the underlying proceedings, and then in the Complaint filed with this Court, the teacher at issue has been referred to as Teacher X. In order to maintain her confidentiality, and because there is no dispute between the parties about the identity of Teacher X, Defendants have continued to refer to her here as Teacher X.

March 31, 2021, Ms. Gethings and Ms. Clarino met with Teacher X, Plaintiff, and their union representative (Ms. Morrison) to bring the two teachers together, get clarity, and to get to the bottom of what may or may not have been said. (SOF ¶ 32; 33)

Around that same time, Plaintiff was informed that she was being moved to first grade for the 2021-2022 school year, and three other individuals were moved, too. (SOF ¶ 31) In April 2021, Plaintiff submitted a complaint about Ms. Gethings and Ms. Clarino, which listed all of the areas where she believed she was being retaliated against as of that date. (SOF ¶ 34) Hilarie Alden was the second grade teacher for Plaintiff's son, and she had a difficult relationship with Plaintiff in her capacity of a parent of a student in Ms. Alden's class. (SOF ¶ 36; 37; 38) In May 2021, Ms. Alden filed a complaint against Plaintiff. (SOF ¶ 36) On June 7, 2021, Ms. Gethings and Ms. Clarino submitted a document that responded to Plaintiff's complaint and constituted a cross-complaint against Plaintiff. (SOF ¶ 35) The Board hired the law firm of Bercham & Moses to conduct the investigation of all three pending complaints, which it did and then issues three reports. (SOF ¶ 50-51) In regard to Plaintiff's complaint, the firm only found one issue from her complaint to be retaliatory, and then they found three post-complaint actions to be retaliatory, too. (SOF ¶ 52; 54) Bercham & Moses found that the remaining issues raised by Plaintiff could not be substantiated as retaliation, including the grade change and the comments in her evaluation. (SOF ¶ 53) Plaintiff then brough this lawsuit based on the results of that investigation.

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

"The standards governing summary judgment are well-settled." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2002).  Summary judgment is appropriate if, after discovery, the non-

moving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Carrett*, 477 U.S. 317, 323 (1986). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Ford*, 316 F.3d at 354. "[T]he burden on the moving party may be discharged by 'showing' - that is pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Pepsico, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). Rule 56 "provides that the mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). "Unsupported allegations do not create a material issue of fact." *Main St. Am. Assurance Co. v. DRW Properties, LLC*, 2022 WL 1128908, at *1 (D. Conn. Apr. 15, 2022). When a motion for summary judgment is supported by documentary evidence and sworn declarations, the nonmoving party must do more than "vaguely assert[] the existence of some unspecified disputed material facts" or present mere speculation or conjecture. *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (citation omitted). The existence of "a scintilla of evidence in support of the [nonmoving party's] position is insufficient; there must be

evidence on which the jury could reasonably find for the plaintiff[].” *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004) (citation omitted.).

### III.    MS. GETHINGS IS ENTITLED TO JUDGMENT AS A MATER OF LAW ON PLAINTIFF’S RETALIATION CLAIM UNDER 42 U.S.C. § 1983.

In Count Two, Plaintiff brings a First Amendment retaliation claim against Principal Gethings pursuant to 42 U.S.C. § 1983. Although asserted in Count Two, Defendants address this claim first because the resolution of the First Amendment issue will impact the Court’s analysis of Plaintiff’s § 31-51q claim in Count One, which is based on state and federal law.

#### A.  Legal Standard.

It is well settled that a “public employee who alleges First Amendment retaliation must prove the following: ‘(1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he or she suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action.’” *Everitt v. DeMarco*, 704 F. Supp. 2d 122, 129 (D. Conn. 2010). “Even if the plaintiff demonstrates these factors, the defendant can still prevail on a motion for summary judgment if it can show that it would have taken the same adverse employment action even in the absence of the protected conduct.” *Gaynor v. City of Meriden*, 2022 WL 1137155, at *4 (D. Conn. Apr. 18, 2022)(Haight, J.).

#### B.  Plaintiff engaged in a limited set of protected activity.

“If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, the employee has no First Amendment cause of action based on his or her employer’s reaction to the speech.” *Heusser v. Hale,* 777 F. Sup. 2d 366, 376 (D. Conn. 2011) (Citation omitted; internal quotation marks omitted.). When

public employees make statements pursuant to their official job duties, even when, arguably, the topic of the statements would be a matter of public concern, the employees are not speaking as citizens for First Amendment purposes, and, therefore, the Constitution does not insulate these communications from employer discipline. *See Anemone v. Metropolitan Transportation Authority,* 629 F.3d 97, 115-16, (2d Cir. Jan. 4, 2011) (rejecting argument that speech was made as a private citizen, rather than pursuant to official duties). Or, as Your Honor noted, "[w]hen a First Amendment retaliation claim is made in the context of a plaintiff's employment with the government, it is subject to a higher threshold than an ordinary First Amendment retaliation claim." *Barrett-Browning v. Connecticut Dep't of Correction*, 2019 WL 3412173, at *5 (D. Conn. Jul. 29, 2019)(Meyer, J.). "Because a government employer—like any employer—has the right to maintain a reasonably efficient and orderly work environment, the government *qua* employer may restrict or penalize the speech of its own employees in ways that would not be acceptable if the government were regulating the speech of the citizenry in general." *Id*. "For this reason, when a plaintiff is a public employee who claims that she has been the victim of First Amendment retaliation in the government employment context, the plaintiff's speech is not subject to protection from adverse action unless her speech addressed a matter of *public concern* and unless she spoke *in her capacity as a citizen* rather than an employee." *Id*.

"This determination of whether speech involves a matter of public concern and is made as a citizen rather than an employee is a question of law for a court to decide in light of the content, form, and context of a given statement." *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008). "Speech involves matters of public concern when it can be fairly

considered as relating to any matter of political, social, or other concern to the community, or

when it is a subject of legitimate news interest; that is, a subject of general interest and of

value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (internal citations

and quotation marks omitted). The main question is "whether the employee's speech was

calculated to redress personal grievances or whether it had a broader public purpose." *Ruotolo*,

514 F.3d at 189 (internal citations and quotation marks omitted). If the former applies, "the

employee has no First Amendment cause of action based on his or her employer's reaction to

the speech." *Barrett-Browning,* 2019 WL 3412173, at *5.

Here, the Complaint identifies three instances of purported protected public speech by

Plaintiff:

1.  Plaintiff participated in a car caravan with the teachers' union in New Haven and
    spoke openly about the need for a unified district-wide plan to reopen schools
    safely, which comments were televised.

2.  Plaintiff spoke at the Board's public meetings in the following months on the
    following topics:

    a.  January 2021 – Plaintiff spoke about her disagreement with the anticipated
        return to in-person instruction given that the vaccine would be available in
        short order.
    b.  February 2021 – Plaintiff spoke and urged the Board to adopt a unified,
        district-wide policy regarding COVID-19.
    c.  March 2021 – Plaintiff raised questions about the lack of consistency in
        COVID-19 safety rules across the district and the challenges of enforcing
        safety protocols.

3.  Plaintiff commented "I don't think letters were sent," and then "Hooker never sent
    a letter" in a Facebook post about COVID-19 statistics and the need to send letters
    notifying parents of known cases of COVID-19 at the school.

See Complaint ¶10. It is undisputed that at all relevant times Plaintiff was a teacher employed

by the Board of Education. Plaintiff was specifically identified as a teacher at the car caravan,

which was organized by the teachers' union. When speaking at the Board meetings, she

referred to herself as a teacher, and she was speaking to her employer—the Board of Education. All of these instances of speech, therefore, relate in whole or in part to her job duties as a teacher employed by the New Haven Board of Education, whether she should be back in the classroom, how to enforce safety protocols in the classroom, or the implementation of a district-wide plan for COVID-19. Nevertheless, the Defendants do not contest that these three Board meetings were instances of Plaintiff speaking as a citizen on a matter of public concern.

Defendants do contest, however, Plaintiff's claim that her Facebook post in March 2022 was protected speech. As set forth in the SOF, on March 9, 2021, Melody Gallagher, a representative of the Executive Board of the New Haven Teachers Union, posted a chart on the New Haven Public School Advocates Facebook group, which showed the schools that had positive COVID-19 cases since January 19, 2021. (SOF ¶21). This chart showed Worthington Hooker having at least 1 case, and Plaintiff then commented on the post "I don't think letters were sent." In response to someone asking, "For your school?", Plaintiff then commented "Hooker never sent a letter." (Id) Ms. Gethings believed Plaintiff made that post in her capacity as a teacher as she was talking about Hooker. (SOF ¶ 22) Plaintiff's post gave the impression that the school had a COVID case that required a notification letter, and that no letter was sent, but that was false. There was no situation that required sending a letter. (SOF ¶ 23) Ms. Gethings heard from other teachers, including Kathleen Morrison, Megan Rose, Hilarie Alden, and Teacher X, who reported that they were concerned about Plaintiff's posts, which were misrepresenting the school. (SOF ¶ 25)

At that time, the COVID regulations for schools were evolving and it was a time of change. For that reason, Ms. Gethings and other Principals met every Wednesday with the Assistant Superintendent in order to obtain updated information, which they would then pass on to their respective schools.  During that time, it was important for schools to be consistently messaging COVID information, and for all information to be accurate. (SOF ¶ 24, 26-29)

On March 12, 2021, Ms. Gethings therefore sent a schoolwide email stating: "It has been brought to our attention from several community members including staff and parents that WHS is being mentioned with inaccurate information which also includes social media. We ask that if you are aware of any negative talk or postings, to please help protect and preserve our school. We hope that people will refrain from making their own inferences and/or misrepresenting our school. We must always keep in mind that we are working together and not against each other." (SOF ¶24)

As this demonstrates, the Board expected teachers to provide accurate information to the public about COVID, and in this case Plaintiff's post gave the appearance that she was posting as a representative of Worthington Hooker. Plaintiff also made a declaratory statement about the school's response to an alleged COVID case—which was inaccurate, and which Ms. Gethings and other teachers believed was misrepresenting the school. The court should therefore find that Plaintiff's comments in the Facebook post were not made as a citizen speaking a matter of public concern, and, therefore, were not protected speech.

C. **Plaintiff did not suffer an adverse employment action.**

Even if Plaintiff's statements in one or all of those incidents constitute protected speech, Plaintiff's First Amendment retaliation claim still fails because she did not suffer any adverse

employment action following such speech. To the contrary, Plaintiff remains employed to this day, with the same pay and benefits she had previously.

"In the context of a First Amendment retaliation claim, [the Second Circuit has] held that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation marks and alterations omitted). "The list of adverse actions has included harsh measures, such as discharge, refusal to hire, refusal to promote, reduction in pay, and reprimand, as well as some lesser sanctions, such as failure to process a teacher's insurance form, demotion, reassignment to a place that aggravated physical disabilities, and express accusations of lying." *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012). "This list of retaliatory conduct is certainly not exhaustive, however, and lesser actions may also be considered adverse employment actions. . . . Adverse employment actions may include negative evaluation letters, express accusations of lying, assignment of lunchroom duty, reduction of class preparation periods, failure to process teacher's insurance forms, transfer from library to classroom teaching as an alleged demotion, and assignment to classroom on fifth floor which aggravated teacher's physical disabilities." *Zelnik,* 464 F.3d at 226 (citation and quotation marks omitted). On the other hand, it "would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Wrobel*, 692 F.3d at 31.

In *Wrobel*, for example, the plaintiff identified three possible acts of retaliation: "(1) a July 1, 2001 'interrogation,' undertaken by Rider without the presence of a union

representative, in which he told Wrobel to tell his wife to 'stay out of the County buildings';
(2) Wrobel's questioning by a county sheriff about a theft at the Aurora barn; and (3)
defendants' (orchestrated) false testimony at Wrobel's arbitration hearing in 2002." *Id*. The
Second Circuit concluded that items 1 and 2 were "de minimis slights and insults [that] do not
amount to retaliation," as they were not "the type of conduct that would 'deter an individual of
ordinary firmness from exercising his or her constitutional rights.'" *Id*. (quoting *Zelnik*, 464
F.3d at 225). The Second Circuit also concluded that there was no evidentiary support for
Plaintiff's belief that Defendants orchestrated false testimony at the hearing. *Id*. Therefore,
the plaintiff's first amendment retaliation claim failed.

In this case, Plaintiff submitted her retaliation complaint to the Board's human
resources department in April 2021. SOF ¶ 34. When drafting that complaint, Plaintiff
attempted to do as thorough as job as possible, and it was important for her to list all of the
various ways she thought she was being retaliated against. SOF ¶ 34. In that complaint, which
was then investigated by Bercham & Moses, Plaintiff listed seven general incidents of alleged
retaliation:

a.   Ms. Gethings and Ms. Light pressured her to stop or modify her public speech
     regarding the school district's response to the COVID-19 pandemic and in the
     process instructing me not to allow my students' parents to have telephone
     access to me.

b.   Ms. Gethings and Ms. Clarino "falsely accused me of revealing to a parent
     information about another teacher having contracted COVID-19."

c.   Ms. Gethings and Ms. Clarino "prevented me from engaging meaningfully in
     various school-related committees and groups and in the professional
     development opportunities I expressed interest in."

d.   Ms. Gethings and Ms. Clarino "engaged in conversations about me with fellow
     teachers and parents that negatively affected their perception of me and damaged
     our relationship, including, but not limited to, the teacher who contracted

COVID-19." This all related to statements made about Teacher X, which is the same as subparagraph b.

e.    Ms. Gethings and Ms. Clarino "included a comment in my TEVAL that is unjustified and intended to raise a warning flag for anyone reviewing my record in the future."

f.    Ms. Gethings and Ms. Clarino made her attend a series of meetings regarding the above issue and her TEVAL, where they allegedly berated, belittled, accused me falsely, and attempted to undermine her confidence and relationship with her peers.

g.    Ms. Gethings and Ms. Clarino "moved me from teaching the third grade to teaching first grade in the upcoming year on pretextual grounds."

*See* SOF ¶ 34; *see also* Light Dep. p. 98, 102-110(confirming allegations in complaint). As

Plaintiff confirmed in her deposition, however, Bercham & Moses only found that items (b)

and (d), both of which deal with the Teacher X situation, were retaliatory, and they specifically

rejected Plaintiff's claim that the other items—e.g. her transfer from third grade to first

grade—were retaliatory. <u>See</u> Light Dep. p. 98, 102-110; Ecf 1-1, p. 24-25 of 26.[2] Bercham &

Moses also found that Plaintiff had been retaliated against in three other ways after she filed

her original complaint with human resources: (1) when Ms. Gethings allegedly left emails on

the printer in teacher Paul Salem's third grade classroom related to Plaintiff's son, (2) when

Ms. Gethings and Ms. Clarino allegedly told Mr. Shortt that a few teachers thought he was in

cahoots with Plaintiff, and (3) based on Ms. Gethings' alleged comments to Ms. Maffuid about

coverage during dismissal. (Ecf. 1-1, p. 25)

    In the Complaint filed with this Court, Plaintiff never alleges that Bercham & Moses

was incorrect about its findings on the five areas where it found Plaintiff *had not* been

retaliated against, and they are not the focus of the Complaint. Instead, the Complaint bases the

---

[2] A copy of the report is Exhibit A to the Complaint. *See* Ecf. 1-1.

retaliation claim on the fact that Bercham & Moses found that Plaintiff "had been retaliated against in at least four instances by Ms. Gethings." (Complaint ¶ 49). Indeed, paragraphs 49-56 all begin with either "The investigation concluded" or "The investigation determined," which demonstrates that the Complaint is basing Plaintiff's retaliation claim squarely on the findings in the investigation report that substantiated four narrow instances of alleged retaliation. This conclusion is buttressed by the fact that Plaintiff chose to attach a copy of Bercham & Moses report to her Complaint. *See* Ecf. 1-1. By incorporating that report into her Complaint, phrasing the allegations in the way she did, and attaching a copy of the report to the Complaint, it is clear that Plaintiff has chosen to base her retaliation claim on only those limited areas where Bercham & Moses found conduct that it classified as retaliatory.

Plaintiff's reliance on these four instances of alleged retaliation is inappropriate for numerous reasons. First, Bercham & Moses' findings on these four issues are speculative, baseless, and fail to address the appropriate legal standard under state and federal law. Second, the findings are internally inconsistent—for example, the finding on the papers being left in Ms. Salem's printer notes that there is no evidence that it was in retaliation for prior speech, but reaches that conclusion nevertheless. Finally, the four instances cited by Bercham & Moses are *de minimis* and cannot support a First Amendment retaliation claim. Therefore, the findings in the Bercham & Moses report on these four issues should be disregarded by the Court. Instead, the Court should find the following:

In regard to the conversations concerning Teacher X, it is undisputed that Teacher X's health condition was disclosed, at least one member of Plaintiff's learning pod asked about a teacher having COVID, but that information was not public. (SOF ¶ 19) It also is undisputed

that, when she heard "through the grapevine" that two teachers had COVID, Ms. Light saw

that one teacher confirmed it on Facebook, and she then reached out to the other teacher to

determine if that was true. (SOF ¶ 17-18) Ms. Light wanted to ensure that she had accurate

information and didn't want to lie to the members of her pod, as she had told them she would

move out to a hotel if she had exposure at school. Plaintiff also discussed all of this with Sarah

Miller, a friend with no connection to Worthington Hooker. (SOF 17-18) At that time, Teacher

X was teaching remotely, and no contact tracing letter was sent to the school community.

　　　　When Teacher X heard that her COVID-19 positive status has been disclosed, she told

Ms. Gethings and Ms. Clarino that might be filing a complaint against Plaintiff over the

disclosure. Based on this information, Ms. Gethings and Ms. Clarino held a meeting with

Teacher X, Plaintiff, and their union representative. (SOF ¶ 33) Although Plaintiff may not

have liked being asked if she was the source of the leak, there is nothing in the record showing

that this was different than any other investigatory meeting that occurs in workplaces across the

state on a daily basis and was appropriate given the information obtained from Teacher X. Put

another way, there is nothing about this meeting, even accepting Plaintiff's version of events as

true, that "would deter a similarly situated individual of ordinary firmness from exercising his

or her constitutional rights" by speaking at a Board meeting. *Zelnik*, 464 F.3d at 225.

　　　　Bercham & Moses next found that "Ms. Gethings caused documents to appear on Mr.

Salem's printer, which were emails from Plaintiff's husband about their son's experience in

Ms. Alden's classroom that could paint Plaintiff or her husband in a negative light." (Ecf. 1-1,

p. 25 of 26). At the time, Mr. Salem was teaching third grade along with Plaintiff. In August

2021, Mr. Salem purportedly found a copy of emails on the personal printer he had in his

office, which was not connected to the school's network.  Ms. Gethings did not know Mr.

Salem had a personal printer in his office. Ms. Gethings did not print those papers to Mr.

Salem's office, as she only printed them to the main office printer while in the presence of Ms.

Clarino, who retrieved them from the main office printer. There is simply no evidence that

Ms. Gethings put the emails on Mr. Salem's printer or printed them there accidentally (or even

that she could), just as there is no evidence that Plaintiff herself put those papers in Ms.

Salem's printer or mistakenly printed them to that printer. It is pure speculation to believe that

it was either Ms. Gethings or Plaintiff that caused the emails to be on the printer. There also is

no evidence that Ms. Gethings did so in an effort to retaliate against Plaintiff for her alleged

protected speech. Absent any evidence in the record that Ms. Gethings had any involvement

whatsoever in those emails appearing in that printer, there is no basis for the Court to find that

this occurred, much less that, even if it had, it was a retaliatory act that "would deter a

similarly situated individual of ordinary firmness from exercising his or her constitutional

rights . . . ." *Zelnik*, 464 F.3d at 225. Moreover, this allegedly occurred in August 2021,

which is too far removed from January, February, and March 2021 to give rise to an inference

of retaliation. *See Chamberlin v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007)(gap of five

months too long to support inference of retaliation).

The remaining two alleged incidents of retaliation are the exact type of "de minimis"

incidents that the Second Circuit has stated cannot support a First Amendment retaliation

claim. *Wrobel*, 692 F.3d at 31. As an initial matter, Ms. Gethings and Ms. Clarino told Mr.

Shortt something along the lines of that a couple of teachers had told them that they (the

teachers) were concerned that he was in cahoots with Plaintiff and running for union steward in

order to team up against Ms. Clarino and Ms. Gethings. (SOF ¶ 49) This conversation did not

involve Plaintiff at all, and even according to Bercham & Moses' report Mr. Shortt stated that

(1) he did not believe Ms. Gethings and Ms. Clarino were attempting to create discord between

him and Plaintiff, (2) he is not particularly close with Plaintiff, (3) he was not trying to take

down anybody, (4) he disagreed with Plaintiff on COVID-related issues, and (5) he avoided

Plaintiff at all costs because she wanted him to speak at Board meetings against reopening

schools, while he felt differently. (Ecf. 1-1 p. 17-18 of 26). Finally, Bercham & Moses noted

that it was not possible to determine if this related to Plaintiff's protected activity. For all of

these reasons, there is simply no evidence in the record suggesting that this incident "would

deter a similarly situated individual of ordinary firmness from exercising his or her

constitutional rights . . . ." *Zelnik*, 464 F.3d at 225.  Moreover, this was in October 2021.

*See* Complaint and Answer ¶ 42.  October 2021 is too far from January, February, and March

2021 to give rise to an inference of retaliation. *See Chamberlin v. Principi*, 247 F. App'x 251,

254 (2d Cir. 2007)(gap of five months too long to support inference of retaliation).

   The final incident of alleged retaliation from the Bercham & Moses report that Plaintiff

relies on is that Ms. Gethings reprimanded Ms. Maffuid, a paraprofessional, for assisting Ms.

Light at dismissal, which would cause an individual to hesitate to offer assistance to Ms. Light

in the future. (Ecf. 1-1 p. 25 of 26) This finding was faulty on numerous levels, and cannot

support Plaintiff's First Amendment retaliation claim. As an initial matter, it is undisputed that,

at the time, the school was engaged in a very specific dismissal process, where parents would

pull up to the building, show a sign with their child's name, and students would then be sent

out from the classroom to the car. (SOF ¶ 46-48) One day Plaintiff left her room during

dismissal to get changed for the afterschool running club, leaving Ms. Maffuid to oversee dismissal. Ms. Maffuid was not familiar with the dismissal process, however, as she was a special education paraprofessional and she worked in a different cohort of classes. It was therefore inappropriate for Plaintiff to leave Ms. Maffuid in charge of the classroom at dismissal at that time. (SOF ¶ 47-48) Like the Shortt situation, this discussion between Ms. Maffuid and Ms. Gethings did not even involve Plaintiff, and in her deposition Plaintiff testified that, even after that incident, Ms. Maffuid never refused to help her. (Light 121). In addition, when Ms. Gethings explained her concerns in an email to Plaintiff, Plaintiff did not claim that Ms. Gethings was wrong or that the situation was different than Ms. Gethings observed. *See* Exhibit 9 to the Gethings Declaration.[3] Again, there is simply no factual basis to conclude that this incident was retaliatory, much less retaliation for protected speech.

Because Plaintiff has not identified any incident of retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights, *Zelnik*, 464 F.3d at 225, she cannot establish that she suffered an adverse employment action. Therefore, Count Two of the Complaint must be dismissed.[4]

---

[3] A review of that email demonstrates that Ms. Gethings' email is professional, while Plaintiff's response is sarcastic. *See* Exhibit 9 to Gethings' Declaration, where Plaintiff states in full that: "I apologize for any inconvenience. I will communicate with you in the future and will make sure not to overhydrate in preparation for running club."

[4] Even if the Court were to consider the incidents that were not substantiated as retaliation by Bercham & Moses, Plaintiff's claim still fails because those incidents have even less support than those already addressed in the text above. For example, in regard to the grade changes, there were complaints against Plaintiff in her capacity as a teacher, Ms. Gethings did not want Plaintiff teaching in the same grade as her child, and Ms. Gethings moved four teacher's assignments for the 2021-2022 school year—something that she has the discretion to do. (SOF ¶ 36-43) Plaintiff has not offered any evidence that Ms. Gethings pressured her not to speak publicly, and in her deposition Plaintiff clarified that this referenced her discussions with Human Resources, not Ms. Gethings. (Light Dep. p. 127-127). The statement in the TEVAL just referenced a statement that Ms. Gethings would get an answer to any questions Plaintiff may have, which is benign and falls well short of retaliation. (SOF ¶30). Simply nothing in Plaintiff's original complaint to Human Resources constitutes retaliation.

**D. Plaintiff cannot establish that any protected activity was the cause of her adverse employment actions.**

"A causal relationship can be demonstrated either indirectly by means of circumstantial evidence, including that the protected speech was followed by adverse treatment, or by direct evidence of animus." *Wrobel*, 692 F.3d at 32. "The sufficiency of such circumstantial evidence depends on the circumstances of each case." *Id*. Although the causal connection needed for a prima facie case can also be established indirectly by showing that the protected activity was closely followed in time by the adverse action, the Second Circuit has found that a gap of five months is too attenuated to support an inference of retaliation. *See Chamberlin v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007); *see also Donaldson v. Coca Cola Refreshments USA, Inc.*, No. 3:18-CV-01713 (VLB), 2020 WL 2542779, at *8 (D. Conn. May 19, 2020)(granting summary judgment on retaliation claim; distance of seven months did not support retaliation claim).

In this case, Plaintiff cannot establish a causal connection between the alleged incidents of retaliation discussed above, and her protected activity in January, February, and March of 2021. As noted above, the conversations about and with Teacher X, the conversation with Mr. Shortt, and the discussion of proper dismissal protocol with Ms. Maffuid all came about in the normal course of the school day either through information provided to Ms. Gethings or Ms. Clarino, or through Ms. Gethings' own observations of Ms. Maffuid in the dismissal process. Plaintiff cannot seriously dispute this fact, and Ms. Gethings (and Ms. Clarino and all other school administrators) are allowed to address issues that arise during the school day—especially safety issues like dismissal and the disclosure of health information about a teacher. Plaintiff has not identified any evidence even suggesting that these incidents were retaliation to her protected

speech, a point noted in previously in the Bercham & Moses report. (*See e.g.*, ECF 1-1, p. 18). Such evidence would be surprising, moreover, because the topics addressed in her statements to the Board (the need for consistent COVID plans for the return to school) have nothing to do with the incidents that she claims to be retaliatory, whether that be the disclosure of a teacher's health condition, proper dismissal rules, or issues with her child's performance in the second grade classroom with Ms. Alden. Moreover, the statements at the Board were not even aimed at or critical of Ms. Gethings or anything specific at Worthington Hooker, and Ms. Gethings was never disciplined for anything raised by Plaintiff at the Board meetings or in the Facebook post. Therefore, there was not reason for Ms. Gethings to retaliate against Plaintiff. Finally, as noted before, the alleged incident with the emails on the printer was at least five months past the protected activity, and the conversation with Mr. Shortt was in October 2021—which undermines any claim of a causal link to her protected activity. *Chamberlin*, 247 F. App'x at 254. For all of these reasons, her First Amendment retaliation claim fails on this basis, too.[5]

## IV.    THE BOARD IS ENTILTED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S CONN. GEN. STAT. § 31-51q CLAIM.

In Count One of the Complaint, Plaintiff brings a claim against the Board under § 31-51q, claiming that she was disciplined in retaliation for her exercise of free speech rights under the federal and state constitutions. As set forth previously in Part III of this Memorandum, Plaintiff's claims under federal law are deficient and must be dismissed. To the extent the § 31-51q claim is based on federal law, it fails for the same reasons. To the extent Plaintiff's § 31-

---

[5] The same conclusion applies to the alleged retaliation that was not substantiated by Bercham & Moses. For example, the grade change was based entirely on intra-school concerns, and nothing connects that to Plaintiff's public comments. The TEVAL comment is benign, and Plaintiff was never told not to make public comments. None of these alleged incidents have any causal connection to Plaintiff's public comments.

51q claim is also based on Plaintiff's rights under state law, it fails for the reasons set forth below. Accordingly, the Board is entitled to judgment as a matter of law on the § 31-51q claim.

### A. Legal standard.

"Connecticut General Statute section 31-51q prohibits employers from disciplining or discharging an employee for exercising rights protected by the First Amendment to the United States Constitution and sections 3, 4, and 14 of the Connecticut Constitution." *Winik-Nystrup v. Manufacturers Life Ins. Co.,* 8 F. Sup. 2d 157, 159 (D. Conn. 1998). At the relevant time period for this case, § 31-51q provided:

> Any employer … who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge[.]

As Your Honor appropriately summarized, in "[t]o prevail on a claim for retaliation under § 31-51q, a plaintiff must show that he engaged in protected speech that was causally linked to a discipline or discharge he suffered, and that the protected activity did not interfere with the central purposes of the employment relationship." *D'Onofrio v. Westport/Weston Health Dist.*, No. 3:21-CV-1052 (JAM), 2022 WL 1809714, at *5 (D. Conn. June 2, 2022); accord *Winik-Nystrup*, 8 F. Sup. 2d at 159. Plaintiff cannot make such a showing in this case, and, therefore, the Board is entitled to judgment as a matter of law on Plaintiff's § 31-51q claim.

**B.    Plaintiff engaged in only limited protected speech.**

For purposes of this motion for summary judgment, Defendants adopt the analysis of protected activity set forth in Part III of this Memorandum when discussing Plaintiff's First Amendment claim. That is, Defendants do not contest that the comments at the Board's public meetings were protected speech, but contest the Facebook post.

**C.    Plaintiff has not suffered any adverse employment action.**

As noted previously, a plaintiff brining a § 31-51q claim must plead and prove that they suffered an adverse employment action. Here, it is undisputed that Plaintiff remains employed as a teacher in the New Haven Public Schools, and that she has not suffered an adverse employment action. Accordingly, she cannot proceed to trial on her § 31-51q claim

At this time, neither the Connecticut Supreme nor Appellate courts have provided guidance on the definition of "discipline" as it relates to § 31-51q. One leading Superior Court case stated that discipline must "involve affirmative acts of punishment that … leaves the recipients in a less happy state than that which they enjoyed that which they enjoyed before the punishment began … 'Discipline' is an affirmative act of deprivation that diminishes the status or happiness of the recipient rather than a failure to enhance that status or happiness." *Bombalicki v. Pastore*, No. CV–378772, 2000 WL 726839, at *3–*5 (J.D. New Haven, May 10, 2000)(Blue, J.).

In *Weinstein v. University of Connecticut*, Superior Court, judicial district of Hartford, Docket No. CV-11-6027112-S (April 25, 2018, Noble, J.) (66 Conn. L. Rptr. 400), Judge Noble defined discipline slightly differently, stating that it is "any adverse material

consequence relative to a right, term, condition or benefit of employment that existed at the time of the protected speech."

Judge Susan Pack has issued several decisions on this topic. In one such decision, she noted that in prior jury instructions she defined discipline under § 31-51q as follows:

> an adverse employment action short of discharge which creates a material employment disadvantage. Such adverse employment actions may include demotion, suspension, reduction in pay, reprimand, significantly diminished responsibilities but may also include lesser affirmative acts of punishment or deprivation take by the employer which leave an employee less well off and which in combination and in their totality, create a working environment that is unreasonably inferior, hostile or adverse to the employee when compared to a typical or normal, not ideal or model, workplace. Incidents that are relatively minor and infrequent such as a change of working conditions that is a mere inconvenience or simply alters an employee's job responsibilities, personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers will not meet this standard.

*Sans-Syzmonik v. Hartford Pub. Sch.*, No. HHDCV146051355S, 2014 WL 7156776, at *5 (Conn. Super. Ct. Nov. 7, 2014)(Peck, J.).

Your Honor recently defined discipline under § 31-51q as an "adverse material consequence imposed by an employer on an employee for the purpose of punishing or deterring behavior that the authority wishes to suppress." *D'Onofrio*, supra, 2022 WL 1809714, at *5. The Court was quoting dicta from *Browne v. State Dep't of Correction*, 2017 WL 5243854, at *3 (Conn. Super. Ct. 2017) (Ecker, J.), which was contained in Judge Ecker's analysis of how he might rule in the future if forced to decide whether to adopt Judge Blue's definition from *Bombalicki*.[6]

---

[6] *See, e.g., Pucillo v. Town of Madison*, No. NNH-CV-216115012, 2022 WL 6392904, at *3 (Conn. Super. Ct. Sept. 14, 2022)(noting that in *Browne*, Judge Ecker "stated in dicta that in its view '[d]iscipline is any adverse material consequence imposed by an employer on an employee for the purpose of punishing or deterring behavior that the authority wishes to suppress.'").

At this time, Judge Blue's definition from *Bombalicki* appears to have the most following in the Connecticut Superior Court, and it is a thoughtful standard that complies with the plain language of § 31-51q as well as the standard understanding of the word "discipline." For example, in the context of a § 31-51q claim, the Second Circuit has noted that "the word 'discipline' means 'chastisement … imposed as a penance or as a penalty.'" *Avedisian v. Quinnipiac Univ.*, 387 F. App'x 59, 61 (2d Cir. 2010). In that same case, the Second Circuit quoted approvingly from Judge Blue's decision in *Bombalicki*, and, under that standard, found that "the University's decision [to deny the Plaintiff tenure] simply maintained the status quo. It did not affirmatively punish or chastise her. Under these circumstances and consistent with the aforementioned precedent, we conclude that the Connecticut Supreme Court would not hold that the denial of tenure subjected Avedisian to discipline." For these reasons, Judge Blue's definition should be applied in this case, and Plaintiff should have to prove an affirmative act of punishment or discipline in order to demonstrate an adverse employment action.

Again, the analysis from the First Amendment section is applicable to § 31-51q, and is incorporated herein. As already demonstrated in that analysis, Plaintiff has not alleged or established that of the four incidents found to be retaliatory by Bercham & Moses constitute an affirmative act of punishment or discipline. For example, her relationship with Mr. Shortt was not impacted in any manner by the one conversation between Mr. Shortt and Ms. Gethings.[7] Similarly there is no evidence that Ms. Gethings' conversation with Ms. Maffuid impacted her relationship with Plaintiff, and Plaintiff testified that Ms. Maffuid never refused to help

---

[7] If anything, the record demonstrates that their relationship already was not as good as Plaintiff believed because, as noted in the Bercham & Moses report, Mr. Shortt already had told Ms. Gethings that he goes out of his way to avoid Plaintiff because he disagreed with her about COVID issues, and he does not view them as particularly close. (Ecf. 1-1).

Plaintiff after that conversation with Ms. Gethings. Finally, Plaintiff has not provided any evidence that there was any lasting impact on her relationship with Teacher X based on Ms. Gethings alleged statements about the disclosure of Teacher X's COVID-positive status.

Even if the Court were to disregard Judge Blue's standard, and apply the language from Judge Ecker's decision, and even if the Court were to view these alleged retaliatory incidents in the aggregate, instead of individually, Plaintiff's claim still fails. At best, Plaintiff can show she had a meeting with Teacher X and their union representative, which occurs regularly across the state. The conversation with Ms. Maffuid was in one school year, and the conversation with Mr. Shortt and incident with Mr. Salem were in another. There is no common thread connecting these events, and there is no factual basis to show that they are an adverse employment employment.

> **D.    Even if Plaintiff can meet the first two elements, she cannot demonstrate that her comments did not substantially interfere with her job performance.**

To state a claim under § 31-51q, "[t]he majority of the [Connecticut] Superior Court decisions and decisions from the United States District Court for the District of Connecticut hold that the plaintiff must plead and prove lack of substantial interference[.]" *Miller v. Hous. Auth. of City of New Haven,* 2014 WL 2871591, at *9 (D. Conn. June 24, 2014). "This requirement derives from the text of the statute, which only protects employees from adverse employment action for exercise of free speech rights where 'such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer....' Conn. Gen. Stat. § 31-51q." *Turner v. Connecticut Lottery Corp.,* 2021 WL 4133757, at *8 (D. Conn. Sept. 10, 2021).

Here, Plaintiff pleaded that her alleged protected speech did not substantially interfere with her job performance. The facts show otherwise, however. In early 2021, the students were just starting to return to the school building, as New Haven was one of the last school districts in Connecticut to return the students.  At the same time, the COVID protocols and guidance from the CDC and state authorities were evolving, and Principal Gethings and other Principals were meeting every Wednesday with an Assistant Superintendent in order to get updates and then pass them along to their respective schools. (SOF ¶ 27) At the March 2022 Board meeting, Plaintiff got up and spoke about an issue that she had raised that same morning with Ms. Gethings, and that Ms. Gethings had said she would look into and get updated information. Plaintiff's comments at the Board meeting, therefore, undermined her relationship with Ms. Gethings and other teachers in the building. The same is true of the Facebook comments, which numerous teachers reported to Ms. Gethings because they felt the comments were misrepresenting the school and giving the impressing that the school failed to do something (send a contact tracing notification letter) that it was required to do—which was false. (SOF ¶ 25) Mr. Shortt would attempt to avoid Plaintiff, and parents voiced their concerns about Plaintiff's comments. Plaintiff's conduct, therefore, was materially interfering with the working relationship between her and her employer.

**V.  DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFF'S FALSE LIGHT CLAIMS.**

In Count Three, Plaintiff brings a false light invasion of privacy claim against Ms. Gethings. This claim is baseless, and must be dismissed on summary judgment.

"Connecticut has adopted the definition of false light invasion of privacy provided by the Restatement (Second) of Torts, recognizing that liability may be imposed where a

defendant 'gives publicity to a matter concerning another that places the other before the public in a false light … if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'" *Chiaravallo v. Middletown Transit Dist.,* 561 F. Supp. 3d 257, 291 (D. Conn. 2021). "The statements themselves must be false; moreover, they must be 'such a major misrepresentation of [a plaintiff's] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position.'" *Id.*, at 291–92.

"[T]he publicity element of a false light invasion of privacy claim requires publication of the allegedly false matter to the public at large or to so many persons as to make it substantially certain that the matter will become public knowledge." *Grigorenko v. Pauls*, 297 F. Supp. 2d 446, 448 (D. Conn. 2003); *see also*, *Geiger v. C&G of Groton, Inc.,* 424 F. Supp. 3d 276, 294 (D. Conn. 2019) ("The 'publicity' associated with invasion of privacy 'means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'").

"[T]o successfully prosecute a false light claim, evidence of what was said or written about the plaintiff is essential. This is so because without knowledge of the words that were publicized, the trier of fact cannot evaluate an essential element of the cause of action, namely the falsity of the words." *Weissman v. Koskoff*, No. HHDCV106012922S, 2011 WL 590461, at *9 (Conn. Super. Ct. Jan. 19, 2011), aff'd sub nom. *Weissman v. Koskoff, Koskoff & Bieder*, P.C., 136 Conn. App. 557(2012). Therefore, "[a] an invasion of privacy by false light

action is subject to the same specificity requirements as a defamation action . . . ." *Croslan v. Hous. Auth. for City of New Britain*, 974 F. Supp. 161, 171 (D. Conn. 1997)(citation omitted); *accord Weissman*, 2011 WL 590461, at *9 ("a claim of defamation must be pleaded with specificity, as the precise meaning and choice of words employed is a crucial factor in any evaluation of falsity. . . . a false light privacy claim must also be pleaded with specificity.")(cleaned up).

In this case, Count Three of Plaintiff's Complaint simply incorporates the prior 77 paragraphs and states that "the aforementioned conduct by Defendant Gethings placed Plaintiff in a false light which would be highly offensive to a reasonable person." (Complaint, Count Three). As such, Count Three does not identify the precise words used in a single statement from Ms. Gethings that Plaintiff believed cast her in a false light. For this reason alone, Defendants are entitled to summary judgment. *Weissman*, 2011 WL 590461, at *9 ("The Court agrees with the defendant that the plaintiff has not sufficiently pleaded her claims of defamation or false light invasion of privacy because she has utterly failed to allege any details concerning its alleged misrepresentations about her to others upon which those claims are based.").

During discovery, Plaintiff again proved reluctant to identify a specific statement that she viewed as placing her in a false light, much less could she meet the high standard for such a claim. Rather than focus on one or two particular statements, Plaintiff instead chose to identify the following in her Interrogatory responses as the allegedly false light statements:

1. September 24, 2020 - East Rock Park outing
2. March 28, 2021 - PTA Executive Board
3. March 2021 - Mrs. Gethings and Mrs. Clarino lied to Teacher X about me
4. March 31, 2021 - Meeting with Mrs. Gethings, Mrs. Clarino, Mrs. Morrison and Teacher X
5. April 1, 2021 - Submitted TEVAL (Teacher Evaluation) Document

6.  April 2, 2021 - Conversations with Paul Salem about Grade Change
7.  April 21, 2021 - Mrs. Gethings comments against me at the PTA meeting
8.  May 10, 2021 - Ms. Alden files a complaint against me
9.  May 26, 2021 - Mrs. Gethings solicited email complaint from a parent
10. May 26, 2021 - Phyllis Maffuid gets reprimanded for helping me
11. June 7, 2021 - Mrs. Gethings and Mrs. Clarino file a retaliatory complaint
12. June 21, 2021 - Mrs. Gethings tainted and delayed the investigation
13. September 1, 2021 - BOE HR asks me to waive my right to speak publicly
14. Before December 3, 2021 - Mrs. Clarino lies to investigators
15. October 7, 2021 - Conversations with Tim Shortt
16.  February 9, 2022 - Returning from FMLA without a classroom
17. See also LIGHT003328-31 [which is an email from Plaintiff recapping her notes from the meeting the prior Friday that did not include Ms. Gethings].

*See* J. Light Interrogatory Responses, Response to Int. # 15, attached as Exhibit A. Such an approach fails to comport with her burden to plead and prove the specifics of what allegedly was said by Ms. Gethings. Because these interrogatory responses fail to cure the lack of specificity in the Complaint, her false light claim should be dismissed. *Weissman*, 2011 WL 590461, at *9.

Moreover, a brief review of the statements identified in her Interrogatory response demonstrates that a significant majority relate either to a conversation or meetings that she was not a party to, and, therefore, she has no direct knowledge of what was said or not. See Items 6, 8, 9, 10, 12, 14, 15. Item 13 addresses communications between Plaintiff and "Board HR," which did not include Ms. Gethings at all.  Similarly, Item 17 is an email summarizing Plaintiff's notes from a meeting with human resources personnel that, as the email itself indicates, Ms. Gethings *did not even attend*. See LIGHT003328-31, attached as Exhibit B. All of these Items should be summarily rejected as alleged grounds for Plaintiff's false light claim.

The remaining Items in that Interrogatory response prove no more helpful to Plaintiff than the previously-discussed ones. For example, in regard to Item 1, Plaintiff admitted in her

deposition that she did not know the details of Ms. Gethings alleged statements about Ms.

Alden's planned outing at East Rock Park, and only learned of it through the Bercham &

Moses report. (Lights 65) Similarly, when asked about Item 2, Plaintiff could not provide any

details and replied "At this moment, I am drawing a blank. I apologize." (Light 67). These

vague, unsupported Items cannot form the basis of a false light claim.

   Items 3 and 4 both address the situation with Teacher X. In regard to those Items,

Plaintiff answered as follows in her deposition:

Q: What statements—specific statements do you believe were made by Principal Gethings
  in that meeting that were defamatory?

A: Again, I would refer you to the recording. But as I sit here today, I remember that Miss
  Gethings said that her was that everyone said I had one it and that - - and reference a
  Facebook post about students' COVID data and that she told me - - when I said that it
  was untruthful that I was the leak, she told me not to say that it was untruthful, because
  that was disparaging to my colleague [Teacher X].

Q: Anything else?

A: She stated that teacher had come to her but that she would not say their names, because
  they were fearful that I would retaliate against them.

(Light 70-71). Nothing about this meeting painted Plaintiff in a false light.  Ms. Gethings

testified that Teacher X informed Ms. Gethings that she (Teacher X) was contemplating a

complaint against Plaintiff over the disclosure of her COVID-positive status, and, therefore,

Ms. Gethings brought Teacher X and Plaintiff together for a meeting to get to the bottom of

what was said or not said. Even if Plaintiff was accused in that meeting of leaking Teacher X's

status, that accusation (a) did not place Plaintiff in a false light in which the other was placed

would be highly offensive to a reasonable person, and (b) there is no evidence showing that

Ms. Gethings had knowledge of or acted in reckless disregard as to the falsity of the publicized

matter and the false light in which the other would be placed. *Chiaravallo,* 561 F. Supp. 3d at

291. Indeed, the opposite is true because the two individuals who came forward with questions about a teacher having COVID were both in the same learning pod as Plaintiff, which suggested they had inside information. Finally, it is undisputed that these comments by Ms. Gethings were made in a meeting with Plaintiff herself, and then in a meeting with Plaintiff, Teacher X, and a union representative. There was no "publication of the allegedly false matter to the public at large or to so many persons as to make it substantially certain that the matter will become public knowledge." *Grigorenko*, 297 F. Supp. 2d at 448. For all of these reasons, the situation involving Teacher X fails to support a false light claim.

Item 5 addresses a comment in Plaintiff's 2021 TEVAL document. Although not pleaded with specificity, Plaintiff has indicated that she believes one sentence is retaliatory, defamatory, and paints her in a false light. (Light 72-73) That sentence states: "As we have discussed in your mid year please consider asking questions any time you have a concern, if we do not have the answer we will do our best to obtain the answer." (SOF ¶ 30). Plaintiff has not and cannot demonstrate that this sentence is false, or that it is "such a major misrepresentation of [her] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable [woman] in [her] position.'" *Chiaravallo*, 561 F. Supp. 3d at 291–92. Moreover, Plaintiff has not alleged that this TEVAL was disclosed to anyone but her, and it never would be as teacher evaluation documents are not subject to the Freedom of Information Act. See Conn. Gen. Stat. § 10-151c. Thus, there was not the public disclosure required for a false light claim. *Grigorenko*, 297 F. Supp. 2d at 448.

In regard to Item 7, Plaintiff clarified in her deposition that this involves an alleged statement by Ms. Gethings at a PTA meeting that Mr. Shortt's nomination to be the

parent/teacher representative to PTA should be handled by the school, outside of the PTA meeting process, which Ms. Gethings said she had discussed that with Plaintiff prior to the PTA meeting. (Light 75-76). Plaintiff believes this second part was false, and people viewed it as Ms. Gethings admonishing her. Even accepting Plaintiff's version as true, this routine conversation would hardly be viewed as "such a major misrepresentation of [her] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable [woman] in [her] position.'" *Chiaravallo*, 561 F. Supp. 3d at 291–92

Item 11 addresses Ms. Gethings and Ms. Clarino's response to Plaintiff's complaint, which they also characterized as a complaint against Plaintiff. Although Plaintiff may disagree with the statements within that document, they were well within their rights to file that—just as Plaintiff was within her rights to file her original complaint. Plaintiff's disagreement with certain statements in that reply hardly makes it "such a major misrepresentation of [her] character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable [woman] in [her] position.'" *Chiaravallo*, 561 F. Supp. 3d at 291–92. More importantly, though, that document is lengthy, and Plaintiff fails to identify what specific statements within that document she believes painted her in a false light. Finally, just like with other documents, this document was only submitted to the Board's human resources department, and then to Bercham & Moses. As a result, Plaintiff cannot demonstrate that there was "publication of the allegedly false matter to the public at large or to so many persons as to make it substantially certain that the matter will become public knowledge." *Grigorenko*, 297 F. Supp. 2d at 448.

Finally, Item 16 references her returning from her FMLA leave of absence without a classroom. This item is just as baseless as all of the rest of the allegations. Plaintiff testified that she was told by the union that Ms. Gethings and Ms. Clarino stated to the union that when Plaintiff went on FMLA leave, Ms. Gethings, Ms. Clarino, and the other first grade teachers discovered that Plaintiff's students did not have reading and writing notebooks set up, that they were not able to efficiently log into the Chromebooks correctly, and other New Haven mandates were not being followed. Plaintiff cannot demonstrate that these statements were false, and, moreover, every public school teacher in Connecticut (like all employees) is subject to some criticism of their teaching performance occasionally. Finally, according to Plaintiff's testimony, this information was relayed only to the union, and then to Plaintiff. Therefore, Plaintiff also cannot demonstrate the widespread distribution necessary for a false light claim. *Grigorenko*, 297 F. Supp. 2d at 448.

In sum, despite Plaintiff's attempt to throw a lot of statements at the proverbial wall, none of them stick, and none of them meet the high standard necessary to establish a false light claim. Accordingly, Ms. Gethings is entitled to judgment as a matter of law on Count Three.

## VI.    MS. GETHINGS DID NOT DEFAME PLAINTIFF AND THEREFORE COUNT FOUR FAILS AS A MATTER OF LAW.

Plaintiff's defamation claim in Count Four relies on all of the same alleged statements as her false light claim, except for the one statement about her return from FMLA leave, and her defamation claim fails for essentially the same reasons as her false light claim.

Under Connecticut law, "[a] defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Cweklinsky v. Mobil Chemical*

*Co.*, 267 Conn. 210, 217 (2004). "A cognizable claim for defamation requires a showing that: (1) the defendant made a defamatory statement; (2) the defamatory statement identified the plaintiff to a reasonable third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the defamatory statement." *Chiaravallo,* 561 F. Supp. 3d at 289. "Statements of opinion, even if negative or otherwise harmful, cannot, as a matter of law, form the basis for a defamation claim." *Wallace v. Sharp*, 2022 WL 428102, at *13 (D. Conn. Feb. 11, 2022). "Although a defamatory statement must be false in order to meet the standard, 'determination of the truthfulness of a statement is a question of fact for the jury.'" *Chiaravallo,* 561 F. Supp. 3d at 289.

Truth is an absolute defense to an allegation of defamation. *See, e.g., Goodrich v. Waterbury Republican–American, Inc.*, 188 Conn. 107, 112 (1982). "A defendant is not required to prove complete or absolute truth; substantial truth will suffice." *Dean v. Liberation Programs, Inc.*, 2015 WL 6558263, at *6 (Conn. Super. Ct. Oct. 5, 2015). "[W]here minor inaccuracies [are] immaterial to the 'sting' or harm suffered by the plaintiff … [or] where the inaccuracies [are] of a technical nature that conveyed the same meaning as the true facts would have in the eyes of the average reader, summary judgment may be appropriate." *Mercer v. Cosley*, 110 Conn. App. 283, 304 (2008) (internal quotation marks and citation omitted). "Where statements alleged to be defamatory are shown to be substantially true, a plaintiff has failed to meet her burden, and summary judgment may properly enter." *Dean*, 2015 WL 6558263, at *6 (citation omitted).

"Under these authorities it has been held that, a claim of defamation must be pleaded with specificity, as the precise meaning and choice of words employed is a crucial factor in any

evaluation of falsity. The allegations should set forth facts sufficient to apprise the defendant of the claim made against him. A complaint for defamation must, on its face, specifically identify what allegedly defamatory statements were made, by whom, and to whom." *Weissman*, 2011 WL 590461, at *9 (cleaned up)

When a plaintiff cannot meet all the elements of a defamation claim, including describing the allegedly defamatory statements with specificity, it must be dismissed. *See, e.g.*, *Lops v. YouTube, LLC*, No. 3:22-CV-843 (JAM), 2023 WL 2349597, at *4 (D. Conn. Mar. 3, 2023)(dismissing defamation claim when plaintiff "does not explain who acted in reliance on the alleged defamatory statements, how the reliance harmed him, and what the nature and magnitude of the alleged loss was," and relied on "threadbare recital of the elements of a cause of action without including supporting factual allegations" instead); *Egbarin v. Hoffmann & Assocs.*, 2019 WL 1129454, at *5–7 (D. Conn. 2019) (dismissing defamation and related claim for intentional infliction of emotional distress where plaintiff failed to identify particular statements); *Croslan v. Hous. Auth. for City of New Britain*, 974 F. Supp. 161, 170–71 (D. Conn. 1997) (defamation plaintiff must allege particular statements).[8]

As noted in regard to the false light claims, Plaintiff has failed to meet her burden to identify the allegedly defamatory statements with any specificity, much less the specificity required for defamation claims. Instead, Count Four just once again incorporates the prior 73 paragraphs of the complaint, and states that Ms. Gethings published defamatory statements. Because Plaintiff failed to identify such statements with the required specificity, Ms. Gethings is entitled to judgment as a matter of law on the defamation claim. *Weissman*, 2011 WL

---

[8] The Court cited both of these cases recently in *Sarner v. Caldwell-Boyd*, No. 3:21-CV-987 (JAM), 2022 WL 4132940, at *4 (D. Conn. Sept. 12, 2022).

590461, at *10 ("The Court agrees with the defendant that the plaintiff has not sufficiently

pleaded her claims of defamation or false light invasion of privacy because she has utterly

failed to allege any details concerning its alleged misrepresentations about her to others upon

which those claims are based.").

In her Interrogatory responses, Plaintiff once again did not identify the specifics of the

alleged defamatory statements. Instead, she set forth a list of alleged statements that is almost

identical to the list discussed previously in the false light section of this Memorandum.

1.  September 24, 2020 - East Rock Park outing
2.  March 28, 2021 - PTA Executive Board
3.  March 2021 - Mrs. Gethings and Mrs. Clarino lied to Teacher X about me
4.  March 31, 2021 - Meeting with Mrs. Gethings, Mrs. Clarino, Mrs. Morrison and Teacher X
5.  April 1, 2021 - Submitted TEVAL (Teacher Evaluation) Document
6.  April 2, 2021 - Conversations with Paul Salem about Grade Change
7.  April 21, 2021 - Mrs. Gethings comments against me at the PTA meeting
8.  May 10, 2021 - Ms. Alden files a complaint against me
9.  May 26, 2021 - Mrs. Gethings solicited email complaint from a parent
10. May 26, 2021 - Phyllis Maffuid gets reprimanded for helping me
11. June 7, 2021 - Mrs. Gethings and Mrs. Clarino file a retaliatory complaint
12. June 21, 2021 - Mrs. Gethings tainted and delayed the investigation
13. Before December 3, 2021 - Mrs. Clarino lies to investigators
14. October 7, 2021 - Conversations with Tim Shortt
15. February 9, 2022 - Returning from FMLA without a classroom

*See* Exhibit A. This list fails to provide any specificity about the alleged defamatory

statements, which fails to meet her burden. *See Weissman*, 2011 WL 590461, at *10.

Even if the Court chooses to consider Plaintiff's defamation claim further, it still fails

for similar reasons set forth previously in regard to the false light claim. Briefly, those reasons

include that Plaintiff cannot provide any specifics about the alleged statements involved in

Items 1 and 2 and was not involved in the conversations in items 3, 6, 9, 10, 12, 13, and 14.

Therefore, Plaintiff has no first-hand knowledge of any statements made at those times, and

she cannot provide any specifics about those statements. In regard to Item 4, any statements made in that meeting were either fully or substantially true (e.g. Teacher X said you disclosed her health information) or statements of opinion (we think you leaked Teacher X's information). The benign statement in the TEVAL in Item 5, and the statement from Item 7 at the PTA meeting, where Ms. Gethings said Mr. Shortt's nomination should go through the school and she had discussed that with Plaintiff previously, both are true and therefore not actionable. Even if they were, there is nothing about the statements in Items 4, 5, and 7 that would harm the reputation of Plaintiff as to lower her in the estimation of the community or to deter third persons from associating or dealing with her. *Cweklinsky*, 267 Conn. at 217.

Items 8 and 9 both cite lengthy complaints filed against Plaintiff by her co-worker Ms. Alden, and then Ms. Gethings and Ms. Clarino, respectively. Plaintiff fails to identify any statements within those documents that she views as defamatory. Finally, as discussed previously, upon Ms. Light's return from FMLA, Ms. Gethings expressed some concerns about her student's performance and readiness at the time the leave first began. Those statements are either true or substantially true based on the observations of the other first grade teachers who took over her students, or statements of opinion about the students' levels of performance. Moreover, these are routine performance review statements, which employees across the state receive on a daily basis. There is nothing about them that would harm the reputation of Plaintiff as to lower her in the estimation of the community or to deter third persons from associating or dealing with her. *Cweklinsky*, 267 Conn. at 217.

Finally, even if some of the statements could be viable for alleged defamation, they would be barred by the intracorporate communications privilege. *See Torosyan v. Boehringer*

*Ingelheim Pharms., Inc.*, 234 Conn. 1, 29, 662 A.2d 89 (1995) ("[C]ommunications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business."); *see also Malik v. Carrier Corp.*, 202 F.3d 97, 108 (2d Cir. 2000) ("Connecticut affords a qualified privilege to intracorporate communications.") (citing *Torosyan*, 234 Conn. at 29).  For all of these reasons, therefore, Ms. Gethings is entitled to judgment as a matter of law on Count Four of the Complaint.

## VII.    Conclusion

As set forth above, even if Plaintiff did engage in protected speech at the Board meetings or in any other capacity, she has not suffered any adverse employment actions and, even if she did, there is no evidence that those actions were caused by her prior speech. Moreover, Plaintiff has substantially failed to meet her burden to prove any specific statements that were defamatory or that placed her in a false light. Therefore, the Defendants are entitled to judgment as a matter of law on the Complaint in its entirety, together with such further and additional relief the Court deems necessary.

DEFENDANTS,

NEW HAVEN BOARD OF EDUCATION
and MARGARET-MARY GETHINGS


By ____/s/ *Peter J. Murphy*_____
    Peter J. Murphy (ct26825)
    Shipman & Goodwin LLP
    One Constitution Plaza
    Hartford, CT  06103-1919
    Telephone: (860) 25l-5950
    Facsimile: (860) 251-5316
    pjmurphy@goodwin.com
    Their Attorney