# EXHIBIT B

1            UNITED STATES DISTRICT COURT
              DISTRICT OF CONNECTICUT
2
   – – – – – – – – – – x
3  JESSICA LIGHT,          No. 3:22cv425(AVC)
             Plaintiff,
4
       vs.
5
  NEW HAVEN BOARD OF EDUCATION
6  and MARGARET-MARY GETHINGS.
            Defendants.  December 19, 2022
7  – – – – – – – – – – x

8

9

10

11       DEPOSITION OF MARGARET-MARY GETHINGS

12

13  Taken before Cindy J. Carone, CCR 383, a Court Reporter
   and Notary Public, within and for the State of
14  Connecticut, pursuant to Notice and the Federal Rules
   of Civil Procedure, at Monarch Law, 1 Schooner Lane,
15  Unit 1C, Milford, Connecticut, on December 19, 2022,
   commencing at 10:07 a.m.

16

17

18

19

20

21

22        Falzarano Court Reporters, LLC
              4 Somerset Lane
23           Simsbury, CT 06070
             860.651.0258
24      www.falzaranocourtreporters.com

25

1    degree and then take the test.

2         Q    Which college did you get the 092 from?

3         A    Southern.

4         Q    Do you recall when you received the 092?

5         A    I would say sometime around 2007.

6         Q    How long were you assistant principal at

7    Fair Haven School?

8         A    About four years.

9         Q    Did you have a subsequent job title before

10   you left Fair Haven School to go to Branford?

11        A    I was the principal.

12        Q    How long were you the principal at

13   Fair Haven?

14        A    Six years?

15        Q    Did you leave Fair Haven School in 2015?

16        A    Yes.

17        Q    Was that to become the principal at Sliney

18   School in Branford?

19        A    Yes.

20        Q    Then there came a point in time approximately

21   2018 when you returned to New Haven to be the principal

22   at Worthington Hooker, correct?

23        A    Correct.

24        Q    Why did you decide to leave Branford to come

25   back to New Haven in or around 2018?

```
 1              attorney/client privilege and attorney work

 2              product.  I don't think it's appropriate to

 3              inquire further.

 4                   MR. INTERLANDI:  I disagree but I'll

 5              move forward.

 6    BY MR. INTERLANDI:

 7         Q    You've read this document before today,

 8    correct?

 9         A    Yes.

10         Q    And you contributed to it, correct?

11         A    Yes.

12         Q    Please turn to page 3, paragraph ten.  Please

13    read the allegation and your answer and let me know

14    when you're done.

15         A    Done.

16         Q    You deny that Ms. Light indicated that she

17    made the Facebook post in the capacity of a parent of a

18    children attending Worthington Hooker, correct?

19         A    Yes.

20         Q    Why did you deny that allegation?

21         A    Because she was talking about teachers, and I

22    was under the impression that it was regarding

23    teachers.

24         Q    Why were you under the impression that her

25    Facebook post was regarding teachers?
```

Falzarano Court Reporters, LLC

1     A     Because it just said that we didn't send

2  letters.

3     Q     She said we didn't send letters?

4     A     Hooker didn't send letters.

5     Q     Letters regarding what?

6     A     Positive cases.

7     Q     Positive cases for all of the school's

8  community, teachers and students, or was that regarding

9  just students?

10    A     It was everyone.

11    Q     You've read the Facebook post, yes?

12    A     Yes.

13    Q     You read Ms. Light's comments, correct?

14    A     Correct.

15    Q     Did she indicate at that time that she was

16 making the post in her capacity as a teacher?

17    A     No.

18    Q     Did she indicate at that time that she was

19 making her post in her capacity of something else?

20    A     No.

21    Q     The last sentence of this answer only

22 references the Board and not you.  Do you also have

23 insufficient knowledge or information upon which to

24 admit or deny the remaining allegations in paragraph

25 ten?

 1             MR. MURPHY:  I'll just jump in and say I
 2          believe that's a typo and that should be
 3          Defendants, as is every other reference.
 4   BY MR. INTERLANDI:
 5      Q    Do you agree with that, Ms. Gethings?
 6      A    Yes.
 7      Q    Let's turn to paragraph 12.  Please read the
 8   allegation and your answer and let me know when you're
 9   done.
10      A    Done.
11      Q    You deny falsely accusing Ms. Light of
12   wrongdoing, correct?
13      A    Yes.
14      Q    Why did you accuse Ms. Light of leaking
15   confidential information regarding Teacher X?
16      A    I didn't accuse her of leaking information.
17      Q    Do you recall having a meeting with
18   Teacher X, Ms. Clarino, and Ms. Light in 2021?
19      A    Yes.
20      Q    What was that meeting about?
21      A    It was a meeting to bring clarity and bring
22   two teachers together.  Teacher X was contemplating a
23   complaint against Ms. Light, and we were trying to
24   facilitate getting to the bottom of what may or may not
25   have been said.

```
1    from Teacher X, from Megan Rose, from Kate Paine,
2    Kathleen Morrison, that Jessica was the person.
3         Q    Teach X had a feeling.  Did you ask her
4    specifically why she had that feeling?
5         A    I didn't speak to her; Ms. Clarino spoke to
6    her.
7         Q    Do you know if Ms. Clarino asked her why she
8    had a feeling it was Ms. Light?
9         A    Yes, I would assume she did.
10        Q    Don't assume.  Do you know if she asked her
11   that?
12        A    No, I don't know.
13        Q    The two people you said and the two others
14   you heard from, who were those people?
15        A    Claire Rowe and Matthew Rodeheffer, I think
16   is his last name.  He sent the email to Ms. Bullen,
17   saying that his ex, who is a very good friend of
18   Ms. Light's, had found they might not be sending their
19   daughter back to school.  The ex found out that there's
20   a lot of case.
21        Q    Did he say, I heard Teacher X has COVID?
22        A    No.  But there was no one else was talking
23   about anyone else besides Teacher X.
24        Q    When did Teacher X have COVID, if you recall?
25        A    I don't recall.
```

1  done.  I'm referring to Exhibit 2.  I'll take Exhibit 3

2  back.

3      A    Just reading 14 and the answer?

4      Q    Yes.

5      A    I'm done.

6      Q    It says here that you gave Ms. Light a copy

7  of the form printed by her union.  Do you see that?

8      A    Yes.

9      Q    Why did you give her a form printed by her

10  union?

11      A    I didn't.  We gave it out to the whole staff,

12  the AFT letter reminding teachers of their speech.  It

13  was a reminder that came from the teacher's union.

14      Q    "AFT", what does that stand?

15      A    American Federation of Teachers.

16      Q    So here in the answer it says that during a

17  meeting on November 2, 2020, with you and Ms. Clarino

18  and Ms. Light, a copy of the form printed by her union

19  was given to the Plaintiff.

20           So is it your testimony today --

21      A    It was given at the staff meeting that was on

22  that date.  We gave it to everyone.  I didn't give --

23  everybody received this AFT letter.  That one, yes.

24      Q    Showing you what I marked Exhibit 23, you

25  just said yes, that one?

```
1   staff there was an agenda, correct?

2       A    I think so, yes.

3       Q    Was that an actual written agenda that was

4   distributed to the staff, either before or during that

5   meeting?

6       A    I don't recall.

7       Q    If an agenda is prepared, who is the person

8   at Worthington Hooker that would prepare the agenda for

9   the staff meetings?

10      A    Ms. Clarino or myself.

11      Q    Do you recall who prepared the agenda for

12  this November 2, 2020 meeting?

13      A    No.

14      Q    Let's look at paragraph 15.  Please read the

15  allegation and your answer.  Let me know when you're

16  done.

17      A    Done.

18      Q    What was the school policy at

19  Worthington Hooker in 2021 regarding sharing personal

20  cellphone numbers to members of the school community?

21      A    It's always been encouraged that teachers not

22  share their personal phone number to protect

23  themselves.

24      Q    Have teachers shared their personal cellphone

25  numbers with students and parents?
```

Falzarano Court Reporters, LLC

```
 1        A      I hope not with students.

 2        Q      With a student's parents?

 3        A      With the student's parents, I believe it was

 4   a common practice prior to me becoming a principal.

 5        Q      And then is there a written policy that

 6   requires teachers to refrain from sharing their

 7   personal cellphone numbers with parents?

 8        A      So, we have in our staff handbook that we

 9   encourage teachers to have a Google phone number,

10   and/or to use email as communication.

11               Yearly when they have DCF training, is it

12   also encouraged and recommended not to share any

13   personal information about yourself, including your

14   phone number.  There's a variety of reasons why it

15   would be highly encouraged not to use your cellphone.

16        Q      What you just explained, is that in writing?

17        A      It is now.  It's in our handbook.  In the

18   beginning of the school year, we have two full days of

19   staff meetings, and I know that I always mention it and

20   I mention it for a variety of the reasons.

21               I have said every August, Teachers, please

22   don't share your cellphone numbers with parents.

23   Because a relationship can change very quickly and

24   there could be misinterpretation, and you also could --

25   on your own personal time can be violated.
```

1        A       No.  We know they have access to Google's

2    platform through the school, and if they want, to use

3    Google Voice.  So if they feel like, I have to talk to

4    a parent, we say to use the Google Voice.

5             I use it very rarely because I'm at school

6    all the time and I think that's the best mode to use is

7    the school phone.  But the number changes.

8        Q       Right.  That's what I was going to ask you.

9    If every teacher obtains a Google phone number, they

10   all would have different phone numbers; is that

11   correct?

12       A       Yes.  So they're encouraged to use the school

13   phone, email, Remind, and never to use their cellphone.

14       Q       Understood.  What prompted the meeting that

15   is identified in paragraph 15, if you remember?

16       A       Sure.  I remember it well.  It was after open

17   house.  Ms. Light had a very nice PowerPoint presenting

18   to her families, and on the last PowerPoint, I noticed

19   that she had listed her cellphone number.

20             As she was walking out of school, I said,

21   You're done, good job.  And I think I might have asked,

22   Did you get to go to your children's, and she said I

23   went to one.

24             I said, What a nice compliment Mr. Butler

25   gave you, and she smiled and said, Yes, it made me feel

```
1    wonderful.
2            And I said, Listen, I saw that you listed
3    your cellphone.  At that time she said, Yes, I always
4    do.  And I said, You shouldn't.  She said she was never
5    told that and she said she didn't know, and I explained
6    to her what could happen.  She agreed and said moving
7    forward she wouldn't use her cellphone.
8            She never mentioned anything about being a
9    parent or her relationships and it wasn't related to
10   her being a parent or having relationships.  It was
11   about putting that out there.
12           You know, it's nice to have a parent call you
13   who is happy and likes you, but if you have a
14   disgruntled or an angry parent, you're now -- so it was
15   in her best interest and best intentions.  It was never
16   anything more than there are many other ways to
17   communicate and please don't put your cellphone out
18   there.
19       Q    How did you know it was her personal
20   cellphone and not a Google phone number that was listed
21   on the PowerPoint?
22       A    Because I know her number.
23       Q    Okay.
24       A    We have each others' numbers.
25       Q    Okay.
```

Falzarano Court Reporters, LLC

```
 1   around, in your recollection, COVID 19?
 2       A    Yes.  Unless you can give me more context of
 3   the discussion.  I'm sure it will come to me if I saw
 4   it.  But there were many meetings around protocols,
 5   safety measures, and I don't have a recall of which
 6   comments this was referring to.  I think it was the
 7   desks.
 8       Q    When you say "this" referring to paragraph
 9   16?
10       A    No.  When you said all the comments that she
11   made.
12       Q    Right.  So you said she made a lot of
13   comments in March of 2021.  I guess my question then
14   is:  Were those comments focused on her concerns with
15   COVID-19 protocols?
16       A    Yes.
17       Q    Referring back to paragraph 16 and your
18   answer, who told Ms. Light to wait?
19       A    I did.  I asked her -- so I believe she
20   asked -- again this is about spacing of desks and when
21   students could have a snack.
22            This was a very fluid time in the District.
23   Decisions were coming from CDC Guidelines to our
24   superintendent.  People were meeting.  We had
25   frequently Q and A.
```

1          I met every Wednesday with my assistant

2     superintendent and 13 other principals, and we shared

3     the wealth.  Like, what are you doing for shared

4     materials?  What are you doing at recess time?  How are

5     you getting kids to authentically learn.

6          We had shifted from 6 feet to 3, and in some

7     enrolled classes, it wasn't a problem because you could

8     still have ample spacing.

9          There was also some ambiguity around if

10    snacks could be had every other row, and there was not

11    a known answer yet so I asked not, like, wait until

12    we're done having lunch or wait until we get around to

13    it.  Wait until -- this is a very common question that

14    others are seeking.

15          I was reminded of that hearing some of the

16    recorded meetings.  I am well aware that the Board

17    would never answer a question.  You could ask them

18    anything and it's just public comment.  So I was always

19    encouraging Ms. Light to come to us because perhaps I

20    would either have the answer or seek the answer.

21          In this particular situation, it was to be

22    patient because that was a great question but everyone

23    was waiting for that information.

24    Q    You just testified that it was a fluid time?

25    A    Yes.

Falzarano Court Reporters, LLC

1    you, by Ms. Light?

2        A    Yes.

3        Q    Do you recall what she said in that Facebook

4    post?

5        A    Hooker didn't send letters.

6        Q    And that was false?  Hooker did send letters?

7        A    We didn't have a need to send letters.

8        Q    So you're saying Ms. Light said Hooker didn't

9    send letters, and that's a misrepresentation because

10   there was no need, correct?

11       A    Yes.

12       Q    Was that a public Facebook group or page that

13   she made that post?

14       A    I believe it was in two places -- I am not on

15   either of them -- the New Haven Advocates, as well as

16   New Haven Teachers Facebook page.

17       Q    How did you learn about that post?

18       A    A screenshot was sent to me.

19       Q    My whom?

20       A    Kathleen Morrison, Meghan Rose,

21   Grace Nathman, a principal at another school.

22       Q    How about Ms. Cavanaugh?  Did she send you a

23   screenshot?

24       A    Not that I recall.  I do know she saw it and

25   mentioned it to me.  I don't remember that she sent it

 1       A     She wasn't.  We all needed that.  We wanted
 2  to know that.  It was known that we wanted that
 3  information.
 4       Q     Understood.  I'll take back 8 and 13.  In
 5  front of you, you still have 23, right, which I can
 6  take back.  Now you just have Exhibit 2, right?
 7       A     Okay.
 8       Q     We're going to look at paragraph 20.  Read
 9  the allegation and your answer.  Let me know when
10  you're done.
11       A     Done.
12       Q     Why did you raise the issue of Teacher X
13  during Ms. Light's TEVAL if she had already denied
14  being the source of the leak?
15       A     I don't know.  I don't recall.
16       Q     Which staff people felt that it was very hard
17  to work with Ms. Light because of her public comments?
18       A     None because of her public comments.
19       Q     Did any staff people feel that it was very
20  hard to work with Ms. Light for other reasons?
21       A     Yes.
22       Q     What were those reasons?
23       A     She had a difficult relationship with a
24  second grade teacher as the parent.
25       Q     Is that Ms. Hilarie, Alden Hilarie?

```
 1        A      Her name is Ms. Hilarie Alden.

 2        Q      Hilarie Alden, okay.  Because of a parent.

 3   What do you mean by that?

 4        A      There was conflict that Ms. Light and her

 5   husband had with Ms. Alden, and there was conflict the

 6   year before with Ms. Tortora, the first grade teacher.

 7   There had been conflict with Ms. Morrison, who was

 8   Ms. Light's older son's teacher.

 9        Q      They had conflict with Ms. Light because of

10   things she said to them in her capacity as a parent?

11        A      Correct.

12        Q      In paragraph 20 you indicate that an

13   investigation or the investigation found this meeting

14   was not retaliatory and appropriate.  Which

15   investigation were you referring to in this paragraph

16   20 answer?

17        A      Berchem Moses found that it was not

18   retaliatory.

19        Q      There were more than one report, right?

20        A      Yes.

21        Q      Do you recall which attorney's report you

22   were referring to in this answer?

23        A      I think it was in Rebecca's because Rebecca

24   did the final.  Her grade change was not deemed to be

25   retaliatory, and of course, it was not.
```

```
1        Q      When did you decide to reassign Ms. Light?

2        A      Probably in January.  I actually know I have

3   told the staff since January we were making teacher

4   assignment changes, and I personally --

5        Q      So in January of 2021?

6        A      Yes.

7        Q      Okay, perfect.  That's when you made the

8   decision.  Then in your role as a principal at

9   Worthington Hooker, what were your day-to-day job

10  responsibilities in 2021?

11       A      You want . . .

12       Q      What were your job responsibilities as the

13  principal of the school?

14       A      Okay.  I hesitate to answer that since you

15  just spoke to how long I could give an answer.  Where

16  would you like me to begin?

17       Q      Just give me the top five.  Don't give me 95

18  things that you do.  Just give me the top five things

19  that you do as the principal at Worthington Hooker.

20       A      Okay.  You make the school a safe learning

21  environment.  You oversee teaching and learning.  You

22  respond to emotional, academic, and physical needs of

23  staff and students.  You build the best school that you

24  can have, climate and culture.  You make school the

25  place that everyone wants to come.
```

1    to reassign Ms. Light from her third grade teaching

2    position to first grade?  I just want the names.  I

3    don't need the whole background information.

4         A    Ms. Clarino, Ms. Keisha Redd-Hannans.

5         Q    Anyone else?

6         A    I mentioned it to Lisa Mack.

7         Q    Who is Lisa Mack?

8         A    The head of HR.

9         Q    Is she still the head of HR today?

10        A    Yes.

11        Q    She's the head of HR for Worthington Hooker

12   or the entire District?

13        A    The entire District.

14        Q    And Ms. Redd-Hannans, what is her job title

15   today?

16        A    Assistant Superintendent of Teaching and

17   Learning.

18        Q    Did you consult with anyone else before you

19   made the decision to transfer Ms. Light from third to

20   first grade?

21        A    No.  I would like to say that I spoke to Ken

22   Matthews, who is the head of the math department,

23   because I was changing a number of the teachers and I

24   wanted to be assured -- we were going to a new math

25   program -- that when I made changes, these people could

```
 1        Q    Do you remember what you said in that email?

 2        A    I don't.  I'm pretty sure I said it so she

 3   was aware of it and that she was aware of it from me.

 4   I was just keeping her in the know because I knew that

 5   she might be contacted by Ms. Light.

 6        Q    Do you know a man named Mr. Salem?

 7        A    Yes.

 8        Q    How do you know Mr. Salem?

 9        A    I've had the privilege of working with him

10   for four years.

11        Q    Does he no longer work with you?

12        A    No, he still does.

13        Q    What is his first name?

14        A    Paul.

15        Q    What grade does he teach at

16   Worthington Hooker?

17        A    He's currently our literacy coach.  He taught

18   third grade.

19        Q    In paragraph 21 you state that the

20   investigation referenced in paragraph 21 speaks for

21   itself and Defendants, that's you and New Haven Board

22   of Ed, deny that it was accurate in regard to the

23   findings listed in paragraph 21 concerning Mr. Salem.

24   Do you see that?

25        A    Yes.
```

Falzarano Court Reporters, LLC

```
 1        A     Correct.

 2        Q     In terms of the report, do you know if that

 3   report was done by Mr. Testa, or Ms. Goldberg or

 4   someone else?

 5        A     I don't know.  But I know that in one of them

 6   it said that Mr. Salem did not request a grade change,

 7   and that is not my recollection of our conversation.

 8   It was what was founded in his interview by one of

 9   them.

10        Q     So one of the investigators states in his or

11   her report that Mr. Salem said he did not request a

12   grade change?

13        A     Yes.

14        Q     And your recollection of your conversation

15   with Mr. Salem is that he did?

16        A     Absolutely, yes.

17        Q     Is there anything else as it relates to

18   Mr. Salem in the Berchem Moses report that is, in your

19   opinion, inaccurate?

20        A     Not that I recall.  That being the most

21   inaccurate for my experience of meeting with him.

22              And I'm glad I reread 21 because I actually

23   called Lisa Mack because I knew there wasn't a policy

24   on parents and teachers but I wanted to be sure that I

25   had that discretion and autonomy.
```

Falzarano Court Reporters, LLC

1    Q    So you emailed her a question?

2    A    Nope.  I called.  I spoke with her, and then

3  I emailed her.  There's an email, and I'm sure you have

4  it, where I was letting her know that I would have

5  changed her grade.

6    Q    Did she reply to that email?

7    A    I don't recall.

8    Q    Showing you what we marked Exhibit 14 (sic)

9  that's a report by Berchem Moses with Ms. Goldberg's

10 name at the bottom.  It's Exhibit 3, sorry, and I'm

11 going to direct your attention to page 14 where it says

12 Paul Salem.

13   A    Yes.

14   Q    Please read all the paragraphs under

15 Mr. Salem's name and let me know when you're done.

16        Actually, let me redirect your attention to

17 the bottom of page 18, which appears at the bottom.

18   A    Okay.

19   Q    Read the last paragraph please to yourself.

20 Let me know when you're done.

21        Is there anything in this paragraph that you

22 think is inaccurate?

23   A    I don't know if the April 2nd date is

24 correct.  But I do know that Mr. Salem came to me for

25 his TEVAL and wanted to preserve the relationship with

```
 1   suggesting that it is her.
 2        Q    And those are the people that you mentioned
 3   earlier when I asked you, correct?
 4        A    Correct, yes.
 5        Q    In what way as a teacher at Hooker could
 6   Ms. Light retaliate against the people who told you she
 7   was the source of the leak?
 8        A    I'm not sure if retaliation is the right verb
 9   but I do know that perspective from Ms. Alden was a
10   terrible experience with a parent/teacher relationship.
11   So keeping that in mind, I know no one wanted to endure
12   an experience like that.
13        Q    How did you know that?
14        A    Because the teachers that Ms. Clarino met
15   with during their TEVALs expressed that they didn't --
16   wouldn't want to kind of have the experience.  It was
17   pretty known in our school.  It's very small and people
18   were aware of how distraught Ms. Alden had become
19   through the experience.
20        Q    But your testimony earlier was that it was in
21   Ms. Light's capacity as a parent because one of her
22   children was a student of Ms. Alden's, right?
23        A    Yes.  She's both.  She's a parent and
24   it's . . .
25        Q    Okay.  So what did Ms. Light do to Ms. Alden,
```

```
 1   if you know, as a result of the issue they had?

 2        A     There was just conflict and challenging.

 3   Challenge of what sources and curriculum you're using,

 4   what you said or didn't say.

 5              There are teachers who have worked with

 6   Ms. Light who have found her to be very difficult:  Our

 7   literacy coach, our former literacy coach, our former

 8   math coach.

 9        Q     Has anyone ever said that it's difficult to

10   work with you?

11        A     Sure, I assume.

12        Q     What's the most recent one?

13        A     They don't say it to me.

14        Q     How about Ms. DiPietro?

15        A     No.  She never said it to me.

16        Q     Has she filed a complaint?

17        A     No.

18        Q     She has not?

19        A     Not that I'm aware of.

20        Q     Okay.

21        A     And we would have to be informed.

22        Q     Probably, yeah.

23        A     Yeah.

24        Q     Let's look at 24.  Read that and read your

25   answer and let me know when you're done.
```

Falzarano Court Reporters, LLC

```
 1        A    Talking, emailing; texting, I would assume,
 2   if they're friends.
 3        Q    So that's to the Google phone numbers or just
 4   their own personal --
 5        A    Teachers --
 6        Q    Cellphone?
 7        A    -- freely can use each other's cellphones.
 8        Q    Okay.  Let's look at paragraph 42.  Let me
 9   know after you read the allegation and answer.
10        A    Okay, I've read it.
11        Q    Do you recall having a meeting with
12   Mr. Shortt in or around October of 2021?
13        A    Yes.
14        Q    Do you recall why you had the meeting with
15   him during that time?
16        A    Yes.
17        Q    Why did you meet with him specifically in
18   October, 2021?
19        A    I haven't had to do this.  Can I ask Peter a
20   question?
21        Q    We can take a break and you can ask him a
22   question if you want but I don't think it's appropriate
23   on the record.
24        A    So I just want to make sure I don't say
25   anything I'm not supposed to say about another teacher.
```

1      Q    Okay.  Let's take a five-minute break.  You

2  guys can talk.  I'll leave.

3      A    Thank you very much.

4      Q    No problem.

5

6           (Recess:  2:38 to 2:42 p.m.)

7

8           MR. INTERLANDI:  Back on the record.

9      A    Thank you.

10      Q    Did you receive the clarification that you

11  needed?

12      A    Yes, and thank you for the time.

13      Q    You're welcome.

14           My question is as it relates to paragraph 42

15  and the answer.  Did you tell Mr. Shortt that a couple

16  of teachers were concerned that he had run for union

17  steward to team up with Ms. light to throw you and

18  Ms. Clarino under the bus and push you out?

19      A    No.

20      Q    What did you tell him, if anything, about his

21  running for the union steward position?

22      A    I said that some teachers had come and were

23  concerned and I wanted to name it for what it was, that

24  people were saying that you are aligning yourself with

25  Ms. Light to take on the administration, and I would

1    think at one time I did, like, take notes and look at

2    it and many things were taken out of context.

3        Q    What did you do with those notes?  Do you

4    still have them?

5        A    Yes.  For example, I wrote a very nice

6    favorable midyear comment, and the only thing that's

7    reported -- and it still to me doesn't rise an eyebrow,

8    and I would of course always think twice about doing

9    anything -- when I said to Ms. Light, Please come to

10   us.  If we have an answer, we'll be happy to either

11   provide it or seek one for you.

12            It omitted what a very nice midyear

13   evaluation -- and I think that this report didn't

14   accurately depict experiences that I remember.

15       Q    Okay.

16       A    And I would say I could be more specific if

17   we went one by one.  I can tell you that it has been on

18   -- I have no -- my guess is that Paul Salem didn't want

19   to tell her he came to me and said I don't want to

20   teach the same grade as Jessica and I don't want to

21   have her child.  Now --

22       Q    But you don't know for sure?

23       A    I don't know for sure but I do know what he

24   said to me.  That I know for sure.

25       Q    So you made some notes as you went through

Falzarano Court Reporters, LLC

```
 1                    STATE OF CONNECTICUT

 2          I, CINDY J. CARONE, CCR 383, a Notary Public

     duly commissioned and qualified in and for the State of
 3

 4   Connecticut, do hereby certify that pursuant to Notice,

 5   there came before me on the 19th day of December, 2022

 6   following named person, to wit:  MARGARET-MARY

 7   GETHINGS, who was by me duly sworn to testify to the

 8   truth and nothing but the truth; that she was thereupon

 9   carefully examined upon her oath and her examination

10   reduced to writing under my supervision; that this

11   deposition is a true record of the testimony given by

12   the witness.

13          I further certify that I am neither attorney nor

14   counsel for, nor related to, nor employed by any of the

15   parties to the action in which this deposition is

16   taken, and further, that I am not a relative or

17   employee of any attorney or counsel employed by the

18   parties hereto, or financially interested in this

19   action.

20          IN WITNESS THEREOF, I have hereunto set my

21   hand this ___6th___ day of____January_____, 2023.

22               /s/   Cindy J. Carone

23                     CINDY J. CARONE, CSR 383
                       Certified Shorthand Reporter
24   My Commission expires:
        May 31, 2023
25
```

Falzarano Court Reporters, LLC