# EXHIBIT A

CERTIFIED
COPY

# In The Matter Of:

*Jessica Light vs New Haven Board of Education,
Margaret-Mary Gethings*

---

*Jessica Light*

*December 14, 2022*

---

*A Plus Reporting Service LLC
55 Whiting Street, Suite 1A
Plainville, CT 06062
203.269.9976*

```
 1   friends.  There's no -- I have a lot of friends and a
 2   lot of acquaintances and associates, but the vast
 3   majority of my support system is outside of New Haven.
 4        Q.      Okay.  Well, there were a lot of text
 5   messages between you and Sara Miller; right?
 6        A.      Yes.
 7        Q.      Is she a friend?
 8        A.      She is a friend.
 9        Q.      Someone you turn to for advice; correct?
10        A.      Correct.
11        Q.      Other than Sara, do you have -- well,
12   withdrawn.
13              Are there individuals, similar to Sara,
14   here in New Haven that you turned to for advice and to
15   discuss things in friendship?
16        A.      Yes.
17        Q.      Such as whom?
18        A.      Julia von Blume.
19        Q.      V-o-n, B-l-o-o-m?
20        A.      Yes.  B-l-u-m-e, I believe.  Sorry, I'm
21   dyslexic.  I'm not sure.
22        Q.      So Sara Miller, Julia von Blume, anyone
23   else?
24        A.      That I turned to for emotional support or
25   that I -- that's what I'm getting confused with the good
```

Jessica Light

1    Q.    At what point do you start advocating in

2    regards to issues with the New Haven public schools?  Is

3    it before or after ████████ enrolled in school?

4    A.    I do not recall.

5    Q.    Do you recall ever going to a Board of Ed

6    meeting before ████████ enrolled in school?

7    A.    Not right now, no.

8    Q.    At some point, though, you started -- I

9    thought I understood your testimony before to be saying

10   that at some point you started going to and speaking at

11   Board of Ed meetings.

12   A.    Correct.

13   Q.    What year did you become an employee of

14   the New Haven public schools?

15   A.    I'm very horrible with dates, but I

16   believe it was 2009.

17   Q.    Okay.  It was after ████████ was born?

18   A.    Oh, yeah, it would have been like 2010.

19   So ████████ was born in New York.  We lived there for a

20   year.  We moved to New Haven, I finished Columbia for a

21   year.  After finishing Columbia in May, that would have

22   been in 2010, and that following school year I would

23   have begun at Davis, to the best of my math at this

24   moment.

25   Q.    Okay.  Like I said, if you don't remember

```
 1        Q.      And it was in the paper.  Sounds like an
 2  interesting photo, so that's great.
 3        A.      Unless that was perhaps ███████ and then
 4  it would be dated wrong.  I'm not positive of the dates.
 5  I just remember there was a child on my hip.
 6        Q.      We can figure out when Garth's contract
 7  was up.
 8        A.      Yes.  I apologize for the lack of year.
 9        Q.      Okay.  And after that day when you spoke
10  in favor of the superintendent, how would you describe
11  your continued involvement at Board of Ed meetings?
12                That's a poor question.  Let me phrase it
13  another way.
14                After you spoke at that meeting, how often
15  did you speak at other Board meetings?
16        A.      I'm not sure I can answer that.
17        Q.      Okay.  Do you think you generally spoke
18  once a year, five times a year, every meeting?
19        A.      I don't think that there was a pattern.  I
20  spoke when moved to.
21        Q.      Okay.  We got off on a little tangent
22  there, but I want to go back and follow up on some of
23  the individuals you named before.  Julia von Blume, who
24  is she?
25        A.      She is a scientist at Yale.  She's working
```

```
 1   with a protein called the von Blume Protein.

 2        Q.      Any idea what the von Blume Protein is?

 3        A.      That is far beyond my understanding of

 4   science.

 5        Q.      How do you know Miss von Blume?

 6        A.      She is the mother of one of my child's

 7   friends.

 8        Q.      Okay.  ██████████  friend or ████████

 9   friend?

10        A.      ██████████

11        Q.      All right.  How long have you known Miss

12   von Blume?

13        A.      A couple of years.

14        Q.      Okay.  And how did you come to know Miss

15   von Blume?

16        A.      I was asked if I would be willing to be in

17   a -- have my child -- sorry, ████████  I was asked if my

18   child would be willing to be in a learning pod with von

19   Blume's child and another child.  So then we became a

20   pod, and I went from not knowing her to being one of the

21   few people I allowed myself contact with.

22        Q.      Okay.  Let's go back.  What is a learning

23   pod?

24        A.      Because school was fully remote at the

25   time, the three families made an agreement that we would
```

Jessica Light

```
 1    host all three children at different houses on different
 2    days so that the parents would be free to work on the
 3    other days and the children would have that social
 4    interaction, and we made a commitment to be
 5    hypervigilant in terms of other exposures, besides the
 6    pod.
 7        Q.        You mentioned it was three families.  Your
 8    family, the von Blume family, and who's the third
 9    family?
10        A.        Claire Rowe and her daughter, █████, and
11    Len is her husband.
12        Q.        █████ is the child?
13        A.        Yes.
14        Q.        Rome is the last name?
15        A.        Rowe.
16        Q.        Rowe, I apologize.  And when,
17    approximately, did this learning pod start?
18        A.        So the first semester of Covid remote
19    learning, it was not in effect, but once the school year
20    began -- so █████ second grade school year began.  It
21    started then, that September or early August.
22        Q.        So late August, early September of 2020?
23        A.        Yes.
24        Q.        And how long did that learning pod system
25    remain in effect?
```

1    A.    Until the three children went back to

2 school.

3    Q.    When was that?

4    A.    I believe it was after spring break.

5    Q.    Of 2021?

6    A.    Correct.

7    Q.    How did that learning pod work out?

8    A.    Could you rephrase the question?

9    Q.    Sure.  What don't you understand about it?

10    A.    What you were asking about the learning

11 pod.

12    Q.    Sure.  Did it work out well for your

13 family, or did it not work out well?

14    A.    I think there are both advantages and

15 disadvantages to being in a learning pod.

16    Q.    What were some of the disadvantages?

17    A.    I was suddenly in a pod with two families

18 that had only been acquaintances prior, and they were

19 suddenly the only adults I allowed myself to be in

20 contact with.  So I got the opportunity to know new

21 people, but it was an instant family that comes with

22 growing pains.

23    Q.    Can you give me an example of a growing

24 pain within that family?

25    A.    Some parents have different academic

```
 1   expectations for their children than others.  So that

 2   was tricky to accommodate when we didn't know each other

 3   well.  Additionally, the von Blume family has immigrated

 4   from Germany, so there was -- while their English is

 5   fluent, there were -- there was a need for very direct

 6   discussions -- direct intentional word use, and

 7   miscommunication occurred.

 8        Q.        ▮▮▮▮▮▮  was friends with the von Blume

 9   child before the learning pod started?

10        A.        No.

11        Q.        No?

12        A.        I mean, they were aware of her and

13   acquaintances within the school, but they had never had

14   a play date outside of school.

15        Q.        How did the -- you end up with the Rowes

16   and the von Blumes?  How did that learning pod come

17   about?

18        A.        Claire Rowe knew that I lived in

19   Westville, and she also lives on the west side of town.

20   So I think we were the third family invited.

21        Q.        You said the learning pod ended in the

22   spring of 2021 when the kids returned to school; right?

23        A.        Correct.

24        Q.        Are you still in touch with the von Blumes

25   or the Rowes?
```

1    deposition?

2         A.        No.

3         Q.        Do you still socialize with Miss Melnick?

4         A.        Yes.

5         Q.        Does she know about this lawsuit?

6         A.        Yes.  It was in the newspaper.

7         Q.        Have you discussed this lawsuit at all

8    with Miss Melnick?

9         A.        Not to my recollection.

10        Q.        So sometime in August or September of 2020

11   you joined that learning pod; right?

12        A.        Yes.

13        Q.        And you said that the three families made

14   a commitment to be hypervigilant about exposure while in

15   that learning pod; right?

16        A.        Yes.

17        Q.        What did you mean by that?

18        A.        Claire Rowe is a stay-at-home mom.  She

19   agreed to only leave the house for shopping purposes,

20   other than interacting with the pod.  Her husband worked

21   at a lab at Yale, but at the time they were only -- to

22   my recollection, they were only allowing one or two

23   people on a floor at a time, so they believed that he

24   would have no exposure at that lab.

25                  Julia von Blume also worked at a lab that

1  had similar protocols and the husband, Wolf Dan Fink,

2  was a stay-at-home father, so he was only to go shopping

3  and do outdoor activities with the kids and interact

4  with the learning pod.  At the time I was teaching

5  remotely from home.  I was only going to go shopping and

6  socializing with the learning pod.  My husband, at the

7  time, was working remotely from home and he agreed to

8  the same.

9       Q.      Okay.  In that period of time some people

10  were very relaxed about going out and about during

11  Covid, others were hypervigilant.  Absent the pod and

12  these other families, where do you think you fell on the

13  spectrum?

14      A.      During that period of time, I was

15  hypervigilant.

16              I'm sorry, could you rephrase what period

17  of time you're referring to?  Obviously, the scale

18  changed over time.

19      Q.      You said during the period of time, during

20  the learning pod period of time, so August 2020 to

21  spring of 2021.

22      A.      Prior to the end of -- I'm sorry, I cut

23  off your question.

24      Q.      During that learning period of time, the

25  only social contact that you had was with the other

```
 1        A.        I remember that it was more than 12.
 2        Q.        Do you remember if it was almost all of
 3   them?
 4        A.        It was not almost all of them.
 5        Q.        At that point in time -- explain to me how
 6   it worked at that time.  Some of your students were
 7   back, some of your students were remote.  How did you go
 8   about your day?
 9        A.        Right.  That speaks to why I did not view
10   it as a great experience.  I didn't perceive it to be a
11   great experience for my children, as well.
12             The desks were separated 6 feet apart, or
13   were supposed to be.  And children were to remain at
14   their seats on their Chromebooks while the teacher
15   taught remotely to the children at home and also
16   interacted with the kids in the classroom, but was also
17   to remain 6 feet away from the children.
18             So, as described, following protocols from
19   the Board of Ed felt like a large learning pod itself,
20   because we were still essentially teaching remotely with
21   children in our room that we weren't allowed to like
22   come up and lean in and talk to them quietly and give
23   them separate help.  It was not a typical classroom
24   setup with the typical pros of in-person learning.  At
25   least not all the pros of in-person learning.
```

 1   individuals who you spoke to or kind of shared your same

 2   level of concern?

 3        A.      Beth Hart, Paul Salem.

 4        Q.      Anyone else?

 5        A.      Laurie Guiazda.

 6        Q.      Can you spell that?

 7        A.      No.

 8                   MR. MURPHY:  Can you?

 9                   MS. GETHINGS:  G-u-i-a-z-d-a.

10        A.      Beth Mitchell.  And I believe there were

11   others, but they are not coming to mind at the moment.

12        Q.      A few questions about Worthington Hooker,

13   and then we'll take a break.

14                   Was Worthington Hooker the first school

15   you were assigned to in New Haven?

16        A.      No.

17        Q.      Where did you work first?

18        A.      Davis Street Interdistrict Magnet School.

19        Q.      What grades are at Davis Street?

20        A.      Pre-K through 8.

21        Q.      What position did you hold there?

22        A.      I moved grades.

23        Q.      What grades did you teach at Davis Street?

24        A.      4th through 6th.

25        Q.      Okay.  How long were you at Davis Street?

1  Approximately.

2        A.        Five years.

3        Q.        Where did you go next?

4        A.        Worthington Hooker.

5        Q.        What was the first grade level you taught

6  there?

7        A.        Third.

8        Q.        Why did you move from Davis Street to

9  Worthington?

10        A.        Worthington was known as an incredible

11  school within the district.  Additionally, they

12  departmentalized the 5th grade that I was teaching, and

13  I wanted to not be a middle school teacher but an

14  elementary school teacher, and there were other personal

15  reasons.

16        Q.        What were those personal reasons?

17        A.        The desire for a change.  The desire to be

18  reinvigorated by a change at a school that did not have

19  the issues of poverty so prevalent in the population.

20        Q.        The population at Davis Street was poor?

21        A.        It was a very mixed community.

22        Q.        But there were issues with poverty.  Is

23  that what you were saying?

24        A.        There were issues with poverty at Davis

25  Street school, yes.

1    accurate than my memory.

2         Q.      What does your son have a 504 Plan for?

3         A.      Anxiety due to a physiological condition.

4         Q.      What is that condition?

5         A.      Dyslexia.

6         Q.      Is it for anything else?  Does this 504

7    Plan relate to anything, other than anxiety and

8    dyslexia?

9         A.      No.

10        Q.      And that's for █████████

11        A.      █████████

12        Q.      Tell me about the January 11, 2021 Board

13   meeting, what you remember about that.

14        A.      I remember that one of my main concerns

15   was that we were told that the vaccines were coming so

16   soon, so it didn't -- with the vaccines just around the

17   corner, it made sense to get people vaccinated prior to

18   beginning in-person learning.

19        Q.      Okay.  Anything else you remember about

20   what you said at that meeting?

21        A.      I do not remember which things I said, so

22   I'm afraid of giving comments to the wrong meeting.

23        Q.      You know there's minutes to those

24   meetings?

25        A.      Yeah, recorded.  There are video

```
1    teacher in the building.  Additionally, Miss Gethings,
2    in her e-mail to me, believes that I had gone to the
3    bathroom to change for running club when, in fact, I had
4    gone to the restroom and changed my shirt.
5          Q.    Why did you change your shirt?
6          A.    Because I was on my period, and I wanted a
7    longer shirt.
8          Q.    There was no running club that day?
9          A.    There was running club that day.
10          Q.    Were you getting changed for running club?
11          A.    No.
12          Q.    You've gone all day, you went to the
13    bathroom at the very end of the day as dismissal was
14    occurring, and that's were you saw Phyllis; right?
15          A.    No.
16          Q.    Isn't that what you just testified?
17          A.    Prior to dismissal, I desperately needed
18    to use the restroom.  I waited at my door until an adult
19    was able to supervise my class, at which point I saw
20    Kyle Miller, who came to supervise my class, and I went
21    to the restroom to use the restroom and take care of the
22    fact that I was on my period and had not been able to
23    use the restroom in time.
24          Q.    What does that have to do with your
25    changing your shirt?
```

1      Q.      Okay.  You submitted a complaint to human

2  resources, and that complaint was about Principal

3  Gethings and Mrs. Clarino; correct?

4      A.      Yes.

5              (Whereupon, the Complaint Written by

6  Jessica Light, Defendant's Exhibit 2, was marked for

7  Identification.)

8      Q.      I'm handing you what is marked as

9  Defendant's Exhibit 2.  Is that the complaint you

10  submitted?

11      A.      It appears to be, yes.  I haven't read it.

12      Q.      You don't have any reason to doubt that

13  this is the complaint that you submitted?

14      A.      No.

15      Q.      And you submitted this complaint because,

16  in the second full paragraph on page 1, you believed you

17  had been retaliated against in certain ways; right?

18      A.      Yes.

19      Q.      And in that second full paragraph you list

20  7 different ways in which they allegedly retaliated

21  against you; correct?

22      A.      I haven't counted them.

23      Q.      I'll give you a second.  If you look

24  towards the end, it says 7, they moved me from teaching

25  third grade to teaching first grade in the first year.

```
 1        A.      Yes.

 2        Q.      If you read that whole paragraph, it says

 3   1st, 2nd, 3rd, 4th, 5th, 6th, 7th.

 4        A.      Yes.

 5        Q.      This is a 12-page document; right?

 6        A.      Eleven.  No, 12.

 7        Q.      A 12-page document.

 8                How long do you think it took you to

 9   create this document?

10        A.      A long time.

11        Q.      You put a lot of effort into it?

12        A.      Yes.

13        Q.      And why did you do that?  Not why did you

14   submit the complaint, but why did you do such a thorough

15   job?

16        A.      I tried to always do a thorough job with

17   anything that I do.

18        Q.      Okay.  And was it important to you to list

19   all the various ways you thought you were being

20   retaliated against?

21        A.      Yes.

22        Q.      And did you do that in paragraph 2 there?

23        A.      Yes.

24        Q.      And as a result of this complaint,

25   ultimately the school district hired Berchem & Moses to
```

Jessica Light

```
 1   retaliation, that they were -- pressured you to stop or

 2   modify your public speech regarding the school

 3   district's response to the Covid-19 pandemic?

 4        A.     The paragraph that you were referring to

 5   is an analysis of the November 2nd meeting.  Berchem &

 6   Moses determined that in isolation when looking at the

 7   November 2nd meeting, it was not enough to constitute

 8   retaliation for public speaking.

 9        Q.     They found there was no retaliation for

10   your public speech in regards to your first alleged

11   incident of retaliation; right?

12        A.     No.

13        Q.     If you could flip to page 24 of the

14   report.

15        A.     (Witness complies.)

16        Q.     At the very bottom of page 23, there's a

17   section that starts out --

18        A.     23 or 24?

19        Q.     At the very bottom of page 23, there's a

20   section that starts, "Findings of Retaliatory Conduct".

21   Do you see that?

22        A.     Yes.

23        Q.     On then page 24 it was four different

24   bullet points where Berchem & Moses believed there was

25   retaliatory conduct; right?
```

1    A.    Yes.

2    Q.    And within those four bullet points

3    there's no findings that you were pressured to stop or

4    modify your public speech regarding the school

5    district's response to the Covid-19 pandemic; correct?

6    A.    Would you restate the question?

7    Q.    Sure.  There's four bullet points that

8    highlight what Berchem & Moses believe was retaliatory

9    conduct; right?

10    A.    Yes.

11    Q.    What do those four bullet points relate

12    to?

13    A.    The situation with teacher X, the

14    situation with Miss Phyllis, the situation with Mr.

15    Salem, the situation with Mr. Shortt.

16    Q.    And none of those four situations have to

17    do with you speaking at Board meetings or being

18    pressured to stop your speech at Board meetings.

19    A.    Correct.

20    Q.    Okay.  And so going back to my original

21    question, you raised that concern in your complaint,

22    Berchem & Moses did not include it in their list of

23    alleged retaliatory conduct.  Are you still claiming

24    retaliation in regards to being pressured to stop or

25    modify your public speech in regard to the Board's

```
 1   complaint, the only one Berchem & Moses substantiated,
 2   in their opinion, was the 2nd and the 4th grounds;
 3   right?
 4        A.      Yes.
 5        Q.      And that they added in the comments to
 6   Miss Phyllis and the comments to Mr. Shortt?
 7        A.      They added in?
 8        Q.      Meaning those were included in the
 9   retaliatory conduct section, as well; right?
10        A.      After the complaint was submitted, yes.
11        Q.      Because those discussions happened after
12   the complaint was submitted?
13        A.      Yes.
14        Q.      So of the four bullet points, two are
15   included in your complaint and then two occurred after
16   your complaint was filed?
17        A.      Yes.
18        Q.      Looking at page 24 of Exhibit 3, the first
19   bullet point relates to the situation with Teacher X;
20   correct?
21        A.      Yes.
22        Q.      And Berchem & Moses said that you were
23   "accused of leaking confidential information regarding
24   Teacher X, based on speculation brought on by her
25   protected speech and the view that she was vocal."
```

Jessica Light

1    Correct?

2        A.      Yes.

3        Q.      In regards to that situation with Teacher

4    X, you weren't suspended or disciplined; correct?

5        A.      Correct.

6        Q.      Regarding the second bullet point

7    addressing Miss Phyllis, that bullet point relates to a

8    discussion between Principal Gethings and Miss Phyllis;

9    right?

10       A.      Yes.

11       Q.      At no time were you disciplined for going

12   to the bathroom and leaving Miss Phyllis in the

13   classroom?

14       A.      I have never been formally disciplined.

15       Q.      Same question with the third bullet point

16   where it talks about documents being left on Mr. Salem's

17   printer.  Now, you weren't disciplined or suffered any

18   other adverse employment action with regard to that

19   bullet point; right?

20       A.      Adverse employment action?

21       Q.      Yeah.

22       A.      I'm not sure on that.

23       Q.      Did that bullet point -- anything relating

24   to that bullet point affect your pay or your discipline

25   history or anything of that nature?

1    A.      It did not affect my pay or discipline.

2    Q.      Did it affect anything in regards to your

3  employment?

4    A.      Yes.

5    Q.      What did it affect?

6    A.      My relationship with Mr. Salem, my trust

7  of the administration, my feelings of safety at work,

8  and my ability to perform my job to the best.

9    Q.      You remain employed to this day?

10   A.      Yes.

11   Q.      The same salary level or higher than you

12 had at the time?

13   A.      Yes.

14   Q.      And you're a member of a union?

15   A.      Yes.

16   Q.      All teachers in New Haven are a member

17 of -- well, withdrawn.

18           As a member of the union, you're subject

19 to the collective bargaining agreement between the

20 Teacher's Union and the Board of Education?

21   A.      Yes.

22   Q.      And that governs the conditions of

23 employment for teachers?

24   A.      Some of them.

25   Q.      It governs your pay, it has a disciplinary

1    process set forth in it?

2        A.    Yes.

3        Q.    You can only be fired if the District goes

4    through the 10-151 process?

5        A.    I've not heard that term before.

6        Q.    Well, that's a good thing.  As you said

7    before, you've never been disciplined; right?

8        A.    Not formally.

9        Q.    What do you mean by that?  Is there

10   informal discipline in the district?

11       A.    I believe so.

12       Q.    What is that?

13       A.    Using this administration, where you're

14   warned or scolded for actions, e-mails sent letting you

15   know of disapproval of actions, would be informal

16   discipline.

17       Q.    Okay.  If you had informal discipline

18   against you, that would be governed by the terms of the

19   Collective Bargaining Agreement; right?

20       A.    I'm not sure.

21       Q.    All right.  And the 4th bullet point on

22   page 24 relates to an alleged conversation with Mr.

23   Shortt; right?

24       A.    Yes.

25       Q.    And that conversation didn't involve you,

1   particular?

2          Q.      Fine, we can break it down.

3                  With your colleagues, have there been any

4   difficulties with your colleagues at your new school?

5          A.      No.

6          Q.      How's it going within your classroom?

7          A.      The students within my classroom are in

8   the 2nd grade and, on average, are performing at a

9   kindergarten level.  There are significant challenges

10  daily, but it's rewarding.

11         Q.      Okay.  What impact, if any, did the

12  transfer to the new school have on your home life?

13         A.      I have less time to spend with my

14  children, I have had to invest a lot financially to set

15  up my classroom, which takes away from my family.  I

16  have been dealing with the stress of losing my community

17  and trying to rebuild that, so I've had to invest a

18  significant amount of my mental, emotional, and actual

19  time in the process of getting used to a new job, which

20  has affected them greatly.

21                 And my youngest is still at Worthington

22  Hooker, which has led to some emotional strain, given

23  that they're sometimes asked questions as to why I'm not

24  there.  And I'm less able to advocate for my child as a

25  parent due to this past history, and I don't feel

1    from giving out your personal cellphones?

2         A.       No.

3         Q.       We discussed briefly your complaints about

4    some committees at the school; right?

5         A.       Yes.

6         Q.       Were any of those paid or stipend

7    positions?

8         A.       The training for some of the positions

9    were, but the actual position was not.

10        Q.       So at one point you had a gardening club;

11   is that right?

12        A.       Gardening committee, yes.

13        Q.       And you didn't receive any money when you

14   headed the gardening committee; right?

15        A.       Correct, I paid a lot of money.

16        Q.       Prior to speaking at the Board meetings in

17   the 2020/2021 school year, do you recall receiving a

18   memo from your Union outlining what may be protected

19   speech and what may not be protected speech?

20        A.       Yes.

21        Q.       So you remember receiving that at the

22   Board meetings?

23        A.       Yes.

24        Q.       So you remember knowing at that time that

25   certain conduct might not be protected from discipline?

Jessica Light

```
 1        A.       Yes.

 2        Q.       Again, you were never disciplined in this

 3   case?

 4        A.       Never formally disciplined.

 5        Q.       Okay.  Did anyone from the Union ever tell

 6   you that you or other teachers getting up to speak at

 7   the Board of Ed was interfering with the Union's

 8   relationship with the Administration?

 9        A.       Quite the opposite.

10        Q.       What was it like -- withdrawn.

11                 Would you agree that, as we talked a

12   little bit about before, the 2020/'21 school year was

13   more stressful than prior years due to the ongoing Covid

14   pandemic?

15        A.       Was the 2020/'21 school year, as a whole,

16   more stressful due to the Covid pandemic?

17        Q.       Yes.  Than the prior years that you were a

18   teacher.

19        A.       At that point the stress of the

20   retaliation was already existent.

21        Q.       2020/2021 school year started out with all

22   teachers teaching remotely; right?

23        A.       Yes.

24        Q.       As we talked about.  And all the students

25   were remote, too; right?
```

1        A.      Yes.

2        Q.      Why did you send this to Dave?

3        A.      I would have to read the rest of it.  We

4   really needed a unified health plan or at least an

5   answer to our best practice questions.

6        Q.      Okay.  And when you read this e-mail, does

7   that match up with your memory?  Do you remember being

8   anxious and exhausted when the kids returned to

9   Worthington Hooker?

10       A.      Yes.

11       Q.      On the third full page, the bottom is a

12  Bates number of 2461.  Do you see that?  One more page

13  over.

14       A.      Okay.

15       Q.      So 2461 is a series of text messages

16  between you and someone else; right?

17       A.      Sara Miller.

18       Q.      Are you the light gray text or the dark

19  gray text?

20       A.      Typically, the person who's phone it is is

21  the one on the right side.

22       Q.      The darker one?

23       A.      Yes.

24       Q.      That's what I understand, is that the

25  darker ones are your texts.  So this is a text message

1  that I can."  That really weighed on you; right?

2      A.    Yes.  Otherwise, I wouldn't have spoken.

3      Q.    On page 2498, can you flip to that?

4      A.    (Witness complies.)

5      Q.    Now, 2498 had some additional text

6  messages between you and Miss Miller; right?

7      A.    It appears so, yes.

8      Q.    And these are from February and March of

9  2021; right?

10      A.    Yes.

11      Q.    And it starts at the top of the page with

12  you saying, "There are two teachers positive at Hooker I

13  heard through the grapevine only but then confirmed with

14  actual teachers."  Right?

15      A.    Yes.

16      Q.    "I do not want to step on anyone's privacy

17  so it becomes difficult to make sure they are reflected

18  in numbers."  Because you, as a teacher at Worthington

19  Hooker, would not be told who, specifically, had Covid

20  if one of the teachers came down with it at that period

21  of time; right?

22      A.    Please restate the question.

23      Q.    Sure.  That you were a teacher at

24  Worthington Hooker in late February of 2021; right?

25      A.    Yes.

```
 1        Q.      And if another teacher at Worthington
 2   Hooker contracted Covid at that time, you would not have
 3   been told what teacher that was; right?
 4        A.      I was not told that there was a teacher.
 5        Q.      That's not my question.  My question is --
 6        A.      I would not have been told which teacher
 7   had Covid, just that there was exposure.
 8        Q.      Right.  But you heard there were two
 9   teachers that were positive at Hooker, and the next text
10   down you state, "No one, not even staff, were told
11   officially, but when I heard through the grapevine, I
12   asked the individuals to confirm and they both did."
13   Explain that text.
14        A.      What's your question?
15        Q.      Sure.  The way I understand it, you heard
16   there were people who had Covid, other teachers who had
17   Covid, you weren't given their names from the school but
18   you -- officially, but you heard who they were, so you
19   called them to confirm and they both did.
20        A.      I did not call them.
21        Q.      How did you find out?
22        A.      One of -- both of the teachers were my
23   friends on Facebook.  One of the teachers posted openly
24   about it on Facebook.  The other, I asked are you okay
25   in an e-mail and she responded yes, I'm recovering from
```

```
 1   Covid.
 2        Q.      Okay.  And so why did you feel the need
 3   to -- well, one posted it on Facebook; right?
 4        A.      Yes.
 5        Q.      Why did you feel the need to reach out to
 6   the other one?
 7        A.      She had been in my classroom.  She had
 8   been in my classroom, and had I known at the time of her
 9   diagnosis of Covid, I would have moved to a hotel.  I
10   was just concerned that I wasn't getting information in
11   a timely way to be able to make safe decisions for my
12   family, and I didn't want to have lied to the members of
13   my pod, because I told them that I would move to a
14   hotel.
15        Q.      Why are you discussing this with Miss
16   Miller?
17        A.      Because the dashboard of information was
18   removed from New Haven Public Schools website and --
19        Q.      Not at that time, though; right?
20        A.      I believe it says -- they were trying to
21   figure out a way to somehow improve the dashboard
22   accounting of cases so that parents and teachers could
23   make informed decisions and -- yeah.
24        Q.      But why -- Miss Miller doesn't teach at
25   Worthington Hooker; right?
```

1    A.    No.

2    Q.    She has no kids at Worthington Hooker;

3  right?

4    A.    Yes.

5    Q.    Why are we discussing whether two teachers

6  have Covid at Hooker with Miss Miller?

7    A.    Because we are trying to determine if the

8  information on the dashboard is correct.  I assume --

9  she says, "I assume the exclusion is intentional, not an

10 oversight."  So there was a lot of fear within the

11 district that the dashboard was not accurate, people

12 were trying to get an accurate accounting to make the

13 most informed decisions for the families.

14   Q.    The text we were just reading says, "We

15 weren't told officially, but when I heard through the

16 grapevine I asked the individuals to confirm and they

17 did."  But you told me before that one of them posted on

18 Facebook.  Doesn't that seem inconsistent with this

19 text?

20   A.    Text is an informal form of communication,

21 so I -- one of the teachers confirmed -- I knew through

22 Facebook, and one of the teachers I heard through the

23 grapevine.

24   Q.    Did you ever discuss Teacher X's diagnosis

25 with either of the other families in your learning pod?

Jessica Light

1              C E R T I F I C A T E

2    UNITED STATES DISTRICT COURT

3    DISTRICT OF CONNECTICUT

4

5

6              I, DEBRA A. CHASSE, Court Reporter and
     Notary Public within and for the State of Connecticut,
7    duly commissioned and qualified, do hereby certify that
     pursuant to Notice, JESSICA LIGHT, the deponent herein,
8    was by me first duly sworn to testify the truth, the
     whole truth and nothing but the truth of her knowledge
9    touching and concerning the matters in controversy in
     this case; that she was thereupon carefully examined
10   upon her oath and her testimony reduced to writing by
     me; and that the deposition is a true record of the
11   testimony given by the witness.

12             I further certify that I am neither
     attorney or counsel for, nor related to or employed by
13   any of the parties to the action in which this
     deposition is taken, and further that I am not a
14   relative or employee of any attorney or counsel employed
     by the parties thereto or financially interested in the
15   action.

16             IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my notarial seal this 2nd day of
17   January, 2023.

18                                  _____

19                                  Debra A. Chasse, CSR
                                    Notary Public
20                                  State of Connecticut

21

22   My Commission Expires:
     June 30, 2026
23   CSR No. 00055

24

25