**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

**JESSICA LIGHT**                                          CIVIL ACTION NO:
                                                                           3:22-CV-00425 (JAM)
          **Plaintiff,**

  **v.**

**NEW HAVEN BOARD OF EDUCATION &**
**MARGARET-MARY GETHINGS in her**
**individual capacity**

          **Defendants.**                                 **AUGUST 31, 2023**

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and D. Conn. L. Civ. R. 7 and 56, the Plaintiff, Jessica Light, hereby objects to the defendants' motion for summary judgment on the grounds that genuine issues of material fact exist, and the defendants are not entitled to judgment as a matter of law.

**I.        INTRODUCTION**

The COVID-19 pandemic has had a profound and widespread impact, causing serious illness and death on a global scale. Its rapid spread and high transmission rate strained healthcare systems and necessitated unprecedented measures to mitigate its effects, particularly in 2020 and 2021. Plaintiff, a public-school teacher and parent of two minor children, filed this lawsuit in March 2022. The relevant timeframe in which Plaintiff's claims arose is late 2020 through early 2022. Plaintiff's Amended Complaint sets forth claims for retaliation in violation of the First Amendment of the United States Constitution enforceable under 42 U.S.C. § 1983 and Conn. Gen. Stat. ("C.G.S.") § 31-51q, as well as claims for false light and defamation.

Upon the completion of discovery, defendants initiated the instant motion for summary judgment as to all counts. Plaintiff hereby opposes defendants' motion for summary judgment in all respects.

## II.    **FACTUAL BACKGROUND**

Plaintiff is a longstanding teacher with the New Haven Board of Education. Am. Compl. at ¶ 1. Defendant Margaret-Mary Gethings ("Ms. Gethings" or "Defendant Gethings") was the Principal at Worthington Hooker School ("WHS"), a public elementary school located in the City of New Haven. Am. Compl. at ¶ 5. During the relevant time period, Plaintiff was a teacher at WHS and a parent to elementary school children attending WHS. Am. Compl. at ¶ 8; *see also* Light Aff. ¶ 5.

On or about March 16, 2020, Governor Lamont ordered all schools closed due to the COVID-19 pandemic. Light Aff. ¶ 4. The 2019-2020 school year at WHS concluded on June 22, 2020. *Id.* at ¶ 6. Plaintiff attended and spoke at a meeting held by Defendant New Haven Board of Education ("Defendant NHBOE" or "NHBOE") on July 21, 2020. *Id.* at ¶ 7. She asked Superintendent, Dr. Iline Tracey ("Dr. Tracey"), to reopen schools only if she felt it was safe to do so. *Ibid*. A colleague, who shared Plaintiff's concerns, also spoke at this meeting. *Ibid*.

On or about July 23, 2020, Plaintiff participated in a "car caravan," which was organized by the New Haven Public School Advocates in Hartford, Connecticut. *Id.* at ¶ 8. A reporter at WTNH interviewed Plaintiff regarding her opinion as to the reopening of schools. *Ibid*. Plaintiff wanted schools to reopen, but only if they were fully funded and safe for everyone who entered the buildings, including herself and her children. *Ibid*. As was commonly done by individuals in the public during the pandemic, Plaintiff posted about the car caravan on her Facebook page. *Ibid*. Several days later, on or about July 29, 2020, a reporter at WFSB-3 interviewed Plaintiff. *Id.* at ¶ 9. During the interview, Plaintiff advocated for the safe reopening of schools. *Ibid*. On or about July 30, 2020, Plaintiff participated in a second "car caravan," which was organized by the New Haven Teacher's Union. *Id.* at ¶ 10. A reporter at NBC-CT interviewed Plaintiff. Plaintiff posted about the car caravan on her Facebook page. *Ibid*.

On August 24, 2020, the NHBOE decided to continue remote classes only. *Id.* at ¶ 11. Plaintiff's youngest child was in a learning pod to start the 2020-2021 school year. *Id.* at ¶ 12. Claire Rowe, an Officer of the Parent Teacher Association for WHS, and her family had serious concerns about COVID-19 and the risk of exposure. Affidavit of Claire Rowe ("Rowe Aff.") ¶¶ 3-4. Her daughter was entering second grade at WHS for the 2020-2021 school year. *Id.* at ¶ 5. Mrs. Rowe invited Wolfgang Fink, Co-President of the Parent Teacher Association for WHS, and his family and Plaintiff and her family to be part of a learning pod. *See* Rowe Aff. ¶ 6; Affidavit of Wolfgang Fink ("Fink Aff.") ¶¶ 3-6; Light Aff. ¶ 12. The parents in this pod, including Plaintiff, did not provide academic instruction. Light Aff. ¶ 12. Plaintiff never shared school-based decisions about COVID-19 with anyone in her learning pod nor requested others in her learning pod to question the administration at WHS about safety measures taken at the school. Rowe Aff. ¶¶ 11-12; Fink Aff. ¶¶ 11-12.

While trying to decide whether to return their children to school or remain remote, Plaintiff and her husband attended a city-wide parent information meeting in October 2020. Light Aff. ¶ 13. At the meeting, Plaintiff asked a question about reopening schools for in-person learning. *Ibid.* Shortly thereafter, at the NHBOE meeting on October 26, 2020, Plaintiff spoke about the challenges of the hybrid teaching model. *Id.* at ¶ 14. Two days later, the Yale Daily News quoted Plaintiff, as well as others, in an article titled: "Community members divided on NHPS plan as reopening date looms." *Ibid.* Ultimately, the City of New Haven and/or the NHBOE decided to cancel plans to reopen schools. *Id.* at ¶ 15.

On November 2, 2020, Plaintiff attended a virtual meeting with Misses Gethings and Clarino about Plaintiff's older child's 504-plan accommodations. *Id.* at ¶¶ 16-17. During the meeting, Ms. Gethings informed Plaintiff that the NHBOE leadership reprimanded her for the

question Plaintiff asked at the city-wide parent meeting. *Id.* at ¶ 16. In retaliation, Misses Gethings and Clarino admonished Plaintiff for her comments at the meeting. *Ibid.*

On January 11, 2021, Plaintiff attended a NHBOE meeting at which she voiced her disagreement with the anticipated return to full, in-person instruction, given that a vaccine would be available soon. *Id.* at ¶ 19. Elementary schools reopened for full, in-person learning on January 19, 2021. *Id.* at 20. On February 22, 2021, Plaintiff attended a NHBOE meeting during which she urged the NHBOE to adopt a unified district wide policy regarding COVID-19. *Id.* at ¶ 22.

On or about March 6, 2021, as a concerned parent of children at WHS, Plaintiff commented on a Facebook post that displayed student data of reported COVID-19 cases within the school district. *Id.* at ¶ 26. WHS was listed as a school with at least 1 – but no more than 5 – positive case. *Ibid.* Plaintiff did not comment in her capacity as a teacher. *Ibid.* Plaintiff's comments referred to the fact that as a parent of children at WHS, she did not receive a "parent letter" if there was a reported case at the school per the chart. *Ibid.*

Several days later, on March 9, 2021, Plaintiff was required to attend a 90-minute meeting with Misses Gethings and Clarino during which they accused her of "leaking" a teacher's COVID-19 diagnosis ("Teacher X"). *Id.* at 27. They also claimed to have evidence but refused to share it with her. *Ibid.* The meeting was followed by Ms. Gethings sending a school-wide email on March 12, 2021 stating, in relevant part, "It has been brought to our attention from several community members including staff and parents that WHS is being mentioned with inaccurate information which also includes social media. . . ." *Id.* at ¶ 28. The email was sent in direct response to Plaintiff's Facebook comments, painting Plaintiff in a false light, as if she had posted "inaccurate information," which was false. *Ibid.*

On March 22, 2021, Plaintiff attended a NHBOE meeting. *Id.* at ¶ 30. Plaintiff raised questions about the lack of consistency in COVID-19 safety rules across the district and the

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

challenges of enforcing safety protocols. *Ibid*. Shortly thereafter, on March 26, 2021, Plaintiff attended her mid-year TEVAL meeting with Misses Gethings and Clarino. *Id.* at ¶ 31. During the meeting, Plaintiff was warned that Teacher X was going to file a complaint against Plaintiff for "leaking" her COVID diagnosis to the community. *Ibid*. Plaintiff immediately denied that she was the source of the "leak." *Ibid*. At the meeting, Ms. Gethings informed Plaintiff that she planned to reassign Plaintiff to another grade. Plaintiff requested a move to a higher grade level. *Ibid*.

On March 31, 2021, Plaintiff attended a meeting with Teacher X and Misses Gethings, Clarino, and Morrison. *Id.* at ¶ 32. Without any proof whatsoever, Misses Gethings and Clarino accused Plaintiff of leaking Teacher X's COVID-19 diagnosis. *Ibid*. During the meeting, Ms. Gethings falsely stated: "We hear that you are saying it wasn't you but I need you to know that every person said you were the source." *Ibid*. Contrary to Ms. Gethings' statement, Teacher X did not name Plaintiff as the source of the leak to Ms. Gethings. Gethings Dep. 36 (Exhibit E). Teacher X's status was widely known. *Id.* at ¶ 23; *see also* Rowe Aff. ¶¶ 10-11.

Two days after the meeting, on April 2, 2021, Plaintiff received her TEVAL from Ms. Gethings, which included the following comment: "As we discussed in your mid year please consider asking questions any time you have a concern, if we do not have the answer we will do our best to attain the answer." Light Aff. ¶ 33. This statement was a direct response to Plaintiff having spoken to the Board of Education on March 22, 2021, and at the March 26, 2021 meeting with Misses Gethings and Clarino. *Ibid*.

On April 19, 2021, Plaintiff's child returned to in-person learning at WHS. *Id.* at ¶ 34. The next day, Plaintiff met with Ms. Gethings and Dave Cicarella, President of the New Haven Teachers Union. *Id.* at ¶ 35. The purpose of the meeting was to discuss the unfair and hostile prior meetings, to clear the air, and to end Ms. Gethings concerns. *Ibid*. During this meeting, Ms.

Gethings admitted that she saw Plaintiff speak at every NHBOE meeting. *Ibid*. Later, Ms. Gethings admitted discussing Plaintiff's public comments with others. *Ibid*.

On or about April 26, 2021, Plaintiff's union informed Ms. Gethings that she intended to file a complaint. *Id.* at ¶ 36. In response, Ms. Gethings advised Mr. Cicarella that Ms. Alden intended to file a complaint against the Plaintiff. *Ibid*. Further, one day later, on April 27, 2021, Ms. Gethings officially reassigned Plaintiff from the third-grade to the first-grade for the upcoming 2021-2022 school year, despite Plaintiff requesting a higher grade if reassignment was necessary.[1] *Id.* at ¶ 37.

On April 30, 2021, Plaintiff submitted her initial complaint to the NHBOE Human Resources department. *Id.* at ¶ 39. Ms. Gethings obstructed the investigation of Plaintiff's complaint when she contacted a potential witness, Douglas Jones. *Id.* at ¶ 41; Plaintiff's Rule 56(a)(2) Statement of Facts ("Pl.'s SOF") § B, ¶ 16.

On May 10, 2021, Ms. Alden filed a complaint against Plaintiff. Light Aff. ¶ 40. On May 25, 2021, Plaintiff asked another teacher, Kyle Miller, to cover her class so she could use the restroom. *Id.* at ¶ 42. Ms. Maffuid saw Plaintiff entering the restroom and offered to assist by watching Plaintiff's class. *Ibid*. Despite no policy violation for the assistance by Ms. Maffuid, Ms. Gethings reprimanded her for helping Plaintiff. *Ibid*.; Gethings Dep. 100 (Exhibit E).

On or about May 26, 2021, Ms. Clarino solicited an email from Vicki Grubaugh regarding Plaintiff's public comments. *Id.* at ¶ 43; Clarino Dep. 96 (Exhibit H); and Doc. No. 1-1, p. 5 of 26. On June 7, 2021, Misses Gethings and Clarino filed a document entitled "retaliatory complaint," which accused Plaintiff of fabricating evidence, creating a hostile work environment, and undermining the administration. Light Aff. ¶ 44. Defendant NHBOE hired Berchem Moses to

---

[1] By March 2021, Ms. Gethings had served as the WHS Principal for approximately 3 years. Gethings Dec. ¶ 3. This was the first time she reassigned a teacher for having a child in the same grade. Gethings Dep. 228.

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

conduct/overtake the investigations because Ms. Bonner discovered information in Misses Gethings and Clarino's retaliatory complaint that she found professionally concerning. *Id.* at ¶ 44; Pl.'s SOF § B, ¶ 16. As a result, she brought it to the attention of her supervisor, and they "brainstormed" the best way to move forward in light of the concerns she had. Pl.'s SOF § B, ¶ 16.

Berchem Moses attorney, Paul A. Testa, completed the investigation of the "retaliatory complaint" against the Plaintiff. Light Aff. ¶ 44. Attorney Testa concluded that, "[w]hile her comments clearly displayed fear, the investigation found no evidence that they actually caused any meaningful disruption in the school environment. Further . . . the fact that a parent asks questions about COVID safety is not evidence that Ms. Light [funneled] information to [others]." *Ibid.* Likewise, Berchem Moses attorney, Christopher R. Henderson, completed the investigation of Ms. Alden's Complaint for Defendant NHBOE in or around December 2021. *Id.* at ¶ 40. Attorney Henderson concluded that, "[b]ased on the evidence, there is no violation of Board policies on harassment or 'discourteous, offensive or abusive language or conduct towards other employees, students or the public.'" *Ibid.*

Fifty-five days after her original complaint Plaintiff became concerned with the amount of time it was taking to complete the investigation. *Id.* at ¶ 45. A telephone conversation with WHS employee Taryn Bonner revealed that the investigation was delayed because Ms. Gethings tainted one or more witnesses. *Ibid.* During the investigations, Plaintiff continued to report additional instances of retaliation to Ms. Bonner and/or directly to Attorney Goldberg. *Id.* at ¶ 47.

On or about August 24, 2021, Mr. Salem reported to Plaintiff that he found documents on his printer that included emails from Plaintiff's husband to Misses Gethings and Clarino about Plaintiff's child, who was a student at WHS in Ms. Alden's class. *Id.* at ¶ 46; Doc. No. 1-1, p.16-17 of 26.

As Plaintiff's stress and anxiety continued to increase due to the adverse employment actions and retaliation that she continued to encounter, at the advice and approval of her health care providers, she began a period of approved family and medical leave beginning on November 1, 2021. Light Aff. ¶ 48.

On December 3, 2021, Plaintiff received copies of the Berchem Moses investigation reports prepared by Attorneys Goldberg, Testa and Henderson, which concluded that Plaintiff did not do anything wrong. *Id.* at ¶ 49. On the other hand, Attorney Goldberg found that the WHS administrators retaliated against Plaintiff in the following ways: (a) the handling of the Teacher X situation, (b) the reprimand given to Ms. Maffuid for watching my class during dismissal, (c) the documents that mysteriously ended up on Mr. Salem's printer, and (d) the negative commentary made about me to Mr. Shortt, union steward. *Ibid.* Upon receiving the results of the investigations, Plaintiff proposed next steps and continued to inquire about ways to correct misinformation propagated by Misses Gethings and Clarino to WHS staff. *Id.* at ¶¶ 50-53.

Without any answers or apologies, on January 18, 2022, Ms. Bonner sent Plaintiff correspondence demanding that she return to work or be subject to disciplinary action. *Id.* at ¶ 54. Likewise, one day later, on January 19, 2022, NHBOE Human Resources denied the union's request for administrative leave until mediation occurred and safeguards installed to prevent further retaliation or hostility. *Id.* at ¶ 55. On January 24, 2022, Plaintiff forwarded a letter from her doctor to Misses Bonner and Mack requesting no contact with Ms. Gethings or safeguards to prevent any retaliation. *Id.* at ¶ 56. Ms. Mack responded by instructing Plaintiff to make an official request for workplace accommodation. Plaintiff replied that she was simply requesting a "non-hostile workplace free from retaliation." *Ibid.*

On February 9, 2022, Plaintiff returned to work against the advice of her doctors and under the threat from Defendant NHBOE's Human Resources department. Prior to her return, Plaintiff

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

learned that Misses Gethings and Clarino intended to change her assignment to co-teacher. *Id.* at ¶ 57. The next day, Plaintiff attended a meeting with Misses Gethings and Clarino, as well as other individuals to discuss her co-teaching assignment and a letter that was going to be sent to the parents regarding her return. Light Aff. ¶ 58. Soon thereafter, Keisha Redd Hannans, the Assistant Superintendent, instructed Misses Gethings and Clarino to return Plaintiff to her original teaching assignment by March 1, 2022. *Id.* at ¶ 59. On March 1, 2022, Plaintiff resumed teaching her first-grade class. *Id.* at ¶ 60. Ms. Gethings refused to Plaintiff inform parents ahead of time. *Ibid.*

Further, on May 24, 2022, Plaintiff found a copy of a document authored by Ms. Alden entitled, "List of Concerns." Plaintiff's name was mentioned in the first sentence in public view, on the counter in front of teacher mailboxes. *Id.* at ¶ 61. On May 26, 2022, Plaintiff met with her union representative and Ms. Clarino. *Ibid.* During the meeting, she learned that a para-professional in the other first-grade class received a copy of Ms. Alden's "List of Concerns" in her mailbox. *Ibid.*

In or around July 2022, Plaintiff replied to an email from Ms. Gethings and expressed interest in an open third-grade position for the upcoming school year at WHS. *Id.* at ¶ 62. Ms. Gethings never responded to the email and later told Plaintiff that she already filled the position. *Ibid.* In mid-August, however, the position still appeared to be open so Plaintiff sent an email to Ms. Bonner expressing her interest in the position. *Ibid.* Ms. Gethings hired Madison Hartt instead of returning Plaintiff to the third-grade. *Ibid.* Ms. Gethings testified that she did not consider Plaintiff for the position because she missed too much time teaching the first-grade due to her extended medical leave.[2] Pl.'s SOF § B, ¶ 18.

In August 2022, Plaintiff found two disturbing notes in her classroom for the upcoming 2022-2023 school year. Light Aff. ¶ 63(a). The first note said, "Just do it. Just leave our school.

---

[2] Presumably in retaliation for Plaintiff exercising her rights pursuant to the FMLA.

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

You are toxic." The second note read, "Mrs. Light's To Do List. Wash hair. Leave or Just Die." *Ibid*. Plaintiff reported the notes to her union and the NHBOE Human Resources department. *Ibid*. Shortly thereafter, on August 24, 2022, Plaintiff received a text message informing her that WHS administration re-assigned the para-professional assigned to her first-grade classroom, despite nearly all first-grade classrooms in the district having a para-professional to assist the teacher. Light Aff. ¶ 63(b).

As a result, Plaintiff reluctantly accepted a transfer to Ross Woodward Classical Studies in early September 2022 due to the ongoing hostility toward her at WHS and Defendant NHBOE's failure to protect her from further retaliation. Light Aff. ¶ 63. Plaintiff has had to deal with the stress of losing her community and trying to rebuild it. She has invested "a significant amount of her mental, emotional, and actual time in the process of getting used to a new job, which has affected them greatly." Pl.'s SOF § B, ¶ 20.

## III.    STANDARD OF REVIEW

Summary judgment is a "drastic procedural weapon because [it] cuts off a party's right to present his case to the jury." *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988). A district court may grant summary judgment only if the evidence, viewed in the light most favorable to the non-movant, presents no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Samuels v. Mockry*, 77 F.3d 34, 35 (2d Cir. 1996). The burden lies with the moving party to demonstrate the absence of any genuine issue of material fact; all inferences and ambiguities are to be resolved in favor of the nonmoving party. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000); *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999).

In considering the motion, the district court must diligently review the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-

moving party. *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996). In ruling on a motion for summary judgment, the court asks not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the non-moving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "The court cannot assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001). The ultimate question is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party." *Anderson*, 477 U.S. at 250.

In the context of employment cases, the appropriateness of summary judgment is "a particularly delicate subject." *Feliciano v. Alpha Sector, Inc.*, 2002 WL 1492139 at *5 (S.D.N.Y. July 12, 2002). Summary judgment dismissal is particularly disfavored in employment cases where the employer's "intent is at issue." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). The Second Circuit has recognized that a "smoking gun" rarely exists in employment actions, and that the challenged conduct "is often accomplished by discrete manipulations and hidden under a veil of self-declared innocence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). Consequently, courts must be especially cautious in granting the drastic provisional remedy of summary judgment in a case such as this, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference sustaining the plaintiffs claim. *Belfi*, 191 F.3d at 135. Indeed, summary judgment is "ordinarily inappropriate in cases such as this where "intent and state of mind are in dispute." *Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). "[A] trial court should exercise caution when granting summary judgment to an employer where, as here, its intent is a genuine factual issue." *Id*.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

## IV.    ARGUMENT

### A.    SUMMARY JUDGMENT AS TO PLAINTIFF'S FIRST AMENDMENT RETALIATION CLAIM UNDER 42 U.S.C. §1983 MUST BE DENIED.

In Count Two, Plaintiff alleges a First Amendment retaliation claim against Defendant Gethings pursuant to 42 U.S.C. § 1983. Defendants address this claim first in their Memorandum in Support of Motion for Summary Judgment. Therefore, Plaintiff will do the same herein.

#### 1.    DEFENDANT GETHINGS VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHTS.

"[T]he Supreme Court has consistently held that while the government enjoys significant greater latitude when it acts in its capacity as employer then when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech." *Reuland v. Hynes*, 2006 WL 2391163 *3 (2d Cir. 2006), citing *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001). In order to pursue a claim of First Amendment retaliation, it is well settled that a plaintiff must establish that (1) her speech was constitutionally protected, (2) she suffered an adverse employment action, and (3) a causal connection exists between her speech and the adverse employment action, such that it can be said that her speech was a motivating factor for the adverse employment action. *Ritz v. Town of East Hartford*, 110 F. Supp. 2d 94, 102 (D. Conn. 2000) citing *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003). Contrary to the defendants' assertion, Plaintiff has presented evidence sufficient to raise issues of fact on all three elements of this claim.

#### 2.    PLAINTIFF'S SPEECH WAS CONSTITUTIONALLY PROTECTED.

Beginning in the summer of 2020, as the pandemic raged, Plaintiff, a teacher and parent of children enrolled at WHS, made several public statements and inquiries regarding the school district's response to the COVID-19 pandemic. *See* Am. Compl. ¶ 9. The statements and activity included:

   a. Participating in a car caravan with the New Haven Teacher's Union speaking openly about the need for a unified district-wide plan to reopen schools safely. Ms. Light's comments were televised.

   b. Speaking out at New Haven Board of Education meetings raising concerns over the need for a unified district-wide plan to reopen schools safely and requesting answers to COVID-19 related health and safety questions. In January 2021, Ms. Light voiced her disagreement with the anticipated return to in person instruction given that the vaccine would be available in short order. In February 2021, she urged the Board of Education to adopt a unified district wide policy regarding COVID-19. In March 2021, she raised questions about lack of consistency in COVID-19 safety rules across the district and the challenges of enforcing safety protocols.

   c. A Facebook post from March 9, 2021 where in response to a post from another New Haven public school employee displaying data of reported COVID-19 cases at Worthington Hooker, Ms. Light in her capacity as a parent to children attending Worthington Hooker, responded "I don't think letters were sent" and "Hooker never sent a letter," referring to letters notifying parents of known cases of COVID-19 at the school.

*Id*. at ¶ 10. It is undisputed that at all relevant times, Plaintiff was a parent of children attending WHS, as well as a teacher at the school. Nonetheless, the defendants ignore the fact that Plaintiff possessed dual roles, as a parent of children attending WHS and a teacher.

   a. **PLAINTIFF'S SPEECH WAS NOT RELATED TO HER JOB DUTIES.**

   Without citing to any admissible evidence, Defendants make the unsupported assertion that Plaintiff's speech was somehow related to her duties as a teacher: "All these instances of speech, therefore, relate in whole or in part to her job duties as a teacher employed by the New Haven Board of Education…" Defs' Mem. p. 11. This is nothing more than a vague, unsupported conclusory statement. There is no cite to a specific provision in Plaintiff's job duties. In fact, Plaintiff's duties never involved any policy making or formulating of COVID-19 protocols. Light Aff. ¶ 18. The fact that Plaintiff was a teacher who academically instructed children at WHS does not make the implementation and formulation of policies during an unprecedented COVID-19 pandemic part of her job duties. In *Barzilay v. City of New York*, 610 F. Supp. 3d 544, 576 (S.D.N.Y. 2022), the court stated:

In *Matthews v. City of New York*, the Second Circuit held that an officer speaking to his commanding officers about an arrest quota policy spoke as a citizen because his "policy-oriented speech was neither part of his job description nor part of the practical reality of his everyday work." 779 F.3d 167, 174 (2d Cir. 2021). The court stated that "when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee." *Id*.

Likewise, in our case, Plaintiff's speech including, but not limited to, the need for a district wide plan, requesting answers to COVID-19 protocol and policy questions and disagreement regarding the timing of the return to in-person learning was not part of the Plaintiff's specific duties as a teacher at WHS. Light Aff. ¶ 18. Further, the defendants have not cited any admissible evidence or specific job duty provisions that support their argument.

### b. **PLAINTIFF WAS SPEAKING ON A MATTER OF PUBLIC CONCERN AS A CITIZEN AND PARENT OF CHILDREN ATTENDING WORTHINGHTON HOOKER.**

Defendants do not contest that the Plaintiff was speaking as a citizen at the three Board of Education meetings. Defs' Mem. p. 11. Defendants do, however, contest that Plaintiff was speaking as a citizen at the car caravan and when she commented on a Facebook post, and therefore, claim her speech was not protected. *Id*. Contrary to defendants' argument, the Supreme Court has recognized a First Amendment interest in posting on social media. *See Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). While discussing *Packingham*, Judge Bryant concluded:

A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). The forum in which Plaintiff spoke does not affect the protection afforded his speech. The Supreme Court has identified "cyberspace—the vast democratic forums of the internet in general ... and social media in particular" as an important place for the exchange of views and ideas. *Id.* (internal quotation marks and citation omitted). Thus, Plaintiff's Facebook posts constitute the exercise of a protected First Amendment right. *See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019) ("As a general matter, social media is entitled to the

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

same First Amendment protections as other forms of media.") (citing *Packingham*,
137     S.     Ct.     at     1735-36).

*Woolard v. Santiago*, No. 3:19CV1256 (VLB), 2020 WL 2079533, at *5 (D. Conn. Apr. 30, 2020).
With regard to the car caravan and Facebook post, the defendants focus on Plaintiff being
identified as a teacher at the car caravan and recognized as a teacher who commented on the
Facebook post. Inconsistent with this argument, is the fact that Plaintiff was identified at the Board
meetings as a teacher at WHS, but defendants unequivocally state that they do not contest that
Plaintiff was speaking as a citizen at the Board meetings. Merely because Plaintiff was recognized
as a teacher at the car caravan and on Facebook does not negate the fact that she also was a
concerned parent of children attending WHS, and spoke as a citizen.

“[A] topic is a matter of public concern for First Amendment purposes if it is of general
interest, or of legitimate news interest, or of value and concern to the public at the time of the
speech. This standard applies both to verbal as well as an employee's expressive conduct.”
(internal quotation marks omitted; citations omitted.) *Barzilay*, 610 F. Supp. 3d at 575. Plaintiff's
Facebook comment stating: “I don't think letters were sent,” and “Hooker never sent a letter”
should be attributed to the Plaintiff as a citizen and parent who never received a letter regarding
COVID-19 cases from the school that her children attend. Light Aff. ¶ 26. Plaintiff was a citizen
speaking and/or posting on a matter of public concern. *Ibid*.

Further, rather than relying on admissible evidence in support of their argument that
Plaintiff's Facebook comments are not protected speech, defendants rely upon nothing more than
hearsay, speculation and “impression.” For instance, the defendants argue that “Plaintiff's post
gave the **impression** that the school had a COVID case that required a notification letter…Ms.
Gethings heard from other teachers, including Kathleen Morrison, Megan Rose, Hilarie Alden and
Teacher X, who reported that they were concerned about Plaintiff's posts, which were
misrepresenting the school.” Defs' Mem. p. 11 (emphasis added). Such a statement is inadmissible

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

hearsay. Other than Defendant Gethings' own self-serving testimony, there is no credible evidence to support that Misses Morrison, Rose, Alden or Teacher X reported to Misses Gethings and Clarino that they were concerned about Plaintiff's Facebook comments. Light Aff. ¶ 29.

Further, the defendants failed to identify or provide any admissible evidence of an individual who was misled by Plaintiff's comments. They provide nothing more than mere speculation that one could have been misled or given a wrong impression by the comments. Moreover, the defendants' argument is irrelevant, as the applicable standard to be applied for determining whether speech is protected under the First Amendment is whether the individual was speaking as a citizen about a matter of public concern, not whether the speech at issue gave a certain "impression."

Therefore, with regard to the car caravan and Facebook comments, genuine issues of material fact exist as to whether the Plaintiff was speaking on a matter of public concern as a citizen, who is a parent of children attending WHS, or as a teacher. Plaintiff contends that she was speaking as a concerned parent of children attending WHS. This is further evidenced by the fact that Plaintiff continued to have her children remain in remote learning even after the re-opening of schools. Light Aff. ¶¶ 20, 34. A reasonable jury could find that Plaintiff was speaking as a citizen on a matter of public concern, and therefore, her speech was protected.

**3.  PLAINTIFF SUFFERED ADVERSE EMPLOYMENT ACTION.**

In addition to arguing that "Plaintiff engaged in a limited set of protected activity," the defendants contend there is no adverse employment action. This contention is contradicted by the record. "[W]hether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006).

The Supreme Court rejected the proposition that there is a bright line threshold for adverse employment action. Rather, the Court found:

> We phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006); citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998).

The "constellation of circumstances" in this matter includes, but is not limited to, Misses Gethings and Clarino reprimanding Plaintiff for a question she asked at the city-wide parent meeting (Light Aff. ¶ 13); Misses Gethings and Clarino requiring Plaintiff to attend two meetings at which they accused Plaintiff of leaking Teacher X's COVID-19 condition and refused to share evidence that they claimed to possess about the purported leak (Light Aff. ¶¶ 27, 31-32); Ms. Gethings printing email to Mr. Salem's printer that were from Plaintiff's husband that could portray Plaintiff and her husband in a negative light (Light Aff. ¶ 46); Ms. Gethings reassigning Plaintiff to teach a different grade (Light Aff. ¶ 37); Ms. Gethings reprimanding Ms. Maffuid, a paraprofessional who assisted Plaintiff, which caused other individuals to hesitate to assist or associate with Plaintiff (Light Aff. ¶ 42); Misses Gethings and Clarino telling Mr. Shortt, the new union steward, that some teachers thought he might be in cahoots with the Plaintiff to take down the administration - suggesting that he should not associate with Plaintiff; Plaintiff's speech was referenced in her TEVAL for all to see in the future (Light Aff. ¶ 33); and when her FMLA expired (or was about to), Ms. Bonner sent Plaintiff correspondence demanding that she return to work or be subjected to disciplinary action – despite Plaintiff requesting a safe work environment, free from further retaliation. (Light Aff. ¶¶ 50-56).

Here, the circumstances support the conclusion that Plaintiff was subjected to adverse employment action. At the very least, they present disputed issues of material fact that bar summary judgment. For example, a disputed issue of material fact exists as to whether Misses

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

Gethings, Clarino and others would have engaged in the same conduct and decisions stated above absent Plaintiff's protected speech.

The defendants argue that Plaintiff's alleged adverse employment actions are *de minimus* and cannot support a First Amendment retaliation claim. Defs' Mem. pp. 16, 18. Defendants rely heavily upon *Wrobel v. County of Erie*, 682 F.3d 22 (2012) for their claim that Plaintiff's alleged adverse employment actions are not sufficiently harsh. Yet, they completely ignore and fail to apprise this Court of footnote 2, which permits "**a critical mass of minor incidents**" to "**support a claim for retaliation**." (emphasis added). Such footnote is later relied on by the court in *Butts v. New York City Department of Education*, 2018 WL 4725263: "Furthermore, some of the alleged acts of retaliation, treated separately, might be trivial, but— drawing all reasonable inferences in Plaintiff's favor— they were part of a chain of events…viewed as part of a pattern of retaliatory conduct… these alleged incidents form a critical mass [that] may support a claim for retaliation. *Wrobel*, 692 F.3d at 31 n.2."

The defendants' conduct constitutes adverse employment action; however, should the Court find that the alleged actions are trivial when viewed individually, Plaintiff contends that her alleged adverse employment actions constitute a critical mass that supports a retaliation claim. In *Kiernan v. Town of Southampton*, 734 F. App'x 37, 41–42 (2d Cir. 2018), the Second Circuit Court held:

> The district court determined that Kiernan did not suffer an adverse action as a result of Wilson's attempts to have him demoted or arrested, as he was never, in fact, demoted from the lieutenant position or arrested. However, there is no 'exhaustive' list of retaliatory conduct, and this Court has never held that a public employee plaintiff alleging retaliation in violation of the First Amendment must demonstrate a material change in employment terms or conditions.
>
> A plaintiff may suffer adverse employment action even without dismissal, reduction in pay, or demotion in rank. Lesser actions may also be considered adverse employment actions such as a negative job evaluation. Curtailment of job responsibilities may also be adverse.

(internal quotations marks omitted; citations omitted). Furthermore, the Second Circuit reversed the District Court's granting of summary judgment, stating: "Courts are 'reluctant' to dispose of retaliation claims by summary judgment where questions concerning the employer's state of mind predominate the inquiry into whether an employee's expression was a substantial or motivating factor in the adverse employment decision." (internal quotation marks omitted; citations omitted). *Id*. at 44.

Likewise, whether Plaintiff would have suffered the same consequences regardless of the alleged retaliation is a disputed issue material fact in this case. A reasonable jury is in the best position to decide the severity of the defendants' conduct and the motives for their actions. Thus, drawing all reasonable inferences in favor of Plaintiff, even if "the measures taken by the defendants were otherwise justified," Plaintiff has presented enough evidence for a reasonable juror to find that retaliation was a "motivating factor." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014). In addition, Plaintiff has presented evidence of Misses Gethings and Clarino's hostility towards her, which raises a genuine issue of material fact, *i.e.*, whether or not their actions were driven in large part by a retaliatory motive. *See* Light Aff. ¶¶ 16, 27, 32, 35 and 44; Doc. No. 1-1, p. 25 of 26.

### 4. **PLAINTIFF'S PROTECTED ACTIVITY AND SPEECH WERE THE CAUSE OF THE ADVERSE EMPLOYMENT ACTIONS.**

The defendants argue that Plaintiff cannot establish a causal connection between the alleged retaliatory conduct and the protected activity because there purportedly is a gap of five months. Defs' Mem. pp. 21-22. Such an argument is inaccurate, fatally flawed and does not support the granting of summary judgment. "A plaintiff can establish the causal connection between protected expression and an adverse employment determination indirectly by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2004). The Second Circuit "has not

drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001).

In our case, the alleged retaliatory conduct continued one incident after another. Plaintiff continued to amend her complaint with Human Resources as new retaliatory incidents occurred. If we examine the four instances of retaliatory conduct found in the Berchem Moses investigation, we see that a causal connection exists, as well as disputed issues of material fact, barring summary judgment.

The Berchem Moses investigation found that Defendant Gethings engaged in retaliatory conduct when Plaintiff was accused of leaking confidential information concerning Teacher X based solely on speculation based upon Plaintiff's protected speech. Plaintiff engaged in protected speech at the Board meetings in January, February, and March 2021. On or about March 6, 2021, as a concerned parent of two children attending WHS, Plaintiff commented on a Facebook post that displayed data regarding reported student COVID-19 cases in the district. Light Aff. ¶ 26. Plaintiff's Facebook comments included: "I don't think letters were sent," and "Hooker never sent a letter." Three days later, on March 9, 2021, Plaintiff was subjected to a 90-minute meeting during which she was accused of leaking Teacher X's COVID-19 diagnosis. Misses Gethings and Clarino claimed that they had evidence but refused to share it with Plaintiff. Light Aff. ¶ 27. Then again, a couple weeks later, on March 31, 2021, Plaintiff was subjected to another meeting with Misses Gethings and Clarino, as well as Teacher X and Union Representative Morrison. Plaintiff was reprimanded for denying that she leaked Teacher X's diagnosis and falsely told that "every person" named her as the source. Light Aff. ¶ 32. These instances of retaliatory conduct all occurred within

the same month as Plaintiff commented on the Facebook post. Clearly, the proximity of the post to the meeting supports Plaintiff's contention that a causal connection exists.

The next incident of alleged retaliatory conduct discussed by the defendants is the fact that emails, which could paint Plaintiff and her husband in a negative light, were found on Mr. Salem's computer. The defendants' argument creates the false narrative that Plaintiff engaged in protected activity and no retaliatory action was taken for five months, when the emails were found on Mr. Salem's computer. In essence, hostility and adverse employment conduct continued to occur during the interim period from the last meeting regarding the leaking of Teacher X's condition on March 31, 2021, to the finding of the email in Mr. Salem's computer in August 2021. For example, on April 27, 2021, Defendant Gethings reassigned Plaintiff from third grade to first grade on April 27, 2021. Light Aff. ¶ 37.

Further, on or about May 25, 2021, Plaintiff received assistance in her classroom from Paraprofessional Ms. Maffuid, who was then reprimanded by Defendant Gethings for assisting Plaintiff. Light Aff. ¶ 41. This could cause other individuals to hesitate to provide assistance to Plaintiff in the future. Such an incident was found to be retaliatory conduct in the Berchem Moses investigation. On or about May 26, 2021, Ms. Clarino solicited an email from a parent, Vicki Grubaugh, regarding Plaintiff's public comments. Light Aff. ¶ 42. On June 7, 2021, Misses Gethings and Clarino filed a "retaliatory complaint," which accused Plaintiff of fabricating evidence, creating a hostile work environment, and undermining the administration. Light Aff. ¶ 43. During the investigations, Plaintiff informed Ms. Bonner and/or Attorney Goldberg of additional instances of retaliation. Light Aff. ¶ 47; NHBOE-Bonner Dep. 83-84. All of these instances of alleged retaliatory conduct occurred in the "interim" leading up to the email that mysteriously ended up on top of Mr. Salem's printer. The claim that a five-month gap existed is

simply incorrect. A reasonable jury could clearly find a causal connection between Plaintiff's

protected speech and the alleged retaliatory adverse employment actions.

In support of their argument that no causal connection exists, the defendants rely on

*Donaldson v. Coca Cola*, 2020 WL 2542779. That case, however, is distinguishable from our case.

Specifically, the court found:

> Apart from the insufficient temporal proximity of seven months between Plaintiff's
> protected activity in November 2016 and his termination in April 2017, **he does not**
> **adduce any additional evidence suggestive of a retaliatory motive during the**
> **interim period, such as a change in his working conditions or remarks by**
> **management that are reasonably indicative of a retaliatory motive.**

(emphasis added). *Id*. at *8*. In *Donaldson*, the court referred to an interim period in which no

alleged retaliatory conduct occurred. In contrast, the alleged retaliatory conduct in the present case

continued on a rolling basis through the purported five-month gap relied on by the defendants. The

excerpt stated above suggests that a continuous chain of retaliation, as in our case, would cause the

Court to find a causal link. Here, a reasonable jury could find that Plaintiff's protected speech was

a motivating factor behind the many allegedly adverse actions against her. The adverse actions

consistently occurred shortly after the protected speech took place or during the pendency of an on-

going, lengthy investigation. Therefore, a causal connection exists, and summary judgement is not

appropriate at this juncture.

## B. SUMMARY JUDGMENT AS TO PLAINTIFF'S CONN. GEN. STAT. §31-51q CLAIM MUST BE DENIED.

Plaintiff incorporates herein her argument in support of denial of motion for summary

judgment on Plaintiff's First Amendment retaliation claim set forth in this memorandum, *supra*.

The Connecticut Supreme Court expressly observed that it is guided by federal precedent with

respect to state statutes, such as C.G.S. § 31-51q, that are comparable to federal law. *Schnabel v.*

*Tyler*, 230 Conn. 735, 646 (1994), *Levy v. Commission on Human Rights & Opportunities*, 236

Conn. 96, 103 (1996). Thus, Connecticut Supreme Court decisions have relied extensively upon

federal precedent in connection with the application of C.G.S. § 31-51q. *Daley v. Aetna Life and Casualty Co.*, 249 Conn. 766 (1999).

Additionally, Plaintiff also provides the following argument set forth below in response and in opposition to the defendants' argument requesting summary judgment as to Plaintiff's C.G.S. § 31-51q claim against Defendant NHBOE. For the reasons previously stated in Plaintiff's First Amendment retaliation claim and those set forth below, the defendants are not entitled to judgment as a matter of law, and disputed issues of material fact exist. Therefore, summary judgment must be denied.

First, the defendants boldly proclaim that "Plaintiff's claims under federal law are deficient and must be dismissed." Defs' Mem. p. 22. The defendants, however, apply the wrong standard to their argument. In fact, the defendants waived any argument they had regarding the sufficiency of the allegations in the Amended Complaint, because they failed to file a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Moreover, the fact that the defendants answered the Amended Complaint is sufficient to proceed. *See* Answer (Doc No. 11). In *Derisme v. Hunt Leibert Jacobson, P.C.*, 880 F. Supp. 2d 311, 319 (D. Conn. 2012), the court rejected a similar argument the defendants attempt here:

> On summary judgement, the Court's analysis is focused on the sufficiency of the evidence and not the sufficiency of the pleadings. . . . Accordingly, the Court will not entertain any arguments as to the sufficiency of Plaintiff's allegations in her third amended complaint on summary judgment from either party.

(citations omitted). Likewise, this Court should not entertain defendants' arguments regarding the sufficiency of Plaintiff's allegations.

### 1.  PLAINTIFF'S SPEECH AND FACEBOOK POSTS ARE PROTECTED.

For C.G.S. § 31-51q to apply, the speech "must be constitutionally protected; only the exercise… of rights guaranteed by the 1st amendment to the United States [c]onstitution or section 3, 4 or 14 of the article first of the [c]onstitution of the state falls within the ambit of the statute."

*Schumann v. Dianon Systems, Inc.*, 304 Conn. 585, 600 (2012). Section 31-51q protects statements that address a matter of public concern. *Daley*, 249 Conn. at 776. "[S]peech deals with matters of public concern… when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]" *Gleason v. Smolinski*, 319 Conn. 394, 412 (2015). The defendants do not contest that Plaintiff's speech and Facebook commentary addressed matters of public concern.

Nonetheless, the defendants do contest that the Facebook comments are protected speech. Plaintiff incorporates herein her argument that the comments are protected speech under her First Amendment analysis. Plaintiff contends that her comments were made as a citizen who was a concerned parent, during a global pandemic, with children attending WHS. Plaintiff merely commented that she did not receive a "parent letter," hence, she did not believe they were sent out to WHS families. At the very least, there exists a disputed issue of material fact as to whether Plaintiff made the Facebook comments as a teacher or citizen who was a concerned parent of children attending WHS.

### 2. PLAINTIFF SUFFERED FROM ADVERSE EMPLOYMENT ACTIONS RESULTING FROM HER PROTECTED ACTIVITY.

An employee must demonstrate that her speech was the motivating factor causing the employer to take adverse action. *D'Angelo v. McGoldrick*, 239 Conn. 356, 362 (1996). Plaintiff incorporates herein her argument regarding adverse employment actions she suffered, and the analysis set forth in the earlier argument concerning her First Amendment retaliation claim. Moreover, Plaintiff contends that it is patently clear that her speech and Facebook comments were motivating factors that led to adverse employment actions taken against her.

Although the statements at the Board meetings were not aimed at or critical of Ms. Gethings or specific to WHS – and Ms. Gethings was never disciplined for anything raised by Plaintiff at the Board meetings or in the Facebook comments – the record reveals that Misses

Gethings and Clarino were questioned and pressured about Plaintiff's public statements, which impacted the motive behind their conduct towards her. The Berchem Moses investigative report details, in relevant part, "Ms. Gethings stated it felt that Dr. Tracey was saying they were leaving people uninformed and that it was embarrassing and uncomfortable for them." Doc. No. 1-1., p. 6 of 26. Moreover, "Ms. Gethings conveyed that it was perceived that they did not know what they were doing because a parent/teacher (Ms. Light) brought these questions to the meeting." *Id*. Attorney Goldberg's report attributes this quote to Defendant Gethings: "The night that you're speaking, my phone goes off like I don't even know." *Id.* at p. 11 of 26. During her deposition, Ms. Clarino echoed these sentiments when she testified that Plaintiff's public comments made them feel discredited. Clarino Dep. 44.

Therefore, because of Plaintiff's protected speech, the defendants subjected her to adverse employment actions, including but not limited to, being accused of "leaking" Teacher X's COVID-19 diagnosis based upon speculation[3] and her protected speech, and Defendant Gethings falsely represented that "every person" pointed to Plaintiff as the source of the "leak," thereby damaging her relationships with co-workers. Light Aff. ¶¶ 27-32, 35. Furthermore, Defendant Gethings drove the wedge even deeper when she reprimanded Ms. Maffuid for assisting Plaintiff in her classroom.[4] Light Aff. ¶ 42. And during the pending investigations, Plaintiff asserts that Ms. Gethings caused an email from Plaintiff's husband to appear in Mr. Salem's printer, which could paint Plaintiff and her husband in a negative light with staff and parents. Light Aff. ¶ 46. At the

---

[3] According to Ms. Gethings, Teacher X never told her that Plaintiff shared her COVID status. Gethings Dep. 36. Teacher X said she "suspected Plaintiff based on her social media activity." Doc. No. 1-1, p. 8 of 26. Teacher X's status was widely known. Pl.'s SOF § B, ¶ 14.

[4] Defendants have presented no evidence of violation of any school policy by Ms. Maffuid when she briefly watched Plaintiff's classroom during dismissal on May 25, 2021. The administrators and staff at WHS "all help each other." Gethings Dep. 100. Nonetheless, Defendant Gethings called Ms. Maffuid into a closed-door meeting and reprimanded her for helping Plaintiff. Doc. No. 1-1, p. 13-14 of 26.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

very least, there are numerous questions of material fact as to whether Plaintiff's speech was a motivating factor for the many adverse employment actions by Defendants.

The defendants also contend that Plaintiff did not suffer from an adverse employment action and state: "At this time, neither the Connecticut Supreme nor Appellate courts have provided guidance on the definition of "discipline" as it relates to § 31-51q." Defs' Mem. p. 24. In support of their position, the defendants cite several superior court decisions to convince this Court that the critical mass of adverse employment actions bestowed upon the Plaintiff should be ignored - as if they never occurred or are too trivial. They also argue that discipline requires "an affirmative act." For instance, the defendants state: "Plaintiff has not alleged or established that of the four incidents found to be retaliatory by Berchem & Moses constitute an affirmative act of punishment or discipline." Defs' Mem. p.26. The defendants go on to reference various judges and cherry-pick excerpts that do not accurately represent the judge's full position within the decision.

For example, in *Weinstein v. Univ. of Connecticut*, No. HHD-CV11-6027112S, 2018 WL 2222131, at *6 (Conn. Super. Ct. Apr. 25, 2018), the court (Nobel, J.) found:

> [T]he definition of "discipline" as employed in § 31–51q, as ascertained from the text of the statute itself and its relationship to other statutes; see General Statutes § 1–2z; refers to any adverse material consequence relative to a right, term, condition or benefit of employment that existed at the time of the protected speech. There is nothing in the definitions relied upon by the *Bombalicki* court that restrict discipline to affirmative acts. It is defined now, as it was in 1999, by Black's Law Dictionary as: "Punishment intended to correct or instruct; esp., a sanction or penalty imposed after an official finding of misconduct." Black's Law Dictionary, (10th Ed. 2014). **Nothing in this definition, or any of the others considered by the *Bombalicki* court, suggests that deprivation is limited to only affirmative acts.**

(emphasis added) Defendants also reference, Judge Peck's decision in *Sans-Syzmonik v. Hartford Pub. Sch.*, No. HHDCV146051355S, 2014 WL 7156776 (Conn. Super. Ct. Nov. 7, 2014) (Peck, J.) in support of their argument that Plaintiff's alleged adverse employment actions are not "affirmative acts of punishment or discipline." Defs' Mem. p. 26. However, Defendants fail to apprise this Court of Judge Peck's decision in *Matthews v. Dep't of Pub. Safety*, No.

HHDCV116019959S, 2013 WL 3306435, at *12–14 (Conn. Super. Ct. May 31, 2013) (Peck, J.),

in which the court engages in a lengthy analysis of "discipline":

> The court disagrees with the defendant that discipline requires "official" action, and instead agrees with the plaintiff that "discipline" can be a collection of smaller incidents and conduct, as long as that conduct is affirmative in nature... The statute is concerned with retaliatory activity against an employee. **Whether an act is retaliatory deals more with the intent of the actor and the proposed effect of the act on the subject of the retaliation. It is entirely possible for an employer, through a series of unofficial acts, perhaps seemingly benign on their own, to seek retaliation. There is no apparent reason to limit such retaliatory conduct to official reprimand or single isolated events. Retaliatory action that is taken through multiple events can be just as, if not more, damaging to an employee and that employee's freedom of expression. As long as those events can be shown to be "affirmative act[s] of deprivation that dimini[sh] the status or happiness of the recipient," and those acts were performed in response to the plaintiff's speech, then it does not matter whether or not individually those acts might not qualify as "discipline."** *Bombalicki v. Pastore, supra,* Superior Court, Docket No. 378772...

> Turning to the present case, the plaintiff alleges that he was disciplined when the defendant (1) transferred him to a new position; (2) removed duties from him; (3) issued a performance appraisal that did not reflect his true performance; (4) refused to investigate threats made toward him; (5) designated him as the subject of "bogus" internal and criminal investigations; (6) failed to provide him with a workspace; (7) failed to properly protect him from threats made by members of the state police; (8) caused him to lose overtime opportunities; and (9) denied him supervisory experience and failed to promote the plaintiff to master sergeant or lieutenant; and (10) selected oral examiners who were expected to give the plaintiff a failing grade on the oral portion of Sergeant/Lieutenant examination.

> Some of the above acts clearly do not qualify as "discipline" under § 31–51q. The mere failure to promote the plaintiff and give him supervisory experience cannot constitute "discipline" as such conduct is clearly an omission and there is no duty on the employer to promote an employee. The other conduct, when construed in light most favorable to the plaintiff, qualifies as "discipline." Although in some situations a transfer to a new assignment may not be discipline, where that transfer is to a position that is so objectively undesirable it could be considered a demotion, then such a transfer could be "discipline." Likewise, a removal of duties is an affirmative act that could be considered a demotion in certain circumstances. The defendant's alleged targeting of the plaintiff in "bogus" investigations also would be a form of retaliatory discipline, assuming the plaintiff could show that the investigations were groundless and caused by the defendant's desire to retaliate against the plaintiff's speech. The selection of examiners who were expected to fail the plaintiff could also be an act of discipline as it was affirmative conduct meant to deprive the plaintiff of a fair chance for a promotion. Finally, although in a strict sense these acts might be an "omission," the defendant's failure to investigate threats made toward the plaintiff

and protect him from those wishing to do him harm could be "discipline" because employers generally are supposed to protect employees from threatening or harassing coworkers... **Again, some of the conduct might not be discipline on its own, but when all the alleged conduct is aggregated and viewed in a light most favorable to the plaintiff, it can be inferred that the defendant was disciplining the plaintiff for speaking out on certain matters.**

(emphasis added).

In *Matthews*, *supra,* Judge Peck clearly found that a plethora of adverse conduct can be considered "discipline" under C.G.S. § 31-51q. In our case, as previously discussed, Plaintiff was subjected to a constant barrage of adverse employment actions, some of which were found to be retaliatory in the Berchem Moses investigation and others that may still be considered adverse, and when taken together, can be seen as discipline. Resembling the examples of discipline in the *Matthews* case excerpt quoted above, the Plaintiff in our case was removed from her duties serving on the Gardening Committee, as well as, overlooked for positions to which she applied in other committees such as the Scheduling Committee, Signage Committee and being a Social-Emotional Learning Ambassador. *See* Doc. No. 1-1, p. 20-21 of 26; Ms. Gethings reassigned Plaintiff from third-grade to first-grade. Light Aff. ¶ 37; Plaintiff's TEVAL performance appraisal included a comment referring to her public speech: "As we discussed in your mid year please consider asking questions any time you have a concern, if we do not have the answer we will do our best to attain the answer." Light Aff. ¶ 33; Plaintiff was subjected to and threatened with bogus complaints and investigations.

Moreover, Defendant Gethings accused Plaintiff of leaking Teacher X's COVID-19 diagnosis based upon speculation and her protected speech, and falsely stated to Plaintiff (in front of others) that "every person" pointed to Plaintiff as the source of the leak, thereby damaging Plaintiff's relationships with co-workers. Light Aff. ¶¶ 27, 32. Ms. Bonner, from NHBOE Human Resources Department, sent Plaintiff correspondence demanding she return to work or be subject to disciplinary action. Light Aff. ¶ 54. This and other alleged conduct, as set out in the Light

Affidavit, illustrate how Plaintiff was forced to endure numerous adverse employment acts, which constitute discipline for protected speech.

### 3. PLAINTIFF'S SPEECH AND FACEBOOK POSTS DID NOT SUBSTANTIALLY INTERFERE WITH HER JOB PERFORMANCE.

Defendants contend that Plaintiff's speech substantially or materially interfered with her job performance. However, the defendants have offered no evidence of substantial or material interference. At a minimum, there are questions of material fact that must be addressed by the jury as to whether the speech caused a substantial or material interference.

### a. BURDEN SHOULD BE ON DEFENDANTS TO ESTABLISH SUBSTANTIAL AND MATERIAL INTERFERENCE.

A split in authority exists as to whether the burden lies with the plaintiff or the defendant to plead and prove the substantial or material interference or lack thereof. Throughout the past, Connecticut Superior Court decisions and decisions from this Court placed the burden on the plaintiff to plead non-interference. *Sierra v. State*, Superior Court, Judicial District of Hartford, Docket No. 00CV0803588, 2001 WL 34094302 (June 4, 2001) (Beach, J.) (collecting Connecticut Superior Court cases requiring affirmative pleading of non-interference with job performance or working relationship with employer.); *Kennedy v. Coca-Cola Bottling Co. of New York, Inc.*, 170 F.Supp.2d 294, 299 (D. Conn. 2001) (citing Connecticut District Court cases setting forth requisite elements of § 31-51q claim).

However, the more recent trend in both Superior Court and this Court is to place the burden on the defendant to plead and prove that a substantial and material interference occurred due to the speech. *Blue v. City of New Haven*, Docket No. 3:16-cv-1411 (MPS), 2019 WL 399904 (D. Conn. January 31, 2019); *Matthews*, 2013 WL 3306435 at *8-10); *Algarin v. LB&O, LLC*, Superior Court, Judicial District of Fairfield at Bridgeport, Docket No. FBT-CV16-6060589, 2017 WL 3879306 (July 19, 2017) (Kamp, J.).

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

The recent trend in recognizing that the burden should be on the defendant employer is more persuasive than the original majority view. See *D'Amato v. New Haven Bd. Of Educ.*, Superior Court, judicial district of New Haven, Docket No. NNH-CV19-6091032, 2020 WL 1656202 at *12 (Mar. 3, 2020) (Wilson, J.) (reviewing majority and minority cases in federal and state court; finding the minority view more persuasive.).

In *Matthews, supra*, Judge Peck concluded that the cases placing the burden on the plaintiff employee were all based upon a holding in *Daley v. Aetna*, Superior Court, Judicial District of Hartford, Docket No. 94-0533693, 1994 WL 422642 (August 3, 1994) (Sheldon, J.), which relied upon *Vince v. Worrell*, Superior Court, Judicial District of Hartford, Docket No. 86-0319386, 1992 WL 172135 (July 14, 1992) (Schaller, J.). The court in *Matthews* found that neither of those cases contained a "substantive judicial analysis on the issue of which party bears the burden of proof on this element, and thus the cases the defendant cites are not persuasive." Judge Peck then examined the following language in the statute: "[P]rovided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer…" Finally, Judge Peck concluded that clauses introduced by "provided" are "provisos or exceptions" and found "that 'provided' creates a proviso that limits the application of § 31-51q, and that the defendant bears the burden of raising the facts triggering the proviso as a special defense." *Id*.

In *Blue, supra*, Judge Shea denied defendant's motion for summary judgment as to plaintiff's state free speech under Conn. Gen. Stat. § 31-51q. The court noted the split in authority on whether the plaintiff or the defendant bears the burden with respect to the substantial and material interference element under the statue. Judge Shea concluded that the burden is placed on the defendant because "the defendant is able to allege specific facts concerning any incidents of disruption. *Id*. at *10-11. The Court further stated that because the defendant presented only

conclusory statements of substantial or material interference, and  failed to present evidence of disruption or interference, the "[c]ity had not met its burden in showing that the plaintiff's speech 'substantially or materially interfere[d] with [her] bona fide job performance or the working relationship between [her] and the [City],' Conn. Gen. Stat. § 31-51q, thereby making summary judgment inappropriate on this ground." *Id*. The cases set forth above offer the more reasoned approach to the burden of proof, and therefore, this Court should find that the burden of proof is on the defendants.

### b. <u>EVEN IF THIS COURT FINDS THAT THE BURDEN IS ON THE PLAINTIFF, QUESTIONS OF MATERIAL FACT EXIST REQUIRING DENIAL OF SUMMARY JUDGMENT.</u>

No evidence exists that the Plaintiff's speech or Facebook comments impacted the performance of her job duties. Defendants rely upon nothing more than vague, conclusory statements and speculation. In support of their claim that Plaintiff's performance was impacted, defendants state: "At the March 2022 Board meeting, Plaintiff got up and spoke about an issue that she had raised that same morning with Ms. Gethings, and that Ms. Gethings had said she would look into and get updated information. Plaintiff's comments at the Board meeting, therefore, undermined her relationship with Ms. Gethings and other teachers in the building." Defendants' Mem. p. 28. Defendants cite no evidence in support of this vague claim. First and foremost, Defendants' reference to a March 2022 Board meeting at which Plaintiff spoke is incorrect. At the March 22, 2021 Board meeting, Plaintiff merely raised questions about the lack of consistency in COVID-19 safety rules across the district and the challenges of enforcing safety protocols. Light Aff. ¶ 30. Defendants' vague argument does not identify how such questions substantially or materially interfered with Plaintiff's performance of her job duties or how they were impacted. Further, Plaintiff's union contract states, "It is agreed that the teacher's primary responsibility is to teach and to otherwise supervise the children s/he teaches." Light Aff. ¶ 18 (Ex. 4). No evidence of

interference with this primary responsibility or any other responsibility or duty exists. Other than relying upon pure speculation about "undermining" relationships with Ms. Gethings and "other teachers," defendants' statement fails to address any specific interference, or even impact, on her primary job duties of teaching and supervising children. The defendants set forth nothing more than a vague, unsupported statement.

Next, the defendants present more of the same by claiming that "numerous teachers" reported Plaintiff's Facebook comments because they felt the comments were misrepresenting the school and giving the impression that the school failed to send out a letter to parents. Defs' Mem. p. 28. As discussed earlier in this brief, there is absolutely no evidence of "numerous teachers" reporting or complaining about the comments. Light Aff. ¶ 29. Hence, the defendants do not cite any admissible evidence in support of their vague, conclusory argument. Additionally, Plaintiff's Union contract provides that any complaints be "promptly called to such teacher's attention." *See* Light Aff. ¶ 18 (Ex. 4). None of these complaints were ever communicated to Plaintiff by WHS administration. Furthermore, Ms. Gethings stated "[Alden] spoke with Ms. Clarino and just made her aware that this was on Facebook," and did not state that Alden was concerned about misrepresentations. NHBOE-Gethings Dep. 26. Likewise, Ms. Clarino testified, "I don't think so," when asked if Ms. Alden shared the Facebook post with her. Clarino Dep. 49. Defendants' argument is fatally flawed and is not sufficient to establish that Plaintiff's speech or Facebook commentary substantially and materially interfered with the performance of her job duties.

Defendants offer no evidence of actual interference, let alone substantial interference. Further, Attorney Goldberg's investigatory report states: "In view of the total circumstances, the extent of the disruption attributable to Ms. Light's public comments was two parents making a total of 3-5 comments to building administrators and one of those parents sending an email well after the fact. Other claims of disruption from Ms. Light's comments were not clearly attributable

to her…" Doc. No. 1-1, p. 6 of 26. There is no evidence that Plaintiff's speech or Facebook comments substantially or materially interfered with her job duties. Summary judgment must be denied as to Plaintiff's C.G.S. § 31-51q claim as defendants are not entitled to judgment as a matter of law and disputed issues of material fact exist.

C. **SUMMARY JUDGMENT AS TO PLAINTIFF'S FALSE LIGHT CLAIM MUST BE DENIED.**

Contrary to Defendants' contention, they are not entitled to judgment as a matter law regarding Plaintiff's false light invasion of privacy claim set forth in Count Three of Plaintiff's Amended Complaint. Defs' Mem. p. 28.

"In order to establish invasion of privacy by false light, the plaintiff must show (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Jonap v. Silver*, 1 Conn. App. 550, 557-558 (1984). Whether the matter communicated would be "highly offensive" to a reasonable person is a question of fact for the jury." *Id*. at 559-560. Based on the evidence set forth by the Plaintiff, a jury could reasonably find in Plaintiff's favor with respect to each element of this claim.

In Plaintiff's response to Defendants' Interrogatory No. 15, Plaintiff provides a chronological list of events and incidents where false light statements were made against the Plaintiff. Misses Gethings and Clarino made statements about Plaintiff that were false and defamatory, such as, including but not limited to, on March 12, 2021, Ms. Gethings sent a school-wide email stating, in relevant part, "It has been brought to our attention from several community members including staff and parents that WHS is being mentioned with inaccurate information which also includes social media . . . ." In her interview with Attorney Goldberg, Ms. Gethings acknowledged that she sent the email in response to Plaintiff's Facebook comments. Light Aff. ¶ 28. This school-wide email is false, as Plaintiff did not give "inaccurate" information. She merely

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

commented to a post that she did not believe letters were sent out and that she did not receive a letter. There is nothing inaccurate about such comments. Defendant Gethings disseminated the email containing the false statement about Plaintiff and her protected speech school wide.

Another example is on March 31, 2021, when Plaintiff attended a meeting with Teacher X and Misses Gethings, Clarino, and Morrison. Without any proof whatsoever, Misses Gethings and Clarino accused Plaintiff of leaking Teacher X's COVID-19 diagnosis. During this meeting, Ms. Gethings stated: "We hear that you are saying it wasn't you but I need you to know that every person said you were the source." Light Aff. ¶ 32. This was a false statement that Misses Gethings and Clarino knew was false and made in the presence of Teacher X and Ms. Morrison.

Further, on Plaintiff's April 2, 2021 TEVAL, Ms. Gethings included the following comment: "As we discussed in your mid year please consider asking questions any time you have a concern, if we do not have the answer we will do our best to attain the answer." Light Aff. ¶ 33. This statement was a direct response to Plaintiff having spoken to the Board meeting on March 22, 2021. Being on Plaintiff's TEVAL publishes the statement to all future individuals viewing Plaintiff's file. It is a warning flag, portraying Plaintiff as a "trouble-maker."

Additional incidents of false light statements include, on June 7, 2021, Misses Gethings and Clarino filed a "retaliatory complaint," which accused Plaintiff of fabricating evidence, creating a hostile work environment, and undermining the administration. Light Aff. ¶ 44. On or about August 24, 2021, Mr. Salem reported to Plaintiff that he found documents on his printer that included emails from Plaintiff's husband to Misses Gethings and Clarino about Plaintiff's child, who was a student at WHS in Ms. Alden's class. These emails could have painted Plaintiff and her husband in a negative false light to all who viewed them. Light Aff. ¶ 46.

The above-referenced instances and false statements and those set forth in Plaintiff's response to Defendants' Interrogatory No. 15 portrayed Plaintiff in a false light which would be

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

highly offensive to a reasonable person. Defendant Gethings, and in some instances, Ms. Clarino, had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff would be placed. This is acknowledged in Attorney Goldberg's report:

> Ms. Gethings criticized Ms. Light for defending herself…, told Teacher X not to apologize when it was clear she had misstated whether she had told Ms. Light that she had covid, and falsely stated that 'every person' pointed to her as the source when, in fact, nobody had named her as the source. Ms. Clarino echoed Ms. Gethings' sentiments, stating they had 'major concerns' regarding Ms. Lights actions. This occurred in front of Teacher X as well as Ms. Morrison…Ms. Clarino further spoke with Ms. Paine regarding the subject during the pendency of this investigation after being instructed…not to discuss the investigation while it was pending…

Doc. No. 1-1, p. 25 of 26. Additionally, Ms. Clarino admitted that she painted Plaintiff in a false light when she told investigators that Plaintiff "lost it" when speaking to Ms. Gething's about Ms. Alden's East Rock Park Outing. Such statement was untrue and caused Ms. Alden to file a Complaint against Plaintiff.

Defendants' arguments that Plaintiff was not a party to or had no knowledge of what was said, or could not reiterate the statement exactly word for word at her deposition, do not erase the fact that the evidence shows that false statements were publicized about the Plaintiff, as set forth above and in Plaintiff's response to Interrogatory No. 15. At most, Defendants' arguments demonstrate that there are disputed issues of material fact as to Count Three and Defendant Gethings is not entitled to judgment as a matter of law. Summary judgment as to Plaintiff's false light claim must be denied.

**D.  <u>SUMMARY JUDGMENT AS TO PLAINTIFF'S DEFAMATION CLAIM MUST BE DENIED.</u>**

"Defamation, the tort that encompasses libel and slander, is established by demonstrating that (1) the defendant published a defamatory statement; (2) the defamatory statement identified plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. *Cweklinsky v. Mobil Chemical*

*Co.*, 267 Conn. 210, 217 (2014). In *Lizotte v. Welker*, 45 Conn. Supp. 217, 220 (1996), the court defined defamation as "that which tends to injure reputation in the popular sense, to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him."

In *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627 (2009), the Court defines a defamatory statement as "a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Such a definition clearly aligns with the facts in our case, such as Ms. Gethings printing on Mr. Salem's printer email from Plaintiff's husband that could paint Plaintiff in a false light and deter others from associating with her. Light Aff. ¶ 46; Ms. Alden's "List of Concerns" with statements about the Plaintiff at the top of the list in public view being placed on the counter in front of the teachers' mailboxes and in a paraprofessional's mailbox. Light Aff. ¶ 61; Ms. Gethings communicating to the Union steward, Mr. Shortt, that teachers think he is in cahoots with the Plaintiff to take down the administration. Light Aff. ¶ 49(d); Ms Gethings reprimanding Ms. Maffuid and communicating to her about Plaintiff and the assistance she gave Plaintiff in her classroom resulting in other individuals hesitating to help Plaintiff in her classroom. Light Aff. ¶ 43; and false communications by Defendant Gethings about Plaintiff and Teacher X's diagnosis, as quoted in Attorney Goldberg's report, *i.e.*, Doc. No. 1-1.

All of the incidents set forth above that painted Plaintiff in a false light and those included in Plaintiff's response to Defendants' Interrogatory No. 6 support Plaintiff's claim that Defendant Gethings made untrue statements and/or spread rumors that caused harm to Plaintiff's reputation. Plaintiff hereby incorporates her argument in opposition to the granting of summary judgment as it relates to her false light claim herein.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

Defendants argue that Ms. Gethings' statement in Plaintiff's TEVAL and the statements she made upon Plaintiff's return from FMLA are true and not defamatory. Defs' Mem. p. 39. Although a defamatory statement must be false in order to meet the defamation standard, "determination of the truthfulness of a statement is a question of fact for the jury." *Chiaravallo v. Middletown Transit Dist.*, 561 F. Supp. 3d 257, 289 (D. Conn. 2021). As such, summary judgment is not appropriate with regard to Count Four, as there exist disputed issues of material fact that must be presented to a jury.

To the extent the defendants are attempting to hide behind the intracorporate communications privilege, their efforts are futile, and their argument is fatally flawed. In *Gambardella*, 291 Conn. at 630, the Connecticut Supreme Court discussed the privilege: "[T]his court first recognized a qualified privilege for intracorporate communications in the context of employment decisions. Under this rule, communications between managers regarding the review of an **<u>employee's job performance</u>** . . . are protected by a qualified privilege." (emphasis added). Here, the communications alleged to be defamatory do not relate to the Plaintiff's job performance. Plaintiff's union contract states, "It is agreed that the teacher's primary responsibility is to teach and to otherwise supervise the children s/he teaches." Light Aff. ¶ 18 (Ex. 4). None of Plaintiff's alleged defamatory communications are about her teaching or supervision of children. Even the statement by Ms. Gethings in Plaintiff's TEVAL does not address Plaintiff's primary responsibilities per her union contract. Ms. Gethings included the following comment: "As we discussed in your mid year please consider asking questions any time you have a concern, if we do not have the answer we will do our best to attain the answer." Nothing in such a statement has anything to do with teaching or supervising children. Instead, it addressed Plaintiff's protected speech to the Board of Education and the communications by Defendant Gethings at the March 26, 2021 TEVAL meeting at which Defendant Gethings attempted to intimidate the Plaintiff by stating

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

Teacher X intended to file a complaint against Plaintiff for "leaking" her COVID-19 diagnosis. Light Aff. ¶¶ 31-33. Ms. Gethings acted with malice when she unnecessarily included the statement on Plaintiff's TEVAL, which continues to this day to serve as a warning flag that Plaintiff is a "trouble-maker" and it will remain on the TEVAL form for all to view now and in the future. Defendants' reliance on the intracorporate communications privilege is misplaced, as none of the alleged defamatory statements concern Plaintiff's teaching and supervision of children. For the above-stated reasons, summary judgment as to Plaintiff's defamation claim must be denied. Defendant Gethings is not entitled to judgment as a matter of law and disputed issues of material fact exist.

## V.    **CONCLUSION**

For these reasons, as well as those set forth in Plaintiff's SOF and the supporting affidavits/exhibits, the defendants' Motion for Summary Judgment must be denied as to all counts.

THE PLAINTIFF,
JESSICA LIGHT

By: */s/ Anthony J. Interlandi*
Anthony J. Interlandi (ct27512)
tony@monarchlaw.com

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on August 31, 2023, a copy of the foregoing was filed electronically and served by mail to anyone unable to accept electronic filing as indicated below. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filings as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


*/s/ Anthony J. Interlandi*
Anthony J. Interlandi

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**