**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JESSICA LIGHT | CIVIL ACTION NO: |
| | 3:22-CV-00425 (JAM) |
| **Plaintiff,** | |
| v. | |
| NEW HAVEN BOARD OF EDUCATION & MARGARET-MARY GETHINGS in her individual capacity | |
| **Defendants.** | **AUGUST 31, 2023** |

## APPENDIX TO PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Affidavits**

Exhibit A – August 30, 2023 Affidavit of Jessica Light

*Supporting exhibits:*

1. 2018-2019 Teacher Evaluation "TEVAL" – LIGHT003337-45
2. Email bearing bates label LIGHT003297
3. Article bearing bates label LIGHT003928-3301
4. Union contract (Section 12. Non-teaching Duties) – DEF000513-41
5. Text message communication bearing bates label LIGHT002498
6. Email bearing bates labels LIGHT002979, 2986 and 2988
7. March 2021 Facebook post with comments
8. Email bearing bates label LIGHT002872
9. Defendant Gethings' screenshot of Facebook comments – DEF000123 and 565
10. Emails regarding Ms. Paine
11. Plaintiff's initial complaint to the NHBOE Human Resources Department – LIGHT000070-81.
12. Berchem Moses / Attorney Henderson investigative report (DEF000409-433)
13. Berchem Moses / Attorney Testa investigative report (LIGHT002873-2885)
14. Email bearing bates label LIGHT000970-71
15. Email thread bearing bates label LIGHT000993-95
16. Email bearing bates label DEF000994-96
17. Follow up email bearing bates label DEF000754-57
18. Correspondence from Ms. Bonner bearing bates label DEF001206 and 83
19. Email thread bearing bates label DEF000617-22

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

20. Email thread bearing bates label DEF000771-73
21. Email thread bearing bates label DEF001178-80
22. Email from Ms. Redd-Hannans – DEF001314-15
23. Plaintiff's response to Ms. Alden's "List of Concerns" – DEF000443-58
24. Email bearing bates label DEF000296-300
25. Email bearing bates label DEF001864
26. Classroom notes
27. Text message bearing bates label LIGHT01433

Exhibit B – August 10, 2023 Affidavit of Claire Rowe

Exhibit C – August 10, 2023 Affidavit of Wolfgang Fink


**Excerpts of Deposition Transcripts**

Exhibit D – Deposition of Plaintiff, Jessica Light, dated December 14, 2022

Exhibit E – Deposition of Defendant, Margaret-Mary Gethings, dated December 19, 2022

Exhibit F – Deposition of Defendant, New Haven Board of Education ("NHBOE") / Margaret-Mary Gethings as corporate representative, dated February 27, 2023

Exhibit G – Deposition of Defendant, NHBOE / Taryn Bonner as corporate representative, dated February 17, 2023

Exhibit H – Deposition of Jenny Clarino, dated May 18, 2023


**Document Production**

Exhibit I – selected documents from Defendant's discovery production (bearing "DEF" bates label prefix)


THE PLAINTIFF,
JESSICA LIGHT


By: */s/ Anthony J. Interlandi*
Anthony J. Interlandi (ct27512)
tony@monarchlaw.com

## CERTIFICATION OF SERVICE

I hereby certify that on August 31, 2023, a copy of the foregoing was filed electronically and served by mail to anyone unable to accept electronic filing as indicated below. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filings as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                                        _/s/ Anthony J. Interlandi_____
                                        Anthony J. Interlandi

**MONARCH LAW LLC**
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **JESSICA LIGHT** | **CIVIL ACTION NO:** |
| | **3:22-CV-00425 (JAM)** |
| **Plaintiff,** | |
| | |
| **v.** | |
| | |
| **NEW HAVEN BOARD OF EDUCATION &** | |
| **MARGARET-MARY GETHINGS in her** | |
| **individual capacity** | |
| | |
| **Defendants.** | |
| | **AUGUST 30, 2023** |

**AFFIDAVIT OF JESSICA LIGHT**

I, Jessica Light, being duly sworn, hereby depose and say:

1. I am over eighteen years of age and believe in the obligation of an oath.

2. I have personal knowledge of the facts set forth in this affidavit, and the facts are true and accurate to the best of my knowledge and belief.

3. On or about June 11, 2019, Ms. Gethings evaluated me as a 5 out of 5 with the comment: "Her classroom space embodies the love of learning and the acceptance of others!" A copy of the TEVAL is attached as Exhibit 1.

4. On or about March 16, 2020, Governor Lamont ordered all schools closed due to the COVID-19 pandemic.

5. During the 2019-2020, 2020-2021 and 2021-2022 school years, my two children were students in the New Haven public schools. *See* Light Dep. Tr. 12-14-22 at 60 (Exhibit D).

6. June 22, 2020, was the last day of the 2019-2020 school year at Worthington Hooker School ("WHS").

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

7. I spoke at the New Haven Board of Education ("NHBOE") meeting on July 21, 2020. I asked Superintendent, Dr. Iline Tracey, to reopen schools only if she felt it was safe to do so. A colleague, who shared my concerns, also spoke at this meeting.

8. On or about July 23, 2020, I participated in a "car caravan," which was organized by the New Haven Public School Advocates in Hartford, Connecticut. A reporter at WTNH interviewed me. I wanted schools to reopen, but only if they were fully funded and safe for everyone who entered the buildings, including myself and my children. I posted about the car caravan on my Facebook page.

9. On or about July 29, 2020, a reporter at WFSB-3 interviewed me for broadcast on the channel's news programs. I communicated with my union before I accepted the interview. *See* email attached as Exhibit 2 (LIGHT003297). During the interview, I advocated for the safe reopening of schools.

10. On or about July 30, 2020, I participated in a "car caravan," which was organized by the New Haven Teacher's Union. A reporter at NBC-CT interviewed me. I posted about the car caravan on my Facebook page.

11. On August 24, 2020, the NHBOE decided to continue remote classes only. *See generally*, https://www.newhavenindependent.org/article/school_year_to_start_remote1 (last visited on August 23, 2023).

12. My youngest child was in a learning pod to start the 2020-2021 school year. The parents in this pod, including myself, did not provide academic instruction. Vicki Grubaugh's daughter was also in a learning pod to the start the 2020-2021 school year. *See* https://yaledailynews.com/blog/2020/11/25/feature-kindergarten-online/ (last visited on August 24, 2023).

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

13. In October 2020, my husband and I attended a city-wide parent information meeting. I asked a question about reopening schools for in-person learning because my husband and I were attempting to decide whether to return our children to school or remain remote.

14. At the NHBOE meeting on October 26, 2020, I spoke about the challenges of the hybrid teaching model. Two days later, the Yale Daily News quoted me, as well as others, in an article titled: "Community members divided on NHPS plan as reopening date looms." A copy of the article is attached as Exhibit 3 (LIGHT003298-3301). Specifically, it states: "Light added that she is OK with risking her own health by conducting in-person classes but is concerned about her son, who has opted into remote learning. She pressed the Board for answers on whether or not the district would provide teachers housing to quarantine away from their families. . . ." *Ibid*.

15. On or about October 29, 2020, the City of New Haven and/or the NHBOE cancelled plans to reopen schools.

16. On November 2, 2020, I attended a virtual meeting with Misses Gethings and Clarino about my older child's 504-plan accommodations. During this meeting, Ms. Gethings informed me that the NHBOE leadership reprimanded her for the question I asked at the city-wide parent meeting. During our meeting, Misses Gethings and Clarino reprimanded me for my comments. I did not receive a copy of the AFT letter during this meeting.

17. Per my oldest son's 504-plan meeting, I told Ms. Morrison that he could not participate in a math program on an application called "IXL." At the beginning of the school year, Ms. Morrison agreed to not use this program, but then attempted to "desensitize" him to it without parental consent and against the advice of his doctors at the Yale Child Study Center.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

18. My job description as a teacher at WHS did not include policy making. Furthermore, in my role as a third-grade teacher, the implementation of policies at WHS and district wide was not part of my job responsibilities. A portion of my union contract, which outlines my non-teaching duties, is attached as Exhibit 4.

19. At the NHBOE meeting on January 11, 2021, I voiced my disagreement with the anticipated return to full, in-person instruction, given that a vaccine would be available soon.

20. On January 19, 2021, the City of New Haven re-opens elementary schools for full, in-person learning.

21. Sarah Miller co-founded the group New Haven Public School Advocates, a coalition that aims to improve New Haven public schools. She is currently a New Haven Alder. We communicated in February and March 2021. The relevant portion of our text message communication is attached as Exhibit 5 (LIGHT002498). During our communication, I said that "I do not want to step on anyone's privacy so it becomes difficult to make sure they are reflected in numbers." *Ibid*.

22. At the NHBOE meeting on February 22, 2021, I urged the NHBOE to adopt a unified district wide policy regarding COVID-19.

23. In late February 2021, I communicated with Teacher X via email and offered to help her while she was out sick. On February 25, 2021, she replied, "Thanks for the offer. I am recovering from Covid. Hope to be back next week?" A copy of the email is attached as Exhibit 6 (LIGHT002979).

24. I am not good friends with Matt Rodeheffer's ex-wife nor have I met with either of them socially outside of school. I previously taught their child in the third-grade.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

25. On March 4, 2021, the City of New Haven re-opens middle schools for full, in-person learning.

26. On or about March 6, 2021, I commented on a Facebook post that displayed student data of reported COVID-19 cases within the school district. My school, WHS, was listed as a school with at least 1 positive case but no more than 5. I did not make comments in my capacity as a teacher at WHS. I am a parent of children who attended WHS and did not receive a "parent letter." A copy of the Facebook post and my comments thereto is attached as Exhibit 7.

27. On March 9, 2021, I attended a 90-minute meeting with Misses Gethings and Clarino during which they accused me of leaking a teacher's COVID-19 diagnosis. They also claimed to have evidence but refused to share it with me.

28. On March 12, 2021, Ms. Gethings sent a school-wide email stating, in relevant part, "It has been brought to our attention from several community members including staff and parents that WHS is being mentioned with inaccurate information which also includes social media. . . ." A copy of the email is attached as Exhibit 8 (LIGHT002872). In her interview with the investigator from Berchem Moses (Attorney Goldberg), Ms. Gethings acknowledged that she sent the email in response to my Facebook comments. A copy of Attorney Goldberg's report was filed in this matter. *See* ECF No. 1-1 at p. 6 of 26 ("Ms. Gethings acknowledged in her interview that the email was a response to the Facebook post and the Teacher X situation, discussed below.").

29. Ms. Gethings shared a screenshot of my Facebook comments with Teacher X and Ms. Morrison via text message. There is nothing in writing indicating that Teacher X or Ms. Morrison originally sent my Facebook comments to Ms. Gethings or that they replied to

Ms. Gethings' text message. Copies of the messages are collectively attached as Exhibit 9 (DEF000123 and 565). Other than Ms. Gethings' own self-serving deposition testimony, there is nothing in the record to support that Misses Morrison, Rose, Alden and Teacher X reported to Misses Gethings and Clarino that they were concerned about my Facebook "posts." Furthermore, why would Ms. Gethings need to share a screenshot of a post that was the basis for them to allegedly contact her.

30. At the NHBOE meeting on March 22, 2021, I raised questions about the lack of consistency in COVID-19 safety rules across the district and the challenges of enforcing safety protocols.

31. I attended my mid-year TEVAL meeting with Misses Gethings and Clarino on March 26, 2021. During this meeting, they warned me that Teacher X was going to file a complaint against me for "leaking" her COVID diagnosis to the community. Again, I denied that I was the source of the "leak." I also learned that Ms. Gethings planned to reassign me to another grade. Although I disagreed with the reason given to me, I requested a move to a higher grade level.

32. On March 31, 2021, I attended a meeting with Teacher X and Misses Gethings, Clarino, and Morrison. Without any proof, Misses Gethings and Clarino accused me of leaking Teacher X's COVID-19 diagnosis. During this meeting, Ms. Gethings stated: "We hear that you are saying it wasn't you but I need you to know that every person said you were the source."

33. Although my April 2, 2021 TEVAL "Feedback from Instructional Manager" was generally fine, Ms. Gethings included the following comment: "As we discussed in your mid year please consider asking questions any time you have a concern, if we do not have the answer we will do our best to attain the answer." This statement was a direct response to my having

spoken to the Board of Education on March 22, 2021, and at the March 26, 2021 meeting referenced above. While this statement may appear innocuous to the layperson, sophisticated managers will see it as a warning flag that I am a "trouble-maker." The comment was both unnecessary and inappropriate for inclusion in my TEVAL.

34. My child did not return to in-person learning on January 19, 2021. On April 5, 2021, I asked the WHS administration if there was space for my child to return. On April 19, 2021, my child returned to in-person learning.

35. On April 20, 2021, I met with Ms. Gethings and Dave Cicarella, President of the New Haven Teachers Union. The purpose of the meeting was to discuss the unfair and hostile prior meetings, to clear the air, and to end Ms. Gethings concerns. During this meeting, Ms. Gethings admitted that she saw me speak at every NHBOE meeting. Ms. Gethings told at least one Berchem Moses investigator that she discussed my public comments with others.

36. On or about April 26, 2021, my union informed Ms. Gethings that I intended to file a complaint. In response, Ms. Gethings advised Mr. Cicarella that Ms. Alden intended to file a complaint against me.

37. On April 27, 2021, Ms. Gethings officially reassigned me from the third-grade to the first-grade for the upcoming 2021-2022 school year.

38. Ms. Paine was a long-term first-grade substitute teacher for Ms. Tortora in the second half of the 2020-2021 school year. After Ms. Gethings informed me of my new grade assignment, Ms. Paine anticipated returning as part of the 2021-2022 first-grade team along with Ms. Forsa and me. *See* emails collectively attached as Exhibit 10. Specifically, on August 2, 2021, Ms. Paine replied to a group email as follows: "Sorry for my delayed response!! Yes, I believe the 18th should work for me as well. If anything changes I will let you know. I am really excited for this year." *Ibid*. At some point after August 2, 2021, Ms.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

Gethings hired Ms. Paine as a full time second-grade teacher to start the 2021-2022 school year. To my knowledge, Ms. Paine, who was previously a substitute would have had to apply for the second-grade teaching position.

39. On April 30, 2021, I submitted my initial complaint to the NHBOE Human Resources department. A copy is attached as Exhibit 11.

40. On May 10, 2021, Ms. Alden filed a complaint against me. Berchem Moses attorney, Christopher R. Henderson, completed the investigation for the NHBOE in or around December 2021. Attorney Henderson concluded that, "[b]ased on the evidence, there is no violation of Board policies on harassment or 'discourteous, offensive or abusive language or conduct towards other employees, students or the public.'" A copy of Attorney Henderson's report is attached as Exhibit 12 (DEF000409-433).

41. On May 25, 2021, Ms. Gethings obstructed the investigation of my complaint when she contacted a potential witness, Douglas Jones.

42. On May 25, 2021, I asked another teacher – Kyle Miller – to cover my class so I could use the restroom, not to change for running club. Ms. Maffuid saw me entering the restroom and offered to assist by watching my class. I did change my shirt while in the restroom, but I did not change into running clothes, *i.e.*, running shoes, sports bra, and shorts. Ms. Gethings reprimanded Ms. Maffuid for helping me.

43. On or about May 26, 2021, Ms. Clarino solicited an email from Vicki Grubaugh regarding my public comments.

44. On June 7, 2021, Misses Gethings and Clarino filed a "retaliatory complaint," which accused me of fabricating evidence, creating a hostile work environment, and undermining the administration. Berchem Moses attorney, Paul A. Testa, completed the investigation for the NHBOE in or around December 2021. Attorney Testa concluded that, "[w]hile her

**MONARCH LAW LLC**
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

comments clearly displayed fear, the investigation found no evidence that they actually caused any meaningful disruption in the school environment. Further . . . the fact that a parent asks questions about COVID safety is not evidence that Ms. Light [funneled] information to him." A copy of Attorney Testa's report is attached as Exhibit 13 (LIGHT002873-2886).

45. On June 21, 2021, which was 55 days after my original complaint, I became concerned with the amount of time it was taking to complete the investigation as I continued to experience retaliation at the hands of the WHS administrators. Through a telephone conversation with New Haven Public School employee Taryn Bonner, I learned that the investigation was delayed because Ms. Gethings tainted one or more witnesses.

46. On or about August 24, 2021, Mr. Salem reported to me that he found documents on his printer that included emails from my husband to Misses Gethings and Clarino about my child, who was a student at WHS in Ms. Alden's class.

47. During the investigations, I reported additional instances of retaliation to Ms. Bonner and/or directly to Attorney Goldberg. *See* ECF No. 1-1, p. 3 of 26 ("During the pendency of this investigation, various other allegations arose based on new events. These were included within the present investigation."). For example, I sent an email to Attorney Goldberg titled, "additional retaliation" on September 22, 2021. A copy of the email is attached as Exhibit 14 (LIGHT000970-71).

48. At the advice and approval of my health care providers, I began a period of approved family and medical leave beginning on November 1, 2021.

49. On December 3, 2021, I received copies of the Berchem Moses investigation reports prepared by Attorneys Goldberg, Testa and Henderson. With regard to the complaints against me, Attorneys Testa and Henderson concluded that I did not do anything wrong. On

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

the other hand, Attorney Goldberg found that the WHS administrators retaliated against me in the following ways: (a) the handling of the Teacher X situation, (b) the reprimand given to Ms. Maffuid for watching my class during dismissal, (c) the documents that mysteriously ended up on Mr. Salem's printer, and (d) the negative commentary made about me to Mr. Shortt, union steward.

50. On December 9, 2021, I sent an email to Misses Bonner and Mack of the NHBOE Human Resources department with proposed next steps. A copy of the e-mail is attached as Exhibit 15.

51. On January 14, 2022, which was 259 days after filing my original complaint, and 42 days after the investigations were completed, I met with Misses Bonner, Mack and Blatteau, and my union representative, Pat Deluca. We asked a lot of questions, but no answers, explanation or apologies were given to us.

52. On January 16, 2022, I sent a follow-up email to Misses Bonner and Mack with a list of unanswered questions that were raised during the January 14, 2022 meeting. A copy of the email is attached as Exhibit 16.

53. On January 18, 2022, I sent another email to Misses Bonner and Mack to ask that they take steps to correct misinformation propagated by Misses Gethings and Clarino to WHS staff and to confirm the accuracy of my notes from the January 14th meeting. A copy of the email is attached as Exhibit 17.

54. Also on January 18, 2022, Ms. Bonner sent me correspondence demanding that I return to work or be subject to disciplinary action. *See* documents collectively attached as Exhibit 18.

55. On January 19, 2022, NHBOE Human Resources denied my union's request for administrative leave until mediation occurred and safeguards installed to prevent further retaliation or hostility. A copy of the email is attached as Exhibit 19.

**MONARCH LAW LLC**
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

56. On January 24, 2022, I forwarded a letter from my doctor to Misses Bonner and Mack that requested no contact with Ms. Gethings or safeguards to prevent any retaliation. Ms. Mack responded by instructing me to make an official request for workplace accommodation to Ms. Bonner. I replied that I was simply requesting a "non-hostile workplace free from retaliation." See correspondence attached as Exhibit 20.

57. On February 9, 2022, I returned to work against the advice of my doctors and under the threat from the NHBOE Human Resources department. Despite Attorney Goldberg's conclusion that retaliation had, in fact, occurred, no protection was put in place for me. Prior to my return, I learned that Misses Gethings and Clarino intended to change my assignment to co-teacher. A copy of Ms. Gethings' email is attached as Exhibit 21.

58. On February 10, 2022, I attended a meeting with Misses Gethings and Clarino, as well as other individuals. During this meeting, we discussed my co-teaching assignment and a letter that was going to be sent to the parents concerning my return.

59. On February 24, 2022, Keisha Redd Hannans, the Assistant Superintendent, instructed Misses Gethings and Clarino to return me to my original teaching assignment by March 1, 2022. A copy of Ms. Redd Hannans' email is attached as Exhibit 22.

60. On March 1, 2022, I resumed teaching my first-grade class; however, Ms. Gethings refused to let me inform parents ahead of time.

61. On May 24, 2022, I found a copy of Ms. Alden's document titled, "List of Concerns," with my name mentioned in the first sentence in public view, on the counter in front of teacher mailboxes. A copy of the document is attached as Exhibit 23. On May 26, 2022, I met with my union representative and Ms. Clarino. During this meeting, I learned that a para-professional in the other first-grade class received a copy of Ms. Alden's "List of Concerns" in her mailbox.

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

62. In or around July 2022, I replied to an email from Ms. Gethings and expressed interest in what I believed to be an open third-grade position for the upcoming school year. Ms. Gethings never responded and told me that she already filled the position. In mid-August, the position still appeared to be open, so I sent an email to Ms. Bonner to express my interest. A copy of the email is attached as Exhibit 24 (DEF000296-300). Ms. Gethings hired Madison Hartt instead of returning me to the third-grade. *See* Exhibit 25 (DEF001864).

63. Reluctantly, I accepted a transfer to Ross Woodward Classical Studies in early September 2022 due to the ongoing hostility toward me at WHS and the NHBOE's failure to protect me from further retaliation, including:

    a. On separate occasions in August 2022, I found two disturbing notes in my classroom for the upcoming 2022-2023 school year. The first note said, "Just do it. Just leave our school. You are toxic." The second note read, "Mrs. Light's To Do List. Wash hair. Leave or Just Die." I reported these notes to my union and the NHBOE Human Resources department. *See* notes collectively attached as Exhibit 26.

    b. On August 24, 2022, I received a text message informing me that WHS administration re-assigned the para-professional assigned to my first-grade classroom. Upon information and belief, nearly all first-grade classrooms in the district have a para-professional to assist the teacher. A copy of the text message is attached as Exhibit 27 (LIGHT01433).

64. Although my job at Ross Woodward is rewarding yet challenging, I still miss the WHS community.

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

_____

JESSICA LIGHT

STATE OF CONNECTICUT    )
                        ) ss: Town/City: New Haven _____
COUNTY OF NEW HAVEN     )


Personally appeared, Jessica Light, who swore to and subscribed the above affidavit before me, this **30th** day of August 2023.

_____
~~NOTARY PUBLIC~~ / COMMISSIONER OF THE SUPERIOR COURT
Name:

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

# EXHIBIT 1

**Building: Worthington Hooker**                **JESSICA LIGHT**                **Responsible: M. GETHINGS**

**Task: Final Conference - Teacher**

## FINAL CONFERENCE - TEACHER

The Instructional Manager will share the form with the teacher. The teacher and IM will complete their individual sections. The final form is not to be submitted by the IM until after the End of Year Conference meeting.

*Did you meet for the required end of year conference? If not, please explain.*

Yes

*Date of Conference*
06/11/2019

Student Learning Growth

*Baseline Data*
Completed by the Teacher or Data file attached at end of form

2 Students scored goal, 2 students were proficient and 20 students were basic on the  district multiplication fact fluency assessment.

The districts constructed written response to text preassessment consisted of two open responses for each student.  My class of 25 students wrote 50 responses.  When scored according to the districts rubric, 4/50 responses were level three, 16/50 were level two and 30/50 were below level two, a category referred to as "approaching level two."

*SLO 1*
from goal-setting

Students will apply their understanding of multiplication fact to efficiently answer multi-step word problems, scoring at least 8/10 on classroom assessments over three trials.

*Student Learning Growth Goal 1-Indicators of Academic Growth and Development (IAGDs)*
From Goal Setting

All students will score in the proficient or goal range on one digit multiplication fact fluency assessments.

*Revised - Student Learning Growth Goal 1-Indicators of Academic Growth and Development (IAGDs)*
Mutually agreed upon at Mid-Year

Students will apply their understanding of multiplication fact to efficiently answer multi-step word problems, scoring at least 8/10 on classroom assessments over three trials.

*Goal 1 Final Data*
Completed by the Teacher or data file attached

Each student was given a ten point assessment covering multi-step multiplication word problems three different times.  Every student scored atleast 8/10 on atleast one of the assessments.  However two special education students recieved below 80% on two of the assessments.  One other student recieved less than 80% on one of the assessments.

*SLO 2*
from goal setting

All students will be able to construct a written response to text at a level 2 on district benchmark.  Level 3 written responses will be increased from 4/50 to 25/50.

*Student Learning Growth Goal 2-Indicators of Academic Growth and Development (IAGDs)*

from Goal Setting

All students will be able to construct a written response to text at a level 2 on district benchmark. Level 3 written responses will be increased from 4/50 to 25/50.

*Revised - Student Learning Growth Goal 2-Indicators of Academic Growth and Development (IAGDs)*

Complete only if both the teacher and IM agree on revised IAGDs

*Goal 2 Final Data*

Completed by the Teacher

All students were able to create at least one level two written response. Level 3 written responses increased from 4/50 to 33/50. Therefore this goal was met. Please see attached form.

*Describe how you used student feedback to improve your instructional and/or professional practice and the impact on student learning.*

I create, administer and analyze student reflections to learn which lessons the students find most meaningful and how students describe their own learning.

*Student Feedback Goal - Results*

From the student feedback I learned students felt more engaged in their learning when I created heterogenous book study groups based on interest in the text and not based of ability level. They enjoyed chances to pick their own groups but felt it was more productive when I picked them ahead of time.

*Student Learning Growth*

Rate the growth on each goal

| | Little or no growth-did not meet goal | Insufficient growth | Adequate growth | Solid growth | Exceptional growth | NA |
|---|---|---|---|---|---|---|
| Goal 1 | | | | ☐ | | |
| Goal 2 | | | | ☐ | | |
| Student Feedback | | | | ☐ | | |

*Overall Student Outcomes Rating*

Combine student learning growth ratings with student feedback.

| | Needs Improvement | Developing | Effective | Strong | Exemplary | Not Rated |
|---|---|---|---|---|---|---|
| Overall Outcomes Rating | | | | ☐ | | |

## Professional Development

*Describe the professional learning you participated in this year and its impact on your practice.*

Both teacher and IM have the ability to edit.

This year I attended professional development through Common Ground and the Audubon society to become better able to serve on the garden committee. I also went to Professional development on "The Change Within" to help our school create a cultural responsive learning enviroment for our students. I also attended workshop on visual literacy, sculpture and creative writing to further our work with Arts Integration. I also observed a colleagues classroom to learn more about the Words their Way program for words study.

## Instructional Practice

*Dates of observations and type of feedback provided (debrief session, email, walkthrough in TalentEd, etc)*

completed by IM

5/7/19

Classroom Practice

*Teacher's Self-Ratings for Purposeful Classroom Practice*

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| C1: Communicates objectives and lesson content clearly and accurately | | | | | ☐ | |
| C2: Employs activities aligned with student knowledge and skills, differentiating as appropriate | | | | | ☐ | |
| C3: Offers students multiple methods to approach material and to demonstrate learning | | | | | ☐ | |
| C4: Monitors and assesses student understanding and adjusts as necessary | | | | | ☐ | |
| Overall Purposeful Classroom Practice | | | | | ☐ | |

*Instructional Manager's Ratings for Purposeful Classroom Practice*

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| C1: Communicates objectives and lesson content clearly and accurately | | | | | ☐ | |
| C2: Employs activities aligned with student knowledge and skills, differentiating as appropriate | | | | | ☐ | |
| C3: Offers students multiple methods to approach material and to demonstrate learning | | | | ☐ | | |
| C4: Monitors and assesses student understanding and adjusts as necessary | | | | | ☐ | |
| OVERALL PURPOSEFUL CLASSROOM PRACTICE | | | | | ☐ | |

*Teacher's Self-Ratings for Supportive Classroom Practice*

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| C5: Develops and maintains standards of conduct that are clear to all students and responds to student needs | | | | | ☐ | |
| C6: Engages and includes all students in classroom activities | | | | | ☐ | |

| | | | | | | |
|---|---|---|---|---|---|---|
| C7: Provides opportunities for meaningful student choice | | | | | | ☐ |
| OVERALL SUPPORTIVE CLASSROOM PRACTICE | | | | | | ☐ |

## Instructional Manager's Ratings for Supportive Classroom Practice

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| C5: Develops and maintains standards of conduct that are clear to all students and responds to student needs | | | | | | ☐ |
| C6: Engages and includes all students in classroom activities | | | | | | ☐ |
| C7: Provides opportunities for meaningful student choice | | | | | | ☐ |
| OVERALL SUPPORTIVE CLASSROOM PRACTICE | | | | | | ☐ |

## Teacher's Self-Ratings for Meaningful Classroom Practice

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| C8: Promotes in-depth knowledge, understanding of significant concepts, and higher order thinking skills | | | | | | ☐ |
| C9: Engages students in substantive conversations with purposeful question to promote inquiry and learning | | | | | | ☐ |
| C10: Makes connections to increase relevancy for students, including connections to different lessons, to different content areas, and to each student's world outside of the classroom | | | | | | ☐ |
| OVERALL MEANINGFUL CLASSROOM PRACTICE | | | | | | ☐ |

## Instructional Manager's Ratings for Meaningful Classroom Practice

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| C8: Promotes in-depth knowledge, understanding of significant concepts, and higher order thinking skills | | | | ☐ | | |
| C9: Engages students in substantive conversations with purposeful question to promote inquiry and learning | | | | | ☐ | |
| C10: Makes connections to increase relevancy for students, including connections to different lessons, to different content areas, and to each | | | | | ☐ | |

student's world outside of the classroom

OVERALL MEANINGFUL CLASSROOM PRACTICE

Planning and Preparation

## Teacher's Self-Ratings for Planning & Preparation

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| P1: Assesses students' prior knowledge and skills | | | | | | |
| P2: Establishes clearly defined student learning goals and objectives for all students | | | | | | |
| P3: Designs and sequences lessons and activities aligned with student learning goals and objectives | | | | | | |
| P4: Prepares assessments which align with student learning goals and objectives | | | | | | |
| P5: Incorporates and addresses the social, emotional and academic needs of individual students | | | | | | |
| P6: Develops lessons and units that are challenging , relevant and promote inquiry | | | | | | |
| OVERALL PLANNING & PREPARATION | | | | | | |

## Instructional Manager Ratings for Planning & Preparation

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| P1: Assesses students' prior knowledge and skills | | | | ☐ | | |
| P2: Establishes clearly defined student learning goals and objectives for all students | | | | | | |
| P3: Designs and sequences lessons and activities aligned with student learning goals and objectives | | | | | | |
| P4: Prepares assessments which align with student learning goals and objectives | | | | | | |
| P5: Incorporates and addresses the social, emotional and academic needs of individual students | | | | | | |
| P6: Develops lessons and units that are challenging , relevant and promote inquiry | | | | | | |

2018-19 Teacher Evaluation          Completed: 06/18/2019

OVERALL PLANNING & PREPARATION

## Teacher's Self-Ratings for Reflection and Use of Data

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| R1: Uses results from ongoing assessments to evaluate student learning and identify areas for further instruction and planning | | | | | | ☐ |
| R2: Reflects on group and individual dynamics and interactions and identify areas for adjustment or refinement | | | | | | ☐ |
| R3: Evaluates the effectiveness of curriculum and instructional strategies in encouraging meaningful and higher-order learning | | | | | | ☐ |
| OVERALL REFLECTION & USE OF DATA | | | | | | ☐ |

## Instructional Manager Ratings for Reflection and Use of Data

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| R1: Uses results from ongoing assessments to evaluate student learning and identify areas for further instruction and planning | | | | ☐ | | |
| R2: Reflects on group and individual dynamics and interactions and identify areas for adjustment or refinement | | | | | | ☐ |
| R3: Evaluates the effectiveness of curriculum and instructional strategies in encouraging meaningful and higher-order learning | | | | | | ☐ |
| OVERALL REFLECTION & USE OF DATA | | | | | | ☐ |

## Overall Instructional Practice - Teacher Self-Rating

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| Overall Instructional Practice Rating | | | | | | ☐ |

## Overall Instructional Practice Rating-Instructional Manager

| | Needs Improvement | Developing | Effective | Strong | Exemplary | Not Rated |
|---|---|---|---|---|---|---|
| Overall Instructional Practice Rating | | | | | | ☐ |

## Teacher's Evidence of Strengths and Development Needs for Instructional Practice

Completed by Teacher

I have aligned my instructional practice with the goals in our School Improvement Plan.

I have integrated art into all subject areas which can be seen throughout my room. In math some examples are a three-dimensional multiplication table and a multiplication bouquet using circular multiplication patterns, creating fractured art with fractions. In social studies we designed maps and created a group performance poetry piece incorporating mixed media canvases about the themes of civil right texts. In science we have written songs, created art with the power of electromagnetism and designed boats. In language arts we have water colored prewriting activities and built puppets of our narrative character. I have been a resource for my grade level partner by sharing lessons, projects and materials to have cross grade level projects. These are only a few examples of the arts integration within my classroom practice.

I have differentiated by creating heterogeneous book clubs with additional supports so that all students can access the text of highest interest to them. I have guided reading and word study groups as well to support and challenge all students. I have differentiated homework and classwork by giving students a large range of choice and enrichment options.

To increase student engagement and the climate, I have created kindness journals, used the Comer Method morning meetings and restorative circles, created interactive bulletin board where students create and respond to content, given students the opportunity to lead our weekly yoga practice, and empowered the students to create the furniture and seating arrangements of their choice.

## *Instructional Manager's Evidence of Strengths and Development Needs for Instructional Practice*

Completed by Instructional Manager

Jessica is a talented teacher. The joy of teaching and learning exists in her room always across subject areas. Her class has shared amazing products of work at our Town Meeting. Jessica has embraced our vertical school wide buddies and participated in some very meaningful exchanges between her class and the 8th grade.

## Professional Values

### *Teacher's Self-Rating Professional Values*

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| Collaboration and Collegiality | | | | | ☐ | |
| Self-improvement | | | | | ☐ | |
| Reliability | | | | | ☐ | |
| High expectations | | | | | ☐ | |
| Respect | | | | | ☐ | |
| Responsiveness and outreach | | | | | ☐ | |
| Professionalism and judgment | | | | | ☐ | |

### *Teacher's Self-Overall Professional Values Rating*

| | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| Overall Professional Values | | | | | ☐ | |

### *Teacher's Evidence of Strengths and Development Needs for Professional Values*

Completed by Teacher

My professional values are evidenced in my involvement in the school community. I have been a part of SPMT and the subcommittee for Anit-Bias and Anti-Racism. I have also served on the Arts integration committee, the Garden committee and the PTA. To ensure the success of one of my students in SRBI, I provide extra reading instruction at 7:30 two days a week. I have given up multiple preps to help in the office when needed, volunteered to chaperone overnight trips and helped our band instructor back stage

when other volunteers unexpectedly became unavailable for the winter concert. I applied for and received the Tariq and Asma Farid Foundation Teachers Grant and successfully launched and completed four projects through Donors Choose.

## Professional Values Rating - Instructional Manager

|  | Needs Improvement | Developing | Effective | Strong | Exemplary | NA |
|---|---|---|---|---|---|---|
| Collaboration and Collegiality |  |  |  | ☐ |  |  |
| Self-improvement |  |  |  | ☐ |  |  |
| Reliability |  |  |  |  | ☐ |  |
| High expectations |  |  |  |  | ☐ |  |
| Respect |  |  |  |  | ☐ |  |
| Responsiveness and outreach |  |  |  |  | ☐ |  |
| Professionalism and judgment |  |  |  |  | ☐ |  |

## Overall Professional Values Rating - Instructional Manager

|  | Needs Improvement | Developing | Effective | Strong | Exemplary | Not Rated |
|---|---|---|---|---|---|---|
| Overall Professional Values |  |  |  |  | ☐ |  |

## Instructional Manager's Evidence of Strengths and Development Needs for Professional Values

Completed by Instructional Manager

Jessica works diligently for the betterment of our school and district. She serves in many capacities and is always willing to give her time and input. Jessica is a continuous learner who is always striving to improve herself and practice. Her classroom space embodies the love of learning and the acceptance of others!

## Combined Instructional Practice and Professional Values

|  | Needs Improvement | Developing | Effective | Strong | Exemplary | Not Rated |
|---|---|---|---|---|---|---|
| Combined Instructional Practice & Professional Values Rating |  |  |  |  | ☐ |  |

| Practice and Professional Values | Student Outcomes | | | | |
|---|---|---|---|---|---|
|  | Needs Improvement (NI-1) | Developing (Dv-2) | Effective (Ef-3) | Strong (St-4) | Exemplary (Ex-5) |
| Needs Improvement (NI-1) | NI-1 | NI-1 | Dv-2 | Ef-3* | EF-3* |
| Developing (Dv-2) | NI-1 | Dv-2 | Dv-2 | Ef-3 | St-4* |
| Effective (Ef-3) | NI-1 | Dv-2 | Ef-3 | St-4 | Ex-5 |
| Strong | Dv-2* | Ef-3 | St-4 | St-4 | Ex-5 |



| | | | | | |
|---|---|---|---|---|---|
| **(St-4)** | | | | | |
| **Exemplary (Ex-5)** | Ef-3* | Ef-3* | St-4 | Ex-5 | Ex-5 |

Use the Student Outcome Rating and Practice Ratings in the Matrix to determine the Summative Rating

## Summative Rating

| Needs Improvement | Developing | Effective | Strong | Exemplary | Not Rated |
|---|---|---|---|---|---|

*If the teacher has "Not Rated" as a summative rating please explain.*

## Additional Feedback from Instructional Manager

Completed by IM

## Additional Comments - Teacher

## Additional Comments - Instructional Manager

| | |
|---|---|
| *Attached Workflow* | Supervisor then Teacher |
| *Current Status* | Approved |
| *Submitted Date* | 06/18/2019 at 3:34 PM |
| *Submitted By* | MARGARET GETHINGS |
| *Workflow Steps* | |

| 1 | Signed by MARGARET GETHINGS on 06/18/2019 at 3:34 PM | PRINCIPAL |
|---|---|---|
| | **Signature:** Margaret Mary Gethings | |
| 2 | Signed by JESSICA LIGHT on 06/18/2019 at 3:38 PM | TEACHER - GRADE 3 |
| | **Signature:** Jessica Light | |
| | **Comments:** Thank you! | |

# EXHIBIT 2

**From:** David nhftlocal933@gmail.com
**Subject:** Re: Wfsb 3
**Date:** July 28, 2020 at 7:53 PM
**To:** Jessica Light jessicelight@hotmail.com



LABOR RELATIONS/UNION REP PRIVILEGE

LIGHT003297

# EXHIBIT 3

Donate | Read the Print Edition
Subscribe | Join the YDN

NEW HAVEN, CONNECTICUT • SATURDAY, SEPTEMBER 10, 2022 • VOL. CXLV

# Community members divided on NHPS plan as reopening date looms

CHRISTIAN ROBLES & OWEN TUCKER-SMITH | 12:50 AM, OCT 28, 2020
STAFF REPORTERS



Vaibhav Sharma, Photo Editor

## MOST READ

Mai Chen
Yale researchers discover potential Long COVID causes and treatments

Nathaniel Rosenberg
Suspected hate crime committed outside Davenport College, police investigate

Sai Rayala
New Asian market opens its doors in New Haven

Himani Pattisam
New orientation program, BUILD, debuts at Camp Yale

Alessia Degraeve
First-years reflect on inaugural year of mandatory pre-orientation programs

City officials' efforts to move school reopening plans forward at Monday night's Board of Education meeting were met with a community divided over the city's preparedness to open New Haven Public Schools safely.

New Haven Public Schools are scheduled to reopen Nov. 9 with a hybrid model. A recent New Haven Public Schools-administered survey found that 44 percent of city students will continue remote learning even after schools reopen. The other 56 percent are expected to return to their campuses. In preparation for the reopening, city officials visited school testing centers to highlight their efficiency and worked with both University and state health experts to ensure that schools have proper air ventilation, test capacity, social distancing signage and contact-tracing protocol.

LIGHT003298

Still, despite the insistence of city leaders that schools can reopen safely, several parents and community members in attendance expressed concern over the rising number of COVID-19 cases in New Haven County, the inability to ensure social distancing on school buses and the effectiveness of school air ventilation systems. Others praised the move as a necessary step.

"For young children, remote learning requires intense parental engagement to make it happen, and it's tough on families," said New Haven Public School parent and primary care physician Ilana Richmond, who expressed support for an optional hybrid school reopening. "People have to choose between working for their families and making remote learning doable for their children."

At the meeting, Integrated Refugee & Immigration Services Education Department Director Dennis Wilson echoed Richmond's assertion that remote learning has burdened some parents and students. Wilson also said that for English Language Learners especially, there is no substitute for in-person teaching. According to Wilson, a safe hybrid reopening would be of great value for ELL students.

Other teachers, parents and community members were more skeptical about the city's plan, sharing critiques and suggestions with the Board during public participation time.

Jennifer Graves, who has taught in the district for 11 years, noted that during remote learning, 12 of the district's 41 buildings have had a staff member test positive.

"Does this not sound an alarm for what is to come when students and staff return?" Graves asked at the meeting. "Nothing is going to stop the virus from walking onto those buses, into our buildings, our classrooms and then back to many three-generation homes."

Jill Kelly, a district parent, advised the Board and superintendent to "make a habit" of checking wastewater statistics often, noting that those statistics can predict the pattern of COVID-19. She noted that a recent wastewater statistics report in Boston forecasted a spike in cases, and that soon afterward, Boston Public Schools reversed its learning plan and went remote.

In a Monday press release, New Haven Public School Advocates offered recommendations for local criteria to guide the district. The group called for a "sensitive local indicator," such as a seven-day city COVID-19 cases average, that would provide the district with new criteria to decide if and when to scale back school reopening. They also called city officials to consider COVID-19 school case numbers and citywide sewage-testing data in these decisions.

"Good planning and collaboration now will prevent panic decision-



**Tweets from @yaledailynews**

Yale Daily News
@yaledailynews · Sep 9

WKND | I'll bite. When the News sent me to the newly opened Tous Les Jours — a South Korean bakery franchise with over a thousand locations worldwide — I had no idea what French-Asian cuisine would look like. Words by @meganvaz.
bit.ly/3eztjJJ

yaledailynews.com
Tous Les Jours opens its doors downtown - Yale Daily News

♡ 4

Yale Daily News
@yaledailynews · Sep 9

NEW HAVEN | The Board of Alders recently approved the City of New Haven Adult-Use Cannabis Zoning

LIGHT003299

making when cases rise, as they inevitably will," the group wrote in the statement. Representatives for New Haven Public School Advocates Maritza Spell and Sarah Miller read the suggestions at the Board of Education meeting.

Some teachers and parents expressed their outright opposition to the city's school reopening plan, highlighting unanswered questions and potential safety hazards.

"Under hybrid, I will be expected to teach under two separate physical locations and virtually at the same time," said New Haven teacher Jessica Light. "There are a lot of contingencies that make it likely that hybrid won't last very long."

Light added that she is OK with risking her own health by conducting in-person classes but is concerned about her son, who has opted into remote learning. She pressed the Board for answers on whether or not the district would provide teachers housing to quarantine away from their families. She also asked the Board for a plan to support children who lose a parent to COVID-19. Light, who teaches at Davis Academy for Arts & Design Innovation Magnet School, also criticized the Board for going forward with school reopening while COVID-19 cases have increased in New Haven County.

During public comment, New Haven Federation of Teachers President David Cicarella asked the Board to specify the extent of COVID-19 precautions in New Haven Public School buildings, a question that stunned board member Darnell Goldson. The Board of Education member expressed concern about the Federation's lack of knowledge about the status of the schools.

"We were told that they were intimately involved in the sign-offs of these schools, and now the president of the union gets on today and asks where we are in that process," he said. "This questions the safety of these schools. I was shocked by that, and I'm surprised no one else was. I again want to reiterate my opposition to opening schools until everybody is on board."

The Board also allotted time for city and University health experts to discuss contact tracing infrastructure and a pilot program for saliva-based tests for students and staff. The pilot program will be tested on certain New Haven Public School students beginning on Nov 9.

The Board of Education will next meet Nov. 9 — the same day that the New Haven public school system is scheduled to begin its hybrid model.

**Christian Robles** | christian.robles@yale.edu

**Owen Tucker-Smith** | owen.tucker-smith@yale.edu

**LIGHT003300**



**CHRISTIAN ROBLES** 🐦 ✉

Christian Robles covers education & youth services. He is a sophomore in Davenport College studying Political Science and Economics.



**OWEN TUCKER-SMITH** 🐦 ✉

Owen Tucker-Smith is Managing Editor. He previously covered New Haven politics. Owen is a sophomore in Ezra Stiles College majoring in Statistics & Data Science.



0 Comments    Yale Daily News    🔒 Disqus' Privacy Policy                  ⬤ Login ▾

♡ Favorite    🐦 Tweet    f Share                                          Sort by Newest ▾

Start the discussion…

LOG IN WITH                 OR SIGN UP WITH DISQUS ⑦

                            Name

Be the first to comment.

✉ Subscribe ⓓ Add Disqus to your siteAdd DisqusAdd ⚠ Do Not Sell My Data

**ALSO ON YALE DAILY NEWS**

'A top of the roller coaster moment': …

a year ago • 2 comments

To evaluate this year's unprecedented number of applications, the Office of …

Sex on the WKND: Lustless LDRs

a year ago • 1 comment

Are you sick of mediocre man sex? In love with your econ TF? Worried corona …

WILLIAMS: Our mental burden

a year ago • 1 comment

It feels all too surreal, this world we find ourselves in. A year ago, I remember …

LIGHT003301

# EXHIBIT 4

# AGREEMENT BETWEEN

# NEW HAVEN BOARD OF EDUCATION AND

# SCHOOL ADMINISTRATORS ASSOCIATION OF

# NEW HAVEN, INC.

## JULY 1, 2020-JUNE 30, 2023

8225656v2
January 23, 2020

DEF000513

TABLE OF CONTENTS

ARTICLE I - General ............................................................................................................ 1

ARTICLE II - Recognition .................................................................................................. 2

ARTICLE III - Board Rights .............................................................................................. 2

ARTICLE IV - Professional Obligations and Working Rules........................................... 2

ARTICLE V - Promotions ................................................................................................... 3

ARTICLE VI -Transfers and Assignments of Administrators ........................................... 4

ARTICLE VII - Evaluation Files of Administrators ......................................................... 7

ARTICLE VIII - Supplies and Office Equipment ............................................................. 8

ARTICLE IX - Administration............................................................................................ 8

ARTICLE X - Rights of Association................................................................................... 9

ARTICLE XI - Protection................................................................................................... 10

ARTICLE XII - Benefit Program ....................................................................................... 11

ARTICLE XIII - Leaves of Absence .................................................................................. 15

ARTICLE XIV - Consultation Procedure .......................................................................... 17

ARTICLE XV - Payroll Deductions................................................................................... 18

ARTICLE XVI - Salaries .................................................................................................... 19

ARTICLE XVII - Grievance and Arbitration Procedure.................................................... 20

ARTICLE XVIII - No Strike .............................................................................................. 24

ARTICLE XIX - Miscellaneous ......................................................................................... 24

ARTICLE XX - Retirement................................................................................................. 25

ARTICLE XXI - Agency Shop ........................................................................................... 26

ARTICLE XXII - Duration.................................................................................................. 26

SCHEDULE A ADMINISTRATIVE - SUPERVISORY SALARY SCHEDULE............. 28

SCHEDULE B ADMINISTRATIVE - SUPERVISORY SALARY SCHEDULE ............. 29

SCHEDULE C ADMINISTRATIVE - SUPERVISORY SALARY SCHEDULE ............. 30

SCHEDULE D DEGREE AND LONGEVITY SCALES ................................................... 31

SCHEDULE E ...................................................................................................................... 32

SCHEDULE F ...................................................................................................................... 43

SCHEDULE G...................................................................................................................... 48

SCHEDULE H...................................................................................................................... 49

DEF000514

AGREEMENT

THIS AGREEMENT IS MADE AND ENTERED INTO by and between the New Haven Board of Education (hereinafter referred to as the "Board") and the School Administrators Association of New Haven, Inc., (hereinafter referred to as the "Association").

ARTICLE I - General

Section 1

This Agreement is negotiated under Section 10-153b through n of the General Statutes of the State of Connecticut, as amended, in order:

(a)     To fix for its term the salaries and all other conditions of employment provided herein, and;

(b)     To encourage and abet effective and harmonious working relationships between the Board and the Administrative Staff in order that the cause of public education may best be served.

Section 2

The Board and the Association recognize the importance of responsible participation by the entire professional staff in the education process, planning, development and growth. To this end both parties agree to maintain communication to inform about programs, to guide in development and to assist planning and growth either by committee, individual consultation or designated representatives.

Section 3

This Agreement shall constitute the policy of the Board and the Association in the subject areas covered by the specific provisions of this Agreement for the duration of the Agreement unless changed by the mutual consent of both parties. Previously adopted policies, rules or regulations of the Board of Education in conflict with this Agreement are superseded by this Agreement.

Section 4

The Board and the Association agree to continue their policies of not discriminating against any bargaining unit member on the basis of his or her race, color, religious creed, age sex, sexual orientation, marital status, national origin, ancestry or present or past history of mental disorder, mental retardation, learning disability or physical disability, including, but not limited to, blindness.

1

DEF000515

## ARTICLE II - Recognition

The Board hereby recognizes the Association as the exclusive representative for purposes of collective bargaining pursuant to the Teacher Negotiation Act, as amended, for all certified professional employees employed by the Board in positions in the administrators' bargaining unit as defined in Conn. Gen. Stat. §10-153b (a).

## ARTICLE III - Board Rights

### Section 1

Nothing in this Agreement shall limit or contravene the authority of the Board as provided in the General Statutes of Connecticut and Charter of the City of New Haven. The Board shall not, however, exercise any of this authority so as to contravene a specific provision of this Agreement.

## ARTICLE IV - Professional Obligations and Working Rules

### Section 1

The Board and the Association recognize and agree that the administrators' responsibility to their students and teachers and their profession generally entails the performance of duties and the expenditure of time beyond their normal scheduled working day, but that the administrators are entitled to regular time and work schedules on which they can ordinarily rely to the extent possible throughout the school system. Therefore, in accordance with the above, the following schedules are hereby adopted:

(a)  Daily Schedule – Personnel covered by the administrative supervisory salary schedule shall work a normal scheduled working day of eight (8) hours, not including the professional time described above.  A duty free lunch period to be taken at a time agreed to by the Area Director shall be provided. For School Administrators, this normal scheduled working day will include the scheduled hours of the student and teachers; for Central Office Administrators, it will include the scheduled office hours of Central Office. As professionals and leaders, administrators will have reasonable discretion to schedule and deliver on remaining leadership obligations, including contact with parents and other stakeholders. Although the obligations of leadership may call for occasional unscheduled or out-of-schedule activities, planned leadership obligations should occur within predictable time periods, and administrators shall have reasonable ability to plan personal and other commitments.

(b)  Yearly schedule - The work year of personnel covered by the administrative supervisory staff salary schedule shall be as follows:

1.  Persons covered hereunder on a ten (10) month work year will be in the school (1) week in advance of the date when all members of the staff are required to be on duty, and shall at the end of the year, remain available one (1) week after staff members have left at the close of the

2

DEF000516

school year. In the event the latter five (5) days fall in the new fiscal year, then said ten (10) month administrators will be paid according to the previous salary schedule. Such persons shall be relieved from duty during all school holidays and all scheduled school vacation periods, provided, however, that the superintendent reserves the right, as the need of the school system may require, to determine the period when such persons may take their holiday and vacation time.

2.      Persons on a twelve (12) month work year are required to be on duty at all times, except for a period of four (4) weeks each year and two (2) of the following vacation periods, if applicable, during the school year: one (1) week of the Christmas recess, one (1) week of the winter recess, one (1) week of the spring recess. The Superintendent, in his/her sole discretion, shall determine when a particular administrator shall be permitted to take vacation as noted above. However, each employee is entitled to 29 vacation days during the school year.

3.      Any administrator who is required to work beyond his/her work year, including summer programs, shall be compensated at his/her per diem rate for each additional work day. Any such extended assignment shall be made by the Superintendent in writing in consultation with the Association with due regard for the affected administrator's vacation schedule and the number of the vacation days to which the administrator is annually entitled.

## ARTICLE V - Promotions

### Section 1

All vacancies in promotional positions caused by death, retirement, discharge or resignation and all promotional positions hereafter created, when such positions are to be filled, shall be filled pursuant to the following procedures, except as otherwise provided in Article VI, Section 2 of this Agreement.

(a)      Such vacancies shall be adequately publicized, including posting on the district website for at least ten (10) school days prior to the filling of the vacancy.

(b)      Information concerning salary and job descriptions shall be available in the office of each school or may be obtained from the Director of Human Resources and Labor Relations.

(c)      Administrators who desire to apply for any such vacancy which is a promotional position for them shall apply online and file their applications within the ten school-day period referred to in Section (a) hereof with the Director of Human Resources and Labor Relations.

(d)      Such vacancy shall be filled on the basis of fitness and qualifications for the vacant post, provided, however, that where two or more applicants in the New Haven School System are substantially equal in fitness and qualifications, the bargaining unit applicant with seniority in the New Haven School System shall be given preference.

(e)      Promotional positions are defined as follows: Positions paying a salary differential and/or positions on the administrative or supervisory level, including, but not limited to, positions such as assistant superintendent, director, supervisor, assistant supervisor, principal, assistant

3

DEF000517

principal, head counselor, housemaster, and middle and high school department head.

    (f)     All vacancies (as defined above in the case of promotional positions) for special project administrators shall also be filled pursuant to the procedures set forth in Section 1 above.

    (g)     Acting appointments to a vacant position shall, as a general rule, be effective no longer than one (1) year, provided, however, at the time of appointment there are no administrators certified and qualified for such position who have applied for the position or administrators who would be available to fill such vacancy by virtue of their position on the reappointment list with appropriate certification and qualifications.

    (h)     Preference shall be given to qualified administrators currently employed by the Board over applicants of relatively equal qualifications from outside the bargaining unit.

    (i)     No administrator shall lose step upon promotion.

## Section 2

When a new administrative position is created by the Board or a job description is changed, a job description will be prepared by the Superintendent, and the job will be placed ("slotted") in a salary group which requires similar or comparable duties and responsibilities and shall then be presented to the Association. If the Association believes that the position has not been placed in the proper salary group ("slotted") by the Superintendent or believes that a new salary group should be created, it may request a meeting with the Superintendent or his/her representatives to discuss the placement ("slotting") of the job. If agreement is not reached between the Superintendent and the Association, the Superintendent may make the position and the placement effective, but the Association may process a grievance pursuant to Article XVII (Grievance and Arbitration). If the Arbitrator finds the placement ("slotting") of the position by the Superintendent to be inconsistent with the relative duties and responsibilities, any placement ("slotting") or newly created group and salary subsequently arrived at by the Arbitrator which requires higher pay than the original placement ("slotting") shall be retroactive to the date the grievance claiming an improper slotting was filed.

### ARTICLE VI -Transfers and Assignments of Administrators

## Section 1. Voluntary Transfer

    (a)     Administrators may apply for administrative positions which may become open and which the Board intends to fill. All such applications must be filed in writing by the interested administrator with the office of the Director of Human Resources and Labor Relations by March 1, annually. No application can be made for a position in a higher paid group.

    (b)     If the administrator wishes to be considered for more than one position, then the administrator shall list his/her choice of schools and positions requested in the order of his/her preference.

4

DEF000518

(c)    In deciding upon an application for transfer to an open position, the Superintendent will consider the qualifications, length of the administrator's service in the system as an administrator, whether he/she has ever been in such position or similar position previously, and if so, his/her performance when so assigned, the wishes of the administrative applicant, as well as the availability of the position, the needs of the particular school and/or position, and the needs of the system before making his/her award of the position to any person. No such transfer will be approved if it impairs the right of any other administrator or former administrator then on the reappointment list.

(d)    No administrator shall lose step upon transfer.

## Section 2. Involuntary Administrative Transfers/Reclassifications

In the event of any change or reclassification by the Board in formulas for determining position differentials or of administrative/supervisory positions or in the event of any transfer or reassignment, the administrator or administrators affected thereby shall be paid the salary called for in the new position as long as it does not result in a reduction in pay, provided that in the event of transfer or reassignment by reason of discontinuance of a position or on grounds of lack of competence or proper qualifications to hold or carry out the duties of the former position, the administrator or administrators affected thereby shall be paid the salary called for in the new position whether or not a reduction. The issue of competence or proper qualifications as aforesaid shall be specifically subject to the grievance procedure provided in Article XVII of the Agreement.

(a)    Administrators involuntarily transferred, upon request, should be furnished with a letter to be placed in their personnel files and a copy for their personal files, stating the reason for their transfer.

(b)    An administrator involuntarily transferred to a new assignment to begin in September may be paid a pro-rated amount of his/her ten (10) month annual base salary for one (1) month's time for time spent to prepare for his/her new assignment during the summer. Such time spent during the summer shall not be paid for by the Board unless the Superintendent gives his/her prior written approval for the spending of such time.

## Section 3. Reduction of Administrative Staff/Elimination of Position

It is understood that it is within the discretion of the Board of Education to reduce the educational program, curriculum, and staff when economic, pupil enrollment decline, and other justifiable reasons dictate.

If, in the Board's opinion, it is necessary to reduce the administrative staff within particular administrative classifications, it shall be on the basis of length of administrative service within the New Haven Public School System, certification and qualifications.

In order to promote an orderly reduction in the administrative personnel, the following procedure will be used.

5

DEF000519

(a)    Any administrator relieved of his/her duties because of reduction of staff or elimination of position shall be offered an administrative opening if one exists, in his/her classification for which he/she is certified, qualified, and had previous experience in the City of New Haven.

(b)    If there is no existing administrative opening in his/her classification, the displaced administrator shall be offered the position of an administrator who has the least seniority in his/her present classification.

(c)    If there is no existing administrative opening in his/her classification and the displaced administrator has the least seniority in his/her classification, he/she will be offered an administrative opening, if one exists, in any other administrative classification for which he/she is certified and qualified and in which he/she has had previous acceptable experience; provided, however, such appointment does not constitute a promotion.

(d)    If there are no existing administrative openings in any administrative classifications, and the displaced administrator has the least seniority in his/her present classification, but has administrative seniority over an administrator in another classification for which the displaced administrator is certified and qualified and in which he/she has had previous experience, the displaced administrator will be offered such position; provided, however, such appointment does not constitute a promotion.

(e)    If an administrator is relieved of his/her duties because of a reduction in staff or an elimination of position and another administrative position is not otherwise available as aforesaid, he/she will be offered a teaching position for which he/she is certified.

(f)    If an administrator is relieved of his/her duties because of a reduction in staff or an elimination of position and employed as a teacher, she/he will be given the experience credit on the salary schedule according to the teacher contract for his/her administrative and teaching experiences both within and outside the school system, and shall retain all accumulated sick leave.

(g)    In the event an administrator is displaced (other than a disciplinary demotion or one based on poor performance) to an administrative classification or teaching position with a salary schedule lower than that which the displaced administrator previously enjoyed, for a period not to exceed three (3) years such administrator's salary shall not be reduced more than one thousand dollars ($1,000.00) the first year; three thousand dollars ($3,000.00) the second year; and six thousand dollars ($6,000.00) the third year; thereafter the administrator will be paid the appropriate salary for the position to which they have been displaced.

(h)    A displaced administrator who receives a position in another administrative classification shall be paid on the same salary step for such position as his/her previous administrative position.

(i)    Any administrator who has been displaced as aforesaid shall be placed on a reappointment list for two (2) years for his/her former administrative position or another similar administrative position of comparable pay and shall remain thereon until reappointed, provided

6

DEF000520

such administrator does not refuse a reappointment. Administrators shall be recalled to positions for which they are certified and qualified and in which they have previous acceptable experience, according to their administrative seniority in the New Haven Public School System. If a reappointment is offered consistent with the above and is refused by the administrator, he/she shall thereupon be removed from the reappointment list.

(j)    The classifications referred to above are as follows:

(1)    Executive Directors
(2)    Directors
(3)    High School Principals
(4)    Middle School Principals, K-8 Principals, Supervisors (12 month)
(5)    Elementary School Principals
(6)    Assistant Principals
(7)    Supervisors (10 month)
(8)    Assistant Supervisor/Coordinators

## Section 4

A 10-month principal assigned to more than one school shall be paid according to Group E of the Administrative Supervisory Salary Schedule for the duration of such assignment. A principal who is assigned to more than one school who subsequently is reassigned as a principal of only one school shall be paid according to the appropriate salary group reflective of the size of the school and number of full-time teachers assigned to that school.

## ARTICLE VII - Evaluation Files of Administrators

## Section 1

Each administrator shall be evaluated at least once during each year of this Agreement. Administrators shall have the opportunity to review and discuss their evaluation with their Supervisors and shall have the right to receive copies of their individual evaluation reports if they request such. The administrator shall acknowledge that he/she has read his/her evaluation report by affixing his/her signature in the space provided for such purpose and such report shall then be placed in his/her personnel file. A signature of an administrator only signifies that he/she has read the report not that he/she agrees with its content

## Section 2

The administrator shall have the right to answer any material filed in his/her personnel file and such answer shall be attached to the file copy. Upon reasonable request, an administrator shall be allowed to examine his/her personnel file. He/she shall also be allowed to make one copy of any material in his/her file upon reasonable notice and at his/her own expense.

7

DEF000521

## Section 3

Any material in an administrator's personnel file shall be removed therefrom or modified when it is deemed inaccurate, improper or unfair when determined by court order or arbitration award.

## Section 4

Administrators shall comply with all directives of the Superintendent concerning the evaluation of tenure and non-tenure teachers and shall evaluate such teachers when required by such directives. Administrators shall sign all evaluations in which they participate.

### ARTICLE VIII - Supplies and Office Equipment

## Section 1

The Board will insure that each administrative unit shall have all the office equipment and supplies consistent with Board policy necessary to do the work required.

## Section 2

The Board will take whatever steps are necessary to attain the goal of uniformity in all records and reports.

## Section 3

The Board of Education will provide sufficient clerical help to see to it each administrator's office is properly run and maintained.

### ARTICLE IX - Administration

## Section 1

The Board recognizes that the principal is charged with the responsibility of the administration of the program within the building to which he/she is assigned and must make decisions necessary to the proper operation and maintenance of the building, provided such decisions are in keeping with the policy of the Board of Education and the Administrative regulations of the Superintendent.

## Section 2

Principals shall be consulted regarding special and federal programs so that such programs may be part of the overall school program in that building.

8

DEF000522

## Section 3

The principal shall be in charge of all disciplinary problems of the school to which he/she is assigned, but shall handle same in a manner consistent with Board policy and administrative regulations of the Superintendent.

### ARTICLE X - Rights of Association

## Section 1

The Superintendent agrees to make available to the Association President a copy of the Agenda of the next public meeting of the Board of Education at least one (1) school day prior to the Board's next public meeting.

In the event a public Board meeting is held during a school day, release time will be provided for the President of the Association or his/her designated alternate to attend the meeting.

## Section 2

In the event the Association feels it needs any public information from the Board so as to allow the Association to better negotiate a successor to this Agreement or process any grievance or appeal, the Association will put such request in writing and send it to the Superintendent who shall provide such information within one (1) week after receipt of such written request, unless otherwise prohibited by law or court order.

## Section 3

A copy of all master contracts between the Board of Education and all organizations having collective bargaining agreements with the Board of Education shall be made available to the Association upon ratification of said contracts.

## Section 4

The Board shall make available the minutes of all official Board meetings (other than those taken in executive session), upon acceptance by Board action, to the President of the Association.

## Section 5

The Association President or his/her designee shall be allowed a maximum of three (3) days release time per year as necessary to conduct Association business outside the district, providing reasonable notice is given to the Superintendent, and providing adequate coverage of his/her administrative duties can be arranged.

9

DEF000523

## ARTICLE XI - Protection

### Section 1

In accordance with the Superintendent's Administrative Directives, all administrators shall promptly report all incidents which occur in their schools or within their area of responsibility. Any administrator involved, or alleged to be involved, in the incident to be reported shall not be required to make such report as aforesaid, but shall promptly delegate the responsibility therefor to another administrator.

### Section 2

The Board and the Superintendent shall comply with any reasonable request of the administrator for information in his/her or the Board's possession not privileged under law and which relates to any incident allegedly involving the administrator.

### Section 3

(a)     In accordance with the provisions of Section 10-235 of the General Statutes, the Board shall protect and save harmless any administrator from financial loss and expense, including legal fees and court costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence or other act resulting in accidental bodily injury to or death of any person, or in accidental damage to or destruction of property within or without the school building, or any other acts resulting in any injury, which acts are not wanton, reckless or malicious provided such administrator, at the time of the acts resulting in such injury, damage or destruction, was acting in the discharge of his/her duties or within the scope of his/her employment or under the direction of the Board.

(b)     If criminal proceedings are brought against an administrator alleging an assault while acting in the scope of his/her employment, such administrator may request the Board to furnish legal counsel to defend him in such proceedings. If the Board does not provide such counsel, and the administrator prevails (including a nolle or dismissal) in the proceedings, then the Board shall reimburse the administrator a reasonable attorney's fee in defending the proceeding. The Board shall have no obligation under this paragraph if the administrator is found guilty.

### Section 4

(a)     Whenever an administrator is absent from school as result of personal injury, compensable under the Connecticut Workers' Compensation Law, and caused by an assault arising out of and in the course of his/her employment, he/she shall be paid his/her full salary for the period of such absence without having such absence charged to the annual sick leave or accumulated sick leave as long as he/she is receiving worker's compensation. Any amount of salary payable pursuant to this Section shall be reduced by the amount of any Workers' Compensation award for temporary disability due to the said assault injury for the period for which such salary is paid. The Board shall have the right to have the administrator examined by a physician selected by the administrator from a list of at least four (4) physicians designated by the Board for the purpose of establishing the length of time during which the administrator is

10

DEF000524

temporarily disabled from performing his/her duties. In the event there is no adjudication under Workers' Compensation or no physician's examination by a physician selected from the aforesaid Board list, then the opinion of the administrator's own physician as to the period of disability shall control.

(b)    The Workers' Compensation Preferred Provider Program shall govern this Section were applicable.

## Section 5

Notification of any complaint pertaining to an administrator which is received by the Central Office shall be forwarded promptly to the administrator involved.  An official complaint must be in writing and the Superintendent shall make a determination as to the validity of the complaint within six (6) weeks from the date of its receipt.  If the complaint against the administrator is determined by the Superintendent to be valid and discipline is imposed, the administrator against whom the complaint was filed may file a grievance at Step 2 of the Grievance Procedure in this Agreement within the time limits therein specified.

## ARTICLE XII - Benefit Program

## Section 1. Accident Benefits

(a)    Whenever an administrator is absent from school as a result of a personal injury compensable under the Workers' Compensation Law of Connecticut and caused by an accident (other than an assault) arising out of and in the course of his/her employment, for a period of up to twelve (12) months of such absence, he/she may elect to charge all or part of such absence during the period of temporary disability due to the accident to the sick leave days to his/her credit under the Board's rules and regulations pertaining to sick leave, in which event (a) he/she shall receive the sick leave pay to which he/she is entitled for the period so charged to his/her sick leave credits less the amount of any Workers' Compensation award made for temporary disability due to said injury for any period for which such sick leave is paid, and (b) his/her accumulated sick leave as of the last day worked prior to the said period of absence shall be charged proportionately in the same ratio that the amount of his/her total daily sick leave benefit less his/her daily Workers' Compensation benefit bears to his/her total daily sick leave benefit. All members of the School Administrators Association of New Haven bargaining unit who are absent from school and entitled to Workers' Compensation will have their sick leave account reimbursed at the rate of two-thirds (2/3rds) of a day for every day the administrator has been charged with his/her eligible sick days during the compensation period. The reimbursement will occur as soon as the payroll office is notified that the administrator has returned to work. In the absence of such election, such administrator shall not receive his/her sick leave payment during the period of his/her absence for temporary disability due to the accident and his/her sick leave credits shall not be reduced by reasons of any Workers' Compensation payments he/she may receive for temporary disability due to the injury. Acceptance of sick leave payments (other than those made in connection with injury due to an assault) for any period for which the administrator may be entitled to receive temporary disability payment under the Workers' Compensation Law shall constitute an election to charge his/her absence for such period to the sick leave days to his/her credit.

11

DEF000525

(b)    Employees shall receive workers' compensation benefits pursuant to the City's Workers' Compensation Preferred Provider Program in accordance with Connecticut General Statutes § 31-279 et al.

Section 2. Health Insurance Benefits

(a)    The Board shall cover all employees scheduled to work twenty (20) hours per week or more and their eligible dependents under one of the following four medical care programs, summaries of which are attached as Schedules E-1, E-2, E-3 and E-4 respectively:

1.    High Deductible/HSA eligible plan ("HDHP")
2.    Comp/Mix plan ("CompMix")
3.    POE ("POE")
4.    Preferred Provider Organization plan PPO ("PPO")

(b)    For 2020-21, the employee shall contribute fifteen and one-half (15.5%) percent of the fully insured equivalent (FIE) rate for the HDHP; for 2021-22 employees shall contribute an amount equal to sixteen (16%) percent of the FIE for the HDHP; and effective 2022-23, employees shall contribute seventeen (17%) percent of the FIE for the HDHP. Employees selecting either the CompMix, POE or PPO plan shall pay the applicable co-pay for the HDHP plus the difference in rate between the HDHP and the FIE rate for the plan selected.

Employees shall participate in the City of New Haven Health Incentive Program, a summary of which is attached as Schedule F. Employees who do not comply with the requirements of the program shall contribute an additional amount towards the cost of the plan as follows:

| | |
|---|---|
| Single Coverage | $50 per month |
| Two Person | $75 per month |
| Family Coverage | $100 per month |

Members whose primary care physician is in the Enhanced Personal Health Care Program (EPHC) shall pay a $15 office visit co-pay. While participating in the HIP Program is required, participation in the EPHC Program shall be voluntary.

(c)    A Health Savings Account (HSA) shall be established for every employee that selects coverage in the High Deductible Health Plan. The account will be established at a financial institution of the Board's choice. The Board will contribute on behalf of each employee an amount equivalent to 50% of the plan's deductible. The Board's contribution will be deposited on July 1 in the first year of the employee's participation in the HDHP, and in subsequent years, one-half on July 1 and one-half on December 1 of the contract year. Employees may make additional contributions to the HSA in accordance with IRS regulations.

(d)    Employees may choose between the medical plans at the time of enrollment and at the time of the City's annual open enrollment.

During the course of this agreement the Board may hold an annual, required reenrollment for all bargaining unit members and their eligible dependents. At this time all members will be

12

DEF000526

required to reenroll in their choice of the Board's offered medical benefit plans pursuant to the regulations prescribed by the Medical Benefits Office. Any individual not participating in this reenrollment will not be eligible for continuation of medical benefits until such time as they reenroll pursuant to this section.

(e)     Prescription coverage shall be as stated on the attached Medical Benefits Matrix (Schedule E-5).

(f)     The Blue Cross Full Service Dental Plan for individual employee and all eligible dependents, including Rider A (additional basic benefits), Rider B (prosthetics), Rider C (periodontics), Rider D (orthodontia), and unmarried Dependent Child (19-24).

(g)     The Board shall adopt and maintain an Internal Revenue Code Section 125 Pre-Tax Premium Conversion Account, also known as a Reimbursement Account Plan ("RA Plan"), for administrators for the purpose of enabling eligible Administrators to divert a portion of their gross salaries, prior to reduction for federal income or social security taxes, by a minimum of $100 to a maximum of $3,000 per Plan Year for Health Reimbursement, and by a minimum of $500 to a maximum of $5,000 per Plan Year for Dependent Care, into an account from which, during the course of the Plan Year, they can be reimbursed for Health Care costs and Dependent Care costs they or their covered dependents incur which are not covered by the Medical or Dental Plans described in this Article, including, but not limited to, their share of the premium costs for such Plans. The following provisions will apply:

Under no circumstances will the Board be required to contribute any monies to the RA plan or to any account established pursuant thereto.

Each Administrator desiring to participate in the RA Plan must apply for participation and enroll by submitting completed forms provided by the Board 30 days prior to July 1 of each Plan Year in which he/she or she desires to participate.

Each Administrator accepted as a participant in the RA Plan must, 30 days prior to July 1, inform the Board in writing of the amount he/she wishes to contribute to the Account during the Plan Year (a minimum of $100 to a maximum of $3,000 per Plan Year for Health Reimbursement, a minimum of $500 to a maximum of $5,000 per Plan Year for Dependent Care), which shall be divided by the number of payroll periods scheduled for the Plan year to determine the amount to be deducted from each paycheck during that Plan Year.

As a condition precedent to the establishment of an account under the RA Plan, the Administrator must submit to the RA Plan Administrator, on forms approved by the Board, written authorization for the Board to deduct from his or her salary, the amounts to be diverted to his or her RA Plan Account, which shall be the same amount from each paycheck issued during the Plan Year.

If the employment of an Administrator terminates for any reason while he/she or she is a participant in the RA Plan, the Administrator will be permitted to withdraw the unencumbered balance from his or her RA Plan Account.

13

DEF000527

Unexpended balances in each RA Account at the end of each plan year will be forfeited in accordance with legal requirements. The RA Plan will be governed by the terms of the RA Plan description. It is intended that the RA Plan shall be interpreted, whenever possible, to comply with such terms of the Internal Revenue Code. In the event the RA Plan Administrator determines, before or during any Plan Year, that the RA Plan may fail to satisfy any non-discrimination requirement imposed by the Code or limitation on benefits to certain participants, the RA Plan Administrator shall take such action as he/she deems appropriate under rules uniformly applicable to similarly situated participants. At this time, the RA Plan as outlined meets all code requirements.

## Section 3. Term Life Insurance

The Administrators shall receive term life insurance and accidental death and dismemberment benefits in the amount of two times the administrator's salary, rounded off to the nearest $1,000.00 (inclusive of degree and longevity), so long as such administrator remains employed by the Board in a position covered by this Agreement.

Each administrator is entitled to purchase term life insurance and accidental death and dismemberment benefits in the amount of two times the administrator's salary, rounded off to the nearest $1,000.00, at the rate paid by the Board of Education. This provision remains in effect as long as the administrator is employed by the Board.

## Section 4. Long-Term Disability Insurance

The Board shall provide a standard long-term disability coverage with payment to age sixty-five (65) of sixty (60%) percent of the employee's normal gross earnings after a waiting period of one hundred eighty (180) calendar days. The amount of benefits will be reduced by any remuneration received during the benefit period from the employer, Workers' Compensation benefits, Connecticut Teachers Retirement Fund Benefits, and primary social security offset benefits. The provisions shall include coverage for disability due to psychiatric illness.

The long-term disability policy shall have a social security freeze provision so that the beneficiary will realize any increases in any further social security benefit payments.

## Section 5. Right to Change or Substitute Carrier

The Board may change or substitute insurance carriers or managed care organizations for the above-referenced health benefit program as long as the level of benefits are substantially equivalent to or better than the existing program. The "substantially equivalent to or better than" standard shall be applied on a program-wide analysis and shall not be benefit specific.

14

DEF000528

ARTICLE XIII - Leaves of Absence

Section 1 Sick Leave

(a)    Upon the retirement or death of a member of the professional administrative staff employed as an administrator prior to July 1, 1994, said member or his/her survivors shall be paid for accumulated sick leave days up to, but not to exceed, the following limits:

> 10 month administrators: 64 days
> 12 month administrators: 73 days

Upon retirement or death of an employee who is hired on or after July 1, 1994 or who becomes an administrator on or after July 1, 1994, said employee or his/her survivors shall be paid for accumulated sick leave as follows:

> 10 month administrators: 34% of his/her accumulated sick leave
> 12 month administrators: 34% of his/her accumulated sick leave

This benefit will not be available to administrators who become members of the bargaining unit after June 30, 2020.

(b)    1.    Administrators on a ten (10) month schedule shall be entitled to sixteen (16) sick days each school year which may be accumulated to a total of two hundred fifteen (215) days.

2.    Employees who are hired on or after July 1, 1994 or who become administrators on or after July 1, 1994 and who work a ten (10) month schedule shall be entitled to sixteen (16) sick days each school year which may be accumulated to a total of one hundred sixty (160) days.

3.    Administrators on a twelve (12) month schedule shall be entitled to nineteen (19) sick days each school year which may be accumulated to a total of two hundred fifteen (215) days.

4.    Employees who are hired on or after July 1, 1994 or who become administrators on or after July 1, 1994 and who work a twelve (12) month schedule shall be entitled to nineteen (19) sick days each school year which may be accumulated to a total of one hundred seventy (170) days.  When administrators have accumulated the maximum sick leave accrual, they will be granted their annual sick leave allotment on July 1 of each year in addition to their accumulated sick leave.  This annual allotment shall not be considered accumulated sick leave for purposes of Section 1(a) above.

(c)    In the event of absence of an administrator for illness in excess of five (5) consecutive working days, the Superintendent may require an examination by an independent physician, such examination to be at the Board's expense.

15

DEF000529

Section 2. Personal Leave

In addition to present or future Board policies authorizing absences or leaves of absences, each administrator shall be entitled as of right to a maximum of two (2) days leave of absence with pay each year for personal, legal, business, household, or family matters which require absence during the school hours. These days may be accumulated to four (4). Application for such leave shall be made in writing and as far in advance as practicable and ordinarily at least forty-eight (48) hours.

Section 3. Funeral Leave

(a)    A leave of absence not to exceed five (5) days immediately following the date of death shall be granted to any administrator whose wife, husband, father, mother, father-in-law, mother-in-law, brother, sister, brother-in-law, sister-in-law, child (or grandparent) or grandchild dies. Such leave shall be with pay and shall not be charged to the administrator's sick leave.

(b)    Time off to attend the funeral of aunts, or uncles, (or grandchildren) shall be granted. Such leave shall be with pay not to exceed one (1) day and shall not be charged to the administrator's sick leave.

Section 4. Maternity Leave

(a)    The Board will not deny reasonable request of an administrator for leave of absence because of the administrator's pregnancy.

(b)    Any administrator requesting such a leave shall present to the Superintendent a written statement from her attending physician indicating her present physical condition, the expected date of childbirth, when it would be expected that the administrator's physical condition would allow her to continue to work and any other information relative to her physical condition that the physician feels appropriate. If complications develop and the administrator is not able to return to work when originally planned, the physician shall so indicate in a letter to the Superintendent prior to the original date of expected return. Such additional notice shall contain a date when the physician expects the administrator's physical condition to be such to allow her to return to work.

(c)    No leave of absence shall be granted for pregnancy or maternity reasons unless the above conditions are met.

Upon return to work from an authorized leave of absence for the reason of pregnancy, the administrator shall be returned to the position she held prior to the leave, or a comparable position if available. If such is not available, she will have the rights provided under the Involuntary Transfer provisions (Article VI, Section 2) of this Agreement.

Section 5. Jury Duty

Any twelve (12) month administrator ordered to report for jury duty shall receive his/her professional salary and shall assign to the Board the jury fee for each day he or she serves as a juror.

16

DEF000530

## Section 6. Conference Leave

The Board agrees that administrators should be encouraged to attend conferences, seminars and conventions which do not detract from their ability to spend the required time to perform their professional services to the satisfaction of the Board. All such leaves for these purposes shall be approved prior to attendance by the Superintendent and, if approved, the administrator's expenses will be paid by the then existing policy of the Board and City of New Haven. Such leave shall be without loss of pay.

## Section 7. Family and Medical Leave

Nothing contained herein to the contrary notwithstanding, Administrators shall be entitled to Family and Medical Leave as provided for by Federal Family and Medical leave laws, as applicable. All leaves provided for herein shall be included in and shall not be in addition to the period(s) of leave required by such laws.

## ARTICLE XIV - Consultation Procedure

### Section 1. Generally

In the event either party to this Agreement wishes to propose that a change, addition, modification, correction or deletion in this Agreement be made, the following procedure will be adhered to:

(a)    The party proposing the change, addition, modification, or deletion shall reduce such to writing and mail it to the Superintendent or the President of the Administrators Association, as the case may be, within a reasonable time.

(b)    Thereafter, and within a two (2) week period, a meeting of representatives of all the parties shall be held to discuss the matter. This time required may be waived upon mutual agreement.

(c)    If agreement is reached on the proposal, such will be reduced to writing and referred to the Board and the Administrators Association for ratification, with the recommendation of both parties.

(d)    Any agreed upon and ratified change, addition, modification, or correction and/or deletion to this Agreement shall become an addendum hereto and become a part hereof.

(e)    Nothing herein shall require either party hereof to agree to any particular proposal submitted pursuant hereto. The obligation of both parties is only to discuss any proposal submitted pursuant to this provision.

17

DEF000531

Section 2. Superintendent's Council

The Board agrees to the establishment of a Superintendents' Council, which will consist of members of the Administrators Association, the Superintendent and his/her designees to meet periodically, but at least once a month, to discuss problems facing school administration. Members of the Board may attend any one or all of such Council meetings. This council is designated to create a vehicle for the discussion of methods by which school administration and policy may be implemented so as to provide for the continued improvement of the New Haven School System. No more than five (5) persons shall represent either the Superintendent or the Administrators Association in any such meeting.

ARTICLE XV - Payroll Deductions

Section 1

In addition to those payroll deductions required by law, the following agencies are eligible for payroll deductions:

(a)     All requests for deductions must be in writing on approved, authorized forms, executed by the individual administrator.

(b)     A list of the approved deductions are as follows:
1.     The School Administrator Association of New Haven
2.     Military Service Time Retirement Fund
3.     United Way
4.     Tax Sheltered Annuity
5.     Voluntary State Retirement Contract
6.     Benefit Premium increases pursuant to Article XII, Section 2(c)
7.     Other deductions as the parties may mutually agree

(c)     The Association shall certify to the Board in writing the current rate of its membership dues. If the Association changes the rate of its membership dues, it shall give the Board thirty (30) days written notice prior to the effective date of such change.

(d)     Deductions referred to in Section 1 above shall be made from any pay due on the first payday of each month. The Board shall not be required to honor for any month any authorizations that are delivered to it later than one (1) week prior to the distribution of payroll from which deductions are to be made.

(e)     No later than September 30 of each year, the Board shall provide the Administrators Association with a list of those employees who have voluntarily authorized the Board in writing to deduct dues for any of the Associations named in paragraph (b) above. The Board shall notify the Association monthly of any changes in said list. Any administrator desiring to have the Board discontinue deductions he/she has previously authorized must notify the Board, the Administrators' Association and the Association or group concerned in writing by September 15 of each year for that school year's dues.

(f)     The amount of any deduction may be changed only once in any calendar year.

18

DEF000532

ARTICLE XVI - Salaries

<u>Section 1</u>

(a)    Schedules A, B and C attached hereto reflect salary rates by which all administrators shall be paid during the term of this Agreement.

In addition to the salary rates set forth for the respective classification on Salary Schedules A, B and C, administrators shall receive additional stipends for their length of service and advanced degrees (beyond the Master's Degree) in accordance with the degree and longevity scale contained in Schedule E attached hereto.

Each year of the contract an administrator not already at Step 3 shall advance one step. In order to reach Step M an administrator must have a performance rating of "effective" or better. To be eligible for Step M, an administrator must have been on Step 3 the prior year, and must have been rated "effective" or better on their last evaluation. Administrators rated less than effective on their last evaluation but who are subsequently rated "effective" or better shall be moved to Step M retroactive. If an administrator who reaches Step M is less than "effective" for two (2) years in a row, they will drop back to Step 3.

Effective July 1, 2017, a new step MM shall be created, which is 2% higher than Step M. To be eligible for Step MM, an administrator must have been on Step M the prior year, and must have been rated "effective" or better on their last evaluation. If an administrator who reaches Step MM is less than effective for two (2) years in a row, they will drop back to Step M; they will move back to Step MM for the following year if they are subsequently rated "effective" or better.

(b)    Any administrator appointed after June 1, 1968, who does not hold a Master's Degree shall be paid the amount specified in the applicable Salary Schedule less the increment paid pursuant to present policy for Master's Degree.

(c)    An administrator whose performance is less than satisfactory will not be moved to the next higher step until he/she has attained satisfactory performance. Upon attaining satisfactory performance, he/she will receive payment for the withheld step, in addition to payment for whatever other step he/she is entitled under the terms of this Agreement.

Upon adoption of a new administrators evaluation system meeting the requirements of 10-151b, and consistent with the Side Letter Regarding School Reform attached as Schedule H, the Parties agree that "satisfactory" shall be defined as "effective" or better and the following applies and replaces the previous paragraph: An Administrator whose performance rating is effective or better will move to the next higher step.

(d)    Each administrator shall elect in writing whether he/she wishes to be paid in twenty-one (21) or twenty-six (26) equal payments. Such election cannot be changed for the duration of the fiscal year. In the event an administrator fails to make an election as specified above, he/she shall be paid in accordance with his/her previous payment election.

19

DEF000533

(e)    Effective upon the signing of this Agreement, bargaining unit members shall administer the teacher reform side letter and memorandum of understanding. The wage schedules attached as Schedules A, B and C reflect this additional compensation. All bargaining unit salaries have been adjusted to reflect these increases, regardless of the level of responsibility for overseeing the teacher reform agreements.

## Section 2

The duties or the responsibilities of any position in the bargaining unit will not be altered or increased without prior negotiations with the Association.

## Section 3

Any administrator on a ten (10) month schedule, scheduled to work during the summer or two months of recess shall receive a per diem rate (and not an hourly rate) calculated by dividing his/her salary (according to the salary, degree and longevity schedules then in effect) by 194 and multiplying the quotient by the number of days during which the required work was performed.

## Section 4

Any member who is promoted will not take a decrease in pay, if the new position begins at a lower pay, but will be placed on such step as will represent an increase above his/her previous position.

## Section 5

Any administrator who works in an administrative position in a higher salary group than his/her regular salary group for more than seven (7) consecutive school days shall receive, retroactive to the first day of any such work, the pay of the higher salary group in which he/she is working.

## ARTICLE XVII - Grievance and Arbitration Procedure

### Section 1 Purpose

The purpose of this procedure is to secure, at the lowest possible administration level, equitable solutions to problems which may arise affecting the welfare or working conditions of administrators. Both parties agree that proceedings shall be kept as confidential as appropriate.

### Section 2. Definitions

(a)    A grievance shall mean a complaint by an employee that (1) he/she has been treated unfairly or inequitably, or (2) there has been a violation, misinterpretation or misapplication of a specific provision(s) of this Agreement or of established policy or practice.

(b)    Administrator shall mean any certified professional employee member of this

20

DEF000534

bargaining unit and may include a group of administrators similarly affected by a grievance. When "days" are referred to in the time limits hereof, such shall mean school days.

## Section 3. Time Limits

(a)     Since it is important that grievances be processed as rapidly as possible, the number of days indicated at each step shall be considered as a maximum. The time limits specified may, however, be extended by written agreement of the parties in interest.

(b)     If an administrator does not file a grievance in writing within thirty (30) days after he/she knew or should have known of the act or conditions on which the grievance is based, then the grievance shall be considered to have been waived.

(c)     Failure by the aggrieved administrator at any level to appeal a grievance to the next level within the specified time limit shall be deemed to be acceptance of the decision rendered at that level.

## Section 4. Informal Procedure

(a)     If an administrator feels that he/she may have a grievance, he/she shall first discuss the matter with his/her immediate supervisor or other appropriate administrator in an effort to resolve the problem informally.

(b)     If the administrator is not satisfied with such disposition of the matter, he/she shall have the right to have the Association assist him in further efforts to resolve the problem informally with his/her supervisor or other appropriate administrator.

## Section 5. Formal Procedure

Step 1

If the aggrieved administrator is not satisfied with the disposition of his/her grievance on an informal basis, he/she may file in writing a grievance with the Association for referral to the Superintendent of schools. Such filing must take place within the thirty (30) day period as set forth in Section 3 (b) above.

(1)     The Association shall, within five (5) days after receipt, refer the grievance to the Superintendent, but prior to doing so, the Association shall provide an opportunity for the aggrieved administrator to meet with the appropriate committee to review the grievance.

(2)     The Superintendent shall, within ten (10) days after receipt of the written grievance, meet with the aggrieved administrator and with representatives of the Association for the purpose of resolving the grievance. A full and accurate record of such hearing shall be kept.

(3)     The Superintendent shall, within five (5) days after the hearing, render his/her decision and the reasons therefor in writing to the aggrieved administrator with a copy to the Association.

21

DEF000535

Step 2

If the aggrieved administrator is not satisfied with the disposition of his/her grievance at Step 1, he/she may, within three (3) days after the decision or within eight (8) days after the hearing, file the grievance again with the Association for appeal to the Board of Education.

(1)    The Association shall, within three (3) days after receipt, refer the appeal to the Board of Education.

(2)    The Board of Education shall, within fifteen (15) days after receipt of the written appeal, meet with the aggrieved administrators and with representatives of the Association for the purpose of resolving the grievance. A full and accurate record of such hearing shall be kept.

(3)    The Board shall, within fifteen (15) days after such meeting, render its decision and the reasons therefor in writing to the aggrieved administrator with a copy to the Association.

Section 6  Arbitration

(a)    If the aggrieved administrator is not satisfied with the disposition of his/her grievance at Step 2, he/she may, within three (3) days after the decision or within eighteen (18) days after the Board meeting, request in writing to the President of the Association that his/her grievance be submitted to arbitration.

(b)    The Association may, within five (5) days after receipt of such request, submit the grievance to arbitration.

(c)    The chairman of the Board and the President of the Association shall, within five (5) days after such written notice, jointly select an arbitrator who is an experienced and impartial person of recognized competence. If the parties are unable to agree on an arbitrator within five (5) days, the matter shall be submitted to the American Arbitration Association under the Voluntary Labor Arbitration Rules of the American Arbitration Association.

(d)    The arbitrator so selected shall confer promptly with representatives of the Board and the Association, shall review the record of prior hearings, and shall hold such further hearings with the aggrieved administrator and other parties in interest as he/she shall deem requisite.

(e)    The arbitrator shall render his/her decision in writing to all parties in interest, setting forth his/her findings of fact, reasoning and conclusions on the issues submitted. The decision of the arbitrator shall be final and binding upon all parties in interest to the extent permitted by law.

(f)    The cost of the services of the arbitrator shall be borne equally by the Board and the Association.

Section 7

The Superintendent and/or the Board shall have the right to file a grievance in writing with the Association, and such grievance shall thereafter be processed beginning with Step 2 of

22

DEF000536

the Grievance Procedure. The Association shall, on its own behalf, have the right to file a grievance alleging a breach of this Agreement affecting the Association as a whole and shall process said grievance beginning with Step 2 of the Grievance Procedure.

## Section 8

All grievances must be submitted in writing pursuant to Step 1 above (or Step 2 if filed by either the Board, the Superintendent, or the Association) within thirty (30) days of the date upon which the occurrence giving rise to the grievance occurred. Failure to file such grievance within the time limits specified herein shall be deemed a waiver of the grievance.

## Section 9

Any arbitrator acting pursuant to this Agreement shall have power only to construe specific provisions of this Agreement and shall have no authority to add to, delete from, or modify in any way any provision of this Agreement.

## Section 10 Representation

(a)    No reprisals of any kind shall be taken by either party or by any member of the Administration against any participant in the grievance procedure by reason of such participation.

(b)    When an administrator is not represented by the Association, the Association shall have the right to be present and to state its views at all stages of the procedure.

(c)    In the event the Association shall not have elected to submit a grievance to arbitration, the aggrieved administrator may submit his/her grievance to arbitration independently by following the procedure outlined above, in lieu of the Association provided, however, that in such case, the costs for the services of the arbitrator shall be borne by the aggrieved administrator.

The Association or the Board may, if it so desires, call upon the professional services of any person it deems necessary to assist the Association or the Board, respectively, at any stage of the procedure.

## Section 11 Miscellaneous

(a)    All documents, communications, and records dealing with the processing of a grievance shall be filed separately from the personnel files of the participants.

(b)    Forms for filing and processing grievances and other necessary documents, shall be prepared by the Superintendent, with the approval of the Association, and be made available to the Association as to facilitate operation of the grievance procedure.

23

DEF000537

## ARTICLE XVIII - No Strike

During the term of this Agreement, neither the Administrators Association or any officer or representative thereof nor any administrator covered hereby shall engage in any strike, work stoppage, slowdown, or refusal to work or mass resignation. Participation in such activity may result in discipline or discharge to the person or persons involved and such shall not be subject to the Grievance and Arbitration procedure hereof. Only the question of whether a particular employee participated in any such activity as defined above may be submitted to the Grievance and Arbitration Procedure hereof.

## ARTICLE XIX - Miscellaneous

### Section 1

The Administrators Association and the Board agree that this Agreement represents the complete agreement between the parties concerning all conditions of employment and salaries of administrators for the duration of this Agreement.

### Section 2

This Agreement is deemed to be in compliance with all State and Federal laws (including the Constitution of the United States and the Constitution of the State of Connecticut), and the Board and the Association shall comply with all applicable State and Federal laws. If for any reason a provision or provisions of this Agreement are determined by a court of competent jurisdiction to be in violation of any of said laws, then that provision or those provisions shall be automatically stricken from this Agreement, and the balance of this Agreement shall continue in full force and effect.

### Section 3

Whenever written notice is required to be given herein, such notice shall be given by letter forwarded to the last address of the person as contained in the files of the Board of Education.

### Section 4

(a)    Wherever "Superintendent" is used, it shall mean the Superintendent of Schools of the City of New Haven or any administrator designated to act by the Superintendent in accordance with the then effective administrative procedures of the system.

(b)    Wherever the term "he" or "she" is used in this Agreement, it is intended to mean either gender and is used for convenience only.

### Section 5

The Board agrees to pay for all costs incurred in printing and distribution of this Agreement.

24

DEF000538

## ARTICLE XX - Retirement

### Section 1

Any Administrator who applies for and receives a retirement allowance from the State of Connecticut within five (5) years before his/her first eligibility for a full retirement allowance or at any time after they have achieved eligibility for the full allowance, and who has been a teacher/administrator for at least ten (10) years in New Haven, and who are not then or at any time thereafter eligible for Medicare insurance coverage, shall be eligible to participate in such medical insurance plan as the Board provides to active employees. The Board shall pay seventy-five (75%) percent of the costs of such medical coverage and the Administrator shall pay twenty- five (25%) percent for such coverage for the Administrator and his/her enrolled dependents until such administrator dies. The cost sharing payment associated with active medical coverage must be made each month in advance. Lack of timely payment will result in the termination of such benefits.

### Section 2

Upon reaching age 65, or such other time as a retiree or spouse becomes eligible for Medicare insurance coverage, the retiree and/or spouse shall be required to apply for and pay the full cost of Medicare Part A and B, and utilize such coverage as primary coverage. The New Haven Board of Education will then provide to the member, a Medicare Supplement plan that together with Medicare Parts A and B will provide the retiree with coverage and benefits substantially equivalent to that provided to active members. The Board shall pay seventy-five (75%) percent of the cost of such medical coverage and the retired administrator shall pay twenty-five (25%) percent of such cost.

### Section 3

Notice of intention to retire pursuant to this Section shall be filed with the Superintendent's office as soon as practicable in order to allow for appropriate succession planning and filling of vacancies. A payment of $7,500 shall be paid to any eligible Administrator who submits their irrevocable intention to retire as of January 1st for retirement on June 30th of the same school year.

### Section 4

(a)     In the event of the death of an administrator who has previously retired pursuant to the retirement provisions of this Agreement, or who would have qualified for such retirement benefits at the time of his/her death, the Board shall continue to pay the medical/health insurance premiums for benefits then in effect for the surviving spouse of such administrator for a period of five (5) years or until he/she sooner dies and for any dependent children. The foregoing is contingent upon the unavailability of comparable benefits to the surviving spouse or dependent children through their own employment at no cost to such individuals.

DEF000539

### Section 5

Bargaining unit members first hired for or appointed to a bargaining unit position on or after July 1, 2020 shall not be eligible for the benefits set forth in this Article.

### ARTICLE XXI - Agency Shop

### Section 1

Within thirty (30) days after employment or the execution of this Agreement, whichever is later, all members of the bargaining unit shall have the opportunity to join the Association, to pay a service fee, or to do neither. Any administrator who elects to join the Association or to pay a service fee shall execute an authorization permitting the deduction of such union dues or service fees and shall deliver said authorization to the Board. Said authorization shall continue in effect from year to year unless such administrator shall notify the Board and the Association in writing in the month of August of any year that it is revoked.

### Section 2

For those administrators who have elected to join the Association or to pay a service fee and delivered said authorization to the Association for submission to the Board of Education, the Board of Education agrees to deduct the annual dues or service fee from their salaries through payroll deductions.

### Section 3

As a condition of the effectiveness of this Article, the Association agrees to indemnify and save the Board harmless against any and all claims, demands, costs, suits or other forms of liability and all court or administrative agency costs that may arise out of, or by reason of, action taken by the Board for the purpose of complying with this Article.

### ARTICLE XXII - Duration

### Section 1

The parties agree to negotiate in good faith in an effort to secure a successor agreement in accordance with Section 10-153d of the Connecticut General Statutes, as amended.

### Section 2

This Agreement shall become effective July 1, 2020 and shall remain in full force and effect until June 30, 2023.

26

DEF000540

New Haven Board of Education

By: _____

Yesenia Rivera, President
New Haven Board of Education

Date: _1/28/2020_____

School Administrators

By: _____

Sequella Coleman, President
School Administrators Association of New Haven

Date: ___1/28/2020_____

27

DEF000541

# EXHIBIT 5

Messages - Sarah Miller

Ask Dave. That needs to be fixed.

I just emailed

We can raise it too - but this far Dave has been ok at getting dashboard changes made

There are two teachers positive at hooker I heard through grapevine only but then confirmed with actual teachers...

I assume the exclusion is intentional - not an oversight

Emphasized "There are two teachers positive at hooker I heard through grapevine only but then confirmed with actual teachers..."

I do not want to step on anyone's privacy so it becomes difficult to make sure they are reflected in numbers

Right. Most of the other dashboards that I have seen report schools for exactly this reason.

2/26/21, 1:14 PM

Can you share the grades of hooker teachers who tested covid pos? Do you know if there has been a letter?

There was no letter - and I do not want to break anyone's privacy... No one not even staff were told officially but when I heard through the grapevine I asked the individuals to confirm and they both did...

Ok

3/1/21, 9:04 PM

I signed up to testify Wednesday but need talking points I don't have time to write a speech

Ok can send some. It doesn't need to be beautiful or poetic - just touch on a few specific examples of underfunding.

3/2/21, 6:47 PM

So if I am 137 what time do I need to be on by... I have my vaccine appointment at 9:45

Really hard to tell. The public portion doesn't start till 11, so you should be fine. I am #48 so can let you know once I go.

LIGHT002498

# EXHIBIT 6

From: **LIGHT, JESSICA** JESSICA.LIGHT@new-haven.k12.ct.us
Subject: Re: Art Thursday and Friday
Date: February 25, 2021 at 9:42 AM
To: CAVANAUGH, JUDITH JUDITH.ALDERMAN@new-haven.k12.ct.us

Please let me know if there is anything at all I can drop off for you

Get Outlook for iOS

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Thursday, February 25, 2021 8:23:35 AM
**To:** CAVANAUGH, JUDITH <JUDITH.ALDERMAN@new-haven.k12.ct.us>
**Subject:** Re: Art Thursday and Friday

Fingers crossed you feel better soon!

Get Outlook for iOS

**From:** CAVANAUGH, JUDITH <JUDITH.ALDERMAN@new-haven.k12.ct.us>
**Sent:** Thursday, February 25, 2021 8:21:27 AM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** Re: Art Thursday and Friday

Thanks for the offer.  I am recovering from Covid.  Hope to be back next week?
Judie

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Wednesday, February 24, 2021 6:57 PM
**To:** CAVANAUGH, JUDITH <JUDITH.ALDERMAN@new-haven.k12.ct.us>
**Subject:** Re: Art Thursday and Friday

Are you ok? Can I help you in anyway?
Get Outlook for iOS

**From:** CAVANAUGH, JUDITH <JUDITH.ALDERMAN@new-haven.k12.ct.us>
**Sent:** Wednesday, February 24, 2021 6:34:05 PM
**To:** HOOKER MIDDLE - ALL <HOOKERMIDDLE-ALL@new-haven.k12.ct.us>; HOOKER ELEM - ALL <HOOKERELEM-ALL@new-haven.k12.ct.us>
**Subject:** Art Thursday and Friday

Hi all-
I will be out of school this Thursday and Friday. I have posted assignments on Google Classroom and left sub plans. Hope everyone is well
Judie

Judie Cavanaugh

Art Teacher
HOTS Site-Coordinator
Worthington Hooker School
New Haven, CT
To leave a message: (475)220-0000 ext. 77320

**LIGHT002979**





**LIGHT, JESSICA**
Fwd: art classes this week
To: Jessica Light

Jessica Light
(She/her)

From: CAVANAUGH, JUDITH <JUDITH.ALDERMAN@new-haven.k12.ct.us>
Sent: Wednesday, February 17, 2021 5:43:46 PM
To: HOOKER MIDDLE - ALL <HOOKERMIDDLE-ALL@new-haven.k12.ct.us>; HOOKER ELEM - ALL <HOOKERELEM-ALL@new-haven.k12.ct.us>
Subject: art classes this week

Hi All
I will not be able to have live meets for the rest of this week.  I will post assignments on Google Classroom and make announcements on the stream.  Sor
Judie

Judie Cavanaugh

Art Teacher
HOTS Site-Coordinator
Worthington Hooker School
New Haven, CT
To leave a message: (475)220-0000 ext. 77320

 

**CAVANAUGH, JUDITH**
Re: still out sick
To: LIGHT, JESSICA

Thanks!

**Judie Cavanaugh**

**Art Teacher**
**HOTS Site-Coordinator**
**Worthington Hooker School**
**New Haven, CT**
**To leave a message: (475)220-0000 ext. 77320**

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Wednesday, March 3, 2021 5:18 PM
**To:** CAVANAUGH, JUDITH <JUDITH.ALDERMAN@new-haven.k12.ct.us>
**Subject:** Re: still out sick

😊feel better

Get Outlook for iOS

**From:** CAVANAUGH, JUDITH <JUDITH.ALDERMAN@new-haven.k12.ct.us>
**Sent:** Wednesday, March 3, 2021 5:17:35 PM
**To:** HOOKER ELEM - ALL <HOOKERELEM-ALL@new-haven.k12.ct.us>; HOOKER MIDDLE - ALL <HOOKERMIDDLE-ALL@new-haven.k12.ct.us>
**Subject:** still out sick

Hi All-
Just to let you know that I'll be out for the rest of the week.  Once again, I have posted assignments and left messages on the stream for classes but if you
know that I won't be having any live Google meets til next week.
Thank you for your well wishes,
Cav

**Judie Cavanaugh**

**Art Teacher**
**HOTS Site-Coordinator**
**Worthington Hooker School**
**New Haven, CT**
**To leave a message: (475)220-0000 ext. 77320**

# EXHIBIT 7

5:36

< New Haven Publ

 **New Haven Public**

Mar 6, 2021 ·

# NHPS Covid reports to th reopening

 1

5:36

 New Haven Publ

Roberto Clemente Leadership Academy for Global Awaren

Page

 Like

 Com

COVID 19 Cases in CT S

# 5:42





## New Haven Pu

## Advocates

Mar 6, 2021 ·

| | | |
|---|---|---|
| ods Architecture and Design Magnet School | <6 | 02/04/2021 - 02/10/202 |
| BioTech, Health and Medical Magnet School | <6 | 02/04/2021 - 02/10/202 |
| Hills Magnet School | <6 | 02/04/2021 - 02/10/202 |
| d Mayo Early Learning Center | <6 | 02/04/2021 - 02/10/202 |
| Community Magnet School | <6 | 02/04/2021 - 02/10/202 |
| School | <6 | 02/04/2021 - 02/10/202 |
| idan Magnet School | <6 | 02/04/2021 - 02/10/202 |
| Business Academy | <6 | 02/04/2021 - 02/10/202 |
| mente Leadership Academy for Global Awareness | <6 | 02/04/2021 - 02/10/202 |

Page 1





**5:35**

 Melody's post

 **Melody Gallagher** shared a

Admin Mar 9, 2021 ·

So apparently these are the schoo
had positive student covid cases ir
1/19, as reported to the state and c
website.

I believe this list is to be read that i
listed as <6 they had positive case
and that may mean 1,2,3,4, or 5 po
(If I am reading it wrong please let

5:37

<       Melody's

 Like        Com

 1

## All comments ∨

 Jessica Light

5:37

   Melody's



**Jessica Light**
We are listed
don't know th
sure

2y   Like   Rep

   **Melody Ga**

5:37



Melody's



Michele No

Melody G

how many

2y    Like



Melody Ga

Michele N

5:37

< Melody's



**Kenneth Caldwell**
Not all cases are
reported. I know t
positive on say a s
weekend so they

2y    Like    Reply

5:38

  Melody's



**Melody Gallagh**

Kenneth Cald

know thank y

tracing still ta

days prior to

those cases?

2y    Like    Rep

# EXHIBIT 8

**Attachment D- Written feedback on Teval March 12 Email**



**Attachment E- March 12 Email**

**Happy Friday!**

GETHINGS, MARGARET-MARY
Fri 3/12/2021 9:34 AM
To: ACKERMAN, MARIE; Alden, Hilarie +52 others

👍 1    ↶    ↞    →    ⋯

Good morning,

It is hard to believe a year ago today was our last in person day for a very long time. Today we are back... stronger and hopeful for the days to come!!! WE are overwhelmed with gratitude for your continuous commitment to the betterment of our school. Thank you for supporting each other in this journey. Please continue to ask questions and share suggestions remember no one has ever done this work before! Thank you for putting joy and happiness in your classroom while maintain a safe environment

It has been brought to our attention from several community members including staff and parents that WHS is being mentioned with inaccurate information which also includes social media. We ask that if you are aware of any negative talk or postings, to please help protect and preserve our school. We hope that people will refrain from making their own inferences and/or misrepresenting our school. We must always keep in mind that we are working together and not against each other.

LIGHT002872

# EXHIBIT 9







No SIM 🔋                    2:24 PM                    80% 🔋

< 141                          J                          📹

Judie Cav >

Mar 31, 2021, 7:19 AM



3 People

**Jessica Light**
I don't think letters were sent
4 mins  Like  Reply  More

**Melody Gallagher**
Jessica Light for your school?
4 mins  Like  Reply  More

**Jessica Light**
Hooker never sent a letter
2 mins  Like  Reply  More

Write a reply...                    Reply

reported to the state and on the state website.
I believe this list is to be read that if a school is listed as <6 they had positive cases that week and that may mean 1,2,3,4, or 5 positive cases. (If I am reading it wrong please let me know.)

It seems we may be missing some letters here on this group page.
Also, I have heard of some schools with cases that I don't see listed on this list nor are there letters posted here.
Does anyone have any positive covid case letters that aren't posted here?
Or does anyone know of any cases we are missing on the list and in albums of letters?

Thank you!

DEF000565

# EXHIBIT 10



---

**From:** Paine, Katherine <Katherine.Paine@new-haven.k12.ct.us>
**Sent:** Monday, June 28, 2021 11:17:11 AM
**To:** FORSA, RACHEL <RACHEL.FORSA@new-haven.k12.ct.us>; LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** Re: Supply List

Thank you so much for taking the time to do this, it looks great!

---

**From:** FORSA, RACHEL <RACHEL.FORSA@new-haven.k12.ct.us>
**Sent:** Sunday, June 27, 2021 6:56 PM
**To:** Paine, Katherine <Katherine.Paine@new-haven.k12.ct.us>; LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** Supply List

Hi Ladies,

I hope you are having a great summer so far!! I put together this supply list based off of last year's template.  I will forward it to Gail to send out with our summer letters!

Rachel Forsa
First Grade Teacher
Worthington Hooker School

Education is the most powerful weapon which you can use to change the world.
-Nelson Mandela

1



---

From: Paine, Katherine <Katherine.Paine@new-haven.k12.ct.us>
Sent: Monday, August 2, 2021 9:57:47 AM
To: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; FORSA, RACHEL <RACHEL.FORSA@new-haven.k12.ct.us>
Cc: CLARINO, JENNY <JENNY.CLARINO@new-haven.k12.ct.us>
Subject: Re: Team planning

Hi Jessica and Rachel,

Sorry for my delayed response!! Yes, I believe the 18th should work for me as well. If anything changes I will let you know. I am really excited for this year 🙂

Best,
Kate

---

From: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
Sent: Thursday, July 29, 2021 12:11 PM
To: FORSA, RACHEL <RACHEL.FORSA@new-haven.k12.ct.us>; Paine, Katherine <Katherine.Paine@new-haven.k12.ct.us>
Cc: CLARINO, JENNY <JENNY.CLARINO@new-haven.k12.ct.us>
Subject: Re: Team planning

Thank you!

Jessica Light

(She/her)

---

**From:** FORSA, RACHEL <RACHEL.FORSA@new-haven.k12.ct.us>
**Sent:** Thursday, July 29, 2021 10:21:41 AM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; Paine, Katherine <Katherine.Paine@new-haven.k12.ct.us>
**Cc:** CLARINO, JENNY <JENNY.CLARINO@new-haven.k12.ct.us>
**Subject:** Re: Team planning

Jessica-I just shared my schedule with you on Google Docs.

Let me know what time works for you on the 18th (as long as that date works for Kate as well)!!

Rachel Forsa
First Grade Teacher
Worthington Hooker School

Education is the most powerful weapon which you can use to change the world.
-Nelson Mandela

---

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Thursday, July 29, 2021 9:42 AM
**To:** FORSA, RACHEL <RACHEL.FORSA@new-haven.k12.ct.us>; Paine, Katherine <Katherine.Paine@new-haven.k12.ct.us>
**Subject:** Re: Team planning

Ok do either of you have a sample schedule you used last year I could look at?

Jessica Light
(She/her)

---

**From:** FORSA, RACHEL <RACHEL.FORSA@new-haven.k12.ct.us>
**Sent:** Thursday, July 29, 2021 8:33:30 AM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; Paine, Katherine <Katherine.Paine@new-haven.k12.ct.us>
**Subject:** Re: Team planning


The 18th works for me if it's good for you!! We can meet at school, it might be easier to see what materials and supplies we already have.

Rachel Forsa
First Grade Teacher
Worthington Hooker School

Education is the most powerful weapon which you can use to change the world.
-Nelson Mandela

---

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Thursday, July 29, 2021 9:11 AM

2

**To:** FORSA, RACHEL <RACHEL.FORSA@new-haven.k12.ct.us>; Paine, Katherine <Katherine.Paine@new-haven.k12.ct.us>
**Subject:** Re: Team planning

Does the 18,19,20 work

Jessica Light
(She/her)

---

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Thursday, July 29, 2021 8:04:21 AM
**To:** FORSA, RACHEL <RACHEL.FORSA@new-haven.k12.ct.us>; Paine, Katherine <Katherine.Paine@new-haven.k12.ct.us>
**Subject:** Re: Team planning

Right now I am in Dallas but once I am back we can. We could meet at my house if you like.

Jessica Light
(She/her)

---

**From:** FORSA, RACHEL <RACHEL.FORSA@new-haven.k12.ct.us>
**Sent:** Thursday, July 29, 2021 6:52:18 AM
**To:** Paine, Katherine <Katherine.Paine@new-haven.k12.ct.us>; LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** Team planning

Hi Ladies!
I hope you are enjoying summer!!! Are you interested in meeting up and planning?!

Rachel Forsa
First Grade Teacher
Worthington Hooker School

Education is the most powerful weapon which you can use to change the world.
-Nelson Mandela

3

# EXHIBIT 11

## I.   Introduction

I, Jessica Light, am filing this complaint because Ms. Gethings and Ms. Clarino have engaged in a pattern of retaliation for approximately six months. The retaliation is due to my exercise of protected activities relating to how the New Haven School District was addressing, or was planning to address, the Covid-19 pandemic. Ms. Gethings and Ms. Clarino believe that these activities put their administration of Worthington Hooker, and presumably them, in a bad light.

As a result of their belief, Ms. Gethings and Ms. Clarino have engaged in various forms of retaliation. First, they pressured me to stop or to modify my public speech regarding the school district's response to the Covid-19 pandemic, and in the process instructed me not to allow my students' parents to have telephonic access to me. Second, they falsely accused me of revealing to a parent information about another teacher having contracted Covid-19. Third, they have prevented me from engaging meaningfully in the various school-related committees and groups and in the professional development opportunities I have expressed an interest in; although any of these decisions alone, and many of these decisions together, could be explained by idiosyncratic non-retaliatory reasons, whether sound or not, all together, and in context, they smack of retaliation. Fourth, they engaged in conversations about me with fellow teachers and parents that negatively affected their perception of me and damaged our relationship, including, but not limited to, informing the teacher who had contracted Covid-19 that I had revealed information about her condition. Fifth, they included a comment in my TEVAL that is unjustified and that is intended to raise a warning flag for anyone reviewing my record in the future. Sixth, they required me to attend a series of meetings with them regarding these issues and my TEVAL where they berated, belittled, accused me falsely, and attempted to undermine my confidence in myself and my relationship with my peers, including one meeting with the teacher who had contracted Covid-19. Seventh, they moved me from teaching the third grade to teaching the first grade in the upcoming year on pretextual grounds and despite all of my experience being in, and all my continuing education being geared towards, higher grades.

These retaliatory acts create a culture of fear that stifles continuous improvement to the democratic process. Additionally they have caused me a great deal of emotional pain and have damaged my professional standing, my professional prospects, and my relationship with my peers. Limiting my students' parents from having phone access to me, constantly pulling me out of my class for meetings, and causing me emotional distress have potentially diminished my teaching effectiveness and damaged my current students. And moving me to the first grade will do a disservice to both the first grade students I will be teaching and the third grade students that I will not be teaching.

LIGHT00070

## II.    My Protected Activities

Since summer 2020, I have engaged in public activities seeking to affect how the New Haven School District addressed the Covid-19 pandemic. For example, in summer 2020, I participated in the New Haven Teacher Union organized Car Caravan for Safety and spoke publicly, including on television, asking for a unified district-wide plan to reopen schools safely. Thereafter, I spoke at most Board of Education meetings raising concerns and requesting answers to safety questions. The most recent Board of Education meeting I spoke at was on March 22, 2021. At all times, when I have spoken it has been about district-wide safety concerns, not concerns relevant only to Worthington Hooker. Thus, these concerns could not have been addressed by Ms. Gethings or Ms. Clarino alone.

The statements Ms. Gethings is upset about were made in the public forum of a civic meeting, on a matter of clear public concern, and thus one of the most protected types of speech, plus one Facebook post on the a public teacher's and advocacy group. I have attached that social media post below. I have recordings or notes regarding all of my public speech.

## III.    Attempts to Stifle My Protected Activities

While Ms. Gethings and Ms. Clarino may not have made an explicit demand that I stop speaking publicly, the number of meetings, the aggressive tone of the meetings, and the relentless pressure and questioning from them made it abundantly clear they did not want me to speak publicly and that they wanted to be able to vet anything that I did say publicly. Some examples of Ms. Gethings and Ms. Clarino's attempts to stifle my protected activities are summarized below:

- At a November 2, 2020 meeting with Ms. Gethings and Ms. Clarino requested by Ms. Gethings, Ms. Gethings told me that not all of my speech was protected by the first amendment and that I was creating a false narrative about the school.

- Thereafter in early November 2020, Ms. Gethings called me to her office and told me it was inappropriate for parents to have my cell phone number, and that I should not speak to them on my cell phone because I was spreading hysteria and panic. I explained that I could not sever all ties with the community, but that I was committed to never giving any false information.

- On March 9, 2021, I was pulled out of my class for a conversation with Ms. Gethings and Ms. Clarino that lasted ninety minutes. They stated that my speaking at the board of education about Covid-19 safety concerns was creating a negative narrative about our school.

LIGHT00071

- On March 12, 2021, Ms. Gethings emailed the staff the following:

  *It has been brought to our attention from several community members including staff and parents that WHS is being mentioned with inaccurate information which also includes social media. We ask that if you are aware of any negative talk or postings, to please help protect and preserve our school. We hope that people will refrain from making their own inferences and/or misrepresenting our school. We must always keep in mind that we are working together and not against each other.*

- On March 22, 2021, I asked Ms. Gethings by email to clarify a safety procedure, but she was unable to answer my question. That evening, after I raised the issue at a Board of Education meeting, Ms. Gethings emailed me about my having done so. She mischaracterized our earlier email exchange, claiming:

  *I assured you that I would seek an answer regarding snacks and lunch distancing which I have done. I said we need to remain patient for a response and that in the meantime we would be following the existing guidelines,...*

  In fact, her earlier email was, in full, as follows:

  *We are awaiting full details from the district. I will share as soon as I know them. I have heard of other districts yeah 2 to 3 feet everywhere so I am not sure. We will only make changes once we have the directions & approval.*

  Moreover, we did not otherwise communicate about the issue before the Board of Education meeting. Ms. Gethings later expressed disappointment at my having discussed the issue at the Board of Education meeting, and suggested that I needed to be patient:

  *I am sorry that you felt you needed to bring the same question to the board. We all must be patient as changes are being considered in response to the CDC new guidelines, then reviewed by Dr. Tracey and our health department will advise.*

While this may appear on the surface to be a benign statement, in context, it was actually a reprimand intended to make me not raise further questions with the Board of Education.

- On March 26, 2021, I was scheduled for a 15 minute TEVAL meeting. At that meeting, Ms. Gehtings and Ms. Clarino reprimanded me for over an hour regarding, among other things, speaking to the Board of Education on March 22, 2021, and having posted on Facebook publicly available data.

With respect to the posting, on March 9, 2021, Melody Gallagher, a representative from the Executive Board for the New Haven Teachers Union, posted that it appeared that the state reported data regarding the number of student Covid-19 cases at each school during each week indicated more cases than the quarantine letters that had been sent. I stated factually that Worthington Hooker had not sent out any quarantine letters, and responded that Worthington Hooker was listed in the state data for the week of 2/11, but that I did not know how many cases Worthington Hooker had or if any were quarantined. I also replied "right I think the rules around what is reported and not need to be clarified because different schools understand the regulations differently."

Among other things, administration told me:

- It did not seem like I was advocating for the city, and that it did not matter that I do not mention Worthington Hooker by name because everyone knows who I am.

- Every night I speak, Ms. Gethings feels pressure, asked to share more information, receives lots of phone calls, and gets scrutinized about what she has and has not told the staff. I was told it was not my place to speak on these matters.

- I increase the level of fear in the community because I do not keep my opinions private.

- It does not feel good when negative things are highlighted publicly.

- Ms. Gethings asked me to attend a March 31, 2021 meeting with her and Ms. Clarino, Ms. Morrison, our school Union representative, and the teacher who had contracted Covid-19. At that meeting, Ms. Gethings said it was not my place to publicly tell

LIGHT00073

people that Worthington Hooker had not done something. She also said that people come to them and ask why I always have to talk.

- Ms. Gethings requested me to attend an April 20, 2021 meeting with her and Ms. Clarino. I asked that Dave Cicarella, President of the New Haven Teacher Union be present, and he was. At that meeting, Ms. Gethings continued to express her concern over my public speaking and the Facebook post. However, Ms. Gethings sent an email following that meeting stating, in part:

  *Lastly, at no time did we ever ask you not to speak at board meetings. We asked for the opportunity to answer questions at the school-level first before you ask the board in the event that we can help. ... We also asked about clarification about your postings on social media that referenced our school.*

## IV.  False Accusations that I Revealed Information About Another Teacher

Ms. Gethings and Ms. Clarino's conduct relating to their accusation that I revealed information about another teacher having contracted Covid-19 ("Teacher X") is summarized below:

- At the March 9, 2021 meeting discussed above, Ms. Gethings and Ms. Clarino stated they believed I leaked information to parents about Teacher X having contracted Covid-19. They continued to press me despite my repeatedly assuring them that this was not the case. They also placed the burden on me to identify where the leak came from, as if I must be to blame if I could not do so. I speculated that parents began to assume she had Covid-19 because she was out for so long in the middle of the pandemic.

- At the March 26, 2021 meeting discussed above, Ms. Gethings and Ms. Clarino once again accused me of spreading rumors and threatened that Teacher X would be filing an official complaint related to my public statements.

- At the March 31, 2021 meeting discussed above, three things became clear. First, Teacher X believed I violated her privacy, and considered filing an official complaint, because Ms. Gethings and Ms. Clarino told her I had told parents and posted online about her. Second, that Ms. Gethings and Ms. Clarino did so based on unfounded assumptions fueled by their animus towards me, and despite me having made clear at the March 9, 2021 meeting that I had not told any parent anything about the Teacher's condition. Third, that Ms. Gethings and/or Ms. Clarino had spoken to

LIGHT00074

parents and possibly teachers about whether I had spread information about the Teacher, thereby impugning my integrity and creating rumors about me.

Teacher X stated that a "staff member" told her that I had gone to parents about why she was out of school, and asked me if that was true. I told her it was not true. Teacher X then brought up that she believed one of the parents went to administration to talk about contact tracing, and Ms. Clarino clarified that it came to her from another staff member, and then she called the parent.

Ms. Gething stated that the parent was informed about the Teacher's condition by someone and that there had been social postings. I explained again that if that parent was informed by someone it was not by me. Ms. Gethings and Ms. Clarino assumed that I told that parent about the Teacher's condition because that parent serves on the PTA board with me and we are friendly. But I only learned about Teacher X's diagnosis after that parent came to believe that the teacher had Covid-19, when Teacher X emailed me on February 25, 2021 and told me she was recovering from COVID-19.

Teacher X then raised that there had been social posts. However, the post being referenced were the March 9, 2021 Facebook posts discussed above regarding the state reported student Covid-19 cases and the quarantine letters. Those posts had nothing to do with the Teacher, or even teachers with Covid-19 generally.

Ms. Gethings claimed that no one had said that anyone but me was the source, and that every person, whether teacher or parent, said I was the source. When I asked who "every person" was, she said she did not have to tell me their names, that she had promised them that she would not tell me their names, and that she would not say who they were because she knew that I would go right to them and that they did not want to be dragged into this.

In sum, there were no relevant online postings, and Ms. Gethings and Ms. Clarino relied on unspecified and untested statements of unidentified individuals. Based on this, they possibly solicited an official complaint from the Teacher, and at the least destroyed my relationship with Teacher X, damaged my relationship with Ms. Morrison, the school Union representative, and created or fed rumors about me with an unknown number of unknown people. Ultimately, Teacher X did not file a complaint because the accusation was unfounded. But this has caused me emotional distress. In addition, because I will have to work with Teacher X in the future, the damage to our relationship will make it harder for Teacher X and I to work together, and the children we jointly teach will suffer from it. Moreover, I fear that my reputation has been irreparably damaged in the small Worthington Hooker parent/teacher/staff community.

LIGHT00075

**V.    Minimizing My Involvement in School-Related Committees and Groups and Professional Development Opportunities**

I recognize that when multiple people want to participate or hold leadership positions in school-related committees and groups, administration must make choices to accommodate what is best for the school and the community of teachers and staff. However, since I began my protected speech activities in Summer 2020, Ms. Gethings and Ms. Clarino's have engaged in an escalating pattern of choices minimizing my involvement in school-related committees and groups and professional development opportunities. Those choices are summarized below somewhat chronologically:

- In 2020, Ms. Gethings asked for volunteers for a summer play-based learning workshop. I volunteered but was not given the opportunity to attend. In her April 23, 2021 email, Ms. Gethings stated "This workshop was for 3 representatives from our school and several members were interested. I selected a K teacher, 2nd grade and our literacy coach for our first steps were to try to build capacity in our K-2 building and expand to grades 3-4...."

- On July 17, 2020, staff were asked to join committees. I volunteered to be on the scheduling committee. On August 14, 2020, I was informed that two other teachers would lead this committee and my input was never considered. In her April 23, 2021 email, Ms. Grethings stated "I had thought Ms. Light attended scheduling meetings and her input of request not to have a special first thing in the morning was honored."

- In Summer 2020, I volunteered to lead the signage committee and was told another teacher would lead. In her April 23, 2021 email, Ms. Gethings stated "...While she was not the lead she was on the committee. We are constantly striving to build capacity in our school others volunteered and we were trying to take the load off of classroom teachers and have some non-classroom teachers become chairs of committees."

- I have chaired the Gardening Committee with parents and other teachers for two years. The garden committee's largest task has been organizing school clean up and outdoor maintenance days. When the other teachers on the committee transferred to new schools, instead of recruiting new members for the committee, on March 8, 2021, Ms. Gethings announced in a staff meeting that she chose to have the Boys Club run the Gardening Committee and have another teacher take over the Garden Committee work.

LIGHT00076

In her April 23, 2021 email, Ms. Gethings stated "Ms. Light had made a plea that she needed assistance with the gardening committee. Subsequently [Teacher Y] was looking for a service project for his 092, I suggested organizing a few of our annual spring clean-ups. Never to take away just to assist in our school wide commitment to cleaning up school grounds to ensure that our students can be outside at both sites. I never announced that [Teacher Y] was taking over the garden committee just that he was hosting 2 clean-up days. Our school's outdoors are very important to all of us and I was simply trying to support [Teacher Y] with a project, including our students the boys club had been planning to do a clean-up last year. Teacher Y connected with Jessica for thoughts and ideas."

I have no problem with Teacher Y's activities related to the Garden Committee, regardless of whether he was "taking over" or not. What I do have a problem with is that however Ms. Gethings wants to portray events, the manner in which she supported Teacher Y with a project left me outside the loop and essentially removed from the Gardening Committee.

- On March 26, 2021, Ms. Gethings emailed the staff asking if anyone wanted to be an SEL ambassador. I immediately said I did. In her April 23, 2021 email, Ms. Gethings stated that eleven teachers were interested in doing this role, and she selected two of the others.

- Ms. Gethings is actively trying to replace me in my role on the PTA. This is particularly egregious because my position is not assigned by administration, but is an elected position.

I have served on the board of the PTA as the Teacher Representative for two years. The position can be held by any PTA member. I was nominated and elected to serve in this role by parents. It is inappropriate for Ms. Gethings to actively recruit someone to run for a position I currently hold. Yet, on March 28, 2021, in the "Hooker Happenings" newsletter, under "Other Teacher Opportunities," Ms. Gehtings stated "**PTA**: Please let us know if you are interested in being the teacher representative for next year."

In her April 23, 2021 email, Ms. Gethings stated "In our weekly newsletter we communicate a wealth of information. We shared that there were other opportunities [sic] for teacher leading positions in the future. Ms. Light has been in the position of teacher rep on the PTA for 2 years."

LIGHT00077

In addition, at a recent PTA meeting, Ms. Gethings publicly humiliated me when I announced that a parent had nominated another teacher who is a friend of mine for the position. Ms. Gethings said, "we have met about this already and that nomination could not come from a parent but will be dealt with at the school level." The PTA board assured me that Ms. Gethings' statement is false.

- The school is required to have an SPMT committee. At the beginning of this school year after hearing that Ms. Gethings had asked others to chair SPMT, and that they declined the offer, I volunteered to be chair and was told she would get back to me. After months passed, in the March 28, 2021 "Hooker Happenings" post, in "Other Teacher Opportunities," Ms. Gethings stated "We are seeking two staff members to co-chair the SPMT....Please send us an email." That same day I sent an email stating "I am also able to continue to serve on SPMT and can co-chair." Ms. Gethings responded, "...We know that others may be interested. We will wait to see who we hear from." After no one else volunteered for more than three weeks, during the meeting on April 20, 2021 discussed above, Ms. Gethings said the school had not started the SPMT committee this year because *"no one"* was willing to chair the committee." In her April 23, 2021 email, Ms. Gethings acknowledged I volunteered to chair the committee, but said she needed "to see the interest of all of our staff members."

## VI.  Damaging My Reputation

It appears Ms. Gethings and/or Ms. Clarino have engaged in conversations about me with fellow teachers and parents that negatively affected their perception of me and damaged our relationship. Their conversations with the teacher who contracted Covid-19, discussed above, may be the most egregious example. And my reputation has also been sullied with respect to Ms. Morrison by that issue. Moreover, Ms. Gethings and/or Ms. Clarino also spoke about me with parents and, possibly with other teachers, regarding that issue. In addition, given their claim during some of our meetings that I am viewed negatively by fellow teachers and other staff, it appears that they have also engaged in, at best, gossiping about me, and possibly in actively seeking to obtain negative input about me. Any conversations that they had with others about me could have created a bad impression and led to rumors and more gossip.

## VII.  Negative Comment in My TEVAL

Although my April 2, 2021 TEVAL "Feedback from Instructional Manager" was generally fine, Ms. Gethings included the following comment: "As we discussed in your mid year please

LIGHT00078

consider asking questions any time you have a concern, if we do not have the answer we will do our best to attain the answer." This statement was a direct response to my having spoken to the Board of Education on March 22, 20121 and the March 26, 2021 meeting discussed above. While this statement may appear innocuous to the layperson, sophisticated managers will see this as a warning flag that I am a "trouble-maker." It was both unnecessary and inappropriate.

## VIII.  Constant Abusive Meetings

Apart from what specifically occurred during the meetings, constantly requiring me to attend abusive meetings itself amounted to retaliation. I have had to attend at least five meetings that should not have been necessary, some of which were both long and emotionally distressing. And the TEVAL meeting, instead of being 15 minutes, lasted much longer.

In addition to the specific facts discussed above, in some of these meetings Ms. Gethings and Ms. Clarino made clear that they thought I was lying, and/or spoke to me in disrespectful, condescending, and/or angry tones. In addition, in some of these meetings they took the opportunity to tell me that my peers did not like me, found me confrontational, or otherwise had negative things to say about me. For example, they made vague references to anonymous complaints they have received about me, stated nobody likes to work with me, and that other teachers are scared of what I might say about them. This caused me great distress, as I believe I have a good working relationship with most of my colleagues. Moreover, according to the Teacher Union contract, all complaints about a teacher must be communicated to the teacher at the time of the complaint. This was never done.

## IX.  Changing My Teaching Assignment to Punish Me

Ms. Gethings and Ms. Clarino have re-assigned me from the Third Grade to the First Grade on pretextual grounds and despite all of my experience being in, and all my continuing education being geared towards, higher grades.

Ms. Gethings has stated the reason I am being reassigned is that my youngest child would be entering the third grade next year, and it is policy that a parent cannot teach in the grade with their own child, even if their child is in a different class. Dave Cicarella, President of the New Haven Teachers Union, informed me that Ms. Gethings's reason for changing my grade was not a New Haven School District policy, or even a common practice. It is my understanding that there are few examples, if any, of teachers being reassigned for that reason in any New Haven schools.

LIGHT00079

Ms. Gethings and Ms. Clarino have chosen to do this despite having other options and being informed of why this is the worst possible assignment for both me and the children I will be teaching. I discussed with Ms. Gethings and Ms. Clarino where I would be better suited. I have experience in Third, Fourth, Fifth, and Sixth Grades. I have received top ratings on my previous evaluations in the Third Grade. I explained that I would be ill-suited for lower grades because of my lack of experience and severe dyslexia that makes teaching phonics and beginning reading difficult for me. Moreover, continuing education studies are usually organized K through 2 and 3 through 5, and I have always taken the courses towards Third Grade and higher. This means that I have not studied phonics to any professional extent since my university days. Accordingly, when asked earlier in the year for assignment preferences, I ranked first grade as my eighth choice of nine positions I am certified for; only Kindergarten was lower.

I acknowledge principals have the discretion to change teacher's grade assignments for the betterment of the school. At my previous school, I changed grades several times to where I was most needed without complaint. And I would have been open to a change in assignment at Worthington Hooker if it was not retaliatory. But there is no rational basis for assigning me to the First Grade, and not only I, but the children will suffer.

## X. My Injuries

Ms. Gethings and Ms. Clarino's actions have hurt me personally and professionally, and have impeded and will impede my ability to teach to the best of my ability.

I feel consistently in a state of conflict while at the school, but know I have done nothing wrong. The ongoing harassment makes my heart rate increase every time I enter the school building, and I often have to meditate in my room before the students arrive to clear my head for the day when mornings used to be my most productive times. I have missed large amounts of instructional and preparation time for long meetings about my "conduct" with no resolution, and that always lead to a follow-up meeting for me to dread. Aside from the time pulled from my classroom for meetings, the hostility and constant harassment about my public comments distracts me from my lessons. The anxiety from upcoming or recent meetings can be debilitating. And time spent addressing these issues takes away from the time I have to prepare lessons both in my prep periods and in the evenings.

As a result of the psychological manipulation of being repeatedly told "no one likes you" and "everyone is too afraid to tell you how they really feel," I have questioned my professional and personal relationships. It is known throughout the school that Ms. Gethings does not like me, and my colleagues feel she will treat them unfavorably if she sees them as my ally. I worried eating lunch with my grade level partner would harm him so we stopped eating together for awhile.

LIGHT00080

Until he reached out to me as a friend and said I shouldn't eat alone. I find it harder to connect with friends and colleagues. I feel isolated. And I have come home in tears on countless days.

I have experienced increased anxiety and nightmares about the school from constantly being questioned, admonished, and having to defend myself in countless meetings about the same subjects. I have been mentally and physically exhausted from replaying and recounting conversations during the day and after I get home. I feel absent at dinner as my mind circles about a looming meeting or a conversation with Ms. Gethings I was just subjected to. I lay awake at night reimagining discussions, and how I can prove myself. My husband has had to take on a larger burden of household duties, because I am unable to be as productive as I normally am. My family is concerned about my mental and physical state.

I have spent hours in the evenings and on weekends typing notes, compiling documents, and searching for the Facebook post Ms. Clarino took issue with. I have missed time with my sons and husband.

Ms. Gethings and Ms. Clarino have tarnished my professional reputation. As discussed above, Ms. Gethings and Ms. Clarino have not kept their concerns about me private. Several other teachers have been in meetings where I have been inappropriately admonished. Ms. Gethings has referenced several conversations she's had about me with other staff members, both named and anonymous. Colleagues have asked me if everything was alright because they have noticed long and frequent meetings in the office, or my class needing coverage because of meetings with administration. Other colleagues likely also notice and wonder what I have done "wrong."

LIGHT00081

# EXHIBIT 12



Confidential

# INVESTIGATION REPORT

## FOR THE NEW HAVEN BOARD OF EDUCTION

### *RE: Complaint by Hilarie Alden against Jessica Light*

By:    Christopher R. Henderson, Esq.
       Berchem Moses, PC

{01560770.DOCX Ver. 1}

1

DEF000409

## I.    BACKGROUND

Berchem Moses, PC was retained by the New Haven Public Schools to investigate a complaint filed by Worthington-Hooker 2nd grade teacher, Ms. Hillarie Alden against teacher, Ms. Jessica Light. Ms. Alden alleged, in part, that Ms. Light was blurring the lines as both a teacher and parent and, due to this, was mistreating Ms. Alden, who had Ms. Light's son in her 2nd grade class, in a manner that was unprofessional and hostile during the 2020-2021 academic year.

## II.    INVESTIGATION

    a.  *Persons Interviewed[1]*
1. Ms. Hilarie Alden (Complainant) – Worthington Hooker Elementary School, Second Grade Teacher
    1. Interviewed In-Person 8/20/21 (with Union Steward Kathleen Morrison present)
    2. Follow-Up Interview via Zoom 9/21/21 (with Union Steward Kathleen Morrison present)
2. Ms. Margaret-Mary Gethings – Worthington Hooker Elementary School, Principal
3. Ms. Jenny Clarino – Worthington Hooker Elementary School, Assistant Principal
4. Ms. Jessica Light (Respondent) – Worthington Hooker Elementary School, First Grade Teacher[2]

    b.  *Collateral Information*
1. May 10, 2021 List of Concerns/Complaint By Ms. Alden
2. May 14, 2021 New Haven Public Schools Email Receipt of Complaint
3. May 19, 2021 Ms. Light's Response to Ms. Alden's List of Concerns
4. Excerpts from Ms. Alden's Remind App Messages re: East Rock Park Event
5. September 24, 2020 Email from Ms. Light to Ms. Gethings re. Ms. Alden East Rock Park Event
6. September 3-8 Emails Between Ms. Light and Ms. Gethings re: Planning 3rd grade "meet and greet"
7. November 21, 2020 Emails Between Ms. Alden and Ms. Light re: Ms. Light's son's work
8. October 14, 2020 Email re. Ms. Light's Son and Reading Intervention
9. Emails between Ms. Alden and Parent re: Houses Around the World Incident

---

[1] All parties interviewed were provided with an *Upjohn* Warning (an advisement to employees stating that communication between organization counsel and organization employees are privileged, but the privilege belongs to the organization and not the individual employee) and all parties acknowledged verbally that they understood the warning and wished to proceed with the interview.
[2] The relevant events of the complaint took place during the 2020-2021 academic year when Ms. Light was a Worthington Hooker Elementary School Third Grade Teacher.

{01560770.DOCX Ver. 1}

2

DEF000410

    *10.* Collective Bargaining Agreement Between New Haven Board of Education and New Haven Federation of Teachers, Local 933 (2018-2021)

    *11.* New Haven Public Schools Personnel Policies

        *1.* 4100 – Statement of Non-Discrimination

        *2.* 4101 – Harassment

    *12.* New Haven Public School Policy – Students

    *c. Interview Summaries*

        ***1. Ms. Hilarie Alden – Interviewed In-Person 8/20/21***

- Ms. Alden is entering into her third year at Worthington Hooker school as a teacher of the 2nd grade.
- Ms. Alden explained the organizational structure at Worthington Hooker generally stating that Ms. Margaret-Mary Gethings is the School Principal and Ms. Jenny Clarino serves as the Assistant Principal.
- Prior to the incidents commencing in Fall 2020, Ms. Alden described her dealings with Ms. Light as cordial. Ms. Alden described the work they were doing together in Summer 2020 around a play-based initiative for the school children. Ms. Alden described those interactions as positive, and that in their otherwise limited interaction with Ms. Light, all experiences were positive.
- A month prior to the start of school in Fall 2020, Ms. Alden was informed that Ms. Light's son would be entering her second grade class. She recalled being excited about having him in the class. Ms. Alden, however, was warned by the first grade teacher about negative experiences they had with Ms. Light as it relates to her son. Ms. Alden also learned that the school literacy coach had some negative experiences with Ms. Light with Ms. Light making many demands upon them and not letting the coach make the decisions based on their expertise.
- Ms. Alden described that the school went fully remote in Fall 2020 resulting in the creation of hybrid classrooms comprised of several learning pods. Ms. Alden states that Ms. Light's son was in a pod with two other children including the child of the then-PTA President.
- Ms. Alden, also described the basic purpose behind the Remind App which was to function as a channel between teacher, parent, and student for classroom related announcements and classwork assignments.

East Rock Park Meet & Greet

- In an effort to provide social and emotional engagement for her students, Ms. Alden planned an optional read-aloud event for her students, originally during the school day. Ms. Alden stated that prior to the event which was posted on the Remind App, Ms. Clarino informed her that the event would need to take place after school per school policies. As a result Ms. Alden changed the event from a read-aloud event to a "meet and greet" outside normal school hours. Ms. Alden reminded families who would be

{01560770.DOCX Ver. 1}

3

attending that masks and social distancing would be required. Ms. Alden was informed that Ms. Light had inquired originally about the event being held during school hours.

- Ms. Alden stated that the Light family came to the "meet and greet" as did Ms. Clarino. Ms. Alden stated Ms. Light's son was running around with other children and that she briefly had a conversation with Ms. Light and her husband at the event which she described as cordial.
- Ms. Alden received high praise about the event from other parents with some parents requesting more frequent events of that nature based on how much their children enjoyed it.
- Ms. Alden states that Ms. Gethings asked about the event due to a complaint from a parent but Ms. Alden does not recall if Ms. Gethings identified Ms. Light by name as the complainant.
  - *[During 9/21/21 Follow-up meeting – Ms. Alden was asked how she found out that Ms. Light had expressed concerns about the event to school-level administrators]*
    - Ms. Alden asked Ms. Clarino for permission to host an event for her students during the day. Ms. Clarino agreed to the idea. Ms. Alden sent a message through the Remind App to parents discussing the event.
    - Ms. Alden learned of Ms. Light's concerns when Ms. Clarino told her that Ms. Light had approached Ms. Gethings questioning why Ms. Alden gets to hold an event during school hours and she cannot not.
    - Ms. Clarino was informed that events during school hours were not allowed and told Ms. Alden she needed to change the time of the event to after school.
    - Ms. Alden cannot recall if she had a conversation with Ms. Gethings about Ms. Light's concerns.


November Parent Teacher Conference

- Ms. Alden described that throughout the semester she would send messages through the Remind App about school work assignments and other classroom announcements. Ms. Alden noted that parents were given the option to use the app to engage with the teacher.
- Ms. Alden stated that there was a parent-teacher conference in the middle of November. During the conference with Ms. Light and her husband, Ms. Alden noted the conference was uneventful until Ms. Alden brought forward concerns about Ms. Light's son's missing homework. Ms. Alden stated after making that point, the meeting turned hostile and confrontational.
- Ms. Alden stated that she sent reminders to parents about turning in homework assignments and even allowed Ms. Alden's son to turn in work in-person to make it easier. Ms. Alden emphasized this when asked about whether she provided more frequent progress reports to the Light family that Ms. Light's son was falling behind. Ms. Alden notes, however, that Ms. Light and her son did not take advantage of the in-

person option; Ms. Alden stated that Ms. Light wanted more personalized messages about what exactly Ms. Light's son needed to turn in.
- o *[During 9/21 Follow-up meeting – Ms. Alden was asked how the parent teacher conference was before the parties discussed missing homework assignment]*
    - Ms. Alden stated that parent/teacher conferences are scheduled for 15 minutes but the one with the Light family took 45 minutes.
    - Ms. Alden stated that it was a lengthy but normal conference and reflected that the Light family had a lot of questions and there was a lot of back and forth.
    - Ms. Alden said the meeting only became tense at the very end when she showed the Light family Ms. Light's son's report card encouraging the family and the son to turn work in using Google Classroom.
- Ms. Alden noted that several other students were also not turning in assignments, resulting in Ms. Alden speaking with the parents about ensuring the assignments do get turned in to properly evaluate the student's progress. Ms. Alden said those students and families made the appropriate correction and it worked out without any further issues. Ms. Alden also pointed out that she tried to set-up her Google Classrooms in an organized way.
- Ms. Alden further described Ms. Light's follow-up response to the conference by sending her over 35 emails with Ms. Light's son's late work which Ms. Alden found inappropriate[3].
- As a result of this conference and follow-up, Ms. Alden requested the assistance of Ms. Gethings and Ms. Clarino specifically to attend the follow-up meeting to the original parent-teacher conference.
- During the second meeting, Ms. Alden highlighted the fact that she was disappointed in Ms. Light's approach as a teacher colleague and the meeting concluded with Ms. Light's husband expressing that he had never been so offended in his life.
    - o *[During the 9/21/21 follow-up meeting Ms. Alden was asked about her tone during the second conference*
        - Ms. Alden was asked if she yelled or raised her voice during the meeting to which she stated that she did not yell or raise her voice but was very "direct" in her tone. While Ms. Alden was disappointed about the Light family's reaction, she did not yell. She stated she was very clear in the words that she used. Ms. Alden said neither Ms. Gethings nor Ms. Clarino expressed concern with her tone of voice during that meeting.]
- December Follow-Up
    - o Ms. Alden conveyed that Ms. Clarino reached out to Ms. Light's husband to see how the semester was progressing with their son turning in assignments. Ms. Alden stated that Ms. Clarino received a long email response diving into everything Ms. Alden was not doing. Ms. Alden further conveyed that the administration had a follow-up meeting with Ms. Light's husband and were blown

---

[3] In Ms. Alden's "List of Concerns" she noted that Ms. Light sent the 35 emails to her personal email but during the 9/21/21 follow-up meeting when asked to clarify that point, Ms. Alden stated the email was sent to her school email address but the point of her concern was that Ms. Light sent 35 emails to her over the weekend.

away by the detail and thoroughness of his response regarding Ms. Alden's teaching.

- o In the context of Ms. Light's husband's response, Ms. Light's husband brought forward concerns about the "Houses Around the World" video that Ms. Alden had shown in class. Ms. Light's husband was also concerned about some web links Ms. Alden provided to her students that he said contained inappropriate violent descriptions of historical events. This complaint about the contents of the video and links was conveyed to Ms. Alden. Ms. Alden stated that she felt really hurt by the accusation that by showing this video that she was somehow a racist. Ms. Alden described that she would post content based on a theme of the day and the "Houses Around the World" video was in support of one of these "day of" themes.
- o *[During the 9/21/21 Follow-Up meeting Ms. Alden was asked if any parents affiliated with the Anti Racist Anti Biased ("ABAR") group reached out to her]*
  - When asked if any parent affiliated with ABAR reached out to her to discuss the "Houses Around the World" video, Ms. Alden stated she received a Remind app message and then a phone call from another parent, Dr. Grossman.
  - Ms. Alden said that Dr. Grossman heard from other parents (Ms. Alden believes a parent in Ms. Light's son's learning pod) about the video. Ms. Alden stated that Dr. Grossman said he did not want to make the call, that he could not believe the allegations, but nevertheless spoke very favorably of Ms. Alden.
  - Regarding the video, Ms. Alden noted that the video was shown as part of class content about "Roofs around the world". Ms. Alden noted that she provided appropriate commentary about the video to the students and did not simply ask them to watch the video without any context.
  - Ms. Alden was asked if any school administrators talked to her about the video. Ms. Alden said that she provided Ms. Clarino and Ms. Gethings a walk-through of her Google classroom. In addition, they talked about the video and Ms. Alden said they agreed that Ms. Alden should make every effort to ensure focus on multi-culturalism. Ms. Clarino noted that they collectively agreed to take down the link regarding "This day in history" to prevent the students from searching the sites and the web containing other content they were not intended to access.
- Seeking Advice
  - o When asked about seeking advice from other teachers about how to manage a relationship with a colleague who is also a parent, Ms. Alden stated that she is not someone who gossips but wanted to speak with other teachers what she could do internally. Other teachers allegedly conveyed that they have had similar issues with the Light family's approach and that Ms. Alden's experience was not unique.
- COVID Protocols
  - o Ms. Alden described a Zoom meeting held in early 2021 regarding the return of in-person learning. Ms. Alden stated that a fellow parent, in Ms. Light's son's

DEF000414

learning pod, asked questions that could only be asked if they were influenced by a teacher working within the school. Ms. Alden said that one of the parents was asking very specific, seemingly scripted questions, about capacity for students in the classrooms and space between desks.

- Statements to BOE
  - o Ms. Alden was asked if she had attended any Board of Education meetings and stated that she had attended via Zoom. Ms. Alden recalled Ms. Light stating to the Board, "I don't want to die" in reference to COVID. Ms. Alden felt that Ms. Light's comments to the Board and on other social media platforms has made her very uncomfortable to express opinions in and around Ms. Light. Ms. Alden stated that Ms. Light's comments created a distrust between other parents and teachers. Moreover, Ms. Alden feels silenced and unable to voice opinions for fear that Ms. Light will convey those opinions negatively on social media.
- General Concerns
  - o Ms. Alden stated that if she is aware that Ms. Light is involved in a particular committee or other school initiative, she will ask HR and school administrators for her not to be involved as Ms. Alden does not want to work with Ms. Light.
  - o Ms. Alden was asked about her comments about the Board addressing the issue with Ms. Light, functioning as both a parent and a teacher. Ms. Alden hoped that Ms. Light would be collegial as a parent and understand the importance of respecting the role of the teacher.
  - o Ms. Alden stated that there were no further issues in Spring 2021 with the exception of Ms. Light's son making comments that he does not like Ms. Alden and related comments undermining her as his teacher.
  - o Ms. Alden has not received other complaints from parents but only from Ms. Light and her husband.
  - o Ms. Alden feels that staff meetings are no longer a safe space to communicate when Ms. Light is there.
- Gethings/Clarino Influence
  - o Ms. Alden was asked if Ms. Gethings or Ms. Clarino influenced her to file her complaint, she stated, "no, not at all." *[During the 9/21/21 follow-up meeting, Ms. Alden was asked again about external influences and unequivocally stated she was in no way influenced by any school administrator to file the complaint.]*
    - ▪ *[During the 9/21/21 follow-up meeting, Ms. Alden was asked why she waited until the end of the Spring semester to file her complaint]*
      - Ms. Alden discussed why she waited until the end of the Spring semester to file the complaint. She noted that part of it was her concern about Ms. Light's son returning to the classroom at the end of spring break and the fear that the Light family would respond to everything sent home and question everything she was doing.
      - Ms. Alden also stated the timing of the complaint was based on the constant messages coming from school administration about changes coming the following year, the fact that much of the staff

{01560770.DOCX Ver. 1}

7

DEF000415

meeting discussion focused on preferences for the following year, and the desire to not work with Ms. Light in the following year.

- Ms. Alden said during her TEVAL with Ms. Clarino, she made it clear she did not want to teach with Ms. Light. Ms. Alden spoke with the union about her concerns as far back as December when she was advised to take notes and not take any action unless the situation escalated. Ms. Alden originally sent her list of concerns to Ms. Morrison, which triggered the union trying to facilitate a mediation with Ms. Light and Ms. Alden. Ms. Alden said Ms. Light did not wish to meet and after that time, Ms. Alden sent her complaint officially to HR.]

  - o When asked why she believed Ms. Light reacted the way she did during the school year with respect to her son and Ms. Alden's teaching, she believes Ms. Light interpreted her comments about Ms. Light's son as questioning Ms. Light's parenting. Ms. Alden stated that she was in no way doing that but just wanted Ms. Light's son to turn in his work so she could help him along with his progress in 2nd grade.
  - o Ultimately, Ms. Alden said that as a result of the complaint, she hopes that no other teacher has to go through what she did with the Light family and that all teachers can express their educational perspectives without retaliation or fear.

### 2. *Ms. Margaret-Mary Gethings – Interviewed In-Person 8/23/21*

- General
  - o Ms. Gethings serves as the Principal for the Worthington Hooker School and has been in that role for approximately four years.
  - o Ms. Gethings stated in relation to her experience with Ms. Light that Ms. Light has been a teacher at Worthington Hooker for about 6 to 8 years. Ms. Gethings described her as a creative and passionate teacher who is heavily involved in the school but notes that she does not always get along with others.
  - o Ms. Gethings states that she had had a very good relationship with Ms. Light and found Ms. Light often praising her for her own work. This was the case until December 2020 when Ms. Gethings began to discuss changing Ms. Light's grade assignment for the following academic year.
  - o As it relates to Ms. Alden, Ms. Gething stated that she hired Ms. Alden, and while she is not Ms. Alden's Instructional Manager, she has found Ms. Alden to be a remarkable teacher, devoted, and an amazing asset to the school.
- East Rock Outing
  - o Ms. Gethings expressed that she was not specifically involved in the planning of Ms. Alden's read-aloud event but had encouraged teachers to plan outdoor activities.
  - o Ms. Gethings stated that perhaps the district message was unclear that there were not to be activities such as the one Ms. Alden was planning during school hours. Ms. Gethings was under the impression that Ms. Clarino mistakenly believed activities during school hours were permitted when they were not.

{01560770.DOCX Ver. 1}

8

- o Ms. Gethings stated that Ms. Light received a message through the Remind App from Ms. Alden to her class regarding an event during school hours. As a result, Ms. Light approached Ms. Gethings inquiring whether the rule had changed. Ms. Gethings thought Ms. Light was concerned about this because if the event was during the school day she would be unable to attend with her son due to her own teaching obligations. Ms. Gethings informed Ms. Light that the policy had not changed and subsequently informed Ms. Clarino that Ms. Alden's event would need to take place after school hours.
- o Ms. Gethings stated that after the event that was held after school, she asked Ms. Light how the event went. Ms. Gethings stated Ms. Light complained about both the lack of a planned activity and the lack of masking and social distancing observed.
- o Ms. Gethings stated that she did not receive complaints from other parents expressing concern about the lack of activities, or the lack of masking and social distancing. In fact, Ms. Gethings heard nothing but positive feedback from other parents about the event.
- Parent-Teacher Conference
  - o Ms. Gethings stated that Ms. Alden asked her and Ms. Clarino for support after the first parent-teacher conference with Ms. Light and her husband. Ms. Gethings stated that she and Ms. Clarino agreed and came to the meeting to find ways to help support Ms. Light's son.
  - o Ms. Gething said the meeting was not great and that Ms. Light's husband did most of the talking. Ms. Gethings stated that she could feel the tension and found the exchange odd in light of the fact that Ms. Alden and Ms. Light had worked collaboratively on the play-based initiative during the previous summer.
  - o Ms. Gethings discussed how Ms. Light's husband was upset with Ms. Alden about her classroom set-up but Ms. Gethings stated that Ms. Alden's Google Classroom was the model for the school.
  - o Ms. Gethings felt that Ms. Light and her husband were trying to find fault with Ms. Alden with respect to their son, and as a result continued to find fault with everything Ms. Alden did. During the meeting, Ms. Gethings said that everyone seemed defensive.
  - o As it relates to the need to provide progress reports to the Light family, if Ms. Light's son was falling behind, Ms. Gethings stated that would occur if an intervention was needed. However she noted that was not at issue with Ms. Light's son as it was more about turning in work so Ms. Alden could evaluate his work in order to determine if an intervention was needed in the first place.
  - o When asked if Ms. Gethings apologized for Ms. Alden's statements during the parent-teacher conference follow-up, Ms. Gethings stated no, she only apologized for what had happened but not for Ms. Alden's statements. In that vein, she would not know what she was apologizing for.
  - o Based on subsequent correspondence, it was determined, according to Ms. Gethings, that Ms. Light's husband would be the spokesperson for their son going forward.
  - o Ms. Gething stated she also received an email from Ms. Light's husband regarding the showing of the "Houses Around the World" video. Within that context Ms. Gethings discussed the role of the Anti-Biased Anti-Racism group at the school and stated that the group has no official relationship to the school but is a group comprised of school community members that has gathered to discuss school culture and equity.

{01560770.DOCX Ver. 1}
9

DEF000417

- According to Ms. Gethings, only Ms. Light's husband complained about the "Houses Around the World" video even though Ms. Light's husband said another parent was irate about the video. Ms. Gethings stated that she received no complaint from this irate parent.
  - Ms. Light's husband also pointed out problematic content with a link Ms. Alden provided to the class. The link related to content around "this day in history" and inappropriate material contained within the link. Ms. Gethings stated that Ms. Alden was informed to remove that link.
  - As to the school administration's response to the "Houses Around the World" video, Ms. Gethings discussed it with the District as well as Ms. Clarino and did not see a need to address the issue. Ms. Alden appropriately narrated throughout the video providing it relevant context. Overall, Ms. Gethings was not concerned about the video.
- General
  - Ms. Gethings was asked if other teachers had expressed concern about Ms. Light's behavior. Ms. Gethings stated that other people are offended by her comments and by her dramatic approach. She stated that some teachers had complained about the lack of communication from Ms. Light when she served as the teacher liaison to the PTA. Ms. Gethings also commented that Ms. Light's past grade level partner did have a good relationship with her, but others in the school do not want to work with her. Ms. Gethings did not identify who these others were.
  - When asked about Ms. Light's public utterances, Ms. Gethings stated that her comments did not pertain to Ms. Alden but focused more about the district not following certain policies related to re-opening of schools. Ms. Gethings said that Ms. Light would speak for a long time at BOE meetings about reopening. Ms. Gethings expressed that she wished Ms. Light would address her concerns at the school level first before voicing them at BOE meetings.
  - Ms. Gethings was asked about the occasion when a 2nd grade parent and PTA President asked about touring the building during a meeting with 2nd grade parents regarding reopening protocols. Ms. Gethings said that they hosted remote meetings with all grades to discuss the reopening in Spring 2020 and to answer questions from parents. Ms. Gethings said that meetings in all grades went very well except for the 2nd grade meeting. Ms. Gethings stated that the questions asked by the 2nd grade parent were very focused and ridden with fear derived from Ms. Light's influence as some of questions assumed information only a teacher would be aware of. The meeting was uncomfortable according to Ms. Gethings and found the question about whether the parent could tour the building with a checklist inappropriate in light of the fact that the Superintendent of Schools and the local health department had already done so and found the school protocols adequate to ensure community safety.
  - When asked about Ms. Light's social media post about positive cases in the school, Ms. Gethings stated there were no known exposure in the school at any time the school was in session. Despite this, Ms. Gethings felt that Ms. Light's posts inaccurately influenced other parents leading them to believe the school was unsafe.
  - In discussing how the second semester went with respect to the other parent teacher conferences between the Lights and Ms. Alden, Ms. Gethings stated they went fine and described them as night and day from the previous

conferences. Ms. Gethings noted that Ms. Clarino was in attendance for all of the remaining parent-teacher conferences.
- o Ms. Gethings did comment that she thought that many of the concerns about Ms. Alden were brought forward by Ms. Light's husband and not Ms. Light herself.
- o Ms. Gethings was asked whether she was attempting to exclude Ms. Light from committee assignments, whether she coached Ms. Alden to file the complaint or influenced the content of the complaint, or if she harbored any animus towards Ms. Light, and to each of those questions, Ms. Gethings answered in the negative.

### 3. Ms. Jenny Clarino – Interviewed In-Person 8/24/21

- General /Intro
    - o Ms. Clarino has serves as the Assistant Principal at Worthington Hooker School
    - o In regards to her relationship with Ms. Alden, Ms. Clarino describes her as a strong and receptive teacher who is coachable and has a passion and drive to ensure her students do well. Ms. Clarino says she is a teacher that goes above and beyond. Ms. Clarino added that Ms. Alden is in her second career as a teacher and is used to being successful and brings that energy into her classroom.
    - o As it relates to Ms. Light, Ms. Clarino said that Ms. Light had been in another building but seemed highly regarded by Ms. Gethings which made her believe that Ms. Light was highly respected by the Worthington Hooker community.
    - o Ms. Clarino added that after the first parent-teacher conference, Ms. Alden felt attacked. When Ms. Light sent Ms. Alden her son's homework assignments on a Saturday morning through 30 emails, Ms. Clarino felt that Ms. Light's actions were very targeted. Ms. Clarino felt that Ms. Alden was highlighting a small issue about Ms. Light's son's assignments and as a result of the exchange, believed Ms. Alden felt like she was always being judged.
- East Rock Outing
    - o Ms. Clarino stated that she had misconceptions about the District policy regarding hosting events during school hours. She learned from Ms. Gethings that events would need to be planned after school hours. Ms. Clarino expressed that she learned of this fact after Ms. Light inquired with Ms. Gethings about Ms. Alden's planned event during school hours. According to Ms. Clarino, Ms. Light "lost it" when she learned that Ms. Alden was planning a read-aloud event during school hours.
    - o Ms. Clarino stated she attended the rescheduled event that occurred after school hours and described the event as "amazing." While Ms. Clarino said she came to the event late, she noted that kids were wearing masks and were laughing having a good time while the parents seemed to have fun as well.
    - o Ms. Clarino was not aware of any complaints about the event but was told by Ms. Gethings that Ms. Light had complained to her following the event about the lack of planned activities, and the lack of masking and social distancing.
- Parent-Teacher Conferences
    - o Ms. Clarino and Ms. Gethings agreed to assist Ms. Alden with the follow-up meeting to the November parent-teacher conference and went into the meeting looking for positive outcomes.
    - o Ms. Clarino expressed that Ms. Alden was simply pointing out to the Light family of the need to send in assignments, and it seemed that the Light family was

{01560770.DOCX Ver. 1}

11

taking the point personally. Ms. Clarino said that during the meeting Ms. Alden was crying expressing how hurt she was by Ms. Light as a fellow educator.

- o During the meeting, they worked out an arrangement for Ms. Light's son to turn in assignments in person. Ms. Clarino highlighted that this type of arrangement was not typical during hybrid learning but noted such an arrangement . to turn in work in a different manner than other students was a typical modification.
- o Ms. Clarino discussed that she attended all subsequentconferences with Ms. Alden and Ms. Light's husband. Ms. Clarino would occasionally write to Ms. Light's husband asking how the school year was going. Ms. Light's husband did write back and Ms. Clarino was surprised how critical he was of Ms. Alden's teaching and classroom set-up. When Ms. Light's husband expressed concerns about the organization of the digital classroom and expressed concerns about the "Houses around the world' video, Ms. Clarino met with Ms. Alden to see her Google Classroom. Ms. Clarino found that Ms. Alden's Google Classroom could have been a model for the school. As it related to the video, Ms. Clarino said nothing needed to be done but encouraged Ms. Alden to be more mindful of what she was posting and to ensure she reviews all aspects of a video or link before posting to ensure it is school age-appropriate.
  - ▪ Ms. Clarino noted that Ms. Light's husband stated that other parents were complaining about the "Houses" video and if the administration did not address it appropriately, he would encourage other parents to lodge their complaints. Ms. Clarino stated she received no further complaints about the video.
- o Ms. Clarino also stated that the Anti Biased Anti Racist group apologized to Ms. Alden clarifying that they did not believe posting the "Houses" video made her a racist.
- General
  - o Ms. Clarino was asked if others in the school have complained about Ms. Light. Ms. Clarino provided an example of Ms. Kathleen Morrison having some difficulty with Ms. Light since Ms. Light's older son was in Ms. Morrison's class. On one occasion, Ms. Light was allegedly waiting outside Ms. Morrison's class pacing back and forth waiting to address Ms. Morrison on an issue with her son.
  - o Ms. Clarino expressed that she was concerned that some of Ms. Light's comments have affected parents and caused them to put their backs up. Moreover, Ms. Clarino says some people do not like what Ms. Light has to say.
  - o Ms. Clarino said, in particular, that Ms. Alden has been most affected by Ms. Light. Ms. Clarino serves as Ms. Alden's instructional manager and has sensed a real heaviness to Ms. Alden.
  - o Ms. Clarino sensed that everything changed when they discussed grade changes with Ms. Light. She stated that Ms. Light's third grade partner, who is a highly regarded third grade teacher, expressed concern about Ms. Light's son being in his class and being subject to the same treatment as Ms. Alden. Ms. Clarino stated the other third grade teacher surprisingly wanted to change grades to avoid having to teach Ms. Light's son.
  - o Ms. Clarino said that others do not want to work with Ms. Light.
  - o On the topic of Ms. Light's social media postings and public utterances, Ms. Clarino only stated that she had asked Ms. Light to give her and Ms. Gethings time to address her issues regarding COVID protocols before going to the BOE.
  - o Ms. Clarino also addressed the reopening orientations with the different grade levels and expressed that only the 2nd grade meeting was uncomfortable. During

the meeting Ms. Clarino stated that Ms. Light's camera was off and another parent asked several questions that seemed could only be asked by a teacher in the building. One such question that the parent continued to inquire about was the number of desks allowed in a classroom. Specifically, the parent was looking for a firm number of the maximum number of desks allowed without understanding that the number of desks would be based on need and the number of school children returning to that classroom. Overall, Ms. Clarino felt sad how the meeting went and how it created a lack of trust between the school and the parents.

- General Continued
    - o Ms. Clarino said the second half of the year was uneventful and she did not hear of any further complaints as it relates to Ms. Alden and the Light family. Ms. Clarino would check in with Ms. Light's husband regarding Ms. Light's son and would often not receive a reply.
    - o Ms. Clarino did note that Ms. Light's son made some odd remarks once he returned to in-person learning. According to Ms. Clarino, the son was alleged to have said to Ms. Alden  "I don't like you" or "I cannot wait to be out of this school." Ms. Clarino stated that Ms. Light's son seemed really mad at Ms. Alden.
- Gethings/Clarino Impact on Filing the Complaint
    - o Ms. Clarino was asked if she was attempting to exclude Ms. Light from committee assignments, whether she encouraged Ms. Alden to file the complaint, or whether she harbored any animus against Ms. Light and to each she answered in the negative.
    - o As it relates to issues concerning a false narrative about Ms. Light perpetuated by Ms. Clarino, Ms. Clarino stated she had not created a false narrative. She noted that other teachers in the school see social media posts that mention Worthington Hooker. Ms. Clarino commented further that she had no idea regarding the allegation that Ms. Light's social media actions were reflected in Ms. Light's TEVAL.
        - ▪ Relatedly, Ms. Clarino commented on one post made by Ms. Light showing a chart depicting Worthington Hooker as having less than 6 COVID cases. The relevance of this issue is that any positive cases in the school would be reported to parents in a letter from the school. Ms. Light's post could have resulted in school administration losing credibility with the parents because it made it seem that the school was not informing parents of positive cases. According to Ms. Clarino, there were no positive cases in school. She notes there was one teacher who tested positive but did not physically enter the school and thus there was no obligation to inform the parent community.

### 4. *Ms. Jessica Light – Interviewed via Zoom 9/17/21 (with Union Representative Pat Deluca*

- Professional Background
    - o Ms. Light has worked for New Haven Public Schools for approximately 12 years.
    - o Ms. Light currently serves as a 1st grade teacher at Worthington-Hooker Elementary school.
    - o During the 2020-2021 academic year, Ms. Light was the 3rd grade teacher at Worthington Hooker and served in that capacity for 4 years.

DEF000421

- o According to Ms. Light, she had no negative evaluations and noted during the pandemic year that the District dispensed with their normal numerical evaluation system but prior to that she had received the highest numerical rating a teacher could receive.
  - o Ms. Light's direct supervisor is Ms. Gethings and noted Ms. Alden's supervisor is Ms. Clarino. They had previously worked in two different buildings.
- Pre-Fall 2020
  - o Ms. Light expressed that prior to the Spring and Summer 2020, Ms. Light did not have much interaction with Ms. Alden.
  - o In Spring 2020, Ms. Light wrote a grant for the PTA for outdoor learning/enrichment opportunities for students during the pandemic. In July 2020, Ms. Light worked with Ms. Alden to create a list of items for the PTA to purchase related to these opportunities using the grant funds. During that time, Ms. Alden's son was babysitting Ms. Light's son. Ms. Light said they worked together cordially. Ms. Light described their relationship as shallow but cordial.
  - o Ms. Light learned towards the end of July/early August that Ms. Alden would be her son's teacher. Ms. Light noted that she did not find out her son's teacher for the following year at the same time as other parents typically would.
- East Rock Park Event
  - o Ms. Light learned through the September 24, 2020 remind app message from Ms. Alden that Ms. Alden was planning a meet and greet during school hours at East Rock Park. Previous to this, Ms. Light had hosted her own outdoor events but was instructed that they had to be after school hours and an entire grade could not have an event at the same time.
  - o Ms. Light said she quickly wrote to Ms. Gethings and talked to Ms. Gethings about that fact Ms. Alden was planning an outdoor event during school hours to ensure that it could be revised quickly so parents were not confused by Ms. Alden's mistake since Ms. Light understood that events could not be planned during school hours. She was inquiring whether the rules had changed regarding events during school hours.
  - o According to Ms. Light, Ms. Alden's event combined both second grade classes which was counter to what she was told before by Ms. Gethings whereby such events could not combine all classes from a single grade.
  - o Prior to Ms. Alden's event, Ms. Light had hosted two outdoor events for her class and two events for her grade partner's classes and Ms. Light was in the process of planning her third event.
  - o Ms. Light attended Ms. Alden's meet and greet event with her son. She noted there were no issues during the event. Ms. Light had thanked Ms. Alden for hosting the event in a brief exchange.
  - o Ms. Light commented that East Rock Park is a large park, but the playground area is small. She noted that with 50 kids playing on the playground and approximately 100 parents in attendance, it was a little crowded. She mentioned, however, that at no point did she feel unsafe and stated her son stayed at the event the entire time.
  - o In planning her third outdoor event, Ms. Light asked Ms. Gethings if she could have the event with both third grade classes as Ms. Alden had done. In her response, Ms. Gethings asked Ms. Light how Ms. Alden's event went. Ms. Light stated it went fine but was a little crowded. Ms. Light said that was the only statement she made about the event. Ms. Light reiterated that she did not speak negatively about the event to Ms. Gethings.

DEF000422

- November Parent-Teacher Conference
  - Prior to the conference, Ms. Light wrote to Ms. Alden, the administration, and others, advocating for her son to be in reading intervention. She thought her son would benefit from reading intervention as he had in first grade.
  - Ms. Light discussed how assignments in Ms. Alden's class were conveyed to students. Ms. Light said Ms. Alden, like other teachers, used Google classrooms, and posted a slide show with the assignments containing various links. Sometimes students had to post their pictures in the assignment section of the software. Apparently, her son would click "done," but some of the picture assignments submitted were blurry or difficult to read.
  - Ms. Light said that during the November parent-teacher conference, Ms. Alden came out immediately to state that Ms. Light's son had done no work, could not grade his assignments, and was not as high-functioning as the other students.
  - When asked when a teacher would need to provide a parent with progress reports if a child was falling behind, Ms. Light said that typically per the District policy, a teacher would send such a report about halfway through the marking period. In practice, at the elementary school, she stated that if a student was really behind, the teacher would let the parent know as a courtesy more frequently and engage in more frequent follow-up with the parent. This practice is what Ms. Light does with her students and parents.
  - At the conclusion of the meeting, they discussed their uncertainty with what exactly Ms. Alden was looking for but had agreed to create a binder for her son to keep track of assignments. Ms. Light and family additionally agreed to submit work for their son going forward and take any pictures needed for assignments to ensure they were not blurry.
  - Ms. Light noted that she did not request a follow-up parent teacher meeting but that Ms. Alden did so given concerns about Ms. Light's son not turning work in.
  - Following the meeting, Ms. Light sent Ms. Alden the missed assignments to her BOE email address. In doing so, she tried to organize them in a clear way based on subject matter and given the limitations of the BOE email system sent them at the quantity she did. Ms. Light did not expect Ms. Alden to grade all the assignments but due to Ms. Alden's use of the term "not high-functioning" she wanted to clear up any negative feelings Ms. Light may have had towards Ms. Light's son.
- Follow-up Parent Teacher conference.
  - According to Ms. Light, very soon after the first conference, a second one was scheduled with Ms. Alden, Ms. Gethings, and Ms. Clarino.
  - When asked to describe the point in the conversation when Ms. Alden stated that she was disappointed with Ms. Light as a parent and as a teacher, Ms. Light reflected that she made that statement because Ms. Alden thought Ms. Light, in her role as a teacher, should know how to operate Google Classroom. With respect to her role as a parent, Ms. Light should be helping her kids more like other parents.
    - Ms. Light was extremely angry with these statements questioning her as both a parent and a teacher. Ms. Light said her husband had to hold onto her knee to make sure she held her tongue. Two of her core identities are being a parent and being a teacher, and Ms. Light felt that Ms. Alden attacked them both in front of her bosses. Ms. Light was extremely offended by this.
  - Ms. Light said that during this meeting, Ms. Alden was yelling at a high volume.

- o When asked if the Light family took advantage of the arrangement for in-person drop off, Ms. Light said that they had when there were paper assignments but that became less pertinent because many of the assignments were online.
  - o Ms. Light felt very offended that Ms. Alden would believe that her son was not willing to submit work.
  - o At the conclusion of the meeting, the parties attempted to come to a consensus but once it seemed clear that was not possible, Ms. Light's husband ended the meeting by hanging up the phone.
  - o When asked about additional communication with Ms. Alden and school administration, Ms. Light said that in order to keep the peace and maintain her relationships, her husband handled any type of parental advocacy.
  - o Ms. Light noted that she heard through her husband that Ms. Gethings apologized for Ms. Alden's statements.
  - o Ms. Light reiterated that she was very offended that Ms. Alden continued to describe her son as not high-functioning. Ms. Light understood that phrase had a particular meaning of a child with disabilities. Ms. Light was offended that Ms. Alden pre-identified her son as having disabilities, without analyzing his work, and without a school psychologist's diagnosis.
  - o On Ms. Light's husband's follow-up message to Ms. Clarino, Ms. Light said she had no role in crafting those responses but her husband showed her some messages in advance of sending to Ms. Clarino.
- ABAR/Houses Video
  - o ABAR was a sub-committee of the School Planning and Management Team. Ms. Light noted that Ms. Gethings decided that she did not want it to be a part of SPMT so it had no official connection to the school.
  - o Ms. Light described the group, to the extend it is a group according to Ms. Light, as a collection of parents concerned about racism and bias in the schools.
  - o To Ms. Light's knowledge, the group has not met formally since before the start of the pandemic and may have met as far back as 2019.
  - o Ms. Light was asked why the "Houses Around the World" video was shown, and she explained that it was not part of any District curriculum. She understood it was presented as a social studies video.
  - o Ms. Light expressed that the day the video was shown, her child was attending school at a different parent's home and she did not have first-hand knowledge of whether Ms. Alden provided commentary during the video when it was shown to the students.
  - o Ms. Light said that there were other problematic links Ms. Alden provided to the class in the context of links titled "A Day in History" that showed inappropriate pictures and images, like the Jonestown massacre and the Kennedy assassination.
  - o Ms. Light said that they did not initially bring their concerns about the video to school administration because there was a lot "scuttlebutt" amongst the parents about the video and the Light family believed another parent would address the matter with school administration.
  - o It was not until Ms. Clarino asked Ms. Light's husband how things were going with Ms. Alden and Ms. Light's child, that Ms. Light's husband conveyed their concerns about the video to school administration.
  - o Ms. Light did not believe any corrective action was taken other than that the videos were taken down. Ms. Light expressed her belief that the fact that Ms.

Alden brought up the video in her complaint shows that Ms. Alden does not understand how racist the video was.

- o  Ms. Light was asked if other parents affiliated with ABAR spoke to Ms. Alden about their concerns with the video, and Ms. Light noted one other mother sent her a draft of a message for school administration but Ms. Light was not sure if it was sent. Additionally, she noted that Ms. Alden mentioned in her complaint that another parent complained about the video.

- General Issues
  - o  Ms. Light was asked about her relationships with her other colleagues and noted that she has a group of core friends and core allies but there are little issues with others, none of which are major.
  - o  Ms. Light was asked about her role as a PTA teacher liaison and said that the role was created for her given her status as both a teacher and a parent. Ms. Gethings had asked if anyone else wanted to run for the position and Ms. Alden expressed interest. In order to avoid having Ms. Alden as a political opponent with everything else going on, Ms. Light decided not to run.

- COVID Advocacy/BOE Statements
  - o  Ms. Light was asked the significance of the data she posted on social media showing that Worthington Hooker had less than 6 cases. She noted that the issue was based on the fact that Worthington Hooker one week was not on the graph, and then was subsequently on the graph, and was then again not on the graph. Per Ms. Light's research through the CDC, when the graph says less than 6, that does not mean there could be zero cases. She was concerned that school administration did not send out a notice to the school community about the case and was trying to figure out if there was a COVID exposure in the school so she could keep herself and others safe.
  - o  Ms. Light was not aware of any positive cases of those who were physically in the school but was surprised to learn about the less than 6 cases from the government and not her own school.
  - o  Ms. Light was asked if it was possible that Ms. Alden had attended the BOE meetings when she spoke and was then affected by those statements. Ms. Light said it was impossible to know who attended a BOE meeting because it was virtual. Ms. Light said Ms. Alden had not attended or spoken at BOE meetings when they were in-person like she had. Given that Ms. Alden did not cite to Ms. Light's BOE statements, she believed that Ms. Alden learned of her statements second-hand.

- In-Person Orientation Meeting
  - o  Ms. Light said that when the school was transitioning back to in-person learning, she and other teachers had sent information to parents to show them what their classes would look like.
  - o  The school administration held a series of meetings with parents to discuss resuming in-person learning, and Ms. Light attended with other parents within her son's learning pod.
  - o  Ms. Light was asked if she provided any parents with questions to ask or a script to follow and Ms. Light said "absolutely not."
  - o  Ms. Light noted that the parent that was asking questions was the President of the PTA and was asking the administration questioned based on his role. Ms. Light noted that the particular parent is a German Antifacist and perhaps came across in ways he did not intend, but was at all times speaking for himself.

- o   Moreover, Ms. Light noted that advocating for the PTA to conduct walk-throughs of buildings was the antithesis of what Ms. Light believes given the impacts of COVID.
- Other General Issues
  - o   As to the issue of the blurred lines between teacher and parent, Ms. Light said it can be awkward but it is not a major issue suggesting this investigator reach out to her son's first grade teacher, with whom she worked well.
  - o   No other teachers have come to her with concerns, but again said it can be weird when she is advocating as parent given her role as a teacher.
  - o   When asked how this issue between her and Ms. Alden can be resolved, Ms. Light suggested a sit down mediation where Ms. Alden can understand her role and to also clear the air. This was previously attempted before but according to Ms. Light, Ms. Alden originally refused to meet with her and the Union president. Ms. Alden suggested that Ms. Kathleen Morrison, one of the union stewards attend, and Ms. Light felt it was not appropriate and did not want to meet under those conditions because she felt it was unfair because Ms. Morrison would be playing more of an advocacy role and based on the fact that her older son had Ms. Light's son in her class. It was inappropriate, in Ms. Light's view, to have a union steward there when the Union President, a position above that of a steward, would be present. Ms. Light noted she would be happy to meet with Ms. Morrison separately.
- Gethings/Clarino Impact
  - o   Ms. Light was asked what led her to believe that Ms. Gethings and Ms. Clarino influenced Ms. Alden to file the complaint against her. Ms. Light said that the timing was suspect. Ms. Light is concerned that Ms. Alden was informed that Ms. Light complained about the East Rock park meet and greet when she did not complain. She then noted that all issues that took place with Ms. Alden happened in November 2020 and was concerned that the complaint was not filed until late Spring 2021. Ms. Light outlined a series of dates that evidences her concern with the timing of Ms. Alden's complaint:
    - On April 23, 2021, the Union president informed Ms. Gethings and Ms. Clarino that Ms. Light was likely to file a retaliation claim.
    - On April 26, the Union President called Ms. Gethings and Ms. Clarino and learned that Ms. Light would not teach 2nd grade because Ms. Alden filed a complaint.
    - On April 30, Ms. Light emailed her retaliation complaint to Ms. Mack.
    - On May 5, Ms. Alden expressed that she would not meet with Ms. Light and the Union President to mediate their dispute without Ms. Morrison present.
    - On May 6, Ms. Light's son told her that Ms. Alden laughed at him and said "that's a funny shirt" when he wore a shirt that said "my mom is my superhero."
    - On May 11, Ms. Alden sent her list of concerns that triggered the investigation.
  - o   Ms. Light feels that the wording in the complaint sounds coached (specifically the issues around the BOE meetings that Ms. Alden does not attend) and that it was done intentionally to push her off committees. Ms. Light noted this is not the first time the administration solicited complaints against her.
  - o   Ms. Light confirmed that for the 2021-2022 school year she is teaching first grade.

{01560770.DOCX Ver. 1}

18

DEF000426

### III.    FINDINGS

#### a.  East Rock Park Issues

Ms. Alden expressed concern in her "List of Concerns" regarding a series of complaints brought by Ms. Light regarding an outdoor school event at East Rock park. The first concern Ms. Alden had was that Ms. Light complained directly to the administration that Ms. Alden was planning an event during school hours which Ms. Light thought was not approved by the school. Ms. Alden would have preferred that Ms. Light register her concern directly to her, as a colleague, and not go directly to the school administration.

The evidenced gathered showed that Ms. Light had desired to host events for her third-grade students during the school day but had been informed by Ms. Gethings, her direct supervisor, that all outdoor activities would need to be done after school hours.

As Ms. Alden was planning her class event, she had the approval and support of Ms. Clarino, Ms. Alden's supervisor. Ms. Alden acted in reliance on this approval to plan the event during school hours. Through the statements of Ms. Gethings and Ms. Clarino, Ms. Clarino misunderstood the broad prohibition against outdoor events during school hours and gave her support to Ms. Alden's event in error.

Ms. Alden sent a message to the parents of her class about the event to be held during school hours. Ms. Light saw this message, given her son's placement in Ms. Alden's class. Based on Ms. Light's understanding, events were not to be held during school hours, and believing the policy may have changed asked Ms. Gethings if it had. This is evidenced by an email from September 24, 2020, the same day Ms. Alden sent the Remind App message to parents. The email states the following, "I understand this was mistakenly planned for during the day, but let me know if it is changing or if it is just going to be allowed this one time, so I can plan for Child A." In addition, in Ms. Gethings statement, she noted that Ms. Light approached her in person as well, asking if the policy for outdoor school hour events had changed since she had been unable to hold events during the school day previously. Based on this evidence, Ms. Light did not complain or express in negative terms the fact that Ms. Alden was holding an event during school hours. The evidence suggests it was an inquiry based on an interest in holding similar events during school hours and to make appropriate arrangements for her son.

Ms. Gethings informed Ms. Clarino that Ms. Alden's event could not be held during school hours. Ms. Clarino believed that Ms. Light came to Ms. Gethings upset about this (i.e., she believed Ms. Light "lost it") and this may have been conveyed to Ms. Alden when Ms. Clarino told her to change the time of the East Rock event. Again, the evidence supports that Ms. Light merely inquired about the policy and plans and did not "complain," but Ms. Alden believed that Ms. Light had complained to Ms. Gethings.

The next concern with respect to the East Rock Park event was that Ms. Light complained to the administration that the event itself lacked a planned activity and lacked adherence to the guidelines on social distancing.

All parties interviewed stated the event went well and was highly enjoyed by the second-grade community. Ms. Light and Ms. Alden had a cordial exchange during the event.

According to Ms. Light and Ms. Gethings, after the event Ms. Gethings asked Ms. Light how the event was. Ms. Gethings stated Ms. Light complained that the event lacked a planned activity and students and parents were not observing social distancing guidelines. Ms. Gethings reiterated this response to Ms. Clarino who provided this investigator with that response. Ms. Light states that she answered by saying the event was "fine" but it was a bit crowded given the size of the playground area. Ms. Light further clarified that is all she said about the event and said nothing further that could be construed as negative. Moreover, Ms. Light credibly stated at no point did she feel unsafe and actually allowed her son to stay for the duration of the event.

The evidence based on witness statements, shows that Ms. Light merely stated the event was crowded and did not lodge any other complaints concerning the safety of the event or complain about the activity during the event. Ms. Light said her son had a good time, he stayed for the entire event, and when asked how the event went, Ms. Light answered honestly by saying it was a little crowded. Ms. Gethings may have construed this as a criticism of the event's safety but given that Ms. Light's son attended the entire event, no issues came up at the event itself, and the relative size of the area of the event, Ms. Light's statement that she said it was a little crowded is credible. Ms. Light would not have allowed her son to stay for the entire event if she felt the conditions were unsafe for her or her child. Evidently the Ms. Gething's characterization of Ms. Light's statements as a complaint was conveyed to Ms. Alden but it is more likely than not Ms. Light only stated that the event was crowded and nothing further.

**b.** Parent-Teacher Conferences

Ms. Alden expressed concern about her experiences with Ms. Light during the November parent-teacher conference. Ms. Alden stated that most conferences last 15 minutes but in the case of the Light family, it lasted 45 minutes.

Based on a review of witness statements, the first part of the conference was not at issue. Ms. Alden's testimony that it was normal but lengthy is credible and the meeting did not start out in negative way. Ms. Light and family had questions for Ms. Alden generally and the parties engaged in a series of back and forth but there was no evidence that the content of these questions was inappropriate or led to a hostile meeting.

The tone of the meeting changed when Ms. Alden presented Ms. Light's son report card that contained a message encouraging the family to turn in Ms. Light's son's assignments through Google classrooms because they had not been received and Ms. Alden was unable to evaluate Ms. Light's son's work. Ms. Light and her husband became tense and asked Ms. Alden to provide more support to the family despite Ms. Alden noting that she had communicated with parents often about assignments through the Remind App.

Evidently Ms. Light's son had completed the work but due to the format of the Google classrooms did not submit them or if they were submitted, the pictures came back blurry.

As a result of this conference, Ms. Light sent Ms. Alden her son's missing assignments on a weekend to Ms. Alden's work email. Ms. Alden thought it was inappropriate that Ms. Light did this when it was not requested. Ms. Light misunderstood exactly what Ms. Alden was looking for and decided to provide the missing assignments to Ms. Alden. Ms. Alden's response to the 35 emails was direct and Ms. Light's response seemed to be designed to lower the tension. Based on this evidence, the hostility between the parties arose when Ms. Light interpreted Ms. Alden's comments about the lack of work turned in as a criticism of her parenting and Ms. Alden took Ms. Light responses as a criticism of her as a teacher.

After the second conference, when school administration's attendance was requested, this interpretation of the situation became more clear. As Ms. Light noted in her interview, she felt that Ms. Alden was challenging two of her core identities, that of a parent and that of teacher.

Ms. Alden did not directly state that she felt Ms. Light and her husband criticized her role as a teacher, but Ms. Alden's reaction and tense demeanor during the meeting shows that she felt that way.

The statements from Ms. Alden about the tone of her voice during the conference was found to be credible as no member of the school administration found it necessary to address the tone or volume of her voice. It is clear, as Ms. Alden expressed, that she was firm in her tone but not loud nor yelling.

On the allegation from Ms. Light that Ms. Alden should have informed the Lights about the fact that their son was falling behind based on District practice, the policy, not the practice dictated Ms. Alden's response. Only in the event that a student is at risk of failing is a progress report to be provided to the parents. Since Ms. Alden did not receive Ms. Light's son's assignments to make a valid assessment of his work, Ms. Alden could not provide such a progress report. While Ms. Alden could have informed the parents of her concerns at an earlier point, she was under no obligation to do so and was using the parent-teacher conferences as the vehicle to highlight her concerns which is both appropriate and arguably within the practice of informing the parents at the earliest stage as Ms. Light suggests.

Another point of note is Ms. Alden categorizing Ms. Light's son as not as high functioning as other students. Ms. Light notes that this terminology implies a learning disability that Ms. Alden is not authorized to diagnose. Based on the lack of concern expressed by school administration about Ms. Alden's use of the term, it is clear Ms. Alden was using the term in a general sense and not in a technical sense. Ms. Alden was merely expressing her concern that Ms. Light's son was not performing at the same level as other students. Again, Ms. Light interpreted this as a further indictment of her parenting and through the heated exchange at the second meeting, Ms. Alden took the Light family's response as an indictment of her teaching. This is all further evidenced by the fact that Ms. Alden said how disappointed she was with Ms. Light with her response because Ms. Light understands the difficulties of being a teacher in a remote environment in the middle of a global pandemic.

Again, Ms. Alden took Ms. Light and family's statements during the parent-teacher conferences as a criticism of her as a teacher, one of her core identities. Similarly, Ms. Light took Ms. Alden's comments about Ms. Light's son not turning in work as a criticism of her as a parent, one of her core identities.

These interactions during the conferences were unfortunate and could have been avoided if the parties shifted their perspectives, but there were no policy violations based on the conduct of any of the conference attendees.

     **1.** "Houses Around the World"

Ms. Alden alleged that her name was submitted to Anti-Biased/Anti-Racist (ABAR) group stating that she was promoting North American superiority by showing a video clip titled "Houses around the World" which depicted different homes around the world in various conditions. Ms. Alden was concerned she was being inaccurately labeled a racist within the Worthington Hooker community.

The catalyst for this concern stems from Ms. Clarino asking Ms. Light's husband how the school year was progressing with respect to Ms. Light's son following the parent-teacher conferences. Ms. Light's husband expressed concern about the "Houses Around the World" video shown stating that it is "propagating stereotypes about different cultures and European-American superiority." Ms. Light's husband also expressed concern about other links provided to the students that could lead to inappropriate violent content.

As a result of this concern, school administrators met with Ms. Alden where Ms. Alden walked them through her entire Google Classroom. It was determined that Ms. Alden provided commentary about the videos to the students before showing them the video as part of a "Roofs around the world" theme. The links that could lead to students viewing violent content were removed and Ms. Alden was informed to be more mindful of what is posted and to analyze potential postings through the lens of multi-culturalism. The school administration conferred with the District Office and all believed that no further action was needed and that the video was not "racist."

Ms. Alden expressed that she received a phone call from another student's parent affiliated with the ABAR group and stated how he did not believe Ms. Alden to be a racist, and was, in fact, a fine teacher. The central allegation here is that Ms. Light influenced her husband to complain about the video to school administration and organized an effort for members of the ABAR group to complain about the video. While Ms. Light said that she had reviewed her husband's emails prior to him sending them, she noted she did not author the emails. Ms. Light further acknowledged that she had corresponded with other parents to assess whether her opinion of the video was appropriate.

In essence, Ms. Light was concerned about the video in her role as a parent, and engaged other parents regarding her concern which later resulted in Ms. Light's husband sending Ms. Clarino an email expressing his concerns with the video. Ms. Light certainly had some role, even if she was not the one that directly complained, leading to the investigation of Ms. Alden's use of the video in the classroom. These actions did result in school administrators inquiring about Ms.

{01560770.DOCX Ver. 1}

22

DEF000430

Alden's use of the video and Ms. Alden's character being questioned. Ultimately, school administration took appropriate corrective action to address any concerns about the video or the posting of the links. Ms. Light was acting in her role as a parent and not as a teacher in the Worthington-Hooker School. As such, even if Ms. Light had some role in Ms. Alden being maligned, it does not evidence wrongdoing by Ms. Light as a teacher.

      **c.** Statements to the Board

Ms. Alden also expressed concern with Ms. Light's comments to the Board particularly her statements around COVID safety protocols. Ms. Alden expressed how because of Ms. Light's vocal approach, she is afraid to share her opinions for fear of harassment and retaliation by Ms. Light. Ms. Alden was also concerned that Ms. Light's statements created distrust between parents, students, and the school community.

Ms. Light spoke frequently at Board meetings expressing her concerns around the District's COVID-19 protocols. Since she identified herself at the meetings as a New Haven Public School teacher, many may have attributed her comments and criticisms to her school administration but the evidence shows her comments were directed to Districtwide concerns.

Of particularly note that stirred some concerns amongst the Worthington-Hooker school community, was Ms. Light commenting on a post on social media that showed Worthington-Hooker as having less than 6 positive COVID-cases. Ms. Light believes that because previous iterations of the same data did not include Worthington-Hooker, there was at least one positive case in the school. According to district policies, in the event of a positive case in schools, a letter was to be sent to the parents indicating that fact and Ms. Light was concerned that it did not occur. When school administration was questioned, they noted that there were no positive case in the school itself, in other words while school was in session and in person, no person who was positive, physically entered the building. Due to this, they were not under any obligation to provide a letter to the parents. Ms. Light's post made it appear that the administration was not being transparent and was jeopardizing the safety of the community. While it may be unfortunate that Ms. Light's actions may have contributed to concern within the community, her posts were not directed to Ms. Alden specifically.

While there is little doubt that Ms. Alden had personal feelings about Ms. Light's comments to the Board, none of Ms. Light's comments to the Board around COVID safety protocols were directed to Ms. Alden in particular. None of Ms. Light's comments discussed Ms. Alden's classroom management, her particular efforts to ensure safety, or Ms. Alden's teaching or personality generally. As such, it is clear Ms. Light had been a vocal advocate to the Board and it may have affected Ms. Alden indirectly, there is no violation of Board policy as it relates to Ms. Light's comments and Ms. Alden's reaction.

      d. In-Person Orientation

As the school was preparing to resume in-person learning in Spring 2021, the school administration held a series of virtual orientation meetings with parents from each grade. During the second grade meeting, a parent from Ms. Light's son's learning pod asked the administration very specific questions that Ms. Alden and school administration felt could only

come from a school employee. Given Ms. Light's vocal approach on COVID issues, they believed Ms. Light was influencing this other parent to ask these specific questions. During the meeting, one parent asked the administration permission to walk the halls of the school with a checklist to ensure the school was operating consistent with COVID related guidelines. Again, many felt Ms. Light had influenced this parent to make such a request.

The evidence illustrates the opposite. Ms. Light stated that the parent asking those questions was the PTA president and noted he made statements in a manner and style perhaps in a way he did not intend. However, her denial that she did not influence this parent's statements or requests is found to be credible. Ms. Light in her interview made it clear that she did not support what the parent was advocating for and thought it would highly inappropriate and unsafe for members of the PTA to walk the halls checking to ensure the school was following safety guidelines. Ms. Light was equally clear that she was against having more people roaming the school hallways than was necessary. It is likely that the PTA president, in his capacity as such, had sufficient knowledge of the operations of the school to ask the kind of specific questions he did. No evidence suggests that Ms. Light influenced this in any way. Moreover, while these questions came from a parent whose child was in Ms. Alden's class, the comments were not directed to Ms. Alden herself.

        e.  Gethings/Clarino Influence

Ms. Light in her response to Ms. Alden's "List of concerns" expressed her belief that Ms. Clarino and Ms. Gethings had encouraged Ms. Alden to file her complaint with the goal to push her off various committees. The facts suggest no such influence. Ms. Clarino, Ms. Gethings, and Ms. Alden vociferously denied any involvement in the complaint. While Ms. Light highlights that the timing of the complaint was suspect, no such conspiracy exists. Ms. Alden had communicated with her union about her concerns regarding Ms. Light as far back as December 2020. She was instructed to document her concerns up to the point where the situation escalated. Ms. Alden was concerned about the return of Ms. Light's son into the classroom after Spring Break for fear her actions would be put under a microscope by the Light family. Throughout this time, school administration was making statements that changes were coming for the following school year and as the year drew close to the end and Ms. Alden's was concerned that those changes would result in her working together with Ms. Light, which influenced the timing of Ms. Alden's complaint. In addition, before filing the complaint with HR, efforts were made to mediate the issues but the parties could not reach a consensus on format which resulted in the mediation efforts failing. Given this failure, Ms. Alden sent her complaint to HR. It is important to note that both Ms. Alden and Ms. Light have divergent opinions over the cause of the mediation efforts failing, but it matters less because the point is that Ms. Alden reached a critical point in the school year, could not resolve her issues "in-house" in time to protect herself from working with Ms. Light, and filed her complaint with HR when she did. Ms. Light's perception that the timing suggests influence is ultimately not supported by the evidence.

It is important to note that in some cases, Ms. Clarino seemed to misinterpret certain statements Ms. Light made to Ms. Gethings about the East Rock park event. Ms. Clarino described Ms. Light stating the East Rock Park event was chaos when the evidence does not support that.

## IV.    CONCLUSIONS/RECOMMENDATIONS

{01560770.DOCX Ver. 1}

24

DEF000432

Based on the evidence, there is no violation of Board policies on harassment or "discourteous, offensive or abusive language or conduct towards other employees, students or the public." To the extent there was certain behaviors that were contentious, they did not rise to the level of policy violations. As such, no disciplinary action is warranted.

Given that there is certainly tension between Ms. Alden and Ms. Light, the parties should attempt to reengage the mediation process. As with any voluntary meditation, the terms of such mediation should be mutually agreed upon, and given the failure of the last attempt, it may be wise to bring in a professional mediator outside the New Haven Public School community to ensure objectivity while bolstering credibility.

Moreover, many of the issues discussed in this investigation are due to the blending of Ms. Light's role as both a teacher and a parent. It is likely Ms. Light is not the only teacher in the school system with their own children attending New Haven Public Schools. To avoid potentially negative experiences amongst teachers as seen in this case, the Board should consider adopting a policy that:

1. Ensures teachers with a child in the same school they teach in are assigned to a different grade than their child; and
2. Ensures that teachers who are also parents with children in the New Haven Public School system use the same channels and processes as other parents, i.e. addressing any and all child-student issues after school hours and using non-New Haven Public school resources

Ms. Light or other similarly situated teacher-parents may be encouraged but not directed to have another family member or guardian advocate for the child-student to avoid any problems of overlapping roles as parent and as teacher.

Going forward, all parties herein should be cautioned to be mindful of what information is conveyed and how at information is conveyed. Misinterpretations of comments as complaints and speculations as to motive are unnecessarily escalating an already fragile situation.

*Christopher R. Henderson*

Submitted: Christopher R. Henderson, Esq.
11/17/21

DEF000433

# EXHIBIT 13



# BERCHEM
# MOSES.

### INVESTIGATION SUMMARY REPORT
### FOR NEW HAVEN PUBLIC SCHOOLS

RE: Complaint by Margaret-Mary Gethings and Jenny Clarino against Jessica Light

By:    Paul A. Testa, Esq.
       Berchem Moses, PC

LIGHT002873

## I. INTRODUCTION

On or about April 30, 2021, Jessica Light, then a third-grade teacher at Worthington Hooker School filed a complaint alleging retaliation by Principal MargaretMary Gethings and Assistant Principal Jenny Clarino. She states that she engaged in various forms of protected speech related to COVID, for which Ms. Gethings and Ms. Clarino took various retaliatory actions culminating in Ms. Light being reassigned to teach first grade.

On June 7, 2021, a cross complaint was filed by Gethings and Clarino against Light. In their complaint, Gethings and Clarino claimed that Light engaged in the following conduct:

- Submitted and fabricated false statements to Human Resources as retaliation for changing her grade level from Grade 3 to Grade 1;
- Intentionally created a hostile work environment for Administration and Staff;
- Internalized information shared at Staff Meetings and the School's weekly communication forum (Hooker Happenings) as personal messages or vendettas; and
- Undermined administration, breached confidentiality and created intentional and unneeded anxieties for School families.

In addition, teacher Hilarie Alden filed a complaint regarding Light in May 2021 .

Originally, to ensure that all parties were treated fairly, and each complaint was thoroughly investigated, the three separate complaints were assigned to three separate investigators from Berchem Moses PC. Light's complaint was assigned to Rebecca Goldberg; Alden's complaint was assigned to Chris Henderson; and Gethings' and Clarino's complaint to the undersigned.

However, after interviewing Gethings and Clarino, it became apparent that the cross complaint in reality was a response to the alleged falsehoods that Gethings and Clarino believed Light made in her complaint, and as a way to defend themselves. Had Light not filed a complaint, Gethings and Clarino probably would have discussed the issues with Light, but would not have filed their own complaint.

As the two complaints arise from the same transactions, Light's complaint and Gethings' and Clarino's response to that complaint, it was determined that it did not make sense to view the two complaints as separate and distinct. Therefore, the facts and circumstances of both complaints were investigated by Rebecca Goldberg and are subject to an Investigation Report authored- by Atty. Goldberg. Please refer to said report for a thorough analysis of the facts and circumstances of the issues between Light and Gethings and Clarino.

Notwithstanding this, and in the interest of being thorough, below please find a summary of the Gethings and Clarino interviews conducted by the undesigned and a brief summary of findings of Gethings' and Clarino's complaint.

{01563624.DOCX Ver. 1}                           2

LIGHT002874

## II.    INTERVIEW SUMMARIES

Jenny Clarino (interviewed on September 1, 2021) (Union Representative Sequella Coleman was present for the interview

Background

- She has been employed by the New Haven Board of Education since 2003.

- She currently serves as the Assistant Principal, Worthington Hooker School

- As Assistant Principal her duties include but are not limited to: securing the school, running a safe school, educating students, supporting curriculum, staff development, evaluating teachers, and making sure all the moving parts are working together.

Experience with Margaret Mary Gethings

- Gethings is her direct supervisor.
- They have a positive working relationship. However, they are not friends outside of work.
- She has no issues with Gethings.
- They communicate daily but do not see each other every day.

Experience with Jessica Light

- This year is the first time they are working in the same building.
- They did not work in the same building last year.
- She did not have many interactions with Light last year.
- Her opinion is that Light has a positive impact in the Hooker community.
- Prior to this complaint, she had no major issues with Light.
- Before Light's grade change, she had a positive relationship with Light.

Gethings' and Light's relationship

- As far as she can tell, Light is highly regarded by Gethings. For example, Gethings would give her "shout outs" in staff meetings.
- Gethings would stop meeting just to say "hi" to Light.

{01563624.DOCX Ver. 1}                3

**LIGHT002875**

- From what she saw, they had a really positive relationship.
- Before this, she was not aware of any issues between Gethings and Light.

Complaints against Light

## Internalizes information shared at staff meetings and in the school's weekly communication forum (Hooker Happenings) as personal messages or vendettas

- Light takes everything as personal attack. For example, a freedom of speech email was sent to all staff and Light took it as it was directed exclusively to her, as a personal threat, and as a slight against her.
- She believes that Light spreads school information to the community to get parents upset and paints an inaccurate narrative. For example, she believes that Light told people that a certain teacher tested positive for COVID.
- She believes that Light tells community members information that is discussed in staff meetings. However, she has no proof.
- For example, one classroom was much smaller than other classrooms and there was no way the community could know this unless a teacher told them. She believes Light told some parents. However, she admits that she cannot prove it and does not know for sure that it was Light.

## Hostile work environment for Administration and Staff

- Light has a negative tone.
- Light asks negative questions to put the school in a bad light.
- Light makes teacher's feel uncomfortable. Light has had issues with Ms. Morrison and Ms. Alden specifically.

## Undermines administration

- When Light has questions about issues, for example COVID protocols, rather than asking the administration and giving them a chance to reply, she goes right to the BOE or public first — makes the administration look bad and undermines it and creates anxiety in the community.
- Light does not follow the administration expectations. For example, teachers are not supposed to give out their cell phone numbers to parents, but Light posted her cell phone number.

LIGHT002876

- Light says one thing and then turns it around to make them look bad. For example, Light said that she did not want to be on the PTA board any longer, so they send a communication that the PTA board is looking for teachers. Light turned it around to say that they did not want her on the PTA board anymore.
- For example, the Gardening Committee was looking for more people, so they made an announcement. Light took it as they wanted to replace her.
- Light makes negative/inaccurate comments to the community/other teachers that makes the administration look bad.
- Clarino said she had no proof, but she believes Light made comments in the community about a teacher testing positive for COVID and that the school did not inform the school community. This was untrue and undermined the administration.
- Light was very vocal in the community about her grade change. Some parents were concerned about her teaching their children as she did not want the firstgrade assignment.

## Light's Grade Change

- They could not put Light in the same grade as Alden.
- They could not have Light in the same grade as her son.
- Mr. Salem asked to change his grade level, so he did not get Light's son.

## Miscellaneous

- Because Light complained about Gethings and her together, they thought it prudent to respond together.
- She probably would not have filed a complaint if Light did not file one against them first, but would have discussed the issues with Light.
- The community needs to have confidence in what the administration and teachers are saying publicly.
- Light cannot separate the teacher/parent dynamic.
- Light's complaint was only made as a way to stop her grade from being changed or as a way to get her grade changed back.

## Resolution

- Build back trust.

LIGHT002877

- Work together instead of against the administration.
- Move forward and get back to focusing on students.
- Remind her about not crossing line between being a teacher and a parent.
- Discuss with her about best practices for the dissemination of information to the community.
- Remind her about not to undermine the administration.
- Remind her to keep school information confidential — not tell people what is said in staff meetings.
- It will be difficult to move forward based on all the false and negative things Light has said about her Gethings and her.

## Margaret-Mary Gethings (interviewed on September 1, 2021) (Union Representative Sequella Coleman was present for the interview

### Background

- She has been employed by the New Haven Board of Education for 26 years . (there was a break in 2015 when she left to work as an Admiriistrator for Fair Haven schools).
- She has served as Principal for Worthington Hooker School since 2018.
- As Principal, her duties include but are not limited to: running a safe school, supporting teaching and learning, maintaining the school budget, overseeing operation of the building, leading school staff, and supporting community.

### Experience with Jenny Clarino

- She is Clarino's direct supervisor.
- They have a very good working relationship. She feels lucky to work with her.
- They are friendly, but do not hang out outside of work.
- She has no issues with her.

### Experience with Jessica Light

- Light is a 1st grade teacher.
- Light is the parent of two children in the school: one in 3rd grade and one in 8th grade.

**LIGHT002878**

- She believes Light has been a teacher for the New Haven Board of Education for 7 years.
- They had a very positive relationship before the decision was made to change Light's grade.
- They were friendly with each other prior to this, but were not friends outside of work.
- Light is very thoughtful and somewhat eccentric.
- Light had been supportive of her in the past. For example, Light had referred to herself as on Team MM (Margaret Mary).
- Light is very passionate and very driven in her causes.
- The pandemic was very challenging for Light.

## Clarino's and Light's relationship

- She cannot really tell how they get along as they have not been working together consistently until this year.
- She has not had enough time to assess their relationship.
- From what she knows, she does not know of any problems between them.

## Complaints against Light

- Light's complaint against her and Clarino was very hard for her to read.
- It hurts her immensely over what Light is doing.
- She would have done anything for Light and she still will, but she has to do what is best for everyone involved.
- She believes Light is telling parents information that only school employees would know. She is confident it was Light because it came from parents of students in Light's son's pod or friends of Light.
- For example, at a parent meeting, friends of Light were asking questions only that staff would know.

## Light's Committee Work

- It is false that they denied Light committee work.

LIGHT002879

PTA Teacher representative
- She supported Light for the position.
- Light said that she did not want to be on the PTA board any longer, so they sent a communication that the PTA board is looking for teacher representatives.
- They did not take it away from her.

Gardening Committee
- She did not take this committee away from Light.
- Light had asked for help with the committee.
- Another teacher Jones was in need of community service work, so she recommended that he help with the Gardening Committee.
- Jones went to talk to Light about having clean up days and Light was evasive and told him to just set it up himself.

Shares confidential school information

COVID positive teacher
- Teacher was positive but was teaching remotely so there was no need to send home a letter because there was no school exposure.
- A parent of a student in Light's son's pod said, "we know you have a positive case and are not reporting it."
- She has no proof but believes Light was spreading the information.
- The teacher in question was very upset that this information was out in community.

One classroom was much smaller than the other classrooms
- Parents were complaining about the room size and there was no way parents would know this unless a staff member told them.
- She cannot prove it but believes it was Light who told parents because parents from Light's son's pod were the ones complaining.
- Parents would have to admit that they heard this from Light.
- This creates a hostile/negative environment and breaches confidentiality.

Hostile work environment for Administration and Staff

- Some staff were uncomfortable with some of the things Light said at BOE meetings.
  - Some staff also uncomfortable as Light would ask them to speak out at BOE meetings.
- She received complaints from parents at how vocal Light was as a teacher at BOE meetings about not wanting to return to school.

{01563624.DOCX Ver. 1}                                        8

LIGHT002880

- This gave parents the impression that Light did not want to teach in person. • This gave parents the impression that the school should not be reopening for inperson instruction.
- This undermined the administration.

A parent of a student from Light's son's pod asked to tour the building for COVID concerns

- The parent wanted to make sure that the school was following COVID protocols.
-  Light's family was at this family's house during one of the zoom information sessions about reopening.
- This family had prepared questions for the administration — out of 436 families, this was the only family with questions. She believes Light prepared or helped prepare the questions, but admits that she has no proof.

Light's older

Issues with Ms. Alden
- Light's issues with Alden created a hostile environment for Alden.

Failure to follow administration directives

- She fails to follow administration directives.
- For example, teachers are not supposed to give their cell phone numbers out to parents. This is because of concerns with an invasion of the teacher's privacy.
-  The teachers are supposed to give their school number/email. However, Light posted her cell phone number and then claimed that Gethings was trying to prohibit her from doing so.

{01563624.DOCX Ver. 1}                    9

LIGHT002881

<u>Light's Grade Change</u>

- They had little options.
- They could not put her in the same grade with Alden.
- Salem told her that he did not want to have her son, or work with her
  - ➢ they are friendly so he did not want any issues
  - ➢ he wanted to keep the relationship on good terms
- So, if Light remained in the grade, Salem would need to be moved.
- Class assignments are at the discretion of the principal. Gethings makes decisions based on the best interest of the school.
- Other teachers have had their grade changes in the past.
- Light knew about grade change since December of prior school year, but did not file a complaint until she knew for sure that her grade was being changed.

<u>Miscellaneous</u>

- After receiving Light's complaint and seeing all the falsities in it, they felt that they needed to defend themselves.
- Light only filed her complaint to stop her grade exchange.
- Light's false claims made her very uncomfortable.
- Light's complaint was made against both of them, so they decided to respond together.
- Even before Light filed her complaint, Gethings definitely thought about filing a complaint against Light, but probably would not have acted upon it.
- Gethings is not "sue-happy." She does not think that a principal should file a complaint against a teacher. She has never seen that in her time as an educator.
- It is probably less likely that Gethings would have filed a complaint if Light did not make so many false statements about her.
- It is very unsettling to her that she has to deal with the false allegations from Light.
- Her most important concern is how Light can work as a team going forward.
- She has to think how she speaks to staff because Light takes everything as a personal attack.
- Her biggest fear is how Light will respond to instructions.
- She is concerned that Light will not take any constructive criticism.
- To her, it feels like Light is watching her every move. It is a very uncomfortable situation that is keeping her up at night.
- She is not sure how to effectively supervise her.

{01563624.DOCX Ver. 1}                                    10

**LIGHT002882**

- It has become awkward with Lights children. Light's children will not even look at her.
- On a recent occasion, she said good morning to Light's husband, and he just ignored her.
- To date, her interactions with Light have been fine.

## Resolution

- She wishes this would have been resolved before it went this far.
- Light has significantly breached her trust so much that she is not sure how she can continue to work with her.
- She really does not want to work with her. It is tough to work with someone who would do this to her. She wishes Light would work somewhere else, transfer to a different school.
- Light definitely needs to build back her trust.
- Light needs to be better at separating her roles as a teacher and a parent.
- Light needs to not abuse the information she gets as a teacher and keep it confidential.

## III.    BRIEF SUMMARY OF FINDINGS

**Light submitted and fabricated false statements to Human Resources as retaliation for changing her grade level from Grade 3 to Grade 1**

The investigation found that the change to Light's teaching assignment was the final straw prompting her filing of a formal complaint, but any implication that Light falsified the complaint as retaliation for it was not borne out. It is true that not all of Light's allegations could be corroborated, but it did not appear that she was falsifying her claims. Please see Atty. Goldberg's Investigation Report for a more thorough analysis of the facts and circumstances of the issues between Light and Gethings and Clarino.

**Intentionally created a hostile work environment for Administration and Staff**

The investigation found that Light did not intentionally create a hostile work environment for administration and staff. However, it did find that several staff members were not in agreement with Light's public statements. It also found that Light did ask some teachers to speak up at the Board meetings and some did not want to engage in discussion with her on this topic. Nevertheless, Light's public speech, while at times controversial, does not create a hostile work environment. Nor does asking someone to speak up at the Board

{01563624.DOCX Ver. 1}                    11

**LIGHT002883**

meeting. Further, there was no evidence that Light ever intentionally sought to create hostility for anyone. Please see Atty. Goldberg's Investigation Report for a more thorough analysis of the facts and circumstances of the issues between Light and Gethings and Clarino. Further, please see Atty. Henderson's Investigation Report regarding Ms. Alden's complaint against Light.

Internalized information shared at Staff Meetings and the School's weekly communication forum (Hooker Happenings) as personal messages or vendettas

The investigation did find that there were some announcements in Hooker Happenings that Light viewed as directed to her but, were innocuous and not personally directed to Light. Light also complained that Gethings and Clarino failed to select her for multiple committees and workshops and sidelined her from committees with which she was already involved, as acts of retaliation. However, each decision had an explanation that does not suggest retaliation for protected activity.

Further, throughout the investigation, different parties stated that they felt things they had said or done were being twisted, misinterpreted, or blown out of proportion. This resulted in Light fearing what Gethings and Clarino would do next, and vice versa. All were extremely upset and anxious about the situation and the investigation. Please see Atty. Goldberg's Investigation Report for a more thorough analysis of the facts and circumstances of the issues between Light and Gethings and Clarino.

Undermined administration, breached confidentiality and created intentional and unneeded anxieties for our families

Light was very vocal on topics related to COVID and at times her statements were controversial and had the potential to present the school in a negative light, despite her stated intentions not to do so. While her comments clearly displayed fear, the investigation found no evidence that they actually caused any meaningful disruption in the school environment. Further, while it is conceivable and perhaps likely that Light increased some of these concerns with her statements, the fact that a parent asks questions about COVID safety is not evidence that Light is funneling information to him. Please see Atty. Goldberg's Investigation Report for a more thorough analysis of the facts and circumstances of the issues between Light and Gethings and Clarino.

Please contact us if you would like to discuss further.

{01563624.DOCX Ver. 1}                          12

LIGHT002884

Paul A. Testa                        Date

LIGHT002885

# Worthington Hooker School

**691 Whitney Avenue, New Haven, CT  06511 (475) 220-7200, Fax (475) 220-7205**
**180 Canner Street, New Haven, CT  06511 (475) 220-3700, Fax (475) 220-3705**
**Margaret Mary Gethings, *Principal*    Margaret-m.gethings@new-haven.k12.ct.us**
**Jenny Clarino, *Assistant Principal*    Jenny.clarino@new-haven.k12.ct.us**

June 7, 2021

Dear Ms. Bonner,

Please accept this rebuttal against allegations made in reference to retaliatory actions by Margaret Mary Gethings and Jenny Clarino against teacher Jessica Light.

We provide the evidence contained herein to (1) discredit the libel allegations made against Principal and Assistant Principal of Worthington Hooker school and (2) ***to file a retaliatory complaint to Human Resources to support that Jessica Light:***

- Submitted and fabricated false statements to Human Resources as retaliation for changing her grade level from Grade 3 to Grade 1
- Intentionally creates a hostile work environment for Administration and Staff
- Internalizes information shared at Staff Meetings and our weekly communication forum (Hooker Happenings) as personal messages or vendettas
- Undermines administration, breaches confidentiality and creates intentional and unneeded anxieties for our families.

For each of the 7 forms of retaliation Ms. Light identifies, we provide evidence identified by letter/number combination attached.

We look forward to the opportunity to further explain.

Sincerely,

Margaret Mary Gethings

Jenny Clarino

LIGHT002886

# EXHIBIT 14

**To:** Jessica Light <jessicalight@hotmail.com>
**Cc:** CICARELLA, DAVID <DAVID.CICARELLA@new-haven.k12.ct.us>
**Subject:** RE: additional retaliation

CAUTION:
This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jessica,

I am confirming receipt of this email and the one you sent regarding SPMT. I will need to interview you to flesh out these events in more detail. My next availability is on 9/30 and I can be flexible with timing on that day.

**Rebecca Goldberg**
Berchem Moses PC



 75 Broad Street Milford, CT 06460

(203) 783-1200    http://www.berchemmoses.com

rgoldberg@berchemmoses.com



CONFIDENTIALITY NOTICE: This email transmission (and/or the attachments accompanying it) may contain legally privileged and confidential information, and is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any dissemination, disclosure, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please promptly notify the sender by reply email and destroy the original message.

**From:** Jessica Light <jessicalight@hotmail.com>
**Sent:** Wednesday, September 22, 2021 6:40 AM
**To:** Rebecca Goldberg <rgoldberg@berchemmoses.com>; Maria Garcia <mgg@mgglaw.com>
**Subject:** additional retaliation

I hope this email finds you well. I called hr previously and left a message. I need to explain an incident that occurred yesterday.

While my students were in Music and I was on prep, one of them ran out of the school building upset. The special education para that helps her followed her, took a picture document the event, and coaxed her back into the building.

I spent the last half of my prep talking with the child and social worker about making safe chooses. The para showed Ms. Clarino the picture of the child on the other side of the door and told me. She said something to the effect of, "I took a picture because people don't always believe me when X does things wrong."

**LIGHT000970**

As the para left my room, she said I will see you at 12:00. I asked what was at 12. She said Ms. Clarino had scheduled a meeting to discuss how to best help the student.

I went to the office, but was not invited to this meeting. Afterwards I spoke with the para. She was told it was going to be a meeting about how to help the student, but Ms. Clarino and Ms. Gethings instead spoke to her asking why she was allowing me to soil her relationship with the special education teacher.

Afterwards the special education teacher spoke to me, because she wanted to clear the air. She heard I told the para she didn't trust her. I explained that wasn't true, but that I hoped the 3 of us could talk together because the conversations with only 2 of us at a time were causing confusion.

I fear administration is continuing to try to encourage teachers not to trust me. I was not invited to the meeting about me, so I do not know the extent of the conversation, but it has lead to a teacher and para having new concerns about me.

It is the morning before open house, and should be practicing my presentation not writing this. This hostile environment is preventing me from giving my students and parents my best.


Jessica Light

-- WARNING: FRAUD ALERT. If you receive an e-mail appearing to be from this office which requests that you wire or otherwise transfer funds to any party, you must confirm the request and any corresponding instructions via telephone before you initiate any wire or other transfer. PLEASE CONFIRM BY CALLING THE ORIGINATOR OF THE EMAIL, USING PREVIOUSLY KNOWN CONTACT INFORMATION, PRIOR TO WIRING OR OTHERWISE TRANSFERRING FUNDS.


**Links contained in this email have been replaced by ZixProtect Link Protection. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.**

LIGHT000971

# EXHIBIT 15

From: DELUCIA, PASQUALE PASQUALE.DELUCIA@new-haven.k12.ct.us
Subject: Re: Official complaint reports
Date: December 9, 2021 at 10:31 AM
To: LIGHT, JESSICA JESSICA.LIGHT@new-haven.k12.ct.us, BONNER, TARYN TARYN.BONNER@new-haven.k12.ct.us,
MACK, LISA LISA.MACK@new-haven.k12.ct.us, CICARELLA, DAVID DAVID.CICARELLA@new-haven.k12.ct.us,
mgq@mgqlaw.com, Jessica Light jessicalight@hotmail.com

I will discuss with Dave today and send some dates and times.

Thank you,

Pat

Pat DeLucia
Executive Vice President
NHFT Local 933
203-773-0266

---

From: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
Sent: Thursday, December 9, 2021 10:27 AM
To: BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; CICARELLA, DAVID <DAVID.CICARELLA@new-haven.k12.ct.us>; DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>; mgq@mgqlaw.com <mgq@mgqlaw.com>; Jessica Light <jessicalight@hotmail.com>
Subject: Re: Official complaint reports

Whenever the union is free, I can make myself available at your earliest convenience.

Thank you for you prompt response.
Jessica Light
(She/her)

---

From: BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>
Sent: Thursday, December 9, 2021 10:17:22 AM
To: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; CICARELLA, DAVID <DAVID.CICARELLA@new-haven.k12.ct.us>; DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>; mgq@mgqlaw.com <mgq@mgqlaw.com>; Jessica Light <jessicalight@hotmail.com>
Subject: RE: Official complaint reports

Ms. Light,

Thank you for your email and for providing detailed action steps for the district to consider. Your position is duly noted.

Please allow our office time to consider what you have provided below and we can schedule a virtual meeting in the very near future to respond. Understanding that you are currently out of work, can you share with me some dates you are available next week for Lisa Mack and I to meet with you and your union representative virtually (or if that is something you are even open to at this juncture).

LIGHT000993

Warm Regards,

Taryn R. Bonner

*Office of Human Resources*
**New Haven Public Schools**

  

**NEW HAVEN PUBLIC SCHOOLS**

**From:** LIGHT, JESSICA
**Sent:** Thursday, December 9, 2021 9:41 AM
**To:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; CICARELLA, DAVID <DAVID.CICARELLA@new-haven.k12.ct.us>; DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>; mgq@mgqlaw.com; Jessica Light <jessicalight@hotmail.com>
**Subject:** Re: Official complaint reports

Thank you for sending the three investigative reports on Friday afternoon. While I don't agree with all of the factual findings, and conclusions, I feel relieved and overwhelmingly vindicated as this process comes to a close. I am looking forward to returning to my classroom as soon as possible. To that end, I would like to discuss the timeline, process and assurances for a safe return.

The investigative reports show the school administration engaged in a pattern of retaliation, confirming four instances. It also shows clear, unprofessionalism, malfeasance, dishonesty and hostility. Further, the administration attempted to interfere with the investigation which is further proof of their unabashed hostility toward me, lack of commitment to transparency and continued poor judgment. These actions were not limited to a discrete incident, but were sustained over a substantial period of time, where among other conduct, they took away my voice, solicited a complaint from a parent (mentioned in their complaint against me), planted documents and made slanderous statements.

This situation has caused tremendous hardship, stress and disruption to myself and my family. I have incurred therapy bills for "PTSD triggered by a hostile workplace" and attorney services. I have used my personal sick time during my leave. My relationship with colleagues and the school community has been damaged. And my reputation has been impugned.

I have been treated incredibly unfairly and I fear the results of this investigation will cause further distress for myself, colleagues and children. I do not know if the administration has also received the results of the investigation, this gives me worry every day, as my children are in their care at the school, and the administration has been proven to act with malice. Additionally, I worry for my colleagues who were named in the report and spoke the truth.

**LIGHT000994**

I do not think my colleagues and the parents of the school would have confidence in the administration if they knew the revelations contained in the investigative reports. And I trust the district has similar thoughts.

Additionally, I would like the district consider the following restorative actions.
- Retroactively converting my FMLA leave to paid leave, as the investigation proved my workplace was unduly hostile during the investigation.
- Assurance my position as a third-grade teacher will be restored next school year, as the investigation showed the decision to move my grade was based on "conflicting" reasons and false fabricated statements attributed to, but never said, by my former grade-level partner. The claim that it was not done with animus is only made by Ms. Gethings and Ms. Clarino, who proved to be unreliable witnesses. Furthermore, my son will not be in the third-grade next year.
- A restorative justice process with my colleagues, as the investigation revealed more open negativity and hostility than even I was aware of.

Thank you for your time and consideration, and for the tremendous effort I'm sure this situation has taken. I look forward to hearing from you in the next few days to further discuss. I am eager to return to my class with a plan in place to protect me from further harm and allows me to do my work in a safe environment.

Sincerely,

Jessica Light
(She, Her)

LIGHT000995

# EXHIBIT 16

| | |
|---|---|
| **From:** | LIGHT, JESSICA |
| **To:** | BONNER, TARYN; MACK, LISA; BLATTEAU, LESLIE; DELUCIA, PASQUALE |
| **Subject:** | Jan 14 Meeting follow-up |
| **Date:** | Sunday, January 16, 2022 9:28:09 AM |

Good Morning Everyone,

Here are my notes from our meeting on Friday. Everyone feel free to correct any errors I have made. Lisa and Taryn, but please feel free to clarify and add more.

I hope these notes speed the process so we can reach our mutual goal of my return to work in an environment free of hostility.

Thanks everyone,
Jessica

Jan. 14 meeting Recap

Present: Lisa Mack, Taryn, Jessica, Pat, Leslie

Lisa said good morning and that we are finally at the point where we are trying to move forward and put closure in regards to my complaint, given the surge, the uptick, the vacation we had to rely on counsel to get our information, so I am happy to say; we are returning you to work on Tuesday, back to your school. Sick days will not be restored, because they are days that I took. Returning you to third grade that is an instructional decision, so I can apply at end of the year but would be Ms. Gethings decision as building leader, because we can't take the rights from the principal. They have autonomy. We the restorative circle we will offer you EAP there is an opportunity for restorative circle conferences with your colleagues but they have to agree to it. So we can not mandate your colleagues to meet to restore the harm that may have been done. If they are willing we will help coordinate the conference that would take place.

I asked questions about the process and how things were decided.

- Originally Taryn was working at this investigation, and then we spoke and Taryn spoke and she felt the investigation had been tainted because of coaching that Ms. Gethings did and it had to be sent to outside counsel, so that there could be a valid investigation. **I wondered your take on whether Berchum and Moses was able to achieve that valid investigation? Do you believe their findings were valid?**

Lisa responded We hire outside counsel to conduct investigations and this the information that we are relying on. I do not have a personal or profession opinion on this. We went to a professional to manage that.

I clarified- are you basing your decisions on their findings. Lisa said she wasn't sure what I was asking.

- When I filed the complaint with Taryn, I felt really comfortable with Taryn, in that first interview, you did a great job. And at the end of our first interview, you if any additional acts retaliation continue let me know immediately, because after you file a complaint with HR you have extra protections and HR will make sure that retaliation won't continue. **Berchum and Moses found four acts of retaliation against me. Three of which happened after I filed the HR complaint. So I am wondering since you were unable, not unwilling but unable to protect me from retaliation during the process of the investigation, What information do you have that makes you believe that I would be protected from further retaliation in the future?**

Taryn responded whenever we engage in a professional environment it is our hope that individuals behave in the best interest of the work we are doing. So regardless of this complaint being filed or founded, It is our hope that we have addressed the issue, identified that there was some missteps along the way and hope that when we bring the parties back together we go forward in a best faith effort. We are moving forward with a common goal, we don't have to do it holding hands but we have to do our jobs in a way that does not retaliate or create more harm.

**- Do you believe I will be safe from employee retaliation in the future give that Berchum and Moses found a pattern of retaliation that increased after my complaint to HR?**

Taryn responded I was asking for her personal opinion so I clarified professional. Taryn stated she did not have a crystal ball and cannot tell me that tomorrow something won't happen. It is my professional hope and my personal hope that it will not happen That is part of what the disciplinary process is you hope that if I do something wrong if I am help accountable by whatever means. That level of accountability is to deter me from doing that act again. So when you go through this process and things are founded, actions are put in place with the hope that the behavior is corrected. So that is where the district is, something happened, we did our due diligence to uncover it and accountability will take place and we hope the parties moving forward understand you can't do this and the behavior is

DEF000994

curtailed

- In the investigative reports to the lawyers Mrs. Gethings said that she did not feel she could supervise me anymore and that she wished I transferred to another school because she could not effectively manage me given the hostility, she felt against me. Given that she has stated that on a legal document, what assurances do I have that she was wrong in that statement?  It was her decision not mine that I shouldn't work with her.  It was always my intention to have mediation and make this work, but then she kinda went for the throat and said it is either her or I.  So **what new information do you have that I don't have tells you that she was incorrect in her assessment that she wouldn't be able to supervise me?**

Taryn responded we are not in a position to say whether she was correct or incorrect in saying anything. What she said is is what she said and if it is documented it is there.  That is not the purpose for our roles here, to kind of assess what was done Our hope today is to talk about how we move forward. So I don't have an opinion about that statement being correct or incorrect.

I said I understood and moving forward I want to know that the person who is supervising me believes they can supervise me.  So while I am trying to process the last year and a half of my life. The complaint was filed in April but was about the previous 8 months.  So this began in July of 2020.  So there is some backwards relooking at how we got here, in order for me to move forward, but I absolutely agree with your statement that we want to move forward. And I think you can attest to me trying to get this moving very quickly and I have been on top of that.  Taryn agreed.


- **What steps can be taken to make sure my children are not retaliated against as students at Worthington Hooker?**

Taryn asked if I have concern that my children have been and I said yes. I explained examples of hostility and retaliation my sons had faced and that  Berchum and Moses found Ms. Gethings planted false documents about my husband on a teacher's desk painting him and my family in a negative light. So it is not just me that has been attacked but my husband and my children.  So moving forward what can we do to make sure that we are all safe?

Taryn asked if I had any suggestions and I stated hoped hr could up with parameters that would protect us.

Taryn clarified- but you don't have anything to offer or for us to consider at this point? I explained at this point I am unaware of a way to do that with Ms. Gethings as principal, but I am open to brainstorming with you. Taryn said she would get back to me. Because it is a parent student issue, I don't think Lisa and I are the best people to make this decision by ourselves.


- **The instigation showed that a lot of misinformation has been spread about me to the staff and I was wondering if that misinformation would be corrected so that I can go to work without the hostility and the cloud of suspicion that has now been put over my head?**  If you would like me to give you examples I can but that might be quite long winded?

(there was what I perceived as a long silence) so I gave information on how Phylis (told not to help me if I need to use restroom), Ms. Cav, Ms. Morrison, Ms Paine (were told there was evidence I disclosed private health information when I did not) Ms. Alden ( was told I complained about her outdoor event when the investigation found I had not and had been actively encouraging outdoor events) Mr. Salem (presented with false documents on his desk painting me and my family in a false light), Mr. Shortt ( discouraged from representing me as my union steward)

Those are the staff members THAT I KNOW OF, that have been given false information about me that will make it pretty hard for me to collaborate openly and honestly with them, until they know this was misinformation.

**So is the district ready to correct that misinformation so I can go into a non-hostile environment?**

Taryn asked what other questions I have on my list because she felt it would be inappropriate for me to respond without circling back to my director first and the superintendent because I don't want to tell you something and then it not be the case.

- **Is it the belief of New Haven public schools that Employee retaliation is illegal?**

- **What will be done to protect me if it does continue?**

- **Do you trust Ms. Gethings to continue to run Worthington Hooker school without retaliating against other teachers given that she has shown no remorse at this time?**

- **What evidence do you have that I will be safe?**

I explained I have two independent doctors telling me it is not safe so I need some other evidence showing me that it will.

Lisa Mack said we will have to collaborate and speak to our super intendant and or our counsel in regards to your concerns and questions and responses we may be able to provide to you.  She said Taryn has taken copious notes but I should email too if there are specific

DEF000995

questions and we will respond accordingly.  I stated I appreciated that.


Leslie B, Teachers union president, jumped in-- As the union representation for Jessica we fully support her in seeking some safeguards if she is to return to work given the circumstances of the investigation. So we wanted to put some safeguards on the table.

**1) Ensure that Jessica has union representation at all meetings with her administrators not just disciplinary.**

**2) Request an instructional manager is there someone other than Ms. Gethings or Ms. Clarino and in not given that Jessica is getting back to work in mid to late January can we agree on a no rating for the 2021-2222 school year?**

**3) The last safeguard which is a baseline request we want to make sure a mediation is put into place 1:1 with Gethings 1:1 with clarino not the two of them with Jessica.  Mediation with both of those individuals.  Mediations are often ongoing but we at least want to have one started before Jessica is expected to return to work. And that can be part of her return to work is to get these mediations going.**

**4) This is Jessica's first year teaching first grade what would be supportive for staff and students alike is a phase in where Jessica is able to do some observation of her grade level and see what is happening in first grade in mid-January, do some co-teaching and we think that is in the best interest of Jessica, grade level partner and the students as well.**

Taryn said she had no official responses but all safeguards seem realistic but she will have to circle back with the team.  She will contact EAP director to see if mediation can be scheduled for next week. She will make it a priority to work on them today so at the very latest I have some information over the weekend to kind of digest it.

I reiterated I wouldn't be able to return Tuesday unless that return was doing the mediation.  The mediation needs to happen prior to my entering the building I do not want the first time for me to see Ms. Gethings or for Ms. Gethings to see me to be in the hallway with students. We need to have a sit-down adult discussion prior to my entering the building. I understand the districts point of view of wanting to get me back into the classroom and I have been desperately wanting to get back into the classroom, which is why I have been trying to get this process to move more quickly, but at the same time my return to work paperwork from my Doctors has said Jessica is fully capable of returning to work with safeguards in place.  So, it is an impossibility for me to return to work prior to at least a sit-down meeting with those people who will now have power over me- My abusers that will now have power over me


Lisa asked if I would be open to a virtual meeting and I said yes.

Leslie said she appreciates that we are collaborating to make sure these baseline safeguards are in place, the union does stand with Jessica in her continued concerns about her overall workplace safety.  I responded to, "To me this is band aids for an amputation. So, I appreciate the band-aids, but I am hurting."

I also reiterated that it was not a choice to go on leave.  It was a medical requirement, based on the environment I was in.  Taryn said dully noted.

Pat, Union Vice president asked, Just so I am clear if for some reason things are delayed and we don't hear back, Jessica will not be reporting on Tuesday. Is that where we are landing here.

Taryn said I do not know that our office is landing on that.  I responded that right now I am on sick leave.  HR does not have discretion over whether or not I am healthy enough to return.  Lisa agreed.

I reiterated my doctors have said in order for it to be healthy for me to return to work safeguards need to be in place.  So, I would not be legally allowed to return to work until at least some safeguards are in place, as much as I would love to.  Unless it was an administrative leave in which case HR would have the control.

Taryn said you have given me plenty to work on, so unless there is anything else we need to say we should going hop off and she would work like the energizer bunny.  We all say thank you.




Jessica Light

DEF000996