# EXHIBIT 17

| **From:** | LIGHT, JESSICA |
| **To:** | BONNER, TARYN; MACK, LISA; BLATTEAU, LESLIE; DELUCIA, PASQUALE |
| **Subject:** | Re: Jan 14 Meeting follow-up |
| **Date:** | Tuesday, January 18, 2022 3:09:00 PM |

Taryn, Lisa-

Please let me know if there is anything you would like to change in the minutes of our meeting.

Jessica Light
(She/her)

---

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Sunday, January 16, 2022 9:28 AM
**To:** BONNER, TARYN; MACK, LISA; BLATTEAU, LESLIE; DELUCIA, PASQUALE
**Subject:** Jan 14 Meeting follow-up

Good Morning Everyone,

Here are my notes from our meeting on Friday. Everyone feel free to correct any errors I have made. Lisa and Taryn, but please feel free to clarify and add more.

I hope these notes speed the process so we can reach our mutual goal of my return to work in an environment free of hostility.

Thanks everyone,
Jessica

Jan. 14 meeting Recap

Present: Lisa Mack, Taryn, Jessica, Pat, Leslie

Lisa said good morning and that we are finally at the point where we are trying to move forward and put closure in regards to my complaint, given the surge, the uptick, the vacation we had to rely on counsel to get our information, so I am happy to say; we are returning you to work on Tuesday, back to your school. Sick days will not be restored, because they are days that I took. Returning you to third grade that is an instructional decision, so I can apply at end of the year but would be Ms. Gethings decision as building leader, because we can't take the rights from the principal. They have autonomy. We the restorative circle we will offer you EAP there is an opportunity for restorative circle conferences with your colleagues but they have to agree to it. So we can not mandate your colleagues to meet to restore the harm that may have been done. If they are willing we will help coordinate the conference that would take place.

I asked questions about the process and how things were decided.

- Originally Taryn was working at this investigation, and then we spoke and Taryn spoke and she felt the investigation had been tainted because of coaching that Ms. Gethings did and it had to be sent to outside counsel, so that there could be a valid investigation. **I wondered your take on whether Berchum and Moses was able to achieve that valid investigation? Do you believe their findings were valid?**

Lisa responded We hire outside counsel to conduct investigations and this the information that we are relying on. I do not have a personal or profession opinion on this. We went to a professional to manage that.

I clarified- are you basing your decisions on their findings. Lisa said she wasn't sure what I was asking.

- When I filed the complaint with Taryn, I felt really comfortable with Taryn, in that first interview, you did a great job. And at the end of our first interview, you if any additional acts retaliation continue let me know immediately, because after you file a complaint with HR

DEF000754

you have extra protections and HR will make sure that retaliation won't continue. **Berchum and Moses found four acts of retaliation against me. Three of which happened after I filed the HR complaint. So I am wondering since you were unable, not unwilling but unable to protect me from retaliation during the process of the investigation, What information do you have that makes you believe that I would be protected from further retaliation in the future?**

Taryn responded whenever we engage in a professional environment it is our hope that individuals behave in the best interest of the work we are doing. So regardless of this complaint being filed or founded, It is our hope that we have addressed the issue, identified that there was some missteps along the way and hope that when we bring the parties back together we go forward in a best faith effort. We are moving forward with a common goal, we don't have to do it holding hands but we have to do our jobs in a way that does not retaliate or create more harm.

**- Do you believe I will be safe from employee retaliation in the future give that Berchum and Moses found a pattern of retaliation that increased after my complaint to HR?**

Taryn responded I was asking for her personal opinion so I clarified professional. Taryn stated she did not have a crystal ball and cannot tell me that tomorrow something won't happen. It is my professional hope and my personal hope that it will not happen That is part of what the disciplinary process is you hope that if I do something wrong if I am help accountable by whatever means. That level of accountability is to deter me from doing that act again. So when you go through this process and things are founded, actions are put in place with the hope that the behavior is corrected. So that is where the district is, something happened, we did our due diligence to uncover it and accountability will take place and we hope the parties moving forward understand you can't do this and the behavior is curtailed

- In the investigative reports to the lawyers Mrs. Gethings said that she did not feel she could supervise me anymore and that she wished I transferred to another school because she could not effectively manage me given the hostility, she felt against me. Given that she has stated that on a legal document, what assurances do I have that she was wrong in that statement? It was her decision not mine that I shouldn't work with her. It was always my intention to have mediation and make this work, but then she kinda went for the throat and said it is either her or I. So **what new information do you have that I don't have tells you that she was incorrect in her assessment that she wouldn't be able to supervise me?**

Taryn responded we are not in a position to say whether she was correct or incorrect in saying anything. What she said is is what she said and if it is documented it is there. That is not the purpose for our roles here, to kind of assess what was done Our hope today is to talk about how we move forward. So I don't have an opinion about that statement being correct or incorrect.

I said I understood and moving forward I want to know that the person who is supervising me believes they can supervise me. So while I am trying to process the last year and a half of my life. The complaint was filed in April but was about the previous 8 months. So this began in July of 2020. So there is some backwards relooking at how we got here, in order for me to move forward, but I absolutely agree with your statement that we want to move forward. And I think you can attest to me trying to get this moving very quickly and I have been on top of that. Taryn agreed.

**- What steps can be taken to make sure my children are not retaliated against as students at Worthington Hooker?**

Taryn asked if I have concern that my children have been and I said yes. I explained examples of hostility and retaliation my sons had faced and that Berchum and Moses found Ms. Gethings planted false documents about my husband on a teacher's desk painting him and my family in a negative light. So it is not just me that has been attacked but my husband and my children. So moving forward what can we do to make sure that we are all safe?

Taryn asked if I had any suggestions and I stated hoped hr could up with parameters that would protect us.

Taryn clarified- but you don't have anything to offer or for us to consider at this point? I explained at this point I am unaware of a way to do that with Ms. Gethings as principal, but I am open to brainstorming with you. Taryn said she would get back to me. Because it is a parent student issue, I don't think Lisa and I are the best people to make this decision by ourselves.

**- The instigation showed that a lot of misinformation has been spread about me to the staff and I was wondering if that misinformation would be corrected so that I can go to work without the hostility and the cloud of suspicion that has now been put over my head?** If you would like me to give you examples I can but that might be quite long winded?

(there was what I perceived as a long silence) so I gave information on how Phylis (told not to help me if I need to use restroom), Ms. Cav, Ms. Morrison, Ms Paine (were told there was evidence I disclosed private health information when I did not) Ms. Alden ( was told I complained about her outdoor event when the investigation found I had not and had been actively encouraging outdoor events) Mr. Salem (presented with false documents on his desk painting me and my family in a false light), Mr. Shortt ( discouraged from representing me as my union steward)

DEF000755

Those are the staff members THAT I KNOW OF, that have been given false information about me that will make it pretty hard for me to collaborate openly and honestly with them, until they know this was misinformation.

**So is the district ready to correct that misinformation so I can go into a non-hostile environment?**

Taryn asked what other questions I have on my list because she felt it would be inappropriate for me to respond without circling back to my director first and the superintendent because I don't want to tell you something and then it not be the case.

**- Is it the belief of New Haven public schools that Employee retaliation is illegal?**

**- What will be done to protect me if it does continue?**

**- Do you trust Ms. Gethings to continue to run Worthington Hooker school without retaliating against other teachers given that she has shown no remorse at this time?**

**- What evidence do you have that I will be safe?**

I explained I have two independent doctors telling me it is not safe so I need some other evidence showing me that it will.

Lisa Mack said we will have to collaborate and speak to our super intendant and or our counsel in regards to your concerns and questions and responses we may be able to provide to you. She said Taryn has taken copious notes but I should email too if there are specific questions and we will respond accordingly. I stated I appreciated that.


Leslie B, Teachers union president, jumped in-- As the union representation for Jessica we fully support her in seeking some safeguards if she is to return to work given the circumstances of the investigation. So we wanted to put some safeguards on the table.

**1) Ensure that Jessica has union representation at all meetings with her administrators not just disciplinary.**

**2) Request an instructional manager is there someone other than Ms. Gethings or Ms. Clarino and in not given that Jessica is getting back to work in mid to late January can we agree on a no rating for the 2021-2222 school year?**

**3) The last safeguard which is a baseline request we want to make sure a mediation is put into place 1:1 with Gethings 1:1 with clarino not the two of them with Jessica. Mediation with both of those individuals. Mediations are often ongoing but we at least want to have one started before Jessica is expected to return to work. And that can be part of her return to work is to get these mediations going.**

**4) This is Jessica's first year teaching first grade what would be supportive for staff and students alike is a phase in where Jessica is able to do some observation of her grade level and see what is happening in first grade in mid-January, do some co-teaching and we think that is in the best interest of Jessica, grade level partner and the students as well.**

Taryn said she had no official responses but all safeguards seem realistic but she will have to circle back with the team. She will contact EAP director to see if mediation can be scheduled for next week. She will make it a priority to work on them today so at the very latest I have some information over the weekend to kind of digest it.

I reiterated I wouldn't be able to return Tuesday unless that return was doing the mediation. The mediation needs to happen prior to my entering the building I do not want the first time for me to see Ms. Gethings or for Ms. Gethings to see me to be in the hallway with students. We need to have a sit-down adult discussion prior to my entering the building. I understand the districts point of view of wanting to get me back into the classroom and I have been desperately wanting to get back into the classroom, which is why I have been trying to get this process to move more quickly, but at the same time my return to work paperwork from my Doctors has said Jessica is fully capable of returning to work with safeguards in place. So, it is an impossibility for me to return to work prior to at least a sit-down meeting with those people who will now have power over me- My abusers that will now have power over me


Lisa asked if I would be open to a virtual meeting and I said yes.

Leslie said she appreciates that we are collaborating to make sure these baseline safeguards are in place, the union does stand with Jessica in her continued concerns about her overall workplace safety. I responded to, "To me this is band aids for an amputation. So, I appreciate the band-aids, but I am hurting."

I also reiterated that it was not a choice to go on leave. It was a medical requirement, based on the environment I was in. Taryn said dully noted.

Pat, Union Vice president asked, Just so I am clear if for some reason things are delayed and we don't hear back, Jessica will not be reporting on Tuesday. Is that where we are landing here.

DEF000756

Taryn said I do not know that our office is landing on that.   I responded that right now I am on sick leave.  HR does not have discretion over whether or not I am healthy enough to return.  Lisa agreed.

I reiterated my doctors have said in order for it to be healthy for me to return to work safeguards need to be in place.  So, I would not be legally allowed to return to work until at least some safeguards are in place, as much as I would love to.  Unless it was an administrative leave in which case HR would have the control.

Taryn said you have given me plenty to work on, so unless there is anything else we need to say we should going hop off and she would work like the energizer bunny.  We all say thank you.

Jessica Light
(she/her)

DEF000757

# EXHIBIT 18

| | |
|---|---|
| **From:** | BONNER, TARYN |
| **To:** | LIGHT, JESSICA |
| **Cc:** | MACK, LISA; BLATTEAU, LESLIE |
| **Subject:** | Return to Work Notice |
| **Date:** | Tuesday, January 18, 2022 12:48:00 PM |
| **Attachments:** | image001.png |
| | J. Light Letter 1-2022.pdf |
| **Sensitivity:** | Confidential |

Good Afternoon Ms. Light,

Please see the attached. A hard copy has been mailed to your home address for your records.

Sincerely,

Taryn R. Bonner


 **Labor Relations Manager**

*Office of Human Resources*

**New Haven Public Schools**

54 Meadow Street, 2nd floor

New Haven, CT  06519

**Office**: 475 220-1549

**Fax**:   203 946-8805



NEW HAVEN PUBLIC SCHOOLS

DEF001206

# NEW HAVEN PUBLIC SCHOOLS
## DEPARTMENT OF HUMAN RESOURCES

54 Meadow Street, 2nd Floor • New Haven, Connecticut 06519
Phone 475-220-1000 • Fax 203-946-8805

**SENT VIA ELECTRONIC & REGULAR MAIL**

January 18, 2022

Jessica Light
1370 Ella T. Grasso
New Haven, CT 06515

RE: **Notice to Return to Work**

Dear Ms. Light:

This letter follows a meeting held with the Human Resources Office on Friday, January 14, 2022. Present during the virtual meeting along with you and I were, Taryn Bonner, Labor Relations Manager, Pat Delucia and Leslie Blatteau, Executive Leaders for your union, Local 933. The purpose for the meeting was to respond to your written request, dated December 9, 2021 and to discuss your return to work.

As previously discussed, you are hereby expected to return to work, Tuesday, January 18, 2022. You will be returning to your previous location, Worthington Hooker School. Per your request, you will be permitted to co-teach for a period of time as you transition back into the school environment.

Should you have any additional questions in this regard, please contact your union, the Human Resources Office or me directly.

Very truly yours,

Lisa Mack
Director of Human Resources & Labor Relations

CC:     Leslie Blatteau
        File

Human Resources • 54 Meadow Street, New Haven, CT 06519

DEF000083

# EXHIBIT 19

| | |
|---|---|
| **From:** | BLATTEAU, LESLIE |
| **To:** | DELUCIA, PASQUALE |
| **Subject:** | Fw: Return to Work Notice |
| **Date:** | Monday, February 7, 2022 7:57:01 PM |
| **Attachments:** | image001.png |
| **Sensitivity:** | Confidential |

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>

**Sent:** Monday, February 7, 2022 5:11 PM

**To:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; mgq@mgqlaw.com <mgq@mgqlaw.com>

**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; Eric W. Chester <ericchester@fdclawoffice.com>

**Subject:** Re: Return to Work Notice

Despite the lack of safeguards in place, my questions from our January 14th meeting remaining unanswered and mediation still unsolidified, I will return to work Wednesday.

I hope mediation can be planned for that day (or soon after) but if not, I can return to the school building, because the risk of being declared insubordinate is too great and I have limited sick days.

Please let me know what class I will be coteaching and what subjects I should prepare, and for how many students.

Jessica Light
(She/her)

**From:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>

**Sent:** Wednesday, January 26, 2022 12:18:20 PM

**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>

**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; Eric W. Chester <ericchester@fdclawoffice.com>

**Subject:** RE: Return to Work Notice

Good Afternoon Ms. Light,

You were directed to return to work on January 18, 2022. Therefore, you will not be placed on administrative leave. It is the district's expectation that you return to work as directed; failure to do so may be considered insubordination.

The Alden complaint was submitted, investigated and you received a copy of the findings on December 3, 2021. Through the investigation, the complaint raised against was unfounded. No

DEF000617

additional action is required at this time. Mediation can be offered to the parties, however, both parties would have to consent to the mediation process.

Regards,

Taryn R. Bonner

### *Office of Human Resources*
**New Haven Public Schools**



**NEW HAVEN PUBLIC SCHOOLS**

---

**From:** LIGHT, JESSICA
**Sent:** Wednesday, January 26, 2022 6:50 AM
**To:** BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; Eric W. Chester <ericchester@fdclawoffice.com>
**Subject:** Re: Return to Work Notice
**Sensitivity:** Confidential

Good morning Taryn and Lisa,

I am following up because I have not yet received a reply.

Is the request from the union for administrative leave being honored?

Are there any corrections you would like me to make to our meeting minutes?

Also we have yet to discuss a resolution to the Alden complaint when can that be done?

I am eagerly awaiting reply to these questions and those asked at our meeting so that I can safely return to work.

Thank you for your response,

Jessica

Jessica Light
(She/her)

---

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Tuesday, January 25, 2022 5:46:03 AM
**To:** BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; BONNER, TARYN

DEF000618

<TARYN.BONNER@new-haven.k12.ct.us>

**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; Eric W. Chester <ericchester@fdclawoffice.com>

**Subject:** Re: Return to Work Notice

Good morning Taryn and Lisa,

Are you honoring the union's request for administrative leave until mediation?

We have the same goal- my safe return to work. We agreed mediation was the first step. Please let me what the delay is and if there is anything I can do to help.

Thank you,

Jessica Light
(She/her)

---

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Monday, January 24, 2022 9:27:05 AM
**To:** BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; mgq@mgqlaw.com <mgq@mgqlaw.com>; Eric W. Chester <ericchester@fdclawoffice.com>
**Subject:** Re: Return to Work Notice

Please let me know any updates on mediation.

Jessica Light
(She/her)

---

**From:** BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>
**Sent:** Wednesday, January 19, 2022 2:52:36 PM
**To:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; mgq@mgqlaw.com <mgq@mgqlaw.com>; Eric W. Chester <ericchester@fdclawoffice.com>
**Subject:** Re: Return to Work Notice

Good afternoon,

As we continue to wait for updates regarding the schedule for the agreed upon return-to-work mediation for Ms. Light at Worthington Hooker, the union would like to ask for Ms. Light to be put on paid administrative leave from Tuesday, January 18, 2022 until the date of the mediation/her return to work. The mediation is a necessary component for Ms. Light's safe return and she is ready to participate. We are waiting on HR to schedule the mediation so Ms.

DEF000619

Light can get back to work.

Thank you,
Leslie

**From:** BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>
**Sent:** Tuesday, January 18, 2022 6:03 PM
**To:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; mgq@mgqlaw.com <mgq@mgqlaw.com>; Eric W. Chester <ericchester@fdclawoffice.com>
**Subject:** Re: Return to Work Notice

Good evening,

I want to make sure we are in agreement. During our meeting on Friday, it was my understanding that HR agreed to initiate the EAP mediation process with Jessica and Ms. Gethings/Ms. Clarino to support Jessica's return. Can you please let us know the date/time for this first mediation? Jessica is eager to return to work once the agreed upon mediation is scheduled.

Thank you,
Leslie

**From:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>
**Sent:** Tuesday, January 18, 2022 1:47 PM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; mgq@mgqlaw.com <mgq@mgqlaw.com>; Eric W. Chester <ericchester@fdclawoffice.com>
**Subject:** RE: Return to Work Notice

Hello again Ms. Light,

Although I do not agree with every point you raised below, your response is duly noted.

Sincerely,

Taryn R. Bonner

### *Office of Human Resources*
**New Haven Public Schools**

DEF000620



---

**From:** LIGHT, JESSICA
**Sent:** Tuesday, January 18, 2022 1:25 PM
**To:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; mgq@mgqlaw.com; Eric W. Chester <ericchester@fdclawoffice.com>
**Subject:** Re: Return to Work Notice
**Sensitivity:** Confidential

Taryn,

I am in receipt of the return to work letter. This letter is inconsistent with what was discussed at our meeting on January 14, 2022, where we discussed safeguards that would enable my safe return to school, and where you and Ms. Mack stated you would be getting back to me about these safeguards. I have not received any substantive response from you or the District to any of the points I raised or that the union raised on my behalf. Nor has there been any interactive process to address my doctor's notes and the implementation of safeguards to ensure my physical and mental health in light of the retaliation which I suffered and may still be subjected to.

As I said at the meeting, if appropriate safeguards are not put in place, I cannot return to work, nor should I be expected to, and I will be taking another sick day on January 18, 2022. I am ready and willing to return to work when it is safe to do so, and nothing has been done to address my legitimate concerns.

Our last communication was that you were arranging mediation and were going to get back to me by the end of the day Friday, because my doctor has authorized me to return once the environmental health risks have been addressed.

Please call if you would like to discuss next steps. I truly want to return as soon as possible.

Jessica Light

---

**From:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>
**Sent:** Tuesday, January 18, 2022 12:48 PM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>
**Subject:** Return to Work Notice

DEF000621

Good Afternoon Ms. Light,

Please see the attached. A hard copy has been mailed to your home address for your records.

Sincerely,

Taryn R. Bonner

**Labor Relations Manager**

*Office of Human Resources*

**New Haven Public Schools**

54 Meadow Street, 2nd floor

New Haven, CT  06519

**Office**: 475 220-1549

**Fax**:   203 946-8805



DEF000622

# EXHIBIT 20

| | |
|---|---|
| **From:** | LIGHT, JESSICA |
| **To:** | MACK, LISA; BONNER, TARYN; MCCREA, SHENIQUIA; BLATTEAU, LESLIE; mgq@mgqlaw.com; Eric W. Chester |
| **Subject:** | Re: Jessica L"s letter. |
| **Date:** | Monday, January 24, 2022 11:02:20 AM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |

I am simply requesting a non-hostile workplace free of retaliation. I do not need any accommodation that should not be provided all employees.

Jessica Light
(She/her)

---

**From:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>
**Sent:** Monday, January 24, 2022 10:57:51 AM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; MCCREA, SHENIQUIA <SHENIQUIA.MCCREA@NEW-HAVEN.K12.CT.US>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; mgq@mgqlaw.com <mgq@mgqlaw.com>; Eric W. Chester <ericchester@fdclawoffice.com>
**Subject:** RE: Jessica L's letter.

Good morning Jessica,

Thank you for submitting the additional information. As per your request, you are requesting a job accommodation.    Taryn will work with you and provide the steps to submit and process the request.

Regards,
**Lisa J. Mack**
**Director of Human Resources & Labor Relations**
*Office of Human Resources*
**New Haven Public Schools**
54 Meadow Street, 2nd floor
New Haven, CT  06519
**Office**: 475 220-1540
**Fax**:    203 946-8805
**E-mail**: lisa.mack@nhboe.net



**NEW HAVEN PUBLIC SCHOOLS**
Stay healthy.

DEF000771

   

Cover your   Wash and   Keep your   Stay home
face       sanitize    distance   if you feel ill

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Monday, January 24, 2022 10:34 AM
**To:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; MCCREA, SHENIQUIA <SHENIQUIA.MCCREA@NEW-HAVEN.K12.CT.US>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; mgq@mgqlaw.com; Eric W. Chester <ericchester@fdclawoffice.com>
**Subject:** Fwd: Jessica L's letter.

I have previously sent the return to work letter from my Doctor at the PTSD center and am now sending this additional letter from my other doctor as a follow up.

Thank you,

Jessica Light
(She/her)

---

**From:** Jessica Light <jessicalight@hotmail.com>
**Sent:** Monday, January 24, 2022 10:27 AM
**To:** LIGHT, JESSICA
**Subject:** Fwd: Jessica L's letter.

<div style="border:1px solid #000; background:#fdf3c0; padding:8px;">

**CAUTION:**

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

</div>

Begin forwarded message:

> **From:** Gale Levin <glevin770@gmail.com>
> **Date:** January 14, 2022 at 5:09:05 PM EST
> **To:** jessicalight@hotmail.com
> **Subject: Jessica L's letter.**
>
> To Whom it May Concern,
> I have been seeing Jessica Light (DOB 7/7/1981) monthly since 4/28/2020.

DEF000772

On 5/12/21, she began reporting increased anxiety and decreased mood as she began feeling she was being pushed out of the school for being outspoken about what COVID protocols should be in place. She reported being taken off committees, having her regular 3rd grade teaching assignment taken from her and given 1st grade for which she felt ill prepared, tensions increased as she was accused of things she did not do.etc

These events triggered her anxiety, depression, and PTSD. She has been out on medical leave for this reason. However, since the investigation into this supported the patient's claims, she has improved significantly and is ready and able to return to work.

However since the principal, who was the subject of the investigation, still remains in the same position, I feel this would again trigger her symptoms.

My recommendation is that Ms Light be allowed to work where she would not have contact with the principal, Ms. Gethings. If that is not possible, safeguards must be put in place to prevent any retaliation which might cause a recurrence or exacerbation of symptoms.

I greatly appreciate your consideration in this matter.

Sincerely,
Gale Levin M.D.

DEF000773

# EXHIBIT 21

**From:** LIGHT, JESSICA
**To:** GETHINGS, MARGARET-MARY; CLARINO, JENNY; MACK, LISA; BONNER, TARYN; BLATTEAU, LESLIE
**Subject:** Re: Returning to work
**Date:** Wednesday, February 9, 2022 2:10:24 AM
**Attachments:** Outlook-2rcoe5o1.png

Great, I look forward to reconnecting with everyone.

Here is the first draft of the letter requested:

https://docs.google.com/document/d/15RcjKkt1buVxpwjWVgi7URbHDEoJfgG3zAI8vxx_ags/edit

Jessica Light
(She/her)

---

**From:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Sent:** Tuesday, February 8, 2022 10:29 PM
**To:** LIGHT, JESSICA; CLARINO, JENNY; MACK, LISA; BONNER, TARYN; BLATTEAU, LESLIE
**Subject:** Re: Returning to work

Good evening, Jessica,

 We are glad that you will be returning to work. We too look forward to participating in mediation and agree it will be important for all of us. This week,  as you return to WHS, we think it will be important for you to spend time acclimating with 1st grade and reconnecting with your students who are in 1A and 1B.  I suggest spending the remainder of the week rotating your time in both classrooms spending time in literacy and math to observe and support the learning of first graders. We would like you to spend literacy in 1A and Math in 1B on Wednesday and then on Thursday rotate and do literacy in 1B and math in 1A.

In addition to observe and supporting learning, we also think it would be important to take time:

- review your student's progress on their report card from the past two marking periods
- review assessment data
- connect with Courtney Costa to arrange a time to meet for support with IReady Math, Courtney has been working during grade level meetings with our K-4
- prepare a message to families of your return and that you will be spending this week observing and acclimating yourself back , please share with Ms. Clarino when completed
- familiarize yourself with Second Step and where 1st grade is with SEL lessons
- observe intervention block and groupings of students

- review past Hooker Happenings to get updated on school events & resources

(you can do the above in the book room or room 1C)

DEF001178

Please be aware we are planning to have a meeting on Thursday with your union president Leslie, our union president Sequella, you and WHS administration to discuss your transition back to WHS and plan for a successful return and discuss what you will be doing. I have requested the meeting and I am just awaiting a time, once I know the time, I will share it with you.

Welcome Back! Please let me know if you have questions or need anything. I am sure you students will be happy to see you. We will wait until we meet until we tell the students what if going to happen, I imagine there will be many questions and I think best if we just all answer that we are happy Ms. Light is back to school and the next couple of days we are all just showing her what we are learning and doing. Given that we just found out we have not had time to inform our students and families.

Good luck returning! I hope you have a good day!

Best,
Margaret Mary

Best,
Margaret Mary

**Margaret Mary Gethings**
**Principal**
**Worthington Hooker School K-8**
***"Children are likely to live up to what you believe of them"*** *~ Lady Bird Johnson*



---

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Monday, February 7, 2022 5:40 PM
**To:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>; CLARINO, JENNY

DEF001179

<JENNY.CLARINO@new-haven.k12.ct.us>; MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>

**Subject:** Returning to work

The union and I had hoped that mediation could be arranged prior to my return, unfortunately that has not happened. I have limited sick day so I cannot accommodate the delay as much as I know it would be helpful for all of us.

I will return to work Wednesday. Please feel free to contact me about the logistics of my return.

I am excited to get back to working with our wonderful community of learners.

Thank you.

Jessica Light
(She/her)

DEF001180

# EXHIBIT 22

**From:** HANNANS, KEISHA
**To:** BONNER, TARYN; MACK, LISA
**Subject:** Fwd: Grade 1
**Date:** Friday, February 25, 2022 2:43:06 PM
**Attachments:** image.png
image.png
Outlook-z5xglxzq.png

Please see below.

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

**From:** HANNANS, KEISHA <KEISHA.REDD@new-haven.k12.ct.us>
**Sent:** Friday, February 25, 2022, 1:50 PM
**To:** GETHINGS, MARGARET-MARY
**Cc:** COLEMAN, SEQUELLA
**Subject:** Re: Grade 1

Good Afternoon,

If you believe it is appropriate to have a union representative present when you meet with Ms. Light, please have one present.   However, the meeting needs to occur in the morning to provide her with time to prepare her classroom.

As discussed,  based upon our previous conversations I was under the impression that Ms. Light was already teaching in her original class in her classroom.  I also believed that you were utilizing Ms. Light's initial three days during her return from FMLA to provide her with a chance to reacclimate herself to the school environment and to notify first grade parents about the return to the original configuration of classes.  However, it is very clear that you have not done this and this is very disappointing.  This process will not be delayed any further.

During our conversation yesterday,  you stated content that you would include in the letter and your comments were appropriate.  Please know that you will write the letter as the principal of the school and you will work with families and students to make them aware of the benefits of this transition to the original configuration of classes that you planned.

Have a great weekend.

Keisha Redd-Hannans
Assistant Superintendent for Instructional Leadership

Sent from my Verizon, Samsung Galaxy smartphone
Get Outlook for Android

---

DEF001314

**From:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Sent:** Friday, February 25, 2022, 1:26 PM
**To:** HANNANS, KEISHA
**Subject:** Re: Grade 1

Good afternoon Keisha,

We will meet with Ms. Light on Monday Feb.28th to notify her of the plan for her teaching her class from the beginning of the school year. Should we be meeting with Ms. Light and her union rep? Just to be clear there is no time for any transition this is to happen on March 1st? While I heard you that this is to happen for Tuesday March 1st, I do not believe this is the best time frame and we worry immensely about the impact on our students' academics and emotions.

I also just want to make sure you received this email and are aware as I have shared this is the common request of 1st grade families and while we will do as directed, we are going to need support and guidance on how to respond to families. Additionally, we have absolutely no knowledge as to who will be doing Ms. Light's evaluations, midyear conference or providing feedback to her. We have just begun mediation that did not even include a dialogue between all of us. We have been put in the most compromising position and we have only been trying to do what is best for students. It is also important to be aware that multiple staff members have reached out to the union for guidance regarding our 2/7/2022 staff meeting that Ms. Light attended and was offensive to several members of our staff, while they were encouraged to have a "courageous conversation" these have not taken place.

I will work on a letter based on what we discussed yet if could please send me a draft of what you want included that would be helpful. Can you please clarify if we are met with the resistant that we anticipate and if our parents want to speak to someone besides the school administration should we have parents contact you?

Thank you for your support and guidance.

Best,
Margaret Mary

DEF001315

# EXHIBIT 23

Exhibit 3

Jessica Light's Response to Ms. Alden's "List of Concerns"

On May 11, 2021, I received a "List of Concerns" from the New Haven Teachers Union written by Ms. Alden, my colleague and my son's second grade teacher. Below, I first rebut the concerns Ms. Alden raises paragraph by paragraph. Then I address my belief that some of Ms. Alden's concerns result from Ms. Gethings and Ms. Clarino involving Ms. Alden in their retaliatory, slanderous, and hostile behavior towards me, and that Ms. Alden submitting the Concerns is an unwitting part of that behavior.

## Response to Ms. Alden's Concerns

Concerns ¶ 1. Prior to the start of school, Jessica and I worked cordially and effectively on a Summer project for the upcoming year. I was looking forward to having her son, ▇▇▇ in my class, and getting to know the family this year. ▇▇▇ remains in a remote learning POD with two other classmates.

I agree.

Concerns ¶ 2. During the first week of school for the CY20-21 year, I communicated to all of my families via the "Remind App" that we would have a read aloud and hot chocolate at East Rock Park during lunch. Jessica immediately and without any communication whatsoever sought out the school's administration to formally complain that I was planning this during school hours. Given the extraordinary times of a global pandemic where all educators were attempting to more fully engage with their students in unique and creative ways, it was most disconcerting that a colleague wouldn't extend a courtesy and express her opinion directly. The Administration asked me to plan an after-school optional gathering of the class, and the other second grade teacher and I hosted an informal "Meet and Greet" at East Rock Park for the families that was extremely well attended and appreciated by all of the attending families. Again, without expressing an iota of concern or extending a simple professional courtesy, Jessica ignored any collegiality and again went to the Administration to be the self-proclaimed "voice of the parents in my classroom." In this circumstance, Jessica inaccurately claimed the optional "meet and greet" had no activity planned or provided, and the kids were not socially distancing. In fact, I actually heard the opposite from several parents and they were grateful to have the students get together in a safe and secure setting. This was an optional opportunity to have the children get acquainted with their friends, meet their teacher in person (on the teacher's own time) at an outdoor venue on a Friday after-school.

Ms. Alden's hostility towards me makes more sense now in light of this complaint. Either "the Administration," presumably Ms. Gethings, but possibly with Ms. Clarino, fed Ms. Alden misinformation about me regarding her "Meet and Greet," or "the Administration" misrepresented my conduct to someone else who then told Ms. Alden. I *never* complained, *formally* or otherwise, to "the school's administration" or anyone else about Ms. Alden's attempt to hold her "Meet and Greet" during school hours or about the actual "Meet and Greet" that occurred after school. Instead, I first asked if I could follow her suit and also hold an event during school hours and then later asked whether we could hold a grade level event and was told no both times.

Prior to the school year beginning, my mother-in law and I sewed over fifty masks for the whole third grade (there are two third grade classes). Over twenty days prior to learning of Ms. Alden's

1

DEF000443

planned in-school "Meet and Greet," I emailed Ms. Gethings asking if we could tie dye the masks as a grade during school hours. I was told all outdoor activities needed to be done at the park, after school hours, and with only one class at a time. The email exchange is included at the end of this section. Accordingly, I set up for each third grade class separately, both a tie dye event and a writing and water color event at East Rock Park. In other words, a total of four events, two separate events each for each class.

On September 24, 2020, two days after my class had finished our second in park event, I received a notice from Ms. Alden that the second grade was planning an activity the next day during school hours. Far from complaining about it, I hoped this meant my I would also be able to have in person activities at the park *during school hours* instead of after school. I went to Ms. Gethings and asked if we now had permission to do in park activities during school hours. Ms. Gethings seemed shocked that the second grade "Meet and Greet" was planned for during school hours, told me she was going to tell Ms. Alden and to change it to after school hours, and denied what I actually wanted, which was for all of the teachers to be able to hold park events during school hours. Ms. Alden then sent out an amended notice changing the time of the "Meet and Greet" to after school.

My family and I attended the second grade "Meet and Greet." My family had a good time, as did everyone else from all appearances. While there I thanked Ms. Alden for organizing it.

By this time my grade partner and I were planning a science in the park activity. As the second grade "Meet and Greet" was done as an entire grade, rather than as separate classes, afterward I ask Ms. Gethings if the third grade could start having activities in the park with both classes at the same time as well. Again, far from complaining about what Ms. Alden had done, I was trying to do the same. Ms. Gethings asked if it was possible to social distance with two classes participating at once. I knew that it would not help my cause, but honestly told her the second grade meet and greet it had gotten a little crowded at times on the playground with fifty plus kids playing at once. I also told her that the science in the park activity I was planning could be more spread out. A reasonable person could not have interpreted my request or my response to Ms. Gethings' specific question as a complaint about Ms. Alden's "Meet and Greet." Ms. Gethings said she was not comfortable with two classes being together at the park at the same time. I said I understood and planned a science in the park activity for my class alone.

The statement that I "went to the Administration to be the self-proclaimed 'voice of the parents in my classroom'" is false. I have never claimed to be the "voice of the parents in my classroom," I was happy with Ms. Alden's "Meet and Greet," and I did not complain about it to "the Administration." In fact I have only communicated about "meet and greet" with Ms. Gethings as a teacher for scheduling purposes.

The statement that I "claimed the optional 'meet and greet' had no activity planned or provided" is false. The content of Ms. Alden's "Meet and Greet" did not come up with Ms. Gethings in any meaningful way, and I had no concerns about the activities.

The statement that I "claimed … the kids were not socially distancing" is false. While I answered Ms. Gethings question as honestly as I could, I did not tell her that the children were unsafe. Moreover, she knew that I allowed my child to participate, so she should have inferred that I felt comfortable with the social distancing that occurred.

2

DEF000444

Here is the email exchange between Ms. Gethings and me about planning East Rock Park activities that occurred at the beginning of the school year:

From: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
Sent: Tuesday, September 8, 2020 5:34:08 PM
To: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; SALEM, PAUL <PAUL.SALEM@new-haven.k12.ct.us>
Subject: Re: 3rd grade meet and greet

You should do them at separate times & unfortunately they can not be done during the "school day"

Get Outlook for iOS
From: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
Sent: Tuesday, September 8, 2020 1:38:46 PM
To: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>; SALEM, PAUL <PAUL.SALEM@new-haven.k12.ct.us>
Subject: Re: 3rd grade meet and greet

Ok, if it is better for third grade classes can do it on different days at East Rock park.

Could I do it next Monday at 2:00 at East Rock Park during my Social Studies /Flex time?

From: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
Sent: Monday, September 7, 2020 7:33 AM
To: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
Subject: Re: 3rd grade meet and greet

Jessica I'm sorry it took me so long to answer I've been waiting for an answer and unfortunately the answer I got is no students on school campus for now.

Get Outlook for iOS
From: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
Sent: Friday, September 4, 2020 8:23:09 AM
To: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
Subject: Re: 3rd grade meet and greet

I would like to give the parents enough notice so please let me know.

Get Outlook for iOS
From: LIGHT, JESSICA
Sent: Thursday, September 3, 2020 11:38:17 AM
To: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
Subject: 3rd grade meet and greet

Can we reschedule the third grade meet and greet/ mask tie dying for Tuesday on the field here- at 1:50-2:50

Concerns ¶ 3. In November, I scheduled parent teacher conferences via remote technology. I expressed substantial and sincere concern to Jessica and her husband Dave that their son ███████ was not turning in his assignments on Google Meets, and that this was one area that I would greatly appreciate their assistance to ensure that the next semester would be more productive for their son. I explained that it is hard for me to help ███████ if he was unwilling to submit his work products consistent with requirements of all other members of the class. It became very difficult for me to understand the strengths and opportunities and offer additional support to ███████ if the requisite work was not submitted. Rather than being a supportive parent and agreeing to help make sure their son is turning in his assignments, Jessica and her husband requested that I offer even more of my own personal time and send the parents a personalized email detailing the required work and its due dates. I explained that I have sent numerous "Remind app" messages to the parents that detailed the curriculum, and asked them to please check google classroom and make sure their child is turning in the work. The google classroom communication format allows parents and students to easily view what is assigned and what needs to be turned in. What was meant to be a 15 minute conversation, turned into a 45 minute conference that needed to be continued. The following day, Jessica sent me over 35 emails to my personal email of all his late work. This is not acceptable. I did not ask her to do this, nor did I feel it necessary to go back and grade all last semesters late work. This is when I

3

DEF000445

began to feel very uncomfortable communicating with Jessica and her husband, and asked the administration to join me in our continued conference and on all correspondences.

I protest Ms. Alden raising these claims with HR, or HR considering them. HR may be a proper forum for a teacher's complaints about another teacher's performance of her duties. HR is not a proper forum for a teacher's complaints about the conduct of a parent. Here, Ms. Alden is complaining about my actions **as a parent**. Nonetheless, I will respond to Ms. Alden's claims.

During the initial parent teacher report card conference, my husband and I immediately met with hostility and were dismayed to discover our son had not turned in many assignments and others were turned in too blurry to read. I had checked his Google Classroom "To Do List" on a regular basis and it always reflected that he had turned in his assignments. Unbeknownst to me, it reflected that assignments were turned in when my son had unintentionally failed to properly attach the assignment or when the attached assignment was too blurry to read. In addition, although teachers are required to send progress reports to parents half-way through the marking period if a child is behind, we did not receive such a progress report for my son. Accordingly, we had every expectation that he had been submitting his assignments and that he was doing well. We expressed to Ms. Alden our concern that the report card conference—more than two months after the start of school—was the first we were hearing of this. In any event, we agreed to help him turn in assignments.

On my son's report card, and during the remote conference, Ms. Alden stated that she needed all of my son's work turned in. In retrospect, I obviously misunderstood Ms. Alden. Nonetheless, accordingly, I organized my son's things, took pictures of all of his work and sent them to Ms. Alden's school email (**not** her personal email as she claims). There were a lot of emails, but this is because each email is only allowed to have a few pictures attached. While I didn't expect Ms. Alden to grade his past work, I wanted Ms. Alden to see that he had done the work. She aggressively responded:

> Jessica-
> Can you please help me understand why this Saturday morning you have sent over 35 emails of ███████ late work from last quarter to my new haven email address. We didn't discuss the need for you to remit this. I do however recall discussing that the directions for ALL my students is to upload pictures of their assignments into google classroom within the given dates assigned. I also shared that I remind students when they haven't turned an assignment in by sending a message via google classroom. I do accept late work within that quarter.
>
> Moving forward, please upload his assignments under classwork into google classroom. As you can imagine, having 24 students sending the work in to one designated spot allows me to give the necessary feedback in a timely fashion so that I can plan for further instruction.
>
> Thank you for following the class protocol.
>
> My best-
> Hilarie Alden

While I did not understand why Ms. Alden was exhibiting hostility, in an effort to smooth tensions I responded:

> "Good afternoon, please do not feel you have to go through it all- it is quite overwhelming. I know I have been trying to sort through it all for three hours this morning, so that Wesley can have a fresh organized start. He has been lost wading through all these papers everyday.

4

DEF000446

> You said you were unable to read the work he took pictures of and uploaded to google classroom. I do not know what day each work was from or what things you needed so I wanted to make sure you had a chance to see anything you wanted. I am not sure what is last marking period and what is current.
>
> I originally didn't think you wanted to see all of this, but in our conversation you said you needed all the work turned in and commented the same on his report card.
>
> Now that I know you want to see things I will make sure we do not get so backlogged.
>
> Again I didn't expect you to look through it all this weekend, I am just trying to give ▮▮▮ a better chance for success.
>
> Best,
> Jessica"

While I may have misunderstood what Ms. Alden wanted, I do not believe sending her my son's work was inappropriate, let alone so inappropriate as to cause such hostility.

Concerns ¶ 4. At our second conference, I felt harassed and bullied --- retaliation by Jessica and Dave for fulfilling my duties and responsibilities for communicating ▮▮▮ inability to submit his work. In my opinion, they attacked my google classroom organization, my daily slide decks provided to all of the students, and my communication methods as to what needs to be turned in versus what is classwork practice. I offered them an additional accommodation that they could turn in his work in person, rather than upload the materials in the hopes that it may yield a better result for the family and the student. This accommodation was not made for any other family, nor did any other student have difficulty in adhering to the process. I expressed my disappointment in her as a colleague who uses the same google classroom platform, and knows how challenging it is to manage 22 students work remotely. I told her that I expected my colleague would understand, and would at the very least follow the classroom protocols, rather than expecting me to send her individualized emails and allow him to turn in his work in person. Jessica's husband ended the conference at this time and said he has never been so offended by a teacher.

For the same reasons discussed with respect to Concern ¶ 3, I protest Ms. Alden raising these claims with HR, or HR considering them. Nonetheless, I will respond to Ms. Alden's claims.

My husband and I did not believe we needed to involve Ms. Gethings or Ms. Clarino after the initial report card conference discussed in Concern ¶ 3. However, **at Ms. Alden's request**, my husband and I participated in a remote meeting with her, Ms. Gethings, and Ms. Clarino to continue our discussion. Despite Ms. Alden's claims, at this second meeting my husband and I did not criticize Ms. Alden's performance. At most, we explained why our son was having difficulties with the class mechanics. In response, throughout the meeting Ms. Alden admonished us as parents. Ms. Alden said again that our son was "not as high functioning as the other children in the learning pod" and that she was disappointed in me as an educator and mother. She also raised her voice (neither I nor my husband did so). My husband did in fact say he had never been so offended by a teacher and ended the call. While I wish the call could have ended courteously, the conversation was clearly not productive and needed to be ended.

With respect to Ms. Alden's claim that we were provided with a unique accommodation, this was not a particularly burdensome accommodation on her part. Indeed, my grade level partner and I allowed all of our students to turn in hard copies of their work, and to my knowledge most, if not all, teachers allowed it in grades 3 and up.

5

DEF000447

With respect to Ms. Alden's complaint about our purported expectation of "individualized emails," all we expected was that she follow district policy. As I noted above, she was supposed to have let us know through a progress report if he was failing or in danger of failing. But quite apart from that, I would expect a teacher to inform any parent if their child is falling weeks behind. For example, I email my student's parent every time they fail to turn in a major assignment, and email them if my student fails to turn in multiple daily assignments. We were not asking she do more than I do for any of my students.

After this second remote conference, my husband and I agreed to preserve my working relationship with Ms. Alden, he should handle follow-up communications without me. My husband informed me that he spoke to Ms. Gethings and Ms. Clarino and they also agreed. He informed me in a follow-up remote meeting he had with Ms. Gethings and Ms. Clarino, they apologized for Ms. Alden's inappropriate statements, attributed Ms. Alden's behavior to stress caused by switching to remote learning, and seemed to understand the challenges other parents were having with Ms. Alden's Google Classroom.

From this point in November forward, I limited my interaction with Ms. Alden, unaware of the source of the hostility and wanting to preserve our professional relationship. At Ms. Gethings and Ms. Clarino's instruction, my husband continued to communicate with them rather than Ms. Alden regarding our son's progress. Since then, my communications with Ms. Alden regarding my son have been limited to a few courteous exchanges through the "Remind App". Here are those communications:



6

DEF000448



Concerns ¶ 5. In December, my administrator checked-in with Jessica and her husband to see how things were going, and to determine if ███████ was turning in his work via the in person accommodation. Right before break an email was sent back attacking my teaching, my assignments, my judgment, and how I was not spending enough individualized and small group time with their so. For example, I received a courtesy phone call from another students parents in my class that my name was submitted to the antiracist/anti bias Hooker parent group regarding a video clip I shared with my students that showed architectural pictures of different houses around the world. I was accused of promoting North American superiority over other countries. I felt that my integrity was being questioned and in some ways being inaccurately labeled as a racist within the Hooker community. Open communication obviously had not improved, nor was there demonstrated effort on the parent's part, notwithstanding my additional and focused attention to assist ███████ and his continued development.

For the same reasons discussed with respect to Concern ¶ 3, I protest Ms. Alden raising these claims with HR, or HR considering them. Nonetheless, I will respond to Ms. Alden's claims.

In December, Ms. Clarino emailed my husband, and my husband did respond with his concerns. Although I did read the emails, I was not copied on the email from Ms. Clarino to my husband or on his return email, and I should not be held responsible for my husband's communication with the school. However, I will respond in more detail to the specific example Ms. Alden mentions.

In years past there was an ABAR (anti-bias Anti- Racism) subcommittee of SPMT, which I was on. However, several years ago, Ms. Gethings told ABAR that they could not meet at our school or be a part of SPMT any longer. Thereafter, for a time, the parent members of ABAR met outside of the school at people's houses to organize book studies. But, as far as I know, ABAR has not met for over a year. In any event, neither I nor my husband submitted a "complaint" to ABAR regarding Ms. Alden, and I do not believe there is even a process to submit a "complaint" to the largely defunct group.

7

DEF000449

I first became aware Ms. Alden showed the "Houses Around the World" YouTube video to her class when picking up my son from his learning pod. The pod mother, whose husband is Chinese, was very upset and told me that a video had been played that portrayed Chinese people as living in huts. When I got home, I looked at the video; I was horrified by how offensive and inappropriate it was. Moreover, I was concerned about my son's response to the video. However, I was also open to the possibility that I was being too sensitive. Accordingly, I reached out to two friends who were in ABAR with me, explaining how bothered I was by the video and asking for their input. In addition to both of them validating my concerns, one of them shared that my husband and I were not the only parents who were concerned. Here is my email to them (I have intentionally deleted names to protect their privacy):

> Hi X,
>
> I am reaching out to you because I really respected the input you put into the ABAR meeting we went to a long time ago and a video was shown in my son's second grade class that really offended me but when my husband brought it to administrations attention, they did not seem to see the issue. This makes me worry I am just being too sensitive. Could you give me an honest opinion about whether or not I should be concerned about this.
>
> It was a video about homes around the world, the European and American homes were modern and fancy, while the African, Asian and South American were presented as huts.
>
> My son left saying "Wow I would only want to live in America or Europe" I was mortified and showed him other images of these areas of the world, but I am very worried about the message it sent and all the other parents who maybe unaware of the need to correct this misinformation.
>
> But as always I find it difficult to advocate as fiercely as I would like because I work there and I worry maybe others wouldn't get the same message from it my son did.
>
> https://youtu.be/mVoLH7DLqaI

Here are my friends' responses (again, I have intentionally deleted names to protect folks' privacy):

### Email response from first friend

> Hi, Jessica,
> First and foremost, you have the right to object! It is your child. You have every right to have your concern addressed as opposed to dismissed.
>
> I would advise your husband to write the district (Dr. Tracey, Diaz, Hammonds, etc.) and outline your concerns.
>
> - Include the video shown in class
> - Include your son's statement
> - State that you contacted the teacher and/or principal regarding the video
> - State that you are the only complaining parent
> - Most importantly, who is the video producer Tony Pace? Is he an educator? Why is this video allowed to be shown in a classroom?
> - I would have your husband also address the fact that you wear dual roles at WH -in this instance, you are acting as a parent.
>
> Please let me know if I can provide any additional assistance. Also, I was on the phone with ["X"] that I just received your email. I told her that I just received an email from you. I did not have any details at that time, but I want to apologize in advance if I broke any confidence.
>
> Best,
> ["Y"]

### Email response from second friend

8

DEF000450

Hi, Jessica,

Thank you so much for emailing me and of course I don't think you are being too sensitive, I completely understand and agree with you. I had not seen this until now. I will go back and watch it with Y and discuss why it is racist and show him other images as you have done with your son. But of course other action needs to be taken too, and thank you for what you have done so far. You are not alone and I plan to say something. Out of curiosity, who in the administration did you bring your concerns to? And have you discussed with Mrs. Alden? No judgment about any of your answers to those questions; I understand you are in a tough spot with dual roles as teacher and parent, I'm just asking to have a sense of who is being unresponsive so far. I do wonder if it would be most helpful at this point to send an email to Dr Tracey. I'd be happy to discuss if chatting is easier than email--. Feel free to text call or email, whatever is best for you.
Sincerely,

Here is a draft of another parent's concern about the video shown. I did not ask this parent to share this email with me and did not directly tell this parent about the video, but they heard through others and sent me a draft of their email. I am unsure if or when a final draft was sent to the school:

Dear Principal Gethings, Assistant Principal Clarino and Ms. Alden and Ms. Villanueva:

I hope that you and your families are safe and well. Everyone misses school and I hope that we are all able to see each other soon.

The purpose of my note, however, is to express some dismay at a video that was shown to a second grade class about how people live around the world.

I recognize that it's challenging to find content that is engaging for small children to give them ideas about subjects when they are online, and I appreciate the effort to find videos that are short and digestible but I think that the video titled HOUSES AROUND THE WORLD is inappropriate and a real misfire.

The video shows some homes in Northern Europe, then shows a series of yurts, mud huts, thatched roofs and caves as the dwellings of people in Africa, Asia and Latin America – where the majority of the world's population lives – before jumping to the Las Vegas Strip and then a series of buildings in the USA.

This is problematic, inaccurate and misleading.

The person who made this video clearly has likely never traveled to any of these countries nor knows much about the daily lives of the billions of people he represents with huts, caves and tree houses. His work does not meet the standard of information to be taught to children. (He also doesn't spell check because he refers to the country of "CHOREA" – a movement disorder - instead of either North Korea or South Korea).

While I'm really frustrated that this video got shown in our school, I'm not assuming any malice here. I do think, however, that showing this type of video to children without any context creates the impression that people who live in these places are all in pre-modern homes when in fact such traditional dwellings are the EXTREME MINORITY homes around the world. That there is only ONE built structure of stone, steel or brick shown from anywhere around the world except N. Europe and the USA is ridiculous… The example for the Philippines is a TREEHOUSE!

The video credits show that it was made by Tony Pace Productions… The only one I found on a simple google search shows that this is a Vegas lounge act singer who makes children's activities on the side… that could explain the lack of professionalism. Perhaps it is someone else but in either case, I don't think this is representative of the quality of materials that is usually presented to WHS students. I hope that this is NOT going to be shown in the future and that some context and explanation is given to the kids who have already been shown the video.

We are lucky to have a diverse and well-educated community with families from all over the world. Perhaps in the future we could tap some of that potential to have people share info about their lives, experiences from around the world. At the very least, using materials that have been vetted by the district or a few people to make sure they meet the standards and goals of the classroom

9

DEF000451

environment. (If the goal is to show different types of homes here is a short video on the TIME for Kids website and another site from Australia about different housing .)

Again, appreciate the challenges our teachers and families are facing in this virtual learning environment and all the efforts are teachers have and are continuing to make. Just wanted to share how I felt about this video because it really misses the mark and can distort how kids think about people and way of life around the world. I'm sure I'm not the only one with these concerns.

I thank you for your attention and look forward to your reply.

As my child's pod co-parent and my friends' responses show, I am far from the only person who found the video Ms. Alden showed to be problematic. Yet, despite my friends' advice that I elevate this concern, I choose not to in yet another attempt to keep the peace with Ms. Alden. And I cannot be blamed if other parents chose to elevate the issue due to their outrage over Ms. Alden showing an inappropriate video to second-graders.

Ms. Alden including this incident as a concern about me shows that she still believes this was a perfectly acceptable video to show second-graders. Thus, it also shows that whatever effort, if any, Ms. Gethings and Ms. Clarino made to address the bias in the class materials, Ms. Alden has not learned from this incident. To my knowledge the bias in the video was not addressed in the classroom and the harm to the children has not been mitigated.

Concerns ¶ 6. Having Jessica as a colleague and also as a parent of a Hooker student has made me extremely uncomfortable, especially given her unwillingness to engage in a productive and professional rapport. Rather than having a partner to work with, I feel that I have someone who is always judging me as a teacher and looking for ways to complain. It is not a healthy environment having a colleague's child, and is exacerbated by the fact that he is a remote learner and is often sitting in his own home with both parents listening in to our classroom. I spoke with other teachers seeking advice to effect a more positive result, and they expressed that this was a very big concern and recurring problem in first grade as well.

For the same reasons discussed with respect to Concern ¶ 3, I protest Ms. Alden raising these claims with HR, or HR considering them. Nonetheless, I will respond to Ms. Alden's claims.

This paragraph is mainly about Ms. Alden's feelings. I am not responsible for her feelings.

Ms. Alden raises no new specific conduct on my part. Although she refers to me purportedly being unwilling "to engage in a productive and professional rapport," she does not identify any conduct on my part forming the basis of her claim. I submit that as described above, at every stage I have made every reasonable effort to engage in a productive and professional rapport with Ms. Alden, including stepping back from personally advocating for my son and choosing not to complain to the administration about Ms. Alden's performance. This is in contrast to Ms. Alden raising her voice and admonishing me and my husband.

As to Ms. Alden talking to other teachers about me, if she said anything to them akin to what she has said in her Concerns, then she has done me a great disservice.

With respect to her claim that "they expressed that this was a very big concern and recurring problem in first grade as well," it is impossible for anyone to respond to an anonymous "they" and unidentified concerns or problems. But I will try. I have the utmost respect for my son's first

10

DEF000452

grade teacher and I never complained to the administration about her. At one point during first grade I advocated as a parent for my son to remain in reading intervention when the teacher told me he had shown so much growth he could be exited. We agreed he would remain in the reading intervention group, but not be formally entered into the SRBI process. My son's first grade teacher never complained to me about my advocacy, and no one has informed me she had any concerns.

Concerns ¶ 7. As a member of the NHPS and Hooker educational community, Jessica has become extremely vocal on social media and has misrepresented our school and the protocols we have in place. I am embarrassed by how she incorrectly addresses the BOE and feels compelled to function as the voice of " New Haven Teachers." I am afraid to share my opinions for fear of continued harassment and retaliation, and her continued misrepresentations shared on social media, as well as to parents in my class. The parents in Jessica's learning Pod have directly discussed information about our school, which can only originate from an employee. For example, one parent asked if he could walk the building with a checklist of items to ensure we are following guidelines and protocols. This created a lack of trust between the parents in second grade and the administration and school staff. I felt that any open and honest transparency and relationship that were built this year were violated. Her aggressive and misguided interpretations of what plans we had in place made me uncomfortable and fearful of the parents' trust in me to keep their child safe. I also do not feel comfortable volunteering my time to grow professionally on committees or projects in fear that I will have to work side by side with her. This should not be stifling my own professional growth, but it has impacted me significantly.

I protest Ms. Alden raising these claims with HR, or HR considering them. HR may be a proper forum for a teacher's complaints about another teacher's performance of her duties. HR is not a proper forum for a teacher's complaints about the conduct of a parent **or the conduct of a citizen**. Here, Ms. Alden is complaining either about my actions as a parent **or as a citizen**. Nonetheless, I will respond to Ms. Alden's claims.

I have the right to voice my opinions on social media, and Ms. Alden complaining about my posting on social media is inappropriate. In any event, I am not "extremely vocal on social media" about our school nor did I misrepresent our school and the protocols we have in place. I made **one** post referencing public student COVID data, and the need for reporting guidelines. More specifically, I simply stated Worthington Hooker had not sent a quarantine letter when weekly state student data showed us as having less than six cases. My statement was accurate.

Other social media posts regarding our school have been completely positive. For example, I posted a music video I made for students on my own time with permission from Ms. Gethings. And as to posting about Ms. Alden, all I have ever posted that could be interpreted as being about her is that my son was enjoying sharing his writing remotely, and that Ms. Alden went above and beyond to send me a picture of my son enjoying his first in-person day. Here are those posts:

https://www.youtube.com/watch?v=RFdbDYc-8us

11

DEF000453



As for my addressing the Board of Education (the "BOE"), I am not responsible for Ms. Alden being embarrassed by my conduct as a citizen. I do not know what Ms. Alden means when she states that I "incorrectly address" the BOE. Not only does she fail to identify what statements she is concerned about, I am not aware of Ms. Alden attending or participating in BOE meetings, so I do not know whether she even has knowledge of my actual statements. Moreover, while I have often spoken to echo the teacher's union's position for the safe reopening of the schools, I have never claimed to speak for anyone other than myself, let alone to be the voice of New Havens' teachers; every statement I have made at the BOE for the past 8 years has begun: "I am Jessica Light, a New Haven Parent, teacher, and resident." It is my constitutional right and my moral obligation to speak when I have opinions regarding areas of public concern. While Ms. Alden may disagree with me, I have never incorrectly addressed the BOE.

As for Ms. Alden being afraid to share her opinions, I have never harassed Ms. Alden or retaliated against her in any way. I have never represented anything about her on social media other than the positive comments discussed above, let alone misrepresented anything about her on social media. And other than the communications discussed above regarding the Houses Around the World YouTube video, I have never communicated with any other parent about any concern that I had with Ms. Alden.

As for the tour issue, one parent in my son's learning pod is the president of the PTA. In that capacity, he asked Ms. Gethings and Ms. Alden if the PTA could have a tour of the building to check to see if protocols were in place. I did not encourage him to ask this and did not know he was going to ask this. Additionally, him asking this question does not show that he had any direct information about the school he should not have had. He was a concerned parent who happened to know me. I am, once again, being blamed for another's actions. And any lack of trust between some members of the parent community and the administration has nothing to do with me specifically.

12

DEF000454

As for Ms. Alden being "uncomfortable and fearful of the parents' trust in me to keep their child safe," and not feeling "comfortable volunteering my time to grow professionally on committees or projects" because she fears that she will "have to work side by side" with me, once again, how she feels is not my responsibility and she does not explain how I was "aggressive and misguided" in my interpretations "of what plans we had in place." In any event, as noted above, I have a constitutional right and a moral obligation to advocate on matters of public concern, and I have never misrepresented anything about our school when speaking to the BOE.

Concerns ¶ 8. We have recently been asked to share our preference for teaching next year. My only request is that the administration please consider the extreme challenges that teachers have endured during the pandemic and will continue to have if Jessica continues to serve as both parent and teacher at Hooker. It is not a healthy combination in light of Jessica's history and combative approach. She has severely impacted the trust, our willingness to openly and transparently communicate and share our opinions with each other, and how we chose to manage our classroom, the online resources we utilize, and how we manage our daily schedules. I am aware of many teachers who are fearful that she will discuss our school and protocols on social media. This has created a hostile work environment at both the upper and lower school. She is not considered a teammate, but rather someone who only serves her own mission. Teaching during a pandemic has its own challenges, but when you are in constant fear of what you say and how you teach, it is not considered healthy. We need to be a united front, not divided individuals, or in fear or concern regarding what or how Jessica Light may react pursuant to her personal agenda!

It is unclear whether in the first two sentences, Ms. Alden is stating that she did tell or that she would tell the administration to "please consider the extreme challenges that teachers have endured during the pandemic and will continue to have if Jessica continues to serve as both parent and teacher at Hooker." If Ms. Alden did tell, it was unprofessional and did me a disservice. I have a right to be a both a parent and a teacher in our school community. There is no basis for Ms. Alden to request that my children and I be denied the right afforded to other teachers and families. The fact that Ms. Alden did or would ask this demonstrates the amount of animus she has for me.

The rest of this paragraph is a litany of unspecified and unsupported attacks.

Ms. Alden references "Jessica's history and combative approach." But she does not provide any examples or details in addition to what she previously stated. "My history" does include me advocating for my child. It also includes teachers voting me as their school union representative for more than five years at my prior school. It includes me advocating for my students, just as when I tried to see if I could provide them with in-park events during school hours or as a grade-level. It includes me working with my grade-level partner hand-in-glove since I came to Hooker. And, while I certainly advocate for my children, my students, my school and our district– I will not roll over when someone attacks me as Ms. Alden has. None of the concerns she raised above support the notion that I am "combative." More specifically, I have always behaved courteously towards Ms. Alden and chose not to elevate issues that I could have elevated.

Ms. Alden's next claims are unsupported and apparently based on gossip:

13

DEF000455

She has severely impacted the trust, our willingness to openly and transparently communicate and share our opinions with each other, and how we chose to manage our classroom, the online resources we utilize, and how we manage our daily schedules. I am aware of many teachers who are fearful that she will discuss our school and protocols on social media. This has created a hostile work environment at both the upper and lower school.

Once again, I am not responsible for others, only for my actions. This claim in no way identifies any action on my part that was inappropriate. And I have never discussed confidential information with any parent or public. In any event, no teacher has brought these concerns to me and I have a right to know the allegations being made when they are made, not months later when it is most convenient for Ms. Alden (or "the Administration").

Ms. Alden's next claim, that I am "not considered a teammate, but rather someone who only serves her own mission," is not merely hearsay, but unsourced hearsay–in other words, gossip– and libelously mischaracterizes my goals. I can hardly defend myself against unsourced gossip. Ms. Alden cannot speak to whether others consider me a "teammate" and the fact that she believes she has the knowledge to do this shows that while Ms. Alden has not addressed her concerns with me she has gossiped with others about me.

I am sure that some teachers disagree with some of my beliefs expressed to the BOE or with some of the issues that I advocate for at school. But that does not make my conduct inappropriate. And, again, no teacher has brought these concerns to me and I have a right to know the allegations being made when they are made.

Moreover, this claim ignores that Ms. Alden does not, and cannot, provide even one example of a misstep or wrongdoing related to our work together as teachers. For example, together with our grade level partners we organized the third graders sharing our Nonfiction Book projects with the second grade. Here are our interactions regarding that project:

**Re: Nonfiction Picture Book Share**
Alden, Hilarie
Fri 12/11/2020 11:56 AM
      **To:** SALEM, PAUL; VILLANUEVA, JULIE
      **Cc:** LIGHT, JESSICA

We would love to have you share with 2A! We will work around your schedule.  Thank you so much

My best-
Hilarie Alden
**From:** SALEM, PAUL <PAUL.SALEM@new-haven.k12.ct.us>
**Sent:** Friday, December 11, 2020 11:25:05 AM
**To:** VILLANUEVA, JULIE <JULIE.VILLANUEVA@new-haven.k12.ct.us>; Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Cc:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** Nonfiction Picture Book Share

Hey guys!

Jessica and I had our kids write short nonfiction picture books about a topic and several of them would love to share with your students! We will figure out an exact number soon. We thought we could plan a time during that few days right before Christmas where we could put them in small groups to read their books. We are open to suggestions to how this might best work as we are trying to think of ideas as well. Would this something you guys would be up for? Let us know and we can try and figure out a way to make it happen! We are open to ideas! Have a wonderful weekend 😊

Paul

14

DEF000456

**Re: Thank you 2nd grade**

VILLANUEVA, JULIE
Mon 12/21/2020 11:33 AM
    **To:** LIGHT, JESSICA; Alden, Hilarie; GETHINGS, MARGARET-MARY; CLARINO, JENNY; SALEM, PAUL

 Looking forward to 2B's turn tomorrow!!

Julie Villanueva
Second Grade Teacher
Worthington Hooker School
New Haven, CT
475-220-3700

          "By learning you will teach; by teaching you will learn" -Latin Proverb

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Monday, December 21, 2020 10:44 AM
**To:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>; VILLANUEVA, JULIE <JULIE.VILLANUEVA@new-haven.k12.ct.us>; GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>; CLARINO, JENNY <JENNY.CLARINO@new-haven.k12.ct.us>; SALEM, PAUL <PAUL.SALEM@new-haven.k12.ct.us>
**Subject:** Thank you 2nd grade



The third graders are having a blast sharing our nonfiction picture book with the second grade- thank you so much for helping make this happen

Additionally our report card conference in February was without incident.

Omitting the absolute normalcy of all of our interactions after the November conference, both as a teacher and as a parent (*see* the Remind App exchanges noted above), is an attempt to rewrite history.

Moreover, my grade level partner and I have had a splendid working and social relationship. I can also cite numerous other examples of my working well with other teachers on both in-school and extra-curricular activities. I am confident that, if necessary, I can parade a host of teachers that will affirm that I am, in fact, a good teammate.

I agree with Ms. Alden's next claim, that "[t]eaching during a pandemic has its own challenges, but when you are in constant fear of what you say and how you teach, it is not considered

15

DEF000457

healthy." However, I am not responsible for the pandemic or the challenges associated with teaching during a pandemic. Nor, once again, am I responsible for Ms. Alden's fears. I have done nothing inappropriate to her and have chosen not to escalate some matters that I could have escalated.

As to Ms. Alden's comment, that "[w]e need to be a united front, not divided individuals, or in fear or concern regarding what or how Jessica Light may react pursuant to her personal agenda!," this is merely a restatement of Ms. Alden's vitriol throughout the Concerns suggests that she over blows her purported fears, but again, I am responsible for my conduct, not how others react to it.

As for serving only my "own mission," my "own mission" is to do the best I can for my students and community, including not only doing the best job of teaching that I can but advocating for them when necessary. And yes, that includes advocating for the safe reopening of our schools and a commitment to furthering the anti-racism that I believe our entire school community–including Ms. Alden, the other teachers, the staff, the administration, and the parents–strives for.

In sum, Ms. Alden's conclusory allegations are unspecified, unsupported, unsourced, based on hearsay, and/or relate to her reactions to her false interpretations of my conduct or gossip that she has heard. And Ms. Alden does not cited even a single inappropriate thing I have actually said or done as a teacher.

16

DEF000458

# EXHIBIT 24

**From:** LIGHT, JESSICA
**To:** Jessica Light
**Subject:** Fw: Follow up Re: Hooker
**Date:** Sunday, August 14, 2022 6:11:15 AM

---

**From:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>
**Sent:** Friday, August 12, 2022 1:44 PM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; HANNANS, KEISHA <KEISHA.REDD@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>
**Subject:** Re: Follow up Re: Hooker

Thank you for your prompt response.

I will connect with the Principal of Edgewood this afternoon regarding 1st grade. The Coach position would need to be discussed with Lynn Brantley (who is presently on vacation). I will see what can be done to get in communication with her as well.

Regards,
Taryn Bonner

Get Outlook for iOS

---

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Friday, August 12, 2022 1:30:16 PM
**To:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; HANNANS, KEISHA <KEISHA.REDD@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>
**Subject:** Re: Follow up Re: Hooker

Thank you Taryn,

Based on the list you sent me the positions that stand out to me the most are:

Edgewood Literacy coach or first grade, as this is my neighborhood school and I am already invested in this community and have a Masters from Teachers college,  Columbia University.

W. Hooker third grade, as I was rated a five the last time I held this position.

Fame third grade as I have heard exemplary things about the community and was rated a five as a third grade teacher.

I eagerly await your reply, as I am currently setting up the first grade classroom at W. Hooker.

DEF000296

Jessica Light
(She/her)

**From:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>
**Sent:** Friday, August 12, 2022 1:13:24 PM
**To:** DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>; LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; HANNANS, KEISHA <KEISHA.REDD@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>
**Subject:** RE: Follow up Re: Hooker

You are welcome. If I can assist further, please let me know. Our office is working hard to handle a number of requests at this hour so your patience is appreciated.

Taryn R. Bonner

### *Office of Human Resources*
**New Haven Public Schools**



**From:** DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>
**Sent:** Friday, August 12, 2022 1:12 PM
**To:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; HANNANS, KEISHA <KEISHA.REDD@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>
**Subject:** Re: Follow up Re: Hooker

Thank you Taryn.

Pat

Pat DeLucia
Executive Vice President
NHFT Local 933
203-773-0266

**From:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>
**Sent:** Friday, August 12, 2022 1:09 PM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; HANNANS, KEISHA <KEISHA.REDD@new-

DEF000297

haven.k12.ct.us>
**Cc:** DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>; MACK, LISA
<LISA.MACK@new-haven.k12.ct.us>
**Subject:** RE: Follow up Re: Hooker

Please see the attached. This information is accurate as of 8/11/2022. By the close of business today, this information will change as the district is actively filling positions and existing staff are actively leaving the district or transferring to other locations/positions.

If you will, please feel free to share this information with your attorney as I am unable to locate the appropriate email address at this time.

Regards,

Taryn R. Bonner

### *Office of Human Resources*
**New Haven Public Schools**



---

**From:** BONNER, TARYN <>
**Sent:** Friday, August 12, 2022 9:36 AM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; BLATTEAU, LESLIE
<LESLIE.BLATTEAU@new-haven.k12.ct.us>; MACK, LISA <LISA.MACK@new-haven.k12.ct.us>;
HANNANS, KEISHA <KEISHA.REDD@new-haven.k12.ct.us>
**Cc:** DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>
**Subject:** RE: Follow up Re: Hooker

Thank you for your response Ms. Light.

Regards,

Taryn R. Bonner

### *Office of Human Resources*
**New Haven Public Schools**



---

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Friday, August 12, 2022 7:53 AM
**To:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; BLATTEAU, LESLIE
<LESLIE.BLATTEAU@new-haven.k12.ct.us>; MACK, LISA <LISA.MACK@new-haven.k12.ct.us>;
HANNANS, KEISHA <KEISHA.REDD@new-haven.k12.ct.us>
**Cc:** DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>
**Subject:** Re: Follow up Re: Hooker

Good morning Taryn,

Thank you for your quick reply. Did you get the email I sent Wednesday asking for what steps could be done immediately to about safety concerns for my family and myself? I never received a reply.

I respectfully disagree regarding who is most appropriate to carry out this investigation given the city's counsel found Ms. Gethings to have planted papers in an attack against me last August and in June of 2021 you personally called me to let me know administration had tainted hr's own investigation.

That being said, I am currently focused on safety. The union communicated hr was working on creating a current list of openings for a possible transfer (as the website is outdated) and that you hoped this would be available Wednesday. Is this list available yet or should I spend today preparing my room at Hooker?

Jessica Light
(She/her)

---

**From:** BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>
**Sent:** Thursday, August 11, 2022 4:44:27 PM
**To:** BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>; MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; HANNANS, KEISHA <KEISHA.REDD@new-haven.k12.ct.us>
**Cc:** DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>; LIGHT, JESSICA
<JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** RE: Follow up Re: Hooker

Good Afternoon,

Both Ms. Mack and Ms. Hannans are away on vacation. Please expect their extended reply once they are available.

In their absence, it is important to share that as the building administrator on duty during the summer months, it was appropriate for the principal to inquire about the incident that was reported on Monday. This aligns with standard practice.

DEF000299

Sincerely,

Taryn R. Bonner

**Office of Human Resources**
**New Haven Public Schools**



**From:** BLATTEAU, LESLIE <LESLIE.BLATTEAU@new-haven.k12.ct.us>
**Sent:** Thursday, August 11, 2022 3:36 PM
**To:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; BONNER, TARYN <TARYN.BONNER@new-haven.k12.ct.us>; HANNANS, KEISHA <KEISHA.REDD@new-haven.k12.ct.us>
**Cc:** DELUCIA, PASQUALE <PASQUALE.DELUCIA@new-haven.k12.ct.us>; LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** Follow up Re: Hooker

Good afternoon everyone,

Given the recent developments at Hooker, our continued concerns about Jessica's safety, and the lack of support provided to resolve her complaints, we are reaching out to ask what are the specific next steps NHPS will take about these issues.

We are concerned with the leadership at Hooker, specifically the fact that Ms. Gethings, who has not engaged in mediation with Jessica, conducted the investigation regarding the threatening papers posted in Jessica's classroom. In addition, this latest incident is a reminder that there are unresolved issues related to culture, climate, and building leadership at Hooker which will most likely continue if they are left unaddressed.

We are asking for central office to work to address these issues before the 22-23 school year starts. We offer our collaboration and support to try to make progress on these issues soon.

Thank you,
Leslie and Pat

DEF000300

# EXHIBIT 25

## Murphy, Peter J.

| | |
|---|---|
| **Subject:** | FW: Gr.3 position at WHS |
| **Attachments:** | Rec for Madison Hartt Gr.3 WHS.pdf |

**From:** GETHINGS, MARGARET-MARY
**Sent:** Monday, August 1, 2022 11:33 AM
**To:** Esdaile, Morgan <Morgan.Esdaile@new-haven.k12.ct.us>
**Cc:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>; Human Resources <HumanResources@new-haven.k12.ct.us>
**Subject:** Gr.3 position at WHS

Good morning Chantel

I hope you are doing well and had a nice weekend! When we spoke on Thursday, I said I would let you know on Monday which teacher should be offered the permanent Gr. 3 position to replace Julie Villanueva it should be Madison Hartt.


Please let me know if you need any other information from me.

**Jennifer Dowson should remain Gr. 3 Esser Funds**

**Madison Hartt permanent Gr.3 replacing Julie Villanueva who is transferring to East Rock SPED**


Have a great day! Thank you for all your help!

Best,
MM
**Margaret Mary Gethings**
**Principal**
**Worthington Hooker School K-8**
*"Children are likely to live up to what you believe of them"* ~ *Lady Bird Johnson*



DEF001864

# EXHIBIT 26





# EXHIBIT 27

Messages - Debbie Mrs. D

8/22/22, 4:53 PM

I will be coming in on Wednesday morning. I will clean up the closet and if there is anything else you need let me know. Anything new?

> I made welcome gift bags for everyone- I just got the new list and we have 15 instead of 16

> I need to check and see if there are any other changes-when I get to school and can compare the two lists

Ok. Is there anything I can get for the bags?

> Last year I made welcome gift bags for all three classes but this year when I offered Rachel said she wanted to do her own

Ok. Do you need anything for the bags?

> No I got little space themed things and made a card that said welcome to first grade. This year will be out of this world fun! Love, Mrs. Light and Mrs. D

> If destiny wants to do the same thing I have a few extras but she never got back to me so I don't know yet

Oh that sounds cute! Should we make book bags for each kid so they have something to pull out to read? I bought zip lock bags and can put them together on Wednesday if you want.

> Yes- putting names on those would be great. Sorting the library is my big task for tomorrow and trying to build that table I found screws I think will work

> But I have an appointment at 1 so I will only be at school for a little while tomorrow- but I will see you Wednesday

8/22/22, 7:22 PM

Ok

8/24/22, 12:49 PM

I have been assigned to 2B.

> Noooo!!!

She just told me. I also have to help in office till they find a clerk.

> I am devastated-

LIGHT001433

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JESSICA LIGHT

    **Plaintiff,**

v.

NEW HAVEN BOARD OF EDUCATION &
MARGARET-MARY GETHINGS in her
individual capacity

    **Defendants.**

CIVIL ACTION NO:
3:22-CV-00425 (JAM)

AUGUST 10, 2023

## AFFIDAVIT OF CLAIRE ROWE

I, Claire Rowe being duly sworn, hereby depose and say:

1. I am over eighteen years of age and believe in the obligation of an oath.

2. I have personal knowledge of the facts set forth in this affidavit, and the facts are true and accurate to the best of my knowledge and belief.

3. From 2020 – 2021, I served as an Officer of the Parent Teacher Association ("PTA") for Worthington Hooker School.

4. My husband's name is Lin; we have one child named Eileen. Collectively, we had serious concerns about COVID-19 and the risk of exposure, during 2020-2021 school year.

5. My daughter was entering second grade at Worthington Hooker School for the upcoming 2020-2021 school year, which was closed for in-person learning because of the COVID-19 pandemic.

6. In or around August 2020, I invited two families to be part of a learning pod with my family.

7.  In or around January 2021, I spoke at a New Haven Board of Education meeting about COVID-19 safety concerns. After I spoke at this meeting, the school's Principal (Margaret-Mary Gethings) and Assistant Principal (Jenny Clarino) called me. They told me that "people from central office" were asking "why are people from your school saying negative things about COVID preparedness." Moreover, I felt inappropriately pressured by the phone call.

8.  I was an attentive facilitator of online learning when the children were at remote school from my house. I constantly watched the screen to make sure the children stayed on task. I had a window into the classroom through the live stream, and sometimes would even participate in the art classes. During the semester, I noticed and became concerned that the art teacher was absent from class for several weeks. This lead me to assume the art teacher had COVID-19. I figured out the art teacher had COVID-19 on my own.

9.  As the PTA Officer managing the after-school program, I reached out to teacher Kate Paine (former director of the after-school program) to discuss the feasibility of reopening the after-school program. I expressed a concern about the difficulty with COVID-19 exposure contact tracing in the afterschool program and cited the art teacher's absence as part of the reason for my concern.

10. Ms. Light did not tell me that the art teacher had COVID-19, nor did I tell or imply to Kate Paine that Ms. Light told me she had COVID-19. I assumed it based on the global pandemic and the art teacher's weeks-long absence. At the time, students were both in-school and remote. Later, I learned many parents noticed and were suspicious of the art teacher's absence and stated to me they assumed the art teacher had COVID-19. Parents of

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

in-school learners were particularly concerned as their children had been in the school with the art teacher.

11. After my conversation with Kate Paine, Ms. Clarino called me and asked how I knew about the art teacher. I did not identify or mention Ms. Light as the source of my conclusion. Ms. Clarino communicated the school followed correct protocols related to the art teacher's COVID-19 case.

12. As a PTA Officer, I was an involved parent who had knowledge about school operations and motivated to ask questions of my own volition.

13. Ms. Light did not request that I question the school's administration about COVID safety measures taken at the school.

14. In May 2021, another PTA member asked me to get Ms. Light's perspective on a proposed $5 gift card at Atticus Bookstore for all teachers on Teacher Appreciation Day. Ms. Light opined that the $5 gift card wouldn't go very far. I did not state or imply that Ms. Light was upset with the proposed gift or the monetary amount.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

*Claire Rowe*

CLAIRE ROWE

STATE OF CONNECTICUT    )

    ) ss: Town/City: _New Haven_

COUNTY OF NEW HAVEN    )

       Personally appeared, Claire Rowe, who swore to and subscribed the above affidavit before me, this __10th__ day of August 2023.

_____

NOTARY PUBLIC / COMMISSIONER OF THE SUPERIOR COURT

Name:

MONARCH LAW LLC

363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037

TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JESSICA LIGHT

      Plaintiff,

v.

NEW HAVEN BOARD OF EDUCATION &
MARGARET-MARY GETHINGS in her
individual capacity

      Defendants.

CIVIL ACTION NO:
3:22-CV-00425 (JAM)

AUGUST 10, 2023

## AFFIDAVIT OF WOLFGANG FINK

I, Wolfgang Fink, being duly sworn, hereby depose and say:

1. I am over eighteen years of age and believe in the obligation of an oath.

2. I have personal knowledge of the facts set forth in this affidavit, and the facts are true and accurate to the best of my knowledge and belief.

3. From 2020 – 2021, I served as Co-President of the Parent Teacher Association ("PTA") for Worthington Hooker School.

4. My wife's name is Julia von Blume; we have one child named Paulina. Collectively, we had, and continue to have, serious concerns about COVID-19 and the risk of exposure.

5. My daughter was entering second grade at Worthington Hooker School for the upcoming 2020-2021 school year, which was closed for in-person learning because of the COVID-19 pandemic.

6. In or around August 2020, Claire Rowe invited my family to be part of a learning pod with her family and Jessica Light's family.

1
MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

7. Each family had a child entering Ms. Alden's second-grade class for the 2020-2021 school year.

8. The learning pod remained in effect until the three children returned to in-person learning in April 2021.

9. During a remote meeting, which was held on or about January 15, 2021, I raised my concern about the distancing requirements at the school, including the arrangement of classroom desks.

10. At or around the time when some students physically returned to the classroom, I communicated with administrators at Worthington Hooker School about social distancing and requested an on-site visit to observe the safety protocols implemented at the school. I wanted information to determine if it was safe for my own daughter and others to return.

11. As the PTA Co-President, I was an involved parent who had knowledge about school operations and motivated to ask questions of my own volition.

12. Ms. Light did not share school-based decisions about COVID-19, nor did she request that I question the school's administrators about safety measures taken at the school.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

_Wolfgang Fink_
WOLFGANG FINK

STATE OF CONNECTICUT      )
                                  ) ss: Town/City: __New Haven__

COUNTY OF NEW HAVEN     )

Personally appeared, Wolfgang Fink, who swore to and subscribed the above affidavit before me, this __10th__ day of August 2023.

___Mee Carolyn Wong___

NOTARY PUBLIC / COMMISSIONER OF THE SUPERIOR COURT

Name: __Mee Carolyn Wong__

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

# EXHIBIT D

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    \*
                                             \*
JESSICA LIGHT,                               \*
                                             \*
          Plaintiff                          \*
                                             \*
     VS                                      \* CIVIL ACTION NO.
                                             \* 3:22-cv-00425(AVC)
NEW HAVEN BOARD OF EDUCATION,                \*
MARGARET-MARY GETHINGS in her                \*
Individual capacity,                         \*
                                             \*
          Defendants                         \*
                                             \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    \*

                            December 14, 2022

                            New Haven, CT

                            9:08 a.m.


                    - - -
          DEPOSITION OF JESSICA LIGHT
                    - - -

with a protein called the von Blume Protein.

Q.    Any idea what the von Blume Protein is?

A.    That is far beyond my understanding of science.

Q.    How do you know Miss von Blume?

A.    She is the mother of one of my child's friends.

Q.    Okay.  Sebastian's friend or Wesley's friend?

A.    Wesley.

Q.    All right.  How long have you known Miss von Blume?

A.    A couple of years.

Q.    Okay.  And how did you come to know Miss von Blume?

A.    I was asked if I would be willing to be in a -- have my child -- sorry, Wesley.  I was asked if my child would be willing to be in a learning pod with von Blume's child and another child.  So then we became a pod, and I went from not knowing her to being one of the few people I allowed myself contact with.

Q.    Okay.  Let's go back.  What is a learning pod?

A.    Because school was fully remote at the time, the three families made an agreement that we would

had similar protocols and the husband, Wolf Dan Fink, was a stay-at-home father, so he was only to go shopping and do outdoor activities with the kids and interact with the learning pod.  At the time I was teaching remotely from home.  I was only going to go shopping and socializing with the learning pod.  My husband, at the time, was working remotely from home and he agreed to the same.

Q.      Okay.  In that period of time some people were very relaxed about going out and about during Covid, others were hypervigilant.  Absent the pod and these other families, where do you think you fell on the spectrum?

A.      During that period of time, I was hypervigilant.

I'm sorry, could you rephrase what period of time you're referring to?  Obviously, the scale changed over time.

Q.      You said during the period of time, during the learning pod period of time, so August 2020 to spring of 2021.

A.      Prior to the end of -- I'm sorry, I cut off your question.

Q.      During that learning period of time, the only social contact that you had was with the other

A.      Correct.

Q.      All right.  And you are -- at all times were a teacher in the New Haven public schools; right?

A.      Yes.

Q.      And at all times you were a parent of a child in the New Haven public schools?

A.      Of two children.

Q.      Of two children in the New Haven public schools.

A.      Yes.

Q.      Did you make it clear when you were speaking at those four board meetings in what capacity you were speaking?

A.      I believe that there might have been one meeting where, due to time, I shortened my introduction, because each public comment is 2 minutes but, in general, whenever I have spoken at the Board of Ed meetings, I begin with, "I am Jessica Light, a New Haven public school teacher, parent, resident," and then begin my statement.

Q.      You identified earlier, July of 2020 is a period where things begin to change in your relationship with Principal Gethings?

A.      Correct.

Q.      How, prior to July of 2020, was your

Q.    What statements -- specific statements do you believe were made by Principal Gethings in that meeting that were defamatory?

A.    Again, I would refer you to the recording. But as I sit here today, I remember that Miss Gethings said that her truth was that everyone said I had done it and that -- and reference a Facebook post about students' Covid data and that she told me -- when I said that it was untruthful that I was the leak, she told me not to say that it was untruthful, because that was disparaging of my colleague.

Q.    Anything else?

A.    She stated that teachers had come to her but that she would not say their names, because they were fearful that I would retaliate against them.

Q.    In regards to that meeting, you identified four different statements you believe Miss Gethings made; her truth, everyone had said I had done it, she referenced a Facebook post about student Covid data --

A.    I would like to --

            MR. SEIDEN:  Let him finish.

A.    Sorry.

Q.    The third one, when I said it was untruthful, she said it was disparaging to your colleagues and, four, that she wouldn't say the names

Correct?

A.    Yes.

Q.    In regards to that situation with Teacher X, you weren't suspended or disciplined; correct?

A.    Correct.

Q.    Regarding the second bullet point addressing Miss Phyllis, that bullet point relates to a discussion between Principal Gethings and Miss Phyllis; right?

A.    Yes.

Q.    At no time were you disciplined for going to the bathroom and leaving Miss Phyllis in the classroom?

A.    I have never been formally disciplined.

Q.    Same question with the third bullet point where it talks about documents being left on Mr. Salem's printer.  Now, you weren't disciplined or suffered any other adverse employment action with regard to that bullet point; right?

A.    Adverse employment action?

Q.    Yeah.

A.    I'm not sure on that.

Q.    Did that bullet point -- anything relating to that bullet point affect your pay or your discipline history or anything of that nature?

A.      It did not affect my pay or discipline.

Q.      Did it affect anything in regards to your employment?

A.      Yes.

Q.      What did it affect?

A.      My relationship with Mr. Salem, my trust of the administration, my feelings of safety at work, and my ability to perform my job to the best.

Q.      You remain employed to this day?

A.      Yes.

Q.      The same salary level or higher than you had at the time?

A.      Yes.

Q.      And you're a member of a union?

A.      Yes.

Q.      All teachers in New Haven are a member of -- well, withdrawn.

        As a member of the union, you're subject to the collective bargaining agreement between the Teacher's Union and the Board of Education?

A.      Yes.

Q.      And that governs the conditions of employment for teachers?

A.      Some of them.

Q.      It governs your pay, it has a disciplinary

it seemed that she was under pressure, as well.

Additionally, simply -- employee retaliation is illegal

and Berchem & Moses found that I was retaliated against,

and no actions were done to protect me, and it has been

593 days since I filed my complaint with HR, and I have

not gotten an apology.

Q.    How do you know it's been 593 days since

filing your complaint?

A.    Because I've been keeping count.

Q.    You keep count every day?

A.    Yes.  I've been waiting for a resolution.

Q.    And at this time you've taken a job at a

different school; right?

A.    Yes.

Q.    What school are you at now?

A.    Ross Woodward.

Q.    1st grade?

A.    2nd grade.

Q.    You're still employed by the New Haven

Board of Ed?

A.    Yes.

Q.    When you say you're seeking resolution,

what are you seeking?

A.    I'm seeking damages for everything I've

lost.  I'm seeking an apology, I'm seeking the stability

particular?

Q.      Fine, we can break it down.

With your colleagues, have there been any difficulties with your colleagues at your new school?

A.      No.

Q.      How's it going within your classroom?

A.      The students within my classroom are in the 2nd grade and, on average, are performing at a kindergarten level.  There are significant challenges daily, but it's rewarding.

Q.      Okay.  What impact, if any, did the transfer to the new school have on your home life?

A.      I have less time to spend with my children, I have had to invest a lot financially to set up my classroom, which takes away from my family.  I have been dealing with the stress of losing my community and trying to rebuild that, so I've had to invest a significant amount of my mental, emotional, and actual time in the process of getting used to a new job, which has affected them greatly.

And my youngest is still at Worthington Hooker, which has led to some emotional strain, given that they're sometimes asked questions as to why I'm not there.  And I'm less able to advocate for my child as a parent due to this past history, and I don't feel

C E R T I F I C A T E

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

I, DEBRA A. CHASSE, Court Reporter and Notary Public within and for the State of Connecticut, duly commissioned and qualified, do hereby certify that pursuant to Notice, JESSICA LIGHT, the deponent herein, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth of her knowledge touching and concerning the matters in controversy in this case; that she was thereupon carefully examined upon her oath and her testimony reduced to writing by me; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 2nd day of January, 2023.

_____
Debra A. Chasse, CSR
Notary Public
State of Connecticut

My Commission Expires:
June 30, 2026
CSR No. 00055

# EXHIBIT E

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - x
JESSICA LIGHT,                        No. 3:22cv425(AVC)
                    Plaintiff,

        vs.

NEW HAVEN BOARD OF EDUCATION
and MARGARET-MARY GETHINGS.
                    Defendants.   December 19, 2022
- - - - - - - - - - x

DEPOSITION OF MARGARET-MARY GETHINGS

Taken before Cindy J. Carone, CCR 383, a Court Reporter and Notary Public, within and for the State of Connecticut, pursuant to Notice and the Federal Rules of Civil Procedure, at Monarch Law, 1 Schooner Lane, Unit 1C, Milford, Connecticut, on December 19, 2022, commencing at 10:07 a.m.

Falzarano Court Reporters, LLC
4 Somerset Lane
Simsbury, CT 06070
860.651.0258
www.falzaranocourtreporters.com

Q    Are you aware that Ms. Light recorded some of your meetings with her in November 2020 through 2021?

A    Yes.

Q    In fact, you've listened to a few of those recordings in preparation for your deposition today, right?

A    Yes.

Q    During that meeting that you had, do you recall the date of that meeting with Ms. Light, Ms. Clarino, and Teacher X?

A    It was March.  I'm not sure of the date.

Q    During that meeting, did you claim that every person said Ms. Light was the source of the leak?

A    Anyone who had come to me, yes, or gone to Ms. Clarino, yes.

Q    Who came to you?

A    Teachers.  You want their names?

Q    Yes.

A    Sure.  Ms. Rose.

Q    What's her first name?

A    Meghan, M-e-g-h-a-n.

Q    Who else?

A    Kathleen Morrison, Katherine Paine.  So that teacher went to Ms. Clarino, and Ms. Clarino went to me, Kate Paine.

Q    Who else?

A    A parent, Claire Rowe, called Katherine Paine.

Q    Claire Rowe, R-o-w-e?

A    Yes.

Q    She went to whom?

A    Called Kate Paine and mentioned that there were -- Teacher X was out and the school had not reported it.

Q    Anyone else?

A    No.

Q    What did Ms. Megan Rose tell you about the source of the leak of the confidential information regarding Teacher X?

        MR. MURPHY:  Object to the form.  You can answer.

BY MR. INTERLANDI:

Q    Do you understand the question?

A    I understand that you're asking what did Meghan say?

Q    Sure.

A    She just came to me and said that there's stuff on Facebook and she forwarded me the Facebook post.  That's what I recall.

Q    Did she say specifically anything about

Falzarano Court Reporters, LLC

Ms. Light?

A    Well, everyone was talking about kind of a little bit of how Ms. Light was presenting at the Board meetings and different things, but I don't recall that she said anything about Ms. Light.

Q    How about Kathleen Morrison?  Did she tell you that Ms. Light was the source?

A    She forwarded me her post on Facebook and said -- I don't think she said that she was the source. She just said that some families were considering not coming back.

And there was another teacher, Erin Bullen, who got email from a parent who had heard that there were cases and had decided for their child to come back and they might be changing their minds.

Q    Can you spell Erin Bullen's name?

A    Sure.  E-r-i-n B-u-l-l-e-n.

Q    And she's a parent?

A    Teacher.

Q    Teacher.

A    And she got an email from a parent.

Q    Did any of these people you just mentioned, whether they came directly to you or Ms. Clarino, say Ms. Light by name was the source of leaking confidential information regarding Teacher X?

Falzarano Court Reporters, LLC

A    None of them who came to me, however, Teacher X came to Ms. Clarino and said that parents had approached her and had said that they had heard she was out sick with COVID.

Q    Did Teacher X say that those parents who approached her said Ms. Light told them that?

A    No.

Q    Showing you what is marked Exhibit 3, the title of this document is Investigation Report for New Haven Public Schools regarding complaint by Jessica Light against Mary Gethings and Jenny Clarino.

A    Yes.

Q    Take a look at that document and let me know if you've seen it before today.

A    Yes.

Q    Yes, you have seen it?

A    Yes, I have seen it.

Q    Is this one of the reports that you reviewed to prepare for your deposition today?

A    Yes.

Q    Please turn to page 8 and let me know when you're there.

A    I am there.

Q    The second to the last paragraph on that page, quoted text that is attributed to you by

A    I hope not with students.

Q    With a student's parents?

A    With the student's parents, I believe it was a common practice prior to me becoming a principal.

Q    And then is there a written policy that requires teachers to refrain from sharing their personal cellphone numbers with parents?

A    So, we have in our staff handbook that we encourage teachers to have a Google phone number, and/or to use email as communication.

Yearly when they have DCF training, is it also encouraged and recommended not to share any personal information about yourself, including your phone number.  There's a variety of reasons why it would be highly encouraged not to use your cellphone.

Q    What you just explained, is that in writing?

A    It is now.  It's in our handbook.  In the beginning of the school year, we have two full days of staff meetings, and I know that I always mention it and I mention it for a variety of the reasons.

I have said every August, Teachers, please don't share your cellphone numbers with parents. Because a relationship can change very quickly and there could be misinterpretation, and you also could -- on your own personal time can be violated.

Q    You said it is now in writing.  Since when has it been reduced to a writing in the handbook?

A    It's been in the handbook since I have revised the handbook since I've gotten there.

Q    When did you revise the handbook?

A    I think in 2019/2020.  I came in in December.

Q    When you say "December", you came in December 2018?

A    Yes.

Q    Earlier we talked about or I asked you if you had a cellphone issued by the District and you said no, correct?

A    Right.

Q    If you've had to communicate with staff at Worthington Hooker by cellphone, by text message, did you use your personal cellphone?

A    I did.

Q    You also just mentioned that you encouraged staff to get a Google Doc phone number?

A    Yes.

Q    What does that mean?

A    So Google Voice.  We have the Google platform and you can get a Google phone number.

Q    You personally have a Google phone number?

A    I do.

around, in your recollection, COVID 19?

A    Yes.  Unless you can give me more context of the discussion.  I'm sure it will come to me if I saw it.  But there were many meetings around protocols, safety measures, and I don't have a recall of which comments this was referring to.  I think it was the desks.

Q    When you say "this" referring to paragraph 16?

A    No.  When you said all the comments that she made.

Q    Right.  So you said she made a lot of comments in March of 2021.  I guess my question then is:  Were those comments focused on her concerns with COVID-19 protocols?

A    Yes.

Q    Referring back to paragraph 16 and your answer, who told Ms. Light to wait?

A    I did.  I asked her -- so I believe she asked -- again this is about spacing of desks and when students could have a snack.

This was a very fluid time in the District.  Decisions were coming from CDC Guidelines to our superintendent.  People were meeting.  We had frequently Q and A.

I met every Wednesday with my assistant superintendent and 13 other principals, and we shared the wealth.  Like, what are you doing for shared materials?  What are you doing at recess time?  How are you getting kids to authentically learn.

We had shifted from 6 feet to 3, and in some enrolled classes, it wasn't a problem because you could still have ample spacing.

There was also some ambiguity around if snacks could be had every other row, and there was not a known answer yet so I asked not, like, wait until we're done having lunch or wait until we get around to it.  Wait until -- this is a very common question that others are seeking.

I was reminded of that hearing some of the recorded meetings.  I am well aware that the Board would never answer a question.  You could ask them anything and it's just public comment.  So I was always encouraging Ms. Light to come to us because perhaps I would either have the answer or seek the answer.

In this particular situation, it was to be patient because that was a great question but everyone was waiting for that information.

Q    You just testified that it was a fluid time?

A    Yes.

Falzarano Court Reporters, LLC

would have to come in.

Q    Make a recommendation to whom?

A    The superintendent.

Q    That's the answer I'm looking for, okay.  So when you decide to reassign someone from a third grade to a first grade teacher position, do you have to make a recommendation to someone like the assistant superintendent or do you do that on your own?

A    You have the autonomy.  But I consulted with several people about it because I was making a number of grade changes and I wanted to make sure that the teachers who I change could have the training that they would need for the upcoming school year.  So I did it ahead of time.

Sometimes you find out in June your assignment for the next year.  I wanted to be sure they could go to the math training, they could meet their grade level partners.  Any changes that I made, I would always speak to my assistant superintendent about because they oversee how we are overseeing the building.

Q    So yes, you did have the autonomy to make that reassignment, right?

A    Yes, absolutely.

Q    With whom did you consult before you decided

to reassign Ms. Light from her third grade teaching position to first grade?  I just want the names.  I don't need the whole background information.

A    Ms. Clarino, Ms. Keisha Redd-Hannans.

Q    Anyone else?

A    I mentioned it to Lisa Mack.

Q    Who is Lisa Mack?

A    The head of HR.

Q    Is she still the head of HR today?

A    Yes.

Q    She's the head of HR for Worthington Hooker or the entire District?

A    The entire District.

Q    And Ms. Redd-Hannans, what is her job title today?

A    Assistant Superintendent of Teaching and Learning.

Q    Did you consult with anyone else before you made the decision to transfer Ms. Light from third to first grade?

A    No.  I would like to say that I spoke to Ken Matthews, who is the head of the math department, because I was changing a number of the teachers and I wanted to be assured -- we were going to a new math program -- that when I made changes, these people could

A    Correct.

Q    In terms of the report, do you know if that report was done by Mr. Testa, or Ms. Goldberg or someone else?

A    I don't know.  But I know that in one of them it said that Mr. Salem did not request a grade change, and that is not my recollection of our conversation. It was what was founded in his interview by one of them.

Q    So one of the investigators states in his or her report that Mr. Salem said he did not request a grade change?

A    Yes.

Q    And your recollection of your conversation with Mr. Salem is that he did?

A    Absolutely, yes.

Q    Is there anything else as it relates to Mr. Salem in the Berchem Moses report that is, in your opinion, inaccurate?

A    Not that I recall.  That being the most inaccurate for my experience of meeting with him.

And I'm glad I reread 21 because I actually called Lisa Mack because I knew there wasn't a policy on parents and teachers but I wanted to be sure that I had that discretion and autonomy.

Falzarano Court Reporters, LLC

Q    There was coverage instances?

A    Of course.

Q    But in terms of you having to speak with a teacher, you're saying the incident with Ms. Maffuid -- is that how you say her name?

A    Good enough.  She's not here.  We're not sure of that.  We call her Ms. Phyllis to avoid that.

Q    How long has she been working at Worthington Hooker?

A    I don't know.  Maybe 12, 15 years.

Q    And you're still not sure how to pronounce her name?

A    They call her Ms. Phyllis.

        MR. MURPHY:  I'll object to that
        question.  It's inappropriate.
BY MR. INTERLANDI:

Q    Was it against the school's policy and procedures for Ms. Light to ask Ms. Maffuid to cover her classroom?

A    There are no policies.  We all help each other.

Q    So the answer is no.  What did Ms. Maffuid say to you when you spoke to her that day?

A    I asked Phyllis where Ms. Light was because Ms. Phyllis had her the back to all of the cars and

Q    Okay.  Let's take a five-minute break.  You guys can talk.  I'll leave.

A    Thank you very much.

Q    No problem.

(Recess:  2:38 to 2:42 p.m.)

MR. INTERLANDI:  Back on the record.

A    Thank you.

Q    Did you receive the clarification that you needed?

A    Yes, and thank you for the time.

Q    You're welcome.

My question is as it relates to paragraph 42 and the answer.  Did you tell Mr. Shortt that a couple of teachers were concerned that he had run for union steward to team up with Ms. light to throw you and Ms. Clarino under the bus and push you out?

A    No.

Q    What did you tell him, if anything, about his running for the union steward position?

A    I said that some teachers had come and were concerned and I wanted to name it for what it was, that people were saying that you are aligning yourself with Ms. Light to take on the administration, and I would

Falzarano Court Reporters, LLC

Q    What did she say?

A    She said that she would never want to have a child in Ms. Light's classroom and was fearful for the children that would have to have a teacher that spoke so strongly about not going back to school.  She was delighted that school was opening and that her four then five-year-old daughter would not be learning on a Chromebook and appreciated our efforts of reopening the schools.

Q    When did she tell you that?

A    January 19th.

Q    What year?

A    2021.

Q    So 2021.  She told that to you verbally?

A    Yes.

Q    Was that in a phone call or in-person meeting?

A    In person, bringing bagels to our school.

Q    Very nice.  So she brought bagels, told you her concerns about Ms. Light in January of 2021?

A    Yes.

Q    If I understand your testimony correctly?

A    Yes.

Q    Did she ever send you an email about her concerns regarding statements Ms. Light made to the

Board of Ed?

A    Yes.

Q    Isn't it true that the email she sent to you is dated more their two months after Ms. Light's last statement at the Board of Ed meeting?

A    Yes.

Q    Do you know why it took her so long to put that in an email to you?

A    If you read the email it was more than her statements, it was criticism that Ms. Light had made to the PTA for teacher appreciation.  I don't know why she put it in writing.

Q    You didn't solicit it from her, did you?

A    Absolutely not.

Q    Did you have other email communications with Ms. Grubuagh concerning Ms. Light?

A    Never.

Q    So this was the one and only email Ms. Grubuagh sent to you concerning Ms. Light?

A    She sent it to me and Ms. Clarino.

Q    Did you reply and comment to her after she sent it to you?

A    I don't recall.  But no, I don't remember doing -- no.

Q    You don't remember or you did not?

Falzarano Court Reporters, LLC

also constituted some kind of obstruction with the complaint that Ms. Light filed in or around the spring of 2021?  I know about Mr. Jones.

A    Right.

Q    Was there anyone else that you maybe contacted and they kind of lumped that person in with Mr. Jones?

A    Not that I'm aware of.

Q    Your understanding is this was the only individual or potential witness that you reached out to and that they thought --

A    Yes.

Q    -- was improper?

A    I've been told it was because of the email to Mr. Jones.

Q    Okay.

A    I was told that by Taryn.

Q    Mr. Jones.  Did I say Mr. Douglas?

A    No.

Q    Okay, good.

Are you aware of the *New Haven Public School Board of Ed Statement of Ethics for Administrators*?

A    Yes.

Q    Are you aware if there have been any revisions from the year 2000 to 2001 to 2022?

BY MR. INTERLANDI:

Q    Is there a written policy within Worthington Hooker that says the teacher cannot teach a grade if his or her child is in that school and in the same grade?

A    No.

Q    In your recent tenure at Worthington Hooker as principal, have you ever reassigned a teacher whose student was going to be in the same grade but in a different teacher's classroom?

A    Student or child?

Q    Child that is a student.

A    Never had the situation.

Q    How did Ms. Light challenge her grade in the upcoming school year -- I think you meant divisive manner.

A    Yes, thank you.

Q    What did she do?  Did she say I'm not coming back?  You're out of your mind?  Or did she, like, do something else?  Tell me.

A    What I recall is one situation where our math coach went to bring professional development material for the training and she said, Don't give them to me. She's not moving me.

Q    Okay.

Falzarano Court Reporters, LLC

A    There was also I recall a lot of thought had to go into what grade but third, and unless you want me to, I can go through the rationale.

Q    No, I don't need the rationale.

A    But I had many meetings with her and Dave about different grades.

Q    Who is Dave again?

A    Dave is the president of the teacher union.

Q    He said this is an issue now that's changing the tide?  Something like that you said?

A    Yes.

Q    The math teacher, who was that?  What was his or her name?

A    Kyle Miller.

Q    Do you recall when that happened approximately?

A    No.  It was in the spring.  It was after she had been told, we were launching a new curriculum for math and there was going to be training.

Q    Do you know at that point had you already talked to Dave about Ms. Light's concern about this grade level change?

A    Many times we spoke.

Q    Before this incident with Mr. Miller?

A    Yes.  Well, that was -- I had spoken to Dave

A    Not that I'm aware of.

Q    Was she ever assigned to Ms. Light's first grade classroom while Ms. Light taught at Worthington Hooker?

A    She was assigned to the first grade.  There were three sections of first grade and she's a paraprofessional.

Q    So, no?

A    Not specifically to her class.

Q    Was she removed from first grade?

A    Yes.

Q    Do you know why?

A    Student numbers and enrollment, and we needed support in second grade.

Q    Did you consider Ms. Light for the open third grade position at Worthington Hooker for the 2022/2023 school year since her child would no longer be a student in that grade?

A    Yes, I consider her because I knew she was interested.

Q    Did you interview her?

A    No.

Q    Why didn't you interview her?

A    Given the amount of time that she had missed in her first-grade experience, I am a firm believer

that you need to give things time. And if I moved Ms. Light, I would also be moving other people.

So while this may be about Ms. Light, I had to consider the impact on everyone. I had chosen to have her remain, given the amount of time she was out. Best interest of hers to stay, learn that curriculum and be there.

Q    She missed time from first grade. Do you know why?

A    Yes.

Q    Tell me.

A    She was on *FMLA* for medical reasons.

Q    Had she taught first grade prior to reassignment in 2021 at Worthington Hooker?

A    Not that I'm aware of.

Q    I'm showing you Exhibit 20. It appears to be an email that was sent by Mr. Pat DeLucia, who you mentioned earlier.

A    Yes.

Q    Let me know if you've seen this email before today.

A    I don't think I've seen this.

Q    You're referenced in there. Margaret-Mary, that's you?

A    Yes.

STATE OF CONNECTICUT

I, CINDY J. CARONE, CCR 383, a Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Notice, there came before me on the 19th day of December, 2022 following named person, to wit:  MARGARET-MARY GETHINGS, who was by me duly sworn to testify to the truth and nothing but the truth; that she was thereupon carefully examined upon her oath and her examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this _6th_ day of_____January_____, 2023.

/s/ _____Cindy J. Carone_____

CINDY J. CARONE, CSR 383
Certified Shorthand Reporter
My Commission expires:
    May 31, 2023

Falzarano Court Reporters, LLC

# EXHIBIT F

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

- - - - - - - - - - x
JESSICA LIGHT,                 No. 3:22cv425(AVC)
              Plaintiff,

    vs.

NEW HAVEN BOARD OF EDUCATION
and MARGARET-MARY GETHINGS.
           Defendants.  February 27, 2023
- - - - - - - - - - x

DEPOSITION OF MARGARET-MARY GETHINGS

Taken before Cindy J. Carone, CCR 383, a Court
Reporter and Notary Public, within and for the State
of Connecticut, pursuant to Notice and the Federal
Rules of Civil Procedure, at Shipman & Goodwin LLP,
265 Church Street, Suite 1207, New Haven, Connecticut,
on February 27, 2023, commencing at 9:30 a.m.

Falzarano Court Reporters, LLC
4 Somerset Lane
Simsbury, CT 06070
860.651.0258
www.falzaranocourtreporters.com

Q     Which parents were concerned?  Do you recall their names?

A     Yes.

Q     Who?

A     Vicki Grudbaugh.

Q     Vicki.  What was her last name?

A     It's Grudbaugh, G-r-u-d-b-a-u-g-h.

Q     Who else, if anyone?

A     There was another parent who spoke with Ms. Clarino.  Her name is Dominique.  There were Wolfgang Fink, who spoke at second grade hybrid meeting of concern for arrangement of desks and layout of the school.

Q     Did he mention specifically concerns he had about what Ms. Light had said?

A     No.  He was in the learning pod with Ms. Light and seemed knowledgeable of school-based decisions and asked to be able to walk through the school to assess whether or not the proper distancing was in place.  And Claire Rowe, also a member of that learning pod.

Q     What did she do or say that showed Ms. Light's comments negatively impacted the community?

A     She called or spoke with a teacher regarding Teacher X.

Falzarano Court Reporters, LLC

Q    What about her?

A    Just that we weren't reporting cases.  And there was also another email that we received from a Matthew Rodeheffer regarding the return of his child to school saying that his daughter's wife was hearing that there were cases that weren't reported.

Q    Did Ms. Light publicly say that there were cases that were not reported?

A    She said in her Facebook book that we didn't send letters.

Q    She said that in a Facebook post?

A    Yes.

Q    Letters?  That the school didn't send letters?

A    Letters, Hooker didn't send letters.

Q    So you've cited a few names here:  Matthew Rodeheffer, Claire Rowe, Wolfgang Fink, Dominique, the parent.  What did Dominique have to say about her concern about what Ms. Light said?

A    I am not sure.  She spoke to Ms. Clarino.

Q    What about Vicki Grudbaugh?  What did she say in terms of her concern as to what Ms. Light said?

A    She remarked to me on January 19th that she was concerned for the third graders that would have to have her as a teacher after the way she spoke, that it

A    Well, they had concern for our school, our school's reputation, and the impression that that was leading people to think that we were negligent or not following a protocol or not communicates something. They were worried for how it represented the school.

Q    How about Megan?  What did Megan tell you, if anything, about Ms. Light's public comments that led you to believe she was being perceived as someone representing the school district?

A    I think Megan said she wished that she wouldn't have posted that.  It was misleading.  We were not to be sending out a letter.  There was a situation that didn't merit a letter to be sent out.  It led people to believe that we weren't communicating positive cases.

Q    How about Hilarie Alden?  What did she say to you about the post, if anything?

A    She spoke with Ms. Clarino and just made her aware that this was on Facebook.

Q    Was any discriminatory action taken against Ms. Light as a result of --

A    Never.

Q    -- the feedback?  No?  Okay.

(Discussion off the record.)

STATE OF CONNECTICUT

I, CINDY J. CARONE, CCR 383, a Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Notice, there came before me on the 27th day of February, 2023 following named person, to wit:  MARGARET-MARY GETHINGS, who was by me duly sworn to testify to the truth and nothing but the truth; that she was thereupon carefully examined upon her oath and her examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this __12th__ day of__March_____, 2023.

/s/ _Cindy J. Carone_____

CINDY J. CARONE, CSR 383
Certified Shorthand Reporter

My Commission expires:
    May 31, 2023

Falzarano Court Reporters, LLC

# EXHIBIT G

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

– – – – – – – – – – x

JESSICA LIGHT,                          No. 3:22cv425(AVC)

                    Plaintiff,

        vs.

NEW HAVEN BOARD OF EDUCATION
and MARGARET-MARY GETHINGS.
                    Defendants.    February 17, 2023

– – – – – – – – – – x

DEPOSITION OF TARYN BONNER

Taken before Cindy J. Carone, CCR 383, a Court
Reporter and Notary Public, within and for the State
of Connecticut, pursuant to Notice and the Federal
Rules of Civil Procedure, at Shipman & Goodwin LLP,
265 Church Street, Suite 1207, New Haven, Connecticut,
on February 17, 2023, commencing at 9:24 a.m.

Falzarano Court Reporters, LLC
4 Somerset Lane
Simsbury, CT 06070
860.651.0258
www.falzaranocourtreporters.com

to put it in writing so we have it in a working document.  But it has not been approved and formalized just yet.

Q    Is it in some sort of draft form?

A    Yes.

Q    So is it typed up?

A    Yes.

Q    So it's typed up in draft form, and my understanding is that it's waiting to be approved?

A    Correct.

Q    Who would be making that approval?

A    The superintendent.

Q    Does that get presented at a Board of Ed meeting?

A    It could.  I'm not sure what route the superintendent wants to take with it just yet because we're still in the vetting stages, but it could.

Q    Then the procedure for reassignments to a different grade level position within a school, that process was a bit different you said, right?

A    Yes.

Q    And that process that you described a few minutes ago, is that somewhere within the district in a written document?

A    Clarify for me.  The reassignment process?

Q    Yes.

A    No, it's not written down.

Q    Are you aware that Ms. Gethings reassigned Jessica Light to a first-grade position at some point after January 2020?

A    Yes.

Q    Do you recall if Ms. Gethings gave you her rationale for reassigning Jessica Light to the first grade teaching position?

A    Yes.

Q    What do you recall was Ms. Gethings' rationale for reassigning Jessica to the first grade teaching position?

A    To be honest, I can't remember exactly what it was.  I do remember her sharing it with me however.

        MR. MURPHY:  To be fair, I don't think
            that was necessarily a topic that was
            included within the numbers for her, for
            Ms. Bonner.

        MR. INTERLANDI:  Technically not within
            topic four.

        MR. MURPHY:  I know you have some
            latitude.  I'm not objecting, just noting
            that for the record.

        MR. INTERLANDI:  That's fair.

A    Yes.

Q    How did that come about?

A    Sure.  I mentioned that her initial complaint was assigned to me.  I met with Jessica maybe May of 2021.  I met with her twice, to hear her complaint and at the second step to hear her response to a separate matter.

After meeting with her, because her complaint was specific to two administrators, ultimately they had to receive notice of the complaint; so I notified the two administrators of the complaint sometime after meeting with Jessica.

Within a couple of days or maybe a week or so after that, I received notice of the complaint.  They responded with a rebuttal complaint.

If I recall correctly, in that rebuttal complaint there was some information that I was professionally concerned with as far the investigation, so I brought it to the attention of my supervisor and we brainstormed the best way to move forward in light of the concerns.

Next, while we're still thinking of the best way to move forward or if I just continue to move forward with Jessica's complaint, the City or the district received notice that Jessica had retained her

own attorney and there was possible litigation that could ensue.

So all of these things together, a little bit compounded by the fact that at the point it was the summer. I'm not sure how familiar you are with the school district but in the summer it completely shuts down except for payroll and for HR. Everybody else, it's a ghost town so it's harder to move things along.

So the complexity of how the case had grown, the timeliness, the delay in it being summer break, the team decided it might be best to pay a firm who had more staff, more resources, and hopefully more availability to get it done to take on the investigation at that point.

Q    The info that you received that was professionally concerning to you, what information was that?

A    In the rebuttal complaint from the administrators, there was a copy of an email to a teacher at Worthington Hooker school asking about a certain occurrence.

It was concerning to me because Jessica Light had identified that teacher as someone who could speak to one of things in her complaint. For me, the teacher was already on my witness list for Jessica's complaint.

A    From my view, no, however, she did raise concerns.  And I think they're different because I feel like Jessica would raise those concerns because when I initially had my initial meeting with her to accept or talk about her complaint, part of my general practice is if you feel like you're being retaliated against or if any wrongdoing is happening after now, talk to your union about it or bring it to HR because we may need to look into that further.

I believe that's what Jessica did during the process, and if they came to me, I would either, one, tell Jessica to bring it to Ms. Goldberg or myself or Lisa would then give it to Ms. Goldberg so they could address it while they were already investigating matters.

Q    Are you aware of if her union did that as well in terms of additional complaints, bringing them to the HR team's attention or to Berchem Moses?

A    I'm not sure.

Q    So what I'm getting at is that process.  If there was additional complaints after the initial complaint and it was received by the HR team, how did that, if at all, factor into Berchem Moses' investigation?  Was it just forwarded, like, here is a new complaint to investigate, or did it create some new

type of issue, I guess, that you had them investigate?

A    I think a little bit of both.  It was just forwarded to Rebecca or to the Berchem Moses team to say this concern was raised.  We know you're still interviewing people.

I do also recall having a conversation with Rebecca to say how do we best deal with that, and she said her and her team, they would ask about it during their investigation.

For instance, if I was on the docket to be interviewed tomorrow, if I could speak to some of the additional concerns that came up, Rebecca would ask me about it when she interviewed me for the initial complaint, if that makes sense.

Q    Yes, it does.

MR. INTERLANDI:  Off the record.


(Discussion off the record.)


MR. INTERLANDI:  Back on the record.
Just a few questions.  First, I'll just say topic 13 I'm going to skip because that's included in something we talked about earlier related to job descriptions that were in one of the earlier exhibits; so we're not going

STATE OF CONNECTICUT

I, CINDY J. CARONE, CCR 383, a Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Notice, there came before me on the 17th day of February, 2023 following named person, to wit:  TARYN BONNER, who was by me duly sworn to testify to the truth and nothing but the truth; that she was thereupon carefully examined upon her oath and her examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this __2nd__ day of__March_____, 2023.

/s/ _____Cindy J. Carone_____

CINDY J. CARONE, CSR 383
Certified Shorthand Reporter

My Commission expires:
   May 31, 2023

Falzarano Court Reporters, LLC

# EXHIBIT H

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


--------------------------------x
JESSICA LIGHT
                Plaintiff            Case No.
                                     3:22CV425 (AVC)
        vs.

NEW HAVEN BOARD OF EDUCATION         May 18, 2023
AND MARGARET-MARY GETHINGS
                Defendants
--------------------------------x




DEPOSITION OF JENNY CLARINO




     Taken before Irma Sanchez-Farnham, a Notary Public within and for the State of Connecticut, pursuant to Notice and Federal Rules of Civil Procedure, at the law office of Shipman & Goodwin, LLP, 265 Church Street, New Haven, Connecticut, on May 18, 2023, commencing at 9:47 a.m.


FALZARANO COURT REPORTERS, LLC
4 Somerset Lane
Simsbury, CT 06070
860.651.0258
www.falzaranocourtreporters.com

A    I don't believe so.

Q    Okay.  And then do you recall if Ms. Light had a response to you or Ms. Gethings during the meeting about the comments she made in response to the post by Melody Gallagher?

A    Do I remember Jessica Light's response?

Q    Yeah.  Did she say anything in response to what you may have said to her?

A    Not that I could remember specifically.  I can't remember her specific response but I do remember what we spoke to her about, our message.

Q    And again, what was that message?

A    That this was a sensitive time and that we needed to give families the opportunity to choose to either have their children or child learn at home, virtually, or in person.  And it was a time where we needed to gain the trust of parents that we would uphold protocols.  So writing something on a public site that would indicate we didn't follow some kind of protocol would cause alarm and maybe discredit, you know, what we're trying to create, a safe environment during a pandemic.

Q    Before you delivered that message during the meeting, did you or Ms. Gethings go to Facebook to find this post to read it, read the entire post to get a better understanding of what was posted and the comments that were

A    I believe so.  And I don't recall specifically.

Q    Okay.  Is she -- did she teach at the school for the '21-'22 school year?

A    She retired.

Q    Did she ever raise any concerns about coming back in person during Covid 19?

A    Not that I could recall.

Q    Do you know a woman named Hilarie Alden?

A    Yes.

Q    How do you know Ms. Alden?

A    She's a second grade teacher at Worthington Hooker School.

Q    How long have you known Ms. Alden?

A    When I started at Worthington Hooker as assistant principal in 2020.

Q    Do you remember if Ms. Alden contacted you about Ms. Light's Facebook comments that we've looked at in Exhibit 3?

A    I don't think so.

Q    I'm going to show you what I've marked as Exhibit 4.

A    Thank you.

Q    You're welcome.  It's an excerpt from Ms. Gethings's corporate representative deposition.  I'm going to ask you to read page 26 to yourself and let me know when you're done.

96

wouldn't take action or do anything about, such as Jessica Light speaking at board meetings, then I don't ask them to put it in writing.

Q    Okay.  So you had Ms. Grubaugh and Ms. O' Connell make some comments to you?

A    Yes.

Q    And that's all you can remember at this time?

A    Vicki Grubaugh, in May of that year, said to me -- it was May and that's when we do teacher appreciation.  She felt badly that I guess it was communicated to her through the PTA, every teacher got an Atticus gift card.  And it was communicated to Vicki, who did all this on the PTA board that Ms. Light was disappointed with the Atticus gift card and would have appreciated, and thought all the teachers would have appreciated an Amazon gift card instead.

So I asked her can you send me that -- can you send me that because I needed to look into that a little bit more.  Can you send me that in writing or can you send me an email?

And then when she sent it, she shared more concerns about Ms. Light, through the -- she had felt, I believe, in the letter that it reflected poorly on the PTA or Ms. Light's -- something with the PTA.

Q    You said her letter?

104

A    Vicki O'Connell, yes.

Q    Okay.  So they, you talked to them or they commented to you a total of three to five times?

A    Um-hum.

Q    And then you said parents would come crying.

A    Parents would have a hard time saying goodbye to their students.

Q    So did those, like, other than Dominique and Vicki, were there other parents who were crying and concerned and they told you it was because of Ms. Light's comments?

A    No.  Or I'm unaware of why they were crying.  Or I mean, why it was being more difficult.  I'm thinking it's because it's a pandemic and they're sending their youngest children to school.

Q    I'm going to give you a copy of what I marked as Exhibit 14.  I jumped ahead a bit.  It's an email.  Have you seen this email before today?

A    I have.

Q    All right.  And it looks like, you know, the top part is you're not copied on it, right?  That's between Lisa Flegler, who I believe is Lisa Mack; is that right?

A    Correct.

Q    And then Taryn Bonner, right?

A    Correct.

MR. INTERLANDI:  And just for the

STATE OF CONNECTICUT

I, Irma Sanchez-Farnham, a Notary Public, duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to Notice there came before me, on the 18th day of May 2023, the following named person, to wit:  JENNY CLARINO, who was by me duly sworn to testify to the truth and nothing but the truth; that she was thereupon carefully examined upon her oath and her examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand this 18th day of May 2023.

s/s_____
                Irma Sanchez-Farnham
                Notary Public

My Commission Expires:  February 29, 2028

# EXHIBIT I

GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>

Tue 3/2/2021 7:40 PM

**To:** Bullen, Erin <Erin.Bullen@new-haven.k12.ct.us>

Have you responded to this parent

If you have not I would be respond

Thank you for informing me and please continue to keep me updated with your decision.  So far, we have not had any positive cases reported that have taken place at school.

**Margaret Mary Gethings**
**Principal**
**Worthington Hooker School K-8**
*"Children are likely to live up to what you believe of them"* ~ *Lady Bird Johnson*





(F2)

---

**From:** Bullen, Erin <Erin.Bullen@new-haven.k12.ct.us>
**Sent:** Tuesday, March 2, 2021 4:48 PM
**To:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Subject:** Fw: Re:

---

**From:** Matt Rodeheffer <matthew.rodeheffer@gmail.com>
**Sent:** Tuesday, March 2, 2021 7:45 AM
**To:** Bullen, Erin <Erin.Bullen@new-haven.k12.ct.us>
**Subject:** Re:

↗ *Parent's concern*

**CAUTION:**
This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Erin,

  Have there been any teachers/staff in the wh school out with covid in the past few weeks? Evies mom is being told now that there are many cases there currently and is now changing her mind about sending evie back in person.

DEF000120

------------------------------------

On Mar 1, 2021, at 6:55 PM, Bullen, Erin <Erin.Bullen@new-haven.k12.ct.us> wrote:

Good evening,

  Mrs. Gethings has responded and Evie should be all set with the nurse to attend school in person this Thursday. I will speak with Mrs. Gethings to confirm this tomorrow and will get back to you. Thank you!

Get Outlook for iOS

DEF000121

To: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>

Yes I agree with your recollection of our conversation. My part in the school clean- up days were only to satisfy my 092 course requirements, I am not in charge of the gardening committee.

Douglas Jones.

Sent from my T-Mobile 4G LTE Device
Get Outlook for Android

---

**From:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Sent:** Wednesday, May 26, 2021 12:30:57 PM
**To:** JONES, DOUGLAS <DOUGLAS.JONES@new-haven.k12.ct.us>
**Subject:** Fwd: Clean-Up Days


Get Outlook for iOS

---

**From:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Sent:** Tuesday, May 25, 2021 4:52 PM
**To:** JONES, DOUGLAS
**Subject:** Clean-Up Days


Mr. Jones,

Thank you again for organizing our most recent clean-up days! They were very productive days!!! All of our classes are benefitting from our spruced-up school grounds!

I have enjoyed working with you as you completed your coursework for your 092.

When you came to me about your service project, I asked you what you had in mind and then I shared areas of where the school could benefit from a service project. One of the recommendations that I gave you was to arrange for a clean-up day (s) at both sites this way we could include parents, students, and community at large. It is something we have done in the past and was much needed. I also asked you to connect with Mrs. Light about the project given that she has served on the gardening committee and was looking for help. I also mentioned the upcoming clean-up days at our staff meeting on March 8, 2021 to encourage staff to attend as well as to share that we would be cleaning up spaces outside for learning spaces for our students & staff.

Can you please confirm that my recollection of our conversation is what you recall and that at no point did I give th gardening committee to you?

Thank you again for assisting our school and completing a very successful service project!

Best,
Margaret Mary

**Margaret Mary Gethings**
**Principal**
**Worthington Hooker School K-8**

DEF001781