UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
JESSICA LIGHT,                  :  No. 3:22CV425(JAM)
                                :
              Plaintiff         :
                                :
         v.                     :
                                :
NEW HAVEN BOARD OF EDUCATION &  :
NARGARET-MARY GETHINGS, in her  :
individual capacity,            :
                                :  New Haven, Connecticut
              Defendants        :  December 5, 2023
                                :
- - - - - - - - - - - - - - - - x
```

MOTION HEARING

B E F O R E:

    THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        MONARCH LAW
            363 New Britain Road, First Floor
            Berlin, Connecticut 06037
        BY: ANTHONY J. INTERLANDI, SR., ESQ.

    FOR THE DEFENDANTS:

        SHIPMAN & GOODWIN
            One Constitution Plaza
            Hartford, Connecticut 06103
        BY: PETER JOSEPH MURPHY, ESQ.

                  Diana Huntington, RDR, CRR
                  Official Court Reporter

1              **3:02 P.M.**

2              THE COURT:  We're here today on a motion for

3    summary judgment in the matter of Light v. New Haven,

4    et al.

5              Appearance of counsel, please, for plaintiff.

6              MR. INTERLANDI:  Yes, Your Honor.  Anthony

7    Interlandi, counsel for the plaintiff Jessica Light.

8              THE COURT:  Is that Ms. Light next to you?

9              MR. INTERLANDI:  Yes, it is, Your Honor.

10             THE COURT:  Welcome to you.

11             And for the defendants?

12             MR. MURPHY:  Good afternoon, Your Honor.  Peter

13   Murphy, Shipman & Goodwin, for the New Haven Board of Ed

14   and Principal Gethings.

15             THE COURT:  I saw Principal Gethings out in the

16   hallway.  Great.  Glad you could find the right room.

17             MR. MURPHY:  We got it situated.  We're all set

18   now.  There's a couple more people walking in as well, I

19   apologize.

20             THE COURT:  You have other counsel or other

21   people?

22             MR. MURPHY:  Attorney Alexiades is here as well.

23             THE COURT:  Nice to see you again.

24             I guess, Mr. Murphy, if you'd like to proceed on

25   your motion.

```
 1            MR. MURPHY:  Great.  Thank you, Your Honor.
 2            THE COURT:  If you don't mind -- oh, I should
 3   have said this at the outset.  You can see I'm wearing a
 4   mask.  I'm undergoing treatment for cancer and I've been
 5   doing it for a number of months.  I feel fine right now, I
 6   certainly am familiar with the materials in the case.  But
 7   the reason I wear a mask is because of possible
 8   immunocompromise.  That's why you can see other staff
 9   members close to me are also wearing masks.  We have good
10   ventilation in this courtroom, but if I could just ask
11   folks to stay at counsel table rather than come up to the
12   traditional lectern.
13            MR. MURPHY:  No problem, Your Honor.  And I wish
14   you well, obviously, and I'm sure opposing counsel does as
15   well.
16            MR. INTERLANDI:  Yes, Your Honor.
17            THE COURT:  Thank you.
18            MR. MURPHY:  Thanks for having us down.  I was
19   commenting, it's nice to be in person again.
20            THE COURT:  Yes, it is.
21            MR. MURPHY:  So many virtually with you in the
22   past, but now it's good to be back in person.
23            And I know you're very familiar with the
24   pleadings, four counts in this, First Amendment
25   retaliation, state law analogous, and then for false light
```

 1    and defamation as well, and we've moved for summary

 2    judgment on all four.  I'm happy to take them in that

 3    order, Your Honor, the order we briefed them, unless

 4    Your Honor has specific questions.

 5              THE COURT:  Go ahead.  Fire away.

 6              MR. MURPHY:  All right.

 7              We'll start with the First Amendment

 8    retaliation.  I know Your Honor's familiar with these

 9    types of claims, right, and speech must be made as a

10    citizen on a matter of public concern, they must suffer an

11    adverse employment action, and the speech must be a

12    substantial or motivating factor in that adverse

13    employment action.  We take issue with all three of those

14    prongs in our brief, Your Honor.

15              First, I'd like to clarify just for a second on

16    the speech of matter of public concern.  I think our

17    memorandum of law was clear that we're only challenging

18    the Facebook post, the March 2021 Facebook post, and we're

19    not challenging the Board of Ed hearings or the car

20    caravan as speech on a matter of public intern.  I think

21    our motion overstated it, it definitely did, but the

22    memorandum of law is clear.  So I just wanted to clarify

23    that.

24              THE COURT:  So you're not challenging -- the

25    only thing you're challenging is the Facebook posting?

1                 MR. MURPHY:  That is correct.

2                 THE COURT:  But the other alleged categories of

3     speech you're saying --

4                 MR. MURPHY:  We'll accept that they're speech as

5     a matter of public concern, okay.  So I just wanted to

6     clarify that.  I know our motion was unclear on that, so I

7     apologize to the Court.

8                 THE COURT:  Okay.

9                 MR. MURPHY:  But the memorandum of law, we laid

10    it out there.

11                You know, the Facebook post we do think is

12    different because she was speaking based on knowledge she

13    obtained as a teacher, knowledge a member of the public

14    would not have had.  She stated definitively in that post

15    definitively that the school hadn't sent these COVID

16    notification letters, and that really gave the impression

17    the school should have and wasn't doing its job.  And the

18    school takes issue with that.  I think that one is

19    different.

20                At the end of the day, that's not going to be

21    the driving factor, I don't think, in the Court's analysis

22    because where her claims really rise and fall are on lack

23    of adverse employment action.

24                THE COURT:  I'll just ask you, it seems to me,

25    I'm not quite clear, then, what your public concern,

1  First Amendment public concern is with respect to the

2  Facebook post.  Because it seems to me -- what if you

3  have, you know, a secretary to the chief of police, right,

4  who overhears the chief of police engaging or planning

5  some sort of corrupt deal, right?  And then that secretary

6  or assistant goes home that night and posts something

7  about it.  Or, you know, walks to the New Haven Green,

8  frankly, and carries a placard saying there's corruption

9  at the New Haven Police Department.  I don't think that

10  you'd say, well, that speech is not protected simply

11  because it concerns information she learned while working

12  as a public employee, would you?  Is that your argument?

13          MR. MURPHY:  I think that's a little bit

14  different.  Context is always important in these cases.  I

15  think the Second Circuit's been clear on that, and some of

16  the cases we cited, the *Zelnik*, the *Wrobel*, whatever, that

17  line of cases, that context is always important, right?

18          And the context in this case I think we need to

19  take a step back and remember how odd that time of the

20  year was of 2020 and 2021, COVID's going on, the public

21  school is shut down, it was a very complicated and

22  difficult time for the public schools.  And teachers were

23  at the center of that both monitoring their classrooms,

24  communicating with parents, et cetera.  And the school was

25  trying to -- or the district in total and the school on

1    its own was trying to maintain the united front in terms

2    of the information that was being communicated to their

3    school community, right?  And teachers I think are

4    different than the secretary you mentioned.  Teachers were

5    at the center of that, monitoring their classrooms,

6    communicating with the public in terms of what's going on

7    with their school.  Certainly, Principal Gethings, as the

8    head of the school, was the principal person responsible

9    for distributing that information.  So I think it is a

10   little different than the hypothetical you gave me.

11           Granted, teachers are primarily responsible for

12   teaching their students, I get that, and that's their

13   primary duty.  But at the time back in 2021 when we're

14   just trying to get these students back to school and

15   things were changing, the CDC, the Board of Ed, the

16   mayor's office changing things on a daily basis, it was

17   important to have consistency of messaging.  And for a

18   teacher to get on Facebook and say no letters were sent

19   and really implying strongly letters should have been sent

20   in that situation was wrong, and we think it relates

21   directly to her employment.

22           I would suggest, Your Honor, I know there was a

23   recent case from Judge Bryant, it's called -- and I just

24   noticed it.

25           THE COURT:  I'll tell you what, if you just

 1   noticed the case and it's not discussed in your

 2   briefing --

 3            MR. MURPHY:  It just came out, Your Honor, I

 4   apologize.

 5            THE COURT:  That's okay.  That's all right.  If

 6   you feel like there's supplemental authority you want the

 7   Court to be aware of, it's probably best just to file a

 8   letter of supplemental authority.  That way both sides can

 9   know exactly what it is.  It won't be very productive,

10   frankly, for me to try to understand what you

11   characterize --

12            MR. MURPHY:  I think I will do that, Your Honor,

13   just because I think it goes to the point of when someone

14   goes to a board of ed meeting and speaks on information --

15   and I know this wasn't at a Board of Ed meeting, but I

16   think the principle is the same -- when someone speaks

17   based on information they've obtained through the course

18   of their job to the public and as a representative of the

19   Board of Ed.  So I apologize, I just saw that case

20   yesterday, Your Honor.

21            THE COURT:  But I thought you were conceding.

22            MR. MURPHY:  Well, on that one point, the

23   Facebook post.  I apologize, the case that I'm referring

24   to involved speech at a board of ed meeting.  The one

25   we're challenging with Ms. Light involves a Facebook post,

1    but the analogy is the same.  So I will file a notice of

2    supplemental authority on that case for Your Honor and for

3    Mr. Interlandi to consider.

4              THE COURT:  So let me ask, then, I'm trying to

5    figure out if your position is internally consistent.  If

6    the test is, is she talking about information that she

7    learned while serving as a teacher, and then you say,

8    well, that's what the Facebook post was about, therefore

9    it's not protected.  But at the same time it seems like

10   you're not disputing what she said at the Board of Ed

11   meeting even though presumably it's based on the fact that

12   she's a teacher and she would have learned the information

13   in her capacity as a teacher.  Is there something

14   different between these two examples?

15             MR. MURPHY:  Yes, Your Honor, I think there are.

16             At the Board of Ed meeting, the way I understand

17   Ms. Light's comments there was, you know, slow down, don't

18   bring our kids back to school yet, systemwide her own

19   concerns about what approach the Board of Ed was going to

20   take to returning the students.

21             The Facebook post -- this is a good question,

22   Your Honor -- is different because she's making

23   representations about what's going on at Worthington

24   Hooker, what should have been done, and knowledge she

25   would have had in her capacity as a teacher because they

1    were the conduit through which you communicate to your

2    parents.  When students are in class, teachers communicate

3    all the time to parents in the class.  And teachers have

4    knowledge about inner workings, especially at that time,

5    whether certain teachers would have COVID or students,

6    et cetera, right, knowledge that would not be --

7          THE COURT:  So if she had taken what she said in

8    the Facebook posting and she just stood up at one of these

9    Board of Education meetings and said exactly the same

10    thing, your argument would be it's protected, what she

11    said at the Board of Education meeting, but it's not

12    protected what she said in the Facebook post?

13          MR. MURPHY:  Not necessarily, Your Honor.

14    Whether it's on a Facebook post or at a Board of Ed

15    meeting, it's the content that matters.  And the content

16    here, I think, is the problem.  And that's what I think

17    Judge Bryant's case gets to which I hope the Court will

18    consider when it gets to this issue.

19          THE COURT:  Sure.

20          MR. MURPHY:  I hope that answers Your Honor's

21    question.  I'll certainly submit that brief.

22          As I said, I think the more important argument

23    here is the lack of any adverse employment action.  You

24    know, adverse employment action, everyone understands that

25    to be termination or suspension or reduction in pay,

1    something along those lines.  The Second Circuit talks

2    about some lesser sanctions and they give a host of

3    examples for that.  At the end of the day, what those

4    lesser sanctions that the Court says might qualify, they

5    must deter a similarly situated individual of ordinary

6    firmness from exercising their constitutional rights.  And

7    here, I think there's a little uncertainty, Your Honor, as

8    to what they're even basing their retaliation claim on.

9        In the original complaint -- so stepping back,

10   Ms. Light made an internal complaint to the Board's Human

11   Resources Department.  In that complaint, there were seven

12   different instances of alleged retaliation, right?  As you

13   know, the Board hired an outside law firm to investigate

14   that.  Ultimately, that firm issued a report where they

15   found that one of those, one topic raised by Ms. Light

16   was, in their mind, retaliation.  In that same report --

17            THE COURT:  Can I ask about that?

18            MR. MURPHY:  Sure.

19            THE COURT:  Because both parties kind of rely on

20   the report in some way.

21       Does the law firm report have any kind of

22   evidentiary weight?  In other words, ordinarily it's

23   just -- it's a conclusion by somebody who has been hired

24   to give their opinion.  So is the Bercham & Moses report

25   entitled to any more evidentiary weight than, I don't

1    know, a fifth grade teacher's opinion about whether there

2    was retaliation?

3              MR. MURPHY:  I don't believe so, Your Honor.

4    And that's kind of the point I was getting to.  Ms. Light

5    raised seven.  Bercham & Moses found one of those seven

6    plus three kind of subsequently arising situations to be

7    retaliation in their mind.  As we argued in the brief, I

8    don't think the Court should give that any weight in terms

9    of that those incidents were retaliation, those four that

10   were identified by Bercham & Moses were retaliatory

11   conduct.

12             Again, Your Honor, I'm still unclear as to what

13   the exact basis of plaintiff's retaliation claim is.  When

14   I read their opposition, I think the way you read it is

15   they agree that none of those four that were found by

16   Bercham & Moses standing alone constitute retaliation.  I

17   think what I understand the argument on the other side is

18   that those four and maybe some others, when you take them

19   all together, reach that critical mass that constitutes

20   retaliation in the whole.

21             But just stepping back --

22             THE COURT:  I'll just ask you, as an initial

23   matter, is it appropriate for a court to consider the

24   collective of conduct such that there could be an adverse

25   action for First Amendment retaliation purposes based upon

1    essentially a series of events that happened?  Or are you

2    saying that there has to be kind of incident-specific

3    identification of one single incident of one action,

4    particular action, that is of itself sufficient?

5              MR. MURPHY:  I agree, Your Honor.  Most cases

6    involve that one act.  Normally, we're before you because

7    someone was fired, a clear adverse.  Here, it's different.

8    I think the case we mentioned before, the *Zelnik* case, and

9    others talk about how a critical mass can in some

10   circumstances reach the level of retaliation.  I didn't

11   understand that to be the way they pleaded in the

12   complaint.  I thought they were alleging specific

13   retaliatory acts standing alone that constitute

14   retaliation.  But now they're arguing this essentially

15   critical mass theory.  So it's legally viable.

16             THE COURT:  I wanted to make sure there wasn't a

17   dispute about that.  I thought that's right.  I don't know

18   if you want to quibble with the complaint.  I'm not sure

19   the complaint has to do that, descend to the particulars

20   of saying, well, and by the way, if not one of these

21   actions is independently actionable, collectively they all

22   are.  The plaintiff doesn't have to do that, right?

23             MR. MURPHY:  Maybe not in the complaint.  But

24   here at this stage there needs to be a factual basis for

25   this critical mass.  I think we ran through all of the

1    different incidents in our brief, and the way I understand
2    it, Your Honor -- but that's part of what I wanted to
3    raise with the Court today.  What is that critical mass?
4    How did they define that?  Is it four?  Is it seven?  Is
5    it more incidents than that?  It's been kind of a shifting
6    target, including in the brief itself.  I think we noted
7    in a couple different places how the number --

8            THE COURT:  I guess I'm a little mystified why
9    they have to say of 13 whatever possible incidents that
10   could be the basis for this, we say the following subset
11   of the 13.  Why wouldn't they ordinarily -- I would think
12   they could say, well, all you need to do, to the Court, is
13   conclude whether the 13 taken together collectively would
14   suffice to constitute an adverse action.  And then it goes
15   to the jury and the jury decides.  They're told, well, the
16   plaintiffs contend all 13 of these when you look at them
17   together is an adverse action or maybe, you know, the
18   plaintiffs contend that at least half of these.  But it
19   seems to me it's hard for me to parse that out at this
20   point and require the plaintiff to say this specific
21   combination of the 13 is by itself enough.

22           MR. MURPHY:  I don't think so, Your Honor.  I
23   think quite the opposite.  The way I understand the
24   complaint is that they have -- they're relying on four
25   incidents that they believe were retaliation: the printer

1    incident where they think Ms. Gethings printed to a

2    teacher's printer that wasn't hooked up to the network;

3    the statement to the union representative that teachers

4    had expressed a concern that he was in cahoots with

5    Ms. Light to take down the administration; the

6    conversation with the paraprofessional, just counseling

7    her about proper dismissal techniques, again, in that

8    COVID environment where there were very strict dismissal

9    protocols; and then the conversation or two with Teacher X

10   about the alleged, you know, leaking of that Teacher X's

11   COVID status.  So those are the four incidents that I

12   understand them to be running on the outer limit, the

13   four.

14         I understand Your Honor's point about could two

15   or three or one of those constitute retaliation.  It can't

16   be one, because the way I understand their argument not

17   one of those standing alone is sufficient to constitute

18   retaliation.  It can't possibly be that the printer and

19   the statement about cahoots survive -- or there's enough

20   factual evidence to allow those to survive summary

21   judgment as a possible basis for First Amendment

22   retaliation claim.  There's no evidence whatsoever that

23   Ms. Gethings had anything to do with the printer just like

24   there's no evidence that Ms. Light herself didn't have

25   anything to do with it.  No one knows where those things

1    came from.  So it's pure speculation to believe

2    Ms. Gethings had anything to do with it.

3           The statement about her being in cahoots with

4    Mr. Shortt, that wasn't even made to her; it was made to

5    Mr. Shortt based on concerns raised with Principal

6    Gethings by other teachers.  That's undisputed.  It's

7    entirely appropriate for Ms. Gethings to raise that with

8    the union representative who during -- you know, in the

9    fall of 2021.  This is six months after the Board of Ed

10   meetings, right?  One was August, one was October of 2021,

11   well beyond -- or well after the protected activity.  So I

12   don't think those give the Court a factual basis to find

13   that there's a critical mass issue for the jury.

14          The dismissal, I touched on it before,

15   Your Honor, you know, Principal Gethings was in charge of

16   a school building that had very strict dismissal protocols

17   in the spring of 2021, if we go back.  And I think we

18   presented the evidentiary record on that.  And she walked

19   into a classroom and saw a paraprofessional who didn't

20   know the dismissal protocol, and she addressed it as she

21   has to.  I think the Second Circuit has been clear as has

22   the United States Supreme Court in *Tinker* and other cases

23   that context matters, you know.  The test in the

24   First Amendment is highly context specific, and we apply

25   it in light of the special characteristics of the school

```
 1    environment.  So it was entirely appropriate for her to

 2    engage with the paraprofessional on that issue.  I just

 3    don't see how there's any factual basis right now for the

 4    Court to find that there's an issue of fact on the

 5    critical mass that could go to the jury.

 6              THE COURT:  The assignment to teach the

 7    different grade, can you speak to that?

 8              MR. MURPHY:  Of course, Your Honor.

 9              First, although, you know, I don't think the

10    Bercham & Moses report really is entitled to weight, I do

11    think they're correct in finding that's non-retaliatory.

12    In our affidavits and the records provided to the Court,

13    we provided good reasons why she was reassigned, as well

14    as I believe three other teachers all had their grades

15    change.  Teachers are certified for K through 6 at that

16    level.  You're never assigned to a particular grade in

17    perpetuity.  I've had, you know, teacher termination

18    because teachers refused to move grade, but they have to.

19    It's entirely within Principal Gethings' discretion.  And

20    there were good reasons for it, as we outlined.  Ms. Light

21    had issues with the teachers of her children in prior

22    years, including the year immediately before this.  Her

23    student was now going to be in the same grade she taught.

24    That was going to be an awkward situation, a difficult

25    situation for that other teacher.  And so Ms. Gethings
```

1    reassigned her to first grade as well as moved two or

2    three other teachers around as part of the normal course

3    in the school that year.  So it was entirely appropriate.

4    It's not an adverse employment action.  The pay was the

5    same.  The prestige was the same.  Everything is the same,

6    just two different grade levels, third grade versus first

7    grade, Your Honor.  So I don't see how that grade change

8    is an adverse employment action either.

9         And then I know we've talked about it a little

10   bit already, but causation obviously is the third element.

11   That kind of overlaps with a lot of things we've talked

12   about.  Principal Gethings was never disciplined by the

13   superintendent or any other administrator.  There would be

14   no reason for her to retaliate against Ms. Light for the

15   concerns raised at the Board of Ed meetings or even in

16   that Facebook post.

17        The four different things that we've been

18   talking about to date, even the grade change, Your Honor,

19   they're all entirely different things.  The grade change

20   has nothing to do with the concern about seeing the

21   paraprofessional handling dismissal inappropriately.  The

22   grade change has nothing to do with a conversation six

23   months later with Mr. Shortt once he became the union

24   representative.  It has nothing to do with papers that

25   mysteriously appeared on a printer and somehow are alleged

1   to be Ms. Gethings' fault.  So there's no common thread

2   with any of these things.  Most of them -- almost all of

3   them are based on concerns that were raised within the

4   school system either because Ms. Gethings saw it by her

5   own in the dismissal or because Teacher X came to her and

6   said I think Ms. Light disclosed my COVID positive status

7   or because teachers raised a concern about Mr. Shortt,

8   et cetera.  So they're all so unique and so different and

9   so spaced apart I don't see how there's any collective

10  thread through any of them.  And I don't see how they --

11          THE COURT:  So one of the things courts do when

12  they look at causation is they look at temporal proximity,

13  in part, at summary judgment.  Temporal proximity alone is

14  not sufficient to sustain at summary judgment, ordinarily,

15  causation at least.  But here, isn't there more than just

16  temporal proximity in the sense that it's undisputed that

17  the principal is concerned about what it is is being said

18  by the plaintiff in the case, right, by Ms. Light?  In

19  other words, lots of these kinds of cases, they arise

20  where somebody has said something, made some sort of

21  speech, and then two months later the employer does

22  something that's adverse to the plaintiff.  Here, we seem

23  to have the extra.  Which the extra is that, it seems,

24  that the principal is quite concerned about the speech and

25  what's being said by Ms. Light.  Am I wrong about that?

```
 1            MR. MURPHY:  I would take a little bit of issue
 2   with that, Your Honor.
 3            THE COURT:  Okay.
 4            MR. MURPHY:  On the Board of Ed meeting, for
 5   example, the March one, and I know there's some evidence
 6   in the record about this, Ms. Light that morning asked
 7   Principal Gethings about the 6-foot distancing when the
 8   kids are eating.  Again, context.  Things were changing by
 9   the day, by the week, by the month at that time.  Things
10   were very fluid.  New Haven was just bringing the kids
11   back.  She says, "I'm waiting for information."  Principal
12   Gethings and the other principals were meeting every week
13   with the assistant superintendent to get updated
14   information.  She said, "I'll get that to you."
15            Ms. Light goes to the Board of Ed that night and
16   raises that same concern.  And the emails are in the
17   record, Your Honor.  You'll see the emails are very
18   benign, hey, I know you spoke to the Board of Ed, I'm
19   trying to get that information for you -- I'm
20   paraphrasing -- I'm trying to get that information, I'll
21   get it to you as soon as --
22            THE COURT:  And aren't there emails suggesting
23   feel free to raise concerns with me, impliedly suggesting
24   not to go to outside bodies to raise concerns?
25            MR. MURPHY:  I think, Your Honor, that goes to
```

1    that consistency approach.  Information is being funneled

2    down from the principal and she funnels it out to the

3    school.  That's not a reprimand.  That is not a warning.

4    That's not anything that would --

5              THE COURT:  Well, no, hold on.  We're not

6    talking about the adverse action.  You moved us on to the

7    next element, which is causation.

8              So Principal Gethings is acutely aware, it seems

9    to me, on the record, that Ms. Light is talking about

10   COVID protections at the school in multiple form.  And on

11   top of that, if I accept the notion that there has been

12   adverse action, then it seems to me if that adverse action

13   has occurred within a reasonably short time period of just

14   a matter of months or so, then it strikes me that, at

15   least for summary judgment purposes, it's hard for me to

16   say that there's not enough for a jury -- at least as to

17   causation.  I've got your arguments about why none of the

18   stuff is adverse action.  That's what I struggle with on

19   your argument there.

20             MR. MURPHY:  In part of what I think is causing

21   the Court and really myself to struggle with this is that

22   lack of definition as to what other retaliatory acts.  For

23   example, Principal Gethings was concerned about the

24   Facebook posts, right, and other teachers were as well who

25   came to Principal Gethings with their concerns.  In

1    response, what did Principal Gethings do?  In the record,

2    she sent a school-wide email just reminding people to be

3    mindful of statements made on social media, right?  Didn't

4    take any sort of direct action against Ms. Light based on

5    that Facebook post, right?  Sent a general email to the

6    whole school around that same time a few days later.

7            THE COURT:  Remind me, the Facebook post, what

8    date was that?

9            MR. MURPHY:  I believe March 9, Your Honor.  The

10   school-wide email was the 12th.  And I believe it was

11   right before that, Your Honor.  I don't have that right in

12   front of me.

13           THE COURT:  Okay, fair enough.

14           MR. MURPHY:  But my point to Your Honor's

15   concern about the temporal connection, you know, we've got

16   to go back to what are the acts that are alleged to be

17   retaliatory in order to measure that temporal connection,

18   right?  If you look at the printer and the cahoots, those

19   were in the fall, so those were well beyond what I think

20   the Court and I are talking about.  The dismissal with the

21   paralegal -- paraprofessional, excuse me, I don't think

22   the Court can find there's any causal connection there.

23   It was a safety issue.  This goes back to the concern I

24   talked about before from *Tinker* and others, the school

25   environment, she had to address that with the

1    paraprofessional.  The temporal link is not strong enough

2    there.

3         And I think with the conversation with Teacher X

4    and with Ms. Light and their union representative, it was

5    a chance to get everyone on the same page.  They met with

6    them together.  And, again, if a teacher comes to a

7    principal and says "I'm worried a colleague is disclosing

8    my health status to others" -- at the time, you know, it

9    was sensitive who had COVID, who didn't -- Ms. Gethings

10    had to meet with them to discuss that.  That just happened

11    to come up in the normal course of a school day.  I don't

12    see how the temporal -- yeah, it was within a short period

13    of time after the Facebook post and after the Board of Ed

14    meetings, but I don't think that's enough for causal

15    connection at the summary judgment stage.

16         THE COURT:  I got your argument.

17         MR. MURPHY:  I think that kind of exhausts the

18    arguments on that topic unless Your Honor has additional

19    questions.

20         THE COURT:  I don't on the First Amendment.

21         Is your argument pretty much the same on the

22    31-51?

23         MR. MURPHY:  It is.  I'm certainly not going to

24    repeat everything.  I think it is a little different just

25    because the law is a little different, right?  I think

1    that that federal standard of, you know, must deter a

2    similarly situated individual of ordinary fairness doesn't

3    apply in the 31-51 field.  The decision by Judge Noble

4    that both parties cited in their briefs talks about that.

5            31-51q is different.  It's different than the

6    federal standard.  It's different than some of the

7    Connecticut similar statutes.  For example, its kind of

8    sister statute, which I'm sure Your Honor's dealt with,

9    31-51m talks about discharge, discipline or otherwise

10   penalizing an employee.  31-51q leaves out that final

11   qualification, it just says you can't charge or

12   discipline.  And discipline's got to mean something.  And

13   I think the courts are struggling what that exactly means.

14   But at the end of the day, whatever definition Your Honor

15   decides to follow out of the ones cited in the briefs, I

16   don't think any of those four incidents qualify as

17   discipline.  Speaking to the union representative,

18   speaking with the paraprofessional, getting Teacher X and

19   Ms. Light in a room to talk about things, those incidents

20   don't meet any standard of discipline either collectively

21   or together.  And so that's the only distinction, I

22   believe, between the arguments under the First Amendment

23   and 31-51q.

24           THE COURT:  Is the scope of speech that's

25   protected -- I take it that the claim under 31-51q is

1    based upon conduct that violates the Federal Constitution

2    or the State Constitution; is that right?

3             MR. MURPHY:  It can be.  I didn't understand

4    them to be arguing they had greater protections under the

5    State Constitution.  I know our State Constitution

6    certainly in some circumstances does provide greater

7    protection.

8             THE COURT:  And the Connecticut Supreme Court

9    has ruled, right, on -- basically, Connecticut Supreme

10   Court in the case of *Trusz v. UBS Investors* ruled, I

11   think, declined to follow the Supreme Court's decision in

12   *Garcetti v. Ceballos* and adopted a different scope of

13   protection than *Garcetti*, a more generous scope of

14   First Amendment protection.  I didn't see that really

15   addressed in either party's briefing.  But I just wanted

16   to let you know that I'm also considering that decision by

17   the Connecticut Supreme Court and plenty of cases since

18   then that have talked about how a 31-51q claim that

19   asserts rights under the Connecticut Constitution allows

20   an employee to exercise or has broader protection for the

21   First Amendment.

22            MR. MURPHY:  That's correct, Your Honor.  In our

23   brief, I think we spent very little time even addressing

24   that first prong.  Really, our argument focused on whether

25   this was discipline.  I think that's really where her

1    claim fails in this case.

2            THE COURT:  But I think your argument, in part,

3    the Facebook post is not protected speech.  I think you're

4    saying that.

5            MR. MURPHY:  I am.  I am, Your Honor.

6            Again, she has the Board of Ed meetings, the car

7    caravan which we haven't talked about yet, but that was

8    almost a year before a lot of these incidents occurred,

9    eight months to a year before.  So I don't think there's

10   any temporal connection for that car caravan.

11           THE COURT:  I see.

12           MR. MURPHY:  But, really, discipline means

13   something under the Connecticut law.  And I don't think

14   the record establishes discipline either individually or

15   collectively.

16           Moving on to the separate -- we have two

17   different buckets.  We have that bucket and now we have

18   the false light and defamation bucket which again overlap

19   in some important respects.

20           For the false light invasion of privacy, which

21   is directed at Principal Gethings, there must be falsity,

22   there must be publicity, and there must be specificity.

23           Maybe taking those in reverse order for

24   Your Honor, again, it's not clear to me what plaintiff is

25   relying on in regards to the specific statements that she

1    believes were a false light and invasion of privacy.  The

2    complaint didn't do a very good job -- I apologize, no

3    offense, but it doesn't specify those statements that

4    they're relying on.  The interrogatory response which we

5    quoted in our motion for summary judgment just lists 17

6    kind of general incidents without specifying the specific

7    statements that were believed to be invasion of privacy

8    and therefore I think it fails on the specificity ground

9    alone.

10            Next is the publication.  In order for a

11    statement to be a false light invasion of privacy, the

12    statement must be made to the public at large or so many

13    individuals that it's substantially certain it will become

14    public knowledge.  And when Your Honor looks at the list

15    of the 17 statements I believe it is, I think the only

16    thing that could possibly qualify as publication is that

17    school-wide email that didn't mention Ms. Light.  The rest

18    of them were either individual conversations or

19    conversations that either Principal Gethings wasn't

20    involved with or Ms. Light wasn't involved with, were in

21    closed-door meetings with the union representative.

22    Nothing that meets that publication requirement.  I think

23    all of her false light claims fall on that ground as well.

24            Finally, the falsity or major misrepresentation

25    of plaintiff's character, we challenged that in our brief

1    and we went through each of those statements.  I won't

2    recite them all for Your Honor today.  I think at the end

3    of the day when you read through our brief and parse out

4    those statements, again, even the ones that were about

5    Ms. Light were not false or major misrepresentation of her

6    character.  And so we challenge her count on all three of

7    those grounds.

8            Defamation is very similar in terms of it has to

9    be -- the plaintiff, in order to proceed on a defamation

10   claim, must plead with specificity the claims they believe

11   were defamatory, right?  And must specifically identify

12   the defamatory statements, when they were made, to whom,

13   et cetera.  Here, again, we got a list of 15 different

14   statements -- or not even statements, that's overstating

15   it.  Fifteen different incidents that may have involved a

16   defamatory statement without any specifics.  Again, we

17   went through that in our motion.  Unless the Court has

18   questions on any specific one, I'll just rely on our

19   memorandum of law there.

20           In our reply brief, the intracorporate

21   communications privilege also comes into play with a large

22   extent of those communications.  Meeting with employees

23   about possible disclosures of health information, meeting

24   with a paraprofessional about performance and her failure

25   to conduct dismissal in an appropriate manner is covered,

1    I believe, under that intracorporate communications

2    privilege.  I know the Second Circuit has just ruled on

3    that again and stressed the importance of that privilege

4    in the employment context.

5            And so unless Your Honor has specific

6    questions --

7            THE COURT:  I don't think so.

8            MR. MURPHY:  -- I will rely on that too.  Thanks

9    for your time, Your Honor.

10            THE COURT:  Okay, great.

11            Mr. Interlandi.

12            MR. INTERLANDI:  Yes, Your Honor, thank you.  A

13    lot to cover here.  I'm going to do my best.

14            First, I want to just say Counsel's absolutely

15    right, the documents, all of the documents in the record

16    speak for themselves.  Everything from the Facebook posts

17    to the emails to the complaint to the answer and

18    affirmative defenses, they all speak for themselves.  And

19    I just ask the Court look through those when considering

20    this motion because it's our position that disputed

21    material facts do exist for this case to continue on its

22    path to a trial so that Ms. Light can tell her story to a

23    jury of her peers.

24            And to the extent, Your Honor, that the Court in

25    our Exhibit 7 of our responsive documents, as I was

1    looking at that -- that is the Facebook post -- I was

2    looking at it recently, it looked like it may not have

3    uploaded where you could read the entire post and

4    comments.  I have a copy.  I have a mask, too, if I can

5    proceed --

6              THE COURT:  I'll tell you what to do.  Do you

7    need to refer to all of that right now?

8              MR. INTERLANDI:  I'm going to read from some of

9    it, yes, Your Honor.

10             THE COURT:  If you have extra copy.  Have you

11   given a copy to Counsel?

12             MR. INTERLANDI:  I believe he has it already.  I

13   can certainly provide that to him if he needs it.

14             THE COURT:  My law clerk can pick it up from

15   you.

16             What I'll ask you to do is file a motion, if you

17   can, substitute this revised Exhibit Number 7.

18             MR. INTERLANDI:  I will.  Yes, Your Honor.

19             THE COURT:  Unless there's going to be an

20   objection.

21             Will there be an objection to this particular

22   exhibit, do you know, Mr. Murphy?  Have you had enough

23   chance to look at it, frankly?

24             MR. MURPHY:  I haven't, Your Honor.

25             MR. INTERLANDI:  Your Honor, so when these

1    images were converted to PDF files, they were combined

2    with a PDF file and then uploaded to the Court and filed

3    with our paperwork.  When I then printed it or when I went

4    to view what was uploaded from the Court's website, it

5    looked like portions of that document were shrunken down.

6    I'm not sure how that happened or why it happened.  So it

7    is the exact same document, it's just the full document.

8    I believe defense counsel has these documents already.

9            THE COURT:  Okay.

10            MR. MURPHY:  That would be my only concern,

11    Your Honor.  I notice there's no Bates numbers on these.

12    There's been so many documents in this case --

13            THE COURT:  You know what?  I think what I'm

14    going to do is I'm going to let you make your argument now

15    about this document that you've handed up to the Court,

16    but I'm going to ask you to consult with opposing counsel

17    after this hearing is over and see if there's an agreement

18    that this document may be substituted for what's on the

19    Court's official records.  If there is, then you can file

20    this document with agreement that -- obviously there may

21    not be an agreement about the inference the Court should

22    draw, but an agreement that it's proper evidence in the

23    case.  If not, then you'll have to file a motion to

24    substitute, and of course I'll allow a response to that

25    motion.

1                     MR. INTERLANDI:  Thank you, Your Honor.

2                     THE COURT:  To keep things moving for now, I'll

3      consider what you have to say about this document, but I

4      may not consider it at all if I decide not to allow you to

5      supplement the record.

6                     MR. INTERLANDI:  Understood.

7                     I don't think it is disputed in this case that

8      Ms. Light commented on a post, a post that was shared by a

9      lady named Melody Gallagher who was a teacher in the

10     New Haven public school system.  Ms. Gallagher was sharing

11     a post from a different website.  The post contained

12     student data of positive COVID cases.  Student data.  It's

13     undisputed that my client is a teacher in the school

14     district but also a parent.  There's absolutely nothing in

15     the record in terms of her duties as a teacher to go out

16     on social media and comment on certain items specifically

17     to COVID.  So, as a parent, she commented to the post that

18     Ms. Gallagher presented out into the public and she made

19     two very limited comments.  And those comments are,

20     Ms. Gallagher posts -- makes a post with about three

21     paragraphs sharing the page from New Haven Public School

22     Advocates.  Ms. Light responds, "I don't think letters

23     were sent."  I don't think letters were sent.

24     Ms. Gallagher responds, "For your school?"  She says,

25     "Hooker never sent a letter."  Again, this is regarding

1    student data of reported cases for the week of

2    February 11, 2021.  That's it.  That is the extent of what

3    the defense is saying interfered with our messaging to the

4    public.  Our messaging that we need a cohesive front so

5    that parents will trust us and send their kids back to

6    Worthington Hooker.  And because Ms. Light just commented

7    saying I don't think letters were sent, I didn't get a

8    letter, she experienced the wrath of the administration at

9    Worthington Hooker.  Okay.

10          So, I'm Italian.  My mom likes to make pasta.

11   So growing up there would be a big pot, water would go in

12   it, it would fill to the top.  The stove would go on.  My

13   mother would put it on, and it would take a while for that

14   water to boil.  Here, it was the reverse.  Every time

15   starting back in mid- to late-2020 when Ms. Light would

16   make comments out in the public, car caravan, some other

17   meetings, the administrators started to poor some water in

18   the pot and let it sit.  They didn't put it on the stove

19   yet.  They didn't put it on the stove apparently until

20   this Facebook post interfered with the messaging they

21   wanted to get out there.  And after that, we have a whole

22   lot of stuff going on, okay?  We have meetings, multiple

23   meetings.  Not just during the course of the day.  I'm

24   talking about 90-minute meetings where my client is

25   accused of violating her co-worker's privacy rights.

1    Everyone is telling us, "You're the one, you're the source

2    of the leak.  You said Teacher X has COVID."  She denied

3    it multiple times but it kept going.

4            They alleged, they say that multiple teachers

5    came to them, a handful of teachers, really, who

6    complained about the Facebook post.  And then what did

7    they do?  A few days later on March 12, the school-wide

8    email goes out to the school community saying apparently

9    some of you -- Jessica -- is out there on social media

10   spreading misinformation about the school.  Okay.  So at

11   least those handful of people who allegedly told

12   Ms. Clarino and Ms. Gethings about the Facebook post, they

13   knew who that was about.  And we're talking about a school

14   within a district and people talk.  So -- and I'll get to

15   that later in terms of the false light claim.

16           THE COURT:  I guess your theory, in part, is

17   that because of this Facebook posting, the school got so

18   angry that they decided to falsely accuse her of releasing

19   information that Teacher X was positive?

20           MR. INTERLANDI:  Yes, Your Honor.  That's what

21   we've alleged.

22           THE COURT:  There's no dispute there is a

23   Teacher X and that Teacher X had COVID, right?

24           MR. INTERLANDI:  Correct.

25           THE COURT:  So you're just saying they concoct

1    this scheme to falsely accuse her of leaking information

2    about Teacher X.

3             MR. INTERLANDI:  Yes.  Which is consistent with

4    what Attorney Goldberg stated in her report from

5    December 2021 after her full investigation.  So, yes,

6    that's exactly what happened.  They were telling

7    Ms. Light, Ms. Morrison, who was in a meeting with her,

8    Teacher X, Ms. Clarino was in the meeting too, "Everyone

9    is telling us you're the one, you said it."  And they had

10   no support.  They didn't have -- there's -- if at best for

11   purposes of this motion, there is a disputed material fact

12   that needs to be presented to a jury.

13            State of mind is of utmost importance here, and

14   the case law details that.  I'm talking about the state of

15   mind of school administrators and doing what they did,

16   again, turning up to 10 that stove after the Facebook

17   post, okay?  Meetings.  Teacher evaluations.  For the

18   first time telling Ms. Light, we think we're going to

19   change your grade assignment.  Prior years there were

20   issues and difficulties with Ms. Light and her kids'

21   teachers.  But they didn't say anything to her then.  It

22   wasn't until a few days, a few weeks later when they

23   finally said, hey, you know what?  We're going to change

24   your assignment now.  Why?  Well, you know, people are

25   saying stuff or you have issues with teachers.

1              And Attorney Goldberg's report supports the fact

2    that Mr. Salem, who was the at-that-time third grade

3    teacher didn't make a comment until after the decision was

4    made.  And so Ms. Light then says, "Well, look, I don't

5    want to do that.  Can we talk about it?"  And it's alleged

6    in the complaint.

7              The complaint -- and I disagree, Your Honor, in

8    terms of it wasn't well pled or whatever defense counsel

9    may have said.  I strongly disagree with that.  We -- it

10   contains a very good timeline of everything that happened,

11   the constellation of events that goes back to mid- to

12   late-2020 all the way to August of 2021 and even beyond

13   that as the reports came out.  We have connection.  We

14   have connection.  What is the common thread?  The common

15   thread is the complaint.

16             Ms. Light says, okay, well, what am I going to

17   do?  I'm getting stonewalled left and right.  I'm going to

18   file a complaint.  They're threatening me that Teacher X

19   is going to file a complaint against me even though I told

20   them it wasn't me.  What can I do?  She files a complaint.

21             As that complaint is pending, additional things

22   happen.  Ms. Maffuid is reprimanded for covering the class

23   when Ms. Light had to use the ladies room.

24             THE COURT:  Can I ask about that?  That struck

25   me as very odd, that allegation.  Are you thinking that

 1   Principal Gethings is plotting and saying I'm just going

 2   to wait until Ms. Light leaves her room in charge of the

 3   paraprofessional and then I'm going to burst in and

 4   reprimand the paraprofessional?

 5        MR. INTERLANDI:  Well, I don't know if that's

 6   exactly how it turned out.  Ms. Maffuid was called into a

 7   meeting and was reprimanded, "Why were you doing this?

 8   You shouldn't be doing this."  This wasn't a written

 9   procedure or something so specific that someone couldn't

10   be told what they needed to do for ten, you know -- maybe

11   not ten minutes, but for a few minutes so that someone can

12   use a restroom.  Yet this lady was called in and

13   admonished for doing this.  And it made her feel like,

14   hey, I can't associate with Ms. Light.  I'm going to get

15   more heat with the administrators.  So, yeah --

16        THE COURT:  But ultimately you're saying the

17   administration by doing this is retaliating against

18   Ms. Light for previously speaking her mind?

19        MR. INTERLANDI:  Yes.  And the common thread is

20   the complaints.  Ms. Light files the complaint.  Teacher X

21   a month later -- she had all this time, but a month later

22   files a complaint.  And then the administrators file their

23   own complaint in which they call a retaliatory complaint.

24   It's in the actual document.  It says retaliatory

25   complaint against Ms. Light.  And they say, hey,

1    Ms. Bonner, HR specialist or whomever it was presented to,

2    she's undermining the administration, she's spreading

3    false or misinformation about the school, do something

4    about it.  And as the investigation starts, Ms. Bonner

5    finds out and then consults with Ms. Mack, another HR

6    leader at the school, I think some things are fishy here.

7    I think maybe they tainted the investigation by talking to

8    some witnesses.

9            And it wasn't until Ms. Light kept following up

10   and had to hire an attorney that they decided let's

11   commission, let's outsource this to Bercham & Moses,

12   well-experienced attorneys.

13           You asked earlier if it should be provided any

14   additional weight.  My position is yes.  It's a

15   third-party investigation.  It's a business record.

16   Independent, lawful, experienced in labor and employment

17   law.  Three different attorneys were appointed to this.

18   One for Ms. Light's complaint.  One for Ms. Gethings' and

19   Clarino's complaint.  And the other for Teacher X's

20   complaint.  Nothing was substantiated against Ms. Light.

21   And Ms. Goldberg found four instances of retaliation along

22   the constellation from March to --

23           THE COURT:  Is there any legal support or

24   precedent you can cite that says the Court should give

25   evidentiary weight to the opinions of an outside law firm

1    that does an investigation?

2              MR. INTERLANDI:  None that I've cited in my

3    brief, Your Honor.

4              THE COURT:  That's a problem, right?  Because

5    essentially you could then say, okay, well, the

6    administration can come back or some other party could

7    come back and hire a different outfit to render an opinion

8    about whether the law was broken.  And that's usually what

9    courts are supposed to do.  So it's hard for me to know

10   whether to give it any weight at all, the fact of the

11   investigation in terms of its conclusions.  I can give

12   weight to the fact that there was an investigation, I get

13   that.  Statements were made and the like and perhaps

14   responded to.  But the idea that somehow I should be

15   ratifying or saying that the opinions of not one, two, or

16   three lawyers at a private law firm have independent

17   weight.  So if you know of some case that tells me I

18   should to that, please feel free to file a supplemental

19   letter on the docket.

20             MR. INTERLANDI:  Yes, Your Honor.

21             And I'm not saying that because Attorney

22   Goldberg found the way she found that it's a slam dunk.

23   I'm saying there exists this incident that happened or

24   this event where things switched over to a third-party

25   investigation and it was concluded as such.  And I think

1    that holds a little more weight.

2            But what defense counsel even today here is

3    cherrypicking then from the report and saying, well, you

4    know, Attorney Goldberg, by the way, found that the

5    reassignment from third to first, that wasn't a big deal.

6    But, okay, fine.  It's either all or nothing, then.  We're

7    not claiming those four are the only four.  We're claiming

8    the constellation of events started on a particular

9    timeline and it continued.  It continued through

10   August 2021.

11           There's a printer.  Mr. Shortt -- no, Mr. Salem

12   says, hey, I don't know, I got this email, what's going on

13   with this?  That is a disputed fact in this case.  How did

14   it get there?  I don't know.  I have some evidence that

15   somebody did an investigation and she found a certain way.

16   But ultimately that's for the jury to decide.

17           THE COURT:  So is there any single event that

18   occurs during this window of time that you believe by

19   itself meets the adverse action standard or, for the

20   purposes of the 31-51q claim, the discipline standard, any

21   single one?

22           MR. INTERLANDI:  By itself?

23           THE COURT:  By itself.

24           MR. INTERLANDI:  I would argue that accusing a

25   teacher of invading her coworker's privacy rights by

1    saying that she had COVID to other people and spreading

2    that throughout the community is enough.  She didn't have

3    any specific loss in terms of benefits or wages at that

4    point, but what then ensued is Teacher X files a complaint

5    against my client a month or so later, a month and a half.

6    She has to defend herself.  And not only -- all the while

7    she has two young children in the school, we're one year

8    into a global pandemic.  Yes, there are changing policies

9    and procedures --

10            THE COURT:  So the answer to my question --

11    you've been going on for a while -- is there's one event

12    that by itself could qualify, the alleged false accusation

13    of leaking information about Teacher X?

14            MR. INTERLANDI:  Yes, Your Honor, if I had to

15    pinpoint one.  But I think we've established that case law

16    would allow for a constellation of --

17            THE COURT:  Okay.  Well, all right.  If you're

18    going to do the constellation approach, just to sort of

19    say, as you're trying to do today, it seems to me, that

20    there's this particular time frame, it starts in the

21    middle of 2020, it runs up to August of 2021, anything

22    that, you know, upset my client during that time is part

23    of the constellation.  And that creates a problem when

24    cases -- especially in terms of if a case goes to trial of

25    what is it exactly that are the specific adverse events.

1    That should be part of the constellation.  It's not enough

2    just to say there's a time range.  Lots happen during a

3    time range.

4              MR. INTERLANDI:  Is the question what is it?

5              THE COURT:  Yes.

6              MR. INTERLANDI:  It starts in November 2020 when

7    my client attends a meeting with Ms. Clarino and Gethings

8    when Ms. Gethings -- and this is in the affidavit that

9    Ms. Light provided -- Ms. Gethings says, "Hey, the Board

10   of Ed or someone, I can't recall, heard some of the

11   comments you made and they're coming to me, they're asking

12   me about that."  You know.  And reminding her about public

13   speech and the AFT letter that was provided -- and this is

14   in the record -- back in July.  That's when it starts.

15             Then we kind of jump into January.  Ms. Light is

16   trying to decide, okay, where are we?  What is going on

17   with in person versus hybrid learning?  Are we going full

18   in person?  She talks at Board of Ed meetings.  They've

19   conceded that the Board of Ed meetings are not part of --

20   or that it is public speech.  And then we jump to March.

21             And so it's like November starts it.  We carry

22   through.  She's making these comments publicly at Board

23   of Ed meetings, online, and then there's a Facebook

24   comment, two comments.  And then we go from there and we

25   have the Teacher X situation.  We have the school-wide

1    email about someone in the community spreading

2    misinformation.  We have Teacher X is going to file a

3    complaint against you.  We have the TEVAL and the

4    reassignment to first grade.  And all of that -- so our

5    argument here is, no, there is not just one.  This is --

6    if there was ever a case for a constellation of events,

7    it's this case.  And we're only talking, you know, a

8    nine-month period, give or take.  November 2020 to

9    August 2021.  That's kind of where we're going with what

10   was provided to Attorney Goldberg.

11            Now, they made an argument in their papers that,

12   oh, five months, made a big deal about five months.  But

13   Ms. Light provided an affidavit.  And I don't think it's

14   disputed, Attorney Goldberg was receiving ongoing

15   complaints as they were happening.  And that's why she

16   considered all of this in her report in December.

17            And then Ms. Light wanted a safe return.  She

18   was out on FMLA during that time.  Her doctor had an order

19   that Ms. Gethings wouldn't be her supervisor.  She was

20   looking for reassurances.  And then the school district

21   did a 180 after a meeting in the middle of January and

22   said, you know what?  You have to come back next week or

23   it's insubordination.

24            And I just want to touch -- I'm going to

25   pivot --

1          THE COURT:  So the constellation is at least

2     time limited from November 2020 to August of 2021?

3          MR. INTERLANDI:  I would say I misspoke there

4     slightly.  In terms of what Attorney Goldberg was

5     reviewing and considering in her investigation, it's that

6     piece of it.  And then there's a connector which is the

7     report and then the finding and trying to get back to

8     school in a safe work environment.  And the school saying,

9     you know what?  We're not going to allow you to take paid

10    time off or use sick days here.  You've got to come back

11    and come back in a week.

12          So I would -- today here in court, I'm saying it

13    is from November 2020 to January of 2022.  And that is

14    supported in the complaint.  Defense counsel has not filed

15    any Rule 12 motions, not a motion for more particular

16    statement or not a 12(b)(6) motion.  Our argument is that

17    is waived.  We cited a case.

18          There was also the case that defense counsel

19    cites, the *Weinstein* case -- I'm sorry, was it the

20    *Weissman* case?  It is recognized that the use of a motion

21    for summary judgment instead of a motion to strike may be

22    unfair to the nonmoving party because the granting of the

23    defendant's motion for summary judgment puts the plaintiff

24    out of court.  And then there's a standard to establish

25    its right to judgment based upon the insufficiency of the

1    plaintiff's complaint or any count thereof, defendants

2    bear the burden of proving that there is no genuine issue

3    of material fact that the plaintiff has insufficient

4    evidence to cure the defects.  And that's not what has

5    been argued in the defendants' paperwork, the motion for

6    summary judgment paperwork.

7            I will get to the false light part, Your Honor.

8            In terms of the false light, we have that email,

9    that school-wide email.  Okay.  It meets that second prong

10   where it goes to so many people that it could be spread to

11   the public at large, right?  It wasn't for sure like

12   someone got on a microphone and blasted it out to millions

13   of people, but it was an email to the entire school

14   community about what had just happened.  Some teachers

15   brought it up to Ms. Gethings, and she blasted this email

16   out.

17           Then we have the false accusations in terms of

18   Teacher X.  And it's connected.  Hey, this is what you

19   did.  Everyone is telling us you did this.

20           THE COURT:  That email, does it identify your

21   client by name?

22           MR. INTERLANDI:  It does not identify.  I'm not

23   aware that defense counsel has cited any case law that

24   says it specifically has to identify her by name.  I'm not

25   aware of that.  I know in the context of defamation claims

1    that's not necessarily the case as long as the receiver of

2    the false information can understand who the person is.

3    And I believe there's case law there.  I did not cite that

4    in my brief.  I can, if Your Honor would like.  And so

5    that goes to the publication and identification of

6    Ms. Light in that email.

7          And then that complaint, that retaliatory

8    complaint that was filed a month and a half or so later

9    where additional information is provided.

10          Those three incidents kind of support -- that do

11    support, in my opinion, the false light and there are

12    genuine issues of material fact here that should be

13    presented to a jury.  I think summary judgment on false

14    light claim is inappropriate.

15          I also think it's inappropriate for defamation.

16    Clearly, they're in a meeting.  There's more than just

17    Ms. Gethings and Ms. Light in that meeting.  We have

18    Ms. Morrison and we have Ms. Clarino.  And Ms. Gethings is

19    saying to the people there, "Everyone's telling us you,

20    Jessica, you're the one."  And it's not true.  And so we

21    need a jury to decide that.

22          THE COURT:  So any time within the context of a

23    work environment organization, be it a company or a

24    school, somebody says something that turns out to be

25    false, that's enough for defamation, notwithstanding the

```
 1    intracorporate --

 2              MR. INTERLANDI:  I acknowledge the

 3    intracorporate privilege, Your Honor.  We briefed that in

 4    the objection.  That has a certain application, right, in

 5    the context of performance reviews and discussing someone

 6    as an employee.  We want to give administrators the

 7    ability to speak freely such like the privilege we have

 8    for people speaking in court so they're not afraid to have

 9    a defamation claim.  This is different.  This is way

10    different, in my opinion.

11              Again, the timeline, the facts, it's not just,

12    hey, let's talk about this.  These are 90-minute meetings,

13    at least one, where there's back-and-forth.  And Ms. Light

14    trying to get a better understanding of who said this.

15    "Everyone.  We're not going to tell you who.  Because

16    they're afraid you're going to retaliate."  How can a

17    third grade teacher retaliate against people that said she

18    was the source?

19              THE COURT:  Attorney Murphy has raised concerns

20    about the specificity of statements at issue.  Have you

21    been specific enough?

22              MR. INTERLANDI:  Yes, Your Honor.  My position

23    is yes.  They've waived the ability to do that at this

24    stage also.  The discovery responses, we objected to

25    those.  We answered subject to the objection.  I never
```

1    received any emails or letters saying you need to withdraw

2    those objections or revise the answer.  Defense counsel

3    had the opportunity to depose Ms. Light.  He did.  And so

4    that argument's waived.  But if Your Honor disagrees with

5    that, then my position is we've pled it.  Yes, we've

6    incorporated those allegations into those claims.  Someone

7    reading that can see, this paragraph says the statement

8    and that statement was false.  And so our position would

9    be those are clearly identified as the statements that

10   were made to whom, when, who else was there, and that they

11   were false.

12          Let me see if I have a couple of other points I

13   wanted to make, Your Honor, if I may.

14          Attorney Murphy said Ms. Gethings was never

15   disciplined.  In a limited context, that's true.  She was

16   not disciplined, I believe the statements were made in the

17   summary judgment papers, based on anything that Ms. Light

18   said at the Board of Ed meetings.  But based on the

19   Attorney Goldberg report, my understanding is she was

20   disciplined.  So I would say that's not -- that's limited

21   to the three Board of Ed meetings in early 2021.

22          THE COURT:  Can you repeat that?  I'm not sure

23   it sunk in with me.

24          MR. MURPHY:  So defense counsel argued earlier

25   or presented to the Court that Ms. Gethings was never

1  disciplined.  And I think the qualifier should have been

2  "for anything that Ms. Light said at the Board of Ed

3  meetings" because that's what's been present to the Court

4  in the record.  But in the general sense, that's not true.

5        I would say the contextual, it's a heavily

6  fact-specific contextual determination as outlined in the

7  *Hoyt* case, the Second Circuit.  And that's kind of what

8  we're discussing here today.  I think it illustrates the

9  point that this is not appropriate to be disposed of at

10  the summary judgment level.

11        We do discuss the *Matthews* case by Judge Peck.

12  Yes, we do provide a lengthy quote.  But I thought it was

13  important to provide that.  The *Matthews* case does get

14  into the *Garcetti* versus *Pickering*, *Connick* test, and the

15  *Pickering* more of a balancing and broader test.  And I

16  would leave it at that.  So it's touched upon in terms of

17  the -- what we have presented to the Court in regards to

18  the *Matthews* case decided by Judge Peck.

19        And then defense counsel noted a case by Judge

20  Noble earlier.  And that would be the *Weinstein* case where

21  he defined discipline as "any adverse material consequence

22  relative to a right, term, condition, or benefit of

23  employment that existed at the time of the protected

24  speech."  That was in the context of a motion to strike.

25  And then on page 4 he said there's no appellate authority

1    that establishes the linguistic contours of the words

2    discipline or discharge.  And then he says we have to

3    start with *Bambalicki*, which I don't disagree.  And then

4    he cites to *Matthews* and he says which retreated slightly.

5    So Judge Peck retreated slightly from the absolute

6    requirement that discipline requires an administrative --

7    I'm sorry, an adverse affirmative act.  Requires an

8    affirmative act by observations that an admission cannot

9    constitute discipline unless the employer had a duty to

10   act for an employee.  In that case, Judge Peck said there

11   are instances where a failure to act where the employer

12   has a duty to protect an employee, that could constitute

13   an affirmative act, an omission where the duty exists.

14          So for those reasons, Your Honor, on all counts

15   I'd ask that the Court deny the motion for summary

16   judgment and give Ms. Light the opportunity to present her

17   story, the facts of the case to a jury.

18          THE COURT:  Thank you, sir.

19          Mr. Murphy, anything in response?  Since it's

20   your motion, you get last word.

21          MR. MURPHY:  I appreciate that, Your Honor.  And

22   I will try to be fairly brief.  Famous last words, though,

23   right?

24          I think I have four points, Your Honor.

25          The first one has to deal with you asked Counsel

1    whether that Bercham & Moses report should be given any

2    weight.  He says absolutely, it should.  I think maybe

3    it's not so much a question of how much weight, preclusive

4    or otherwise, the Court should give it, but how they chose

5    to frame their pleadings.  And by framing the complaint

6    the way they did, I believe it supports our argument that

7    they're relying on these four acts that Bercham & Moses

8    found were retaliatory, and that's how they're framing the

9    complaint, the critical mass that we talked about earlier.

10   So I think what I heard from Counsel supports our

11   argument, Your Honor, as to how the Court should measure

12   that.

13           Similarly, as a follow-up, you asked about the

14   timeline.  And Counsel brought up something that --

15           THE COURT:  So hold on a second.  I want to

16   understand that first argument.

17           You're basically saying the complaint limits

18   them to just the acts that were found by Bercham & Moses

19   to be retaliatory?

20           MR. MURPHY:  I think that's the way they've pled

21   it, Your Honor.  They even attached the report to the

22   complaint itself, right?  And because they believe that

23   Bercham & Moses found these acts to be retaliatory.

24   That's, as we've outlined in our brief, how they framed

25   out the complaint.  That's the fairest way to read it, and

1    I think that's exactly what I heard from opposing counsel

2    is that those four incidents are the incidents that

3    they're relying on for that critical mass.

4             THE COURT:  So the Bercham & Moses report may be

5    helpful to identify, in your view, what are the critical

6    mass incidents that are relevant --

7             MR. MURPHY:  Correct, Your Honor.

8             THE COURT:  -- that are relied on my plaintiff.

9    But is your argument otherwise that there's independent

10   weight that could be given at summary judgment to the

11   Bercham & Moses either way, whether it favors you or not?

12   Because usually when I see these kind of situations, first

13   thing I do at trial, one of the early things at trial is I

14   preclude any reference to the findings of third parties

15   about what happened in a case.  So I just hope the parties

16   are aware of that and they don't think, well, we're going

17   to be able to tell the jury all the findings in the

18   Bercham & Moses report that help me in some way.  That's

19   premature.  I don't have to address that yet.  I'll just

20   say my usual approach is ordinarily to be favorable to

21   precluding third-party opinion evidence.

22             MR. MURPHY:  I think the way we framed it in our

23   brief and hopefully it came through to Your Honor is we

24   understand them to be arguing that there's these four

25   incidents that were found to be retaliatory and that's

1    what we're relying on for critical mass.

2         Then our next argument that I know we said

3    explicitly is Bercham & Moses used the wrong standard.

4    This Court needs to make its own decision on those four as

5    to whether they constitute a critical mass.  And they

6    don't, for all the reasons we've already discussed.

7         Second, Counsel tried to expand that timeline

8    for critical mass going into January about Ms. Light's

9    return to work.  As the papers show, that's a conversation

10   between Ms. Light and Human Resources and the Board of Ed.

11   The first count is against Principal Gethings, not

12   Ms. Bonner, not anyone in HR.  Those January

13   return-to-work things can't possibly be a basis of the

14   critical mass because Principal Gethings wasn't involved

15   with those decisions.

16         THE COURT:  The first -- sorry if I am

17   misunderstanding this.  The -- oh, I see.  One of the

18   speech counts, Count One, I'm just looking at the

19   complaint in front of me, it appears to be against the

20   Board.  Would you agree?

21         MR. MURPHY:  I'm sorry, I -- that's right.  We

22   briefed them out of order.  In my mind, I have the

23   First Amendment as Count One because we briefed that

24   first.  I apologize, Your Honor.

25         THE COURT:  So it seems, though, that the

1    complaint does go right up and alleges facts -- and I'm

2    looking at paragraph 73.  It seems like it does allege

3    specific facts that occurred in January of 2022.  And I'm

4    not sure why the complaint didn't give fair notice of its

5    reliance on what happened into January 2022 even though it

6    wasn't Principal Gethings that was acting at that point in

7    time.  It seems like it could be chargeable to the Board

8    more generally.

9              MR. MURPHY:  In Count One.  My point with

10   Ms. Gethings is to the extent Ms. Light takes issue with

11   conversations she had with Human Resources and Ms. Bonner,

12   that couldn't relate to Ms. Gethings.  She wasn't

13   involved.  She wasn't the decision maker.  She didn't

14   retaliate in that manner.

15             Second, to the extent there's a dispute between

16   Ms. Light and Human Resources about her reentry to the

17   workplace following a medical leave, you know, that's not

18   discipline.  I don't think that meets the standard of

19   discipline for the reasons we've discussed before.

20             Third, along those same lines of the timeline,

21   there was a reference to a November 2020 meeting between

22   Principal Gethings and Ms. Light about some comments she

23   made at some parent meeting.  And that's alleged in the

24   complaint, but it's not alleged as an incident of

25   protected speech.  As we noted in paragraph 10, there's

1   only three things: the car caravan, the Board of Ed

2   meetings, and the Facebook post.  I don't think they can

3   bring those November conversations in as an incident of

4   retaliation much less her comments in any November meeting

5   as an incident of speech on a matter of public concern.

6         The false light and defamation I'll just rely on

7   our arguments before, although I still don't hear Counsel

8   and Ms. Light identifying what specific statements they

9   believe are defamatory.  I don't know what the hesitation

10  is to identify the particular retaliatory acts.  I don't

11  know what the hesitation is to identify the particular

12  defamatory statements.  Under the law, it's required for

13  defamation.  Same thing with false light, specificity is

14  required.  So we'd ask the Court to grant summary judgment

15  on that.

16         And then, finally, the discipline, Your Honor.

17  Ms. Gethings was never disciplined for anything to do with

18  Ms. Light and the Board of Ed.  I spoke directly on that.

19  I believe there's nothing about Ms. Gethings' discipline

20  in the record before the Court.  Ms. Gethings is a

21  long-tenured administrator of the New Haven public

22  schools, has a tremendous record.  This case is incorrect

23  in a lot of the things it says about her.  She was never

24  disciplined for anything to do with those Board of Ed

25  meetings or the Facebook posts or anything of that nature.

 1    And I don't believe there's anything in the record about

 2    that as well.  I just want to make that clear to

 3    Your Honor.

 4              With that, I appreciate your time.

 5              THE COURT:  Thank you.

 6              I appreciate the arguments from both sides.

 7    There's a lot going factually in this case for the Court

 8    to evaluate.  Today I'm not going to rule one way or the

 9    other on the motion for summary judgment.  I will try to

10    rule as quickly as I can on it.

11              I gather that Ms. Light is still teaching?

12              MR. INTERLANDI:  Yes, Your Honor, at a different

13    school.

14              THE COURT:  At a different school.

15              And I often kind of recommend to parties to

16    consider, is there some way to come together possibly in a

17    case?  We have a mechanism for that here in the federal

18    system which involves settlement discussions mediated by a

19    magistrate judge.  And I've found that they can oftentimes

20    resolve difficult disputes much more efficaciously than

21    the drawn out back-and-forth.  And I know you've been

22    litigating for a while in the case.  No one will force

23    either party to settle the case.  But I've found that

24    magistrate judges in this district are particularly

25    effective at exploring the possibilities that there could

 1    be a resolution there.  Most often, I'll tell you, I make

 2    referrals for settlement conferences in cases where an

 3    employee has alleged wrongdoing by the employer and the

 4    employee still works under the auspices not of one

 5    defendant but the New Haven Board of Education here.  You

 6    know, that can be a lot better for everybody concerned if

 7    it's possible to have a resolution.  It may not be.  So I

 8    think this is a long way of me telling you I think I'm

 9    going to enter a referral for settlement conference unless

10    you believe it could not be productive.

11         MR. INTERLANDI:  Your Honor, I don't think it

12    would be productive because I've already inquired from

13    defense counsel --

14         THE COURT:  Don't go into contents of --

15         MR. INTERLANDI:  -- and they weren't interested.

16    So I can't imagine that they would go through the effort

17    of filing the papers and then -- but I'll leave that to

18    defense counsel.

19         MR. MURPHY:  That puts me in a terrible spot,

20    Your Honor.

21         I understand the Court's concern.  And if the

22    Court decides that's the best practice in this particular

23    case --

24         THE COURT:  I think what I'm going to do is I'm

25    going to make the referral because it's going to take me a

1    while to rule on this motion.  Ordinarily, magistrate

2    judges conduct settlement conferences oftentimes by Zoom.

3    And they see is there something possible.  There may not

4    be.  I get it.  No problem if there's not.  The magistrate

5    judge puts a notice on the docket saying conducted a

6    preliminary conversation with counsel, settlement is not

7    possible at this time.  It could be you decide no way, no

8    how until we get a ruling from Judge Meyer on the summary

9    judgment motion.  That's your right to do that.  So I

10   don't want to undercut that.  But I do want to make clear

11   to you I think the conversation should start.  And I think

12   there are multiple reasons why in this particular kind of

13   case where it would be to the benefit of both parties to

14   give very serious consideration to whether a settlement is

15   possible.  It can be helpful to have a magistrate judge

16   involved with that process.

17          So anything else you want to raise at this

18   point?

19          MR. INTERLANDI:  No, Your Honor.

20          THE COURT:  You won't forget, Mr. Interlandi, to

21   share again this exhibit.  I'm actually going to pass it

22   to you.  You handed it up, but you didn't show me specific

23   parts of it.  So I'm going to give it right back to you,

24   because I'm not going to consider it right now.

25          MR. INTERLANDI:  That was Exhibit 7, Your Honor.

```
 1              THE COURT:  Hopefully, you can iron out with the
 2   sides whether there's any objection to admission of
 3   Exhibit 7.  I get it, if there was an electronic snafu
 4   that something didn't upload properly, that's usually a
 5   reason to allow the record to be amended.  But if you're
 6   trying to get something in extra, that could be a reason
 7   why a Court wouldn't do that.  I ask counsel consult about
 8   that.
 9              MR. INTERLANDI:  Yes, Your Honor.
10              THE COURT:  Okay.  Anything else you want to
11   seek leave to do or anything?
12              Thank you all for coming in, especially the
13   parties as well.  We'll stand in recess.
14                   (Proceedings adjourned at 4:21 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

1

2

3                    C E R T I F I C A T E

4

5  RE: JESSICA LIGHT v. NEW HAVEN BOARD OF EDUCATION, ET AL.
                    No. 3:22CV425(JAM)

6

7          I, Diana Huntington, RDR, CRR, Official Court

8  Reporter for the United States District Court for the

9  District of Connecticut, do hereby certify that the

10  foregoing pages 1 through 59 are a true and accurate

11  transcription of my shorthand notes taken in the

12  aforementioned matter to the best of my skill and ability.

13

14

15

16

17                    _____/s/_____

18                    DIANA HUNTINGTON, RDR, CRR
                        Official Court Reporter
19                  United States District Court
                    141 Church Street, Room 147
20                  New Haven, Connecticut 06510
                        (860) 463-3180
21

22

23

24

25