# Plaintiff's Exhibit 2

Exhibit 1 - Tutorial 2

5:36



‹    New Haven Public School Adv...

**New Haven Public School Advocates**

VOCAT  Mar 6, 2021 · 🌐

NHPS Covid reports to the State since Jan 19 reopening

👤 1                     8 comments  5 shares

👍 Like          💬 Comment          ↗ Share

COVID-19_Cases_in_CT_Schools__By_School_-3

| School name | School total | Report period |
|---|---|---|
| Augusta Lewis Troup School | <6 | 02/25/2021 - 03/03/2021 |
| Barnard Environmental Magnet School | <6 | 02/25/2021 - 03/03/2021 |
| Benjamin Jepson Magnet School | <6 | 02/25/2021 - 03/03/2021 |
| Brennan Rogers School | <6 | 02/25/2021 - 03/03/2021 |
| Conte/West Hills Magnet School | <6 | 02/25/2021 - 03/03/2021 |
| Davis Academy for Arts & Design Innovation | <6 | 02/25/2021 - 03/03/2021 |
| East Rock Community Magnet School | <6 | 02/25/2021 - 03/03/2021 |
| Edgewood School | <6 | 02/25/2021 - 03/03/2021 |
| Hill Central Music Academy | <6 | 02/25/2021 - 03/03/2021 |
| John C. Daniels | <6 | 02/25/2021 - 03/03/2021 |
| John S. Martinez Sea and Sky STEM School | <6 | 02/25/2021 - 03/03/2021 |
| King/Robinson Magnet School | <6 | 02/25/2021 - 03/03/2021 |
| Mauro-Sheridan Magnet School | <6 | 02/25/2021 - 03/03/2021 |
| Nathan Hale School | <6 | 02/25/2021 - 03/03/2021 |
| Roberto Clemente Leadership Academy for Global Awareness | <6 | 02/25/2021 - 03/03/2021 |
| Ross/Woodward School | <6 | 02/25/2021 - 03/03/2021 |
| Celentano BioTech, Health and Medical Magnet School | <6 | 02/18/2021 - 02/24/2021 |
| East Rock Community Magnet School | <6 | 02/18/2021 - 02/24/2021 |
| James Hillhouse High School | <6 | 02/18/2021 - 02/24/2021 |
| John C. Daniels | <6 | 02/18/2021 - 02/24/2021 |
| Lincoln Bassett Integrated PK | <6 | 02/18/2021 - 02/24/2021 |
| Ross/Woodward School | <6 | 02/18/2021 - 02/24/2021 |
| Beecher School | <6 | 02/11/2021 - 02/17/2021 |
| Betsy Ross Arts Magnet School | <6 | 02/11/2021 - 02/17/2021 |
| Bishop Woods Architecture and Design Magnet School | <6 | 02/11/2021 - 02/17/2021 |
| Brennan Rogers School | <6 | 02/11/2021 - 02/17/2021 |
| Clinton Avenue School | <6 | 02/11/2021 - 02/17/2021 |
| Conte/West Hills Magnet School | <6 | 02/11/2021 - 02/17/2021 |
| Dr. Reginald Mayo Early Learning Center | <6 | 02/11/2021 - 02/17/2021 |
| Engineering - Science University Magnet School | <6 | 02/11/2021 - 02/17/2021 |
| Fair Haven School | <6 | 02/11/2021 - 02/17/2021 |
| Roberto Clemente Leadership Academy for Global Awareness | <6 | 02/11/2021 - 02/17/2021 |
| Ross/Woodward School | <6 | 02/11/2021 - 02/17/2021 |
| Truman School | <6 | 02/11/2021 - 02/17/2021 |
| Wilbur Cross High School | <6 | 02/11/2021 - 02/17/2021 |
| Worthington Hooker School | <6 | 02/11/2021 - 02/17/2021 |
| Augusta Lewis Troup School | <6 | 02/04/2021 - 02/10/2021 |
| Barack H. Obama Magnet University School | <6 | 02/04/2021 - 02/10/2021 |
| Benjamin Jepson Magnet School | <6 | 02/04/2021 - 02/10/2021 |
| Bishop Woods Architecture and Design Magnet School | <6 | 02/04/2021 - 02/10/2021 |
| Celentano BioTech, Health and Medical Magnet School | <6 | 02/04/2021 - 02/10/2021 |
| Conte/West Hills Magnet School | <6 | 02/04/2021 - 02/10/2021 |
| Dr. Reginald Mayo Early Learning Center | <6 | 02/04/2021 - 02/10/2021 |
| East Rock Community Magnet School | <6 | 02/04/2021 - 02/10/2021 |
| Fair Haven School | <6 | 02/04/2021 - 02/10/2021 |
| Mauro-Sheridan Magnet School | <6 | 02/04/2021 - 02/10/2021 |
| Metropolitan Business Academy | <6 | 02/04/2021 - 02/10/2021 |
| Roberto Clemente Leadership Academy for Global Awareness | <6 | 02/04/2021 - 02/10/2021 |

💬 Message New Haven Public School Advocates

LIGHT003544

5:36



‹     New Haven Public School Adv...

Roberto Clemente Leadership Academy for Global Awareness <6        02/04/2021 - 02/10/2021

Page 1

👍 Like          💬 Comment          ↗ Share

COVID-19_Cases_in_CT_Schools__By_School_-3

| School | Cases | Dates |
|---|---|---|
| Ross/Woodward School | <6 | 02/04/2021 - 02/10/2021 |
| Wilbur Cross High School | <6 | 02/04/2021 - 02/10/2021 |
| Augusta Lewis Troup School | <6 | 01/28/2021 - 02/03/2021 |
| Barack H. Obama Magnet University School | <6 | 01/28/2021 - 02/03/2021 |
| Beecher School | <6 | 01/28/2021 - 02/03/2021 |
| Benjamin Jepson Magnet School | <6 | 01/28/2021 - 02/03/2021 |
| Bishop Woods Architecture and Design Magnet School | <6 | 01/28/2021 - 02/03/2021 |
| Clinton Avenue School | <6 | 01/28/2021 - 02/03/2021 |
| Columbus Family Academy | <6 | 01/28/2021 - 02/03/2021 |
| Conte/West Hills Magnet School | <8 | 01/28/2021 - 02/03/2021 |
| Dr. Reginald Mayo Early Learning Center | <6 | 01/28/2021 - 02/03/2021 |
| Hill Central Music Academy | <6 | 01/28/2021 - 02/03/2021 |
| Hill Regional Career High School | <6 | 01/28/2021 - 02/03/2021 |
| James Hillhouse High School | <6 | 01/28/2021 - 02/03/2021 |
| John C. Daniels | <6 | 01/28/2021 - 02/03/2021 |
| John S. Martinez Sea and Sky STEM School | <6 | 01/28/2021 - 02/03/2021 |
| King/Robinson Magnet School | <6 | 01/28/2021 - 02/03/2021 |
| Lincoln Bassett Integrated PK | <6 | 01/28/2021 - 02/03/2021 |
| Mauro-Sheridan Magnet School | <6 | 01/28/2021 - 02/03/2021 |
| Metropolitan Business Academy | <6 | 01/28/2021 - 02/03/2021 |
| Nathan Hale School | <6 | 01/28/2021 - 02/03/2021 |
| New Haven Academy | <6 | 01/28/2021 - 02/03/2021 |
| Ross/Woodward School | <6 | 01/28/2021 - 02/03/2021 |
| Sound School | <6 | 01/28/2021 - 02/03/2021 |
| Wexler/Grant Community School | <6 | 01/28/2021 - 02/03/2021 |
| Barnard Environmental Magnet School | <6 | 01/21/2021 - 01/27/2021 |
| Beecher School | <6 | 01/21/2021 - 01/27/2021 |
| Benjamin Jepson Magnet School | <6 | 01/21/2021 - 01/27/2021 |
| Bishop Woods Architecture and Design Magnet School | <6 | 01/21/2021 - 01/27/2021 |
| Columbus Family Academy | <6 | 01/21/2021 - 01/27/2021 |
| Conte/West Hills Magnet School | <6 | 01/21/2021 - 01/27/2021 |
| Edgewood School | <6 | 01/21/2021 - 01/27/2021 |
| King/Robinson Magnet School | <6 | 01/21/2021 - 01/27/2021 |
| Lincoln Bassett Integrated PK | <6 | 01/21/2021 - 01/27/2021 |
| Mauro-Sheridan Magnet School | <6 | 01/21/2021 - 01/27/2021 |
| Nathan Hale School | <6 | 01/21/2021 - 01/27/2021 |
| Wexler/Grant Community School | <6 | 01/21/2021 - 01/27/2021 |

Page 2

👍 Like          💬 Comment          ↗ Share

 Message New Haven Public School Advocates

LIGHT003545

5:42

**New Haven Public School Advocates**

Mar 6, 2021 · 🌐

| | | |
|---|---|---|
| ds Architecture and Design Magnet School | <6 | 02/04/2021 - 02/10/202 |
| ioTech, Health and Medical Magnet School | <6 | 02/04/2021 - 02/10/202 |
| Hills Magnet School | <6 | 02/04/2021 - 02/10/202 |
| J Mayo Early Learning Center | <6 | 02/04/2021 - 02/10/202 |
| Community Magnet School | <6 | 02/04/2021 - 02/10/202 |
| School | <6 | 02/04/2021 - 02/10/202 |
| Iden Magnet School | <6 | 02/04/2021 - 02/10/202 |
| s Business Academy | <6 | 02/04/2021 - 02/10/202 |
| rmenta Leadership Academy for Global Awareness | <6 | 02/04/2021 - 02/10/202 |

Page 1             Page 2

👍 Like     💬 Comment     ↗ Share

😮 1

**5 Shares**

**Most relevant** ⌄

**Jessica Light**
So it means greater than 6 staff and students at each of these schools?

2y · Like · Reply

✎ Author
**New Haven Public School Advocates**
Jessica Light this is just students, not including staff.

2y · Like · Reply     1 👍

**Janet Palombo**
Jessica Light looks like less than 6.

2y · Like · Reply     1 👍

📷   Write a comment...   🖼 GIF 🙂



Home    Friends    Watch    Marketplace    Notifications    Menu

LIGHT003546

# Plaintiff's Exhibit 3

5:35



‹    Melody's post    •••



**Melody Gallagher** shared a **post.**

Admin Mar 9, 2021 · 🖼

So apparently these are the schools that have had positive student covid cases in NHPS since 1/19, as reported to the state and on the state website.

I believe this list is to be read that if a school is listed as <6 they had positive cases that week and that may mean 1,2,3,4, or 5 positive cases. (If I am reading it wrong please let me know.)

It seems we may be missing some letters here on this group page.
Also, I have heard of some schools with cases that I don't see listed on this list nor are there letters posted here.
Does anyone have any positive covid case letters that aren't posted here?
Or does anyone know of any cases we are missing on the list and in albums of letters?

Thank you!



**New Haven Public School Advocates**

🔲 Mar 6, 2021 · 🌐

NHPS Covid reports to the State since Jan 19 reopening



 

Write a comment...

                    
Home      Friends      Watch      Marketplace   Notifications   Menu

LIGHT003547

5:37

**Melody's post**

👍 Like          💬 Comment          ➤ Send

👍 1

**All comments** ⌄

**Jessica Light**
I don't think letters were sent

2y    Like    Reply

**Melody Gallagher**
Jessica Light for your school?

2y    Like    Reply

**Jessica Light**
Hooker never sent a letter

2y    Like    Reply                    1 👀

**Melody Gallagher**
Jessica Light hmmm...
interesting- I thought that was
part of their protocol to notify
families and such.
How many cases? And what
week? Any quarantined?

2y    Like    Reply                    1 👍

Write a reply...

Write a comment...                     GIF ☺

                                
Home       Friends      Watch    Marketplace  Notifications   Menu

**LIGHT003548**

5:37



**‹**    Melody's post    **•••**

 **Jessica Light**
We are listed at week of 2/11, I
don't know the other answers for
sure

2y    Like    Reply

**Melody Gallagher**
Jessica Light thank you!

2y    Like    Reply

 Write a reply...

 Write a reply...

**Michele Norwood**
Believe there is a case at our school.
Fair Haven.  Students, teacher and
para are out and quarantined but no
notification from admin.  No letter from
Dr. Tracey.  Only info we are getting is
through the rumor mill.

2y    Like    Reply

**Melody Gallagher**
Michele Norwood Do you know
how many are on quarantine? And
is this from last week or a different
week?

Write a comment...      

 Home     Friends     Watch     Marketplace     Notifications     Menu

LIGHT003549

**5:37**

< **Melody's post** •••

**Michele Norwood**
Melody Gallagher I don't know how many. From last week.

2y   Like   Reply

**Melody Gallagher**
Michele Norwood thank you!

2y   Like   Reply     1 

**Michele Norwood**
Melody Gallagher you're welcome 

2y   Like   Reply

Write a reply...

**Melody Gallagher**
Michele Norwood also, by chance, did you all receive 2 other letters? Fair Haven is listed on the state list twice but there are no letters here.

2y   Like   Reply

**View 5 replies...**

Write a reply...

 **Kenneth Caldwell**
Not all cases are or have to be

  Write a comment... 

     
Home    Friends    Watch    Marketplace    Notifications    Menu

LIGHT003550

5:37



<        **Melody's post**        •••

 **Kenneth Caldwell**
Not all cases are or have to be reported. I know that some kids tested positive on say a snow day or the weekend so they didn't get counted.

2y    Like    Reply

 **Jessica Light**
Kenneth Caldwell right I think the rules around what is reported and not need to be clarified because different schools understand the regulations differently

2y    Like    Reply

 **Kenneth Caldwell**
Yeah. Also, if the kid calls out and then tests positive it doesn't count. There are lots of ways to work around counting a case it seems.

2y    Like    Reply

 **Melody Gallagher**
Kenneth Caldwell interesting to know thank you! Does the contact tracing still take into account the 2 days prior to positive test results in those cases?

2y   Like   Reply

 Write a comment...      

                    
Home    Friends    Watch    Marketplace    Notifications    Menu

LIGHT003551

5:38

← **Melody's post** ⋯

**Melody Gallagher**
Kenneth Caldwell interesting to
know thank you! Does the contact
tracing still take into account the 2
days prior to positive test results in
those cases?

2y  Like  Reply

**Melody Gallagher**
Kenneth Caldwell and do not all
cases have to be reported to the
state or to the school community
in the form of a letter, do you
know?

2y  Like  Reply

Write a reply...

**Melody Gallagher**
My school is listed in 4 reporting
weeks- so at minimum 4 cases.
However, we have had only 2 letters
with a total of 5 cases. Did they spread
the 5 cases across 4 reporting weeks?
Are there cases without letters? Maybe
2 of those weeks were remote learner
cases? It's hard to make sense of the
state vs dashboard vs letter data.

2y  Like  Reply                    1 

Write a comment...             

               
Home   Friends   Watch   Marketplace   Notifications   Menu

LIGHT003552

# Plaintiff's Exhibit 15

Exhibit 1/Tab 11



# INVESTIGATION REPORT

# FOR NEW HAVEN PUBLIC SCHOOLS

*RE: Complaint by Jessica Light against Margaret-Mary Gethings and Jenny Clarino*

By:  Rebecca Goldberg, Esq.

Berchem Moses PC

DEF000488

{01563140.DOCX Ver. 1}

## I.     Introduction

On or about April 30, 2021, Jessica Light, then a third-grade teacher at Worthington Hooker School filed a complaint alleging retaliation by Principal Margaret-Mary Gethings and Assistant Principal Jenny Clarino. She states that she engaged in various forms of protected speech related to covid, for which Ms. Gethings and Ms. Clarino took various retaliatory actions culminating in Ms. Light being reassigned to teach first grade. Ms. Light was formally notified of her teaching assignment for the upcoming school year on April 27, 2021.

Ms. Gethings and Ms. Clarino received written notification of the complaint on May 24, 2021. A cross complaint by Ms. Gethings and Ms. Clarino was filed thereafter. In addition, teacher Hilarie Alden filed a complaint regarding Ms. Light in May 2021. These complaints were investigated by Paul Testa and Chris Henderson, respectively, of Berchem Moses PC.

During the pendency of this investigation, various other allegations arose based on new events. These were included within the present investigation.

This investigation included a review of documents and recordings submitted by the witnesses and Human Resources, as well as interviews with:

- Jessica Light
- Judith Cavanaugh
- Douglas Jones
- Hilarie Alden
- Paul Salem
- Phyllis Maffuid
- Deborah DiPietro
- Laura Tortora
- Ann Raymond
- Timothy Shortt
- Katherine Paine
- Jenny Clarino
- Margaret-Mary Gethings

## II.    Claimed Protected Activity

### A. Specific Activities

Ms. Light spoke to the Board of Education on multiple occasions regarding her opinions as to how the District should address matters related to covid, from July 21, 2020 forward. She also spoke through Facebook comments, car caravans, talking with newspaper reporters, and petitions. Ms. Gethings and Ms. Clarino were aware of Ms. Light's activities in general and were specifically aware of her Board meeting comments and a particular Facebook post, discussed below. She typically identified herself as a teacher and sometimes identified herself as a parent and/or resident as well. In her comments to the Board in January 2021, she indicated her disagreement with the upcoming return to in-person instruction when the vaccine would be available so soon. In that meeting and others, she asked specific questions about how to maintain

2 {01563140.DOCX
Ver. 1}

safety under the circumstances. On February 22, 2021, she asked for a unified policy, and said she wanted to work together. On March 22, 2021, she asked the Board as "my employer" about consistency of rules and how to enforce safety protocols when students could now be closer than 6 feet apart, while still being expected to eat in the classroom. Her comments reflected fear that she or others would contract covid and die and a belief that the District was gambling with teachers' lives. Others conveyed similar concerns, although nobody from Worthington-Hooker School did so to the same extent as Ms. Light. She sought a unified policy from the Board to address covid concerns, as she believed decisions could not or should not be handled at the school level.

The Facebook post at issue is from March 9, 2021. Another teacher, Melody Gallagher (from another New Haven public school) posted case data for New Haven schools from a state website. Although the source is not shown, it appears to be from https://data.ct.gov/stories/s/COVID-19-in-PK-12-Public-and-Private-Schools/mpdc-p8wg/. The data listed Worthington Hooker as having <6 cases. There has been much discussion as to whether "<6" can include zero, or whether it means at least one. The site linked here includes the note, "If no cases were reported, 0 cases are displayed. If a school reported 1-5 cases, <6 is displayed. If 6 or more cases were reported, the exact number is displayed." Therefore, it appears that Worthington Hooker was reported as having at least one case in the state data. Ms. Light commented on the post, "I don't think letters were sent" and in response to the question, "For your school?" stated, "Hooker never sent a letter." It is true that the school had not sent a notification letter, but Ms. Gethings and Ms. Clarino have explained that the data include cases of individuals who were not necessarily in school at the time, and so this would not trigger a letter. This post (hereinafter "the Facebook post") was the subject of discussion, as described below.

Ms. Light's comments to the Board on March 22, 2021, where she asked questions about how to enforce safety protocols with the distance between students decreasing, must be understood in the context that she had emailed Ms. Gethings questions on this topic that morning. Ms. Gethings had responded that they were awaiting full details from the District and would share as soon as she knew them and that they would only make changes once they have the directions and approval. Following Ms. Light's comments to the Board, Ms. Gethings emailed Ms. Light that evening stating, "I am sorry if you didn't get my prompt response to your morning email, I responded very quickly. I assured you that I would seek an answer regarding snacks and lunch distancing which I have done. I said we need to remain patient for a response and that in the meantime we would be following the existing guidelines, I am sorry you felt the need to bring the same question to the board. We all must be patient as changes are being considered in response to the CDC new guidelines, then reviewed by Dr. Tracey and our health department will advise. All this information will be forthcoming."

B. Alleged Disruption

Ms. Gethings and Ms. Clarino have suggested that Ms. Light's comments caused disruption in the school environment and that parents became concerned because of her comments. While her comments clearly displayed fear, there was no evidence that they actually caused any meaningful disruption in the school environment.

Ms. Clarino stated that several staff members told her that they are not in agreement with

3 {01563140.DOCX

Ver. 1}

Ms. Light's public statements. Ms. Light also asked some teachers to speak up at the Board meetings and some did not want to engage in discussion with her on this topic. For example, when Ms. Light spoke out against school reopening in January 2021, Mr. Shortt felt that school should be in-person so he did not want to speak. Simply disagreeing with Ms. Light's beliefs and/or being asked to speak up at a Board meeting does not amount to disruption. In addition, others felt that Ms. Light was sharing concerns that they also held, but they were unwilling to be as vocal as she was.

In their written response to Ms. Light's complaint, Ms. Gethings and Ms. Clarino included a copy of the Facebook post and an annotation stating that parents became concerned and interpreted the comment as suggesting negligence and thus the comment built a lack of trust amongst the community. In support of this, they attached an email from a parent, Matt Rodenheffer, to a teacher in the school that asked, "Have there been any teachers/staff in the wh [Worthington Hooker] school out with covid in the past few week? Evies (sic) mom is being told now that there are many cases there currently and is now changing her mind about sending evie (sic) back in person." Not only does the email lack any reference to Ms. Light or her public comments or a social media post, the email was from March 2, 2021, a week before the Facebook post that Ms. Gethings and Ms. Clarino claim led to this email. Ms. Gethings stated in her interview that a few people came to her regarding the Facebook post, including another principal and including Ms. Clarino, but that no parents came to her about it.

On May 26, 2021, another parent, Vicki Grubaugh, emailed Ms. Gethings and Ms. Clarino regarding her views on Ms. Light's comments to the Board and how it was unfair for students and parents to be with a teacher who felt strongly that she did not want to be at school. Ms. Grubaugh did not have a child in Ms. Light's class, but was expressing how it must feel for parents who did. She also discussed her views on Ms. Light's approach to certain PTA matters. Ms. Gethings denied asking Ms. Grubaugh to put these comments in an email. Yet, it is unclear why Ms. Grubaugh would send this email more than two months after Ms. Light's last public comments at the Board of Education, within two days of receiving written notice of the investigation by HR into Ms. Light's retaliation complaint, and within one day of Ms. Gethings seeking confirmation from Mr. Jones regarding his recollection of events related to the gardening club in connection with the investigation (see below). While these facts give rise to a suspicion that the email was solicited, even if it was not, a single email would not reflect a level of disturbance, particularly when it came months after the speech at issue and after many of the events cited by Ms. Light as retaliatory had already taken place.

Ms. Clarino also stated that Ms. Grubaugh and a parent named Dominique would mention Ms. Light's comments to her after Board meetings and seek comfort or confirmation that sending their children to school was safe. She stated that Ms. Grubaugh and Dominique commented to her a total of 3-5 times.

Ms. Gethings and Ms. Clarino also cited an example of Wolfgang Fink, the president of the PTA, inquiring about matters such as how many desks fit in classrooms and wanting to visit in person to see certain covid-related measures firsthand. This was also attributed to Ms. Light, as she is friendly with Mr. Fink. They suggested that Mr. Fink's request demonstrated knowledge only available to those in the school, so that Ms. Light would likely have been the source of the information. Yet, they offered no information to show what knowledge Mr. Fink possessed that could only be obtained from an insider. In addition, Mr. Fink, as president of the

4 {01563140.DOCX

Ver. 1}

PTA, was an involved parent who would have knowledge about school operations and would be motivated to ask questions of his own initiative.

In view of the total circumstances, the extent of the disruption attributable to Ms. Light's public comments was two parents making a total of 3-5 comments to building administrators and one of those parents sending an email well after the fact. Other claims of disruption from Ms. Light's comments were not clearly attributable to her, such as the email from Mr. Rodenheffer supposedly occasioned by a Facebook post that had not yet occurred. C. Responses to Claimed Protected Activity

On November 2, 2020, a meeting was held with Ms. Gethings, Ms. Clarino, and Ms. Light. This meeting was recorded by Ms. Light. At a meeting about the hybrid model the prior week, Ms. Light had stated that the school was telling her to seek direction from the District and that the District was telling her to seek direction about the school. Ms. Clarino stated that in response to comments by Ms. Light at the meeting about the hybrid model, Dr. Tracey told them not to tell teachers or parents to refer to the District for answers when she should be providing it at the school level. Ms. Gethings stated it felt that Dr. Tracey was saying they were leaving people uninformed and that it was embarrassing and uncomfortable for them. They would provide the specifics of their school-level plan as soon as they had them, but they did not want parents to ask specific questions about their school to the District. Ms. Gethings conveyed that it was perceived that they did not know what they were doing because a parent/teacher (Ms. Light) brought these questions to the meeting. Ms. Light indicated that she believed they were doing the best they could and being as transparent as possible in the context of a situation with moving parts. The discussion on this topic lasted about 30 minutes on November 2nd and was followed by a lengthy discussion about an issue involving Ms. Light's son, as to which Ms. Gethings and Ms. Clarino were supportive and accepted her concerns. Both Ms. Gethings and Ms. Clarino stated they could not recall this meeting. Based on the recording, Ms. Gethings did not, as claimed by Ms. Light in her complaint, state that not all of Ms. Light's speech was protected by the First Amendment and that she was creating a false narrative about the school. This meeting was an effort by Ms. Gethings and Ms. Clarino to share their perspective and concerns. Ms. Light was not told not to speak publicly, but she was made aware of some of the impact of her statements. This was not retaliation, but an effort to address concerns and minimize disruption.

On March 12, 2021, in apparent response to the Facebook post, Ms. Gethings sent a schoolwide email stating, "It has been brought to our attention from several community members including staff and parents that WHS is being mentioned with inaccurate information which also includes social media. We ask that if you are aware of any negative talk or postings, to please help protect and preserve our school. We hope that people will refrain from making their own inferences and/or misrepresenting our school. We must always keep in mind that we are working together and not against each other."

Ms. Clarino stated that the email was not specifically related to Ms. Light, as there were other teachers who expressed nervousness about returning to school and that they wanted to decrease anxieties held by these teachers. She noted that districtwide, there was a split regarding in-person schooling. Ms. Gethings acknowledged in her interview that the email was a response to the Facebook post and the Teacher X situation, discussed below.

5 {01563140.DOCX

Ver. 1}

████████████████████████

The email does not name Ms. Light and under the circumstances appears to be an effort by school administration to prevent disruption caused by negative inferences being shared in the community. The evidence shows that this email was a means of countering a potentially damaging message (the implication that the school was not meeting its notification responsibilities) rather than retaliating against Ms. Light.

III.    "Teacher X" Situation

A teacher identified in Ms. Light's complaint as "Teacher X" had covid in February/March 2021. Claire Rowe, a friend of Ms. Light's and a member of the PTA executive board, asked a teacher, Kate Paine, if the ████████ had covid. According to Ms. Paine, she and Ms. Rowe were discussing matters relating to the PTA afterschool program, which Ms. Paine directed, and related covid protocols when Ms. Rowe told her that she had heard that the ███ ████████ had covid, and attributed her knowledge to an inside source. Ms. Rowe stated she had heard that the school was not following covid protocols. Ms. Paine felt uncomfortable with the discussion and told Ms. Clarino about it. There was no discussion between Ms. Rowe and Ms. Paine as to who the inside source was. Ms. Light's name was not mentioned. When Ms. Paine discussed the matter with Ms. Clarino, Ms. Clarino asked if Ms. Paine knew who the person was who had shared information with Ms. Rowe, and Ms. Paine did not have that information. Ms. Light was not referenced specifically during that discussion. Ms. Paine stated that the only person she heard this from at the time was Ms. Rowe. Ms. Clarino's description of the events to that point matched Ms. Paine's.

Ms. Clarino then spoke with the ████████, Teacher X, and told her what was being said. Ms. Clarino then called Ms. Rowe to assure her that the District had done its due diligence and reported that the teacher had covid, but there was no need for any quarantine because the teacher had not been in school at the time. Ms. Clarino stated during her interview that Ms. Light's name did not come up on the call and that the purpose was to give her the correct information.

Ms. Clarino stated during her interview that Ms. Light was confirmed to her to be the "inside source," but could not recall who told her that. She struggled to recall this information during her interview, but stated she believed it came from Ms. Paine after the fact. Ms. Clarino stated that it is human nature to believe that the source was someone who had been very vocal, i.e., Ms. Light.

Several days after her interview, Ms. Clarino contacted the investigator stating, "Kate Paine is the individual that confirmed to me that J. Light shared confidential information about a staff member with parents." Asked how she confirmed this information, Ms. Clarino wrote, "I could not locate the information in my notes but am confident that it was confirmed that Ms. Light shared this confidential information. As a result, I had a conversation with Ms. Paine who is a second grade teacher. Ms. Paine's sister is the mother of 3 students who attend WHS. Ms. Paine's sister, Abigail Piane (sic), informed her sister that Ms. Light told parents in the community that [Teacher X] had Covid and administration did not conduct contact tracing or send a letter to families."

Ms. Paine stated during her interview that Ms. Clarino contacted her regarding the matter and stated she wanted to confirm she was sharing accurate information. Ms. Paine did not feel

6 {01563140.DOCX

Ms. Clarino was trying to influence any statement she would give. However, Ms. Paine's version of her sister's involvement differed in a material respect from how Ms. Clarino represented it in her email communication. Specifically, Ms. Paine stated that her sister asked her whether it was true that Ms. Light had shared the information regarding Teacher X, not that the sister informed Ms. Paine that Ms. Light was sharing this information with parents in the community, and that this is what she conveyed to Ms. Clarino.

It should be noted that Ms. Clarino, like all interviewees, was instructed in writing and during the interview by the investigator not to discuss the subject matter while the investigation was pending. It was inappropriate for her to contact Ms. Paine. Moreover, based on Ms. Paine's description of her sister's communications with her and how that information was conveyed to Ms. Clarino, Ms. Clarino erroneously informed this investigator that Ms. Paine's sister told (rather than asked) Ms. Paine that the source of the information was Ms. Light.

Ms. Gethings was not directly involved at this point, but stated that she believed that someone had told Ms. Clarino that parents were informed about Teacher X having covid by Ms. Light.

Teacher X suspected Ms. Light based on her social media activity, but understood she did not have any proof that Ms. Light was the source of the information. Teacher X was very offended that her covid status was being discussed in the community.

Ms. Light stated that a meeting occurred on March 9, 2021, during which she was asked by Ms. Gethings and Ms. Clarino about the Teacher X situation and after denying that she was the source, was pressed to explain the source of the leak. Ms. Light stated the meeting lasted ninety minutes. It is clear that there was discussion about this question with Ms. Light prior to March 31, 2021, but the specifics of timing or the length of the meeting could not be confirmed.

In her midyear TEVAL meeting on March 26, 2021, Ms. Light was told that Teacher X might be planning to file a complaint. Ultimately, Teacher X did not do so because she lacked proof that Ms. Light was the source. Teacher X, Ms. Clarino, and Ms. Gethings all denied that building administrators encouraged Teacher X to file a complaint.

Without any proof or even a claim by anyone with knowledge that Ms. Light was the source of the information, a meeting was held on March 31, 2021 with Ms. Light, Teacher X, union representative Kathleen Morrison (at Teacher X's request), Ms. Gethings, and Ms. Clarino. That meeting was recorded by Ms. Light.

At the meeting, Teacher X asked Ms. Light if it was true that she had gone to parents about why she was out of school, and Ms. Light stated that it was not true. Ms. Light stated that she had been asked about Teacher X's absence and she stated she thought it was a planned absence. When it was clarified that Ms. Rowe had spoken to a staff member who had spoken to Ms. Clarino who went to Teacher X, Ms. Light stated it was a long chain and was starting to feel like a rumor. Ms. Gethings stated it was not a rumor because there was also a social media posting about it. However, the social media posting Ms. Gethings was referencing was the Facebook post, which concerned state data, not any particular person. While the timing of the social media post was close, the content was not about Teacher X in particular and related only to general data.

Ms. Light stated that it was "not truthful" that she had shared the information. Ms. Gethings then stated, "Can I stop you for one minute there? I don't know who you're saying is not truthful but I encourage you to have a little sensitivity to the fact that anyone that said anything is a colleague of yours, and a colleague of [Teacher X's], and a colleague of Jenny's and mine and they may not want to be compromised or feel that they will come under attack by you publicly, have things being said about them if they come forward, so I don't think you should….maybe it's not your truth, but you shouldn't say it's not truthful."

Ms. Light stated it is not the truth that she told Ms. Rowe. Then, Ms. Gethings asked Teacher X whether there was anything she wanted to say about how it made her feel, which appears to show that she did not accept Ms. Light's explanation. (In her interview, Ms. Gethings stated that she did not believe Ms. Light. She stated, "I have no real evidence outside of it was confusing to me that the people that knew were people that she knows socially and as friends and that she seemed very defensive in both meetings.")

Ms. Light stated in the meeting that she did not think it was true that Teacher X had covid until Teacher X said so in an email. Teacher X stated, "I would not have put that in writing to you" since they are not friendly. Ms. Light screen shared showing the email, to which Teacher X responded, "My mistake, I am sorry." Ms. Gethings then stated, "I don't even see it as a mistake. The mistake is how did families know and unfortunately in addition to you not feeling well you had to inherit this experience." Ms. Gethings was apparently unwilling to allow for a simple apology to Ms. Light for what was shown to be an inaccurate statement by Teacher X that she had not emailed Ms. Light about her covid status.

Ms. Gethings went on to state, "We can respect some people do not want their names mentioned and they certainly deserve that respect. Not one person has said anyone besides you as being the source. We hear that you are saying it wasn't you but I need to you to know that every person said you were the source." Ms. Light asked, "Who is every person?" Ms. Gethings responded, "I am not saying because I know what you will do and go right to them and they do not want to be dragged into this, but I told you a week ago this is not an easy conversation for us, we are very concerned but I do not have to tell you their names and I promised them that I would not, but I can tell you that even though it is not a proven. I am not giving you a name I am giving you my truth that there is not another person in our community whether it is a parent or a teacher that has not said that you were how they found out." Ms. Light stated she acknowledged there was a rumor that she had shared the information. Ms. Clarino stated they have "some major concerns" about the situation and that they would discuss with Ms. Light in the future.

In her interview, Ms. Gethings denied stating that the information had come to her through a colleague, that Ms. Light should not say that it was not truthful that she had shared the information, or that Teacher X should not acknowledge her mistake regarding the email. However, the recording shows that Ms. Gethings is not correct on these points. Ms. Gethings still believed that any leak must have come from Ms. Light, noting that it would be difficult under the hybrid model for parents to simply notice that a specials teacher was out for a long time and guess she had covid, which was what Ms. Light was proposing as an alternative explanation. Ms. Gethings stated Teacher X was only out about two weeks. Further, even if it did come from an inside source, it does not appear it was ever considered that it might be someone in the school other than Ms. Light. Teacher X, however, stated that it could have been possible for someone outside the school to notice her absence. She stated she was out from

8 {01563140.DOCX

Ver. 1}

February 6th through March 5th. Ms. Gethings stated in the interview that she did not know if anyone had conveyed to her or Ms. Clarino that the information had originated with Ms. Light. She stated that Ms. Morrison and Hilarie Alden had shared that people were talking about Teacher X being absent and they thought it had to be coming from Ms. Light (without citing the basis for their belief). Ms. Gethings denied saying that Ms. Light would go to these sources and drag them in, but this is contradicted by the recording. Ms. Gethings stated during her interview that there were no parents who indicated to her that Ms. Light was the source of the information and that she was not aware of any parents indicating to anyone else that Ms. Light was the source of the information.

While this investigation does not make any conclusion about whether Ms. Light was or was not the source of information being shared in the community regarding Teacher X, the manner in which it was addressed was unfair to Ms. Light in several respects. Ms. Light was brought into what was essentially a restorative justice meeting to make peace with Teacher X for conduct she denied doing. Her statements that she did not share the information were given no serious consideration and she was told not to say that it was not truthful that she shared the information. It was insinuated that if Ms. Light denied the conduct, she was castigating her colleagues for coming forward. However, no colleague had claimed to have any knowledge (rather than speculation) that Ms. Light was the source. Ms. Gethings claimed that "every person" said she was the source, whether it was a parent or a teacher, when this was simply not true. When called upon to identify who "every person" was, Ms. Gethings refused to do so claiming that Ms. Light would drag them into the matter, when it appears more likely that it is because there were no actual sources claiming to have any knowledge that Ms. Light had shared the information. This incident continues to impact the relationship between Ms. Light and Teacher X and Ms. Light states it has further strained an already difficult relationship with Ms. Morrison.

Based on the multiple references to the Facebook post regarding general data as a basis for believing Ms. Light was the source, given the lack of any specific claim that Ms. Light was the source, and given the false claims that there were witnesses who stated she was the source, this incident is concluded to be retaliation for Ms. Light's Facebook post. Again, this investigator does not have sufficient information to determine whether Ms. Light was or was not the source of any information being shared, but Ms. Light was accused based only upon speculation in connection with her prior public statements and she was falsely informed that there were multiple individuals claiming she was the source. Even if it was reasonable to suspect Ms. Light, the declarations that multiple individuals had named her as the source of the information were untrue and made without justification.

IV.    TEVAL

Ms. Light's midyear conference was held on March 26, 2021. Most midyear meetings were approximately 15-45 minutes long. Ms. Light's meeting, which was recorded by Ms. Light, was approximately 1 hour and 13 minutes long. At the meeting, Ms. Light was told that Ms. Gethings and Ms. Clarino were anticipating a written complaint from Teacher X (which ultimately never came to fruition). There was also an extensive discussion regarding Ms. Light having asked questions at the Board of Education meeting regarding covid protocols on March 22, 2021, rather than waiting for Ms. Gethings and Ms. Clarino to provide answers once they were available. Ms. Clarino stated that it was uncomfortable for them because it showed they

9 {01563140.DOCX

were failing her by not providing answers. Ms. Light offered to provide comments ahead of speaking at Board meetings to reduce their discomfort. Ms. Gethings stated, "The night that you're speaking, my phone goes off like I don't even know." She felt she was being scrutinized regarding what instructions she had and had not given to staff. She stated the Facebook post was "not your place." She also referenced "other staff people who feel it's very hard to work with you" based on how she had been outspoken and how she was representing the school. Ms. Clarino stated that Ms. Light was speaking negatively about the school and that they were trying to change the narrative about the school. Ms. Light was somewhat distressed during the meeting, which was noted by Ms. Gethings and Ms. Clarino. However, Ms. Light did not ask to leave the meeting or suggest she did not want to continue.

Within the TEVAL document, dated April 2, 2021, the section on feedback from the instructional management contains praise from Ms. Gethings to Ms. Light. Within that paragraph, Ms. Gethings included the note, "As we discussed in your mid year please consider asking any time you have a concern, if we do not have the answer we will do our best to attain the answer." Ms. Light perceives this comment as a warning flag regarding her public comments. Ms. Gethings stated it was not meant as a warning flag, but as important feedback. Ms. Gethings stated that since the Board does not provide answers at meetings during public comment, this would be a more effective way for Ms. Light to get the information she wanted. She also stated that people would feel uneasy about a teacher who would be asking so many questions on a regular basis at Board meetings, rather than starting with her own building administration.

Ms. Light's TEVAL from the 2020-2021 school year was not completed given the difficulty of finalizing an evaluation under the circumstances of the complaint, although there is disagreement as to whether HR advised Ms. Gethings not to complete the final steps.

Ms. Light stated that on September 21, 2021, Ms. Clarino observed her class, but that she had not yet given feedback, while other teachers had received feedback after their observations. Ms. Clarino stated in her interview that she had not conducted an observation yet for Ms. Light and that she could have been in her class for other reasons. She stated that once the observation is done, Ms. Light will receive feedback.

The actions in the TEVAL process, including the comment in the document, do not constitute retaliation. The meeting was difficult, but all attendees were discussing their beliefs extensively and there is no reason to believe that it was established as extremely long meeting in order to retaliate. The comment in the document suggests asking questions of administration and does not tell Ms. Light not to pursue answers in other forums.

V.    Comments to Co-workers/Others/Claims of Solicited Complaints

A. Hilarie Alden

An incident occurred in September, 2020, where Ms. Alden was planning an outdoor event for second graders during lunch. She sent an invitation to the class and was told that afternoon by Ms. Clarino that she could not do that event because Ms. Gethings had been informed by Ms. Light about it and that it had to be done outside of school hours. Ms. Clarino had, in error, approved the event. Ms. Alden reported that she asked Ms. Clarino who had

10

DEF000497

complained and that Ms. Clarino informed her that Ms. Light had asked Ms. Gethings and was asking why Ms. Alden was allowed to do the event under these circumstances and not her. Ms. Alden believed that Ms. Light brought it up with Ms. Gethings to ask why Ms. Alden was allowed and not her, or to ask if Ms. Gethings knew she was doing it. Ms. Alden felt that Ms. Light was tattling on her and there was no reason Ms. Light could not have come to her first. Ms. Alden changed the event to comport with the rules. Ms. Alden stated that Ms. Clarino did not frame Ms. Light's discussion with Ms. Gethings as a complaint, but she perceived it as tattling. Ms. Clarino also stated that she did not view it as a complaint, but an inquiry. Ms. Gethings was very clear in her interview that Ms. Light was not trying to get Ms. Alden in trouble but legitimately wanted to know if the rules had changed because she wanted to hold her own events during school hours. Ms. Gethings stated that Ms. Light was not complaining of inconsistent application of the rules (i.e. allowing Ms. Alden to do something she could not), but was asking about whether they had changed.

Ms. Alden filed a complaint regarding Ms. Light in May 2021. Ms. Alden's complaint regarding Ms. Light begins with a complaint about this situation, noting that after receiving the invitation for the event, "Jessica immediately and without any communication whatsoever sought out the school's administration to formally complain that I was planning this during school hours." This overstates what occurred, as certainly no formal complaint was filed. Ms. Light and Ms. Gethings, the parties to the conversation, agree that it was not presented as any kind of complaint. Ms. Alden acknowledged that Ms. Clarino did not present it to her as such, but she perceived Ms. Light's actions as tattling. Ms. Alden's framing of the issue as a complaint contributed to Ms. Light's belief that Ms. Gethings and Ms. Clarino were setting her peers against her. The relationship between Ms. Alden and Ms. Light further deteriorated and it appears that this incident set the relationship off in a negative direction, with many subsequent events playing a role, culminating in the May 2021 complaint. Ms. Light stated that she believes Ms. Gethings and Ms. Clarino encouraged Ms. Alden to file this complaint. She stated she believed the complaint was coached, and questioned why the complaint was filed in May when the most recent specific event complained of occurred in December 2020. Ms. Alden stated that the rest of the year was "horrible" and she tried to put in the complaint before spring break because she was worried about what would happen when Ms. Light's son returned to in-person learning, in her class. Ms. Gethings, Ms. Clarino, and Ms. Alden all denied any discussion of the complaint by Ms. Alden against Ms. Light prior to its filing. Ms. Alden stated that she filed her complaint because she was highly concerned that with possible grade movements, Ms. Light could be made her grade-level partner, which would be extremely difficult following the difficulties they had had that year. There were delays in the complaint actually being initiated given attempts to resolve matters informally.

After Ms. Light's son returned to in-person learning, on one occasion he wore a shirt that said, "My mom is my hero." Ms. Light stated that Ms. Alden said the shirt was funny and Ms. Clarino laughed at him. Both denied this, although both remembered the shirt and Ms. Alden said she might have stated, "I like your shirt." Given that the only other witness was a 7-yearold, the allegations cannot be corroborated.

Ultimately, there is no evidence that Ms. Gethings or Ms. Clarino misstated Ms. Light's actions when communicating with Ms. Alden, encouraged Ms. Alden to file a complaint, or coached her in writing one. The evidence shows that Ms. Alden was the first to describe Ms.

11

DEF000498

Light's inquiry to Ms. Gethings about her event as a "complaint."

### B. Laura Tortora

Ms. Light reported that Ms. Tortora, currently a kindergarten teacher, came into her classroom on or about May 26, 2021 and told her that Ms. Gethings had asked her why she was friends with Ms. Light and stated that she needed to be careful. She said that Ms. Tortora stated, "I want to speak with you some time when you don't have kids, but I need to be quick, because if Gethings knows I'm friendly with you, it might cost me politically. I want you to know you have allies and if you need anything, you can always count on me." Ms. Light stated that Ms. Tortora is not a close friend, so she was surprised by this.

Ms. Tortora reported that she had difficulties with Ms. Gethings and Ms. Clarino during the 2020-2021 school year as she was returning from maternity leave. She cited multiple concerns that are beyond the scope of this investigation, but that bore some similarity to Ms. Light's allegations. She stated that things have been better this year and that she is trying to move forward in a positive way with both building administrators.

Ms. Tortora also had prior difficulties with Ms. Light, when Ms. Tortora was Ms. Light's son's teacher for first grade. However, they have gotten to know each other better recently and Ms. Tortora states that they now have a friendship.

Ms. Tortora denied that Ms. Gethings or Ms. Clarino had spoken to her about her friendship with Ms. Light, as alleged. She stated that she told Ms. Light last year when she heard what she was going through with Ms. Gethings and Ms. Clarino that she was also having a tough time with them and told her that if she needs someone else to speak about how they had been treating staff, she had also been mistreated. She stated that she did not say that if Ms. Gethings knew they were friends, it might cost her politically. She did not feel that there would be any negative fallout from a friendship with Ms. Light. Therefore, this allegation cannot be substantiated.

### C. Phyllis Maffuid

Ms. Maffuid is a special education paraprofessional. She works under Ann Raymond, the special education teacher. She described her relationship with Ms. Gethings as good and with Ms. Clarino as distant, as Ms. Maffuid had only worked in the lower school[1] for a few weeks. She only got to know Ms. Light recently as Ms. Maffuid works in her classroom in the mornings serving a child in her classroom, but previously knew her only slightly.

On or about May 26, 2021, Ms. Light used the bathroom around dismissal time. She stated that she asked Kyle Miller, the math coach, to watch her class so she could use the bathroom, but then saw Ms. Maffuid who agreed or volunteered to watch her class. After using the bathroom, Ms. Light switched her shirt because she had running club. Ms. Gethings emailed her afterward stating that she should not change her clothes during dismissal time. Ms. Light said that she did not leave the class to change her clothes, but did so while she was using the

---

[1] Worthington Hooker is divided into a lower school (k-2) and an upper school (3-8). Ms. Clarino generally leads the lower school while Ms. Gethings generally leads the upper school, although they are both involved with both schools.

12

bathroom anyway. It does not appear that Ms. Gethings pressed the issue further with Ms. Light. Ms. Maffuid stated it took less than a minute.

Ms. Maffuid reported that although it is extremely common to watch a teacher's class for a short period, the following day, Ms. Gethings called her into the office and shut her door and asked why Ms. Maffuid would cover for Ms. Light and stated that teachers cannot leave the class. Ms. Maffuid stated she asked Mr. Miller if he had been called in to discuss this and he said no. (Ms. Gethings was unaware of Mr. Miller's involvement, if any.) She stated that Ms.

Gethings made a "really big deal" about the situation and that the conversation lasted about five minutes. She stated that Ms. Gethings' tone was "reprimanding," but she was confused as to why because she did not believe she had done anything wrong. Ms. Maffuid promptly told Ms. Light about the conversation, which Ms. Light includes as part of the pattern of alleged retaliation against her, namely that Ms. Gethings reprimanded Ms. Maffuid for helping Ms. Light in a manner that was not out of the ordinary.

Ms. Gethings stated that she only spoke with Ms. Maffuid about the situation as it was occurring, when she saw her outside the school with Ms. Light's class. She stated that she asked where Ms. Light was and Ms. Maffuid said she was getting changed for running club. Ms. Gethings admits sending the email to Ms. Light regarding not changing clothes during dismissal, but denies that she ever discussed the matter with Ms. Maffuid again. She stated that Ms. Maffuid's actions in covering the class were not out of the ordinary, but that Ms. Light should not have asked her to cover dismissal where avoidable.

Ms. Light reported this to Human Resources on May 28, 2021, stating, "Phyllis, who covered my class with Mr. Miller so I could go to the bathroom Tuesday, sought me out of (sic) the end of the day yesterday, Thursday telling me she had been forced into a closed-door meeting with administration. She reported she was admonished and asked 'Why are you helping Mrs. Light out?' and 'What is Jessica up to, what is she planning with you?' As if helping me was something nefarious, even though she explained she often watches teachers classrooms for a min so they can go to the restroom. She also told me she was worried she might get in more trouble if she was seen being friendly and talking to me so had to cut the conversation short."

Ms. Gethings named Ms. Maffuid (along with Mr. Shortt) when asked during her interview whether anyone would be untruthful. She stated that Ms. Maffuid has constant drama and gossiping and that she would prefer neither Ms. Clarino nor Ms. Gethings be in the positions they are in. She stated that Ms. Maffuid fails to tell her important details and gets facts wrong. She stated that Ms. Maffuid has misrepresented facts on other occasions and gives inconsistent reports.

There was no evidence to support that Ms. Gethings asked what Ms. Light was planning with her or anything to that effect. The allegation that there was an admonishing closed-door meeting was conveyed to Ms. Light by Ms. Maffuid shortly after it is alleged to have occurred and those aspects were corroborated by Ms. Maffuid. The only question is whether Ms. Maffuid fabricated this incident, as suggested by Ms. Gethings' identification of her as someone who might be untruthful. Ms. Maffuid did not appear to have any motive to fabricate this episode and convey it to Ms. Light (which is uncontroverted) at a time when Ms. Maffuid and Ms. Light did not know each other well. By contrast, Ms. Gethings would have a motive to deny it. It should

13

DEF000500

also be noted that this occurred at a time of high tension between Ms. Light and building administration, two days after Ms. Gethings received written notice from HR of Ms. Light's complaint. Therefore, the credibility assessment supports that Ms. Gethings did reprimand Ms. Maffuid for providing ordinary support to Ms. Light.

Another incident involving Ms. Maffuid arose on September 21, 2021, relating to a meeting following an incident where a student under Ms. Maffuid's watch ran out of the building. The meeting included Ms. Maffuid, Ms. Gethings, and Ms. Clarino. Ms. Light was not invited because the meeting pertained to matters not directly involving her, and Ms. Raymond was invited but saw the invitation too late. At that meeting, there was some discussion about Ms.

Maffuid photographing the student to demonstrate that she was telling the truth about the student's behavior because she might otherwise not be believed. This apparently stemmed from Ms. Raymond expressing some doubt to Ms. Light about whether Ms. Maffuid was accurately reporting the student's behaviors, not because Ms. Maffuid was viewed as dishonest, but because the behaviors were extreme and did not match Ms. Raymond's observations of the student in other settings. Ms. Light told Ms. Maffuid that Ms. Raymond had asked her this question. At the meeting, there was a statement by Ms. Gethings to the effect that Ms. Maffuid had worked with Ms. Raymond for a long time, suggesting that Ms. Maffuid should not believe that Ms. Raymond would really say she did not believe her. According to all present at the meeting, the focus was not on Ms. Light and whether she was interfering with the relationship between Ms. Maffuid and Ms. Raymond, but Ms. Light presented this as her concern following Ms. Maffuid's report of the meeting. Ultimately, Ms. Raymond, Ms. Maffuid, and Ms. Light reached an understanding about the inquiry Ms. Raymond had made to Ms. Light about the accuracy of Ms. Maffuid's reporting, and all experienced some discomfort related to that incident. However, the evidence does not support Ms. Light's claim that Ms. Maffuid told her, "I thought this was going to be a meeting about strategies to help the Student, but really Ms. Clarino and Ms. Gethings were just asking me if I thought you (Ms. Light) were trying to get in between Ms. Raymond and me (Ms. Maffuid)." Ms. Maffuid denied that she was asked anything about Ms. Light soiling her relationship with Ms. Raymond or anything to that effect. Ms. Maffuid did state that the question about why she thought she would not be believed was asked early in the meeting, but at that time, she had not yet identified Ms. Light as having any involvement, and even once Ms. Light was identified, the discussion did not turn to focus on Ms. Light.

Therefore, the allegation that Ms. Gethings admonished Ms. Maffuid for helping Ms. Light is substantiated, but the allegation that Ms. Gethings and Ms. Clarino discussed whether Ms. Light was trying to get in between Ms. Raymond and Ms. Maffuid could not be substantiated.

### D. Paul Salem

Mr. Salem, a third-grade teacher, was Ms. Light's grade-level partner. They had a good working relationship. On or about August 24, 2021, around the time Chris Henderson from Berchem Moses was interviewing Ms. Gethings and Ms. Clarino regarding the complaint brought by Ms. Alden against Ms. Light, documents appeared on Mr. Salem's printer. The documents were emails from Ms. Light's husband, David Bianchine, to Ms. Gethings and Ms. Clarino. The subject matter pertained to Mr. Bianchine and Ms. Light's child and Ms. Alden, his

14

{01563140.DOCX Ver. 1}

████████████████████████████████████

teacher.  The documents arguably could show Ms. Light and her husband as people who criticize their sons' teachers.

Mr. Salem contacted Ms. Light about the documents, assuming that she had printed them since they concerned her child.  Ms. Light was surprised, as she had not printed them.  Mr. Salem stated that they were sitting on the printer as though they had just been printed and did not appear to have been placed there, given their position and the neatness of the stack of paper. Although Mr. Salem's printer is not connected to the wireless network, Mr. Salem stated that it is possible to print to his printer from a different computer, as another teacher had recently done so.

Ms. Gethings acknowledged printing the emails in connection with her interview with Chris Henderson.  She stated that she has the copy she printed, so she does not have any idea how it could have ended up on his printer.  Ms. Gethings stated she was not aware whether Mr. Salem has a printer.  She stated she printed it in the main office and that she did not have recall having any printer problems that might have caused her to print multiple copies or that might indicate the document was inadvertently sent to the wrong printer.  She suggested that perhaps she inadvertently printed a second copy in the main office and someone picked it up and brought it to Ms. Light.  However, she could not explain how or why a copy printed in the main office would have been placed on Mr. Salem's printer.  The IT department was not able to provide information that would clarify the events leading to Mr. Salem's discovery of the documents.

There is no dispute that the documents were printed by Ms. Gethings and no reason to doubt Mr. Salem's discovery of the documents on his printer.  It is difficult to fathom why if somebody discovered an extra copy of the documents on the main office printer, that person would have placed them in a neat stack on Mr. Salem's printer.  The preponderance of the evidence indicates that Ms. Gethings placed the documents there or printed them directly to Mr. Salem's printer, whether from his classroom or elsewhere.  Given that there is no legitimate reason for Mr. Salem to have been given these documents, this suggests retaliation against Ms. Light.

### E. Debbie DiPietro

Ms. Light reported that on September 22, 2021, Debbie DiPietro, a paraprofessional, told Ms. Light, "I'm not the type of person to say anybody's names, but I've been told repeatedly to please come and let anyone know if things are going wrong with you or if anything's going wrong in your classroom."  Ms. DiPietro was interviewed and stated that when Ms. Light was first coming to the lower school for the 2021-2022 school year, somebody told her, "Make sure she treats you right," and Ms. DiPietro did not understand why.  Ms. DiPietro stated that the person did not elaborate.  She stated that she believes she mentioned this comment to Ms. Light as they were talking one morning, in the context of Ms. DiPietro stating she enjoys working with Ms. Light.  While Ms. DiPietro could not recall who made this comment, when asked whether it was Ms. Gethings, Ms. Clarino, Ms. Raymond, Ms. Maffuid, Mr. Shortt, Ms. Alden, or Mr. Salem, she said she did not believe it was one of them.

Ms. DiPietro stated that she believed this was the only comment, but that it was possible somebody else said something along similar lines as well.  She was clear that nobody told her to report information to that person or suggested any concern that there would be problems in Ms. Light's classroom.

DEF000502

Ms. DiPietro reported positive relationships with Ms. Gethings, Ms. Clarino, and Ms. Light. There was no apparent motive for her to be untruthful. Per Chris Henderson, Ms. Clarino called him on October 7, 2021, and reported that Ms. Light gave Ms. DiPietro a gift card. Ms. DiPietro acknowledged receiving a gift card recently as a token of appreciation, which she stated teachers have done in the past. When Ms. Clarino was interviewed, she answered no to an inquiry about whether she was aware of any attempts to influence investigation responses.

The evidence does not support the claim made by Ms. Light in this instance. Ms. DiPietro denies both the underlying claim and telling Ms. Light anything other than that someone told her one time to make sure Ms. Light treats her right. While the circumstances of that interaction are unclear, it does not rise to the level of a claim that Ms. DiPietro was told repeatedly to report on actions in Ms. Light's classroom.

### F. Timothy Shortt

Mr. Shortt, who had previously served as a union steward, recently ran against Ms. Morrison for that role. He reported that he won the election by a wide margin (16:7).

Ms. Light reported on October 7, 2021, "Today I went to East Rock park to pick up my son . . . from running club. Tim Short[t] is the teacher who leads running club and was recently elected our school's union steward. While there he told me he recently had his first meeting with administration as union steward and administration told him they were concerned that the only reason he had run for union steward was because he was in 'cahoots with me' and wanted to 'take down the administration.' He was warned that I was decisive and his motives for being friendly with me were questioned."

When interviewed, Mr. Shortt confirmed that in a meeting, Ms. Gethings and Ms. Clarino told him that a couple of teachers were concerned that he had run for union steward to team up with Ms. Light to throw them under the bus and push them out. He stated that multiple people had asked him if he was interested in becoming steward because they felt Ms. Morrison was becoming very close with Ms. Gethings. According to Mr. Shortt, during this first monthly meeting in his capacity as union steward with Ms. Gethings and Ms. Clarino, they stated that a few teachers thought he might be in cahoots with Ms. Light and they did not elaborate. They did not identify any teachers specifically. While he could not recall if the terms "in cahoots" or "out to get them" were used, that was the tone of the suggestion. He stated that Ms. Clarino asked if more than one person wanted to run for steward, suggesting it was only Ms. Light. Mr. Shortt stated about 5 people approached him and the vote was decisive, so Ms. Light was not his only supporter. He stated Ms. Light did ask him to run, but there was nothing more to that.

Mr. Shortt stated he was upset by the conversation and did not want the drama, as he is not trying to undermine anybody. He did not recall them discussing any friendship with Ms. Light, and noted that they are not particularly close. He did not think they were trying to warn him about her or create discord between him and Ms. Light. He stated he reported this to Ms. Light because as the union steward, he felt she should know that her name was brought up in that fashion.

When interviewed, Ms. Gethings stated that she had said in the meeting that she thought it was unfortunate that people suggested that "they" were teaming up to take down the

16

{01563140.DOCX Ver. 1}

DEF000503

administration. She stated she did not know who "they" referred to and that she did not refer to Ms. Light.

When asked whether anyone involved in this investigation might give untruthful information, Ms. Clarino was not aware of anyone. Ms. Gethings, however, immediately responded to the same question naming Mr. Shortt (as well as Ms. Maffuid). She stated that Mr. Shortt has a more difficult time with her as an administrator, citing a prior sensitive matter from a few years ago, where Mr. Shortt felt wronged by Ms. Gethings. This matter predated Ms. Clarino's time at Worthington Hooker and she may not have been aware of it. When asked about his relationship with Ms. Gethings, Mr. Shortt stated that the relationship was good now, but that there was a prior incident that was all resolved.

Prior to this question for Ms. Gethings at the very end of a lengthy interview, there was no indication throughout this process that Mr. Shortt was ever untruthful. This was the case even when both Ms. Gethings and Ms. Clarino were asked about the meeting at issue. Although both administrators denied discussing Ms. Light, Mr. Shortt's recounting is more credible. Specifically, given the passage of time following the difficult situation between Mr. Shortt and Ms. Gethings without other instances cited of him fabricating any other matters, it is difficult to comprehend why Mr. Shortt would fabricate this episode to support Ms. Light. This is especially so because, although they are friendly, they are not close personal friends. Mr. Shortt previously told administration he disagreed with her on covid-related issues and Ms. Gethings stated he previously told her that he avoided Ms. Light at all costs because she wanted him to speak at Board meetings against reopening school, while he felt differently. He also stated in his interview that he disagreed with Ms. Light's interpretation that various decisions by administration were being made to punish her for speaking out regarding covid issues. If Mr. Shortt were trying to undermine administration by fabricating this comment, it is likely he would have supported Ms. Light's claims on other incidents. Further, if Mr. Shortt were fabricating this episode, it stands to reason he would be more certain about the precise words used in order to solidify the point he was making.

Given the many layers of negativity in the relationship between building administrators and Ms. Light at this time, it is not possible to identify the precise motive and whether it relates to any protected activity on Ms. Light's part. However, the preponderance of the evidence supports that Ms. Clarino and Ms. Gethings made negative commentary regarding Ms. Light in the meeting with Mr. Shortt, suggesting they were working together to undermine building administration. It should be noted that this occurred while this investigation was underway.

VI.    Change to First Grade

Ms. Light has taught, at various times, third, fourth, fifth, and sixth grades. When she came to Worthington Hooker, she was assigned to third grade and served in that role for four years. While Ms. Light understands that teachers can be moved to different grades to meet school needs, she feels that the decision to move her to first grade is retaliatory, given the timing and the fact that she strongly disfavors teaching at that level. She states that she disfavors teaching at that level due to "severe dyslexia" that makes it difficult to teach phonics, and because she has not attended training geared toward the younger grades in some time.

The rationale offered for needing to move Ms. Light's assignment was that her son was entering third grade and there were concerns about having a parent teaching the same grade level

17

DEF000504

███████████████████

her child was in, even if the child would not be in her class. There are no other examples of a teacher having a child in Worthington Hooker School for comparison. While there is not a districtwide policy against having a parent teaching the same grade level as her child, it is reasonable that Ms. Gethings and Ms. Clarino, in their discretion, sought to avoid it.

Teachers were told that some teaching assignments would be changed for the next year going back to approximately December 2020. At the March 26, 2021 TEVAL meeting, Ms. Light was told specifically that her assignment was going to be changed. She explained her reasons for not wanting first grade and indicated a preference for a higher grade if she needed to be moved.

Ms. Gethings and Ms. Clarino stated that they gave consideration to not placing Ms. Light in first grade, but other suitable options did not exist. She could not be moved to second grade because she could not be placed with Ms. Alden given their animosity toward one another. Fourth grade was not ideal because there was a well-functioning team in place that would be disrupted by a move and because Ms. Light would have to be moved again after the year because her child would then be in fourth grade. Fifth and sixth grades were taught departmentally by a team and there was a strong team in place as well. Therefore, first grade was the only option they felt could work. They explained the situation to Ms. Light and Dave Cicarella in the spring of 2021.

Recognizing that the first grade placement was not ideal given Ms. Light's concerns, Ms. Gethings and Ms. Clarino offered support to help with phonics instruction. Ms. Gethings indicated that all teachers in grades 1-3 are supported with professional development and coteaching. She also noted that Ms. Light has not indicated any struggles this year while teaching first grade.

There were some aspects of the explanations provided by Ms. Gethings and Ms. Clarino that were not consistent. Ms. Clarino stated that Ms. Light had previously caused difficulty with other teachers for her children by virtue of being in the building, citing an example of Ms. Light waiting for Ms. Morrison by the doors to the building to talk to her about an issue involving her son. Ms. Clarino stated that they wanted to have a safer environment for teachers by putting her at the lower school, so that teachers would not have to worry about being confronted without warning. By contrast, Ms. Gethings provided the explanation above regarding why moves to the various grades would not be suitable. She expressly denied that the first grade placement had to do with Ms. Light's relationships with other teachers and/or an effort to create space by having her work in the lower school.

Ms. Gethings and Ms. Clarino both cited a request from Paul Salem, Ms. Light's gradelevel partner, not to have Ms. Light's child in his class. Ms. Gethings stated that on April 2, 2021, Mr. Salem stated that he and Ms. Light worked really well together and he did not want to hurt her, so he would rather teach fourth grade because having her child in his class would disturb the friendship. She said he did not explain how it would disturb the friendship, but that it was about not wanting to change the positive relationship they had. This conversation occurred after the TEVAL meeting in March when Ms. Light was told her grade would be changed because of her son being in third grade, so it is not clear how Mr. Salem's comments factored into the decision at all. Further, Mr. Salem stated that he only asked how to navigate the

18

{01563140.DOCX Ver. 1}

relationship if he had Ms. Light's son in class, but that he did not request any assignment changes. He also stated that he never spoke to Ms. Clarino about the subject, while Ms. Clarino stated that she discussed the request he had made to Ms. Gethings and asked him to put it in writing. Neither school administration nor Human Resources received such a written request.

While Ms. Gethings and Ms. Clarino offered different explanations for the move to first grade, the consistent factor was that it was viewed as problematic to have Ms. Light teaching the same grade that her child would be in, even if he was in a different class. Mr. Salem's comment about any concerns he may have had was expressly not a negative comment about Ms. Light, but rather an effort to preserve positive relations. Given Ms. Gethings' timeline, however, Mr. Salem's comment came only after a decision had already been made to move Ms. Light. Once it was clear that Ms. Light would be reassigned, there was no evidence to suggest that first grade was not the best placement in view of all the circumstances. While it was far from Ms. Light's preference, she has not expressed an inability to perform the role. She stated that she would have been open to the grade change, were it not retaliatory.

In view of the fact that a grade change was a reasonable measure in light of the parent/teacher role and in view of the reasons offered for why first grade was the only suitable placement, the evidence does not support a conclusion that the placement was retaliatory.

VII.    Committees/Workshops

Ms. Light complained that Ms. Gethings and Ms. Clarino failed to select her for multiple committees and workshops and sidelined her from committees with which she was already involved, as acts of retaliation. As detailed below, each decision has an explanation that does not suggest retaliation for protected activity.

A.    Summer Play-Based Learning Workshop

Ms. Light stated that she volunteered but was not given the opportunity to attend a summer play-based learning workshop in summer 2020.

The opportunity was presented to Ms. Gethings by the Early Childhood Administrator and the Director of Early Learning Programs on May 13, 2020, and was stated to be an opportunity for professional development for pre-k through Grade 1 teachers. Ms. Gethings forwarded the announcement that day to staff members working with those grades. Ms. Alden, a second grade teacher, was included, because of a prior specific role in play-based learning. Ms. Light stated that she was instrumental in securing a grant for play-based materials, so she felt she should also have been given the opportunity. Ms. Light stated that this was paid professional development.

The facts show that Ms. Light was not excluded from this opportunity in retaliation for protected speech. At the time of the May 13, 2020 email, Ms. Light had not yet engaged in any of the activity she identifies as protected. Ms. Light stated there was not significant tension in the relationship with Ms. Gethings at this point (and it pre-dated Ms. Clarino's arrival). Ms. Light acknowledged that non-selection for this opportunity was less clearly retaliatory under the circumstances. It should also be noted that others stated that this opportunity was not paid. In addition, other purposeful play resources were provided to all teachers.

B.    Scheduling Committee

19

{01563140.DOCX Ver. 1}

Ms. Light stated that she volunteered to be on the Scheduling Committee and that subsequently, she was informed that two other teachers would lead the committee and her input was never considered.

Ms. Light stated that she was told not to attend the first meeting because there would be more focus on grades 4-8. Ms. Gethings stated that the first meeting of the scheduling committee focused on the upper grades, so while she did not recall telling Ms. Light not to attend, it seemed accurate. She stated that the scheduling committee involves 2-3 people making most of the arrangements with other members contributing thoughts. Ms. Gethings stated that Ms. Light's input was considered in that her request not to start the school day off with a special was granted, but Ms. Light denied making that request.

Ms. Gethings and Ms. Light were in agreement that Ms. Light was on the committee and that her role was relatively minimal. However, it appears this is a matter of how the committee functions, with most of the members playing a minor role by contributing suggestions on a schedule built by the committee leaders.

C. Signage Committee

Ms. Light stated that she volunteered in the summer of 2020 to lead the Signage Committee, but Ms. Raymond was assigned to lead instead. She described the committee's role as meeting to decide on signs for things like handwashing, social distancing floor stickers, etc. related to covid measures. Ms. Light stated that when she went to the first meeting she was invited to, in November 2020 (in anticipation of a reopening that was later delayed), all of the mental work had already been done and they were just putting stickers on the floor, meaning that her role was relegated to manual labor rather than mental input. There is no Signage Committee this year because the function is not needed.

Ms. Raymond, when interviewed, did not believe that she was chosen to lead the committee. The role was so minimal that she did not realize she was taking on a different role from anyone else, other than that she selected times for the group to meet to place the signs. She described it as a "no brainer committee," whose function was sticking arrows on the wall and similar tasks. According to Ms. Gethings, the signs were pre-made and it was simply a matter of placing them.

Given the extreme insignificance of the signage committee "leader" role, it does not appear that Ms. Light was being sidelined when Ms. Raymond was given the role instead. She may have felt that way because the remaining tasks were manual in nature, but this was so for everyone else on the committee and Ms. Raymond's additional role was so trivial that she didn't even recognize that she had been selected to lead. Ms. Light may not have been aware of how little there was to do other than simply placing the signs.

D. Gardening Committee

Ms. Light led the Gardening Committee in the 2020-2021 school year. She states that Ms. Gethings announced in a staff meeting on March 8, 2021, that she chose to have the Boys Club run the Gardening Committee and have another teacher, Douglas Jones, take over the work. Ms. Light stated that Ms. Gethings retaliated against her by leaving her outside the loop and essentially removing her from the Gardening Committee by having Mr. Jones take over the work.

20

███████████████████████████████████████

Mr. Jones needed to lead a project for his 092 program that would involve engaging the community. Mr. Jones runs a Boys Club that has engaged in various activities, including cleanup projects. When Mr. Jones discussed possibilities with Ms. Gethings for his 092 project, she suggested working with Ms. Light on gardening clean-up days on two Saturdays in the spring. He stated that the idea was developed organically. Ms. Light was the only person on the Gardening Committee at the time and was seeking assistance with her efforts.

Ms. Light states that on March 9th, she told Ms. Gethings and Ms. Clarino that her feelings were hurt that she was not included in the planning of the clean-up days. The following morning, Ms. Gethings emailed Mr. Jones, copying Ms. Clarino and Ms. Light, asking Mr. Jones to work with Ms. Light to create a Sign-up Genius form. Ms. Gethings and Ms. Clarino attributed Ms. Light's statement of hurt feelings to later meetings, rather than March 9th.

Mr. Jones worked with Ms. Light to share ideas, and Ms. Light came to one of the two clean-up days. Mr. Jones took on a larger role, seeking community involvement, such as support from Lowe's. Mr. Jones was unaware of Ms. Light's role on the Gardening Committee and assumed that Ms. Gethings was asking him to work with her in connection with her role on the PTA. Mr. Jones realized Ms. Light seemed upset when he spoke with her about the project, but he did not know why.

Ms. Gethings sent Mr. Jones an email on May 25, 2021, after Ms. Light had filed her complaint, asking Mr. Jones to confirm his recollection of events related to this matter. Mr. Jones confirmed her recollection, but stated he was confirming that it was for 092 purposes and not taking over the Gardening Committee. He did not agree with the complete description, specifically that he did not recall her mentioning the Gardening Committee in the original meeting and he did not recall her stating that Ms. Light was looking for help. He did not identify these discrepancies in his email response, but did so during his interview.

Ms. Gethings and Mr. Jones were in agreement that there was never any discussion of Mr. Jones or the Boys Club taking over the Gardening Committee, as opposed to working on a specific project with Ms. Light. Further, both agreed that Ms. Gethings told Mr. Jones at the outset to work with Ms. Light. Since the clean-up days in the spring, the Boys Club has not performed any gardening-related tasks. Ms. Light decided not to sign up for Gardening Committee this year.

E.  Social-Emotional Learning (SEL) Ambassador

Ms. Light stated that she volunteered for this role in March 2021 but was not selected. She stated that Rachel Forsa and Meghan Rose were chosen instead and that this was a paid position. Ms. Light stated that Ms. Gethings explained this choice as wanting to spread out responsibilities, but that Ms. Rose and Ms. Forsa were also chosen to be after-school coordinators, which is also a paid role, which Ms. Light felt negated Ms. Gethings' explanation.

The SEL ambassador role is not a paid opportunity. Ms. Gethings and Ms. Clarino felt that Ms. Rose demonstrated a passion for social-emotional learning and would be a good fit because she worked with ESL students. They felt this would be a good opportunity for Ms. Forsa, a new staff member, to get to know other staff.

21

DEF000508

Multiple staff members, including Ms. Alden, applied for this role and were not chosen. There was no evidence that Ms. Light was singled out in any way.

F.    School Planning and Management Team (SPMT)

Ms. Light volunteered to chair SPMT for the 2020-2021 school year. She stated that Ms. Gethings stated in a meeting in April 2021 that the school had not started the SPMT committee that year because no one was willing to chair it. Ms. Light again expressed interest in serving as chair for the 2021-2022 school year. She currently serves on the committee, but is not chair.

The SPMT chair role involves working with many stakeholders and having strong interpersonal skills to work with those stakeholders. Based on her observations of Ms. Light's interpersonal and leadership skills and relationships with staff, Ms. Gethings did not feel this would be a suitable role for Ms. Light. Ms. Gethings stated that she said in a meeting that SPMT was not running because there was not a chair, rather than because no one was willing to chair it. It also never got running because of the unusual format of the school year with remote instruction. Recognizing the difficulty of stating that the reason there was no chair was because Ms. Gethings was unwilling to have Ms. Light serve as chair, it appears Ms. Gethings did not at that time explain why there was no chair notwithstanding Ms. Light's willingness to serve. The reasons articulated in Ms. Gethings' interview did not pertain to any protected activity, but rather a general ability to lead multiple stakeholders. Therefore, this is not found to be an act of retaliation pursuant to the complaint.

G.    PTA

Ms. Light was the only teacher at Worthington Hooker School who was also the parent of children in the school. The position of parent/teacher representative was created for her at the PTA and she served on the executive board for a two-year term. In a Hooker Happenings newsletter on March 28, 2021, the administration included the language, "PTA: Please let us know if you are interested in being the teacher representative for next year." Ms. Light stated that with nominations being in May, the timing of this announcement seemed particularly early, such that it appeared to be timed to come out at a time when tensions were high between Ms. Light and administration regarding her public comments. The announcement came two days after the TEVAL meeting at which her public comments were discussed. There was also an incident during a PTA meeting where Ms. Light indicated that a parent wished to nominate Mr. Shortt and Ms. Gethings stated that it was inappropriate for her to inform people of nominations because it should be done by the school leadership team, which Ms. Light states is at odds with the bylaws. Ms. Light stated that Ms. Gethings said in response, "We have met about this already and that nomination could not come from a parent but will be dealt with at the school level." Ms. Light ultimately decided to step down from the executive board and remain a regular member of the PTA.

The invitation in Hooker Happenings is innocuous and does not appear to be designed to encourage others to run against Ms. Light, rather than simply apprising them of the opportunity. The timing of the announcement at the end of March seems appropriate in terms of presenting time for teachers to consider their interest prior to nominations in May. Presently, three teachers serve as teacher representatives: Meghan Rose, Tim Shortt, and Hilarie Alden. There was no indication that these teachers were persuaded to take on the position by Ms. Gethings or Ms.

22

{01563140.DOCX Ver. 1}

DEF000509

Clarino.  Regarding the comment about Mr. Shortt's nomination, Ms. Gethings stated that the "we" she was referencing was building administration and the PTA, not Ms. Light specifically.  It does not appear that this comment was designed to paint Ms. Light negatively or that it was retaliatory for her public comments.  VIII. Miscellaneous

Ms. Light alleged various miscellaneous actions that she believes are retaliatory.

For example, Ms. Light said she was spoken to about allowing parents to contact her on her personal cell phone.  She stated that since her children attend the school, it was not possible to avoid sharing her personal cell phone.  She stated Ms. Gethings was trying to isolate her from other parents out of a fear that Ms. Light would spread hysteria.  However, Ms. Gethings showed a slide from an open house presentation where Ms. Light shared her cell phone number and invited parents to call or text her.  Ms. Gethings stated her discussion with Ms. Light about this was a very short conversation where she shared a compliment regarding Ms. Light's presentation and then mentioned not sharing her cell phone number for her own protection.  Ms. Gethings shared a copy of the slide with the investigator, supporting her explanation regarding the context.  This does not appear to be retaliatory in any respect or an effort to isolate Ms. Light.

When she moved to the lower school, Ms. Light moved her own belongings.  She stated that Ms. Gethings told her to move her belongings to Ms. Raymond's classroom, but then provided movers for Julie Villanueva, who was also moving between schools.  Ms. Gethings stated that Ms. Light began moving her belongings and asked where she could place her belongings, and Ms. Gethings told her she could put them in Ms. Raymond's classroom or Ms. Rose's classroom.  Ms. Light stated that the email announcing movers came more than a month after she moved her belongings.  The evidence was not sufficient to show that Ms. Gethings told Ms. Light to move the belongings on her own while holding back the knowledge that movers would be provided.

Ms. Light stated that standard wooden furniture was not present in her new classroom when she moved to the lower school.  She was told by the custodian that there was an email saying supplies and furniture were available and that teachers could take what they needed.  Ms. Light felt slighted by this.  An email was produced dated 8/6/21 that was sent to Hooker-ElemAll and Hooker-Middle-All which included, "In the front hallway of each building there are several boxes of books and materials, everyone is welcome to help themselves."  This was the only email identified that might relate to the subject.  Given that it was sent to the full staff, it does not appear Ms. Light was omitted from the communication.

Ms. Light stated that she ordered supplies last school year and had not received them by the date of our interview in late September.  Ms. Light stated she printed her W.B. Mason cart and gave it to Ms. Gethings.  However, the secretaries typically handle the supply orders and Ms. Gethings does not recall receiving a printout from Ms. Light.  It does appear that Ms. Light created a shopping cart in June, as was the protocol, and it is not clear why the secretary apparently did not see her order.  Upon the issue being raised, Ms. Gethings worked to ensure the supplies would be ordered.  This appears to be a miscommunication.

IX.    Findings of Retaliatory Conduct

The following findings of retaliatory conduct are supported by the factual findings above:

23

{01563140.DOCX Ver. 1}

- Ms. Light was accused of leaking confidential information regarding Teacher X based on speculation brought on by her protected speech and the view that she was vocal. Ms. Gethings criticized Ms. Light for defending herself by denying the actions, told Teacher X not to apologize when it was clear she had misstated whether she had told Ms. Light that she had covid, and falsely stated that "every person" pointed to her as the source when, in fact, nobody had named her as the source. Ms. Clarino echoed Ms. Gethings' sentiments, stating they had "major concerns" regarding Ms. Light's actions. This occurred in front of Teacher X as well as Ms. Morrison, with whom Ms. Light already had a strained relationship, thus damaging her relationships with colleagues. Ms. Clarino further spoke with Ms. Paine regarding the subject during the pendency of this investigation after being instructed during her interview and in writing not to discuss the investigation while it was pending. She then told this investigator that Ms. Paine's sister was the source of information that Ms. Light had shared the information, when this was not an accurate reflection of what she had been told by Ms. Paine.

- Ms. Gethings reprimanded Ms. Maffuid for assisting Ms. Light in providing ordinary support provided by a paraprofessional at a time when tensions were high due to Ms. Light's filing of a complaint against Ms. Gethings and Ms. Clarino. Such a reprimand would tend to cause an individual to hesitate to offer assistance to Ms. Light in the future.

- Ms. Gethings caused documents to appear on Mr. Salem's printer. The documents were emails from Ms. Light's husband that could paint Ms. Light and/or her husband in a negative light. This was done during the pendency of the overlapping investigations.

- In their first meeting with Mr. Shortt, the new union steward, Ms. Gethings and Ms. Clarino told him that a few teachers thought he might be in cahoots with Ms. Light to take down administration and suggested that only Ms. Light wanted him to run for steward. They thus set the tone of their relationship with the new union steward in a manner suggesting that he should not support or ally himself with Ms. Light.

X.    Conclusions

While Ms. Light's complaints detailed numerous actions of perceived retaliation, this investigation resulted in four findings of retaliatory conduct, noted above. Throughout the investigation, different parties stated that they felt things they had said or done were being twisted, misinterpreted, or blown out of proportion. This resulted in Ms. Light fearing what Ms. Gethings and Ms. Clarino would do next, and vice versa. All were extremely upset and anxious about the situation and the investigation.

Ms. Light may have viewed many innocent actions as retaliatory, but this is understandable in light of the climate. In the Teacher X situation, she was treated as guilty without any proof and hauled into a meeting to hear how the actions attributed to her had harmed Teacher X. She was told not to state that the allegations were not truthful and was falsely told that multiple people – who would not be identified lest Ms. Light attack them publicly – had identified her as the source of the information. While the situation with Ms. Maffuid was relatively minor, it formed part of a pattern of attempting to separate Ms. Light from the support

24

{01563140.DOCX Ver. 1}

of her colleagues. The papers left on Mr. Salem's printer that arguably could present Ms. Light and her husband as difficult parents and the comment to Mr. Shortt suggesting that an alliance with Ms. Light is indicative of an effort to take down administration continued this pattern.

Ms. Light stated that in isolation, she would not have complained about many of the actions in her complaint, and she noted that many could have innocent explanations. Indeed, that was found to be the case. In particular, Ms. Light noted that she had not complained about grade changes at her previous school, but she felt this one was retaliatory. While the facts ultimately did not bear that out, it is understandable why in such a tense climate, Ms. Light being moved to a grade she had expressly stated would be a very undesirable assignment for her, especially given her dyslexia, would appear retaliatory. Ms. Gethings and Ms. Clarino claimed that Ms. Light's complaint was retaliation for the change to first grade. It does appear that the change to her teaching assignment was the final straw prompting the filing of a formal complaint, but any implication that Ms. Light falsified the complaint as retaliation for it is not borne out. It is true that not all of Ms. Light's allegations could be corroborated, but it did not appear that she was falsifying her claims.

Ms. Light was very vocal on topics related to covid and at times her statements were controversial and had the potential to present the school in a negative light, despite her stated intentions not to do so. However, Ms. Gethings and Ms. Clarino used Ms. Light's public comments to jump to a conclusion that virtually any question or comment on the subject of covid to Ms. Light. It is obvious that parents, teachers, and others in the community would have strong opinions, fears, and questions about covid irrespective of any statements by Ms. Light. While it is conceivable and perhaps likely that Ms. Light increased some of these concerns with her statements, the fact that a parent asks questions about covid safety is not evidence that Ms. Light is funneling information to him. And even if only somebody in the school could have noted that Teacher X was absent for weeks (which is not necessarily the case), it is a significant leap to suggest that any inside source must be Ms. Light.

Please contact me to discuss recommendations.

25

# Plaintiff's Exhibit 16



BERCHEM
MOSES<sub>PC</sub>

**INVESTIGATION REPORT**

**FOR THE NEW HAVEN BOARD OF EDUCTION**

*RE: Complaint by Hilarie Alden against Jessica Light*

By:    Christopher R. Henderson, Esq.
       Berchem Moses, PC

Confidential

## I.   BACKGROUND

Berchem Moses, PC was retained by the New Haven Public Schools to investigate a complaint filed by Worthington-Hooker 2nd grade teacher, Ms. Hillarie Alden against teacher, Ms. Jessica Light. Ms. Alden alleged, in part, that Ms. Light was blurring the lines as both a teacher and parent and, due to this, was mistreating Ms. Alden, who had Ms. Light's son in her 2nd grade class, in a manner that was unprofessional and hostile during the 2020-2021 academic year.

## II.   INVESTIGATION

   a.   *Persons Interviewed[1]*
   1.   Ms. Hilarie Alden (Complainant) – Worthington Hooker Elementary School, Second Grade Teacher
        1.   Interviewed In-Person 8/20/21 (with Union Steward Kathleen Morrison present)
        2.   Follow-Up Interview via Zoom 9/21/21 (with Union Steward Kathleen Morrison present)
   2.   Ms. Margaret-Mary Gethings – Worthington Hooker Elementary School, Principal
   3.   Ms. Jenny Clarino – Worthington Hooker Elementary School, Assistant Principal
   4.   Ms. Jessica Light (Respondent) – Worthington Hooker Elementary School, First Grade Teacher[2]

   b.   *Collateral Information*
   1.   May 10, 2021 List of Concerns/Complaint By Ms. Alden
   2.   May 14, 2021 New Haven Public Schools Email Receipt of Complaint
   3.   May 19, 2021 Ms. Light's Response to Ms. Alden's List of Concerns
   4.   Excerpts from Ms. Alden's Remind App Messages re: East Rock Park Event
   5.   September 24, 2020 Email from Ms. Light to Ms. Gethings re. Ms. Alden East Rock Park Event
   6.   September 3-8 Emails Between Ms. Light and Ms. Gethings re: Planning 3rd grade "meet and greet"
   7.   November 21, 2020 Emails Between Ms. Alden and Ms. Light re: Ms. Light's son's work
   8.   October 14, 2020 Email re. Ms. Light's Son and Reading Intervention
   9.   Emails between Ms. Alden and Parent re: Houses Around the World Incident

---

[1] All parties interviewed were provided with an *Upjohn* Warning (an advisement to employees stating that communication between organization counsel and organization employees are privileged, but the privilege belongs to the organization and not the individual employee) and all parties acknowledged verbally that they understood the warning and wished to proceed with the interview.
[2] The relevant events of the complaint took place during the 2020-2021 academic year when Ms. Light was a Worthington Hooker Elementary School Third Grade Teacher.

{01560770.DOCX Ver. 1}
2

10. Collective Bargaining Agreement Between New Haven Board of Education and New Haven Federation of Teachers, Local 933 (2018-2021)
11. New Haven Public Schools Personnel Policies
    1. 4100 – Statement of Non-Discrimination
    2. 4101 – Harassment
12. New Haven Public School Policy – Students

c. *Interview Summaries*

### 1. *Ms. Hilarie Alden – Interviewed In-Person 8/20/21*

- Ms. Alden is entering into her third year at Worthington Hooker school as a teacher of the 2nd grade.
- Ms. Alden explained the organizational structure at Worthington Hooker generally stating that Ms. Margaret-Mary Gethings is the School Principal and Ms. Jenny Clarino serves as the Assistant Principal.
- Prior to the incidents commencing in Fall 2020, Ms. Alden described her dealings with Ms. Light as cordial. Ms. Alden described the work they were doing together in Summer 2020 around a play-based initiative for the school children. Ms. Alden described those interactions as positive, and that in their otherwise limited interaction with Ms. Light, all experiences were positive.
- A month prior to the start of school in Fall 2020, Ms. Alden was informed that Ms. Light's son would be entering her second grade class. She recalled being excited about having him in the class. Ms. Alden, however, was warned by the first grade teacher about negative experiences they had with Ms. Light as it relates to her son. Ms. Alden also learned that the school literacy coach had some negative experiences with Ms. Light with Ms. Light making many demands upon them and not letting the coach make the decisions based on their expertise.
- Ms. Alden described that the school went fully remote in Fall 2020 resulting in the creation of hybrid classrooms comprised of several learning pods. Ms. Alden states that Ms. Light's son was in a pod with two other children including the child of the then-PTA President.
- Ms. Alden, also described the basic purpose behind the Remind App which was to function as a channel between teacher, parent, and student for classroom related announcements and classwork assignments.

East Rock Park Meet & Greet

- In an effort to provide social and emotional engagement for her students, Ms. Alden planned an optional read-aloud event for her students, originally during the school day. Ms. Alden stated that prior to the event which was posted on the Remind App, Ms. Clarino informed her that the event would need to take place after school per school policies. As a result Ms. Alden changed the event from a read-aloud event to a "meet and greet" outside normal school hours. Ms. Alden reminded families who would be

{01560770.DOCX Ver. 1}

3

attending that masks and social distancing would be required. Ms. Alden was informed that Ms. Light had inquired originally about the event being held during school hours.

- Ms. Alden stated that the Light family came to the "meet and greet" as did Ms. Clarino. Ms. Alden stated Ms. Light's son was running around with other children and that she briefly had a conversation with Ms. Light and her husband at the event which she described as cordial.
- Ms. Alden received high praise about the event from other parents with some parents requesting more frequent events of that nature based on how much their children enjoyed it.
- Ms. Alden states that Ms. Gethings asked about the event due to a complaint from a parent but Ms. Alden does not recall if Ms. Gethings identified Ms. Light by name as the complainant.
  - o [During 9/21/21 Follow-up meeting – Ms. Alden was asked how she found out that Ms. Light had expressed concerns about the event to school-level administrators]
    - ▪ Ms. Alden asked Ms. Clarino for permission to host an event for her students during the day. Ms. Clarino agreed to the idea. Ms. Alden sent a message through the Remind App to parents discussing the event.
    - ▪ Ms. Alden learned of Ms. Light's concerns when Ms. Clarino told her that Ms. Light had approached Ms. Gethings questioning why Ms. Alden gets to hold an event during school hours and she cannot not.
    - ▪ Ms. Clarino was informed that events during school hours were not allowed and told Ms. Alden she needed to change the time of the event to after school.
    - ▪ Ms. Alden cannot recall if she had a conversation with Ms. Gethings about Ms. Light's concerns.

November Parent Teacher Conference

- Ms. Alden described that throughout the semester she would send messages through the Remind App about school work assignments and other classroom announcements. Ms. Alden noted that parents were given the option to use the app to engage with the teacher.
- Ms. Alden stated that there was a parent-teacher conference in the middle of November. During the conference with Ms. Light and her husband, Ms. Alden noted the conference was uneventful until Ms. Alden brought forward concerns about Ms. Light's son's missing homework. Ms. Alden stated after making that point, the meeting turned hostile and confrontational.
- Ms. Alden stated that she sent reminders to parents about turning in homework assignments and even allowed Ms. Alden's son to turn in work in-person to make it easier. Ms. Alden emphasized this when asked about whether she provided more frequent progress reports to the Light family that Ms. Light's son was falling behind. Ms. Alden notes, however, that Ms. Light and her son did not take advantage of the in-

person option; Ms. Alden stated that Ms. Light wanted more personalized messages about what exactly Ms. Light's son needed to turn in.

- o *[During 9/21 Follow-up meeting – Ms. Alden was asked how the parent teacher conference was before the parties discussed missing homework assignment]*
  - Ms. Alden stated that parent/teacher conferences are scheduled for 15 minutes but the one with the Light family took 45 minutes.
  - Ms. Alden stated that it was a lengthy but normal conference and reflected that the Light family had a lot of questions and there was a lot of back and forth.
  - Ms. Alden said the meeting only became tense at the very end when she showed the Light family Ms. Light's son's report card encouraging the family and the son to turn work in using Google Classroom.
- Ms. Alden noted that several other students were also not turning in assignments, resulting in Ms. Alden speaking with the parents about ensuring the assignments do get turned in to properly evaluate the student's progress. Ms. Alden said those students and families made the appropriate correction and it worked out without any further issues. Ms. Alden also pointed out that she tried to set-up her Google Classrooms in an organized way.
- Ms. Alden further described Ms. Light's follow-up response to the conference by sending her over 35 emails with Ms. Light's son's late work which Ms. Alden found inappropriate[3].
- As a result of this conference and follow-up, Ms. Alden requested the assistance of Ms. Gethings and Ms. Clarino specifically to attend the follow-up meeting to the original parent-teacher conference.
- During the second meeting, Ms. Alden highlighted the fact that she was disappointed in Ms. Light's approach as a teacher colleague and the meeting concluded with Ms. Light's husband expressing that he had never been so offended in his life.
  - o *[During the 9/21/21 follow-up meeting Ms. Alden was asked about her tone during the second conference*
    - Ms. Alden was asked if she yelled or raised her voice during the meeting to which she stated that she did not yell or raise her voice but was very "direct" in her tone. While Ms. Alden was disappointed about the Light family's reaction, she did not yell. She stated she was very clear in the words that she used. Ms. Alden said neither Ms. Gethings nor Ms. Clarino expressed concern with her tone of voice during that meeting.]
- December Follow-Up
  - o Ms. Alden conveyed that Ms. Clarino reached out to Ms. Light's husband to see how the semester was progressing with their son turning in assignments. Ms. Alden stated that Ms. Clarino received a long email response diving into everything Ms. Alden was not doing. Ms. Alden further conveyed that the administration had a follow-up meeting with Ms. Light's husband and were blown

---

[3] In Ms. Alden's "List of Concerns" she noted that Ms. Light sent the 35 emails to her personal email but during the 9/21/21 follow-up meeting when asked to clarify that point, Ms. Alden stated the email was sent to her school email address but the point of her concern was that Ms. Light sent 35 emails to her over the weekend.

away by the detail and thoroughness of his response regarding Ms. Alden's teaching.

o   In the context of Ms. Light's husband's response, Ms. Light's husband brought forward concerns about the "Houses Around the World" video that Ms. Alden had shown in class. Ms. Light's husband was also concerned about some web links Ms. Alden provided to her students that he said contained inappropriate violent descriptions of historical events. This complaint about the contents of the video and links was conveyed to Ms. Alden. Ms. Alden stated that she felt really hurt by the accusation that by showing this video that she was somehow a racist. Ms. Alden described that she would post content based on a theme of the day and the "Houses Around the World" video was in support of one of these "day of" themes.

o   [During the 9/21/21 Follow-Up meeting Ms. Alden was asked if any parents affiliated with the Anti Racist Anti Biased ("ABAR") group reached out to her]

  ▪   When asked if any parent affiliated with ABAR reached out to her to discuss the "Houses Around the World" video, Ms. Alden stated she received a Remind app message and then a phone call from another parent, Dr. Grossman.

  ▪   Ms. Alden said that Dr. Grossman heard from other parents (Ms. Alden believes a parent in Ms. Light's son's learning pod) about the video. Ms. Alden stated that Dr. Grossman said he did not want to make the call, that he could not believe the allegations, but nevertheless spoke very favorably of Ms. Alden.

  ▪   Regarding the video, Ms. Alden noted that the video was shown as part of class content about "Roofs around the world". Ms. Alden noted that she provided appropriate commentary about the video to the students and did not simply ask them to watch the video without any context.

  ▪   Ms. Alden was asked if any school administrators talked to her about the video. Ms. Alden said that she provided Ms. Clarino and Ms. Gethings a walk-through of her Google classroom. In addition, they talked about the video and Ms. Alden said they agreed that Ms. Alden should make every effort to ensure focus on multi-culturalism. Ms. Clarino noted that they collectively agreed to take down the link regarding "This day in history" to prevent the students from searching the sites and the web containing other content they were not intended to access.

• Seeking Advice

  o   When asked about seeking advice from other teachers about how to manage a relationship with a colleague who is also a parent, Ms. Alden stated that she is not someone who gossips but wanted to speak with other teachers what she could do internally. Other teachers allegedly conveyed that they have had similar issues with the Light family's approach and that Ms. Alden's experience was not unique.

• COVID Protocols

  o   Ms. Alden described a Zoom meeting held in early 2021 regarding the return of in-person learning. Ms. Alden stated that a fellow parent, in Ms. Light's son's

{01560770.DOCX Ver. 1}
6

learning pod, asked questions that could only be asked if they were influenced by a teacher working within the school. Ms. Alden said that one of the parents was asking very specific, seemingly scripted questions, about capacity for students in the classrooms and space between desks.

- Statements to BOE
  - o Ms. Alden was asked if she had attended any Board of Education meetings and stated that she had attended via Zoom. Ms. Alden recalled Ms. Light stating to the Board, "I don't want to die" in reference to COVID. Ms. Alden felt that Ms. Light's comments to the Board and on other social media platforms has made her very uncomfortable to express opinions in and around Ms. Light. Ms. Alden stated that Ms. Light's comments created a distrust between other parents and teachers. Moreover, Ms. Alden feels silenced and unable to voice opinions for fear that Ms. Light will convey those opinions negatively on social media.

- General Concerns
  - o Ms. Alden stated that if she is aware that Ms. Light is involved in a particular committee or other school initiative, she will ask HR and school administrators for her not to be involved as Ms. Alden does not want to work with Ms. Light.
  - o Ms. Alden was asked about her comments about the Board addressing the issue with Ms. Light, functioning as both a parent and a teacher. Ms. Alden hoped that Ms. Light would be collegial as a parent and understand the importance of respecting the role of the teacher.
  - o Ms. Alden stated that there were no further issues in Spring 2021 with the exception of Ms. Light's son making comments that he does not like Ms. Alden and related comments undermining her as his teacher.
  - o Ms. Alden has not received other complaints from parents but only from Ms. Light and her husband.
  - o Ms. Alden feels that staff meetings are no longer a safe space to communicate when Ms. Light is there.

- Gethings/Clarino Influence
  - o Ms. Alden was asked if Ms. Gethings or Ms. Clarino influenced her to file her complaint, she stated, "no, not at all." *[During the 9/21/21 follow-up meeting, Ms. Alden was asked again about external influences and unequivocally stated she was in no way influenced by any school administrator to file the complaint.]*
    - ▪ *[During the 9/21/21 follow-up meeting, Ms. Alden was asked why she waited until the end of the Spring semester to file her complaint]*
      - Ms. Alden discussed why she waited until the end of the Spring semester to file the complaint. She noted that part of it was her concern about Ms. Light's son returning to the classroom at the end of spring break and the fear that the Light family would respond to everything sent home and question everything she was doing.
      - Ms. Alden also stated the timing of the complaint was based on the constant messages coming from school administration about changes coming the following year, the fact that much of the staff

{01560770.DOCX Ver. 1}

7

meeting discussion focused on preferences for the following year, and the desire to not work with Ms. Light in the following year.

- Ms. Alden said during her TEVAL with Ms. Clarino, she made it clear she did not want to teach with Ms. Light. Ms. Alden spoke with the union about her concerns as far back as December when she was advised to take notes and not take any action unless the situation escalated. Ms. Alden originally sent her list of concerns to Ms. Morrison, which triggered the union trying to facilitate a mediation with Ms. Light and Ms. Alden. Ms. Alden said Ms. Light did not wish to meet and after that time, Ms. Alden sent her complaint officially to HR.]

   o When asked why she believed Ms. Light reacted the way she did during the school year with respect to her son and Ms. Alden's teaching, she believes Ms. Light interpreted her comments about Ms. Light's son as questioning Ms. Light's parenting. Ms. Alden stated that she was in no way doing that but just wanted Ms. Light's son to turn in his work so she could help him along with his progress in 2nd grade.
   o Ultimately, Ms. Alden said that as a result of the complaint, she hopes that no other teacher has to go through what she did with the Light family and that all teachers can express their educational perspectives without retaliation or fear.

### 2. Ms. Margaret-Mary Gethings – Interviewed In-Person 8/23/21

- General
   o Ms. Gethings serves as the Principal for the Worthington Hooker School and has been in that role for approximately four years.
   o Ms. Gethings stated in relation to her experience with Ms. Light that Ms. Light has been a teacher at Worthington Hooker for about 6 to 8 years. Ms. Gethings described her as a creative and passionate teacher who is heavily involved in the school but notes that she does not always get along with others.
   o Ms. Gethings states that she had had a very good relationship with Ms. Light and found Ms. Light often praising her for her own work. This was the case until December 2020 when Ms. Gethings began to discuss changing Ms. Light's grade assignment for the following academic year.
   o As it relates to Ms. Alden, Ms. Gething stated that she hired Ms. Alden, and while she is not Ms. Alden's Instructional Manager, she has found Ms. Alden to be a remarkable teacher, devoted, and an amazing asset to the school.
- East Rock Outing
   o Ms. Gethings expressed that she was not specifically involved in the planning of Ms. Alden's read-aloud event but had encouraged teachers to plan outdoor activities.
   o Ms. Gethings stated that perhaps the district message was unclear that there were not to be activities such as the one Ms. Alden was planning during school hours. Ms. Gethings was under the impression that Ms. Clarino mistakenly believed activities during school hours were permitted when they were not.

- o Ms. Gethings stated that Ms. Light received a message through the Remind App from Ms. Alden to her class regarding an event during school hours. As a result, Ms. Light approached Ms. Gethings inquiring whether the rule had changed. Ms. Gethings thought Ms. Light was concerned about this because if the event was during the school day she would be unable to attend with her son due to her own teaching obligations. Ms. Gethings informed Ms. Light that the policy had not changed and subsequently informed Ms. Clarino that Ms. Alden's event would need to take place after school hours.
- o Ms. Gethings stated that after the event that was held after school, she asked Ms. Light how the event went. Ms. Gethings stated Ms. Light complained about both the lack of a planned activity and the lack of masking and social distancing observed.
- o Ms. Gethings stated that she did not receive complaints from other parents expressing concern about the lack of activities, or the lack of masking and social distancing. In fact, Ms. Gethings heard nothing but positive feedback from other parents about the event.
- Parent-Teacher Conference
  - o Ms. Gethings stated that Ms. Alden asked her and Ms. Clarino for support after the first parent-teacher conference with Ms. Light and her husband. Ms. Gethings stated that she and Ms. Clarino agreed and came to the meeting to find ways to help support Ms. Light's son.
  - o Ms. Gething said the meeting was not great and that Ms. Light's husband did most of the talking. Ms. Gethings stated that she could feel the tension and found the exchange odd in light of the fact that Ms. Alden and Ms. Light had worked collaboratively on the play-based initiative during the previous summer.
  - o Ms. Gethings discussed how Ms. Light's husband was upset with Ms. Alden about her classroom set-up but Ms. Gethings stated that Ms. Alden's Google Classroom was the model for the school.
  - o Ms. Gethings felt that Ms. Light and her husband were trying to find fault with Ms. Alden with respect to their son, and as a result continued to find fault with everything Ms. Alden did. During the meeting, Ms. Gethings said that everyone seemed defensive.
  - o As it relates to the need to provide progress reports to the Light family, if Ms. Light's son was falling behind, Ms. Gethings stated that would occur if an intervention was needed. However she noted that was not at issue with Ms. Light's son as it was more about turning in work so Ms. Alden could evaluate his work in order to determine if an intervention was needed in the first place.
  - o When asked if Ms. Gethings apologized for Ms. Alden's statements during the parent-teacher conference follow-up, Ms. Gethings stated no, she only apologized for what had happened but not for Ms. Alden's statements. In that vein, she would not know what she was apologizing for.
  - o Based on subsequent correspondence, it was determined, according to Ms. Gethings, that Ms. Light's husband would be the spokesperson for their son going forward.
  - o Ms. Gething stated she also received an email from Ms. Light's husband regarding the showing of the "Houses Around the World" video. Within that context Ms. Gethings discussed the role of the Anti-Biased Anti-Racism group at the school and stated that the group has no official relationship to the school but is a group comprised of school community members that has gathered to discuss school culture and equity.

- o According to Ms. Gethings, only Ms. Light's husband complained about the "Houses Around the World" video even though Ms. Light's husband said another parent was irate about the video. Ms. Gethings stated that she received no complaint from this irate parent.
- o Ms. Light's husband also pointed out problematic content with a link Ms. Alden provided to the class. The link related to content around "this day in history" and inappropriate material contained within the link. Ms. Gethings stated that Ms. Alden was informed to remove that link.
- o As to the school administration's response to the "Houses Around the World" video, Ms. Gethings discussed it with the District as well as Ms. Clarino and did not see a need to address the issue. Ms. Alden appropriately narrated throughout the video providing it relevant context. Overall, Ms. Gethings was not concerned about the video.
- General
  - o Ms. Gethings was asked if other teachers had expressed concern about Ms. Light's behavior. Ms. Gethings stated that other people are offended by her comments and by her dramatic approach. She stated that some teachers had complained about the lack of communication from Ms. Light when she served as the teacher liaison to the PTA. Ms. Gethings also commented that Ms. Light's past grade level partner did have a good relationship with her, but others in the school do not want to work with her. Ms. Gethings did not identify who these others were.
  - o When asked about Ms. Light's public utterances, Ms. Gethings stated that her comments did not pertain to Ms. Alden but focused more about the district not following certain policies related to re-opening of schools. Ms. Gethings said that Ms. Light would speak for a long time at BOE meetings about reopening. Ms. Gethings expressed that she wished Ms. Light would address her concerns at the school level first before voicing them at BOE meetings.
  - o Ms. Gethings was asked about the occasion when a 2nd grade parent and PTA President asked about touring the building during a meeting with 2nd grade parents regarding reopening protocols. Ms. Gethings said that they hosted remote meetings with all grades to discuss the reopening in Spring 2020 and to answer questions from parents. Ms. Gethings said that meetings in all grades went very well except for the 2nd grade meeting. Ms. Gethings stated that the questions asked by the 2nd grade parent were very focused and ridden with fear derived from Ms. Light's influence as some of questions assumed information only a teacher would be aware of. The meeting was uncomfortable according to Ms. Gethings and found the question about whether the parent could tour the building with a checklist inappropriate in light of the fact that the Superintendent of Schools and the local health department had already done so and found the school protocols adequate to ensure community safety.
  - o When asked about Ms. Light's social media post about positive cases in the school, Ms. Gethings stated there were no known exposure in the school at any time the school was in session. Despite this, Ms. Gethings felt that Ms. Light's posts inaccurately influenced other parents leading them to believe the school was unsafe.
  - o In discussing how the second semester went with respect to the other parent teacher conferences between the Lights and Ms. Alden, Ms. Gethings stated they went fine and described them as night and day from the previous

conferences. Ms. Gethings noted that Ms. Clarino was in attendance for all of the remaining parent-teacher conferences.
- o  Ms. Gethings did comment that she thought that many of the concerns about Ms. Alden were brought forward by Ms. Light's husband and not Ms. Light herself.
- o  Ms. Gethings was asked whether she was attempting to exclude Ms. Light from committee assignments, whether she coached Ms. Alden to file the complaint or influenced the content of the complaint, or if she harbored any animus towards Ms. Light, and to each of those questions, Ms. Gethings answered in the negative.

### 3. Ms. Jenny Clarino – Interviewed In-Person 8/24/21

- • General /Intro
  - o  Ms. Clarino has serves as the Assistant Principal at Worthington Hooker School
  - o  In regards to her relationship with Ms. Alden, Ms. Clarino describes her as a strong and receptive teacher who is coachable and has a passion and drive to ensure her students do well. Ms. Clarino says she is a teacher that goes above and beyond. Ms. Clarino added that Ms. Alden is in her second career as a teacher and is used to being successful and brings that energy into her classroom.
  - o  As it relates to Ms. Light, Ms. Clarino said that Ms. Light had been in another building but seemed highly regarded by Ms. Gethings which made her believe that Ms. Light was highly respected by the Worthington Hooker community.
  - o  Ms. Clarino added that after the first parent-teacher conference, Ms. Alden felt attacked. When Ms. Light sent Ms. Alden her son's homework assignments on a Saturday morning through 30 emails, Ms. Clarino felt that Ms. Light's actions were very targeted. Ms. Clarino felt that Ms. Alden was highlighting a small issue about Ms. Light's son's assignments and as a result of the exchange, believed Ms. Alden felt like she was always being judged.
- • East Rock Outing
  - o  Ms. Clarino stated that she had misconceptions about the District policy regarding hosting events during school hours. She learned from Ms. Gethings that events would need to be planned after school hours. Ms. Clarino expressed that she learned of this fact after Ms. Light inquired with Ms. Gethings about Ms. Alden's planned event during school hours. According to Ms. Clarino, Ms. Light "lost it" when she learned that Ms. Alden was planning a read-aloud event during school hours.
  - o  Ms. Clarino stated she attended the rescheduled event that occurred after school hours and described the event as "amazing." While Ms. Clarino said she came to the event late, she noted that kids were wearing masks and were laughing having a good time while the parents seemed to have fun as well.
  - o  Ms. Clarino was not aware of any complaints about the event but was told by Ms. Gethings that Ms. Light had complained to her following the event about the lack of planned activities, and the lack of masking and social distancing.
- • Parent-Teacher Conferences
  - o  Ms. Clarino and Ms. Gethings agreed to assist Ms. Alden with the follow-up meeting to the November parent-teacher conference and went into the meeting looking for positive outcomes.
  - o  Ms. Clarino expressed that Ms. Alden was simply pointing out to the Light family of the need to send in assignments, and it seemed that the Light family was

taking the point personally. Ms. Clarino said that during the meeting Ms. Alden was crying expressing how hurt she was by Ms. Light as a fellow educator.

o During the meeting, they worked out an arrangement for Ms. Light's son to turn in assignments in person. Ms. Clarino highlighted that this type of arrangement was not typical during hybrid learning but noted such an arrangement . to turn in work in a different manner than other students was a typical modification.

o Ms. Clarino discussed that she attended all subsequentconferences with Ms. Alden and Ms. Light's husband. Ms. Clarino would occasionally write to Ms. Light's husband asking how the school year was going. Ms. Light's husband did write back and Ms. Clarino was surprised how critical he was of Ms. Alden's teaching and classroom set-up. When Ms. Light's husband expressed concerns about the organization of the digital classroom and expressed concerns about the "Houses around the world' video, Ms. Clarino met with Ms. Alden to see her Google Classroom. Ms. Clarino found that Ms. Alden's Google Classroom could have been a model for the school. As it related to the video, Ms. Clarino said nothing needed to be done but encouraged Ms. Alden to be more mindful of what she was posting and to ensure she reviews all aspects of a video or link before posting to ensure it is school age-appropriate.

- Ms. Clarino noted that Ms. Light's husband stated that other parents were complaining about the "Houses" video and if the administration did not address it appropriately, he would encourage other parents to lodge their complaints. Ms. Clarino stated she received no further complaints about the video.

o Ms. Clarino also stated that the Anti Biased Anti Racist group apologized to Ms. Alden clarifying that they did not believe posting the "Houses" video made her a racist.

- General
  o Ms. Clarino was asked if others in the school have complained about Ms. Light. Ms. Clarino provided an example of Ms. Kathleen Morrison having some difficulty with Ms. Light since Ms. Light's older son was in Ms. Morrison's class. On one occasion, Ms. Light was allegedly waiting outside Ms. Morrison's class pacing back and forth waiting to address Ms. Morrison on an issue with her son.

  o Ms. Clarino expressed that she was concerned that some of Ms. Light's comments have affected parents and caused them to put their backs up. Moreover, Ms. Clarino says some people do not like what Ms. Light has to say.

  o Ms. Clarino said, in particular, that Ms. Alden has been most affected by Ms. Light. Ms. Clarino serves as Ms. Alden's instructional manager and has sensed a real heaviness to Ms. Alden.

  o Ms. Clarino sensed that everything changed when they discussed grade changes with Ms. Light. She stated that Ms. Light's third grade partner, who is a highly regarded third grade teacher, expressed concern about Ms. Light's son being in his class and being subject to the same treatment as Ms. Alden. Ms. Clarino stated the other third grade teacher surprisingly wanted to change grades to avoid having to teach Ms. Light's son.

  o Ms. Clarino said that others do not want to work with Ms. Light.

  o On the topic of Ms. Light's social media postings and public utterances, Ms. Clarino only stated that she had asked Ms. Light to give her and Ms. Gethings time to address her issues regarding COVID protocols before going to the BOE.

  o Ms. Clarino also addressed the reopening orientations with the different grade levels and expressed that only the 2nd grade meeting was uncomfortable. During

{01560770.DOCX Ver. 1}
12

the meeting Ms. Clarino stated that Ms. Light's camera was off and another parent asked several questions that seemed could only be asked by a teacher in the building. One such question that the parent continued to inquire about was the number of desks allowed in a classroom. Specifically, the parent was looking for a firm number of the maximum number of desks allowed without understanding that the number of desks would be based on need and the number of school children returning to that classroom. Overall, Ms. Clarino felt sad how the meeting went and how it created a lack of trust between the school and the parents.

- General Continued
  - o Ms. Clarino said the second half of the year was uneventful and she did not hear of any further complaints as it relates to Ms. Alden and the Light family. Ms. Clarino would check in with Ms. Light's husband regarding Ms. Light's son and would often not receive a reply.
  - o Ms. Clarino did note that Ms. Light's son made some odd remarks once he returned to in-person learning. According to Ms. Clarino, the son was alleged to have said to Ms. Alden "I don't like you" or "I cannot wait to be out of this school." Ms. Clarino stated that Ms. Light's son seemed really mad at Ms. Alden.
- Gethings/Clarino Impact on Filing the Complaint
  - o Ms. Clarino was asked if she was attempting to exclude Ms. Light from committee assignments, whether she encouraged Ms. Alden to file the complaint, or whether she harbored any animus against Ms. Light and to each she answered in the negative.
  - o As it relates to issues concerning a false narrative about Ms. Light perpetuated by Ms. Clarino, Ms. Clarino stated she had not created a false narrative. She noted that other teachers in the school see social media posts that mention Worthington Hooker. Ms. Clarino commented further that she had no idea regarding the allegation that Ms. Light's social media actions were reflected in Ms. Light's TEVAL.
    - ▪ Relatedly, Ms. Clarino commented on one post made by Ms. Light showing a chart depicting Worthington Hooker as having less than 6 COVID cases. The relevance of this issue is that any positive cases in the school would be reported to parents in a letter from the school. Ms. Light's post could have resulted in school administration losing credibility with the parents because it made it seem that the school was not informing parents of positive cases. According to Ms. Clarino, there were no positive cases in school. She notes there was one teacher who tested positive but did not physically enter the school and thus there was no obligation to inform the parent community.

### 4. *Ms. Jessica Light – Interviewed via Zoom 9/17/21 (with Union Representative Pat Deluca*

- Professional Background
  - o Ms. Light has worked for New Haven Public Schools for approximately 12 years.
  - o Ms. Light currently serves as a 1st grade teacher at Worthington-Hooker Elementary school.
  - o During the 2020-2021 academic year, Ms. Light was the 3rd grade teacher at Worthington Hooker and served in that capacity for 4 years.

- o  According to Ms. Light, she had no negative evaluations and noted during the pandemic year that the District dispensed with their normal numerical evaluation system but prior to that she had received the highest numerical rating a teacher could receive.
- o  Ms. Light's direct supervisor is Ms. Gethings and noted Ms. Alden's supervisor is Ms. Clarino. They had previously worked in two different buildings.
- Pre-Fall 2020
  - o  Ms. Light expressed that prior to the Spring and Summer 2020, Ms. Light did not have much interaction with Ms. Alden.
  - o  In Spring 2020, Ms. Light wrote a grant for the PTA for outdoor learning/enrichment opportunities for students during the pandemic. In July 2020, Ms. Light worked with Ms. Alden to create a list of items for the PTA to purchase related to these opportunities using the grant funds. During that time, Ms. Alden's son was babysitting Ms. Light's son. Ms. Light said they worked together cordially. Ms. Light described their relationship as shallow but cordial.
  - o  Ms. Light learned towards the end of July/early August that Ms. Alden would be her son's teacher. Ms. Light noted that she did not find out her son's teacher for the following year at the same time as other parents typically would.
- East Rock Park Event
  - o  Ms. Light learned through the September 24, 2020 remind app message from Ms. Alden that Ms. Alden was planning a meet and greet during school hours at East Rock Park. Previous to this, Ms. Light had hosted her own outdoor events but was instructed that they had to be after school hours and an entire grade could not have an event at the same time.
  - o  Ms. Light said she quickly wrote to Ms. Gethings and talked to Ms. Gethings about that fact Ms. Alden was planning an outdoor event during school hours to ensure that it could be revised quickly so parents were not confused by Ms. Alden's mistake since Ms. Light understood that events could not be planned during school hours. She was inquiring whether the rules had changed regarding events during school hours.
  - o  According to Ms. Light, Ms. Alden's event combined both second grade classes which was counter to what she was told before by Ms. Gethings whereby such events could not combine all classes from a single grade.
  - o  Prior to Ms. Alden's event, Ms. Light had hosted two outdoor events for her class and two events for her grade partner's classes and Ms. Light was in the process of planning her third event.
  - o  Ms. Light attended Ms. Alden's meet and greet event with her son. She noted there were no issues during the event. Ms. Light had thanked Ms. Alden for hosting the event in a brief exchange.
  - o  Ms. Light commented that East Rock Park is a large park, but the playground area is small. She noted that with 50 kids playing on the playground and approximately 100 parents in attendance, it was a little crowded. She mentioned, however, that at no point did she feel unsafe and stated her son stayed at the event the entire time.
  - o  In planning her third outdoor event, Ms. Light asked Ms. Gethings if she could have the event with both third grade classes as Ms. Alden had done. In her response, Ms. Gethings asked Ms. Light how Ms. Alden's event went. Ms. Light stated it went fine but was a little crowded. Ms. Light said that was the only statement she made about the event. Ms. Light reiterated that she did not speak negatively about the event to Ms. Gethings.

{01560770.DOCX Ver. 1}
14

DEF000422

- November Parent-Teacher Conference
  - Prior to the conference, Ms. Light wrote to Ms. Alden, the administration, and others, advocating for her son to be in reading intervention. She thought her son would benefit from reading intervention as he had in first grade.
  - Ms. Light discussed how assignments in Ms. Alden's class were conveyed to students. Ms. Light said Ms. Alden, like other teachers, used Google classrooms, and posted a slide show with the assignments containing various links. Sometimes students had to post their pictures in the assignment section of the software. Apparently, her son would click "done," but some of the picture assignments submitted were blurry or difficult to read.
  - Ms. Light said that during the November parent-teacher conference, Ms. Alden came out immediately to state that Ms. Light's son had done no work, could not grade his assignments, and was not as high-functioning as the other students.
  - When asked when a teacher would need to provide a parent with progress reports if a child was falling behind, Ms. Light said that typically per the District policy, a teacher would send such a report about halfway through the marking period. In practice, at the elementary school, she stated that if a student was really behind, the teacher would let the parent know as a courtesy more frequently and engage in more frequent follow-up with the parent. This practice is what Ms. Light does with her students and parents.
  - At the conclusion of the meeting, they discussed their uncertainty with what exactly Ms. Alden was looking for but had agreed to create a binder for her son to keep track of assignments. Ms. Light and family additionally agreed to submit work for their son going forward and take any pictures needed for assignments to ensure they were not blurry.
  - Ms. Light noted that she did not request a follow-up parent teacher meeting but that Ms. Alden did so given concerns about Ms. Light's son not turning work in.
  - Following the meeting, Ms. Light sent Ms. Alden the missed assignments to her BOE email address. In doing so, she tried to organize them in a clear way based on subject matter and given the limitations of the BOE email system sent them at the quantity she did. Ms. Light did not expect Ms. Alden to grade all the assignments but due to Ms. Alden's use of the term "not high-functioning" she wanted to clear up any negative feelings Ms. Light may have had towards Ms. Light's son.
- Follow-up Parent Teacher conference.
  - According to Ms. Light, very soon after the first conference, a second one was scheduled with Ms. Alden, Ms. Gethings, and Ms. Clarino.
  - When asked to describe the point in the conversation when Ms. Alden stated that she was disappointed with Ms. Light as a parent and as a teacher, Ms. Light reflected that she made that statement because Ms. Alden thought Ms. Light, in her role as a teacher, should know how to operate Google Classroom. With respect to her role as a parent, Ms. Light should be helping her kids more like other parents.
    - Ms. Light was extremely angry with these statements questioning her as both a parent and a teacher. Ms. Light said her husband had to hold onto her knee to make sure she held her tongue. Two of her core identities are being a parent and being a teacher, and Ms. Light felt that Ms. Alden attacked them both in front of her bosses. Ms. Light was extremely offended by this.
  - Ms. Light said that during this meeting, Ms. Alden was yelling at a high volume.

{01560770.DOCX Ver. 1}
15

DEF000423

- o  When asked if the Light family took advantage of the arrangement for in-person drop off, Ms. Light said that they had when there were paper assignments but that became less pertinent because many of the assignments were online.
- o  Ms. Light felt very offended that Ms. Alden would believe that her son was not willing to submit work.
- o  At the conclusion of the meeting, the parties attempted to come to a consensus but once it seemed clear that was not possible, Ms. Light's husband ended the meeting by hanging up the phone.
- o  When asked about additional communication with Ms. Alden and school administration, Ms. Light said that in order to keep the peace and maintain her relationships, her husband handled any type of parental advocacy.
- o  Ms. Light noted that she heard through her husband that Ms. Gethings apologized for Ms. Alden's statements.
- o  Ms. Light reiterated that she was very offended that Ms. Alden continued to describe her son as not high-functioning. Ms. Light understood that phrase had a particular meaning of a child with disabilities. Ms. Light was offended that Ms. Alden pre-identified her son as having disabilities, without analyzing his work, and without a school psychologist's diagnosis.
- o  On Ms. Light's husband's follow-up message to Ms. Clarino, Ms. Light said she had no role in crafting those responses but her husband showed her some messages in advance of sending to Ms. Clarino.

- • ABAR/Houses Video
  - o  ABAR was a sub-committee of the School Planning and Management Team. Ms. Light noted that Ms. Gethings decided that she did not want it to be a part of SPMT so it had no official connection to the school.
  - o  Ms. Light described the group, to the extend it is a group according to Ms. Light, as a collection of parents concerned about racism and bias in the schools.
  - o  To Ms. Light's knowledge, the group has not met formally since before the start of the pandemic and may have met as far back as 2019.
  - o  Ms. Light was asked why the "Houses Around the World" video was shown, and she explained that it was not part of any District curriculum. She understood it was presented as a social studies video.
  - o  Ms. Light expressed that the day the video was shown, her child was attending school at a different parent's home and she did not have first-hand knowledge of whether Ms. Alden provided commentary during the video when it was shown to the students.
  - o  Ms. Light said that there were other problematic links Ms. Alden provided to the class in the context of links titled "A Day in History" that showed inappropriate pictures and images, like the Jonestown massacre and the Kennedy assassination.
  - o  Ms. Light said that they did not initially bring their concerns about the video to school administration because there was a lot "scuttlebutt" amongst the parents about the video and the Light family believed another parent would address the matter with school administration.
  - o  It was not until Ms. Clarino asked Ms. Light's husband how things were going with Ms. Alden and Ms. Light's child, that Ms. Light's husband conveyed their concerns about the video to school administration.
  - o  Ms. Light did not believe any corrective action was taken other than that the videos were taken down. Ms. Light expressed her belief that the fact that Ms.

Alden brought up the video in her complaint shows that Ms. Alden does not understand how racist the video was.

- o  Ms. Light was asked if other parents affiliated with ABAR spoke to Ms. Alden about their concerns with the video, and Ms. Light noted one other mother sent her a draft of a message for school administration but Ms. Light was not sure if it was sent. Additionally, she noted that Ms. Alden mentioned in her complaint that another parent complained about the video.
- General Issues
  - o  Ms. Light was asked about her relationships with her other colleagues and noted that she has a group of core friends and core allies but there are little issues with others, none of which are major.
  - o  Ms. Light was asked about her role as a PTA teacher liaison and said that the role was created for her given her status as both a teacher and a parent. Ms. Gethings had asked if anyone else wanted to run for the position and Ms. Alden expressed interest. In order to avoid having Ms. Alden as a political opponent with everything else going on, Ms. Light decided not to run.
- COVID Advocacy/BOE Statements
  - o  Ms. Light was asked the significance of the data she posted on social media showing that Worthington Hooker had less than 6 cases. She noted that the issue was based on the fact that Worthington Hooker one week was not on the graph, and then was subsequently on the graph, and was then again not on the graph. Per Ms. Light's research through the CDC, when the graph says less than 6, that does not mean there could be zero cases. She was concerned that school administration did not send out a notice to the school community about the case and was trying to figure out if there was a COVID exposure in the school so she could keep herself and others safe.
  - o  Ms. Light was not aware of any positive cases of those who were physically in the school but was surprised to learn about the less than 6 cases from the government and not her own school.
  - o  Ms. Light was asked if it was possible that Ms. Alden had attended the BOE meetings when she spoke and was then affected by those statements. Ms. Light said it was impossible to know who attended a BOE meeting because it was virtual. Ms. Light said Ms. Alden had not attended or spoken at BOE meetings when they were in-person like she had. Given that Ms. Alden did not cite to Ms. Light's BOE statements, she believed that Ms. Alden learned of her statements second-hand.
- In-Person Orientation Meeting
  - o  Ms. Light said that when the school was transitioning back to in-person learning, she and other teachers had sent information to parents to show them what their classes would look like.
  - o  The school administration held a series of meetings with parents to discuss resuming in-person learning, and Ms. Light attended with other parents within her son's learning pod.
  - o  Ms. Light was asked if she provided any parents with questions to ask or a script to follow and Ms. Light said "absolutely not."
  - o  Ms. Light noted that the parent that was asking questions was the President of the PTA and was asking the administration questioned based on his role. Ms. Light noted that the particular parent is a German Antifacist and perhaps came across in ways he did not intend, but was at all times speaking for himself.

- o Moreover, Ms. Light noted that advocating for the PTA to conduct walk-throughs of buildings was the antithesis of what Ms. Light believes given the impacts of COVID.
- Other General Issues
  - o As to the issue of the blurred lines between teacher and parent, Ms. Light said it can be awkward but it is not a major issue suggesting this investigator reach out to her son's first grade teacher, with whom she worked well.
  - o No other teachers have come to her with concerns, but again said it can be weird when she is advocating as parent given her role as a teacher.
  - o When asked how this issue between her and Ms. Alden can be resolved, Ms. Light suggested a sit down mediation where Ms. Alden can understand her role and to also clear the air. This was previously attempted before but according to Ms. Light, Ms. Alden originally refused to meet with her and the Union president. Ms. Alden suggested that Ms. Kathleen Morrison, one of the union stewards attend, and Ms. Light felt it was not appropriate and did not want to meet under those conditions because she felt it was unfair because Ms. Morrison would be playing more of an advocacy role and based on the fact that her older son had Ms. Light's son in her class. It was inappropriate, in Ms. Light's view, to have a union steward there when the Union President, a position above that of a steward, would be present. Ms. Light noted she would be happy to meet with Ms. Morrison separately.
- Gethings/Clarino Impact
  - o Ms. Light was asked what led her to believe that Ms. Gethings and Ms. Clarino influenced Ms. Alden to file the complaint against her. Ms. Light said that the timing was suspect. Ms. Light is concerned that Ms. Alden was informed that Ms. Light complained about the East Rock park meet and greet when she did not complain. She then noted that all issues that took place with Ms. Alden happened in November 2020 and was concerned that the complaint was not filed until late Spring 2021. Ms. Light outlined a series of dates that evidences her concern with the timing of Ms. Alden's complaint:
    - On April 23, 2021, the Union president informed Ms. Gethings and Ms. Clarino that Ms. Light was likely to file a retaliation claim.
    - On April 26, the Union President called Ms. Gethings and Ms. Clarino and learned that Ms. Light would not teach 2nd grade because Ms. Alden filed a complaint.
    - On April 30, Ms. Light emailed her retaliation complaint to Ms. Mack.
    - On May 5, Ms. Alden expressed that she would not meet with Ms. Light and the Union President to mediate their dispute without Ms. Morrison present.
    - On May 6, Ms. Light's son told her that Ms. Alden laughed at him and said "that's a funny shirt" when he wore a shirt that said "my mom is my superhero."
    - On May 11, Ms. Alden sent her list of concerns that triggered the investigation.
  - o Ms. Light feels that the wording in the complaint sounds coached (specifically the issues around the BOE meetings that Ms. Alden does not attend) and that it was done intentionally to push her off committees. Ms. Light noted this is not the first time the administration solicited complaints against her.
  - o Ms. Light confirmed that for the 2021-2022 school year she is teaching first grade.

### III.    FINDINGS

#### a.  East Rock Park Issues

Ms. Alden expressed concern in her "List of Concerns" regarding a series of complaints brought by Ms. Light regarding an outdoor school event at East Rock park. The first concern Ms. Alden had was that Ms. Light complained directly to the administration that Ms. Alden was planning an event during school hours which Ms. Light thought was not approved by the school. Ms. Alden would have preferred that Ms. Light register her concern directly to her, as a colleague, and not go directly to the school administration.

The evidenced gathered showed that Ms. Light had desired to host events for her third-grade students during the school day but had been informed by Ms. Gethings, her direct supervisor, that all outdoor activities would need to be done after school hours.

As Ms. Alden was planning her class event, she had the approval and support of Ms. Clarino, Ms. Alden's supervisor. Ms. Alden acted in reliance on this approval to plan the event during school hours. Through the statements of Ms. Gethings and Ms. Clarino, Ms. Clarino misunderstood the broad prohibition against outdoor school events during school hours and gave her support to Ms. Alden's event in error.

Ms. Alden sent a message to the parents of her class about the event to be held during school hours. Ms. Light saw this message, given her son's placement in Ms. Alden's class. Based on Ms. Light's understanding, events were not to be held during school hours, and believing the policy may have changed asked Ms. Gethings if it had. This is evidenced by an email from September 24, 2020, the same day Ms. Alden sent the Remind App message to parents. The email states the following, "I understand this was mistakenly planned for during the day, but let me know if it is changing or if it is just going to be allowed this one time, so I can plan for Child A." In addition, in Ms. Gethings statement, she noted that Ms. Light approached her in person as well, asking if the policy for outdoor school hour events had changed since she had been unable to hold events during the school day previously. Based on this evidence, Ms. Light did not complain or express in negative terms the fact that Ms. Alden was holding an event during school hours. The evidence suggests it was an inquiry based on an interest in holding similar events during school hours and to make appropriate arrangements for her son.

Ms. Gethings informed Ms. Clarino that Ms. Alden's event could not be held during school hours. Ms. Clarino believed that Ms. Light came to Ms. Gethings upset about this (i.e., she believed Ms. Light "lost it") and this may have been conveyed to Ms. Alden when Ms. Clarino told her to change the time of the East Rock event. Again, the evidence supports that Ms. Light merely inquired about the policy and plans and did not "complain," but Ms. Alden believed that Ms. Light had complained to Ms. Gethings.

The next concern with respect to the East Rock Park event was that Ms. Light complained to the administration that the event itself lacked a planned activity and lacked adherence to the guidelines on social distancing.

{01560770.DOCX Ver. 1}
19

All parties interviewed stated the event went well and was highly enjoyed by the second-grade community. Ms. Light and Ms. Alden had a cordial exchange during the event.

According to Ms. Light and Ms. Gethings, after the event Ms. Gethings asked Ms. Light how the event was. Ms. Gethings stated Ms. Light complained that the event lacked a planned activity and students and parents were not observing social distancing guidelines. Ms. Gethings reiterated this response to Ms. Clarino who provided this investigator with that response. Ms. Light states that she answered by saying the event was "fine" but it was a bit crowded given the size of the playground area. Ms. Light further clarified that is all she said about the event and said nothing further that could be construed as negative. Moreover, Ms. Light credibly stated at no point did she feel unsafe and actually allowed her son to stay for the duration of the event.

The evidence based on witness statements, shows that Ms. Light merely stated the event was crowded and did not lodge any other complaints concerning the safety of the event or complain about the activity during the event. Ms. Light said her son had a good time, he stayed for the entire event, and when asked how the event went, Ms. Light answered honestly by saying it was a little crowded. Ms. Gethings may have construed this as a criticism of the event's safety but given that Ms. Light's son attended the entire event, no issues came up at the event itself, and the relative size of the area of the event, Ms. Light's statement that she said it was a little crowded is credible. Ms. Light would not have allowed her son to stay for the entire event if she felt the conditions were unsafe for her or her child. Evidently the Ms. Gething's characterization of Ms. Light's statements as a complaint was conveyed to Ms. Alden but it is more likely than not Ms. Light only stated that the event was crowded and nothing further.

      **b.** Parent-Teacher Conferences

Ms. Alden expressed concern about her experiences with Ms. Light during the November parent-teacher conference. Ms. Alden stated that most conferences last 15 minutes but in the case of the Light family, it lasted 45 minutes.

Based on a review of witness statements, the first part of the conference was not at issue. Ms. Alden's testimony that it was normal but lengthy is credible and the meeting did not start out in negative way. Ms. Light and family had questions for Ms. Alden generally and the parties engaged in a series of back and forth but there was no evidence that the content of these questions was inappropriate or led to a hostile meeting.

The tone of the meeting changed when Ms. Alden presented Ms. Light's son report card that contained a message encouraging the family to turn in Ms. Light's son's assignments through Google classrooms because they had not been received and Ms. Alden was unable to evaluate Ms. Light's son's work. Ms. Light and her husband became tense and asked Ms. Alden to provide more support to the family despite Ms. Alden noting that she had communicated with parents often about assignments through the Remind App.

Evidently Ms. Light's son had completed the work but due to the format of the Google classrooms did not submit them or if they were submitted, the pictures came back blurry.

As a result of this conference, Ms. Light sent Ms. Alden her son's missing assignments on a weekend to Ms. Alden's work email. Ms. Alden thought it was inappropriate that Ms. Light did this when it was not requested. Ms. Light misunderstood exactly what Ms. Alden was looking for and decided to provide the missing assignments to Ms. Alden. Ms. Alden's response to the 35 emails was direct and Ms. Light's response seemed to be designed to lower the tension. Based on this evidence, the hostility between the parties arose when Ms. Light interpreted Ms. Alden's comments about the lack of work turned in as a criticism of her parenting and Ms. Alden took Ms. Light responses as a criticism of her as a teacher.

After the second conference, when school administration's attendance was requested, this interpretation of the situation became more clear. As Ms. Light noted in her interview, she felt that Ms. Alden was challenging two of her core identities, that of a parent and that of teacher.

Ms. Alden did not directly state that she felt Ms. Light and her husband criticized her role as a teacher, but Ms. Alden's reaction and tense demeanor during the meeting shows that she felt that way.

The statements from Ms. Alden about the tone of her voice during the conference was found to be credible as no member of the school administration found it necessary to address the tone or volume of her voice. It is clear, as Ms. Alden expressed, that she was firm in her tone but not loud nor yelling.

On the allegation from Ms. Light that Ms. Alden should have informed the Lights about the fact that their son was falling behind based on District practice, the policy, not the practice dictated Ms. Alden's response. Only in the event that a student is at risk of failing is a progress report to be provided to the parents. Since Ms. Alden did not receive Ms. Light's son's assignments to make a valid assessment of his work, Ms. Alden could not provide such a progress report. While Ms. Alden could have informed the parents of her concerns at an earlier point, she was under no obligation to do so and was using the parent-teacher conferences as the vehicle to highlight her concerns which is both appropriate and arguably within the practice of informing the parents at the earliest stage as Ms. Light suggests.

Another point of note is Ms. Alden categorizing Ms. Light's son as not as high functioning as other students. Ms. Light notes that this terminology implies a learning disability that Ms. Alden is not authorized to diagnose. Based on the lack of concern expressed by school administration about Ms. Alden's use of the term, it is clear Ms. Alden was using the term in a general sense and not in a technical sense. Ms. Alden was merely expressing her concern that Ms. Light's son was not performing at the same level as other students. Again, Ms. Light interpreted this as a further indictment of her parenting and through the heated exchange at the second meeting, Ms. Alden took the Light family's response as an indictment of her teaching. This is all further evidenced by the fact that Ms. Alden said how disappointed she was with Ms. Light with her response because Ms. Light understands the difficulties of being a teacher in a remote environment in the middle of a global pandemic.

Again, Ms. Alden took Ms. Light and family's statements during the parent-teacher conferences as a criticism of her as a teacher, one of her core identities. Similarly, Ms. Light took Ms. Alden's comments about Ms. Light's son not turning in work as a criticism of her as a parent, one of her core identities.

These interactions during the conferences were unfortunate and could have been avoided if the parties shifted their perspectives, but there were no policy violations based on the conduct of any of the conference attendees.

1. "Houses Around the World"

Ms. Alden alleged that her name was submitted to Anti-Biased/Anti-Racist (ABAR) group stating that she was promoting North American superiority by showing a video clip titled "Houses around the World" which depicted different homes around the world in various conditions. Ms. Alden was concerned she was being inaccurately labeled a racist within the Worthington Hooker community.

The catalyst for this concern stems from Ms. Clarino asking Ms. Light's husband how the school year was progressing with respect to Ms. Light's son following the parent-teacher conferences. Ms. Light's husband expressed concern about the "Houses Around the World" video shown stating that it is "propagating stereotypes about different cultures and European-American superiority." Ms. Light's husband also expressed concern about other links provided to the students that could lead to inappropriate violent content.

As a result of this concern, school administrators met with Ms. Alden where Ms. Alden walked them through her entire Google Classroom. It was determined that Ms. Alden provided commentary about the videos to the students before showing them the video as part of a "Roofs around the world" theme. The links that could lead to students viewing violent content were removed and Ms. Alden was informed to be more mindful of what is posted and to analyze potential postings through the lens of multi-culturalism. The school administration conferred with the District Office and all believed that no further action was needed and that the video was not "racist."

Ms. Alden expressed that she received a phone call from another student's parent affiliated with the ABAR group and stated how he did not believe Ms. Alden to be a racist, and was, in fact, a fine teacher. The central allegation here is that Ms. Light influenced her husband to complain about the video to school administration and organized an effort for members of the ABAR group to complain about the video. While Ms. Light said that she had reviewed her husband's emails prior to him sending them, she noted she did not author the emails. Ms. Light further acknowledged that she had corresponded with other parents to assess whether her opinion of the video was appropriate.

In essence, Ms. Light was concerned about the video in her role as a parent, and engaged other parents regarding her concern which later resulted in Ms. Light's husband sending Ms. Clarino an email expressing his concerns with the video. Ms. Light certainly had some role, even if she was not the one that directly complained, leading to the investigation of Ms. Alden's use of the video in the classroom. These actions did result in school administrators inquiring about Ms.

{01560770.DOCX Ver. 1}
22

Alden's use of the video and Ms. Alden's character being questioned. Ultimately, school administration took appropriate corrective action to address any concerns about the video or the posting of the links. Ms. Light was acting in her role as a parent and not as a teacher in the Worthington-Hooker School. As such, even if Ms. Light had some role in Ms. Alden being maligned, it does not evidence wrongdoing by Ms. Light as a teacher.

      **c.** Statements to the Board

Ms. Alden also expressed concern with Ms. Light's comments to the Board particularly her statements around COVID safety protocols. Ms. Alden expressed how because of Ms. Light's vocal approach, she is afraid to share her opinions for fear of harassment and retaliation by Ms. Light. Ms. Alden was also concerned that Ms. Light's statements created distrust between parents, students, and the school community.

Ms. Light spoke frequently at Board meetings expressing her concerns around the District's COVID-19 protocols. Since she identified herself at the meetings as a New Haven Public School teacher, many may have attributed her comments and criticisms to her school administration but the evidence shows her comments were directed to Districtwide concerns.

Of particularly note that stirred some concerns amongst the Worthington-Hooker school community, was Ms. Light commenting on a post on social media that showed Worthington-Hooker as having less than 6 positive COVID-cases. Ms. Light believes that because previous iterations of the same data did not include Worthington-Hooker, there was at least one positive case in the school. According to district policies, in the event of a positive case in schools, a letter was to be sent to the parents indicating that fact and Ms. Light was concerned that it did not occur. When school administration was questioned, they noted that there were no positive case in the school itself, in other words while school was in session and in person, no person who was positive, physically entered the building. Due to this, they were not under any obligation to provide a letter to the parents. Ms. Light's post made it appear that the administration was not being transparent and was jeopardizing the safety of the community. While it may be unfortunate that Ms. Light's actions may have contributed to concern within the community, her posts were not directed to Ms. Alden specifically.

While there is little doubt that Ms. Alden had personal feelings about Ms. Light's comments to the Board, none of Ms. Light's comments to the Board around COVID safety protocols were directed to Ms. Alden in particular. None of Ms. Light's comments discussed Ms. Alden's classroom management, her particular efforts to ensure safety, or Ms. Alden's teaching or personality generally. As such, it is clear Ms. Light had been a vocal advocate to the Board and it may have affected Ms. Alden indirectly, there is no violation of Board policy as it relates to Ms. Light's comments and Ms. Alden's reaction.

      d.  In-Person Orientation

As the school was preparing to resume in-person learning in Spring 2021, the school administration held a series of virtual orientation meetings with parents from each grade. During the second grade meeting, a parent from Ms. Light's son's learning pod asked the administration very specific questions that Ms. Alden and school administration felt could only

come from a school employee. Given Ms. Light's vocal approach on COVID issues, they believed Ms. Light was influencing this other parent to ask these specific questions. During the meeting, one parent asked the administration permission to walk the halls of the school with a checklist to ensure the school was operating consistent with COVID related guidelines. Again, many felt Ms. Light had influenced this parent to make such a request.

The evidence illustrates the opposite. Ms. Light stated that the parent asking those questions was the PTA president and noted he made statements in a manner and style perhaps in a way he did not intend. However, her denial that she did not influence this parent's statements or requests is found to be credible. Ms. Light in her interview made it clear that she did not support what the parent was advocating for and thought it would highly inappropriate and unsafe for members of the PTA to walk the halls checking to ensure the school was following safety guidelines. Ms. Light was equally clear that she was against having more people roaming the school hallways than was necessary. It is likely that the PTA president, in his capacity as such, had sufficient knowledge of the operations of the school to ask the kind of specific questions he did. No evidence suggests that Ms. Light influenced this in any way. Moreover, while these questions came from a parent whose child was in Ms. Alden's class, the comments were not directed to Ms. Alden herself.

      e.  Gethings/Clarino Influence

Ms. Light in her response to Ms. Alden's "List of concerns" expressed her belief that Ms. Clarino and Ms. Gethings had encouraged Ms. Alden to file her complaint with the goal to push her off various committees. The facts suggest no such influence. Ms. Clarino, Ms. Gethings, and Ms. Alden vociferously denied any involvement in the complaint. While Ms. Light highlights that the timing of the complaint was suspect, no such conspiracy exists. Ms. Alden had communicated with her union about her concerns regarding Ms. Light as far back as December 2020. She was instructed to document her concerns up to the point where the situation escalated. Ms. Alden was concerned about the return of Ms. Light's son into the classroom after Spring Break for fear her actions would be put under a microscope by the Light family. Throughout this time, school administration was making statements that changes were coming for the following school year and as the year drew close to the end and Ms. Alden's  was concerned that those changes would result in her working together with Ms. Light, which influenced the timing of Ms. Alden's complaint. In addition, before filing the complaint with HR, efforts were made to mediate the issues but the parties could not reach a consensus on format which resulted in the mediation efforts failing. Given this failure, Ms. Alden sent her complaint to HR. It is important to note that both Ms. Alden and Ms. Light have divergent opinions over the cause of the mediation efforts failing, but it matters less because the point is that Ms. Alden reached a critical point in the school year, could not resolve her issues "in-house" in time to protect herself from working with Ms. Light, and filed her complaint with HR when she did. Ms. Light's perception that the timing suggests influence is ultimately not supported by the evidence.

It is important to note that in some cases, Ms. Clarino seemed to misinterpret certain statements Ms. Light made to Ms. Gethings about the East Rock park event. Ms. Clarino described Ms. Light stating the East Rock Park event was chaos when the evidence does not support that.

## IV.   CONCLUSIONS/RECOMMENDATIONS

{01560770.DOCX Ver. 1}
24

DEF000432

Based on the evidence, there is no violation of Board policies on harassment or "discourteous, offensive or abusive language or conduct towards other employees, students or the public." To the extent there was certain behaviors that were contentious, they did not rise to the level of policy violations. As such, no disciplinary action is warranted.

Given that there is certainly tension between Ms. Alden and Ms. Light, the parties should attempt to reengage the mediation process. As with any voluntary meditation, the terms of such mediation should be mutually agreed upon, and given the failure of the last attempt, it may be wise to bring in a professional mediator outside the New Haven Public School community to ensure objectivity while bolstering credibility.

Moreover, many of the issues discussed in this investigation are due to the blending of Ms. Light's role as both a teacher and a parent. It is likely Ms. Light is not the only teacher in the school system with their own children attending New Haven Public Schools. To avoid potentially negative experiences amongst teachers as seen in this case, the Board should consider adopting a policy that:

1. Ensures teachers with a child in the same school they teach in are assigned to a different grade than their child; and
2. Ensures that teachers who are also parents with children in the New Haven Public School system use the same channels and processes as other parents, i.e. addressing any and all child-student issues after school hours and using non-New Haven Public school resources

Ms. Light or other similarly situated teacher-parents may be encouraged but not directed to have another family member or guardian advocate for the child-student to avoid any problems of overlapping roles as parent and as teacher.

Going forward, all parties herein should be cautioned to be mindful of what information is conveyed and how at information is conveyed. Misinterpretations of comments as complaints and speculations as to motive are unnecessarily escalating an already fragile situation.

*Christopher R. Henderson*

Submitted: Christopher R. Henderson, Esq.
11/17/21

# Exhibit 1

List of concerns:

1. Prior to the start of school, Jessica and I worked cordially and effectively on a Summer project for the upcoming year. I was looking forward to having her son, ▓▓▓ in my class, and getting to know the family this year. ▓▓▓ remains in a remote learning POD with two other classmates.

2. During the first week of school for the CY20-21 year, I communicated to all of my families via the "Remind App" that we would have a read aloud and hot chocolate at East Rock Park during lunch. Jessica immediately and without any communication whatsoever sought out the school's administration to formally complain that I was planning this during school hours. Given the extraordinary times of a global pandemic where all educators were attempting to more fully engage with their students in unique and creative ways, it was most disconcerting that a colleague wouldn't extend a courtesy and express her opinion directly. The Administration asked me to plan an after-school optional gathering of the class, and the other second grade teacher and I hosted an informal "Meet and Greet" at East Rock Park for the families that was extremely well attended and appreciated by all of the attending families. Again, without expressing an iota of concern or extending a simple professional courtesy, Jessica ignored any collegiality and again went to the Administration to be the self-proclaimed "voice of the parents in my classroom." In this circumstance, Jessica inaccurately claimed the optional "meet and greet" had no activity planned or provided, and the kids were not socially distancing. In fact, I actually heard the opposite from several parents and they were grateful to have the students get together in a safe and secure setting. This was an optional opportunity to have the children get acquainted with their friends, meet their teacher in person ( on the teacher's own time) at an outdoor venue on a Friday after- school.

3. In November, I scheduled parent teacher conferences via remote technology. I expressed substantial and sincere concern to Jessica and her husband Dave that their son ▓▓▓ was not turning in his assignments on Google Meets,  and that this was one area that I would greatly appreciate their assistance to ensure that the next semester would be more productive for their son.  I explained that it is hard for me to help ▓▓▓ if he was unwilling to submit his work products consistent with requirements of all other members of the class. It became very difficult for me to understand the strengths and opportunities and offer additional support to ▓▓▓ if the requisite work was not submitted.  Rather than being a supportive parent and agreeing to help make sure their son is turning in his assignments, Jessica and her husband requested that I offer even more of my own personal time and send the parents a personalized email detailing the required work and its due dates.  I explained that I have sent numerous "Remind app" messages to the parents that detailed the curriculum, and asked them to please check google classroom and make sure their child is turning in the work.  The google classroom communication format allows parents and students to easily view what is assigned and what needs to be turned in.  What was meant to be a 15 minute conversation, turned into a 45 minute conference that needed to be continued. The following day, Jessica sent me over 35 emails to my personal email of all his late work.  This is not acceptable.  I did not ask her to do this, nor did I feel it necessary to go back and grade all last semesters late work. This is when I began to

feel very uncomfortable communicating with Jessica and her husband, and asked the administration to join me in our continued conference and on all correspondences.

4. At our second conference, I felt harassed and bullied --- retaliation by Jessica and Dave for fulfilling my duties and responsibilities for communicating███████inability to submit his work. In my opinion, they attacked my google classroom organization, my daily slide decks provided to all of the students, and my communication methods as to what needs to be turned in versus what is classwork practice. I offered them an additional accommodation that they could turn in his work in person, rather than upload the materials in the hopes that it may yield a better result for the family and the student. This accommodation was not made for any other family, nor did any other student have difficulty in adhering to the process. I expressed my disappointment in her as a colleague who uses the same google classroom platform, and knows how challenging it is to manage 22 students work remotely. I told her that I expected my colleague would understand, and would at the very least follow the classroom protocols, rather than expecting me to send her individualized emails and allow him to turn in his work in person. Jessica's husband ended the conference at this time and said he has never been so offended by a teacher.

5. In December, my administrator checked-in with Jessica and her husband to see how things were going, and to determine if███was turning in his work via the in person accommodation. Right before break an email was sent back attacking my teaching, my assignments, my judgment, and how I was not spending enough individualized and small group time with their son. For example, I received a courtesy phone call from another students parents in my class that my name was submitted to the antiracist/anti bias Hooker parent group regarding a video clip I shared with my students that showed architectural pictures of different houses around the world. I was accused of promoting North American superiority over other countries. I felt that my integrity was being questioned and in some ways being inaccurately labeled as a racist within the Hooker community. Open communication obviously had not improved, nor was there demonstrated effort on the parent's part, notwithstanding my additional and focused attention to assist███████and his continued development.

6. Having Jessica as a colleague and also as a parent of a Hooker student has made me extremely uncomfortable, especially given her unwillingness to engage in a productive and professional rapport. Rather than having a partner to work with, I feel that I have someone who is always judging me as a teacher and looking for ways to complain. It is not a healthy environment having a colleague's child, and is exacerbated by the fact that he is a remote learner and is often sitting in his own home with both parents listening in to our classroom. I spoke with other teachers seeking advice to effect a more positive result, and they expressed that this was a very big concern and recurring problem in first grade as well.

7. As a member of the NHPS and Hooker educational community, Jessica has become extremely vocal on social media and has misrepresented our school and the protocols we have in place. I am embarrassed by how she incorrectly addresses the BOE and feels compelled to function as the voice of " New Haven Teachers." I am afraid to share my opinions for fear of

continued harassment and retaliation, and her continued misrepresentations shared on social media, as well as to parents in my class. The parents in Jessica's learning Pod have directly discussed information about our school, which can only originate from an employee. For example, one parent asked if he could walk the building with a checklist of items to ensure we are following guidelines and protocols. This created a lack of trust between the parents in second grade and the administration and school staff. I felt that any open and honest transparency and relationship that were built this year were violated. Her aggressive and misguided interpretations of what plans we had in place made me uncomfortable and fearful of the parents' trust in me to keep their child safe. I also do not feel comfortable volunteering my time to grow professionally on committees or projects in fear that I will have to work side by side with her. This should not be stifling my own professional growth, but it has impacted me significantly.

8. We have recently been asked to share our preference for teaching next year. My only request is that the administration please consider the extreme challenges that teachers have endured during the pandemic and will continue to have if Jessica continues to serve as both parent and teacher at Hooker. It is not a healthy combination in light of Jessica's history and combative approach. She has severely impacted the trust, our willingness to openly and transparently communicate and share our opinions with each other, and how we chose to manage our classroom, the online resources we utilize, and how we manage our daily schedules. I am aware of many teachers who are fearful that she will discuss our school and protocols on social media. This has created a hostile work environment at both the upper and lower school. She is not considered a teammate, but rather someone who only serves her own mission. Teaching during a pandemic has its own challenges, but when you are in constant fear of what you say and how you teach, it is not considered healthy. We need to be a united front, not divided individuals, or in fear or concern regarding what or how Jessica Light may react pursuant to her personal agenda!

DEF000436

# Exhibit 2

| | |
|---|---|
| *From:* | MACK, LISA (LISA.MACK@new-haven.k12.ct.us) |
| *Sent:* | Fri 5/14/2021 02:43 PM |
| *Rcvd:* | Fri 5/14/2021 02:43 PM |
| *To:* | Alden, Hilarie (Hilarie.Alden@new-haven.k12.ct.us) |
| *CC:* | BONNER, TARYN (TARYN.BONNER@new-haven.k12.ct.us) |
| *BCC:* | |
| *Subject:* | RE: Concerns with co-worker |

==========================================

Good morning Ms. Alden,

This e-mail serves as receipt of your complaint.  Please be advised our labor relation manager, Ms. Bonner will be in contact with you early next week to discuss your concerns.

Regards,

**Lisa J. Mack**

**Director of Human Resources & Labor Relations**

***Office of Human Resources***

**New Haven Public Schools**

54 Meadow Street, 2nd floor

New Haven, CT  06519

**Office**: 475 220-1540

**Fax**:   203 946-8805

**E-mail**: lisa.mack@nhboe.net

DEF000437

Stay healthy.

Cover your
face

Wash and
sanitize

Keep your
distance

Stay home if you feel ill

**From:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Sent:** Monday, May 10, 2021 8:23 AM
**To:** MACK, LISA <LISA.MACK@new-haven.k12.ct.us>
**Subject:** FW: Concerns with co-worker

Hi Lisa-

DEF000438

To date there has been no resolution with Jessica Light and I regarding my concerns from this year. This has taken way too long to resolve. I was finally informed on Friday May 7th, that an "unofficial union mediation or conversation" wouldn't be possible because Mrs. Light doesn't agree to the terms of me having my union steward present for the conversation. I wrote this list of concerns (attached) prior to Spring Break, and would like at this time to formally file a complaint against Mrs. Light regarding the hostile work environment that has occurred having her as both a co-worker and parent at Hooker. Thank you in advance and I look forward to speaking with you.

Kind regards,


**Hilarie Y. Alden**
2nd grade teacher
**Worthington Hooker School**


203-623-4533


hilarie.alden@new-haven.k12.ct.us


"Never, Never, Never, Give Up" - Winston Churchill


**From:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Date:** Wednesday, April 7, 2021 at 3:00 PM
**To:** CICARELLA, DAVID <DAVID.CICARELLA@new-haven.k12.ct.us>,
MORRISON, KATHLEEN <KATHLEEN.MORRISON@new-haven.k12.ct.us>

DEF000439

**Cc:** CLARINO, JENNY <JENNY.CLARINO@new-haven.k12.ct.us>, GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Subject:** Re: Concerns with co-worker

Hi Dave-

Thank you for your prompt response. I agree wholeheartedly that this needs to be promptly addressed so that no other teacher experiences these unfortunate situations. I am asking that in light of her past behaviors on social media, that Jessica is verbally told of my concerns and not presented with a written copy. I fear that this will be circulated on social media and to other members in the community without my knowledge or consent. Thank you for understanding in advance, and I am happy to have any necessary conversations about my statement at your earliest convenience.

Kind regards,

told

**Hilarie Y. Alden**
2nd grade teacher
**Worthington Hooker School**

203-623-4533

hilarie.alden@new-haven.k12.ct.us

"Never, Never, Never, Give Up" - Winston Churchill

DEF000440

**From:** CICARELLA, DAVID <DAVID.CICARELLA@new-haven.k12.ct.us>
**Date:** Wednesday, April 7, 2021 at 2:21 PM
**To:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>, MORRISON,
KATHLEEN <KATHLEEN.MORRISON@new-haven.k12.ct.us>
**Cc:** CLARINO, JENNY <JENNY.CLARINO@new-haven.k12.ct.us>, GETHINGS,
MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Subject:** Re: Concerns with co-worker

Good Afternoon Hilarie,

 I am sorry to hear that these concerns exist. Contractually we must convey any
complaints concerning an NHFT member to that member(s) promptly.


Kathleen will need to send this to Jessica. If Hilarie prefers not to inform Jessica,
then you would need to withdraw the complaint.


Let me know what you decide to do, and if you need to speak to me feel free to
call, email, or text.



Dave

203-988-7408 cell#




David Cicarella

President

New Haven Federation of Teachers

203-773-0266 office


...for in the final analysis, our most basic common link is we all inhabit this small
planet. We all breathe the same air. We all cherish our children's futures...
 President John F. Kennedy

DEF000441

**From:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Sent:** Wednesday, April 7, 2021 1:40 PM
**To:** MORRISON, KATHLEEN <KATHLEEN.MORRISON@new-haven.k12.ct.us>
**Cc:** CICARELLA, DAVID <DAVID.CICARELLA@new-haven.k12.ct.us>;
CLARINO, JENNY <JENNY.CLARINO@new-haven.k12.ct.us>; GETHINGS,
MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Subject:** Concerns with co-worker

Kathleen-

As you are aware, I have some significant challenges with Jessica this year and I
would like to provide a formal accounting of this emotional distress that this has
caused me.

Kind regards,

**Hilarie Y. Alden**
2nd grade teacher
**Worthington Hooker School**

203-623-4533

hilarie.alden@new-haven.k12.ct.us

"Never, Never, Never, Give Up" - Winston Churchill

DEF000442

**Exhibit 3**

Jessica Light's Response to Ms. Alden's "List of Concerns"

On May 11, 2021, I received a "List of Concerns" from the New Haven Teachers Union written by Ms. Alden, my colleague and my son's second grade teacher. Below, I first rebut the concerns Ms. Alden raises paragraph by paragraph. Then I address my belief that some of Ms. Alden's concerns result from Ms. Gethings and Ms. Clarino involving Ms. Alden in their retaliatory, slanderous, and hostile behavior towards me, and that Ms. Alden submitting the Concerns is an unwitting part of that behavior.

**<u>Response to Ms. Alden's Concerns</u>**

Concerns ¶ 1. Prior to the start of school, Jessica and I worked cordially and effectively on a Summer project for the upcoming year. I was looking forward to having her son, ▉▉▉ in my class, and getting to know the family this year. ▉▉▉ remains in a remote learning POD with two other classmates.

I agree.

Concerns ¶ 2. During the first week of school for the CY20-21 year, I communicated to all of my families via the "Remind App" that we would have a read aloud and hot chocolate at East Rock Park during lunch. Jessica immediately and without any communication whatsoever sought out the school's administration to formally complain that I was planning this during school hours. Given the extraordinary times of a global pandemic where all educators were attempting to more fully engage with their students in unique and creative ways, it was most disconcerting that a colleague wouldn't extend a courtesy and express her opinion directly. The Administration asked me to plan an after-school optional gathering of the class, and the other second grade teacher and I hosted an informal "Meet and Greet" at East Rock Park for the families that was extremely well attended and appreciated by all of the attending families. Again, without expressing an iota of concern or extending a simple professional courtesy, Jessica ignored any collegiality and again went to the Administration to be the self-proclaimed "voice of the parents in my classroom." In this circumstance, Jessica inaccurately claimed the optional "meet and greet" had no activity planned or provided, and the kids were not socially distancing. In fact, I actually heard the opposite from several parents and they were grateful to have the students get together in a safe and secure setting. This was an optional opportunity to have the children get acquainted with their friends, meet their teacher in person (on the teacher's own time) at an outdoor venue on a Friday after-school.

Ms. Alden's hostility towards me makes more sense now in light of this complaint. Either "the Administration," presumably Ms. Gethings, but possibly with Ms. Clarino, fed Ms. Alden misinformation about me regarding her "Meet and Greet," or "the Administration" misrepresented my conduct to someone else who then told Ms. Alden. I *never* complained, *formally* or otherwise, to "the school's administration" or anyone else about Ms. Alden's attempt to hold her "Meet and Greet" during school hours or about the actual "Meet and Greet" that occurred after school. Instead, I first asked if I could follow her suit and also hold an event during school hours and then later asked whether we could hold a grade level event and was told no both times.

Prior to the school year beginning, my mother-in law and I sewed over fifty masks for the whole third grade (there are two third grade classes). Over twenty days prior to learning of Ms. Alden's

1

planned in-school "Meet and Greet," I emailed Ms. Gethings asking if we could tie dye the masks as a grade during school hours. I was told all outdoor activities needed to be done at the park, after school hours, and with only one class at a time. The email exchange is included at the end of this section. Accordingly, I set up for each third grade class separately, both a tie dye event and a writing and water color event at East Rock Park. In other words, a total of four events, two separate events each for each class.

On September 24, 2020, two days after my class had finished our second in park event, I received a notice from Ms. Alden that the second grade was planning an activity the next day during school hours. Far from complaining about it, I hoped this meant my I would also be able to have in person activities at the park *during school hours* instead of after school. I went to Ms. Gethings and asked if we now had permission to do in park activities during school hours. Ms. Gethings seemed shocked that the second grade "Meet and Greet" was planned for during school hours, told me she was going to tell Ms. Alden and to change it to after school hours, and denied what I actually wanted, which was for all of the teachers to be able to hold park events during school hours. Ms. Alden then sent out an amended notice changing the time of the "Meet and Greet" to after school.

My family and I attended the second grade "Meet and Greet." My family had a good time, as did everyone else from all appearances. While there I thanked Ms. Alden for organizing it.

By this time my grade partner and I were planning a science in the park activity. As the second grade "Meet and Greet" was done as an entire grade, rather than as separate classes, afterward I ask Ms. Gethings if the third grade could start having activities in the park with both classes at the same time as well. Again, far from complaining about what Ms. Alden had done, I was trying to do the same. Ms. Gethings asked if it was possible to social distance with two classes participating at once. I knew that it would not help my cause, but honestly told her the second grade meet and greet it had gotten a little crowded at times on the playground with fifty plus kids playing at once. I also told her that the science in the park activity I was planning could be more spread out. A reasonable person could not have interpreted my request or my response to Ms. Gethings' specific question as a complaint about Ms. Alden's "Meet and Greet." Ms. Gethings said she was not comfortable with two classes being together at the park at the same time. I said I understood and planned a science in the park activity for my class alone.

The statement that I "went to the Administration to be the self-proclaimed 'voice of the parents in my classroom'" is false. I have never claimed to be the "voice of the parents in my classroom," I was happy with Ms. Alden's "Meet and Greet," and I did not complain about it to "the Administration." In fact I have only communicated about "meet and greet" with Ms. Gethings as a teacher for scheduling purposes.

The statement that I "claimed the optional 'meet and greet' had no activity planned or provided" is false. The content of Ms. Alden's "Meet and Greet" did not come up with Ms. Gethings in any meaningful way, and I had no concerns about the activities.

The statement that I "claimed … the kids were not socially distancing" is false. While I answered Ms. Gethings question as honestly as I could, I did not tell her that the children were unsafe. Moreover, she knew that I allowed my child to participate, so she should have inferred that I felt comfortable with the social distancing that occurred.

2

DEF000444

Here is the email exchange between Ms. Gethings and me about planning East Rock Park activities that occurred at the beginning of the school year:

From: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
Sent: Tuesday, September 8, 2020 5:34:08 PM
To: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; SALEM, PAUL <PAUL.SALEM@new-haven.k12.ct.us>
Subject: Re: 3rd grade meet and greet

You should do them at separate times & unfortunately they can not be done during the "school day"

Get Outlook for iOS
From: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
Sent: Tuesday, September 8, 2020 1:38:46 PM
To: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>; SALEM, PAUL <PAUL.SALEM@new-haven.k12.ct.us>
Subject: Re: 3rd grade meet and greet

Ok, if it is better for third grade classes can do it on different days at East Rock park.

Could I do it next Monday at 2:00 at East Rock Park during my Social Studies /Flex time?

From: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
Sent: Monday, September 7, 2020 7:33 AM
To: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
Subject: Re: 3rd grade meet and greet

Jessica I'm sorry it took me so long to answer I've been waiting for an answer and unfortunately the answer I got is no students on school campus for now.

Get Outlook for iOS
From: LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
Sent: Friday, September 4, 2020 8:23:09 AM
To: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
Subject: Re: 3rd grade meet and greet

I would like to give the parents enough notice so please let me know

Get Outlook for iOS
From: LIGHT, JESSICA
Sent: Thursday, September 3, 2020 11:38:17 AM
To: GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
Subject: 3rd grade meet and greet

Can we reschedule the third grade meet and greet/ mask tie dying for Tuesday on the field here- at 1:50-2:50

Concerns ¶ 3. In November, I scheduled parent teacher conferences via remote technology. I expressed substantial and sincere concern to Jessica and her husband Dave that their son ▮▮▮▮ was not turning in his assignments on Google Meets, and that this was one area that I would greatly appreciate their assistance to ensure that the next semester would be more productive for their son. I explained that it is hard for me to help ▮▮▮▮ if he was unwilling to submit his work products consistent with requirements of all other members of the class. It became very difficult for me to understand the strengths and opportunities and offer additional support to ▮▮▮▮ if the requisite work was not submitted. Rather than being a supportive parent and agreeing to help make sure their son is turning in his assignments, Jessica and her husband requested that I offer even more of my own personal time and send the parents a personalized email detailing the required work and its due dates. I explained that I have sent numerous "Remind app" messages to the parents that detailed the curriculum, and asked them to please check google classroom and make sure their child is turning in the work. The google classroom communication format allows parents and students to easily view what is assigned and what needs to be turned in. What was meant to be a 15 minute conversation, turned into a 45 minute conference that needed to be continued. The following day, Jessica sent me over 35 emails to my personal email of all his late work. This is not acceptable. I did not ask her to do this, nor did I feel it necessary to go back and grade all last semesters late work. This is when I

3

began to feel very uncomfortable communicating with Jessica and her husband, and asked the administration to join me in our continued conference and on all correspondences.

I protest Ms. Alden raising these claims with HR, or HR considering them. HR may be a proper forum for a teacher's complaints about another teacher's performance of her duties. HR is not a proper forum for a teacher's complaints about the conduct of a parent. Here, Ms. Alden is complaining about my actions *as a parent*. Nonetheless, I will respond to Ms. Alden's claims.

During the initial parent teacher report card conference, my husband and I immediately met with hostility and were dismayed to discover our son had not turned in many assignments and others were turned in too blurry to read. I had checked his Google Classroom "To Do List" on a regular basis and it always reflected that he had turned in his assignments. Unbeknownst to me, it reflected that assignments were turned in when my son had unintentionally failed to properly attach the assignment or when the attached assignment was too blurry to read. In addition, although teachers are required to send progress reports to parents half-way through the marking period if a child is behind, we did not receive such a progress report for my son. Accordingly, we had every expectation that he had been submitting his assignments and that he was doing well. We expressed to Ms. Alden our concern that the report card conference—more than two months after the start of school—was the first we were hearing of this. In any event, we agreed to help him turn in assignments.

On my son's report card, and during the remote conference, Ms. Alden stated that she needed all of my son's work turned in. In retrospect, I obviously misunderstood Ms. Alden. Nonetheless, accordingly, I organized my son's things, took pictures of all of his work and sent them to Ms. Alden's school email (**not** her personal email as she claims). There were a lot of emails, but this is because each email is only allowed to have a few pictures attached. While I didn't expect Ms. Alden to grade his past work, I wanted Ms. Alden to see that he had done the work. She aggressively responded:

> Jessica-
> Can you please help me understand why this Saturday morning you have sent over 35 emails of [      ] late work from last quarter to my new haven email address. We didn't discuss the need for you to remit this.  I do however recall discussing that the directions for ALL my students is to upload pictures of their assignments into google classroom within the given dates assigned.  I also shared that I remind students when they haven't turned an assignment in by sending a message via google classroom. I do accept late work within that quarter.
>
> Moving forward, please upload his assignments under classwork into google classroom.  As you can imagine, having 24 students sending the work in to one designated spot allows me to give the necessary feedback in a timely fashion so that I can plan for further instruction.
>
> Thank you for following the class protocol.
>
> My best-
> Hilarie Alden

While I did not understand why Ms. Alden was exhibiting hostility, in an effort to smooth tensions I responded:

> "Good afternoon, please do not feel you have to go through it all- It is quite overwhelming.  I know I have been trying to sort through it all for three hours this morning, so that Wesley can have a fresh organized start.  He has been lost wading through all these papers everyday.

4

DEF000446

> You said you were unable to read the work he took pictures of and uploaded to google classroom. I do not know what day each work was from or what things you needed so I wanted to make sure you had a chance to see anything you wanted. I am not sure what is last marking period and what is current.
>
> I originally didn't think you wanted to see all of this, but in our conversation you said you needed all the work turned in and commented the same on his report card.
>
> Now that I know you want to see things I will make sure we do not get so backlogged.
>
> Again I didn't expect you to look through it all this weekend. I am just trying to give ▮▮▮ a better chance for success.
>
> Best,
> Jessica"

While I may have misunderstood what Ms. Alden wanted, I do not believe sending her my son's work was inappropriate, let alone so inappropriate as to cause such hostility.

Concerns ¶ 4. At our second conference, I felt harassed and bullied --- retaliation by Jessica and Dave for fulfilling my duties and responsibilities for communicating ▮▮▮▮ inability to submit his work. In my opinion, they attacked my google classroom organization, my daily slide decks provided to all of the students, and my communication methods as to what needs to be turned in versus what is classwork practice. I offered them an additional accommodation that they could turn in his work in person, rather than upload the materials in the hopes that it may yield a better result for the family and the student. This accommodation was not made for any other family, nor did any other student have difficulty in adhering to the process. I expressed my disappointment in her as a colleague who uses the same google classroom platform, and knows how challenging it is to manage 22 students work remotely. I told her that I expected my colleague would understand, and would at the very least follow the classroom protocols, rather than expecting me to send her individualized emails and allow him to turn in his work in person. Jessica's husband ended the conference at this time and said he has never been so offended by a teacher.

For the same reasons discussed with respect to Concern ¶ 3, I protest Ms. Alden raising these claims with HR, or HR considering them. Nonetheless, I will respond to Ms. Alden's claims.

My husband and I did not believe we needed to involve Ms. Gethings or Ms. Clarino after the initial report card conference discussed in Concern ¶ 3. However, **at Ms. Alden's request**, my husband and I participated in a remote meeting with her, Ms. Gethings, and Ms. Clarino to continue our discussion. Despite Ms. Alden's claims, at this second meeting my husband and I did not criticize Ms. Alden's performance. At most, we explained why our son was having difficulties with the class mechanics. In response, throughout the meeting Ms. Alden admonished us as parents. Ms. Alden said again that our son was "not as high functioning as the other children in the learning pod" and that she was disappointed in me as an educator and mother. She also raised her voice (neither I nor my husband did so). My husband did in fact say he had never been so offended by a teacher and ended the call. While I wish the call could have ended courteously, the conversation was clearly not productive and needed to be ended.

With respect to Ms. Alden's claim that we were provided with a unique accommodation, this was not a particularly burdensome accommodation on her part. Indeed, my grade level partner and I allowed all of our students to turn in hard copies of their work, and to my knowledge most, if not all, teachers allowed it in grades 3 and up.

5

DEF000447

With respect to Ms. Alden's complaint about our purported expectation of "individualized emails," all we expected was that she follow district policy. As I noted above, she was supposed to have let us know through a progress report if he was failing or in danger of failing. But quite apart from that, I would expect a teacher to inform any parent if their child is falling weeks behind. For example, I email my student's parent every time they fail to turn in a major assignment, and email them if my student fails to turn in multiple daily assignments. We were not asking she do more than I do for any of my students.

After this second remote conference, my husband and I agreed to preserve my working relationship with Ms. Alden, he should handle follow-up communications without me. My husband informed me that he spoke to Ms. Gethings and Ms. Clarino and they also agreed. He informed me in a follow-up remote meeting he had with Ms. Gethings and Ms. Clarino, they apologized for Ms. Alden's inappropriate statements, attributed Ms. Alden's behavior to stress caused by switching to remote learning, and seemed to understand the challenges other parents were having with Ms. Alden's Google Classroom.

From this point in November forward, I limited my interaction with Ms. Alden, unaware of the source of the hostility and wanting to preserve our professional relationship. At Ms. Gethings and Ms. Clarino's instruction, my husband continued to communicate with them rather than Ms. Alden regarding our son's progress. Since then, my communications with Ms. Alden regarding my son have been limited to a few courteous exchanges through the "Remind App". Here are those communications:

 

6

DEF000448



Concerns ¶ 5. In December, my administrator checked-in with Jessica and her husband to see how things were going, and to determine if ▮▮▮▮ was turning in his work via the in person accommodation. Right before break an email was sent back attacking my teaching, my assignments, my judgment, and how I was not spending enough individualized and small group time with their so. For example, I received a courtesy phone call from another students parents in my class that my name was submitted to the antiracist/anti bias Hooker parent group regarding a video clip I shared with my students that showed architectural pictures of different houses around the world. I was accused of promoting North American superiority over other countries. I felt that my integrity was being questioned and in some ways being inaccurately labeled as a racist within the Hooker community. Open communication obviously had not improved, nor was there demonstrated effort on the parent's part, notwithstanding my additional and focused attention to assist ▮▮▮▮ and his continued development.

For the same reasons discussed with respect to Concern ¶ 3, I protest Ms. Alden raising these claims with HR, or HR considering them. Nonetheless, I will respond to Ms. Alden's claims.

In December, Ms. Clarino emailed my husband, and my husband did respond with his concerns. Although I did read the emails, I was not copied on the email from Ms. Clarino to my husband or on his return email, and I should not be held responsible for my husband's communication with the school. However, I will respond in more detail to the specific example Ms. Alden mentions.

In years past there was an ABAR (anti-bias Anti- Racism) subcommittee of SPMT, which I was on. However, several years ago, Ms. Gethings told ABAR that they could not meet at our school or be a part of SPMT any longer. Thereafter, for a time, the parent members of ABAR met outside of the school at people's houses to organize book studies. But, as far as I know, ABAR has not met for over a year. In any event, neither I nor my husband submitted a "complaint" to ABAR regarding Ms. Alden, and I do not believe there is even a process to submit a "complaint" to the largely defunct group.

7

I first became aware Ms. Alden showed the "Houses Around the World" YouTube video to her class when picking up my son from his learning pod. The pod mother, whose husband is Chinese, was very upset and told me that a video had been played that portrayed Chinese people as living in huts. When I got home, I looked at the video; I was horrified by how offensive and inappropriate it was. Moreover, I was concerned about my son's response to the video. However, I was also open to the possibility that I was being too sensitive. Accordingly, I reached out to two friends who were in ABAR with me, explaining how bothered I was by the video and asking for their input. In addition to both of them validating my concerns, one of them shared that my husband and I were not the only parents who were concerned. Here is my email to them (I have intentionally deleted names to protect their privacy):

Hi X,

I am reaching out to you because I really respected the input you put into the ABAR meeting we went to a long time ago and a video was shown in my son's second grade class that really offended me but when my husband brought it to administrations attention, they did not seem to see the issue. This makes me worry I am just being too sensitive. Could you give me an honest opinion about whether or not I should be concerned about this.

It was a video about homes around the world, the European and American homes were modern and fancy, while the African, Asian and South American were presented as huts.

My son left saying "Wow I would only want to live in America or Europe" I was mortified and showed him other images of these areas of the world, but I am very worried about the message it sent and all the other parents who maybe unaware of the need to correct this misinformation.

But as always I find it difficult to advocate as fiercely as I would like because I work there and I worry maybe others wouldn't get the same message from it my son did.

https://youtu.be/mVoLH7DLqaI

Here are my friends' responses (again, I have intentionally deleted names to protect folks' privacy):

### Email response from first friend

Hi, Jessica,
First and foremost, you have the right to object! It is your child. You have every right to have your concern addressed as opposed to dismissed.

I would advise your husband to write the district (Dr. Tracey, Diaz, Hammonds, etc.) and outline your concerns.

- Include the video shown in class
- Include your son's statement
- State that you contacted the teacher and/or principal regarding the video
- State that you are the only complaining parent
- Most importantly, who is the video producer Tony Pace? Is he an educator? Why is this video allowed to be shown in a classroom?
- I would have your husband also address the fact that you wear dual roles at WH -in this instance, you are acting as a parent.

Please let me know if I can provide any additional assistance. Also, I was on the phone with ["X"] that I just received your email. I told her that I just received an email from you. I did not have any details at that time, but I want to apologize in advance if I broke any confidence.

Best,
["Y"]

### Email response from second friend

8

Hi, Jessica,

Thank you so much for emailing me and of course I don't think you are being too sensitive, I completely understand and agree with you. I had not seen this until now. I will go back and watch it with Y and discuss why it is racist and show him other images as you have done with your son. But of course other action needs to be taken too, and thank you for what you have done so far. You are not alone and I plan to say something. Out of curiosity, who in the administration did you bring your concerns to? And have you discussed with Mrs. Alden? No judgment about any of your answers to those questions; I understand you are in a tough spot with dual roles as teacher and parent, I'm just asking to have a sense of who is being unresponsive so far. I do wonder if it would be most helpful at this point to send an email to Dr Tracey. I'd be happy to discuss if chatting is easier than email--. Feel free to text call or email, whatever is best for you.
Sincerely,

Here is a draft of another parent's concern about the video shown. I did not ask this parent to share this email with me and did not directly tell this parent about the video, but they heard through others and sent me a draft of their email. I am unsure if or when a final draft was sent to the school:

Dear Principal Gethings, Assistant Principal Clarino and Ms. Alden and Ms. Villanueva:

I hope that you and your families are safe and well. Everyone misses school and I hope that we are all able to see each other soon.

The purpose of my note, however, is to express some dismay at a video that was shown to a second grade class about how people live around the world.

I recognize that it's challenging to find content that is engaging for small children to give them ideas about subjects when they are online, and I appreciate the effort to find videos that are short and digestible but I think that the video titled **HOUSES AROUND THE WORLD** is inappropriate and a real misfire.

The video shows some homes in Northern Europe, then shows a series of yurts, mud huts, thatched roofs and caves as the dwellings of people in Africa, Asia and Latin America – where the majority of the world's population lives – before jumping to the Las Vegas Strip and then a series of buildings in the USA.

This is problematic, inaccurate and misleading.

The person who made this video clearly has likely never traveled to any of these countries nor knows much about the daily lives of the billions of people he represents with huts, caves and tree houses. His work does not meet the standard of information to be taught to children. (He also doesn't spell check because he refers to the country of "CHOREA" – a movement disorder - instead of either North Korea or South Korea).

While I'm really frustrated that this video got shown in our school, I'm not assuming any malice here. I do think, however, that showing this type of video to children without any context creates the impression that people who live in these places are all in pre-modern homes when in fact such traditional dwellings are the EXTREME MINORITY homes around the world. That there is only ONE built structure of stone, steel or brick shown from anywhere around the world except N. Europe and the USA is ridiculous… The example for the Philippines is a TREEHOUSE!

The video credits show that it was made by Tony Pace Productions… The only one I found on a simple google search shows that this is a Vegas lounge act singer who makes children's activities on the side… that could explain the lack of professionalism. Perhaps it is someone else but in either case, I don't think this is representative of the quality of materials that is usually presented to WHS students. I hope that this is NOT going to be shown in the future and that some context and explanation is given to the kids who have already been shown the video.

We are lucky to have a diverse and well-educated community with families from all over the world. Perhaps in the future we could tap some of that potential to have people share info about their lives, experiences from around the world. At the very least, using materials that have been vetted by the district or a few people to make sure they meet the standards and goals of the classroom

9

environment.   (If the goal is to show different types of homes here is a <u>short video on the TIME for Kids website</u> and another site from <u>Australia about different housing</u> .)

Again, appreciate the challenges our teachers and families are facing in this virtual learning environment and all the efforts are teachers have and are continuing to make. Just wanted to share how I felt about this video because it really misses the mark and can distort how kids think about people and way of life around the world. I'm sure I'm not the only one with these concerns.

I thank you for your attention and look forward to your reply.

As my child's pod co-parent and my friends' responses show, I am far from the only person who found the video Ms. Alden showed to be problematic. Yet, despite my friends' advice that I elevate this concern, I choose not to in yet another attempt to keep the peace with Ms. Alden. And I cannot be blamed if other parents chose to elevate the issue due to their outrage over Ms. Alden showing an inappropriate video to second-graders.

Ms. Alden including this incident as a concern about me shows that she still believes this was a perfectly acceptable video to show second-graders. Thus, it also shows that whatever effort, if any, Ms. Gethings and Ms. Clarino made to address the bias in the class materials, Ms. Alden has not learned from this incident. To my knowledge the bias in the video was not addressed in the classroom and the harm to the children has not been mitigated.

Concerns ¶ 6. Having Jessica as a colleague and also as a parent of a Hooker student has made me extremely uncomfortable, especially given her unwillingness to engage in a productive and professional rapport. Rather than having a partner to work with, I feel that I have someone who is always judging me as a teacher and looking for ways to complain. It is not a healthy environment having a colleague's child, and is exacerbated by the fact that he is a remote learner and is often sitting in his own home with both parents listening in to our classroom. I spoke with other teachers seeking advice to effect a more positive result, and they expressed that this was a very big concern and recurring problem in first grade as well.

For the same reasons discussed with respect to Concern ¶ 3, I protest Ms. Alden raising these claims with HR, or HR considering them. Nonetheless, I will respond to Ms. Alden's claims.

This paragraph is mainly about Ms. Alden's feelings. I am not responsible for her feelings.

Ms. Alden raises no new specific conduct on my part. Although she refers to me purportedly being unwilling "to engage in a productive and professional rapport," she does not identify any conduct on my part forming the basis of her claim. I submit that as described above, at every stage I have made every reasonable effort to engage in a productive and professional rapport with Ms. Alden, including stepping back from personally advocating for my son and choosing not to complain to the administration about Ms. Alden's performance. This is in contrast to Ms. Alden raising her voice and admonishing me and my husband.

As to Ms. Alden talking to other teachers about me, if she said anything to them akin to what she has said in her Concerns, then she has done me a great disservice.

With respect to her claim that "they expressed that this was a very big concern and recurring problem in first grade as well," it is impossible for anyone to respond to an anonymous "they" and unidentified concerns or problems. But I will try. I have the utmost respect for my son's first

10

DEF000452

grade teacher and I never complained to the administration about her. At one point during first grade I advocated as a parent for my son to remain in reading intervention when the teacher told me he had shown so much growth he could be exited. We agreed he would remain in the reading intervention group, but not be formally entered into the SRBI process. My son's first grade teacher never complained to me about my advocacy, and no one has informed me she had any concerns.

Concerns ¶ 7. As a member of the NHPS and Hooker educational community, Jessica has become extremely vocal on social media and has misrepresented our school and the protocols we have in place. I am embarrassed by how she incorrectly addresses the BOE and feels compelled to function as the voice of " New Haven Teachers." I am afraid to share my opinions for fear of continued harassment and retaliation, and her continued misrepresentations shared on social media, as well as to parents in my class. The parents in Jessica's learning Pod have directly discussed information about our school, which can only originate from an employee. For example, one parent asked if he could walk the building with a checklist of items to ensure we are following guidelines and protocols. This created a lack of trust between the parents in second grade and the administration and school staff. I felt that any open and honest transparency and relationship that were built this year were violated. Her aggressive and misguided interpretations of what plans we had in place made me uncomfortable and fearful of the parents' trust in me to keep their child safe. I also do not feel comfortable volunteering my time to grow professionally on committees or projects in fear that I will have to work side by side with her. This should not be stifling my own professional growth, but it has impacted me significantly.

I protest Ms. Alden raising these claims with HR, or HR considering them. HR may be a proper forum for a teacher's complaints about another teacher's performance of her duties. HR is not a proper forum for a teacher's complaints about the conduct of a parent *or the conduct of a citizen*. Here, Ms. Alden is complaining either about my actions as a parent *or as a citizen*. Nonetheless, I will respond to Ms. Alden's claims.

I have the right to voice my opinions on social media, and Ms. Alden complaining about my posting on social media is inappropriate. In any event, I am not "extremely vocal on social media" about our school nor did I misrepresent our school and the protocols we have in place. I made *one* post referencing public student COVID data, and the need for reporting guidelines. More specifically, I simply stated Worthington Hooker had not sent a quarantine letter when weekly state student data showed us as having less than six cases. My statement was accurate.

Other social media posts regarding our school have been completely positive. For example, I posted a music video I made for students on my own time with permission from Ms. Gethings. And as to posting about Ms. Alden, all I have ever posted that could be interpreted as being about her is that my son was enjoying sharing his writing remotely, and that Ms. Alden went above and beyond to send me a picture of my son enjoying his first in-person day. Here are those posts:

https://www.youtube.com/watch?v=RFdbDYc-8us

11



As for my addressing the Board of Education (the "BOE"), I am not responsible for Ms. Alden being embarrassed by my conduct as a citizen. I do not know what Ms. Alden means when she states that I "incorrectly address" the BOE. Not only does she fail to identify what statements she is concerned about, I am not aware of Ms. Alden attending or participating in BOE meetings, so I do not know whether she even has knowledge of my actual statements. Moreover, while I have often spoken to echo the teacher's union's position for the safe reopening of the schools, I have never claimed to speak for anyone other than myself, let alone to be the voice of New Havens' teachers; every statement I have made at the BOE for the past 8 years has begun: "I am Jessica Light, a New Haven Parent, teacher, and resident." It is my constitutional right and my moral obligation to speak when I have opinions regarding areas of public concern. While Ms. Alden may disagree with me, I have never incorrectly addressed the BOE.

As for Ms. Alden being afraid to share her opinions, I have never harassed Ms. Alden or retaliated against her in any way. I have never represented anything about her on social media other than the positive comments discussed above, let alone misrepresented anything about her on social media. And other than the communications discussed above regarding the Houses Around the World YouTube video, I have never communicated with any other parent about any concern that I had with Ms. Alden.

As for the tour issue, one parent in my son's learning pod is the president of the PTA. In that capacity, he asked Ms. Gethings and Ms. Alden if the PTA could have a tour of the building to check to see if protocols were in place. I did not encourage him to ask this and did not know he was going to ask this. Additionally, him asking this question does not show that he had any direct information about the school he should not have had. He was a concerned parent who happened to know me. I am, once again, being blamed for another's actions. And any lack of trust between some members of the parent community and the administration has nothing to do with me specifically.

12

DEF000454

As for Ms. Alden being "uncomfortable and fearful of the parents' trust in me to keep their child safe," and not feeling "comfortable volunteering my time to grow professionally on committees or projects" because she fears that she will "have to work side by side" with me, once again, how she feels is not my responsibility and she does not explain how I was "aggressive and misguided" in my interpretations "of what plans we had in place." In any event, as noted above, I have a constitutional right and a moral obligation to advocate on matters of public concern, and I have never misrepresented anything about our school when speaking to the BOE.

Concerns ¶ 8. We have recently been asked to share our preference for teaching next year. My only request is that the administration please consider the extreme challenges that teachers have endured during the pandemic and will continue to have if Jessica continues to serve as both parent and teacher at Hooker. It is not a healthy combination in light of Jessica's history and combative approach. She has severely impacted the trust, our willingness to openly and transparently communicate and share our opinions with each other, and how we chose to manage our classroom, the online resources we utilize, and how we manage our daily schedules. I am aware of many teachers who are fearful that she will discuss our school and protocols on social media. This has created a hostile work environment at both the upper and lower school. She is not considered a teammate, but rather someone who only serves her own mission. Teaching during a pandemic has its own challenges, but when you are in constant fear of what you say and how you teach, it is not considered healthy. We need to be a united front, not divided individuals, or in fear or concern regarding what or how Jessica Light may react pursuant to her personal agenda!

It is unclear whether in the first two sentences, Ms. Alden is stating that she did tell or that she would tell the administration to "please consider the extreme challenges that teachers have endured during the pandemic and will continue to have if Jessica continues to serve as both parent and teacher at Hooker." If Ms. Alden did tell, it was unprofessional and did me a disservice. I have a right to be a both a parent and a teacher in our school community. There is no basis for Ms. Alden to request that my children and I be denied the right afforded to other teachers and families. The fact that Ms. Alden did or would ask this demonstrates the amount of animus she has for me.

The rest of this paragraph is a litany of unspecified and unsupported attacks.

Ms. Alden references "Jessica's history and combative approach." But she does not provide any examples or details in addition to what she previously stated. "My history" does include me advocating for my child. It also includes teachers voting me as their school union representative for more than five years at my prior school. It includes me advocating for my students, just as when I tried to see if I could provide them with in-park events during school hours or as a grade-level. It includes me working with my grade-level partner hand-in-glove since I came to Hooker. And, while I certainly advocate for my children, my students, my school and our district– I will not roll over when someone attacks me as Ms. Alden has. None of the concerns she raised above support the notion that I am "combative." More specifically, I have always behaved courteously towards Ms. Alden and chose not to elevate issues that I could have elevated.

Ms. Alden's next claims are unsupported and apparently based on gossip:

13

She has severely impacted the trust, our willingness to openly and transparently communicate and share our opinions with each other, and how we chose to manage our classroom, the online resources we utilize, and how we manage our daily schedules. I am aware of many teachers who are fearful that she will discuss our school and protocols on social media. This has created a hostile work environment at both the upper and lower school.

Once again, I am not responsible for others, only for my actions. This claim in no way identifies any action on my part that was inappropriate. And I have never discussed confidential information with any parent or public. In any event, no teacher has brought these concerns to me and I have a right to know the allegations being made when they are made, not months later when it is most convenient for Ms. Alden (or "the Administration").

Ms. Alden's next claim, that I am "not considered a teammate, but rather someone who only serves her own mission," is not merely hearsay, but unsourced hearsay–in other words, gossip– and libelously mischaracterizes my goals. I can hardly defend myself against unsourced gossip. Ms. Alden cannot speak to whether others consider me a "teammate" and the fact that she believes she has the knowledge to do this shows that while Ms. Alden has not addressed her concerns with me she has gossiped with others about me.

I am sure that some teachers disagree with some of my beliefs expressed to the BOE or with some of the issues that I advocate for at school. But that does not make my conduct inappropriate. And, again, no teacher has brought these concerns to me and I have a right to know the allegations being made when they are made.

Moreover, this claim ignores that Ms. Alden does not, and cannot, provide even one example of a misstep or wrongdoing related to our work together as teachers. For example, together with our grade level partners we organized the third graders sharing our Nonfiction Book projects with the second grade. Here are our interactions regarding that project:

**Re: Nonfiction Picture Book Share**
Alden, Hilarie
Fri 12/11/2020 11:56 AM
        **To:** SALEM, PAUL; VILLANUEVA, JULIE
        **Cc:** LIGHT, JESSICA

We would love to have you share with 2A! We will work around your schedule.  Thank you so much

My best-
Hilarie Alden
**From:** SALEM, PAUL <PAUL.SALEM@new-haven.k12.ct.us>
**Sent:** Friday, December 11, 2020 11:25:05 AM
**To:** VILLANUEVA, JULIE <JULIE.VILLANUEVA@new-haven.k12.ct.us>; Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Cc:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** Nonfiction Picture Book Share

Hey guys!

Jessica and I had our kids write short nonfiction picture books about a topic and several of them would love to share with your students! We will figure out an exact number soon. We thought we could plan a time during that few days right before Christmas where we could put them in small groups to read their books. We are open to suggestions to how this might best work as we are trying to think of ideas as well. Would this something you guys would be up for? Let us know and we can try and figure out a way to make it happen! We are open to ideas! Have a wonderful weekend 😊

Paul

14

DEF000456

**Re: Thank you 2nd grade**

VILLANUEVA, JULIE
Mon 12/21/2020 11:33 AM
   **To:** LIGHT, JESSICA; Alden, Hilarie; GETHINGS, MARGARET-MARY; CLARINO, JENNY; SALEM, PAUL

❤Looking forward to 2B's turn tomorrow!!

Julie Villanueva
Second Grade Teacher
Worthington Hooker School
New Haven, CT
475-220-3700

"By learning you will teach; by teaching you will learn" -Latin Proverb

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Monday, December 21, 2020 10:44 AM
**To:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>; VILLANUEVA, JULIE <JULIE.VILLANUEVA@new-haven.k12.ct.us>;
GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>; CLARINO, JENNY
<JENNY.CLARINO@new-haven.k12.ct.us>; SALEM, PAUL <PAUL.SALEM@new-haven.k12.ct.us>
**Subject:** Thank you 2nd grade



The third graders are having a blast sharing our nonfiction picture book with the second grade- thank you so much for helping make
this happen

Additionally our report card conference in February was without incident.

Omitting the absolute normalcy of all of our interactions after the November conference, both as
a teacher and as a parent (*see* the Remind App exchanges noted above), is an attempt to
rewrite history.

Moreover, my grade level partner and I have had a splendid working and social relationship. I
can also cite numerous other examples of my working well with other teachers on both in-school
and extra-curricular activities. I am confident that, if necessary, I can parade a host of teachers
that will affirm that I am, in fact, a good teammate.

I agree with Ms. Alden's next claim, that "[t]eaching during a pandemic has its own challenges,
but when you are in constant fear of what you say and how you teach, it is not considered

15

DEF000457

healthy." However, I am not responsible for the pandemic or the challenges associated with teaching during a pandemic. Nor, once again, am I responsible for Ms. Alden's fears. I have done nothing inappropriate to her and have chosen not to escalate some matters that I could have escalated.

As to Ms. Alden's comment, that "[w]e need to be a united front, not divided individuals, or in fear or concern regarding what or how Jessica Light may react pursuant to her personal agenda!," this is merely a restatement of Ms. Alden's vitriol throughout the Concerns suggests that she over blows her purported fears, but again, I am responsible for my conduct, not how others react to it.

As for serving only my "own mission," my "own mission" is to do the best I can for my students and community, including not only doing the best job of teaching that I can but advocating for them when necessary. And yes, that includes advocating for the safe reopening of our schools and a commitment to furthering the anti-racism that I believe our entire school community– including Ms. Alden, the other teachers, the staff, the administration, and the parents–strives for.

In sum, Ms. Alden's conclusory allegations are unspecified, unsupported, unsourced, based on hearsay, and/or relate to her reactions to her false interpretations of my conduct or gossip that she has heard. And Ms. Alden does not cited even a single inappropriate thing I have actually said or done as a teacher.

16

DEF000458

## Ms. Gethings and Ms. Clarino's Impact

Both the timing and the content of Ms. Alden's Concerns suggest strongly that they result from Ms. Gethings and Ms. Clarino involving Ms. Alden in their retaliatory, slanderous, and hostile behavior towards me, and that Ms. Alden submitting the Concerns is an unwitting part of that behavior.

Ms. Alden's including "I also do not feel comfortable volunteering my time to grow professionally on committees" is complicated by the timing. Most committee sign up opportunities are at the beginning of the year, prior to any of these alleged issues arising. Therefore, this statement seems like a coached excuse for Ms. Gethings and Ms Clarino excluding my meaningful participation in committees.

Except for our courteous Remind App exchanges, which Ms. Alden does not complain about, all of my interactions with Ms. Alden, as well as the YouTube video incident, occurred in the first semester. Yet, rather than raise her Concerns when they occurred, or shortly thereafter, Ms. Alden did not submit her Concerns until May 2021, after Ms. Gethings and Ms. Clarino were openly punishing me for speaking publicly and I filed my retaliation complaint regarding Ms. Gethings and Ms. Clarino to Human Resources. The timing suggests that Ms. Alden was encouraged in some form by Ms. Gethings and/or Ms. Clarino to submit her Concerns.

In addition, the hostility that Ms. Alden has exhibited throughout the year appears to have its birthplace in her misconceptions that I complained to Ms. Gethings about Ms. Alden's "Meet and Greet" not once, but twice. She could only have formed these misconceptions from Ms. Gethings or from someone to whom Ms. Gethings gossiped. This should be seen as further evidence that Ms. Gethings and/or Ms. Clarino have slandered me throughout this school year.

My husband informs me when he raised the "Houses around the world" video incident with Ms. Gethings and Ms. Clarino, she told him that he was being overly critical. Since my husband did not communicate with Ms. Alden directly, she could only have known that he was concerned about the video from Ms. Gethings and/or Ms. Clarino. Since Ms. Alden raises the video as one of her concerns, it appears that rather than pointing out to Ms. Alden that parents had a legitimate concern about the video, and that it should not be used in the future, Ms. Gethings and/or Ms. Clarion simply threw my husband and I under the bus. And since at least one other parent complained about the video ("For example, I received a courtesy phone call from another students parents in my class that my name was submitted to the antiracist/anti bias Hooker parent group regarding a video clip I shared with my students that showed architectural pictures of different houses around the world."), there was no need to identify my husband if Ms. Gethings and Ms. Clarino were not going to take remedial steps. Its only purpose could have been to further nurture Ms. Alden's animus towards me and my husband.

Ms. Gethings and/or Ms. Clarino's influence is also evinced by Ms. Alden's comments regarding my social postings and presentations to the BOE. As noted above, the Concerns include a false narrative regarding my social posting. It is the same false narrative that Ms. Gethings and Ms. Clarino used repeatedly in discussions about me with other teachers, even though I have previously proven these accusations to be untrue to Ms. Gethings and Ms. Clarino.

17

DEF000459

It is obvious that despite removing myself from the interactions relating to my son, Ms. Aden holds me responsible for any negative feedback about her classroom. I suspect this is nurtured by Ms. Gethings and/or Ms. Clarino.

18

DEF000460

**Christopher R. Henderson**

| | |
|---|---|
| **From:** | Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us> |
| **Sent:** | Tuesday, September 21, 2021 4:08 PM |
| **To:** | Christopher R. Henderson |
| **Subject:** | FW: 2A Classroom Library |

**Exhibit 4**

I forgot to include
Dr. Grossmans response sorry

Kind regards,

*Hilarie Y. Alden*

**Hilarie Y. Alden**
2nd grade teacher
**Worthington Hooker School**

☏ 203-623-4533
✉ hilarie.alden@new-haven.k12.ct.us

"Never, Never, Never, Give Up" - Winston Churchill

---

**From:** Grossman, Matthew <matthew.grossman@yale.edu>
**Date:** Wednesday, December 23, 2020 at 10:37 AM
**To:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Subject:** Re: 2A Classroom Library

CAUTION:

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Mrs Alden,
Thank you so much for chatting with me.  You are such a wonderful teacher and you have done such an amazing job in such a challenging time (Levi is tearing through the books you sent him!).  I really appreciate that you were so open to this discussion and I am so happy that you are Levi's teacher.  Have a great holiday and good luck with the move!
Matt

Matthew Grossman, M.D.
Associate Professor of Pediatrics
Vice Chair for Quality, Dept of Pediatrics
Yale School of Medicine
Quality and Safety Officer

1

DEF000461

Yale-New Haven Children's Hospital

---

**From:** "Alden, Hilarie" <Hilarie.Alden@new-haven.k12.ct.us>
**Date:** Tuesday, December 22, 2020 at 11:16 AM
**To:** "Grossman, Matthew" <matthew.grossman@yale.edu>
**Subject:** Re: 2A Classroom Library

Dr. Grossman-
I just wanted to send a quick note and thank you for our conversation today.  I appreciate you giving me feedback and I am grateful for the way in which it was delivered.  I am wishing you and the entire Grossman family a wonderful holiday break!  Enjoy those beautiful boys.

---

**From:** Grossman, Matthew <matthew.grossman@yale.edu>
**Date:** Monday, December 21, 2020 at 6:20 PM
**To:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Subject:** Re: 2A Classroom Library

---

CAUTION:

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

That sound great! I'll call you then.
Matt

Sent from my iPhone

> On Dec 21, 2020, at 5:27 PM, Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us> wrote:
>
> Dr. Grossman-
> I would love to talk to you and understand your perspective.  Thank you very much for reaching out.  Are you available tomorrow morning before school starts? Like at 8:00?  If so my number is 203 623-4533.  Thank you in advance.

My best-
Hilarie Alden

My best-
Hilarie Alden

---

**From:** Grossman, Matthew <matthew.grossman@yale.edu>
**Sent:** Monday, December 21, 2020 5:01:13 PM
**To:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Subject:** Re: 2A Classroom Library

2

DEF000462

> **CAUTION:**
>
> This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Mrs Alden,

I hope all is well and I wanted to thank you for what a great teacher you have been for Levi. He is such a fan of yours and we are so thankful for your flexibility with his education this year. Your gift to us was so kind - we have been happy to help out with the class and the other families however we can.

I did want to check in with you and see if you might have a quick moment to chat about the video that was played in the classroom about houses from around the world. Millie and I had heard from a few families about it so we had watched it ourselves. It is a cool little video that shows a tremendous variety of houses and I found it quite interesting. I think what was of concern to some of the other parents and to me was that the houses from Europe and the USA were modern style houses while the houses in Africa, South America and Asia were more primitive and did not appear to have electricity and how that might shape how the children think of those areas. I was hesitant to reach out to you about this but, I teach at the medical school and have received feedback from students on topics not too dissimilar from this and ended up appreciating it. I'd love to chat for 5 minutes if you have some time but understand if you are busy and ready to unplug for the holidays. Either way I hope you have a wonderful holiday and we feel blessed that you are ████ teacher. Thanks!

Matt

Matthew Grossman, M.D.
Associate Professor of Pediatrics
Vice Chair for Quality, Dept of Pediatrics
Yale School of Medicine
Quality and Safety Officer
Yale-New Haven Children's Hospital

---

**From:** "Alden, Hilarie" <Hilarie.Alden@new-haven.k12.ct.us>
**Date:** Monday, September 14, 2020 at 7:45 PM

DEF000463

███████████████████████████████████

, "LIGHT, JESSICA" <JESSICA.LIGHT@new-haven.k12.ct.us>,

███████████████████████████████████████

<d.brunsonsuccess@gmail.com>
**Subject:** 2A Classroom Library

Parents-
Today I assigned each student a "google forms sheet" for you to fill out if you would like books from our 2A Classroom Library while we are learning remotely. It is located under the topic of "Reading" in google classroom. Please turn in ONLY if you want to borrow books. This Friday when you pick up our weekly packet, I will send the books home.

Tonight you will receive your child's reading level in the Remind App from the last official Running Record (Reading Test) your child had from 1st grade. This may not be where they are today especially if they read all Summer. This is literally just a starting point so I know where to begin examining what types of books would be best for them at home. I will be assessing the students over the next several weeks to get an accurate understanding of where they could benefit from instruction in small groups and independently.

I will explain our Collaborative Reading and Writing program at Back to School night later this month, but for the time being, I wanted to make sure your child has physical books available to read during our IDR (Independent Reading Time).

PLEASE REMEMBER.....Books are leveled, students are NOT! It isn't a competition between students nor should their levels be shared with each other. Every child progresses at their own pace and each is unique and has different reading skills. It is my goal to find the types of books that will captivate your child's interest and elevate their passion for reading.

Please let me know if you have any questions

---

**From:** "Alden, Hilarie" <Hilarie.Alden@new-haven.k12.ct.us>
**Date:** Monday, September 7, 2020 at 10:55 PM

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

"LIGHT, JESSICA" <JESSICA.LIGHT@new-haven.k12.ct.us>

**Subject:** Re: Remind sign-up

2A Families-
I will be communicating this week through the Remind App.  If you haven't already, please sign up asap.
Thank you in advance.  Please kindly use the app to also communicate to me.  I do not want to miss any
parent questions or communications.  Have a great evening!

<image001.png>

---

**From:** "Alden, Hilarie" <Hilarie.Alden@new-haven.k12.ct.us>
**Date:** Thursday, September 3, 2020 at 2:55 PM

"LIGHT, JESSICA" <JESSICA.LIGHT@new-haven.k12.ct.us>

**Cc:** "CLARINO, JENNY" <JENNY.CLARINO@new-haven.k12.ct.us>
**Subject:** Re: Remind sign-up

5

DEF000465

2A Families-
Thank you for your patience as we navigate on-line learning. I was so incredibly impressed with the children and their engagement. I know it is very different than what we wish for our child to experience, but together we will do our best. Today and tomorrow we will spend more time online than usual as we develop our class community. I know we had a lot of screen time, but I felt it important for them to not only be seen, but also have a voice in our class. We were able to discuss procedures and expectations as well as share about ourselves. Your students were kind, respectful and absolutely adorable. Thank you for all your support and help.

Please reach out to me with any issues or concerns you have. I am open to feedback and will make this a great year however we end up delivering the learning.

My best-
Hilarie Alden

**From:** "Alden, Hilarie" <Hilarie.Alden@new-haven.k12.ct.us>
**Date:** Wednesday, September 2, 2020 at 2:05 PM

"LIGHT, JESSICA" <JESSICA.LIGHT@new-haven.k12.ct.us>

**Cc:** "CLARINO, JENNY" <JENNY.CLARINO@new-haven.k12.ct.us>
**Subject:** Remind sign-up

2A families-
Worthington Hooker will be using the remind app this year for all communication. I am attaching the instructions on how to access and sign up for our class. Thank you in advance! This will replace dojo!

Best-
Mrs. Alden

6                                                                    DEF000466

\<image002.png\>

_____

**From:** "Alden, Hilarie" <Hilarie.Alden@new-haven.k12.ct.us>
**Date:** Wednesday, September 2, 2020 at 1:48 PM

"LIGHT, JESSICA" <JESSICA.LIGHT@new-haven.k12.ct.us>,

**Cc:** "CLARINO, JENNY" <JENNY.CLARINO@new-haven.k12.ct.us>
**Subject:** Epic Sign in instructions

2A Families-
My plan is to send home leveled books for each child and set up a time to bookshop from our class library next week.  We also will be using epic for digital books.  You will receive a bookshop schedule from me next week so that your child can chose their interests.

1. In the packet are a list of leveled series.  Please look over them and begin thinking about which ones are appropriate for your student to read at their level.  I have asked the first grade teachers to give me each child's level from last year.

2. Here is a picture by author or series that I have in school to share.  I also have Non-fiction book shelves too.  (I will send a list home with my series as well)

3.

\<image003.png\>
\<image004.png\>

DEF000467

4. Attached please find instructions to sign into your child's Epic account.  Please help them log in and bookmark into favorites on their chrome books.  Thank you very much!

   Best-
   Hilarie Alden

DEF000468

**Exhibit 5**

## Christopher R. Henderson

| | |
|---|---|
| **From:** | LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us> |
| **Sent:** | Thursday, September 16, 2021 11:43 AM |
| **To:** | Christopher R. Henderson |
| **Subject:** | Fw: New message from Mrs. Alden's Alden 2A class |

My exchange about Ms. Alden's East Rock meet and greet with Ms. Gethings

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Thursday, September 24, 2020 11:50 AM
**To:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Subject:** Re: New message from Mrs. Alden's Alden 2A class

never mind- Ms. Alden just sent the correction

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Thursday, September 24, 2020 11:49 AM
**To:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Subject:** Fw: New message from Mrs. Alden's Alden 2A class

I understand this was mistakenly planned for during the day, but let me know if it is changing or if it is just going to be allowed this one time, so that I can plan for ▮▮▮▮

**From:** Mrs. Alden via Remind <chat+abd58db0-c839-4857-81cc-dd5f92aa05ec@mail.remind.com>
**Sent:** Thursday, September 24, 2020 8:17 AM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** New message from Mrs. Alden's Alden 2A class

**CAUTION:**
This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

☒

**ALDEN 2A ANNOUNCEMENT**

**Mrs. Alden:**

1

DEF000469

"Thank you for your feedback during open house. It was suggested that we try and get together again with the children at East Rock Park.
So..........
Tomorrow we will have Packet Picnic and Pick-up at the Park.
where: East Rock Playground
when: 12:00-1:30
Bring: face masks, towel to sit on, brown bag lunch, hot chocolate, Matilda Books!
We will eat, play, and drink our hot chocolate while listening to our Matilda read aloud. We will then head back home for Gym at 1:30.
If you can't make it, the packets will be available in the office!
We may even see Miss Honey (heheh)!"

Respond to Mrs. Alden

OR REPLY DIRECTLY TO THIS EMAIL

Do more with Remind

Get the app

x

© 2020 Remind, 965 Mission Street, San Francisco, CA 94103

2

DEF000470

CONTACT US • REPORT THIS MESSAGE • MANAGE PREFERENCES • UNSUBSCRIBE

Links contained in this email have been replaced by ZixProtect Link Protection. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

DEF000471

DEF000472

**Christopher R. Henderson**

| | |
|---|---|
| **From:** | LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us> |
| **Sent:** | Thursday, September 16, 2021 11:45 AM |
| **To:** | Christopher R. Henderson |
| **Subject:** | Fw: 3rd grade meet and greet |

**Exhibit 6**

My exchange with Ms. Gethings about my own prior meet and greet

**From:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Sent:** Tuesday, September 8, 2020 5:34 PM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>; SALEM, PAUL <PAUL.SALEM@new-haven.k12.ct.us>
**Subject:** Re: 3rd grade meet and greet

You should do them at separate times & unfortunately they can not be done during the "school day"

Get Outlook for iOS

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Tuesday, September 8, 2020 1:38:46 PM
**To:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>; SALEM, PAUL
<PAUL.SALEM@new-haven.k12.ct.us>
**Subject:** Re: 3rd grade meet and greet

Ok, if it is better for third grade classes can do it on different days at East Rock park.

Could I do it next Monday at 2:00 at East Rock Park during my Social Studies /Flex time?

**From:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Sent:** Monday, September 7, 2020 7:33 AM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** Re: 3rd grade meet and greet

Jessica I'm sorry it took me so long to answer I've been waiting for an answer and unfortunately the answer I got is no
students on school campus for now.

Get Outlook for iOS

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Friday, September 4, 2020 8:23:09 AM
**To:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Subject:** Re: 3rd grade meet and greet

I would like to give the parents enough notice so please let me know.

Get Outlook for iOS

**From:** LIGHT, JESSICA
**Sent:** Thursday, September 3, 2020 11:38:17 AM

1

DEF000473

**To:** GETHINGS, MARGARET-MARY <MARGARET-M.GETHINGS@new-haven.k12.ct.us>
**Subject:** 3rd grade meet and greet

Can we reschedule the third grade meet and greet/ mask tie dying for Tuesday on the field here- at 1:50-2:50
Get Outlook for iOS

Links contained in this email have been replaced by ZixProtect Link Protection. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

2

DEF000474

**Exhibit 7**

## Christopher R. Henderson

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Thursday, September 16, 2021 12:01 PM
**To:** Christopher R. Henderson
**Subject:** Fw: Wesleys Late Work

Email exchange about turning in ███████ work- please note it is to school not personal email

---

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us> .
**Sent:** Saturday, November 21, 2020 12:54 PM
**To:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Subject:** Re: Wesleys Late Work

Good afternoon, please do not feel you have to go through it all- it is quite overwhelming. I know I have been trying to sort through it all for three hours this morning, so that ████ can have a fresh organized start. He has been lost wading through all these papers everyday.

You said you were unable to read the work he took pictures of and uploaded to google classroom. I do not know what day each work was from or what things you needed so I wanted to make sure you had a chance to see anything you wanted. I am not sure what is last marking period and what is current.

I originally didn't think you wanted to see all of this, but in our conversation you said you needed all the work turned in and commented the same on his report card.

Now that I know you want to see things I will make sure we do not get so backlogged.

Again I didn't expect you to look through it all this weekend, I am just trying to give ████ a better chance for success.

Best,
Jessica

Get Outlook for iOS

---

**From:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Sent:** Saturday, November 21, 2020 12:32:03 PM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** Wesleys Late Work

Jessica-
Can you please help me understand why this Saturday morning you have sent over 35 emails of ████ late work from last quarter to my new haven email address. We didn't discuss the need for you to remit this. I do however recall discussing
that the directions for ALL my students is to upload pictures of their assignments into google classroom within the given dates assigned. I also shared that I remind students when they haven't turned an assignment in by sending a message via google classroom. I do accept late work within that quarter.

1

DEF000475

Moving forward,  please upload his assignments under classwork into google classroom.  As you can imagine, having 24 students sending the work in to one designated spot allows me to give the necessary feedback in a timely fashion so that I can plan for further instruction.

Thank you for following the class protocol.

My best-
Hilarie Alden

Links contained in this email have been replaced by ZixProtect Link Protection. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

2

DEF000476

**Christopher R. Henderson**

**Exhibit 8**

| | |
|---|---|
| **From:** | LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us> |
| **Sent:** | Thursday, September 16, 2021 12:05 PM |
| **To:** | Christopher R. Henderson |
| **Subject:** | Fw: ▓▓▓ srbi |

Email prior to report card conferences about ▓▓▓▓ reading difficulties.

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Wednesday, October 14, 2020 6:27 PM
**To:** CLARINO, JENNY <JENNY.CLARINO@new-haven.k12.ct.us>
**Subject:** Re: ▓▓▓ srbi

Pleas do not take this as a criticism of Mrs. Alden, she is working amazingly hard. I just know as a mom ▓▓ is struggling to learn to read and the reading intervention group he was in last year, truly helped him.

I was diagnosed with "severe dyslexia" in second grade. My mother was diagnosed with dyslexia around the same age and my older son was also diagnosed. There is a known genetic component, but I also don't want to prematurely have him tested- the pandemic has thrown a wrench into things but I want to make sure we all have the most accurate data possible when making future decisions and therefore just want to see how he does with reading intervention this year.

Get Outlook for iOS

**From:** CLARINO, JENNY <JENNY.CLARINO@new-haven.k12.ct.us>
**Sent:** Wednesday, October 14, 2020 5:38:21 PM
**To:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Subject:** Re: Wesley srbi

Jess, I'm in the same boat with my own daughter. It's so hard as moms who are educators.

Get Outlook for iOS

**From:** LIGHT, JESSICA <JESSICA.LIGHT@new-haven.k12.ct.us>
**Sent:** Wednesday, October 14, 2020 4:31:32 PM
**To:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>; LADORE, DANIELA <DANIELA.PORTOLADORE@new-haven.k12.ct.us>; CLARINO, JENNY <JENNY.CLARINO@new-haven.k12.ct.us>
**Subject:** Wesley srbi

Hi all, ▓▓▓▓ mentioned he was given a literacy test with Mrs. Ladore and I wanted to follow up to find out how he is doing. He is incredibly frustrated with his progress in reading and wants to be capable of reading books independently he can not yet. Last year he was in Srbi and then reading intervention and I wanted to know when this will be beginning again and if I need to get him on lexia again. We did the rest of first grade lexia and ms. Traca's reading intervention group last year and over the summer. Thank you for your help!

Jessica
Get Outlook for iOS

DEF000477

Links contained in this email have been replaced by ZixProtect Link Protection. If you click on a link in the email above, the link will be analyzed for known threats. If a known threat is found, you will not be able to proceed to the destination. If suspicious content is detected, you will see a warning.

2

DEF000478

**Exhibit 9**

**Christopher R. Henderson**

| | |
|---|---|
| **From:** | Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us> |
| **Sent:** | Tuesday, September 21, 2021 1:10 PM |
| **To:** | Christopher R. Henderson |
| **Subject:** | FW: Notice of Investigatory Interview |
| **Follow Up Flag:** | Copied to Worldox (Client Files\18811\0428\01538492.MSG) |

Kind regards,

*Hilarie Y. Alden*



**Hilarie Y. Alden**
2nd grade teacher
**Worthington Hooker School**

☎ 203-623-4533
✉ hilarie.alden@new-haven.k12.ct.us

"Never, Never, Never, Give Up" - Winston Churchill

---

**From:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Date:** Wednesday, September 15, 2021 at 4:29 PM
**To:** Rebecca Goldberg <rgoldberg@berchemmoses.com>
**Subject:** Re: Notice of Investigatory Interview

Here is the message about the read-aloud and then the messages about the reschedule.

DEF000479

| FRIDAY SEP. 25, 2020<br>6:18 AM EDT | Alden 2A | 30 | Friendly reminder about our after-school Ea<br>I am looking forward to seeing you today a<br><br>*** I will bring this weeks packet pick-up so<br>school to pick it up unless you will not be j<br><br>Please let me know if another parent is pic<br><br>ps. Please see attached flyer about Movie<br>https://docs.google.com/presentation/d/1L<br>ApD_P-ReICH41iy-y0Sf823Y/edit?usp=driv |
|---|---|---|---|
| THURSDAY SEP. 24, 2020<br>11:49 AM EDT | Alden 2A | 30 | IMPORTANT UPDATE:<br>I apologize in advance but our play date wi<br>tomorrow to after school at East Rock Park<br><br>Same place, different time!<br><br>Ms. Honey and I will be waiting for you at 2<br>This play date is completely OPTIONAL.<br><br>Just an opportunity to see each other while<br>distancing. Masks required please.<br><br>This weeks packet has a craft inside. Then<br>home. I'll bring to the park w/ the book ba<br>filled out the google form.<br><br>You can always pick up the during our norr<br><br>Thank You! |

| THURSDAY SEP. 24, 2020<br>8:17 AM EDT | Alden 2A | 30 | Thank you for your feedback during open<br>that we try and get together again with the<br>So..........<br>Tomorrow we will have Packet Picnic and<br><br>where: East Rock Playground<br>when: 12:00-1:30<br>Bring: face masks, towel to sit on, brown<br>Matilda Books!<br><br>We will eat, play, and drink our hot chocol<br>Matilda read aloud. We will then head bac<br><br>If you can't make it, the packets will be av<br><br>We may even see Miss Honey (heheh)! |
|---|---|---|---|

Kind regards,

DEF000480

*Hilarie Y. Alden*



**Hilarie Y. Alden**
2nd grade teacher
**Worthington Hooker School**

☎ 203-623-4533
✉ hilarie.alden@new-haven.k12.ct.us

"Never, Never, Never, Give Up" - Winston Churchill

---

**From:** Rebecca Goldberg <rgoldberg@berchemmoses.com>
**Date:** Wednesday, September 15, 2021 at 4:19 PM
**To:** Alden, Hilarie <Hilarie.Alden@new-haven.k12.ct.us>
**Subject:** Automatic reply: Notice of Investigatory Interview

---

CAUTION:

This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I am out of the office with very limited access to email and phone (and no access at all on Thursday). I will return on Monday, September 20th.
If you need immediate assistance, please call 203-783-1200 and ask to speak with Cathy or the partner on your matter.
-- WARNING: FRAUD ALERT. If you receive an e-mail appearing to be from this office which requests that you wire or otherwise transfer funds to any party, you must confirm the request and any corresponding instructions via telephone before you initiate any wire or other transfer. PLEASE CONFIRM BY CALLING THE ORIGINATOR OF THE EMAIL, USING PREVIOUSLY KNOWN CONTACT INFORMATION, PRIOR TO WIRING OR OTHERWISE TRANSFERRING FUNDS.

DEF000481

Exhibit 10

Agreement shall be construed or interpreted so as to apply retroactively.

SECTION 5. Non-discrimination

The parties agree to continue to follow the policy of not discriminating against any employee on the basis of race, color, religious creed, age, sex, sexual orientation, marital status, national origin, ancestry, or present or past history of mental disorder, mental retardation, learning disability or physical disability, including, but not limited to, blindness, or membership or partnership in or association with the activities of any employee organization or political party, or on account of membership in a protected classification under Connecticut or Federal equal employment opportunity statutes as they currently exist or as they may be amended from time to time.

SECTION 6. Despite references herein to the Board or the Federation as such, each reserves the right to act hereunder by committee or by designated representative (professional or lay, whether or not a member). Each party will provide to the other satisfactory evidence of authority so to act.

SECTION 7. During the term of this Agreement no member of the bargaining unit or representative of the Federation shall engage in or participate in any refusal to work, mass resignation, slowdown or strike. Engaging in or participating in such activity shall constitute just cause for discipline, including suspension and discharge. Any individual discharged or otherwise disciplined for engaging or participating in such activity shall be entitled to arbitration in accordance with the provisions set forth in Article III hereof but only on the issue of whether he engaged in or participated in such activity, and the Arbitrators authority shall be so limited.

SECTION 8. Nothing contained herein to the contrary notwithstanding, bargaining unit members shall be entitled to family and medical leave as provided for by the Federal Family and Medical Leave Act, as applicable. Leaves provided for in this Agreement shall be included in and shall not be in addition to the period(s) of family and medical leave required by such law.

## ARTICLE II
## GENERAL WORKING CONDITIONS

SECTION 1. Fair Disciplinary Policy

(a)     No teacher shall be suspended except for just cause.

(b)     Notification of suspension shall be given to the teacher in writing with a copy to the Federation. The reason for such discharge or suspension shall be stated therein.

(c)     The teacher may, if s/he so desires, upon receipt of notification of suspension, file a grievance at the third step of the grievance procedure, provided in this Agreement. If suspension is found to be unjustified at any step of this procedure, the teacher's full pay and benefits shall be restored for the full period of her/his suspension.

SECTION 2. School Year

(a)     The work year of all teachers covered by this Agreement shall commence no earlier than the Tuesday after Labor Day, unless mutually agreed upon by the Board and the Federation, and shall terminate no later than June 30 annually if possible under State Law. During such period there shall be scheduled no more than one hundred eighty-two (182) regular teaching days where pupil attendance is required. Similarly, during such period, teachers shall be required to report one day

2

DEF000482

# Exhibit 11

4100

*TO BE PUBLISHED ANNUALLY BY THE SUPERINTENDENT OF SCHOOLS*

## STATEMENT OF NON-DISCRIMINATION

The New Haven Board of Education is committed to the principles of equal employment opportunity for all job applicants and current employees. The Board bases all employment decisions upon the qualifications and abilities of each individual without regard to race, color, religious creed, age, marital status, national origin, ancestry, sex, sexual orientation, status as a veteran of the Vietnam era or as a disabled veteran, learning disability or present or past history of mental disorder, mental retardation or physical disability, including, but not limited to, blindness.

To implement this policy, the Board will continue to:

QQ.    Recruit, hire, train and promote persons in all job classifications without regard to race, color, religious creed, age, marital status, national origin, ancestry, sex, sexual orientation, status as a veteran of the Vietnam era or as a disabled veteran, learning disability or present or past history of mental disorder, mental retardation or physical disability, including, but not limited to, blindness.

RR.    Base employment decisions only on job-related criteria so as to further the principle of equal employment opportunity.

SS.    Ensure that promotion decisions are in accord with principles of equal employment opportunity by imposing only valid job-related requirements for promotion opportunities.

TT.    Ensure that all personnel actions (including but not limited to compensation, benefits, transfers, layoffs, return from layoff, Board-sponsored training, education, tuition assistance, and social and recreational programs) are administered without regard to race, color, religious creed, age, marital status, national origin, ancestry, sex, sexual orientation, status as a veteran of the Vietnam era or as a disabled veteran, learning disability or present or past history of mental disorder, mental retardation or physical disability, including, but not limited to blindness.

To implement this policy, I have appointed _____ as E.E.O. Coordinator, whose name will appear on all internal and external communications regarding the Board's Equal Employment Opportunity policy.

Equal Employment Opportunity is not only the law, but it is a principle of our Board's operation. I expect each employee to cooperate to achieve this goal and I personally stand behind this principle.

_____
Superintendent of Schools

Regulation amended: January 11, 1999        **NEW HAVEN PUBLIC SCHOOLS**
New Haven, Connecticut

DEF000483

**4101**

## Personnel -- Certified/Non-Certified

### Nondiscrimination and Equal Employment Opportunity

The Board will follow the intent and spirit of all provisions of applicable federal, state and local laws and regulations with respect to recruitment, hiring, promotion, compensation, benefits, transfers, layoffs, recalls, training and job assignments, without regard to race, color, religion, creed, age, sex, sexual orientation, marital status, national origin, ancestry, or past or present history of mental disorder, mental retardation, learning disability, physical disability (including blindness) or other disability provided the individual can perform the essential functions of the job with or without reasonable accommodation (except in the case of a bona fide occupational qualification).

### Harassment

The Board absolutely prohibits any form of unlawful employee harassment, whether based on race, color, religion, sex, marital status, national origin, ancestry, sexual orientation, age, or disability.  Employees are responsible for respecting the rights of their co-workers.

If an employee experiences any harassment which arises our of our workplace based on race, color, religion, sex, marital status, national origin, ancestry, sexual orientation, age or disability, he or she should promptly report it to his or her supervisor.  If the employee believes it is inappropriate to discuss the matter with his or her supervisor, he or she may bypass the supervisor and report it directly to the Superintendent of Schools, who will undertake an investigation.

If the Board determines that an employee is guilty of harassing another employee, appropriate discipline will be taken against the offending employee, up to and including termination without prior notice.

The Board prohibits any retaliation against any employee for filing a bona-fide complaint under this policy or for assisting in any complaint investigation.

Policy amended: January 11, 1999         **NEW HAVEN PUBLIC SCHOOLS**
                                          New Haven, Connecticut

**4101**

**Personnel -- Certified/Non-Certified**

**Nondiscrimination and Equal Employment Opportunity (continued)**

**Equal Education Opportunity**

The Board will follow the intent and spirit of all provisions of the IDEA, Title IX of the Education Amendments of 1972, Title VI of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973. Every student has the right to participate fully in classroom instruction and extracurricular activities and such right shall not be abridged or impaired because of age, sex, sexual orientation, race, religion, national origin, pregnancy, parenthood, marriage, disability or for any reason not related to his/her individual capabilities.

No otherwise qualified individual with disabilities shall, solely by reason of such disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program of the New Haven Board of Education, including, but not limited to:

> Admission
> Use of School Facilities
> Vocational Education
> Competitive Athletics
> Student Rules, Regulations and Benefits
> Financial Assistance
> School-sponsored Extracurricular Activities
> Enrollment in Courses
> Counseling and Guidance
> Physical Education
> Graduation Requirements
> Treatment as a Married and/or Pregnant Student
> Health Services
> Most Other Aid, Benefits or Services

Policy amended: January 11, 1999

**NEW HAVEN PUBLIC SCHOOLS**
New Haven, Connecticut

4101

**Personnel -- Certified/Non-Certified**

**Nondiscrimination and Equal Employment Opportunity (continued)**

The Civil Rights Coordinators for the New Haven Board of Education have the responsibility to monitor compliance with this policy.  The names and location of the Civil Rights Coordinators shall be published each year by the Superintendent of Schools.  Further, compliance with this policy is a responsibility of all district administrators.

*Legal References*:      *Conn. Gen. Stat. § 46a-51* *et seq.*
                         *Title IX of the Education Amendments of 1972*
                         *Titles VI and VII of the Civil Rights Act of 1964*

Policy amended:  January 11, 1999          **NEW HAVEN PUBLIC SCHOOLS**
                                            New Haven, Connecticut

Exhibit 12

5124

### Students

### Reporting to Parents

The Board of Education encourages good communication between parent and teacher and shall promote frequent and varied reporting contacts. All forms and methods of communications, such as parent-teacher conferences, mail, telephone, and school visitation by parents will be utilized.

### Report Card

Written reports on student progress will be issued to parents four times a year. The reporting dates will be determined annually and placed on the school calendar. Parents will be advised no later than the third reporting period of a student's potential failure and the possibility of having to repeat a grade or a course.

Teachers also will report on student progress at regularly scheduled parent conferences.

### Warning Notices

Student progress reports may be sent any time between marking periods to parents/guardians of students who need some type of special attention. These reports do not necessarily mean that a student is failing, but a deficiency is noted which needs correction. Acknowledgment of this report by a note, phone call or visit by the parent or guardian is advisable.

If the parents of a child are separated or divorced, both parents will have the right to be informed of their child's progress in school unless there is an order from the court to the contrary. To receive written reports and notification of conferences, a noncustodial parent will make such request to the school principal.

Legal Reference:     Connecticut General Statutes

                        10-15b Access of parent or guardian to student's records.

                        46b-56 Access to records of minor children by noncustodial parent.

Policy adopted:     August 14, 1995          NEW HAVEN PUBLIC SCHOOLS
                                                    New Haven, Connecticut

DEF000487