UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
JESSICA LIGHT,                  :  No. 3:22CV425(JAM)
                                :
              Plaintiff         :
                                :
         v.                     :
                                :
NEW HAVEN BOARD OF EDUCATION &  :
MARGARET-MARY GETHINGS, in her  :
individual capacity,            :
                                :  New Haven, Connecticut
              Defendants        :  July 29, 2024
                                :
- - - - - - - - - - - - - - - - x
```

PRETRIAL CONFERENCE

B E F O R E:

      THE HONORABLE JANET BOND ARTERTON, U.S.D.J.

A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        MONARCH LAW
            363 New Britain Road, First Floor
            Berlin, Connecticut 06037
        BY:  ANTHONY J. INTERLANDI, SR., ESQ.

    FOR THE DEFENDANTS:

        SHIPMAN & GOODWIN
            One Constitution Plaza
            Hartford, Connecticut 06103
        BY:  PETER JOSEPH MURPHY, ESQ.
            CHELSEA McCALLUM, ESQ.

                    Diana Huntington, RDR, CRR
                    Official Court Reporter

1                          **<u>1:09 P.M.</u>**

2               THE COURT:  We are here this afternoon in the

3    matter of Light v. New Haven Board of Education,

4    Docket No. 22CV425.  The second defendant is Margaret-Mary

5    Gethings.

6               May I please have appearances of counsel,

7    starting with the plaintiff.

8               MR. INTERLANDI:  Yes, Your Honor.  Anthony

9    Interlandi, I am counsel for the plaintiff Jessica Light.

10              THE COURT:  Thank you.

11              And for the defendants.

12              MR. MURPHY:  Good afternoon, Your Honor.  Peter

13   Murphy for the defendants.

14              MS. McCALLUM:  Good afternoon, Your Honor.

15   Chelsea McCallum for the defendants as well.

16              THE COURT:  And will both of you be arguing

17   today or is one of you taking the laboring oar?

18              MR. MURPHY:  I'll probably take the laboring oar

19   today, Your Honor, although Chelsea knows just as much if

20   not more about some of these motions that I may want her

21   to participate as well.

22              THE COURT:  Please be seated.

23              Let me first go over with you some questions

24   that arose in my review of all of the file as well as the

25   pending motions in limine.  This is our final pretrial

1    conference.  Let me ask the following questions:

2         Is Defendant Gethings planning or asserting a

3    qualified immunity defense or has that been superseded by

4    what I understood to be the acknowledgments that it was

5    protected speech and that she was speaking as a private

6    person?  If you can help me out with that, Mr. Murphy.

7         MR. MURPHY:  Sure, Your Honor.  I do think

8    Judge Meyer found in his summary judgment -- well,

9    stepping back, at summary judgment we didn't challenge the

10   speaking, the protected speech element except in one

11   discreet instance, the Facebook one.  And Judge Meyer

12   found that that was protected speech, I believe.  I think

13   we're not challenging that anymore, Your Honor.

14        THE COURT:  What does that mean?  Is there a

15   qualified immunity defense or no?

16        MR. MURPHY:  I think we still have the argument

17   that there were no adverse actions.  So if, as a factual

18   matter, the jury finds there were certain adverse actions,

19   I think we can then make the argument that she's still

20   entitled to qualified immunity on those because no person

21   in her situation would have understood that it was illegal

22   for her to take those actions.  Right, Your Honor?  I hope

23   that answered your question.

24        THE COURT:  So the issue of qualified immunity

25   will need to be reflected or assessed in light of a

1    special interrogatory to the jurors, right?

2              MR. MURPHY:  Correct.  That's why we put those

3    couple questions in our verdict form about the retaliatory

4    conduct, the alleged retaliatory conduct.  Because -- I

5    guess that's one of my fundamental problems and

6    difficulties here, Your Honor, with preparing for this

7    trial is normally in a case "I was terminated," that's the

8    retaliatory act, and it's clear what everyone is arguing

9    about.  Here, I still don't understand, as we are heading

10   to trial next week, what the exact retaliatory acts that

11   Ms. Light is complaining about.  Is it the four in the

12   Berchem Moses report?  Is it ten things, including things

13   that Berchem Moses found were not retaliatory?  Has she

14   decided to --

15             THE COURT:  Okay, I'll get to that with

16   Mr. Interlandi in just a second.  I just wanted to

17   understand where, if at all, the qualified immunity

18   defense comes in given that the protected nature of her

19   speech is not in dispute, correct?

20             MR. MURPHY:  Correct.  And the way I understood

21   the case law when I read up on this was the question of

22   qualified immunity should not go to the jury but that

23   certain factual questions can, and then Your Honor

24   would --

25             THE COURT:  And then it is also not disputed

1    that when she made her speech that has been found to be

2    protected or is not disputed, she was speaking as a

3    private person?

4              MR. MURPHY:  Correct.

5              THE COURT:  That's undisputed.

6              MR. MURPHY:  Undisputed or as found by

7    Judge Meyer.  Like the board of ed meetings, for example,

8    Your Honor, we never challenged that.  She was there in

9    her capacity as a parent, et cetera.

10             THE COURT:  All right.  And notwithstanding

11   those either findings or concessions, you still think that

12   qualified immunity is a cognizable legal defense?

13             MR. MURPHY:  That was my understanding,

14   Your Honor.  Maybe I misread it, but...

15             THE COURT:  So it is a cognizable legal defense

16   if the jury finds retaliatory acts; is that your claim?

17             MR. MURPHY:  Correct.  The way I thought I

18   understood the variety of case law that's out there on

19   that was that questions of certain conduct can go to the

20   jury.  And then the question of whether that conduct, if

21   it was engaged in, is protected by qualified immunity

22   would be for the Court.

23             THE COURT:  So are you saying that retaliatory

24   acts against a person speaking in a private capacity and

25   speaking protected speech, that can be qualifiedly immune?

1   That is, could those premises that no reasonable school

2   official would have sought that to be unlawful?

3            MR. MURPHY:  Speaking to the paraprofessional --

4   again, picking one example, Your Honor.  Speaking to a

5   paraprofessional about proper dismissal protocols, right,

6   if the jury were to assign somehow that that is a

7   retaliatory act, I think the law -- the case law out there

8   permits us to argue that no person in Ms. Gethings'

9   position would have understood that to be a retaliatory

10  act.

11           THE COURT:  All right.  Well, I understand your

12  position.  I suspect we will have further discussion about

13  whether that applies to a qualified immunity defense, but

14  we are clear that the existence or not of qualified

15  immunity doesn't go to the jury.

16           MR. MURPHY:  I would agree with that,

17  Your Honor, yes.

18           THE COURT:  Anything you want to add to that,

19  Mr. Interlandi?

20           MR. INTERLANDI:  Your Honor, just that in my

21  proposed jury instructions on page 4, Footnote 13 would

22  cover my position which is that, given the acceptance of

23  the protected speech and that she was speaking as a

24  private person, it appears that the defense is moot, that

25  this is an immunity from suit rather than a mere defense

1    to liability.  So my position would be set out in page 4,

2    Footnote 13.

3            THE COURT:  Okay.  All right.  Next, talk to me

4    about the defendants' apparent claim of intracorporate

5    communications privilege.  Do you still maintain that?

6            MR. MURPHY:  I do, Your Honor.  Unfortunately,

7    Judge Meyer didn't get into it on his ruling on the motion

8    for summary judgment, but my understanding of the

9    intracorporate communications privilege is that it applies

10   in this type of situation when someone is having an

11   oversight meeting, whether it's a termination meeting or

12   an investigation meeting or whatever we want to call that

13   meeting with the union and the two teachers, that those

14   communications are covered by the intracorporate

15   communications privilege.  Because the point of the

16   privilege is to protect the free-flowing discussion in the

17   workplace of employee performance, et cetera.

18           THE COURT:  Pretty broad, isn't it?  Isn't the

19   intracorporate privilege limited to the top people who are

20   talking about, usual case, a corporate decision making and

21   what they will do and why they're going to do it, as

22   opposed to the way I'm hearing you describe it, it's

23   everything that went on in the workplace?

24           MR. MURPHY:  Well, I just made that same

25   argument in another case that's pending right now as well,

```
 1    Your Honor, same case, a termination case.  This is where
 2    it typically comes up, right, where managers are
 3    asserting --
 4              THE COURT:  But your description of who would be
 5    covered was more than just managers.  It was union people
 6    and so forth.  That's why I'm curious about the scope of
 7    your assertion of this privilege.
 8              MR. MURPHY:  The way I understand Your Honor's
 9    question -- and I hope I understand this correctly -- in a
10    meeting here, in this case, for example, we have the
11    principal and the assistant principal.  I know
12    Your Honor's point is that if they were talking together
13    by themselves that would be covered, right, because
14    they're two managers talking about the performance of
15    Ms. Light if she was out of the room.  I think your
16    question to me is, does the presence of the union
17    representative and the two teachers defeat the privilege.
18    And I don't think it does in this case, Your Honor.
19    You're right, standing around the copier talking about,
20    you know, we could come up with many examples that might
21    not be covered.  Here, in this context when they're
22    talking about an employee's -- essentially her
23    performance, her treatment of a fellow colleague who was
24    complaining about her, I think we have a valid argument
25    that that's covered by the intracorporate communications
```

```
 1   privilege.
 2            THE COURT:  What would be left for trial?
 3            MR. MURPHY:  Well, that's why we moved for
 4   summary judgment, Your Honor.  I agree, I feel that one --
 5   Judge Meyer dismissed thirteen or fourteen of the alleged
 6   defamatory statements and kept the one, didn't address the
 7   intracorporate communications privilege, and I feel like
 8   it should have been covered there.
 9            THE COURT:  But it wasn't and so here we are.
10            MR. MURPHY:  Correct.
11            THE COURT:  And we are now going to start trial
12   picking our jury on Thursday, starting evidence on Monday.
13            MR. MURPHY:  Right.
14            THE COURT:  Okay.
15            Anything you want to add to that,
16   Mr. Interlandi, that will be of assistance in figuring out
17   what goes where?
18            MR. INTERLANDI:  Yes, Your Honor.
19            I'm going to hold up my commuter.  My eyesight
20   isn't as good as it used to be.
21            In my opinion, the case law is clear.  In
22   Connecticut the intracorporate privilege is limited to a
23   narrow scope.  And that is in the process of termination
24   or in review, right, a performance review.  So reviewing
25   an employee's job performance in preparation of
```

1    termination paperwork.

2          Here, as has been discussed, we have a very

3    narrow focus of the slander claim, and that is March 31,

4    2021, a meeting with five people: Defendant Gethings, the

5    plaintiff, the assistance principal Jenny Clarino,

6    Teacher X, and a union representative.  And it is alleged

7    that Defendant Gethings said -- and I'm going to

8    paraphrase -- "Everyone's telling us it was you.  You're

9    the source of the leak."

10          So my position is because of the narrow

11    defamation slander claim here that is left, the

12    intracorporate privilege does not apply.

13          THE COURT:  So in your defamation claim you have

14    in your papers referred to slander per quod.  Is that

15    really a cause of action in this case or is it just

16    defamation with your recognition that you have to prove

17    damages?

18          MR. INTERLANDI:  Your Honor, I believe this is

19    obviously defamation, we have to prove our damages.  And I

20    don't think it's a slander per se where it would meet the

21    definition of per se, and so I've defined it in the

22    paperwork in our proposed jury instructions as slander

23    per quod.  And it's my understanding as it relates to

24    that, Ms. Light's obligation is to prove damages.

25          THE COURT:  But we're not going to need to have

1    the jury make a finding on slander per quod; is that

2    right?

3              MR. INTERLANDI:  I believe that's correct.

4              THE COURT:  It's just your way of communicating

5    your recognition that you have to prove your damages.

6              MR. INTERLANDI:  Yes, Your Honor.

7              THE COURT:  Got it.

8              Now, in the question of proof of substantial

9    interference with bona fide job performance, that prong,

10   is that an affirmative defense or is that an element of

11   the plaintiff's claim?

12             MR. INTERLANDI:  My understanding, Your Honor,

13   is that the law isn't exactly clear on that.  Our position

14   is that it is on the defendants to prove that there was

15   substantial interference, material interference with the

16   bona fide job performance.  Defense counsel disagrees and

17   believes that that is an element of the claim and that the

18   plaintiff is responsible.

19             THE COURT:  Okay.

20             Now, Mr. Murphy, am I recalling correctly that

21   you pled that as an affirmative defense?

22             MR. MURPHY:  I think in the alternative because

23   plaintiff's counsel and plaintiff had alleged it in their

24   complaint, I feel like they took on the burden of that.

25   I'm just pulling up our answer, Your Honor.  In the cases

1    I cited in our proposed jury instructions, those cases

2    treat it as an element of the plaintiff's case.  And I

3    think that's the stronger line of authority.

4             THE COURT:  So if it were just the plaintiff's

5    pleading that, that would be clear.  But where you have

6    asserted it as an affirmative defense, what does that do

7    to the plaintiff's burden?  Have you taken that on?

8             MR. MURPHY:  I don't believe so, Your Honor.  In

9    case -- because, as Attorney Interlandi mentioned, the law

10   is a little unclear on that, if we hadn't alleged it, then

11   we would be caught flat here if Your Honor determined it's

12   our burden, right?  So I think even though they took that

13   on, by us pleading it, it's a reflection of some of the

14   status of some of the cases that have gone the other way.

15            THE COURT:  But you acknowledge that you have

16   pled that as an affirmative defense?

17            MR. MURPHY:  Yes, Your Honor.

18            THE COURT:  Okay.  Now, let's just think ahead a

19   little bit.  If there is a liability verdict and damages

20   are awarded, how do they get allocated between

21   Ms. Gethings and the board of education?  The plaintiff

22   will say they get paid by both.  But how should we think

23   about that?

24            MR. MURPHY:  You know, I don't know, Your Honor.

25   Let me -- if you just give me one minute.  I apologize.

1    While you were talking, I was looking for a case on your

2    intracorporate communications privilege that I have that

3    addresses Your Honor's questions.  I'll find that and give

4    it to you.  So I didn't have the verdict form in my mind.

5            Did we put it together?  We did.  Ultimately,

6    Ms. Gethings is a teacher employed by the board of

7    education and statutorily entitled to indemnification of

8    acts taken within the scope of her job.

9            THE COURT:  Is she also a teacher in addition to

10   being principal?

11           MR. MURPHY:  A principal, I apologize.  They

12   fall within the definition of that.

13           THE COURT:  So the issue won't really come up

14   because she's entitled to indemnification anyhow.

15           MR. MURPHY:  Correct, Your Honor.  She's been a

16   defendant here by the board in accordance with their

17   statutorily imposed indemnification obligations.  Frankly,

18   they don't believe she did anything wrong here either.

19           THE COURT:  Okay.

20           Mr. Interlandi, is there any circumstance of

21   proof where the jury could find the board having

22   responsibility for damages that Ms. Gethings is not

23   responsible for?  Or is it going to be all of a piece?

24           MR. INTERLANDI:  I believe it will be all of a

25   piece.  Well, let me step back.

```
 1          In terms of the 31-51q claim, that's the claim

 2    against the New Haven Board of Education.  A large part of

 3    that claim is based on the conduct of Ms. Gethings.  But

 4    there are allegations from December 3, 2021, through the

 5    end of January 2022 where Ms. Light is looking for

 6    safeguards, looking for an opportunity to return in an

 7    environment that she is comfortable in and that was not

 8    really afforded to her.  There was a meeting it is alleged

 9    on January 14, 2021, and the school, the board of ed,

10    Ms. Bonner made some representations.  And then within a

11    week or so after that, she received -- the plaintiff

12    received a letter to say it's time to come back.

13          THE COURT:  Does any of that suggest that the

14    board could be separately on the hook for damages apart

15    from those a jury might award against Ms. Gethings?

16          MR. INTERLANDI:  I believe so.

17          THE COURT:  And by Mr. Murphy's telling, then,

18    we won't have an allocation problem because whatever is

19    awarded against Ms. Gethings, if anything, is going to get

20    indemnified.  So all we are interested in from the jury,

21    if they find liability, is amount.  Do you agree with

22    that, Mr. Murphy?

23          MR. MURPHY:  That's my understanding,

24    Your Honor, yes.

25          THE COURT:  Okay.
```

1          And then for the defamation or I guess the

2    31-51q claim, those both carry the potential of punitive

3    damages?

4          MR. INTERLANDI:  Yes, Your Honor.

5          MR. MURPHY:  Do you mind if I shut the door,

6    Your Honor?

7          THE COURT:  Go right ahead.

8          My question for you is:  Punitive damages under

9    defamation is just going to be fees and costs?

10          MR. INTERLANDI:  Yes, I agree.

11          THE COURT:  Is that true under 31-51?

12          MR. INTERLANDI:  I believe it is limited to fees

13    and costs under 31-51q.

14          THE COURT:  Would counsel agree that the Court

15    should quantify that as opposed to you having to submit

16    attorney's fees, affidavits to the jury to calculate an

17    attorney's fee?

18          MR. INTERLANDI:  I agree with the former.  I

19    purposely did not include those documents as our exhibits

20    because I prefer for the Court to take that task.

21          THE COURT:  Any objection to that?

22          MR. MURPHY:  No, Your Honor.

23          THE COURT:  So we'll just have the specific

24    interrogatory about punitive damages.  And if that is

25    affirmatively answered by the jury, the Court will take

1    that up, okay.

2              Mr. Interlandi, are there any modifications in

3    the retaliatory acts that you are claiming?  Is there any

4    difference between adverse action and retaliatory action

5    in your theory?

6              MR. INTERLANDI:  I'll take on the latter part

7    first.  No, I don't think there's any difference in

8    adverse action versus retaliatory acts.

9              THE COURT:  And what at this point are those

10   claims?  My question really is getting at, have you

11   narrowed this a bit for purposes of trial?

12             MR. INTERLANDI:  The short answer is no, because

13   of the outstanding issue concerning Berchem Moses reports,

14   which is subject to two motions in limine.

15             THE COURT:  We're going to get to that in one

16   second.  But what is the caveat there?  The short answer

17   is because of the outstanding issue.  What do you mean?

18             MR. INTERLANDI:  If the report comes in, then

19   potentially we have a more narrow focus, right?  Four

20   instances of retaliation.

21             THE COURT:  I see.  But you were going to -- but

22   you go beyond those four instances, yes?

23             MR. INTERLANDI:  If the report doesn't come in,

24   then I feel like it's fair game.  Ms. Light submitted her

25   complaint in roughly --

 1          THE COURT:  Can you tell me what you're

 2    currently planning to prove as the retaliatory acts?

 3          MR. INTERLANDI:  We have the reassignment from

 4    third grade to first grade.  We have exclusion and/or

 5    being taken off of certain committees.  There's also the

 6    PTA teacher representative position, I believe, that was

 7    an issue.  We have part of it included the accusations or

 8    spreading of rumors that Ms. Light was the source of

 9    Teacher X's diagnosis.  There are additional issues that

10    followed or that came after the complaint which would be

11    talking to a witness during the investigation.

12          THE COURT:  Why is that a retaliatory act

13    against her?

14          MR. INTERLANDI:  Ms. Light filed a complaint --

15          THE COURT:  Right.

16          MR. INTERLANDI:  -- where she felt she was being

17    retaliated against due to her public speech in Facebook

18    and board of ed meetings.  And then along the way the

19    New Haven Board of Ed undertook the investigation and then

20    determined that either Ms. Gethings or Ms. Clarino

21    contacted a witness that was "professionally concerning" I

22    believe was the phrase used by Ms. Bonner to her.  And so

23    we feel that that was part and parcel of the pattern of

24    the retaliatory acts that started in and around February

25    to early March of 2021 and ran through to the summer of

1  2021.

2              THE COURT:  Anything else?

3              MR. INTERLANDI:  They were -- these additional

4  issues were raised to the Berchem Moses attorneys, the

5  attorney who undertook Ms. Light's complaint, and that was

6  where an email was found on another teacher's printer.  It

7  was an email from Ms. Light's husband to Ms. Clarino.

8  That was investigated by Attorney Goldberg.

9              There was also Ms. Alden's list of concerns

10 which was the second in line of complaints that were

11 brought to HR's attention.  Ms. Alden's complaint was

12 found in a mailbox of another teacher's.

13             And again, it's the same argument where this

14 is -- we're talking about a five-month period, give or

15 take, of this conduct by the administrators but

16 specifically Ms. Gethings.

17             THE COURT:  Okay.  Does that complete your list?

18             MR. INTERLANDI:  Plus what I said earlier

19 concerning from the middle of December to the end of

20 January, which is Ms. Light felt a certain way after the

21 reports came out.

22             THE COURT:  But that is not a retaliatory act by

23 the defendants.  That is on her damages.  No?

24             MR. INTERLANDI:  I think it's both.  I think it

25 goes to damages.  It goes to damages because of the use of

 1  her sick time.

 2       THE COURT:  But what's the act of the defendants

 3  in the December to January time period that you say

 4  constitutes a retaliatory act?

 5       MR. INTERLANDI:  There's the discussion of

 6  returning Ms. Light in an environment where -- and it gets

 7  a little muddy because of the Berchem Moses reports.  But

 8  she's coming back.  She was out on FMLA for two months or

 9  so, she's coming back or she's asked to come back to an

10  environment where now she feels that there are people who

11  have retaliated against her.

12       THE COURT:  You say that's a whole separate act

13  of retaliation, telling her to come back?

14       MR. INTERLANDI:  Yes.  There's a meeting.  There

15  are multiple emails that are exchanged from the middle of

16  December to the end of January of 2022.  There's a meeting

17  on January 14, as I said earlier.  And then Ms. Bonner had

18  made a promise that she would work like an Energizer Bunny

19  to look into these issues.  Within a week after that,

20  Ms. Light receives a letter saying you need to return and

21  if you don't essentially you're going to be insubordinate.

22       THE COURT:  So what you're saying is that a

23  retaliatory act that she is claiming is telling her to

24  return without the remedial measures.

25       MR. INTERLANDI:  Correct.

```
1              THE COURT:  Anything else?

2              MR. INTERLANDI:  I believe that covers it all.

3              THE COURT:  Does that help you, Mr. Murphy, in

4    focusing and narrowing?

5              MR. MURPHY:  It certainly didn't narrow the list

6    of issues, Your Honor.

7              THE COURT:  Let's work on focus.

8              MR. MURPHY:  It's slightly focused.

9         I do have one question.  There were two things

10   that were not mentioned and I don't know if those are

11   dropped or not.  Oh, no, you did mention the emails on the

12   printer, the Paul Salem issue.  One thing you didn't

13   mention was Timothy Shortt, I'm just not sure --

14             MR. INTERLANDI:  Correct.  There's actually --

15   Your Honor, I apologize.

16             THE COURT:  Why are you making the list longer,

17   Mr. Murphy?

18             MR. MURPHY:  I don't want to be surprised next

19   week, Your Honor.

20             THE COURT:  You wouldn't be surprised because

21   this is the list.

22        Go ahead.

23             MR. INTERLANDI:  Counsel brought it up earlier

24   and I should have picked up on that with Phyllis Maffuid,

25   who is a teacher's assistant, concerning her being spoken
```

1    to about the dismissal procedure where Ms. Light needed to

2    use the restroom.  So there's that, which I believe was in

3    that time -- definitely was in the time frame.

4              THE COURT:  The reprimand of her for taking over

5    for the plaintiff is a retaliatory act for her protected

6    speech?

7              MR. INTERLANDI:  That is the allegation.

8              And the other act is the discussion with

9    Mr. Shortt about, you know, teaming up or siding with

10   Jessica Light in terms of his union activities, I believe.

11   You know, they were worried that -- I believe the

12   allegation is that the administrators approached this

13   gentleman who is a teacher and questioned him about his

14   alignment with Ms. Light.

15             THE COURT:  So questioning Mr. Shortt with the

16   implication that he's organizing with Ms. Light is a

17   retaliatory act?

18             MR. INTERLANDI:  That is the allegation.

19             THE COURT:  Okay.

20             Let's turn to --

21             MR. MURPHY:  Your Honor, I'm not sure if you're

22   attempting to move on to another issue.

23             THE COURT:  I am.

24             MR. MURPHY:  Can I briefly be heard on that

25   issue?

  1              THE COURT:  Certainly.

  2              MR. MURPHY:  I want to make sure you understood

  3  it.  Right now we have a list -- I counted ten, I hope

  4  that matches up with what Your Honor has.  Ten things

  5  that -- yes, okay.  Ten different things that potentially

  6  may be retaliatory acts either by themselves or

  7  collectively.  But then I also heard that if the report's

  8  admitted it will be limited to four.  I want to make sure

  9  I understood that correctly.

 10              MR. INTERLANDI:  Yes, Your Honor.  That's what I

 11  said.

 12              MR. MURPHY:  Okay.

 13              THE COURT:  So what are you doing, withdrawing

 14  your motion in limine?

 15              MR. MURPHY:  No, not at all.

 16              THE COURT:  We're going to get to that right

 17  now.

 18              MR. MURPHY:  Thank you, Your Honor.  I didn't

 19  mean to interrupt.  I wanted to make sure we were on the

 20  same page.

 21              THE COURT:  There are ten -- I just wanted to

 22  make sure we aren't going to have more.

 23              MR. INTERLANDI:  Your Honor, I may have one

 24  more, I apologize.  In thinking, looking back at the

 25  initial complaint that Ms. Light submitted to Ms. Bonner,

```
 1    I believe one of the acts was that she was subjected to

 2    unusual, in terms of length, meeting with the

 3    administrators.  Like a 90-minute meeting to talk about

 4    her public speech.

 5            THE COURT:  The length of the meeting is a

 6    retaliatory act?

 7            MR. INTERLANDI:  And she did not have a union

 8    representative present.

 9            THE COURT:  What's the date of that meeting?

10            MR. INTERLANDI:  I believe the date of that

11    meeting is March 26, 2021.  It may have been earlier,

12    however, Your Honor.  I can look at the complaint.

13            THE COURT:  Okay.  Eleven.

14            Now, let's talk about 69 and 75, to admit or to

15    exclude the investigative reports and the testimony by the

16    attorneys preparing those reports.  Let me hear you.

17    You've obviously briefed it.  I am familiar with that

18    sometimes in preparation for oral argument people focus or

19    change their focus of their argument.  What I am trying to

20    understand is does the defendants' motion relate -- I

21    think it does not -- just to the reports and testimony by

22    the authors of those reports?  Or is it a much broader

23    motion in limine?  Which I ask because you have so many

24    objections to plaintiff's evidence because it refers to

25    the report.
```

```
 1              MR. MURPHY:  It was a broad objection at this
 2    time, Your Honor.  However, if Your Honor rules that the
 3    reports are not admissible but there's certain exhibits or
 4    meetings that Tony would still like to try to admit, we
 5    can discuss that first and then maybe talk about it with
 6    Your Honor.  As it's phrased in our motion, it's broad.
 7    It's the reports, it's the testimony from the attorneys
 8    about what they did during the investigations, who they
 9    spoke to, what their conclusions were.  I think if the
10    reports were excluded, the testimony from those three
11    attorneys is off the table.  I don't see how
12    Attorney Interlandi would pursue that or Your Honor would
13    allow that.  Really, it's as broad as possible right now
14    subject to some refinement about the return-to-work
15    meeting.
16              THE COURT:  I want to limit it to what the real
17    focus ought to be for a motion in limine which is:  Are
18    these investigative reports by attorneys who were never
19    parties to any of the action admissible to the jury?  The
20    plaintiff says it's not for the truth but for the impact
21    or effect of those reports.  Those are two different
22    things, aren't they?
23              MR. INTERLANDI:  Yes, Your Honor.
24              THE COURT:  So, in other words, we could
25    preclude the admissibility of the reports themselves but
```

1  not testimony with respect to or bearing on the impact of

2  the reports on the conduct of the defendants.

3          MR. INTERLANDI:  I suppose it could be parsed

4  out, Your Honor, so that testimony could come in.  I don't

5  know how, in that scenario, I could do that without having

6  Ms. Light testify about the four instances of retaliation.

7          THE COURT:  What if that's -- because that's the

8  conclusion of one of the reports, if that were excluded,

9  then whether or not there are reports that made these

10  conclusions isn't part of the trial.

11          Let me go at it a different way.  Why is the

12  report, particularly the conclusion of the four

13  retaliatory acts, not evidence that's telling a jury what

14  result to reach?

15          MR. INTERLANDI:  This is a report, an

16  investigation that was taken on by a third party, neutral

17  third-party attorney, investigating conduct that Ms. Light

18  complained about in the springtime of 2021 and then

19  additional instances that she presented to the

20  investigators per HR's instructions that if anything comes

21  up, you can go ahead and submit that to the attorney.  The

22  investigation concluded -- again, it was kind of

23  commissioned by New Haven Board of Ed.  New Haven Board of

24  Ed had done this in the past where it got an outside firm

25  involved in doing its investigation and creating a report.

1    There was no limitation on the use of that report or any

2    subject to confidentiality.  And our position is that

3    whole report is part of this timeline.

4            THE COURT:  But isn't it, in essence -- why

5    isn't it, in essence, exactly what the jury's going to

6    hear and draw its conclusions about whether there were

7    retaliatory acts and which ones they were?

8            MR. INTERLANDI:  Because it is -- again, it is

9    an investigation.  It's not conclusive of the issues.  And

10   what happens --

11           THE COURT:  Then what's its relevance?

12           MR. INTERLANDI:  The relevance is what happens

13   next.  What happens next is the parties have to figure out

14   or try to figure out safeguards for Ms. Light --

15           THE COURT:  So why can't that be done in the

16   course of offering evidence to the jury that there was an

17   investigation and as a result of that the defendants did

18   or didn't do something, the plaintiff did or did not do

19   something, without the substance of that investigation

20   report being a part of what the jury considers?

21           MR. INTERLANDI:  I think it leaves it too open.

22   Because there's a retaliatory complaint file by the

23   administrators.  There's Ms. Alden's complaint.  There is

24   this investigation that ensues.  And then we get to

25   December 3, 2021.  And if we're telling the jurors, you

1    know, the investigation's concluded and then everyone had

2    to come back, she had to come back to work, then it could

3    go against Ms. Light as well.  The jurors could think,

4    well, maybe she did something wrong too.  I think with

5    limiting instructions, the fear -- and I appreciate it --

6    can be avoided.

7            THE COURT:  Why can the attorneys who did these

8    reports testify where they had not been parties to any of

9    these actions?  They are, in essence, sitting as they

10   prepare the reports just like the jurors hearing the

11   evidence.

12           MR. INTERLANDI:  Well, in terms of their

13   testimony, I would only be seeking them to provide

14   testimony in terms of, you know, when they started, what

15   they did, and then what they concluded.

16           I appreciate your concern as well, Your Honor,

17   but the fact of the matter is these attorneys were hired

18   to do an investigation, and they completed the

19   investigation.  They had a job to do.  They did it.  And I

20   think it's entirely relevant to the claims and defenses in

21   the case.  They took statements from the defendant

22   Ms. Gethings and other parties in the case.  And I think

23   there's just information within those reports that could

24   and should have a place in the trial.

25           In terms of the credibility of Ms. Gethings,

1    there's also statements that were made by Ms. Gethings

2    that are, I believe, fair game for her on cross if she's

3    going to be testifying, and I assume she is, for the

4    defense.  And that's why I'm looking to get that in as

5    well as, like I said in the papers, the effect or impact

6    it had on the readers of what happened from December into

7    early 2022.  And not looking to -- and again, I think the

8    way around that is the limiting instruction to the jurors

9    to say this was a process, it played out this way, and

10   you're not to, you know, take that decision as your own.

11           THE COURT:  All right.  Let me have Mr. Murphy

12   tell me why the position of Mr. Interlandi as to why the

13   reports themselves and the testimony of the attorneys on

14   when they started, what they did, and what they concluded

15   is -- I think your principal argument is it invades the

16   province of the jury.

17           MR. MURPHY:  That is certainly one of the key

18   ones, Your Honor, for sure.  Like Your Honor said, it

19   certainly is offered to them to instruct them what they

20   should find, right?  That these four acts were

21   retaliatory, which is improper.

22           Two, it's full of hearsay.

23           Three, it doesn't meet the business records

24   exemption.  The case we cited in our brief, the *Thomas v.*

25   *Metro. Dist*. case, is I think right on point, Your Honor.

1    It's a short one-and-a-half-page opinion by Judge Eginton,

2    it's perfectly on point.  It doesn't fall within any of

3    the appropriate exemptions.  It's just going to mislead

4    the jury, confuse jury.  I don't see how that report comes

5    in.  If that report comes in, then I also would have an

6    issue with those three lawyers testifying.  It seems to me

7    they would have nothing to offer other than "I did an

8    investigation" which we can get through other parties.

9         And I know Your Honor's received plenty of

10   papers on this topic from both sides.  So I really don't

11   have anything else to add at this time.

12        MR. INTERLANDI:  Your Honor, may I be heard

13   briefly?

14        THE COURT:  Yes.

15        MR. INTERLANDI:  I would just note that we also

16   cited cases, we've looked at cases.  I don't think there

17   are any cases that are directly on point with the facts in

18   this case.  I would cite and refer the Court to -- which I

19   have cited in our paperwork -- Judge Meyer's decision

20   earlier this year in *Tyson v. Department of Energy &*

21   *Environmental Protection*, specifically page 14 where DEEP

22   essentially handed over an investigation to the state

23   police because of an allegation that the person, the

24   plaintiff, found a noose on his desk.  Judge Meyer found

25   that the investigation was highly relevant evidence.  And

1    he said in that instance the defendant can propose a

2    limiting instruction.

3         So I don't think the case law is as on point as

4    the defense may think.  I think there are variances in the

5    fact patterns of all these cases that make it within the

6    Court's --

7         THE COURT:  That's usually the case, isn't it?

8         MR. INTERLANDI:  Yes.

9         THE COURT:  So I'm not sure, Mr. Murphy, whether

10   you are, by your remarks today, just saying that the

11   substance of the report and the testimony of the

12   investigating lawyers is out because it usurps the

13   function of the jury, it doesn't fall under any of the

14   exceptions, or whether you are also seeking to preclude

15   any reference whatsoever to the existence of an

16   investigative report that prompted action by others

17   subsequently.

18        MR. MURPHY:  And by actions subsequently, the

19   time frame in December and January that Attorney

20   Interlandi referenced earlier about the return-to-work

21   discussion, sending them the letters, et cetera?

22        THE COURT:  The plaintiff says, among other

23   things, that it's the impact of this report that has

24   relevance in explaining or demonstrating either the

25   retaliatory motivation or the injury to the plaintiff.

1          First of all, I don't hear anything from the

2   plaintiff claiming that the lawyers had any personal

3   knowledge of these events beyond what they were told as

4   part of their investigation, so I'm quite pressed to

5   understand how they could testify.  But with respect to

6   the existence of the investigative report and what

7   happened after its existence, it came into being, why

8   shouldn't that come in?  That doesn't usurp the function

9   of the jury.  It in fact is part of the tableau they will

10   be considering of motivation of the defendants and the

11   state of mind and so forth.  Would you agree that if the

12   reports themselves don't come in and the lawyers don't

13   testify, that reference to the existence of a report

14   pegged to what happened after that or why it happened

15   should come in?

16          MR. MURPHY:  Yes.  It helps explain the

17   timeline.  And I think that's what I was trying to get

18   with Your Honor previously, which I apologize if I wasn't

19   clear.  If the report and the attorneys are not

20   testifying, then certainly when we're talking about those

21   instances in January and December, you're right, I think

22   there would have to be some mention that there was a

23   report or there was an investigation and it helps explain

24   the timeline, there might be some reference.  I think in

25   that *Thomas* case, that's exactly what happened.  They

1    mentioned there was an investigation, but the report and

2    the testimony about the report and the findings were

3    excluded.

4            THE COURT:  Okay.  I think probably

5    Mr. Interlandi is right that there would need to be

6    potentially a limiting instruction for the jury that

7    they're not to guess or speculate about this report but

8    merely understand that it occurred and that things

9    proceeded from it.

10           I'm going to ask both sides for a limiting -- to

11   think about what that limiting instruction would look

12   like.  I really am convinced that the plaintiff's motion

13   to admit the Berchem Moses investigation reports should be

14   denied and, I guess concomitantly, that the defendants'

15   motion to preclude them should be granted.

16           I'm going to issue a brief memorandum ruling

17   outlining the rationale which I think we've aired quite

18   substantially here and focus the narrowing of the grants

19   and denials of those motions.  Okay.  That's what we're

20   going to do with them.

21           Let's talk about the -- I think there are two

22   sets of things that are post-lawsuit filing: the classroom

23   notes and the application for the third grade position.

24   Anything else that is post-complaint?

25           MR. INTERLANDI:  No, Your Honor.

1          THE COURT:  So that's Numbers 70 and 72.

2          And I would like to ask Mr. Murphy why the fact

3    or date of the filing of the lawsuit should bring about

4    such a distortion in the reality of what the meaning is of

5    what happened.

6          MR. MURPHY:  Your Honor, my concern with those

7    notes and the related argument that those notes caused her

8    to transfer out of the school and the application for the

9    third grade position that Ms. Light wanted, those are

10   couched as additional incidents of retaliation.  My strong

11   concern is that the jury is going to use those to find

12   that they were -- to support a finding that there was

13   retaliation against her.

14         THE COURT:  But that's not in the list.

15         MR. MURPHY:  It's not.

16         THE COURT:  So you don't have to worry about

17   that.

18         MR. MURPHY:  Okay.  Well, that's --

19         THE COURT:  If the classroom notes are permitted

20   as relevant to the scope of the plaintiff's damages, why

21   shouldn't the jury be able to hear the evidence and the

22   counterevidence that -- I guess the counterevidence is

23   there's no connection.  The substance of the note suggests

24   that might not be a wholly winning argument, but it might

25   be.

1          I take it you're not really disagreeing that

2    those notes found in her desk could cause emotional

3    distress.

4          MR. MURPHY:  Well, my argument really is a step

5    backwards, Your Honor.  Those notes, my understanding,

6    relate to the defamation claim.  I read in the motion that

7    these go to her reputation, right?  And the reputation is

8    the key injury for the defamation claim, right?  But that

9    defamation claim is hinged entirely on one discussion with

10   Teacher X, the union representative, Ms. Light, and

11   Principal Gethings.  And there's been no foundation at all

12   to suggest that whatever was discussed in that meeting was

13   disseminated outside of that meeting.  This is a note four

14   or five months later by Ms. Light purportedly in her

15   classroom.  There's been no evidence whatsoever that

16   Ms. Gethings put it there or anybody else put it there.

17   It's just as likely Ms. Light put it there.  So there's no

18   connection to the alleged defamatory statement.  It's just

19   not relevant to the alleged defamatory statement.

20         THE COURT:  So let me ask, Mr. Interlandi, I

21   hadn't quite understood that your offer of those notes was

22   to prove liability for the defamation claim as opposed to

23   prove evidence of damages for the environment claimed to

24   have been created by the defendants.

25         MR. INTERLANDI:  The notes relate to the

1    reputational injury and harm that Ms. Light suffered as a

2    result of the defamatory comment in the March 31, 2021,

3    meeting.  It did come out of that meeting by way of the

4    administrators, Ms. Gethings and Ms. Clarino's retaliatory

5    complaint where they put that in there, where they said

6    she's disclosing Teacher X's information.

7              THE COURT:  No, no, that doesn't have anything

8    to do with what we're talking about which is the classroom

9    notes about wash your hair and get out of here.

10             MR. INTERLANDI:  Defense counsel said that there

11   was no evidence that that statement made its way out of

12   that meeting.  But it did.  It did in May of 2021 when the

13   administrators finally decided to file their own

14   complaint.  So that lie, so to say, did make it out of

15   that meeting.  And then the injury, it's certainly up for

16   debate and the jury can decide, you know, did she offer

17   harm to her reputation.  She's alleged in her complaint,

18   paragraphs 77 and 79, that she suffered harm to her

19   reputation.  And also, let's see, I believe there was some

20   other information in the complaint.  But I would just

21   focus on 77 and 79, harm to her reputation.  She's finding

22   notes in her classroom in August of 2022.  That is very

23   concerning.  And so --

24             THE COURT:  The defamation claim is the

25   allegedly false accusation that she outed Teacher X.

1            MR. INTERLANDI:  Yes.

2            THE COURT:  These notes that you seek to

3   introduce have what relationship with that defamatory

4   material?

5            MR. INTERLANDI:  They relate as to harm to her

6   reputation.  We would offer them --

7            THE COURT:  What's the causal relationship of

8   harm to reputation between accusing her of disclosing

9   Teacher X as a COVID victim and these notes?  Let's say

10  the notes show injury or cause injury to reputation.  But

11  what's the causal relationship?

12            MR. INTERLANDI:  That they're within the school.

13  They occurred during a time whereafter, right?  So they

14  were found after the statement was made within about 12 to

15  14 months or so.  And it's not -- it's a typed note.  So

16  it's not something that a first grader or a third grader

17  did on their own.  An adult -- I would dare to say an

18  adult did this.  And it is I believe circumstantial

19  evidence of harm to her reputation.  The causal connection

20  is that the notes were found in her classroom, most likely

21  prepared by an adult, someone within the school community

22  who didn't want her there for one reason or another.  Our

23  position is because she was put out there to the community

24  that she outed Teacher X as it relates to her COVID

25  diagnosis.

```
 1              THE COURT:  Anything further, Mr. Murphy?

 2              MR. MURPHY:  No.  I'm glad we clarified the

 3    timeline there.  That 12 months I think really makes the

 4    prejudice even higher.  It doesn't closely follow the

 5    alleged retaliatory acts and the disclosure of -- or the

 6    statement made in that meeting with Teacher X and the

 7    union representative.

 8              MR. INTERLANDI:  Your Honor, if I may, I would

 9    just, again, direct the Court's attention to the Tyson

10    case at page 9.  Relevancy is not negated by the fact that

11    conduct occurred one year later after arising events is

12    discussed there.  In other words, as related to the

13    supervisor's termination.  And also in that case there was

14    a prank text message that was well after the complaint was

15    filed.  And Judge Meyer allowed that to come in because it

16    was relevant to damages.

17              MR. MURPHY:  That Tyson case, Your Honor, is a

18    hostile work environment case.  It's very different than

19    this case.

20              THE COURT:  Is it very different or is it

21    somewhat different?

22              MR. MURPHY:  I think it's very different because

23    she's not asserting a hostile work environment claim.

24    She's claiming certain acts were retaliation.  First

25    Amendment retaliation, 31-51q, adverse employment action,
```

```
1   discipline.  It's very specific in what amounts to an
2   adverse employment action discipline.  Because she wasn't
3   discharged.  Disciplined.
4            THE COURT:  But if the adverse employment action
5   is falsely accusing her of doing something wrong, the
6   damages that flow from that is not necessarily limited in
7   the way that you describe.  Doesn't it make more sense to
8   reserve on this motion to admit?  It's a bit of a peculiar
9   procedural posture to have motions to admit as opposed to
10  just having the motions to exclude.  So I think what I'll
11  do is reserve, not quite deny.  But what I'm going to look
12  for is the relationship between the defamation claim about
13  Teacher X and these notes.
14           MR. INTERLANDI:  Your Honor, may I be heard on
15  one point?
16           THE COURT:  Sure.
17           MR. INTERLANDI:  As it relates, there is no
18  traditional hostile work environment that that claim
19  exists under the state, federal antidiscrimination laws.
20  But in paragraphs 60 and 72 we do allege that acts that
21  occurred were hostile and that there was a hostile
22  environment.
23           THE COURT:  But that's a term of art.
24           MR. INTERLANDI:  Yeah.
25           THE COURT:  So you can have a hostile
```

1    environment or, as the author of the note suggests, a

2    toxic one.  But that's not a cause of action in and of

3    itself.

4              MR. INTERLANDI:  And we haven't alleged a cause

5    of action.  We felt that was important.

6              THE COURT:  Does that make sense?

7              MR. MURPHY:  Yes, Your Honor.  I just want to

8    say when we were thinking about motions in limine,

9    Attorney Interlandi informed me that he was going to file

10   a few.  So that's why I didn't cross-move on the same ones

11   and just responded.  We kind of worked that out.

12             THE COURT:  That's fine.

13             MR. MURPHY:  We didn't want to burden you with

14   too many motions.

15             THE COURT:  And that's fine.  Particularly one

16   that is I think not particularly easily resolved in the

17   in limine posture.  So let's leave the notes as marked

18   exhibits and then see what the evidentiary basis is going

19   to be.

20             So, Mr. Interlandi, do you agree that even if

21   these notes caused her great emotional distress, they have

22   to have more of a hook to what is claimed as defamation

23   than just harm to her from receiving these nasty notes?

24             MR. INTERLANDI:  No, Your Honor.  I think these

25   notes were found in her classroom.  And there's

1    allegations in the complaint and I believe it will come

2    through with testimony that she felt, as a result of what

3    was said about her, that she felt her position in the

4    community felt diminished.  People were afraid to sit with

5    her, people were afraid to associate with her.  And this

6    is kind of a link in that chain.

7            THE COURT:  The link being that they believed

8    the assertions by the defendants that she was the snitch?

9            MR. INTERLANDI:  Yeah.  Yes, Your Honor.

10           THE COURT:  Well, that's what we'll look for.

11           MR. INTERLANDI:  Okay.

12           THE COURT:  The application for the third grade

13   position, the plaintiff says it goes to at least two

14   things: her claim that she prefers third grade so that the

15   reassignment to first grade, injury from that is manifest;

16   and that the sequence of events of her application for

17   that third grade position the second time, well, after the

18   lawsuit was filed, and the circumstances goes to the

19   defendants' -- the credibility of the defendants'

20   non-retaliatory explanation for changing her grade

21   assignment.  Do I have that right, Mr. Interlandi?

22           MR. INTERLANDI:  Yes, Your Honor.

23           THE COURT:  Why is that not fair grounds for

24   trial, Mr. Murphy?

25           MR. MURPHY:  For a variety of reasons,

 1    Your Honor, all of which we have tried to set forth in our

 2    opposition.

 3            One, her preference for a grade has no bearing

 4    here.

 5            THE COURT:  Well, if she's made to do something

 6    against her will and that thing she's being made to do is

 7    a retaliatory act, why isn't that up to the jury to decide

 8    its significance?

 9            MR. MURPHY:  Ms. Light, without getting into her

10    subsequent application, can talk about why she viewed the

11    transfer from third grade to first grade as punitive, why

12    she preferred third grade, her experience.  She can get

13    all that in.

14            THE COURT:  She will get all that in.

15            MR. MURPHY:  Absolutely.

16            THE COURT:  But what the plaintiff is saying,

17    and this corroborates it.

18            MR. MURPHY:  A couple things, Your Honor.

19            First, unlike the note which, you know, arguably

20    they have some argument that there was someone in the

21    school and this goes to her reputation.  They're pinning

22    this straight on Principal Gethings, and they're saying

23    Ms. Light applied and Principal Gethings didn't give her

24    the job and that's some evidence of harm to her

25    reputation.  But Principal Gethings is the decision maker.

1    What they're suggesting to the jury is this another

2    retaliatory act without pleading it and without proving

3    it.

4         THE COURT:  I didn't understand it that way.  I

5    understood it to be an offer of proof that Ms. Gethings'

6    original rationale given to her for why she had to go

7    teach first grade and couldn't teach third grade, because

8    her kid was going to be in third grade, is not credible

9    because other teachers had kids in their respective grade

10   and because the reason that Gethings gave this time why

11   she couldn't be the third grade teacher was not the same

12   thing, it was something different.  Why is that not

13   entitled to credibility assessment by the jury?

14        MR. MURPHY:  We also dispute the timeline and

15   the arguments being made.  There are very good reasons why

16   she didn't get that job.

17        THE COURT:  There may be, but isn't that what --

18        MR. MURPHY:  We have to talk about who applied

19   for it, when.  Because it's school.  Ms. Gethings doesn't

20   make one hiring decision in a vacuum.  Every summer --

21   I've worked with a lot of schools and it's a very busy

22   time for them, Your Honor, and it's a very difficult time

23   to figure out who is going where.  This is going to suck

24   up a good amount of time.

25        THE COURT:  Well, the delay and prolongation of

1    trial is of concern to the Court.  But it seems to me that

2    I should not have a concept of undue delay that you argue

3    trump the plaintiff's argument that Gethings wasn't being

4    straight with why she had to be transferred the first

5    time.  And that she prefers to teach third grade is

6    somewhat of a minor thing.  I think that -- and the fact

7    that it comes post-complaint is not persuasive to me.

8            I think that this testimony and evidence about

9    her application for the third grade position after she'd

10   already gone elsewhere should be presented to the jury or

11   at least the evidence should be proffered and I can make a

12   determination at trial whether this is, as the defendant

13   says, not worthy of the delay or the prolongation of trial

14   it will create.

15           So I'm going to -- this is the problem with a

16   motion in limine.  If I grant it, it sounds like it's

17   going to come in.  If I deny it, it sounds as if I

18   determined it stays out.  It's neither.  It's really you

19   can offer that and I will entertain whatever objections I

20   hear at trial if different or more than what's been aired

21   here.

22           MR. INTERLANDI:  Your Honor, may I be heard

23   briefly?

24           THE COURT:  Sure.

25           MR. INTERLANDI:  In terms of the preference, why

1     else would the administrators ask for teachers' preference

2     mid-year?  They ask for a reason.  And Ms. Light has never

3     put kindergarten or first grade at the top of her

4     preference list --

5              THE COURT:  This is called your evidence at

6     trial.

7              MR. INTERLANDI:  Right.  But I think the

8     preference is relevant.  It was brought up by Counsel.

9     And in terms of, again, like the credibility piece, is

10    very important.  And I think it's a critical piece as it

11    relates to Defendant Gethings.

12             THE COURT:  Okay.  So you're going to offer it

13    at trial on the defendants' credibility and the

14    plaintiff's preference for third grade.

15             Okay.  Let's talk about this Facebook post which

16    is Number 71 and which I'm a little bit uncertain what I'm

17    reading.

18             Mr. Interlandi, let me ask you just, in short,

19    what do we get from the Facebook post itself that we don't

20    get from her testimony?

21             MR. INTERLANDI:  I think what we have here is it

22    goes to the rule of completeness, Your Honor.

23             THE COURT:  But tell me what you get out of the

24    Facebook post, which is mostly comments from other people,

25    that she can't testify to herself?

1            MR. INTERLANDI:  We get the full context of what

2    was happening here.

3            THE COURT:  Tell me what that means.

4            MR. INTERLANDI:  So what that means is -- it's a

5    little bit of a long explanation.  There's an entity, a

6    group on the social media platform Facebook, New Haven

7    Public School Advocates.  And data that it obtained from

8    the state was posted.

9            THE COURT:  Right.

10            MR. INTERLANDI:  Ms. Light made some comments

11    there.

12            THE COURT:  But her comments were the Hooker

13    school never sent out a letter.

14            MR. INTERLANDI:  Yes, but initially the first

15    post -- so I guess I'll jump back.

16            In the course of what was happening with

17    Ms. Light and the administrators is screenshots of

18    whatever they had on their phone was presented.  And not

19    what we kind of went with all along.  We never had the

20    full context of these posts or the comments that were made

21    to the posts.  We just were focused in, we zeroed in or at

22    least the other side did on Ms. Light's two comments.  But

23    this provides greater context.  And it was only because we

24    went back and tried to find the original post, and we did,

25    and we presented it.  Yes, we did produce it earlier this

1    year to defense counsel.

2             So the first post by New Haven Public School

3    Advocates is March 6 and it provides data.  And Ms. Light

4    makes comments where she's getting a better understanding

5    of what that data means.  Positive student cases, at least

6    one, less than six.

7             And then the person who is the administrator for

8    New Haven Public School Advocates page, Melody Gallagher,

9    shares that post on March 9 with an explanation of what

10   this is.  And that's where you have Ms. Light's two

11   comments.

12            I deposed Ms. Clarino and Defendant Gethings

13   extensively on this.  I asked them about the comments, if

14   anybody went back to clarify what Ms. Light said, they

15   said no.  They agreed or at least Ms. Clarino did that it

16   was a public page, that they were forwarded these posts.

17   All I received in discovery were some screenshots of a

18   cracked cell phone that had a text message from

19   Ms. Morrison and maybe another one from another teacher of

20   what was forwarded to them.  When I asked for additional

21   communications, there were none.  To me, this is providing

22   the context in which Ms. Light spoke.  And it goes not

23   only to her claims but it also goes to the defense of

24   truth.

25            THE COURT:  That doesn't answer my question

1    about why can't she give the context in which she made her

2    comments, as opposed to kind of this -- it's sort of a

3    messy way to set it forth.  It has people talking who are

4    not party opponents.  We have to make the distinction

5    between whether it is for the truth of the matter versus

6    something else.  That's actually not an easy line to draw.

7    Why not just have her testify to the extent there is

8    either a failure of her memory in which she can be

9    refreshed by this Facebook page and then cross-examination

10   of the defendants' witnesses if they purport to in some

11   way distort the context?

12            MR. INTERLANDI:  I mean, she can certainly

13   testify to what she remembers, and I could present the

14   information to her to refresh her memory.  But I think

15   this provides the full context in which at the time this

16   was put out there, and it goes exactly to the issue that

17   she was speaking at the board of ed which was they were

18   trying to get a better understanding of what the guidance

19   was, what the rules were.  There's content in here where

20   they're looking at -- or at least she's making a comment,

21   Ms. Light, she thought that the rules around what is

22   reported and not need to be clarified because different

23   schools understand the regulations differently.  And

24   Ms. Clarino and Ms. Gethings are saying we had to send her

25   a message.  We had to tell her that you can't be putting

1    this, like, misinformation out there in social media.

2    That's not what she was doing.

3              THE COURT:  I'm sorry, that is in the Facebook

4    post that they tell her that she's --

5              MR. INTERLANDI:  No.  When they met with her.

6    So this provides context for the jury for the meeting that

7    happened as a result of this post.  It was an email that

8    was sent I believe the next day where Ms. Gethings wrote

9    to the community that there's been information brought to

10   us that a member of our community is spreading

11   misinformation -- and I'm paraphrasing -- and it's clearly

12   regarding Ms. Light.  And the fact of the matter is there

13   wasn't a letter sent.  She didn't lie.  She understood

14   this to mean student data for a week at Hooker.  And she

15   made the comments here.  And so this provides the full

16   context.

17             I get it, yes, Ms. Light can testify about the

18   post, the date, you know, in what was shown.

19             THE COURT:  If on cross-examination it is

20   suggested that it's a different context, then it seems to

21   me perhaps this Facebook would be -- the post would be

22   useful, not duplicative, and not confusing or delaying.

23             Let me hear, however, what Mr. Murphy has to say

24   about this.

25             MR. MURPHY:  Not too much other than what we

1    briefed, Your Honor.  I think, as Attorney Interlandi just

2    indicated, at the time my client Ms. Gethings only had a

3    screenshot of one particular section.  That's produced and

4    that's going to be in evidence.  It would be unfair to

5    give the jury some expanded context when the parties

6    didn't have the context at the time the events were going

7    on.

8            For all the reasons we cited in our brief,

9    Your Honor, our motion should be granted or his motion

10   should be denied I guess it is.

11           THE COURT:  Okay.  I'm going to deny the motion

12   to admit without prejudice to renew as an offer if -- and

13   what I will be looking for is the necessity of that offer

14   as well as its evidentiary propriety.  The fact that it

15   was not produced until after discovery is not part of the

16   Court's ruling.  Defense had it well in advance of trial.

17   And there's no indication their trial preparations have

18   been harmed by the timing of the disclosure.

19           Now let's go to 73, which is the plaintiff's

20   motion to admit the plaintiff's recordings of six

21   meetings.

22           Now, in these recorded records, there are

23   statements made by Ms. Gethings, statement of a party

24   opponent.  Why doesn't that come in, Mr. Murphy?

25           MR. MURPHY:  Statements by Ms. Gethings, yes, I

1    would agree with Your Honor there.  There's also

2    statements by union people and the union representative

3    and Teacher X and others.  And fundamentally, I guess are

4    we admitting these -- I don't quite understand the offer.

5    Are we admitting them to play them to the jury?  Just to

6    have them?  What's the purpose?

7              THE COURT:  Let me get clarification from

8    Mr. Interlandi.

9              You can use the statement, recorded statement of

10   Ms. Gethings, as an admission of a party opponent.  You

11   don't even need a witness for that.  You can just play it

12   or whatever you're going to do for the jury.  However,

13   there's a whole lot more to these six recordings.  What

14   are you aiming to do?

15             MR. INTERLANDI:  Your Honor, all along this

16   process I've been communicating with defense counsel and

17   we've talked multiple times about all the issues in the

18   motions in limine.

19             THE COURT:  And that's the way it should be, it

20   makes it smooth.

21             MR. INTERLANDI:  And it's been a smooth process.

22   And I appreciate defense counsel's cooperativeness.

23             So I presented this as we have these recordings,

24   you have them, they've been produced in discovery long,

25   long ago.  There also have been some documents produced in

1    discovery that Ms. Light took it upon herself to type up

2    transcripts or at least put them in an email.  Except for

3    one, which is the February 2022, they're all alleged in

4    the complaint.  So starting with the November --

5              THE COURT:  Can we get to why the recorded

6    statements, which are out-of-court statements by people

7    that are not party opponents, gets admitted in this way?

8              MR. INTERLANDI:  Well, there are some that you

9    have Ms. Bonner speaking, she's a HR representative for

10   the New Haven Board of Education.

11             THE COURT:  So let's add her to the list of

12   party opponents.

13             MR. INTERLANDI:  They're all employees of the

14   New Haven Board of Education but not necessarily a

15   representative as Ms. Bonner was.

16             THE COURT:  They don't become party opponents

17   for that, do they?

18             MR. INTERLANDI:  No, they do not.

19             To the extent that they're going to be presented

20   to talk, to testify, I should say, you know, Ms. Clarino,

21   for example, if she's listed and defendants are going to

22   have her testify -- and this is how I presented it

23   originally to Attorney Murphy -- I wanted to have the

24   ability to cross-examine or have that --

25             THE COURT:  I don't think he's disputing that.

1            MR. INTERLANDI:  Right.  We couldn't come to an

2    agreement.  What we did is present the information to the

3    Court for a ruling.  I think it's important because,

4    again, it goes to the allegations in the complaint.  There

5    are statements that some parties have made, Ms. Light,

6    Ms. Bonner, as a representative of the defendant New Haven

7    Board of Ed, and Ms. Gethings.

8            THE COURT:  Okay, Ms. Light cannot offer her own

9    out-of-court statement.

10           MR. INTERLANDI:  Yes, I'm not saying that she

11   can.  I'm just saying it's a statement by a party in the

12   case that could be used by the defense.

13           THE COURT:  Can be used by the defense, for

14   sure.

15           Why don't we do it this way.  Why don't we not

16   have all six recordings be considered as admissible for

17   the jury.  Why don't we have you focus those recordings on

18   Gethings, Bonner, and I don't remember if there was any

19   other party opponent.

20           MR. INTERLANDI:  There are no other party

21   opponents.

22           THE COURT:  And that's already prepared.  So

23   that can be read to the jury in the plaintiff's case.  The

24   defendant can use any of this for cross-examination of the

25   plaintiff.  I don't mean to really say any of this.  And

1    it's a much more concise way of presenting this with

2    narrow focus.  Doesn't that make sense, Mr. Murphy?

3                MR. MURPHY:  To use the transcripts, Your Honor?

4                THE COURT:  To use the transcripts of party

5    opponents as evidence, yes.

6                MR. MURPHY:  The only -- and maybe Attorney

7    Interlandi and I can talk further.  My only concern is of

8    course there's the one statement by Principal Gethings

9    that they challenge, but it's in a free-flowing

10   discussion, right?

11               THE COURT:  But that's not what I'm proposing is

12   relevant or admissible.  And I don't know how the context

13   for the statement by Ms. Gethings will be presented, but

14   in and of itself, assuming its relevance, it's admissible.

15   Don't you agree?

16               MR. MURPHY:  A statement by Ms. Gethings?

17               THE COURT:  Gethings and Bonner.

18               MR. MURPHY:  Gethings and Bonner, I would agree

19   with that, Your Honor.

20               THE COURT:  I think that's the way we should

21   treat these transcripts.

22               MR. INTERLANDI:  Okay.

23               THE COURT:  There may be something else that

24   comes up during trial that it becomes either a basis for

25   cross-examination or something else for both sides.

1          MR. MURPHY:  Your Honor, maybe I could be given

2    another day, we have a few days.  Maybe I would withdraw

3    my objection to the transcript or the audio of a

4    particular -- I think there are six.  I don't think

5    all six --

6          THE COURT:  All six I don't think come in.

7          MR. MURPHY:  -- are appropriate.

8          THE COURT:  Feel free to narrow this trial.

9    Earlier before trial is better, even during trial is fine.

10         So we're agreed that the motion to admit all six

11   transcripts of the recorded meetings is going to be denied

12   without prejudice and with recognition that, at a minimum,

13   the transcript of statements of Gethings and Bonner are

14   admissible.  Okay.

15         MR. MURPHY:  And, conversely, Ms. Light if used

16   by me.

17         THE COURT:  Correct.

18         MR. MURPHY:  Okay.

19         THE COURT:  Now let's get to the motion to

20   exclude the details of life events that led to the

21   plaintiff's prior PTSD diagnosis, this is Number 74.

22         I'm not quite sure what the plaintiff seeks to

23   exclude exactly.  I take it you do not seek to exclude her

24   prior PTSD diagnosis, correct?

25         MR. INTERLANDI:  Correct.  Not that she had a

1    trauma as a child, not that she may have had any prior

2    diagnosis, just the specific details.  It's very

3    disturbing and --

4            THE COURT:  But, of course, that's what's behind

5    the original PTSD diagnosis.  Your important testimony is

6    going to be what triggers, what triggers recurrence of

7    PTSD symptoms and is it consistent with what she

8    experienced.  Can't we limit this to testimony -- and I

9    don't know whether this comes in through -- what's her

10   name, Dr. Levin?

11           MR. INTERLANDI:  Yes.

12           THE COURT:  -- that the plaintiff suffered or

13   experienced childhood sexual abuse and additional family

14   trauma, including her father's murder.  But why would we

15   need additional details beyond that, Mr. Murphy?  That's

16   pretty significant.

17           MR. MURPHY:  Something along those lines is what

18   I was -- look, this is the least favorite part of the job,

19   cross-examining or asking somebody about their prior

20   trauma.  Here, without hearing her testimony on direct,

21   it's hard for me to make agreements as to what may be

22   admissible and what may not.  That seems to me, what I

23   just heard Your Honor suggest, seems to me something

24   further than what plaintiff herself was suggesting in her

25   papers, that she suffered childhood sexual abuse.  In

1    fact, I think that's almost what -- it would have to be by

2    her father.  I mean, her father is the one who did that

3    and her father was killed by her boyfriend.

4              THE COURT:  I don't really think we need to have

5    all of the melodrama, do we?  She suffered because she was

6    sexually abused as a kid.

7              MR. MURPHY:  Right.

8              THE COURT:  And she suffered because her father

9    was murdered.  Maybe not for the reasons one might

10   originally think would be the source of the suffering, but

11   so what?  Why not limit it to that?  But the important

12   part I thought for the plaintiff was what's the nature of

13   PTSD and how could things that seem lesser trigger

14   whatever is claimed to have been triggered.  Isn't that

15   the context that the jury really needs to make its

16   assessment?

17             MR. INTERLANDI:  Yes, Your Honor, I do agree.  I

18   think what triggers it is speaking up and then not being

19   heard, not being believed, and being shunned or retaliated

20   against.

21             THE COURT:  And that will be up to -- you don't

22   have a medical expert; is that right, Mr. Murphy?

23             MR. MURPHY:  I don't.

24             THE COURT:  All right.  If we are agreed, then,

25   that the details of her life events that led to the

1    original PTSD diagnosis and her treatment is childhood

2    sexual abuse, family trauma, including father's murder,

3    have we satisfied the purpose of your motion to exclude

4    details?

5              MR. INTERLANDI:  Yes.

6              THE COURT:  And you do not object to it in that

7    fashion?

8              MR. MURPHY:  Two comments.

9              One, Your Honor, her father was murdered by her

10   boyfriend.  I feel like that's relevant in a key detail.

11   It is, Your Honor.  I can see you disagree.  I feel like

12   it is.

13             Two, I would just ask, as some of your prior

14   rulings, that this one is subject to renewal at testimony

15   given her -- Ms. Light's potential testimony on direct.

16             MR. INTERLANDI:  Your Honor, it's the opposite

17   of what I said earlier where no one listened.  He listened

18   to her and he took action, right?  The boyfriend.  And did

19   something.  And suffered the consequences for that.  So I

20   don't think it's related to the trigger, which is, you

21   know, she was sexually abused and her family didn't

22   believe her.

23             THE COURT:  I presume losing her boyfriend to

24   the prison system is a trauma.

25             MR. INTERLANDI:  Yes.  He suffered and he went

1    to prison.  But what I'm saying is the fact that it was

2    her boyfriend is not relevant to -- really for the jury's

3    consideration of her emotional distress.  What is is the

4    sexual abuse and that no one listened to her, no one

5    believed her.  Just like when she's speaking up here and

6    no one is listening, she feels that way, it is alleged.

7            THE COURT:  Let's, for the time being, leave it

8    with the formulation, with the limitation trying to be

9    childhood sexual abuse, nobody believed her, family

10   trauma, including her father's murder, period.  I don't

11   agree -- that's a pretty broad sweep of very traumatic

12   things understandably producing PTSD.  But that's not

13   really what the issue is.  You're not disputing that she

14   had PTSD.  The question is, was there something about her

15   experience at Worthington Hooker that re-lit the symptoms

16   of that PTSD.  So let's leave it at that limitation.  And

17   we can adjust it, if necessary, depending on how the

18   evidence is coming in.  So when granting the motion to

19   exclude details of certain life events and limiting it to

20   just those life events.

21           Have I missed -- is that all of your motions in

22   limine?

23           MR. INTERLANDI:  Yes, Your Honor, I believe that

24   is all of them.

25           THE COURT:  Okay.

1              Now that we have addressed the motions

2      in limine, I think that will translate into moderation if

3      not elimination of objections to certain of the exhibits,

4      particularly the ones by the defendant that find it

5      prejudicial because it refers to the Berchem Moses report

6      such as the letter from Tracey to Clarino on the verbal

7      warning.  Is there anything in the objections that either

8      side has to the other's exhibits that is not resolved by

9      the Court's rulings?

10             MR. INTERLANDI:  Your Honor, there are a lot of

11     objections.  It's hard for me to say without taking time

12     to review all of the objections.  I think perhaps, based

13     on your rulings today, I can meet with Attorney Murphy

14     here --

15             THE COURT:  That's fine.

16             MR. INTERLANDI:  -- and go through and see if we

17     can do that on our own and then present back to

18     Your Honor.

19             THE COURT:  That may be useful.  I just want to

20     make this as smooth as possible for the jury.  They are

21     our only client here.  We'll want to make it clear so they

22     can do their job and so you can get the fair result to

23     which you're entitled.

24             Okay.  We will do that.  You can file an

25     amended -- I guess an amended trial exhibit list which

1    will tell me what remains under objection.

2         Is there anything else that we can take up

3    pretrial that we haven't already addressed?

4         MR. MURPHY:  No.  And I'll certainly work with

5    Attorney Interlandi on revising our objections.  And I

6    think Your Honor's right, I think it will substantially

7    eliminate almost all of them.  Given Your Honor's rulings

8    about certain retaliatory acts or the scope of the claims,

9    I might have to propose a few additional exhibits.  But I

10   can work with Attorney Interlandi on that as well.

11        THE COURT:  Anything further from you?

12        MR. INTERLANDI:  I don't think there is anything

13   further.  Maybe just some housekeeping stuff that I can

14   discuss with the clerk, things of that nature.  Nothing

15   that needs Your Honor's ruling on.

16        THE COURT:  Okay -- yes?

17        MR. MURPHY:  I didn't mean to cut you off.  The

18   only thing I was going to add, I saw you looking at the

19   jury box.  If you have suggestions or issues you want to

20   raise with Attorney Interlandi and I for Thursday, happy

21   to discuss them.

22        THE COURT:  We will bring in the prospective

23   jurors.  We will have somewhere in the 45 range of folks

24   that we will seat out in the spectator section.  They will

25   be told what the case is about, introduce you all.  You

1    can introduce the people you represent.  And I don't know

2    whether you plan to have them here.  If you're going to

3    have them here, introduce them.  And then we will ask the

4    jurors certain basic questions about their ability to

5    serve.  We'll then draw -- so you will know who remains

6    there.  Inevitably people who have changes of plans and

7    can't now serve, we'll get rid of those.  And then draw up

8    the first 18 people to come and sit over here in the jury

9    box.  And they will have a little questionnaire where they

10   can tell you about their employment and education and

11   stuff like that.  And then a list of questions for them to

12   which we will then have individual responses that may be

13   significant or not.  We should then know about ability,

14   qualification, and availability.

15           And beyond that it would be -- I will call you

16   to sidebar and ask you if there are any cause challenges.

17   At the same time I will ask you if there are any follow-up

18   questions you want me to ask.

19           And then that will leave us with plenty enough

20   jurors for you to each exercise your three peremptories,

21   alternately, such that we end up with a jury of eight.

22   Okay?

23           MR. INTERLANDI:  Yes, Your Honor.  Thank you.

24           THE COURT:  Any other questions?

25           MR. MURPHY:  No.  Thank you.

1          THE COURT:  Okay.  What else do we need to know?

2          MR. INTERLANDI:  I just had one question.  We

3     haven't connected on this recently, but we were

4     potentially passing draft stipulation of facts.  If we

5     were to have something that we wanted to present to the

6     Court in terms of time frame and how we should do that,

7     what would Your Honor prefer?

8          THE COURT:  Well, you have to do it before

9     Monday.

10          MR. INTERLANDI:  So Friday?

11          THE COURT:  Think about whether you might want

12     to wait until we get through the evidence, if what you're

13     trying to do is focus them, and we can give them the

14     parties agree that the following is true or has been

15     proved or something like that.  You think about what the

16     timing of that would be.  We'll give them some preliminary

17     instructions in addition to the description of the case.

18     The reason that it's a little premature, in my thinking,

19     to do it at the beginning of the case, they don't know

20     what this case is about.  Telling them certain facts are

21     undisputed is not deeply meaningful.

22          MR. INTERLANDI:  I agree.  Okay.

23          THE COURT:  So I'm happy to do stipulations of

24     fact if it's a substitute for an exhibit or a witness, we

25     might want to do that at the end of evidence, but before

1   you all close.  Think about it.

2            MR. INTERLANDI:  Okay.

3            Another issue that I just thought about is, to

4   the extent that we have some additional or that objections

5   remain to certain potential exhibits, how would we go

6   about presenting those to Your Honor?

7            THE COURT:  Well, hopefully the whole purpose of

8   your joint trial memo and this pretrial conference is to

9   have aired everything.  To the extent there is something

10  new, it's an objection.  I don't want to hear a whole lot

11  of the objection.  I will hear you either at sidebar.  In

12  a civil case, generally I ask you to wait for a recess and

13  I'll hear you then so that I don't have you giving the

14  full essence of your argument in front of the jury.

15           MR. INTERLANDI:  Okay.

16           THE COURT:  That would be my preference.  If you

17  can raise your objection and it keys to what we have

18  already discussed, I will know what it is.

19           MR. INTERLANDI:  Okay.  Thank you.

20           THE COURT:  Nothing else?

21           MR. INTERLANDI:  No.

22           THE COURT:  I look forward to this, gentlemen.

23  And I think that -- you hope that both sides feel that

24  they get a fair and good trial.  Okay.

25           MR. MURPHY:  I'm sorry, as long as we're talking

1    about trial, in terms of schedule, does Your Honor have an

2    expectation of how long -- I know it's ultimately up to

3    us, what our witnesses say, and everything else.

4            THE COURT:  Obviously it would be good to get

5    the evidence concluded by Friday afternoon.  That's five

6    full days.  I'm sort of thinking it might be enough.  If

7    we conclude before Friday or we have a little bit on

8    Friday, we can adjourn and give you more time to prepare

9    your closings.

10            And the closings will be an hour.  Plaintiff

11    gets a rebuttal.  That's all part of the hour.  I keep

12    track of the time.  And that allows us to give the jury

13    the schedule that they need to understand.  From what I

14    have read, it's really difficult to make the assessment of

15    how chatty people are going to be on the stand.  We ought

16    to be able to be finished by Friday.

17            MR. MURPHY:  I sure hope so, Your Honor.

18            THE COURT:  If you want a day off to prepare

19    your closings so we tell them they're coming back for

20    closings and start their deliberations on Monday, that's

21    fine.

22            MR. INTERLANDI:  Okay.  Just to jump back, you

23    said the rebuttal would be included within the hour that

24    we get?

25            THE COURT:  Yes, yes.

 1              MR. INTERLANDI:  So if I used 45 minutes, then

 2    I'd have 15 minutes to spare on rebuttal?

 3              THE COURT:  Correct.

 4              MR. INTERLANDI:  Thank you.

 5              THE COURT:  Okay.  You will want to have your

 6    marked exhibits, give them to Diahann, because they will

 7    go to the jury.  You have already put them in

 8    electronically?

 9              MR. INTERLANDI:  Not yet.

10              THE COURT:  And that's a good time when you can

11    be parsing so that what you have electronically is

12    tailored.  Because the jurors will have them available to

13    them in the jury room during deliberations as well as the

14    hard copy.

15              MR. INTERLANDI:  Okay.

16              THE COURT:  What else?

17              MR. MURPHY:  I'm not that familiar with this

18    court.  I haven't been here as much as the other ones.  Is

19    it possible for us to see the jury room?  I'm curious as

20    to see the room they're going to be in.

21              THE COURT:  Sure.

22              Anything else?

23              MR. MURPHY:  I'm familiar with the ones in

24    Hartford, just not here.

25              THE COURT:  But this is the most beautiful

1  courtroom.

2          MR. MURPHY:  That's what we were talking about

3  before.  Somehow I suspect the jury room is not quite this

4  beautiful.

5          MR. INTERLANDI:  In terms of electronic, I

6  believe in Judge Meyer's guidelines, you could do it by

7  email, but if it was too large, to submit it on a USB or a

8  DVD.  Is that what we're referring to in terms of the

9  electronic exhibits?  We're not e-filing like in state

10  court; it will be on a thumb drive or a USB drive.

11          THE COURT:  Are you anticipating presenting any

12  exhibits electronically?

13          MR. INTERLANDI:  I am not.

14          THE COURT:  Because anything you need IT for to

15  set up for you, you've got to get in their queue right

16  away.

17          MR. INTERLANDI:  We reached out in terms of the

18  audio, but I don't think that's going to be an issue now.

19  So I think we're all set.

20          THE COURT:  Very good.  Thank you very much.

21  Stand in recess.

22              (Proceedings adjourned at 3:03 p.m.)

23

24

25

1

2                          C E R T I F I C A T E

3

4      RE: JESSICA LIGHT v. NEW HAVEN BOARD OF EDUCATION, ET AL.

5                          No. 3:22CV425(JBA)

6

7

8           I, Diana Huntington, RDR, CRR, Official Court

9      Reporter for the United States District Court for the

10     District of Connecticut, do hereby certify that the

11     foregoing pages 1 through 66 are a true and accurate

12     transcription of my shorthand notes taken in the

13     aforementioned matter to the best of my skill and ability.

14

15

16

17

18                    _____
                                /s/

19                    DIANA HUNTINGTON, RDR, CRR
                        Official Court Reporter
20                    United States District Court
                       141 Church Street, Room 147
21                    New Haven, Connecticut 06510
                           (860) 463-3180
22

23

24

25