UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                                  :
JESSICA LIGHT,                    :    No. 3:22CV425(JBA)
                                  :
              Plaintiff           :
                                  :
         v.                       :
                                  :
NEW HAVEN BOARD OF EDUCATION &    :
MARGARET-MARY GETHINGS, in her    :
individual capacity,             :
                                  :    New Haven, Connecticut
              Defendants          :    August 5, 2024
                                  :
- - - - - - - - - - - - - - - - - x

JURY TRIAL
VOLUME I

B E F O R E:

     THE HONORABLE JANET BOND ARTERTON, U.S.D.J.,

          and a Jury of Eight

A P P E A R A N C E S:

   FOR THE PLAINTIFF:

        MONARCH LAW
             363 New Britain Road, First Floor
             Berlin, Connecticut 06037
        BY:  ANTHONY J. INTERLANDI, SR., ESQ.

   FOR THE DEFENDANTS:

        SHIPMAN & GOODWIN
             One Constitution Plaza
             Hartford, Connecticut 06103
        BY:  PETER JOSEPH MURPHY, ESQ.
             CHELSEA McCALLUM, ESQ.

                        Diana Huntington, RDR, CRR
                        Official Court Reporter

# TABLE OF CONTENTS

PAGE

OPENING JURY INSTRUCTIONS ................. 6, 24

OPENING STATEMENT BY PLAINTIFF ............... 16

OPENING STATEMENT BY DEFENDANTS .............. 19

| PLAINTIFF'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
| --- | --- | --- | --- | --- |
| JESSICA LIGHT | | | | |
| By Mr. Interlandi | 28 | | | |
| By Mr. Murphy | | 182 | | |

**9:05 A.M.**

THE COURT:  Please be seated.

Counsel, are we ready to proceed in the matter of Light v. New Haven Board of Education and Margaret-Mary Gethings?

MR. INTERLANDI:  Yes, Your Honor, we are.

THE COURT:  Who is your first witness?

MR. INTERLANDI:  My first witness will be the plaintiff, Jessica Light.

THE COURT:  All right.

And you have advised opposing counsel of your immediately subsequent witnesses?

MR. INTERLANDI:  We haven't talked about the schedule, per se.

THE COURT:  I'd like for you to do that, both of you.  I'd like you to give each other notice of who is being called, who are the next two people being called.  It allows you to focus your preparation on cross-examination on those people and not more diffusely; it's more efficient.

The other super sanct rule is always have a witness available for us to put on, okay?

MR. INTERLANDI:  Absolutely.  Thank you, Your Honor.

THE COURT:  Anything else before we proceed?

MR. INTERLANDI:  Just for me to tell -- maybe a short break so that I can go through the schedule with --

THE COURT:  Well, I'm sure that Ms. Light will be longer than your opening statements and so forth.

MR. INTERLANDI:  Yes.

THE COURT:  So we could do it at a recess.

Anything from you, Mr. Murphy?

MR. MURPHY:  Not at this time, Your Honor.

THE COURT:  All right, then.

Please bring in the jurors.

MR. MURPHY:  Your Honor, maybe before they come in, the last time we were here the Court was able to lower the blinds.  I don't know if that's possible again.

THE COURT:  They're already lowered.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Good morning, ladies and gentlemen.  Please be seated.

We welcome you back as the jurors in the civil case of Jessica Light v. New Haven Board of Education and Margaret-Mary Gethings.

You will recall that Ms. Light is represented by Anthony Interlandi at the table nearest you and that the defendants Board of Education and Margaret-Mary Gethings are represented by Peter Murphy and Chelsea McCallum.

I want to ensure that we have all of the correct jurors here.  Is there a role call you wish to take?

THE CLERK:  Juror Number One, are you here?

JUROR:  Yes.

THE CLERK:  Juror Number Two?

JUROR:  Yes.

THE CLERK:  Juror Number Three?

JUROR:  Yes.

THE CLERK:  Juror Number Four?

JUROR:  Here.

THE CLERK:  Juror Number Five?

JUROR:  Yes.

THE COURT:  Wait.  Wait.

THE CLERK:  Five?

JUROR:  Yes.

THE CLERK:  Six?

JUROR:  Here.

THE CLERK:  Juror Number Seven?

JUROR:  Here.

THE CLERK:  Juror Number Eight?

JUROR:  Here.

THE COURT:  Thank you.

I'll ask you now to please stand and take the oath to be jurors in this case and carry out your obligations.  Please raise your right hand.

(Jury sworn.)

THE COURT:  Please be seated.

You have now been sworn in as jurors and your obligations as jurors start from this point on.

I'm going to give you some preliminary instructions to guide you in this important function that you are carrying out as jurors.  These will simply be general instructions.  And at the end of the case when you've heard all of the evidence and before counsel give you their closing arguments, I will give you a more extensive full set of instructions and you will have a copy of those instructions.  So don't think that you have to remember every detail of the instructions I'm about to give you, because they will be repeated, but please pay attention.

What I am going to say now is not a substitute for the instruction of law that you will get at the end.  It is, however, designed to give you an overview before you hear the opening statements of counsel and begin hearing the evidence.  It will be your duty to listen to and consider the evidence and to decide what the evidence shows.

Remember, you and you alone are judges of the facts in this case.  You will then have to apply those facts as you find them to the law that I will give you at

the end of the case.  It is your duty to find the facts after you have considered all the evidence in the case.

You may consider as evidence the following:

The sworn testimony of witnesses on both direct and cross-examination regardless of who called the witness;

Second, any exhibits received into evidence;

Third, any facts to which the attorneys have agreed or stipulated.

At the end of the case you will have all the exhibits with you in the jury room.

I want to make sure you understand what is not evidence as we begin and must not be treated as evidence by you.

All of the statements and arguments and questions by the lawyers and if I ask any questions, that is not evidence.  Only the answers by witnesses to questions are evidence, as well as documents that are specifically admitted as evidence.

Objections to questions are not evidence. Lawyers have an obligation to their clients to make an objection when they believe evidence should not be admitted under the Federal Rules of Evidence.  That is a determination for me to make.  But you should not be influenced by either the objection or the Court's ruling

on it.

If an objection is sustained, that means the objection was correct and you must ignore the question that was asked and any answer that may have been given. If an objection is overruled or I say something to the affect "the question is allowed," that means that the objection is not proper and you should treat the answer to the question as you would any other answer.

It may be that I rule an answer is stricken, and that takes it out of the body of evidence and you must ignore the answer because it will not be evidence.

Now, from time to time evidence will be admitted for a limited purpose only. I will tell you what that limited purpose is and you must follow that instruction and consider the evidence for only that specific purpose. Otherwise, evidence is admitted for all purposes.

Anything you may have seen or heard outside the courtroom of course is not evidence and must be disregarded. You remember that your obligation is to decide this case solely on the evidence presented to you here in this courtroom.

There are two kinds of evidence: direct evidence and circumstantial evidence. Direct evidence, as its claim suggests, is direct proof of a fact, such as the testimony of a witness about what that witness saw, heard,

or did.  Circumstantial evidence, or indirect evidence, is proof of facts from which you may infer or conclude that other facts exist even though you did not have direct proof of those facts.  This word "infer" or the expression "to draw an inference" means to find a fact exists although it has not been proved directly.  Either kind of evidence is perfectly competent evidence.  I just note for you at the outset that there are two different kinds which are equally admissible.  Your role in considering both circumstantial and direct evidence will be to decide how much weight, if any, you give to either.

Now, one of your important jobs -- and they are all important -- is to determine witness credibility.  It is the jury alone who decides the credibility of witnesses, the weight of their testimony.  And in considering the weight and value of the testimony of any witness, you may take into consideration the appearance, the attitude, the behavior of the witness, the interest of the witness in the outcome of the case, if any, and the inclination of the witness to speak truthfully or not.  As well, you will consider the probability or the improbability of a witness's statements and all the other facts and circumstances you have in evidence.  You should evaluate the evidence that they give by using your own knowledge of human nature and the motives that influence

and control human actions.

In short, you are asked to assess a witness's testimony using the same considerations and the same sound judgments and common sense that you apply to the questions of truth and veracity that present themselves in your daily lives.  It will be up to you to decide which witnesses to believe, which witnesses not to believe, whether it's because a witness is intentionally not telling the truth or simply mistaken, and how much of any witness's testimony you will accept or reject.

Let me talk about what we call the burden or standard of proof.

The burden of proof is on the plaintiff, Ms. Light, who brings this case.  The standard of proof is that she must prove her case by a preponderance of the evidence.  What's preponderance of the evidence?  It means that there must be enough evidence to show that a fact is more likely true than not true.  This is the standard for a civil case like this one, which is a lawsuit for money damages.  This is not a criminal case where there's a much higher standard of proof and it is on the government beyond a reasonable doubt.  That is not the standard that we use in a civil case such as the one you are about to hear.

Let me just refresh your memory a little bit

about what this case is about.  I did give you some detail last Thursday when we selected you.

The plaintiff is Jessica Light.  She's a third grade teacher.  At the time of this case she was employed by the New Haven Board of Education, one of the defendants in this case, at the Worthington Hooker School.  During the events of the case, the principal of the Hooker School was the other defendant, Margaret-Mary Gethings.

The case that she brings against both the Board of Education and Ms. Gethings presents three what we call counts; that is, claims of wrongdoing.

Ms. Light's first count alleges that the defendant Board of Education violated the Connecticut statute that we call 31-51q, which is a state law that prohibits employers from discharging or disciplining an employee because of that employee's exercise of free speech rights protected by the federal or state constitutions.  Ms. Light claims that in 2020 and 2021 she made public comments about school reopening policies related to the COVID-19 pandemic.  She maintains that the Board of Education through Defendant Gethings imposed adverse consequences on her for making these public statements in violation of 31-51q.

To prove her claim, she must prove three elements.  Each count is composed of elements.

The first is that she was engaged in speech protected by the federal or state constitutions.  To do this, she must show she spoke as a citizen rather than as an employee and that she spoke on a matter of public concern.  With respect to this element, the parties have agreed that she satisfies this element of her claim.

The second element that she must prove is that she was disciplined by the Board of Education through Ms. Gethings.  Here, the word "discipline" means an action imposed on Ms. Light that leaves her less well off. Discipline can be a single significant act or a combination of lesser acts that, in the aggregate, create this inferior working environment.

The third element Ms. Light must prove is a causal link between her protected speech and the discipline she experienced.  That is, she must show that her protected speech was a substantial or motivating factor in the discipline she received.  New Haven Board of Education denies it took any adverse employment actions against Ms. Light and argues that any consequences Ms. Light may have experienced were not causally connected to her protected speech.

Now, there is what is called an affirmative defense which is a position taken by the defendant on which the defendant bears the burden of proof.  You

remember the plaintiff bears the burden of proof on everything else.  It is also by a preponderance of the evidence.

The Board of Education asserts an affirmative defense against Ms. Light's claim of retaliation which is that her exercise of her free speech rights substantially or materially interfered with her job performance or her working relationship with the Board of Education.  The Board of Education, if it proves that affirmative defense, it will have proved the Board is not liable even if Plaintiff Light has proved the other elements of her claim.

The second count is against Ms. Gethings. Ms. Light claims that Ms. Gethings is liable to her under a federal statute which is called Title 42 U.S.C. 1983. 1983 is a federal law that prohibits state officials from violating another person's federal constitutional rights. Ms. Gethings is a state official because she is a public school principal.

Ms. Light alleges that Ms. Gethings violated 1983 by retaliating against her for exercising her First Amendment rights.  In order for Ms. Light to prove this claim against Ms. Gethings, she must prove three things, three elements.

She must show she engaged in speech protected by

the First Amendment.  As a public employee, Ms. Light's speech is protected by the First Amendment if she spoke as a citizen rather than as an employee and if she spoke on a matter of public concern.  And the parties agree that Ms. Light can satisfy this element of her claim.

Second, Ms. Light must show that Ms. Gethings took an adverse employment action against her.  An adverse action can be a single act or a combination of more minor incidents.

Third, she must show there's a causal connection between her protected speech and the adverse action to show her protected speech was a substantial motivating factor in the actions that Ms. Gethings took against her. That's the third element of the second claim, count.

Ms. Light's third count is a defamation count. This is brought against Defendant Gethings.  And she claims that Ms. Gethings falsely stated that school employees and others had identified Ms. Light as the person who leaked the COVID positive status of another teacher.

In order for Ms. Light to prove her claim against Ms. Gethings, she must prove four elements.

She must prove that Ms. Gethings made a defamatory statement about her.  A defamatory statement is a statement that tends to harm the reputation of another

person.

Second, Ms. Light must show that Ms. Gethings' statement identified her, the plaintiff.

Third, Ms. Light must show that Ms. Gethings made the allegedly defamatory statement to a third person.

And fourth, that her reputation suffered as a result of the statement.

Now, there's an affirmative defense here on this count as well. Ms. Gethings argues that her statement about Ms. Light was true. If Ms. Gethings proves by a preponderance of the evidence that the statement was true, then she is not liable for defamation.

So that gives you at least a little introduction to what you will be hearing by way of evidence and where that evidence fits into what you will be deciding as jurors in your deliberation.

We're now going to hear from counsel who have brief opening statements that are intended to give you a bit of a road map on what their evidence will be and how it will be directed.

Remember, as you listen to the lawyers, you'll remember that what they say is not evidence, only what they expect the evidence at trial will actually show, because it's your duty at the end of the case to decide what the evidence has been shown to prove as well as the

facts that you will use in applying the law.

I'm going to invite counsel to now give their opening statements starting with Mr. Interlandi for Jessica Light.

MR. INTERLANDI:  Thank you, Your Honor.

Your Honor, may I enter the podium area?

THE COURT:  Yes.  You can be at the podium with a microphone.

MR. INTERLANDI:  Thank you.

Your Honor, Counsel, Members of the Jury:

My name is Tony Interlandi, and I represent the plaintiff in this case, Jessica Light.

Like you, Jessica wears many hats.  She's a daughter, she's a sister, she's a wife, a teacher, a parent, and an advocate.  During this trial we will present evidence concerning the retaliation that Jessica suffered when she spoke out publicly as well as a false statement that was made about her that injured her name and reputation.

Arguably, we live in the greatest country in the world.  The founding fathers and framers of the Constitution built a democracy.  They set up civil liberties and fundamental rights.  One of those rights is the freedom of speech which is in the First Amendment to the United States Constitution as well as the Connecticut

Constitution.  It's a building block of liberty.

They also gave us the civil justice system, which is the greatest system in the world.  It allows someone like Jessica to come into court and bring claims against her employer and her boss and have those claims heard and decided by a jury of her peers.

Now, when we were here last week Judge Arterton mentioned to you that in the past jurors came to her and expressed a feeling of deep personal significance having served on a jury.  And I have no doubt that you will have a similar experience.

So, what is the cost of advocacy, the cost for standing up for what you believe in, the cost for speaking out on matters of public concern and public safety and rights?  When someone like Jessica speaks on a matter of public concern and we disagree with it or her co-workers disagree with it, does that allow the employer to take steps to shut her up?  That's not our way.

During this trial you will hear testimony and receive documents in evidence.  Please listen carefully and read intently.  You will hear Jessica provide testimony about her work experience at Worthington Hooker School, her advocacy for a district-wide uniform COVID safety plan and protocols, about the roadblocks Margaret-Mary Gethings and others put in her way, and the

pain, stress, suffering, humiliation, and isolation she felt as a result.

You will also hear from Jessica's husband, David. He'll testify about his observations of Jessica before and after the retaliation and defamation.

You'll hear from some co-workers who will testify about specific events that we claim were a pattern of retaliation by Margaret-Mary Gethings.

You'll hear from two medical providers who will come to court, testify, and offer their opinion as to whether or not the defendants' conduct exacerbated any underlying medical conditions that Jessica may have had at that time.

You'll also hear from the vice president of Jessica's union. He's the former vice president of the union, and he will testify about what he witnessed during and after the investigation of Jessica's internal complaint about the administrators at Worthington Hooker School. You will have that complaint in evidence as well as the administrators' retaliatory complaint, letters, emails, and medical bills. As I said earlier, please read those intently.

Finally, we'll present the HR representative who was tasked with investigating Jessica's complaint. We expect her to testify about the process, about her

involvement in the investigation, as well as Jessica's return to work in February of 2022 after a period of medical leave.

Members of the jury, at the end of this case, we'll review what was proven by a fair preponderance of the evidence, and together we'll come to two conclusions: (1) the defendants disciplined Jessica in retaliation for her public speaking; and (2) that Margaret-Mary Gethings made a false statement about Jessica in front of two co-workers and the assistant principal, Jenny Clarino. Then and only then I will ask you for an award to compensate Jessica for her damages and to punish the defendants for their actions.

Thank you for your attention.

THE COURT:  Thank you.

All right.  On behalf of the defendants, Mr. Murphy.

MR. MURPHY:  Good morning.

This case is really about oversight responsibility and oversight responsibility during an unprecedented time.

Now, my client New Haven Board of Education operates the public schools in the city of New Haven, grades K through high school.  The events of this case will focus on Worthington Hooker School, as Judge Arterton

already told you.  That school has two buildings.  The evidence will show that grades K through 2 are in one building and grades 3 through 8 are in a separate building.

The principal of the entire Worthington Hooker School is Margaret-Mary Gethings who is here today.  Principal Gethings will testify about her, how she oversees the upper school, grades 3 through 8, and Assistant Principal Jenny Clarino oversees the lower school with grades K through 2.

You will hear evidence about the oversight responsibilities that administrators are charged with.  They run a public school.  They deal with student issues, education issues, special education issues, parent issues, outside issues, the range of responsibilities that come with being a principal in an elementary school.

Now, you will also hear testimony about how COVID, as we all know, started in March of 2020 and the events that occurred after that and how that impacted the operational responsibilities for Principal Gethings and all the staff and teachers at Worthington Hooker School, right?  Overnight you will hear evidence about how they had to transition to a remote teaching environment that never happened before.  You'll hear evidence about how the Board, principals such as Principal Gethings, and teachers

such as Ms. Light were working to come up with a plan to return students to the building.  You will hear evidence about the COVID protocols that came into place and were constantly changing.  You'll hear evidence they came from the government, the CDC, the Board, the State of Connecticut, and how those were changing as teachers and then students were returning to the classroom.

Against this context, as you heard Attorney Interlandi say, Ms. Light got up and testified at some Board of Education meetings and made a Facebook post.  And the parties agree, as Judge Arterton already told you, that that was speech on her behalf.

Now, Ms. Light also claims, as Attorney Interlandi just said, that Ms. Light was disciplined for that speech.  And I ask you, as we go forward through this trial, to listen to what the witnesses say and review, as Attorney Interlandi said, review all the documents carefully on that question of discipline and adverse employment actions as Judge Arterton just mentioned with the elements.

The evidence will show that some of the issues we're talking about are reassignment from one grade to another.  And you'll hear from Principal Gethings as to why Ms. Light's grade was changed within the building.

You will hear evidence about committees.

Another thing Ms. Light is going to allege that was discipline was school committees, voluntary unpaid committees. And you're going to hear evidence about that and what committees she was on, what committees she wanted to be on, and why those decisions were made by Principal Gethings and others.

Teachers are evaluated each year. You're going to hear evidence about Ms. Light's review, the mid-year review in 2021, March of 2021. You're going to see that document. You're going to see yourself the language that was used by Principal Gethings as she gave Ms. Light her review. And I want you to read that carefully, as Attorney Interlandi said, and determine what statements in that review were positive and which statements, if any, were negative and some sort of discipline.

As I've mentioned already and we all know, COVID protocols impacted the public schools significantly, right? One area that you're going to learn about is dismissal from the public schools, how kids were dismissed to their parents. On one occasion, Ms. Gethings provided some feedback to Ms. Light about the dismissal process. You're going to see documents related to that feedback. And you're going to have to ask yourself whether that email constitutes discipline against Ms. Light.

Finally, as Attorney Interlandi mentioned,

Ms. Light was out for a period of time.  You're going to hear evidence that she originally started as a first grade teacher in the 2021-2022 school year and then went out on leave and came back.  You're going to hear evidence about her return to work.  When she went out, the evidence will show that her class was split into two other third grade classrooms.  And when she returned, the students had to be recombined into her class.  And there was a transition period for that.  And you're going to hear evidence about that.

At the end of the trial, we are going to ask you to find that none of those incidents constituted retaliation or discipline under the two statutes that Judge Arterton mentioned and find in favor of the Board and Principal Gethings on that claim.

In regard to defamation, Ms. Light does have a defamation claim.  You'll hear evidence about the meeting where the alleged defamatory statements were made.  You'll hear evidence that it was Ms. Gethings; Ms. Clarino, the assistant principal; Ms. Light; the other teacher involved; and their union representative.  You'll hear evidence and you'll see documents related to any statements made in that meeting, and we're confident that at the end of the case you will find and you will agree that no statements by Ms. Gethings were defamatory.

With that, I thank you for your time and attention.

THE COURT:  All right.  Thank you.

Now, I have a couple of housekeeping matters for you which are also instructions that are important for you to follow.  These relate to your conduct during recesses or adjournments of the Court.

Until the trial is over, you cannot discuss this case with anyone, including members of the jury.  And you cannot permit anybody to talk to you about the case.  The prohibition also extends to using any technology and social networking to find out about this case or to discuss this case.  It's important because if you are discussing the case before you've heard all the evidence, there's a risk you might prematurely make decisions about what the evidence shows that would be different from what you would decide if you waited until you heard everything.

Also, if you were to be spoken to about it or you were to find in any of the posts such as websites, X, Twitter, Facebook, Instagram, you might find misinformation.  Remember, what is the evidence in the case is what is submitted to you only in this courtroom. So that is why you must not use your cell or other communication devices to communicate about any of your activities or opinions regarding this case as well as what

else may be out there on any particular part of the case.

Second, keep an open mind throughout this trial. Reach your conclusions only during your final deliberations when all the evidence is in and you've heard my instructions and you've heard the attorneys' closing arguments. And then you should only reach a conclusion after you and your fellow jurors have exchanged your views, examined your views, and assessed each other's views.

You can't talk to your fellow jurors until you begin your deliberations for two reasons: One, you might prematurely conclude something that will not turn out to be accurate; And secondly, if you are talking to each other, you may not be talking to all eight at the same time and that would mean that you have had some premature deliberations without the benefit of all of you there.

Third, don't read or listen to anything relating to this case in any way. This extends, as I said earlier, to watching internet or television accounts, reading newspaper articles, or if someone should try to talk to you about it. Please remember that you should decline to engage in that. And if someone attempts to speak to you about this case, please let me know as promptly as possible, even if it's just the next morning, and do so with a note with your juror number on it. From now on, we

won't be using your names, just your numbers.

Don't conduct any research.  Don't make any investigation about this case.  Your friend Google should not be consulted about anything to do with any aspect of the case.  That's because, remember, you're deciding the case only on the basis of the evidence presented to you. What comes from some outside source is not evidence.

While you're serving on this jury, don't speak with any of the parties or their attorneys or any witnesses or anyone that you see here in the courtroom accept, of course, my courtroom deputy, Ms. Lewis, about this case or about anything.  The reason that I say it that way is that if one side sees you speaking to someone who may have some affiliation with the other side, you can't hear -- they can't hear, perhaps, what you're saying.  You may be saying, "Hot day, isn't it?"  But they don't know that.  And it leaves a sense or inference of some undue influence is being exercised.  And what we need to ensure all the parties is that you be aloof in this way so that they can ensure absolute impartiality, assure impartially from you.  So if you run into anybody in the hallway or elevator or anywhere else, just smile politely and nothing more.

Now, although you can't talk with the parties or other people during trial, you can certainly chat among

yourselves during the breaks and the like.  Just don't have conversations that bear in any way about the substance of the case.

Now, you may take notes during the course of the trial.  I believe you have notebooks there.  When you leave the jury room other than to come back into court, please leave your notebooks there.  Any notes that you take are only memory aids for you.  Don't rely on your notes if they turn out to conflict with your independent recollection of all the evidence.  If you don't take notes, don't consult with or rely on your fellow jurors, just your own recollection of the proceedings.

So these are just preliminary instructions.  I hope it has done something to orient you to hear the evidence, make you feel more confident with the task you are embarking on, and await my final instructions before you begin your deliberations.  I'm sure you'll bear these principles in mind and keep an open mind until you have heard all the evidence and my formal instructions.

All right.  At this point we turn to the plaintiff and invite counsel to call your first witness.

MR. INTERLANDI:  Thank you, Your Honor.  Our first witness is the plaintiff Jessica Light.

THE COURT:  Ms. Light, you're going to be testifying from this witness box.  Please remain standing,

raise your right hand to be sworn.

                    JESSICA LIGHT,

     called as a witness, having been first duly

     sworn, was examined and testified as follows:


          THE CLERK:  Please state your name and spell your last name.

          THE WITNESS:  Jessica Light, L-I-G-H-T.

          THE CLERK:  Give us your city and state of residence.

          THE WITNESS:  New Haven, Connecticut.

          THE COURT:  You may proceed.

          MR. INTERLANDI:  Thank you, Your Honor.


                    DIRECT EXAMINATION

BY MR. INTERLANDI:

Q.   Good morning, Jessica.

A.   Good morning.

Q.   Jessica, what is your current profession?

A.   I'm a teacher.

Q.   And where are you a teacher?

A.   At Ross Woodward School, New Haven.

Q.   Who is your employer?

A.   New Haven Public Schools.

Q.   Are you married?

A.   I am.

Q.   Who are you married to?

A.   David Bianchine.

Q.   Do you have any children?

A.   I do.

Q.   How many children do you have?

A.   I have two biological children and a goddaughter.

Q.   Great.  What are their names?

A.   Sebastian, Wesley, and Priscilla.

Q.   How old is Sebastian?

A.   Fifteen.

Q.   And how old is Wesley?

A.   Eleven.

Q.   And how about Priscilla?

A.   Twenty-two.

Q.   And do Wesley and Sebastian go to school within the New Haven public school system?

A.   Yes, they do.

Q.   Where is Wesley currently a student?

A.   Last year Wesley was a student at Hooker.

Q.   Okay.  And going into the new school year, where will he be a student?

A.   At Edgewood School, I hope.

Q.   How about Sebastian?

A.    The Sound School.

Q.    You said South?

A.    Sound.  Like Long Island Sound.

Q.    Is that a high school?

A.    It is.

Q.    Do you have any pets?

A.    I do.

Q.    What kind of pets do you have?

A.    I have a dog.

Q.    What's the dog's name?

A.    Luna.

Q.    How old is Luna?

A.    About eight years.

Q.    What kind of dog is it?

A.    A total mutt.

Q.    Where did you go to high school?

A.    Highland Park High School in Dallas, Texas.

Q.    How about college, did you go to college?

A.    I did go to college.  I went to Emerson College, then I transferred to Virginia Commonwealth University.  Then I went to Teachers College, Columbia University.

Q.    Emerson, where is that?

A.    Boston.

Q.    And Virginia is obviously in Virginia?

A.    Yes.  Richmond.

Q.   What degree or degrees did you graduate with?

A.   From VCU, I have a double major in theater education and English education.

Teachers College, I have inclusive elementary education, master's.

Q.   Do you hold any special certificates in your role as a teacher?

A.   I have a certificate to teach kindergarten through sixth grade.

Q.   All right.  So, tell me about your work history. What was the first teaching job that you had?

A.   In New York City in the Bronx.

Q.   And what grade were you teaching in the Bronx?

A.   6, 7, and 8 theater.

Q.   How long -- well, scratch that.

What was the name of the school there?

A.   M.S. 224.

Q.   How long were you there?

A.   A year.

Q.   And where did you teach next?

A.   Then I went back for my master's.

Then after my master's I taught at Davis Street School in New Haven.

Q.   Do you remember the year, approximate year that you started teaching at Davis?

A.    Um, 2009.

Q.    What grade were you teaching in 2009?

A.    Fourth.

Q.    How long were you at Davis?

A.    About five years.

Q.    And did you always teach fourth grade at Davis?

A.    No.

Q.    What grades did you teach there?

A.    I taught fourth, fifth, and sixth.

Q.    While you were teaching at Davis, did the administrators there ask you your preference for grades that you would like to teach?

A.    Yes.

Q.    How does that happen with the administrators?

A.    Um, towards the end of the year we're given a sheet that just is a numbered sheet of which position you would like to have next year.  And then they take that into consideration.

Q.    So do you rank the grades by most preferable to least preferable?

A.    You do.

Q.    And at the time, do you remember what your most preferable grade to teach was?

A.    When I was at Davis?

Q.    At Davis.

A.    Fourth grade.

Q.    Why is that?

A.    Um, it's where I started, and I liked it.  I really enjoyed the curriculum.  I enjoyed the novels that we had.  I loved that age group.  They were able to understand my sarcasm.

Q.    What is that age group for fourth grade?

A.    Um, like nine and ten.

Q.    You testified a few minutes ago about some grade changes.  You said you taught fourth, fifth, and sixth at Davis.  How does that happen?  Did you get some letter in the mail, all of a sudden you're told to go teach fifth grade, or is there some other mechanism for that to happen?

A.    Um, all of my grade changes at Davis were a conversation between myself and the principal.  I only taught sixth grade for a short period of time because a teacher was injured and they needed me to take over the class.  So I was primarily fourth and fifth.

        Um, I didn't want to switch to fifth grade.  When the principal explained she felt it was in the best interest of the school, I had no problem with it.  I got to loop with my students.

Q.    What does that mean, loop with your students?

A.    It means that you get to have some of your students

for more than one year.  So my principal felt that my students had a good connection with me.

Q.   And when you had the conversation or conversations with the principal, do you recall in terms of the time frame when that may have happened?

A.   Usually towards the beginning of the last marking period.  Um, so about eight weeks before school ends, probably.

Q.   Going back to the preference sheet I think maybe you referred to it as, did you ever list either kindergarten or first grade at the top of your preference chart?

A.   No.

Q.   Do you recall where you would have had those grades listed on your preference charts or sheets at the time you were working at Davis?

A.   Um, at the very bottom.  They probably wouldn't have made my list.

Q.   And then why did you leave Davis?

A.   Um, I left Davis for a lot of reasons.  I'd been there for five years.  Davis is a very wonderful school that faces a lot of inequality.  And it was hard to face that daily, to want to be able to take care of every kid in ways that you can't as a teacher, necessarily.  You can't buy groceries for everybody.  You can get them a snack.  And so I was finding that a little difficult.  Um,

and so when I heard about the opening at Hooker, I sought the transfer.

Q. What grade was that opening for?

A. Third grade.

Q. Do you recall the year that you applied for the open third grade position at Hooker?

A. I'm sorry, right now I don't remember the year.

Q. And when you applied for the transfer, was it granted?

A. After -- yes.

Q. Do you recall who the principal was at Hooker when you started to work there?

A. Yes. Dr. Robles.

Q. How long was Dr. Robles there before Margaret-Mary Gethings became the principal?

A. Um, I'm not sure she was there a long time before I was there. So I had Dr. Robles for a year, a year and a little bit.

Q. How did you like your first year teaching at Worthington Hooker School?

A. I loved it.

Q. Why?

A. Um, I believed it was a model of what every school should be. It was in the city. And it embraced all economic statuses but where there wasn't a feeling of have

and have-nots, everybody was lifted up.  The teachers were incredibly collaborative together.  It was a beautiful campus.  It has huge connections with Yale.  It -- it taught -- it taught -- every student should have a school like that.

Q.   Can you describe more about the setup of the campus?

A.   Um, well, it's divided into two buildings.  K-2 is in one building and 3-8 is in another building.  And there's -- it's a pretty typical school building.

Q.   Okay.  You said K-2, kindergarten through second grade; is that right?

A.   Correct.  What we call the Little Building.

Q.   What street is that located on?

A.   Canner.

Q.   Did you say Canner?

A.   Canner, yeah.

Q.   How about the other school that houses grades 3-8, where is that located?

A.   Whitney Avenue.

Q.   Is it a walking distance from Canner Street to Whitney Avenue to get from one building to the other?

A.   Yes.

Q.   Approximately how long does it take to walk from one building to the other?

A.   Ten minutes.

Q.   So your first year, if I understand it correctly, you were working at the building on Whitney Avenue?

A.   Correct.

Q.   And you said there came a point in time when Dr. Robles left and Margaret-Mary Gethings replaced her. Do you recall anything specific about that transition?

A.   Um, I remember that it was somewhat abrupt and was right at the -- school was like -- had started before Ms. Gethings was found.  So we had an interim principal for a while.  And I was on the SPMT committee that was interviewing candidates for the position.

Q.   What is SPMT?

A.   School Planning & Management Team.

Q.   Did somebody ask you to be on that?

A.   Dr. Robles.

Q.   Do you recall the person who was appointed as the interim principal at Hooker?

A.   Um, I remember that her first name is Bonnie and her last name started with a P.  I'm sorry.  She was only there for about a month.

Q.   Do you recall the school year that this happened?

A.   Um, I think 2019.

Q.   Okay.  And at the time when Dr. Robles was the principal, did the school have an assistant principal?

A.   Yes.

Q.    Who was that person?

A.    Donna Aiello.

Q.    And when Dr. Robles left, did Donna Aiello stay as the assistant principal?

A.    Yes.

Q.    Is she still the assistant principal there today?

A.    No.

Q.    Do you know when Donna Aiello left Hooker as the assistant principal?

A.    She retired a year after Ms. Gethings became principal.  I apologize.

Q.    That's all right.

      Who replaced Donna Aiello as the assistant principal at Hooker?

A.    Jenny Clarino.

Q.    Is she still the assistant principal at Hooker?

A.    Yes.

Q.    Did you enjoy your time working at Hooker?

A.    Yes.

Q.    Why did you enjoy working there?

A.    Um, teachers were given the freedom to reach students where their needs were.  And we had the resources we needed to do that.  So we could create an inquiry based project based on a kid's needs and get them interested in anything.  So if we had a kid that was interested in

skateboarding, we could do a whole science project on, you know, acceleration and find books on skateboarding. It was just awesome. We had everything we needed to be the teachers we wanted to be and it was a community that really valued education, and it had students from all over the world. It was amazing.

Q. Were there any other unique characteristics about Hooker as it related to the other schools in the district?

A. In terms of funding, it was far more affluent of a neighborhood.

Q. Which neighborhood is it located in?

A. East Rock.

Q. Any other characteristics that you thought were unique?

A. There's no busing.

Q. What does that mean, no busing?

A. Um, so even other schools where it's neighborhood preference, if you're not in the neighborhood, you could take a bus into that neighborhood if you get in through an application process or if you're a magnet school there's a bus. I believe there's maybe one or two schools in New Haven that do not have buses. But it meant that the community was a little bit of a self-selecting group. So if you got into the school but were not in the neighborhood, you had to find your own transportation.

Q.   I want to make sure I understand your testimony. When you're referring to bus, are you referring to a city bus or a school bus?

A.   I'm referring to school buses.  In the high schools sometimes the New Haven Public Schools will give like city bus passes, but they don't do that for Hooker because it's like elementary/middle school.

Q.   So there were no yellow school buses for Hooker, right?

A.   Correct.

Q.   While you were at Davis, did you have an opportunity to be reviewed, your performance reviewed by the administrators?

A.   Yes.

Q.   And do you recall that process?

A.   Yes.

Q.   What do you recall about the performance review process while you were at Davis?

A.   Um, so it involves the administrators coming into your room and taking observations.  It should really be a conversation around what you're doing well, what you should improve.  And then at the end of it, we kind of look at a rubric of how well you're doing.  And then you're given a number rating.  And it went well.  I felt it was a very collaborative process.

Q.    Was there a specific time in the school year where the administrators gave you this performance review?

A.    So, at the beginning of the year we create goals of what we want to get done with our students that year, how much growth we want to see.  Mid-year we will have a review.  And then at the end we'll have a final review.

Q.    And so for people who are not teachers, what does mid-year mean?

A.    Um, usually around February, March.

Q.    And as a result of the mid-year meeting, do you receive any sort of written documentation?

A.    Yes.

Q.    And what is -- does that have a specific name, that document you receive?

A.    It's called a TEVAL, for teacher evaluation.

Q.    So your rating at Davis, do you recall the ratings that you received the five years that you were a teacher at Davis?

A.    Yeah.  So, it's a scale of 1 to 5.  I was given a 4 or a 5 every year.

Q.    And the process that you just explained for performance reviews at Davis, was that similar at Hooker?

A.    Yes.

Q.    And so who did your review the first year you taught at Hooker?

A.   Dr. Robles.

Q.   Do you recall the rating that was given to you after your TEVAL meeting?

A.   A 4.

Q.   Were you ever in your career for this employer, the New Haven Board of Ed, ever given a rating of 3 or lower?

A.   No.

Q.   And did Dr. Robles give you a performance review only one time?

A.   Um, only one final review.  But it was from the beginning to the end of the year.  So it was based on lots of observations.

Q.   And any subsequent TEVAL meetings or TEVAL documentation that you received, who was that completed by?

A.   Ms. Gethings.

Q.   So let's talk about COVID.

     Do you recall when COVID caused your school Hooker to shut down?

A.   March of 2020.

Q.   Okay.  And can you walk us through the process, at least in that first month in terms of what you were supposed to do with your students?

A.   Yes.  So it was really a shock -- sorry.  It was really a shock for all of us.  We were given a limited

time to run into our classrooms and get everything we thought we might need to teach at home. We piled our cars full. And we created Google Classrooms where we had Google Meets, which are like Zooms with our students. We posted assignments. And we were creating a whole new world.

Q. And for that school year, the 2019-2020 school year, did it end when it was supposed to end as if you were still in person or did it go shorter or longer?

A. It ended when it was supposed to.

Q. Okay. And then what happened in the summer? Like in terms of coming back to work, was there any discussion about how that was going to happen?

A. Yeah. Everyone was really unsure of how it was going to happen and how to do it safely. We really missed -- I can't speak for other people. I really missed being in person, but we just didn't know how the logistics would work.

Um, I spent the summer sewing masks so that we could do tie-dye activities in the park. We were just trying to figure out the best we could.

Q. Why did you miss being in person?

A. Um, I love the energy students give and I love being a teacher.

Q. So during this time, let's say June to August, how

were you feeling about the prospect of coming back to work and teaching students during this uncertain time during COVID?

A.   Um, scared.

Q.   Why?

A.   There was not a unified plan for how we would do it safely.  We hadn't been vaccinated yet.  And I just realized that, you know, when a student enters my classroom, I'm responsible for keeping them safe.  So I felt the pressure of making sure I could keep everyone healthy.

Q.   And during this time, were you in a teachers union?

A.   I was.

Q.   What was the name of the teachers union?

A.   New Haven Federation of Teachers.

Q.   Have you ever heard of an entity called AFT Connecticut?

A.   Yes.

Q.   Do you have an understanding of what that is?

A.   Yeah.  It's above.  The New Haven chapter is just our local chapter.

Q.   And in the summer of 2020 did you receive any written correspondence from AFT Connecticut about public speaking as it related to COVID?

A.   Yes.

MR. INTERLANDI:  Your Honor, may I approach the clerk?

THE COURT:  You may.

MR. INTERLANDI:  Your Honor, may I approach the witness?

THE COURT:  You may.

BY MR. INTERLANDI:

Q.   Jessica, I'm showing you what we've marked as Plaintiff's Exhibit 1.  Have you seen this letter before today?

A.   I have.

Q.   What is this letter?

A.   It's a letter from the union letting us know our First Amendment rights.

Q.   Okay.  And when you received this, what did you -- did you have any feelings or thoughts about this letter?

A.   I appreciated the letter.

Q.   Why did you appreciate the letter?

A.   Because it lets you know -- the last paragraph says COVID-19 pandemic is clearly a matter of public concern. So if it's a matter of public concern, you're free to speak about it.  So it was empowering.

MR. INTERLANDI:  Your Honor, may I approach to take the exhibit back?

THE COURT:  Yes.

Are you offering one 1 as a full exhibit?

MR. INTERLANDI:  Yes, Your Honor.  We are offering Exhibit 1 as a full exhibit.  It is agreed upon.

THE COURT:  Without objection, then?

MR. MURPHY:  Without objection, Your Honor.  I was just curious if we were going to offer all the unobjected-to exhibits.

THE COURT:  You can do that and tell me when we get to one that is not agreed on, all right?

MR. INTERLANDI:  Okay.

THE COURT:  Exhibit 1 is a full exhibit.

BY MR. INTERLANDI:

Q.   For the 2020-2021 school year, do you recall around the time frame that the school was -- the year was to start, the school year?

A.   So we started remotely at the end of August.

Q.   Was there any discussion about going back full in person or hybrid?

A.   Yes.

Q.   What do you recall, if anything, about the discussion concerning the type of reopening for the school district?

A.   Um, so there was discussion about going back in person or in a hybrid situation.  Until the very last minute, I remember the Board of Ed changed their decision right before we were supposed to go back in person.

Q. How were you feeling at this time?

A. Um, anxious.

Q. Why were you feeling anxious?

A. Um, because there was just so much undecided.  And -- yeah, I'm a planner.

Q. Did you say you're a planner?

A. Yeah.

Q. And at this time, let's say, the 2019-2020 school year, was your son Wesley a student at Hooker?

A. Yes.

Q. What grade was Wesley in?

A. In 2019?

Q. I'm sorry, the 2020-2021 school year.

A. Second grade.

Q. And what grade was Sebastian a student in?

A. Eighth grade -- seventh grade, sorry.

Q. Was Sebastian a student at Hooker?

A. Yes.

Q. So both Wesley and Sebastian were students at Hooker for that 2020-2021 school year?

A. Correct.

Q. How did you feel as a parent sending your -- well, did they go back in person or were they part of a remote teaching classroom?

A. At the beginning of the school year, in person wasn't

an option.

Beginning at some point in January, I believe, in person was an option. And both of my children stayed home for a little bit longer until after spring break. And then they returned in person.

Q. So that would have been spring break of the 2020-2021 school year?

A. Correct.

Q. Have you ever heard of a learning pod?

A. I have.

Q. Do you have an understanding of what that means?

A. Yes.

Q. What's your understanding?

A. So, during COVID a lot of people created learning pods where a small group of students would work together with their parents so that they could access the online learning component of schools but also have some social interaction with a smaller more safer group.

Q. Were your children in a learning pod or learning pods to start the 2020-2021 school year?

A. Wesley was, yes.

Q. And was there a reason why Sebastian was not?

A. Um, because no one approached us with a learning pod option.

Q. During this time of the reopening of schools in the

beginning part of the 2020-2021 school year, did you attend any meetings or Board of Education meetings to speak out about the school district's plan for reopening?

A.    Yes.

Q.    Okay.  Do you recall anything that you talked about during those meetings?

A.    I asked for a unified plan.  I knew that different schools had different ideas as to how to open.  But I wanted to make sure safety was seen at all schools at the same level and that there was equity amongst the students in New Haven.

Q.    How did you know at that time different schools had different ideas?

A.    Well, I had taught at Davis before.  My children had gone to Edgewood and Brennan-Rogers.  And I was working at Hooker.  Plus just speaking with different teachers within the union, just the actual facilities of the different schools vary a lot.  And the ability to space out varies a lot based on the building setup.

Q.    What did you mean when you said you wanted to make sure that there was equity in how the school approached reopening?

A.    Um, well, for instance, a lot of people were scared of school buses being, you know, a contributor of COVID. That wasn't a concern at Hooker.  So we had to make sure

that all schools were able to open in a way that the kids could spread out, you know, and that it wasn't -- like some librarians were told that after a kid read a book you were supposed to kind of quarantine that book for a while. Other people were told that you could give the book to a student right away afterwards, that there wasn't any contact -- so no one had an idea of what the proper protocols were.  So I knew I couldn't enforce the protocols until there was a set of proper protocols.  And I wanted to make sure I kept my students safe.

Q.   Did you have any discussions with the principal, Margaret-Mary Gethings, during this time frame, September, let's say, to November of 2020?

A.   Yes.

Q.   Were those conversations concerning COVID and how to reopen safely?

A.   Yes.

Q.   Do you remember anything specifically that you talked to Defendant Gethings about as it related to school reopenings?

A.    Um, I mean, we talked about so many things at that time.  How to fit -- like how to physically fit the desks in my room where they were supposed to be 6 feet apart and there wasn't room to fit all the desks 6 feet apart.  Then people came up with, like, different ways of measuring,

like if it was 6 feet from the edge of the desk or 6 feet from your nose.  There was just a million micro decisions being made that we talked about all the time.

Q.   Did the administrators express to you a position about whether or not they wanted to return in person or stay remote?

A.   They were in favor of returning in person.

Q.   And that would have been to start the school year at the end of August of 2020?

A.   Correct.

Q.   How did that make you feel, knowing that your administrators wanted to come back to in-person learning at that time of uncertainty?

A.   Um, I appreciated their desire to come back.  I wanted to come back too.  I just didn't know if we could do it.

Q.   Why didn't you know if you could do it?

A.   Um, because some of the plans given to us by New Haven Public Schools said the windows should be open and some of them said they should be closed.  It was a constant -- we just didn't know how to physically facilitate people coming back safely at that time.

Q.   When you say "people," who are you referring to?

A.   Students.

Q.   Did Defendant Gethings ever talk to you about any

public comments you made during Board of Education meetings during this time, September, let's say, to November of 2020?

A.    Yes.

Q.    Do you recall what she said to you as it related to your public comments during that time?

A.    Yes.  She said -- should I?

Q.    Yes.  She's a party.

A.    She said that when I spoke, even if I didn't say that I was a Hooker teacher, everyone knew I was a Hooker teacher and her phone blew up.  And there was an impression that she wasn't being transparent and that she wasn't telling the teachers what she should be telling them, and that the teachers -- there was an impression that she wasn't doing her job when I spoke, and that it put extra pressure on her and a really hard time.

Q.    Do you recall when this conversation occurred?

A.    We had this conversation several times.

Q.    Was there -- did you ever have a meeting that lasted a longer time than usual?

A.    So during my TEVAL meeting, we had that conversation as well.

Q.    So that would have been in 2021?

A.    Yes.

      Also, on November 2nd we had a meeting but it was

about my comments at a parent meeting, not the Board of Ed.

Q.   What did you say at the parent meeting?

A.   At the parent meeting I was trying at that point to legitimately decide whether or not to send my children back.  I was undecided.  And I explained that when I asked details about how we were going to reopen to school, administration, they said they didn't know yet, they were waiting for answers from the Board of Education.  And then when I went to the Board of Education, they said speak to your principal.  And so I felt like I was in this circle and I didn't know where to get the nitty-gritty information.

Q.   And is that what you're saying you expressed during this parent meeting?

A.   Yes.

Q.   Do you know how Ms. Gethings learned of your comments during that parent meeting?

A.   She purported to me that she was listening to the parent meeting.  It was like an online meeting, a Zoom meeting.

Q.   Was that something like a Parent Teacher Association meeting or some other parents organization?

A.    It was Central Office presenting a meeting for parents.

Q.    When you say "Central Office," what are you referring to?

A.    The Downtown Board of Education.

Q.    Of which city?

A.    New Haven.

Q.    And just so that we're clear, what did Ms. Gethings say to you specifically during this November meeting as it related to your comments at the, I guess, New Haven Board of Ed sponsored parent meeting?

A.    That my speaking made her look bad.  That it felt like we weren't on the same team.  That even if I was speaking as a parent, everybody knew who I was.  And that she had gone to a principals meeting and the superintendent had told the whole -- all of the principals to make sure the teachers are informed so we don't have this happen again.  And then pulled her and Jenny Clarino aside and said, "By the way, that example I gave you was you."  And they felt they were in trouble for my speaking.

Q.    How did it make you feel having this meeting with Ms. Gethings in November 2020?

A.    Um, scared.

Q.    Why were you scared in November of 2020?

A.    Um, because I had a moral duty not to stop speaking, but I also desperately wanted to keep good bridges with my boss.  So I didn't know how I could do both.  And my job

meant so much to me.

Q.   Why did you feel that you had a moral duty to keep speaking?

A.   Um, because before you can teach a kid to read, they have to be safe.  Because parents at that time weren't allowed in buildings.  So I was one of the very few adult eyes on the situation.  So I felt like I had to speak what I saw.

Q.   Now, prior to this time, had you ever engaged in any public speaking to advocate for, you know, students or anything else within the school district?

A.   Prior to COVID?

Q.   Yes.

A.   Yes.

Q.   What were -- give us some examples of the types of matters you were advocating for back then.

A.   We had science kits that rotated between our schools, and I advocated to get the science kits to our schools earlier in the school year.  I advocated for additional funding for New Haven schools.  I spoke in favor of one of the superintendent's renewal of his contract because he had sent an email with a quote that I found really inspirational and I found him to be an inspiring leader.  When they were considering increasing the amount of charter schools in the city, the union asked teachers to

speak about the good things happening in our schools.  So I didn't necessarily speak against charter schools, but I spoke about the awesome things happening in my class.  I spoke about the inequity between the schools.

Q.    Those examples you just gave us, were you speaking as a teacher, as a parent, do you recall?

A.    I was speaking as a community member.  I know that you're only given two minutes at the Board of Ed meetings.  Originally, it was three.  But you have to identify yourself.  And I always said, "I'm Jessica Light, a teacher, parent, and community member of New Haven."

Q.    So let's go now into January of 2021.  We're still in the 2020-2021 school year, but now we're in January of 2021.  What is the status of returning to in-person learning versus staying remote or maybe doing a hybrid?  Do you recall the status?

A.    At that time I think they decided to do a hybrid situation where some people were at home and some people were in person.

Q.    You were in a union.  Do you recall what the union's position was on this position at this time?

A.    Um, the union was aware that vaccines were right around the corner and were trying to delay the opening until teachers had their first dose of vaccines.

Q.    Do you recall if there was any discussion in that

time which teachers would come back to in-person learning and which teachers would stay remote to teach the remote learners?

A.    That's not how New Haven organized it.  What they did was we would have our in-person students in the classroom with us, but we would also have our video on us teaching so that the students at home would have a live feed of the classroom we were teaching.  So we were teaching both remote and in-person students at the same time.

MR. INTERLANDI:  Your Honor, may I approach the clerk?

THE COURT:  Yes.

MR. MURPHY:  Your Honor, I have no objection if he wants to leave the notebook over at the witness.

THE COURT:  Mr. Murphy proposes that you leave the notebook on the witness stand.

MR. INTERLANDI:  Fine with me.

THE COURT:  Actually, let's take a brief no more than 15-minute break.

Remember, leave your notebooks in the courtroom on your seat, probably put your number on the front so they don't get mixed up.  And then they will be secured and you will get them back when you come back in 15 minutes.  Thank you.

MR. INTERLANDI:  Thank you, Your Honor.

(Whereupon the jury left the courtroom.)

THE COURT:  Counsel, anything before we take our recess?

MR. INTERLANDI:  No, Your Honor.  I think we're okay for now.

THE COURT:  Ms. Light, don't speak to anybody about your testimony until you've completed it, okay?

Stand in recess.

(Whereupon, a recess followed.)

THE COURT:  We'll bring back the jury.

I take it you would have alerted me if there was anything we need to take up before the jury returns. Okay.

MR. MURPHY:  Just for planning purposes, we don't recall what Your Honor said about lunch break. 12:00?  12:30?

THE COURT:  So what I am planning is 12:15 for a 45-minute lunch break.  Such that it's 1:00 to 2:45, then a recess, then 3:00 to 4:00.  Does that sound okay with you?

MR. INTERLANDI:  That's fine.  Yes, Your Honor. Thank you.

MR. MURPHY:  Yes.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated.

Ms. Light, would you kindly return to the stand.

You may proceed.

MR. INTERLANDI:  Thank you, Your Honor.

As discussed before the recess, may I approach to give the witness my binder of the plaintiff's exhibits?

THE COURT:  Yes.  Is there enough room for your exhibit book?

BY MR. INTERLANDI:

Q.   Jessica, I've put in front of you Plaintiff's Exhibit 45.  Have you seen this document before today?

A.   Yes.

Q.   What is this document?

A.   It is an email from -- well, it's an email chain.

Q.   Who is it from?

A.   So it says from Sarah Miller to Jessica Light.

Q.   Below that?

A.   It is from the union president to the mayor, the superintendent, and the head of the -- the president of the Board of Education.

Q.   Exhibit 45, does that accurately reflect the position of your union as it related to the school reopening in or around January 14, 2021?

A.   Yes.

Q.   The position of the union was what?

A.    Um, the -- um, that the reopening proposal was missing crucial information that puts lives at risk.  We needed a more formulated plan.

Q.    Okay.  And did you agree with that position?

A.    Yes.

Q.    I just want to go back to the parent meeting that you talked about that was towards the end of 2020.  What were the details that you were expressing that you needed in order to make a decision about sending your kids back to school?

A.    Um, how distanced students would be from each other, how large the classes would be, if mask breaks would be taken outside or inside.  And since the teachers were going to be teaching to the remote learners as well, if the people in school would be on their computers all day anyway, it kind of felt like -- as it was described to me, it kind of felt like the students in the school would still be getting remote learning just be housed in the schoolroom because they would have to be on the computer to interact with the teacher that was teaching remotely to the other students.

Q.    In January of 2021 did your employer provide information in terms of any of the positive cases that it had within the schools in the district?

A.    Could you repeat the question?

Q.    Yeah, that was probably not a great question.

Did the school -- did your employer provide information about any positive COVID tests or instances of people within the school system?

A.    Yes.

Q.    Where did you -- how did you learn about that?

A.    On New Haven Public Schools website they had a dashboard of cases per school.  And schools were sending out letters.

Q.    So when you say cases per school, is that student COVID and teacher COVID positive tests or is it just for students?

A.    Um, I believe the dashboard on New Haven's site might have been the two conflated.  And the chart on the Health Department site had it separated.

Q.    Separated for what?

A.    Student data and community data.

Q.    When you say letters, what are you referring to?

A.    Um, so schools would send out a letter saying there have been three instances of COVID in our schools, zero people have had to quarantine, or -- they were just informing parents of what was going on in the schools.

Q.    During this time frame January 2021 did you ever receive a letter from Hooker about a positive student case in the school?

A.    No.

Q.    Did you receive a letter at all for the rest of that 2020-2021 school year, January to June?

A.    No.

Q.    Have you ever heard of a group New Haven Public School Advocates?

A.    Yes.

Q.    Do you have an understanding of what organization does?

A.    Yes.

Q.    What does it do?

A.    Um, it is a group largely of parents but also some teachers that advocate for different public school initiatives.  Sometimes I agree with their position; sometimes I don't.

Q.    Is there a membership -- can you become a member of that group?

A.    I don't think it's that organized.

Q.    Do you know who organized that group?

A.    Sarah Miller.

Q.    Is that group still functioning today in 2024?

A.    Um, I believe their Facebook page is still up, but I haven't heard of a meeting happening in several years.

Q.    Did you ever advocate with similar positions as the New Haven Public School Advocates?

A.    Absolutely.

Q.    Do you recall any of the sorts of things that you advocated for that were similar to what that entity or organization was advocating for as well?

A.    Yes.  At one point there was -- proposed a lot of teacher layoffs.  Also, the New Haven Advocates were wanting a delayed reopening as well.

Q.    What did you speak on with regard to the teacher layoffs?

A.    Um, that I didn't want teachers to be laid off.

Q.    Has the employer ever asked you or your colleagues to speak on its behalf?

A.    Yes.

Q.    I'm going to direct your attention to Plaintiff's Exhibit 41 in the binder in front of you.  Let me know when you're there.

A.    I'm here.

Q.    Okay.  This appears to be an email string.  Do you recall seeing this before today?

A.    Yes.

Q.    What is this document?

A.    Central Office of New Haven Public Schools had -- Keisha Redd-Hannans, the assistant superintendent, had asked teachers to speak at a state -- I don't remember if it's a council, at the state level for funding for

New Haven Public Schools.

Q.   And did you oblige and speak?

A.   Yes.

Q.   Did you send your testimony to Ms. Hannans to show her that you did in fact speak publicly for the school district?

A.   Yes.

Q.   And what is the date of -- what was the date that you provided the testimony?

A.   March 4, 2021.

Q.   Thank you.

A.   And she replied thank you.

Q.   "Thank you so much Jessica."

So Facebook, have you ever been a member of Facebook?

A.   Yes.

Q.   Are you familiar with social media?

A.   Yes.

Q.   Are you still on Facebook?

A.   Yes.

Q.   I'm going to direct your attention to the binder in front of you, Exhibit 2, Plaintiff's Exhibit 2.  Let me know when you're there.

A.   I'm here.

Q.   So in March of 2021 you had a Facebook account.  Were you -- was it just something that you signed up for and it

just sat there, or was it something that you did post things like photos and comments, things like that?

A. I would post regularly.

Q. So you posted regularly.

What sorts of things were you posting about in the early part of 2021?

A. Um, I would post pictures of my kids. I would post funny jokes. I would post political positions.

Q. Were you friends with any of the teachers that you worked with on Facebook?

A. Yes.

Q. Do you recall in that early period of January to March 2021 which teachers at Hooker you were friends with on Facebook?

A. Um, I remember a few, yes.

Q. Which ones?

A. Paul Salem, Hillary Alden, Ms. Cavanaugh, Tim Shortt, Kathleen Morrison, Kyle Miller, Julie Villaueva, Laurie Gwiazda.

Q. Say the last name again?

A. Gwiazda. Ms. Tortora.

I think that's all I remember right now.

Q. Were you friends on Facebook with any of the administrators at Hooker?

A. No.

Q.    Paul Salem, you mentioned.  What grade did he teach at Hooker?

A.    Third.

Q.    How about Hillary Alden?

A.    Second.

Q.    How about Judie Cavanaugh?

A.    Art.

Q.    Mr. Shortt?

A.    5-6 science.

Q.    How about Ms. Morrison?

A.    7-8 math.

      Ms. Kegel.

Q.    What was the last name?

A.    Ms. Kegel.

Q.    What did she teach?

A.    Music.

Q.    How about Mr. Miller?

A.    He was the math coach.

Q.    How about Ms. Villanueva?

A.    She was second grade.

Q.    Ms. Gwiazda?

A.    Ms. Gwiazda was 5-6 language arts.

Q.    How about Ms. Tortora?

A.    First grade.

Q.    The last teacher you mentioned, Ms. Kegel?

A.    Ms. Kegel was music.

Q.    Music, got it.  Okay.

So now I'm showing you Exhibit 2, Plaintiff's Exhibit 2.  It is a post by someone other than you.  Who made this post?

A.    Melody Gallagher.

Q.    Do you know Melody Gallagher?

A.    I have met her at union meetings, but I don't know her well.

Q.    Is she a teacher within the New Haven Board of Education system?

A.    Yes.

Q.    Do you know which school she taught at?

A.    I know that it was high school.

Q.    So you know she was a high school teacher for the Defendant Board of Education.  And she made this post on March 9, 2021; is that right?

A.    Correct.

Q.    And is this just her own post or is she sharing a post of someone or something else?

A.    She's sharing a post from the New Haven Public School Advocates.

Q.    What is the post itself?  What is she sharing?

A.    Melody Gallagher had been collecting examples of all of the letters sent from all of the schools to make sure

that the New Haven Public Schools database of COVID cases and the state database of COVID cases and the letters all matched and that we weren't missing information and that everything was transparent.

Q.   These were the letters that you were referring to earlier where you were saying the school would send letters to parents?

A.   Yeah, they'd send them to parents.

Q.   And when this was posted, did you see it on Facebook?

A.   Yes.

Q.   And did you make any comments to the post?

A.   Yes.

Q.   So let's look at page 2 of Exhibit 2.  And I see your name there.  What were your comments to Melody Gallagher sharing the original post of the New Haven School Advocates?

A.   "I don't think letters were sent."

Q.   And then did Melody respond to you?

A.   She asked me if it was at my school.

Q.   Did you have a reply?

A.   I said, "Hooker never sent a letter."

Q.   Okay.  And so why did you say Hooker never sent a letter?

A.   Because, as a parent, I should have received a letter if they sent a letter.  Given that I never got a letter, I

didn't think they sent it.  So I was just trying to help her understand why there were less letters than cases.

Q.   Why did you say that?  Was there any reason that led you to believe that you should have received a letter?

A.   Yeah.  Other weeks Hooker hadn't been listed on the state data.  But that week Hooker was listed as having less than six cases.  And the state had stated that less than six was more than zero.

Q.   Okay.  And on page 3 of Exhibit 2 there's a comment that you made in response to someone else.  What was your comment to -- well, do you know Mr. Kenneth Caldwell?

A.   No.

Q.   What was your response to him?

A.   That I thought the rules around when letters should be sent out should be clarified because different schools were doing different things.  So some schools would only send out letters if people needed to be quarantined.  Other schools would send out letters and just say zero people need to be quarantined.  So I thought there needed to be a unified plan.

Q.   Did any of the other teachers that you mentioned earlier -- Mr. Salem, Ms. Alden, Mr. Miller, Ms. Morrison -- did any of them make comments to this post by Melody Gallagher?

A.   Not to my knowledge.

Q.   Did any of those teachers you mentioned or anyone else at Hooker, even the administrators, see this post and make comments in response to your comments?

A.   No.

Q.   Was this a private post only certain people could see?

A.   No.

Q.   Did you then receive any response from your administrators directly after you made these comments to this Facebook post?

A.   Yes.

Q.   And what response did you receive from the administrators after you made comments to Melody Gallagher's Facebook post?

A.   I was told that I was giving incorrect information about the school, that I was creating a negative narrative, that I was causing the community to be fearful when there was nothing to be afraid of, that I was not operating as a teammate.

Q.   Did you have a response for them?

A.   I said that I simply stated that I didn't receive a letter and there was no judgment.

Q.   What do you mean "no judgment"?  What does that mean?

A.   I didn't know if they were required to send a letter. I was just trying to clear up why there wasn't a letter.

I never got one.

Q.   And at this time, just to be clear, March 9, 2021, you had two children at Hooker; is that right?

A.   Correct.

Q.   Shortly after the conversation that you had with Ms. Gethings, did Ms. Gethings send an email out to the entire school community that referenced at least your social media post, in part?

A.   Yes.

Q.   I'm going to direct your attention to Plaintiff's Exhibit 3.  Let me know when you have it.

A.   I've got it.

Q.   Did you receive this email from Ms. Gethings?

A.   Yes.

Q.   And what is the subject of this email?

A.   That it's been brought to their attention that people are speaking negatively of Hooker on social media and to please not do that and to let them know if anyone does it.

Q.   Did you reply to this email?  Did you reply to Ms. Gethings after she sent this email to the entire school community?

A.   I don't believe so.

Q.   Did you have a -- how did you feel after having spoken to Ms. Gethings about the Facebook comments and then seeing this email, how did that make you feel?

A.    Targeted.  Isolated.

Q.    Why?

A.    Because when speaking to her, I had tried to explain to her that there was no judgment, and I thought that we had gotten on pretty okay ground.  And I felt like she was painting my actions in a really negative light to the whole community.  And that -- well.

Q.    Did she tell you how she saw your comments to that Facebook post?

A.    At one point Jenny Clarino said she had seen them on New Haven Advocates, but then I think Ms. Gethings told me that teachers had texted her my comments.

Q.    Did she tell you which teachers texted her your comments?

A.    I believe it was Kathleen Morrison, Meghan Rose, and maybe Ms. Cav.

Q.    Ms. Cav?

A.    Cavanaugh.

Q.    Did you have any other feelings about what she said to you regarding the Facebook comments or receiving this email that went to your peers and colleagues at Hooker?

A.    Um, I felt isolated and, I don't know, sad.

Q.    Did you provide misinformation in the Facebook post in March 2021?

A.    No.

Q.   So tell me about Judie Cavanaugh.  Who is she?

A.   She was the art teacher at Worthington Hooker.

Q.   Do you know if she's still the art teacher there?

A.   She retired this year.

Q.   And in March of 2021 was she the art teacher for one or both of your children?

A.   Yes.

Q.   Both of them or just one?

A.   Both.

Q.   How was your working relationship with Ms. Cavanaugh?

A.   Initially, we were very friendly.  I'm a kind of artsy person.  She complimented a lot of the things I did; I complimented a lot of things she did.  We liked each other.

Q.   Did she speak to you at all about your comments to Melody Gallagher's Facebook post?

A.   No.

Q.   Did Ms. Alden come and speak to you about any of the comments you made to Melody Gallagher's Facebook post?

A.   No.

Q.   Did Ms. Morrison come to you and speak to you about any of the comments you made to Melody Gallagher's post?

A.   No.

Q.   At the time you were teaching third grade.  Which grade was Ms. Morrison teaching?

A.    7-8 math.

Q.    Would she have been in the same building as you are?

A.    Yes.

Q.    And Ms. Cavanaugh, where was she located physically? Was she in one building?

A.    She moved between the two buildings.

Q.    Ms. Tortora, did she come to you and say anything to you about the comments you made to Melody Gallagher's post?

A.    No.

Q.    Did anyone, any teachers come to you and say they saw your comments and had a problem with it?

A.    No.

Q.    How about any teachers -- I'm sorry, any parents, parents of your students, did they see your Facebook comments and make a statement to you about what you said?

A.    No.

Q.    Any parents anywhere, anyone come to you and say, hey, I saw your comments and I don't appreciate them; anyone say that?

A.    No.

Q.    So we're around that mid-year point as I understand it when you explained the mid school year.  Did you have a performance review with Ms. Clarino and Ms. Gethings at the mid point of the 2020-'21 school year?

A.    I did.

Q.    Do you recall approximately when that occurred?

A.    Towards the end of March.

Q.    Do you recall how long that TEVAL meeting lasted?

A.    An hour and a half.

Q.    Was that typical, in your experience?

A.    No.  We sign up for 15-minute time slots.

Q.    What do you mean you sign up?  Where do you sign up?

A.    In the main office there's usually a sheet of when the principals or administrators are available to meet. And every 15 minutes there's a line for another person to sign up.  So it would be like 1:00, 1:15.

Q.    Who did your review for the 2019-2020 school year?

A.    Ms. Gethings.

Q.    Was Ms. Clarino present for that?

A.    No.

Q.    How long did that TEVAL meeting last?

A.    Fifteen minutes.

Q.    In your career teaching for the defendant New Haven Board of Education, has any TEVAL meeting lasted more than 30 minutes that you've had other than the one in March of 2021?

A.    No.

Q.    So you had a teacher evaluation meeting with just Ms. Gethings for the 1920 school year.  Earlier you

testified about ratings.  Do you recall the rating that Ms. Gethings gave you for that school year?

A.    Yes.

Q.    What was the rating?

A.    A 5.

Q.    And just remind me, what does 5 mean?  Does it have any significance?

A.    It's the top rating.  In the comments she said my classroom was the embodiment of the joy of learning.

Q.    And then just one year later you had another TEVAL meeting with Ms. Gethings joined by Ms. Clarino, right?

A.    Correct.

Q.    And what was discussed during this teacher evaluation meeting?

A.    Um, my public speaking and my role on the PTA and my Facebook posts, um, and how that reflected on my professionality.

Q.    So let's unpack that.

      Let's start with the Facebook posts.  You said posts, plural.  Were they talking about more than one post or were they talking about the comments that were in Exhibit 2?

A.    I think they're talking about the comments.

Q.    So they weren't talking about other Facebook posts that you made?

A.    Correct.

Q.    I just wanted to make that clear.

So they talked about that.  And then you said something about the PTA.  What were you referencing there?

A.    So they sat down at the table.  Um, Ms. Gethings asked me, "So what exactly is the title of your role in the PTA?  Is it teacher representative or parent teacher vice president?"  And clarified my role on the PTA prior to the beginning of my teacher evaluation.

Q.    And then you said you also discussed your public speaking during this teacher evaluation meeting?

A.    Yes.

Q.    Let me just take a step back from there.

Have you ever, with any of the people reviewing you, talked about things other than your performance during the teacher evaluation meetings?

A.    No.

Q.    So she asked you about public speaking.  What specifically was she talking to you about in regard to your public speaking?

A.    Um, about how it made them feel uncomfortable.  Again, she talked about how she got a lot of phone calls after I spoke.  And that it was causing fear in the community and made them feel like I wasn't a team player and I was making a tough situation tougher on them.

Q.    Did you have a response to them when they told you that?

A.    Yes.

Q.    How did you respond to this?

A.    Um, I really wanted to keep bridges open.  So I tried my -- I tried my very best to explain that I had a moral obligation to speak on safety concerns.  But I offered -- like I explained to them that it was no criticism on them, which is why I never mentioned the school itself.  But that I wanted a unified plan.

I offered to -- they said they felt blindsided by my comments.  I offered to give them a copy of what I was going to say before I spoke so that they wouldn't be blindsided.  I offered to even let them -- like, if there was something that I was going to say that they didn't think was right, I would take their comments into consideration before I spoke.  They didn't accept that compromise.

I explained that I had to be able to look at myself in the mirror.  But that I -- I was also willing to go to the Board of Ed and state publicly that I believed them to be good administrators and that it was not their fault.

So I was really trying to come up with ways that I could speak without hurting my relationship with them. But none of my olive branches were taken.

Q.   Did Ms. Gethings reference any specific comments that you made at Board of Education meetings?

A.   That I did not want to die.

Q.   Okay.  Did you say that at a Board of Education meeting?

A.   Yes.

Q.   Do you recall when you said that?

A.   I believe it was January.

Q.   Why did you make that comment at a Board of Education meeting?

A.   Um, because at the Board of Ed, you only get two minutes.  So quite often you become white noise unless you open fairly dramatically.  And it was true.  I didn't want to die.  We were told vaccines were two weeks away.  So it didn't make sense to me that we should risk student and staff lives for ten days.

Q.   Were you also concerned about the safety of your children at that time?

A.   Yes.  And my family, if I became infected, absolutely.

Q.   Did Judie Cavanaugh come up at all during your teacher evaluation meeting?

A.   Yes.

Q.   Why did Judie Cavanaugh come up during your teacher evaluation meeting?

A.   Because there was a rumor that I had said -- told parents that Ms. Cavanaugh had COVID.

Q.   Did you say that?

A.   No.

Q.   Did you ever tell anyone and identify Judie Cavanaugh as someone who had COVID at Hooker?

A.   No.

Q.   Did you have a response for Ms. Gethings when she accused you -- let's strike that.

     Did you have a response for Ms. Gethings when she told you about this rumor you were spreading about Ms. Cavanaugh having COVID?

A.   I told her it wasn't true.

Q.   What did she say in response to that?

A.   She said that that may be my truth, but it's not her truth.  I'm the only name coming up.  Everyone thinks it's you.  No one trusts you.

Q.   Did she make that comment to you during this meeting or a subsequent meeting?

A.   I know she made it during a subsequent meeting.  I believe she also made it during our first meeting talking about Ms. -- we had three meetings talking about Ms. Cavanaugh.  I'm not sure which one each thing was said at.  I'm sorry.

Q.   That's okay.

But you've been pretty specific about some of the things said at this teacher evaluation meeting.  How are you able to be so specific given that it was, you know, three years ago?

A.   I made a recording.

Q.   So you recorded it.  How did you record it?

A.   On my phone.

Q.   And did you save it on your phone?

A.   Yes.

Q.   After you saved it, did you do anything to alter or modify the audio file?

A.   No.

Q.   What I'm going to do is point you to Exhibit 24 in your binder.  If you can look at that and let me know when you're there.

A.   I'm here.

Q.   Is this a transcript of the audio recording that you took at the teacher evaluation meeting?

A.   Yes.

Q.   And the teacher evaluation meeting, what date was that?

A.   March 26.

Q.   Of what year?

A.   2021.

Q.   Thank you.

Did anything else come up regarding your teaching or your teaching assignment during your teacher evaluation meeting?

A.    Yes.

Q.    What was discussed regarding your teaching or your assignment for the next school year?

A.    That I was likely going to be moved to the Little Building.

Q.    When you say the Little Building, is that the K through second grade?

A.    Correct.

Q.    Okay.  And did you have a response for that?

A.    Yes.

Q.    How did you respond to learning that it was likely you would be reassigned to the Little Building?

A.    I explained that all of my experience was in upper grades.  And that I had been teaching in New Haven for a long time, all of it in the upper grades.  And I had not received any training for the lower grades.  I have dyslexia, and I found it difficult to do some of the phonics components of my son's kindergarten, first grade, second grade work.  So I didn't think it would be of service -- it wouldn't be a good fit for the students or myself.

Q.    And you explained all of this during the meeting?

A.    I believe so.

Q.    I'll turn your attention to pages 11 and 12 of Exhibit 24.  Let me know when you're there.

A.    Did you say 11?

Q.    Yes, please, 11.

A.    I am here.

Q.    Okay.  I'm going to direct your attention to line 11 on page 11 where it starts with Ms. Gethings stating, "And we don't know exactly who will be teaching what," do you see that?

A.    Yes.

Q.    Is this where the discussion about the reassignment started?

A.    It appears so, yes.

Q.    And just to be clear, your response, is that contained anywhere in pages 11 and 12?

A.    Yeah.  At the end of page 11, I say, "So I guess my -- like with all transparency I have severe dyslexia and I'm very nervous about the word study components of that."

Q.    And what else did you say?

A.    Um, then Ms. Clarino asked a clarifying question.  And then I say, the word study like the phonics component of the lower grades.  I came from fifth grade at Davis.  So third grade, and I've done some -- some of that, some

root, using roots and stuff for my English language learners.  But, you know, Daniella -- she was the literacy coach -- really tried to help me with word study.  It was in my TEVAL last year that it was weakness.  When I tried to help Wesley with his homework, I thought everything was an oddball.  Like I really can't share it or teach it, so it would be really difficult for me to teach a grade significantly lower than third.  I'm willing to do a workshop over the summer.

Q.    That year, for the mid-year, did you submit a preference sheet for 2020-2021 school year?

A.    Yes.

Q.    Do you recall what your preference was?  What was at the top of the list?

A.    Third grade.

Q.    What was at the bottom of the list?

A.    Kindergarten.

Q.    What was second to the bottom?

A.    First grade.

Q.    But you're certified to teach K through 6?

A.    Yes.

Q.    So what's the big deal?  Why can't you just go teach first grade?

A.    Um, I am certified to teach K-6.  I think having coming directly out of college, had I been given a lower

grade, the professional development that I received from New Haven would have been focused on phonics. But now that I am decades since I've had a phonics class and my expertise is in the higher grades, it makes sense to put someone in the phonics component that is better at it than me.

Q. And at this point they didn't tell you you were definitely going to first grade?

A. No. They just said it's looking like the Little Building.

Q. In my understanding, was this different than your experience at Davis where I think your earlier testimony was you had a conversation with the administrator there first, right?

A. Right.

Q. Was that conversation that you had part of your TEVAL meeting or was that part of a different conversation?

A. It was a different conversation.

Q. And was it typically around the mid-year point or was it earlier than that?

A. Um, it was around -- it was around that time, maybe a little earlier. But, like I said, even when it wasn't my preference, I understood my grade being changed before.

Q. Okay. And if they would have put you in first grade -- they, being Mrs. Clarino and Mrs. Gethings --

let's say they told you in April, how long would you have had to get yourself ready and prepared to teach first grade for the next school year?

A.    Not very long.  I mean, as I said here, I was willing to take a summer workshop.

Q.    This meeting in total, how did it make you feel?

A.    Terrified.  Isolated.  Frustrated.  Voiceless.

Q.    Why did you feel voiceless?

A.    Because it seemed like everything had been decided and nothing I said mattered.  So I was trying to come up with other solutions, and none of them were taken.  I was truly worried about being able to serve the students. That didn't seem to be considered.  I was told that Ms. Cav was going to file a complaint against me, someone I thought was a friend, who hadn't said anything was wrong.  So I really questioned a whole lot of how I perceived the school and how others perceived me.

Q.    What were you frustrated about?

A.    I was frustrated that I knew I was -- I trusted my -- I knew I was right, but it didn't matter.  I was frustrated that I had put in my time to New Haven Public Schools and that I had always been willing to change my grade or do whatever was best for the school, but I truly didn't believe that this was for the betterment of the student.  I thought they were just out to get me.

Q.   You testified a little while ago that you spoke at a January 2021 Board of Education meeting.  Did you speak at any subsequent Board of Education meetings in February and March of 2021?

A.   No.

Q.   Why not?

A.   Fear.

Q.   Fear of what?

A.   Well, the retaliation had gotten too much.  It was clear that they didn't want me to speak.  It was clear that if I continued to speak, I wouldn't be in the good graces with my boss.

Q.   Still looking at Exhibit 24, I'm going to direct your attention to pages 19 through 21.  Let me know when you're there.

A.   I am here.

Q.   Is this the part of the teacher evaluation meeting when the administrator started to talk to you about your Facebook comments?

A.   Yes.

Q.   What did Ms. Gethings say specifically as it related to your Facebook comments?

A.   She said "what I do know is that, and I saw it myself, there were pieces where you were commenting on Facebook that our school didn't send out letters.  Do you

know what I'm referring to?"

Q.    Your response?

A.    My response was, "I never referred to a teacher having anything on Facebook."

Q.    And then what did she say?

A.    "No, but you said our school didn't send out letters."

Q.    And then did you reply?

A.    I replied, "I said that our school hadn't sent out any letters and that the state thing said that we had below six.  I did say that."

Q.    And then she asked you, "So why do you think we didn't send that letter?"

      And what did you say?

A.    "I don't know."

Q.    And this was also -- I direct your attention to page 18.  At the bottom of 18, is that where -- bottom of page 18 of Exhibit 24, is that where the administrators during your teacher evaluation meeting started to talk to you about Judie Cavanaugh and whether or not you disclosed her COVID status to other people?

A.    Yes.

Q.    If you can read where it starts at line 23, what did Ms. Gethings say to you?

A.    "We know that this year has been stressful for

everyone.  I can speak to that we are anticipating a written statement from Ms. Cav who is -- had -- feels that she has a complaint against you, and I don't think this has been brought to you from her because it's relatively new.  But she feels that her health was spoken about by you and that she was not given the privacy as an individual that she deserves.  And I know you told us it wasn't you that told Claire and it wasn't you that told parents and only you know what you did or didn't do."

Q.   Thank you.

Did you eventually meet with Ms. Cavanaugh and other folks at Hooker School to talk about this issue?

A.   Yes.

Q.   And do you recall the date of that meeting?

A.   No.

Q.   Okay.

A.   Sorry.

Q.   I'm going to direct your attention to Plaintiff's Exhibit 25, it's the next exhibit in the binder.  Let me know when you're there.

A.   I'm there.

Q.   And so did you record this meeting?

A.   Yes.

Q.   How did you record it?

A.   On my phone.

Q.   Did you save the audio file on your phone?

A.   Yes.

Q.   After you recorded it, did you do anything to alter or modify the audio file?

A.   No.

Q.   Is what's shown in Exhibit 25 a transcript of the audio recording that you took on March 31, 2021?

A.   Yes.

Q.   Who else was here at this meeting on March 31, 2021?

A.   Ms. Clarino and Kathleen Morrison, Ms. Cav, myself, and Ms. Gethings.

Q.   So five people in total?

A.   Yes.

Q.   Why was Ms. Morrison there?

A.   I was not told beforehand that she was going to be there, but she was the union steward for our school.

Q.   Why was Ms. Clarino there?

A.   I don't know.

Q.   How long did this meeting last?

A.   Um, I'm not sure the exact time, but quite a while.

Q.   What was discussed at this meeting?

A.   Um, Ms. Cav said that she wasn't going to file a complaint against me because there was no evidence that I had leaked her information, but that she did feel like her privacy had been breached in some way.

Q.   Did you have a response for her?

A.   I said that I was so sorry she had to deal with it and that I hadn't breached her information and that I hadn't even known she had COVID at the time.

Q.   Did there come a point in time where you learned that she had COVID?

A.   Yes.

Q.   And how did you learn that she had COVID?

A.   Um, she eventually emailed me that she had COVID when I asked if she was okay -- like, she kept emailing us saying I'm not going to come to art today, I'm not going to come to art today.

Q.   When were those emails?

A.   Um, the month of February she was gone.

Q.   Okay.  And is this where Margaret-Mary Gethings made the defamatory statement about you?

A.   Yes.

Q.   I'll direct your attention to page 19 of Exhibit 25. Let me know when you're there.

A.   I'm on page 19.

Q.   Let's start at line 8.  Can you read to the jury the defamatory statement that Ms. Gethings made about you?

A.   "And just so you know, Jessica, we spoke with Judie before and said anyone -- and we can respect some people do not want their names mentioned and they certainly

deserve that respect. No one person has said anyone besides you as being the source. We hear that you're saying it wasn't you, but I need you to know that every person said you were the source."

Q. Did you have a response for that?

A. "Who's every person?"

Q. And what did she say in response to your question?

A. "I just said I'm not -- there's -- because I know what you will do and go right to them. They do not want to be dragged into this. But I told you a week ago this is not an easy conversation for us to have. We are very concerned but we do not have to tell you their names and I promised them that I would not tell them."

Q. Did she ever tell you the names of the people or, I guess, everyone, every person that said it was you?

A. No.

Q. How did this meeting make you feel?

A. Um, very isolated.

Q. Why?

A. Um, because I thought I had good relationships with my teacher friends and my colleagues. And to hear that everybody doesn't like you and that nobody trusts you, um, makes you second-guess every relationship you have.

Q. Did you have any other thoughts or feeling about this meeting after you left it?

A.   Um, I felt hopeless.  I felt depressed and angry.

Q.   Why were you feeling hopeless at that time?

A.   Um, because by this point it was the third meeting where I had said it wasn't me.  And then every meeting always ended with, well, I still have concerns.  So it felt like no matter what I said or what I did, there would always just be another meeting about them having concerns.  Because there was no way I could prove something -- a negative.

Q.   After the teacher evaluation meeting that you had a few days earlier, did you receive a written document for your teacher evaluation?

A.   Yes.

Q.   Do you recall receiving that?

A.   Yes.

Q.   Did you have any thoughts or feelings about it at the time?

A.   Um, I did not agree with the comments that Ms. Gethings put in the document.

Q.   Let's turn to Exhibit 4 in the notebook in front of you.  Let me know when you are there.

A.   I'm here.

Q.   This appears to be what part of your teacher evaluation?

A.   The comments.

Q.    Typically, how many pages is the teacher evaluation, if you recall?

A.    It's an online form.  Maybe a couple pages.

Q.    So this is just the last page of the document.  And you said there's a comment section.  What were the comments that you were concerned about that were entered into your teacher evaluation feedback?

A.    "As we discussed in your mid year please consider asking questions any time you have a concern, if we do not have the answer we will do our best to attain the answer."

Q.    Why were you concerned about that comment?

A.    Um, because it felt like she was, again, asking me not to speak at the Board of Ed.  She was saying go to her.  And any administrator that read that would see it as me not understanding kind of the chain of command.

Q.    Why would any other administrator ever read this document?

A.    Um, well, I know when I got the position at Hooker, Dr. Robles read the comments of my previous TEVALs from Davis.

Q.    Is that the reason why you feel future administrators would look at this document?

A.    Yeah.  Every time that you apply as an internal candidate, they see the comments on your TEVAL.

Q.    Did you have any other thoughts or feelings after

receiving this written teacher evaluation signed by Margaret Gethings on April 1, 2021?

A.    Um, no, just apprehension.

Q.    Why apprehension?

A.    Um, because I could tell our relationship was not where it used to be.

Q.    Do you recall the number rating you were given for this teacher evaluation?

A.    I don't believe I was given a number evaluation.

Q.    What's the basis for your belief that you don't believe you received a number rating?

A.    Prior to the number ratings going in, I filed a complaint.

Q.    Okay.  We'll get to that in a minute.

Tell me about any committees or -- let's stick with committees.  Any committees that you work on when you first arrived at Hooker as a new teacher through the 2020-2021 school year?

A.    I was on SPMT.

Q.    Again, what is that acronym, in case people forgot?

A.    School Planning & Management Team.

Q.    Thank you.  Let me stop you there, actually.

What does the School Planning & Management Team do?

A.    So it's supposed to have stakeholders from all parts of the community -- teachers, parents, administration --

to help govern the school on a more micro level than the Board of Education.

Q.    How many years were you on the SPMT?

A.    I was on the SPMT my whole time at Hooker, and I was on it at Davis as well.

Q.    Were there any other committees that you served on while you were at Hooker?

A.    Yes.

Q.    What were the committees?

A.    I was in the Gardening Committee.

Q.    What else?

A.    Um, I am drawing a blank.  Any committee I was offered, I would take up.

Q.    Okay.

A.    The Play-Based Learning Committee.

Q.    What was that again?

A.    The Play-Based Learning Committee.

Q.    What is Play-Based Learning Committee, what does that do?

A.    It was an initiative to get more play into the classroom.

Q.    Was that your initiative or was that the school's initiative?

A.    I think it was Ms. Gethings'.

Q.    I direct your attention to Exhibits 9 and 10 in the

binder in front of you.  Let me know when you're there.

A.    I'm there.

Q.    Before we talk about Exhibits 9 and 10, have you ever been a teacher representative with the PTA?

A.    Yes.

Q.    And did there come a point in time where Ms. Gethings either took you off of committees or questioned your role on, for example, the SPMT or as a teacher rep on the PTA?

A.    So, for SPMT, Ms. Gethings asked a colleague if he was willing to be the chair of the committee.  He said no. So I knew she was looking for a chair.  I offered to be a chair.  Um, she said, well, we'll have to think about it and see who else would like to do it.

     The PTA originally created the position or approached me with a position of the parent/teacher representative because I was the only person that was both a parent and a teacher, so it was a position created for me.  But after my TEVAL, I believe it was two days, Ms. Gethings sent notice to the whole school of opportunities for teachers. The PTA's going to have elections soon, anyone is welcome to run for the parent/teacher representative role.  I wasn't going to deal with the political fight, so...

Q.    And how about any of the committees?  Were you given the opportunity to continue on those committees or were you taken off?  How did that happen?

A.    So, the Gardening Committee, we had -- it was called Gardening, but it was really the Outdoor Space Committee. We created like this beautiful live edge picnic table area for the students.  We built an amphitheater for an outdoor classroom.  We did have gardening beds.  But our big events, we had two big cleanups for the year which the Gardening Committee organized.

    At the same time that she asked for other people to run for the PTA, she also announced that I believe it was the Boys Club was going to be doing the Garden Cleanup Day and that the Garden Committee would essentially not have a role.

Q.    When you say "we," in reference to the Garden Committee, who are you referring to?

A.    Um, so the Garden Committee was myself, a couple of other teachers that came in and out, and parents.

Q.    Any of the teachers that we've mentioned today already?

A.    Ms. Carloni.  I don't know if we've mentioned her.

Q.    Carloni.

A.    Mr. Salem was on the Gardening Committee at one point.

Q.    When you describe what you were doing with the live edge and the garden beds, when did that occur?

A.    So we started making the outdoor spaces prior to

COVID, so the live edge picnic tables were done the year before COVID. The amphitheater was built in the 2020 -- like mainly the summer. And then that spring fair we had the kids' mosaic to make it pretty.

Q. If I understand your testimony, there was no other teacher at Hooker who also had a child at Hooker?

A. At the time.

Q. Did there come a point in time while you were working there that there was a teacher?

A. Not while I was working there. The year after.

Q. Okay. And looking at Exhibits 9 and 10, have you seen those documents before today?

A. Yes.

Q. Just generally, what are these two exhibits in front of you?

A. I was explaining -- I had talked to my union president about how I was feeling pushed out of committees and feeling pushed out of the school, in general. And these were specific examples, so that it wasn't just based on my feeling but actual opportunities that I felt I had missed. Just trying to back it up with a little data instead of just my emotions.

Q. And did there come in point in time where you had a meeting with Ms. Gethings to address your concerns?

A. Yes.

Q.    And these documents that are in Exhibits 9 and 10, do you know if those documents were created after the meeting you had with Ms. Gethings?

A.    Um, I'm not sure when -- I know that my concerns were given to her before the meeting.  I don't know when she drafted her responses to my concerns.

Q.    So if you look at Exhibit 9, it appears to be an email from April 23, 2021, and the first line is "As a follow up to our meeting on Tuesday."  Does that refresh your memory?

A.    Yes.

Q.    So do you think these were created after?

A.    I believe so.

Q.    Exhibit 10 is your response?  Is it not your response to Ms. Gethings' replies to your concerns?

A.    Correct.

Q.    And they're what we've already just discussed?

A.    Yes.

Q.    Okay.

A.    It also has the other committees that I blanked on earlier when you were asking.

Q.    Did you have any thoughts or feelings at this time mid to end of April as it related to the committee issue, the other issues in these documents, 9 and 10, the March 31 meeting with Ms. Cavanaugh, Gethings, and the

rest, and then the teacher evaluation?  How are you feeling now?  You're at the end of April, what were your thoughts and feelings?

A.   Um, I really felt like I just wasn't wanted there.

Q.   Why?

A.   Because in every position I offered to help, I was kind of pushed aside.  And it was clear that, you know, things had changed.  Yeah, I had thought, you know, maybe this is in your head.  But then, like, when -- we didn't even have an SPMT that year.  And she said because she was still looking for a chair at the end of the year when I had offered to chair.  Every, like, opportunity that was emailed out.  So, like, there was like a summer play-based learning opportunity, does anybody want to do it?  I'd say yes.  I'm already on the Play-Based Learning Committee, I already wrote the grant with the PTA to get the materials, but I'm not one of the teachers considered.

     Each individual one of these things would have been understandable.  You want to spread out the responsibilities in a community.  But when you're hit with every single time that you volunteer or you position yourself in a room, being told no thank you, um, it stops being a coincidence.

Q.   Did there come a point in time in the end of April of 2021 that you learned you would be reassigned to a

specific grade?

A.   Yes.

Q.   Do you recall approximately when that occurred?

A.   Um, probably around April -- between the 20th and 28th, I'm not sure.

Q.   I want to jump back for a second as it relates to reassignment.

September to December of 2020, had any of the administrators come to you and said, hey, we're thinking about making some changes, just giving you a heads-up?

A.   At what point?

Q.   September to December 2020.

A.   No.

Q.   And how about before the teacher evaluation, had there been any discussion at all about changes and that you were going to be part of a reassignment?

A.   Ms. Gethings had mentioned that there would be changes for the school, but nothing directed towards me.

Q.   And when she said changes for the school, did she say that directly to you or was that an announcement to --

A.   At a staff meeting.

Q.   Do you recall when that staff meeting happened?

A.   No.

Q.   You mentioned a few minutes ago that you wound up filing a complaint; is that right?

A.    Yes.

Q.    Who did you file a complaint against?

A.    Ms. Gethings and Ms. Clarino.

Q.    Who did you file that with?

A.    HR.

Q.    Anyone specific in Human Resources that you filed it with?

A.    Um, I believe I sent it to Lisa Mack.  And then Taryn Bonner was assigned to investigate it.

Q.    Why did you file a complaint against the administrators at Hooker?

A.    Um, because it was becoming untenable to work there. Because even after the meeting with the union where we tried to build bridges, it wasn't happening.  It was always, well, we still have concerns, well, we still have concerns.  I, um -- I felt that they were working against me and just didn't want me there.  Um, the union said that this would be a middle step to filing a grievance.

Q.    And when you were bringing these concerns to the union, I think you mentioned earlier in reference to the committee issue, was there someone in particular that you were bringing the concerns to?

A.    Dave Cicarella.

Q.    Was there anyone else in the union leadership that you communicated your concerns with as it related to your

experience with the administrators at Hooker?

A.    Pat.

Q.    What's Pat's last name?

A.    DeLucia.

Q.    DeLucia?

A.    DeLucia.

Q.    What was his role?

A.    Vice president.

Q.    And at that time who was your union steward?

A.    Kathleen Morrison.

Q.    Is that the same Ms. Morrison that sent the screenshot of your comments to Ms. Gethings?

A.    Allegedly.

Q.    So you filed this complaint.  You learned that Ms. Mack, I guess, gives it to Ms. Bonner to investigate. What was the process that followed?

A.    Um, so at first I was -- I mean, I was obviously really stressed, but I was pretty optimistic.  My first conversation with Taryn Bonner, she seemed to be taking my complaint seriously.  She asked me lots of questions.  I answered them.  And, you know, she let me know that this investigation would likely end by the end of the school year.

Q.    Let's go to Exhibit 38 in the binder in front of you. Let me know when you're there.  This is a multipage

document.  For reference, it starts with control number at the bottom LIGHT00228 and goes through LIGHT00234.

A.    Okay.

Q.    So what I'd like you to do is go to the last page of this exhibit.  It appears to be an email string.

A.    Okay.

Q.    Do you recall sending an email to Lisa Mack on April 30, 2021?

A.    Yes.

Q.    Is the last page of Exhibit 38 the email that you sent when you decided to file a complaint against the administrators?

A.    Yes.

Q.    And then you learned, I think you said, that Ms. Bonner was going to be investigating this, correct?

A.    Correct.

Q.    And does this email string reflect that assignment as it was relayed to you?

A.    I believe so.

Q.    I direct your attention to LIGHT00231, it appears to be an email from Ms. Mack to you and others, including Ms. Bonner and David Ciccarela, your union president.  Do you recall receiving that email?

A.    Yes.

Q.    Is that where she told you Ms. Bonner, the labor

relations manager, would be in contact with you?

A.    Yes.

Q.    And then you continued to email with Ms. Bonner; is that right?

A.    Correct.

Q.    If you go to Exhibit 5, please.

I'd like to know if that was the complaint you sent to Ms. Mack on April 30th.

A.    Yes.

Q.    This is a multipage document and it starts with control numbers at the bottom of DEF000153 through DEF000165; is that right?

A.    Yes.

Q.    What were the concerns or claims that you were making in this complaint about the administrators?

A.    That I was being -- um, that I had had protected speech.  And that because of that protected speech, I had been forced into a series of meetings, abusive meetings.  That there was always allegation against me concerning the teacher's COVID status.  That they were attempting to minimize my role on school-related committees.  And that my change in teaching assignment was serving to punish me.

Q.    Were there any other issues or concerns that you raised in this complaint?

A.    Damages to my reputation, negative comment on the

TEVAL, my position on the PTA.  That's pretty much it.

Q.    You listed towards the end, last two pages -- actually, DEF000163 on to -164 -- your injuries?

A.    Yes.

Q.    What were your injuries you were claiming at that time?

A.    Um, I felt like I'd been hurt personally and professionally.  But even though I had done nothing wrong, I was being betrayed as someone who had.  And that, like I was -- that I was fearful.  And that time handling these issues took away from the time that I needed to be spending teaching.

Q.    That's a good point.  I want to touch on that.

When you were having these meetings, you said one lasted an hour and a half, I don't think you recalled how long the other one lasted, was that during your teaching time?

A.    Most of them, yes.

Q.    Most of the meetings that you had with Ms. Gethings that are identified in this complaint were meetings that you -- would have been time that you would have been with your students; is that right?

A.    They were usually planned for time when the students would be at, like, art but then they would go past the time when I should have been teaching.

Q.   So, for example, the 15-minute block that you were mentioning earlier, after that 15 minutes you would have went back to teaching your class; is that right?

A.   Correct.

Q.   I just wanted to make sure I understood what you were saying there.

How about at home?  It seems --

THE COURT:  I suggest if you're going to a new subject that we break for lunch.

MR. INTERLANDI:  I'm just going to wrap up with the last page of her complaint.

THE COURT:  All right.  Go right ahead.

MR. INTERLANDI:  Thank you.

BY MR. INTERLANDI:

Q.   At home -- on the last page DEF000164 you list some things that you were going through mentally and physically.  What were those?

A.   Um, I was having nightmares.  Um, I was having increased anxiety.  Um, I was afraid to eat with co-workers, that they would be seen negatively.  I was not as good of a wife and mother.  I was preoccupied.  I could read it, but that's what I remember.

Q.   That's okay.

MR. INTERLANDI:  All right, Your Honor.

THE COURT:  Ladies and gentlemen, we'll take 45

minutes for lunch.  And that will have us back here at 1:00.  Enjoy your lunch.  Leave your notebooks here. Don't discuss the case.

(Whereupon the jury left the courtroom.)

THE COURT:  Counsel, is there anything that we need to discuss before you go to lunch?

MR. INTERLANDI:  Not at the moment.  I don't believe so.

MR. MURPHY:  Not right now, Your Honor, no.

THE COURT:  Is that a preview of coming attractions?

MR. INTERLANDI:  There are a few items I think we were planning to address, specifically with respect to there's some exhibits that are still objected to, but we didn't know if you wanted to talk about those before or --

THE COURT:  Will you get to them this afternoon?

MR. INTERLANDI:  No, I don't think so.

MR. MURPHY:  Potentially on cross, but probably not on direct.

MR. INTERLANDI:  I may.

THE COURT:  Do you anticipate finishing with Ms. Light today?

MR. INTERLANDI:  I think so.  I think we will be able to finish, depending on how long cross and redirect and recross go.

THE COURT:  All right.  We're going to be taking a recess at 2:45.  Possibly we can take up your issues then, probably better to do it at the end of the day.

Thank you very much.  Stand in recess.

(Whereupon, a recess followed.)

THE COURT:  Counsel, we will bring the jurors back in.

However, I need to admonish the people who I assume are teachers or associated with teachers behind defense counsel with respect to their visible responses to the plaintiff's testimony during the plaintiff's testimony.

MR. MURPHY:  I'm happy to speak with them, Your Honor.  I'm not aware --

THE COURT:  You do not have eyes in the back of your head, but there is a great deal of whispering, gestures, notes, and particularly the shaking of heads with respect to the plaintiff's testimony.

MR. MURPHY:  Understood.  Is Your Honor going to speak with them or --

THE COURT:  Well, I thought they'd be back here by now.

MR. MURPHY:  I don't know if they're stuck in security or --

THE COURT:  We'll wait a minute or so.

MR. MURPHY:  I know my client is just wrapping up in the bathroom.  She should be here at any second.

THE COURT:  If that doesn't stop, there will be fewer people in the audience.

MR. MURPHY:  Understood.

THE COURT:  I want you to make crystal clear to them that that kind of demonstration of their view about the plaintiff or her testimony is completely unacceptable.

MR. MURPHY:  Agreed, Your Honor.

MR. INTERLANDI:  Your Honor, I have one matter I want to bring to the Court's attention.

I'm not sure if you noticed, but I noticed the Juror Number 4 in the front has fallen asleep often during direct.  Just didn't know if there was a way to, I guess, address that with the jurors either now or while they're in recess.

MR. MURPHY:  I didn't notice that, Your Honor.

THE COURT:  I think there's another juror who is --

MR. INTERLANDI:  The gentleman in the back.

THE COURT:  -- is a bit groggy as well.

MR. INTERLANDI:  I just wanted to bring it to the Court's attention that I noticed.

THE COURT:  All right.  I will raise the issue in general.  And I will task Ms. Lewis with going over and

tapping if a person is asleep.

MR. INTERLANDI:  Thank you, Your Honor.  I'll try to be more entertaining.

THE COURT:  Officer Lewis.

THE CLERK:  Yes.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Ladies and gentlemen, please be seated.

So we have finished our lunch break.  I want to particularly underscore the importance for all of you of staying attentive and not dozing off during the testimony.  I think there has been some movement in that direction earlier, so I ask you to please be very careful about staying fully attentive as this case is presented.

Ms. Light, would you kindly return to the stand.

You may proceed.

MR. INTERLANDI:  Thank you, Your Honor.

BY MR. INTERLANDI:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Before we took our lunch break we were talking about the complaint you filed on April 30, 2021.  What I wanted to ask you next was about the steps that were told to you by Ms. Bonner.  I believe they're listed or at least

outlined in Exhibit 38 in the binder.  If you can go back to that exhibit.  Let me know when you're there, please.

A.    Okay.

Q.    And again, this was an email string or thread that you had with Ms. Bonner.  What was your understanding of the process going forward when she was installed as an investigator?

A.    She said that she was going to -- after she talked to me, she would talk to the other people involved and that I was not to talk to anyone about the investigation, and that it should be wrapped up by the end of the school year.  And that regardless of how it turned out, Ms. Gethings wouldn't be removed as principal but to please let her know any small thing that happened during the course of the investigation.  Even if it seemed small and I wouldn't have complained about it initially, now that the investigation had started, every incident took on more meaning.  So if I felt uncomfortable at any time, to report every incident.

Q.    Did you meet with Ms. Bonner more than once to talk to her about your complaint?

A.    Yes.

Q.    How many times did you meet with Ms. Bonner?

A.    Originally, two.

Q.    Okay.  Why did you say originally?  Did you then see

her again?

A.    Um, well, I think -- I guess -- we talked about my complaint, my initial complaint twice.  But since the investigation went on, just logistics I talked to her about at other times.  But in terms of being interviewed by her, I was interviewed twice.

Q.    How long -- do you recall the first interview how long that took?

A.    About two hours.

Q.    How about the second interview with Ms. Bonner, how long did that take?

A.    It was shorter.  Probably about an hour.

Q.    In connection with the complaint that you submitted, did you submit any, like, documents, any exhibits with your complaint?

A.    With my complaint?

Q.    Look at Exhibit 5, if you will.  That is your complaint.  I'll direct your attention to the last page of Exhibit 5.

A.    Um, I -- I attached the Facebook post.

Q.    The Facebook post with your comments?

A.    Yes.

Q.    During the interview process did Ms. Bonner ask you for any additional documentation?

A.    I don't believe so.

Q.   How were you feeling at this time?  Now you've submitted a complaint for what you felt you were being retaliated to suppress your free speech and the false statement made against you, how were you feeling, let's say, now we're now late April, early May of 2021?

A.   Still very apprehensive.  Isolated.  Terrified.

Q.   So we're in the May 2021 time frame.  Earlier you mentioned you are on Facebook at the time and you had friends and some of them were your co-workers.  Did you lose any of those co-workers as Facebook friends in or around May 2021 time frame?

A.   Yes.

Q.   Do you recall which Facebook friends you lost?

A.   Ms. Alden.

Q.   Anyone else?

A.   Ms. Cav.

Q.   Ms. Cavanaugh?

A.   Yes.

Q.   So from now on we'll refer to her as Ms. Cav.

A.   Okay.

Q.   Anyone else?

A.   Ms. Morrison.

Q.   Tell me anyone else that you lost as a Facebook friend.

A.   Um, I believe that's it.

Q.    How do you know that you're no longer Facebook friends with those three individuals?

A.    Um, because I was blocked.  So when I looked -- I tried to send Ms. Alden a message and saw that I was blocked.  And then it made me wonder if other teachers had also unfriended me.

Q.    So it was your understanding, then, that those were the three people that unfriended you?

A.    Correct.

Q.    Did you unfriend any of the co-workers that you had at Hooker on Facebook?

A.    No.

Q.    How did you feel about discovering these teachers that you had worked in the school with unfriended you on Facebook?

A.    Um, I felt like my fears were being validated.  That I was -- that I wasn't trusted anymore.  And that, yeah, I felt isolated from the community.

Q.    Ms. Alden, she was here earlier today, wasn't she?

A.    Yes.

Q.    Is she still here today?

A.    I don't see her.

Q.    After you filed your complaint, did she file a complaint against you?

A.    Yes.

Q.    Okay.  And were you able to file a response to Ms. Alden's complaint?

A.    Yes.

Q.    Prior to her filing a complaint, did the administrators come to you to tell you about any issues or concerns that Ms. Alden had about you as a teacher?

A.    No.

Q.    Prior to the complaint, did the administrators come to you to tell you about any issues that Ms. Alden had with you in your role as a parent?

A.    Um, the administration didn't come to me, but I was aware.

Q.    How were you made aware that Ms. Alden took issue with your role as a parent?

A.    Um, at -- she was my -- was Wesley's teacher, second grade teacher.  And at parent/teacher conferences, she informed me that she had not gotten any of Wesley's work submitted online.  And said that she would expect more from me as a teacher and a parent.  Yeah, that Wesley hadn't done any work for the first nine weeks of school.

So then I -- I wanted her to know that Wesley had in fact done the work but perhaps was having difficulty uploading it correctly or the pictures were too fuzzy for her to read.  So I emailed her pictures of the work.  And she responded, um, in what I viewed as an aggressive way.

Q.    How old was Wesley at that time?

A.    Eight?  Eight.

Q.    So what was the time frame of that, again?

A.    So that would be October 2021.

Q.    And then how did the rest of that time frame, let's say from September to December 2021, how did your interactions with Ms. Alden go as Wesley's parent?

A.    So I responded to her email that I didn't expect her to re-grade the whole year's worth of work.  I just wanted her to know that Wesley wasn't delinquent.  And she requested a meeting with -- a second parent/teacher meeting with me, my husband, and the administration.

We had that meeting.  It did not go well.  And at that point I talked to my husband about making -- I wanted to keep the relationship with Ms. Alden professional.  So my husband would take over all communications related to our children or specifically Wesley and Ms. Alden to preserve the relationship.

Q.    And in that same time frame did your husband have any interactions for any concerns he had with Ms. Alden?

A.    Um, in what time frame, I'm sorry?

Q.    September to December 2020 was there anything that he presented to Ms. Alden or the administration that he found was concerning to him regarding her class?

A.    Um, so initially he did not.  But then I believe

Ms. Clarino emailed him asking him what he felt about the class.  And with my husband, if you ask him what he feels, he tells you.

Q.   Okay.  As a parent from January -- now let's move into 2021.  January until May of 2021, were you aware of any issues that Wesley was having in the classroom with Ms. Alden?

A.   I was aware of some issues, but I didn't address any.

Q.   Did Ms. Alden present any concerns she had about Wesley or about you as a parent in that time frame, January to May of 2021?

A.   No.

Q.   So she filed her complaint and you filed a response. What did you understand, if anything, about how the investigation of her complaint would proceed?

A.   So I was under the impression it would proceed the same way my complaint, where everyone would be interviewed and a conclusion would come to quickly.

Q.   I'll direct your attention to Exhibits 6 and 8 in the binder in front of you.

A.   Okay.

Q.   Is Exhibit 6 a copy of the complaint that Ms. Alden filed?

A.   Yes.

Q.   What did she title her complaint?

A.   List of Concerns.

Q.   Did you file a response?

A.   Yes.

Q.   Is that response contained in Exhibit 8?

A.   Yes.

Q.   How did you feel at this time when you received a complaint from your son's second grade teacher?

A.   Um, frustrated.  Um, voiceless.  Um, scared.

Q.   Were all of her concerns, Ms. Alden's concerns about you about you being as a parent or were her concerns a mix of you as a teacher and a parent?

A.   It seemed primarily about me as a parent.

Q.   Did there come a point in time when Ms. Gethings and Ms. Clarino filed a response to your complaint?

A.   Yes.

Q.   Do you recall approximately when they responded to your complaint?

A.   Um, June.  Mid-June.

Q.   Before we get to that, do you know a woman named Phyllis Maffuid?

A.   Yes.

Q.   Who is Phyllis Maffuid?

A.   She's a paraprofessional at Worthington Hooker School.

Q.   Is she still a para there?

A.    Yes.

Q.    Was she a paraprofessional for your third grade classroom in 2021?

A.    No.

Q.    So you just knew at that time that she was a paraprofessional in the building?

A.    Correct.

Q.    Let's turn to Exhibit 37.  Let me know when you have it.

A.    I have it.

Q.    Was there an incident with you and Ms. Gethings relating to dismissal in around May of 2021?

A.    Yes.

Q.    And was Ms. Maffuid involved in that, let's call it, event?

A.    Yes.

Q.    What is Exhibit 37?

A.    Exhibit 37 is an email chain between -- originally between Ms. Gethings, Clarino, and myself.  And then I forwarded it on to Taryn Bonner.

Q.    Why did you forward it on to Taryn Bonner?

A.    Because she asked me to let her know if any additional incidents occurred.

Q.    And what was this incident or event that occurred that involved Ms. Maffuid?

A.    Um, I needed to use the restroom.  And teachers can't just leave their classrooms.  So the typical practice is that you wait at your doorway until an adult without kids passes and you ask them if they can watch your class for a second.  I did that.  And no one came.

I called the office to see if someone could come. There was no one available.  Eventually, Kyle Miller, the math coach, came down the hall and watched my class so I could use the restroom.

As I entered the restroom, Phyllis saw that I was going to the restroom and then took over my class for Mr. Miller.

So initially I didn't need to use the restroom at dismissal.  It just happened that it took a while to get someone.

Q.    And the email that Ms. Gethings sent to you, why did you feel that necessary to bring to Ms. Bonner's attention?

A.    So Phyllis had let me know that she felt reprimanded for --

MR. MURPHY:  Objection, Your Honor.

THE WITNESS:  Okay.  Because --

THE COURT:  I'm sorry.  Do you claim that?

MR. INTERLANDI:  I'll accept the objection and move on.

THE COURT:  All right.

We'll ask the jury to disregard "so Phyllis let me know that she felt reprimanded."

Please continue.

BY MR. INTERLANDI:

Q.   Don't tell us what Ms. Maffuid told you.

Why did you feel it necessary to send this email to Ms. Bonner?

A.   Because Ms. Gethings was reprimanding me for using the restroom close to dismissal and appeared to believe that I had changed clothes to go to running club after school instead of being with my class.  That wasn't the case.  I just needed to use the restroom.  Um, I could explain more if you want.

Q.   You used the restroom.  Why did she think that -- if you know, why did she accuse you of using the restroom to get changed for running club?

A.    So I did have my period, and I did change my shirt. I did not change into running shorts.  I didn't have a sports bra.  I didn't have running shoes.  I just -- I always carry a shirt with me at school in case I get Play-Doh on it or paint.  And I just changed my shirt because it was a little longer, cover up where I had had my period, and went and got back to my class.

Q.   So let's move forward.  June, there's a response to

your complaint.  And I'll direct your attention to Exhibit 7 in the binder in front of you.  When you're there, let me know if that's the -- if you've seen any part of that exhibit before.

A.   Yes, I've seen parts of this before.

Q.   Does any part stand out to you?

A.   On Defendant 102, the retaliatory complaint that Ms. Gethings filed against me.

Q.   Okay.  So Exhibit 7 has an email where their response, Ms. Gethings and Clarino filed a response to your complaint.  And then they filed their own complaint against you, right?

A.   Yes.

Q.   What was the title of their complaint?

A.   Retaliatory Complaint.

Q.   When did you receive the letter that you said, DEF102?

A.   Mid to late June.

Q.   Did you see all the rest of the stuff attached to the letter dated June 7, 2021, all the supporting documentation that they provided?

A.   No.

Q.   Did you submit a response to the June 7, 2021, retaliatory complaint?

A.   No.

Q.    Were you allowed to or able to do so?

A.    I wasn't able to do so because I only received the cover of it.

Q.    Did you contact anyone in Human Resources about the retaliatory complaint?

A.    Ms. Bonner.

Q.    Let's go to Exhibit 12 in the binder.  Let me know when you're there.

A.    I'm here.

Q.    This is dated June 30, 2021.  And it appears to be an email from you to Ms. Bonner.  Is this an email that you sent to Ms. Bonner?

A.    Yes.

Q.    Why did you send this email to Ms. Bonner on June 30?

A.    Um, well, the school year had ended.  And the investigation hadn't ended.  And I had a lot of concerns.

Q.    What were your concerns?

A.    Um, I was asking for a copy of the complaint they filed against me so that I could respond.  And I was feeling very, um, nervous about going back to school without figuring -- with these lingering issues from the year before.

Q.    Were there any issues that you had concern with as it related to your own complaint that was filed in April of 2021?

A.    Yes.

Q.    What were your concerns as related to your complaint?

A.    Ms. Bonner had -- Ms. Bonner called me and told me that the administration had tainted witnesses in the investigation.  And that because of that, they were going to send my complaint out to a law firm.

Q.    And to do what?

A.    Um, Taryn Bonner said she didn't believe she could finish the investigation with integrity.  And so -- because of this tainting.  So the law firm was going to start the investigation over.

Q.    Is that something that you provided or at least recounted in the email you sent to Taryn on June 30, 2021, in Plaintiff's Exhibit 12?

A.    Yes.

Q.    Did she reply to you and say no, I disagree, I never said that?

A.    No.

Q.    So we're done with school for that year.  You're out during the summer.  Were you actively looking for a new job?

A.    No.

Q.    Did you ever receive an email about an open position at another school from someone at the New Haven Board of Education?

A.    Um, I believe so.

Q.    Let's turn to Exhibit 40.  Let me know if this is an email that you received in the summer of 2021.

A.    It is.

Q.    What was this a position for?

A.    Um, it says that it was like a coaching position for ESSER teachers.  For ESSER teachers.  So the ESSER funds for COVID relief, the additional teachers that had been hired, it would be the coach for those teachers.  A bit of a step up.

Q.    Did you ask anyone to send you information about open positions?

A.    No.

Q.    Who was this sent by?

A.    Lisa Mack.

Q.    And what was the date that she sent you this email?

A.    July 15.

Q.    Did you have a reaction or any thoughts to this email?

A.    Um, yeah.  I thought it was very odd because Lisa Mack was the head of HR involved in these investigations. I felt like they were looking for a position that I could take outside of Hooker School.

Q.    Did you do anything in the summer of 2021 to help you get prepared to teach first grade?

A.    Yes.

Q.    What were you doing in the summer of 2021 to help you in that regard?

A.    Well, first, I contacted our -- first, I enrolled in an online program for teaching, The Science of Reading. But then when I spoke to our literacy coach, I was informed that we didn't use that program.  So I purchased a book called *Shifting the Balance* about how to incorporate phonics into the balanced curriculum, the balanced literacy curriculum.

I joined Facebook groups about The Science of Reading.

I went to two free online seminars about phonics.

Q.    In the summer of 2021 did the administrators at Hooker offer you any opportunities for training to help you get prepared for first grade?

A.    No.

Q.    Did you do anything else to help you get ready to start teaching first graders in the summer of 2021?

A.    Um, I mean, I prepared my classroom.  I moved all my things from the Big Building to the Little Building.  Um, I got permission to paint the bulletin boards to liven up the classroom.  I took the math curriculum home and read over the curriculum.  But since it wasn't such a deficit of mine, I really focused on researching the literacy

component.

Q.    How are you feeling as you approach the start of the new school year as a new first grade teacher?

A.    Um, I am trying to be as optimistic as possible, but I'm quite terrified.

Q.    Why are you terrified?

A.    Because it's the first year in over a decade that I felt like I was new at what I was doing and not an expert. I didn't feel like I received a very warm welcome at the Little School.  Um, I still had the lingering concerns from the year before.  And all of the teachers that had kind of been my friends and allies were at the Big School. So my circle of people I could turn to was dwindling.

Q.    Ms. Alden was at the Little School, right?

A.    Yes.

Q.    Where was Ms. Gethings' office as it relates to the two buildings?

A.    Ms. Gethings' office was in the Big School.

Q.    And where was Ms. Clarino's office?

A.    In the Little School.

Q.    What was the status of the investigation of your complaint in September -- I'm sorry, August of 2021?

A.    Um, it was -- it was still ongoing.  The law firm hadn't really interviewed me over the summer.

Q.    Did you ask for any updates from Ms. Bonner?

A.    I believe so.

Q.    Let's turn to Exhibit 11.  Let me know if that's an email that you sent to Ms. Bonner.

A.    Yes.

Q.    This is a three-page document, control numbers are LIGHT00214 -- I'm sorry, I misspoke.  It's a two-page document, -214 through LIGHT00215.

      Why did you send this email to Ms. Bonner on August 20, 2021?

A.    Because I felt like I had continued to experience retaliation through the course of the investigation.

Q.    What was the title of this email that you sent to Ms. Bonner?

A.    Timeline.

Q.    Was she able to provide you with a timeline as to when the investigation would be concluded?

A.    No.

Q.    So you started teaching first grade for the first time for the 2021-2022 school year.  How were those first months teaching first grade?

A.    Um, time with children always has joy in it, but it was really hard.

Q.    And when we're talking about first graders, what are their ages?

A.    Five and six.

Q.   Going back to your request for a timeline, did Ms. Bonner discuss with you or provide you any protocols or rules for how to navigate being back at school while you had these pending complaints being investigated?

A.   We tried to set up safeguards.  And just I think we called them -- actually, at that point I think we called them rules of engagement.

Q.   When you say "we," who are you referring to?

A.   Taryn Bonner; myself; Dave Cicarella, the union president; and Ms. Gethings I believe was allowed to draft as well.

Q.   Please turn to Exhibit 13.  Let me know when you're there.

A.   I'm there.

Q.   Have you seen this document before today?

A.   Yes.

Q.   What is this?

A.   It is an email about asking for safeguards and my brainstorm of things that could be done.

Q.   Did Ms. Bonner provide you by email a draft of rules of engagement?

A.   Um, she had started a draft, yes.

Q.   What were some of the rules of engagement that were being discussed for you to return to the school environment at the start of the 2021-2022 school year?

A.    That I was to carry out my duties as a teacher.  You know, conduct myself professionally.  Refrain from discussing the investigation.  Uphold confidentiality.  Be allowed to participate in school-based events.  Be mindful that the administration has to observe me.  And be open to feedback.

Q.    Did you receive a draft or a revised draft from Ms. Gethings or Ms. Clarino as it relates to these rules?

A.    Yes.

Q.    Were there, like, any significant changes or was it the same?

A.    Um, I do not remember the specific words, but the change was that I was not to speak about school matters.

Q.    So you started working -- was there a finalized draft, a finalized document that everyone agreed to?

A.    No.  I believe I sent Ms. Bonner a response basically saying that since this is about the First Amendment and being allowed to speak, I'm unwilling to waive that right.

Q.    So now you're teaching first grade.  You mentioned observations.  Who was observing you in your classroom?

A.    Ms. Clarino was observing me.  My students.

Q.    How often does an assistant principal observe the teachers in the school, in your experience?

A.    So, typically, you have two to maybe four observations a year.

Q.   How many times did Ms. Clarino observe you from the end of August to the middle of October in 2021?

A.   She was in my room very regularly.  And she would sit with her computer taking notes on the observation.  Or appeared to be taking notes.  She could have been doing something else on her computer.

Q.   When you say "regularly," are you able to provide the Court with a number of times you think that she observed you?

A.   I believe she observed me well over four in the first two months.

Q.   Did you think that was strange?

A.   Yes.

Q.   Why?

A.   Um, because I never received any of the written feedback from the observations.  And I felt like it's just not typical to be kind of that scrutinized that early in the year when you're trying to get your footing in a new position.

Q.   How were you doing emotionally at this time, September-October time frame 2021?

A.   I'm very distressed.

Q.   Why?

A.   Um, because we never came up with the safeguards for how we were to interact.  Um, it appeared that the

administration was looking for me to do something wrong constantly in my room. There were -- I didn't feel welcomed in terms of, like, people would walk past my -- like, as they entered the building, as they walked past everyone's doors they would say hello, but they wouldn't say hello to me in my classroom which was a stark thing when it's the one missed.

So it felt -- my supplies weren't ordered. Even though -- yeah, my supplies weren't ordered.

I was just constantly in fear knowing that, you know, having been told that no one trusts you and no one likes you and then it seems like no one trusts you and no one likes you. So it was hard.

Q. Was Ms. Bonner keeping you -- or the law firm who was doing the investigation, were those folks keeping you updated on the progress they were making with the investigation through this time frame, September through October 2021?

A. In September is when I was first interviewed by the law firm. But I don't feel that I was given updates regularly, no.

Q. Did you complete the first, let's call it the first half of teaching first grade?

A. I went on FMLA.

Q. What do you mean by FMLA?

A.    Family Medical Leave Act.

Q.    Why did you need to take a medical leave of absence during that term?

A.    Um, well, the diagnosis that I was given was PTSD triggered by a hostile work environment.

Q.    Who was that diagnosis given by?

A.    Nicole Ventura.  Also, Dr. Levin said that I had PTSD.

Q.    Let's look at Exhibit 14 and let me know if you've seen that before.

A.    Yes.

Q.    What is this document?

A.    Um, my application for FMLA.

Q.    And was your application granted?

A.    Yes.

Q.    And the reason -- well, let me back up.

On the second page, it appears that a health-care provider completed this form.  Who was the health-care provider that completed the form for you?

A.    Nicole Ventura.

Q.    And she listed on the next page a brief description, other appropriate medical facts related to the conditions for which the employee seeks FMLA leave.  What did she put?

A.    "Complex PTSD being triggered by hostile work

environment, increase in anxiety, depression, intrusive thoughts, lack of sleep, and difficulty concentrating."

Q.    There was an estimated time for your leave.  It appears to be on the bottom of the page.  What was the estimated time for your leave?

A.    From 10/25 to 12/03.

Q.    Were you out on medical leave during that time?

A.    Yes.

Q.    During that time did you ask for any updates concerning the investigation?

A.    Yes.

Q.    Let's look at Exhibits 36 and 35.  Go to Exhibit 36 first, please.

Is this an email that you sent to Ms. Bonner and the attorney who was investigating your complaint?

A.    Yes.

Q.    What was the name of the attorney who was investigating your complaint?

A.    Rebecca Goldberg.

Q.    What law firm does she work at?

A.    Berchem Moses.

Q.    What were you saying in this email that you sent to Ms. Bonner -- actually, Ms. Bonner, Ms. Mack, who we've already talked about today, and Ms. Goldberg, among others?

A.    I was basically letting them know that while people are on leave you're typically not supposed to contact them, but that they should feel free to contact me about the investigation so that we could keep things moving along.  And that getting a resolution would hopefully clear the way to relieving some of my anxiety.  And that it had been a long time.

Q.    Okay.  A long time for what?

A.    Um, a long time since my complaint had started.  So since I had found my voice to be able to speak, I felt unheard.

Q.    There's some other folks listed in this email.  You sent it to David Cicarella.  Who was that, again?

A.    The president of the union.

Q.    And there's an email MGQ@MGQlaw.com.  Who was that?

A.    My original attorney.

Q.    And then let's look at Exhibit 35.  It's a subsequent email, multiple pages, appears to be an email string.  And this email, are you looking for an update on the status of your investigation?

        MR. MURPHY:  Objection, Your Honor.  Specifically, leading.  I tried to let it go a little bit.

        THE COURT:  You may rephrase.

        MR. INTERLANDI:  Sure.  I don't think it was leading, but...

BY MR. INTERLANDI:

Q.   Why were you sending this email to Ms. Bonner?

A.   So it's a long chain, but I was asking for the next steps in the complaint.  And she's assuring me that it's close to ending.

Q.   There was a reference by Ms. Bonner, a final interview was scheduled for that week?

A.   Yes.

Q.   Do you know who the person was that was the final interviewee?

A.   I don't know.

Q.   Did the defendant Board of Education require you to extend or ask you to extend your medical leave since you weren't able to return to work on the original time frame?

A.   Um, they didn't ask me to extend my leave.  I extended my leave.

Q.   Let's look at Exhibit 34.  Let me know if that's an email you've seen before today.

A.   I have seen it before.

Q.   And it was a request that you sent to extend your FMLA?

A.   Correct.

Q.   And that's for your medical leave.

     And then do you know a lady named Sheniquia McCrea?

A.   Only through email.

Q.    And did she need something specific from you in order to grant your request?

A.    Um --

Q.    I direct your attention to LIGHT00715.

A.    She says, "Your FMLA request ended on December 03... Our office does not have any additional information from your physician.  If you have returned, please submit the return to work to my attention to process.  If not we need documentation to support your absences."

Q.    Were you able to supply the documentation that she was requesting?

A.    Yes.

Q.    And as a result, was your period of leave extended?

A.    Yes.

Q.    So when did this investigation finally conclude?

A.    December 3rd.

Q.    How do you know that it concluded on December 3rd?

A.    I was at a wedding and I got an email with the investigation reports.

Q.    Okay.  And did you have any response after receiving the email?

A.    Um, response, you mean how did I feel?

Q.    Sure.  How did you feel?

A.    Um, I felt somewhat validated.  Um, I also felt concerned and a bit scared.

Q.    Why were you scared?

A.    Um, because I discovered all of my fears were justified.

Q.    I'll direct your attention to Exhibit 46.  Now, this is an email that has been redacted, so it's not the full exhibit -- I'm sorry, the full document.  But it is agreed upon as a full exhibit with the redaction.

        MR. MURPHY:  Correct.

BY MR. INTERLANDI:

Q.    So taking out the blank parts of the page, is this an email that you sent to Ms. Bonner on December 9, 2021?

A.    Yes.

Q.    Why did you send this email to Ms. Bonner on December 9, 2021?

A.    Um, because I was looking to return to my classroom as soon as possible, but I wanted to figure out the next steps now that the investigation was concluded.  And I was suggesting, you know, additional -- like what safeguards we could do.

Q.    What did you suggest?

A.    Um, so I asked for my FMLA days to be returned.  I asked for assurance of return to my third grade position for the next year.  And I asked for a restorative justice process with my colleagues to correct any misgivings they had about me.  And, um, I think there were other things,

but I don't want to accidentally say something that's redacted.

Q.   That's okay.

What do you mean by a restorative justice process?

A.   At our schools we have restorative justice circles where we talk about how we have been wronged and just correct any misinformation and come to an understanding of how to move forward.  We do this with students.  We do this with teachers.  So I wanted -- yeah, I wanted the colleagues that had the wrong impression of me to have the right impression.

Q.   Was that something that the defendant New Haven Board of Education was agreeable to?

A.   They agreed to mediation between me and Ms. Gethings.

Q.   To mediate what?

A.   Um, our relationship.  Because it -- I wanted to be able to return to a safe environment, so we wanted to have a mediation so that the first time Ms. Gethings and I are seeing each other after this long period of time isn't in front of students, but that everything has been kind of squared away and we're, you know, good to go, I'm not afraid of further retaliation, she sees me as a team player.  So we could move forward.

Q.   Were you able to return back to work in December before the end of the year?

A.   No.

Q.   Did you return back to work in January of 2022?

A.   I forget the exact date.

Q.   Did you have -- did you have any meetings with HR or anyone like the administrators in January 2022?

A.   Yes.

Q.   Do you recall the date of that meeting?

A.   No.

Q.   Did you record that meeting?

A.   Yes.

Q.   How did you record that meeting?

A.   With my phone.

Q.   And did you save the audio recording on your phone?

A.   Yes.

Q.   After you saved it, did you do anything to alter or modify the audio file that you recorded?

A.   No.

Q.   Let's go to Exhibit 27.

     Now, having looked at the first page of this document, does it refresh your memory as to when you had this meeting?

A.   Sorry.  January 14.

Q.   Of what year?

A.   2022.

Q.   Now, this appears to be a transcript that you had

created from your audio file; is that right?

A.    Correct.

Q.    And counsel and I have agreed to a redacted version, so it's not the full recording, okay?

A.    Okay.

Q.    What was the purpose of this meeting?

A.    Lisa Mack and Taryn Bonner were requesting that I return to work.

Q.    What did they say, if anything, about the request that you had made to return back to work?

A.    Um, so I just presented them with the things I felt like needed to happen before I returned and again requested a mediation.

Q.    So who attended this meeting?  Tell me all the people.

A.    Myself; Lisa Mack; Taryn Bonner; Leslie Blatteau who is the new union president; and Pat DeLucia.

Q.    Just to clarify, was Leslie Blatteau the union president in January 2022?

A.    Yes.

Q.    Is she currently the union president?

A.    Yes.

Q.    Pat DeLucia, what was his role?

A.    He was the vice president but he had been the vice president under the previous president as well.  So

he was the one who knew the investigation from the beginning to the end.

Q.    Please turn to page 5.  Are you there?

A.    I am.

Q.    Actually, let's go to page 4, line 21.

This appears to be Ms. Mack speaking on the requests or, I guess, the safeguards that you were requesting and whether or not they were going to be agreeable to them. Can you just read out what she said to you in response to your request for safeguards?

A.    Yeah.

"And so, you know, given concerns of taking a vacation and we had to, you know, rely on counsels to get our information.

"So we're happy that -- I want to first say that we're returning you back to work on Tuesday, back to your school, they'll have your classroom back in place.  But with regards to your request for restoration of your sick days, returning you back to the 3rd grade next year and a restorative counsel, I have information on all three of those.

"Unfortunately, we won't be restoring your sick days simply because they're days that you took so we won't be restoring your sick days.

"Returning you back to the 3rd grade next year, that

is up to the building leader to determine if there is a grade 3 available and you can apply for it.  You certainly have an opportunity to apply for any position after the end of the school year at any grade level or request a grade level change back to the 3rd grade, and that's something you can discuss with your building leader because we can't take the rights from the principal.  They have their autonomy to realign, direct the work as the needs of the business for the school year.

"So we cannot guarantee you'll be in 3rd grade position next year unless you apply again at the time which you are available to apply for any 3rd grade position or any position within the district at the end of the school year.  Or and if you have, you know, you find another position within a building you meet with your building leaders and request to be moved to another grade level you can, but I can't guarantee that.

"And lastly but certainly not least the restorative circle conference with your colleagues, we'll offer you EAP and if there's an opportunity for the steward of circle conferences with your colleagues, but they have to agree to it.  So we cannot mandate your colleagues to meet to try to restore the harm that may have been done, but there's an opportunity there and we will certainly offer EAP.  And if they are willing to then we'll coordinate

those efforts to ensure that a conference does take place."

Q.   Okay, thank you.

     And did you have any questions in response to what she said to you?

A.   I did.

Q.   What were your questions?  You don't have to read them out.  What were your questions?

     MR. MURPHY:  Can I -- objection, incomplete.  If she could finish the prior paragraph, Your Honor.  I just want to make sure it's accurate.

BY MR. INTERLANDI:

Q.   Please read lines 15 through 17, Ms. Light.

A.   "So if [there's] something that all is in agreement with we certainly will facilitate that process to ensure it does happen.  Okay?"

Q.   Did you have any questions in response?

A.   Yes.

Q.   What were your questions?

A.   Um, so -- um -- um, so I was wondering what extra protections would be available to me to make sure retaliation didn't happen again.

     MR. MURPHY:  Objection, Your Honor.

     THE COURT:  Basis?

     MR. MURPHY:  I think the testimony violates

Your Honor's prior rulings that you and counsel and I have discussed.

THE COURT:  All right.

Can you be more general in your question without getting into eliciting the substance of what she is saying?

MR. INTERLANDI:  Yes, Your Honor.

THE COURT:  Go ahead.

MR. MURPHY:  Is the prior testimony stricken, Your Honor?

THE COURT:  No, not at this point.

BY MR. INTERLANDI:

Q.    And so you had questions and you just raised those. What were -- were any safeguards or changes -- any safeguards put in place or any changes made as you prepared yourself to return to work in early 2022?

A.    Um, I asked, um, HR if they thought I would be safe returning.  They said they didn't have an opinion on that. I don't believe any safeguards were put in place.

Q.    Who was the building leader at Hooker at this time?

A.    Ms. Gethings.

Q.    As a result of -- there was an investigation that concluded.  Were you -- did you receive any discipline as a result of the complaint that Ms. Alden filed against you?

A.   No.

Q.   Did you receive any discipline because of the retaliatory complaint that Ms. Gethings and Ms. Clarino filed against you?

A.   No.

Q.   During this meeting on January 14, 2022, did you discuss a timeline for you to come back to work?

A.   Um, we discussed that we needed mediation to happen first.  Um, and I believe that was the main issue with the timeline.

Q.   Did you have any thoughts or feelings after you had this meeting?

A.   I felt hopeless.

Q.   Why?

A.   Um, because it seemed like no matter what I did, it didn't matter and we were just going to return to the same unsafe situation.

Q.   Did you follow up with anyone after this meeting on January 14, 2022?

A.   Yes.

Q.   Who did you follow up with?

A.   Lisa Mack and Taryn Bonner.

Q.   Let's turn to Exhibit 33.  Let me know when you have it.

A.   I got it.

Q.   Now, this is another document where there have been some redactions.  Counsel and I have agreed to these redactions.  It's not the full text of the email.

Why did you send this email to Taryn Bonner on January 16, 2022?

A.   Um, so after asking all of my questions, they had -- in the meeting they had said if you want to email us your questions, we'll get back to you with answers and about setting up the mediation.  Um, so I emailed her my questions, my recap of the meeting, and asked what was going to happen.

Q.   And this is an email and then there's another email, it's a response.  It looks like you responded to your same email and you sent a message to Ms. Mack and Ms. Bonner.  What were you asking them there in that second email?

A.   I said, "Please let me know if there is anything you would like to change in the minutes of our meeting."

Q.   Did they get back to you and let you know that they wanted you to change anything in the minutes you provided to them?

A.   No.

Q.   Did anyone else that was copied on this email, Leslie Blatteau, Pasquale DeLucia, did they get back to you and say there were things in your meeting minutes that were incorrect?

A.    No.

Q.    So what happened next?

A.    Um, I received an email and a letter in the mail saying that if I didn't return, I would face disciplinary action.

Q.    Please turn to Exhibit 16.  Let me know when you have it.

A.    I have it.

Q.    Is this a copy of the letter that you received?

A.    Yes.

Q.    What is the subject of this letter as it is indicated in bold text?

A.    "Notice to Return to Work."

Q.    Next let's look at Exhibit 19.  Let me know when you have that.

A.    I have it.

Q.    This appears to be an email chain.  There is a redaction on the top part of the first page.  I think that was done previously.

      What was -- is this the email that you received?  It's a chain, if you go to DEF000082.

A.    Yes.

Q.    So this is the email that you just testified about?

A.    Yes.

Q.    And did you have a response to this email?

A.    I did.

Q.    What was your response to Taryn Bonner sending you an email and attaching you the letter that Ms. Mack signed telling you that you needed to get back to work?

A.    Um, that it was inconsistent with the meeting we had had.  That since I was on FMLA, I needed a return to work note from a doctor saying it was safe for me to return. And my doctors didn't believe yet that it was safe.  Um, and that we hadn't put any place guards -- we hadn't put any safeguards in place.  And that they hadn't addressed any of my legitimate concerns for myself or my family.

Q.    Did Ms. Bonner have a response to you or did she reply to your email?

A.    She said, "Although I do not agree with every point you raised below, your responses are duly noted."

Q.    Did anyone else chime in?  There were a few other people listed in the emails that were part of the chain. Did anyone else chime in to put forth their opinion?

A.    The union president.

Q.    What was Ms. Blatteau's position at that time?

A.    Um, we had made the agreement that we needed mediation scheduled before I could return to work.

Q.    Did mediation happen before you returned to work?

A.    No.

Q.    Do you know why?

A.    No.

Q.    I'm going to direct your attention to Exhibit 15. It's dated January 14, the original, I guess it's a chain. So it's LIGHT00164 through LIGHT00167.

I'll just ask you, what is this document?

A.    It's an email chain regarding my PTSD and returning to work.

Q.    And were you providing any sort of medical note or letter to your employer?

A.    Yes.

Q.    What did you provide to the employer at that time?

A.    There's a letter from Dr. Levin expressing that the events had triggered anxiety and depression, she's been out on medical leave for that reason.  However, I've improved significantly and would be able to return to work.

"However, since the principal who was the subject of the investigation still remains in the same position, I feel it would again trigger her symptoms.

"My recommendation is that Ms. Light be allowed to work where she would not have contact with the principal, Ms. Gethings.  If that is not possible, safeguards must be put in place to prevent any retaliation which might cause a recurrence or exacerbation of symptoms.

"I greatly appreciate your consideration in this

matter."

Q.   And did you provide that letter to the employer?

A.   Yes.

Q.   And did the employer have a response to you after you sent it, that letter?

A.   Yeah.  Lisa Mack said that I was requesting a job accommodation and that I would have to provide the steps to submit a request for that.

Q.   Did you agree?

A.   No.

Q.   In this email you referenced on LIGHT00165, "I have previously sent the return to work letter from my Doctor at the PTSD center and am now sending this additional letter..."

    Who was the person at the PTSD center that you sent the letter from?

A.   Nicole Ventura.

Q.   Let's look at Exhibit 17.  Is that the letter that you provided to the employer?

A.   Yes.

Q.   Did Ms. Ventura believe that you were able to resume working on a full-time basis without any safeguards in place?

        MR. MURPHY:  I object, Your Honor.  Ms. Ventura will be a witness.

THE COURT:  Pardon?

MR. MURPHY:  Ms. Ventura will be a witness. There's no independent knowledge here.

THE COURT:  I think that the contents of the letter ought to be restricted for examination to Nicole Ventura when she testifies.

THE WITNESS:  I apologize.

MR. INTERLANDI:  That's okay.

BY MR. INTERLANDI:

Q.   You provided this letter to the New Haven Board of Education?

A.   Yes.

Q.   Did anyone have a response to the letter that you sent from Ms. Ventura?

A.   No.

Q.   Do you recall the day that you returned to teaching first grade?

A.   Um, I did this morning.  I don't right now.

Q.   That's okay.

Let's look at Exhibit 39.  Let me know if that refreshes your memory.

A.   February 9.

Q.   I believe it's your testimony that a mediation had not occurred yet?

A.   That's correct.

Q.    And so how were you feeling now?  You had these emails back and forth after the January 14, 2022, meeting and you're receiving the return to work notice.  You're looking for some more information or safeguards.  How were you feeling at this time, end of January, early February 2022?

A.    Um, depressed, hopeless, voiceless, scared.

Q.    Why were you scared?

A.    Because my doctors had said it wasn't safe for me to return unless there were safeguards.  There were no safeguards.  So I was returning against doctors' advice.  Um, and I had no reason to believe the retaliation would end.

Q.    When you came back to work on February 9, were you teaching -- what was the plan for you teaching your first grade class?

A.    Originally, we had agreed that I would co-teach for a couple of days and then the classes would be separated again.  That didn't happen.

Q.    What happened instead?

A.    Um, I came to school prepared with like a read-aloud about how -- never mind.  I was prepared to reconnect with my students, but I was told -- I was given a list of things to do.  And I was told to sit in the back of the two separate first grade classrooms and watch the other

teachers so that I could learn from them.

Q.    How long did that last?

A.    Um, until after February break.

Q.    When is February break usually, if you recall?

A.    I don't know.

Q.    Are you okay?

A.    I am.

Q.    Did you have a meeting with the HR folks and any of your union representatives in February about the plan for you returning back to full teaching your original first grade class?

A.    Um, could you clarify what you mean by "the HR folks"?

Q.    Yeah.  Leslie Mack and Taryn Bonner.

A.    So in February we had a meeting with the two unions, the administrators union and the teachers union, Ms. Gethings, Ms. Clarino, and myself, because we were attempting to come up with some sort of halfway point since HR hadn't done a mediation yet.

Q.    And was there any resolution as you left that meeting?  Was there any decision?

A.    Previously, Ms. Gethings had asked me to write a welcome letter.  And the administrators union president asked me not to send it.  I agreed.  And I was seeking to be returned to my job as a teacher, and the administrators

wanted me not to, to pull small groups and do other tasks.

Eventually, the administrators, union president said we're going to have to agree to disagree on this one. And it ended.

Q.   The meeting ended?

A.   The meeting ended, yeah. Sorry.

Q.   Earlier today you testified about preference sheets for this school year. Did you complete a preference sheet?

A.   Yes.

Q.   I will direct you to Exhibit 42.

Do you recall the date when you completed the preference sheet during the 2021-2022 school year?

A.   March 14.

Q.   Do you recall the grade that was your most preferred at that time?

A.   Third.

Q.   Do you have any recollection of what your least preferable grade assignment was at that time?

A.   Kindergarten.

Q.   What was your second least preferable grade?

A.   First.

Q.   Why did you send this email to Lisa Mack and Ms. Gethings on March 14, 2022?

A.   Um, because Lisa Mack had sent out a preference

sheet.  I filled out the form.  But then when I looked at it, it appeared blank, so I wanted to make sure they received my preference.

Q.   Did anyone that you sent this email to reply to the email to you?

A.   Lisa Mack just said, "FYI.. see below."

Q.   Are you sure she sent that to you or did she send that to someone else?

A.   She sent it to someone else, but I was on copy.

Q.   And the person she sent it to, do you know a lady named Meri Minor?

A.   No.

Q.   Did there come a point in time that you learned there would be an opening for a third grade position at Hooker?

A.   Yes.

Q.   And when did you discover that there was a third grade teaching position open at Hooker?

A.   Um, Ms. Gethings sent out an email.

Q.   Do you recall when she sent out that email?

A.   That summer.

Q.   Was there a job posting that you saw?

A.   Yes.

Q.   Let's look at Exhibit 43.  Let me know if that's the job posting you saw for the open grade 3 position at Hooker.

A.   Yes.

Q.   Do you recall the date that this job was posted?

A.   June 22.

Q.   Did you apply for this position?

A.   Immediately.

Q.   When did you apply for this position?

A.   The day it was posted.

Q.   Let's look at Exhibit 44.  Have you seen that email before today?

A.   Yes.

Q.   And what is that an email regarding?

A.   Um, it's an email saying that my completed application was received.

Q.   And what is the date that is referenced there?

A.   The 24th.  I apologize.

Q.   Is that the date you saw the posting?

A.   Yes.

Q.   So it appears that -- okay, I'll just keep going.

     So you applied for this position.  Did you get it?

A.   No.

Q.   Do you know why?

A.   No.

Q.   Did you get to interview for the position?

A.   No.

Q.   Who was the person who would be making the decision

whether or not to hire you or any other applicants for that open third grade position at Hooker?

A.    Margaret-Mary Gethings.

Q.    Did Margaret-Mary Gethings call you or email you to let you know that she was not going to give you the position?

A.    No.

Q.    When did you learn that someone else got the position?

A.    I believe I received an email to Hooker All congratulating the new applicant.

Q.    Do you recall approximately when you got that?

A.    I don't.

Q.    How were you feeling about that at that time?

A.    Um, frustrated.  Um, Ms. Gethings had -- well, um, my child had been in third grade and was no longer in third grade which was purportedly the reason why I was moved from third grade.  So now that I didn't have a child in the third grade, I wanted back.  And I saw no reason why I shouldn't at least get an interview.

Q.    And yet you're in the summer of 2022, were you planning to -- even though you didn't get the third grade position, were you planning to return to Hooker to teach first grade?

A.    Um, I was planning to, but I was also kind of keeping

my feelers out because it had been a tough road.

Q. Prior to the end of the 2021-2022 school year, did co-workers talk to you at work?

A. No.

Q. Where do you eat lunch as a teacher at work?

A. In our classrooms. Um, I was by myself in my classroom.

Q. Were there times in the past where teachers would sit together while they ate lunch?

A. Most definitely.

Q. Did you have any friends at work at that time, the end of the 2021-2022 school year?

A. Um, the paraprofessional that worked in my room was friendly to me.

Q. What was her name?

A. Debbie.

Q. Did you have any interactions with Ms. Alden at the end of that school year, 2021-2022?

A. Yes.

Q. What were your interactions like with Ms. Alden during that time?

A. Um, at one point -- at one point we were having a retirement party for the librarian and I was sitting with my grade level partner. And then Ms. Alden came up and asked my grade level partner to sit with her. And

everybody got up and moved, um, so that I was sitting alone.

Um, I had mentioned to my doctors that, you know, no one said hello to me.  And my doctors or my therapist was, like, "Well, say hello to them first."  I said hello to Ms. Alden.  And then she said, "That's the most unprofessional thing I have ever heard."

Q.   Did you reply to her?

A.   I cried.

THE COURT:  We are in range of taking our afternoon break.  I think this would be an appropriate time to do that.

MR. INTERLANDI:  I just have a few more questions in this line, Your Honor.

THE COURT:  All right.

MR. INTERLANDI:  Thank you.

BY MR. INTERLANDI:

Q.   At this time Ms. Alden and you are teaching in the Little School together?

A.   Yes.

Q.   And earlier you testified about her complaint about you that was titled List of Concerns?

A.   Yes.

Q.   Did any other teachers at either school, Little School, Big School, during the 2021-2022 school year find

or receive a copy of her complaint?

A.    Yes.

          MR. MURPHY:  Objection, leading, Your Honor, again.

          THE COURT:  Sustained.

          Please rephrase.

BY MR. INTERLANDI:

Q.    Do you know if any teachers at Hooker found or received a copy of the List of Concerns Ms. Alden filed against you?

A.    Yes.

          MR. MURPHY:  Objection, Your Honor.

          THE COURT:  I'm going to overrule.  That does not suggest the answer.  It is not otherwise leading.

          You may ask answer.

          THE WITNESS:  One day before school I went to make copies.  Right next to the copier is the teacher mailboxes.  And on the table directly below the mailboxes I saw a copy of Ms. Alden's List of Concerns.

          I immediately took it, went to my room, told the union that it was in plain sight in the office.  And I also noted that it did not contain my rebuttal arguments.  It was just her List of Concerns about me.

          Um, I was later brought into a meeting with Ms. Clarino and Pat DeLucia on Zoom and myself in person

where I was told that a paraprofessional had found a list of complaints in her mailbox. So I was fearful that it had been in other mailboxes I didn't know about. It seemed to be around the school.

BY MR. INTERLANDI:

Q. Did your -- did you or your husband communicate with Ms. Alden during that school year via email, 2021-2022 school year?

A. It would have been the -- wait. Yes.

Q. All right.

A. Wait. I'm confused.

Q. How about the year before?

A. The year before, we did.

Q. Do you know if any teachers found any email communications that your husband sent to Ms. Alden?

A. Yes.

Q. Who found email communications that your husband sent to Ms. Alden?

MR. MURPHY: Object on the ground of hearsay, Your Honor.

MR. INTERLANDI: I'm not asking her what --

THE COURT: I'm going to permit that question, but I don't know where you're going with it.

BY MR. INTERLANDI:

Q. I'm just going to ask if you know who found it.

A.    Paul Salem.

Q.    And where did he find it?

A.    He found it on his printer.  He thought I had used his computer.

MR. MURPHY:  Same objection.

THE COURT:  I'm going to sustain the objection at that point.  This is getting into the substance of what Mr. Salem said or knew which is, in fact, hearsay.

MR. INTERLANDI:  All right.  Well, I'm not asking her for what he said, I'm just --

THE COURT:  You did ask what he said.

MR. INTERLANDI:  I asked her where did he find it.

THE COURT:  How else would she know?

MR. INTERLANDI:  Okay.

BY MR. INTERLANDI:

Q.    So another teacher found the email and his name was Paul Salem, yes?

A.    Yes.

Q.    And --

MR. MURPHY:  I'm sorry, I'm going to object again, Your Honor.  This whole line of inquiry is based on hearsay.

THE COURT:  I'm going to take a recess.  We have this recess coming up, it's come up.  I'll take up your

objections outside the presence of the jury.

You are excused for 15 minutes.

(Whereupon the jury left the courtroom.)

THE COURT:  You may step down, Ms. Light, and enjoy 15 minutes of recess.

Let's sort this out.

The question is did another teacher find Ms. -- was it Ms. Alden's complaint on the printer?

MR. MURPHY:  I think it was some separate emails, Your Honor.  I think it's a different topic than Ms. Alden's complaint.

THE COURT:  And your objection is?

MR. MURPHY:  The only way she would know that is by statements made by Paul Salem.

THE COURT:  Is there another way that she knew that?

MR. INTERLANDI:  Is there any other way that she knew that he found them?  He told her.  But she's not testifying that he told her.  She discovered that another teacher found an email on his printer.  I'm not asking her how or what he said, just asking her if she knows if someone found that email.

THE COURT:  Why is that hearsay?

MR. MURPHY:  I'm sorry, it was a little difficult to hear.  Why was what?

THE COURT:  Your objection is hearsay.

MR. MURPHY:  Yes.

THE COURT:  Why is that hearsay?

MR. MURPHY:  She has no knowledge of what someone may or may not have found on their printer other than by what was told to her.  So by answering the question, she's necessarily repeating what someone told her.  She's not saying she found them on a printer or she found them in a mailbox or whatever, like with the prior document.  I didn't object to that because she found that, she said, under a mailbox.

THE COURT:  Your position?

MR. INTERLANDI:  There's -- in terms of the evidence, it is what she found.  I'm not asking her how she learned that he found it.  So the fact of the matter is, she did learn that he found them on his printer.  I'm not asking her how she learned about it.  If she said he told me, then I think that would be obviously hearsay.  But the jury is free to try to discern how she learned about it.  She could have learned it from someone else or she could have discovered it herself.

THE COURT:  I think it's a little premature to quite call that hearsay if the only question is did she find out that another teacher found an email on the printer, to that effect.  And particularly because the

issue of the truth of any underlying communication is not at issue, it is the fact of the impact on her.  So I'm going to permit that question.

MR. MURPHY:  I'm sorry -- again, I don't know why I'm having a hard time hearing.  I didn't hear the first part of Your Honor's explanation.

THE COURT:  I think it's premature to call it hearsay.  Because the question is did she find out that another teacher found the emails on the printer.  And she says yes.  The relevance is the impact of that on her.  The substance of how she found out has not been raised and does not seem to be the course that Mr. Interlandi is taking.

MR. MURPHY:  But her whole knowledge of whether papers were found on a printer is from hearsay.  There's been no foundation that she has it from some other source.  And she's offering it for the truth of the matter asserted, meaning she's offering it to demonstrate that there were things on that printer when she has no idea whether there were things on that printer.  She's only reporting what people told her about that.  And that is hearsay.  They have no other independent basis for her knowledge.

MR. INTERLANDI:  It's premature, like you said, Your Honor.  And the impact on the listener.  I haven't

had a chance to get there.  The next question is:  What did you do?  She is going to say I ran down there and got it.  So I don't see where we're getting into hearsay.  And even if it is, that is an exception to the hearsay for the impact it had on the listener.

THE COURT:  I'm going to permit the question.  We'll take this up after our recess.

(Whereupon, a recess followed.)

THE COURT:  Please be seated, ladies and gentlemen.

I'll ask Ms. Lewis to bring in the jury.

So the point where we are is the plaintiff was told that there were emails on his printer and she acted in response.  Is that in essence --

MR. INTERLANDI:  My next question is:  What did she do?

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, ladies and gentlemen.

Ms. Light, please return to the stand.

Mr. Interlandi, you may proceed.

BY MR. INTERLANDI:

Q.   Okay, Jessica.  After you learned that this email was on another teacher's printer, did you do anything in

response?

A.    Yes.

Q.    What did you do?

A.    I immediately got in my car and went to the Big School to get them.

Q.    And where did you find them?

A.    Um, they were handed to me by Mr. Salem.

Q.    And what did you do after you received the emails?

A.    Um, I took pictures and informed my union and HR.

Q.    Was there an investigation concerning the documents that were discovered?

A.    Um, yes.

Q.    Are you aware if whoever investigated it reached a conclusion?

A.    Um, am I allowed to say?

        THE COURT:  Just "yes" or "no."

        THE WITNESS:  Yes.

BY MR. INTERLANDI:

Q.    What was the conclusion?

        THE COURT:  Now, which investigation are we talking about here?  Are you talking about something that was done internally in the school?

        MR. INTERLANDI:  Yes.

        THE COURT:  And that's all?

        MR. INTERLANDI:  Yeah.  Whomever -- like --

THE COURT:  Why don't we have background about what that investigation was.

MR. INTERLANDI:  Sure.

THE COURT:  And who was involved.

BY MR. INTERLANDI:

Q.   Do you know which person at Hooker was appointed to investigate the email that you found on Mr. Salem's printer?

A.   Um, I'm a little confused.

Q.   Okay.

A.   The email --

THE COURT:  Would you ask a clarifying question, please.

MR. INTERLANDI:  Sure.

BY MR. INTERLANDI:

Q.   Did someone look into the reason why that email was found in another teacher's classroom?

A.   Berchem Moses.  Um --

Q.   That's all I want to know.

THE COURT:  Nothing further.

BY MR. INTERLANDI:

Q.   As a result of Ms. Gethings' false statement about you, did you feel that your reputation in the school, in Hooker School, had been damaged?

A.   Yes.

Q.   Why do you feel that way?

A.   Um, prior to my advocacy I was -- I had no problems with anyone.  I never sat alone at lunch.  I was involved in every committee I could possibly be involved in.  I loved it there.  I was happy to be at work.  I felt supported.  And after, um, I felt completely alone and, you know, cried before I went to work.

Q.   Was your reputation harmed as you were entering the end of that 2021-2022 school year?

A.   Yes, I think -- yes.

Q.   Why do you believe it was still harmed as you're finishing that school year?

A.   Um, because nothing had improved.  People were still not sitting with me, speaking to me.  The list of Ms. Alden's concerns, I didn't know how widely that had been spread.  Ms. Clarino did an investigation on that.

Q.   Was there a conclusion as it related to the investigation of the finding of the List of Concerns?

A.   No.

Q.   Are there any other examples of how you believed your reputation was harmed as you were leaving the end of that school year?

A.   Um, well, the retirement party where no one would sit at the same table as me.  The para that worked in my room came and sat next to me.  And then I informed HR of the

situation.  And Ms. Clarino did an investigation of that the last day of school.  So it was all the way up to the very end of the school year where things were still unclear and, um, I felt like I couldn't speak to anyone.  Um, I was no longer on any committees.  Um, I was -- before, teachers would come to me if they had concerns about my children.  Now they didn't.  I felt like I lost my reputation as a teacher, I lost my role as a parent.  And, yeah, the last day of school I was -- I was alone cleaning up while everyone else was celebrating and happy.

There was a teacher who was pregnant.  They had a baby shower.  They didn't invite me, but it was, you know, right before school in the school building.  Yeah, it never ended.

Q.   Did you receive any notification about the conclusion of Ms. Clarino's investigation about the retirement party?

A.   Um, no.

MR. INTERLANDI:  Your Honor, I'm at a point where I would like to introduce certain exhibits that were part of an objection.  I'd like to make my offer.

THE COURT:  I'm going to ask you to skip that to another area, if you can.  Okay?

MR. INTERLANDI:  Yes.

THE COURT:  We will take up the disputed documents after the jury leaves and be prepared to return

to that tomorrow morning.

MR. INTERLANDI:  Yes.

BY MR. INTERLANDI:

Q.   Finally, I guess, I want to talk to you about your damages that you're claiming in this case.

Have you suffered any damages as a result of the conduct you're alleging was done to you by Ms. Gethings and the defendant New Haven Board of Education?

A.   Yes.

Q.   What are the damages that you're alleging in this case?

A.   My sick days which were paid for at retirement.  My damages to my reputation.  I -- prior to all of this, I had a therapist that I saw once a month, sometimes twice a month.  Through the course of this, it became -- I started having two providers and having close to ten appointments a month sometimes.  These were all out-of-pocket medical expenses.  At one point I fainted at school from the stress, had to be taken by ambulance.

Q.   I would like to ask you a question about the therapist.  What was the therapist's name that you said you were seeing one time a month, maybe sometimes twice?

A.   Dr. Eric Berger.

Q.   And how long were you treating with Dr. Berger?

A.   About eight years.

Q.   Okay.  Was there a specific reason why you were seeing Dr. Berger for eight years?

A.   Um, yeah.  It was maintenance for PTSD.

Q.   Okay.  Was there any significant trauma in your past?

A.   Yes.

Q.   What was that trauma?

A.   As a child I was habitually sexually abused.  Um, and in 2001 my father was murdered.

Q.   And what did Dr. Berger do for you?  Like, what kind of doctor is he?

A.   Um, so he prescribed medication and used talk therapy.  I had been stable.

Q.   And did there come a time where you had to look for a new therapist?

A.   Yes.

Q.   Why did you do that?

A.   Dr. Berger retired.

Q.   So he retired and did you find someone to replace him?

A.   Yes.

Q.   And who did you find?

A.   Dr. Levin.

Q.   And was Dr. Levin the same type of doctor that Dr. Berger was for you?

A.   Um, she prescribes medication and has short sessions.

Um, but she does not do as much talk therapy.

Q.    Do you recall when you started treating with Dr. Levin?

A.    No.

Q.    Please turn to Exhibit 30 in your binder and look at Exhibit 30.  Let me know if that refreshes your memory.

A.    It appears I started on April 28, 2020.

Q.    And how were you paying for Dr. Levin's services?

A.    Um, partially my health insurance, partially me.

Q.    And did it take you a while?  This is during COVID, it appears.  Did it take you a while to find a therapist after Dr. Berger closed his practice?

A.    Yes.

Q.    How long had you been looking for someone after he closed his practice?

A.    I don't believe that there was a large gap between when Dr. Berger -- my last session with Dr. Berger, but he informed me that he was going to retire, like, six months ahead of time.  During COVID, it was very hard to find a new provider just because there was so much need.  There was just wait lists.

Q.    And earlier we talked about you mentioned someone named Nicole Ventura?

A.    Yes.

Q.    When did you start seeing Nicole Ventura?

A.    Um, I don't remember the exact date, but significantly after Dr. Levin.

Q.    Let's look at Exhibit 29.  Let me know, after looking at that, if that refreshes your memory.

A.    March 8, 2021.

Q.    Why was there a significant gap in the time that you were able to find Ms. Ventura?

A.    Um, originally I was seeking for a therapist that was in network for my health insurance.  I wasn't able to find one.  And eventually -- eventually I found the PTSD center.  As soon as they started offering in-person sessions, I began.

Q.    How were you paying for these sessions?

A.    Out of pocket.

Q.    So when you're seeing Dr. Levin, what's the frequency of your appointments with Dr. Levin from April 2020 through, let's say, August 2022?

A.    About once a month.

Q.    And when you start treating with Ms. Ventura, how about the frequency of those appointments from March 2021 through August 2022?

A.    About once a week.  Oh --

Q.    Go ahead, did you have something to clarify?

A.    When I was on FMLA, it was twice a week.

Q.    So it varied?

A.    It varied.  So whenever my work schedule allowed, it was twice a week.

Q.    Is Ms. Ventura a doctor?

A.    Um, no.

Q.    What is her license in?

A.    Um --

Q.    If you know.

A.    I don't know the letters after her name.  But she was working under Dr. David Read at the PTSD center.

Q.    Okay.  And you continue to see or treat with Dr. Levin today?

A.    Yes.

Q.    Do you continue to see or treat with Ms. Ventura today?

A.    Yes.

Q.    Is Ms. Ventura still at the PTSD center?

A.    She recently started her own practice.

Q.    And so when you went to Ms. Ventura initially at the PTSD center, what were you talking to her about at that time?

A.    Um, I hoped to address my childhood trauma.

Q.    Were you able to do that with her?

A.    Somewhat, but no.

Q.    Why not?

A.    Um, because the past had to take a back burner to the

present.  Um, so I wasn't able to address those issues because I needed to address the problems I was facing that day.

Q.   And what was happening, as you refer to, in the present?

A.   The feelings of depression and isolation.  Um, the intrusive suicidal thoughts.  Um, feeling like I've lost my standing professionally and as a mother.

Q.   Do you attribute those feelings to anyone or anything in particular?

A.   Um, I believe that it was an unsafe environment at my school.  Um, I believe that -- I had to make the decision every morning if I valued my job over my safety.  And every day that I chose to value my job over myself, it diminished myself to me.  I became a victim of abuse instead of a survivor of abuse for the first time in 20 years.

Q.   Since the end of the 2021-2022 school year, have you talked at any Board of Education meeting?

A.   No.

Q.   Have you advocated for any changes or plans within the school district?

A.   No.

Q.   Is there anything else that you used to do that you're no longer able to do today?

A.    Yes.

Q.    What?

A.    Um, I don't join committees unless I'm specifically asked.  I often don't go -- like, if we're invited to a friend's house, I often don't go, um, because I feel like I'll be a downer.  Um, I used to be involved in my kids' school; my husband's taken that over.  I used to know the names of all my kids' friends; I can't do that anymore. The eighth grade dance, I wanted to go and take pictures like every other mother, but I knew that that would be making a political statement myself.  So my husband took my son.  Um, I don't go to PTA anymore.  I, um -- I do the bare minimum to keep going.

Q.    And where do you currently work?

A.    Ross Woodward.

Q.    And when did you start working there?

A.    Um, 2022.

Q.    Is there anything that you used to do that you do today but you're hesitant to do?

A.    Um, yeah.  I mean, my -- my assistant principal asked me to be on the SPMT there.  So I try to go.

      I, um, don't -- I had a hard time going out, like, to dinner with my husband because I thought it would be a waste of money because I would just be sad.  But I force myself to go out with my husband once a week.

I used to be involved in a lot of book clubs at the bookstore near me.  And I don't go regularly now, but I have gone.

Um, I make sure I get to staff meetings early so that I sit in the middle so that people have to sit next to me.

I don't go to any happy hours that teachers invited me to.

I have not gone to a union party.

I haven't -- I haven't gone to any holiday parties at my school.

I haven't been able to go to Thanksgiving because I feel like people just ask me how's it going with school.  And if I'm honest, I ruin the mood.

I feel like a rain cloud.  Yeah, I feel like people might be better without me there.

Q.   You referenced earlier that you had a lawyer in I believe 2021; is that correct?

A.   Yes.

Q.   Why did you hire a lawyer in 2021?

A.   Um, because I knew it was a dangerous thing to file a complaint against your boss.  And, yeah, I was fearful.  I wanted someone to advocate for me when I knew I couldn't advocate for myself.

Q.   Did you have to pay this attorney for her services?

A.   Yes.

Q.   And when you mentioned earlier you lost sick days, do you remember how many sick days you lost?

A.   Sixty-six.

Q.   Do you have an idea what the value of those 66 lost sick days is?

A.   About -- at retirement, about $26,000, based on the information the union gave me at the per-day rate.

Q.   How would you describe your last two years at Worthington Hooker?

A.   Crumbling.  Devastating.  Isolating.

MR. INTERLANDI:  Your Honor, I don't have any further questions other than the issue that we discussed earlier.

THE COURT:  I propose that you begin your cross-examination, and we will return later on possibly even on redirect.

You may proceed.

CROSS-EXAMINATION

BY MR. MURPHY:

Q.   Good afternoon, Ms. Light.

A.   Good afternoon.

Q.   A little bit earlier under questioning from your attorney you mentioned you were unfriended by three co-teachers at Worthington Hooker, right?

A.   Yes.

Q.   I think you listed Hillary Alden, Kathleen Morrison, and Judie Cav?

A.   Correct.

Q.   And Hillary Alden, that school year -- I'm sorry, let's back up.

You said you noticed that in the summer of 2021, correct?

A.   Um, at this point in the day, I'm giving all the dates wrong, but I believe you.

Q.   In the 2020-2021 school year Hillary Alden taught one of your children, right?

A.   Yes.

Q.   Wesley, right?

A.   Yes.

Q.   In the 2020-2021 school year, Mrs. Morrison also taught your older son, right?

A.   Yes.

Q.   And Judie Cavanaugh is the teacher who believed you were spreading a rumor about her COVID diagnosis, correct?

A.   Um, yeah.

Q.   She's the one you met with on March 31st with your union representative, Principal Gethings, and Assistant Principal Clarino, correct?

A.   I just -- I just don't want to say what she believes

at this point. I know that at one point there was a rumor that I had spread her information, yes.

Q. And at the March 31, 2021, meeting she raised her concerns about that rumor, correct?

A. Correct.

Q. And those were the three individuals that unfriended you that school year?

A. Correct.

Q. Okay. Ms. Light, I'd also like to start by showing you one of the exhibits you covered with your attorney which was the TEVAL document, okay?

A. Okay.

Q. That's Exhibit 7, I believe.

MS. McCALLUM: It's 4.

MR. MURPHY: Four.

Your Honor, we're going to broadcast exhibits on the screens for the witness and the jury if Your Honor is amenable.

THE COURT: That's fine.

BY MR. MURPHY:

Q. Okay. I'm showing you what your attorney marked as Exhibit 4. Do you see that on your screen?

A. Yes.

Q. Is this the document you were referring to before?

A. Yes.

Q.    Okay.  The TEVAL is a multipage document I think you said?

A.    Correct.

Q.    This is one page from your mid-year TEVAL document?

A.    Correct.

Q.    Okay.  I think your attorney asked you if you remembered if you got a score on this document.  Do you remember that question?

A.    Yes.

Q.    I think your answer was "I don't recall"?

A.    I think my answer was I didn't get a score.

Q.    Because you don't get a score with a mid-year TEVAL document, correct?

A.    You get scored on the different sub sections, but you don't get an overall score, correct.

Q.    So when you were asked questions whether you were a 4 or 5 or 3, in prior years' TEVALs that number would not be reflected on this document, correct?

A.    Correct.  This is just the comments.

Q.    And I think you answered some questions about the section under the title Feedback from Instructional Manager, right?

A.    Yes.

Q.    And I just want to walk through these various statements in there and let the jury read that section and

get a sense as to whether you believe -- what you believe about these various statements.

So the first sentence says "your classroom embodies the joy of learning."  And you agree with that statement?

A.    Yes.

Q.    That's a positive statement, right?

A.    Thank you.

Q.    Do you agree?

A.    Um, I try.

Q.    I didn't understand your answer.  I apologize.

A.    I try.  I mean, I don't -- I try.  I try for it to always embody the joy of learning, yes.

Q.    Of course.  And Principal Gethings there is expressing that your classroom embodies that joy of learning, right?

A.    Yes.

Q.    Okay.  And so the second sentence she says, "You always integrate the arts and allow for students to create and express themselves."  Again, that's a positive statement, correct?

A.    Yes.

Q.    Okay.  Next line, "I think you have made tremendous effort to balance the demands of in person and remote learners."  Right?  Would you agree that that's another positive -- example of positive feedback for you?

A.    Absolutely.

Q.    And you were proud of that, right?

A.    Um, I wouldn't put those words in my mouth.

Q.    Okay.  The next sentence talks about the amphitheater that you envisioned and created as a gift to our students and teachers, right?

A.    Yes.

Q.    An exclamation point on that sentence, yes?

A.    Yes.

Q.    And you talked earlier about the Gardening Committee, and that was something you did through your role on the Gardening Committee, right?

A.    Correct.

Q.    So, again, another positive feedback for you?

A.    Yes.

Q.    Okay.  And next sentence, "Thank you for your willingness to chair the gardening committee."  She goes on to talk about Mr. Jones helping you with that, right?

A.    I would just like to --

        MR. INTERLANDI:  Objection.  There's no reference to Mr. Jones here.

        MR. MURPHY:  Yes, there is.

        I'll withdraw the question.  I'll read it.

        "Thank you for your willingness to chair the gardening committee" --

MR. INTERLANDI:  I apologize --

THE COURT:  Wait, wait, wait, wait.

MR. INTERLANDI:  I see it now.  It is here.  Sorry.

THE COURT:  The objection is withdrawn.

BY MR. MURPHY:

Q.    Okay.  Well, I'll read it anyways.

"Thank you for your willingness to chair the gardening committee.  Please know that as a result of your plea for support Mr. Jones and the boys will be helping to ensure that our outdoor spaces are best prepared for the spring."

Correct?

A.    Yes.  Um, I would just --

Q.    I don't have a question.

A.    Okay.  Yes.

Q.    Okay.  You already addressed the next sentence, and we'll come back to that.

She closes by saying, "I look forward to seeing how you will include play based learning in your classroom."

And you talked a little bit about play-based learning before, right?

A.    Correct.

Q.    You were on that committee?

A.    Yes, initially.

Q.    And finally, she says "Thank you for serving for the past two years as the teacher representative of the PTA"?

A.    Correct.

Q.    Now, going back to the one sentence you highlighted before, "As we discussed in your mid year please consider asking questions any time you have a concern.  If we do not have the answer we will do our best to attain the answer."

And that's the one sentence you found critical in that whole section, correct?

A.    No.

Q.    That's the only sentence you testified about before under questioning from your attorney, correct?

A.    That's the sentence that I saw most offensive, yes.

Q.    When asked questions by your attorney earlier, that was the only sentence you read to the jury, right?

A.    Um, I also talked about how she said my classroom embodies the joy of learning.

Q.    Which was a positive statement?

A.    I also talked about Mr. Jones and the Boys Club taking over the Gardening Committee's role including the outdoor spaces.

Q.    We'll come back to that.  We're going to talk about Mr. Jones later.

Okay.  Now, Ms. Light, under your questioning before,

you were asked about your union, a little bit about your union, right?

A.    Yes.

Q.    All teachers are members of the teachers union, correct?

A.    Yes.

Q.    And as a teacher who is a member of the union, you're subject to a collective bargaining agreement?

A.    Correct.

Q.    And that covers things such as salary, right?

A.    Yes.

Q.    Discipline?

A.    Somewhat.

Q.    Somewhat.  There's a -- well, withdrawn.

There's also a grievance process within that CBA, right?

A.    A grievance process?

Q.    Sure.

Are you familiar with the teachers union contract?

A.    I am familiar with the contract.  Yes.  I don't know it word for word.

Q.    And are you familiar generally with the grievance process that's in that contract?

A.    Um, not in the sense that you're discussing it.

Q.    Have you ever filed a grievance?

A.    No.

Q.    When you were teaching at Worthington Hooker, were you aware that you had the opportunity to file a grievance if you thought there had been a violation of the contract?

A.    Um, I was advised by the union to file a complaint. Um, I believed that the complaint was synonymous with grievance.

Q.    Okay.  But my question was:  Were you aware of the grievance process in that document?

MR. INTERLANDI:  Objection, asked and answered.

THE COURT:  Sustained.

BY MR. MURPHY:

Q.    I don't recall if I asked you this question, I apologize.  Have you ever filed a grievance when you were working for the New Haven Board of Education?

A.    No.

Q.    How many teachers are there in New Haven, approximately?

A.    Um, I would be guessing.

MR. INTERLANDI:  Objection.  Requires her to speculate.

THE COURT:  Well, maybe not.

MR. INTERLANDI:  If he's asking if she knows. He asked her how many, approximately.

THE WITNESS:  I would be speculating.

BY MR. MURPHY:

Q.    Over a thousand?

A.    I have no idea.

Q.    Okay.  Prior to the onset of COVID, had you been in communications at points with the head of the union, David Cicarella?

A.    Cicarella, yes.

Q.    Cicarella, I apologize.

     And what sort of things would you communicate with Mr. Cicarella about?

A.    Um, I was a union steward at Davis.  So I communicated with Dave Cicarella often.

Q.    So before COVID, Mr. Cicarella knew who you were?

A.    Absolutely.

Q.    Okay.  How was your relationship with Mr. Cicarella prior to COVID?

A.    Um, like all people, I agreed with some things he believed and I disagreed with others.

Q.    Okay.  Did you believe he -- well, withdrawn.

     Can I have -- were you ever -- prior to the onset of COVID, had you ever been quoted in the newspaper regarding Mr. Cicarella?

A.    Absolutely.

Q.    All right.  Can I have Exhibit J, please.

     Okay.  Ms. Light, showing you and the jury what's

been marked as Exhibit J, Defendants' Exhibit J, do you recognize this document?

A.   I do.

Q.   Okay.  Can you explain what it is?  Well, withdrawn.

It's an email.  It starts out at the top, it's an email from you to Mr. Cicarella on May 4th of 2021, correct?

A.   Correct.

Q.   And in that email you're forwarding a -- it looks like a picture of a newspaper article, correct?

A.   Screenshot, correct.

Q.   Screenshot, I apologize.  That's a Wi-Fi signal.

So this is something from your phone, it's a screenshot?

A.   Yes.

Q.   And you took that screenshot?

A.   I believe so.

Q.   And you forwarded it to Mr. Cicarella?

A.   Yes.

Q.   And this is a newspaper article from the *New Haven Independent*, correct?

A.   Correct.

Q.   Okay.  And do you recall approximately what year this newspaper article was from?

A.   I believe it was from -- given the election cycle, I

believe it was probably 2017, 2018, but I would be speculating.

Q.   I will agree with you that it was 2018.  It's definitely pre-COVID and it was 2018.

This is an article.  And it starts out "Even some outspoken teachers who regularly make appearances at school board meetings said they agree with Cicarella."

Right?

A.   Could you repeat the beginning of the question?

Q.   Sure.  I'm sorry, maybe I was reading too fast.  I'm just reading from the document.

A.   I was confused.  You said the beginning of the article?

Q.   Yes.

A.   This is not the full article.  This is actually the last section of the article.

Q.   Fair enough.

The beginning of the excerpt of the article starts out by saying "Even some outspoken teachers who regularly make appearances at school board meetings said they agree with Cicarella."  Right?

A.   Yes.

Q.   And then it goes on to quote you, a teacher at Worthington Hooker, correct?

A.   Correct.

Q.   All right.  And it quotes you as saying, "Right now Cicarella 'takes the heat for the teachers who don't feel like they can speak.'"  Correct?

A.   Correct.

Q.   Okay.  And it says -- the second paragraph, I'd like to discuss that with you.

In there it quotes you as saying, "I knew the union would have my back.  I knew there was no way to let that cause me professional harm."  Right?

A.   Correct.

Q.   So in 2018, you knew the union would have your back about speaking out at Board of Education meetings, right?

A.   I believed so.

Q.   Okay.  And a little further down it quotes you as saying, "I'm not going to feel safe unless I have a president or leadership who can ensure no retribution against me, and I wouldn't know that with someone new."  Correct?

A.   Correct.

Q.   At the time Mr. Cicarella was the union president, right?

A.   Correct.

Q.   And as you discussed with your attorney a little bit earlier, he remained the union president until I believe January of 2022, correct, or that time frame?

A.    It might be 2021.  I'll have to look at the dates. I'm sorry.

Q.    That's okay.  At some point Leslie took over for David?

A.    Correct.

Q.    And you don't recall, as you sit here today, when exactly that was?

A.    Yeah.  Correct.

Q.    Do you know if it was at some point in late 2021 or early 2022?

A.    It was in January either of 2021 or 2022.

Q.    Okay.  But at least as far back as 2018 you were advocating for Mr. Cicarella to stay in leadership because he had your back?

A.    All teachers.

Q.    All teachers.  Okay.

      And when you felt you were being retaliated against in 2021 and 2022, you communicated with David about that, right?

A.    Absolutely.

Q.    Often?

A.    Yes.

Q.    By email and by text?

A.    Yes.

Q.    And you mentioned Pat DeLucia before.  You also

communicated with Mr. DeLucia about your concerns that you were being retaliated against, right?

A.    Correct.

Q.    And did they have an opportunity to attend some meetings with you?

A.    Yes.

Q.    And we know Mr. Cicarella attended some meetings with you in April of 2021, right?

A.    A meeting.

Q.    Excuse me?

A.    A meeting, yes.

Q.    A meeting.

And Mr. DeLucia attended at least the meeting in January of 2022 with you about your return to work, right?

A.    Correct.

Q.    Do you think he attended more than just that one meeting?

A.    Yes.

Q.    How many meetings do you think he attended with you?

A.    Through the course of the investigation of the complaint, he was the one who, um, sat with every teacher interviewed.  So he was like the union witness.  So every interview that Berchem Moses did, he was on --

Q.    And --

A.    -- but -- oh.

Q.    I apologize.  I didn't mean to cut you off.

A.    In terms of meetings with -- I'm not sure if you're asking me about meetings with the administration.

Q.    Did he attend meetings with the administration with you?

A.    Um, he attended the one at my return and the one investigating the List of Concerns found in the office --

Q.    Okay.

A.    -- virtually.

Q.    Earlier under questioning from Attorney Interlandi you indicated why you hired a private attorney, right?

A.    Correct.

Q.    Okay.  And it's true that either Mr. Cicarella or Mr. DeLucia facilitated you getting in contact with the union's attorney, correct?

A.    Correct.

Q.    All right.  And you spoke with the union's attorney at some times?

A.    Correct.

Q.    Several times, rather?

A.    A couple times.

Q.    A couple times, okay.

    And you're not represented by the union's attorney in this proceeding?

A.    Correct.

Q.   Did the union ever file a grievance on your behalf?

A.   The union told me the complaint was part of the grievance process.

Q.   I'm going to go back at the start of your testimony. You testified a little bit about a learning pod.

A.   Okay.

Q.   How many other families are in that learning pod?

A.   Two.

Q.   You said the learning pod involved your younger child Wesley?

A.   Correct.

Q.   Wesley was in second grade at the time?

A.   Yes.

Q.   Was Claire Rowe a member of your learning pod?

A.   A parent.

Q.   Okay.  There were two families involved, two other families involved in your learning pod?

A.   Yes.

Q.   One was Claire Rowe and her family?

A.   Yes.

Q.   And the other was Julia von Blume and her family?

A.   Yes.

Q.   Who was Julia von Blume's husband?

A.   Wolfgang Fink.

Q.   Wolfgang Fink?

A.    Yes.

Q.    And in this learning pod you expressed to them that you would be hypervigilant about exposure to COVID, right?

A.    Correct.

Q.    And that you would get tested weekly?

A.    Once I was returning to school.

Q.    Okay.  Fair enough.

So from the time period from early September through whenever you returned to school, you did not need to test weekly?

A.    I never needed to test weekly.  I chose to test weekly.

Q.    And when exactly did you return as a teacher to school, to the school building?

A.    I believe it was January.

Q.    At the same time as the kids?

A.    Um, there was a period of time when we were in the building without kids.

Q.    Okay.  And how long was that?

A.    I don't remember.

Q.    Do you think it was a week?  Do you think it was a month?

A.    I don't remember.

Q.    In any event, going back to your learning pod, you told Ms. Rowe and Ms. von Blume and their families that

once you returned to school you would get tested weekly?

A.    Correct.

Q.    And did you make any representations to them about what would happen if you were exposed to COVID?

A.    If I was exposed to COVID, I was going to go to a hotel.

Q.    Okay.  And how did the learning pod work?

A.    Could you be more specific?

Q.    Sure.  There were three families in the learning pod, correct?

A.    Yes.

Q.    How would it work?  Where would the kids go?

A.    Different days of the week the kids would be housed at different houses.  Um, the parents would supervise the kids while they were online learning.  Since I was teaching, my husband supervised them when they were at our house.

Q.    And Ms. Rowe and Ms. von Blume, do they live nearby?

A.    Yes.

Q.    Like how close?  Neighbors?  Across the street?  Around the block?

A.    At the time or now?

Q.    At the time.

A.    The von Blume/Finks lived in East Rock which is further away from us.  But Claire Rowe lives in

Beaver Hills neighborhood which is adjacent to my neighborhood.

Q.   So could you walk to their houses or did you have to drive to their houses?

A.   Drive.  I could walk, but it would be a long walk.

Q.   And you mentioned before there was a period of time where children were able to return to the New Haven public schools in January of 2021, right?

A.   Correct.

Q.   I think you said you kept your child and the learning pod stayed intact through April vacation?

A.   I believe, yes.

Q.   When you first -- when children first returned to your classroom, I think you indicated you were concerned about their safety, right?

A.   Yes.

Q.   Okay.

         MR. INTERLANDI:  Your Honor, may I just -- I'm sorry, there's an exhibit up on the screen.  I don't know if we need that up or not.

         MR. MURPHY:  I apologize.

BY MR. MURPHY:

Q.   And you were concerned about your own safety as well, right?

A.   Yes.

Q.   What sort of personal protective devices did you have on that day?

A.   On my very first day back?

Q.   Yes, with children.

A.   New Haven gave us face shields.  Um, I had a mask.

Q.   Two masks?

A.   Two masks.

Q.   And a shield?

A.   I believe so.

Q.   Anything else?

A.   Um, I mean, nothing related to COVID.

Q.   Okay.  You, as you testified on direct, thought the school should delay the reopening a little bit further, right?

A.   Correct.

Q.   Until the vaccine was available?

A.   Correct.

Q.   Okay.  Did you discuss this with people -- did you discuss this with other people, your position that schools should wait longer?

A.   Yes.

Q.   Did you discuss it with Sarah Miller?

A.   Yes.

Q.   And I think you said you met her before the COVID outbreak, right?

A.    Far before.

Q.    Excuse me?

A.    Much before.

Q.    Much before.

And you did some advocacy work with her.  Not always in agreement, but sometimes?

A.    Correct.

Q.    I'm going to show you one exhibit.  It's just going to take one second.

Okay.  So Ms. Light, I'm showing you what's Defendants' Exhibit D, okay?

Can we blow that up?  Thank you.  Perfect.

A.    Okay.

Q.    Can you scroll to the bottom.

Okay.  Is this a text message exchange between you and Mrs. Miller?

A.    Ms. Miller.

Q.    Ms. Miller, I apologize.

A.    Yes.

Q.    And on the entry dated October 9, 2020, at 5:41 p.m. she forwarded you a link to an article in the *New Haven Independent*, correct?

A.    Correct.

Q.    You indicate you hadn't seen it and you didn't realize it was written by her, right?

A.    Correct.

Q.    Okay.  And then if we can go to the next page.

You indicate you haven't been following, you're trying not to comment on *New Haven Independent* articles, right?

A.    Correct.

Q.    But Ms. Miller states, "I see some hooker parent rage... And the illusion of choice as a public good."

Do you see that?

A.    Yes.

Q.    And what's your response?

A.    "Hooker parents are crazy - all of them want to return."

Q.    So as of October 2020 you wanted to stay remote and the parents who disagreed and wanted to return were crazy?

A.    At least the ones that commented on the article.

Q.    You testified a little bit before about the PTA, the Parent Teacher Association, right?

A.    Correct.

Q.    Okay.  You were the teacher representative on that?

A.    The parent teacher representative.

Q.    Parent teacher representative.

For how many years?

A.    Two years.

Q.    Who -- how did you come to be the parent teacher

representative?  I don't think you testified about that on direct.

A.    Um, a parent named Rhonda approached me and asked me if I would take a role on the Executive Board of the PTA because I was the only parent and teacher.

Q.    Okay.  Who is Michael Delaney?

A.    He is a member of the Westville community.  His daughters at one point went to Hooker.  He was also on the PTA.

Q.    He was on PTA with you?

A.    Correct.

Q.    Okay.  And if you could scroll to the top.

So this is another email -- I'm sorry, text message exchange with Ms. Miller, correct?

THE COURT:  You're referring to Defendants' E.

MR. MURPHY:  Defendants' Exhibit E.  Thank you, Your Honor.

THE WITNESS:  I don't know the question.

BY MR. MURPHY:

Q.    The question was:  This is another text message exchange with Ms. Miller?

A.    Correct.

Q.    All right.  And you sent her a screenshot that's a little illegible, right?

A.    Correct.

Q.   Okay.  And she asks who it is, assuming who wrote that?

A.   Correct.

Q.   All right.  And you say, "I am fairly sure - I know it" --  I think that should be "shouldn't" -- "bother me but this shit drives me crazy.  I think it's mike Delaney, if you know him"?

A.   Correct.

Q.   And then you go on to describe him as "a jerk who said I was the best teacher his daughter ever had but then last year I didn't vote the some way he did on some pta politics and he has gone for blood ever since - 97% sure it is him."

     Correct?

A.   Correct.

Q.   What did you mean by "he's gone for blood ever since" then?

A.   Um, he was at one point a friend of my husband's. They used to go out together.  They were part of the Westville dads.  He said very negative things about me to my husband.  Um, my husband told him to keep my name out of his mouth.

Q.   And the negative things he said to you involved your role on the PTA?

A.   Correct.  I wanted there to be federally financial

aid for --

Q.    I'm sorry --

A.    -- families.

Q.    It's a yes or no question, I believe.  The question was --

THE COURT:  The question, what you asked:  The negative things he said to you involved your role on the PTA; is that correct?

THE WITNESS:  Yes.

THE COURT:  Go ahead.  Next question.

MR. MURPHY:  All right.

BY MR. MURPHY:

Q.    Ms. Miller texted you a few additional things and notes she developed a pretty thick skin for it.  What's your response to her text?

A.    "Yeah I will grow a thicker skin - it's a weakness."

Q.    So are you indicating there you have thin skin?

A.    Comparatively to Sarah Miller, yes.

Q.    And would you agree with me that thin skin is generally defined as a tendency to get easily upset or offended by other things -- I'm sorry, to get easily upset or offended by the things other people say or do?

A.    Will you repeat that question?

Q.    Sure.  What's your definition of "thin-skinned"?

MR. INTERLANDI:  Objection, Your Honor.  She

hasn't testified that she has a definition of "thin-skinned."

THE COURT: She can say that.

THE WITNESS: I haven't formulated a definition of "thin skin." But, in general, I think of it as meaning that I take to heart criticism and try to be as reflective as possible.

MR. MURPHY: I didn't know when Your Honor was planning on breaking.

THE COURT: You're right, we're at 4:00. Are you at --

MR. MURPHY: I'm at a fine stopping point, Your Honor.

THE COURT: Ladies and gentlemen, thank you very much. We will see you tomorrow at 9:00.

Leave your notebooks on your chair. Ms. Lewis will collect them and secure them and distribute them to you again tomorrow.

Remember, do not talk about this case or do any research related to it.

Thank you. And you may go.

(Whereupon the jury left the courtroom.)

THE COURT: All right. There are matters that you wish to raise with respect to -- why don't you tell me which exhibits you want to discuss.

MR. INTERLANDI:  Those are Plaintiff's 21 and 22, Your Honor, the classroom notes that were found by Ms. Jessica in her classroom in August of 2022.

THE COURT:  This is the toxic notes?

MR. INTERLANDI:  Yes.

THE COURT:  Mr. Murphy, you want to set out your objection?

MR. MURPHY:  Yes, Your Honor.  I'm sorry, I was trying to go back to the point where I believe Attorney Interlandi was referencing those.

Well, I guess first I'd like to hear his offer so I can respond to it.  What basis?

THE COURT:  There has been no offer thus far. And how is it that you propose to offer them?

MR. INTERLANDI:  I'm offering these, Your Honor, consistent with our motion in limine.

THE COURT:  What is the context in which you will offer them?  She will be on the stand.

MR. INTERLANDI:  In relation to her claim for damages to her reputation.

THE COURT:  What is the background or context in which she will be testifying about this?

MR. INTERLANDI:  She has testified that throughout that school year she experienced several instances of conduct against her towards -- I mean, from

colleagues at the school, the most recent of which was on the exact last day of school, the retirement party to which she filed a complaint, and that matter was investigated by the assistant principal.  And so we are claiming this as part of her damages as damage to her reputation resulting from the defamatory statement that was made about her in March of 2021.

Also, Your Honor --

THE COURT:  Let's get some time in here.  The March of 2021 is when the defendant made the alleged defamatory statement?

MR. INTERLANDI:  Yes, Defendant Gethings made the statement.

THE COURT:  What is your context of when Ms. Light found these notes?

MR. INTERLANDI:  I have not gotten there yet with her testimony, Your Honor.

THE COURT:  Well, I'm asking for a proffer.

MR. INTERLANDI:  Proffer is going to be that as she was preparing for the upcoming school year, she was preparing her classroom and found the two notes in August of 2022.

THE COURT:  So what is the relationship between Ms. Gethings' statement of March 21, '22, and her finding these nasty notes in her classroom in August of '22, five

months later?

MR. INTERLANDI:  So, Your Honor, the statement was made on March 31, 2021, in front of Ms. Morrison, Ms. Cavanaugh, and Jenny Clarino.  Jenny Clarino and Ms. Gethings on or around June 7, 2021, file a retaliatory complaint and a response to Ms. Light's initial complaint. Part of that complaint is the issue regarding teacher acts that Ms. Light defamed -- I'm sorry, that she leaked the information about her COVID-positive status.

Obviously, now over the summer of 2021 there's an investigation.  It wraps up in December of 2021.  But before that, Ms. Light is now reassigned to go work in first grade at the Little School where Ms. Alden is located and Ms. Clarino is located.

So as we come around to January 2022, we have the meeting, there's discussions.  Ms. Light is back to work.  She's not happy about how she's being eased into the role.  And eventually within three to four weeks she finally gets her class back.

There are other issues that come after that as well as before.  She testified about the email being found.  She testified about Ms. Alden, who is a second grade teacher located in the Little School, about her List of Concerns being found in the mail room, and the retirement party on the last day of school which was in

2022 and located in the Little School.  There is a gap from June to July.  Now we're into August.

Our proffer is this is all related from the beginning of March these rumors were spread, the defamatory statement was made, and other teachers -- arguably, it's not direct evidence but it's certainly circumstantial evidence of injury to her name and reputation.  Folks are telling her -- not folks, I'm sorry.  But the letters are saying "you are toxic," "leave our school or just die," "Ms. Light's to-do list:  Leave our school or wash your hair."  No one is sitting with her at lunch.  She says hello to a colleague and they have an unreasonable reaction.

That is our offer, Your Honor.

THE COURT:  So when you say that the litany of bad treatment against Ms. Light includes circumstantial evidence of injury to her name and reputation found in the notes, how do you make that link?  It's the link to what Ms. Gethings said in March, right?

MR. INTERLANDI:  Yes.

Your Honor, if I may, I want to take a look at Ms. Alden's initial complaint.

MR. MURPHY:  While he's looking at that, can I just clarify the timeline?  It's March of 2021 to August of 2022.

MR. INTERLANDI:  I already clarified it.

MR. MURPHY:  I thought you guys were discussing a five-month difference.

THE COURT:  I thought we were too.

So the defamatory statement claimed to ruin reputation is -- harm reputation is March 21, '21.  The discovery of the notes in her classroom is August '22.

MR. MURPHY:  Correct.

THE COURT:  All right.

Did you find what you were looking for?

MR. INTERLANDI:  No, Your Honor, I did not.  I found the exhibit, but I thought that maybe there was a reference to --

THE COURT:  What Mr. Murphy is saying, that's a big gap.

MR. INTERLANDI:  That is a gap.  I'm saying there is a chain link, right?  It's contained -- it starts in this meeting on March 31.  But it doesn't just live there.  It finds its way outside of that meeting by way of the retaliatory complaint that is filed.  That complaint is then investigated.  Teachers are questioned or interviewed first by Ms. Bonner, then by Berchem Moses attorneys.  And along the way it's part of kind of the fabric of the timeline.

THE COURT:  When you say that from March 2021

the statement by Ms. Gethings finds its way out and a complaint is then investigated, the complaint as to what Ms. Gethings said to the people in that meeting?

MR. INTERLANDI:  Ms. Gethings' retaliatory complaint.

THE COURT:  Her complaint.

MR. INTERLANDI:  Yes.  Is that Ms. Light disclosed that teacher's COVID status.  Which is untrue.

THE COURT:  And the retaliatory complaint was filed when?

MR. INTERLANDI:  June 7th was the date of the letter.

THE COURT:  What year?

MR. INTERLANDI:  2021.

THE COURT:  And then it was investigated.  And what is the next point in time that you say bears on demonstrating this causal link?

MR. INTERLANDI:  The next point in time is -- well, along the way there are interviews of teachers. Teacher X, Ms. Cavanaugh, being one of them who is an art teacher that goes between both schools, Little School and Big School.  She at some point decided she wasn't going to file a complaint.

December 3rd or thereabouts there's the Berchem Moses report.  That is disclosed to the parties: the

principal, the assistant principal, union representatives, Jessica Light.

And then we're back now in early 2022. And we're looking for safeguards to be put in place, et cetera. Ms. Alden is teaching at the Little School. Ms. Clarino's office is located in the Little School. And it's our position that this is, like I said, part and parcel of the timeline. And I recognize I don't have anyone saying I'm leaving that note in the office or in your classroom because of the defamation because you disclosed Teacher X's COVID status but, again, I do believe that it is some evidence of harm to corroborate her claim that there was harm to her reputation. If I say someone fights pit bulls in the street and three months from now or a year from now they get an anonymous letter saying that they're a bad person, I believe that should be evidence of that person's reputational harm.

He can certainly make the argument that it's so far away that how could this even be considered. And he can do that in his closing. And he can do that on cross.

MR. MURPHY: Well, that's not my only objection, but it's certainly a major one.

THE COURT: All right.

Let me hear from Mr. Murphy.

MR. MURPHY: Thank you, Your Honor.

Certainly, it's the timeliness argument.

Second, just looking at what Ms. Light testified was the alleged defamatory statement, it was Ms. Gethings saying something along the lines of everyone's saying it's you.  No one has said it's anyone else.  That's the gist of that statement from that March 31, 2021, meeting.  And there's been no testimony that Principal Gethings said that again outside of that meeting or anything else.  That statement was confined to one particular meeting with Judie Cavanaugh who certainly didn't want to go talking about it because she was upset it was talked about in the first place, right, according to the record.  And then, two, the union representative.

This is just a huge leap to suggest that one comment in a meeting about one particular issue a year and five months before has some sort of connection to these notes allegedly being found in Ms. Light's classroom in a separate school from where she was previously -- a separate building, rather.  There's just no connection whatsoever.

It's a huge leap and would be unfairly prejudicial to the defendants to admit these notes, especially when I don't understand Ms. Light to even be alleging that she knows who left them or that there's any evidence as to who left them, whether, you know,

Principal Gethings, a teacher, Ms. Light herself.  There's just no evidence anyone has left those notes there.

THE COURT:  So the offer of proof is not that these notes showed how bad the atmosphere had gotten regarding Ms. Light within the school system, but that these notes were the product of Ms. Gethings' allegedly false accusation much earlier.

I'm not seeing any reasonable way to draw causal connection between what Ms. Gethings -- between Ms. Gethings' defamation in March of '21 as to which we at least thus far have no evidence was repeated.  The investigations that are being referred to are a much broader complaint, as I understood it.

And while we are not getting into the contents of the Berchem Moses report findings, the report was disclosed in December of 2021, and we still have to account for what happened between then and August 22.

Do I have my dates correct?

MR. INTERLANDI:  Yes, Your Honor.

THE COURT:  So to say that the harm from the defamatory statement includes those anonymous notes seems to me on the record so far is too attenuated to have relevancy on the issue of damages.

Now, when it's presented and when the actual evidence purporting to show the relationship is on, you

will not have to go through this whole argument in front of the jury, and I will be listening to see if I've heard anything more that connects the nasty notes with the defamatory statement a year and five months earlier.

Okay.  Anything else to take up?

MR. INTERLANDI:  I have a few, Your Honor.

I have a question concerning use of the Berchem Moses reports for the limited purpose of impeaching witnesses for statements that they provided to the investigators during their interviews.  I would like to use those reports for that limited purpose.  And given Your Honor's ruling on the findings and the attorneys testifying, I just was seeking some clarification if I would be able to do so.

THE COURT:  So you're talking about witnesses down the road.

MR. INTERLANDI:  Yes.

THE COURT:  Who are they, specifically?

MR. INTERLANDI:  Ms. Clarino, Ms. Gethings, Ms. Maffuid, Mr. Salem, Mr. Shortt, and Ms. Alden.

THE COURT:  And would it be fair to say that only Clarino and Gethings are party opponents?

MR. INTERLANDI:  I would also add Ms. Bonner to the extent, I don't recall if -- actually, scratch that.

Ms. Clarino is not a party in the case.

THE COURT:  She's not a party, but she is an agent of the Board of Education.

MR. INTERLANDI:  Yes, I agree.

THE COURT:  So she is, for the purposes of the use of her statements, a party.

MR. INTERLANDI:  Yes.

THE COURT:  Okay.  But these other people aren't.

MR. INTERLANDI:  They are not.

THE COURT:  What is your intended inquiry of the other people?

MR. INTERLANDI:  Well, Mr. Shortt and Salem are my witnesses.

THE COURT:  Right.

MR. INTERLANDI:  I don't intend to ask them questions about that, but if they testify in a manner that is inconsistent, I would like the opportunity to use that. And defense counsel has claimed I believe Mrs. Alden and Maffuid as their witnesses.

THE COURT:  Okay.  So your purpose and your anticipated proffer, I guess, is to use the statements of some or all of these nonparty witnesses to impeach what they are saying in their testimony here?

MR. INTERLANDI:  Yes, Your Honor.  If they say something that is inconsistent with what they provided to

Attorney Goldberg in the report, I believe that should be fair game.

THE COURT: All right.

If they testify inconsistently, your intention is to say isn't it a fact that you said to investigators A, B, and C?

MR. INTERLANDI: Yes, Your Honor. I would ask them if they were interviewed by investigators during the course of the investigation, if they provided statements.

THE COURT: And the statements that you're referring to, are they written statements that the witnesses signed?

MR. INTERLANDI: No, Your Honor, they are not. Essentially, it's Attorney Goldberg stating in her report what those individuals said to her during their interviews.

MR. MURPHY: Allegedly.

MR. INTERLANDI: And they can certainly disagree with the statement and say I never said that. I mean, my understanding is that we're allowed to reference the report, not the findings. And so if we are allowed to reference the report, I can ask them if they were interviewed in the course of the investigation and if they provided -- if they were provided any statements. If they say yes, then I believe that's fair game.

THE COURT:  It's this word "statement" that I think is getting a little bit lost.

Let me hear Mr. Murphy on this.

MR. MURPHY:  I guess that's my concern.  I hadn't really thought about this issue until it was just raised right now.  My concern is that exact thing.  It's a report written by Attorney Goldberg based on her perceptions of what witnesses may or may not have said.  It's not an email from the person.  It's not a sworn deposition testimony.  It's not something that Mr. Shortt or Mr. Salem or whoever has agreed is even accurate in the first place.

Two, I think it just opens up a very dangerous issue.  We addressed the report, some parts coming in, others not.  I'm just worried about that.

THE COURT:  Well, the peril of the reports is their conclusions, which is what is most certainly to be kept from the jury because it usurps their role.  If things took place during that that can be probative of something in this case, that's okay.

What I'm trying to envision is how you do this.  Because Attorney Goldberg is not testifying.  She's never going to be testifying did you ask and did he say.  The best it seems to me you're going to do is the witness says I never said that I heard that the plaintiff outed

Teacher X.  And yet the report would reflect, in essence, that he claimed he did hear plaintiff say something about Teacher X's health.  So then you say isn't it a fact that you told -- in the course of one of these investigations you told them that you had heard this.  And he says yes or no.  And it ends there.  Right?

MR. INTERLANDI:  Yes.

THE COURT:  So the report itself is never in evidence as such.

MR. INTERLANDI:  Correct.

THE COURT:  And I don't know whether -- if it's a difference between having a recollection refreshed versus confronting with an inconsistent statement, the statement in the report doesn't come in.  Do you agree?

MR. INTERLANDI:  Yes.

THE COURT:  So what's wrong with that dissection?

MR. MURPHY:  I have less concerns about that, Your Honor.

THE COURT:  Well, that's I think the limit that you're going to get without getting us into the whole area of the investigation and report that supplants what these jurors are doing here.  Okay.

MR. INTERLANDI:  And that would be, isn't it true that you said this to this person, and they say yes

or no.

THE COURT: Right. And there's nothing more that you can do if they deny that.

MR. INTERLANDI: Okay.

THE COURT: Anything else to be reviewed before tomorrow?

MR. INTERLANDI: Not before tomorrow, Your Honor.

THE COURT: Okay. Well, don't surprise me if you don't have to.

MR. INTERLANDI: I would, just to clarify -- sorry. I did raise -- I brought this issue to opposing counsel's attention this morning in terms of the Berchem Moses, the issue I just raised. I wanted that to be clear. I didn't just spring it on him ten minutes ago.

THE COURT: Oh, I don't think he's saying that.

MR. INTERLANDI: I think he said he just learned about it just now.

MR. MURPHY: I said I hadn't really thought about it. I thought that's what I said, at least.

THE COURT: I'm working on your charge.

MR. INTERLANDI: That was one of the other -- we maybe have time but maybe not.

THE COURT: Pardon?

MR. INTERLANDI: I thought maybe we had some

time to talk about that.

THE COURT:  Well, if there are things you want to raise.

I want to raise with you the issue of damages for defamation -- no, 31-51q, punitive damages.

I'm going to ask our clerk to give you three cases that found damages for 31-51q based on the statutory construction was more than just fees and costs.

MR. INTERLANDI:  Yes, Your Honor.  We did discuss this recently.  We're in agreement that punitive damages -- correct me if I'm wrong -- would be available under 31-51q.

THE COURT:  Okay.

MR. INTERLANDI:  Aside from the -- I'm sorry, in addition to attorney's fees.

THE COURT:  Okay.  No issue then.  That's how I'll draft it.

MR. MURPHY:  We both proposed some language to that effect in our proposed instructions.  And the other day I think we just got confused.

THE COURT:  Now I know that you've become unconfused.

MR. MURPHY:  Thanks.

THE COURT:  All right.

MR. INTERLANDI:  There's a housekeeping matter.

I wanted to be clear.

I think the exhibits that were coming up -- where, on the screen?

THE PLAINTIFF:  Yes.

MR. INTERLANDI:  -- on your screen were redacted?

THE PLAINTIFF:  They were not redacted.  So when I had seen them prior --

MR. INTERLANDI:  Okay.  I misunderstood.  We'll talk about that.

THE COURT:  Okay.  But the hard exhibits, which are the same as the electronic exhibits, are properly redacted?

MR. INTERLANDI:  Yes.  As far as I'm concerned today, they are.

THE COURT:  Anything else that you want to raise?

MR. INTERLANDI:  No.  That's it, Your Honor.

THE COURT:  Okay.  I am going to try to give you a draft charge tomorrow.  And that is given to you way in advance in hopes that we can have a charge conference perhaps the next day.

Very good.  Thank you very much.  We'll stand in recess.

(Proceedings adjourned at 4:36 p.m.)

C E R T I F I C A T E


RE: JESSICA LIGHT v. NEW HAVEN BOARD OF EDUCATION, ET AL.

No. 3:22CV425(JBA)




        I, Diana Huntington, RDR, CRR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages 1 through 226 are a true and accurate

transcription of my shorthand notes taken in the

aforementioned matter to the best of my skill and ability.








                        _____/s/_____

                        DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
                        United States District Court
                        141 Church Street, Room 147
                        New Haven, Connecticut 06510
                           (860) 463-3180