UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - x
                              :
JESSICA LIGHT,                :  No. 3:22CV425(JBA)
                              :
            Plaintiff         :
                              :
        v.                    :
                              :
NEW HAVEN BOARD OF EDUCATION &  :
MARGARET-MARY GETHINGS, in her  :
individual capacity,          :
                              :  New Haven, Connecticut
            Defendants        :  August 6, 2024
                              :
- - - - - - - - - - - - - - - x
```

JURY TRIAL
VOLUME II

B E F O R E:

THE HONORABLE JANET BOND ARTERTON, U.S.D.J.,

and a Jury of Eight


A P P E A R A N C E S:

FOR THE PLAINTIFF:

MONARCH LAW
363 New Britain Road, First Floor
Berlin, Connecticut 06037
BY:  ANTHONY J. INTERLANDI, SR., ESQ.

FOR THE DEFENDANTS:

SHIPMAN & GOODWIN
One Constitution Plaza
Hartford, Connecticut 06103
BY:  PETER JOSEPH MURPHY, ESQ.
CHELSEA McCALLUM, ESQ.


Diana Huntington, RDR, CRR
Official Court Reporter

1

TABLE OF CONTENTS

2

3 PLAINTIFF'S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PASQUALE DeLUCIA | | | | |
| By Mr. Interlandi | 233 | | | |
| By Mr. Murphy | | 243 | | |
| By Mr. Interlandi | | | 257 | |
| | | | | |
| JESSICA LIGHT | | | | |
| By Mr. Murphy (Resumed) | | 261 | | |
| By Mr. Interlandi | | | 340 | |
| By Mr. Murphy | | | | 382 |
| By Mr. Interlandi | | | 388 | |
| | | | | |
| DAVID BIANCHINE | | | | |
| By Mr. Interlandi | 391 | | | |
| By Mr. Murphy | | 424 | | |
| By Mr. Interlandi | | | 428 | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       **8:57 A.M.**

2              THE COURT:  Good morning, counsel, ladies and

3  gentlemen.

4              MR. INTERLANDI:  Good morning, Your Honor.

5              MR. MURPHY:  Good morning, Your Honor.

6              THE COURT:  Are we ready for the jury?

7              Are there any matters that need to be taken up?

8              MR. INTERLANDI:  Yes, Your Honor.

9              THE COURT:  All right.

10             MR. INTERLANDI:  We have agreed to take a

11 witness out of order.  And that would be the former union

12 vice president Pasquale DeLucia.

13             THE COURT:  Okay.

14             MR. INTERLANDI:  He will be our next witness and

15 we're just going to take him out of order.

16             THE COURT:  And after Mr. DeLucia?

17             MR. INTERLANDI:  We'll resume Ms. Light.

18             THE COURT:  All right.  Thank you.

19             MR. MURPHY:  And then I understand her husband

20 will testify.  And then yesterday I know Your Honor saw

21 there was a supplemental witness list filed with two

22 additional witnesses, weren't on the list originally.

23             THE COURT:  Yes.

24             MR. MURPHY:  I haven't seen any subpoenas for

25 them to appear.  I represented earlier I couldn't accept

```
1    subpoenas on their behalf because they're not agents of

2    the Board.  One of them is potentially on the docket

3    today.  I just wanted to raise my concern with that.

4                THE COURT:  So when you say you haven't seen any

5    subpoenas for them to appear, what is the significance of

6    that?

7                MR. MURPHY:  I didn't believe they were being

8    called.  I had understood there would be subpoenas for

9    them.  Then I never saw a subpoena for them.  So I

10   understood they wouldn't be called or potentially only on

11   rebuttal.

12               THE COURT:  But they're not being called today

13   or tomorrow, right?

14               MR. INTERLANDI:  Not today.  Wednesday

15   afternoon.  I listed -- I -- when I read the names of

16   potential witnesses to the potential jurors, Mr. Shortt

17   and Mr. Salem were listed.  It was an oversight that it

18   did not go back to amend our witness list.  But the reason

19   why they were not originally on the witness list is

20   because we were trying for the Berchem Moses reports and

21   we had those attorneys listed as witnesses.  Once the

22   Court made its ruling, we had to pivot, and I did not do

23   that.

24               THE COURT:  So there's plenty of time for the

25   defendants to prepare.
```

1              MR. MURPHY:  So my understanding is they're not

2     being called today?

3              THE COURT:  They're not being called today.

4              MR. MURPHY:  Okay.

5              THE COURT:  Okay.

6              Ms. Lewis, would you bring in the jury.

7              Mr. Murphy, have you given the observers my

8     admonition?

9              MR. MURPHY:  Yes.  I did as soon as Your Honor

10    mentioned it.  And I hope it has been cured.

11             THE COURT:  It seemed to be.

12                  (Whereupon, the jury entered the

13                   courtroom.)

14             THE COURT:  Please be seated, ladies and

15    gentlemen, and good morning.

16             We have less temperature, same amount of

17    humidity, right?  Okay.

18             The plaintiff is going to call out of order,

19    that is we're going to interrupt Ms. Light's testimony to

20    call Pasquale DeLucia.

21             MR. INTERLANDI:  Yes, Your Honor.

22             Mr. DeLucia.

23             THE COURT:  Mr. DeLucia, would you kindly come

24    over here and take the stand and raise your right hand so

25    that you may be sworn.

1                    PASQUALE DELUCIA,

2          called as a witness, having been first duly

3          sworn, was examined and testified as follows:

4

5               THE CLERK:  Please state your name and spell

6    your last name.

7               THE WITNESS:  Pasquale DeLucia,

8    D-E-capital-L-U-C-I-A.

9               THE CLERK:  And give us your city and state of

10   employment.

11              THE WITNESS:  I am currently retired.

12              THE CLERK:  City and state of residence.

13              THE WITNESS:  I live in Hamden.  I worked in

14   New Haven.

15              THE COURT:  You may be seated.

16              You may proceed.

17              MR. INTERLANDI:  Thank you, Your Honor.

18

19                    DIRECT EXAMINATION

20   BY MR. INTERLANDI:

21   Q.   Good morning, Mr. DeLucia.

22   A.   Good morning.

23   Q.   Are you here voluntarily or because I served you with

24   a subpoena?

25   A.   Because you served me with a subpoena.

```
 1   Q.   And what was your profession before you retired?
 2   A.   I was a special ed teacher in New Haven and I served
 3   as executive vice president for the New Haven Federation
 4   of Teachers.
 5   Q.   How long were you a teacher in New Haven?
 6   A.   Approximately 40 years.
 7   Q.   How long were you the executive vice president of the
 8   union?
 9   A.   Around 15 years.
10   Q.   Is that something that you were appointed to or did
11   you have a run for --
12   A.   Run for election.
13   Q.   Run for election, okay.
14        And when did you retire?
15   A.   Last December 31, '23.
16   Q.   Which school did you teach at last?
17   A.   I was at Riverside Academy, an alternative high
18   school in New Haven on The Boulevard.
19   Q.   Do you know a woman named Jessica Light?
20   A.   Yes, I do.
21   Q.   How do you know Jessica?
22   A.   I worked with her during her time at Worthington
23   Hooker while she was going through some issues at the
24   school.
25   Q.   Do you recall what issues -- the issues that she was
```

1  going through?

2  A.   There were some threatening notes left.  She was

3  being bullied.

4  Q.   Anything else?

5       MR. MURPHY:  Your Honor, I object to that

6  testimony.

7       THE COURT:  Overruled.  He's just answering the

8  question.

9       Go ahead.

10 BY MR. INTERLANDI:

11 Q.   You said bullied.  Anything else?

12 A.   She just felt like she was being treated unfairly.

13 Q.   Do you recall by whom she felt that she was being

14 treated unfairly?

15 A.   Some staff.  Some administration.

16 Q.   Do you remember any of the administration, in

17 particular?

18 A.   She had mentioned Assistant Principal Clarino and

19 Principal Margaret-Mary Gethings.

20 Q.   As the executive vice president of the union, what

21 was your role?

22 A.   My role was to support Jessica, to try to attend any

23 meetings or hearings, and to try to bring this to some

24 kind of resolution.

25 Q.   Did there come a point in time when you became aware

1    that she filed a complaint against both administrators?

2    A.    Yes.

3    Q.    Did there also come a point in time when you learned

4    that the administrators had filed a retaliatory complaint

5    against her?

6    A.    Yes.

7    Q.    Did you follow the investigation that the school --

8    I'm sorry, the Board of Education undertook?

9    A.    I -- excuse me.

10   Q.    There's some water, if you'd like.

11   A.    I had tried to move it along through HR.  And there

12   were just too many roadblocks.  There was a shortage in HR

13   and just couldn't seem to get the time or get it done.

14   Q.    Do you recall a time when some other entity took over

15   the investigation of those complaints?

16   A.    To my best recollection, when we brought it to HR

17   they said that the investigation would be handled at the

18   school level by the principal.  That was their protocol.

19   I had reached out to Chief Thaddeus Reddish at the time

20   when Jessica had presented some notes to me that she found

21   and asked him if he could pursue it.  And it just seemed

22   to drop there.

23   Q.    During the investigation of Jessica's complaint did

24   you sit in on any witness interviews?

25   A.    Not that I remember.  We did try to -- there was a

1   mediation scheduled.  I can't remember the gentleman's

2   name, I'm sorry.  And that just kind of -- didn't really

3   seem to go anywhere.

4   Q.   Were you involved with assisting Jessica in returning

5   back to work after the investigation concluded?

6   A.   I kept in contact with her.  She would call me in the

7   morning or text me or email and let me know how the day

8   had started.  And then I asked her any assistance that I

9   could help her with to just let me know.

10  Q.   Did you attend any meetings with or on her behalf in

11  January of 2022?

12  A.   You know, I may have.  I know she did -- I don't know

13  if it was a deposition.  You had mentioned the attorney's

14  name.  I sat in on that one.  I don't know.

15  Q.   Would that be Attorney Rebecca Goldberg?

16  A.   Yes, yes.

17  Q.   You sat in on her interview of Jessica?

18  A.   Yeah.

19  Q.   And did you sit in on any other interviews that

20  Rebecca Goldberg did as it related to the investigation?

21  A.   I think I sat in until they were completed with

22  Jessica Light and Ms. Goldberg.

23  Q.   When Ms. Goldberg interviewed Margaret-Mary Gethings,

24  did you attend that interview?

25  A.   No, I did not.

```
 1    Q.   I'm going to -- there's a binder in front of you and

 2    it has the plaintiff's exhibits in this case.  I'd like to

 3    direct your attention to Exhibit 33.  Just let me know

 4    when you're there.

 5    A.   Okay.

 6    Q.   You said you think you may have attended a meeting

 7    but you weren't sure on the date.  Was that your testimony

 8    a few minutes ago?

 9    A.   Yes.

10    Q.   Looking at Exhibit 33, I see your name in the middle

11    of the first page.  Is that in fact your name?

12    A.   Yes.

13    Q.   Do you recall receiving this email?

14    A.   Yes, I do.

15    Q.   And did you attend the January 14 meeting?

16    A.   To be honest, I don't recollect.

17    Q.   Okay.  Do you recall -- did you reply to this email

18    after you received it?

19    A.   I usually reply to all emails that I receive.

20    Q.   In response to this email did you tell Jessica that

21    her meeting minutes were wrong or that they needed to be

22    corrected?

23              MR. MURPHY:  Objection, leading.

24              THE WITNESS:  I don't --

25              THE COURT:  Just a moment.
```

1              Your claim?

2              MR. INTERLANDI:  It's not leading.  I'm asking

3    if he did something in response to the email.

4              THE COURT:  I'm going to permit the question.

5              THE WITNESS:  I don't remember, to be honest.

6    I'm sorry.

7    BY MR. INTERLANDI:

8    Q.   I'll direct your attention now to Exhibit 24.

9    Actually, let's go to 27 instead.  Exhibit 27.

10   A.   Okay.

11   Q.   If you go to the second page, do you see your name

12   there at the top of the second page?

13   A.   Yes, I do.

14   Q.   Do you recall anything specific about the meeting

15   that you attended on January 14, 2022, as it related to

16   Jessica Light?

17   A.   No, I don't.

18   Q.   I'll direct your attention to page 25 of this

19   exhibit.  Let me know when you get to page 25, please.

20   A.   Okay.

21   Q.   Please read to yourself lines 21 to 25 and let me

22   know when you're done.

23   A.   That's on Exhibit 25, you said?

24   Q.   Exhibit 27.

25   A.   Oh, I'm sorry, 27.  Okay.

1    Q.    Page 25.

2    A.    Okay.

3    Q.    And lines 21 through 25, please read those to

4    yourself and let me know when you're done.

5    A.    I do remember that.

6    Q.    And what do you remember?

7    A.    I remember we were trying to make sure that Jessica

8    was safe and felt okay going back to work.

9    Q.    Why would she have needed to feel safe going back to

10   work?

11   A.    Because she had expressed concerns.

12   Q.    Concerns about what?

13   A.    About treatment and just not feeling safe in that

14   building.

15   Q.    Do you recall attending any meetings for Jessica in

16   February of 2022?

17   A.    Not to my knowledge, but I'm sure I did.

18   Q.    Are you aware of the time when Jessica returned to

19   teach her first grade class in 2022?

20   A.    Yes.

21   Q.    And do you recall the process in which the

22   administrators brought her back to her classroom?

23   A.    Not clearly, no.

24   Q.    Do you know if she was able to teach her class right

25   away or if she had to do some kind of co-teaching?

```
 1   A.   I don't think she went right back in.  I thought she

 2   may be -- I don't know if it was two or three days where

 3   she kind of, I don't know, shadowed or whatever you want

 4   to call it.

 5   Q.   Was it two or three days or did it last longer than

 6   that, if you recall?

 7   A.   I don't remember.  I don't recall.

 8   Q.   Did you have any thoughts or feelings about the

 9   timing that it took for Jessica to get back teaching her

10   first grade class?

11   A.   I mean, I thought, based on what Jessica and I talked

12   about, I thought maybe it was a good start to ease back

13   in.

14   Q.   Was there a delay in time from when Jessica returned

15   to work to when she started teaching her first grade

16   class?

17   A.   I don't remember.

18   Q.   Do you recall if you ever called the delay, if there

19   was any, ridiculous?

20   A.   I don't.  I'm sorry.

21   Q.   Did you use the word "safeguards" a few seconds ago?

22   A.   What's that?

23   Q.   Have you ever heard Jessica ask for safeguards to

24   return to work?

25   A.   Just to ensure that she would, you know, she would be
```

1    safe there.

2    Q.   Were there any other particular safeguards that you

3    recall that Jessica asked for?

4    A.   I may have.  I don't recall.

5    Q.   Did you ever in your role as the vice president of

6    the union advise Jessica to file a grievance against the

7    administrators at Hooker?

8    A.   We looked into filing a grievance.  I called our

9    attorney Eric Chester who represents AFT Connecticut and I

10   discussed it with him and the field rep.

11   Q.   And did you have a conclusion as to whether or not

12   she should file a grievance?

13   A.   At that point they advised us not to.

14   Q.   Is there anything else that you remember as it

15   relates to Jessica Light and her complaint against the

16   administrators at Hooker?

17   A.   Nothing other than that she was in constant contact.

18   Q.   With whom?

19   A.   With myself.  Through email or phone or --

20   Q.   Do you recall approximately when that started?

21   A.   I really don't.  I know it had switched from our

22   previous president Dave Cicarella, and then we had a new

23   president come in, Leslie Blatteau, and then they gave the

24   case to me after I returned to work.

25   Q.   After you returned to work, when was that?

1    A.    After my wife had passed away, and then I came back

2    on and Jessica and I -- I met her for the first time.

3             MR. INTERLANDI:  Thank you, sir.  I don't have

4    any further questions for you at this time.

5             THE COURT:  Cross-examination.

6

7                     CROSS-EXAMINATION

8    BY MR. MURPHY:

9    Q.    Good morning, Mr. DeLucia.

10   A.    Good morning.

11   Q.    Following up on the last question, I was a little

12   confused about the timeline.

13        When did you first meet Jessica Light?

14   A.    I don't recall offhand.

15   Q.    We peg a lot of things around COVID, right, that --

16   A.    I'm sorry, I can't hear you.

17   Q.    I'm sorry.  We peg a lot of things in our life around

18   COVID.  We all know it started in March of 2020, right?

19   A.    Right.

20   Q.    Do you think you met her before or after March of

21   2020?

22   A.    It was after COVID.

23   Q.    After COVID, okay.

24        Mr. DeLucia, in your years as an executive vice

25   president of the union, you've become familiar with the

1  union contract governing teachers, right?

2  A.   Yes.

3  Q.   So the union and the Board of Education have a

4  contract that governs the working conditions of teachers?

5  A.   Correct.

6  Q.   It's called a collective bargaining agreement,

7  correct?

8  A.   Yes.

9  Q.   And it addresses things such as -- it addresses all

10  work conditions for teachers, right?

11  A.   Correct.

12  Q.   All right.  So that would include fair disciplinary

13  policy?

14  A.   Yes, to a point.

15  Q.   Okay.  Things such as the hours of the workday, class

16  size?

17  A.   Right.

18  Q.   Okay.  Teaching load?

19  A.   Yes.

20  Q.   It's really extensive, right?

21  A.   Yes, it is.

22  Q.   Okay.

23  A.   Yes, it is.

24  Q.   And Attorney Interlandi asked you a few questions

25  about grievances.  In your 17-year career as executive

1  vice president, you've certainly been involved with

2  grievances, right?

3  A.    Yes, I have.

4  Q.    And when a teacher files a grievance there's several

5  steps for that grievance, correct?

6  A.    Yes, there is.

7  Q.    You've been to a lot of grievance meetings, right?

8  A.    Yes, sir.

9  Q.    Some of those, when a grievance reaches a third stage

10  and it's denied, it can go to arbitration, right?

11  A.    Mediation, arbitration, right, right.

12  Q.    First it goes to mediation and then it goes to

13  arbitration, correct?

14  A.    Correct.

15  Q.    And in your 17-year career have you gone to

16  arbitration on some grievances?

17  A.    Yes, I have.

18  Q.    Frequently?

19  A.    No.  We're able usually to resolve them along the

20  way.

21  Q.    At some step along that process?

22  A.    Right.

23  Q.    You mentioned Eric Chester.  He's an attorney that

24  represents AFT, right?

25  A.    Right.

1    Q.    And that's the teacher's union?

2    A.    Yes.

3    Q.    You mentioned you discussed Jessica Light with

4    Attorney Chester, right?

5    A.    Correct.

6    Q.    And he advised you not to file a grievance or there

7    were no grounds to file a grievance?

8    A.    Not to file yet because he thought maybe we could

9    work this out through HR and not file the grievance

10   because the grievance can take a long time.  Especially if

11   it gets to mediation, it could be a year.

12   Q.    So ultimately the union did not file any grievance on

13   behalf of Jessica Light?

14   A.    No, we did not.

15   Q.    How many teachers approximately are in the union

16   right now?

17   A.    When I served there was roughly between 1850 and

18   1900.

19   Q.    And in the school year 2020-2021 was that about the

20   same?

21   A.    Approximately, yes.

22   Q.    What is -- are you familiar with a Connecticut

23   statute 10-151?

24   A.    I'm not sure.

25   Q.    Okay.  Are you aware -- did you become aware during

```
 1   your 17-year career that there's a statute that governs

 2   the termination of teachers?

 3   A.    Yes.

 4   Q.    Okay.  As part of that statute teachers are entitled

 5   to notice, correct?

 6   A.    Correct.

 7   Q.    And then they're entitled to a hearing, correct?

 8   A.    Correct.

 9   Q.    Okay.  And the union would represent them in that

10   hearing, correct?

11   A.    Correct.

12   Q.    And so Ms. Light, as far as you're aware, that's

13   never -- you've never discussed a termination proceeding

14   with Ms. Light, right?

15   A.    No.

16   Q.    No one in the administration ever told you she was

17   being fired?

18   A.    No.

19   Q.    Are you aware of any discipline that was ever issued

20   to Ms. Light?

21   A.    Not that I was aware of.

22   Q.    Are you aware of adverse employment actions that were

23   taken against Ms. Light?

24   A.    Not that I was aware of.  Her name never came up.

25   Q.    She texted you often and repeatedly I think you said?
```

1   A.   We were in contact regularly, yes.

2   Q.   Ms. Light likes to email the union?

3   A.   When it was necessary.

4   Q.   And she would text you as well?

5            MR. INTERLANDI:  Objection, asked and answered.

6            THE COURT:  He's already answered that yes.

7            MR. MURPHY:  Okay.

8   BY MR. MURPHY:

9   Q.   Did Ms. Light receive an evaluation in the 2021-2022

10  school year?

11  A.   Everybody is supposed to.

12  Q.   The question was:  Did Ms. Light receive one?

13  A.   I don't know.

14  Q.   Would it be unusual for a teacher not to receive an

15  evaluation?

16  A.   There are some exceptions.

17  Q.   What would those be?

18  A.   It could be based on attendance.  It could be based

19  on the amount of observations that were done, the type of

20  observations that were done.  A lot of dotting your I's,

21  crossing your T's.  It doesn't happen often.

22  Q.   It's rare, correct?

23  A.   It's rare.

24  Q.   Do you remember when -- well, withdrawn.

25       You testified about your conversations with Ms. Light

1    about her concerns about the administration, right?

2    A.    Yes.

3    Q.    Did you have discussions with other teachers at

4    Worthington Hooker School about their concerns about

5    Ms. Light?

6    A.    There were some teachers on staff that reached out to

7    me.

8    Q.    Who were those teachers?

9    A.    Oh, God, I don't -- there was probably six or seven.

10   I don't remember them all.  I really don't.

11   Q.    Six or seven teachers reached out to you with

12   concerns about Ms. Light?

13   A.    Yes.

14   Q.    And what names, if any, do you recall?

15   A.    I remember Hillary.  I don't remember the others.  We

16   actually had a phone conversation.

17   Q.    Okay.  Can you tell us about that phone conversation?

18   A.    They were just expressing their concerns about the

19   tone of the building and what was going on.  And I told

20   them that, you know, I was representing Jessica and I

21   would listen to their concerns.  And I've also had

22   discussions with Ms. Clarino and Margaret-Mary who I

23   worked well with for years to try to get this resolved.

24   So it was in the interest of just trying to keep moving

25   this forward and coming to some resolution.

```
 1        And we also had met, Leslie and I, had met with a
 2   group of teachers that were concerned the other way --
 3   Q.   And --
 4   A.   -- that were supportive of Jessica.
 5   Q.   Okay.  And I apologize for cutting you off.
 6   A.   That's okay.
 7   Q.   And the teachers you spoke with, do you recall any of
 8   the specifics of their concerns about Ms. Light?
 9   A.   Nothing -- nothing really specific.  Just, you know,
10   when she was commenting at the Board of Ed meetings and
11   that's really it.
12   Q.   Do you recall any questions to you about a
13   professional development presentation on transgender
14   issues and Ms. Light's behavior in that meeting?
15   A.   I don't recall that at all.
16   Q.   Okay.  In your phone call with those individuals who
17   had -- those five or six individuals that had concerns
18   about Ms. Light, do you remember saying that you were
19   trying to get her out of Worthington Hooker School?
20   A.   No.  I said I was working with her to make sure that
21   if she wanted to transfer, that I could make that.  But
22   that was ultimately her decision.
23   Q.   And the teachers you spoke with, those five or six
24   teachers that had concern about Ms. Light, you represented
25   them too, right?
```

1    A.    No.   They were not under my direct representation.   I

2    do represent them as a union, but when I was working with

3    Jessica they would have to go to Leslie or somebody else.

4    So when the case -- two members, one of us would take one

5    member and one would take the other member.

6    Q.    Well, regardless, at some point they called and you

7    had a conversation with the five of them on the phone

8    together?

9    A.    Correct.

10   Q.    And that was to discuss their concerns about

11   Ms. Light?

12   A.    Correct.  That was their concerns, yes.

13   Q.    Attorney Interlandi asked you if you were aware of

14   the complaint that Ms. Light filed and the complaint that

15   Principal Gethings and Ms. Clarino filed.  Were you also

16   aware of the List of Concerns that Hillary Alden submitted

17   against Ms. Light?

18   A.    I don't think so.  I don't think I saw a complete

19   list.  I knew that there was something, but I don't

20   remember exactly what it was.

21   Q.    And by "something," do you mean Ms. Alden's concerns

22   about Ms. Light's behavior as a parent of a student in her

23   class?

24   A.    I don't know.  I don't recall that.

25   Q.    Going back -- I apologize.

1        Going back a second, you said you worked well with

2   Principal Gethings, correct?

3   A.   Yes.  In the past we've sat on some committees

4   together.

5   Q.   Okay.  Is it fair to say that Ms. Light was sending

6   you emails on her concerns, right?  You've testified to

7   that?

8   A.   Yes.

9   Q.   And is it fair to say you were also communicating

10  with Principal Gethings and Ms. Clarino about this issue?

11  A.   Correct.

12  Q.   By email?

13  A.   Correct.

14  Q.   Okay.  On those emails you didn't copy Ms. Light,

15  right?

16  A.   No.  They were phone conversations just trying to see

17  where we were in the process, if mediation was a

18  possibility.  I actually reached out to their union

19  president, Ms. Coleman, to see if we could work together

20  to try to get this issue resolved.

21  Q.   Right.  And there were conversations with

22  Ms. Coleman, right?

23  A.   Oh, yes.

24  Q.   How many?  More than five?

25  A.   I don't think so.  No.  Less than five.

1    Q.    At some point, as you testified before, a mediation

2    was scheduled, right?

3    A.    Correct.

4    Q.    And that was -- was that paid for by the Board?

5    A.    I think so, yes.

6    Q.    It was with a private attorney, correct?

7    A.    I forget his name.

8    Q.    Gregg Adler?

9    A.    Yes.

10    Q.    Okay.  And what was the purpose of that mediation?

11    A.    To try to come to some kind of resolution to see

12    where we could go, what next steps would be.

13    Q.    Okay.  Is it fair to say at that mediation Ms. Light

14    had concerns about Principal Gethings and Ms. Clarino but

15    Ms. Clarino and Principal Gethings also had concerns about

16    Ms. Light, and the purpose was to mediate both sides'

17    concerns, right?

18    A.    Correct.

19    Q.    And you said before you've been involved in a lot of

20    mediations through the grievance process, right?

21    A.    Yes.

22    Q.    I know it's slightly different, but mediation is

23    mediation, and oftentimes mediations don't come to a

24    conclusion, right?

25    A.    Unfortunately, yes.

1   Q.   This isn't the first mediation that was unsuccessful

2   that you have been involved in?

3   A.   Right.

4   Q.   There were some questions from Attorney Interlandi

5   about Ms. Light's return to work in late January, early

6   February of 2022.  I'd like to ask you some follow-up

7   about that.

8       You testified that you recall maybe it was two or

9   three days where she was scheduled to shadow I think you

10  said, right?

11  A.   I think it was shadowing or something, yes.

12  Q.   You said she was going to ease back into it?

13  A.   Correct.

14  Q.   All right.  And you, as executive vice president for

15  17 years, you've been involved in situations where

16  teachers were out on leave for a variety of reasons,

17  right?

18  A.   Yes.

19  Q.   And then they had to come back to the school.  In

20  your experience would it be a standard practice to ease

21  the teacher back in in that situation?

22  A.   It really depends on the situation.  Depends on the

23  school.  Depends what the reason for leaving was, the

24  reason they were able to return.

25  Q.   And in that January/February time frame do you know,

1    as you sit here today, if Ms. Light's class was intact and

2    she just had to step back into the classroom or do you

3    know if her class was split amongst other teachers and

4    then had to be reconstituted for her?

5    A.    If I recall correctly, I think they were split.

6    Q.    Okay.  And in that situation, if Ms. Light was going

7    to come back and be eased back in, there would be two

8    classrooms for her to observe, correct?

9    A.    Depending on how it was set up.  I don't know.

10   Q.    Well, if that's true, if twelve kids were in one

11   classroom and 12 in another, for her to become

12   reacclimated with those students or reacquainted, rather,

13   she would have to observe in both classrooms, correct?

14   A.    That would make the most sense, yes.

15   Q.    Eventually, Ms. Light left Worthington Hooker and

16   went to a different school, correct?

17   A.    Correct, yes.

18   Q.    You knew that, right?

19   A.    Yes.  I was the one that helped her with the

20   transfer.

21   Q.    You were involved with Ms. Light and the other

22   teachers and Principal Gethings at that time with that

23   discussion, right?

24   A.    No, it was mostly between Jessica and myself.

25   Q.    Did Jessica bounce ideas off of you and ask for your

1    input?

2    A.    Yes.

3    Q.    All right.  And when she was leaving Worthington

4    Hooker did she send an email to the entire school?

5    A.    That, I don't remember.

6    Q.    You don't?

7    A.    I don't remember.

8    Q.    If she did, would you have thought that was a good

9    idea?

10    A.    Depending on the content.

11    Q.    Were you copied on emails between Ms. Light and

12    Ms. Clarino?

13    A.    Probably.

14    Q.    And other administrators as well, potentially?

15    A.    I'm sure.  I averaged about 500 emails a day, so, you

16    know.  I'm not making excuses, it just was a busy time.

17    Q.    I think many of us can appreciate that.

18         Did you ever express a sentiment that you thought

19    some of Ms. Light's emails were not being helpful?

20    A.    At the time when we were doing this, no.  You know,

21    maybe some, you know, I may not have sent.  But she was

22    the one in the heat of the battle, so to say.

23         Our role as officers is just, you know, to advise and

24    let them know their rights and then offer our opinion as

25    to what we think would be the best course of action.  But

1    ultimately the decision rests on them.

2    Q.   Okay.  And sometimes teachers follow your advice and

3    other times they don't?

4    A.   Oh, yes.

5              MR. MURPHY:  I don't have any further questions.

6    Thank you for your time.

7              THE COURT:  Redirect?

8              MR. INTERLANDI:  Yes, Your Honor.

9

10                  REDIRECT EXAMINATION

11   BY MR. INTERLANDI:

12   Q.   Hello again.

13   A.   Hi.

14   Q.   Did Jessica Light ever disregard any recommendations

15   or opinions you offered to her?

16   A.   Not to my knowledge.  She listened intently and we

17   had some robust discussions, for sure.

18   Q.   In your experience as the executive vice president of

19   the union, typically how long does a shadowing, would that

20   last?

21   A.   I mean, I've seen it go as long as a week.  Four or

22   five school days, but usually not that long.

23   Q.   Do you recall when you had this phone call with I

24   believe counsel said five to six other teachers, do you

25   recall when you had that phone call?

1    A.    Yeah.  Actually, I was getting out of an eye doctor
2    appointment.  I think it was in the summer.  And they
3    asked if they could just speak with me.
4    Q.    And which summer was that, do you recall the year?
5    A.    I don't remember.
6    Q.    As a result of that conversation, did any of those
7    teachers who you spoke with file a complaint against
8    Ms. Light?
9    A.    I don't know if there was a formal complaint.  I
10   don't recall.
11   Q.    Was there an informal complaint?
12   A.    They expressed their concerns, and I turned that over
13   to Leslie.
14   Q.    Do you know what happened after that?
15   A.    I don't.  But at that time I was talking to Jessica
16   about the possibility of transferring.
17   Q.    You testified a few minutes ago about the purpose of
18   the mediation and that there were concerns on both sides.
19   What were the administrators' concerns about Jessica at
20   that time, if you recall?
21   A.    I'm trying to phrase it correctly.  It brought some
22   divisiveness to the staff.
23   Q.    Was there anything else?
24   A.    Not to my recollection, no.
25   Q.    What were the concerns that Jessica was raising that

1  needed to be mediated by Mr. Gregg Adler?

2  A.   That she just felt she wasn't being treated fairly.

3  You know, she was kind of like an outlier.

4  Q.   Was there anything else?

5  A.   Like I said, just that she -- I don't know if

6  something was written on her board.  I know there were

7  some notes left where she would find them that were pretty

8  disparaging, so very upsetting to her.

9  Q.   You said you were aware of the initial complaint that

10  Jessica filed against the administrators.  Do you recall

11  any of the specific concerns that she raised in that

12  initial complaint?

13  A.   I know I read through a cursory, but I don't remember

14  specifics.

15  Q.   When Jessica would email or text you, do you recall

16  the sorts of things that she would raise to you during

17  those emails and text messages?

18  A.   I mean, she was extremely upset.  She was like beat

19  down.  She just, you know, didn't know what else she could

20  do.  She just wasn't feeling part of the staff, she didn't

21  feel like she was being treated fairly.  And she was

22  really, you know, some days she was ready to throw in the

23  towel.  I mean, you could feel her pain.  You could tell

24  that she was conscientious and she just wanted to teach.

25  And then she had a concern because her children were

```
 1   students in the building.

 2           MR. INTERLANDI:  Thank you.  I don't have any

 3   further questions.

 4           THE COURT:  Any recross?

 5           MR. MURPHY:  No, Your Honor.

 6           THE COURT:  All right.

 7           Mr. DeLucia, thank you very much.  You may step

 8   down and you are excused.  Thank you.

 9           Will the plaintiff please call your next

10   witness.

11           Mr. Interlandi, do you have a next witness?

12           MR. MURPHY:  Are we back to Ms. Light's

13   cross-examination?

14           THE COURT:  All right.

15           MR. INTERLANDI:  That was the plan, Your Honor.

16           THE COURT:  That's the plan.  Let's go with the

17   plan.

18           Ms. Light, please resume the stand and please

19   remember that you are under oath.

20           Cross-examination continues.

21

22                   JESSICA LIGHT,

23     recalled as a witness, having been previously duly

24     sworn, was examined and testified further as follows:

25
```

```
  1                      CROSS-EXAMINATION (Resumed)
  2   BY MR. MURPHY:
  3   Q.   Good morning, Ms. Light.
  4   A.   Good morning.
  5   Q.   To start today, Ms. Light, I want to go back and talk
  6   a little bit about your feelings about COVID in the fall
  7   of 2020, okay?
  8   A.   Okay.
  9   Q.   Remember we had some discussion about that yesterday?
 10   A.   Yes.
 11   Q.   Okay.  And if I could have Exhibit F.
 12        Is that available to everyone?
 13            THE COURT:  You all can see that on your
 14   monitors?  All right.
 15   BY MR. MURPHY:
 16   Q.   We'll start at the top.
 17        Ms. Light, I'm showing you what is Defendants'
 18   Exhibit F.  This is another text message exchange between
 19   you and Ms. Miller, correct?
 20   A.   Yes.
 21   Q.   All right.  If you could just scroll down a little
 22   bit.
 23        Now, here we are on an entry dated October 26th of
 24   2020, correct?
 25   A.   Correct.
```

```
 1   Q.   All right.  And you start out that exchange by saying

 2   "Could you hear me."  Do you recall what you're referring

 3   to there?

 4   A.   I had just spoken at the Board of Ed.

 5   Q.   Okay.  And she says you did a nice job.  And her

 6   children were a little giggly that day, right?

 7   A.   Yes.

 8   Q.   Then can you read your next response to Ms. Miller,

 9   please?

10   A.   "Yes to both.

11        "I am considering resigning - I most likely won't -

12   but I can't stop thinking it might be the moral decision."

13   Q.   Okay.  Yesterday we talked a little bit about an

14   October 2020 text message where you thought Worthington

15   Hooker parents were crazy for wanting to return and at the

16   same time you're considering resigning, right?

17   A.   Please rephrase the question.

18   Q.   Sure.

19        In October of 2020 we went over yesterday you sent a

20   text message saying that Worthington Hooker parents were

21   crazy for wanting to return, right?

22   A.   Yes.

23   Q.   Okay.  And at that time same, that same month you're

24   considering resigning because of your concerns about

25   COVID, correct?
```

```
 1   A.   Yes.
 2            MR. MURPHY:  Your Honor, I'd like to turn to an
 3   exhibit that I believe Attorney Interlandi is still
 4   objecting to.  Maybe the jurors' monitors could be turned
 5   off.
 6            THE COURT:  Why don't you move to a different
 7   point and at the recess we'll take up the objection.
 8            MR. MURPHY:  Okay.
 9            THE COURT:  The exhibit number that you are
10   referring to?
11            MR. MURPHY:  Exhibit V.
12            THE COURT:  I'm sorry, D?
13            MR. MURPHY:  V, as in Victor.  Apologize.  And W
14   as well.  I was hoping to discuss it with the witness.
15            THE COURT:  If you need to lay a foundation for
16   our colloquy on admissibility, go ahead.
17            MR. MURPHY:  I'll come back to it, Your Honor.
18   BY MR. MURPHY:
19   Q.   Now, Ms. Light, yesterday you talked about a
20   November 2020 city-wide parent meeting that you attended
21   via Zoom, right?
22   A.   Correct.
23   Q.   And Ms. Gethings was listening in, and then you
24   discussed a conversation you had with her afterwards,
25   right?
```

```
 1   A.    Yes.
 2   Q.    I think you testified that you believed that the
 3   superintendent had talked to Principal Gethings before her
 4   conversation with you?
 5   A.    That's what was reported to me.
 6   Q.    Okay.  Following that conversation you received no
 7   formal discipline, correct?
 8   A.    Um, define "formal."
 9   Q.    How would you define "formal discipline"?
10   A.    I'm not sure what you're asking.
11   Q.    Okay.  You didn't get written up.  You didn't receive
12   a written warning, for example?
13   A.    Um, I was called to meetings to discuss.  I was told
14   there were concerns.  I was sent emails.
15   Q.    Okay.  And after that November discussion with
16   Principal Gethings you went to the Board of Ed meeting and
17   you spoke in January of 2021, right?
18   A.    Correct.
19   Q.    And then you went and you spoke in February of 2021
20   at the Board of Ed meeting?
21   A.    In February?
22   Q.    Uh-huh.
23   A.    I believe I spoke in January and March.  I'm not sure
24   that I spoke in February.  But if it's in the minutes, I
25   did.
```

1    Q.    And part of your claim in this case is that you spoke

2    at those three meetings and posted on Facebook in March of

3    2021, and that was your protected activity, right?

4    A.    I don't know how to answer that in a yes or no.

5    Q.    What's confusing about my question?  I'm happy to

6    rephrase.

7    A.    I engaged in far more protected speech than just

8    those incidents.

9    Q.    Okay.  But following your November 2020 discussion

10   with Principal Gethings, you spoke at several Board of Ed

11   meetings, correct?

12   A.    I believe I spoke in January and March.

13   Q.    Now, I'd like to talk a little bit about the Facebook

14   posts that we just discussed, which is Exhibit 2.  Do you

15   remember discussing that yesterday with your attorney?

16   A.    Which -- yes.  Facebook, yes.

17   Q.    And as you see it on your screen right now and the

18   jury can see it on their screen, this is your March 9

19   Facebook post with Ms. Gallagher, your Facebook discussion

20   with Ms. Gallagher, correct?

21   A.    Yes.

22   Q.    All right.  And if we could scroll down just a little

23   bit.

24         Now we can see Ms. Gallagher's statement in its

25   entirety.  And she says so apparently there are schools

1    that have had positive student cases in New Haven Public

2    Schools since January 19 as reported to the state and on

3    the state's website, right?

4    A.    Yes.

5    Q.    And according to Ms. Gallagher, her interpretation is

6    "I believe this list is to be read that if a school is

7    listed as <6 they had positive cases that week and that

8    may mean 1, 2, 3, 4, or 5 cases," right?

9    A.    Correct.

10   Q.    And then she says, "It seems we may be missing some

11   letters here on this group page."

12        So in -- what did you interpret her to be saying

13   there?

14   A.    She was collecting letters sent from all the schools

15   in New Haven to parents regarding COVID cases.  She did

16   not have all the letters that were sent, she believed.

17   Q.    Okay.  And then she says, "I have heard some schools

18   with cases that I don't see listed on this list nor are

19   there letters posted here."

20        So was it her concern some schools had cases and

21   weren't sending the letters that she believed were

22   required?

23            MR. INTERLANDI:  Objection, Your Honor.  Calls

24   for the witness to speculate.

25            MR. MURPHY:  She responded to the post.  I'm

```
 1    just asking what she understood about Ms. Gallagher's
 2    post.
 3              MR. INTERLANDI:  He's asking her what --
 4              MR. MURPHY:  I can rephrase, Your Honor.
 5              THE COURT:  Did you have -- go ahead, rephrase.
 6              MR. MURPHY:  Sure.
 7    BY MR. MURPHY:
 8    Q.   When you read that sentence, what did you understand
 9    Ms. Gallagher to be asking about?
10    A.   Let me re-read it.
11    Q.   Sure.  Please.
12    A.   It seems like she's trying to gather all the letters
13    and make sure she has all of them.
14    Q.   Okay.  Page 2, if we could scroll to page 2.
15         We covered this yesterday, right, you said "I don't
16    think letters were sent"?
17    A.   Correct.
18    Q.   Would you agree that if someone was concerned schools
19    had cases and weren't sending letters, they could
20    interpret your comment as meaning Worthington Hooker did
21    something wrong, they had a case and they didn't send a
22    letter?
23    A.   I don't want to speculate how other people could
24    interpret me.
25    Q.   Did anyone ever tell you that's how they interpreted
```

1    your comment?

2    A.    Ms. Gethings.

3    Q.    Anyone else?

4    A.    Ms. Clarino.

5    Q.    Anyone else?

6    A.    Um, no.

7    Q.    You said you knew -- you testified yesterday I think

8    you said Judie Gallagher and Kathy Morrison both

9    screenshotted this and sent it to Principal Gethings,

10   right?

11   A.    Allegedly.

12   Q.    You've seen those screenshots, correct?

13   A.    Um, I have seen screenshots with this post on it.

14   I -- I'm having difficulty because I'm not sure exactly

15   what you're asking me.  The pictures appeared to be not

16   from Ms. Gethings -- it appeared that Ms. Gethings sent it

17   to them, not that they sent it to her, based on the side

18   of the screen the messages were.  So I don't want to

19   attest to who sent who what.

20   Q.    Okay.  Let's move on, talk about Ms. Miller again.

21         Now, Ms. Miller, you've had some communications with

22   her about COVID and letters, et cetera, right?

23   A.    Yes.

24   Q.    If we could go to Exhibit H.

25         This is a series of text messages between you and

 1   Ms. Miller, correct?

 2   A.    Yes.

 3   Q.    And at the time -- what were you discussing with

 4   Ms. Miller?

 5   A.    Can I have a second to read?

 6   Q.    Of course.

 7   A.    At the beginning she tells me to take deep breaths

 8   and calm down.

 9         Then I'm asking her if it's possible to FOIA whether

10   or not Dr. Tracey was putting pressure on Ms. Gethings.

11   Q.    Okay.  And in the next text message, what do you say

12   there?

13   A.    The second one?

14   Q.    Starting with "I want to be able."

15   A.    "I want to be able to show my principal was pressured

16   to get me to stop talking."

17   Q.    Okay.  Is that what you believed in March of 2021,

18   that Principal Gethings was being pressured by someone to

19   get you to stop talking?

20   A.    Yes.

21   Q.    Do you still believe that today?

22   A.    Yes.

23   Q.    Have you -- well, withdrawn.

24         Okay.  Can we go to Exhibit I, please.

25         Now, Ms. Light -- there we go.  Defendants' Exhibit I

1    is on the screen.

2        Right there it starts with a -- in the middle of the

3    page a March 2, 2021, email from Principal Gethings to

4    All Hooker Middle and All Hooker Elementary, right?

5    A.    Yes.

6    Q.    When it says "HookerMiddle-All," who is included

7    in that group?

8    A.    I know that it includes teachers.  I'm not sure if it

9    includes other staff.

10   Q.    Okay.  It doesn't include parents, correct?

11   A.    Correct.

12   Q.    All right.  It's people who are employed by the

13   New Haven Board of Education?

14   A.    Correct.

15   Q.    And same holds true for HookerElementary-All, right?

16   A.    Correct.

17   Q.    Okay.  And if we could scroll down a little bit.

18        Well, do you recall receiving this email?

19   A.    Yes.

20   Q.    All right.  What, to your recollection, is Principal

21   Gethings saying here -- well, withdrawn.  I'll focus your

22   attention on a particular part.

23        The first part talks about vaccinations, right?

24   A.    Yes.

25   Q.    And in the second paragraph, Principal Gethings says

1    that if we have a positive case at Worthington Hooker

2    School this information will be shared by our school

3    nurses and administration, right?

4    A.    Correct.

5    Q.    Because in March of 2021 this was a concern for

6    teachers and students and parents about sharing

7    information about positive COVID cases, right?

8    A.    Yes.

9    Q.    It was a concern for you, right?

10   A.    Yes.

11   Q.    If there was a COVID positive case at Worthington

12   Hooker in March, you would want to know about it?

13   A.    Yes.

14   Q.    And then she says "Please do not assume or speculate

15   why people are absent, additionally please know we must

16   report any cases that are contracted in school."  Right?

17   A.    Yes.

18   Q.    Then she says it is unfortunate that there seems to

19   be a rumor circulating that we have a lot of positive

20   cases at Worthington Hooker School; is that correct?

21   A.    Could you show me that line?

22   Q.    Sure.  It's the last sentence in the second full

23   paragraph.

24            MR. INTERLANDI:  Your Honor, I object to this

25   line of questioning.  This is a document that's agreed on.

1    It's in evidence.  Just reading line by line and asking

2    her if she agrees that the document says what it says --

3              THE COURT:  If that's what he wants to do, I'm

4    going to permit it.

5              MR. MURPHY:  It's a March 20, 2021, email.

6    We're going to get to some other questions about it, but

7    I'm just trying to refresh the witness here.

8              MR. INTERLANDI:  Your Honor, there's no evidence

9    that she doesn't have a memory of this.

10             THE COURT:  She did not say she doesn't have a

11   recollection on this.

12             MR. MURPHY:  Okay.

13   BY MR. MURPHY:

14   Q.   The last sentence, Ms. Light, talks about a rumor

15   circulating that there were a lot of positive cases at

16   Worthington Hooker School.  Do you remember early March of

17   2021 rumors circulating about positive cases at

18   Worthington Hooker?

19   A.   I do not remember a lot of rumors circulating about

20   positive cases at Worthington Hooker.

21   Q.   Okay.  Do you recall Principal Gethings, based on

22   this email, having that concern?

23   A.   Yes.

24   Q.   And by way of this email she's alerting all middle

25   school and elementary -- I'm sorry, upper school and lower

```
 1   school employees about her concerns?
 2   A.   I would be speculating.
 3   Q.   Well, it's an email to --
 4   A.   I don't know her intentions.
 5   Q.   Okay.  If we could scroll to the top.
 6        Now, on that same day you forward this email to
 7   jessicalight@hotmail.com?
 8   A.   Correct.
 9   Q.   Why did you do that?
10   A.   Because it's my personal email.
11   Q.   Okay.  And then you forwarded it along to Sarah
12   Miller, correct?
13   A.   Yes.
14   Q.   This was an email intended for school personnel that
15   you forwarded to Sarah Miller?
16   A.   Yes.
17   Q.   And this is before your May 9, 2021, Facebook post,
18   correct?  Right?
19   A.   I can't remember the date of the Facebook post.
20   Q.   Okay.
21   A.   I don't think it was May 9.
22   Q.   Did I say May?  I apologize.  March 9.  Now I
23   understand your confusion.  I apologize.
24        If we could take this down and go to Exhibit B,
25   please.  Okay.  Scroll down a little bit.
```

1     Okay.  Now, here, Ms. Light, I'm showing you

2   Defendants' Exhibit B which is, as you see here, a

3   February 17, 2021, email from Dr. Tracey, correct?

4   A.   Yes.

5   Q.   Who was she at the time?

6   A.   The superintendent of New Haven Public Schools.

7   Q.   Okay.  And can you scroll up.

8       Now, just above that it shows that you forwarded that

9   again to your hotmail account, right?

10  A.   Yes.

11  Q.   So that indicates you received Dr. Tracey's email,

12  correct?

13  A.   Correct.

14  Q.   And if we could scroll back down a little bit.  I

15  know it's hard to read, Ms. Light, but I'd like to focus

16  your attention on the second paragraph, okay?

17  A.   Okay.

18  Q.   In the first sentence Dr. Tracey says there's a chain

19  of command.  "If there are issues or concerns in schools -

20  things are reported to the school principals, and if they

21  are not mitigated, it is shared with the unions, who then

22  share with us."

23      Is that your understanding of how the district wanted

24  concerns to be addressed in February of 2021?

25  A.   I'm not sure I can answer that with a yes or no.

1   Q.    Okay.  Why not?

2   A.    Um, the district includes thousands of people.

3   Q.    By way of this email, did you understand Dr. Tracey

4   to be telling you and other staff members who received

5   this email to follow a chain of command and report issues

6   first at the school level?

7   A.    School-level issues should be addressed at the school

8   level.

9   Q.    Okay.  And then shared with the unions who then will

10  share with the administrators, right?

11  A.    That is what she said.

12  Q.    Okay.  Can you scroll to the top, please.

13        Now, here on February 18 we just discussed you

14  forwarded it to yourself and you again forwarded it to

15  Ms. Miller, correct?

16  A.    Correct.

17  Q.    All right.  You said it was another cringe worthy

18  email.  Why was this email cringe worthy?

19  A.    Could you scroll back down?

20        She said when people criticize -- it's in bold.

21  "When people criticize New Haven Public Schools it

22  reflects on all of us.  When we fail - it is all of us.

23  When we succeed, it is all of us."

24        This came two days after the Board of Ed meeting when

25  multiple people spoke.  It appeared to be her asking

1    people not to speak at the Board of Ed.

2    Q.    And as we noted, you spoke at the March Board of Ed

3    meeting after receiving this email, correct?

4    A.    Correct.

5    Q.    All right.  And Ms. Miller at the very top of this

6    email responds "Chains of command are for the military.

7    The exact opposite of building trust and community."

8         Did you agree with that statement?

9    A.    I don't remember how I felt at the time.

10   Q.    Okay.  If I could -- if we could have Plaintiff's

11   Exhibit 3.

12        Okay.  We talked earlier about your March 9, 2021,

13   Facebook post.  And yesterday you testified about this

14   March 12, 2021, email from Principal Gethings to the

15   school community.  Right?

16   A.    Yes.

17   Q.    Okay.  And this email, which I know we went over

18   yesterday, it doesn't mention you by name, correct?

19   A.    Correct.

20   Q.    It doesn't mention your Facebook post at all

21   directly, correct?

22            MR. INTERLANDI:  Objection.  It's not her

23   Facebook post.  She made comments on a post, Your Honor.

24   So it's mischaracterizing --

25            THE COURT:  Sustained.

```
 1                 Rephrase, please.
 2                 MR. MURPHY:  Happy to.
 3    BY MR. MURPHY:
 4    Q.   It doesn't mention your comments on a Facebook post,
 5    correct?
 6    A.   Correct.
 7    Q.   This email that Principal Gethings sent to the school
 8    staff was not discipline for you, correct?
 9    A.   I don't know that I can answer that.
10    Q.   It was an email directed to many school employees, as
11    we see on Plaintiff's Exhibit 3, correct?
12    A.   It occurred two days after she admonished me for my
13    Facebook posts and --
14                 MR. MURPHY:  Your Honor, the question I think
15    was:  It was an email to numerous school employees,
16    correct?
17                 THE WITNESS:  That's what was disturbing.
18                 THE COURT:  The question was:  It was an email
19    directed to many school employees?
20                 Can you answer that question?
21                 THE WITNESS:  It was directed to many school
22    employees, yes.
23                 THE COURT:  Next question.
24                 MR. MURPHY:  Okay.
25
```

```
 1   BY MR. MURPHY:
 2   Q.   And yesterday you said that this email made you feel
 3   targeted and isolated, correct?
 4   A.   Yes.
 5   Q.   Following this email you went and you testified --
 6   I'm sorry, you spoke at the March 2021 Board meeting?
 7   A.   Yes.
 8   Q.   Okay.  I'd like to go back to Exhibit 25 which your
 9   counsel asked you some questions about yesterday.  Can we
10   go to page 19, please.
11        I'm sorry, Exhibit 24.  I apologize.
12             MS. McCALLUM:  Twenty-four?
13             MR. MURPHY:  Twenty-four.
14   BY MR. MURPHY:
15   Q.   Now, Ms. Light, yesterday you and your attorney had a
16   back-and-forth on the quotes from the middle to the bottom
17   of page 19.
18             THE COURT:  I'm sorry, is this 24?
19             MR. MURPHY:  This is Exhibit 24, Your Honor.
20   It's the TEVAL meeting, I think it was referred to
21   yesterday.
22   BY MR. MURPHY:
23   Q.   To be clear, this is the transcript of the meeting
24   you had with Principal Gethings and Ms. Clarino about your
25   TEVAL, okay?
```

```
 1  A.   Okay.
 2  Q.   All right.  And on page 19 you and Attorney
 3  Interlandi discussed the quotes beginning on line 17 and
 4  down, okay?  There you say -- just to set up my
 5  questions -- Ms. Gethings says "but you said our school
 6  didn't sent out letters."  Then you said, "I said that our
 7  school hadn't sent out any letters and the state said we
 8  had below six.  I did say that."
 9       Attorney Interlandi asked you about lines 22 through
10  24 as well.
11            THE COURT:  Just a moment.
12                 (Pause.)
13            THE COURT:  Okay.
14  BY MR. MURPHY:
15  Q.   And in lines -- I want to finish the discussion here.
16  Line 25 -- well, take it back.
17       Ms. Gethings explained to you her concern about your
18  post, your comment on a Facebook post, right?
19  A.   Yes.
20  Q.   All right.  And her explanation here is in lines 25
21  through 9 on the next page where she says, "Well, I'll
22  tell you and then -- we had no need to."  And she
23  explained to you why there was no need at that time for
24  Hooker to send out a letter, right?
25  A.   Yes.
```

1    Q.    She said we had no cases that took place in school

2    that we would have to.

3        Is that your understanding that's correct in March of

4    2021, Hooker had no cases that required them to send out a

5    letter?

6    A.    That's not my understanding.

7    Q.    That's what Principal Gethings told you, correct?

8    A.    Yes.

9    Q.    And she was the principal in charge of the building

10   at the time, correct?

11   A.    Yes.

12   Q.    And if someone had a COVID case in grade

13   kindergarten, for example, they wouldn't have had to come

14   to you to tell you about it, right?

15   A.    Absolutely not.

16   Q.    They would have gone directly to Principal Gethings,

17   correct?  Or Ms. Clarino or an administrator, right?

18   A.    Or the health department.

19   Q.    Or the health department.  Not you, right?

20   A.    Correct.

21   Q.    All right.  If I could turn to Exhibit 5, please.

22       Ms. Light, I'm going to show you what your attorney

23   marked as Exhibit 5.  This is the complaint you submitted

24   to HR, right?

25   A.    Yes.

```
 1    Q.    Single-spaced complaint?

 2    A.    Yes.

 3    Q.    Do you recall how long it is?

 4    A.    No.

 5    Q.    If I told you 13 pages, would that sound correct?  I

 6    mean, we could count it, if you want.

 7              MR. INTERLANDI:  Objection, Your Honor.

 8              THE COURT:  I'm sorry, your objection?

 9              MR. INTERLANDI:  Relevance.  Single-spaced.

10              THE COURT:  Overruled.

11    BY MR. MURPHY:

12    Q.    And did you draft this yourself or did you get help

13    from other people?

14    A.    I got help from other people.

15    Q.    All right.  You have two individuals you consider

16    brothers?

17    A.    Yes.

18    Q.    They're not biologically related but you consider

19    them brothers?

20    A.    Yes.

21    Q.    They're both attorneys?

22    A.    Yes.

23    Q.    And you went back and forth with them on this

24    complaint, right?  They provided you with their advice?

25    A.    No.
```

1    Q.   You didn't send this email to -- this complaint to

2    your brother for advice?

3    A.   Um, I don't recall sending this complaint to my

4    brother.

5    Q.   Okay.  Do you recall sending it to anyone else for

6    advice?

7    A.   Yes.

8    Q.   Who?

9    A.   My adopted dad.

10   Q.   Maybe I have their names confused, I apologize.

11        You sent it to a family member for advice, correct?

12   A.   Yes.

13   Q.   All right.  And then did you send it to anyone else

14   who is a non-family member?

15   A.   Um, did I send --

16        MR. INTERLANDI:  Objection, Your Honor.  Broad.

17   Anyone else.

18        THE COURT:  That's not a basis for an objection.

19        MR. INTERLANDI:  It's vague.

20        THE COURT:  The question is:  Did you send your

21   draft complaint to anyone else who is a non-family member?

22        Perhaps it's the word "else" that is troubling.

23        MR. INTERLANDI:  Objection, vague and confusing,

24   yes.

25        MR. MURPHY:  I'll rephrase, Your Honor.  I'm not

```
 1   trying to confuse her.
 2              THE COURT:  Let's get an answer.
 3              THE WITNESS:  I'm more, um, confused about the
 4   word "draft."
 5   BY MR. MURPHY:
 6   Q.   Okay.  At some point you submitted a complaint to
 7   Human Resources, right?
 8   A.   Yes.
 9   Q.   And before you submitted it, you sought input from
10   other people on the contents of the complaint, right?
11   A.   Yes.
12   Q.   Why did you do that?
13   A.   Um, this was an incredibly overwhelming task,
14   something I had never done before.  Um, I realized that it
15   was putting -- I realized I was giving voice to myself in
16   an environment that did not value advocacy, but that this
17   time I was advocating for myself and I wanted as much help
18   as I could get.
19   Q.   And you put a lot of time into this complaint, right?
20   A.   Absolutely.
21   Q.   Didn't you send this complaint to Sarah Miller and
22   ask her for advice on it?
23   A.   I believe I sent it to her.  Um, I believe she
24   offered advice.  I don't know that I asked for advice.
25   Q.   Okay.
```

```
 1   A.   We can look at the exhibit.

 2   Q.   All right.  Let's go to Exhibit C.

 3        All right.  Ms. Light, this is Defendants' Exhibit C

 4   which is an email exchange between you and Ms. Miller?

 5   A.   Correct.

 6   Q.   And on April 28th of 2021 in the middle of the page

 7   you send an excerpt at least of your complaint to

 8   Ms. Miller, right?

 9   A.   Yes.

10   Q.   Actually, we'll scroll through the email, but you

11   send your entire complaint to Ms. Miller, right?

12   A.   Yes.

13   Q.   And she provides you with feedback on your complaint,

14   right?

15   A.   Yes.

16   Q.   Okay.  And I want to draw your attention to Item

17   Number 3 from Ms. Miller.  She says, "Expand on statements

18   like 'it was actually a reprimand intended to make me not

19   raise further questions with the Board of Education,'"

20   right?  She's quoting a portion of your complaint?

21   A.   Okay.

22   Q.   All right.  And then she says "not immediately clear

23   why and important to be direct so as to avoid the

24   perception that you are imagining things or exaggerating."

25        She said that to you, right?
```

```
 1  A.   Correct.
 2  Q.   And she gave you a specific example of a statement
 3  "it was actually a reprimand intended to make me not raise
 4  questions with the Board of Ed" that you should change,
 5  right?
 6  A.   Yes.
 7  Q.   All right.  If we scroll down to page Defendants'
 8  877.
 9            MS. McCALLUM:  887 or 877?
10            MR. MURPHY:  877.  It's the fourth page.  Okay.
11  At the top of the page.
12  BY MR. MURPHY:
13  Q.   And here we have the statement that Ms. Miller was
14  referring to, correct?
15  A.   Could you point it out to me?
16  Q.   Sure.  If you look at this page that we're looking
17  at, you make the statement "Ms. Gethings later expressed
18  disappointment at my having discussed the issue at the
19  Board of Education meeting, and suggested that I needed to
20  be patient:" and then you quote what Principal Gethings
21  said, correct?
22  A.   Correct.
23  Q.   And that's in that March email that went to school
24  employees addressing social media posts, right?
25  A.   Correct.
```

```
 1    Q.   All right.  And then you say, "While this may appear

 2    on the surface to be a benign statement, in context, it

 3    was actually a reprimand intended to make me not raise

 4    further questions with the Board of Education."

 5         My question is:  Did you change that statement based

 6    on Ms. Miller's concern that it gives the perception that

 7    you're imagining things or exaggerating?

 8    A.   No.

 9    Q.   And you often turned to Ms. Miller -- well,

10    withdrawn.

11         You often texted or emailed Ms. Miller at this time,

12    right?

13    A.   Yes.

14    Q.   And we reviewed several text messages already between

15    you, correct?

16    A.   Yes.

17    Q.   And you emailed her frequently as well, correct?

18    A.   Yes.

19    Q.   Because -- well, withdrawn.

20         At the time you filed your complaint you were still

21    employed by the Board of Education, right?

22    A.   Yes.

23    Q.   You're still employed to this day?

24    A.   Yes.

25    Q.   At the time you filed your complaint you were still
```

1    teaching third grade?

2    A.    Yes.

3    Q.    You hadn't received any formal discipline?

4    A.    I had been called into meetings that appeared to

5    be -- felt disciplinary.  I had been sent emails.

6    Q.    With respect, my question was:  You hadn't received

7    any formal discipline, right?

8    A.    Um, I had not received any formal discipline going to

9    HR.  Typically in schools, principals manage teachers by

10   calling them into meetings and admonishing them for

11   wrongdoing.  I viewed it as discipline.

12   Q.    And the CBA sets out a discipline process, correct?

13   We talked about this yesterday.

14   A.    The CEA?

15   Q.    CBA.  The collective bargaining agreement addresses

16   teacher discipline, right?

17   A.    Yes.

18   Q.    And you're still a member of the union?

19   A.    Yes.

20   Q.    Your pay remains -- well, withdrawn.

21         Your pay is set by the collective bargaining

22   agreement, correct?

23   A.    Correct.

24   Q.    Every year it goes up according to a step?

25   A.    Hopefully.

```
 1   Q.   Hopefully.  Has there ever been a year it hasn't?

 2   A.   Yes.

 3   Q.   But that's because all teachers were frozen that

 4   year, correct?

 5   A.   Correct.

 6   Q.   It wasn't an individual decision for you, right?

 7   A.   Correct.

 8   Q.   So every year other teachers went up, you went up as

 9   well?

10   A.   Correct.

11   Q.   All right.  Can we go to Exhibit 7, please.

12        Okay.  Exhibit 7 is the email -- well, Exhibit 7 is a

13   March 22 -- I apologize.  We'll have to come back to this.

14   I think we have the wrong PDF here.  Oh, no, I apologize.

15   Page 105.

16        Okay.  At the bottom of page 105 there's an email

17   from you to Principal Gethings?

18           MR. INTERLANDI:  Your Honor, what exhibit is

19   this?

20           MR. MURPHY:  It's Plaintiff's Exhibit 7,

21   Defendants' page 105.

22           MR. INTERLANDI:  Thank you.

23           MR. MURPHY:  If you can scroll to 106.

24   BY MR. MURPHY:

25   Q.   Here we have the email that you sent to
```

```
 1   Principal Gethings at 5:30 in the morning?
 2           MR. INTERLANDI:  Your Honor, this is not --
 3   wait, I'm sorry.
 4           MR. MURPHY:  Plaintiff's Exhibit 7, Defendant
 5   105.
 6           MR. INTERLANDI:  Okay.  I apologize.  You're
 7   right.
 8   BY MR. MURPHY:
 9   Q.   Why did you send her this email at 5:30 in the
10   morning?
11   A.   Um, are you asking why I sent the email or why I sent
12   it at 5:30?
13   Q.   Good question.
14        You had a concern about students and eating and
15   remaining 6 feet apart, right?
16   A.   Yes.
17   Q.   And you emailed it to Principal Gethings at
18   5:30 a.m., right?
19   A.   Yes.
20   Q.   If we go back to page 105, she responded to you at
21   5:39, correct?
22   A.   Yes.
23   Q.   And you remember this email exchange, right, as we
24   sit here today?
25   A.   Yes.
```

1    Q.    And you respond, "Thank you."

2         Then that night you went to the Board of Education

3    meeting and spoke on this same exact topic, correct?

4    A.    Yes.

5    Q.    And if we scroll to page 104.  All right.

6         And at that time Principal Gethings sent you this

7    email at 6:04 p.m., right?

8    A.    P.M., yes.

9    Q.    After you spoke?

10   A.    Yes.

11   Q.    You then responded, 609, said, "Thank you - I am

12   hoping for a unified policy for not just Hooker but for

13   the school district as a whole, this was just an example."

14        So at the Board of Ed meeting that night you didn't

15   call out Principal Gethings by name, correct?

16   A.    Correct.

17   Q.    You were asking about a unified policy for the

18   district?

19   A.    Correct.

20   Q.    All right.  And then Principal Gethings responds to

21   you again -- can you scroll up.

22        What does she tell you?

23   A.    "You are not alone, that is the intention of our

24   entire district & we are all working for hard."

25   Q.    Okay.  And if you can scroll up.

1        And you say we all have the best intentions.  Right?

2    A.   Yes.

3    Q.   Now, I have a few questions for you, Ms. Light, on

4    the March 31, 2021, meeting you had with Ms. Gethings,

5    Ms. Clarino, Ms. Morrison, and Judie Cav, okay?

6    A.   Okay.

7    Q.   You taped that meeting, right?

8    A.   Yes.

9    Q.   On your phone?

10   A.   Yes.

11   Q.   And you didn't tell anyone you were taping that

12   meeting?

13   A.   Correct.

14   Q.   And so as of March you were already sending emails,

15   school-based emails to your hotmail account, right?

16   A.   Yes.

17   Q.   And you were taping meetings on your phone?

18   A.   Yes.

19   Q.   And that wasn't the first meeting you had taped

20   without telling people you were taping it?

21   A.   Correct.

22   Q.   How many meetings do you think you taped without

23   telling people you were taping it?

24   A.   Um, the ones in exhibit -- the ones --

25   Q.   Several meetings, correct?

1    A.    Yes.

2    Q.    Those meetings included meetings with just you and

3    Principal Gethings and Ms. Clarino, right?

4    A.    Yes.

5    Q.    And it included other meetings where your fellow

6    teachers were there as well, right?

7    A.    Yes.

8    Q.    And union representatives, right?

9    A.    Um, yes.

10    Q.    Yes.  Both building level and Mr. DeLucia, for

11    example, right?

12    A.    Yes.

13    Q.    All right.  And you didn't tell your union

14    representatives that you were taping the meetings either?

15    A.    Correct.

16    Q.    If we could turn to Exhibit G, please.  Okay.

17          Now, this Exhibit G is another text message between

18    you and Ms. Miller, correct?

19    A.    Yes.

20    Q.    And it looks like there was some text messages on

21    February 8th of 2021.  And then on February 9th of 2021

22    you text her at 8:19 a.m., correct?

23    A.    Correct.

24    Q.    And in that text message you're letting her know that

25    a Hooker teacher is positive but she hasn't been in the

```
 1  building because her daughter had it, right?

 2  A.   Yes.

 3  Q.   And you say "Please don't share."

 4  A.   Yes.

 5  Q.   So this is building level information that you're

 6  sharing with Ms. Miller and telling her not to share it

 7  further?

 8  A.   No.

 9  Q.   Yes.  This -- well, I'll rephrase.

10       This is a text message about a Hooker teacher who has

11  COVID, right?

12  A.   Yes.

13  Q.   And you sent it to Ms. Miller.

14       By the way, is Ms. Miller an employee of the

15  New Haven Board of Education?

16  A.   No.

17  Q.   Does she have children at Worthington Hooker School?

18  A.   No.

19  Q.   Okay.  Can we scroll to the third page of this PDF.

20  Okay.

21       On this same exhibit on page 2498 there is more text

22  messages with Ms. Miller, correct?

23  A.   Yes.

24  Q.   All right.  And here you again raise the issue of

25  teachers at Hooker who have COVID positive cases, right?
```

1  A.    That I heard through the grapevine.

2  Q.    You heard that there were two teachers positive at

3  Hooker?

4  A.    Yes.

5  Q.    You said you heard it through the grapevine but then

6  you confirmed with the actual teachers?

7  A.    Correct.

8  Q.    I think one teacher you confirmed via Facebook,

9  right?  She put something out about it on Facebook?

10  A.    She posted about it on Facebook, yes.

11  Q.    And the second teacher was Judie Cav, right?

12  A.    Yes.

13  Q.    She did not post about it on Facebook.  How you find

14  out about it?

15  A.    She emailed me and told me she had COVID.

16  Q.    Isn't it true, Ms. Light, that you emailed her first

17  and in response to your email she told you she had COVID?

18  A.    It was an email chain.

19  Q.    She didn't spontaneously email you and say, hey,

20  Jessica, I have COVID?

21  A.    She emailed me four weeks in a row saying she

22  wouldn't be in her classroom.  I emailed her asking if

23  there was anything I could do, if she was okay.  She said

24  she was okay, she had COVID.  I offered if she needed

25  anything.

 1    Q.    Okay.  Well, let's go to -- let's go back to the

 2    transcript from that meeting with Judie Cav which I

 3    believe is Exhibit 25.

 4         Okay.  Now, Ms. Cav told you in that meeting that she

 5    thought your email was a little odd; isn't that true?

 6    A.    I believe so.  If you could point to the line, it

 7    would be helpful.

 8    Q.    Absolutely.  Page 17, line 21.

 9         So Ms. Cav says to you, "So I did inform teachers

10    when I was out and when I was posting lessons and you did

11    reach out to, you asked me if I was all right, and then

12    you asked if you could drop something off for me, which I

13    thought was a little odd since we live in separate cities

14    and that we're not that friendly, but I don't believe that

15    I ever wrote what my illness was."

16         So you understood in that meeting, correct, that

17    Ms. Cavanaugh thought your email was a little odd?

18    A.    I don't remember -- I remember feeling hurt that she

19    didn't see us as friends.

20    Q.    You testified before under questioning from your

21    attorney that you believed you and Ms. Cavanaugh were

22    friendly, and she told you in that meeting she didn't feel

23    the same way, correct?

24    A.    Correct.

25    Q.    In fact, she told you in that meeting that she might

```
 1   not be able to trust you moving forward, correct?
 2   A.   Um, I don't remember the exact words.  I know that I
 3   showed my screenshot of the email.  She remembered that
 4   she had sent me the email and she apologized for saying
 5   she hadn't sent me an email confirming her COVID case and
 6   that she had actually been friendly enough to send it.  I
 7   said that I would work on gaining our trust back, and I
 8   think she said that it would take a long time for her to
 9   regain her trust, but that she had in fact sent me the
10   email.
11   Q.   That's right.  She did in fact say that.
12        Here on page 20 you say, "I acknowledge that it will
13   take a long time, if ever, for Judie to respect me or
14   trust me again.  But I, you know, I'll do the best I can
15   to do that."  Right?
16   A.   Yes.
17   Q.   And that's what you knew at that March 2021 meeting?
18            THE COURT:  If you have finished on this
19   section, I'd like to take a morning recess.
20            MR. MURPHY:  Absolutely, Your Honor.  I'm sorry,
21   I lost track of time.
22            THE COURT:  Ladies and gentlemen, we'll take 15
23   minutes.
24                (Whereupon the jury left the courtroom.)
25            THE COURT:  Counsel, we'll take five minutes and
```

 1    be back to hear you on --

 2              MR. MURPHY:  Exhibits V and W?

 3              THE COURT:  -- V and W.

 4                   (Whereupon, a recess followed.)

 5              THE COURT:  Please be seated.

 6              I will hear plaintiff's objection on V.  Your

 7    pretrial filings indicate that it is relevance --

 8    prejudice, relevance, and hearsay.  Let's proceed to

 9    expand on that.  I take it you are claiming the whole

10    thing?

11              MR. MURPHY:  Yes.  Both V and W.

12              THE COURT:  Let's start with V, please, unless

13    the issue can be taken up jointly.

14              MR. MURPHY:  It seems to me they're kind of the

15    same.

16              THE COURT:  Mr. Interlandi.

17              MR. INTERLANDI:  I'm trying to get to it, V.

18              So the issue I have with this is the statement

19    that Ms. Light made to her brother in a text message in

20    October 2020, and he's referring -- I'm sorry --

21              THE COURT:  I'm sorry, I'm looking --

22              MR. INTERLANDI:  V and W?

23              THE COURT:  I am.  V seems to be sent October 8,

24    2020.

25              MR. INTERLANDI:  Yes.

1              THE COURT:  And this is from her brother?

2              MR. INTERLANDI:  It's a text message thread

3    between Ms. Light and her brother.

4              THE COURT:  And her brother's name is Silva?

5              MR. INTERLANDI:  Fredo Silva.

6              And the issue I have is the reference to her

7    principal is prejudicial and there's really --

8              THE COURT:  The whole thing or just her use of

9    the word "bitch"?

10             MR. INTERLANDI:  Just the word.

11             THE COURT:  As to --

12             MR. INTERLANDI:  I'm sorry, Your Honor, I

13   believe it's prejudicial, harm outweighs the probative

14   value.

15             THE COURT:  And if that were removed, does your

16   objection get met?

17             MR. INTERLANDI:  Yes.

18             THE COURT:  All right.

19             Let me see what defendant has to say about that.

20             MR. MURPHY:  I think it's highly relevant,

21   Your Honor.  Ms. Light has --

22             THE COURT:  We're now focusing on just the one

23   phrase: "My principal is a bitch."

24             And the question is, given the, let's call it,

25   inflammatory nature, why you don't achieve what the

1    purpose is for which you offer this -- that is I'm

2    assuming the plaintiff's negative regard for Ms. Gethings?

3              MR. MURPHY:  That's right.

4              THE COURT:  So why can't you achieve that by she

5    is horrible, all the things that she has done that places

6    the plaintiff's life at risk?  Why is that not enough?

7              MR. MURPHY:  These are four text messages from

8    her to her brother all about her views and attitude

9    towards reopening and towards Principal Gethings at the

10   time.  While the word "bitch" might be unhelpful to

11   plaintiff's case, that doesn't render it inadmissible.

12             THE COURT:  It's really a 403 objection that

13   it's unduly prejudicial.

14             MR. MURPHY:  I don't see how it could be unduly

15   prejudicial when it's her own language about her principal

16   who she claims took all these bad acts against her in the

17   spring of 2021, yet by in October of 2020 she already

18   views the principal as a bitch.  It's highly relevant.

19             THE COURT:  Well, why is that not satisfied by

20   characterizing her as horrible?

21             MR. MURPHY:  It's -- I guess I don't understand

22   Your Honor's point.  We shouldn't be censoring the

23   plaintiff's language that she used about her supervisor in

24   October.  It shows -- it goes right to her credibility of

25   the claims she testified on direct.  It goes right to the

1    credibility of her claims.  And the jury is allowed to

2    consider that.  Just because it's a swear word doesn't

3    render it inadmissible under Rule 403.  It's not going to

4    mislead the jury.

5              THE COURT:  It's not inadmissible as such.  The

6    objection that I see is unfair prejudice.  The other two

7    grounds in your pretrial filings don't seem to make sense.

8              MR. MURPHY:  The word "horrible" isn't even

9    hers; that's her brother's.

10             THE COURT:  Oh, I see.  I see.  So the dark ones

11   on the right side --

12             MR. MURPHY:  Are Ms. Light, correct.

13             MR. INTERLANDI:  Yes.

14             THE PLAINTIFF:  The right side is the side that

15   sent it.

16             MR. INTERLANDI:  Your Honor, I don't think it

17   contradicts -- she didn't say that she had a great

18   relationship with Ms. Gethings in October of 2020 or that

19   she thought highly of her in October of 2020.  She didn't

20   say that on her direct or cross.  So I also think it's

21   irrelevant.

22             MR. MURPHY:  She's called the parents of

23   Worthington Hooker crazy at the time.  She called the

24   other PTA guy poor language, I forget the exact quote, but

25   it's already in evidence.  The whole thing goes to her

```
 1    attitudes towards reopening and her inability --

 2              MR. INTERLANDI:  That doesn't goes towards that.

 3              MR. MURPHY:  All three, four of these text

 4    messages --

 5              MR. INTERLANDI:  It goes to specific people in

 6    which she had a thought about those people.  It has

 7    nothing to do with reopening.

 8              THE COURT:  I think the whole relationship is

 9    about differences of opinion on how to reopen, no?

10              MR. INTERLANDI:  Yes.  There is a difference of

11    opinion.

12              THE COURT:  I think that, given that word choice

13    is indicative of credibility and bias and that the

14    defendant is defending on, in essence, overreaction, I

15    think this is relevant and I'm going to permit it.

16              Exhibit W, I'm not sure I understand the

17    objection.  Is W -- you do have listed hearsay.  Tell me

18    what your objection is to W.

19              MR. INTERLANDI:  My objection is along the same

20    lines of what they're trying to do and offer these

21    inflammatory statements.  This is highly prejudicial where

22    there's a private text message between my client and her

23    friend in August of 2020, okay, where she's making a

24    comment about her union president and saying, you know --

25    I'm just trying to find where it says this.
```

1          MR. MURPHY:  Yeah.  I want to punch him or could

2     I punch him now.  "When can I run for union president -

3     fuck him."

4          Anytime someone disagrees with Ms. Light, she

5     uses poor language --

6          MR. INTERLANDI:  That's not true.

7          MR. MURPHY:  -- she thinks they're attacking

8     her, et cetera --

9          MR. INTERLANDI:  That's an overexaggeration.

10          THE COURT:  Excuse me, excuse me.  Let me find

11     what you are reading.

12          I'm sorry, where do I find something about

13     punching?

14          MR. INTERLANDI:  It's 2457, Your Honor, third

15     page of Exhibit W.

16          She asks her friend in a private message between

17     the two of them, this one is in October of 2020, "Could I

18     punch Dave now."

19          THE COURT:  I see.

20          Well, I don't think under a 403 analysis that

21     manifestations of a party's -- I want to say character,

22     but going to credibility is so prejudicial it outweighs

23     its relevance on credibility.  So I'm going to permit

24     these exhibits and you can clarify that this is all

25     private conversation, unguarded conversation, whatever

1    else you want to do.  But it just -- it is a reflection of

2    her thinking contemporaneous with many of these events,

3    no?

4              MR. INTERLANDI:  It's concerning COVID.

5              THE COURT:  October 2020 is certainly part of

6    our time span.

7              MR. INTERLANDI:  Yes, it is.

8              THE COURT:  Anything further?

9              MR. INTERLANDI:  I would just -- in addition, it

10   contains hearsay.

11             THE COURT:  And which is the hearsay?

12             MR. INTERLANDI:  The statements made by Sarah

13   Miller.

14             THE COURT:  Okay.  But are they being offered

15   for the truth or they're just completing this dialogue?

16             MR. INTERLANDI:  I don't know what they're being

17   offered --

18             MR. MURPHY:  I'm not offering anything by Sarah

19   Miller for the truth of the matter asserted.  I'm just

20   focusing solely on Jessica Light's statements in her text

21   messages.

22             MR. INTERLANDI:  As he did before, I mean, I

23   don't know if he's going to read line by line the

24   communication.  I don't know if the jury can make that

25   distinction if that's being offered or not.

```
 1              THE COURT:  Okay.  Let's proceed.  Let's bring
 2    the jury back.
 3                    (Whereupon, the jury entered the
 4                    courtroom.)
 5              THE COURT:  Please be seated.
 6              Ladies and gentlemen, I see how efficient you
 7    are now getting to be in finding your seats.  I'm sorry
 8    that we delayed a little.  There was a matter I needed to
 9    take up with counsel.  It's just much more efficient and
10    appropriate if I take it up outside of your hearing.  We
11    will proceed.
12              You may proceed.
13              Let's see, we need Ms. Light.
14              Go ahead.
15              MR. MURPHY:  Your Honor, my understanding is
16    both Exhibits V and W --
17              THE COURT:  Are admissible, yes, over objection.
18              MR. MURPHY:  If I could have Exhibit V, as in
19    Victor.
20    BY MR. MURPHY:
21    Q.   Ms. Light, I want to follow up with you about
22    additional text messages from that October 2020 time
23    frame.  You recall we discussed some text messages where
24    you were referring to the parents of Worthington Hooker,
25    right, calling them crazy for wanting to return?
```

```
1    A.    Yes.
2    Q.    Okay.  And we discussed some other text messages.
3          Now I want to focus your attention on Exhibit V,
4    which is a October 8, 2020, text message between you and
5    Fredo Silva.
6          Who is Fredo Silva?
7    A.    My brother.
8    Q.    He's someone you refer to as your brother but he's
9    not biologically related to you, correct?
10   A.    Correct.
11   Q.    And in that text message can you read us the first
12   text message, please?
13   A.    From me or my brother?
14   Q.    From you.
15   A.    "My principal is a bitch - I am ok but very worried
16   about the possibility of returning in person who she is at
17   the helm."
18   Q.    I want to -- I just wanted that first line.
19         And so in October of 2020 you were teaching remotely,
20   correct?
21   A.    Yes.
22   Q.    All right.  And all teachers were teaching remotely?
23   A.    Yes.
24   Q.    And you were worried about returning to in-person
25   instruction and you called your principal a bitch.  Why
```

1    did you do that?

2    A.    I do not speak professionally when speaking to my

3    brother.

4    Q.    Okay.  Second text message: "Instead of just moving

5    my class to the gym she wants me to teach both third grade

6    classes with another teacher in the gym."

7         You had had that discussion with Principal Gethings?

8    A.    Yes.

9    Q.    In October of 2020 you recognize that Principal

10   Gethings was trying to plan a return to the school for all

11   of the children, right?

12   A.    We all were.

13   Q.    This was the context of the discussion, you were

14   trying to figure out how to make it work, right?

15   A.    Yes.

16   Q.    And she was making a suggestion and you disagreed

17   with that suggestion?

18   A.    Yes.

19   Q.    Okay.  And you indicate in the third one you told her

20   you didn't mind giving up your room but that gatherings

21   over 25 were still illegal right now, right?

22   A.    Yes.

23   Q.    All right.  And then at the end you say, "My life

24   should not be placed at additional risk simply to fix

25   logistical problem on her end."

1        Is that what you thought Principal Gethings was

2    doing?

3    A.    I thought my life would be at additional risk and the

4    lives of my students if we were in such a large group.

5    Q.    Did you think she was disregarding safety for your

6    life really just to adjust a logistical problem?

7    A.    Yes.

8    Q.    And that made her a bitch?

9    A.    In the colloquial speak that I use with my brother,

10   absolutely.

11              MR. MURPHY:  If I could have Exhibit W, please.

12   BY MR. MURPHY:

13   Q.    Now, at the top of Exhibit W it shows this is yet

14   another text message between you and Ms. Miller, correct?

15   A.    Yes.

16   Q.    And this is in August -- these text messages are from

17   August of 2020, right?

18   A.    Yes.

19   Q.    And if we could go to page 2 of this PDF.

20        In August of 2020 you text Ms. Miller that your

21   husband has just begged you not to because I just need the

22   heat to not be on me right now.  Right?

23   A.    That's what I'm reading.

24   Q.    Do you understand what that means?

25   A.    Um, if I could refer to earlier in the conversation,

1    I would be able to.

2    Q.   Sure.

3         So on 8/10 you send Ms. Miller a link to the

4    *New Haven Independent*, right?

5    A.   Yes.

6    Q.   And you're talking about testifying.  Do you recall

7    as you sit here today what sort of testimony you were

8    thinking about giving?

9    A.   Where does it say testify on this page, I'm sorry?

10   Q.   No problem.  In the last big text message from you at

11   the bottom it says "Do you think I need to testify."

12   A.   Oh, it says that it's about reconsidering remote

13   only.

14   Q.   And you were in favor of keeping remote-only

15   instruction, right?

16   A.   Yes.

17   Q.   All right.  And then now with that context, if you

18   can scroll to the second page, you say your husband begged

19   you not to testify, right?

20   A.   Yes.

21   Q.   And this is in August of 2020?

22   A.   Yes.

23   Q.   All right.  A little farther down that page you send

24   a screenshot of your phone, and you say "Dave c's response

25   is sickening"; do you see that?

1    A.    I do.

2    Q.    We don't know -- can you tell what that screenshot

3    is?

4    A.    I cannot.

5    Q.    Is it fair to say it was something related to what

6    you and Ms. Miller were discussing previously which is,

7    you know, a return from remote-only instruction?

8    A.    I don't want to speculate.

9    Q.    Okay.  At the bottom of that little screenshot you

10   say "Dave c's response is sickening."

11        And Dave C. refers to Dave Cicarella who we discussed

12   yesterday, right?

13   A.    Correct.

14   Q.    The union president at the time?

15   A.    Correct.

16   Q.    And you disagreed with him on his response to

17   whatever -- it looks like a response to you, right?

18   A.    Um, I mean, we went back and forth.  I don't know who

19   started the chain.

20   Q.    Okay.  But now that we have that context, it suggests

21   that that screenshot is a screenshot of a text message

22   exchange between you and Dave C., correct?

23   A.    It is -- I'm unsure of your question.  It is a text

24   message chain between me and Dave Cicarella.  I am unaware

25   of what it says.

```
 1   Q.    Agreed.
 2         But whatever it said, you thought his response was
 3   sickening?
 4   A.    Yes.
 5   Q.    Okay.  On the next page, now this is a October 13,
 6   2020, text message between you and Sarah Miller.
 7         You start it off by saying "Could I punch Dave
 8   now" --
 9   A.    Yes.
10   Q.    -- right?
11         And she says what happened, I just logged off.  Does
12   that suggest to you you were watching some sort of online
13   meeting?
14   A.    It's possible.
15   Q.    It's likely, isn't it?
16   A.    I don't know.
17   Q.    All right.  And is it true that -- well, withdrawn.
18         You wanted to punch him because you were disagreeing
19   again with something he was saying, right?
20   A.    Um, I don't believe I wanted to punch him, no.
21   Q.    That's what you wrote, correct?
22   A.    No.  I said, "Could I punch him now."  Not that I
23   wanted to.
24   Q.    "Could I punch him now" is what you said, right?
25   A.    Yes.
```

```
 1  Q.   All right.  And you normally want to punch someone

 2  when you disagree with them, right?

 3  A.   But I never have.

 4  Q.   You have never punched someone?

 5  A.   Correct.

 6  Q.   But you have disagreed with Dave?

 7  A.   Absolutely.

 8  Q.   And you disagreed with him at this time about issues

 9  related to a potential return to school?

10  A.   I don't know that that's what I was disagreeing

11  about.

12  Q.   Okay.  Next page, scroll a little farther down.

13       Here we have some text messages on March 22 of 2021

14  between you and Ms. Miller.  And there's a discussion

15  about what's being discussed at the Board of Ed, "should I

16  speak"; do you see that?

17  A.   Yes.

18  Q.   Okay.  And then there's a little discussion.

19       And then later on that same day at 5:47 you say "When

20  can I run for union president - fuck him," right?

21  A.   Yes.

22  Q.   Ms. Miller said "what happened."

23       Can you read us your response?

24  A.   "'I would just like to thank the superintendent for

25  always having the teachers' safety in mind.'"
```

1    Q.   So you're quoting a statement Dave made somewhere,

2    right?

3    A.   It appears so.

4    Q.   And actually we know that date, March 22, 2021, we

5    know there was a Board of Ed meeting that night, right?

6    A.   I trust you.

7    Q.   Well, earlier in your testimony today we went over

8    the email chain between you and Principal Gethings on

9    March 22 where you emailed her at 5:30 in the morning --

10   A.   Yes.

11   Q.   -- and then so on and so forth, right?

12   A.   Yes.

13   Q.   So we know there was a Board of Ed meeting that

14   night.  We know you texted Ms. Miller at 5:47 and indicate

15   your disagreement with something Dave said on camera,

16   right?

17   A.   Yes.

18   Q.   Okay.  If I could have Exhibit 37, please.

19        All right.  Now, Ms. Light, on Plaintiff's Exhibit 37

20   do you remember discussing this email with your counsel

21   yesterday?

22   A.   Yes.

23   Q.   And do you remember -- and this involves an incident

24   at dismissal time where you had to go to the bathroom and

25   you had someone watch your class, right?

1    A.    Prior to dismissal.

2    Q.    And here, it starts on page 2, there's an email from

3    Principal Gethings to you, right?

4    A.    Yes.

5    Q.    And you received this email and you responded to it,

6    right?

7    A.    Yes.

8    Q.    All right.  And she says that she was concerned not

9    to see you at dismissal today with your students, correct?

10   A.    That is what she said.

11   Q.    Okay.  And then on the prior page you respond, right?

12   A.    On the --

13   Q.    And I'm getting to my point.  So you respond.  And

14   then at the top you forwarded it to Ms. Bonner?

15   A.    What's the question?

16   Q.    The question is:  Yesterday when you were talking

17   about your email to Ms. Bonner, you said that you first

18   called the office and you couldn't get anyone to cover

19   your class and that's how you ended up with Ms. Maffuid

20   covering your class, right?

21   A.    Mr. Miller and then Ms. Maffuid.

22   Q.    And you said you called the office first and no one

23   was available?

24   A.    No one came.

25   Q.    When you called the office did you talk to anyone?

1  A.   Yes.

2  Q.   Who did you talk to?

3  A.   Pam Green.

4  Q.   And how would Pam Green find people to cover your

5  classroom?

6  A.   If there was someone that she knew was available.

7  Q.   Does the office have a walkie-talkie?

8  A.   Yes.

9  Q.   Would they have radioed out "we need someone to cover

10  Ms. Light's class"?

11  A.   I do not know what they did.

12  Q.   Okay.  Is that a common practice when a teacher needs

13  coverage for the office to radio people who might be

14  available?

15  A.   It doesn't sound out of the realm of possibility.

16  I'm not in the office.

17  Q.   Does Principal Gethings carry a walkie-talkie at the

18  school?

19  A.   Sometimes.

20  Q.   And so if a call had gone out, she would have heard

21  it, right?

22  A.   I would hope so.

23  Q.   All right.  And then she would not have been

24  surprised to see Ms. Maffuid covering your class, right?

25  A.   I don't understand what the -- what's the question?

1    Q.    I'll withdraw it.

2          The question is:  You don't know if the office put

3    out a call via walkie-talkie?

4    A.    Correct.

5    Q.    In your email to Ms. Bonner on May 27 did you mention

6    that you called the office first and no one was available?

7    A.    No.

8    Q.    In your -- in the last full paragraph there you say,

9    "Again, not a major issue, but an example of tiny

10   critiques of normal actions."

11         Was that your position at the time, that it was not a

12   major issue?

13   A.    It was not an issue that would have been a separate

14   complaint, but since Taryn Bonner had asked me to tell her

15   of issues, I thought it was major enough to let her know,

16   not major enough to file an HR complaint.

17   Q.    The last sentence you say -- I'm sorry, if we could

18   scroll down.

19         The last sentence of your email -- keep going,

20   please -- you state "I apologize for any inconvenience.  I

21   will communicate directly with you in the future and make

22   sure not to over hydrate in preparation of running club"?

23   A.    Correct.

24   Q.    Was that sarcasm?

25   A.    No.

1    Q.   Can we move to Exhibit 9, please.

2         I want to talk briefly about school committees with

3    you.

4         Now, you testified before that you were on the PTA,

5    correct?

6    A.   Correct.

7    Q.   And that was for two years?  How many years were you

8    the PTA representative?

9    A.   I was on the Executive Board for two years.  I was on

10   the PTA longer.

11   Q.   Was that a paid position?

12   A.   Um, no.  There's a discount in after-school fees.

13   Q.   It's an unpaid position, correct?

14   A.   There's a discount in after-school fees.

15   Q.   You testified about the Gardening Committee.  And you

16   raised some concerns about Doug Jones.

17        Doug Jones was another teacher at Worthington Hooker?

18   A.   Is your question is Doug Jones a teacher?  Yes.

19   Q.   And he was at Worthington Hooker with you, right?

20   A.   Yes.

21   Q.   And he was pursuing his 092.  What's an 092?

22   A.   Administrator's license.

23   Q.   So we know from the prior emails that we reviewed

24   that he was involved with the boys group and they were

25   going to help on a clean-up day, right?

1    A.    Could you rephrase that question?

2    Q.    Sure.

3          How did Doug Jones get involved with the Gardening

4    Committee?

5    A.    I do not know.

6    Q.    And did he ever take over from you as the head of the

7    Gardening Committee?

8    A.    Um, the Gardening Committee no longer had the

9    activities that they typically had, so there was -- it

10   became defunct.

11   Q.    And the Gardening Committee, that's an unpaid

12   position?

13   A.    Correct.

14   Q.    You raised a concern about the Summer Play-Based

15   Learning Committee, right, on your direct testimony?

16   A.    Concern?

17   Q.    Sure.  We'll go about this another way, Ms. Light.

18         Exhibit 9 is Ms. Gethings' response to some concerns

19   you raised about various school committees, right?

20   A.    And professional development opportunities, yes.

21   Q.    Okay.  And you raised those concerns, your union sent

22   them to Principal Gethings, you met about them, and then

23   she put her responses in writing for you, right?

24   A.    Yes.

25   Q.    And you had an opportunity to respond to those?

```
1    A.    Yes, I emailed responses.

2    Q.    Right.  We saw them yesterday, right?

3    A.    Yes.

4    Q.    Okay.  And it addresses various committees.

5          The first one on page 9 is the Summer Play-Based

6    Learning Workshop, right?

7    A.    Correct.

8    Q.    All right.  Principal Gethings explained to you that

9    they were trying to build -- they selected other people

10   because she was trying to build capacity at the grades K-2

11   level, right?

12   A.    That is what she wrote.

13   Q.    And you were in grade 3 at the time, right?

14   A.    Correct.

15   Q.    Okay.  Then there was -- a little further down

16   there's a discussion of the Scheduling Committee?

17   A.    Right.

18   Q.    And you wanted to lead that committee, right?

19   A.    Um, I wanted to be on the committee from the

20   beginning.

21   Q.    And you were on the committee, right?

22   A.    Um, I was asked not to go to the first meeting.

23   Q.    Did you have any conflicts at that time?

24   A.    No.

25   Q.    Was there a suggestion you should be somewhere else
```

1  at that time?

2  A.    Not to my knowledge, no.  I was told that most of the

3  scheduling had to do with grades that I wasn't teaching

4  and that I wasn't needed.

5  Q.    Okay.  And again, that committee, unpaid, voluntary

6  position?

7  A.    Yes.

8  Q.    Signage Committee, that was a one-time committee

9  addressing COVID-related signage in the building, right?

10 A.    I don't believe it was one time.

11 Q.    It was a committee that was constituted in the summer

12 of 2020 to address COVID-related signage in the building,

13 right?

14 A.    Correct.

15 Q.    We all remember the arrows on the hallways, and those

16 were the types of things the Signage Committee would deal

17 with?

18 A.    Correct.

19 Q.    And again, that's a voluntary unpaid committee?

20 A.    Correct.

21 Q.    The SEL Ambassador, now, that is a stipend position,

22 right?

23 A.    Yes.

24 Q.    Do you know what the stipend was?

25 A.    Not very much.

```
 1    Q.   But you know that other people applied for that
 2    position, correct?  You were told that?
 3    A.   I don't believe there was an application process.
 4    You just asked.
 5    Q.   Other people asked to be on that stipend position,
 6    right?
 7    A.   Yes.
 8    Q.   Two people were chosen.  Do you recall how many
 9    people applied or how many people --
10    A.   No.
11    Q.   And you never grieved that decision, did you?
12    A.   No.
13    Q.   I want to ask you a little bit about your return to
14    work, because there was questions from your attorney about
15    that.
16         When you went out on leave, you had one class.  How
17    many kids were in your class?
18    A.   I believe 17.
19    Q.   And when you went out on leave, what happened to
20    them?
21    A.   Um, two of them went to the other classroom.  And a
22    third teacher that had a small class started teaching in
23    my classroom with her students as well.
24    Q.   And so your kids were split into two different
25    classrooms?
```

```
 1   A.    Two of them were separated, yes.
 2   Q.    Okay.  Can I have Exhibit M, please.
 3         So here we have Defendants' Exhibit M which is a --
 4   starts out towards the bottom a February 8, 2022, email
 5   from Principal Gethings to you, Ms. Clarino, Lisa Mack
 6   from HR, Taryn Bonner from HR, and your union person,
 7   correct?
 8   A.    Yes.
 9   Q.    All right.  And if we could scroll down just a little
10   bit.
11         This set out a proposed plan for you to return to
12   work, right?
13   A.    Yes.
14   Q.    Ms. Gethings says she's glad to be having you return
15   to work and looks forward to mediation and here's our
16   plan.  Is that how you understood this email?
17   A.    Um, no.
18   Q.    Okay.  We'll take them in order.
19         She says first that she's glad you will be returning
20   to work, right?
21   A.    Yes.
22   Q.    All right.  And "look forward to participating in
23   mediation and agree it will be important for us all"?
24   A.    Yes.  Yes, that's what she said.
25   Q.    And then a couple lines down she says "I suggest
```

1    spending the remainder of the week rotating your time in

2    both classrooms spending time in literacy and math to

3    learn and support the learning of first graders."

4         That's what she was proposing to you, right?

5    A.    Yes.

6    Q.    And she even gives you a specific schedule on

7    Wednesdays and Thursdays and how you should rotate, right?

8    A.    Yes.

9    Q.    And then if we could scroll further down, she gives

10   you seven additional bullet points to think about, right?

11   A.    To think about?

12   Q.    Yeah.

13   A.    Yeah, it seems like it's a to-do list, yes.

14   Q.    A to-do list.  A better way to phrase it, thank you.

15        So she gives you seven points on a kind of to-do list

16   when you come back to help you reintegrate into the

17   school, right?

18   A.    Yes.

19   Q.    If we could go back up to the top.

20        What was your reply?

21   A.    "Great, I look forward to reconnecting with everyone.

22   Here is the first draft of the letter you requested."

23   Q.    Okay.  Now can we go to Exhibit N.  Thank you.

24        All right.  Ms. Light, I show you what's admitted as

25   Defendants' Exhibit N, as in Nancy.  Are these your

1    handwritten notes?

2    A.    Yes.

3    Q.    Okay.  Bear with me, I have the wrong notebook up

4    here.

5          In that one, two, three -- fourth paragraph that

6    begins I have respect for you, do you see that?

7    A.    Yes.

8    Q.    I actually misquoted that.  It says, "I have respect

9    for your authority as administrator and believe in our

10   joint goal of school improvement"?

11   A.    Yes.

12   Q.    My question is:  Afterwards you say, "You have the

13   discretion to decide what committees I am on and what

14   grade level I teach" --

15   A.    Yes.

16   Q.    -- right?

17         And you agree, as you sit here today, that Principal

18   Gethings has the discretion to decide which grade level

19   you teach within her building, right?

20   A.    I apologize.  Do you see the -- can you read the

21   caret in the sentence that you were reading?  I could read

22   it for you.

23   Q.    I see.  I am on -- I'll read it again so you and I

24   are on the same page, thank you.

25         "You have the discretion to decide what committees I

1    am on and what grade level I teach for the betterment of

2    our school."

3        Did I read that correctly this time?

4    A.    Yes.

5    Q.    Okay, thank you.

6        So you agree, as you sit here today, that Principal

7    Gethings as a school principal has the discretion to

8    assign teachers to particular grades?

9    A.    For the betterment of the school.

10   Q.    Okay.  Principals likes Principal Gethings don't need

11   to clear that decision with the superintendent, for

12   example, right?

13   A.    I don't know the exact process, but I believe you're

14   correct.

15   Q.    Same thing with school committees, it's ultimately up

16   to Principal Gethings to make those assignments as

17   necessary?

18   A.    Yes.

19   Q.    For the betterment of the school?

20   A.    Presumably, yes.

21   Q.    Do you know approximately when these notes are from?

22   Because they're undated.

23   A.    Um, I am not positive of when they are from.

24   Q.    Okay.  Can we go to the next page, please.

25        These are some additional undated notes and that's

```
 1   your handwriting, right?
 2   A.   Correct.
 3   Q.   The fourth line down you say, "Claire told me and I
 4   said I didn't believe it was true."
 5        And that's referring to Claire Rowe, right?
 6   A.   Correct.
 7   Q.   A member of your learning pod?
 8   A.   Yes.
 9   Q.   And at some point in early 2021 you had a
10   conversation with her about Judie Cav?
11   A.   Yes.
12   Q.   And it's your testimony, I believe, from this
13   document that Ms. Rowe came to you and asked you if you
14   knew whether Judie Cav had COVID?
15   A.   She said she knew Judie Cav had COVID.  I said I did
16   not believe it was true.
17   Q.   So at some point in February of 2021 you were
18   discussing Judie Cav with Claire Rowe?
19   A.   I'm not sure of the date.
20   Q.   Okay.  Well, it was either -- when was Judie Cav out
21   of work, do you recall?
22   A.   All of February.
23   Q.   Okay.  On the left-hand side you state "You have deep
24   pockets.  Fuck it."
25        What does that mean?
```

1    A.    Um, it was advice given to me to remember that even

2    though the situations felt paralleled to my experiences as

3    a child where I did not have the resources to prevent

4    abuses of power victimizing me, that now I did have the

5    resources to protect myself as an adult.  I have -- I have

6    a support system, I have a voice, and I have the money to

7    hire an attorney.

8    Q.    Okay.  And this was in February of 2021; is that when

9    these notes are from?

10   A.    I do not know when these notes are from.

11   Q.    At the top it says "Take It Slow."  And then you

12   start, there is a rumor that I started a rumor, where did

13   you hear this, and so on and so forth.

14        Were these notes in preparation for your meeting in

15   March of 2021 with Judie Cav?

16   A.    I do not know.

17   Q.    Do the notes, as you sit here today and you read

18   them, suggest that they were in anticipation of that

19   meeting with Judie Cavanaugh in March of 2021?

20   A.    I don't think they suggest anything.

21   Q.    These notes suggest -- withdrawn.

22        Speaking about Judie Cav earlier you testified about

23   your view of a statement that Principal Gethings made in

24   that meeting that you view as defamatory, right?

25   A.    Yes.

 1    Q.   Under questioning from your attorney you identified a

 2    specific sentence in the transcript that you viewed as

 3    defamatory, right?

 4    A.   Yes.

 5    Q.   Okay.  And your defamation claim is based on a

 6    comment made in a Zoom meeting, right?

 7    A.   Yes.

 8    Q.   Meaning you, Judie Cav, the two administrators, and

 9    your union representative all participated via Zoom?

10    A.   The union steward.

11    Q.   Union steward, Ms. Morrison?

12    A.   Yes.  I wasn't aware she was coming.

13    Q.   But she appeared and she was there?

14    A.   Yes.

15    Q.   And so my question is:  No one else but you five were

16    involved in that meeting, right?

17    A.   Not to my knowledge.

18    Q.   Okay.  And to your knowledge -- withdrawn.

19         Ms. Light, you also raised some concerns on your

20    direct about observations when you were in the first grade

21    classroom at the start of the 2021-2022 school year,

22    correct?

23    A.   Yes.

24    Q.   I think you said Ms. Clarino maybe popped in your

25    classroom three or four times with her computer and took

```
 1   notes?
 2   A.   I didn't use the word "popped in."
 3   Q.   How would you describe it, then?
 4   A.   Entered and sat in the back.
 5   Q.   So she entered your classroom four times and took
 6   notes.  And you took those to be observations, right?
 7   A.   Correct.
 8   Q.   At the time you were new to the Little School?
 9   A.   Correct.
10   Q.   All right.  At the time did you know if that was
11   standard practice at the Little School?
12   A.   I know that there were other teachers new to the
13   Little School that did not have this experience.
14   Q.   When you're in your classroom you know when
15   Ms. Clarino is in your classroom, right?  Obviously.
16   A.   Yes.
17   Q.   All right.  And while you're teaching you would not
18   know if Ms. Clarino was in other classrooms, right?
19   A.   Correct.  I -- correct.
20   Q.   Ms. Light, I'd like to ask you a little bit about
21   your claim for damages in this case, a little bit about
22   your emotional distress.
23        I understand you're making a claim for emotional
24   distress damages, right?
25   A.   Correct.
```

```
 1    Q.    Part of your claim is based on the fact that you see

 2    a psychiatrist and you see a therapist, right?

 3    A.    Correct.

 4    Q.    And you're still seeing them at this time?

 5    A.    Yes.

 6    Q.    And when did you first see a therapist?

 7    A.    Excuse me?

 8    Q.    Sure.  I'll --

 9    A.    I just didn't hear your words.

10    Q.    I apologize if I'm standing too far away.

11          Your parents got divorced when you were young, right?

12    A.    Yes.

13    Q.    Your biological parents?

14    A.    Yes.

15    Q.    And that's when you first started seeing a therapist,

16    correct?

17    A.    It's the first time I ever saw a therapist, yes.

18    Q.    And then you had additional traumatic events in your

19    life that you talked about before, both sexual abuse as

20    well as your father being killed?

21    A.    Correct.

22    Q.    And you received therapy after that too, correct?

23    A.    Um, I received therapy in college when it was offered

24    for free.

25    Q.    So your dad was killed in 2001?
```

1   A.   Yes.

2   Q.   You saw a therapist consistently from 2001 to 2003, I

3   understand?

4   A.   Probably those approximate dates.

5   Q.   And then there was a period of time where you saw

6   people but no one consistently?

7   A.   Correct.

8   Q.   At some point you moved to New Haven, right?

9   A.   Correct.

10  Q.   When did you move to New Haven?  I know you said and

11  I don't recall, I apologize.

12  A.   2009?

13  Q.   And at some point you contact Dr. Berger and you see

14  Dr. Berger?

15  A.   Correct.

16  Q.   And you found him through your health insurance I

17  think you said?

18  A.   Correct.

19  Q.   Okay.  And Dr. Berger, as we know, retired in 2020.

20  When he retired did you ask him to forward all your

21  records to Dr. Levin?

22  A.   Yes.

23  Q.   Is it "Levin" or "Levin"?

24  A.   I call her "Levin."

25  Q.   Okay.  Then I'll go with "Levin" as well.

1        Did you ask Dr. Berger to forward all his records to

2   Dr. Levin?

3   A.    Yes.

4   Q.    And did he do that?

5   A.    He did.  To my knowledge, he did.

6   Q.    We'll follow up with Dr. Levin on that, because we

7   certainly --

8   A.    So he sent her a list of all the medications I had

9   ever been on.  I didn't -- I don't believe he took -- I'm

10  not sure what you're referring to as notes.  His records

11  of my medical needs were my medications.  He was managing

12  my medication.  He sent the list of medications I had been

13  on to Dr. Levin.

14  Q.    Exactly.  I agree with you, Ms. Light.

15        Dr. Berger sent Dr. Levin your medication --

16  A.    History.

17  Q.    -- history?

18  A.    Yes.

19  Q.    But as far as you know, he didn't send any notes he

20  took during therapy or any other records to Dr. Levin?

21  A.    I don't believe there were other records.

22  Q.    And we don't know that because Dr. Berger retired and

23  we don't have anything from Dr. Berger today, correct?

24  A.    I believe that if Dr. Berger had more information

25  written down, he would have included it.

```
 1    Q.    You would agree with me that we don't have any
 2    exhibits from Dr. Berger at this trial?
 3              MR. INTERLANDI:  Objection, Your Honor.
 4    Requires her to speculate.  She hasn't seen every single
 5    exhibit in this case.  How would she know?
 6              THE COURT:  Can you rephrase your question to
 7    focus on what you're getting at?
 8              MR. MURPHY:  Sure.
 9    BY MR. MURPHY:
10    Q.    You provided some testimony about how frequently or
11    infrequently you saw Dr. Berger, correct?
12    A.    Correct.
13    Q.    And when you were providing that testimony you didn't
14    have any records -- your attorney didn't show you any
15    records to support your testimony that you saw him, for
16    example, once a month or once a week or whatever it was?
17    A.    We did not provide the bills from Dr. Berger.
18    Q.    You were just testifying based on your memory alone
19    at that point, right?
20    A.    Yes.
21    Q.    And you testified a little bit about how you found
22    Ms. Ventura, she's a therapist and how you found her,
23    correct?
24    A.    Yes.
25    Q.    And you testified that she does not accept insurance,
```

1  right, so you've paid out of pocket for her?

2  A.   Correct.

3  Q.   Since you started treating with Ms. Ventura, have you

4  sought any other therapist who accepts insurance?

5  A.   I have called many people listed on my accepted

6  insurance, and I have not found anyone with openings.

7  Q.   And again, when you testified about that, we have no

8  documentation to support that testimony, correct?

9  A.   No.

10  Q.   Okay.  Ms. Ventura, you said she started her own

11  practice.  Does she take insurance in her current

12  practice?

13  A.   No.

14  Q.   Dr. Berger prescribed you with medication?

15  A.   Correct.

16  Q.   Dr. Levin continues to prescribe you with medication?

17  A.   Correct.

18  Q.   You see Ms. Ventura -- I'm sorry.

19       Do you see Dr. Levin in person or remotely?

20  A.   Remotely.

21  Q.   Is that the only time -- how often did you see

22  Dr. Levin in, say, 2022, to your recollection?

23  A.   Every four to six weeks.

24  Q.   And once you started seeing Ms. Ventura, how often

25  were you seeing Ms. Ventura?

1    A.    Once a week, typically.  During FMLA and other

2    moments of crisis, twice a week.

3    Q.    Okay.  And during that period of time, are you also

4    emailing Ms. Ventura?

5    A.    Yes.

6    Q.    Frequently?  Infrequently?

7    A.    Sometimes infrequently.  Sometimes frequently.

8    Q.    And you would choose to -- why would you email

9    Ms. Ventura?

10   A.    A therapist provides emotional support.  She does not

11   charge me for time that she spends reading and responding

12   to emails.  I saw this as a way to get additional free

13   therapy.

14   Q.    So when you're sending her emails, you're raising a

15   concern about your mental health, right?

16   A.    Or scheduling something.

17   Q.    Leave the scheduling issues to the side for a moment.

18   I want to focus on the emails you sent to her because

19   there were issues you thought were important to your

20   mental health, right?

21   A.    Okay.

22   Q.    Is that true?

23   A.    I certainly emailed her about my mental health, yes.

24   She's my mental health provider.

25   Q.    You were looking to leverage free health care; is

```
 1   that what you just said?
 2   A.   Yes.
 3   Q.   All right.  Would Ms. Ventura respond to you?
 4   A.   Yes.
 5   Q.   Would she give you advice?
 6   A.   Yes.
 7   Q.   That was part of your treatment with her?
 8   A.   Yes.
 9   Q.   And if you emailed her and said, look, I'm having
10   this issue, and she responded to you, and then you met
11   with her, say, two days later, would you discuss that
12   issue in your in-person talk therapy?
13   A.   Not necessarily.
14   Q.   Sometimes?
15   A.   I don't -- I see her twice, once to twice a week.  I
16   can't attest to everything we have spoken about.
17   Q.   Would you text Ms. Ventura too?
18   A.   Yes.
19   Q.   Would you text her for the same reasons you would
20   email her, meaning for scheduling issues?
21   A.   Yes.
22   Q.   And to leverage free health care?
23   A.   Um, yeah.
24          MR. MURPHY:  Your Honor, at this time I'd like
25   to -- we have various records from Ms. Ventura.  I
```

1    understand one of those records -- or the records are not

2    in evidence right now.  I'd like to discuss that with

3    Your Honor and Attorney Interlandi, and I don't know if

4    this is the appropriate time.

5            THE COURT:  Why don't we finish with this

6    witness.

7            MR. MURPHY:  And then I can recall her, if

8    necessary?

9            THE COURT:  If necessary.

10           Ms. Ventura will be testifying?

11           MR. MURPHY:  Excuse me?

12           THE COURT:  Ventura will be testifying, yes?

13           MR. MURPHY:  She will.

14   BY MR. MURPHY:

15   Q.   Let's do this.  Do you recall telling Ms. Ventura in

16   one of those emails that you have an insane amount of

17   emotional baggage?

18   A.   Not specifically.

19   Q.   Does that sound like something you would say?

20   A.   Yes.

21   Q.   You agree that when you started treating with

22   Ms. Ventura you had an insane amount of emotional baggage?

23   A.   Yes.

24   Q.   When your parents got divorced, my understanding is

25   you moved to Virginia for one year to live with your

```
 1    mother; is that correct?
 2    A.    I lived with my mother for less than a year.
 3    Q.    For less than a year, okay.
 4          And then what happened, you moved back to Texas?
 5    A.    Correct.
 6    Q.    And at some point -- and at that point you lived with
 7    your father, correct?
 8    A.    Yes.
 9    Q.    And then at some point you moved out and moved into
10    the Silvas' house?
11    A.    Correct.
12    Q.    And you consider them your family?
13    A.    Yes.
14    Q.    And the parents are -- I apologize, I don't remember
15    their names?
16    A.    Alfredo and Pat Silva.
17    Q.    Alfredo and Pat.
18          And you call them Mommy and Daddy, right?
19    A.    To differentiate between my biological parents who
20    are Mom and Dad.
21    Q.    And Alfredo walked you down the aisle at your
22    wedding, correct?
23    A.    Yes.
24    Q.    Are you -- you have biological sisters?
25    A.    Correct.
```

1  Q.   Are you estranged from them?

2  A.   We do not have close a relationship.  The last time I

3  texted them was a couple weeks ago.

4  Q.   Is it fair to say you don't have a close relationship

5  with your biological mother as well?

6  A.   Excuse me?

7  Q.   Is it fair to say you don't have a close relationship

8  with your biological mother as well?

9  A.   I texted her yesterday.

10  Q.   You said -- you described the situation with your mom

11  and your siblings -- your sisters, rather.  Is it fair to

12  say you're estranged from the other side of your family?

13  A.   Could you explain?

14  Q.   Sure.

15       Are you estranged from your father's side of the

16  family?

17  A.   I'm estranged from an uncle and a cousin.

18  Q.   Okay.  At any point in time -- well, withdrawn.

19       Your husband is going to be a witness in this case,

20  right?

21  A.   Yes.

22  Q.   And I think you talked a little bit about him on your

23  direct.  At some point he thought you were consumed with

24  this litigation, right?

25  A.   Yes.

1    Q.   All right.  At various points in documents you

2    referenced how many days it had been since you filed your

3    HR complaint?

4    A.   Yes.

5    Q.   Do you recall doing that?

6    A.   Yes.

7    Q.   Do you recall doing that on several occasions?

8    A.   Um, I was aware of how long it had been, yes.

9    Q.   Do you recall doing that when I took your deposition

10   in this case?

11   A.   Yes.

12   Q.   Do you know today how many days it's been since you

13   filed your HR complaint?

14   A.   Um, no.

15   Q.   In your direct testimony you mentioned dyslexia,

16   right?

17   A.   Yes.

18   Q.   Have you ever asked for any accommodations at work

19   related to any dyslexia?

20   A.   Accommodation, no.

21          MR. MURPHY:  At this time, Your Honor, I don't

22   have any other questions.

23          THE COURT:  Any redirect?

24          MR. INTERLANDI:  Yes, Your Honor, there is some

25   redirect.  I need maybe a few minutes to organize my notes

```
 1    and exhibits.  Or I can go and do it.
 2              THE COURT:  We will take lunch at 12:15.  Can
 3    you carry on your redirect for those 20 minutes and then
 4    we'll return after lunch?
 5              MR. INTERLANDI:  Yes.
 6              THE COURT:  Thank you.
 7
 8                    REDIRECT EXAMINATION
 9    BY MR. INTERLANDI:
10    Q.   Good morning.
11    A.   Good morning.
12    Q.   Do you have the binder of the plaintiff's exhibits in
13    front of you?
14    A.   I do.
15    Q.   Please turn to Exhibit 3.
16    A.   I'm there.
17    Q.   Which parts of this email did you interpret as
18    intended for you?
19    A.   Um, the second paragraph.  "It has been brought to
20    our attention from several community members including
21    staff and parents WHS is being mentioned with inaccurate
22    information which also includes social media."
23    Q.   Is there anything else in this email?
24    A.   Um, "We ask that if you are aware of any negative
25    talk or postings, to please help protect and preserve our
```

1  school."

2  Q.   Why did you interpret this as being about you?

3  A.   Um, it came two days after Ms. Gethings, um,

4  confronted me about my social media posts insisting it was

5  inaccurate information when it wasn't and referred to my

6  talk as negative talk.

7  Q.   At the time you received this email, were you aware

8  of any colleagues at Hooker who posted on social media

9  that this could have potentially have been in reference to

10  them as well?

11  A.   No.

12  Q.   Let's look at Exhibit 24, please.  Let me know when

13  you're there.

14  A.   I'm here.

15  Q.   Now, you were asked about this TEVAL meeting on cross

16  by Attorney Murphy and specifically in reference to the

17  Facebook post and your comments.

18       During this meeting did either administrator say to

19  you that the state data contained in the Facebook post was

20  wrong?

21  A.   No.

22  Q.   Did either administrator during this meeting or any

23  meeting you had with them thereafter say to you that they

24  were going to reach out to the state and let them know

25  that they didn't need to send a letter for the week that

1    the school was listed?

2    A.    No.

3    Q.    You testified that you made some recordings.  Why did

4    you make those recordings?

5    A.    Um, because I did not want it to be my word versus

6    theirs.  Because I didn't feel that I would be listened to

7    or believed.  Because, um, it made me feel more secure.

8    And so that I could re-listen and examine how I sounded

9    myself in terms of reflecting on my own personal being.

10   Q.    For the school year of 2020 into 2021, did you record

11   every meeting that you had with the administrators?

12   A.    No.

13   Q.    Do you recall any specific reasons why you recorded

14   the meetings that you did record?

15   A.    Um --

16   Q.    So, for example --

17   A.    So the first meeting I recorded I believe was

18   November 2nd.

19   Q.    Of which year?  That school year 2020-2021?

20   A.    Yes.  I knew that it was only between -- I was told

21   it was going to be between myself and Ms. Gethings.  It

22   ended up being between myself Ms. Gethings and

23   Ms. Clarino.  And I had asked if it was a meeting about my

24   role as a teacher or a parent.  And that question hadn't

25   been answered.  So I was worried about what was going on.

1    Q.    Do you recall the next meeting that you recorded?

2    A.    My mid-year TEVAL.

3    Q.    And why did you record that?

4    A.    Um, because at this point I had already felt a lot of

5    instances of retaliation.  I had previously had meetings

6    with Ms. Gethings, um, that I felt were inappropriate.

7    And I felt that it was just, again, going to be only me

8    and Ms. Gethings in the room.  But Ms. Clarino was there.

9    Q.    You were also asked about the March 31, 2021, meeting

10   with Ms. Cavanaugh and others.  Why did you feel it

11   necessary to record that meeting?

12   A.    Because at this point things have gotten ridiculously

13   hard to manage.  Um, this is -- that was the third meeting

14   I had with Ms. Gethings about Ms. Cav.  I was -- I

15   wanted -- I wanted proof of what was happening outside of

16   my own testimony.

17   Q.    Do you recall the next meeting that you recorded?

18   A.    Um, the meeting with Ms. Gethings, Ms. Clarino,

19   myself, and the union president, I believe.

20   Q.    Do you recall the subject matter that was discussed

21   during that meeting?

22   A.    Um, the beginning of it is Ms. Gethings' explanation

23   for my removal from committees.  And then I expressed my

24   concerns.  And we were trying to come to a conclusion so

25   that I didn't have to file a complaint.

1    Q.    Why did you record that meeting?

2    A.    Um, for the exact same reasons.  To make sure that it

3    wasn't a she said/he said.  That there was data.  I didn't

4    feel safe.

5    Q.    Do you recall the next meeting that you recorded?

6    A.    Um, my return-to-work meeting.

7    Q.    Is that the meeting from January 14, 2022?

8    A.    Yes.

9    Q.    Why did you record that one?

10   A.    Um, for the same exact reasons.  I wanted data

11   besides my own testimony.  I felt -- I felt unheard.  I

12   felt not listened to.  So I wanted there to be evidence of

13   what was happening aside from my own feelings and

14   perceptions.

15   Q.    Did you record any other meetings that you had

16   concerning the administrators at Hooker?

17   A.    Um, I believe that there was a recording of the

18   meeting with Pat and Leslie, Ms. Gethings, Ms. Clarino,

19   and the administrators union president Sequella Coleman.

20   Q.    And is that Pat DeLucia you're referring to?

21   A.    Yes.

22   Q.    Was that Leslie Blatteau?

23   A.    Yes.

24   Q.    Do you recall when that meeting would have occurred?

25   A.    It occurred within days of me returning to work.

1    Q.    You were asked about your salary, I believe, that it

2    remained the same or consistent and that it was governed

3    by your collective bargaining agreement.  Do you recall

4    approximately what your salary was when you transferred to

5    Ross Woodward for the start of the '22-'23 school year?

6    A.    About $60,000.

7    Q.    And what is your salary today, if you know,

8    approximately?

9    A.    Approximately the same.

10   Q.    And whose decision was it to transfer to Ross

11   Woodward?

12   A.    I made the decision in distress.

13   Q.    Do you recall any specific reasons why you were in

14   distress?

15   A.    Yes.

16             MR. INTERLANDI:  Your Honor, this is an area

17   where I'd like to revisit two exhibits that were discussed

18   yesterday.

19             THE COURT:  We'll take an early lunch.  And we

20   will be back no later than 1:00.

21                  (Whereupon the jury left the courtroom.)

22             THE COURT:  Be seated.

23             I will hear you, Mr. Interlandi.

24             MR. INTERLANDI:  Yes, Your Honor.

25             This is concerning Exhibits 21 and 22.  They

1    were part of our motion in limine. They've been argued in

2    that regard. Your Honor reserved her opinion for an offer

3    of proof yesterday. I made that offer of proof in

4    connection with Ms. Light's claim for damages, harm to

5    reputation concerning the defamation. But now I'd like to

6    offer those exhibits for a different purpose, which is to

7    show or support the claim that there was this toxic

8    environment, the hostility that she experienced at the

9    school as a result of the retaliation she suffered for

10   expressing her free speech. It is alleged, it's not a

11   claim in this case but it is alleged that there was a

12   hostile environment at the school, and that is alleged in

13   the complaint in at least two areas.

14          And in addition to that, the timeline that was

15   discussed yesterday, the various items in that timeline

16   connecting from at least November 2020 through August 2022

17   when Ms. Light made the decision that she could no longer

18   take it being in the heat of the battle, she decided to

19   transfer out and go to Ross Woodward to avoid any further

20   hostility, which is what I am going to get into if I'm

21   allowed to explore that some more with her.

22          THE COURT: So the argument that you make is

23   that 21 and 22 are relevant specifically to the

24   retaliation she experienced, not a more generalized

25   hostile environment in the school. Do I understand you

1    correctly?

2            MR. INTERLANDI:  It's both.  The retaliation,

3    but then the generalized hostility that she experienced

4    from that point forward, which would be, you know, from

5    the part of the investigation through its conclusion into

6    the new school year, 2022.  Not the new school year but

7    the new year.  Which carried over to the very last day of

8    school with the retirement party, which was testified

9    about yesterday.

10           THE COURT:  So do you want to make a proffer of

11   what your evidence will be that links the notes that are

12   21 and 22 to the retaliation?

13           MR. INTERLANDI:  Yes.

14           THE COURT:  Go ahead.

15           MR. INTERLANDI:  So, as we discussed yesterday,

16   we have testimony in the case so far from Ms. Light that

17   there was retaliation as a result of her free speech.

18   That continued with various other events or aggressions

19   towards her.  These events included the being spoken to

20   about using the bathroom prior to dismissal time as well

21   as an email that was found on her former grade level

22   partner's printer.  Ms. Alden's List of Concerns, which

23   was filed a few weeks after Ms. Light filed her initial

24   complaint being found in the mail room.  Her inability to

25   get safeguards in place and return to work without any

further hostility or retaliation which was in

January 2022.  The having left the meeting not believing

that she was going to have to return to work so quick, she

received a return-to-work notice.  It forced her to use

sick days.  The administrators returned her to work and

she was not able to teach her class right away.  There was

a period of time, a longer period of time that she had to

be shadowing or co-teaching.  And through the rest of that

school year with the retirement party where the colleagues

got up and left her to sit by herself.  She also testified

that she used to eat lunch with people; she wasn't able to

eat lunch any longer.  She felt that she didn't have any

friends.  People who she had been colleagues with

unfriended her on Facebook, at least three names were

identified.  And as she prepared to get back into her

teaching role at -- well, also the grade 3 job application

that she applied for and was never told if she got it or

not in June, July of 2022.

All of that -- I'm probably missing a few -- but

that is the causal link that we have for offering these

two schoolroom notes as it relates to the hostile

environment that was created as a result of the

retaliation.

THE COURT:  All right.

Mr. Murphy.

1            MR. MURPHY:  I guess I'm just a little bit

2    confused, Your Honor.  I heard a lot there, but I'm not

3    sure I heard anything that lays the foundation you were

4    looking for.

5            At the pretrial conference you were very

6    specific and you made the plaintiff identify all of the

7    specific retaliatory acts that she believes the Board or

8    Principal Gethings took against her.  My recollection is

9    the last one occurred in January of 2022 and the whole

10   return to work and whether that was handle appropriately,

11   whether she had to return to her class right away or

12   whether there was an easing-in period.  These notes were

13   found in August of 2022, which is eight months after --

14   seven or eight months after the last alleged retaliatory

15   act.  There's been no connection between even that last

16   one, the return-to-work discussions with HR and the union,

17   et cetera, and the notes allegedly found in the classroom.

18   I'm just perplexed as to how this ties back in to the

19   retaliatory -- alleged retaliatory conduct.  I heard

20   several different things, you know, the bathroom, the

21   email in the printer, the List of Concerns.  Those were

22   all in 2021, right?  The List of Concerns a little bit

23   later.  The return to work January 2022.  And then all

24   these things about, you know, she used to eat lunch by

25   herself, the retirement party.  Again, those have no

1    connection to the alleged retaliatory acts either.

2            THE COURT:  When you say that, how does that

3    address the plaintiff's argument that emanating from the

4    retaliatory acts was an atmosphere of hostility which she

5    says the nasty notes were a part of?  You can argue that

6    they don't have any relationship, but why is that not for

7    the jury to decide?

8            MR. MURPHY:  Well, for the reasons I think we

9    discussed before.  One, timeliness.  Two, she has to show

10   actions by the employer.  We don't even know who left

11   these notes.  There's been no -- they're just speculative

12   where they came from.  Summer break, right before the

13   start of the school year.  Well, I take it back.  One was

14   before Ms. Light made the decision to go to Ross Woodward.

15   My understanding is she found the second one after she

16   had -- and I believe we have an email on this -- after she

17   already accepted the job.  So I think that one cannot

18   possibly -- if that's true, then it can't possibly come in

19   because she already made the decision to leave by the time

20   she found it.  I have an email, I think it was one of our

21   proposed exhibits that was objected to.

22           So I'm just --

23           THE COURT:  So we heard testimony this morning

24   from the union representative about the subject matter of

25   things that Ms. Light had come to him about.  One of the

1     things was fear for her safety.  If one were to take the

2     viciousness of those notes as providing a basis for fear,

3     what's the timing there?

4              MR. MURPHY:  I'm sorry, maybe I didn't catch the

5     second half of your question, Your Honor.

6              THE COURT:  What's the timing between when the

7     union rep is receiving the plaintiff's fear for her safety

8     and whether those notes were arguably part of what

9     underlay her fear for her safety?

10             MR. MURPHY:  I have no idea what was discussed

11    between her and her union rep.

12             THE COURT:  No, we had testimony today.

13             MR. MURPHY:  He said there -- and that's why I

14    objected to it.  Because without the notes I thought his

15    testimony on Ms. Light contacting him about the notes was

16    objectionable.  I feel like I'm not answering Your Honor's

17    question.

18             THE COURT:  So if in fact his testimony about

19    the notes is reflective in some way, arguendo, of her

20    concern for her safety, does that take care of at least

21    the vast remoteness that I found under 403 precluded them

22    as evidence of the impact of the defamation?

23             MR. MURPHY:  I don't think so, Your Honor.  Just

24    because she alerted her union to the fact that these notes

25    were found and she raised some concern about her safety,

1    that doesn't answer the question about whether there's any

2    particular connection to the ten or eleven retaliatory

3    acts that you made her identify at the time of this trial.

4        THE COURT:  Would you agree it satisfies the

5    chronological relationship?

6        MR. MURPHY:  Maybe I'm just misunderstanding

7    Your Honor.

8        I'm having a hard time with the chronological

9    relationship given the fact that they were found a year

10    and five months after March of 2021 and eight months after

11    the last retaliatory act, which was her interactions with

12    HR that have nothing to do with building level staff,

13    right?  It was discussions between Ms. Light, her union,

14    several union officials, and HR staff.  I don't understand

15    how that last retaliatory act eight months before the

16    notes were found has any relation to those notes.  I don't

17    think I've heard testimony from Ms. Light about that.  I

18    agree with -- I apologize, the tone of those notes, right,

19    I get why you're concerned and that Ms. Light found them

20    concerning as well.  I forgot how you just described them.

21    They're vicious I think you said.  And I get that.  I'm

22    not discounting the notes.  I'm just saying the timeline

23    is so far removed.

24        THE COURT:  You say that the notes were eight

25    months after the last retaliatory act.  And specifically

1    what last retaliatory act are you referring to?

2              MR. MURPHY:  I'm referring to the whole

3    return-to-work discussion.  I think the tape recording is

4    January 14th of -- that whole -- it's a little vague on

5    their end, but that whole return-to-work discussion and

6    whether she would return right to her classroom and

7    whether safeguards were in place, et cetera.

8              THE COURT:  And the list we're working on for

9    this trial, are there no adverse actions that took place

10   after the return-to-work discussion?

11             MR. MURPHY:  That's my understanding,

12   Your Honor.  I'm looking at the list right now.  Yes.

13             THE COURT:  All right.

14             So I'm going to ask Mr. Interlandi if you can

15   respond to any of Mr. Murphy's arguments or analyses of

16   what we have as evidence.

17             MR. INTERLANDI:  What we have as evidence,

18   Your Honor, is an overall testimony from my client about

19   her fear, her safety.

20             THE COURT:  But we need to have a little bit

21   more proximity.  My question, Mr. Murphy says that the

22   notes were found eight months after the last identified

23   retaliatory act.  Do you agree with that?

24             MR. INTERLANDI:  Yes.

25             THE COURT:  And that last act was all the

1    return-to-work --

2              MR. INTERLANDI:  Yes, from January to February.

3              THE COURT:   -- discussion and failures to do

4    what were said to be done?

5              MR. INTERLANDI:  Yes.

6              Part of that process included my client's

7    request for safeguards that were never put in place.  At

8    best, she received an opportunity to ease herself in, but

9    she never asked for that duration of time to be done.  She

10   was not -- and she testified about this yesterday, her

11   requests were denied by Ms. Mack and Ms. Bonner.  She

12   testified that when she returned she was told if she

13   wanted a third grade position she had to apply for it.  At

14   this time she's in the same building, the Little Building,

15   with Ms. Alden who filed the List of Concerns complaint

16   against her.  She's in the same building as Mr. Clarino,

17   who was one of the people who filed a retaliatory

18   complaint against her.  She applies for the position which

19   was posted.  She applies for it and does not hear from

20   anyone.  And she's going through the summer, gets into --

21   even before the summer, as I said earlier, is the issue

22   with the retirement party, being kind of, you know, left

23   alone by herself.  And then we get into her getting ready

24   for school.

25             So we are four, five, six months post that

1    return to work February 2022 time, but there has been

2    testimony and there are documents of additional items that

3    are connecting and supporting her fear of being in school

4    and she --

5              THE COURT:  What are those?

6              MR. INTERLANDI:  Well, I sent an email -- or

7    here's my job preference and it's showing up as blank, but

8    I just want to let you know I prefer third grade.  The

9    comments by the human resources representatives saying if

10   she wanted that position she would have to apply for it

11   and she would be considered by the building leader.

12   Testimony that Ms. Gethings never even interviewed her or

13   called her to talk about the position.  And there's

14   various other items that I've mentioned.

15             THE COURT:  All right.  Is that all?

16             MR. INTERLANDI:  Yes, Your Honor.

17             THE COURT:  Let's take our quick lunch and I'll

18   reflect on your comments and hopefully give you a ruling

19   when we come back.

20             MR. INTERLANDI:  Thank you, Your Honor.

21                  (Whereupon, a recess followed.)

22             THE COURT:  Please be seated, counsel.

23             The defendants' objection to the challenged

24   Exhibits 21 and 22 focuses on what is put forth as too

25   great a distance chronologically between the notes found

1    in August of '22 and the identified claimed retaliatory

2    acts such that their admission would be unduly prejudicial

3    given the tone of the notes and the necessary speculation

4    by jurors in drawing a causal relationship.

5          Having examined what the evidence has been so

6    far and in contrast to the earlier challenge to these

7    exhibits raised on a one-off statement occurring many

8    months before the discovery of the notes, this is a series

9    of alleged retaliatory acts and conduct by the plaintiff

10   that spreads throughout a much longer time period and even

11   up to May 24, '22, where there is testimony of

12   Teacher Alden's list of concerns, Plaintiff's 6, being

13   found in front of the teachers' mailboxes.

14         The jury will be determining whether the hostile

15   environment that the plaintiff describes as resulting in

16   former friends no longer speaking with her, teachers

17   distancing themselves from her, not sitting with her in

18   the cafeteria, et cetera, whether that is the result of

19   the plaintiff's conduct or the defendants' retaliatory

20   actions claimed to poison the waters at Hooker.  Unlike

21   the one statement, the concept of poisoning spreads and is

22   called hostile environment.

23         What I find particularly telling is the

24   substance of Alden's complaint which particularly in

25   paragraphs 7 and 8 captures Ms. Alden's acute animosity

1    and pointed directly at the plaintiff and accusing her of

2    creating the hostile work environment, quote, at both the

3    upper and lower school.  She is not considered a teammate

4    but someone who only serves her own mission, end quote.

5    And requesting that, quote, the administration please

6    consider the extreme challenges that teachers have endured

7    during the pandemic and will continue to have if Jessica

8    continues to serve as both parent and teacher at Hooker.

9    And it continues.

10          The forcefulness of the Alden complaint is not

11    dissimilar from the tone of the notes.  And to the extent

12    that it would not be unreasonable for jurors to conclude

13    that the notes are reflective of the hostility in the

14    environment and potentially credited as damages, I find

15    that these two exhibits may be received in evidence having

16    balanced any probability of juror speculation against any

17    claim of unfair prejudice.

18          So the defendants' objection is overruled.

19          We will bring the jurors back in and we will

20    continue.

21          MR. MURPHY:  While they're being brought in,

22    Your Honor, I think Defendants' Exhibits P and Q I had

23    only marked for I.D. only subject to the Court's ruling on

24    Attorney Interlandi's request to admit those two

25    documents.  And so my understanding is there's no

1    objection to my emails.  So now I offer P and Q as full

2    exhibits as well, because they respond to the notes.

3                THE COURT:  Is that right?

4                MR. INTERLANDI:  Yes.

5                THE COURT:  Okay.  That takes care of those as

6    well.

7                      (Whereupon, the jury entered the

8                       courtroom.)

9                THE COURT:  Please be seated, ladies and

10   gentlemen.

11         Lest you think we have been having a pleasant

12   picnic outside in the sunshine, I assure you we have been

13   working over your lunch hour and we've taken more time to

14   carefully consider the matters put forward.  So we are

15   again delayed, but we will proceed and return Ms. Light to

16   the stand.

17   BY MR. INTERLANDI:

18   Q.   Good afternoon, Ms. Light.

19   A.   Good afternoon.

20   Q.   Right before the break we were discussing your

21   decision to leave Hooker and accept a position at

22   Ross Woodward.  Do you recall that?

23   A.   Yes.

24   Q.   Is there any specific incident that helped you make

25   that decision in leaving Hooker to accept a position at

1    Ross Woodward?

2    A.    Yes.

3    Q.    Do you recall what that incident was?

4    A.    Um, when I began setting up my room for the new

5    school year, I found a note pinned to my bulletin board

6    that was very disturbing.

7    Q.    Can you please turn to Exhibit 21.  Let me know when

8    you're there.

9    A.    I'm there.

10   Q.    What is the first page of Exhibit 21?

11   A.    It's a picture of the note I found.

12   Q.    And it has a Nike symbol at the top?

13   A.    Yes.

14   Q.    What does it say on this note?

15   A.    It says "Just Do It.  Just Leave Our School.  You Are

16   Toxic."

17   Q.    What did you do when you saw this note?

18   A.    Um, I immediately took a picture of it and sent it to

19   the union.

20   Q.    Did you take multiple pictures?

21   A.    Yes.

22   Q.    How did you take the pictures, with a camera or your

23   phone?

24   A.    The camera on my phone.  When I found it, it was

25   folded so that you could just see the top part that had

1    the Nike sign and the "Just Do It."  Then when I took it

2    off the board to revamp my board, I found the rest.

3    Q.    Do you recall approximately when you found the note

4    that said "Just Do It.  Just Leave Our School.  You Are

5    Toxic"?

6    A.    In August of 2022.

7    Q.    What did you do with the photographs that you took?

8    A.    I sent them to the union and I believe to HR.

9    Q.    And are the photographs that you took of the note

10   reflected in what is being provided as Plaintiff's

11   Exhibit 21?

12   A.    Yes.

13   Q.    During this time were you considering leaving Hooker?

14   A.    Yes.

15   Q.    Why were you considering leaving Hooker?

16   A.    Um, because I had tried everything I could and it

17   felt like the problems were escalating.

18   Q.    Did you apply for any positions in other schools?

19   A.    I did.

20   Q.    Was Ross Woodward one of them?

21   A.    Yes.

22   Q.    Did there come a point in time before you made your

23   decision to leave and accept a position at Ross that you

24   found another note in your first grade classroom?

25   A.    Yes.

```
 1    Q.   Please turn to Exhibit 22 and let me know if this is

 2    the second note you found in your classroom.

 3    A.   Yes.

 4    Q.   What did you discover that the note said?

 5    A.   "Mrs. Light's To Do List.  Wash hair.  Leave or Just

 6    Die."

 7    Q.   And both of notes, are they handwritten notes?

 8    A.   No.

 9    Q.   Are they typed?

10    A.   Yes.

11    Q.   Are they a normal page, 8 1/2 X 11, like this one?

12    A.   No.

13    Q.   So this note, how big was it, would you say?

14    A.   Um (indicating).

15    Q.   Okay.  Where did you find this note?

16    A.   In a drawer.

17    Q.   And just so the record reflects, you were holding up

18    your fingers and thumbs and connecting them?

19    A.   Yes.

20    Q.   So maybe 2" X 3"?

21    A.   Yes.

22    Q.   And the sign, the Just Do It sign, was that -- and

23    that's Exhibit 21 -- was that like an 8 1/2 X 11 like

24    this?

25    A.   It was pretty close to it, yes, but folded.
```

1    Q.    Okay.  What did you do when you found the second note

2    that provided you with a to-do list to wash your hair or

3    leave or just die?

4    A.    After I received the -- or found the first note and I

5    had talked to my family, my family said if I found any

6    other notes, to leave them where you found them so that

7    perhaps the police could do fingerprinting.  So I left the

8    note on the cabinet and left the school immediately.

9    Q.    Did you take a photograph of it?

10   A.    Yes.

11   Q.    What did you do with that photograph?

12   A.    I sent it to the union and HR.

13   Q.    Anyone in particular that you sent these two notes to

14   at the union?

15   A.    Pat DeLucia.

16   Q.    Was that the same gentleman what was here this

17   morning?

18   A.    Yes.

19   Q.    Thank you.

20        When did you accept the transfer to Ross Woodward?

21   A.    The same day I received the note.

22   Q.    Which note?

23   A.    The second note, the to-do list.

24   Q.    Thank you.

25        Please turn to Exhibit 7 in the binder.  Let me know

1    when you're there.

2    A.    I'm here.

3    Q.    I'd like you to go to the page that has DEF105 at the

4    bottom, it's an email that Attorney Murphy brought up

5    during his cross-examination of you.  And there's an email

6    with the title of "3 feet."  Do you see that?

7    A.    Yes.

8    Q.    Why did you decide to speak at the Board of Education

9    meeting later on on March 22, 2021?

10   A.    Because Ms. Gethings had responded that she didn't

11   know the answer and because I wanted clarification for the

12   whole district, not just for Worthington Hooker School.

13   Q.    Why couldn't you just wait until the next day or a

14   week for Ms. Gethings to get the answer and give you it?

15   A.    Because that was the last Board meeting before we

16   were supposed to enforce the policy.

17   Q.    Which policy would that have been?

18   A.    Having kids eat in the room, I didn't -- when they

19   were eating, they were supposed to be 6 feet apart.  When

20   they weren't eating, they were allowed to be 3 feet apart.

21   Now that we were supposed to serve food in our classroom,

22   the desks were closer than 6 feet apart and I didn't know

23   how to do it.

24   Q.    After you spoke at the Board of Education meeting in

25   March, did anyone present give you an answer to your

1    question?

2    A.    No.

3    Q.    When you returned back to school to teach, did

4    Ms. Gethings give you an answer to your question?

5    A.    No.

6    Q.    Did you eventually receive an answer to that

7    question?

8    A.    Um, partially.

9    Q.    What do you mean by "partially"?

10    A.    Ms. Gethings said that my desks, considering that

11    they are being measured in a different way now, it would

12    be fine for the students to eat in my room.  That she had

13    spoken to other teachers whose desks were closer together

14    and they were to have every other student eat at a time so

15    that it would still be 6 feet apart from each unmasked

16    eating person but not actually students 6 feet apart.

17    Q.    Do you recall the new way of measuring?

18    A.    Yes.

19    Q.    What was your recollection of the new way they were

20    to be measuring the distance?

21    A.    Um, so like if I'm looking at the jurors right now,

22    if you're looking at me, your noses are about 3 feet apart

23    from each other.  So that would be considered 3 feet

24    apart.  If you turned and looked at each other, you would

25    no longer be 3 feet apart.  So it was no longer the desks,

1   but the noses of the students.

2   Q.   You testified about someone you thought was a friend,

3   a co-worker named Judith Cavanaugh.  And you learned when

4   you had a meeting in March 31, 2021, that she wasn't

5   really as much of a friend as you thought she was.  What

6   did you want to drop off to her that you mentioned and

7   that actually she mentioned in that meeting?

8   A.   Like some sort of care package or food if she was

9   isolating with COVID, I didn't know if she needed

10  anything.

11  Q.   Did you make that offer to her after she told you she

12  had COVID?

13  A.   Yes.

14  Q.   Sarah Miller, how long have you known Sarah Miller?

15  A.   I'm not sure of the exact date, but I've known her

16  most of the time I've lived in New Haven.

17  Q.   Does she still have any involvement with the

18  New Haven Public School Advocates?

19  A.   Um, she founded it.  She's not as much involved now

20  that she's an alder for the city.

21  Q.   Did you say alder?

22  A.   Yes.  She became an alder.

23  Q.   When did she become an alder?

24  A.   A couple years ago.

25  Q.   A couple of years ago did she have any children

```
 1   within the New Haven Public Schools system?
 2   A.   Um, yes.
 3   Q.   Were any of those children at Hooker, Worthington
 4   Hooker?
 5   A.   No.
 6   Q.   Did she ever have any children who attended
 7   Worthington Hooker, to your knowledge?
 8   A.   No.
 9   Q.   Did you socialize with Sarah Miller?
10   A.   Yes.
11   Q.   Did you socialize with her often?
12   A.   Um, as much as anyone else.
13   Q.   And when I say "socialize," did you, like, go out to
14   dinner with her or meet up with her for coffee?
15   A.   Yes.  Our children were in the same camp.
16   Q.   Which camp was that?
17   A.   The Schooner Camp.  And Common Ground, actually, the
18   next year.
19   Q.   Did you regularly communicate with her via email?
20   A.   Yes.
21   Q.   And did you regularly communicate with her via text
22   message?
23   A.   Yes.
24   Q.   Did you regularly speak with her on the phone?
25   A.   No.
```

1  Q.   I'm going to show -- well, I'm not going to show you

2  but I'm going to talk to you about Exhibit G.   That is

3  Defendants' Exhibit G.

4       And here in Exhibit G you were sending her a text

5  message or replying -- this is a chain, right?   So it's

6  starting with a message at the very top on the left-hand

7  side of the screen and it says "Yes."  Do you recall what

8  she was saying yes to?

9  A.   No.

10  Q.   Then it goes on.   And this is where you let her know

11  that "a hooker teacher is positive she has not been in the

12  building."  Do you recall that testimony you gave earlier?

13  A.   Yes.

14  Q.   Why were you letting Sarah Miller know this at this

15  time?

16  A.   Um, because we were both trying to figure out, like,

17  whether or not it was safe to go back to school for our

18  kids and getting a true number.

19  Q.   At that time what school was her children attending,

20  if you recall?

21  A.   It was renamed, but it was Columbus at the time.

22  Q.   Did Columbus have school buses, yellow school buses

23  that brought the children to the school?

24  A.   Yes.

25  Q.   And at this time and still today, I believe, Hooker

1    does not have those yellow school buses?

2    A.    Correct.

3    Q.    Does Ross Woodward have yellow school buses that

4    bring the children to the school?

5    A.    Yes.

6    Q.    Did you mention in this document, Exhibit G, bring up

7    the fact about the uniqueness of Hooker as it related to

8    having a school bus or not having a school bus?

9    A.    Um, I believe so.

10            MR. INTERLANDI:  Your Honor, I'm -- I don't know

11   if we have a witness copy, not an electronic but a paper

12   copy of defendants' exhibits.  I'd like to provide that

13   notebook to Ms. Light.  Thank you.

14   BY MR. INTERLANDI:

15   Q.    Please look at Exhibit G.

16   A.    I'm there.

17   Q.    Did you bring up an issue regarding the school bus?

18   A.    Yes.

19   Q.    What was that in your message to Ms. Miller?

20   A.    Um, that our school didn't have school buses and so a

21   lot of people were afraid to go on buses at the time.

22   Q.    Okay.  Next you were asked about Exhibit W.  Please

23   turn to that and let me know when you're there.

24   A.    I'm there.

25   Q.    I'm there too.  This is another text message you had

1    with Ms. Miller specifically relating to Mr. Cicarella; is

2    that correct?

3    A.    Yes.

4    Q.    What did you disagree with him about at that time?

5    A.    That the superintendent had -- I believe, I'm not

6    sure, but I believe that I disagreed with him that the

7    superintendent had taken teacher safety seriously.

8    Q.    As a teacher, in your experience, is there a

9    particular time when the person who wants to be union

10   steward runs for election?

11   A.    Yes.

12   Q.    When is that time, in your experience?

13   A.    Um, the elections run in November.

14   Q.    Okay.  Have you ever run against David Cicarella to

15   be union steward?

16   A.    You mean to be union president?

17   Q.    I mean union president.

18   A.    No.  He asked me to be on his ticket at one point.

19   Q.    And after you sent this message to Sarah Miller

20   towards the end of 2020, did you vote for Mr. Cicarella to

21   be union president?

22   A.    I did.

23   Q.    Please turn to Exhibit M, as in Margaret.

24        Are you there?

25   A.    Yes.

1    Q.    Do you recall sending the top part of the email?

2    A.    Yes.

3    Q.    Were you ready on February 9, 2022, to return to

4    work?

5    A.    Yes.

6    Q.    Why were you ready to return to work?

7    A.    Um, because I had planned lessons and I had created

8    my welcome letter, and I had let everyone know that I was

9    coming.  I was obviously coming back against doctors'

10   requests, but in terms of teaching readiness, I was ready.

11   Q.    In terms of emotionally, were you ready?

12   A.    No.

13   Q.    Why not?

14   A.    Because we hadn't had any mediation or safeguards put

15   in place.  We hadn't had even a meeting between us in

16   person.

17   Q.    Attorney Murphy asked you about your remembrance of

18   the arrows in the hallways at school.  Do you remember

19   that?

20   A.    Yes.

21   Q.    When you came back in January, January 2021 --

22   A.    Yes.

23   Q.    -- were there arrows on the floors?

24   A.    Yes.

25   Q.    Did there come a point in time in teaching at Hooker

1  that they took the arrows off the floors?

2  A.   Yes.

3  Q.   Do you recall when they did that?

4  A.   No.

5  Q.   Was it after you came back in February of 2022?

6  A.   Yes.

7  Q.   When you returned back to work to teach first grade

8  in February of 2022, were the arrows on the floor still

9  there?

10  A.   I don't remember.

11  Q.   Let's look at Exhibit N.  Let me know when you have

12  it.

13  A.   I have it.

14  Q.   2773, that's the first page, right?

15  A.   Yes.

16  Q.   Attorney Murphy left out the second part of the

17  sentence that you handwrote, and it starts with "But," do

18  you see that?  It's in the middle of the page above the

19  caret that you mentioned earlier.

20  A.   I'm just not sure where you're asking me to start.

21  Q.   So where it says "You have the discretion to decide

22  what committees I am on," see that?

23  A.   Yes.

24  Q.   Then there's a caret?

25  A.   Yes.

1  Q.   "For the betterment of our school"?

2  A.   Yes.

3  Q.   What does it say next?

4  A.   But your -- sorry.

5       "You have the discretion to decide what committees I

6  am on and the discretion to decide what grade level I

7  teach for the betterment of our school.  But your decision

8  must not be done out of retaliation."

9  Q.   Thank you.

10      Did you feel at that time that the decisions were

11 done in retaliation?

12 A.   Yes.

13 Q.   In retaliation for what?

14 A.   My public speaking.

15 Q.   The next page that Attorney Murphy asked you about is

16 2774, and you were making a reference to resources, I

17 believe, when he asked you about the comments in the

18 margin.  Do you recall that?

19 A.   Yes.

20 Q.   And in terms of resources, what were you referring to

21 as it related to resources?

22 A.   Um, I was referring to the emotional resources, the

23 support of my family, and the financial resources to get a

24 lawyer.

25 Q.   Okay.  And you eventually hired a lawyer I believe

```
 1   your testimony was in the summer of 2021; is that right?
 2   A.   Yes.
 3   Q.   Okay.  Did you pay for the lawyer?
 4   A.   Yes.
 5   Q.   Has anyone else helped you pay for your legal
 6   services you sought?
 7   A.   Yes.
 8   Q.   Who has helped you in that regard?
 9   A.   I have taken a loan from my brother.
10   Q.   You have a loan.  Is there an agreement for you to
11   repay him?
12   A.   As soon as possible.
13   Q.   Did you pay some of the bills yourself or did he pay
14   all of the bills?
15   A.   I paid some of the bills.  We took out an extra line
16   of credit on our home.
17   Q.   Attorney Murphy referenced you, I believe the word
18   was leveraging Ms. Ventura's free services.  Was there a
19   reason why you were availing yourself of the free
20   services?
21   A.   The cost was a lot.
22            MR. MURPHY:  I believe that was the witness's
23   word, not my word, Your Honor.  That's twice my question's
24   been mischaracterized.
25            THE COURT:  Could you speak a little louder?  I
```

 1   didn't hear you.

 2        MR. MURPHY:  Sure.  That's twice my questions

 3   have been mischaracterized.  I ask that they be accurate

 4   moving forward.

 5        MR. INTERLANDI:  He said the word "leveraging."

 6   I mean, we could have it read back.

 7        THE COURT:  All right.  Let's move on.  The

 8   attorneys' words or questions are not evidence, only the

 9   witness's answers.

10   BY MR. INTERLANDI:

11   Q.   You had a meeting on March 31, 2021, with various

12   people.  We've talked about that already.  Why weren't you

13   aware that Ms. Morrison was going to be in attendance?

14   A.   I wasn't told that she would be in attendance.  I was

15   told it was just going to be a meeting between Ms. Cav and

16   myself and an administrator so that we could work out our

17   differences and move on.

18   Q.   Told by whom?

19   A.   Ms. Gethings.

20   Q.   Was Ms. Morrison there as your union representative

21   or Ms. Gallagher's representative?

22   A.   I've been told Ms. Cav requested her be there.

23   Q.   Did you have any union representation at this

24   meeting?

25   A.   No.

1        It was also just startling because disciplinary

2   meetings, you're required to have a union steward present.

3   So prior to the appearance of Ms. Morrison in the meeting,

4   I didn't believe the meeting was going to be disciplinary.

5   And then I believed it was.

6   Q.    Were you surprised to see Ms. Morrison?

7   A.    Absolutely.

8   Q.    Why were you so surprised?

9   A.    Had I been told that Ms. Morrison was going to be

10  there, I would have prepared more.  I would have assumed

11  it was a disciplinary meeting.  I would have requested

12  that a union representative other than Ms. Morrison would

13  be there given that she was my child's teacher.

14  Q.    Which child was she teaching at that time?

15  A.    Sebastian.

16  Q.    Was this a concern to you that she was present?

17  A.    It was a concern to me.

18  Q.    Did you raise that concern with the union president

19  or vice president?

20  A.    Um, I spoke to them after the fact.

21  Q.    You testified that you had dyslexia, you have

22  dyslexia.  I believe your testimony was that you never

23  asked for an accommodation?

24  A.    Correct.

25  Q.    Did you ever need to ask for an accommodation?

```
1    A.    No.

2    Q.    Why?

3    A.    I taught third grade and up.  Um, it was never an

4    issue.  I did ask for additional training because it had

5    been over a decade since I had any phonics instruction.

6    Q.    When you were teaching or when you were reassigned

7    from third grade to first grade, did you ask the

8    administrators for an accommodation?

9    A.    No.

10   Q.    Why not?

11   A.    Because it wasn't -- I didn't need any

12   accommodations.  I just needed additional professional

13   development.

14   Q.    And did you receive professional development?

15   A.    Um, only what I sought out myself over the summer.

16   Q.    I have one more item for you, Ms. Light.

17            MR. INTERLANDI:  Your Honor, it involves

18   Plaintiff's Exhibit 10.  Counsel and I had talked about a

19   yellow highlight in the copy that we have for the Court

20   that ultimately the jury will have is in black and white.

21   And so there is a notation that Ms. Light's comments are

22   in green, but they're not.  So I was hoping to have

23   Ms. Light just on the side margin highlight in yellow

24   where her comments are on Exhibit 10.

25            THE COURT:  Any objection to that plan?
```

 1            MR. MURPHY:  Well, we have a -- Attorney

 2   Interlandi and I can get -- I believe we have a colored

 3   copy of that document.  So I would suggest we just

 4   substitute the color copy for the copy in the binder now.

 5            THE COURT:  Do you have one --

 6            MR. MURPHY:  I don't have it with me today, no.

 7   We did discuss that.

 8            THE COURT:  Well, if you want to be having her

 9   testify from the document and she knows which part is

10   hers, then you can just continue.  And the exhibit that we

11   would have for the jury would be one that's color-coded.

12            MR. INTERLANDI:  We could do that.

13            MR. MURPHY:  I have no objection to her marking

14   whatever copy is in there.  My suggestion was to make our

15   lives easier we could swap --

16            THE COURT:  Yellow and green?

17            MR. INTERLANDI:  I don't have a green

18   highlighter, Your Honor.

19            THE COURT:  I do.

20            MR. INTERLANDI:  I have every color but that.

21            May I approach?

22            THE COURT:  Yes.

23   BY MR. INTERLANDI:

24   Q.   So what we will do is, if it's okay with Your Honor

25   and counsel, Margaret-Mary Gethings' comments in yellow

```
 1   and, Ms. Light, your comments in green --
 2   A.    Okay.
 3   Q.    -- on Exhibit 10?
 4   A.    Can you take this one back?
 5   Q.    Yes, I will take that back.
 6             MR. INTERLANDI:  May I approach, Your Honor?
 7             THE COURT:  Yes.
 8             MR. MURPHY:  We already have Exhibit 9 which has
 9   Principal Gethings's comments in blue.  So when we look at
10   Exhibit 10, it's obvious whatever follows those is
11   Ms. Light.  So I suggest she just mark hers.
12             MR. INTERLANDI:  That's fine.
13             THE COURT:  Just green.  So you'll have to give
14   him back his yellow.
15             MR. INTERLANDI:  May I approach, Your Honor?
16             THE COURT:  No.  Just question and you can get
17   it later.
18   BY MR. INTERLANDI:
19   Q.    Ms. Light, are you at Exhibit 10?
20   A.    I am.
21   Q.    Great.  At the top it says -- is that your notation
22   at the top of this exhibit?
23   A.    Yes.
24   Q.    And what were you notating there on this exhibit?
25   A.    It was my responses to Ms. Gethings' reasons for not
```

 1  allowing me in committees.

 2  Q.   Okay.  And do your comments to her comments go

 3  through the first page to the last page?

 4  A.   Yes.

 5  Q.   So what I'd like you to do, I don't need you to read

 6  the comments, I want to do it for completeness purposes.

 7  In the right margin if you can please highlight where your

 8  comments appear.  Again, this is your response to

 9  Ms. Gethings' comments, not your initial comments.

10  A.   Uh-huh.

11       Done.

12  Q.   Thank you.  You can leave those there for now.

13       Earlier you referenced -- I do have a few more

14  questions.  Earlier you referenced FOIA.  What does that

15  mean?

16  A.   The Freedom of Information Act.

17  Q.   And why were you asking -- again, Sarah Miller, why

18  were you asking her and not doing that yourself?

19  A.   Um, I was asking her to see if it was possible to

20  FOIA those documents.

21  Q.   And did she do it?

22  A.   No.

23  Q.   One of the emails that Attorney Murphy showed you I

24  believe was Exhibit B.  It referred to Dash Board Plus.

25  Have you heard of that phrase before?

1  A.    Yes.

2  Q.    Do you have an understanding of what that is?

3  A.    Dash Board Plus is the software that New Haven Public

4  Schools use to create their dashboard of COVID cases on

5  their website.

6  Q.    And in regard to Exhibit B as well as Defendants'

7  Exhibit I that you had forwarded to your friend Sarah

8  Miller, was there any rule or guideline that you were

9  aware of that did not allow you to forward the emails to

10  other people?

11  A.    No.  There was no private information in it.  It was

12  all public school information that should be available to

13  people.

14  Q.    Were you ever disciplined for forwarding any emails?

15  A.    No.

16  Q.    Earlier you mentioned that Ms. Miller was an alder.

17  Do you have an understanding of what an alder is?

18  A.    Yes.

19  Q.    What is an alder?

20  A.    An alder represents an area of the city in the city

21  government, works under the mayor.

22  Q.    Is there a particular area that Sarah Miller is the

23  alder for?

24  A.    Fair Haven.

25  Q.    And what neighborhood do you live in?

1    A.    Um, Westville.

2    Q.    Is that part of Fair Haven?

3    A.    No.

4    Q.    Does East Rock include Fair Haven?

5    A.    No.

6    Q.    Do you know who the alder is for the East Rock

7    neighborhood?

8    A.    Yes.

9    Q.    Who is that?

10   A.    Anna Festa.

11           MR. MURPHY:  Objection on relevance, Your Honor.

12           THE COURT:  What is the relevance?

13           MR. INTERLANDI:  I'm done there.  I just was

14   asking if --

15           THE COURT:  I'm going to strike that.  It's not

16   relevant.  We've got enough to deal with.

17           Alder is a contraction of alderman, in case you

18   didn't know that.  I know, alder is also a tree.  But this

19   is a position in city government.

20           MR. INTERLANDI:  No further questions for you,

21   Ms. Light.  Thank you.

22           THE COURT:  Recross.

23           MR. MURPHY:  Just on one topic, Your Honor.

24

25

1                    RECROSS-EXAMINATION

2    BY MR. MURPHY:

3    Q.   Ms. Light, did you have in the 2021-2022 school year

4    a paraprofessional in your classroom?

5    A.   Yes.

6    Q.   What was her name?

7    A.   Debbie.

8    Q.   Okay, Debbie.  We'll just refer to her as Debbie.

9         After you found the notes that you were discussing

10   with Attorney Interlandi did you forward a picture of the

11   note to Debbie?

12   A.   Yes.

13   Q.   Can we have Exhibit P, please.

14        Now, Ms. Light, this is a series of texts between you

15   and Debbie, correct?

16   A.   It appears to be.  This is the first I'm looking at

17   it.

18   Q.   And on the right-hand side we have a picture of the

19   note, correct?

20   A.   Correct.

21   Q.   If we scroll down, a picture of the same wall without

22   the note?

23   A.   Correct.

24   Q.   And then it begins a series of texts between you and

25   Debbie, correct?

1   A.   Correct.

2   Q.   What's her first comment to you about that note?

3   A.   "Could it have been left for me?"

4   Q.   And you reply "it feels targeted to me but you are

5   right it could be you - was behind where your area was not

6   mine."  Correct?

7   A.   Correct.

8   Q.   Can we go to the next, please.

9        And the text messages between you and Debbie

10  continue.  I'd like to direct your attention a little

11  further down the page.

12  A.   Okay.

13  Q.   Okay.  I'd like to direct your attention to the text

14  message that you sent to her on the right-hand side.  It

15  says, "I have no evidence against anyone in particular so

16  don't want to even guess."

17       And that's correct, right?  You have no evidence

18  about who may or may not have left that note in your

19  classroom?

20  A.   Correct.

21  Q.   A couple lines down you say, "I know on a practical

22  level Marie doesn't know how to make text boxes under

23  inserted graphics so it likely wasn't her."

24       Who is Marie?

25  A.   A different paraprofessional.

1    Q.    Okay.  What Marie's last name?

2    A.    Ackerman.

3    Q.    And what classroom was Marie in?

4    A.    The other first grade classroom.

5    Q.    Can we go to the next page, please, toward the

6    bottom.

7         These text messages between you and Debbie continue.

8    And the discussion about who may have left these notes in

9    the classroom continues.

10         And then you say, "Honestly I keep guessing - hillary

11    hates me most but it just doesn't seem like her - she is a

12    mother and focused on her kids over the summer - so I just

13    don't know."

14         Was that your text?

15    A.    Yes.

16    Q.    These were found in the summer when teachers are off,

17    correct?

18    A.    They were found while we were reentering the building

19    to set up our rooms.

20    Q.    Okay.  In the summer teachers do not work, generally,

21    correct?

22    A.    Yes.

23    Q.    All right.

24    A.    Teachers were in the building, though, by the time

25    they were found is the point.  I'm a teacher.

1    Q.    "Mm," is that Margaret-Mary?

2    A.    Yes.

3    Q.    You say Margaret-Mary "is being sued by me but she is

4    not stupid enough to do this."

5         That was your belief at the time, right, that these

6    notes weren't left by Principal Gethings?

7    A.    I -- I have respect for her intelligence.

8    Q.    Okay.  Can we go to Exhibit Q, please.

9         All right.  Now, if you could go to the top.

10         Ms. Light, these are some text messages between you

11    and Fredo Silva, correct?

12    A.    Yes.

13    Q.    And we've discussed before, that's your brother?

14    A.    Correct.

15    Q.    All right.  And if we could start scrolling down.

16    The top half is irrelevant.

17         All right.  And then on August 25th at 3:40, you say

18    "A possible new option may be opening and now the roller

19    coaster continues..."

20         And by -- do you need a second to read this?

21    A.    I don't see where it says that on my screen, I'm so

22    sorry -- oh, at the very top, I see it now.

23    Q.    You know what?  I don't want to confuse you.  Have

24    you seen this document recently?

25    A.    No.

1   Q.    Do you want to take one second and read it?

2   A.    It's okay.

3   Q.    So a possible new option.  So as of August 25 this

4   new option we're talking about is an opportunity at a

5   different school, correct?

6   A.    Correct.

7   Q.    If this was on August 25th, you submitted those

8   applications -- at least to Ross Woodward, you submitted

9   that application well before August 25th, correct?

10  A.    I -- I know that Pat was involved in trying to find

11  what positions were open.  That close to the beginning of

12  the school year, it's not a typical application process

13  because they don't want schools taking other schools'

14  teachers because then we still have vacancies within the

15  school system.  So I really don't know when I would have

16  applied.

17  Q.    It would have been at some point before August 25th

18  though, right?

19  A.    I think I would have told my brother almost

20  immediately.

21  Q.    All right.  Later on that same day you tell him I

22  have an interview at noon tomorrow, correct?

23  A.    Could you -- I'm sorry, could you speak more clearly?

24  Q.    No problem.  I seem to be having problems with this

25  microphone.

1          Further down August 25, 5:01 p.m., at the very bottom

2    of the page, it says "Interview at noon tomorrow"?

3    A.   Correct.

4    Q.   That's the new opportunity you were referencing

5    above?

6    A.   I believe so, yes.  I interviewed at more than one

7    school.

8    Q.   Okay.  And can we go to the next page.

9          Next day, August 26, "I got it."  Right?

10   A.   Yes.

11   Q.   And he says, "Nice!  Will you take it?"

12         "I found this this morning so yes."

13         So you were offered the job on the same day you

14   report that you found this note in the classroom?

15   A.   Yes.

16   Q.   Okay.  With this note you said you found it in a

17   desk?

18   A.   I found it in a drawer of supplies.

19   Q.   Where was that drawer?

20   A.   In my classroom.

21   Q.   Okay.  And you have no understanding of who may or

22   may not have left that note in that drawer, correct?

23   A.   Correct.

24              MR. MURPHY:  All right.  I don't have any other

25   questions, Your Honor.

```
 1              THE COURT:  All right.  Are we finished with
 2   Ms. Light?
 3              MR. INTERLANDI:  Just some follow up, if I may.
 4              THE COURT:  Okay.
 5              MR. INTERLANDI:  Thank you, Your Honor.
 6
 7                    FURTHER REDIRECT EXAMINATION
 8   BY MR. INTERLANDI:
 9   Q.   Was Debbie your paraprofessional before you decided
10   to take the opportunity at Ross?
11   A.   Um, she was reassigned.
12   Q.   Was that before you made the decision to accept the
13   offer the Ross?
14   A.   Yes.
15   Q.   She was reassigned by whom?
16   A.   Um, administration.
17   Q.   Administration where?
18   A.   At Hooker.
19   Q.   Who was the administration at that time?
20   A.   Ms. Gethings and Ms. Clarino.
21   Q.   Did anyone in the administration investigate the
22   notes that you found in your first grade classroom in
23   August of 2022?
24   A.    I -- Pat told me that Ms. Clarino was investigating
25   and Officer Reddish would be involved.
```

1    Q.    Did you ever learn of the person or persons who may

2    have left those notes in the classroom as a result of any

3    investigations that occurred?

4    A.    No.

5    Q.    An exhibit was just shown to you.  You were messaging

6    with your brother and you said "Donorschoose it up."  What

7    did you mean by that?

8    A.    Ross Woodward has far less financial resources than

9    Worthington Hooker, so I was letting my brother know --

10   DonorsChoose, for people who don't know, is a crowd

11   funding service to get supplies for your classroom.  I was

12   letting my brother know that I was going to need some help

13   setting up a new classroom.

14   Q.    And did you have any money available to you at Hooker

15   for classroom supplies?

16   A.    Yes.

17   Q.    Was that not available to you at Ross?

18   A.    Correct.

19   Q.    Was there anything else that you had available to you

20   at Hooker that you did not have at Ross?

21           MR. MURPHY:  Your Honor, I feel this is well

22   outside the scope.

23           THE COURT:  It is outside the scope of the

24   recross.  So can we restrict ourselves to what Mr. Murphy

25   questioned about.

```
 1            MR. INTERLANDI:  Well, he asked about the
 2   message, the text message with -- and that she accepted --
 3   that she accepted the position or that she got it.  So I'm
 4   asking her if there's anything different about Ross as
 5   compared to Hooker.
 6            MR. MURPHY:  And I tried to keep my cross very
 7   narrowly focused on just the notes.
 8            THE COURT:  That's recross.  It gets narrower
 9   and narrower.
10            MR. INTERLANDI:  That's all I have.
11            THE COURT:  Are we finished with Ms. Light?  If
12   so, you may step town.  You are excused.
13            Please call your next witness.
14            MR. INTERLANDI:  Yes, Your Honor.  We call
15   Ms. Light's husband, David Bianchine.
16            THE COURT:  Would you spell the last name --
17   well, I'm going to let him spell the last name.
18            THE CLERK:  Please raise your right hand.
19
20                      DAVID BIANCHINE,
21        called as a witness, having been first duly
22        sworn, was examined and testified as follows:
23
24            THE CLERK:  Please state your name and spell
25   your last name.
```

 1            THE WITNESS:  David Bianchine,

 2    B-I-A-N-C-H-I-N-E.

 3            THE CLERK:  And give us your city and state of

 4    residence.

 5            THE WITNESS:  New Haven, Connecticut.

 6            THE COURT:  You may be seated.

 7

 8                    DIRECT EXAMINATION

 9    BY MR. INTERLANDI:

10    Q.   Good afternoon.

11    A.   Good afternoon.

12    Q.   Mr. Bianchine, what is your profession?

13    A.   I'm the creative director for a watch and jewelry

14    company.

15    Q.   And where do you -- do you work in New Haven or in

16    another city or town?

17    A.   We're currently in Middlebury, Connecticut.  But most

18    days I work remotely from home.

19    Q.   Have you always worked for this company remotely?

20    A.   No.  That was since the pandemic.  And then it worked

21    so well they let us continue.

22    Q.   I'm going to have you move the microphone a little

23    bit closer to you so we can hear better.  Great.  Thank

24    you.

25            How long have you been married to Jessica?

1    A.    We got married in June of 2006.  So 18 years.

2    Q.    How did you guys meet?

3    A.    We were both attending college in Boston at Emerson

4    College.  And the lore or the stories we like to tell it

5    is that I had a friend coming from downtown in the dorms

6    and we had an apartment in Dorchester.  She asked if there

7    was anything they could bring for us, and I said "a cute

8    redhead."  Apparently, Jessica had been dying her hair red

9    that night, so my friend brought her along.

10   Q.    Did there become a period of time where the two of

11   you started dating?

12   A.    Yeah.  I mean, from that night we spent a lot of time

13   together.  So it was never a decision to date.  I think

14   there was pretty much just a connection.

15   Q.    And it sounds like you've been with her ever since?

16   A.    Yeah.

17   Q.    When did you -- for college at Emerson, what year so

18   we can have a proper timeline?

19   A.    We met in the summer of 2001.

20   Q.    So take me from September of 2001 to June 2006, kind

21   of where did you guys go from there and get me to when you

22   got married, please.

23   A.    So I believe it was the following semester after that

24   summer -- I think we did one semester more at Emerson

25   College and decided maybe to look for new opportunities.

```
 1    So we took a semester off.  We bought a red Jeep Cherokee.
 2    We traveled the country, did a big crisscross kind of
 3    following the warm weather.  And landed in Richmond,
 4    Virginia, at another university, Virginia Commonwealth
 5    University, that had both of our majors and a
 6    significantly lower tuition cost than Emerson.
 7    Q.    How long did you spend in Virginia?
 8    A.    We were in Virginia probably 2002 to 2006, because we
 9    gave up our apartment and got married and then moved to
10    New York.
11    Q.    Where did you get married?
12    A.    Key West, Florida.
13    Q.    Why did you decide to get married in Key West,
14    Florida?
15    A.    Our families -- Jessica being from Texas, me being
16    from New York and Boston, our families were spread all
17    over the country, some of them internationally.  And we
18    decided we had to do a destination wedding.  So if we were
19    going to make people travel, it might as well be a nice
20    place to travel to.
21    Q.    Did you have a nice turnout?
22    A.    We had far more people show up than we envisioned.  I
23    think we expected about 40.  And 100 people descended on
24    what's a tiny island.
25    Q.    And how would you describe your wedding day?
```

```
 1   A.   It was absolutely beautiful.  We got married on the
 2   southernmost point of the United States at sunset.  I
 3   mean, even to this day the pictures blow me away.  It was
 4   absolutely beautiful.  We had been together at that point
 5   I think five years.  So it wasn't even -- it felt like not
 6   a big change in our relationship, but it was a memorable
 7   moment.
 8   Q.   After the wedding, where did you go next to live?
 9   A.   We moved to New York City.
10   Q.   Why did you guys go to New York City?
11   A.   We were young and we were both kind of from big city
12   areas.  And we felt that Richmond was kind of a small
13   city.  And we moved to New York.  And realized that it is
14   a far bigger city and maybe we preferred a smaller city.
15   Q.   What part of New York City did you live in?
16   A.   We lived in the South Bronx.
17   Q.   And were you working at that time?
18   A.   I was doing a lot of freelance copywriting for
19   advertising.  And Jessica had a job in the South Bronx in
20   the neighborhood we lived in.
21   Q.   What was her job in the South Bronx?
22   A.   She taught I believe it was sixth grade theater.  It
23   might have been more than just sixth grade.
24   Q.   How long did you live in New York?
25   A.   About two years.
```

1  Q.   During that time you were doing the freelance work?

2  A.   Yeah.  I eventually landed a full-time position in

3  Connecticut, so I had a little bit of a reverse commute or

4  sometimes I would take the train.

5  Q.   And did Jessica remain teaching in that sixth grade

6  position those two years?

7  A.   She made the decision to get her master's -- maybe

8  the decision wasn't made at the time, but I think it was

9  always a goal of hers to get her master's.  So she applied

10 and was admitted to Columbia's Teachers College program.

11 Q.   Did you have any children while you lived in

12 New York?

13 A.   We did.  We found out we were pregnant while we lived

14 in New York.  Our oldest, Sebastian, was literally born on

15 Broadway, 160th and Broadway.  And then by the time I

16 think he was three months, we had relocated to New Haven.

17 Q.   At that time did Jessica finish her master's degree

18 at Columbia?

19 A.   She took a year off.  And one of the reasons we chose

20 to settle or to move to New Haven was that it was still on

21 the commuter rail line or the Metro-North line so that she

22 could travel back and forth easily to Columbia to finish

23 her master's.  So she took a year off while pregnant and a

24 little bit of Sebastian's infancy.

25 Q.   And were you still working for the same employer

```
 1    during this time when you moved into Connecticut?
 2    A.    No.  I had followed a boss from where I was at World
 3    Wrestling Entertainment at the time to the Timex Group
 4    which is in Middlebury, which is where I am now.
 5    Q.    And after Jessica completed her master's program, did
 6    she apply for any teaching jobs in New Haven?
 7    A.    She did.
 8    Q.    What's your recollection of her first job in
 9    New Haven?
10              MR. MURPHY:  Your Honor, I appreciate, I'm
11    trying to give leeway here, but we've heard this from
12    Ms. Light, her employment history.
13              THE COURT:  It's within his personal knowledge,
14    if that's where you want to go.
15              MR. INTERLANDI:  Yes, Your Honor.
16              THE COURT:  The question is:  What is your
17    recollection of Ms. Light's first job in New Haven?
18              THE WITNESS:  I recall that she applied, I
19    think, to teach summer school in the hopes that that would
20    get her foot in the door in New Haven Public Schools and
21    that she really wanted to teach in the city that she lived
22    in and in a city with a more complex diverse population.
23    BY MR. INTERLANDI:
24    Q.    Did she tell you why she wanted to do that?
25    A.    I mean, we've talked about it.  It's part of our
```

1    philosophy on life.  It's one of the reasons we chose to

2    raise our kids in a city just to have them be exposed,

3    have people that are richer than you and poorer than you,

4    people that are browner than you and whiter than you, and

5    just have not a suburban existence, if you will.

6    Q.    I'm going to ask you to speak up more or move closer

7    to the microphone.

8    A.    The chair is sliding back.

9    Q.    How was Jessica doing, in your opinion, in her early

10   days teaching in New Haven?

11   A.    Wonderfully.

12   Q.    Why do you say that?

13   A.    Um, it was struggles that she could overcome.  I

14   mean, I think teaching -- every first-year teacher

15   struggles, from what I hear.  But she overcame those

16   struggles and fell in love with the profession.  She had

17   taught theater in the Bronx, but now was an elementary

18   schoolteacher and really thrived on having that one group

19   of students with her all day.  And she felt really

20   protective.

21            MR. MURPHY:  Your Honor, I object to this

22   inquiry as well.  Ms. Light could have testified to all

23   this on her direct.

24            THE COURT:  Overruled.

25            MR. INTERLANDI:  Your Honor, this goes to her

1   claim for emotional distress damages.

2             THE COURT:  You may continue.

3             MR. INTERLANDI:  Excuse me?

4             THE COURT:  You may continue.

5             MR. INTERLANDI:  Thank you.

6   BY MR. INTERLANDI:

7   Q.   So did there come a point in time when Jessica told

8   you that she wanted to work at another school, a school

9   named Worthington Hooker?

10  A.   There came a point in time where she felt it was time

11  for her to move on from Davis Street School, and she

12  started looking at other opportunities within the city.

13  Q.   Did she express to you why she felt that way?

14  A.   I believe it was they decided to instead of having

15  one classroom teacher for the fourth grade, to start

16  having the fourth and fifth grade kids switch between

17  teachers, which was kind of against what she loved about

18  teaching which was having that group of kids that she

19  could really invest in and protect and buy them groceries

20  and get them school supplies and take them to the

21  Beardsley Zoo when we took our kids to the Beardsley Zoo

22  and be an absolute resource for the community that she

23  taught in outside of school as well as inside of school.

24  Q.   What was your observation of Jessica when she told

25  you that she landed a job as a third grade teacher at

1    Worthington Hooker?

2    A.    Given Hooker's reputation, I was actually a little

3    surprised.

4    Q.    Why?

5    A.    It's a very affluent school in a very affluent

6    neighborhood.  And it was a little shocking that that's

7    where she took her career, but I also think she was a

8    little -- after five years at Davis, a year or two in the

9    Bronx, I think she was a little tired of always trying to

10    solve every problem in the community.

11    Q.    So in the early Hooker years, did you have any

12    thoughts of Jessica as a parent of your two children at

13    that time?

14    A.    She was an amazing mother.  She is an amazing mother.

15    Q.    Can you give me some examples of what made her an

16    amazing mother at that time?

17    A.    I mean, I would come home from work and there would

18    be a roll of paper on the floor with a four-year-old

19    telling me about the number line and the negative numbers

20    and what that means.  And she, you know, valued education

21    but valued, you know, their individuality and their

22    creative side.  It's that mix of having that elementary

23    education and that theater education with an incredibly

24    loving mother.

25    Q.    Did you have any thoughts of Jessica as a wife at

1    that time when she took the job at Hooker?

2    A.   Once she took the job at Hooker and talked about what

3    was going on at Hooker, it became more clear that this

4    was, you know, just a beautiful school where people from

5    different communities and internationally were coming

6    together because of the Yale community.  And it made sense

7    for her to be at a school where everything was working.

8    It's probably a rare opportunity for a teacher to even see

9    that and experience that.

10        So I would say at that point, like, our relationship

11   was thriving, our kids were thriving, her career was

12   thriving, my career was advancing.  We had -- in that time

13   we had purchased a home in New Haven.  And sometimes it

14   shocked us because we looked back and we realized that we

15   had become adults.

16   Q.   And for as long as you've known Jessica, has she

17   advocated on behalf of herself and others?

18   A.   Yeah.

19   Q.   Is there anything that stands out to you in your

20   relationship with Jessica in terms of things that she has

21   advocated for or against?

22   A.   I mean, she advocated -- once we were in New Haven

23   and focused on the schools, I mean, she advocated for

24   getting science kits in classrooms.  She advocated for the

25   rights of teachers.  She advocated for the funding of

1    programs.  You know, I think -- I would say, you know,

2    leading up to 2020 she was probably at every other Board

3    of Education meeting supporting a cause, supporting an

4    initiative from the superintendent.  I know there were

5    times that she spoke at the state level at the request of

6    the New Haven Public Schools.  And, you know, we would

7    be -- there was a period of time where we couldn't sit at

8    an outdoor cafe in New Haven and three people I didn't

9    know would come up to Jessica and say "oh, thank you for

10   doing this," or "I saw you speak at this," someone she was

11   involved in community group with or someone who was

12   opening a community bookstore.  It was -- I was proud to

13   be, you know, at least next to her.

14   Q.    Would you consider yourself an advocate?

15   A.    Maybe more behind the scenes.

16   Q.    Have you ever served on the Parent Teacher

17   Association in New Haven?

18   A.    No.

19   Q.    How was your family doing prior to COVID?  So let's

20   say late 2019, early 2020.

21   A.    Like I said, we were thriving.  And, you know, in

22   that period Jessica also helped our goddaughter who is a

23   first generation immigrant apply -- finish up high school,

24   apply and get into one of the top universities in

25   Connecticut.  So we were -- everything was going right.

 1    I'm not saying there was no problems or, you know, money

 2    didn't become an issue here or there or unexpected things.

 3    But in general, going into 2020 everything was -- was

 4    happy.

 5    Q.    So walk me through COVID as it relates to your family

 6    and Jessica.  Did you see any observations just with the

 7    COVID pandemic itself, any changes in your relationship or

 8    if your family was thriving?

 9    A.    So I think we both panicked about COVID, but I think

10    everyone in the world panicked about COVID.  I tended

11    to -- I was going to Walmart and buying cans of stuff I've

12    never purchased before in my life.  I think some of those

13    cans are still sitting in the pantry.

14         Jessica was really concerned about education and

15    COVID with the schools shutting down and education going

16    remote, thinking about not only our children but the

17    children in her class and the children in the -- within

18    the community.  She, I think, you know, there was a lot of

19    anxiety but a lot of productivity as well.

20         We built an outdoor classroom in our backyard and

21    then transported it, you know, 120-pound piece by

22    120-pound piece to the grounds of Worthington Hooker and

23    reassembled it there.  She was sewing masks and trying to

24    get projects going in the park.

25         She was -- she ended up homeschooling -- or not

1    homeschooling, but working with our children remotely but

2    also one of our good friends is an emergency room doctor

3    at Yale.  And he obviously had to keep working.  And they

4    had a childcare issue.  So every day we had our two kids

5    plus their twins in the house learning.

6    Q.   Is there anything else as it related to COVID that

7    changed anything that your family was doing at that time

8    in mid-2020?

9    A.   I mean, you might have to be more specific, because

10   COVID kind of changed everything.  I was working from

11   home.

12   Q.   Exactly.

13   A.   We ordered every meal.  We couldn't go on vacation.

14   Q.   Since then you've been working remotely I believe

15   your testimony was earlier?

16   A.   Yeah.  Most of the week.  I usually go in a day or

17   two into the office.  Or travel.

18   Q.   Were you involved in your children's schooling in the

19   2020-2021 school year?

20   A.   2020-2021, which would have been the beginning of

21   COVID?

22   Q.   Yes.

23   A.   Yeah, so my job changed a little bit during COVID.

24   So they did partial furloughs because they were unsure

25   what was going to happen.  So I actually got Fridays off.

1       So on Fridays I made sure that I spent time with our

2   children and the twins from the other family.  But most of

3   the education -- you know, I was informed and we talked

4   about everything, but she kind of really led the

5   communication and the liaison with their education.

6   Q.    Who was?

7   A.    Jessica was leading it.

8   Q.    Did there come a point in time when that changed and

9   you took more of an active role?

10  A.    Yeah.

11  Q.    Do you recall when that time was?

12  A.    I believe it was the beginning of Wesley being in

13  second grade which was probably the 2020-2021 school year.

14  Yeah.

15  Q.    And what brought that upon you to take more of an

16  active role?

17  A.    There was -- at our first parent/teacher conference

18  with Ms. Alden, there was a strange amount of hostility.

19  And there was -- she had said that Wesley hadn't been

20  turning in their assignments.  We kind of figured it was

21  because Wesley was an eight-year-old trying to navigate a

22  remote classroom for the first time.  So we looked in

23  their mess of papers and took pictures of everything and

24  sent it to Hillary Alden.  Her response was also really

25  aggressive.  Like, why would you send all this to me?

1    Which we really couldn't figure out because, you know, we

2    didn't -- at least I didn't know Ms. Alden well.  But I

3    knew of her because at some school events my older child

4    who was I think in seventh or eighth grade at the time

5    would watch Ms. Alden's son on the playground at

6    Worthington Hooker during a meeting or a school event.

7    So, you know, when we started getting this hostility from

8    Wesley's second grade teacher, it took us back a little

9    bit.

10   Q.    And then after that, did you have any other meetings

11   with Ms. Alden?

12   A.    Yeah.  We followed up on that parent/teacher

13   conference with a meeting that included my wife or

14   Jessica, myself, Ms. Gethings, Ms. Clarino, and Ms. Alden.

15   Q.    Do you recall what was discussed during that meeting?

16   A.    I could characterize it for you, but I couldn't give

17   you anything close to a word-for-word.

18   Q.    Give me a summary, if you can.

19   A.    We talked about a lot of the challenges of the remote

20   classroom, the challenges we were having as parents.  And

21   I think it was probably taken as a criticism of the Google

22   Classroom itself.  So I think Ms. Alden got really

23   defensive about it.

24   Q.    And was there a plan in place after that meeting for

25   how to communicate with Ms. Alden or the administrators?

1  A.   Yeah.  So from that point on -- and I think Ms. Alden

2  made a couple attacks on Jessica's professionalism in that

3  meeting.  From that point on, I handled the communication

4  with the school.

5  Q.   And did you ever receive any emails from any of the

6  administrators at Hooker concerning Wesley or Ms. Alden as

7  it related to her teaching him?

8  A.   I'm not exactly sure of the timeline, but probably a

9  few days to a few weeks after that meeting Ms. Clarino

10  sent me a note with Ms. Gethings on copy asking how it was

11  going.  And we had made some plans in terms of putting

12  work in a binder for Wesley and me kind of being more

13  active and knowing where to find assignments on the Google

14  Classroom and knowing how to turn in Wesley's work.

15  Q.   Did you reply to Ms. Clarino when she sent you that

16  note?

17  A.   I did.  I had -- I had suggestions about -- you know,

18  coming from an advertising design and I do a lot in

19  E-commerce and web background, I had a lot of suggestions

20  on how to make a Google Classroom easier to navigate for

21  eight-year-olds for the other parents.  So I made those

22  suggestions.

23      But the part of that that I would probably -- is now

24  infamous is that I also -- I made some discoveries in the

25  classroom in terms of content that were really concerning.

1    Q.    Why did you find those concerning?

2    A.    There was a link in -- and I don't any if everyone is

3    aware of how Google Classroom goes, but it's eventually a

4    slide presentation for every day where the assignments

5    would be posted, resources would be posted, there would be

6    links and videos and the kids would go through it.

7         One of the links that appeared on the classroom every

8    day was a This Day In History link which linked out to an

9    outside website.  And if you clicked it on certain days

10   you'd be liable to see photographs of the Kennedy

11   assassination.  These are eight-year-olds, rights, that

12   have the possibility to see that.  There was one day it

13   linked to the Jonestown mass suicide and an overhead

14   picture of bodies.  The suicide of Kurt Cobain was one of

15   the days.  So I put that -- as well as my user interface

16   suggestions, I made it known that I thought that content

17   was unacceptable.

18   Q.    Which content was that?  You said user interface, was

19   that something separate?

20   A.    Yeah, so the user interface stuff.  How to make the

21   classroom more easier to use was part of my email.  And

22   then my objections to the content was another part of the

23   email that I replied to Ms. Clarino's note.

24   Q.    Was there anyone else, if you recall, anyone else

25   included in that email exchange?

A.    No.  I sent it just to Ms. Clarino and Ms. Gethings
who were on the original email to me.

Q.    Did they reply to your email?

A.    I don't recall if they replied in email or a phone
conversation.  I know that they assured me that the
content issues, because there was that content and then
another video that I was concerned with, that those
content issues would be handled.  And I can't remember if
that was an email for a conversation.

Q.    What was the other video that you were concerned
about?

A.    It was a video titled Houses Around the World.  So I
guess they were studying different dwelling units around
the world.  And this video purported to show the different
types of dwelling units around the world.  It started with
Europe and showed some European houses.  It then went to
Africa and showed mud huts and holes in the ground in
Tunisia.  It went to the Philippines and showed a
treehouse.  And then it went to North America and showed
the Las Vegas skyline and a McMansion in Texas or just
beautiful houses.  I think when it showed Las Vegas, it
showed a roller coaster around a skyscraper.  So I was
concerned that it really just reinforced stereotypes
inappropriately for children.  There was also some
spelling mistakes in the video.  It was someone's random

1    YouTube project.

2    Q.    When you had the follow-up communication with the

3    administrators, did you have any thoughts or feelings

4    about that?

5    A.    With my follow-up with administrators?

6    Q.    So after you sent the email I think you said there

7    was an email or a phone call?

8    A.    Yeah, I felt initially that it was -- it was

9    addressed, the content issues were addressed and maybe the

10   classroom set-up issues would be discussed with Ms. Alden.

11   That part was just mostly suggestions.

12   Q.    And then for time frame, what are we talking about?

13   Is this around the December 2020 time frame?  Was it

14   earlier?  Later?

15   A.    It would have been the early winter of -- or maybe it

16   would have been the end of 2020, the beginning of 2021.

17   Q.    Did Ms. Alden remain Wesley's teacher throughout the

18   rest of that school year?

19   A.    Yes.

20   Q.    Did you have any other concerns or issues that you

21   raised to the administration at Hooker about Ms. Alden?

22   A.    I don't believe so.

23   Q.    Okay.

24   A.    It got -- and I don't know if it was Ms. Alden's

25   complaint about Jessica, but somehow I learned that my

1   critique of Ms. Alden's classroom was attributed to me to

2   Ms. Alden, which I thought maybe was inappropriate.  So I

3   tried to avoid having conversations with both Ms. Alden

4   and the school administration.  It was -- it just wasn't

5   being taken in good faith.

6   Q.    After you communicated with the administrators after

7   you sent that email, did Jessica get back in the picture

8   to communicate with Ms. Alden about Wesley's schoolwork or

9   learning that year?

10  A.    No.  We relied on other families in the class.

11  Q.    You mentioned the complaint.  Did there come a point

12  in time -- withdrawn.

13        Did you notice any changes in Jessica during the

14  2020-2021 school year?

15  A.    Yeah.

16  Q.    What were the changes that you noticed in her?

17  A.    Um, I mean, if we go back, it -- changes started with

18  kind of like confusion and frustration.  She would tell me

19  about emails that were sent or meetings that she had with

20  administration.  And I think she was struggling with her

21  course of action.  You know, whether to curb her public

22  speaking or whether to go forward and be the advocate that

23  she has inside of her.  And that kind of confusion and

24  frustration turned into panic as, like, more odd things

25  would happen.  As a husband, sometimes you just want to

1    make everything seem okay, and you say, oh, that's not an

2    aggression, you might be overthinking that.  But all these

3    odd things started happening.  And, you know, it wasn't

4    something I could explain away anymore.

5         And then I saw that frustration turn into panic turn

6    into depression, anxiety.  It became almost nightmarish.

7    It was I -- I had anxiety about midday text messages I

8    would get from Jessica because I was worried about what

9    just happened to her at work.  What am I going to learn

10   about now?  What -- you know, what notes are she going to

11   find in her classroom?  What is she going to find out the

12   principal had said about her?  She was really concerned

13   about, you know, lies and information being spread about

14   her.  And looking back, you can kind of see, you know,

15   this spread of hostility that was initially just the

16   administration and then became the school.

17   Q.   Was there any particular lie that she said was said

18   about her that stands out to you?

19   A.   It was accusations.

20   Q.   What accusation, if you recall, that she relayed to

21   you?

22   A.   The accusation that she had leaked medical

23   information --

24             MR. MURPHY:  Your Honor, I'm going to object.

25   Conversations about what Jessica said to him is --

```
 1              THE COURT:  Sustained.
 2              MR. MURPHY:  -- hearsay.
 3              MR. INTERLANDI:  Hearsay?
 4              MR. MURPHY:  She could have testified --
 5              THE COURT:  The only relevance is the truth of
 6   the matter.
 7   BY MR. INTERLANDI:
 8   Q.   Did you witness any physical changes in Jessica after
 9   she started to -- after you started to see a change in her
10   mood?
11   A.   Yeah.
12   Q.   What physical changes did you see?
13   A.   Well, I mean, there was physical changes in terms of
14   just you can see sadness on people's face.  She would be
15   far jumpier, right, if someone came around the corner.  Or
16   if we were driving in a car and someone merged in front of
17   us too closely, she would have a bigger reaction.
18          But she generally, you know, she was withdrawn.  She
19   was not engaged in the family as much as she had been.  We
20   would have conversations.  And I would say something that
21   happened in my day, and her response would be, you know, a
22   thought about an incident that happened two weeks ago or
23   something that happened that day.  So you could tell that
24   she wasn't engaged with, you know, with what I was saying
25   but just kind of consumed with her own -- her own panic
```

1    and anxiety.

2    Q.    When you said sadness on her face, are you referring

3    to any physical manifestations of sadness on her face when

4    you said that?

5    A.    I mean, she would smile less.  She would, you know --

6    it was almost like the corners of her mouth just drooped

7    all the time.

8    Q.    Did you ever see her crying?

9    A.    I mean, all the time.

10    Q.    How was she doing with sleep?

11    A.    Um, horribly.

12    Q.    Why do you say that?

13    A.    Because I sleep in bed next to her.  And there were

14    some nights -- I tend up to stay up far later than

15    Jessica.  There were some nights where if she was sleeping

16    in bed, I would just go sleep on the couch to not risk

17    waking her up.  And Jessica does not do well with not

18    getting a good night's sleep.  I mean, I think some of us

19    can handle getting six hours.  Jessica is far more

20    emotional the next day if she doesn't get sleep.

21    Q.    During this time that you're describing, how was your

22    relationship with Jessica?

23    A.    It was tough.

24    Q.    Why do you say that?

25    A.    There was strains on the relationship.  There were

1    times where I would get upset at the amount that I was

2    having to do to run the family.  Also, I was working from

3    home now.  I was taking care of the kids at school.  I was

4    doing more of the dishes.  I was making sure her laundry

5    was done.  You know, during this --

6    Q.   Why -- I'm sorry.  Why was she unable to do that

7    stuff?

8    A.   It would pile up in our shared laundry basket.  I

9    could speculate, right, when people are depressed, they

10    take care of themself less.  What I can say is that I did

11    more laundry.

12         Usually by early November the place in the basement

13    where we hide the Christmas presents for the kids is

14    filling up.  And I think it was 2021 and possibly in 2022

15    as well, you know, we would get midway through December

16    and I would start panic buying on Amazon to make sure that

17    we had Christmas presents for the kids.

18         Jessica was really just consumed with the thoughts.

19    She would always ask you probably 20 or more times a week,

20    am I a good person?

21    Q.   How is she doing today?

22    A.   Better.

23    Q.   Why do you say that?

24    A.   I think, you know, maybe it's just getting accustomed

25    to it.  You know, there was times we thought that it was

```
 1   coming to an end when the investigative reports came out.
 2   I remember we were between the ceremony and reception of
 3   my cousin's wedding in Stourbridge, Massachusetts, when
 4   she got the email with the three investigative reports.
 5   And we read 60 pages out loud to each other in the hotel
 6   room that night.  And I think initially she felt that
 7   nightmare was coming to an end.  She felt vindicated
 8   reading the reports --
 9               MR. MURPHY:  Your Honor, I have to object.
10               THE COURT:  I'm going to sustain that objection.
11               Ladies and gentlemen, you've heard some
12   testimony of various places of investigations that were
13   done, internal investigations by outside counsel.  And
14   you've heard references to that in terms of people's
15   reaction to or follow on to that.  But the substance of
16   those investigations is not part of the evidence in this
17   case and is not of concern to you.  Because you, in
18   essence, are the investigators.  You're the ones who are
19   going to listen to all the testimony and the witnesses,
20   review all the exhibits, and make the determination.  So
21   the results of any investigation are not going to be in
22   evidence and you shouldn't speculate as to what they would
23   be because it, in essence, would usurp what you're
24   supposed to do.  So let's keep your job foremost.  Thank
25   you.
```

1          All right.  You need to rephrase the question,

2    please.

3          MR. INTERLANDI:  Okay.

4    BY MR. INTERLANDI:

5    Q.   So you said you saw a change that she's gotten

6    better.  When did you see that change start to occur?

7    A.   I don't know.

8    Q.   Did there come a point in time that you learned that

9    she was going to be leaving Hooker School?

10   A.   Yeah.

11   Q.   Did there come --

12   A.   I think I told her when she got the second note to

13   get the hell out of there.

14   Q.   The second note that was discussed earlier during her

15   testimony, Jessica's testimony?

16   A.   The one that suggested that she die.

17   Q.   At that time were you concerned for Jessica's safety

18   at Hooker?

19   A.   I didn't know what was capable, right?  What

20   anyone -- I was mortified that people that run a school --

21   and again, agreed that we don't know who put the note

22   there, but mortified that anyone who worked at a school,

23   it obviously wasn't a first grader, could do that.  It

24   spoke to a really broken environment.  And I think, you

25   know, even if that note wasn't directed to her, it would

1    be enough for me to say you need to leave this school.

2    Q.    Based on your time with Jessica, you've known her for

3    a long time since 2001, in your observation of her today,

4    is she the same mother, wife, person that you knew in 2019

5    or has she changed?

6    A.    I mean, we all change.  I think she is -- she's

7    getting back.  She's being more involved.  Looking forward

8    to the next school year.  The kids are not -- both of our

9    children are not at Worthington Hooker anymore, so I think

10   she's optimistic.  But I think there's also been times of

11   optimism and times of more crisis since 2020.

12          MR. INTERLANDI:  All right.  Thank you, David.

13   I don't have any further questions for you.

14          THE COURT:  Cross-examination.

15          MR. MURPHY:  Yes, Your Honor.  I just wasn't

16   sure if you wanted to take your afternoon break.

17          THE COURT:  You're right.  Let's take a break

18   and then come back and have cross-examination.

19          Please don't discuss your testimony with anyone

20   until you return to the stand.

21          (Whereupon the jury left the courtroom.)

22          THE COURT:  Anything else before we take our

23   break?

24          MR. INTERLANDI:  Your Honor, I wanted to circle

25   back to the issue that Attorney Murphy brought up earlier.

1          THE COURT:  Can we wait for him to come back?

2          Ms. McCallum, can you retrieve him?

3          MS. McCALLUM:  Absolutely.

4               (Pause.)

5          MS. McCALLUM:  Your Honor, I believe he's in the

6    bathroom.

7          THE COURT:  We'll come back a little early from

8    our recess.

9          MS. McCALLUM:  Okay.  I will let him know.

10          THE COURT:  We'll be back just a bit before

11    3:00.

12               (Whereupon, a recess followed.)

13          THE COURT:  Please be seated.

14          The matter you wanted to bring up,

15    Mr. Interlandi, before when we couldn't find Mr. Murphy?

16          MR. MURPHY:  I apologize.  I heard "break" and I

17    had to go to the bathroom, Your Honor.

18          MR. INTERLANDI:  Yes, Your Honor.

19          THE COURT:  Go ahead.

20          MR. INTERLANDI:  I was just following up on

21    Your Honor's comment about the Ventura records.  I wanted

22    to make sure that that proposed exhibit by the defense,

23    that that wasn't going to come back for Jessica to come

24    back on the stand until after the questions are asked of

25    Ms. Ventura tomorrow.

 1           THE COURT:  Say that again?  She's not going to

 2    be back on the stand.

 3           MR. INTERLANDI:  Well, good.  I wasn't sure.

 4           THE COURT:  It's still your case.

 5           MR. INTERLANDI:  Yeah.  Regarding the

 6    Defendants' Exhibit R -- I believe it's either R or S.

 7           MR. MURPHY:  It's R.

 8           MR. INTERLANDI:  R.  There was a point during

 9    cross where counsel wanted to present that.  And

10    Your Honor appeared to make a ruling or a statement that

11    we were going to wait until Ms. Ventura testified.

12           THE COURT:  Right.  So what's the question?

13           MR. INTERLANDI:  I wanted -- it sounded like

14    there was a possibility that Ms. Light was coming back to

15    testify about those records.  And I wanted to confirm that

16    she's not.

17           THE COURT:  Mr. Murphy, what's the plan?

18           MR. MURPHY:  My plan is obviously -- well, first

19    off, if we want to address right now, Exhibit R contains

20    notes from Ms. Ventura and then all of the emails that we

21    were provided between Ms. Light and Ms. Ventura as well as

22    a few text messages between them.  And based on, A, I

23    think all the emails from Ms. Light are statements of a

24    party opponent and admissible for that basis.

25           THE COURT:  Are they, however, statements that

1    are made in the course of treatment for the benefit of

2    receiving treatment?

3              MR. MURPHY:  Excuse me, Your Honor?

4              THE COURT:  Are they statements that are made to

5    a medical provider for the purpose of receiving treatment?

6              MR. MURPHY:  I think that's what we heard from

7    Ms. Light today, right, that she is leveraging the email

8    to get free health care.  She was sharing her health

9    concerns with Ms. Ventura via the email and Ms. Ventura

10   would reply.  That was the testimony from Ms. Light.  In

11   that situation, our belief is that they're relevant to

12   Ms. Venture's testimony, just like her notes are from the

13   office, and would be relevant to her testimony tomorrow

14   about Ms. Light.

15             THE COURT:  That's, I think, a different

16   question than Mr. Interlandi is saying, which is are you

17   going to call Ms. Light?

18             MR. MURPHY:  I was just trying to answer the

19   initial question about whether the records are admissible.

20   If the records are admissible, I'm going to ask

21   Ms. Ventura about them tomorrow.  Presuming I'm satisfied

22   with that, I would not have to call Ms. Light.

23             THE COURT:  Does that answer your question?

24             MR. INTERLANDI:  It does.  I have a problem with

25   the en masse presentation of notes, emails, text messages

1    as one document.  I mean, I don't think that's

2    appropriate.  I would ask that we break that out into

3    separate exhibits, at least.

4         THE COURT:  How would you propose to do that?

5         MR. INTERLANDI:  Exhibit Z could be the text

6    messages, the communications.  I think that's a lot of,

7    you know, documentation for the jurors to look through.

8         THE COURT:  Well, they're going to have it all.

9         MR. INTERLANDI:  I know they will have it all.

10        THE COURT:  Is there an easier way to organize

11   those records?

12        MR. MURPHY:  I don't believe so, Your Honor.

13   And part of my argument here is the volume of emails.  And

14   that is fully depicted when they're printed out and

15   submitted as one exhibit.  Ms. Light was a frequent

16   emailer to Ms. Ventura, frequent texter.  And I think the

17   jury's entitled to know the sheer volume of things she was

18   sending Ms. Ventura.

19        MR. INTERLANDI:  I would -- my position is that

20   each email or text message communication needs to be

21   discussed with Ms. Ventura.  I'm not going to agree to

22   just 150 pages.

23        THE COURT:  If the witness's testimony

24   identifies that exhibit as all of her treatment records

25   regarding the plaintiff, I think it all comes in.

1          MR. INTERLANDI:  If she says it reflects all of

2    her treatment records, I agree.

3          THE COURT:  So I think it all comes in.  And I

4    am quite sure Mr. Murphy is not going to go through each

5    and every one.  I'm really sure he's not going to do that.

6          MR. MURPHY:  I'm sure now.

7          THE COURT:  If the jury has that at their

8    disposal, they can read it.  If there are things you want

9    to bring out about the record to assist how they read it,

10    that's fine too.

11          MR. INTERLANDI:  And to the extent also that

12    Ms. Ventura would testify that the emails and text

13    messages are also part of the exchange of the services

14    that she's providing for, not just, you know, scheduling

15    or rescheduling.

16          THE COURT:  So I'm assuming, because that

17    particularly plays into Mr. Murphy's theory of her using

18    the emailing as a way of obtaining free services --

19          MR. MURPHY:  That's just not my theory,

20    Your Honor; that was Ms. Light's testimony.

21          THE COURT:  I should have said your emphasis.

22          MR. MURPHY:  Thank you.

23          THE COURT:  All right.  We're all straight.

24          Is she the next witness?

25          MR. INTERLANDI:  She will be.  She's tomorrow

```
 1    morning.  I'm sorry -- yeah, tomorrow morning, 9:00.
 2              THE COURT:  Okay.  All right.
 3              Let's bring our jurors back.
 4              MR. MURPHY:  Just before Your Honor does, I
 5    apologize, I'm going to have a few questions for the
 6    current witness, but it's not going to take me long.  I'm
 7    positive it's not going to take me to 4:00.
 8              THE COURT:  In other words, we're going to be
 9    finished before 4:00?
10              MR. MURPHY:  Correct.  Famous last words from a
11    lawyer, but I'm pretty confident.  I don't intend to be
12    long.  Before the jury comes in, I didn't know if we want
13    to discuss what our plan is.
14              THE COURT:  We will email you a draft charge
15    tonight.  And then we'll see when we think we need to have
16    a charge conference.  I will put notes to you where I've
17    left out a charge.  We'll discuss whether that's now your
18    current thinking.  Especially on the intracorporate
19    privilege, if you think that applies to the defamation
20    claim, you'll need to tell me why.
21              It's hard to think why it would apply if one of
22    the elements is the statement has to have been made to a
23    third person when the intracorporate privilege is between
24    management people.  But I'll let you sort that out for me.
25              Okay.  Let's bring in the jury.
```

```
 1                    (Whereupon, the jury entered the

 2                    courtroom.)

 3              THE COURT:  Ladies and gentlemen, please be

 4   seated.

 5              With a little extra time that we took, you got

 6   to admire the rain and then not rain and then rain.  All

 7   right.

 8              Mr. Bianchine, would you kindly return to the

 9   stand.  All right.  You remain under oath.

10              And Mr. Murphy will cross-examine.

11

12                    CROSS-EXAMINATION

13   BY MR. MURPHY:

14   Q.   All set?

15   A.   Yes.

16   Q.   Good afternoon.

17   A.   Good afternoon.

18   Q.   I think you said you've been married for a little

19   over 20 years now?

20   A.   We've been together for over 20 years.  We've been

21   married for 18 as of June 30th.

22   Q.   Eighteen, okay.  All right.

23        You met in college?

24   A.   Correct.

25   Q.   Okay.  And you love your wife?
```

1    A.    Yes.

2    Q.    You support her?

3    A.    Yes.

4    Q.    All right.  And I think you said before one of your

5    roles as a husband is to want to make everything okay,

6    right?

7    A.    Yeah.

8    Q.    You are a creative director?

9    A.    Correct.

10   Q.    You're not an educator?

11   A.    No.

12   Q.    Not a certified administrator?

13   A.    No.

14   Q.    Never worked in a public school?

15   A.    Nope.

16   Q.    You testified a little bit about some meetings you

17   had regarding Wesley and Ms. Alden, correct?

18   A.    Correct.

19   Q.    And in those meetings it was you and Principal

20   Gethings and Ms. Clarino and your wife?

21   A.    Correct.

22   Q.    And then we've heard -- I know you've been here, so

23   you've heard testimony about a lot of other events at

24   Worthington Hooker, right, other meetings?

25   A.    Yes.

```
 1   Q.   All right.  And other incidents that your wife

 2   relayed that allegedly or did happen at Worthington

 3   Hooker?

 4   A.   Yes.

 5   Q.   You weren't at any of those meetings or incidents,

 6   right, other than with your meetings with Ms. Alden?

 7   A.   I think there were things that I was present for.

 8   Q.   You're right, that was a very broad question.

 9        You attended meetings with Ms. Alden about

10   Ms. Alden's teaching?

11   A.   Correct.

12   Q.   You might have attended one or two other events or

13   meetings?

14   A.   Yes.

15   Q.   But generally speaking, you did not attend any of the

16   meetings your wife was having during the course of her

17   employment?

18   A.   I -- it's still broad.  I would say the meetings with

19   administrators and other school staff not about children,

20   I was not in attendance of.  Board of Ed meetings, some of

21   them I was.  So --

22   Q.   Sure.

23   A.   Basically, yes.

24   Q.   Right.  Within Worthington Hooker there were many

25   things that happened where your sole source of knowledge
```

1    is your wife's -- the information your wife relayed to

2    you?

3    A.    And documents and emails she showed me.

4    Q.    Okay.

5          You testified a little bit about Ms. Alden's -- some

6    back-and-forth with Ms. Alden about Wesley's education

7    including Google Classroom, right?  And you had concerns

8    about the Google Classroom setup?

9    A.    Yes.

10   Q.    And some links that linked to what you thought were

11   inappropriate images?

12   A.    Yes.

13   Q.    And at the time this was in the fall of 2020,

14   correct?

15   A.    Fall or winter of 2020.

16   Q.    And teachers were still working through remote

17   teaching at the time, right?

18   A.    I was very aware of that, yes.

19   Q.    It was a new thing for them, right?

20   A.    Yeah.

21   Q.    At one point did you report Ms. Alden to the

22   Anti-Defamation League?

23   A.    No.

24   Q.    You had concerns about her website, her Google

25   Classroom website?

1   A.   I had concerns about a video she had shared on the

2   classroom, yeah.

3            MR. MURPHY:  No further questions, Your Honor.

4            THE COURT:  Redirect?

5

6                    REDIRECT EXAMINATION

7   BY MR. INTERLANDI:

8   Q.   Hello.

9   A.   Hello.

10  Q.   As a result of the email that you sent, did anyone,

11  including Ms. Alden, correct the links that were on her

12  Google Classroom?

13  A.   Yes.

14  Q.   How do you know that?

15  A.   I was still following the classroom because Wesley

16  was still in the class.  So the links to This Day In

17  History were eventually removed.

18           MR. INTERLANDI:  No further questions.

19           THE COURT:  Okay.  Anything further?

20           Thank you very much then, Mr. Bianchine.  You

21  may step down.

22           I think we may be finished for the day.

23           MR. INTERLANDI:  Yes, Your Honor.  I had

24  anticipated going a little bit longer, so my next witness

25  is not available until tomorrow.

```
 1              THE COURT:  All right.

 2              Then ladies and gentlemen, I'll let you go

 3    early.  We will start tomorrow anticipating a witness

 4    Ms. Ventura who you have heard something about.  And then

 5    we will proceed with a full day.

 6              I will keep you apprised of where we are by the

 7    end of the day if I have what's a reasonably accurate view

 8    of how much longer.  Okay?

 9              So have a pleasant evening.  It might be wet.

10    It might be dry.  And we'll see you tomorrow.

11                   (Whereupon the jury left the courtroom.)

12              THE COURT:  Anything else, counsel?

13              MR. MURPHY:  No, Your Honor.

14              MR. INTERLANDI:  No.

15              THE COURT:  We will recess.  And I will send

16    you, I hope, a draft -- understand it's a draft, it

17    invites your comment.  And your comments can be on the

18    draft or separately as you choose.  I just want to make

19    our charge conference as efficient as possible and as

20    accurate as possible.  Okay.

21              MR. MURPHY:  And when are you expecting those

22    comments, Your Honor?  Tomorrow morning?  Or tomorrow

23    evening?

24              THE COURT:  Well, let's see.  Obviously sooner

25    gives me an earlier time to review them, but I understand
```

1    you might have other things you're doing.  Do your best.

2    We're not going to have a charge conference tomorrow.

3    Okay.

4              MR. MURPHY:  Thank you.

5                   (Proceedings adjourned at 3:23 p.m.)

1

2                    C E R T I F I C A T E

3

4    RE: JESSICA LIGHT v. NEW HAVEN BOARD OF EDUCATION, ET AL.

5                      No. 3:22CV425(JBA)

6

7

8            I, Diana Huntington, RDR, CRR, Official Court

9    Reporter for the United States District Court for the

10   District of Connecticut, do hereby certify that the

11   foregoing pages 228 through 430 are a true and accurate

12   transcription of my shorthand notes taken in the

13   aforementioned matter to the best of my skill and ability.

14

15

16

17

18                    _____
                              /s/

19                    DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
20                    United States District Court
                       141 Church Street, Room 147
21                    New Haven, Connecticut 06510
                           (860) 463-3180
22

23

24

25