432

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3    _____
     JESSICA LIGHT                  )
4              Plaintiff  )         NO: 3:22cv425(JBA)
                          )         August 7, 2024
5      vs.                )         9:02 a.m.
     NEW HAVEN BOARD OF   )
6    EDUCATION, ET AL     )
                Defendants. )
7    _____)    141 Church Street
                                        New Haven, Connecticut

8

9                    DAY THREE OF JURY TRIAL

10                        VOLUME III

11

12

13

14   B E F O R E:

15           THE HONORABLE JANET BOND ARTERTON, U. S. D. J.

16

17   A P P E A R A N C E S:

18   For the Plaintiff :  Anthony J Interlandi, Sr.
                          Monarch Law
19                        363 New Britain Road
                          First Floor
20                        Berlin, CT 06037

21   For the Defendants:  Peter Joseph Murphy
                          Chelsea McCallum
22                        Shipman & Goodwin LLP
                          One Constitution Plaza
23                        Hartford, CT 06103

24

25

1          THE COURT:  Good morning.  Counsel, please be

2   seated.  We are ready to continue the trial and begin

3   with a new witness.  But before we do that, are there any

4   matters that must be determined before we proceed?

5          MR. INTERLANDI:  I don't think so, Your Honor.

6          MR. MURPHY:  No.  Just in terms of exhibits I

7   guess.  One, we're offering a new exhibit that is

8   Ms. Ventura's intake that was received yesterday and

9   we're working on the redactions.

10          Two, Exhibit R my understanding of Tony's

11   concern was that had the emails, Ms. Ventura's records,

12   et cetera, in one big copy.  What I propose doing is what

13   we have done is made copies of Exhibit R, just

14   Ms. Ventura's medical records and none of the emails or

15   texts and so I'm assuming current Exhibit R, if it is

16   just those very nondescript office notes, I assume that

17   resolves your objection to that and we'll handle the

18   emails separate.  I think that will be easier because I

19   don't want to jam everyone up with one big exhibit.

20          THE COURT:  Okay. And then to the extent the

21   emails do not constitute a part of the medical record

22   would depend on Ms. Ventura's testimony, right?

23          I don't know whether in the collection of emails

24   and texts there's nonmedical treatment information, is

25   there?

```
1              MR. MURPHY:  There's some scheduling emails and
2     the like.
3              THE COURT:  Okay.  You have the draft charge and
4     verdict form.  Can I please have your responses, your
5     request to changes or supplements by 6:00 tonight?
6              MR. INTERLANDI:  Yes, Your Honor.
7              THE COURT:  And then I would anticipate if we're
8     on schedule to have a charging conference on Thursday
9     after evidence is finished.  You looked pained, Mr.
10    Murphy.
11             MR. MURPHY:  I do.  6:00 was early.  I was
12    hoping for something a little bit later than that.
13             THE COURT:  I need to work on it as well.
14    That's what the problem is.  The reason we got it out to
15    you yesterday was so that you can have a look and begin
16    working on that yesterday and so let's --
17             MR. MURPHY:  If that's Your Honor's order,
18    that's Your Honor's order.
19             THE COURT:  I need to know when you can do it.
20    I want your best product because that's most helpful to
21    me.  On the other hand, I can't invent more time.  So if
22    you can do the best you can to get it to us this evening.
23    6:00 is ideal because we need to take a look at it.  If
24    you are going to be significantly later than that, you
25    need to text our law clerk.
```

1          MR. MURPHY:  Understood, Your Honor.

2          THE COURT:  Anything else?

3          MR. INTERLANDI:  No.

4          THE COURT:  Shall we invite our jurors in?

5          (In the presence of the jury at 9:08 a.m.)

6          THE COURT:  Good morning, ladies and gentlemen.

7    Please be seated.  We return to the evidence in the trial

8    of Light versus Board of Education and Margaret-Mary

9    Gethings.  I will ask plaintiff to call your next

10   witness.

11         MR. INTERLANDI:  Yes, Your Honor.  We call

12   Nicole Ventura to the stand.

13         THE COURT:  Ms. Ventura, would you kindly come

14   over here.

15         MR. MURPHY:  I think the jury is looking for

16   something, Your Honor.

17         THE CLERK:  Sorry.

18         THE COURT:  Please remain standing.  You will

19   raise your right hand and take the oath.

20                      NICOLE VENTURA

21   Having been called as a witness, was first duly sworn and

22   testified on his/her oath as follows:

23         THE WITNESS:  I do.

24         THE CLERK:  Please state your name, spell your

25   last name, city, state of residence.

```
1              THE WITNESS:  Nicole Ventura, V-e-n-t-u-r-a.

2              THE CLERK:  City and state of employment?

3              THE WITNESS:  New Haven, Connecticut.

4              THE COURT:  You may be seated.  You may proceed.

5    DIRECT EXAMINATION BY MR. INTERLANDI:

6         Q.   Good morning, Ms. Ventura.  What is your

7    profession?

8         A.   I'm a mental health therapist.

9         Q.   Where are you a mental health therapist?

10        A.   New Haven.

11        Q.   What's the name of your employer?

12        A.   My current employment.  My own employer Dramatic

13   Action Therapy.

14        Q.   Can you explain to the jury what education you

15   needed to become a therapist?

16        A.   Yes.  I have a master's in mental health

17   counseling with a specialization in drama therapy that I

18   received from Lesley University in Cambridge,

19   Massachusetts.

20             THE COURT:  Can you speak slower?

21        A.   Absolutely.

22   BY MR. INTERLANDI:

23        Q.   Are you also a licensed professional counselor?

24        A.   Yes.

25        Q.   Do you hold any other designations or
```

1    certifications in your role as a therapist?

2        A.   I have LPC as well as my RDT.  That's Registered

3    Drama Therapist.  Not specific to the State of

4    Connecticut.

5        Q.   What type of training did you go through before

6    you became a therapist?

7        A.   So my master's program and then multiple

8    internships and practicums to accrue the hours needed to

9    then get my licensure and take the appropriate

10   examinations.

11       Q.   How many hours were required for you to obtain

12   that?

13       A.   Postgraduate hours is 3,000 hours to be accrued

14   in no more than two years at any rate no less than two

15   years and then obviously, like I said, that exam as well.

16       Q.   What type of classes did you have to take?

17       A.   Oh, boy.  I had to take just general counseling.

18   There's a bunch of different kind of -- I don't know how

19   to explain it.  A lot of different theories we are

20   exposed to.  You are kind of guided to pick whatever

21   speaks closest to you.  Giving a lot of information then

22   kind of honing in on what your interests are.  But you

23   have just diagnoses and note writing and clinical intakes

24   and all of the practical things becoming a therapist that

25   you need to take, you know, classes on as well.

438

1      Q.   Which schools or colleges did you take these

2   courses at?

3      A.   Those were Leslie University in Cambridge.

4      Q.   Any other colleges or universities that you

5   attended?

6      A.   I actually did do a course at community college

7   to supplement before going into my graduate program

8   because it was a recommendation to have classes in

9   psychology which I had not.  My bachelor's degree was in

10  theater performance from Fordham University.  I

11  unintentionally was providing drama therapy for years and

12  felt that it would be smart to get properly credentialed.

13     Q.   How many years have you been a therapist?

14     A.   I have been a therapist for about six years.

15     Q.   Is that in -- can you tell us about

16  psychotherapy.  Is that what you deal with?

17     A.   I specialize in trauma so the psychotherapy is

18  just the bigger word to explain therapy.  In my practice,

19  trauma center psychotherapy that's very direct.  I think

20  of myself as a trauma surgeon so whatever the complaint

21  is, I go in and I address that immediately so that it can

22  ideally provide relief for my clients.

23     Q.   What's drama therapy?

24     A.   Drama therapy is a form of therapy where you are

25  able to do role play and improvisation.  Very much a

1   rehearsal for life.  You have the ability to go back and

2   things are not playing out the way you wanted to, you

3   have an opportunity to test out different realities in

4   that sense.

5          But specific to Ms. Light, I have not utilized a

6   lot of drama therapy with her, if any.

7       Q.   How many patients have you seen on a daily or

8   weekly basis?

9       A.   Currently I see 26 clients a week.  I have 26

10  sessions a week I would say and some of those clients are

11  doubled up.

12      Q.   When you say "doubled up," what does that mean?

13      A.   I will see people twice a week.

14      Q.   Do you currently see Jessica twice a week?

15      A.   I do.

16      Q.   Do you see patients that have a history of prior

17  traumatic events?

18      A.   I do.

19      Q.   How often do you have those patients in your

20  practice currently?

21      A.   Daily.

22      Q.   Do you see patients involved in work conflicts?

23      A.   Yes.

24      Q.   Is that as often as you have patients who have

25  history of traumatic events or is that less?

1    A.   I would say that's on offshoot.  Not the primary

2    thing I would be doing surgery on if I continue that

3    metaphor.  Something that exists in our other clients'

4    lives, yes.

5         MR. INTERLANDI:  At this time, I would like to

6    render Ms. Ventura as an expert professional counselor

7    therapist.

8         THE COURT:  She's also testifying as a treating

9    therapist?

10        MR. INTERLANDI:  Yes.

11        THE COURT:  What is the additional expertise you

12   are offering?

13        MR. INTERLANDI:  To offer her opinion as to

14   certain matters.

15        THE COURT:  Attorney Murphy, any voir dire?

16        MR. MURPHY:  Well, Your Honor, I understood she

17   was testifying as a treating physician here or treating

18   not physician.  Treating therapist.  I also just heard,

19   Your Honor, that she's a drama action therapist.  That's

20   her background and specialty but does not provide that to

21   Ms. Light.  I'm confused what's she's being offered on.

22        THE COURT:  What's the narrow expert area that

23   you are offering for her as opposed to the treater who is

24   a result of the treatment has formed professional

25   opinions?

1          MR. INTERLANDI:  Your Honor, we did disclose

2     Ms. Ventura as an expert.

3          THE COURT:  With a report and all?

4          MR. INTERLANDI:  No report, just her medical

5     records.

6          THE COURT:  The rules require a report and

7     that's the kind of dividing line.  I don't think it is

8     going to make it any different for her testimony.  Let's

9     proceed.  Ms. Ventura is the plaintiff's treating

10    therapist and examine what the nature of that therapy has

11    been, what the findings are, what the conditions and

12    opinions and progress notes are.  Okay.

13         MR. INTERLANDI:  Thank you, Your Honor.

14    BY MR. INTERLANDI:

15         Q.   What is trauma?

16         A.   Trauma is the negative impact that a person is

17    experiencing based on a number of things.  Could be

18    physical abuse, sexual abuse, schooling abuse, any

19    heightened arousal that would constitute in the client's

20    mind as to what trauma is.  There's a clinical version.

21    I'm unable to speak on how a particular person

22    experiences trauma.

23         Q.   Do you see patients who are suffering from

24    stress?

25         A.   Yes.

1    Q.    What are some stressors that could be

2    impacting a patient's life?

3    A.    I mean relationships are the primary stressor.

4    Based on whether that's a work relationship, a familial

5    relationship, an internet relationship, I would say

6    that's where you can kind of hone in and get the nugget.

7    It boils down to relationship.

8    Q.    Do you have any patients who feel that they have

9    isolation feelings?

10    A.    Yes.

11    Q.    What is that feeling of isolation, if you know?

12    A.    So the feeling of isolation doesn't necessarily

13    mean being alone per se.  It is a feeling of loneliness,

14    whether that's lack of support from the community, from

15    family, from elsewhere and just that hollowness.

16    Q.    Do most people who suffer from a traumatic event

17    improve with time and treatment?

18    A.    If they are with the right therapist.

19    Q.    Do some not fully improve?

20    A.    Sure.  Of course.

21    Q.    What happens when there is not a full recovery?

22    A.    They continue to experience their symptomology

23    and stressors.

24    Q.    How might a person who doesn't fully recover

25    from a traumatic event be affected?

1            MR. MURPHY:  Objection.

2            THE COURT:  Basis?

3            MR. MURPHY:  Again we're outside the scope of

4     her treatment of Ms. Light.

5            THE COURT:  I will permit that.  I think this is

6     the context in which she has treated the plaintiff and is

7     within -- appears to be within the scope of her training

8     and education.

9     BY MR. INTERLANDI:

10           Q.   Do you need me to repeat the question?

11           A.   Yes.

12           Q.   How might a person who doesn't fully recover

13    from a traumatic event be affected?

14           A.   So their relationships may be affected, their

15    self-worth, the way they perceive themselves in different

16    spaces.  They will continue to play out trauma schemes

17    from the original harm in day-to-day.

18           Q.   Can a patient's underlying diagnosis or

19    diagnoses be made worse by a new traumatic event?

20           A.   Yes.

21           Q.   What happens to the person in that situation in

22    your experience?

23           A.   In my experience, the clients can be placed back

24    in the original event or they are still kind of holding

25    onto some elements of the original event that are in the

444

1    current situation.  So the timeline gets pretty

2    fragmented and people who have been through trauma have a

3    very difficult time being present in the here and now

4    because they are constantly in that fight flight.

5        Q.    Who was your employer before your current

6    employer?

7        A.    I worked at the Post Traumatic Stress Center

8    under Dr. David Read Johnson and Hadar Lupin.

9        Q.    How long did you work for that employer?

10       A.    About four years.

11       Q.    And did you have any employment before the Post

12   Traumatic Stress Center?

13       A.    No, that's not relevant.  I was in internships

14   but no employment.

15       Q.    So for the intake process for Jessica Light,

16   where were you working at the time?

17       A.    At the Post Traumatic Stress Center.

18       Q.    Can you take us through the treatment process of

19   a patient generally from initial exam to maybe

20   their final employment?

21       A.    Yeah.  So we were a self-paid facility.  I'm

22   speaking at the Post traumatic Stress Center.  It is a

23   self-pay facility.  Clients will call and speak with our

24   business manager who will then take a very brief intake

25   of presenting problems and will assign them to a

1    therapist who has the availability or has specific

2    expertise in what happens to be the presenting problem.

3    We meet for an hour for an intake where it is just very

4    kind of a catch-all understanding of what's going on in

5    the client's life.  Then typically it would be 45

6    minutes ongoing depending on the need of the client.

7    That would be weekly or every two weeks, twice a week.

8    If you are going to terminate therapy then ideally you

9    would address all of the issues and then they can be

10   transitioned.

11           MR. MURPHY:  Your Honor, I'm sorry.  I don't

12   mean to interject.  Could you instruct the witness to

13   slow down.

14           THE WITNESS:  I talk fast.

15           THE COURT:  You talk very fast.  Sound doesn't

16   travel that fast.

17           THE WITNESS:  Slow.

18   BY MR. INTERLANDI:

19      Q.   So when a patient completes treatment, is there

20   a final document that would be completed at that time?

21      A.   When a client completes treatment you said?

22      Q.   Yes.

23      A.   Depending, yes, there's a document that we would

24   provide that has the reason for terminating treatment.

25   Whether that's successful completion, financial reasons,

1    not being satisfied with the treatment, but it is part of

2    their chart and that would be how a chart is closed.

3        Q.   Just for myself and the jury, what do you mean

4    by "chart"?

5        A.   So the documents that we keep on a client are

6    all housed in one space at the center which is the Post

7    Traumatic Stress Center.  We kept paper documents and

8    every client had a binder so all of their information

9    would be held in one place.

10       Q.   Did you conclude an initial assessment of

11   Ms. Light?

12       A.   I did.

13       Q.   What did you talk about at that time?

14       A.   At that time, the presenting problem -- so her

15   previous therapist had retired and she was finding a new

16   therapist, was very hesitant to start treatment because

17   having to go back and explain things that you may or may

18   not have explained to a previous therapist can be very

19   daunting.

20            On that first meeting we discussed her

21   childhood, her early childhood sexual abuse, her current

22   relationships, her current employment at the time.  Just

23   a very broad brush, you know, of understanding of where

24   she was coming from.

25       Q.   Do you recall approximately the first time when

1    you saw Jessica and completed this initial document?

2        A.    It was on March 8, 2021.

3        Q.    There's a binder in front of you.  I will ask

4    you to turn to Exhibit 14.  Just let me know when you are

5    there.

6        A.    Okay.

7        Q.    Have you seen this document before today?

8        A.    I have.

9        Q.    What is this document?

10       A.    This is Jessica's FMLA paperwork.

11       Q.    Does your name appear at the top of the second

12   page?

13       A.    Yes, it does.

14       Q.    Did you enter any information into this form?

15       A.    I entered all of this information on this form.

16       Q.    Specifically, I would like to reference you to

17   the third page, page 3 of 4 at the top where it says the

18   heading Briefly Describe Other Appropriate Medical Facts

19   Related To The Conditions For Which The Employee Seeks

20   FMLA leave.  Did you write the answer that's there?

21       A.    I did.

22       Q.    What was your answer?

23       A.    Complex PTSD being triggered by hostile work

24   environment, increase in anxiety, depression, intrusive

25   thoughts, lack of sleep and difficulty concentrating.

1     Q.   What's the date that you completed this form?

2     A.   I believe it was October 19, October 20.  Signed

3  yes.

4     Q.   Look at page 4.

5     A.   Okay.

6     Q.   Was that a date that you entered?

7     A.   Yes.

8     Q.   What was the date?

9     A.   October 20, 2021.

10    Q.   Thank you.  Why did you fill out this form for

11 Ms. Light?

12    A.   Jessica had reported it not being sustainable to

13 remain at her place of employment due to fear of

14 retaliation, due to fear of being ostracized.

15    Q.   Do you have an understanding of what she felt at

16 that time she was being retaliated for?

17    A.   Yes.

18    Q.   What was your understanding?

19         THE COURT:  Sorry.  Mr. Murphy is standing.

20         MR. MURPHY:  Objection.  I think the question

21 mischaracterizes the witness's prior testimony.  The

22 witness said Ms. Light had a fear of retaliation.

23         THE COURT:  Sustained.  Would you rephrase?

24 BY MR. INTERLANDI:

25    Q.   Do you have an understanding of what Ms. Light's

1    fear of retaliation was at that time?

2       A.    She was being -- her perception was that she was

3    being mistreated by her principal, Ms. Gethings, and was

4    able to speak up about issues she was seeing within the

5    school system.  Preliminary focusing on the protocols

6    that were not necessarily being adhered to regarding

7    COVID 19.

8       Q.    Did you recall a time that Jessica had to return

9    to work?

10      A.    Yes.

11      Q.    Please turn to Exhibit 17 in your binder and let

12   me know when you are there.

13      A.    Okay.

14      Q.    Have you seen this document before today?

15      A.    I have.

16      Q.    What is this document?

17      A.    This is a document that I wrote to New Haven

18   Public Schools Human Resources Department saying that I

19   believe Jessica would be able to return to work full-time

20   assuming that appropriate safeguards were put in place.

21      Q.    Did Jessica tell you that she didn't feel safe

22   returning to work?

23      A.    Jessica was not confident that she would be

24   returning to work with proper safeguards in place so she

25   was concerned.

1    Q.    Did she tell you why she felt -- did she tell

2    you why she wasn't comfortable?

3    A.    Nothing had been done.

4    Q.    The other signature who else signed?

5    A.    This is Dr. David Read Johnson.

6    Q.    Why did he also sign off on that letter, if you

7    know?

8    A.    At the time that this was written, I was not

9    fully licensed.  I had my associate license so he signed

10   off because he's fully licensed.

11   Q.    I see next to your name there's the designation

12   MA and what does that stand for?

13   A.    A Masters of Arts.

14   Q.    Is there anything in this letter that you

15   disagree with today?

16   A.    No.

17   Q.    Sitting here today, is what you put in this

18   letter your professional opinion as to the exacerbation

19   of Ms. Light's symptomatology at this time?

20   A.    Yes.

21   Q.    Do you recall the time frame when you drafted

22   this letter?

23   A.    January of 2022.

24   Q.    What was Jessica's exacerbated symptomatology at

25   the time you wrote this letter?

1    A.    Increase in anxiety, difficulty concentrating,

2  intrusive thoughts, nightmares, difficulty sleeping.  A

3  number of additional posttraumatic stress symptoms.

4    Q.    Did Jessica's exacerbated symptomatology

5  continue after this letter?

6    A.    Yes.

7    Q.    Do you have an opinion as to why it continued?

8    A.    She remained in what she perceived as a hostile

9  work environment.

10    Q.    As relates to your continued treatment of

11  Jessica after this letter, do you have any opinion as to

12  the cause of Jessica's exacerbated symptomatology?

13    A.    Yes.  Her experience of her workplace being

14  hostile.

15    Q.    At any point during your treatment of Jessica,

16  did you tell her it was okay for you -- for her to send

17  you text messages or emails?

18    A.    Yes.

19    Q.    Why did you tell her that it was okay to do

20  that?

21    A.    Oftentimes with my clients I will say that they

22  can email primarily if they need space to kind of express

23  something in between sessions because I don't work 24-7

24  and that's somewhat of a journal for people.  Text

25  messages are primarily reserved for scheduling or if you

1    need immediate response from me which still could not be

2    the case.

3        Q.    Did there come a point in time in your treatment

4    of Jessica that she began to text message or email you?

5        A.    Yes.

6        Q.    And did there come a point in time when

7    the --withdrawn?

8            What was the frequency of the messages that you

9    received from Jessica in the early part of your treatment

10   from March 2021 to let's say August of 2021?

11       A.    Infrequent.  I would say primarily scheduling.

12       Q.    How about after that point around the time that

13   you wrote the FMLA certification that we talked about

14   earlier, did the frequency increase?

15       A.    I would say so, yes.

16       Q.    Do you have an understanding of why the

17   frequency of the messages increased?

18       A.    Yes.  Jessica was struggling greatly at the time

19   and was expressing her anxiety, her depression, her

20   whatever she was experiencing.

21       Q.    Did you charge Jessica?  Was Jessica charged for

22   the emails or text messages that she sent to you?

23       A.    No.

24       Q.    Do you think Jessica was emailing and texting

25   you because that was free?

1    A.    No.

2    Q.    Why do you think she was texting and emailing

3    you more frequently after August of 2021?

4    A.    Because she needed an outlet to express all of

5    the things she was experiencing, and I was unable to

6    provide that within the 45 minutes or hour that we were

7    currently meeting for.

8    Q.    At the time, what was the frequency of your

9    meeting?

10    A.    Early on we were meeting weekly for 45 minutes.

11    After that October 2021 time, we were meeting an hour

12    long.  Then in November of 2021, it increased to twice a

13    week for an hour.

14    Q.    How many times a week do you see Jessica today?

15    A.    I see Jessica twice a week in anticipation for

16    this.

17    Q.    Please turn to Exhibit 29 in the binder in front

18    of you.  Let me know when you are there.

19    A.    Okay.

20    Q.    You are there?

21    A.    Yes.

22    Q.    Let's focus on the first two pages and have you

23    seen this document before today?

24    A.    I have.

25    Q.    What is this document?

1      A.    This is Jessica's transaction ledger from the

2    Post Traumatic Stress Center.

3      Q.    And the column of dates on the left, what are

4    those dates representing?

5      A.    The dates that she was seen by me.

6      Q.    The PTSD Center does that entity accept health

7    insurance as a form of payment?

8      A.    No.

9      Q.    How do patients pay?

10     A.    It is a self-pay facility.

11     Q.    And the number at the bottom, if we look at that

12   number on the bottom of the first and second page, is

13   that total amount for the services from March 8, 2021

14   through May 2, 2022?

15     A.    Yes.

16     Q.    What is the total?

17     A.    $12,075.

18     Q.    If we skip ahead, I want to get to another

19   document here.  I'm sorry.  I want to find that number.

20   The next pages in this exhibit, Exhibit 29, is another

21   transaction ledger.  Do you see that?

22     A.    Yes.

23     Q.    And is there -- does this go through -- this

24   shows additional dates of service; is that right?

25     A.    Correct.

1    Q.   What does this document go through?

2    A.   This seems to be a full document from the

3  beginning of her treatment on March 8, 2021 and goes

4  until November 30 of 2022.

5    Q.   Are there any other documents in that Exhibit 29

6  in front of you?

7    A.   Yes.  Give me one moment.  There's another what

8  looks to be ledger.

9    Q.   Can you go to the end of that page and let me

10  know what the total amount billed to Ms. Light was?

11    A.   Because Jessica's balance was fully paid.

12  Sorry.  There we go.  $3,000.

13    Q.   What was the last date of service listed on that

14  document?

15    A.   The late date of service on this document is

16  June 14, 2024.

17    Q.   Are there any other documents in that exhibit in

18  front of you?

19    A.   Yes.

20    Q.   What are those documents?

21    A.   This is my statement from my private practice

22  that's categorizing the visits that Jessica has seen me.

23    Q.   What do you charge Jessica for each visit?

24    A.   $200 an hour.

25    Q.   Has Jessica paid you for the visits that she's

 1    attended with you?

 2        A.   Yes.

 3        Q.   Let me get to the document.  It is not in my

 4    binder.  So please give me a minute.  In the progress

 5    notes that you have, that you have completed in the past

 6    for Jessica, they are in the Defendant's Exhibit binder.

 7    Your Honor, may I approach?

 8             THE COURT:  You may.

 9    BY MR. INTERLANDI:

10        Q.   Are you at Exhibit R?

11        A.   I am.

12        Q.   I had a question at the top of the second page.

13        A.   Yes.

14        Q.   There's a line across and it starts with DYS.

15    Do you see that?

16        A.   I do.

17        Q.   What's that stand for?

18        A.   Dysfunction.

19        Q.   And there are certain words that follow that

20    line.  Can you tell the jury what those words mean?

21        A.   Cognition, mood, work relationships and ADLS

22    which is daily living, being able to properly care for

23    yourself, bathe and feed yourself, et cetera.

24             MR. MURPHY:  Your Honor, can I ask for a bates

25    number?

1          MR. INTERLANDI:  The second page of Exhibit 268,

2     Light 268.

3          MR. MURPHY:  Thank you.

4     BY MR. INTERLANDI:

5     Q.   And then if you go to 272 in that document at

6     the bottom in the right hand corner is 00272.  The date

7     is July 14, 2021.  Do you see that?

8     A.   I do.

9     Q.   Above the line that says DYS.  It says overall

10    severity.  Do you see that?

11    A.   Yes.

12    Q.   What does that mean?

13    A.   My perception of how a client's symptoms are

14    impacting their day-to-day life.  So there are three

15    options mild, moderate, and severe.

16    Q.   What does mild mean?

17    A.   Mild is that it is less than their baseline in

18    my opinion and they are able to function with a bit more

19    breath.

20    Q.   What about moderate?

21    A.   Moderate I would consider to be their baseline

22    of interference.

23    Q.   And how about severe?

24    A.   When it becomes either unmanageable or greatly

25    significantly impacting their ability to exist day to

1    day.

2         Q.    During your treatment of Jessica, did the

3    overall severity stay the same or did it change?

4         A.    It varied.  It definitely was moderate for a

5    good chunk, but she did go to severe on a few occasions.

6         Q.    Do you have an opinion as to why it changed?

7         A.    Yes.  So primarily, it was her experience of

8    either what was happening in the school when she was

9    there.  This specific time I'm seeing is July 21, 2021.

10        Q.    Is that in the middle of the page?

11        A.    It is.  I have marked severe.  She had suicidal

12   ideations as well.  If memory serves, that was during the

13   time that it was being determined whether or not Jessica

14   was going to be moved from third grade to first grade at

15   Hooker.

16        Q.    For the line that we have been talking about,

17   which are the words there were checked off?

18        A.    Cognition, mood, work and relationship.

19             MR. INTERLANDI:  Thank you, Ms. Ventura.  I do

20   not have any further questions for you.

21             THE COURT:  Cross-examination.

22   CROSS-EXAMINATION BY MR. MURPHY:

23        Q.    Good morning, Ms. Ventura.

24        A.    Good morning, Mr. Murphy.

25        Q.    I will jump to a few points that you raised on

 1    your direct examination.  First off, I want to talk about

 2    how you charge for your clients.  Okay?

 3         A.    Mm-hmm.

 4         Q.    You at the Post Traumatic Center did not take

 5    insurance?

 6         A.    Correct.

 7         Q.    So you charged Ms. Light by the hour?

 8         A.    Yes.

 9         Q.    Is that still the same currently?

10         A.    It is the same for Jessica.  I do accept Husky.

11         Q.    You charge your clients because they are taking

12    up your time, right?

13         A.    Yes.

14         Q.    You are providing a service during that time?

15         A.    During that time, yes.

16         Q.    You are providing advice to them?

17         A.    I don't know if I would categorize it as advice.

18    They are to live their lives.  They use me as a sounding

19    board, but I'm not giving them advice.

20         Q.    You are a therapist.  You are providing some

21    therapy in the session?

22         A.    Yes.

23         Q.    Your rate is based -- what is your rate based

24    on?

25         A.    My rate was set at the Post Trauma Stress Center

1    based on my credentials and based on my experience.

2    Because Jessica has been with me throughout, I did not

3    change her rate.  I also have a goal to keep it somewhat

4    accessible to other people.

5    Q.    What's the rate you charge to Ms. Light?

6    A.    $150 for 45 or $200 for an hour.

7    Q.    If a new client came in, what would the rate be?

8    A.    $150 for 45 minutes or $200 for an hour.

9    Q.    Are you charging Ms. Light today to be here?

10    A.    I have an appearance fee, yes.

11    Q.    What is your appearance fee?

12    A.    $225.

13    Q.    Per hour?

14    A.    Correct.

15    Q.    You said you engage in some email communication

16    with Ms. Light, right?

17    A.    Correct.

18    Q.    Frequent and regular email communication?

19    A.    She frequently emailed.

20    Q.    She emails more than other clients, correct?

21    A.    She is on the higher end, yes.

22    Q.    When she emails you, she's providing information

23    related to her mental status, right?

24    A.    Correct.

25    Q.    The issue she's going through at the time and

461

1    needs to relay to you as her therapist?

2        A.    Mm-hmm.

3        Q.    Do you respond to those emails?

4        A.    Sometimes.

5        Q.    And provide guidance?

6        A.    More of a reminder of things we discussed

7    previously if I respond, yes.

8        Q.    If she raises an issue, you know, I'm struggling

9    with this today and you are seeing her tomorrow, do you

10   then address that in her session with you?

11       A.    Yes.

12       Q.    Okay.  And when you do respond to her emails, do

13   you charge her for that?

14       A.    No.

15       Q.    Why not?

16       A.    Because that's something that I do on my own

17   time.

18       Q.    You mentioned a little bit about your background

19   earlier.  When you first started seeing Ms. Light, it was

20   in April of 2021?

21       A.    March.

22       Q.    March.  You were an intern at the time?

23       A.    Yes.

24       Q.    You were in graduate school?

25       A.    Yes.

1    Q.    Not a fully licensed therapist?

2    A.    Right.

3    Q.    When you're -- when someone presents to you like

4    Ms. Light and they you ask them to describe -- withdrawn.

5          When Ms. Light appears for her weekly session,

6    how does it start out?

7    A.    Each session is different with Ms. Light.  She

8    has a hard time starting so I often will have to ask how

9    the week has been or pick up where we left off.

10    Q.    Is it your expectation or your experience that

11    your patients will then relate stressors they are feeling

12    at the time?

13    A.    Yes.

14    Q.    The events that are causing them stress?

15    A.    Yes.

16    Q.    Do you accept what they tell you to be true

17    meaning if I say I had a flat tire today that really

18    threw me off, do you accept that to be true that I had a

19    flat tire?

20    A.    I would.

21    Q.    You don't do any investigation to determine

22    whether or not I had a flat tire?

23    A.    No.

24    Q.    You never did any investigation into Ms. Light's

25    alleged stressors, right?

1      A.    No.

2      Q.    Obviously, we'll talk a little bit further about

3   this but during the course of your treatment of Ms.

4   Light, did you speak with anyone from Worthington Hooker

5   School?

6      A.    No.

7      Q.    Did you review any records from the Worthington

8   Hooker School?

9      A.    No.

10     Q.    You are not an educator, right?

11     A.    I am not.  I was employed in the New Haven

12  Public School System but not at Worthington Hooker

13  School.

14     Q.    You mentioned in response to some questions your

15  FMLA form that you completed for Ms. Light?

16     A.    Right.

17     Q.    The date was October 20, 2021?

18     A.    Correct.

19     Q.    The typical year starts on September 1?

20     A.    Thereabouts.

21     Q.    And when you filled out that form, do you

22  know -- do you have any factual knowledge about what was

23  occurring between September 1 of that school year and

24  October 20 of that school year?

25     A.    The information I have during that time is what

1    was reported to me by Ms. Light.  I did not do any

2    additional research.

3         Q.   At the time you mentioned that Ms. Light was

4    fearful of retaliation, right?

5         A.   She had been experiencing retaliation and there

6    was fear of continued retaliation.

7         Q.   Your testimony earlier she was fearful of

8    retaliation at the time?

9         A.   Correct, of continued.

10        Q.   And she was fearful of being excluded I think is

11   your testimony?

12        A.   Ostracized.

13        Q.   Do you know -- withdrawn.

14             Ms. Light -- withdrawn.

15             Also Attorney Interlandi showed you a copy of

16   your letter that you submitted in January of 2022?

17        A.   Correct.

18        Q.   You said she should return with appropriate

19   safeguards in place?

20        A.   Yes.

21        Q.   In that letter, you did not provide the school

22   system with any specifics of safeguards; is that right?

23        A.   That's correct.  I'm happy to tell you why.

24        Q.   At the time you had Dr. Johnson sign the letter,

25   right?

 1    A.   Yes.

 2    Q.   When you met with Ms. Light prior to January of

 3  2022, it was normally just you and Ms. Light, correct?

 4    A.   Yes.  No one entered our sessions.

 5    Q.   Dr. Johnson never attended any of those

 6  sessions?

 7    A.   Correct.

 8         MR. MURPHY: Your Honor, I would like to offer a

 9  new exhibit.  The one we discussed previously.

10         THE COURT:  Do we have an electronic copy?

11         MS. McCALLUM:  Yes.

12         MR. MURPHY:  Your Honor, I have a brief question

13  about redactions.  Could I request a brief sidebar?

14         THE COURT:  You said you have an additional

15  exhibit.  This is an additional Exhibit R.  What are you

16  marking it as?

17         MR. MURPHY:  Whatever your next one Z.

18         THE COURT:  We're on Y. The description.

19         MR. MURPHY:  Ms. Light's intake form for Ms.

20  Ventura that she testified on her direct.

21         THE COURT:  You have that available

22  electronically?

23         MR. MURPHY:  I do.

24         THE COURT:  You will give a copy.  She'll be

25  able to see electronically.  Some of the portions of this

1    have been redacted blacked out and obviously that's not

2    part of what you are to consider.

3        MR. MURPHY:  I have a brief question about the

4    scope of redactions.  I thought maybe a sidebar.

5        (Beginning of sidebar.)

6        MR. MURPHY:  I propose this.  I propose this if

7    Tony is more comfortable.  I don't want to run afoul of

8    your order, though.

9        THE COURT:  We had earlier narrowed the

10   plaintiff's medical records to child sexual abuse, murder

11   of father, other family trauma.  I think the defendant's

12   failure to redact all of these details of her childhood,

13   the nature of self-inflicted bruising, et cetera, should

14   be excluded under that order.  The relevance of these

15   prior medical records is the existence of PTSD, its

16   severity and its retriggering or lighting up under the

17   condition the plaintiff found herself in.  I think we

18   should use the plaintiff's.

19       MR. MURPHY:  They are both mine.  I made two.  I

20   wasn't sure how Your Honor will feel.

21       The fully redacted one.

22       THE COURT:  The fully redacted one would

23   be appropriate.

24       (End of sidebar.)

25   BY MR. MURPHY:

1    Q.   Ms. Ventura, thank you for your patience.  I

2    will show you what we marked as Defendant's Exhibit Y.

3    There's no objection to Exhibit Y?

4              MR. INTERLANDI:  No objection.

5              MR. MURPHY:  So I move that in Defendant's

6    Exhibit Y.

7    A.   This is an intake that I wrote out on March 8 of

8    2021 for Jessica.

9    BY MR. MURPHY:

10   Q.   And you wrote that out, as you say, March 8 of

11   2021?

12   A.   Correct.

13             MR. MURPHY:  You will see -- with that, I move

14   Exhibit Y into evidence.

15             THE COURT:  Y is a full exhibit as redacted

16   without opposition.

17   BY MR. MURPHY:

18   Q.   Ms. Ventura, we have redacted information

19   regarding Ms. Light's childhood, okay, from this exhibit?

20   A.   Yes.

21   Q.   Would you agree with me that that is the large

22   majority of your intake form?

23   A.   Correct.

24   Q.   That the only mention of her work is just that

25   she's a third grade teacher?

1    A.    Her current employment, yes.

2    Q.    Now, I would like to you ask a few more

3    questions about Exhibit R as well what you reviewed

4    briefly with Attorney Interlandi.  Okay.  So this is

5    Exhibit R.  The first page that I don't think you

6    reviewed is a list?

7    A.    Shorthand.

8    Q.    These are abbreviations you used to make your

9    medical records?

10   A.    Yes.

11   Q.    If we go to the next page.  Attorney Interlandi

12   asked you a few questions about your initial medical

13   record with Ms. Light that's located on page Light 268,

14   correct?

15   A.    Yes.

16   Q.    So the entry 3-8-21 is at the top of page?

17   A.    Yes.

18   Q.    You read off some categories to the jury and

19   Attorney Interlandi and those categories were where?

20   A.    Those categories were where?

21   Q.    I will withdraw.  About four lines down on the

22   left-hand side there's a DYS?

23   A.    Yes, dysfunction.

24   Q.    That's what you were referring to before when

25   you were testifying?

1       A.    Yes.

2       Q.    Okay.  When we look at that entry for 3-8-21,

3   you check a few boxes and you circle some things,

4   correct?

5       A.    Correct.

6       Q.    You write down what medication she's on?

7       A.    Yes.

8       Q.    That's a record to you because you can't

9   prescribe medication?

10      A.    That's correct.

11      Q.    We'll go through the records.  Anything about

12  medication is a result of her treatment with someone

13  else?

14      A.    Yes.

15      Q.    You said before someone comes to you and tells

16  you about their stressors in life and that's what you

17  discuss in their session, right?

18      A.    Un-huh.

19          The COURT:  The answer is no?

20          THE WITNESS:  Yes.

21          MR. MURPHY:  I got going a little quick.

22          THE COURT:  We'll get both of you if you slowed

23  down.

24  BY MR. MURPHY:

25      Q.    In this note here, is there any indications to

1    what specific stressors you discuss with Ms. Light on

2    March 8, 2021?

3        A.    No.

4        Q.    So earlier when you testified about a note from

5    7-20-21, four months later, you said if memory serves,

6    this is what we were discussing?

7        A.    Yes.

8        Q.    When you sit here today and look at your medical

9    records, you wouldn't be able to determine what you

10   discussed on 7-21-21, correct?

11       A.    Yes, that's intentional.

12            MR. MURPHY:  Your Honor, at this time given Ms.

13   Light's prior testimony and Ms. Ventura's testimony

14   today, I would like to move to have the emails between

15   the parties be admitted as an exhibit.  We would be on Z.

16   I previously provided Attorney Interlandi with a packet

17   of emails and I'm happy to show to the witness.

18            THE COURT:  Attorney Interlandi, what's your

19   position understanding that these have been I guess

20   essentially culled from Ms. Ventura's overall record.  Is

21   that correct?  In other words, we have the medical record

22   as part and then the emails between the therapist and

23   patient separately.

24            MR. INTERLANDI:  They have been separated out.

25            THE COURT:  The separated out part is Z

471

1    proposed.  Any objection?

2            MR. INTERLANDI:  My objection is that I don't

3    believe the witness has testified or provided any

4    testimony as to those emails or text messages.

5            THE COURT:  Why don't you lay a foundation with

6    the witness.

7            MR. MURPHY:  Sure.

8            THE COURT:  Show her Exhibit Z.

9            MR. MURPHY:  May I approach?

10           THE COURT:  Yes.

11   BY MR. MURPHY:

12       Q.   Now Ms. Ventura, I handed you a stack of

13   documents.  I will remind you those are emails provided

14   to us by Ms. Light and her attorney.  Okay?

15       A.   Yes.

16       Q.   I will give you a second to look at the first

17   page and flip through.  I don't want you to flip through

18   the whole thing.  Look at the first page.  I will have

19   some questions for you about it.

20       A.   Go ahead.  I'm dyslexic.

21       Q.   I will give you another second.  The first page

22   is an email between you and Ms. Light, right?

23       A.   Yes.

24       Q.   There's an example of one of the emails that you

25   referenced before that you exchange with Ms. Light on a

1    frequent basis?

2        A.    Correct.

3        Q.    But do you see on the bottom right-hand corner,

4    there's a Bates number.  If I can have you flip to page

5    330.

6        A.    Yes.

7        Q.    Do you see that?  There's another email.  This

8    is one example.  This is an email exchange between you

9    and Ms. Light on April 20, 2022, correct?

10       A.    Yes.

11       Q.    And if we start at the bottom of that first

12   page, she emails you on a Sunday?

13       A.    I will take your word that's Sunday.

14       Q.    Says Sunday, January 6.  At the bottom, it

15   starts with an email from Ms. Light to someone else who

16   was redacted on a January 6, 2019.

17       A.    Correct.

18       Q.    She forwards that to you on April 20, 2022,

19   right?

20       A.    Yes.

21       Q.    Then she emails you again about 15 minutes

22   later, correct?

23       A.    Yes.

24       Q.    And then again at 4:37 about another 15 minutes

25   later, right?

1    A.    Correct.

2    Q.    You respond that same day?

3    A.    I do.

4    Q.    She responds again at 6:30, 6:35, right?

5    A.    Yes.

6    Q.    You respond at 6:55?

7    A.    Yes.

8    Q.    So this is an example of one of the email

9    exchanges you are having with Ms. Light during your

10   treatment of her, correct?

11   A.    During a heightened time, yes.

12   Q.    As you sit here today, do you remember this

13   specific email exchange and the email she forwarded?

14   A.    I do.

15   Q.    Why do you remember that?

16   A.    I have a very good memory.  I know this specific

17   email has caused her stress and come up multiple

18   times within our therapy.

19   Q.    Multiple times and so the email she forwarded to

20   you that causes her stress and you have discussed a

21   multitude times is from 2019?

22   A.    That's correct.

23   Q.    That's before you started treating with her?

24   A.    Yes, that is correct.

25   Q.    You will agree with me that on the next page, if

1    I can have you flip to page 331.

2        A.    Mm-hmm.

3        Q.    Again significant redactions because of our

4    understanding with the Court.  There's one sentence that

5    I didn't redact.

6        A.    Correct.

7        Q.    What does that say?

8        A.    I haven't seen amounts of emotional baggage and

9    I'm the person I wanted to be.  I continue to address my

10   issues through therapy and I continue to grow.

11       Q.    All right.  If I could have you flip to page 374

12   right now.

13       A.    Okay.

14       Q.    What do you see on page 374?

15       A.    This is an email that Jessica sent to me that I

16   then responded to from April 22, 2022.

17       Q.    She wrote you at 5:52 a.m.

18       A.    Correct.

19       Q.    You respond at 6:57 a.m., right?

20       A.    Yes.

21       Q.    Can you just read us your response please?

22       A.    Everyone else who was supposed to be there for

23   you abandoned you, so I understand why you are afraid I

24   will do the same.  These anxieties and fears are all

25   rational.  You have been hurt by so many people past and

1    present and your overwhelm is justified.

2    Q.   Then you respond by saying thank you, received,

3    we'll talk about that tomorrow.  You were providing her

4    some feedback, right?

5    A.   Yes.

6        MR. MURPHY:  Based on Ms. Ventura's responses

7    and Ms. Light's testimony of emails contained in that

8    packet, I would move the whole thing in as Exhibit Z.

9        THE COURT:  Hearing no objection, it is a full

10   exhibit as redacted.

11   BY MR. MURPHY:

12   Q.   Can we go back to Exhibit R please.  Is it true

13   during your treatment of Ms. Light, that you discussed

14   the impact this case has had on her marriage?

15   A.   Yes.

16   Q.   At points you discussed how this case has

17   consumed her?

18   A.   Yes.

19   Q.   As you sit here today, you have a good memory?

20   A.   That's what I like to believe, yes.

21   Q.   As you sit here today, are there other family

22   events that you have discussed with her that are

23   impacting her emotional state?  I want to be careful I'm

24   not asking about her childhood.  I'm asking about since

25   you have been treating her since 2021 to the present, are

1    there other issues besides Worthington Hooker and besides

2    her childhood that you discussed that have an impact on

3    her emotional state?

4        A.   Yes.

5        Q.   Is there anything specifically as you sit here

6    that you recall?

7        A.   The impact that Worthington Hooker School and

8    her past trauma has on her current relationships whether

9    that's with her husband, whether that's with her family,

10   her community.

11       Q.   And have there been specific incidents between

12   her and her husband that you addressed that have caused

13   her significant emotional distress?

14       A.   Yes.

15       Q.   Those are actions by her husband towards her?

16       A.   Yes.  Or lack thereof.

17           MR. MURPHY:  With that, Your Honor, I don't have

18   any other questions.

19           THE COURT:  All right.  Redirect.

20           MR. INTERLANDI:  Yes, Your Honor.

21   REDIRECT EXAMINATION BY MR. INTERLANDI:

22       Q.   Hello again.  I few follow-up questions for you,

23   Ms. Ventura.

24           In part of your education and training, were you

25   ever trained to do your own independent investigation

1    after the patient told you about an event or something

2    that happened to him or her?

3        A.    No.  That's out of my scope.

4        Q.    You mentioned that you had previously worked for

5    the New Haven Public School System I believe.  Is that

6    what you said?

7        A.    Yes.

8        Q.    What did you do for the New Haven Public

9    Schools?

10       A.    As part of a post trauma stress interest,

11   there's an arm that we went to specific schools within

12   the New Haven Public School System, some in New Britain

13   and North Haven where we brought the Miss Kendra Program

14   which was a proactive SEL program for kindergarten

15   through twelfth grade.

16            THE COURT:  Can we get some definition of what

17   SEL means?

18            THE WITNESS:  Social Emotional Learning for SEL.

19   BY MR. INTERLANDI:

20       Q.    You were asked about the January 22 letter.

21   Attorney Murphy asked you why there aren't any safety

22   guards listed in the letter.  Do you recall that?

23       A.    I do.

24       Q.    Do you know why?

25       A.    Yes.

1      Q.   Why weren't there any?

2      A.   Pardon me.  That is not in my scope.  Those were

3   safeguards that were being discussed between the human

4   resource of NHPS and the various unions to my

5   recollection.

6      Q.   How long was that initial assessment you did for

7   Jessica on March 8, 2021?

8      A.   One hour.

9      Q.   Is everything that you talked about is that

10  contained in the one-page document you were shown in

11  Exhibit Y?

12     A.   No.

13     Q.   Did you discuss things other than what's listed

14  in that document?

15     A.   Yes.  That's a very brief summary of what was

16  discussed.

17     Q.   For the dysfunction line that we have been

18  talking about, the REL is for relations?

19     A.   It says relation, yes.

20     Q.   So what is that really?  What does that mean?

21  Is it familial relations, anything?

22     A.   Any type of relationship.  Like I had stated

23  previously, a lot of trauma is embedded in relationship

24  either to do harm or lack of rescue so in that dynamic,

25  any type of relationship whether it be friendship,

1    intimate, proximate, familial.

2        Q.   How about co-workers?

3        A.   Yeah, of course.

4        Q.   So if you checked off work, what would that mean

5    specifically then?

6        A.   On the instances that I checked off work, it was

7    when Jessica's experience of her job was causing her

8    significant distress.

9        Q.   Give me one minute.  During the initial

10   assessment or initial intake, did Jessica discuss with

11   you why she had been looking for a new therapist, someone

12   to do therapy with?

13       A.   Yes.

14       Q.   Why?

15       A.   Her previous therapist had retired.

16       Q.   At that time, did the PTSD Center have a lot of

17   openings for patients or was it difficult to get an

18   appointment with you or someone else?

19       A.   I can only speak to my own availability, but I

20   did have availability to accept new clients at that time.

21            MR. INTERLANDI:  I don't have any further

22   questions for you.  Thank you.

23            THE COURT:  Anything further?

24            Ms. Ventura, you are excused.  Please call your

25   next witness.

1    MR. INTERLANDI:  Your Honor, our next witness is

2    Dr. Gale Levin.  She is not here yet.  If we're able to

3    take the break, we can let her know she's needed.  She

4    lives in New Haven.  She can be here shortly.

5    THE COURT:  Shortly means really shortly.

6    MR. INTERLANDI:  Within 20 to 30 minutes, Your

7    Honor.

8    THE COURT:  Tell her to hurry.  We'll take a

9    slightly earlier than scheduled break and it might

10   continue slightly longer than we anticipated.  But we'll

11   do that now.

12   (In the absence of the jury at 10:18 a.m.)

13   THE COURT:  All right.  You are texting your

14   next witness and she is on her way.

15   MR. INTERLANDI:  We're calling her now.

16   THE COURT:  Thank you.  We'll stand in recess.

17   (Whereupon, a recess was taken from 10:19 a.m.

18   to 10:52 a.m.)

19   THE COURT:  All right.  We're ready to proceed,

20   counsel?

21   MR. INTERLANDI:  Yes, Your Honor.

22   THE COURT:  Where is our next witness?

23   MR. INTERLANDI:  She's right here.

24   THE COURT:  Would you like to come up and sit

25   there and we'll bring the jury back.  You will then

 1    stand, be sworn and then give your testimony.  All right.

 2    Thank you.

 3         Counsel, while we're waiting for the jury, I

 4    propose your responses to the draft charge and verdict

 5    form will be submitted by 6 but no later than 8 and

 6    responses, if any, as soon as you can and I will be --

 7    you should text them or email them to Mr. Parker who will

 8    send them onto me and we will work as we can tonight.

 9         MR. MURPHY:  Perfect.  Thank you, Your Honor.

10         THE COURT:  If you have light hands that are

11    working behind the scenes, get going.  Okay.  Please be

12    seated.

13         (In the presence of the jury at 10:54 a.m.)

14         THE COURT:  Counsel, jurors, please be seated.

15    We have on the stand ready to testify Dr. Gale Levin.

16    Would you kindly stand and raise your right hand?

17                        GALE LEVIN

18    Having been called as a witness, was first duly affirmed

19         and testified on his/her oath as follows:

20         THE WITNESS:  I affirm.

21         THE CLERK:  State your name?

22         THE WITNESS:  Gale Levin, G-a-l-e L-e-v-i-n.

23         THE CLERK:  City and state of employment.

24         THE WITNESS:  I'm self-employed as a

25    psychiatrist in New Haven, Connecticut.

1           THE COURT:  You may be seated.  Attorney

2    Interlandi, you may proceed.

3    DIRECT EXAMINATION BY MR. INTERLANDI:

4       Q.    Good morning, Dr. Levin.

5       A.    Good morning.

6       Q.    What's the name of your practice?

7       A.    Levin Psychiatric.

8       Q.    Can you please tell the jury what education you

9    needed to become a psychiatrist?

10      A.    I finished college at Drake University and then

11   I did four years of medical school at Rush Medical

12   College in Chicago and four years of residency.

13      Q.    Where did you do your residency?

14      A.    First year was in Chicago.  Then I got married

15   and marriage came to UConn.

16      Q.    What type of training did you go through before

17   you were able to become a psychiatrist?

18      A.    Basically you do rotations through inpatient,

19   outpatient, intensive outpatient programs so you get

20   experience with all sort of different patients.

21      Q.    Did you do that in Chicago and in Connecticut?

22      A.    Chicago also had I think four months of internal

23   medicine then go straight to psychiatry.

24      Q.    What types of classes do you have to take to

25   become a psychiatrist?

1    A.    The classes basically were, you know, you have

2    to do medical school.  Those are the same for everybody.

3    Physiology, anatomy and dissecting bodies and then as you

4    get your residency, there's lectures and you are doing

5    clinical hands-on experience.

6    Q.    Did you do any specialized training or any

7    certificates specific to psychiatry?

8    A.    I did not subspecialize like pediatrics.

9    Straight psychiatry then continuing medical education

10    afterwards.

11    Q.    Currently, how many patients do you see on a

12    daily basis?

13    A.    So I have been practicing about 38 years and now

14    I have cut down a bit, so I work halftime and so I see

15    about 20 clinical hours a week.

16    Q.    Currently?

17    A.    Yes.

18    Q.    Take me through your work history, where did you

19    first start working after your residency?

20    A.    Yeah.  So after my residency, I was at Hartford

21    Community Mental Health Center.  Also the mother of six

22    kids, so I was working part-time at that time.

23        From there, I went to Mid-state Medical Center

24    and we did inpatient and outpatient work there.  They

25    were merging and merges are good times to leave and from

1    there, I went to Winnick Group which is a very busy

2    psychiatric practice in Fairfield and Trumbull.  I was

3    there about 20 years, then I did my own.

4        Q.    Then you decided to open up your own practice?

5        A.    Yes.

6        Q.    Where was that practice located?

7        A.    Out of my home which is New Haven.  Then around

8    COVID time, we went I would say almost 100 percent

9    virtual.

10       Q.    What does that mean when you see patients

11   virtually?

12       A.    We're talking through a HIPAA-compliant platform

13   on the computer and thankfully for psychiatry that works

14   fine.  We don't have to do much physical exam.  Like the

15   patient in the room.  For most people, it works well.

16       Q.    How long are the virtual sessions?

17       A.    How long?

18       Q.    Yes.

19       A.    Basically I set up my practice where I do half

20   hour sessions.  A new intake would be an hour.  That's

21   one of the reasons I left the group.  The trend is very

22   short visits for medication follow up and I felt it

23   wasn't enough so I do half an hour with each patient.

24       Q.    When you see patients, do some of them have a

25   history of prior traumatic events?

485

1       A.    Yes, definitely.

2       Q.    How often do you see those type of patients in

3   your practice?

4       A.    I don't know that I have a number.  They are not

5   necessarily coming in for that.  But trauma is pretty

6   prevalent.  I don't have a number.  A lot of people have

7   past traumas.

8       Q.    Any patients that you have had talk to you about

9   any work conflicts?

10      A.    Yeah.  That comes up often.

11      Q.    How often does that come up?

12      A.    Somebody can have a tiff with their boss or feel

13  they are being harassed so.

14      Q.    Do you have an understanding of what a

15  post-traumatic stress disorder is?

16      A.    Yes.

17      Q.    What is your understanding?

18      A.    Basically there's been exposure to a pretty

19  traumatic event that was witnessed or you were a victim

20  of that.  There's a psychology down the line that affects

21  a person in terms of their emotional well-being having

22  nightmares or flashbacks or difficult time sometimes with

23  interpersonal relationships or irritability.  Triggered

24  by things that may remind you of the event, things like

25  that.

1    Q.    In the thirty-minute sessions that you have with

2    your patients, what are you typically discussing with

3    them?

4    A.    So basically I want to go.  I'm mainly focusing

5    on medication specific things.  I want to go through

6    symptoms.  That's primary things like sleep, appetite,

7    memory, concentration, depression.  Answers to all those

8    type of things.  I'm asking a patient what's going on in

9    your life.  How are these things impacting you.  I do

10   review of symptoms medical and impact psychiatrically and

11   vice versa.  What stressors are going on.  That is pretty

12   much it.  Then we talk about obviously we'll do in

13   terms of medication.

14   Q.    Can you tell the jury about that piece of it?

15   The medicine management or medication management.  How

16   does that work?

17   A.    Basically I try to have a collaborative

18   approach.  Unless somebody is doing something that's not

19   a good idea, I try to work with what the patient is

20   willing to do.  People can trudge through life with all

21   sorts of different things and not necessarily want to get

22   treated for it and I try to be respectful unless it's a

23   really bad idea.

24        Basically we'll talk about the symptoms and

25   discuss how is that for you, how is that impacting your

1    life, where do you want to go with this.  Usually if

2    people have significant symptoms of depression, anxiety,

3    sleep issues, I will tell them their medication options.

4    We'll try to come up with something that's agreeable and

5    medically to both.

6         MR. MURPHY:  Your Honor, can you ask the witness

7    to slow down.

8         THE COURT:  We seem to have speed witnesses

9    today.  It is the impact of the Olympics.  If you can

10   slow down.  These people are trying to follow you as is

11   the court reporter and the lawyers.  Go ahead.

12   BY MR. INTERLANDI:

13       Q.   Do most people who have suffered a traumatic

14   event improve with time and medication in your experience

15   as a psychiatrist?

16       A.   Yes.  People can improve especially if they are

17   working on it.  There's no specific medication that's --

18   that is a treatment say for PTSD.  You would be treating

19   symptoms more and the -- there's a lot of therapy work

20   that would need to be done to deal with the trauma and

21   different techniques that the therapist might use for

22   that.

23       Q.   What would be some of the symptoms that would be

24   related to the PTSD?

25       A.   So again there's -- there could be PTSD.  There

488

1    can also be secondary depression or anxiety as a result

2    of that.  The treatments would be pretty much the same so

3    if a person has PTSD and that is impacting on their life

4    and causes depression or anxiety, there's a lot of

5    different meds one can use.  First line medline is an

6    SSRI, Prozac and that type of family that can help mood

7    and anxiety and some of the symptoms.

8        Q.    What is an SSRI?

9        A.    That stands for Selective Serotonin Reuptake

10   Inhibitor.

11       Q.    Thank you.

12       A.    That cleared it up, right?

13       Q.    Sort of.  So do some patients not fully recover

14   in your experience?

15       A.    Yeah.  I think there's -- again recovery is a

16   funny word because people can have long stretches of time

17   without any problem.  Maybe a trigger or something that

18   might bring up the past event or have some sort of

19   relationship in their mind to that past event and bring

20   symptoms up again.

21       Q.    In your practice, do you require your patients

22   do blood work or anything like that to prescribe them

23   medications?

24       A.    The medicines I just mentioned typically I don't

25   require lab work.  There's some medications that we might

1    add to augment the effect of that and those medications

2    sometimes we have to monitor for blood sugar and

3    cholesterol, triglycerides, things like that.  It can

4    raise up.

5        Q.   How might a person who doesn't fully recover

6    from a traumatic event be affected?  How does a person

7    who doesn't fully recover from a traumatic event be

8    affected in his or her daily living?

9        A.   We're talking generalities.  Some people can

10   have a period of time not affected and something comes up

11   and brings it all back.  That could be decades later.

12   Even so, I think it just depends on how well -- again

13   recover is a funny word.  How well they recovered and

14   what stressors are going on in their life that might

15   negatively impact their recovery.

16       Q.   Can you take us through the treatment process of

17   a patient for you in your practice from the initial exam

18   through the end, if there's an end where the person is

19   better and doesn't need to treat you any longer?

20       A.   In general?

21       Q.   In general.

22       A.   On the initial visit, we'll ask what's the

23   current complaint.  Why are you coming to me.  Then get a

24   history.  Let's say it's depression.  We'll get a history

25   of present illness, when did it start, causes, what do

1    you think did it, what are the symptoms that you are

2    experiencing, then go through past history.  Have you had

3    anything like this before?  Has there been any

4    hospitalizations in the past?  Has there been any past

5    medication trials?  Try and get a past history.  And then

6    I will ask about family history.  A lot of genetics

7    sometimes play a role, and social history.  Do you smoke,

8    do you drink, do you do drugs.  Medical history because

9    again medical things impact and vice versa.  And then

10   basically try to come up with a diagnosis and discuss

11   with the patient what you think it is.  Come up with a

12   treatment plan.  That would be essentially it.

13       Q.   How often would you then see that patient for

14   treatment?

15       A.   So again it depends on what's going on.  I may

16   get a patient that's stable for years, moved and want a

17   new psychiatrist.  Starting out I do it monthly.  If they

18   continue stable, go to two months, three months, four

19   months.  I don't go more than four months if they are

20   stable.  If somebody is not as stable, do more

21   frequently.  Somebody is in crisis, it is whatever is

22   needed.

23       Q.   How long does that initial assessment last when

24   you meet a patient for the first time?

25       A.   Usually done in an hour.

1    Q.    Do you have times where a patient completes his

2    or her plan and you can discharge that person?

3    A.    Yes.

4    Q.    Describe that process the kind of discharging of

5    the patient when he or she has completed treatment?

6    A.    The thing with psychiatric -- actually all

7    medical issues.  Most medical things are chronic unless

8    you have an infection.  You get treated and take an

9    antibiotic and cured.  Most things are continuing like

10   diabetes or hypertension.  Same in psychiatry, a person

11   can have anxiety disorder and our medicine does not cure

12   them.  We treat them with the symptoms.  That same person

13   could be going through a difficult time.  Now that time

14   passed and they don't need the treatment or maybe doing

15   some work on their own through a therapist, through

16   cognitive therapy or different things and have a very

17   strong effect and they don't need the medication.  That's

18   typical examples when somebody is done.

19   Q.    In your prior employment, did you provide the

20   medication management as well as a form of talk therapy?

21   A.    I always talk with my patients.  I feel they

22   don't tell you things unless you spend enough time

23   talking with them.  If people feel rushed like you are

24   not listening, they don't open up.  Supportive-type

25   therapy, some general advice if that's appropriate.

1            As far as like, you know, doing any specific

2    cognitive therapy, I would refer them out.  In the prior

3    employment, there's therapists on standby.  People I see

4    who need therapy, I will give them a referral or they

5    find something on their own.

6        Q.   Do you know someone named Jessica Light?

7        A.   I do.

8        Q.   How did you come to know Jessica?

9        A.   Jessica came to my practice in 2020.  I don't

10   know how she found me.  Online.  I don't recall how she

11   came to me.  But I have been seeing her since then April

12   of 2020.

13       Q.   Did you conduct an initial assessment of

14   Jessica?

15       A.   I did.

16       Q.   Please turn to Exhibit S please.  Assessment you

17   can turn to.  It was labeled at bottom right 003495.  Let

18   me know when you are there.  3495.

19       A.   Okay.

20       Q.   So there are three pages 3495 through 3497 at

21   the bottom control number says page 1 of 3.  A three-page

22   document.  Is this the initial I guess note saying

23   initial visit note that you prepared?

24       A.   Yes.

25       Q.   And do you recall what you talked to Jessica

1    about during the first meeting you had with her?

2        A.    I mean I reviewed it, yes.

3        Q.    What do you recall?

4        A.    Basically she was -- she was coming because her

5    psychiatrist of eight years had retired.  So she was

6    coming for continuing, you know, evaluation and treatment

7    and she was, yeah, her main complaint at that time was

8    low mood and anxiety.

9        Q.    Let's go look at the initial visit note.  In the

10    left-hand column, there's some acronyms.  If we can let

11    the jury know what they are.  The first is allergy.  What

12    is CC?

13        A.    Current complaint.

14        Q.    How about HPI?

15        A.    History of present illness.

16        Q.    The next one?

17        A.    Psyche history.

18        Q.    One below that?

19        A.    Psychosocial history.

20        Q.    On the next page 3496 what's psyche FHX?

21        A.    Psyche family history.

22        Q.    How about below that?

23        A.    Past medical history.

24        Q.    How about OB pregnant HX?

25        A.    Obstetric and pregnant history.

1      Q.    Can you read off the rest?  If they are

2   acronyms, let them know.

3      A.    Past surgical history, social history, mental

4   status exam.  That's the only acronyms left.

5      Q.    The next page?

6      A.    Nothing is there.

7      Q.    Were there any stressors that you talked about

8   with Jessica during the initial assessment?

9      A.    That was during COVID and she was teaching, had

10   to be teaching online at the time because the schools had

11   been closed.  As most people found, that was difficult.

12   First time people had to do it.  I don't think plans were

13   clear.  Everybody is figuring out at the same time how to

14   do it properly and was more I guess individual.  She was

15   saying 25 kids.  She said she has to respond to each of

16   them.

17            THE COURT:  I need you to slow down.

18            THE WITNESS: So she had to respond to each of

19   the kids more individually.

20   BY MR. INTERLANDI:

21      Q.    Did Jessica talk to you often about her work

22   environment during your sessions from when you first met

23   with her until now?

24      A.    Yes.

25      Q.    Do you recall some of the issues that she

1    brought to your attention she was experiencing at work?

2        A.    Well, like I said, first of all, the whole issue

3    of dealing with COVID and doing distance was difficult.

4    Then it became I think they did sort of hybrid.  I think

5    the teachers had to come in.  The kids were not there.

6    Remote from the school.  Maybe a transition and then I

7    think the kids were in part of the day, not all of the

8    day.  A lot of transition going on that I think was

9    difficult probably for everybody.

10           But then the thing that really became an issue

11   later was Jessica had -- she was very concerned about

12   safety during COVID during the height of things and she

13   felt that the kids were getting all the downside and not

14   the benefits so they were being -- she felt that they are

15   not maintaining their policies.  The policies weren't all

16   correct and had exposure.  Had the downside of having to

17   wear masks for social distance which had had a negative

18   effect on a lot of the kids so that became a big issue.

19   Then because she felt she was outspoken about it, she

20   felt there was retaliation.

21       Q.    Did she ever tell you she felt like she was

22   being pushed out?

23       A.    Yes.  She thought her words systematically being

24   pushed out.

25       Q.    Let's look at 3489 in Exhibit S.

```
 1        A.   So we're going backwards?

 2        Q.   Yeah.

 3        A.   I'm there.

 4        Q.   Is this your note from your session with Jessica

 5   on May 12, 2021?

 6        A.   Looks like it, yup.

 7        Q.   And there's a session here says psych symptom/

 8   follow up.  There's a narrative that's typed in. Do you

 9   understand that?

10        A.   Yes.

11        Q.   Who typed in the words that appear in the

12   summary?

13        A.   I did.

14        Q.   Is this where you discussed or at least Jessica

15   told you that she was felt like she was being

16   systematically pushed out?

17        A.   Correct.

18        Q.   And when she had felt she was outspoken about

19   COVID protocols should be in place?

20        A.   Yes.

21        Q.   Did she tell you anything else about how she was

22   feeling or what she was experiencing at work during this

23   session?

24        A.   She said she was on certain committees and she

25   was taken off of them.  She had been a third grade
```

497

1    teacher for a number of years and felt she was a very

2    good teacher and was told she can't teach the third grade

3    because her son was in third grade.  But she wasn't the

4    teacher of her son.  She was given first grade.  She

5    didn't feel she was prepared or equipped for because she

6    has dyslexia and teaching reading at that point.

7         Q.   Was there anything else that she told you during

8    that May 12, 2021 session as related to her experiences

9    at work?

10        A.   She filed a hostile work complaint.  And she

11   said that they told a teacher that Jessica told other

12   people that this teacher has COVID which Jessica said she

13   never did.  That increased the tension between her

14   colleagues at work.

15        Q.   Did there come a point in time that you learned

16   that Jessica didn't feel like she was able to continue

17   working at Hooker?

18        A.   Yeah.  I don't remember the exact date, but I

19   know that she went on FMLA.

20        Q.   Did you discuss that with her in any of your

21   sessions?

22        A.   I'm sure I did.

23        Q.   Do you recall was she able to come back to work

24   after a period of leave?

25        A.   I would have to look at the notes to be sure.  I

1    don't want to say anything wrong.  She went back to work.

2    I don't remember if she went back there.  I know at some

3    point, she went to another school.

4        Q.   Going to -- I'm going out of order.  I will

5    refer you to Exhibit S and 3448.  Let me know when you

6    are there.

7        A.   Actually I believe she did go back.  I remember

8    her saying at one point she was an exceptional third

9    grade teacher and kind of an okay first grade teacher.

10            THE COURT:  When you turn to look at a record,

11   you are not speaking into the microphone.  Jurors, if you

12   can't hear at any point, please raise your hands because

13   you are the people for whom this testimony is directed.

14   BY MR. INTERLANDI:

15       Q.   We'll get back to the medical leave and return

16   to that in a second.

17            During your sessions, did Jessica inform you

18   that she was going to leave Hooker and accept a position

19   at another school?

20       A.   Yes.

21       Q.   Do you recall what she told you in that regard?

22       A.   About when she went there or what aspect are you

23   referring to?

24       Q.   Did she tell you any reasons why she decided to

25   Hooker and go to Ross Woodward?

1    A.    I think the principal who she was having the

2    major difficulty with was not removed.  I think there was

3    an investigation that they had.

4    Q.    We don't want to know any of the results of

5    that.  So we can skip that piece.  So there's something

6    with the principal.  Any other items she brought up to in

7    your September 13, 2022 session that you recall?

8    A.    I think she was going back to prepare her

9    classroom or get things in her classroom and she found a

10   note, a threatening note that said leave or die so she

11   felt she had no choice.

12   Q.    Throughout this time, you are managing Jessica's

13   medication; is that correct?

14   A.    Correct.

15   Q.    Were you making any adjustments because of the

16   symptoms she was presenting with during your sessions?

17   A.    Yes.

18   Q.    And -- withdrawn.

19         Now I will go back to what we're talking about

20   earlier and the FMLA return.

21         Your Honor, may I approach to switch out the

22   notebooks?  Thank you.

23         THE COURT:  Yes.

24   BY MR. INTERLANDI:

25   Q.    Please turn to Exhibit 15.  Let me know when you

1    are there.

2        A.    Okay.

3        Q.    Do you recall writing an email for Jessica about

4    returning to work in January 2022?

5        A.    Yes.  I have written some.  I don't remember the

6    details.

7        Q.    Let's go to the last page of Exhibit 15.  The

8    second to last page, Light 166 to 167.

9            Is that an email that you sent to Jessica?

10       A.    One second and I can turn the page.  Yes.

11       Q.    This is an email that you wrote and sent to

12   Jessica?

13       A.    Correct.

14       Q.    Do you recall why you sent this to Jessica on

15   January 14, 2022?

16       A.    Yes.  My concern was that returning back to the

17   same situation was going to be not in her mental health

18   interest because I felt the thing with the principal that

19   she was having difficulty with that would retrigger her

20   symptoms.

21       Q.    Anything in the email that you are looking at

22   now that you disagree with today?

23       A.    Give me a moment.

24       Q.    Sure.

25       A.    No.  I agree with everything still.

1     Q.   Sitting here today, is what you put in this

2  email on January 14, 2022 about the events that triggered

3  Jessica's anxiety, depression and PTSD your professional

4  opinion, based upon a reasonable degree of medical

5  probability?

6     A.   Can you rephrase?

7     Q.   Is what you put in this letter, sitting here

8  today, about the events that triggered Jessica's,

9  anxiety, depression and PTSD, your professional opinion,

10  based upon a reasonable degree of medical probability?

11     A.   That these were --

12     Q.   The events triggered Jessica's anxiety?

13     A.   Yes, or exacerbated it, yes.

14     Q.   Or exacerbated it.  What does exacerbate mean?

15     A.   Makes worse.

16     Q.   The events that you are referring to were listed

17  in that second paragraph where it says on 5-12-2021?

18     A.   Correct.

19     Q.   You said that she began feeling she was pushed

20  out for being outspoken for what COVID protocols should

21  be in place?

22     A.   Yes.

23     Q.   You also stated that she reported being taken

24  off committees and having her regular third grade

25  teaching assignment taken from her and given first grade

1    for which she felt ill prepared, tensions increased as

2    she was accused of things she did not do, et cetera?

3        A.    Correct.

4        Q.    In your professional opinion, did the work

5    issues that Jessica discussed with you from May 12, 2021

6    through December of 2022 exacerbate her pre-existing

7    psychiatric conditions?

8        A.    Yes.

9        Q.    What is your opinion based upon?  What factual

10   support do you have?

11       A.    Basically the patient's telling me what she's

12   going through and the stressors and the difficulty

13   because she also -- it is not just her. But also her son

14   is in the school.  She was in the position of being

15   sensitive to protecting him from what she might consider

16   retaliation or she thought not being liked by people

17   because of what was going on.  A lot of stress, not being

18   able to -- very important for her to be able to speak up

19   and be heard and the fact that again about the whole

20   investigation thing, she felt the results nothing

21   happened as a result of all of those things were

22   triggering and difficult for her.

23       Q.    Thank you.  For your sessions, do you require

24   clients to pay out of pocket or do you accept insurance

25   or is there a mixture?

503

1      A.    There's a mixture.

2      Q.    Do you accept all forms of insurance?

3      A.    So over the years become less and less as the

4  insurance companies have become worse and worse.  We do

5  accept United Health Care and Cigna.  But it's become

6  less and less.  People have the option to go somewhere

7  else or pay out of pocket.

8      Q.    What is your standard rate for a 30-minute

9  session?

10     A.    A standard rate for a 30-minute session is $200.

11     Q.    Has that changed over the years?

12     A.    Started out 150 or 175.  Now it is 200.

13     Q.    Let's look at Exhibit 30.  Please turn to that

14  tab and let me know when you are there.

15     A.    Muscles for this job.

16     Q.    The trick is to take about an inch at a time.

17     A.    I see that.  Okay.  I'm there.

18     Q.    Great.  Do you recognize the document that

19  appears as Plaintiff's Exhibit 30?

20     A.    I don't see this.  This is probably sent out by

21  the office even though I sign it.  Yeah.  Dates.  Yeah.

22  What the insurance allowed.  What the insurance paid.

23     Q.    At the bottom is that your signature?

24     A.    Yes.

25     Q.    There's a column that says work issues

1    discussed.  Do you see that?

2        A.   Oh yes.

3        Q.   What does that mean as relates to this document?

4        A.   It's just -- I don't recall why this was made.

5    Whether requested by somebody.  Basically showing this

6    was the focus of these sessions.

7        Q.   The letter is dated June 9, 2022, and appears

8    that you had 20 visits at your practice with Jessica as

9    of that date.  Is that what that date is?

10       A.   April 20, June 7, 2022, yes.

11       Q.   And it appears that Jessica was required to pay

12   $50.  Is that what the last column is showing?

13       A.   Correct.

14       Q.   Let's look at Exhibit 31.  Let me know when you

15   have that.

16       A.   I'm there.

17       Q.   Have you seen this transaction detail before?

18       A.   Again I don't really deal with the money.  I

19   hate the money part of it.

20       Q.   In general terms, what do you understand?  Do

21   you have an understanding of what that document is

22   reflecting?

23       A.   It seems to be a ledger showing that she paid.

24       Q.   That who paid?

25       A.   Jessica.  A record of co-pays that she paid.

1    Q.    The co-pays which column would that be reflected

2   in in terms of the amount that Jessica was paying for the

3   sessions you had with her?

4    A.    Looks like she was paying $50 each session.

5    Q.    Except in the middle for the 10-29-21 payment,

6   it appears 75 is that right?

7    A.    10-29-21 you said?

8    Q.    Yes.

9    A.    Yes.  Says 75.  Probably a longer session is

10   what I'm guessing.

11    Q.    That was going to be my follow-up question.

12   Let's turn to what we marked as the same exhibit, just

13   the next page.  I don't know if you can see the control

14   number at the bottom.  Light 3599 is the first page and

15   then --

16    A.    I think it is cut off.

17    Q.    Do you know what Tebra is?

18    A.    That's the platform that we use for our

19   electronic health record.

20    Q.    The amounts that are showing is that what was

21   charged to Jessica?

22    A.    Yes.

23    Q.    Is that $200 a session?

24    A.    Yes.

25    Q.    Was Jessica paying more for your time as she

1  progressed in her treatment?  Did your rate go up?

2      A.    From 2020 again.  I believe we started at 150

3  and 175, even 200.  At some point, she had insurance.

4  She was doing co-pays, not paying for the whole thing.

5      Q.    If you go to the next set of documents. It looks

6  like an invoice.  Can you see that?

7      A.    Which page?

8      Q.    3583.  Please turn to that.

9      A.    Again I can't see the numbers here.  The next

10  page after.

11      Q.    You will see it eventually.  See it now?

12      A.    Yes.

13      Q.    Have you seen this layout before on this kind of

14  document?

15      A.    This looks like probably what's submitted -- I

16  think what's submitted to the insurance.  Again I don't

17  deal with this aspect of it.

18      Q.    On the top, your logo Levin Psychiatric.  At the

19  bottom patient payments collected and then line item

20  total payments.  Would that be the total payment that

21  Jessica paid for that session?  The date of visit is

22  1-17-23 and total payment is 225?

23      A.    1-17 or 5-17?

24      Q.    1-17-23 in the middle of the page.

25      A.    I don't deal with the money part.  I don't know

1  if she had insurance.  The insurance companies you

2  contract with -- different insurance companies for a

3  rate.  They don't pay that rate, but they agree on a

4  certain rate.  I imagine that's what it is.  We don't

5  charge.  We have the charges as I mentioned earlier so

6  that 229 and 354.

7      Q.   Is that the total for your service and then the

8  bottom reflects the payment that Jessica made; is that

9  correct?

10     A.   I honestly don't know.  I never look at this

11 form.  Somebody else handles this.  When people are

12 paying out of pocket, it is consistently the same amount

13 unless it is a significantly longer session.  I think

14 that that's -- yeah.

15     Q.   Okay.  I appreciate you reviewing that document.

16 I understand that you don't deal with the financial side,

17 but that would have been an invoice or document that was

18 generated by Levin Psychiatric and presented either to

19 Jessica or an insurance company for payment?

20     A.   Yeah.  The total says 584.  The payment of 225.

21 That's probably the insurance company.  Then they adjust

22 it minus 359.  That's what they don't pay us.  That's

23 what the insurance company doesn't pay us.

24     Q.   What happens to that piece of it?

25     A.   We don't get paid.

1    Q.   All right.  Thank you so much, Dr. Levin.  I

2    don't have any further questions for you at this time.

3         THE COURT:  Cross-examination.

4    CROSS-EXAMINATION BY MR. MURPHY:

5    Q.   Good morning, Dr. Levin.

6    A.   Good morning.

7    Q.   I want to start asking you a few questions about

8    your practice.  You said 30 minute blocks and focus on

9    medication management, right?

10   A.   Pretty much, yes.  Medication management and

11   again what I call supportive therapy.

12   Q.   Right.  So the first -- I think you said earlier

13   15, 20 minutes medication management and a little time

14   left over for discussion?

15   A.   Kind of all mixed together.  I start out asking

16   the patient what they told me last time and try and

17   update in terms of symptoms or problems currently.

18   Q.   Is it fair to say you are in a therapeutic

19   relationship with them, but you're not doing therapy?

20   A.   I think that's a good way to put it.

21   Q.   Attorney Interlandi asked you some questions

22   about your medical records and reviewing those?

23   A.   Right.

24   Q.   You keep those on an electronic system?

25   A.   Correct.

509

```
 1        Q.   They are a HIPAA-compliant system?

 2        A.   Correct.

 3        Q.   I think you note that in some of your most

 4   recent office notes that it is HIPAA complaint?

 5        A.   Correct.

 6        Q.   You meet with your clients either in person or

 7   via Zoom?

 8        A.   Not Zoom, called Doxy.

 9        Q.   Some sort of online?

10        A.   Same idea, yes.

11        Q.   That's the best practice to meet with them in

12   that format and document your information on a HIPAA

13   compliant form?

14        A.   Correct.

15        Q.   You generally do not have -- you don't provide

16   treatment through emails, correct?

17        A.   Apply treatment through email.

18        Q.   You don't give treatment through emails?

19        A.   I'm not sure what you mean.  There's times when

20   people are, you know, they will contact the office and

21   say can I send in my medication, can you raise my dose

22   but that wouldn't be typical.

23        Q.   Not typical.  In an acute situation, you might

24   exchange an email or text with your client?

25        A.   Might, yes.
```

510

1    Q.    That's not your normal practice?

2    A.    Especially if making any changes, you want

3    somebody to come in, if possible.

4    Q.    You were asked some questions about the duration

5    of treatment and what happens when someone gets better

6    and what do you do at that point.  Do you remember those

7    questions?

8    A.    Yes.

9    Q.    Some people that you treat with or that you

10   treat rather, you treat them for a long period of time,

11   right?

12   A.    That's probably more typical, yes.

13   Q.    And for Ms. Light, she saw Dr. Berger for eight

14   years before she saw you, correct?

15   A.    Correct.

16   Q.    She's seen you for several years as well?

17   A.    Yes.

18   Q.    You don't see that stopping any time soon?

19   A.    Correct.

20   Q.    That's more typical of your client?

21   A.    More typical of medicine and psychiatry in

22   general.

23   Q.    You understand that Ms. Light had seen a

24   psychiatrist and therapist before Dr. Berger, correct?

25   A.    I honestly don't recall, but I know she had seen

1    him for eight years.

2         Q.    You know she had significant childhood trauma?

3         A.    Correct.

4         Q.    That's been a focus of your treatment of her,

5    right?

6         A.    The trigger of that trauma.  Not specifically

7    that one.  She sees a therapist for PTSD.

8         Q.    There was a little discussion about PTSD in your

9    direct testimony and you don't specifically treat Ms.

10   Light for PTSD, correct?

11        A.    That's not exactly true because medication wise

12   the medicine overlaps what you would be using and therapy

13   she was getting somewhere else.

14        Q.    You said that you treat the depression anxiety

15   that's secondary to PTSD?

16        A.    It is kind of chicken and egg thing.  They all

17   go kind of together.

18        Q.    I want to review two records that you reviewed

19   with Attorney Interlandi and I believe the first one was

20   3495.

21        A.    Is that in the first book?  Can I go get it?

22        Q.    I will show you electronically.  3495.

23        THE COURT:  3495 of Exhibit what?

24        MR. MURPHY:  Thank you, Your Honor.  Exhibit S.

25        MR. INTERLANDI:  I think this might be the first

1  time to the extent there's confidential information in

2  there and people here in the courtroom.  As long as it is

3  off that, I'm okay.  Off the bigger monitor.  That's off

4  now so we're good.

5          THE COURT:  I see what you are saying.  Can we

6  focus on the jurors' monitors.

7          MR. INTERLANDI:  Looks like we can.  Thank you.

8  BY MR. MURPHY:

9     Q.   Dr. Levin, when you are looking at this form,

10  this is from April of 2020, correct?

11     A.   Correct.

12     Q.   And when Ms. Light reported to you or appeared

13  before you on April 1020, she indicated, as you noted,

14  her psychiatrist was retiring, right?

15     A.   Yes.

16     Q.   She had been seeing for depression, anxiety and

17  getting overwhelmed?

18     A.   Correct.

19     Q.   Do you remember her telling you that when she

20  appeared in April of 2020?

21     A.   Yes.

22     Q.   Her anxiety was at an eight out of ten.  Do you

23  see that?

24     A.   Yes.

25     Q.   You note that because that's how -- that's part

1    of your initial assessment with your client, correct?

2        A.    Yes.

3        Q.    You give them a rating check?

4        A.    Yes.

5        Q.    Ten is high access on an anxiety scale?

6        A.    Yes.  It is not a formal scale.  What I use with

7    my clients.  Ten is jumping out of your skin.  Zero is no

8    anxiety.

9        Q.    In April 2020, Ms. Light was at an eight out of

10   ten when she first appeared?

11       A.    Correct.

12       Q.    Mood was seven out of ten?

13       A.    That's a good thing.

14       Q.    Mood ten out of ten?

15       A.    That's normal, good mood.

16       Q.    As part of my understanding of your practice is

17   you don't regularly request all of the records from an

18   individual's prior treater?

19       A.    That's correct.

20       Q.    And especially if someone is a good reporter,

21   you will take the information from them in moving

22   forward, correct?

23       A.    Yes.

24       Q.    You did ask Ms. Light to get her medication

25   history from Dr. Berger, correct?

514

1      A.    Right.

2      Q.    Is that what's reflected on page 3497 Ms.

3  Light's medication history?

4      A.    Correct.

5      Q.    So this shows over the years what she was doing

6  with Dr. Berger, right?

7      A.    Correct.

8      Q.    At that first meeting with her, she appeared and

9  she told you that she was on Modafinil?

10     A.    Modafinil.

11     Q.    I wasn't close.  Modafinil.  At the end of that

12 meeting, according to 3497, you prescribed her a

13 different medication, right?

14     A.    She continued on Modafinil and I added

15 Buspirone.

16     Q.    You added a new medication?

17     A.    Correct.

18     Q.    Since that period of time in April of 2020 until

19 today, you have made numerous changes to her medications,

20 right?

21     A.    Correct.

22     Q.    Tried some, removed, added new ones, take them

23 back, right?

24     A.    Yes.

25     Q.    Not just trying new medications but then

1    changing various doses over the years, right?

2        A.    Correct.

3        Q.    That continues until today?

4        A.    Correct.

5        Q.    Can we go to 3489.  Attorney Interlandi asked

6    you some questions about Form 3489.  One thing I want to

7    follow-up on is the first paragraph.  In that first

8    paragraph Ms. Light described a family stressor on that

9    occasion, correct?

10       A.    Yes.

11       Q.    That's in May 2021?

12       A.    I saw they are then.  I don't know the date when

13   that stressor was going on.  It is overlapping that time.

14       Q.    The office note is dated May 12, 2021?

15       A.    Correct.

16       Q.    At this time you wrote in the psychiatric

17   symptoms follow-up section about an incident Ms. Light

18   was having with her estranged sisters, right?

19       A.    Correct.

20       Q.    According to that first sentence, it was leading

21   to lots of drama?

22       A.    Right.

23       Q.    In fact, at the bottom of that first paragraph,

24   you say this was a big stressor.  She had not talked to

25   them in years.  Came to realize she really doesn't want

1   them in her life, right?

2       A.   Correct.

3       Q.   One more document, Dr. Levin.  That's 3492 at

4   least one more office note.  3492.  Is this from a few

5   months earlier March 2021, correct?

6       A.   Yes.

7       Q.   This was at the time -- let's back up.  You

8   started treating her in 2020?

9       A.   Right.

10      Q.   At the time you recommended she see a therapist?

11      A.   Right.

12      Q.   It took time to find a therapist.  Did you know

13  at some point that she wasn't really looking for a

14  therapist?

15      A.   There may have been time that life gets in the

16  way and becomes hard to find a therapist.

17      Q.   That's true.  There's a time in 2020 she wasn't

18  looking?

19      A.   That could be.  Also if someone thought they're

20  doing okay enough.

21      Q.   In 2021, she finds the PTSD Center in New Haven?

22      A.   Yes.

23      Q.   According to your notes in that middle

24  paragraph, she reports to you she feels she can be

25  transformative and wants say go every other week, right?

1      A.    Correct.

2      Q.    At the very bottom, you note under the

3    Impression Section, currently some anxiety and mood

4    problems persist but sleep is better.  She's going to

5    address the elephant in the room regarding her abuse at

6    the PTSD Center in New Haven and that elephant in the

7    room is her underlying childhood abuse, right?

8      A.    Correct.

9      Q.    One thing you didn't really touch on in your

10   direct was Ms. Light's, you know, what's been going on

11   recently with Ms. Light.  I want to ask you some

12   questions about that.  You are aware that she transferred

13   from Worthington Hooker School to Ross Woodward?

14     A.    Yes.

15     Q.    You are aware she transferred schools?

16     A.    Right.

17     Q.    In 2024, you continue to treat her.  Has she

18   reported significant issues in her life over the course

19   of 2024?

20     A.    Well, I mean the issue or the legal issues are

21   obviously continuing as they do to now.  The switching to

22   a new school and the school had its own challenges

23   because a very poor school and didn't necessarily have a

24   lot of resources and the kids were struggling a lot.  She

25   did feel a very supportive environment, some ups and

1    downs about it.

2        Q.    She actually told you her colleagues love her

3    there, right?

4        A.    Yes.

5        Q.    Do you recall her telling you that she's

6    receiving a lot of positive feedback but still feels like

7    she's failing and drowning?

8        A.    It's noted.  I don't remember every detail but

9    yes.  She was still struggling even though it was a

10   supportive environment but a lot of other challenges.

11       Q.    Some of those challenges include being

12   hospitalized?

13       A.    That's a result of the challenges I think.

14       Q.    Let me rephrase the question.  Was Ms. Light

15   hospitalized for a period in 2024?

16       A.    Yes.

17       Q.    On several occasions?

18       A.    I think at least two.

19       Q.    Does she tell you she was also diagnosed with

20   Lyme disease?

21       A.    I believe so.  Again I depend on my notes to

22   look at things.  I believe so.

23       Q.    Did she tell you that she missed a lot of time

24   from work and that's causing her stress in the work

25   environment?

1      A.    Again I believe so.

2      Q.    When someone presents to you and they tell you I

3  think you mentioned that before?

4      A.    Mentioned what?

5      Q.    I will start again. I'm sorry.  I'll back up

6  from the microphone.  When someone presents to you and

7  they tell you I was taken off this committee and causing

8  me a lot of stress, you don't investigate whether or not

9  she was taken off the committee?

10     A.    I do not.

11     Q.    You accept as true that she believes it to be

12 true?

13     A.    Correct.

14     Q.    With all the work events she told you about over

15 the course of the last several years, you accepted her

16 version?

17     A.    We don't investigate.

18          MR. MURPHY:  I don't have any other questions.

19          THE COURT:  Any redirect?

20          MR. INTERLANDI:  Just a few, Your Honor.  Thank

21 you.

22 REDIRECT EXAMINATION BY MR. INTERLANDI:

23     Q.    Hello, Dr. Levin.  What's Medafinil?

24     A.    What's --

25     Q.    Medafinil?

1      A.    Medafinil is typically given for somebody who
2  has excessive daytime sedation, maybe sleep apnea or some
3  other disorder, narcolepsy that might cause them sedation
4  during the day.  Sometime used offlabel as it was in her
5  case.  Offlabel meaning not one of the FDA approved uses.
6  It was used to help her with her mood which is done and
7  did seem to help her.
8      Q.    When you say "her case," who are you referring
9  to?
10      A.    Jessica Light.
11      Q.    Did Jessica ever tell you she was doing okay
12  enough to not go look for a therapist to help her with
13  whatever issues she was having?
14      A.    I don't recall specifically.  She has had ups
15  and downs.  Again looking for another therapist is a
16  stressor in itself.  People don't take insurance, not a
17  match, not taking new clients, sometimes people don't
18  look for somebody because it is difficult or they're
19  doing okay enough.
20      Q.    You talked about some significant issues in 2024
21  with Attorney Murphy.  Do you still discuss with Jessica
22  during your sessions, her feelings or thoughts about how
23  she was treated by the administration at Hooker back in
24  2021, 2022?
25      A.    That definitely comes up.

1          MR. INTERLANDI:  No further questions, Your
2    Honor.
3          MR. MURPHY:  Just briefly, Your Honor, on the
4    2024.
5    RECROSS-EXAMINATION BY MR. MURPHY:
6     Q.   I think you testified earlier that you reviewed
7    your notes in preparation for coming today?
8     A.   Yeah.  I didn't go through all of them.  They
9    called me sooner than supposed to be scheduled so.
10    Q.   I apologize for the timing, but you were
11   reviewing notes including notes from 2024, correct?
12    A.   I was trying to go through all of them.  I have
13   access to me.  I can review them as we go.
14    Q.   You started historically because obviously 2024
15   is more fresh in your heat?
16    A.   Historically it gives me a perspective of what's
17   happening as a timeline.  That works best for me.
18          MR. MURPHY:  That's it.  Thank you.
19          THE COURT:  Anything further?
20          MR. INTERLANDI:  No, Your Honor.
21          THE COURT:  Dr. Levin, you are excused.  You may
22   step down.  Thank you.
23          Who is your next witness?
24          MR. INTERLANDI:  Your Honor, my next witness is
25   going to be here at 12:30.  We thought that Dr. Levin and

1    Ms. Ventura would take longer.  They were able to speak

2    very fast and get us to a point that I don't have anyone.

3    My next witness is Mr. Shortt.  He'll be here at 12:30.

4           THE COURT:  We'll take an early lunch apparently

5    and we will be back at 12:45.

6           MR. INTERLANDI:  Thank you, Your Honor.

7           (In the absence of the jury at 11:56 a.m.)

8           THE COURT:  Anything further before we take our

9    lunch?

10          MR. MURPHY:  Just briefly, Your Honor.  The

11   reason I just followed up with Dr. Levin, we received

12   last night some very recent records from Ms. Light that

13   we don't have as part of Exhibit S.  I believe is her

14   records, Exhibit S, and so certainly didn't have a chance

15   to go through and make all the appropriate redactions.

16   That's why I didn't put them up on a screen or address

17   them.  I would like to once we have redacted them

18   appropriately to submit them as an exhibit.  I can do a

19   new or supplement.

20          THE COURT:  Do S-1 and you will need to approve

21   the redactions.  Let me know if there's a problem.  We'll

22   mark the new supplemental records Exhibit S-1.  Okay.

23   All right.  Then otherwise, we'll stand in recess.

24          (Whereupon, a luncheon recess was taken from

25   11:58 to 12:50 p.m.)

```
 1              THE COURT:  Counsel, you may be seated.  Is
 2    Mr. Shortt here?
 3              MR. INTERLANDI:  Yes, Your Honor.
 4              THE COURT:  Are you Mr. Shortt?
 5              THE WITNESS:  Yes, I am.
 6              THE COURT:  Would you kindly come to the witness
 7    stand.
 8              THE WITNESS:  I have a hearing aid.  I don't
 9    have them with me.
10              THE COURT:  Why don't you have them with you?
11              THE WITNESS:  I can hear.
12              THE COURT:  And speak as if all the jurors are
13    also similarly discomforted.  Sound doesn't carry well in
14    this courtroom.  You will be sworn.  Then you will give
15    your testimony.  Who is your next witness?
16              MR. INTERLANDI:  Paul Salem.
17              THE COURT:  Is he here?
18              MR. INTERLANDI:  He's on his way.
19              THE COURT:  And after that?
20              THE WITNESS:  Phyllis Maffuid.
21              THE COURT:  Is she on her way?
22              MR. INTERLANDI:  I told her to be here at 3.
23              THE COURT:  Will that fill out our day?
24              MR. INTERLANDI:  Yes, Your Honor.
25              MR. MURPHY:  If we need someone, his next
```

```
 1   witness is a board employee.  She's available.  Karen
 2   Bonner.
 3            THE COURT:  Okay.
 4            (In the presence of the jury at 12:53 p.m.)
 5            THE COURT:  All right.  Ladies and gentlemen, we
 6   will proceed with our next witness, Mr. Shortt, who is
 7   here.
 8                      TIMOTHY SHORTT
 9            Having been called as a witness, was first duly
10   sworn and testified on his/her oath as follows:
11            THE WITNESS:  I do
12            THE CLERK:  Please state your name, spell your
13   last name, city state of residence.
14            THE WITNESS:  Timothy Shortt, S-h-o-r-t-t.
15            THE CLERK:  Give us your city and state of
16   employment.
17            THE WITNESS:  New Haven.
18            THE COURT:  Please be seated.
19   DIRECT EXAMINATION BY MR. INTERLANDI:
20      Q.   Good morning -- good afternoon, Mr. Shortt.
21   Thank you for being here.
22            What's your current profession.
23      A.   So I'm a teacher.  Currently a science teacher.
24   I will be teaching seventh and eighth grade science next
25   year.
```

1    Q.    Where do you teach?

2    A.    I will be teaching at FAME.

3    Q.    Where is FAME located?

4    A.    It is in New Haven on the corner of Blatchely

5    Avenue and Grand Avenue.

6    Q.    Who is your current employer?

7    A.    City of New Haven.

8    Q.    How long have you been a City of New Haven or

9    Board of Ed employee?

10    A.    This will be my 23rd year coming up.  23rd year

11    coming up.

12    Q.    How long have you been working at FAME?

13    A.    I recently started.  This will be my first year.

14    Q.    Where were you working prior to that?

15    A.    Wilbur Cross as a science teacher.  Before that,

16    I was at Worthington Hooker School.

17    Q.    How long were you a teacher at Worthington

18    Hooker School?

19    A.    I think about 14 years I think.

20    Q.    What grade did you teach while you worked a

21    Worthington Hooker School?

22    A.    So I started in first grade, went to second,

23    then I taught fifth and sixth.

24    Q.    How long did you teach fifth and sixth?

25    A.    So I started in the sixth grade.  I taught that

1    I believe for three years.  The rest of my time was fifth

2    and sixth grade science.

3        Q.    How long did you teach first grade there?

4        A.    I think I taught first grade at Hooker for six

5    years.

6        Q.    How about second?

7        A.    Second for I believe two.

8        Q.    And then spent the rest of your time at fifth

9    and sixth grades?

10       A.    Yeah.

11       Q.    The last grade that you taught was fifth and

12   sixth grade sciences at Hooker?

13       A.    Yes.

14       Q.    Was there a particular reason why you decided to

15   leave Hooker to go to Wilbur Cross?

16       A.    I felt like I needed a change of atmosphere.  I

17   originally when I got into teaching, I thought I would

18   end up in high school and I'm going to seventh and eighth

19   grade.  A lot of the schools in the district were

20   changing and I felt I needed a change of atmosphere.

21   The school is different.  I felt like I needed to find a

22   new home.

23       Q.    What was different about it?

24       A.    Part of it was -- I don't know -- it felt like

25   the school was becoming a little bit divided.

1      Q.    In what regard?

2      A.    Just I just thought the morale of the building

3  was changing.  I was a union steward.  Not for all of my

4  years there.  But that was stressful actually being a

5  union steward.  That can be stressful.  That was a little

6  bit stressful.

7      Q.    Why was it stressful as a union steward at

8  Worthington Hooker?

9      A.    Basically a steward a lot of your position is

10  communicating things that's going on with the teachers in

11  the building.  Also teachers that have certain issues,

12  I'm usually the person they come to talk to me.  It just

13  became more stressful the last -- the last two-year stint

14  I had just because different things going on with

15  teachers in the building.

16      Q.    When you say the last two-year stint, can you

17  give us an idea of the two years you are referring to?

18      A.    So I decided to give up being steward.  I gave

19  up stewardship.  I have done it for a long time.  I

20  thought it was time for somebody else to take it on.  And

21  then so for two years somebody else took it over.  Then I

22  was asked by teachers in the building if I would consider

23  running again.

24      Q.    What were the two years?

25      A.    Those were the two years so I ran again, got the

1    stewardship back.  That was '21, the year of '21 and the

2    year '22 I think.

3        Q.   So when you say you had to run for it, it was an

4    election?

5        A.   Yeah.  So basically there's an election every

6    two years.

7        Q.   Okay.  They knew you said you gave it up.  Does

8    that mean you didn't run again?

9        A.   No.  So what I did, I gave it up.  Somebody

10   else -- a lot of times so, you know, some buildings don't

11   necessarily have a steward.  Sometimes there's teachers

12   that just don't want to take on the responsibility so I

13   have been -- there's somebody else in the building that

14   wants it.  I basically had a conversation and the person

15   took it over for two years, then I decided to basically

16   run because I was asked to.  I didn't necessarily want to

17   do it.  I was asked to and I felt kind of obligated.

18       Q.   Who was the person that took it over?

19       A.   Kathleen Morrison.

20       Q.   You said in the same building.  Did you teach in

21   the same building as Ms. Morrison?

22       A.   Yes, we were in the same building.  When I first

23   became steward, I was actually a first grade teacher,

24   just to give you context.  I came to Hooker. There was a

25   teacher that was getting ready for retirement and she

1    asked me if I would be steward, so I did because nobody

2    else wanted to do it.

3        Q.    Ms. Morrison stepped in, as I understand your

4    testimony, some teachers approached you about running

5    again for the union steward position again?

6        A.    Say that again.

7        Q.    Teachers approached you about running for the

8    union steward position?

9        A.    Yes.

10       Q.    But do you recall the teachers that approached

11   you?

12       A.    I do remember.  I do remember.

13       Q.    Which teachers approached you?

14       A.    So there was Laurie Keeasda (phonetic).  I'm

15   trying to think some of them aren't there anymore.

16   Laurie Keeasda (phonetic). Julie Villaneuva.  There's

17   other ones.  I can't remember their names off the top of

18   my head.  There's about six teachers that asked.

19       Q.    Was Jessica Light one of them?

20       A.    Yes.

21       Q.    So did you have to run against Ms. Morrison to

22   be elected as union steward?

23       A.    Yeah basically.  So what happened we had a

24   meeting.  The teachers were there before school started.

25   Kathleen had an election.  She started.  We did paper

1    ballots.  We did it so I lost by a vote which was fine

2    and I told everybody.  I had teachers come up.  They said

3    I thought for sure you would fine.  That's fine.  She won

4    and that's fine.  And then some people told me that I

5    should complain to the union leadership.  I said I'm not

6    doing that.  That's sour grapes.  I lost.  That's fine.

7    So what happened was I guess some other teachers must

8    have contacted the union and they weren't supposed to

9    have the election yet.  The president at the time David

10   Cicarella said they weren't supposed to hold a vote.  It

11   was supposed to be done through using whatever we used

12   one of the Google forms.  They held the election again. I

13   won that election.

14        Q.   Were you union steward in both buildings?

15        A.   Yes.

16        Q.   Do you recall like by how many votes you won?

17   Was it narrow or wide?

18        A.   I think it wasn't narrow.  I think I lost by one

19   and the second time was two to one margin I think,

20   somewhere around there.

21        Q.   Do you recall the approximate time frame when

22   you were elected to have that final run at union steward

23   at Hooker?

24        A.   I am going to guess a couple of weeks after the

25   first one.

1    Q.   What was that time frame if you can let the jury

2    know?

3    A.   Sometime beginning of September.

4         THE COURT:   What year?

5         THE WITNESS:   2021.

6    BY MR. INTERLANDI:

7    Q.   So September of 2021.  And after you were

8    elected union steward if you are at Worthington Hooker

9    School, did you have a meeting with Ms. Gethings and Ms.

10   Clorino in October 2021?

11   A.   Yeah.  That sounds right.

12   Q.   During that meeting you had with them, did they

13   mention Jessica Light to you?

14   A.   They did.

15   Q.   What did they say?

16   A.   So they said they had some concerns there were a

17   couple of teachers that had concern that Jessica and I

18   were going to try to basically take them out as

19   administrators.

20   Q.   Take them out as Ms. Gethings and Clorino?

21   A.   Yes.

22   Q.   Did you have a response to that when they told

23   you that?

24   A.   I don't remember exactly what my response was.

25   But I know my heart kind of dropped because that's not.

1    As a steward, you don't have power as a teacher, even as

2    a steward we don't have much power as a steward.  We're

3    really just a support system.

4          I thought about it and talked to my wife when I

5    went home.  She knew I was upset and I told her that I

6    was just giving it up.  I don't want to do this.  I don't

7    want to go through this and she said don't do that.

8    That's being a baby.  So I just stuck with it and was

9    fine for the most part.  I made the right decision.

10    Q.   Why do you feel like you made the right

11   decision?

12    A.   Because I felt I had a lot of experience and I

13   had a lot of trust with people in the building.

14    Q.   Did you work for the New Haven Board of

15   Education before you started at Hooker?

16    A.   So I worked a Timothy Dwight.  That's no longer

17   a school.  They closed.  That's the reason I went to

18   Hooker.

19    Q.   How long did you work there?

20    A.   Six years I think.  First grade.

21    Q.   Did Ms. Gethings tell you during this meeting in

22   October 2021 that she shared similar concerns about a

23   teacher that came to her that you and Jessica were --

24    A.   I don't recall any of that.

25    Q.   Were you aware earlier that year Jessica Light

1    had filed a complaint about the administrators at Hooker?

2        A.    Was I aware of that, yes.

3        Q.    Were you interviewed by anyone who was

4    conducting the investigation concerning Ms. Light's

5    complaint?

6        A.    I was.

7        Q.    Do you recall being interviewed -- do you

8    remember someone named Rebecca Goldberg?

9        A.    I don't remember.  I just know Pat DeLucia asked

10   me.

11       Q.    Pat DeLucia, who was that?

12       A.    Our local president.

13       Q.    Of your union?

14       A.    Mm-hmm.

15       Q.    So is it your testimony he was president when

16   you were interviewed by the --

17       A.    He was.

18            THE COURT:  Let him finish the question.

19   BY MR. INTERLANDI:

20       Q.    Your testimony was that Pat DeLucia contacted

21   you when he was president when you were interviewd by an

22   investigator; is that correct?

23       A.    Yes.

24       Q.    Do you recall where that investigation -- I'm

25   sorry -- where that interview occurred?  Do you recall?

1    A.    It was a Zoom meeting actually.

2    Q.    Do you recall approximately how long the

3    interview took?

4    A.    I want to guess 45 minutes, half an hour, 45

5    minutes.

6    Q.    Did you tell Rebecca Goldberg that the

7    administrators told you that a couple of teachers were

8    concerned that you ran for union steward to team up with

9    Ms. Light to throw them under the bus and push them out?

10    A.    I did.

11    Q.    Why did those teachers come to you and ask you

12    to run for union steward?

13    A.    Part of it was some type of fear in some of

14    them.  Told me there were things that were shared that

15    Kathleen shared with them that she felt was not in their

16    best interest especially as a steward that they should

17    have at least talked to them before.  They didn't feel --

18    they felt like Kathleen was doing things that didn't

19    really -- wasn't on their best behalf like without their

20    knowledge or permission of sharing.

21    Q.    Was that all of the teachers that came to you

22    expressed that concern?

23    A.    From what I remember.

24    Q.    You listed a few Laurie, Julie, Jessica?

25    A.    Yeah.

1    Q.   Were there other teachers at Hooker concerned

2  that Ms. Morrison was becoming very close with Ms.

3  Gethings?

4    A.   I can say yes.  To me that's like gossip.  I

5  think that's --

6    Q.   Did you say that to Ms. Goldberg during the

7  interview?

8    A.   I don't remember.  I don't recall.

9    Q.   I think you said earlier that you felt upset

10  after this meeting you had with Ms. Gethings and Clorino?

11    A.   Right.

12    Q.   Were there any other reasons why you were

13  feeling upset at that time after meeting them?

14    A.   Can you say that again?

15    Q.   Were there any other reasons you felt upset

16  after you had the meeting with Ms. Gethings and Clorino

17  in October 2021?

18    A.   To me it is just -- I'm the type of person I

19  like everybody to get along.  I had an uneasy feeling for

20  awhile.  Just me getting over having to deal with it.

21  Feeling like I had to protect teachers, not necessarily

22  protect them.  That's not really my job.  I felt like I

23  needed to be an ear for teachers and I felt responsible

24  at least to listen and just like everybody, whether you

25  are a teacher or not, you don't agree with everything

1    that people do or say and everybody has different

2    experience, so I was always an ear.  A ear for teachers

3    and other staff.

4        Q.   How many years in total would you say that you

5    served as a union steward?

6        A.   I will guess about 18.

7        Q.   18 total years.  Just generally for the jury's

8    information, what does that entail in terms of your role

9    in the school as union steward?

10        A.   As steward we go to monthly meetings.  We get

11    updated on anything that's going on.  PD that's available

12    to us.  And basically if there's like any teachers are

13    going to meet with the administrator.  If there's

14    disciplinary action that could be taken.  It is an

15    outside person.  Not necessarily back then per se.  To be

16    there during the course of meetings as another set of

17    eyes and ears I guess.

18        Q.   When you said PD, what does that mean?

19        A.   Professional development.  Sorry.

20        Q.   You mentioned earlier that Pat deLucia sat in on

21    the interview you had with the investigator.  I may have

22    missed it, but why did he sit in on that interview if you

23    recall?

24        A.   Some other teachers I think may have done the

25    same.  I don't remember exactly how it happened, but I

1    just wanted him to be aware because I didn't want it to

2    go -- I wanted somebody there that can -- basically I

3    felt more comfortable having him there.

4        Q.   Tell me about your experience at Hooker during

5    COVID.  So March 2020 my understanding is you're probably

6    teaching fifth and sixth grade at that point?

7        A.   I believe I was teaching sixth grade language

8    arts and science.  Was I?  I think it was sixth grade

9    language arts and science.  Then at some point after

10   that, we went to compartmentalize totally fifth and sixth

11   grade.  So my experience with COVID, it was very

12   difficult.  It was difficult for everybody, students,

13   parents, kids, everybody.  Pretty much everybody involved

14   it was a difficult time and it was strained, the whole

15   doing it basically online.  The remote learning was

16   difficult.  What was more difficult for me was actually.

17   I actually found remote was less difficult than the

18   hybrid.  It was hard for me to have kids at home and in

19   the classroom.  The way I kind of -- the way I teach and

20   everybody could be different, but I wanted to be in

21   school fully.  I know all the safety issues for me.  I

22   wasn't worried about myself.  I can see some teachers

23   were more worried about themselves or the students.  I

24   felt I wanted to be there.  And teachers were all over

25   the map.  I wanted to be in person.

1    Q.    Did you have any discussion with the teachers

2    who decided or wanted to stay home?

3    A.    There were teachers on both sides and like I

4    said, you can understand everybody's issue, people afraid

5    to come in.  People that were afraid for the students'

6    safety, for their own personal safety.  And I got that.

7    Just for me, I don't know, being selfish I felt like I

8    was all right being in person just as a teacher.  I tried

9    to just.  I didn't personally worry about it too much.  A

10   lot of other people did.

11   Q.    So if I understand your testimony correctly,

12   there was a period of time where there was remote

13   learning that was put in place after Covid started?

14   A.    Mm-hmm.

15   Q.    But did there come a point that you returned to

16   in person learning?

17   A.    Yeah.  So it was students had a choice to stay

18   home and log-in through a computer and some students came

19   in basically fully masked and having the distance, the

20   desks spread apart.

21   Q.    Was that for the 2020-2021 school year?

22   A.    I think.  I'm not sure about whenever.  I know

23   we went out when COVID hit.  We went out on March 13 and

24   it was remote the rest of the year.

25        Then at some point, I can't remember if it was

1    January of the following school year, that we did the

2    hybrid.  I don't remember the exact dates.

3        Q.    In your career teaching for the New Haven Board

4    of Education, have you become familiar with preference

5    sheets?

6        A.    Yeah.

7        Q.    What's your understanding or your familiarity

8    with those preference sheets?

9        A.    I think it is for teachers and school

10   administrators in the district if somebody wants to

11   change grade or ask for a change.  I taught a bunch of

12   different grades.  So I think it is just a way for

13   schools as a whole to see where teachers want to be,

14   where they may fit in.  There's years that I never filled

15   it out because typically what happens is I was approached

16   when I was in second grade by the principal at the time

17   and she asked me if I would be willing to go to sixth

18   grade.  Working on setting things up.  I did put that on

19   my preference sheet that year.

20       Q.    The preference sheet is it a ranking?

21       A.    Yeah.  From what I know and I believe there's

22   usually maybe three spots, could be more and I know

23   teachers that write them in.  I don't think I wrote them

24   in.  I put my first three.  I believe it was the three.

25   Typically if it was a change in my past experience, the

1    administrator would have a conversation with the teacher.

2    I see you want to go to this grade or would you be

3    interested.  Some type of professional conversation

4    whether teacher induced or administrator induced that

5    teachers have.  I don't know if that answers your

6    question.

7         Q.   Yeah.  In your experience as a teacher within

8    the New Haven Board of Education System as well as union

9    steward, have you ever had any discussions?  I want to

10   know about specifics.  Have you ever had any discussion

11   with folks, with co-workers with preferences that they

12   listed in their preference sheets?

13        A.   I don't really recall any issues that teachers

14   had with those.  I think basically what happens is it is

15   usually like some type of professional discussion like I

16   said the principal asked me if I would be interested in

17   going to sixth grade.  That's usually what happens

18   especially if maybe the preference maybe it is the

19   administrator thought they could be teaching a certain

20   subject or grade level, to have to ask you if you want to

21   move.  I was asked if I want to go to second grade.

22   There's a second grade teacher that wanted me to go up

23   and work with her.

24        The only big issue that I have ever seen my

25   first year at Dwight.  I wasn't a steward.  It was my

1    first year.  There was the principal came down I guess it

2    was November of whatever that year was somewhere around

3    that.  I didn't know.  At the time there were classroom

4    limits, maximum limits I guess.  I had over the limit so

5    there was a teacher and I believe he was a steward at the

6    time it came around and asked people how many kids were

7    in their class so I gave him that number.  That

8    administrator came and asked me why I complained about

9    having too many.  I didn't complain.  Somebody asked me

10   how many students I had in my class so I gave it to him.

11   That's the only thing.  He told me he was put in

12   kindergarten the following year because of that.  I don't

13   know of any teachers that have had concerns.  Not there

14   aren't any.  I don't remember.

15       Q.   After the conversation you had with Mr. Gethings

16   and Clorino in October 2021 where Jessica Light's name

17   came up, did you have any administrators at Hooker ask

18   about Jessica Light?

19       A.   I know I was at a meeting.  I know I went to a

20   meeting that involved another teacher. I talked to

21   Ms. Gethings about helping Jessica moving desks in the

22   room, so they would be far enough apart when kids came

23   back.

24       Q.   Anything else?

25       A.   Not that I can really remember.

1            MR. INTERLANDI:  Thank you for your time, sir.

2    I'm all set.

3            THE COURT:  Cross-examination.

4    CROSS-EXAMINATION BY MR. MURPHY:

5        Q.   Maybe working backward a little bit, Mr. Shortt.

6    You said that you were a union steward for how many

7    years?

8        A.   Two years.

9        Q.   Then this prior term?

10       A.   At Hooker?

11       Q.   At Hooker.

12       A.   At Hooker, I came so I will guess about total of

13   13 or 14 years.

14       Q.   Okay.  In that time, have you ever been involved

15   with a grievance filed by teachers?

16       A.   Have I ever been involved in a grievance?

17       Q.   Have you ever been involved with a grievance

18   filed by teachers?

19       A.   No.

20       Q.   Never?

21       A.   Not that I remember.

22       Q.   You testified earlier about a conversation you

23   had with Ms. Gethings and Ms. Clorino, right?  At that

24   time, you said you were upset, right?

25       A.   I was upset when I heard that.

1    Q.    Okay.  At that time, you had hoped you had a

2  good working relationship with principal Ms. Gethings and

3  Ms. Clorino?

4    A.    Right.

5    Q.    At that time, you had a pretty good relationship

6  with Ms. Gethings?

7    A.    Yes.

8    Q.    Did that continue through your time as union

9  steward?

10    A.    I did not have any personal issues, yes.

11    Q.    You met with them monthly?

12    A.    Sometimes.  Like anything else as much as we

13  could.

14    Q.    Did you have a standing monthly meeting with

15  Ms. Gethings and Ms. Clorino as a union steward?

16    A.    Yes.

17    Q.    During that time, you didn't raise any

18  significant issues with Principal Gethings and

19  Ms. Clorino in your position as union steward, correct?

20    A.    No.  I think I did.  I have before, yes.

21    Q.    Did you raise any issues?  I understood your

22  last time to be --

23    A.    I wasn't union steward when Jessica had whatever

24  issues.

25    Q.    And you became union steward in the Fall of

1    2021?

2        A.    Yes.

3        Q.    My understanding was that you had a conversation

4    about moving desks but that's it?

5        A.    If that's when.  When we came back to school.

6    During that I don't believe I was the steward.  I may

7    have my years wrong.  Whenever we came back, I don't

8    believe I was steward at that time.

9        Q.    And speaking of returning to school, you

10   mentioned that you wanted to return to school, right?

11       A.    I did.

12       Q.    You wanted the kids to return to school more

13   specifically?

14       A.    I had an issue with the learning, just

15   apparently with the learning that students may not get.

16       Q.    And you said others felt differently.  One of

17   those individuals who felt differently was Jessica Light,

18   right?

19       A.    Yeah.

20       Q.    You were aware she spoke out pretty

21   significantly?

22       A.    I had conversations with her.  She knew that I

23   didn't share the feeling the same way.  She wasn't alone.

24   People were all over the map on that.

25       Q.    And I know you know what I'm asking.  You have

1    to let me finish your question for the court reporter.

2        A.    I'm not used to this.

3        Q.    So Attorney Interlandi asked you some questions

4    before about your interview by Attorney Goldberg.  Do you

5    remember that?

6        A.    Yes.

7        Q.    Isn't it true that you told Ms. Goldberg that

8    you disagreed with Ms. Light on COVID return to school

9    issue?

10       A.    Yes.

11       Q.    That you tried to avoid Ms. Light at that time

12   because she wanted you to speak at board meetings against

13   reopening schools?

14       A.    If that's what I said.  That may be true.  I'm

15   not -- I didn't agree with her point on that.  We

16   probably had conversations about it.  I wasn't going to

17   go to a Board of Ed and speak to something that I didn't

18   believe in.

19       Q.    You talked a little bit about preference sheets

20   and you have been a teacher.  You are not an

21   administrator, correct?

22       A.    Yes.

23       Q.    You have never done staffing assignments and

24   made staffing decisions, correct?

25       A.    No.

 1              MR. MURPHY:  I don't have any other questions.

 2              THE COURT:  Redirect?

 3              MR. INTERLANDI:  No, Your Honor.  No further

 4    questions.

 5              THE COURT:  All right.  Thank you, Mr. Shortt.

 6    You may step down.  You are excused.  Your next witness

 7    please.

 8              MR. INTERLANDI:  Yes, Your Honor.  The plaintiff

 9    calls Paul Salem to the stand.

10              THE COURT:  If you would come to the witness

11    stand and remain standing and raise your right hand so

12    the oath can be administered to you.

13                          PAUL SALEM

14    Having been called as a witness, was first duly sworn and

15    testified on his/her oath as follows:

16              THE WITNESS:  Yes.

17              THE CLERK:  State your name and spell your last

18    name.

19              THE WITNESS:  Paul Salem, S-a-l-e-m.

20              THE CLERK:  City and state of employment.

21              THE WITNESS:  New Haven, Connecticut.

22              THE COURT:  Please be seated.  Attorney

23    Interlandi, you may proceed.

24    DIRECT EXAMINATION BY MR. INTERLANDI:

25         Q.   Good afternoon, Mr. Salem.

1      A.    Good afternoon.

2      Q.    Who is your current employer?

3      A.    The New Haven Public Schools.

4      Q.    What is your current position?  What grade do

5   you teach currently?

6      A.    I'm a literacy coach at Worthington Hooker

7   School.

8      Q.    How long have you been a literacy coach?

9      A.    Third year.  Previously taught third grade,

10  fourth grade prior to that at a different school.

11     Q.    Let's start with Hooker.  How long have you been

12  working at Hooker?

13     A.    Since the Fall of 2007.

14     Q.    What grade did you first start teaching at

15  Hooker?

16     A.    At Hooker third.

17     Q.    How long did you teach third grade at Hooker?

18     A.    15 years.  I'm trying to think of the timeline.

19  14, 15 years then I was moved to the literacy coach

20  position 2021 for a few months.  Maybe now a full third

21  year entering that same position as a literacy coach.

22     Q.    Where did you teach before Hooker?

23     A.    Truman that was fourth.

24     Q.    How long did you work at Truman?

25     A.    Three years.

1    Q.    Do you know Jessica Light?

2    A.    Yes.

3    Q.    How do you know Jessica?

4    A.    My teaching partner at Worthington Hooker

5    School.  What was it five years, was it?

6    Q.    So about five years at Worthington Hooker

7    School.  Is that what you refer to as your grade level

8    partner?

9    A.    Yes.

10    Q.    How was it working with Jessica Light as far as

11    her being your grade level partner?

12    A.    We complemented each other well.  I would say I

13    would try to keep things organized.  She would infuse the

14    creativity and bring my creativity with lessons.  We

15    complemented each other well.

16    Q.    I'm not sure you were here to hear Mr. Shortt's

17    testimony.  As far as COVID, what was your experience

18    teaching during the start of the pandemic back in March

19    of 2020?

20    A.    That was tough for those couple of months online

21    then coming back in a very unique situation where I had

22    enough back that I had to split them in between two

23    classrooms.  So I had to have a teacher assistant in one

24    room.  I was in one room and bounce between both each day

25    basically.  So I thought making through that and being

1    able to juggle that was a wow moment for me.

2        Q.   What was that time frame, if you can give the

3    jury a sense of the timeline?

4        A.   So that was Fall of 2020 into the Spring of

5    2021, so we came back January I believe so it was right

6    after that.

7        Q.   January of 2021 and your kids were split in two

8    different classrooms to make the distancing work?

9        A.   I had enough come back where they had to be

10   split.  I would do a morning session in one class, teach

11   literacy in the morning and flip over to the other in

12   math, while the other is watching me on the screen and

13   teach at home.  It was a lot to say the least.

14       Q.   All right.  And then you are -- at that point,

15   you are in the early part of 2021 sounds like getting

16   your feet under you, learning the new way of teaching.

17   How is that going for you at the time?

18       A.   Probably similar to everyone at that time.  You

19   are trying to do your best with what you have to make

20   things work and make the experience as great as you can

21   for the students in front of you.  It was a very

22   different thing that we all had to experience.  Try to

23   get through it together.

24       Q.   How were you getting along with a Jessica at

25   that time?  Let's say it is January to March 2021 time

1    frame?

2        A.    Fine.  No issues that I can recall.

3        Q.    And then at some point toward the end of the

4    school year, the 2020-2021 did you have a discussion with

5    Ms. Gethings about your teaching assignment for the

6    upcoming year?

7        A.    If that was the year that Jessica's child was

8    coming into next fall.  Was that the coming year where

9    her child would be in third grade?

10        Q.    Okay.

11        A.    Yes, we had a discussion just about, you know,

12    feeling like teaching with somebody and also then

13    teaching their child, it was a difficult -- I was trying

14    to -- it was a difficult scenario.  I was trying to think

15    it through in my head.  I was nervous about it.  I didn't

16    want anything to effect our teaching relationship or

17    friendship having her child in class.  So it was a

18    concern for me so I kind of brought it up as like I'm not

19    sure how I feel about this and started that discussion

20    of, you know, just being a little -- trying to figure out

21    a way forward at that time.

22        Q.    Was there any resolution or solution to the

23    concern that you brought to them?

24        A.    It was a concern that was brought up, then it

25    was going to be whatever the solution was.  Whether it be

1    something that we kind of collaborate, hey, this is

2    actually going to work out, whether I had another

3    teaching placement.  I wanted to put that concern out of

4    my mind.  I didn't want to necessarily say to Jessica

5    right up front.  I don't want her to think anything with

6    her or her child.  Just a concern about the dynamic of

7    what that looks like.  I never had to deal with that

8    before.

9       Q.    Did you tell Ms. Gethings you were unwilling to

10   teach third grade if Jessica's child was in your class?

11      A.    I never said I'm leaving if that's the scenario.

12   That was never discussed.

13      Q.    Sounds like from your testimony you approached

14   Ms. Gethings to kind of discuss what the options would

15   be.  Is that fair to say?

16      A.    Also my comfort level in what can we do.  Is

17   there a path forward.  I wanted her opinion and her --

18   just her -- I wanted to just bring it up to her how I was

19   feeling.

20      Q.    Did she have a response to you when you told her

21   that?

22      A.    She heard me like she does when I talk to her.

23   She listened to me.  We don't have a resolution right

24   there.  It was just something I think she would be

25   thinking about going forward.  It was just brought up at

1    that point.

2        Q.    Do you recall how long you spoke to Ms. Gethings

3    about that particular topic?

4        A.    I don't recall.

5        Q.    Do you recall when that conversation occurred?

6        A.    It was the year before the spring before her son

7    was coming into third grade.  Whenever that actually was.

8        Q.    Do you think it was before April 1 or after?

9        A.    I don't recall.  I'm sorry.

10       Q.    Did you have a conversation on that topic with

11   Ms. Gethings more than once?

12       A.    It may have been more than once, yes.

13       Q.    Was anyone else present at the time you had the

14   conversation?

15       A.    Not that I remember.  Not that I can recall.

16       Q.    In any of the conversations you had more than

17   once, did you ever tell Ms. Gethings you were unwilling

18   to teach with Jessica Light's child in your class if she

19   remained in a third grade teaching position?

20       A.    I don't recall saying that.

21       Q.    You don't recall or you did not?

22       A.    I don't recall saying that.  I can tell you

23   that.

24       Q.    Did anyone ask you to put that topic that you

25   brought to Ms. Gethings' attention in writing?

1    A.    Like just that, yes.

2    Q.    Someone did ask you to put it in writing?

3    A.    Yes.

4    Q.    Who asked you to put it in writing?

5    A.    The assistant principal.

6    Q.    What's her name?

7    A.    Ms. Clorino.

8    Q.    When did she ask you to do that?

9    A.    I don't remember the exact date.  That spring I

10   guess.  I don't remember the exact date.

11   Q.    Day was after or before April 30, 2021?

12   A.    I'm not sure.  I'm not 100 percent.  I'm sorry.

13   Q.    Do you have a printer in your class or did you

14   have a printer in your class at Worthington Hooker

15   School?

16   A.    Yes.

17   Q.    Do you currently in your position today do you

18   have a printer?

19   A.    I don't have one in my classroom, no.  You go to

20   the literacy coach, no printer.

21   Q.    When you were teaching third grade, why did you

22   have a printer in your classroom?

23   A.    Just to make things easier rather than, you

24   know, sending down to the office.  There were printers in

25   the district.  I don't know exactly who provided them.

1    But some classes were each having their printer to be

2    able to print from their computers so that was kind of

3    nice.

4        Q.   Were teachers in other grades in that building

5    able to print to your printer in your classroom?

6        A.   Not that I'm aware of.  I never had that happen.

7        Q.   Did anyone in your experience at teaching third

8    grade at Hooker, did any of your colleagues print

9    documents or a document to your printer in your

10   classroom?

11       A.   I don't believe so, no.

12       Q.   Did Jessica Light ever tell you she was going to

13   print something from your classroom to your printer?

14       A.   No.

15       Q.   At that time, the 2020-2021 school year, when

16   you were back to in-person learning, did Jessica Light

17   have a printer in her classroom?

18       A.   I believe so.  I think so.

19       Q.   And there came a point in time when Ms. Light

20   was no longer your grade level partner; is that right?

21       A.   Mm-hmm.

22       Q.   Who became your new grade level partner?

23       A.   So at that time we had Ms. Defabio and Ms.

24   Villaneuva.

25       Q.   Did you ever find any email communications on

1    your printer that were sent from Jessica Light's husband

2    to the administrator at Hooker?

3        A.    There was papers that were on my printer, yes,

4    that were an email with her husband's name on them, yes,

5    to administration, yes.

6        Q.    Do you recall the time frame of when you found

7    those documents on your printer in your classroom?

8        A.    I believe so.  It was the end of summer that

9    following year.  So like setting up class room time

10   period.  I can't be one hundred percent sure of the day

11   that would have been.

12       Q.    Maybe it is 2021-2022 school year?

13       A.    Possibly.

14       Q.    Did you do anything when you discovered the

15   document sitting on top of your printer?

16       A.    I saw David's name.  I called her and told her

17   there's papers that have been accidentally left.  I

18   didn't think of how.  I'm not reading a document that has

19   her husband's name on it.  So I didn't think anything of

20   it.  I called her.  She came to get the papers.  That's

21   it.  I didn't read.  Not my business.

22       Q.    Where was Ms. Light, if you know, at time you

23   called her?

24       A.    Over at the other building.

25       Q.    That's the other Worthington building.  You

1    refer to that as the little building?

2        A.    Yes.

3        Q.    Your testimony was that Ms. Light received your

4    call and came over to get it?

5        A.    Mm-hmm.

6        Q.    Yeah.  Do you know what she did next after she

7    received documents from you?

8        A.    I don't know.

9        Q.    Were you aware that on April 30, 2021, Ms. Light

10   filed a claim against administrators at Hooker?

11       A.    No, I wasn't aware of that.

12       Q.    Were you aware ever she filed an internal

13   complaint against the administrators at Hooker?

14       A.    Yes.

15       Q.    How did you become aware of that?

16       A.    I honestly don't remember.

17       Q.    Do you know Rebecca Goldberg?

18       A.    I did, yeah.

19       Q.    Is that someone who interviewed you relative to

20   Ms. Light's complaint?

21       A.    Yes.

22       Q.    Did she ask you about -- did she ask you about

23   this incident regarding your printer?

24       A.    Yes.

25       Q.    Did she ask you about any other incidents?

1    A.    There were some other things.  I can't recall

2    exactly.  That was a few years ago.

3    Q.    Do you recall if when you found the documents on

4    your printer at the beginning of 2021-2022 school year,

5    had you already interviewed with Rebecca Goldberg?

6    A.    No.

7    Q.    Do you think the interview occurred after you

8    found the documents on the printer?

9    A.    Yes.

10    Q.    Why do you think that is so?

11    A.    Because I was asked about them by her.  Again I

12    don't remember the exact time she asked me but it was

13    after.

14    Q.    How long after you found the documents on your

15    printer, if you recall, were you interviewed by Rebecca

16    Goldberg?

17    A.    I don't remember.

18    Q.    Was it before the end of that year, before

19    December 2021?

20    A.    I believe so.  Can't be sure.

21        MR. INTERLANDI:  Thank you.  I don't have any

22    further questions for you.

23        THE COURT:  Cross.

24  CROSS-EXAMINATION BY MR. MURPHY:

25    Q.    Good afternoon, Mr. Salem.

1      A.   Good afternoon.

2      Q.   You mentioned that you were talking about one

3  occasion where you met with Principal Gethings.  You said

4  she heard me like she does and so you met with her on

5  occasions to discuss things, right?

6      A.   Yeah.

7      Q.   She was your principal.  You had to meet with

8  her about certain things?

9      A.   Absolutely.

10     Q.   She would listen to you and talk it over, right,

11  and that was it?

12     A.   Yes.

13     Q.   You have known Principal Gethings for a decent

14  amount of time?

15     A.   2018.

16     Q.   Because first she served as a teacher with you

17  at Worthington Hooker School?

18     A.   No.  She came in.  She was this administrator

19  and I was teaching third grade.  No, we didn't have that.

20     Q.   So in any event, she was your principal for

21  several years?

22     A.   Yeah.

23     Q.   You had a good relationship with her?

24     A.   Mm-hmm.

25     Q.   You were talking about understandably some of

559

1    the difficulties or challenges when you returned to

2    school in January of 2021?

3        A.    Mm-hmm.

4        Q.    The difficulty of trying to bounce back and

5    forth between two classrooms?

6        A.    I still have a note from Ms. Gethings.  I still

7    have that note hanging.  I need to remind myself of how

8    difficult it was.

9        Q.    I think we all have to remind ourselves of the

10   difficulty and challenges that period of time was.  I'm

11   curious.  The timeline of that New Haven returned in

12   January of 2021?

13       A.    Mm-hmm.

14       Q.    You know other teachers in other parts of the

15   state?

16       A.    Mm-hmm.

17       Q.    You are generally aware of the educational

18   landscape?

19       A.    Mm-hmm.

20       Q.    You know that other districts returned much

21   earlier than you?  November?

22       A.    Yes.

23       Q.    New Haven was actually my understanding is the

24   last district to return to inperson learning.  Is that

25   your understanding?

1    A.    I don't know if it was last.  It took awhile.

2    Q.    At the very end of the spectrum of schools?

3    A.    Right.

4    Q.    Do you know whether some schools returned in

5    September 2021?

6    A.    I'm not sure.

7    Q.    Maybe we can agree New Haven was one of the last

8    to return to inperson learning, right?

9    A.    Yup.

10    Q.    At the time, you and Ms. Light and Principal

11    Gethings and everyone in New Haven had an opportunity to

12    observe other districts, what they were going through

13    ahead of you and learn from them, correct?

14    A.    Yeah.

15    Q.    You aren't writing against a blank slate is my

16    point in January of 2021?

17    A.    Right.

18          MR. MURPHY:  No further questions.  Thank you,

19    Mr. Salem.

20          THE COURT:  Anything further?

21          MR. INTERLANDI:  Yes, Your Honor.

22    REDIRECT EXAMINATION BY MR. INTERLANDI:

23    Q.    Sir, who is the building leader at your school?

24    A.    Margaret-Mary Gethings.

25    Q.    Is she a boss?

1    A.   I consider her that.  I have supervisors for

2  literacy.

3    Q.   I served you with a subpoena to be here?

4    A.   Yes.

5    Q.   Did you call Ms. Gethings after you received the

6  subpoena I served on you?

7    A.   I didn't, no.

8    Q.   Did you reach out to her?

9    A.   No.

10    Q.   But she didn't know that you were going to be

11  here at all?

12    A.   That I don't know.

13    Q.   What did the note say that Ms. Gethings left for

14  you when you said you still have a note?

15    A.   Just about being in awe of how I can navigate

16  two classrooms.  Being able to balance that with students

17  coming back.

18    Q.   Handwritten or typed?

19    A.   Handwritten note.

20    Q.   Was that left in your classroom?

21    A.   I believe so, yes, or in my mailbox.  I can't be

22  100 percent sure.

23        MR. INTERLANDI:  No further questions.

24        THE COURT:  Thank you.  You are excused.

25  Mr. Salem, you may step down.  Your next witness please.

1          MR. INTERLANDI:  The next witness is Phyllis

2    Maffuid.

3          THE COURT:  Please remain standing and raise

4    your right hand.

5                    PHYLLIS MAFFUID

6    Having been called as a witness, was first duly sworn and

7    testified on his/her oath as follows:

8          THE WITNESS:  Yes.

9          THE CLERK:  Please state your name and spell

10   your last name.

11         THE WITNESS:  Phyllis Maffuid, M-a-f-f-u-i-d.

12         THE CLERK:  Give us your city and state of

13   employment or residence.

14         THE WITNESS:  Madison, Connecticut.

15         THE COURT:  You may be seated.

16   DIRECT EXAMINATION BY MR. INTERLANDI:

17       Q.   Good afternoon, Ms. Maffuid.  How are you?

18       A.   Fine.  Thanks.

19       Q.   What is your current profession?

20       A.   I'm a special ed para for New Haven.

21       Q.   So your employer is New Haven Board of

22   Education?

23       A.   Yes.

24       Q.   Which school do you work at?

25       A.   Worthington Hooker School.

1    Q.    How long have you been employed and working at

2    Worthington Hooker School?

3    A.    A long time 2006.

4    Q.    Have you always been in the same position as a

5    para?

6    A.    Well, I was part-time when I first started and

7    now I have been full-time for awhile.

8    Q.    When did you go full-time as a paraprofessional?

9    A.    I think it was like 2010.  But I don't exactly

10   know.

11   Q.    And in that role working at Worthington Hooker

12   School, did you -- were you I guess located in one

13   particular building or go between both buildings?

14   A.    Both buildings.

15   Q.    Just generally what is your role in the position

16   as a full-time para at Worthington Hooker School?

17   A.    I support the special ed staff.

18   Q.    In what ways?

19   A.    Well, they basically tell me what to do, what

20   student to cover.

21   Q.    Anything else?

22   A.    I sub sometimes if teachers have a meeting or if

23   there are no subs.

24   Q.    Do you know a woman named Jessica Light?

25   A.    Yes.

1    Q.   How do you know Jessica?

2    A.   I work with her.

3    Q.   How long did you work with Jessica?

4    A.   Pretty much.  I don't know when she started, but

5    until she left Worthington Hooker School, I worked with

6    her.

7    Q.   And while in your role as a para professional I

8    believe for special ed you said, right?

9    A.   Right.

10    Q.   Who was your direct supervisor?

11    A.   There's been different ones.  Ann Raymond for

12    the majority of the time.

13    Q.   Is that who you reported to on a daily basis?

14    A.   Basically, yeah.  If I needed time off or

15    something I would tell Mrs. Gethings.  I would ask Ms.

16    Gethings but Ann Raymond would tell me where to go and

17    what to do on a daily basis.

18    Q.   As part of your role, did you ever assist other

19    teachers nonspecial ed teachers with watching their class

20    for periods of time?

21    A.   Yes.  All the time.

22    Q.   Under what circumstances would you assist your

23    colleagues by watching a classroom?

24    A.   Like I said, when they had meetings, when they

25    were to attend something.

1    Q.   If they had to use the restroom?

2    A.   Yes, I will cover their class.

3    Q.   Do you recall a time when you covered Ms.

4    Light's class in May of 2021?

5    A.   Yeah.

6    Q.   Do you recall the circumstances of why you were

7    able to or why you offered to help her?

8    A.   Yeah.  We were doing dismissals, so we were all

9    outside like the entire school and staff, and I believe

10   she asked me to go to the bathroom or she might have said

11   I have to go to the bathroom.  I said go, you know.

12   Mr. Miller and I were next to each other and we said we

13   have got them and she went in to use the bathroom I

14   believe.

15   Q.   Was that something that you did often during

16   that time May 2021 time frame when you need a minute to

17   use the restroom?

18   A.   Yes.

19   Q.   Did you do that during around dismissal time as

20   well when anyone had to use the restroom?

21   A.   Sometimes teachers have to leave early.  I would

22   walk their class out for them.

23   Q.   Did Ms. Gethings talk to you about you watching

24   Ms. Light's class after that?

25   A.   Yeah.

1    Q.    Do you recall what she said to you?

2    A.    It was so long ago.  I believe she just said,

3  you know, teachers shouldn't leave their classes at

4  dismissal time.  That's basically what I remember.

5    Q.    Do you remember anything else that she said to

6  you during that meeting?

7    A.    No.

8    Q.    Do you recall the location of that meeting?

9    A.    Yeah, her office.

10    Q.    Was anyone else present with you during that

11  meeting?

12    A.    No.  There were other people in the office.

13    Q.    Who were those people?

14    A.    Just teachers, secretaries.

15    Q.    In Ms. Gethings's office?

16    A.    No, no, no.  The whole office as a whole.  It is

17  a business place.  That's where the teachers' mailboxes

18  are and coffee, and, you know, stuff like that, copier so

19  and the secretaries, so there's always people in there.

20    Q.    I misunderstood your testimony.  You went to Ms.

21  Gethings' office and had that conversation?

22    A.    Yes.  She called me into her office.  I think it

23  might have been the next day.  I don't remember when it

24  was.

25    Q.    The next day Ms. Gethings called you into her

1    office.  Was anyone else present with you and

2    Ms. Gethings in her office?

3        A.    Not that I recall, no.

4        Q.    Was the door open to her office or was it

5    closed?

6        A.    I believe the door was closed.

7        Q.    Do you recall how long approximately the meeting

8    lasted in her office with the door closed?

9        A.    Less than five minutes.

10       Q.    How did you feel after the meeting you had with

11   Ms. Gethings in her office?

12       A.    A little confused because I wasn't sure what I

13   had done.  I didn't think I had done anything wrong so.

14       Q.    Did you have any other feelings after you left

15   that meeting with Mrs. Gethings in her office?

16       A.    No.

17       Q.    Did you tell Jessica you had a meeting with

18   Ms. Gethings in her office?

19       A.    I don't recall if I told her or not.

20       Q.    There's a white binder.  I will have you turn to

21   Exhibit 49.  It is an exhibit for identification purposes

22   only.  If you can flip to Exhibit 49 and let me know when

23   you are there?

24       A.    I can't see this.  I don't have my glasses. Can

25   I get them?

1                    THE COURT:  Yes.

2    BY MR. INTERLANDI:

3        Q.    You can sit.  I was going to ask having seen

4    this document what's marked as Exhibit 49 for

5    identification, does it refresh the memory of a

6    conversation you had with Jessica Light after you met

7    with Ms. Gethings?

8                    MR. MURPHY:  My issue first it is not -- I don't

9    believe there was an issue with her memory on that point.

10   Two, this is not an exhibit right now.

11                   THE COURT:  It is not an exhibit being shown to

12   refresh her recollection with respect to the testimony

13   that about her time in Ms. Gethings' office.  I think it

14   is proper.  You can read that document.

15       A.    Yeah.

16                   MR. MURPHY:  My further objection for the

17   document.

18                   THE COURT:  I understand.  You can use anything

19   you want to refresh a witness's memory.

20                   Does it refresh your memory as to anything that

21   took place after you covered Ms. Light's class so she

22   could go to the bathroom?

23                   THE WITNESS:  I don't remember anything about

24   like the middle quotes.

25   BY MR. INTERLANDI:

1    Q.   Is there anything that refreshes your memory

2   that's in that document as to the conversation you had

3   with Ms. Light?

4    A.   I don't know, not really, no.

5    Q.   No, not really.  Okay.  Did you ever tell

6   Jessica that you were asked why you were helping her by

7   Ms. Gethings?

8    A.   No, I don't recall that.  I don't really

9   remember.  It was so long ago.

10    Q.   You did tell her that you had a meeting with

11   Ms. Gethings after you watched her class the day before?

12    A.   I don't remember a specific conversation about

13   it.

14        MR. INTERLANDI:  I don't have any further

15   questions for you.  Actually, Your Honor, I spoke too

16   soon.  I do have a few more questions.

17   BY MR. INTERLANDI:

18    Q.   How is your recollection of that school year for

19   you at Hooker?

20    A.   It was a difficult year.  We had a real

21   difficult class when I was with Jess.

22    Q.   Any other reasons why it was a difficult year?

23    A.   I mean it was like after COVID, things were

24   tough.  But mostly the student that I had was really

25   difficult. It was a one-on-one with a student in

1    Jessica's class and it was tough.

2        Q.    Did there come a point in time that you

3    considered leaving the school?

4        A.    Yeah.

5        Q.    Did that have anything to do with Ms. Gethings?

6        A.    There were a lot of extra rules coming around.

7    We couldn't use our phones and stuff like that.  I

8    communicated with Ms. Raymond on my phone.  She was at

9    one building and I was in my building.  It was something

10   that I was normally doing all the time.  Then you

11   couldn't use your phone.  That made it difficult.  I

12   couldn't communicate with Ms. Raymond to tell me what to

13   do.

14       Q.    Any other new rules came on that were concerning

15   and led you to the decision to potentially leave the

16   school?

17       A.    No.  I mean I work faraway, so, you know, I was

18   interviewing in my town and that would have been a lot

19   easier to not to have to travel so far.

20           MR. INTERLANDI:  Thank you, Ms. Maffuid.  No

21   further questions.

22           THE WITNESS:  Thank you.

23   CROSS-EXAMINATION BY MR. MURPHY:

24       Q.    At the time you said Principal Gethings spoke to

25   you about dismissal, you were outside with Ms. Light's

```
1   class, right?

2       A.   Yes.

3       Q.   That's at dismissal time?

4       A.   Yes.

5       Q.   Kids were being picked up at that time?

6       A.   Yes.

7            MR. MURPHY:  No further questions.

8            THE COURT:  Anything further?

9            MR. INTERLANDI:  No, Your Honor.

10           THE COURT:  You may step down.  Take your

11  glasses and you are excused.

12           Call your next witness.

13           MR. INTERLANDI:  My next witness is not here.

14  She's an employee of the New Haven Board of Ed.  We

15  discussed this with counsel.  She's available.  She's not

16  here.

17           MR. MURPHY:  She was scheduled for tomorrow

18  morning.  She's on her way.  As soon as I saw how this

19  was going, I texted her.

20           THE COURT:  Recess time.

21           (In the absence of the jury at 2:01 p.m.)

22           THE COURT:  After Ms. Bonner, who is your next

23  witness?

24           MR. INTERLANDI:  I don't have any further

25  witnesses after Ms. Bonner.
```

```
 1            THE COURT:  You will be resting?

 2            MR. INTERLANDI:  Yes, Your Honor.

 3            THE COURT:  Who is your first witness?

 4            MR. MURPHY:  Principal Gethings.

 5            THE COURT:  We might get to Ms. Gethings today.

 6            MR. MURPHY:  I wasn't expecting that.

 7            THE COURT:  You can make the adjustments you

 8    need to while we're on recess waiting for Ms. Bonner.

 9    Okay.

10            (Whereupon, a recess was taken from 2:02 to 2:42

11    p.m.)

12            THE COURT:  Thank you.  Ms. Bonner is here?

13            MR. MURPHY:  Yes.

14            THE COURT:  Ms. Bonner, would you kindly come

15    over to the witness stand?  Would you kindly bring the

16    jurors back?

17            (In the presence of the jury at 2:44 p.m.)

18            THE COURT:  All right.  Please, ladies and

19    gentlemen, you may be seated.  Ms. Bonner is on the

20    stand.  Ms. Bonner, would you kindly stand and raise your

21    right hand and you will be sworn.

22                 TARYN BONNER WILLIAMS

23    Having been called as a witness, was first duly sworn and

24            testified on his/her oath as follows:

25            THE WITNESS:  I do.
```

1          THE CLERK:  Please state your name, spell your

2     last name, city, state of residence.

3          THE WITNESS:  Taryn Bonner Williams,

4     W-i-l-l-i-a-m-s.  New Haven, Connecticut.

5          THE COURT:  You may be seated.  And you may

6     proceed with your examination, Attorney Interlandi.

7          MR. INTERLANDI:  Thank you, Your Honor.

8     DIRECT EXAMINATION BY MR. INTERLANDI:

9     Q.   Good afternoon, Ms. Bonner.

10    A.   Good afternoon.

11    Q.   Thank you for being here today.  I have a few

12    questions for you as relates to woman named Jessica

13    Light.  Do you know Jessica?

14    A.   Yes.

15    Q.   How do you know Jessica?

16    A.   She's an employee at New Haven Public Schools.

17    Q.   How long approximately have you known Jessica

18    Light?

19    A.   Since 2021 I believe.

20    Q.   What is your current job title for the New Haven

21    Board of Education?

22    A.   Labor Relations Manager.

23    Q.   How long have you held that position?

24    A.   Since 2019.

25    Q.   What was your position at the New Haven Board of

1    Ed before that?

2        A.    Labor Relations Specialist.

3        Q.    How long have you worked for the New Haven Board

4    of Education?

5        A.    In total I would say ten years.

6        Q.    Is there a time break in employment where you

7    worked for another employer?

8        A.    Yes.

9        Q.    Where did you work?

10       A.    I worked for the New London Public Schools in

11   2016 until 2019.

12       Q.    What was your role in New London?

13       A.    Human Resources Director.

14       Q.    So in 2021, remind me what was your title at the

15   time for the New Haven Board of Education?

16       A.    It was Labor Relations Manager.

17       Q.    Who was your direct supervisor?

18       A.    Lisa Flegler.  Currently Lisa Flegler who is the

19   Director of Human Resources.

20       Q.    Is she still your direct supervisor?

21       A.    Yes.

22       Q.    How did you come to know Ms. Light in 2021?

23       A.    Ms. Light filed a complaint with the Human

24   Resources Office and I was assigned her complaint.

25       Q.    By whom were you assigned?

1      A.    My director Lisa Flegler.

2      Q.    As a result of that assignment, what did you do

3  next?

4      A.    I read Ms. Light's complaint.  There was

5  initially a written complaint that was submitted and I

6  spent sometime and I met with Ms. Light to go over her

7  complaint.  I actually started to do some initial

8  investigating of the complaint.  I put together a plan to

9  carry out the investigation.  That's essentially the work

10  that I did at the beginning of Ms. Light's complaint in

11  2021.

12      Q.    Is that process that you explained is that in a

13  written document or guideline or protocol for how to

14  process an internal complaint?

15      A.    It is not.

16      Q.    Is that your own process at that time?

17      A.    Yes.  Based off of practice and procedures that

18  we have carved out in the Human Resources Office over

19  several years.

20      Q.    In addition to your role in investigating

21  complaints as a Labor Relation Manager, what other

22  functions did you serve in that role?

23      A.    As a Labor Relations Manager?

24      Q.    Yes.

25      A.    In addition to investigations, I dealt with

1    grievances.  I worked with processing accommodations

2    through the ADA.  I worked in maintaining personnel

3    records, answer Freedom of Information requests.  I'm

4    sure a couple of other things.  Those are the ones that

5    come to mind.

6        Q.    You said ADA.  What are you referring to?

7        A.    The Americans with Disabilities Act.

8        Q.    Personnel records is that personnel files?

9        A.    Employment is really resume, things of that

10    nature.

11        Q.    Are you familiar with terms like if there's any

12    document like the types of documentation that will go in

13    part of a personnel record of a particular employee?  Are

14    you familiar with that?

15        A.    Yes.

16        Q.    For the New Haven Board of Education, at least,

17    does each worker have his or her own personnel file or

18    could there be multiple files?

19        A.    Each employee -- full-time employee has a

20    personnel file within the Human Resource Office.  It is

21    possible that particular departments or particular

22    schools that there may be a separate file maintained at

23    that site.  But it is not a consistent practice across

24    the district.

25        Q.    If a teacher had a complaint, would there be an

1    investigation file concerning that complaint or does that

2    go in the personnel file?

3        A.   There would be a separate file for that.  If the

4    teacher filed a complaint with the Human Resources, that

5    complaint would be maintained what we would call a labor

6    file.

7        Q.   If a teacher received any kind of disciplinary

8    action, which file would that go in?

9        A.   It depends.  It is possible it can go in both.

10   If it is based on a complaint, a copy can live in the

11   labor file attached to that complaint and also in the

12   personnel file.

13           If it was not related to a complaint so say, for

14   instance, if it was for tardiness, that copy of that

15   discipline would only live in the personnel file.

16       Q.   Thank you.  So I heard you say that your plan,

17   as you received Jessica's complaint, was to start your

18   investigation and part of that was to interview Jessica,

19   is that correct?

20       A.   Yes.

21           MR. INTERLANDI:  Your Honor, I would like to

22   request that I treat Ms. Bonner as an adverse witness so

23   I may ask leading questions.  She's a current employee.

24           THE COURT:  You are a management employee; is

25   that correct?

578

1           THE WITNESS:  Yes.

2           THE COURT:  You may.

3           MR. INTERLANDI:  Thank you, Your Honor.

4    BY MR. INTERLANDI:

5      Q.   Did you tell Ms. Light after she filed her

6    complaint, if she felt there were any additional

7    retaliatory conduct toward her, she should report those

8    immediately to you?

9      A.   Yes.

10     Q.   At some point during your process of

11   investigating the complaint, did you tell Ms. Light that

12   you believed the investigation had been tainted by one of

13   the administrators at Hooker?

14     A.   I did not.

15     Q.   There's a binder in front of you.  If you can

16   look at Exhibit 12 and let me know when you are there.

17     A.   I'm there.

18     Q.   This is an email that you received from Ms.

19   Light, correct?

20     A.   If I can have a moment to read it.

21     Q.   Take a look at it.  It is a two-page document,

22   Light 00216 and second page 217.

23     A.   Okay.

24     Q.   Do you recall receiving this email from Ms.

25   Light?

1    A.    I don't specifically, but I don't have any

2    reason to believe that I didn't.

3    Q.    In this email, you told her that a witness had

4    been tainted, isn't that true?

5    A.    That's what it says here.

6    Q.    You never replied to her and said I never said

7    that, correct?

8    A.    I don't recall if I responded to this particular

9    email.

10   Q.    Did you ever tell anyone there was something

11   about the investigation that you felt was professionally

12   concerning to you?

13   A.    I did.

14   Q.    Do you recall when I took your deposition

15   probably let's say February 17, 2023?

16   A.    I do.

17   Q.    You told me back then there was something that

18   you believe was professionally concerning to you.  What

19   was that?

20   A.    In Ms. Light's complaint there was several

21   examples of what she felt were retaliatory acts from the

22   administration. There was a countercomplaint or rebuttal

23   from the administration to Ms. Light's initial complaint

24   that there was -- I can't recall the name but a male

25   teacher who was identified as a witness to one of those

1  particular acts.  The administration had reached out to

2  that individual and asked about that particular incident.

3       I was concerned that that act had happened that

4  the administration had reached out to that particular

5  witness or that individual.  Typically, in my practice, I

6  would interview the witnesses directly as opposed to

7  having some outside person who is directly involved have

8  that conversation or to reach out so that was my concern.

9       Q.  Did you have any other concerns that you found

10  that were not good in your opinion?

11      A.  Not that I can recall right now.

12      Q.  When you provided -- when you provided Ms.

13  Light's complaint at Hooker, did you tell them they

14  should not talk to or try to get any statements from the

15  witnesses?

16      A.  I do believe in my written notice to them,

17  that's language that's in the letter.

18      Q.  As a result of what you found professionally

19  concerning as relates to the investigation, what happened

20  next?

21      A.  I brought my concern to my supervisor Lisa

22  Flegler to brainstorm what, if anything, different needed

23  to happen.

24      Q.  Did you together reach a conclusion on what was

25  to happen next?

1    A.    Yes.

2    Q.    What was that decision?

3    A.    I was directed to reach out to legal counsel to

4    express my concern and to get feedback.

5    Q.    And then what happened next?

6    A.    I reached out to an attorney, got some feedback.

7    And that's all that happened.

8    Q.    Did you continue the investigation of Ms.

9    Light's complaint?

10   A.    Ultimately I did not.  I can't remember the

11   exact date that I stopped and someone else started.  But

12   no, I did not continue the investigation.  I didn't

13   complete the investigation.

14   Q.    Who completed the investigation?

15   A.    The district hired an outside law firm.  Berchem

16   and Moses to complete the investigation.

17   Q.    Did there come a point in time that they

18   completed the investigation?

19   A.    Yes.

20   Q.    Do you recall approximately when that occurred?

21   A.    The end of 2021.

22   Q.    Do you recall when Ms. Light filed her

23   complaint?

24   A.    Spring of 2021.

25   Q.    From the Spring of 2021 to the end of 2021, did

1    Ms. Light send you emails to follow up or look for a

2    timeline when the investigation would be completed?

3        A.    Yes.

4        Q.    Did she do that multiple times?

5        A.    Yes.

6        Q.    Did you ever give Ms. Light a draft or list of

7    Rules of Engagement for her as she started a 2021-2022

8    school year as the investigation was still pending?

9        A.    I do not recall specifically.

10        Q.    Please turn to Exhibit 13 in front of you and

11    let me know when you are there.

12        A.    I'm there.

13        Q.    Okay.  If you can turn to the third page, that's

14    DEF 000091.  Let me know when you are there.

15        A.    I'm here.

16        Q.    Do you recall sending an email to Jessica on

17    August 27, 2021 at 12:47 p.m.?

18        A.    I don't recall sending this email, but I'm sure

19    I did.

20        Q.    That's your name at the bottom sincerely, Taryn

21    R. Bonner?

22        A.    Yes.

23        Q.    And says I started a draft of rules that I

24    believe captures some of the underlining concerns of the

25    parties.  I have attached the draft for you review and

1    feedback.

2            In this time frame of August 2021, do you have

3    any recollection sitting here today what those underlying

4    concerns of the parties were?

5    A.    Yes.

6    Q.    What were they?

7    A.    I recall the concern being how Ms. Light would

8    transition back to working at Worthington Hooker School

9    in light of the administration still being present and

10   being the principal and assistant principal of the

11   school.

12   Q.    And did there come a point in time before this,

13   at the end of a previous school year that you learned

14   that the administrators had filed their own complaint

15   against Ms. Light?

16   A.    Yes.

17   Q.    And were you the person responsible for

18   getting that as well or was someone else assigned to it?

19   A.    Someone else was assigned to it.

20   Q.    Did that person complete or did that

21   investigation go to Berchem and Moses?

22   A.    Went to Berchem.

23   Q.    Did there come a point in time before August

24   2021, you became aware a teacher named Hilarie Alden

25   filed a list of concerns about Ms. Light?

1    A.   Yes.

2    Q.   Were you the person in charge of doing the

3  investigation of that complaint?

4    A.   I was not.

5    Q.   Who was that person that was assigned to?

6    A.   Berchem Moses.

7    Q.   Berchem and Moses took it on.  Is it your

8  testimony took on all three of the complaints?

9    A.   Yes.

10    Q.   The Rules of Engagement that you purport to be

11  part of this email as an attachment, that starts DEF

12  00092, is that -- do you recall drafting that document?

13    A.   I do.

14    Q.   And the first one on 9-2 says Ms. Light will and

15  there's bullet points.  Do you see those?

16    A.   Yes.

17    Q.   Next page says the administration will and a

18  bunch of bullet points there, right?

19    A.   Yes.

20    Q.   One of those on the right side says the

21  administration will be open to receiving suggestions and

22  feedback from JL.  Who is JL?

23    A.   Jessica Light.

24    Q.   Participate fully in the Teval process?

25    A.   That's the teacher evaluation process.

585

1        Q.    At the top of each of those, it has like a blank

2   line where it looks like someone would fill in their

3   name.  Is that what it was meant for?  For example on 9-3

4   at the top, we blank and blank the administration.  Do

5   you see that?

6        A.    I believe that was the intention.

7        Q.    Was it the intention for that to be completed by

8   Ms. Gethings and Ms. Clorino?

9        A.    Yes.

10       Q.    Did any of the parties ever sign their name to

11  these Rules of Engagement?

12       A.    From my recollection, we were unable to get an

13  agreement so, no, I don't believe any of them signed it.

14       Q.    So then the school year started without any

15  rules in place.  Is that fair to say?

16       A.    Not with any special rules that were drafted in

17  this document so no.

18       Q.    No.  But is it fair to say there were no rules

19  of engagement specific to how the parties would engage

20  with each other as they started the new school year,

21  correct?

22       A.    I would say the expectation was for them to be a

23  regular employee.  The same rule that would apply for any

24  teacher and administrator.

25       Q.    Then you state the investigation was completed

1    by Berchem Moses.  Did you receive the reports from

2    Berchem Moses?

3        A.    I'm not sure.

4        Q.    Did you forward those over to Ms. Light?

5        A.    Yes.

6        Q.    Please turn to Exhibit 46 and let me know when

7    you are there.

8        A.    I'm there.

9        Q.    Do you recall receiving this email from Jessica?

10   And for the record, there are portions that are redacted

11   by agreement in this document?

12       A.    I don't remember, but I'm sure I did.

13       Q.    The date of this is December 9, 2021 at 9:41

14   a.m. and lists your name there, correct?

15       A.    Yes.

16       Q.    And it says thank you for sending the three

17   investigative reports on Friday afternoon, correct?

18       A.    Yes.

19       Q.    Do you recall -- I know you don't recall

20   receiving this specifically.  Do you recall if you

21   replied to Ms. Light's email?

22       A.    I do not recall.

23       Q.    Were you aware at this time Ms. Light was out on

24   a period of medical leave?

25       A.    Yes.

1    Q.    Then what happened next?  After the

2   investigation concluded, what was the next step for

3   Jessica to return to work and get her, you know, put her

4   teaching hat back on for her first graders?

5    A.    From my recollection, when her medical leave

6   ended, I believe it was around the end of December.  I

7   think the school was on Christmas break and so the next

8   step was for her to return to work in January 2022.

9    Q.    Do you recall attending any meetings in that

10   regard to discuss when or how to return Jessica back to

11   work?

12    A.    Yes.

13    Q.    Do you recall the date of that meeting?

14    A.    The specific date, no.  I know it was January of

15   2022.

16    Q.    Do you recall the other people who were present

17   during that meeting?

18    A.    I do.

19    Q.    Who was present?

20    A.    My director Lisa Flegler, Ms. Light, Leslie

21   Blatteau, the teacher union president at the time and I

22   believe Pat Delucia was there as well who was the teacher

23   union VP at the time and myself.

24    Q.    Do you recall what was discussed during that

25   meeting specifically?

1     A.   I'm sure I don't recall everything.  From what I

2  do recall, the goal of the conversation was to answer

3  some questions that Ms. Light had about her return to

4  work.  Specific things I can remember what her evaluation

5  would look like if they continue to be evaluated

6  considering this was the middle of the school year.  The

7  specifics of her return and mediation was another focus

8  of that conversation.

9     Q.   Did she also ask about returning to third grade?

10     A.   I don't recall, but it is possible.

11     Q.   Let's move to Exhibit 27.  It is in the binder

12  in front of you.  Let me know when you are there.

13     A.   26 of 27?

14     Q.   27.

15     A.   I'm there.

16     Q.   This is a transcript.  Redacted copy of the

17  transcript that's agreed upon as a full exhibit in this

18  case, and it lists on the second page the name of the

19  folks who are present.  Do you agree with the names?

20     A.   Yes.

21     Q.   Specifically were safeguards by Jessica brought

22  up during this meeting, if you recall?

23     A.   I recall discussing safeguards. I'm not sure

24  Jessica brought them up or who brought them up.

25     Q.   During this meeting, toward the end, you said I

1    would get back to her on points she raised and you would

2    work like the Energizer Bunny.  Do you recall that?

3        A.   I didn't recall that.

4        Q.   At the bottom of 26, I will hop off and try and

5    work like the Energizer Bunny.  Do you recall saying

6    that?

7        A.   Yes.

8        Q.   What were you going to be doing working like an

9    Energizer Bunny for?

10        A.   Specifically what I recall was the mediation

11    piece.  The district has a contract with our EAP program,

12    and it was important, based on this conversation, that

13    some type of mediation happen, so the parties can go back

14    to work successfully.  So it was my goal and I was

15    enthusiastic about trying to set that up.

16        Q.   What's EAP?

17        A.   Employee Assistant Program.

18        Q.   At this time when you are going to work like the

19    Energizer Bunny, was Jessica still out of work?

20        A.   I believe so.

21        Q.   Was she required to come back to work before the

22    mediation was scheduled?

23        A.   I'm not certain.

24        Q.   Let's look at Exhibit 19.  Let me know when you

25    have that in front of you.

1    A.    I have it.

2    Q.    Turn to the last page with the control number of

3    DEF 00082.  This appears to be an email with your name on

4    it and signature block at the bottom.  Do you recall

5    sending this email to Jessica four days after the meeting

6    on January 18, 2022?

7    A.    I don't recall.  I'm sure I sent it.

8    Q.    Okay.  So your name is there and that's your

9    signature block at the bottom, right?

10    A.    Yes.

11    Q.    And says good afternoon, Ms. Light.  See the

12    attached hard copy has been mailed to your home for your

13    records.  The subject is return to work notice, right?

14    A.    Yes.

15    Q.    Please turn to Exhibit 16 and let me know if you

16    have seen that notice to return to work before today.

17    A.    Yes.  I have seen this.

18    Q.    Is this the letter that was referenced in the

19    email that we talked about that was in Exhibit 19?

20    A.    Yes.

21    Q.    This is directing Jessica to return to work on

22    January 18, 2022, right?

23    A.    Yes.

24    Q.    The same day of the letter, correct?

25    A.    Yes.

1      Q.   Is there any mention at all in this letter

2  concerning mediation?

3      A.   No.

4      Q.   And it is signed by whom?

5      A.   Lisa Flegler.

6      Q.   She was your supervisor at the time, correct?

7      A.   Yes.

8      Q.   There's a CC line.  Who is Leslie Blatteau?

9      A.   She was at this time the teacher union

10 president.

11     Q.   The CC line what does that mean?

12     A.   She received a copy of the letter.

13     Q.   Under her name says file.  What does that mean

14 about this letter?

15     A.   It means a copy of a letter is maintained in a

16 file.

17     Q.   Which file would that be?

18     A.   This would likely live in either her medical

19 file or the labor file related to the investigation that

20 was previously completed.

21     Q.   How about her personnel file, would it go in

22 there, too?

23     A.   I don't think so.  It wasn't likely that this

24 would have been placed in her personnel file.

25     Q.   It is not likely?

592

1    A.    Yes.  I think it is unlikely that it was placed

2    in her personnel file.

3    Q.    When I took your deposition back in February

4    2023, do you recall telling me that as related to the

5    ways to return Jessica back to work, you were thinking

6    about one of the things was how do we make sure that

7    Jessica feels supported going back into this environment.

8    Do you remember telling me that?

9    A.    Yes.

10   Q.    Do you have an understanding sitting here today

11   what you meant by that when you told me it over a year

12   ago?

13   A.    As to what I meant when I said.

14   Q.    You said one of the things you were considering

15   how do we make sure that Jessica feels supported going

16   back into that environment.  What did you mean by that?

17   A.    I meant how do we as a district, as a

18   department, support her, at least hear her concerns and

19   respond to them so that she can be successful on her

20   return back to work.

21       Ultimately, the goal is having successful

22   employees deliver quality instruction to the students.

23   If our staff doesn't feel supported or in a good place,

24   it is less likely they will deliver that quality

25   instruction.  Trying to support her in whatever that

1    looks like specifically was my goal.

2        Q.    Were you able to achieve that goal?

3        A.    I tried my hardest but I'm not sure I was able

4    to achieve that.

5        Q.    Was a mediation scheduled?

6        A.    Yes.

7        Q.    Do you recall when that mediation occurred?

8        A.    I do not.

9        Q.    Please turn to Exhibit 18 and let me know when

10    you are there.

11        A.    I'm there.

12        Q.    This appears to be an email from you.

13            Do you remember sending this email?

14        A.    Yes.

15        Q.    Why do you recall this email to those folks?

16        A.    Why do I recall because I was working like the

17    Energizer Bunny to get this mediation set up and squared

18    away.

19        Q.    Was the mediation that occurred held in February

20    of 2022?

21        A.    I'm not sure when the mediation was held.

22        Q.    Were you a participant at that mediation?

23        A.    I don't recall.

24        Q.    Do you recall the outcome of the mediation?

25        A.    I don't.

1    Q.   Do you recall what matters or items were to be

2    mediated during the mediation?

3    A.   No.

4    Q.   But you would agree something needed to be

5    mediated, right?

6    A.   Yes.

7    Q.   After the reports were received by the school

8    district, the New Haven Board of Education, after that

9    point, was Ms. Light disciplined in any way for her

10   actions -- for her alleged actions?

11   A.   No.

12   Q.   Did the administrator at Hooker receive any

13   disciplinary action as a result of their alleged actions?

14   A.   Yes.

15   Q.   What discipline did she receive?

16   A.   I believe --

17        MR. MURPHY:  I object to this question.

18        THE COURT:  Basis?

19        MR. MURPHY:  Has to do with your prior ruling.

20   Maybe we can have a quick discussion about this.

21        THE COURT:  I will see you at sidebar.

22        (Beginning of sidebar.)

23        MR. MURPHY:  Previously excluded a report and

24   all the conclusions from the report and discipline is a

25   result and conclusion of the report.  I don't understand

1    how we can discuss it.  There's two exhibits that haven't

2    been admitted.

3            MR. INTERLANDI:  I'm asking her.  They were

4    verbal warnings and what happened with those next went

5    into the personnel file and ask her about those.  They do

6    not reach the findings or conclusion.  They reference the

7    investigation that there was in court and it says as a

8    result of my finding that there's discipline.

9            THE COURT:  My finding.

10           MR. INTERLANDI:  Superintendent Tracy.  Doesn't

11   say the findings of that investigator or anything about

12   their conclusions reached by Ms. Caldwell.  Does not in

13   27 and 28 I believe.

14           THE COURT:  Is related to after the reports were

15   received.

16           MR. INTERLANDI:  They received discipline.

17           THE COURT:  Discipline that's what you meant

18   after the investigation reports were received.

19   Administrator was disciplined.

20           MR. INTERLANDI:  I'm asking if there were any

21   discipline.

22           THE COURT:  That result in the conclusion of

23   that report, does it not?

24           MR. MURPHY:  Highly suggest that they were

25   disciplined for the context in the report are

1    prejudicial.

2              THE COURT:  The question was asked in a way that

3    disassociates from the investigative report conclusion.

4              MR. INTERLANDI:  The context of the

5    investigation.

6              THE COURT:  I didn't --

7              MR. MURPHY:  That's the investigation.  The

8    superintendent is not a witness.

9              THE COURT:  Apparently the superintendent who is

10   the one that did the discipline.

11             MR. INTERLANDI:  She signed it.

12             THE COURT:  Is your conclusion a conclusion of

13   the investigation?

14             MR. INTERLANDI:  I can withdraw that and say as

15   a result of Jessica Light's complaint, did she ever

16   receive discipline.

17             THE COURT:  But the fact that the superintendent

18   is doing this is that to be explained?

19             MR. INTERLANDI:  That's explained in the letter.

20   In the letter that the verbal warning of that issued.

21             THE COURT:  Verbal warning is not a letter.

22             MR. INTERLANDI:  It is a letter at the top says

23   verbal warning.

24             MR. MURPHY:  We have these discussions all the

25   time.

1    THE COURT:  So the issue is after the

2  investigation of Ms. Light's complaint, was she

3  disciplined.  No.  Was anybody disciplined?  Yes.  The

4  superintendent disciplined them.

5    MR. MURPHY:  It suggests that the discipline was

6  issued because of the result of the investigation.

7    THE COURT:  Let me thread that needle.

8    I think that's appropriate.  If she doesn't

9  discipline, the principal does get disciplined.  That's

10  all part of.

11    MR. MURPHY:  That's my point.  That question

12  should not have been asked is the principal disciplined?

13  It necessarily suggested that the discipline is a result

14  of this report.

15    MR. INTERLANDI:  There's no specific act that

16  occurred.

17    MR. MURPHY:  The letter is an exhibit.  I

18  objected they are not in.  I think the letters are dated

19  May or June.

20    MR. INTERLANDI:  No.  February 22.

21    MR. MURPHY:  I stand corrected.

22    MR. INTERLANDI:  The day of something like it is

23  connected to something.  It is escaping me now.

24    THE COURT:  After that, there's no results?

25    MR. MURPHY:  The last one claimed the January

1    return to work situation.  That's not involved in this

2    HR.

3           You can see by the complicated nature of the

4    conversation.  I think that supports my argument.  That's

5    unfairly prejudicial.  To talk about any discipline

6    necessarily implies the finding about Ms. Gethings were

7    legitimate.

8           MR. INTERLANDI:  This goes to the argument about

9    the timeline where clearly just like a broken train falls

10   off the tracks.

11          For reasons that I stated in the motion in

12   limine the letter is in.  A verbal warning through a

13   letter in her personnel file.

14          THE COURT:  Who did?

15          MR. INTERLANDI:  Ms. Gethings.

16          THE COURT:  So what was -- remind me what's in

17   the records.

18          MR. INTERLANDI:  It says there's an

19   investigation and has a date in there.  Then the second

20   paragraph says, these are my findings.  These are the

21   things that you did wrong.

22          THE COURT:  This is the superintendent's

23   writings?

24          MR. INTERLANDI:  That's what it says in the

25   letter.  As a compromise, I will redact in the first

1    paragraph is that reference to reports.

2          THE COURT:  What did it say?

3          MR. INTERLANDI:  It said that she did two or

4    three bullet points.  I can't remember off the top of my

5    head.  I think one of them has to do with the free speech

6    prong.  Some of this should -- I forget.  I can get it.

7    47.

8          THE COURT:  Why can't this exhibit with

9    substance be admissible.  No one was specifically --

10         (CROSS TALK)

11         THE COURT:  There's a reason that I say that --

12   the superintendent she's making findings that does not

13   mean that's what the report found and it goes on from

14   there.  Doesn't seem fair to me that the jury should ever

15   hear that Ms. Gethings suffered any consequences of any

16   of this undertaking.  They reach conclusions that the

17   jury needs to make and the superintendent is making her

18   own findings so simply deleting the first paragraph seems

19   to me that that's appropriate and not at variance with

20   what is in the reports.  Don't discuss the report's

21   substance in front of the jury.  But that the

22   consequences of the report would be admissible.  I

23   understand the defendant's concern that the jury can draw

24   a conclusion about what the report says, but you have

25   given them the instruction that the report is not a

1    finding.  I think that's the way to handle it.

2          MR. MURPHY:  Yes.  I still maintain the whole

3    letter should be excluded as well as questions about she

4    was disciplined as a result of the investigation I think

5    that should be stricken.

6          THE COURT:  I will strike that from the record.

7    And we'll proceed.

8          MR. MURPHY:  Tomorrow we'll have a redacted

9    copy.  We're not going to finish Ms. Bonner today.

10          THE COURT:  I do want witnesses to be here and

11   waiting opposed to have all of us waiting for them.

12          (End of sidebar.)

13          THE COURT:  I'm going to strike the last two

14   questions and invite plaintiff's counsel to proceed with

15   appropriate questions.

16   BY MR. INTERLANDI:

17     Q.   In early 2022, Ms. Bonner, are you aware of the

18   defendant Margaret-Mary Gethings suffered any

19   consequences of the alleged conduct that Ms. Light set

20   forth in her initial HR complaint?

21     A.   Yes.

22     Q.   What's your understanding of the consequence

23   Ms. Gethings suffered?

24     A.   There was a meeting with the superintendent and

25   Ms. Gethings was issued a warning.

1    Q.   Was that warning reduced to a writing?

2    A.   Yes.

3    Q.   And does that writing go in her personnel file?

4    A.   Yes.

5         MR. INTERLANDI:  Your Honor, that would bring me

6    to that Exhibit 47 and I would offer that with the

7    proposed redaction as a full exhibit.

8         THE COURT:  That's fine.  If you have it fully

9    redacted, it can be a full exhibit but not until it is

10   fully redacted.

11        It is 48.  47 is not being offered, right?

12        MR. INTERLANDI:  Correct.

13        No further questions, thank you.

14        THE COURT:  Cross-examination.

15   CROSS-EXAMINATION BY MR. MURPHY:

16   Q.   Good afternoon, Ms. Bonner.

17   A.   Hello.

18   Q.   Attorney Interlandi showed you Exhibit 12 which

19   was an email from Ms. Light to yourself.  Do you remember

20   that?

21   A.   I don't.

22   Q.   All right.  Does that refresh your recollection

23   as to Exhibit 12?

24   A.   Yes.

25   Q.   All right.  And whose words are in that email

1    from Ms. Light to you?  Who wrote it?

2        A.    I presume Ms. Light.

3        Q.    So the words Attorney Interlandi was attributing

4    to you, were those your words?

5              MR. INTERLANDI:  Objection.  Mischaracterizes.

6              THE COURT:  I don't understand the question.

7    BY MR. MURPHY:

8        Q.    Attorney Interlandi asked you did you ever say

9    the investigation was tainted, correct?

10       A.    Yes.

11       Q.    You denied that, correct?

12       A.    Yes.

13       Q.    The exhibit he showed you was an email from his

14   own client, correct?

15       A.    Yes.

16       Q.    Attorney Interlandi also asked you some

17   questions about the start of the 2021-2022 school year

18   and I want to follow-up on that.  He asked whether or not

19   there were any rules in place to start the school year.

20   Do you remember that question?

21       A.    Yes.

22       Q.    I think your answer was there were no special

23   rules, correct?

24       A.    Yes.

25       Q.    Was there a discussion with Ms. Light and her

603

1    union representative at this time about holding off on

2    evaluations during that school year?

3        A.    Yes.

4        Q.    Were you involved in those discussions?

5        A.    Yes.

6        Q.    Did you grant that request to Ms. Light and her

7    union?

8        A.    Yes.

9        Q.    And why did you do that?

10       A.    I don't recall the specific reason.  I know I

11   helped reach the decision but more of an instructional

12   thing so that's instructional decision that would have

13   come from either the superintendent or assistant

14   superintendent.  I'm not specifically sure why but I can

15   speak from the process part.  It started because of the

16   complaint.

17       Q.    Okay.  I think you were also asked some

18   questions about whether Ms. Light asked to go back to the

19   third grade.  Do you remember those questions?

20       A.    Yes.

21       Q.    And who makes grade choice assignments:  HR or

22   the building principal?

23       A.    It would be the building principal.

24       Q.    Is that something you told Ms. Light --

25   withdrawn?

1           Can we have Exhibit M please.  Ms. Bonner, I'm

2    showing you Defendant's Exhibit M.  That's an email

3    exchange on February 8 and 9 of 2022.  Okay?

4        A.   Yes.

5        Q.   I will give you a second to read through it.

6        A.   Thank you.

7             Okay.

8        Q.   All right.  Your name is on this email, correct?

9        A.   Yes.

10       Q.   Do you remember receiving this email?

11       A.   I don't recall, but I'm sure I did.

12       Q.   As you sit here today, you have had a chance to

13   now read it?

14       A.   Yes.

15       Q.   And as you read it, let me ask you background.

16   Have you been involved in returning teachers to the

17   workplace following a leave of absence in the past?

18       A.   Yes.

19       Q.   Is that part of your labor relations job?

20       A.   Yes.

21       Q.   And in prior experiences, has there been a

22   period of transition when you are returning a teacher to

23   the classroom?

24       A.   Correct.

25       Q.   Is that what's depicted in the email?

1          A.    Yes.

2          Q.    Or is that what's a different way.  Does this

3    email contain a plan for returning Ms. Light to work?

4          A.    Yes, it does.

5          Q.    Do you remember at the time agreeing with this

6    plan or being informed of this plan?

7          A.    As far as agreeing with the plan, I'm not sure I

8    would have agreed or disagreed.  Ultimately it is really

9    up to the building leader as to how they transition the

10   specifics of how they transition their staff member back

11   into the workplace.  HR or the district wouldn't have any

12   say as to what class or what period things are like, what

13   time period a teacher teaches a particular class or how

14   they specifically transition.

15          As far as agreeing with it, I wouldn't have

16   agreed or disagreed.  I believe this is a plan for Ms.

17   Light to transition and return back to Worthington Hooker

18   School.

19          Q.    Okay.

20          MR. MURPHY:  I have no further questions, Your

21   Honor.

22   REDIRECT EXAMINATION BY MR. INTERLANDI:

23          Q.    Hello again.  Have you ever been involved in

24   returning someone to work after a leave of absence, a

25   pending investigation completed by an outside

1    investigator?

2        A.    Ask it one more time.

3        Q.    Have you ever involved in returning someone to

4    work after a medical leave of absence plus a pending

5    investigation done by an outside investigator?

6        A.    Yes.

7        Q.    Who is?

8        A.    Ms. Light.

9        Q.    Anyone else?

10       A.    Likely but I can't think of a name right now.

11       Q.    There's nothing at the school in terms of a

12   written document or policy or instruction that says if

13   someone has been disciplined, the administrator or

14   building principal, because of a complaint by a teacher,

15   that that person can't be a decisionmaker for a grade

16   level change?

17       A.    Correct.  There's nothing in writing that says

18   that.

19       Q.    So Ms. Gethings was in place after March 2021 to

20   make any decisions regarding Ms. Light's applications for

21   an open third grade position, correct?

22       A.    As the building principal, yes.

23            MR. INTERLANDI:  Thank you.  No further

24   questions.

25            THE COURT:  Anything further.  All right, Ms.

1    Bonner.  We're going to excuse you.  You may step down.

2    Thank you.

3         Let's get started.  Do you have any further

4    witnesses?

5         MR. INTERLANDI:  No further witnesses.

6    Plaintiff rests.

7         THE COURT:  So the plaintiff rests.  That means

8    that you have heard all of the evidence the plaintiff has

9    to offer on her case-in-chief, and we will now move to

10   the defendant.  All right.  Attorney Murphy.

11        MR. MURPHY:  Sure.  Our first witness will be

12   Margaret-Mary Gethings.

13        THE COURT:  Ms. Gethings, if you would kindly

14   take the stand, remain standing and raise your right

15   hand.

16              MARGARET-MARY GETHINGS.

17   Having been called as a witness, was first duly sworn and

18            testified on his/her oath as follows:

19        THE WITNESS:  I do.

20        THE CLERK:  Please state your name and spell

21   your last name.

22        My name is Margaret-Mary Gethings.  My last name

23   is spelled G-e-t-h-i-n-g-s.  New Haven, Connecticut.

24        THE COURT:  You may be seated and you may begin,

25   Attorney Murphy.

1    DIRECT EXAMINATION BY MR. MURPHY:

2        Q.    All right.  Good afternoon, Principal Gethings.

3        A.    Good afternoon.

4        Q.    I would like to start by talking about you.

5    Some of the topics we have already discussed today.  In

6    the 2020-2021, school year did you know Paul Salem?

7        A.    Yes.

8        Q.    Who was he?

9        A.    Paul Salem was a teacher and then transitioned

10   to be a literacy coach.

11       Q.    You heard some discussion earlier about emails

12   allegedly found on his printer?

13       A.    Yes.

14       Q.    At the time, did you know Mr. Salem had

15   a printer in his room?

16       A.    No.

17       Q.    At the time, did you ever approve or purchase

18   a printer for his room?

19       A.    I didn't.

20       Q.    At the time, could you print to the printer in

21   his room?

22       A.    Never.

23       Q.    At the time, did you print those emails?

24       A.    No.

25       Q.    To his printer?

1      A.   No.  I should let you finish your question.

2   Sorry.

3      Q.   I want to ask you a few other questions about

4   dismissal?

5           THE COURT:  Could you pull the mic a little

6   closer to you please.  Thank you.

7   BY MR. MURPHY:

8      Q.   I will ask you a few questions about dismissal.

9   When did you first become -- withdrawn.

10          Were you the principal at Worthington Hooker

11  School during COVID?

12     A.   Yes.

13     Q.   Can you tell us briefly about the dismissal

14  process at Worthington Hooker School before COVID?

15     A.   Yes, it was a very orderly process.  It's a

16  happy time of day, completing a full day, but there's

17  very little space so we transition our students to car

18  pick ups or walking dismissal but using different doors

19  to exit.

20          The dismissal usually starts by me making an

21  afternoon announcement wishing everyone a good afternoon

22  and to dismiss in a safely and orderly manner and grade

23  levels have designated spots where they are dismissed and

24  walkers have an area where they meet their parents on

25  foot.  Older students walk home and car pick ups come to

1    the curb for pick up.  It is a very smooth and concise

2    process.

3        Q.   Okay.  Did that process change a little bit or

4    change at all after COVID?

5        A.   Yes.  There was a need for it to change because

6    we were adhering to the recommendations of the health

7    department and we were still trying to keep in mind that

8    students were interacting with their classes and we were

9    dismissing to parents.

10            But parents were not at the time allowed to be

11   in the school so we had what was called a phased

12   dismissal.  Our dismissal began at 2:40 for grades 3 and

13   4.  And we had identified markers outside of the school

14   for car pickups and students in grades 3 to 6 to stand on

15   the markers and face forward with distancing there so

16   that parents could pick up their child.  We also had our

17   families had signage where they were say Peter Murphy.

18   I'm here to get you and we would say good-bye.  Have a

19   nice day.

20       Q.   You heard earlier some testimony about a

21   dismissal issue, right?

22       A.   Yes.

23       Q.   I want to follow-up on that.  Can we have

24   Exhibit 37?  Can you scroll to the bottom of the next

25   page?  Ms. Gethings, you have seen this email before?

1    A.    Yes.

2    Q.    Why did you send this email?

3    A.    I sent the email because I was concerned I did

4    not see Ms. Light at dismissal and I saw Phyllis there

5    and the students were standing in a circle and parents

6    waiting for their children or grandparents who had a sign

7    and our traffic was backing up, and I was concerned

8    because we had established collectively a very smooth

9    experience for our students and when I asked Phyllis, she

10   said that they was dismissing Ms. Light's class which is

11   a common thing for Phyllis to do, but she was not

12   equipped with how to dismiss because she had not

13   dismissed third grade and we would have put -- we would

14   have supported Phyllis if I was knowledgeable that Ms.

15   Light was not going to be at dismissal.

16   Q.    At the time, was your procedure that teachers

17   are to be with their class at dismissal time?

18   A.    Absolutely.

19   Q.    At the times -- well, so this email is dated May

20   25, 2021?

21   A.    Yes.

22   Q.    Do you recall having any other discussion with

23   Ms. Light at May 25 about dismissal?

24   A.    No.  It was simply I wanted to be sure that it

25   was on her radar if she ever needed to not be at

1    dismissal that we kept in mind that dismissal is a hectic

2    time and we wanted to remain consistent with our plan and

3    classroom teachers are responsible for dismissing their

4    students.  They know them best and they know their

5    caregivers.

6        Q.   You heard testimony from Mr. Shortt earlier

7    today, right?

8        A.   Yes.

9        Q.   And do you recall when Mr. Shortt became the

10   union steward at Worthington Hooker School for the second

11   time?

12       A.   I do.

13       Q.   What was your relationship with Mr. Shortt at

14   the time?

15       A.   It was fine.  It was good.  We worked together

16   on multiple things.  He was involved in many things at

17   the school and I think he came to me and vice versa and

18   he was very supportive of the school.  He has a long

19   standing of that.

20       Q.   And then did you have regular meetings with

21   Mr. Shortt in his capacity as a union steward?

22       A.   Yes.  We had an established monthly meeting.  If

23   we needed to meet any time before, there was that line of

24   communication that he would contact us as the

25   administration or we would likewise contact him.

1    Q.    You heard.  Did you hear Mr. Shortt testify

2    about a comment he said you made to him in a meeting?

3    A.    I do.

4    Q.    Can you explain that comment to the jury?

5    A.    Absolutely.  And I recognize and remember that

6    he didn't feel good about that because he cared about

7    that school.  I'm the type of person if I have something

8    to say or have a concern, I named it and again as I heard

9    other testimony, it is quite hard to remember verbatim

10   what happened but the gist was this.  What we have been

11   told that people think that you are running for union

12   representation and the word that was used was to take

13   down the administration with Ms. Light and the reason I

14   named it is I wanted to have it out there.

15        The last thing I want at my school is any type

16   of drama.  Our job is to work and provide the best

17   education and experience for our student, staff and

18   families.

19   Q.    Okay.  And were you able to successfully work

20   with Mr. Shortt after that time?

21   A.    I believe so.

22   Q.    Let's step back now and talk about your general

23   responsibilities as a principal.  Can you just briefly

24   summarize what's on your plate as a building

25   administrator?

1    A.    I'll try.  I'm known not to do anything brief,

2    so I have a tremendous job.  It is a privilege.  My first

3    responsibility is to ensure that we have a safe and

4    orderly school and I oversee -- roughly there's about 60

5    employees that work at the school.  We have 375 students.

6    We have two building, two campuses.  We're one school in

7    two buildings and we service students in Grades K through

8    eight.

9         I oversee teaching and learning, operations,

10   finance, building, parental.  I am a contact for parents.

11   I work for the New Haven Board of Education and I just

12   have the privilege of running a school and there are

13   many, many responsibilities to it.

14   Q.    Okay.  Is staffing assignments one of those

15   responsibilities?

16   A.    Yes.

17   Q.    Ensuring student safety is that one of your

18   responsibilities?

19   A.    Yes.

20        MR. MURPHY:  Your Honor, I see the time.

21        THE COURT:  Why don't you get in a couple of

22   more questions, then we'll conclude for the day.

23        MR. MURPHY:  Okay.

24   BY MR. MURPHY:

25   Q.    What about the discipline?  Are you involved

 1   with teacher discipline at times?

 2       A.   Yes.

 3       Q.   Have you as principal of Worthington Hooker

 4   School issued formal discipline to teachers?

 5       A.   At Worthington Hooker School, I have not had to

 6   issue formal discipline.

 7       Q.   Were you a principal before you became the

 8   principal of Worthington Hooker School?

 9       A.   I was.

10       Q.   Where were you the principal?

11       A.   I had the privilege of being the principal at

12   Fair Haven School in New Haven as well as Sliney School

13   in Branford.

14       Q.   As the principal, have you also been involved in

15   any grievance issues with teachers?

16       A.   I have never had a grievance.

17       Q.   Fantastic.

18            THE COURT:  Why don't we stop there.

19            We'll see you back tomorrow morning at 9:00.

20   Don't discuss your testimony with anyone.  We'll wish the

21   jurors a fine evening.

22            (In the absence of the jury at 4:00 p.m.)

23            THE COURT:  Counsel, I will next hear from you

24   with respect to your responses, if any, to the charge and

25   verdict form that I scheduled under the schedule that I

1    have outlined.  How long do you think?  You may step

2    down.  How long do you anticipate if you can anticipate

3    Ms. Gethings' testimony?

4              MR. MURPHY:  I don't know.  I'm trying to be

5    as -- I'm hoping not to get to lunch tomorrow.  I don't

6    think I will be all that long with Principal Gethings

7    before lunch.

8              THE COURT:  I realize you haven't heard the

9    direct, but any idea how long your cross-examination will

10   be?

11             MR. INTERLANDI:  It really does depend.  I would

12   say about an hour, give or take, maybe less, probably

13   less, half an hour.

14             THE COURT:  All right.  And after she concludes,

15   you have no further witnesses?

16             MR. MURPHY:  I might call Hilarie Alden and

17   Ms. Clorino.  I need to think about that in light of the

18   testimony.  Given how fast we're going now, I don't

19   expect either of those witnesses to be very long.

20             THE COURT:  Have you have rebuttal witnesses?

21             MR. INTERLANDI:  I haven't made that decision

22   yet, Your Honor.

23             THE COURT:  Very well.  See you tomorrow at

24   nine.

25             (Whereupon, the above trial day concluded at

1    4:02 p.m.)

2

3    COURT REPORTER'S TRANSCRIPT CERTIFICATE

4    I hereby certify that the within and foregoing is a true

5    and correct transcript taken from the proceedings in the

6    above-entitled matter.

7

8    /s/  Terri Fidanza

9    Terri Fidanza, RPR

10   Official Court Reporter

11

12                              INDEX

13                          EXAMINATION

14   Witness Name                                        Page

15   **NICOLE VENTURA**

16      DIRECT EXAMINATION BY MR. INTERLANDI............... 436

17      CROSS-EXAMINATION  BY MR. MURPHY.................... 458

18      REDIRECT EXAMINATION BY MR. INTERLANDI ............ 476

19   **GALE LEVIN**

20      DIRECT EXAMINATION BY MR. INTERLANDI............... 482

21      CROSS-EXAMINATION BY MR. MURPHY.................... 508

22      REDIRECT EXAMINATION BY MR. INTERLANDI ........... 519

23      RECROSS-EXAMINATION BY MR. MURPHY ................. 521

24   **TIMOTHY SHORTT**

25      DIRECT EXAMINATION BY MR. INTERLANDI............... 524

1      CROSS-EXAMINATION BY MR. MURPHY.................... 542

2   **PAUL SALEM**

3      DIRECT EXAMINATION BY MR. INTERLANDI............... 546

4      CROSS-EXAMINATION BY MR. MURPHY.................... 557

5      REDIRECT EXAMINATION BY MR. INTERLANDI ........... 560

6   **PHYLLIS MAFFUID**

7      DIRECT EXAMINATION BY MR. INTERLANDI............... 562

8      CROSS-EXAMINATION BY MR. MURPHY.................... 570

9   **TARYN BONNER WILLIAMS**

10     DIRECT EXAMINATION BY MR. INTERLANDI............... 573

11     CROSS-EXAMINATION BY MR. MURPHY.................... 601

12     REDIRECT EXAMINATION BY MR. INTERLANDI ........... 605

13  **MARGARET MARY GETHINGS**

14     DIRECT EXAMINATION BY MR. MURPHY.................... 608

15

16

17

18

19

20

21

22

23

24

25