```
                       UNITED STATES DISTRICT COURT
                         DISTRICT OF CONNECTICUT
        _____
                                            |
        JESSICA LIGHT,                      | No. 3:22-cv-00425-JBA
                            Plaintiff,      |
        v.                                  |
        NEW HAVEN, ET AL.,                  |
                            Defendants.|
        _____| New Haven, Connecticut
```

```
                              JURY TRIAL
                              VOLUME IV

        B E F O R E:
                  THE HONORABLE JANET BOND ARTERTON
```

A P P E A R A N C E S:
For the Plaintiff:
        ANTHONY J INTERLANDI, SR., ESQ.
        Monarch Law
        363 New Britain Road, First Floor
        Berlin, CT 06037
        860-969-2909
        Email: tony@monarchlawct.com

For the Defendants:
        PETER JOSEPH MURPHY, ESQ.
        CHELSEA McCALLUM, ESQ.
        Shipman & Goodwin, LLP
        One Constitution Plaza
        Hartford, CT 06103
        860-251-5950
        Email: pjmurphy@goodwin.com
            cmccallum@goodwin.com

Courtroom Deputy:                Court Reporter:
Diahann Lewis                  Cassie Zayas, RPR

Clerk's Office:  203-773-2140

<pre>
1                              INDEX

2    WITNESS                                      PAGE

3    Margaret-Mary Gethings

4       Continued Direct Examination by Mr. Murphy    622

5       Cross-Examination by Mr. Interlandi           677

6       Redirect Examination by Mr. Murphy            745

7       Cross-Examination by Mr. Interlandi           749

8       Redirect Examination by Mr. Murphy            751

9       Cross-Examination by Mr. Interlandi           752

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

```
 1              (Call to order, outside the presence of the jury,
 2      9:03 a.m.)
 3              THE COURT:  All right.  Please be seated.
 4                   (Court reporter interruption.)
 5                   (Discussion off the record.)
 6              MR. INTERLANDI:  I would have to double-check
 7      Judge Meyer's ruling.
 8              THE COURT:  Okay, please do.  And let's keep
 9      that profound distinction at the forefront of our minds
10      for our charge conference which I presume will take place
11      this afternoon.
12              In terms of your witnesses, you all were going
13      to be considering who you would be calling today, and
14      Mr. Interlandi had not reached a decision after we
15      complete the testimony of Gethings.  Will you have -- no,
16      it's on your case.
17              MR. MURPHY:  My case, Your Honor.
18              THE COURT:  And do you have additional
19      witnesses?
20              MR. MURPHY:  Well, we have Principal Gethings
21      and then, depending on how that goes, potentially
22      Assistant Principal Clarino, and I believe that's it.
23              THE COURT:  And do you have any rebuttal that
24      you currently are prepared to announce?
25              MR. INTERLANDI:  I am not currently prepared to
```

```
 1   announce.  No, Your Honor.
 2              THE COURT:  All right.  It appears as we are
 3   currently situated that we will finish evidence today.
 4              Does that seem an appropriate conclusion?
 5              MR. MURPHY:  That's my hope, at least.
 6              MR. INTERLANDI:  Yes, Your Honor.
 7              THE COURT:  And charge, if possible, tomorrow?
 8              MR. INTERLANDI:  Seems that way, yes.
 9              MR. MURPHY:  That would be agreeable.
10              THE COURT:  Okay.  All right.  We'll bring in
11   the jury.
12                      (Jury in, 9:08 a.m.)
13              THE COURT:  Good morning, ladies and gentlemen.
14   How are you all today?  We will proceed with the continued
15   testimony of Defendant Margaret Mary-Gethings.
16              Would you kindly return to the stand?  And
17   please remember that you remain under oath.
18              THE WITNESS:  Yes, Your Honor.
19    (Witness, remaining under oath, resumes stand, 9:09 a.m.)
20              THE COURT:  All right.  You may proceed.
21                CONTINUED DIRECT EXAMINATION
22   BY MR. MURPHY:
23   Q    Great.  Good morning, Principal Gethings.
24   A    Good morning.
25   Q    I'm going to start out by talking a little bit about
```

```
1   issues between teachers, okay?
2             THE COURT:  Can you please pull the mic closer
3   to you?
4             MR. MURPHY:  I usually talk very loud.  I don't
5   know why I'm having such problems with this microphone.
6   Q    (By Mr. Murphy) So if a teacher -- in your capacity
7   as a principal, if a teacher brings you a concern about
8   another teacher or a different staff member, what would be
9   your normal practice for addressing that?
10  A    So the first thing I would do is listen, and the
11  second I would ask, have you spoken to the teacher
12  directly?  And also ask, how can I help?  And suggest, if
13  it seemed possible for the two individuals to speak, that
14  they would speak.  Or lend -- if I could be of help
15  setting up a meeting so that the teachers could resolve
16  and discuss the concern.
17  Q    Okay.  And you heard some testimony yesterday and the
18  days before about a March 31st meeting with Ms. Light and
19  Ms. Cav; right?
20  A    Yes.
21  Q    Okay.  And did you schedule that meeting?
22  A    Yes.  I scheduled the meeting from a request from
23  Ms. Cav through her union.  She wanted to address
24  Ms. Light and, in this case, she didn't feel comfortable
25  doing it herself and wanted the support of us to be there.
```

1    Q    Okay.  And we heard testimony that Ms. Morrison was

2    invited to that meeting; right?

3    A    Yes.

4    Q    Okay.  And how were people invited to that meeting?

5    Via email, et cetera?

6    A    So I believe, if I recall correctly, they were

7    probably invited by both ways, but they were definitely

8    informed.  It was a Wednesday.  At the time, New Haven did

9    not have students.  It was also the day we were getting

10    our vaccination, so we set up the meeting to be an

11    agreeable time and all parties were informed.

12    Q    Okay.  And it was a Zoom meeting, correct, or some

13    sort of --

14              MR. INTERLANDI:  Objection.  Leading,

15    Your Honor.

16              THE WITNESS:  Yes.

17              MR. MURPHY:  I thought it was established

18    yesterday, but I'll rephrase.

19    Q    (By Mr. Murphy) What type of meeting was it?

20    A    It was a phone conference on Zoom.

21    Q    Okay.  And would anyone invited to that meeting be

22    able to see who else was invited on the invitation?

23    A    If there was an invitation, yes.

24    Q    All right.  And what was the intended purpose of that

25    meeting?

1  A    It was for Ms. Cav to speak to Ms. Light regarding
2  the concerns about her health status being shared with
3  other people.
4  Q    Okay.  And you're aware that Ms. Light believes you
5  made a defamatory statement in that meeting; right?
6            MR. INTERLANDI:  Objection.  Leading.
7            THE COURT:  It is leading.
8            THE WITNESS:  Yes.
9            MR. MURPHY:  No problem.  I'll rephrase.
10 Q    (By Mr. Murphy) Are you aware that Ms. Light alleges
11 that you made a defamatory statement?
12 A    I am.
13 Q    All right.  And did you hear that statement read in
14 court earlier this week?
15 A    I did.
16 Q    Okay.  And can you explain that statement to the
17 jury, what you meant by that statement?
18 A    Yes.
19       So, to paraphrase, what I was saying was that at
20 stake was sort of the wellbeing of everyone.  We wanted no
21 one to be upset.  We wanted to ensure to everyone that our
22 school was safe and we were mitigating the return of
23 students and trying to keep a balance of the joy of
24 learning as well as safely returning students.
25       It had been brought to my attention that a teacher

1    was sharing the information with parents.  I don't know

2    who did it, but I know that the teachers who told me said

3    that it was Ms. Light.  And I basically said to her, only

4    you know what you did or did not do.

5    Q    Okay.  And at the time of that discussion with

6    Ms. Light, had anyone come to you and said it was someone

7    other than Ms. Light?

8    A    Never.

9    Q    Okay.  And at the time you made that statement, did

10    you believe it to be true?  Your statement, not the

11    underlying facts.

12    A    Yes.

13    Q    Okay.  In your capacity as a principal -- now, going

14    back, I'm going to ask you some questions about that

15    2020/2021 school year, okay?

16    A    Yes.

17    Q    All right.  And at that time, was New Haven planning

18    a return to school, in-person learning?

19    A    Yes.  It was ever-evolving, yes.

20    Q    All right.  And in your capacity as a principal, did

21    you attend Board of Education meetings during that time?

22    A    Always.

23    Q    All right.  Why would you attend Board of Education

24    meetings?

25    A    I pride myself on knowing what is happening in the

1    district that I work in as well as wanting to be updated

2    of any information that was shared with the public.  And

3    I, frankly, enjoy it.

4    Q    Did you hear Ms. Light testify that she attended the

5    January 2021 Board meeting?

6    A    Yes.

7    Q    Okay.  And did you attend that January 2021 Board

8    meeting?

9    A    Yes.

10   Q    All right.  And did you have any discussion with

11   Ms. Light following that Board meeting?

12   A    Not that I recall, no.

13   Q    About her comments at that Board meeting?

14   A    No.

15   Q    Okay.  Same question.  There's been some -- well,

16   withdrawn.

17        Do you know if Ms. Light attended the February 2021

18   Board meeting?

19   A    I believe so.

20   Q    All right.  And did you have any conversations with

21   her following that Board meeting about her comments to the

22   Board that night?

23   A    No.

24   Q    I want to ask you a few questions about March of 2021

25   and a few events that occurred in that month.

1           At that point, how long had the students been back in
2    school?
3    A     They had been back since January 19th.
4    Q     Okay.
5    A     So roughly ten weeks, 12 weeks.
6    Q     Okay.  And would you say, as you sit here today, do
7    you remember, were there still concerns about COVID in
8    that period of time?
9    A     Yes.
10   Q     All right.  And did the concerns -- were the concerns
11   held by students?
12   A     Yes.  We had students with some concerns.
13   Q     All right.  Were parents still concerned?
14   A     A few.
15   Q     All right.  And were some staff members still
16   concerned?
17   A     Yes.
18   Q     Was the -- in March of 2021 when the students
19   returned, was the guidance -- what guidance were the
20   schools following at the time?
21   A     So the guidance we were following were
22   recommendations from the health department that came
23   directly to the New Haven Public Schools.  And Dr. Whyte,
24   our assistant superintendent, was sharing that information
25   with district leadership, building leadership.  And it was

1    ever-evolving -- daily, hourly -- and it was uncharted

2    territory, so we were sharing best practices and trying to

3    balance, first and foremost, safety, but put our children

4    and the learning loss that they had as a priority.

5    Q    Okay.  And you mentioned Dr. Light.  Who was

6    Dr. Light [sic]?

7    A    Dr. Whyte.  Dr. Paul Whyte.

8    Q    All right, Dr. Whyte.  And who was Dr. Whyte?

9    A    He's an assistant superintendent.

10    Q    Okay.  And in that period of time, did you have

11    meetings with Dr. Whyte?

12    A    I did, and -- yes.

13    Q    Okay.  Just you or were other people involved?

14    A    So we had Wednesday principal meetings with our

15    assistant superintendent, Keisha Redd-Hannans, where we

16    were in a network.  And, oftentimes, Dr. Whyte came to the

17    meeting to share updates of practices.

18    Q    Okay.  You said, "Keisha Redd-Hannans."

19    A    Yes.

20    Q    Who is she?

21    A    She is the assistant superintendent.

22    Q    And what sort of things were discussed in your weekly

23    meetings with Ms. Hannans?

24    A    We discussed everything from arrival, dismissal, what

25    to do at recess, what to do at lunch, how to start to get

1    other materials beyond Chromebooks in the hands of our

2    children so they could learn and create and discover.  We

3    talked about passing in the hallway.  We talked about

4    having snacks, what would be the best thing to do or not

5    to do, communication with families.  We talked about

6    almost everything that was working.

7        And it was a place where you could bring up a

8    question because, of course, there was no previous

9    experience as such.  So we were learning as we were going

10   and sharing information.

11   Q    Okay.  And was this information and all the

12   information you just discussed related to COVID and --

13   A    Yes.

14   Q    And -- and the return-to-school procedures?

15   A    Yes.

16   Q    And you said you had weekly meetings with

17   Ms. Hannans.  After those meetings, how would you share

18   the information you learned there?

19   A    In a variety of ways.  We still had grade levels

20   because our district didn't have school in session on

21   Wednesdays.  We have weekly bulletins called the "Hooker

22   Happenings" which share a wealth of information, email,

23   and face-to-face.

24       Anyway, for a while, we had frequently a Q-and-A

25   document for our school.  So if you had a question, you

```
1    could put the question on that document.  And if we had
2    the answer, we would provide it or try to attain it.  We
3    also continued to have our regular staff meetings where we
4    would share information.
5    Q    Okay.  We've heard -- well, in that period of time
6    leading up to March 2021, was this a stressful time for
7    you?
8    A    Of course, yes, a little bit.
9    Q    Right.  At the time, you're principal and you were in
10   charge of Worthington Hooker?
11   A    I was.
12   Q    All right.  All right.  Principal Gethings, we're
13   showing you Defendants' Exhibit I.
14        Are you able to see that?
15   A    Yes.
16   Q    Okay.  And what's the date of this email?
17   A    The date of the email is March 2, 2021.
18   Q    Okay.  And why did you send this email?
19   A    It would appear that I sent it for a variety of
20   reasons.
21        The schools were being cleaned and teachers had
22   access to the school on Wednesdays.  But on that
23   Wednesday, they were not to go to school, and to clarify
24   that -- what we had to do for a positive case, that the
25   process would be shared with a school nurse, and asking
```

1    people not to assume or speculate as to why people are

2    absent.

3    Q    Okay.  Was this March 2nd email directed at Jessica

4    Light?

5    A    Absolutely not.

6    Q    Okay.  Principal Gethings, I'm going to show you what

7    Attorney Interlandi submitted as Plaintiff's Exhibit 2.

8         Do you see that up there?

9    A    I can.

10   Q    Okay.  And are you familiar with this Facebook post?

11   A    I've seen it, yes.

12   Q    Okay.  And if we could go to page 2.

13        Are you familiar with the comments that are depicted

14   on this page?

15   A    Yes.

16   Q    Have you seen these before?

17   A    Yes.

18   Q    Do you recall how you first became aware of

19   Ms. Light's comments?

20   A    Yes.

21   Q    And how did you become aware?

22   A    Staff members shared the comments with me.

23   Q    Okay.  And do you recall which staff members shared

24   those comments with you?

25   A    I do.

```
1    Q    And who were they?

2    A    Kathleen Morrison, Meghan Delvecchio, Hilarie Alden,

3    and I believe there were several other members of New

4    Haven Public Schools who shared it with me.

5    Q    Okay.  And do you have any understanding as to why

6    they were sharing it with you?

7    A    Concern.

8    Q    About what?

9    A    That something was being said about our school at a

10   time when we were priding ourselves on doing the right

11   thing, and that this was invoking some concern for

12   families and staff to think that we might not have done

13   something that we should have done.

14   Q    Okay.  And when you saw these comments by Ms. Light,

15   did you share that concern, that it was somehow

16   misrepresenting the school?

17   A    Yes.  We spoke about it.

18   Q    Okay.  Principal Gethings, showing you Plaintiff's

19   Exhibit 7, page DEF122.

20        Do you see that?

21   A    Yes.

22   Q    Okay.  Do you need a second to review it or are you

23   familiar with this email?

24   A    I'm familiar with it.

25   Q    Okay.  Why did you send this email?
```

1  A    Well, I send emails all the time.  And one is to

2  communicate -- at the time, everyone was working so hard.

3  But if we ever start working in contrast of each other,

4  we're in trouble.

5       So I think I wanted to recognize that it actually had

6  been a year from when we left on March 13th, three years

7  ago, and that we had come a long way and that we were

8  stronger and hopeful for the days to come and grateful for

9  our gratitude to everyone's commitment to the betterment

10  of the school, which was very clear.

11      And then I needed to address, as I often do, that we

12  had been approached by phone and email from parents who

13  had said they had heard we had cases at Hooker and they

14  were still debating about sending their children back to

15  school, and we wanted to ensure them that their students

16  would be safe and that we had not -- I guess it's two

17  negatives, not not send notices when we should have.

18  Q    Okay.  And was this email directed at Jessica Light?

19  A    No.

20  Q    Does this email mention Jessica Light?

21  A    Absolutely not.

22  Q    Was this intended as discipline for Jessica Light?

23  A    No.

24  Q    What is your primary mode of communication with your

25  teachers and staff?

```
1   A    I smile because it's probably multiple means.

2   Face-to-face.  I'm present everywhere.  Our "Hooker

3   Happenings" is a wealth of information that we share all

4   the time.  And I daily send emails, multiple emails, to

5   make sure that we can each learn from each other and that

6   I've captured noting something so time doesn't elapse and

7   the issue isn't addressed because it's not typical to

8   always have face-to-face time with all of your staff in

9   one setting.

10  Q    And was that especially true when the school returned

11  from the COVID shutdown?

12  A    Absolutely.

13  Q    Okay.  Principal Gethings, showing you Exhibit 7,

14  page 111.

15       Do you see that up there?

16  A    Yes.

17  Q    And what is this document?

18  A    It's just a -- a grid of committees that we have at

19  our school -- not atypical to any other school year,

20  slightly typical because it was a reopening --

21  subcommittees which had a few smaller committees as we

22  transitioned back.

23  Q    Okay.  And how many committees are listed on this

24  grid?

25  A    Nine.
```

1    Q    Okay.  And how many show that Jessica Light was a

2    member of that committee?

3    A    I see at least three.

4    Q    Okay.

5    A    Yes, three.

6    Q    All right.

7    A    A third.

8    Q    And you heard some discussions about those committees

9    earlier this week; correct?

10   A    Yes.

11   Q    All right.  And so I want to ask you just a few

12   questions about various committees.

13        One that's --

14        THE COURT:  Whose phone is in here, not

15   silenced, and should not be in here?

16        Go ahead.

17   Q    (By Mr. Murphy) There was some discussion about the

18   summer play-based learning workshop.  When was that

19   workshop?  Do you recall what year?

20   A    That was the summer of 2021.

21   Q    Okay.  And who was it designed for; do you remember?

22   A    It was intended for kindergarten to first grade

23   teachers only through a grant that the district had.

24   Q    Were other teachers beyond K through 1 on that

25   committee?

```
 1    A    I sought permission to include second grade as well

 2    as our instructional coaches, with a plan to expand the

 3    training to all of our K-4 teachers for Wednesday's PD for

 4    that following school year.

 5    Q    All right.

 6    A    But it was intended only for K-1 teachers.

 7    Q    And what grade was Jessica Light teaching at that

 8    time?

 9    A    Third.

10    Q    The scheduling committee which is on the bottom

11    right-hand corner of page 111, do you see that?

12    A    I do.

13    Q    And was Jessica Light a member of the scheduling

14    committee?

15    A    She was.

16    Q    And do you have any understanding as to whether she

17    participated in that committee?

18    A    I think minimally, but yes.  A request was made by

19    their team to have their specials changed, and we made

20    that adjustment.

21         The rest of it was primarily for the upper grades

22    that have a much more complex schedule, if you will.

23    Departmentalization, Spanish, et cetera.

24    Q    Okay.  Moving to the left, it says, "signage

25    committee."
```

1      Do you see that?

2  A     Yes.

3  Q     All right.  Was Ms. Light a member of the signage

4  committee?

5  A     She signed up to be, yes.

6  Q     All right.  And was that -- when did that committee

7  come into place?

8  A     It was a one-day type of thing that we had from the

9  district -- arrows, floor markers, the ability to give

10 direction to proper spacing -- and our whole staff was

11 invited to come that day to help get the buildings ready.

12 Q     Okay.  And is there a gardening committee at your

13 school?

14 A     Yes.

15 Q     And who was the head of that in the 2020/2021 school

16 year?

17 A     I don't know that there was an actual head.  There

18 was -- Ms. Light was very involved and dedicated to the

19 gardening club.  Mr. Delaney, a parent, was very involved.

20 And we kind of -- I don't recall anyone being in charge.

21 Q     Okay.  Do you recall -- did you appreciate her

22 efforts on the gardening committee?

23 A     Absolutely.

24 Q     And do you recall some of her efforts on that

25 committee?

1   A    They were countless.  She spent hours creating an

2   amphitheater.  She worked very closely with our common

3   ground teachers for classes.  She participated -- I had

4   started some cleanup days.  Her family and she was always

5   a part of the cleanup days.  She brought her classroom

6   outside to learn very often.  She wrote a grant for some

7   outdoor seating and mats.  Very active.  Very grateful for

8   what she did.

9   Q    Did you ever tell Ms. Light that she could not be

10  part of the gardening committee?

11  A    Never.

12  Q    There was a -- who is Doug Jones?

13  A    Mr. Jones is a seventh and eighth grade teacher.

14  Q    Okay.  And did he ever become involved with the

15  gardening committee in the 2021/2022 school year?

16  A    One day and done.  He -- Mr. Jones was getting his

17  administrative degree, which is called an 092, and he had

18  an obligation to do ten hours of community service.

19       At the time, it was parallel to a desperate need for

20  a spring cleanup, which typically I organized or

21  Ms. Clarino.  And we do a SignUpGenius.  Families come up

22  for both campuses.

23       So I charged him with, you take the day, you organize

24  it, get a group to volunteer to help, connect to Lowe's,

25  get some plants donated, get some leaf bags donated, have

1    the SignUpGenius and support the school and you'll get

2    more than your ten hours.

3    Q    Okay.  And did Ms. Light ever come to you and raise

4    concerns about Mr. Jones' involvement in the gardening

5    committee?

6    A    She didn't come to me.

7    Q    Okay.  Did you hear that Ms. Light had some concerns

8    about Mr. Jones helping with spring cleanup?

9    A    I did hear that she was upset and thought I had given

10   the garden committee to Mr. Jones.

11   Q    Okay.  After the spring cleanup, did Mr. Jones stay

12   involved with the gardening committee?

13   A    No.

14   Q    The committees that we've just discussed -- the

15   summer-based learning, the scheduling committee, the

16   signage committee, the gardening committee -- are those

17   volunteer positions?

18   A    Yes.

19   Q    Okay.  Moving one column further to the left on the

20   page in front of you, Principal Gethings.

21        It says, "health SEL."  What is SEL?

22   A    Social Emotional Learning.

23   Q    Okay.  And why is this on this subcommittee sheet?

24   A    It's paramount and important until we can teach our

25   students, we have to be aware and integrate their needs

```
 1    for social and emotional needs.

 2    Q    Okay.  And how does this committee work?

 3    A    So right now, we have two chairs to the SEL.  But

 4    it's a very collective sharing -- possibly a story, an

 5    activity, sharing advisory activities -- things that would

 6    be beneficial to all students and would gauge how they're

 7    doing.  It's just, if you will, kind of a toolbox of

 8    sharing activities with each other.

 9    Q    Okay.  And are there leaders of this committee?

10    A    We happen to have two SEL ambassadors, yes.

11    Q    And how do you become an ambassador?

12    A    So it's a position that the district made available

13    for each school, and I sent an email asking teachers if

14    anyone was interested.  I also put it on "Hooker

15    Happenings," and then the principal has the discretion to

16    decide who would be doing -- being the SEL ambassadors.

17    Q    Okay.  And did Ms. Light express interest in being an

18    SEL ambassador?

19    A    Yes, she did.

20    Q    Who chooses the ambassadors?

21    A    I do.

22    Q    And who did you choose at that time to be the

23    ambassadors?

24    A    Rachel Forsa and Meghan Delvecchio.

25    Q    And why did you choose those two individuals?
```

```
 1    A    So I chose them -- there was an abundance of interest
 2    in the position.  I chose them for a variety of reasons.
 3         Rachel was a new teacher to our school and she also
 4    had a lot of experience with SEL learning and had already
 5    been sharing many of her ideas.  And I particularly
 6    thought that Meghan would be -- she works in both
 7    buildings.  She is our ESL teacher.  She works with
 8    students who are having a tremendous amount of trauma and
 9    needs, and it was very fitting.
10         I'm very happy with who I chose and grateful that
11    many people still continue to contribute ideas to them, to
12    the school at large.
13    Q    Okay.  You said there was an abundance of interest in
14    being ambassadors.  What did you mean by that?
15    A    Eleven people wanted to do it.
16    Q    Okay.  The school planning and management team, what
17    is that?
18    A    That stands for the school planning and management
19    team, which you just said, and we meet monthly.  It's a
20    representation of all stakeholders, and we make decisions
21    for the betterment of the school.  We share academic
22    updates, we share wellness updates, we share SEL updates.
23    And it's just a forum where we can bring an idea to the
24    school, share what are upcoming events.  And it's a
25    governing body of our school.
```

1  Q    Okay.  And all these committees we're talking about,
2  do you remember Ms. Light and her union providing you with
3  some -- a written document outlining her concerns?
4  A    Yes.
5  Q    All right.  And do you remember responding to that?
6  A    Yes.
7  Q    Okay.  And, Principal Gethings, we've forwarded to
8  Exhibit 7, page 113.
9       Is that your response?
10  A    Yes.
11  Q    Okay.  And if we could go to page 114, please.
12       At the bottom of page 114, is that your response to
13  Ms. Light and her union about the SPMT?
14  A    Yes.
15  Q    Okay.  And what did -- what do you remember telling
16  them at the time about the SPMT position Ms. Light
17  expressed an interest in?
18  A    I said that we value and appreciate Ms. Light's
19  interests, but I would still be looking to see who else
20  would be interested.  And, because I believed so strongly
21  that we are one school, two buildings, I wanted to make
22  sure that I saw who else was interested before deciding
23  who would be the chair.
24  Q    Okay.  And did -- who did you ultimately select to be
25  the chair; do you recall?

```
 1    A      I believe it was Dr. Stein.

 2    Q      Okay.  And what was his position?

 3    A      Dr. Stein is a seventh and eighth grade English

 4    teacher.

 5    Q      Okay.  And is that a male or a female?

 6    A      A female, Eden Stein.

 7    Q      Okay.  One last committee, Ms. -- Principal Gethings,

 8    and that's the PTA.  What is the PTA?

 9    A      The Parent Teacher Association.

10    Q      All right.  And had Ms. Light been involved, up to

11    that point, on the PTA?

12    A      Yes.

13    Q      And how was she involved?

14    A      She was involved as a parent, and then she was

15    approached in a -- nominated and then elected to be the

16    teacher representative on the PTA.  It was a position that

17    I was familiar with at a former school.  It serves as a

18    footbridge between the teachers and the parents.  And she

19    served in that position for two years.

20    Q      Okay.  And you mentioned "Hooker Happenings" before.

21    Who receives "Hooker Happenings"?

22    A      Our staff receives "Hooker Happenings" every Sunday.

23    Q      All right.  And is that an email?

24    A      It's an email with a Google document.

25    Q      Okay.  And at one point, did you address the PTA in a
```

1    "Hooker Happenings"?

2    A     I did.  I said -- sort of -- if I recall correctly,

3    it was spring, and that we would be looking -- not ever to

4    suggest that I nominate or select, but I work very closely

5    with the PTA as the principal of the school, and that it

6    was an opportunity for teachers if they would like to be

7    considered to be the teacher representative on the PTA.

8         I kind of -- if I recall correctly, I noted

9    opportunities for teachers.

10   Q     Okay.  All right.  Sticking with Exhibit 7, now going

11   to page 128.

12        What is this document in front of you?

13   A     That is "Hooker Happenings," or a page of it.

14   Q     Okay.  And does this page reflect what you were just

15   telling the jury about?

16   A     Yes.

17   Q     All right.

18   A     And when it says, "Please let us know if you're

19   interested in being the teacher representative for next

20   year," that simply meant that I would share because I

21   communicated directly with the PTA weekly.

22   Q     Okay.  One follow-up question about your response to

23   Ms. Light's concerns about the committee.  Can we go to

24   page 115, please?  Actually, 114.

25        Okay.  Before, Principal Gethings, we were talking

1    about page 114, which was your response.  Do you remember

2    that?

3    A    Yes.

4    Q    Okay.  Now page 115.

5         THE COURT:  This is still Exhibit 7?

6         MR. MURPHY:  It's still Exhibit 7.  I'm just

7    bouncing back and forth within that document.

8    Q    (By Mr. Murphy) Can you read that first sentence to

9    us, Principal Gethings?

10   A    On the top?

11   Q    Yes.

12   A    "Lastly, at no time did we ever ask you not to speak

13   at a Board meeting.  We asked for the opportunity to

14   answer questions at a school level first before you ask

15   the Board in the event that we can help.  On 11/30/2020,

16   we reinforced the document of the AFT as a reminder to all

17   staff that you received from your union.  We also asked

18   about clarification about your posting on social media

19   that referenced our school.  We look forward to resolution

20   to our last meeting.  Best, Margaret Mary-Gethings and

21   Jenny."

22   Q    Okay.  And going back to that first sentence, "At no

23   time did we ever ask you not to speak at Board meetings,"

24   is that true?

25   A    Yes.

```
1    Q    Okay.  And in the second question, you essentially

2    say, come to the building level first before you ask the

3    Board in the event that we can help.

4         What did you mean by that?

5    A    So I meant two things.

6         To date, our current practice at the Board of

7    Education for New Haven is public comment does not get a

8    response.  So you can say anything like, where can I get a

9    box of Kleenex, and they're not going to tell you.  So,

10   first, come to us.

11        And I also wanted to alleviate Ms. Light of the

12   concerns she may have, and I could easily likely be a

13   resource to her to give her an answer.  If I didn't have

14   it, I would seek it.

15   Q    And going back to these meetings that you were

16   talking about with Ms. Hannans.

17   A    Yes.

18   Q    Did teachers like Ms. Light attend those meetings?

19   A    No.

20   Q    Who attended those meetings?

21   A    Only principals.

22   Q    All right.  And so would you -- at that time, are you

23   receiving information in those meetings that had not yet

24   been disseminated to teachers, potentially?

25   A    Potentially, yes.
```

```
1   Q    Are you aware that Ms. Alden submitted a list of
2   concerns about Ms. Light?
3   A    Yes.
4   Q    Okay.  And are you aware that Ms. Light alleges that
5   a copy was found in a mailbox in 2022?
6   A    Yes.
7   Q    Okay.  Did you know about that at the time, meaning
8   were you informed of that at the time?
9   A    I was informed, but not in school.
10  Q    Okay, where were you?
11  A    In Providence, Rhode Island.
12  Q    And how can you be sure of that?
13  A    It was my son's graduation.
14  Q    Okay.  And do you recall who informed you of this
15  document allegedly being found in a mailbox?
16  A    Ms. Clarino.
17  Q    Did you put that document in the mailbox?
18  A    No.
19  Q    Do you recall what steps Ms. Clarino took when she
20  was informed about Ms. Light's concerns?
21  A    Yes.
22  Q    Would she have reported that to you, as the building
23  principal?
24  A    Yes.
25  Q    Did she report that to you?
```

1    A    Yes.

2    Q    All right.  And what did she report to you?

3    A    She reported that she spoke with Ms. Light and

4    Mr. Delucia.  She looked into getting details and finding

5    out how this could be.

6         She looked at the -- talked to the Xerox copy center

7    and I believe took other steps to ensure that people are

8    not leaving documents out in the mailroom, that we're

9    following mail procedures as well as, I believe, looked at

10   the history of the document.

11   Q    Okay.  And moving on to a different topic.

12        The T-Eval meeting, did you attend Ms. Light's

13   mid-year T-Eval meeting in March of 2021?

14   A    Yes.

15   Q    All right.  And did Ms. Clarino attend, too?

16   A    Yes.

17   Q    And why did Ms. Clarino attend that T-Eval meeting

18   with you?

19   A    Ms. Clarino attended the T-Eval meeting -- that was

20   one of several that she had attended or that, simply said,

21   we intended together.

22        We work closely together and we knew that we would be

23   sharing with some teachers that their grade may be

24   changing, and we knew Ms. Light's grade was going to

25   change and that it was probable and likely that she would

1    work at the lower building.  And we also had other things

2    that we wanted to discuss with Ms. Light together, so

3    that's why she was there.

4    Q    And at the time, how long had Ms. Clarino been with

5    you at Worthington Hooker?

6    A    That was her second year.

7    Q    Okay.  And at that time, was she in charge of the

8    little school?

9    A    Yes.

10    Q    And if Ms. Light moved to the little school, that

11    would be the building -- would that be the building

12    Ms. Clarino was in charge of?

13    A    Yes.

14    Q    Okay.  When you met with Ms. Light at that time, did

15    you know she was taping the meeting?

16    A    No.

17    Q    Were you ever informed at any of your meetings with

18    Ms. Light that she was taping the meetings?

19    A    Never.

20    Q    Ms. Light claims that T-Eval meeting was a little

21    longer than usual.  Are you aware of that?

22    A    It was.

23    Q    Okay.  And why was it a little longer?

24    A    So it's very interesting.  It wasn't just a T-Eval

25    meeting because at the time, New Haven Public Schools was

```
 1    not giving ratings and we were using the T-Eval, which is
 2    the teacher evaluation, to give feedback.
 3        We loved -- that's sacred time for us to have
 4    one-to-one with our teacher.  And we wanted to discuss
 5    other issues and also see how we could support Ms. Light
 6    as well as discuss our plans to be proactive for next year
 7    of changing her class and getting her training and
 8    exposure to the grade that she would be teaching.
 9    Q    All right.  Was this meeting disciplinary for
10    Ms. Light?
11    A    No.
12    Q    Okay.  And if I could show you again Exhibit 7, now
13    page 117.
14    A    Yes.
15    Q    All right.  And what is this --
16    A    So that is the feedback that was provided to her from
17    me following our T-Eval.
18    Q    Okay.  And when you see this section called Feedback
19    from Instructional Manager, how do you view the comments
20    you put in there?
21    A    I think they're very positive and very fitting to
22    capture what we -- what I was saying to Ms. Light.
23    Q    Okay.  There's some handwriting on that form.  Is
24    that your handwriting?
25    A    No.
```

1    Q    Do you recall whose handwriting that is?

2    A    Ms. Clarino.

3    Q    Okay.  In that T-Eval meeting, did Ms. Light raise

4    a -- the issue of dyslexia?

5    A    Yes.

6    Q    Okay.  Had she ever raised that with you before?

7    A    No.

8    Q    Do you recall what your response was when she told

9    you she had dyslexia and that might be a concern for her

10    moving to the little school?

11    A    I recall not knowing.  I recall saying, wow, you've

12    adapted and adjusted to the grade you've taught and we

13    didn't know.  I said, how can we be of help, what can we

14    do?

15        And I also recall checking with HR as well as -- that

16    it was never noted and making sure to see if there were

17    any accommodations that we needed to provide to help her.

18    Q    Okay.  And when Ms. Light -- well, did Ms. Light

19    ultimately teach first grade for a period of time?

20    A    Yes.

21    Q    Okay.  And during that period of time, did she come

22    to you with any concerns about her dyslexia and it

23    impacting her ability to do the job?

24    A    Never.

25    Q    Speaking of grade change, I want to ask you a few

```
1    questions about that, okay?

2    A    Yes.

3    Q    All right.  When during the 2020/2021 school year did

4    you start thinking about grade changes at Worthington

5    Hooker?

6    A    December.

7    Q    And is that -- why do you know that?

8    A    Because I shared it at a staff meeting.  And when you

9    make changes, it's good practice and you want to let

10   people know and you want what's best for the whole school.

11        So Ms. Clarino and I were going into our second year

12   of working together, and we were looking at some changes

13   that we would be making.  And I always am very upfront and

14   I said in a December meeting, we anticipate some changes

15   for next year's teaching.

16   Q    Okay.  And did you ultimately make some changes for

17   next year's teaching?

18   A    I did.

19   Q    Okay.  How many changes did you make?

20   A    Three.

21   Q    Okay.  And did one of those involve Ms. Light?

22   A    Yes.

23   Q    And who were the other two?

24   A    So Ms. Tortora was moved from first grade to

25   kindergarten.  Ms. Villanueva was moved from second grade
```

```
 1   to third grade.
 2   Q    And where did you move Ms. Light?
 3   A    Oh, I'm sorry.  Ms. Light was moved from third to
 4   second grade -- oh, sorry, first.
 5   Q    Did Ms. Light's comments at the Board of Ed meetings
 6   or on Facebook play any role in your decision to move her
 7   grade?
 8   A    None.
 9   Q    Okay.  Why did you move her grade?
10   A    I moved Ms. Light's grade because I felt that there
11   was a conflict between having a parent teach the same
12   grade as their child, and Ms. Light had a student or a
13   child coming into third grade, as well as I needed to make
14   some other changes.  I knew that she would be successful
15   with support and I needed her to move to first grade.
16   Q    Okay.  And I don't recall if you answered this
17   before.
18        Did you discuss that in a March 26th T-Eval meeting
19   with her?
20   A    We did discuss that she would definitely be moving to
21   Canner Street, but I wasn't certain what grade.  And then,
22   on April 27th, I informed her.
23   Q    Okay.  And moving teachers between grades, is that
24   part of your authority as principal of a building?
25   A    Yes.
```

1    Q    Okay.  Part of your responsibilities?

2    A    Yes.

3    Q    Did Ms. Light suffer any loss of pay or benefits or

4    stature by going from third grade to first grade?

5    A    None.

6    Q    Why didn't you move Ms. Light to second grade?

7    A    I believed that Ms. Light going to first grade would

8    be the best decision for dynamics of team and meeting the

9    needs of students and meeting the needs of our building.

10   Q    Okay.  And why -- same question, but the other way:

11   Why not move her to fourth grade?

12   A    I didn't move her to fourth grade because I didn't

13   want to continually keep moving someone.

14        I'd like to say that moving teachers is a very common

15   practice, but not something that you want to keep doing

16   year after year.  And for the reason that I didn't think,

17   personally -- and I have that discretion and I am

18   entrusted to make these decisions -- that a parent

19   teaching the same grade level as their child, if I moved

20   her to fourth, I would be moving her again the following

21   year.

22   Q    Okay.  And did Ms. Light start the year, the

23   2021/2022 school year, as a first grade teacher?

24   A    Yes.

25   Q    Okay.  And did she teach first grade until she went

1    out on FMLA leave in October of that school year?

2    A    Yes.

3    Q    Or do you know when she went on FMLA leave?

4    A    I believe it was in October.

5    Q    Okay.  And during that period of time, did Ms. Light

6    come to you with any concerns about her teaching first

7    grade?

8    A    None.

9    Q    At some point, were you informed that Ms. Light's

10   leave had ended and she would be returning to school?

11   A    Yes.

12   Q    All right.  And when Ms. Light went on FMLA leave,

13   she had her own classroom?

14   A    Correct.

15   Q    Okay.  And what happened to those kids when she was

16   on leave, meaning where did they go?  Who taught them?

17   A    So at the time, because we had a unique situation --

18   we had three classrooms, but we only had less than 54

19   students -- we were able to combine the classrooms.

20        So we were able to take Ms. Light's students and put

21   them into the other two classrooms, and the other first

22   grade teachers taught them.

23   Q    Okay.  And you said that that was a unique

24   circumstance.  Why was that a unique circumstance?

25   A    We had ESSER funds that allowed for an additional

1    teacher in grades 1 to 3 trying to be responsive to the

2    academic and teaching loss of the students in smaller

3    settings.

4    Q    All right.  And at some point after you learned that

5    Ms. Light was returning from her leave, did you establish

6    a plan to facilitate her return?

7    A    Yes.

8    Q    Okay.  Is -- Defendants' Exhibit M, does that reflect

9    your plan?

10   A    Yes.

11   Q    Okay.  In the second sentence, you state, "We think

12   it will be important for you to spend time acclimating

13   with the first grade and reconnecting with your students

14   who are in 1A and B."

15        Why did you think that was important?

16   A    She had been out of school since October.  Our

17   students had adjusted and grown, as young learners do, and

18   to ease back in and to see the progress of her students

19   and to know where they were.

20   Q    Okay.  And because they were in two different

21   classrooms, did you suggest that she should rotate between

22   the two classrooms?

23   A    Yes.

24   Q    All right.  And did you give her some ideas as to

25   what days she should be in certain classrooms and what

```
1    days she should be in certain subjects, rather?
2    A    I did.
3    Q    All right.
4    A    Or we did.
5    Q    Okay.  When you say, "we," who's "we"?
6    A    Ms. Clarino and I.
7    Q    Okay.  And then in regards to those seven bullet
8    points you listed, how did you come up with those topics
9    that you list in those bullet points?
10   A    They're just common sense of priorities that if you
11   are walking in after not being with your students, you
12   would want to know where they're reading, where they are
13   on their math levels, what they've been exposed to.
14        We had a new primary resource of i-Ready, and I
15   wanted her to meet the district coordinator and feel
16   comfortable using the math program.  I'm not sure that she
17   had had a lot of time with it.
18        I wanted her to prepare a message to families because
19   we found out that Ms. Light was returning in a very kind
20   of short notice, if you will, and we wanted to share our
21   plan of what we would be doing.
22        And, as we talked about SEL learning, that would be
23   very important to know what first graders had been exposed
24   to, what they might need.  Our "Hooker Happenings" would
25   have a wealth of information for her to get updated and
```

1    acclimated to what was happening while she was on FMLA.

2    Q    Okay.  Who's Cortney Costa?

3    A    She is a math coach that works for the district.

4    Q    Okay.  And when you referenced a district employee

5    earlier, was that who you were referring to?

6    A    Correct.

7    Q    The fourth message -- I'm sorry, the fourth bullet

8    states, "Prepare a message to families of your return."

9         Did some sort of message ultimately go out to

10   families?

11   A    It did.

12   Q    Okay.  And do you recall -- well, this email is dated

13   February 8, 2022; correct?

14   A    Yes.

15   Q    Okay.  And at some point, did Ms. Light assume --

16   resume, rather, her own classroom?

17   A    Yes.

18   Q    Resume teaching her own classroom?

19   A    She did, yes.

20   Q    Do you recall how many days that took, how many

21   school days?

22   A    The exact number, I'm not sure of.  It was not many.

23   It was not immediately because we wanted her to be able to

24   do this, and we were also weighing the needs of the

25   students who for about four months they had had two

1    changes.  They started the year with Ms. Light, then they

2    had Ms. Jennings or Ms. Forsa.

3         And we were deciding -- our union and the teachers'

4    union were meeting to discuss what would be the best plan.

5    There were several things possible -- taking small groups,

6    possibly integrating science -- and, ultimately,

7    Ms. Light's desire was to have the class that she had

8    started with back.

9         And we wanted to do that, but we wanted to do it

10   wisely and taking into account the needs of the students

11   as well as we had some structural things.  They were

12   already physically in two rooms, and they would be

13   transitioning into -- back to a third.  So it was, I don't

14   know, maybe eight or 11 school days.  Maybe the end of

15   February, we informed families that she would be back to

16   teaching their child.

17   Q    Okay.  You mentioned that it was an unusual

18   circumstance before.  In the normal course when you're a

19   principal and a teacher goes out on maternity leave, for

20   example, how is his -- or, in that case, her classroom

21   covered, typically?

22   A    Typically, there would be a substitute.  This was my

23   first time where we, because of the uniqueness of the

24   enrollment numbers, were able to make a composite of two

25   classrooms.  So they were assigned to two different

1    teachers and they were members of two different

2    classrooms.

3    Q    Okay.  And you said something before about science,

4    and I didn't catch that part of your response.

5    A    When we had met, we had had a meeting with our union,

6    the teachers' union.  I think it was discussed earlier,

7    Ms. Light is great with science.  We talked about her

8    possibly taking enrichment groups for science, also

9    possibly working with other small groups to meet the needs

10   of our students.

11   Q    Okay.  And you just mentioned the union.  Are you

12   familiar with Pat Delucia?

13   A    I am.

14   Q    Did you work with Pat Delucia on a variety of issues?

15   A    I have, yes.

16   Q    Did you work with Pat Delucia on issues involving

17   Ms. Light?

18   A    I did.

19   Q    Okay.  All right.  Principal Gethings, showing you

20   what's been marked as -- admitted, rather -- as

21   Defendants' Exhibit K.

22        Do you see that on the screen?

23   A    I do.

24   Q    Okay.  If we can go to page 2 of that document.

25        Okay.  Do you remember receiving this email from

1    Mr. Delucia?

2    A    I do.

3    Q    All right.  And what is he saying to you in this

4    email?  What did you understand him to be saying to you?

5    A    He was thanking us for a great meeting.  He commented

6    that both Ms. Clarino and I were supportive and welcoming

7    and he recognized, always, that it was not easy for any of

8    us, but this was off to a great start.

9    Q    Okay.  And was this a meeting about Jessica Light?

10   A    Correct.

11   Q    And if we could go back to the first page of that

12   document.

13        All right.  And was this your response to

14   Mr. Delucia?

15   A    Yes.

16   Q    All right.  And did Ms. Light then end up teaching

17   the first grade from her return in February through the

18   end of that school year?

19   A    Yes.

20   Q    Okay.  What was your plan for her for the following

21   school year?

22   A    To remain in first grade.

23   Q    Okay.  And why was that?

24   A    Because I was not making any changes with staff and

25   for her to have -- she had had a limited time in the new

```
 1    position, so to remain constant.  And I didn't have any
 2    known vacancies when we ended the school year.
 3    Q    Okay.  And did a vacancy ultimately come up?
 4    A    Yes.
 5    Q    All right.  And who was placed in that vacancy?
 6    A    Madison Hartt.
 7    Q    Okay.  And when did you decide to put Ms. Hartt in
 8    that position?
 9    A    I decided after -- when the vacancy of Julie
10    Villanueva -- when she left the school to teach special
11    education at another school, once I met Madison, I
12    interviewed her and knew that she would be an excellent
13    addition to our school.
14    Q    Okay.  What was Ms. Villanueva teaching at the time?
15    A    Third.
16    Q    Okay.  And she -- all right.
17         Okay.  Principal Gethings, this is Exhibit X.
18         Do you see that on your screen?
19    A    I do.
20    Q    And it references Andrea DeFabio and Paul Salem; is
21    that correct?
22    A    Yes.
23    Q    Where did Mr. Salem go?
24    A    He stayed in our school, but he transitioned to be a
25    literacy coach for third grade.
```

```
 1   Q    And who filled his position in the third grade?

 2   A    Andrea DeFabio, who was the first grade ESSER

 3   teacher.  It's not a full-time NHPS job.  They were just

 4   relief funds for a few years.  So she transitioned from

 5   ESSER funding to New Haven Public School funding.

 6   Q    Okay.  And when was this decision made?

 7   A    It looks like March 22, 2022.

 8   Q    Keeping with that same exhibit, Exhibit X, page 1865.

 9        Do you see that in front of you right now?

10   A    I do.

11   Q    Okay.  And what is this form?

12   A    This is called a Recommendation for Hire.

13   Q    Okay.  And did you complete this form?

14   A    I did.

15   Q    What's the date on this form?

16   A    6/19/2022.

17   Q    And what does this form reflect?  Like, what did you

18   do?

19   A    I recommended Madison Hartt for a grade 3 position.

20   Q    Who is Jennifer Dowson?

21   A    She was another person that I interviewed.

22   Q    Okay.  And why did you interview her?

23   A    Because I selected her through AppliTrack from

24   applicants, and I thought she had some potential to be an

25   addition to our school.
```

```
 1    Q    All right.  And do you see page 1592 in front of you,
 2    Principal Gethings?
 3    A    I do.
 4    Q    Okay.  And is this -- what are you saying in this
 5    email?
 6    A    I said, "Hope you're having a beautiful day.  Please
 7    find the rec for hire for Jennifer Dowson for our grade 3
 8    ESSER position."
 9    Q    And an ESSER position, is that inside or outside the
10    New Haven Public Schools?
11    A    It's outside because it's not forever.  It was just
12    for a brief period of time.
13    Q    Okay.  Does the school still have those ESSER funds?
14    A    No.
15    Q    And is that third grade ESSER position still in
16    existence?
17    A    No.
18            MR. MURPHY:  Your Honor, I don't recall.  Do you
19    take a break at 10:15 or 10:45?
20            THE COURT:  10:45.
21            MR. MURPHY:  All right.  I will keep going.
22            THE COURT:  10:30, excuse me.
23            MR. MURPHY:  10:30?
24            THE COURT:  Yes.
25            MR. MURPHY:  I should have known that.
```

1    Q    (By Mr. Murphy) Principal Gethings, did you hear some

2    testimony earlier this week about two notes that Ms. Light

3    says she found in her classroom?

4    A    I did.

5    Q    And do you recall hearing about those notes before

6    this proceeding?

7    A    I have.

8    Q    And taking the first one.  When did you hear about

9    the first note that was found?

10    A    I heard about the first one in August.

11    Q    How did you learn about it?

12    A    Taryn Bonner.

13    Q    Okay.  And what did she tell you?

14    A    She told me that Ms. Light had found a note in her

15    classroom and asked for Ms. Clarino or -- to investigate.

16    And I said, well, Ms. Clarino is a ten-month employee and

17    not there, so that I would do it.

18    Q    Okay.  And did you do that?

19    A    I did.

20    Q    And did your investigation determine anything?

21    A    No.

22    Q    Okay.  And what did you do as part of your

23    investigation?

24    A    I spoke to our two custodians.  They had cleaned the

25    building all summer -- there was absolutely no staff in

1    the school during the summer -- and they shared with me

2    that -- what they had done in the classrooms.  And they

3    had not -- I asked them if they had seen a note.  They

4    said the boards were completely bare in her classroom and

5    that they had been wiped down.

6         I also spoke to all of the people who came to school

7    on that same day that Ms. Light did and asked them if they

8    saw or knew anything about it.  One was Ms. Tortora, who

9    came in after Ms. Light and went directly to her room, but

10   had spoken to her and knew nothing about the note.

11        The other was Ms. Sisson, who only exchanged a hello

12   with her when she came to set up her room, but did not

13   know anything about the note, nor did Ms. Light mention

14   the note to either of them.

15        I spoke to Ms. Jennings, who was going -- was her

16   first grade teaching partner, and she also did not know

17   about the note, didn't see the note, and had not gone into

18   the building when Ms. Light was there.

19        I reported it to security, Chief Reddish, and they

20   were only able to conclude that throughout the summer, two

21   people had come to school, Mr. Shortt and Mr. Jake, to

22   deliver science materials.  They didn't go into

23   classrooms -- they left the science materials in the main

24   corridor of the school -- and that the only people that

25   entered from June to August of Ms. Light's classroom were

1    our two custodians, and they did not know anything about

2    the note, nor had anyone seen the note.

3    Q    Okay.  And did you ultimately become aware that

4    Ms. Light said she found a second note in her classroom?

5    A    I did.

6    Q    Okay.  And how did you become aware of that note?

7    A    Ms. Clarino.

8    Q    Okay.  And what steps, if anything, did you take

9    after Ms. Clarino informed you of that note?

10   A    Ms. Clarino -- we were informed of the note after

11   Ms. Light left the school, the day that she was

12   transferring, that it was found in her classroom.  And I

13   believe Mr. Delucia was who informed us as well.

14   Q    Okay.  Did you or Ms. Clarino ever determine where

15   that note came from?

16   A    No.

17   Q    Okay.  So, Principal Gethings, at one point, you were

18   informed that -- were you informed that Ms. Light

19   submitted a complaint to human resources?

20   A    Yes.

21   Q    Okay.  And did you ultimately submit a response to

22   that complaint?

23   A    Yes.

24   Q    Or did you submit a document in response to that

25   complaint?

1    A    Yes.

2    Q    Okay.

3         THE COURT:  Excuse me.  Please stop talking out

4    there in the audience.  It's distracting.

5         Thank you.

6    Q    (By Mr. Murphy) Okay.  So sticking with Plaintiff's

7    Exhibit 7.  And this is page 102.  Perfect.  Thank you.

8         This document is signed by you?

9    A    Yes.

10   Q    And Ms. Clarino?

11   A    Yes.

12   Q    Okay.  And at the top, it says -- well, why did you

13   submit this document?

14   A    Because we felt very strongly that we were being

15   misrepresented in Ms. Light's concerns or complaint, and

16   we did it in response to her complaint.

17   Q    Okay.  And do you see where it says, "To file a

18   retaliatory complaint to human resources to support that

19   Jessica Light," and then it continues?

20   A    Yes.

21   Q    Okay.  What did you mean by that, "retaliatory

22   complaint"?

23   A    I think that simply we should stick to our day jobs

24   of being educators.  We used the wrong word.  It should

25   have said, "in response."

```
1    Q    And did you respond to all of the points in her

2    complaint?

3    A    We did.

4    Q    Okay.  And if we could go to the next page, please.

5         Well, how did you respond?

6    A    By providing evidence and documentation of different

7    things.  For example, this is -- I was always trying to be

8    proactive with all of the moves that I was making, but I

9    wanted Lisa Mack to know, to anticipate.

10   Q    Okay.  And if we could go to page 107.

11        We've reviewed a lot of these documents already.  I'm

12   not going to review them all with you.

13   A    Of course.

14   Q    Okay.  So page 107.  Okay.

15        Who is Vicki Grubaugh?

16   A    She is a parent of a rising first grader and fourth

17   grader and a member of the PTA and a very devoted and

18   dedicated parent.

19   Q    And when she was a member of the PTA, was she

20   involved with Ms. Light on the PTA?

21   A    I assume they might have interacted.

22   Q    In fact, did Ms. Grubaugh raise some concerns about

23   Ms. Light's activity on the PTA?

24   A    Yes, she did.

25   Q    All right.  And what was Ms. -- if you remember,
```

1    without going through it all right now, what do you

2    remember about Ms. Grubaugh's email to you in May of 2021?

3    A    I remember that her email, I think, was intended to

4    capture conversations and concerns that she had already

5    brought to our attention regarding there was some

6    unfortunate, in her opinion, experiences of gift cards

7    that were given from the PTA to teachers, and she felt

8    that Ms. Light might have had a negative response to them,

9    as well as she was concerned with how outspoken Ms. Light

10   was about school not opening and how eager she was for her

11   child, who at the time was a kindergarten student, to have

12   a learning experience of face-to-face in a classroom.

13   Q    And if we could flip to page 132.

14        All right.  And you're looking at page 132 now,

15   Principal Gethings.

16             THE COURT:  Remind us what exhibit all these

17   are.

18             MR. MURPHY:  Sure.  These are all in Exhibit 7,

19   Plaintiff's Exhibit 7.

20             THE COURT:  Seven?

21             MR. MURPHY:  Yes.

22   Q    (By Mr. Murphy) Okay.  And what is depicted on page

23   132, Principal Gethings?

24   A    It appears to be a Remind post from Ms. Alden to 2A

25   families, and then I'm seeing notes that I assume are from

1  Ms. Light.

2  Q    Do you recall having some interactions with

3  Ms. Light's husband concerning their son's -- their

4  child's experience with Ms. Alden?

5  A    I do.

6  Q    Okay.  And in pages 132, 133.

7  A    So that was actually from Wesley's dad.

8  Q    Okay.  And do you recall having some meetings with

9  him regarding Wesley?

10  A    I do.

11  Q    Okay.  And if we can go to 135 -- I'm sorry, 136 --

12  I'm sorry, 137.

13      What sort of meetings do you recall having with

14  Ms. Light's husband over their child?

15  A    One that I was present at was after report cards, and

16  it was to gain a better perspective as to what transpired

17  and how we could be supportive to the family and to Wesley

18  as a student, and also to be sure that -- we were trying

19  to ensure how assignments could get handed in and the

20  navigation of the platform of Google Classroom.

21  Q    Do you recall him raising some concerns to you about

22  Ms. Alden's Google Classroom?

23  A    Yes, and we appreciated them.

24  Q    And do you recall if any changes were made to that

25  classroom as a result?

1    A    Immediately.

2    Q    And did you, as principal, use that experience when

3    talking with other teachers in the building?

4    A    Yes.  We actually -- that's how we all learned.  This

5    was uncharted territory and we valued and appreciated

6    support, feedback, and it was very helpful that he had

7    found that information.

8    Q    Do you recall Ms. Light testifying about not

9    attending an eighth grade dance?

10   A    I do.

11   Q    And was there any prohibition against Ms. Light

12   attending that dance?

13   A    None.  Well, parents don't attend the eighth grade

14   dance.  That's just to give them some autonomy and

15   experience about not having their parents at the dance.

16       But all families were welcome if they wanted to take

17   a photo or come in, and many do and some don't.  And some

18   children are wanting to be dropped off as far away from

19   their parents as possible.  But parents don't chaperone

20   the dance.  They just come to take a picture and to pick

21   up.

22            THE COURT:  If you're going to go into a

23   different area, it is 10:30 and we'll take a recess.

24            MR. MURPHY:  That's perfect, Your Honor.  Thank

25   you.

```
1              THE COURT:  We'll see you in 15 minutes, ladies

2    and gentlemen, with your notebooks in the courtroom,

3    please.

4                    (Jury out, 10:29 a.m.)

5              THE COURT:  Anything further before we recess?

6              MR. INTERLANDI:  No, Your Honor.

7              THE COURT:  I had a question, Mr. Murphy.  I

8    think it's Exhibit X that has your name and some, looked

9    like, routing information on the top.  Would you take a

10   look at that at the recess?

11             MR. MURPHY:  That's just because I printed it

12   out, Your Honor.  Normally, we black out my name.

13             THE COURT:  Maybe we could do that for the final

14   exhibit.

15             MR. MURPHY:  That's fine.

16             THE COURT:  I think it shows up a couple times.

17             MR. MURPHY:  Yeah.  I -- you'll see on some of

18   the exhibits, there's redactions on the top.  And I

19   usually take out my name.  I must have missed that one.

20   I'm sorry.

21             THE COURT:  Okay, good.  Thank you.

22             All right.  We're in recess.

23                  (A brief recess was taken.)

24             THE COURT:  All right.  Please be seated.

25             Before we bring the jury back, I want to make
```

1    sure we have clarity on courtroom etiquette.  With respect

2    to everybody who is here, there shall be no facial

3    expressions or other reactions to testimony that is being

4    given, and no chatting or other distracting activities

5    while a witness is on the stand.

6           This is a trial in which the jury will be

7    deciding the outcome on the basis of the evidence, not

8    what the audience is telegraphing.  So please remember

9    that if you wish to stay as an observer in this trial.

10   That goes for both sides.

11          All right.  Are we ready to proceed?  Okay.

12   Ms. Gethings, if you'll make your way back to the stand,

13   and we'll bring in the jury.

14          I believe we have found the answer to

15   "substantial or motivating."  If you go back to 1977 to

16   *Mt. Healthy*, you will find perhaps the first use.  And it

17   says, "substantial or equivalent, motivating."  That's the

18   language that's used.  And although it has not been

19   faithful yet hereto, in all decisions since then, that's

20   what we'll use.

21          I'll give you a modified charge that's my best

22   incorporation of what you all have requested, and we'll

23   have a look at that.

24          MR. MURPHY:  Did Your Honor have a chance to

25   look at Judge Meyer's summary judgment ruling?

```
 1              THE COURT:  Yes, but we go back to the origins.
 2              And I think that's right.  "Substantial" is the
 3    same thing as "motivating."  That's what Mt. Healthy said.
 4                     (Jury in, 10:51 a.m.)
 5              THE COURT:  Please be seated.
 6              All right.  We'll continue with Ms. Gethings'
 7    testimony.
 8              Mr. Murphy.
 9    Q    (By Mr. Murphy) Okay.  Principal Gethings, did you
10    hear Ms. Bonner testify about your communication with a
11    potential witness in her investigation?
12    A    I did.
13    Q    Did you understand who she was referring to?
14    A    I did.
15    Q    Okay, and who was that?
16    A    Mr. Doug Jones.
17    Q    Okay.  And can we have Exhibit 7, page 112, please.
18         What is this document, Principal Gethings?
19    A    It's an email that I sent to Mr. Jones.
20    Q    Okay.  And why did you send this email?
21    A    I sent the email to thank him for the cleanup day and
22    to seek clarity that he did not think that he was in
23    charge of the gardening committee.
24    Q    Okay.  And do you understand if this is what
25    Ms. Bonner was referring to?
```

```
 1   A     Yes, I believe this is.

 2   Q     Okay.  Did you actually ever speak with Ms. Bonner

 3   about this email?

 4   A     I did.

 5   Q     Okay.  And in this email with Mr. Jones, did he

 6   confirm that he was never in charge of the gardening

 7   committee?

 8   A     Yes.  He said, "I agree with your recollection of the

 9   conversation.  My part of cleanup days was to satisfy my

10   092 course requirements.  I'm not in charge of the

11   gardening committee."

12         MR. MURPHY:  We don't have any other questions

13   at this time, Your Honor.

14         THE COURT:  Okay, thank you.  Re-cross -- cross?

15         MR. INTERLANDI:  Yes, Your Honor.

16                    CROSS-EXAMINATION

17   BY MR. INTERLANDI:

18   Q     Good morning, Ms. Gethings.

19   A     Good morning.

20   Q     I have some follow-up questions for you.

21         Do you recall I took your deposition, and during that

22   deposition you told me that you gave the AFT letter to

23   staff at a meeting on November 2, 2022?

24   A     I recall the deposition, yes.

25   Q     And you testified at that deposition that you gave
```

1   the letter to staff at a meeting on November 2, 2022;

2   isn't that true?

3   A    I don't recall --

4         THE COURT:  I'm sorry, you have an objection?

5         MR. MURPHY:  No.

6   Q    (By Mr. Interlandi) Do you recall that I took your

7   deposition on December 19, 2022?

8   A    I do.

9         MR. INTERLANDI:  Your Honor, may I approach?

10        THE COURT:  You may.

11        THE WITNESS:  Thank you.

12  Q    (By Mr. Interlandi) Direct your attention to page 44

13  and let me know when you're there, please.

14  A    I'm there.

15  Q    Do you recall I asked at your deposition, and I said,

16  "And your testimony is that it was on November 2, 2020?"

17        And your answer was, "There was a staff meeting,

18  yes."

19        Is that true?

20  A    We gave it at a staff meeting, yes.

21  Q    So it was not on November 2nd?

22  A    I'm not sure of the date.  It was three years ago.

23  Q    But at the deposition, you told me it was

24  November 2, 2020; right?

25  A    Then that's when it was.

```
 1    Q    And that would have been a remote meeting; isn't that

 2    true?

 3    A    I believe we were in person and outside, actually.

 4    I'm not sure.  It may have been a remote meeting.

 5    Q    And then you didn't give -- you didn't hand the

 6    letter to anyone during that meeting; correct?

 7    A    We either handed it or they had already received it

 8    from their union.

 9    Q    Correct, they already received it from the union, and

10    you testified at your deposition that you were sending a

11    double message; isn't that true?

12    A    I don't know if I used the "double message," but we

13    were messaging with best intention --

14            THE COURT:  If you're -- I'm sorry.  Just one

15    moment.  If you're asking what she said at her deposition,

16    read it.

17            MR. MURPHY:  Can I ask that he allow the witness

18    to finish her response before the next question?  Jumping

19    on top of her.

20            THE COURT:  Okay.

21    Q    (By Mr. Interlandi) Referring you to page 161 of the

22    deposition in front of you, and let me know when you're

23    there.

24            MR. MURPHY:  Which page?

25            MR. INTERLANDI:  161.
```

```
 1              THE WITNESS:   There.
 2   Q    (By Mr. Interlandi) Okay.  My question was, "So I
 3   just heard you say the teachers received it from the
 4   union.  Did they have this letter when the union gave it
 5   to them?"
 6        Do you see that at lines 17 to 19?
 7   A    So what are you asking me?
 8   Q    Do you see the question from lines 17 to 19 that I
 9   asked you at that deposition?
10   A    Yes.
11   Q    Okay.  And you answered, at line 20, "It was a double
12   message"; correct?
13   A    Yes.
14   Q    And you wanted to make sure everybody was aware;
15   right?
16   A    Correct.
17   Q    That not all public speech is protected by the First
18   Amendment; right?
19   A    Yes.
20   Q    And at that time, many teachers were really voicing
21   about not opening schools; isn't that true?
22        Isn't it true?
23   A    What is your question?
24   Q    Isn't it true at that time when you gave out the
25   letter, the AFT letter to send a double message, that
```

1    other teachers were really voicing not opening schools?

2    A    Some.

3    Q    Some?  So I'll direct your attention to the rest of

4    your answer.

5         It says, "It was a double message" -- from lines 20

6    to 23 -- "it was to make sure everybody is aware.  At the

7    time, there were many, not teachers from Hooker School,

8    but teachers were really voicing not opening schools."

9         You said that; right?

10   A    I did.

11   Q    Isn't it true that you had a meeting with Jessica and

12   Ms. Clarino on November 2, 2020?

13   A    I don't recall if that was the date.

14            MR. INTERLANDI:  Your Honor, may I approach to

15   give the witness the plaintiff's exhibit notebook?

16            THE COURT:  Yes.

17   Q    (By Mr. Interlandi) Please turn to Exhibit 23 in the

18   notebook in front of you, and let me know when you're

19   there.

20   A    I'm there.

21   Q    Okay.  And, earlier, you testified that at some of

22   the meetings that you had with Jessica, you learned that

23   she was recording those meetings; isn't that true?

24   A    That's correct.

25   Q    Okay.  And do you see Exhibit 23?  Have you seen this

```
1    document before today?

2    A    Maybe this week when she was testifying.

3    Q    Isn't it true at a meeting in November 2020 with

4    Ms. Light, you told her that you heard her speak many

5    times?

6    A    Yes.

7    Q    And when you're referring to that, you were referring

8    to her public speech; isn't that true?

9    A    Yes.  Well, I've heard her speak many times.

10   Q    And you were upset because her most recent public

11   speaking in November made you look bad; right?

12   A    Can you rephrase your question?

13   Q    You were upset with Ms. Light in November 2020

14   because you felt that her most recent public speaking made

15   you look bad; right?

16   A    I believe it was that we looked like we were not

17   informing our teachers and that there wasn't good

18   communication.

19   Q    So I'll direct your attention to page 14 of

20   Exhibit 23.  Let me know when you're there.

21   A    Fourteen?  Section 14 in the binder?

22   Q    Page 14 of Exhibit 23.

23   A    Oh, thank you.  I'm sorry.

24   Q    Are you there?

25   A    I am, yes.
```

```
1    Q    You told Jessica during this meeting that society
2    right now, it's fair to say, was very reactive; isn't that
3    true?
4    A    May I have a minute to read what you're referring to,
5    please?
6    Q    Yes.
7              MR. MURPHY:  Your Honor --
8              MR. INTERLANDI:  It's 12 through 16.
9              MR. MURPHY:  I would also ask, if he knows the
10   line that he's asking about, that he inform the witness
11   about it to keep this easy for her.
12             THE COURT:  Let's -- we're on page 14.
13             MR. INTERLANDI:  Lines 12 through 16.
14             THE WITNESS:  Okay.
15             I still don't know what your question is, but
16   perhaps you can ask it again.
17   Q    (By Mr. Interlandi) Sure.
18        You told Jessica that the society right now, it's
19   fair to say, is very reactive.
20        Is that what you said?
21   A    Yes.
22   Q    And then from lines 18 to 21 on the same page, you
23   received a message and the message was that, as a result
24   of whatever Jessica may have said, you guys needed to get
25   yourselves together, pretty much?
```

```
 1          That's what you told Jessica; right?
 2    A    I did so that our teachers knew what was going on --
 3    Q    That's not my question.
 4    A    -- yes.
 5    Q    You did?  You said that?
 6          MR. MURPHY:  He's got to let the witness finish
 7    her answer before he begins his second question.
 8          THE COURT:  Well, if it's not responsive to the
 9    question.  Let's go back and let's get organized.
10          Your question refers to lines 18?
11          MR. INTERLANDI:  Through 21.
12          THE COURT:  And what is your question?
13    Q    (By Mr. Interlandi) That she -- Ms. Gethings, you
14    told Ms. Light that you received a message as a result of
15    her speaking, and the message was that you guys needed to
16    get yourselves together, pretty much; isn't that true?
17    A    That's what this recording says, yes.
18    Q    Do you have any reason to believe that it's
19    inaccurate?
20    A    No.  It's just not as familiar.  It was four years
21    ago almost.
22    Q    Already.  So please turn to page 18.  Let me know
23    when you're there.
24    A    I'm there.
25    Q    Okay.  And then you went on to talk about your
```

```
 1    interactions and your response with Dr. Tracey and that
 2    you felt uncomfortable, referring to lines 24 through 25
 3    at the bottom of 18 and 1 through 4 at 19.
 4    A    I apologize.  I don't -- I'm very confused with what
 5    you're doing.  You're shouting lines and -- what do you
 6    want me to read and what do you want me to --
 7    Q    Did you tell Jessica at this meeting that you felt
 8    uncomfortable with Dr. Tracey?
 9    A    Where would I find that?
10    Q    At the bottom of page 18 and the top of page 19.  So
11    the last two lines of page 18 --
12             THE COURT:  Are you sure you're on the right
13    pages?
14    Q    (By Mr. Interlandi) -- and the top four lines of 19.
15    A    I may be missing -- the bottom of 18 and the top?
16    Q    Do you want me to read it to you?
17    A    Absolutely.  Go ahead.
18    Q    You said, "And then when they overlap, I think it's
19    tricky.  I just was uncomfortable with Dr. Tracey doing
20    that as well as I think -- then you think, oh, my gosh,
21    should we have done more?  What -- I know that what we
22    knew we shared, and I don't think [sic]."
23             Do you recall saying that to Jessica?
24    A    So this was a --
25    Q    Do you recall saying that to Jessica?
```

```
1    A    -- a transcript of a recording.  And I remember

2    sharing that I felt uncomfortable with our

3    superintendent --

4    Q    Thank you.

5    A    -- asking me if our teachers know the information.

6              MR. INTERLANDI:  That was the answer,

7    Your Honor.  She's providing a narrative that's not

8    responsive to my question.

9              THE COURT:  That's all right.  I'll permit that.

10   Q    (By Mr. Interlandi) And you testified about Vicki

11   Grubaugh; correct?

12   A    I did.

13   Q    And she was one parent that commented to you about

14   Jessica on January 19, 2021; right?

15   A    She was a parent, yes.

16   Q    And that was the first day back to in-person

17   learning; isn't that true?

18   A    Correct.

19   Q    And she brought bagels to the school; is that right?

20   A    She did.

21   Q    And she told you what she heard Jessica say at a

22   Board of Education meeting; right?

23   A    She did.

24   Q    And at the time, she did not have a child in

25   Jessica's third grade class; right?
```

```
 1    A    No, she did not.

 2    Q    To start that school year, 2020/2021, one of her

 3    children was in a learning pod; right?

 4    A    I don't know.

 5    Q    She emailed you and Ms. Clarino about Jessica in May,

 6    on May 26th; isn't that true?

 7    A    It is.

 8    Q    And that was four months after she told you about

 9    Ms. Light when she dropped off bagels; correct?

10    A    Compiling other concerns, yes.

11    Q    And that email was contained in your retaliatory

12    complaint; isn't that true?

13    A    Yes, it was.

14    Q    Let's turn to Exhibit 7.  Let me know when you're

15    there.

16    A    I'm there.

17    Q    And at the bottom of the page, you'll see some

18    control numbers, DEF.  Please go to DEF000107.

19         Are you there?

20    A    I am.

21    Q    And there's a notation on this page.  Whose

22    handwriting is that?

23    A    Ms. Clarino.

24    Q    And she said this was one example of a parent's

25    perspective; right?
```

```
1    A    Correct.
2    Q    And is this the only example that you provided in
3    your retaliatory complaint regarding a parent's
4    perspective specifically about Ms. Light?
5    A    Yes.
6    Q    And isn't that true that this email is dated
7    approximately three weeks after Jessica filed her
8    complaint against you and Ms. Clarino?
9    A    That, I wouldn't know.
10   Q    Let's turn to Exhibit 38, please.  Let me know when
11   you're there.
12   A    I am there.
13   Q    Okay.  Would you agree -- if you go to the
14   second-to-last page, LIGHT00233, let me know when you're
15   there.
16   A    00230?
17   Q    00233.
18   A    I am there.
19   Q    Okay.  You would agree with me that this email sent
20   by Jessica to Ms. Mack is dated April 30, 2021; right?
21   A    Yes.
22   Q    And you learned about Ms. Light's complaint in May of
23   2021; right?
24   A    Yes, I guess, if you're saying that.
25   Q    You solicited an email from Doug Jones about the
```

```
1    gardening committee; right?
2    A    No.
3    Q    Let's look at Exhibit 7.
4    A    Maybe it's your verb that you used, but I didn't
5    solicit an email from him.
6    Q    Okay.  Let me know when you're at Exhibit 7.
7    A    I'm here.
8    Q    And please go to DEF000112.
9    A    Yes.
10   Q    You asked him for an email to confirm your
11   recollection of the gardening committee; isn't that true?
12   A    I don't see where I asked him for an email.  I said,
13   "Can you please confirm that my recollection of our
14   conversation is what you recall and at no point did I ask
15   you to be in charge of the gardening committee."
16   Q    And that's what it says in your email; right?
17   A    Yeah.
18   Q    That email is dated May 25, 2021; right?
19   A    Correct.
20   Q    And that's a day before Ms. Grubaugh sent you her
21   email; right?  And that email is also in Exhibit 7.
22        If you go to DEF107, her email is dated May 26, 2021;
23   isn't that true?
24   A    Yes.  I mean, the dates are true.
25   Q    And your email to Mr. Jones constituted obstruction
```

1    of the investigation into Ms. Light's complaint; isn't

2    that true?

3    A    I was not aware.  I have never had a situation of

4    such, and I have now been told that I should not have sent

5    that email.

6        I did it simply to clarify that he wasn't under the

7    impression that he was in charge of the gardening

8    committee.

9    Q    And that was an obstruction of the investigation;

10   right?

11   A    Not that I was aware of, but I have since found out

12   that I should not have solicited that answer from him.

13   Q    And someone told you it was an obstruction; isn't

14   that true?

15   A    I don't remember them using that word.

16   Q    Is your deposition transcript still in front of you?

17   A    It is.

18   Q    Please turn to page 133.

19   A    Sorry.

20   Q    Page 133, lines 8 through 14.

21        Are you there?

22   A    Yes.

23   Q    You told me that you had sent an email to Mr. Jones;

24   right?

25   A    I did.

```
1    Q    To clarify his understanding of a community service

2    effort; correct?

3    A    Correct.

4    Q    And that you were unaware that that would have

5    constituted obstructing an investigation?

6    A    True.

7    Q    And then you said, "It was in response to Ms. Light

8    saying I gave away the gardening committee and then had

9    admonished her"; correct?

10   A    Yes.

11   Q    And after this happened, the investigation of

12   Ms. Light's complaint was outsourced to a law firm; right?

13   A    I'm not sure if this had anything to do with it, but

14   I believe it was outsourced for a variety of reasons.

15   Q    Okay.  Let's look at page 211 of your deposition

16   transcript.  Let me know when you're at page 211.

17   A    I'm there.

18   Q    Referring to page -- lines 18 through 23, please read

19   those to yourself and let me know when you're done.

20   A    On page 211?

21   Q    Yes.

22   A    Okay.

23   Q    Have you read it?

24   A    I have read it, yes.

25   Q    And back in December of 20 -- what was this -- 2022?
```

```
1    A      Correct.

2    Q      You told me you didn't know that you obstructed the

3    complaint; right?

4    A      That's true.

5    Q      And then, because of sending that email, that it was

6    going to result in it having to be outsourced.  That's

7    what you told me; right?

8    A      Yes, that's -- in December, that's what I thought the

9    reason was.

10   Q      Let's talk about Facebook.

11          Are you familiar with the social media platform

12   called Facebook?

13   A      Yes, I am.

14   Q      Are you on Facebook?

15   A      Yes, I am.

16   Q      Are you friends with Jessica Light on Facebook?

17   A      No, I'm not.

18   Q      Are you friends with Jenny Clarino?

19   A      Yes, I am.

20   Q      Are you friends with Hilarie Alden?

21   A      No, I'm not, I don't think.

22   Q      You don't think so?  Are you sure?

23   A      I'm not positive.  I'm friends with her husband.  I'm

24   not sure I'm friends with her.  I'm pretty inactive on

25   Facebook.
```

```
 1   Q     You saw Ms. Light's post -- actually, not Ms. Light's
 2   post, the post Ms. Light commented on in March of 2021; is
 3   that right?
 4   A     Yes.
 5   Q     Would you agree with me that it contained information
 6   regarding student data?
 7   A     I will not agree with you.
 8   Q     Okay.  Let's look at Exhibit 2.  It's in the white
 9   binder in front of you.  Let me know when you're there.
10   Exhibit 2.
11   A     Okay.
12   Q     And when I'm referring to "student data," I'm
13   referring to positive student COVID cases in New Haven
14   Public Schools.
15         You agree that that's what the subject matter of this
16   complaint -- I'm sorry, the subject matter of this post
17   was dealing with?
18   A     I'm not sure because I don't know Melody Gallagher
19   and I don't know anyone in New Haven Advocates and I don't
20   know them to be in charge of student data.
21   Q     So you saw this post; right?
22   A     It was shared with me.
23   Q     Right, it was shared with you.  It was screenshotted
24   and sent to you; is that your testimony?
25   A     Yes.
```

1    Q    And then did you reply to them in the text message to

2    ask them why they sent it to you?

3    A    I don't recall if I replied or if we spoke about it.

4    I know the reason it was shared with me.  The teachers who

5    shared it were concerned with how our school was being

6    reflected.

7    Q    Right.  Because you're concerned with the school's

8    image; right?

9    A    Of course.

10   Q    And your own image, too; right?

11   A    Absolutely.

12   Q    And in this post, if you would agree, Ms. Gallagher

13   says, "So apparently these are the schools that have had

14   positive student COVID cases in NHPS since 1/19, as

15   reported to the state and on the state website."

16        That's what this says; right?

17   A    Yeah, whoever she is.

18   Q    Right.  You don't know her; right?

19   A    Absolutely not.

20   Q    And then she goes on to explain what she understands

21   the information she obtained from the state to mean; isn't

22   that true?

23   A    I believe that's her attempt.

24   Q    That's her -- okay.  And then she's sharing a post

25   from a group called New Haven Public School Advocates from

1    March 6, 2021; right?

2    A    Yes.

3    Q    And this was concerning a spreadsheet from the State

4    of Connecticut; isn't that true?

5    A    I believe it was.

6    Q    And would you agree with me that on that spreadsheet,

7    Hooker was listed as having at least one positive case,

8    but less than six for a specific week?

9    A    I do not know how to interpret that graph and what

10   the "less than six" means.  And we were not guided or

11   given that information, so I cannot interpret it, nor do I

12   think anyone can besides the people from the state or the

13   health department.

14   Q    You would agree that Jessica had two children

15   attending Hooker at the time of her Facebook comments in

16   March of 2021; right?

17   A    They were attending, but not in person, yes.

18   Q    And she was a parent of two children attending Hooker

19   School; right?

20   A    Correct.

21   Q    And there was no reason to send a letter; isn't that

22   true?

23   A    Absolutely not.

24   Q    You never commented on this post to say that; right?

25   A    I wouldn't.  I'm not on that.

```
 1   Q     But you could have.  It was a public post, wasn't it?

 2   A     I believe one is for teachers only, the Melody

 3   Gallagher, and I'm not a member of the New Haven

 4   Advocates.

 5   Q     Did you ever try to find that post and insert any

 6   comments to say that letters did not need to be sent?

 7   A     Absolutely not.

 8   Q     You didn't try to do it?

 9   A     I wouldn't have.  It wouldn't have been the place to

10   do that.  I reached out to people to get an understanding

11   of the graph and why someone, a teacher, was spreading

12   this information and trying to share information.  I

13   didn't know her role or why she would be soliciting

14   information about such.

15   Q     You never asked any Hooker teachers to comment on the

16   post; right?

17   A     No.

18   Q     Other teachers at Hooker saw Jessica's comments;

19   right?

20   A     Yes.

21   Q     None of them commented on the post; right?

22   A     Absolutely not.

23   Q     None of them said, Hooker doesn't need to send a

24   letter; right?

25   A     No.  They didn't know why Jessica was saying that
```

1    Hooker didn't send letters.

2    Q    And at this time, the entire community was very

3    polarized; isn't that true?

4    A    They were extremely polarized with -- we had the

5    highest number of families wanting to come back to school.

6    And then we had --

7    Q    That's not my question.

8         It was very polarized; isn't that true?

9    A    Yeah.  I think giving some context could be helpful

10   to the rest --

11   Q    I don't need -- your counsel could ask you for the

12   context.  I don't need it.

13   A    Perfect.

14   Q    Everybody's level of anxiety, concern, was high at

15   that time; isn't that true?

16   A    I can't say what everybody's level of anxiety was.

17   Q    Well, you told me that when I took your deposition;

18   isn't that true?

19   A    Well, I think there was a high level of anxiety for

20   many people.

21   Q    Okay.  So let's just make sure.  Do you have your

22   deposition transcript in front of you still?

23   A    I certainly do.

24   Q    Okay.  Let's turn to page 66.

25   A    I'm there.

```
 1   Q    Okay.  Directing your attention to lines 10 through
 2   14, can you read your -- actually, you could read the
 3   whole answer.  Lines 5 through 14.  Why don't you read
 4   that out loud.
 5              THE COURT:  Do you want to start with the
 6   question?
 7              MR. INTERLANDI:  Sure.
 8   Q    (By Mr. Interlandi) Do you remember telling me that
 9   you said that everybody's level of anxiety and concern was
10   high?  Do you recall you saying that to me?
11   A    I don't recall that, but I do recall there was a high
12   level of anxiety at that particular time, yes.
13   Q    And then I had asked you if you recall -- I asked you
14   about an email that you sent immediately after you saw the
15   Facebook comments; right?
16   A    And I said, "Simply to protect and preserve our
17   school and make sure that people were not engaging in
18   misrepresenting or not coming to us and they continued to
19   be committed to working as a school community."
20   Q    And what was the rest of that answer?
21   A    "I think it's important -- I think it was -- it's
22   important to note our community was very polarized and
23   everybody's level of anxiety and concerns was high, and
24   not to give anyone any reason.  We also were aware of
25   information that parents and the public were of constant
```

1    interest to know."

2    Q    Thank you.  And then you did send an email.  I think

3    you talked about that already; right?

4    A    Yes.

5    Q    Okay.  So let's look at Exhibit 3.  Let me know when

6    you're there in the white binder in front of you.  Exhibit

7    3.

8    A    I'm there.

9    Q    And this was sent immediately after you received

10   screenshots of Ms. Light's comments to a Facebook post;

11   right?

12   A    I don't know if it was sent immediately after because

13   I sent so much communication to our teachers to try to

14   keep everyone on the same page, and this email has other

15   messages besides referring to communication about making

16   posts.

17        I don't know -- on mine, I don't see what time it was

18   sent, but I have no idea of what the correlation of -- I

19   don't know if it was sent immediately.  I don't think it

20   was.

21   Q    This email was about Jessica Light's comments, at

22   least the second paragraph.  The second paragraph was

23   about Jessica Light's comments on the Facebook post; isn't

24   that true?

25   A    It was about comments on Facebook, yes.

```
 1   Q    About Jessica's comments; right?
 2   A    Frankly, the whole email exchange of teachers trying
 3   to communicate about letters being sent or not being sent
 4   and the district was of concern because it wasn't how we
 5   would get information to our teachers.
 6        So I don't know that it was directly about Jessica,
 7   but it was in general that that's not to be the source of
 8   how we figure things out.
 9   Q    Just one second.
10        You told me that the email was about Jessica Light at
11   your deposition; isn't that true?
12   A    You know, I don't know.  Tell me and I'll look it up
13   and I'll remember.  This --
14   Q    Sure.  Pages 66 through 67.
15   A    What page?
16   Q    Sixty-six -- let's stay with 66, lines 15 through 19.
17   I asked you what misrepresentations were out there that
18   led you to send that email to all staff; right?  I asked
19   you that question?
20   A    Yes.
21   Q    And what was your answer?
22   A    "Well, there was some conversations, people being
23   asked about Hooker and these cases, because of the posting
24   that Ms. Light had made."
25   Q    Thank you.
```

```
1                    THE WITNESS:  May I expand on my answer?

2                    MR. INTERLANDI:  No.

3                    THE COURT:  Your lawyer will have a chance to

4        give you expansion on your answer if that's appropriate

5        for the record --

6                    THE WITNESS:  Thank you, Your Honor.  Thank you.

7                    MR. INTERLANDI:  I'm sorry, Your Honor.  I just

8        need to reorganize some of my notes here.

9        Q    (By Mr. Interlandi) Let's look at Exhibit 7.  Back to

10       the white binder in front of you, Exhibit 7.  Please turn

11       to the email that appears on page 104.  The bottom,

12       DEF00104.

13       A    I'm there.

14       Q    And it goes on to page 105 and 106.

15            Do you recall this email?

16       A    I do.

17       Q    And this was an email that starts off on page 10 --

18       the bottom of 105 and 106 that Jessica sent to you; right?

19       A    Correct.

20       Q    She had a question; correct?

21       A    Yes.

22       Q    And the subject of her email is "3 feet"; right?

23       A    Correct.

24       Q    And this is about social distancing in the classroom;

25       right?
```

```
1    A      Yes.

2    Q      And this was on March 22, 2021; right?

3    A      Yes.

4    Q      And you attached this email to your retaliatory

5    complaint; right?

6    A      We attached it to our complaint, yes.

7    Q      At the top, there are some notes.  Whose notes are

8    those?

9    A      Ms. Clarino.

10   Q      She noted that the both of you requested an

11   opportunity to answer questions at the school level before

12   asking the Board of Education; right?

13   A      Yes.

14   Q      But that's not anywhere in your response to Jessica's

15   original email; correct?

16   A      We had said an abundant number of times to Ms. Light,

17   to our whole staff, to ask us questions so we could seek

18   the answers.

19          As I said before, our Board of Ed does not answer any

20   questions during public comment, so we would want to be

21   able to answer our teachers and get answers for them as

22   soon as possible.  But we were living in a time where

23   everything didn't have an answer immediately because it

24   was uncharted territory.

25   Q      And it was important at that time for people to get
```

1    answers; right?

2    A    Absolutely.

3    Q    But nowhere in this email did you say, please wait

4    for an answer before you talk to anyone or make any

5    comments at Board of Education meetings; right?

6    A    No.  I wouldn't have said that.  I did say I was

7    going to get an answer and, in the interim, we would

8    follow the existing.

9        And in the staff meeting, we had shared what to do as

10    we shifted from 6 feet to 3 feet.  And, again, those were

11    just recommendations.  They were not requirements.

12    Q    But I think the answer is no, right, it's not in this

13    email?

14    A    I wouldn't tell any teacher not to go to the Board of

15    Ed.  If they want to go, they can go.  But they're not

16    going to get an answer.

17    Q    Four days later, you and Ms. Clarino had a teacher

18    evaluation meeting with Jessica; right?

19    A    We had a meeting, yes, and we did some T-Eval and

20    discussed other things.

21    Q    Right, because this was dated March 22nd and the

22    T-Eval meeting is March 26th; right?

23    A    The dates are -- yeah.  I mean, if you say them, I

24    trust you.

25    Q    Thank you.

```
 1        That T-Eval meeting lasted more than minutes; right?
 2   A    Yes.
 3   Q    It lasted more than 30 minutes; right?
 4   A    Yes.
 5   Q    And during this meeting that you had with Jessica,
 6   you told her she shouldn't be able to comment that we're
 7   not doing something that she thought you should have done;
 8   right?
 9   A    Are you quoting from a transcript that was recorded?
10   Q    Well, I'm asking you if you said it.  Do you remember
11   saying it?
12   A    Could you say it again, please?
13   Q    During the meeting, the T-Eval meeting you had with
14   Jessica, you told her she shouldn't be able to comment
15   that we're not doing something that she thought you should
16   have done?
17   A    You know, I'm just trying for a minute to get to all
18   these places that took place a long time ago.  And that
19   being pulled out of context, I really -- I can't say
20   that -- I can say that I recall Ms. Light saying that
21   there was no universal policy and we weren't doing certain
22   things and she wanted answers.
23   Q    There wasn't a universal policy at that time; right?
24   A    No, there's not -- I mean, we're 41 schools in a
25   large district, and our needs in schools are different.
```

1    And, as far as I know, we've never had a pandemic or

2    COVID.  So the universal policies were evolving as we

3    lived.

4    Q    Is Hooker special?  They didn't need to be part of a

5    universal plan?

6    A    Hooker is very special, as are all the schools in New

7    Haven.  But I'm not sure of what Ms. Light was trying to

8    attain by the terms of "universal plans" because she -- we

9    had the discretion and the directions from our Wednesday

10   meetings to apply and make sense of our own buildings and

11   what could work in our schools -- physical spaces,

12   staffing, if we had a librarian, if we wanted to have

13   books taken out, if we wanted to put individual materials

14   for students in bags so they could use them again.

15        We did have some autonomy and we were a school that

16   was going to do the most we could do to return the joy of

17   learning for our students.

18   Q    You had authority to do whatever you wanted?

19   A    I don't.  I didn't say that.

20   Q    So in the T-Eval meeting on March 26, 2021, if you

21   turn to Exhibit 24 in the binder in front of you, page 20.

22   A    Yes.

23   Q    And I'm going to direct your attention to the bottom

24   four lines on that page where you were speaking directly

25   to Ms. Light.  Ms. Clarino was present.

```
1   A    This visit -- these are Ms. Light's recording of the
2   meeting we had on the --
3   Q    Yes, it is.  That's a full exhibit.
4   A    Okay.
5   Q    Are you there?
6   A    At what page?
7   Q    Page 20.
8   A    Yes, I'm here.
9   Q    Can you read the last four lines?
10  A    So line 22 to 25?
11  Q    Yes.  Why don't you read them out loud.
12  A    "We didn't have to have a relationship, but you
13  shouldn't be able to comment that we're not doing
14  something that you think we should have done."
15  Q    Thank you.
16       And you told Ms. Light that everyone has the right to
17  do whatever they want.  Didn't you tell her that during
18  the T-Eval meeting?
19  A    Again, the T-Eval meeting wasn't yesterday, nor was
20  my deposition, so I'm not sure that I trust if you're
21  quoting from her recording.  But I may have said that.
22  Q    Well, let's just go right to the page.  Let's look at
23  page 41 of Exhibit 24.  Let me know when you're there.
24  A    We're still on the transcript?
25  Q    Yes.  Exhibit 24, page 41.
```

1    A    Okay.  Exhibit 24 -- yup, I'm on 41.

2    Q    Specifically lines 11 through 20.

3         Is that where you told Jessica that everyone has the

4    right to speech and the right to oppose, the right to do

5    whatever?

6    A    I did.

7    Q    Okay.  And then it goes on.  Why don't you read the

8    rest of it, lines 13 through 20.

9    A    Would you like me to start with where I said everyone

10   has --

11   Q    No, where it says, "But I."  Why don't you start from

12   there and finish with those.

13   A    Okay.  "But I have to say the part about Hooker

14   didn't say letter.  There's a lot to that because Hooker,

15   you may not agree with that [sic]."

16        It's so weird reading a recording.  I feel like I'm

17   missing some words.

18        "You may agree with that, you may think differently.

19   But, frankly, that isn't your place to tell everyone that

20   we didn't send a letter and make sure a lot of stress for

21   people saying you have cases.  We didn't have school-based

22   cases [sic]."

23   Q    Nowhere in that Facebook comments that Ms. Light

24   responded to the post did she say there was a positive

25   case, did she?

```
 1    A    She didn't, but she cannot control a person's

 2    interpretation of the reader of those posts and what it

 3    developed.  And it ensued a high level of stress in our

 4    community because of that statement.  Not her control, but

 5    it isn't her place to be commenting about who sent letters

 6    and who didn't.  She never came to us about the letters.

 7    She --

 8    Q    Is there a place to control what other people do

 9    after she makes a public comment?

10    A    I'm sorry?

11    Q    Is it her place to control what other people do after

12    she makes a public comment?

13    A    No, but she should be -- realize the impact of what

14    it did to our community.

15    Q    What about if she's speaking the truth?

16    A    What is the truth in this matter?

17    Q    Hooker did not send a letter.

18    A    We didn't need to.

19    Q    The first time you informed Jessica, isn't it true,

20    that she would be reassigned to a new teaching position

21    was during her T-Eval meeting on March 26th; right?

22    A    Yes, but --

23    Q    Okay.  That was the first time you told her

24    specifically.  Not the -- told everyone that you were

25    going to making some changes, but specifically Ms. Light,
```

1    the first time you told her was at her T-Eval meeting;

2    right?

3    A    Right, which is very early for a teacher to be told

4    they were changing for the next school year.

5    Q    And when did school end that year?

6    A    June.

7    Q    And this was towards the end of May?

8    A    No, March.

9    Q    Sorry, the end of March?

10   A    Correct.

11   Q    And at that time, Jessica told you she didn't have

12   any interest in first grade; right?

13   A    She did.

14   Q    She did tell you she had interest or she did not?

15   A    She was not interested in kindergarten or first

16   grade.

17   Q    You're familiar with the schools or the districts

18   sending out preference sheets to teachers; correct?

19   A    I am, yes.

20   Q    And she even told you that she didn't have an

21   interest in first grade during the T-Eval meeting; isn't

22   that true?

23   A    She did, yes.

24   Q    And during the T-Eval meeting, Ms. Clarino asked her

25   for her preference between kindergarten, first, or second;

```
1    isn't that true?

2    A    I don't recall, but I'm sure you can refer to it

3    somewhere.

4    Q    I will.  So let's go page 13 of Exhibit 24.

5          Are you there?

6    A    I'm on page 24.

7    Q    Can you read out --

8              THE COURT:  I'm sorry, are you on Exhibit 24?

9              MR. INTERLANDI:  Oh, I'm sorry.  Exhibit 24,

10   page 13, Your Honor.

11             THE COURT:  Okay.

12             MR. INTERLANDI:  Lines 4 through 5.

13             THE WITNESS:  Okay.

14   Q    (By Mr. Interlandi) And just read out what

15   Ms. Clarino said to Jessica on lines 4 and 5, please.

16   A    Sure.

17         "If you had to, if you choose K, 1, or 2, you would

18   want second?

19         "Yes.

20         "Okay.  A lot of words" --

21   Q    That was it.

22   A    Do you want me to keep reading?

23   Q    No, just --

24   A    Okay, sorry.

25   Q    And so she, out of the three options, Ms. Light
```

1  selected or asked for second grade; right?

2  A    She -- that was her selection, yes.

3  Q    Okay.  All right.  Next, let's talk about Judy

4  Cavanaugh.

5      You know Judy Cavanaugh; right?

6  A    I do, yes.

7  Q    Are you friends with her on Facebook?

8  A    No.

9  Q    You told Rebecca Goldberg -- you remember Rebecca

10  Goldberg, don't you?

11  A    I do.

12  Q    You told her that you were not involved, but parents

13  were informed by Ms. Clarino about someone having COVID by

14  Ms. Light.  Do you recall saying that to Ms. Goldberg?

15  A    I did -- I do.

16  Q    You refused to name every person who said it was

17  Jessica; right?

18  A    Yes.

19  Q    But not a single person actually came to you and said

20  Ms. Light leaked Ms. Cavanaugh's COVID status; isn't that

21  true?

22  A    They didn't come directly to me to say that, no,

23  those exact words.

24  Q    All right.  Let's look at your deposition testimony.

25  That's in the transcript in front of you.  Pages 34

1    through 36.  Let me know when you're at page 34.

2    A    I'm here.

3    Q    Let's start at line 18 on page 34.  And we're

4    referencing what Meghan Rose told you; okay?

5    A    Okay.

6    Q    And I asked you if you understood my question, and

7    then what was your answer on lines 19 to 20?

8    A    "I understand that you're asking, what did Meghan

9    say.  Sure."

10    Q    And then what was your answer?

11    A    "She had come to me -- or she came to me -- she just

12    came to me and said that there's staff [sic] on Facebook,

13    and she forwarded me the Facebook post.  That's all I

14    recall."

15    Q    And did you say, at line 22, "stuff" or "staff"?

16    A    I'm sorry.  Its kind of blurry, the way that U looks,

17    but I guess it says, "there's stuff."

18    Q    Okay.  And then I asked you if she said anything

19    specifically about Ms. Light.  And then at the top of page

20    35, lines 2 through 5, what did you say?

21    A    "Well, everyone was talking about kind of a little

22    bit of how Ms. Light was presenting at Board meetings and

23    different things, but I didn't recall she had said

24    anything about Ms. Light."

25    Q    So Ms. Rose didn't say anything specifically about

1    Ms. Light as it related to Ms. Cavanaugh; right?

2    A    No.

3    Q    And then how about Ms. Morrison; did she tell you

4    specifically that Ms. Light was the source of

5    Ms. Cavanaugh's COVID status, positive diagnosis?

6         Do you recall if Ms. Morrison told you that Ms. Light

7    was the source?

8    A    She didn't say she was the source.  She forwarded me

9    the Facebook responses.

10   Q    Okay.  So not a single person actually came to you

11   and said Ms. Light leaked Ms. Cavanaugh's COVID status;

12   right?

13   A    No.  They came out of concern that people were

14   thinking that our school had COVID cases and somehow they

15   were being told.  And there was -- the only thing we knew

16   was there was this post that led parents to thinking this.

17   Q    And the comments, Ms. Light's comments, was, "I don't

18   think letters were sent"; right?  Is that true?

19   A    That's true.

20   Q    And then her second comment was, "Hooker never sent a

21   letter"; right?

22   A    Right.

23   Q    She never said anything that Teacher X or

24   Ms. Cavanaugh had COVID on that post; isn't that true?

25   A    On that post, no.

1    Q    And isn't it true that Melody Gallagher's post was

2    referring to positive student cases; isn't that true?

3    A    I -- you asked me that before.  I don't know what

4    Melanie [sic] was referring to.

5    Q    Ms. Cavanaugh had a feeling, but she didn't know for

6    sure that it was Ms. Light, isn't that true?

7    A    I can't speak for Ms. Cavanaugh.

8    Q    Okay.  Let's look at your deposition testimony on

9    page 38.  Let me know when you're there.

10   A    I'm there.

11   Q    Directing your attention to lines -- so 7 to 10.

12        I asked you, "And so, what I'm trying to get to the

13   bottom of is which people -- and I would like their

14   names -- who told you Ms. Light was the source of the leak

15   and named her specifically when they told you that, if

16   any?"

17        And then what was your answer from lines 11 through

18   15.  Please read those out loud.

19   A    "Well, Teacher X said she had a feeling that it was

20   Ms. Light, and there was some context because Ms. Rowe,

21   who called Ms. Payne, was in the learning hub with

22   Ms. Light, which was a composite of three families that

23   study together.  And the school has 437 students.  The two

24   parents who were heard from happened to have personal

25   relationships with Ms. Light, and we didn't hear it from

1    any other parents."

2    Q    All right.  Thank you.

3         And so, then, on page 39 at the top, I asked you if

4    you asked Ms. Cavanaugh why she had a feeling that it was

5    Ms. Light.  And you told me what, on lines 5 through 6?

6    A    "I didn't speak to her.  Ms. Clarino spoke to her."

7    Q    Thank you.

8         Claire Rowe was a parent of a child or children

9    attending Hooker at that time; right?

10   A    Yes, a child.

11   Q    She never named Jessica Light specifically when she

12   asked about Ms. Cavanaugh's COVID status; isn't that true?

13   A    I didn't speak to her.

14   Q    Let's go to page 152 of your deposition testimony.

15   Let me know when you're at page 152.

16   A    I'm here.

17   Q    And I asked you then, at the top of the page, if

18   Ms. Rowe had named Jessica Light.  And then line 7, what

19   was your answer?

20   A    "She didn't name her.  She called, knowledgeable that

21   a teacher had it."

22   Q    But she didn't name Jessica specifically; right?

23   A    No.

24   Q    To you, it wasn't a rumor because there was the

25   social media comments; isn't that true?

```
1    A    Can you clarify?  I don't understand your question.
2    Q    To you, it was not a rumor because Jessica had some
3    social media comments; right?
4    A    I -- I'm trying to understand your question.  What
5    wasn't a rumor?
6    Q    That Jessica Light was the person who outed
7    Ms. Cavanaugh.
8    A    It was a rumor.
9    Q    Right.  It was.
10   A    It was destroying our school.  And I was trying to
11   run a school and ensure that everyone was not stressed,
12   and there was stress related to these posts.
13   Q    Okay.  So let's look at Exhibit 25, specifically page
14   8.  Let me know when you're there.  Exhibit 25.
15   A    Okay.  Another transcript from a meeting?
16   Q    Yup, and that's the meeting with Ms. Cavanaugh.  You
17   remember that meeting, don't you?
18   A    I do, yes.
19   Q    And so you were -- you were trying to make the
20   connection that it was Ms. Light because of her comments
21   to the Facebook posts that we've already talked about;
22   right?
23   A    I was trying to get this resolved because I had
24   another teacher who was very upset from her return to
25   school that people knew her health information, and I was
```

1    trying to provide a platform for two teachers to talk, one
2    of whom did not feel comfortable talking alone with the
3    other teacher.
4    Q    Right.  And she had her union representative with
5    her; right?
6    A    She chose to bring a union representative.
7    Q    But Jessica didn't; isn't that true?
8    A    Well, that's the same representative.  And Jessica
9    certainly could have brought anyone she wanted to to the
10   meeting.
11   Q    Did you tell her -- isn't that true that you didn't
12   tell Jessica before the meeting with Ms. Cavanaugh that
13   Ms. Morrison would be there on Ms. Cavanaugh's behalf?
14   Isn't that true?
15   A    That is not true.
16   Q    You didn't -- you did tell Jessica Light that
17   Ms. Morrison would be in attendance on behalf of
18   Ms. Cavanaugh?  That's your testimony?
19   A    I believe that Ms. Light was aware that Ms. Morrison
20   was attending because Ms. Morrison is who Ms. Cavanaugh
21   went to and they set up the meeting.
22   Q    And Ms. Morrison is the same person who screenshotted
23   the Facebook post and texted it to you; right?
24   A    She's one of the concerned staff members who shared
25   that information with me.

```
 1   Q    And she's the one who lost in an election for union
 2   steward thereafter to Mr. Shortt; right?
 3   A    She is, but I'm not sure of why you're trying to
 4   characterize her that way.  But, yes, she lost.
 5        But she was also one of the most concerned staff
 6   members about what this was doing to our school, and I
 7   appreciated any staff member that brought something to my
 8   attention about our school that I would not have known
 9   about.
10   Q    You would do anything to protect the school; right?
11   A    Of course.
12   Q    Even if that meant suppressing someone's free speech
13   rights?
14   A    I would never do that.
15   Q    You had actually --
16   A    And I've never done it.
17   Q    You had no idea, though, at the time if anyone
18   mentioned Jessica by name to Ms. Cavanaugh; right?
19   A    Yes.  I'm not in the business of talking to people
20   about gossip, and I also pride myself on running my school
21   and I don't get into small talk.
22   Q    Yet you told Jessica during the March 31, 2021,
23   meeting with Ms. Clarino there, with Ms. Morrison there,
24   with Ms. Cavanaugh there, you told her -- correct me if
25   I'm wrong -- not one person has said, besides you, as
```

```
 1    being the source?
 2         You said that; right?
 3    A    I did say that, yes, because that's true.
 4    Q    And then you said, "We hear that you're saying it
 5    wasn't you, but I need you to know that every person said
 6    you were the source."
 7         You said that to Jessica?
 8    A    Absolutely.  That's the only person who I had heard
 9    from anyone, whether it was third person or from people
10    coming.  No one knew.  But what we did know were there
11    were some people who were concerned, and they only -- the
12    only relation they made to it was the post or the phone
13    call from Ms. Rowe.
14    Q    And the phone call from Ms. Rowe, she didn't even
15    mention Jessica's name; right?
16    A    She did not directly mention her name, but none of
17    our parents would have had that information.  You would
18    have had to work at our school to know any information
19    about Teacher X.
20    Q    Could someone assume, if she wasn't in her classroom
21    for more than two weeks at a period during the COVID
22    pandemic, that possibly she could have had COVID?  Wasn't
23    that a fair assumption to make?
24    A    I don't think so because she had an active Google
25    Classroom where she posted assignments.  And some
```

1    teachers -- parents were not in schools.  And teachers who

2    were specialists did not always teach in the classroom, so

3    they would not have known.

4    Q    So you don't think that would be a fair assumption to

5    make?

6    A    I do not, no.  And it was the month of February.

7    There was February break.  Teachers' attendance, there

8    were teachers teaching remotely for health reasons.

9         No, I do not think that that would have been an

10    assumption because there were no letters that needed to be

11    sent.  There was no contact or exposure.  So absolutely

12    not.

13    Q    In February 2021, you were the building leader;

14    right?

15    A    I was, yes.

16    Q    And what course or class, I guess, is Ms. Cavanaugh

17    teaching at that time?

18    A    Art.

19    Q    And she's teaching remotely; is that true?

20    A    Well, she taught in classrooms through Google

21    Classroom because she services grades K to 8 -- two

22    buildings, one school -- and we were working on exposure

23    of the specialists, that she didn't see close to 400

24    students.

25         But I'm not sure -- there were some times where she

1  taught a class in person, but she often taught remotely on

2  the screen to the class.

3  Q    And if she had COVID in February of 2021, was she

4  teaching remotely to the class while she had COVID or was

5  she out of work for that period of time?

6  A    She was out of work when she was ill, but she

7  remained constant at posting assignments.  And we, as any

8  time, would cover her class so our students didn't go

9  without art and our families would not have known who

10  taught the art or it would not have been noticed if a

11  teacher was absent because the assignments were still

12  there and the parents weren't in class.

13       So I'm not sure if that answers your question.

14  Q    Let's go to Exhibits 9 and 10, but let's start with

15  9.  It's the binder in front of you.  Let me know when

16  you're there.

17  A    Okay.  I'm here at 9.

18  Q    Okay.  And this is an email that you talked about

19  earlier; right?

20  A    Yes, it is.

21  Q    And this is an email that you sent to Jessica on

22  April 23, 2021; right?

23  A    Yes.

24  Q    And this email says you were following up after a

25  meeting that you had with Jessica on Tuesday; right?

```
1    A    Correct.
2    Q    Isn't that true that Jessica responded to your
3    questions in an email in a subsequent document?
4    A    The one I'm looking at now, yes.
5    Q    You made comments in this email; correct?
6    A    Yes.
7    Q    And then Jessica responded to your comments
8    thereafter; isn't that true?
9    A    Yes.
10   Q    And that's reflected in Exhibit 10; right?
11   A    Yes.
12   Q    And during that meeting that you had that previous
13   Tuesday, you and Jessica were there.  Who else was there?
14   A    I'm sorry, are you asking me --
15   Q    You had a meeting with Jessica to talk about her
16   concerns about committees; right?
17   A    Yes.
18   Q    You were there; correct?
19   A    I assume, yes.
20   Q    Jessica was there; right?
21   A    I assume, yes.
22   Q    Who else was there?
23   A    I don't know if Dave Cicarella was there, and I'm not
24   sure if Ms. Clarino was there or not.  I don't remember.
25        Is there a transcript that I could look at that would
```

1   have who was there?

2   Q    There is.  Turn to Exhibit 26 in the binder in front

3   of you and let me know when you have it.

4   A    I guess it's good these were recorded.

5        All right.  I'm at 26 -- or, no, I'm not.  So this is

6   Jessica's recording of a meeting.  It looks like Jessica

7   Light was there, myself -- I guess I was correct in all

8   the attendees.

9   Q    Yes.  And Ms. Clarino; right?

10  A    Yes.

11  Q    And this was, I think you already said, talking about

12  committees; right?

13  A    Yes.

14  Q    But you were still questioning Ms. Light about the

15  March Facebook comments; right?

16  A    Can you point to me where that is that I'm --

17  Q    Yes, I can.  Page 36, line -- starting at line 22.

18  Actually, it goes on for a little bit.  So let's go to

19  page 36.

20  A    Okay.

21  Q    And you said -- now, this was -- you were talking

22  about committees, but then it turns to this thing with

23  Judy Cavanaugh was nothing small.

24       Do you see that at lines 22 and 23?

25  A    Yes.

```
 1    Q    And what did you say after that?  Why don't you read

 2    that out loud, the next three lines on the page?

 3    A    "We openly aired and asked if you had informed

 4    families.  You said you didn't.  You always put your name,

 5    but we do not know on Facebook" -- I'm not sure if I'm

 6    reading that correctly.  "But we do not know on Facebook.

 7    And I saw that you said that Hooker didn't send out

 8    letters, and we absolutely had no reason to send out

 9    letters.  And it made it, when you talk about perception,

10    different readers.  I don't know what your intention one.

11    It startled people that we had cases that we had not

12    reported that there had been exposure, and that was not

13    the case [sic]."

14    Q    All right.  And then later on, you told Jessica it

15    wasn't her place to tell people that you didn't do

16    something that you should have done -- should not have

17    done; right?

18    A    Later on in this meeting?

19    Q    Yeah.  You told her it wasn't her place; right?

20    A    Where was it that I said that?

21    Q    Lines 21 through 23.  Why don't you read that out

22    loud?

23              MR. MURPHY:  I'm sorry, what page are we on?

24              MR. INTERLANDI:  Thirty-seven, lines 21 through

25    23.
```

1              THE WITNESS:  "It isn't Jessica's place to

2      publicly tell people we didn't do something that we should

3      have done.  It was not part of who you would report.  You

4      have to report and send a letter when there is exposure in

5      school.  These people got sick outside of school and they

6      were not in school [sic]."

7      Q      (By Mr. Interlandi) All right.  And then you're

8      talking about "people."  Who are you talking about?

9      Teachers?

10     A      Correct.

11     Q      And you're still talking about the --

12     A      Because we hadn't had any students cases, which was

13     really something we were --

14     Q      Not according to the state website, though; right?

15     A      Well, I don't know if you're an expert on that

16     website, but even our assistant superintendents didn't

17     understand it, nor did we get an explanation of "less than

18     six," if that meant zero to six or one to six.

19            But I know the reporting that we were mandated to do

20     through nurse or administration and, at the time of those

21     posts, we had not had any student cases.  So the state

22     would not have known of our cases unless we reported them.

23     Q      You go on, because you couldn't get over the Facebook

24     post, and so you kept talking about it during this

25     meeting; isn't that right?

```
1              MR. MURPHY:  Your Honor.
2              THE COURT:  Let's get that question without your
3    comment on it, okay?
4    Q    (By Mr. Interlandi) You kept talking about the
5    Facebook post, isn't that right, at this meeting on
6    April 20, 2021?
7    A    Well, again, I wasn't -- I haven't seen these
8    recordings.  I don't know if I kept -- we were plagued by
9    the impact of those postings as a community, and --
10   Q    The two comments?
11   A    Yes.
12   Q    The two comments that Jessica made to one single
13   post?  That's what you're referring to?
14   A    It ensued a lot of drama in our school and in our
15   community and raised concern for parents who were debating
16   about sending their children back to school if, in fact,
17   we were not following reporting cases.
18   Q    But no one actually told you, any parent said, I saw
19   Jessica Light's post, I don't know if I'm sending my child
20   to school.  No one told you that; right?
21   A    Parents asked about cases because they heard that we
22   had cases that were not reported and they contemplated not
23   sending their children back to school.
24   Q    They never mentioned Jessica's name; correct?
25   A    They weren't concerned with the person.  They were
```

1    concerned with whether or not we had cases that we weren't

2    reporting.

3    Q    Children returned to school; right?

4    A    Many students returned to school, yes.

5    Q    And students learned for the rest of that school

6    year; right?

7    A    Absolutely.

8    Q    And teachers taught; right?

9    A    They sure did.

10   Q    School didn't abruptly end because of two comments

11   that Jessica made in March 2021, did it?

12   A    Of course not.

13   Q    So on page 38 of Exhibit 26, you said -- you were

14   questioning, still, why Jessica made this Facebook

15   comment; right?

16   A    Yes, I guess.

17   Q    And you said, "Why did she put this on Facebook?"

18   A    Could you please tell me the line?

19   Q    Absolutely.  Ten through 13.

20   A    Okay.

21   Q    "Why did she put this on Facebook?  One of the first

22   things we say is, did you say anything to her?  And they

23   say, oh, I'm not saying anything to her."

24       Right?  Do you remember saying that in the meeting?

25   A    I don't remember today saying it, but I do know that

```
 1    people -- it sounds familiar.
 2              MR. INTERLANDI:  Your Honor, I'm about to move
 3    on to another topic.  Do you want me to keep going?
 4              THE COURT:  Yes, please.  We'll break at 12:15.
 5    Q    (By Mr. Interlandi) Let's talk about Ms. Alden.
 6         She's been here every day of the trial; right?
 7    A    She has, yes.
 8    Q    And you told Ms. Alden about the email that you
 9    received from Mr. Bianchine; isn't that true?
10    A    Which email?
11    Q    The email that Mr. Bianchine, Jessica's husband, sent
12    to you and Ms. Clarino about Ms. Alden?
13    A    I'm certain that I would tell any teacher about a
14    parent concern or a parent email.
15    Q    And the email was from Jessica's husband to you and
16    Ms. Clarino because Ms. Clarino had asked him for an
17    update regarding Wesley and Ms. Alden; right?
18    A    We were following up on how the binder was going, how
19    the assignments were going, and checking in.  It is normal
20    protocol.  We pride ourselves on communicating with
21    parents and teachers.
22         So I don't know if that answers your question.
23    Q    It's not normal protocol for a principal and
24    assistant principal to sit in on a parent-teacher
25    conference; right?
```

```
1    A    Actually, it is our protocol.  We do it all the time.
2    We wish we could sit in on every conference.  We spend the
3    week of conferences trying to get to as many as we
4    possibly can.
5         And, actually, the teachers invite us to come to as
6    many conferences as we can.
7    Q    But you didn't sit in on the first parent-teacher
8    meeting that Ms. Alden had with Jessica and her husband;
9    right?
10   A    I did not, and I don't know if Ms. Clarino did.  But
11   we go all day the day of conferences.  We pop into as many
12   conferences as we possibly can.
13   Q    And Ms. Alden actually referenced the email in her
14   list of concerns; right?
15   A    She should be aware.  If an email is about a
16   person --
17   Q    That's not my question.  She referenced it.
18   A    I don't know if she referenced it or not.  But if she
19   did, she did.
20   Q    Okay, so you don't know.
21        So Exhibit 6.  I'll have you turn to Exhibit 6.
22   A    Okay.
23   Q    Let me know when you're there.
24   A    I'm here.
25   Q    Okay.  Have you read the list of concerns before
```

```
1    today?

2    A    I read them a very long time ago, I think.

3    Q    Okay.  And so, in paragraph 5, the second sentence,

4    would you agree with me that it says, "Right before break,

5    an email was sent back, attacking my teaching, my

6    assignments, my" --

7    A    I'm sorry, do you mean number 5 or paragraph 5?

8    Q    Number 5, paragraph 5 -- number 5.  It starts by

9    saying, "In December."

10         Do you see that?

11   A    Okay, yes.  But if I could just have a second because

12   this is very familiar to you, but --

13   Q    Absolutely.

14   A    -- in the scope of my things, I just need a second

15   before you go at me.

16        Okay.

17   Q    Did you have a chance to read number 5?

18   A    I skimmed it, yes.

19   Q    Okay.

20             A JUROR:  Your Honor, I'm sorry, one of the

21   jurors has to go.

22             A JUROR:  I don't feel too well right now.

23             A JUROR:  She's not too well right now.

24             THE COURT:  Who does not feel well?

25             A JUROR:  No, I'll be back in, like, ten
```

```
 1    minutes.
 2              THE COURT:  Shall we just break for lunch now?
 3              Okay, we'll do that.
 4              A JUROR:  Thank you.  Sorry.
 5              THE COURT:  It's okay.
 6                        (Jury out, 12:09 p.m.)
 7              THE COURT:  All right.  We will stand in recess
 8    for lunch and we will be back at one, okay?
 9                    (A lunch recess was taken.)
10              THE COURT:  All right.  Good afternoon, counsel.
11    Are you ready to proceed?
12              MR. INTERLANDI:  Yes.
13              THE COURT:  How much longer do you think you
14    will be with Ms. Gethings?
15              MR. INTERLANDI:  About ten minutes, 15 minutes.
16              THE COURT:  And do you have any sense of how
17    long your redirect will be?
18              MR. MURPHY:  He said a half-hour last time,
19    Your Honor, remember that.
20              THE COURT:  I do.  It's the time warp problem.
21              MR. MURPHY:  Yes, I do the same.  I won't have
22    very long at all.  You know, I would not expect more than
23    ten, 20 minutes.
24              THE COURT:  Okay.  And then after that?
25              MR. MURPHY:  After that, I believe I'm going to
```

```
 1    rest.
 2              THE COURT:  You will rest, okay.  And then who
 3    will -- will you call anyone else?
 4              MR. INTERLANDI:  No, Your Honor.
 5              THE COURT:  So the jury will have all the
 6    evidence by the end of the day.  All right.  That being
 7    said, please be seated.  We'll do our charge conference
 8    when we finish.
 9              MR. INTERLANDI:  Yes, Your Honor.
10              THE COURT:  I think I may have mentioned that I
11    charge before you close.
12              MR. INTERLANDI:  Yes, you did.
13              THE COURT:  And you're invited to use that
14    charge in your remarks.  It's a way of integrating the
15    closing and the law.  The jurors have a copy of the
16    charge -- will have copy of the charge, and you certainly
17    can refer them to the page and number of the charge you're
18    referring to.  It all makes it feel like a cohesive whole.
19    I'm -- you've had a look at the proposed draft that we've
20    updated with your comments?
21              MR. INTERLANDI:  Yes, we've had an opportunity.
22              THE COURT:  Okay.  I don't think there's a lot
23    of troubling disagreement that will take us a very long
24    time.  I'm just trying to make sure that you have some
25    time to prepare your closings.
```

```
 1                MR. INTERLANDI:  Thank you.

 2                THE COURT:  Shall we tell the jury to come back

 3     at nine, 9:30, or ten?

 4                MR. MURPHY:  Tomorrow morning?

 5                THE COURT:  Yes.

 6                MR. INTERLANDI:  I would say ten would be -- I

 7     think ten is good.

 8                THE COURT:  And then they can -- I'm assuming

 9     this charge will take a little over an hour.  You each

10     have an hour.  They can have lunch at one and then begin

11     their deliberations.

12                MR. INTERLANDI:  You would rather start at nine?

13     I mean --

14                MR. MURPHY:  I mean, they're on the nine o'clock

15     schedule.  I know it shrinks an hour of our time, but I

16     assume they would like to appear at nine again and get

17     started.

18                THE COURT:  That's fine.  Okay.

19                MR. INTERLANDI:  Yes.

20                THE COURT:  All right.  So we'll submit the case

21     tomorrow.  Good.  All right.

22                Let's bring in the jury.  I think that may be

23     where Ms. Lewis has gone.

24                     (Jury in, 1:08 p.m.)

25                THE COURT:  Ms. Gethings, would you care to
```

```
 1    return to the stand, please.
 2             THE WITNESS:  Yes, Your Honor.
 3     (Witness, remaining under oath, resumes stand, 1:09 p.m.)
 4             THE COURT:  All right.  Please be seated.
 5             Have we returned to good health, Juror Number 2?
 6             A JUROR:  Pretty much, yes.
 7             THE COURT:  You let us know if you need another
 8    break, okay?
 9             All right.  We will continue with
10    cross-examination of Ms. Gethings.
11             Mr. Interlandi.
12             MR. INTERLANDI:  Yes, Your Honor.  Thank you.
13             Just, Your Honor, I don't recall if there was a
14    question pending before we took the break.  Can I have
15    that read back, please?
16             THE COURT:  Yes.
17        (Requested portion read back by the court reporter.)
18             THE COURT:  All right.  So there's no question
19    pending.  You may proceed.
20             MR. INTERLANDI:  Yes, Your Honor.
21    Q    (By Mr. Interlandi) All right.  Good afternoon.
22    A    Good afternoon.
23             MR. INTERLANDI:  Your Honor, may I approach to
24    present the defendants' notebook of exhibits?
25             THE COURT:  Yes.
```

```
1    Q    (By Mr. Interlandi) Okay.  Please turn to Exhibit X
2    in the black notebook in front of you and let me know when
3    you're there, Ms. Gethings.
4    A    I'm there.
5    Q    And your attorney asked you some questions about
6    these documents earlier today; correct?
7    A    Yes.
8    Q    And I'm going to have some follow-up, okay?
9    A    Yes.
10   Q    Would you agree with me that as of March 22, 2022,
11   there was an open ESSER grade 3 position at Hooker?
12   A    Yes.  Until when?
13   Q    That was until the end of that school year, the
14   '21/'22 school year.
15   A    Correct.
16   Q    And then the ESSER position was available again for
17   third grade for the '22/'23 school year; correct?
18   A    No.  There was only going to be two sections of third
19   grade.
20   Q    But, originally, you offered that ESSER position to
21   someone, and then she declined it right before the start
22   of the school year; right?
23   A    Correct.  I'm sorry.  Yes.
24   Q    And that person, I believe, if you look at DEF1593,
25   her name was Andrea -- I'm sorry, Jennifer Dowson; isn't
```

1    that true?

2    A    Jennifer Dowson, yes.

3    Q    And she was an external candidate; right?

4    A    Yes.

5    Q    And so was Madison Hartt; right?

6    A    Yes.

7    Q    And on the back of 1594, you had listed two other

8    people that you had interviewed for the grade 3 ESSER

9    position for the '22/'23 school year, and they appear to

10   be Rebecca Root and Lauren Dooley.

11        Do you see that?

12   A    Yes, I do.

13   Q    And were those external candidates or internal?

14   A    External.

15   Q    You didn't have -- other than Ms. Light, you didn't

16   have any other internal candidates for the open grade 3

17   position at Hooker for the '22/'23 school year; right?

18   A    I don't recall.  We have multiple applicants on

19   Applitrack that we have the ability to look at internal

20   and external candidates who apply, so I couldn't speak to

21   whether or not -- I'm sure other internal New Haven Public

22   School teachers, I'm sure they applied.

23   Q    And those same two names, Rebecca Root and Lauren

24   Dooley, appear on the second page of the recommendation

25   for hire for Madison Hartt; right?

A    Yes, because they were both grade 3 positions.

And ...

Q    Isn't that true that you learned that Ms. Villanueva

was going to be leaving her position at Hooker after the

school year ended?

A    That is correct.

Q    And do you recall when the school year would have

ended for the '21/'22 school year?

A    I do not.

Q    Would it have been towards the end of June?

A    Yes, of course.

Q    Do you believe it was around July 28th when you

learned that Ms. Villanueva would not be returning to

Hooker for the upcoming school year?

A    I'm not sure if that's when it was posted.  I was

aware of it earlier than that because our district was

looking to fill special education positions and she was

interested in the special ed position at our school.  And

I knew she was -- so I don't know when -- we might know

before it becomes publicly known, like, on a blue sheet.

Q    Did you get a notification when Ms. Light applied for

the open third grade position for the upcoming school

year?

A    I don't know if I got a notification or I could just

see it on my dashboard.

1   Q    But you were aware that she had applied; correct?

2   A    I was, yes.

3   Q    And you did not interview her for that position;

4   right?

5   A    I wouldn't interview someone that I already knew who

6   was working and I knew where she was -- I was placing her

7   to continue in first grade for continuity.

8   Q    And isn't that true that you didn't tell a woman

9   named Chantel about your choice about the open third grade

10  teaching position until August 1, 2022, via email?

11  A    No, it's not true that I didn't tell her.  We were

12  discussing funding for the two external candidates, and I

13  have the discretion to decide who would have become a

14  member of the New Haven Public Schools non-ESSER and

15  ESSER.  So it wasn't that I wasn't telling her.

16       I had met those candidates, knew they would be great

17  additions to New Haven Public Schools, and had the

18  discretion to decide, and I was going back and forth to

19  see who would be best for which position.  I wasn't

20  retaining information from her.

21  Q    And in Exhibit X, there's an email from you to a

22  woman named Chantel, and that's DEF1864.

23       That's your email; correct?

24  A    One second, please.

25  Q    DEF1864.

```
 1   A      Which exhibit?

 2   Q      X.

 3   A      X?

 4   Q      Yes.

 5   A      So I have DEF1594, 1865, 1866, but I don't seem to

 6   have a 1864.

 7             MR. MURPHY:  It should be the last document in

 8   the exhibit.

 9             THE WITNESS:  Okay.

10             MR. MURPHY:  The numbers are a little out of

11   order, it appears.  I believe they're in chronological

12   order rather than numerical.

13             THE WITNESS:  Could you just show me -- I don't

14   know if you want to -- I don't know where I'm supposed to

15   look for that one.  I'm sorry.

16             MR. MURPHY:  It's the last page.

17             MR. INTERLANDI:  Your Honor, may I approach?

18             THE COURT:  You may.

19             THE WITNESS:  Oh, gosh, here it is.  Thank you

20   so much.

21             MR. INTERLANDI:  You're welcome.

22   Q      (By Mr. Interlandi) Is this the email that you sent

23   to Ms. Chantel on August 1, 2022?

24   A      This is an email I sent, yes.

25   Q      And you were letting her know that you had -- you
```

```
 1    were confirming that you guys spoke on Thursday; right?

 2    A    Correct.

 3    Q    And then you said you would let her know on Monday

 4    which teacher would be offered the permanent grade 3

 5    position to replace Julie Villanueva; right?  Is that what

 6    you said?

 7    A    Yes.  There was confusion over funding sources for

 8    them from my original rec for hires.

 9    Q    And then Jennifer Dowson, she did not actually take

10    the grade 3 ESSER funds position; right?

11    A    Correct.

12    Q    And at that time, for the '22/'23 school year,

13    Ms. Light didn't have any children in grade 3 at Hooker;

14    right?

15    A    No, she did not.

16    Q    We're going to go back to the white binder, and I

17    apologize.

18    A    That's okay.

19    Q    So you can put the black binder to the side.

20    A    Sure.

21    Q    Please turn to Exhibit 42 when you have a chance,

22    please.

23    A    Sure.

24         I'm there.

25    Q    On March 14, 2022, do you recall receiving an email
```

1    from Jessica Light concerning her preference for the

2    upcoming school year?

3    A    I do recall seeing this email, and I've seen it since

4    I've been here this week.

5    Q    And then as the building leader, are you -- do you

6    have any interaction or -- withdrawn.

7         As the building leader, do you have any involvement

8    with the job postings for the positions at Hooker?

9    A    I do, yes.

10   Q    And as the building leader, do you see when a

11   position at Hooker is posted on Applitrack?

12   A    Yes.

13   Q    So let's look at 43, please.

14        And isn't that true that the job was posted on

15   June 22, 2022?

16   A    I don't know if that's true.  Where would I find that

17   date?

18   Q    At the top, left side, "date posted."  On Exhibit 43,

19   towards the top on the left side?

20   A    Oh, yes.  That's what this appears, yes.

21   Q    It says June 22nd; right?

22   A    Correct.

23   Q    And this was the third grade position that was given

24   to the external candidate, Madison Hartt; yes?

25   A    That is that -- yes, I assume.  But sometimes there's

1    a lag between HR posting and us filling our positions.

2    Q    Okay.  Let's turn to Exhibit 7 when you -- in your

3    notebook in front of you.  Let me know when you're there.

4    A    I'm at 7.

5    Q    Great.  So let's go into this document.  At the

6    bottom, it says, "DEF000138."

7        Can you get to that page and let me know when you're

8    there?

9    A    Sure.

10        Here.

11   Q    And there are notations on this page.  Whose

12   handwritten notes are these?

13   A    Ms. Clarino.

14   Q    And the letter C that's circled in the right margin,

15   that is to identify a document that was submitted in

16   response to Ms. Light's complaint; correct?

17   A    Yes.

18   Q    Okay.  There's no explanation provided for the letter

19   C, it's just written as a C with a circle around it;

20   right?

21   A    Right.  I think these were our notes -- yeah.

22   Q    And then if you go to Defendant 111, DEF111, which is

23   a little bit more in the front of this exhibit, that is

24   the chart that your attorney asked you about earlier

25   regarding reopening subcommittees; correct?

```
 1   A    Looks like it is, from behind.  I will answer in one
 2   second.
 3        Yes, it is.
 4   Q    Okay.  And then there's a letter C with a number 1
 5   with a circle around it at the top; right?
 6   A    Yes.
 7   Q    And then this document itself, it's not dated; isn't
 8   that true?
 9   A    I'm sure through Google Docs its dated, but I don't
10   know that it's dated -- there's no date on here.
11   Q    Sitting here today, you don't know when this document
12   was created; correct?
13   A    Well, I believe that we began it when we were getting
14   ready to reopen the schools at the beginning of the school
15   year.
16   Q    So when would that have been, the beginning of the
17   school year?
18   A    I'm not -- this was -- the years are so confusing to
19   all of us.  The 2020/'21 school year, I think.  We have
20   these types of grids for every successful start of the
21   school year in different things.
22   Q    Okay.  Let's look at Exhibit 20.  Let me know when
23   you have Exhibit 20 in front of you, please.
24   A    I have it.
25   Q    And Keisha Hannans in February 2022, she was your
```

1    supervisor; right?

2    A     Yes, she was.

3    Q     And on February 25, 2022, she expressed

4    disappointment with your efforts in returning Ms. Light

5    back to her first grade teaching class; correct?

6    A     I'm not sure where you're --

7    Q     All right.  So in the middle of this email that she

8    sent to you on February 25, 2022 --

9    A     Mm-hmm.

10   Q     -- isn't that true that she says, "However, it is

11   very clear" -- in the middle of the page, second paragraph

12   towards the end.  "However, it is very clear that you have

13   not done this, and this is very disappointing."

14        Isn't it true that she said that to you in this

15   email?

16   A     You said in the second paragraph?

17   Q     Second paragraph, second-to-last sentence in that

18   paragraph where it starts, "However"?

19   A     That's what she wrote, yes.

20   Q     And she also told you she did not want the process to

21   be delayed any further; correct?

22   A     That's what she said in this letter, yes.

23   Q     And you received a letter from Dr. Tracey on the same

24   day; isn't that true?

25   A     I don't recall getting a letter from Dr. Tracey.

```
 1   Q    If you look at Exhibit 48, let me know if that's a

 2   letter that you received from Dr. Tracey.

 3   A    This is a letter not related to that that I received,

 4   yes.

 5   Q    Unrelated to that, but it's related to Ms. Light;

 6   right?

 7   A    Yes.

 8   Q    And it's dated February 25, 2022; correct?

 9   A    Yes.

10   Q    And at the top, it says, "verbal warning"; right?

11   A    It does, yes.

12        MR. INTERLANDI:  Thank you, Ms. Gethings.  I

13   don't have any further questions for you.

14        THE COURT:  All right.  Redirect, please.

15                    REDIRECT EXAMINATION

16   BY MR. MURPHY:

17   Q    We're going to be working backwards, Principal

18   Gethings.

19        Towards the end of your testimony there, you said

20   sometimes there's a lag between HR posting a position and

21   us filling a position; is that correct?

22   A    Yes.

23   Q    And why is that?

24   A    Well, there's a couple reasons.

25        There's a large number of people that work for HR and
```

```
 1    their jobs sometimes are interchanging.  Additionally,

 2    schools are looking to fill their position and we can have

 3    put in a request for posting.  And it might take some

 4    days, but we are able to take and interview people from

 5    Applitrack freely, external and internal.  But it's not

 6    always a perfect alignment, if you will.  They're posting

 7    for 41 schools.

 8    Q    And is the summer a busy time for hiring in the New

 9    Haven Public Schools?

10    A    Incredibly busy, yes.

11    Q    You just answered a lot of questions about that third

12    grade position.  Did you ever receive a grievance about

13    any of your hiring decisions for that third grade

14    position?

15    A    Never.

16    Q    Or those third grade positions?

17    A    No.

18              MR. MURPHY:  Sorry, Your Honor.

19              Can I have Exhibit 7, please.  Page 120, please.

20    Q    (By Mr. Murphy) You were just answering some

21    questions again about this Exhibit 7, and I want to direct

22    your attention to page 120.

23         Do you have that on the screen in front of you?

24    A    I do.

25    Q    Okay.  Who's Matt Rodeheffer?
```

1    A    He's a parent of a rising eighth grader.

2    Q    Okay.  Who's his wife?

3    A    I'm sorry, a graduated -- they graduated already.

4    Q    Who's his wife?

5    A    His -- so he's not married, as far as I know, but his

6    child's mother is Valerie Horsley.

7    Q    Okay.  And why was this document submitted with

8    Exhibit 7?

9    A    So they were preparing for their child to return to

10   our school, deliberating on a decision, and parents were

11   both in contact with the teacher wanting their daughter to

12   come back to school.  I think the parents had a difference

13   of opinion, and the father reached out to the teacher to

14   say that Evie's mom is being told that there are a lot of

15   cases that are currently, and now changing her mind about

16   returning back to school [sic].

17   Q    Was their daughter in a learning pod?

18   A    I'm not sure.

19   Q    Did they -- well, withdrawn.

20        You also answered some questions about what we were

21   calling the T-Eval meeting where you informed Ms. Light

22   that her grade was going to change; right?

23   A    Yes.

24   Q    And you said this was a lot earlier than when

25   typically told.  When are teachers typically told about a

```
1    change in grade?
2    A    So teachers could be told as early as the day before
3    school starts.  Best practice is to tell them as soon as
4    you know so they can prepare -- communicate over the
5    summer with their students, collaborate with their grade
6    level.
7         And this was deliberate and intentional so that she
8    and the other two teachers that were being moved could
9    attend the district training for the upcoming school year.
10   Q    Okay.  And do you remember answering some questions
11   about when -- whether something was immediately sent?
12   A    I do.
13   Q    And it was your -- were those questions about your
14   March 12th email?
15   A    Correct, yes.
16   Q    Could we have Exhibit 2, please.
17        All right.  And I think you were asked whether or not
18   the email was sent immediately after the comment on the
19   Facebook post; right?
20   A    Yes.
21   Q    And what was the date of those comments to the
22   Facebook post?
23   A    It appears that it was March 9, 2021.
24   Q    You were also asked some questions about whether you
25   were concerned about the image of your school; right?
```

```
 1   A    Yes.

 2   Q    And in March of 2021, what image were you concerned

 3   about in relation to Ms. Light's Facebook post?

 4   A    So I think I might be, like, mentally saying the word

 5   "image."

 6        It's important.  We're entrusted to ensure safety and

 7   we have the privilege of teaching students.  And I was

 8   concerned that our community was being sort of rallied by

 9   a source -- and, again, I have no idea who Melanie

10   Gallagher is -- and why this was becoming informative or

11   people were making decisions.

12        So that was a concern, that people felt we weren't

13   following the protocols that the district and each of us

14   were all working so hard to communicate.

15             MR. MURPHY:  I'm actually all set, Your Honor.

16   Thank you.

17             THE COURT:  All right.  Any further re-cross?

18             MR. INTERLANDI:  Yes, Your Honor.

19                    RECROSS-EXAMINATION

20   BY MR. INTERLANDI:

21   Q    Hi.

22   A    Hi.

23   Q    In the time frame of February -- I'm sorry -- of

24   March 2021, isn't that true that children were still able

25   to stay at home and learn remotely?
```

```
 1   A     Yes.
 2   Q     And that was an option for the students through the
 3   end of that school year; correct?
 4   A     It was, yes.
 5   Q     And at this time, February and March of 2021, people
 6   were still concerned about contracting COVID; right?
 7   A     Of course, yes.
 8   Q     And you said that there were -- there was a Facebook
 9   post from March 9, 2021; right?
10   A     Yes.
11   Q     And isn't that true that Mr. Rodeheffer's email to
12   you is dated March 2, 2021, at least seven days before
13   that Facebook post?
14   A     Well, obviously, the 2nd comes before the 9th.  Yes.
15   Q     And isn't that true that his email says nothing about
16   Jessica Light's comments on a Facebook post?
17   A     No.  It says that his wife was hearing.  There was
18   also people that were saying they were hearing this, a
19   very small group of people.
20   Q     But does not mention Jessica's name; right?
21   A     It does not, no.
22   Q     Does not mention the two Facebook comments made by
23   Jessica Light; correct?
24   A     No.
25              MR. INTERLANDI:  No further questions,
```

```
 1   Your Honor.

 2            THE COURT:  Anything further?

 3            MR. MURPHY:  Exhibit I, please.

 4                   REDIRECT EXAMINATION

 5   BY MR. MURPHY:

 6   Q    You were just asked some questions about March 2nd;

 7   correct?

 8   A    Correct.

 9   Q    All right.  And is this the email you sent to the --

10   your staff and teachers on March 2nd?

11   A    Yes.

12            MR. INTERLANDI:  Your Honor, this is beyond the

13   scope of my recross.

14            MR. MURPHY:  He asked about March 2nd.  I'm just

15   asking what she did on March 2nd in response to --

16            MR. INTERLANDI:  I didn't ask her everything she

17   did on March 2nd.  I asked her specifically about an email

18   from Matt Rodeheffer.

19            MR. MURPHY:  Right, that references rumors going

20   around --

21            THE COURT:  Is that going to get tied to

22   Defendants' I?

23            MR. MURPHY:  Sure.

24   Q    (By Mr. Murphy) Can you read the last sentence of the

25   second paragraph?
```

```
1    A     Sure.

2          "It is unfortunate that there seems to be a rumor

3    circulating that we have a lot of positive cases at WHS."

4    Q    Okay.  Is that the type of rumor that was just

5    addressed by Mr. Rodeheffer?

6    A    Yes.

7              MR. MURPHY:  Okay.  No further questions,

8    Your Honor.

9              THE COURT:  All right.

10             MR. INTERLANDI:  Your Honor, I have one

11   follow-up question, if I may.

12             THE COURT:  Yes.

13                    RECROSS-EXAMINATION

14   BY MR. INTERLANDI:

15   Q    You've never heard from anyone that Ms. Light has

16   gone -- went around during this time, March of 2021,

17   telling people that there were a lot of positive cases at

18   Hooker; correct?

19   A    No.

20             MR. INTERLANDI:  No further questions.

21             THE COURT:  All right, then.  We are finished

22   with Ms. Gethings.

23             You may step down.  You are excused.

24             THE WITNESS:  Thank you.  Like, excused-excused?

25             THE COURT:  Yes, excused-excused.
```

```
 1                    (Witness excused, 1:41 p.m.)

 2              THE COURT:  Anything further?

 3              MR. MURPHY:  No further witnesses, Your Honor.

 4              THE COURT:  Anything further, Mr. Interlandi?

 5              MR. INTERLANDI:  No, Your Honor.

 6              THE COURT:  All right.  Then the evidence is all

 7   in.  The evidentiary record for the jury's consideration

 8   is now closed.

 9              The next step is for you to receive the

10   instructions of law that you will then apply to the facts

11   as you find them in your deliberations.  You will have a

12   copy of that, each of you.  You can make notes on it,

13   whatever you want.  I will deliver that orally to you

14   tomorrow morning.  And after that, you will hear the

15   closing arguments of the lawyers that represent their view

16   of how the -- what the evidence has been shown.  As I told

17   you in the beginning, what lawyers say is not evidence,

18   but it's intended to help you understand their view of the

19   evidence.

20              We'll get that, and then the case will be

21   submitted to you to begin your deliberations.  And all of

22   the exhibits will be brought in to you, into your jury

23   room.  You will also have them available electronically, I

24   believe, and you will also get lunch.

25              So, with that, I will excuse you for the day and
```

```
 1    see you back at nine o'clock tomorrow morning.

 2              Thank you very much.

 3                    (Jury out, 1:43 p.m.)

 4              THE COURT:  All right.  Counsel, any motions or

 5    anything that we need to consider before we begin our

 6    charge conference?

 7              MR. MURPHY:  Yes, Your Honor.  Could we just

 8    take a -- maybe a ten- or 15-minute break?

 9              THE COURT:  Sure.  Fifteen minutes, fine.  We'll

10    stand in recess.

11                    (A brief recess was taken.)

12              THE COURT:  All right.  Please be seated,

13    counsel.

14              I will hear counsel on motions.

15              MR. MURPHY:  I guess that would be me,

16    Your Honor.

17              On behalf of the defendants, I would move for

18    judgment as a matter of law at this time under Rule 50.

19    As Your Honor well knows, judgment as a matter of law is

20    appropriate under Rule 50 when a reasonable jury would not

21    have a legally sufficient basis to find for a party on an

22    issue.  Here, the motion is appropriate on all three

23    counts.  Taking them maybe in reverse order first,

24    Your Honor.

25              Defamation.  As Your Honor knows from our
```

1    upcoming charge conference, there's four elements to a

2    defamation claim.

3              THE COURT:  I'm going to stop you just a moment.

4              MR. MURPHY:  Of course.

5                    (A brief recess was taken.)

6              THE COURT:  Mr. Murphy, you may proceed.

7              MR. MURPHY:  All right.  Sorry, Your Honor.  As

8    I was saying, as Your Honor knows from the draft charge, a

9    defamation claim has four elements.

10             Here, the evidence at trial was insufficient to

11   support elements 1 and 4.  In regards to the first

12   element, Ms. Light was required to put on evidence that a

13   reasonable --

14             THE COURT:  Can you talk a little slower?

15             MR. MURPHY:  Sure.

16             THE COURT:  Thank you.

17             MR. MURPHY:  -- a reasonable jury could find

18   that Ms. Gethings made a defamatory statement, which is a

19   false communication that tends to harm the reputation of

20   another.

21             Here, Ms. Light has identified one particular

22   comment from a meeting with Judy Cav, what we've been

23   calling the Judy Cav Meeting, and that statement from

24   Principal Gethings was merely relaying concerns that were

25   in the community.  And it's undisputed that Ms. Cavanaugh

1    herself felt that from the transcript that Ms. Light

2    recorded and provided that Ms. Cav thought that Ms. Light

3    may have disclosed her COVID-positive status.  So when

4    Ms. Gethings said something to the effect of, no one has

5    said it was anyone else but you, that was true at the

6    time.  And it's not a defamatory statement.

7            Second, in regards to element 4, that requires

8    Ms. Light to show harm to her reputation from the

9    defamatory statement.  And the evidence at trial,

10   Your Honor, fell short on that count.  It was -- it's

11   undisputed from the evidence that this was a closed Zoom

12   meeting.

13           There was five individuals there:  Two

14   administrators, two teachers, and a union representative.

15   There's no evidence that what that -- that that statement

16   was ever disclosed outside of that meeting or that it

17   harmed Ms. Light's reputation.

18           Now, I understand that Ms. Light presented

19   evidence in this trial concerning, you know, her belief

20   that other things were going on in regards to the school

21   community, but she never tied it back to the defamatory

22   statement.  And I think that's why Your Honor originally

23   precluded the notes that were found in the classrooms,

24   right, purportedly found in the classrooms?  Because there

25   was no evidence tying them back to the alleged defamatory

1    statement.  And we had that whole discussion.  And I think

2    that's true with all the evidence here, Your Honor.

3    There's simply no evidence.

4           And, in fact, look at the individuals who were

5    there.  Judy Cavanaugh, that transcript is replete with

6    statements from Ms. Cavanaugh talking about how they

7    weren't even that friendly beforehand, that she had

8    concerns and that she might not ever trust Ms. Light

9    again.  And those had nothing to do with Principal

10   Gethings' statement in that meeting.  And Ms. Light

11   acknowledged that, saying she would work hard to repair

12   her relationship with Ms. Cavanaugh at the end of that

13   meeting.

14          Second, Ms. Morrison.  Ms. Light has not shown

15   any impact from Ms. Gethings' statement on her

16   relationship with Ms. Morrison.  In fact, I believe I

17   heard her attorney argue this morning that Ms. Morrison

18   already had concerns about Ms. Light, and that's why it

19   was inappropriate for Ms. Morrison to even be at this

20   meeting in the first place; right?

21          And so what we have is a record with an alleged

22   defamatory statement, but no impact on Ms. Light's

23   reputation out and about in the community, which is an

24   essential element of her defamation claim.  And for that

25   reason, no reasonable jury could find in her favor on her

 1    defamation claim.

 2              Moving next to what we'll call the free speech

 3    claims.  As Your Honor knows, it involves a claim under

 4    1983 and a state law claim under 31-51q.  Both of those

 5    require some sort of adverse employment action.  Under

 6    1983, Your Honor is defining an "adverse employment

 7    action" as something that's significant enough that would

 8    deter a reasonable and similarly situated person of

 9    ordinary firmness from exercising his or her

10    constitutional right.

11              And, similarly, under 31-51q, "discipline" means

12    an adverse material action taken against Ms. Light by

13    Ms. Gethings.  And in that regard, Your Honor, we need to

14    look at the list of alleged retaliatory acts; right?  The

15    alleged adverse employment actions.  Now, at the pretrial

16    conference, Your Honor made Ms. Light and her attorney

17    specify what those alleged adverse acts were or what those

18    retaliatory acts were.  And, Your Honor, the evidence

19    showed that those were not any adverse employment action

20    or discipline.  I guess I can take them in order for

21    Your Honor.  They raised a lot, so I'm going to have to

22    address a lot.

23              The reassignment from one grade to another.  It

24    was undisputed that Ms. Light's child was going into third

25    grade, the same grade that she taught.  It's undisputed

1    that her grade level partner had concerns about that and

2    he raised that to her.  It's undisputed that it's in a

3    principal's discretion to change a teacher's job.  In

4    fact, one of the witnesses called by Ms. Light had his

5    grade level changed several times, Mr. Shortt.  First,

6    second, fifth, six, I believe, and now he's on to eighth

7    grade.  There's no evidence showing that that was an

8    adverse employment action.

9         Committees.  Your Honor heard and the jurors

10   heard a lot of evidence on committees.  But these are

11   voluntary, unpaid positions.  They're not even part of the

12   job, and they can't possibly be an adverse employment

13   action for Ms. Light to either be or not be on any of

14   those various committees.  Even if that was possible,

15   Principal Gethings provided evidence -- or testimony,

16   rather, about those various committees and the reason or

17   reasons why not Ms. Light was on them.  In fact, her claim

18   about these committees isn't even very clear.  She was on

19   a lot of them.  She thought she was replaced by the

20   gardening committee, but she wasn't.  And so there's no

21   evidence that any of the committee assignments are adverse

22   employment actions or discipline.

23         Similar with the PTA rep, that's in that same

24   universe of claims, Your Honor.  Ms. Light, it's

25   undisputed, served for two years on the PTA, and then

```
 1    Ms. Light [sic] put out a call to see if other individuals
 2    were interested in serving on that PTA.  The PTA is not
 3    part of a teacher's job and it can't possibly be an
 4    adverse employment action.
 5            THE COURT:  I think you mean Ms. Gethings put
 6    out a call.
 7            MR. MURPHY:  Ms. Gethings.  I apologize.
 8    Ms. Gethings put out the call.
 9            And just to keep going in order, I guess,
10    Your Honor.  There was an allegation that something was
11    left in a mailbox, Ms. Alden's list of concerns.  The
12    plaintiff didn't provide any sort of evidence about that.
13    Just her own testimony, I believe.  Second, there was
14    nothing connecting that back to either Ms. Gethings or any
15    agent of the Board.  There's nothing showing that that was
16    an adverse employment action taking -- or discipline
17    against Ms. Light.
18            Similarly, speaking with Ms. Maffuid, the
19    paraprofessional, it's disputed from Ms. Maffuid's own
20    testimony that she was outside with Ms. Light's class and
21    it was dismissal time.  Principal Gethings saw something
22    and she addressed it in an email to Ms. Light, and she had
23    a conversation with Ms. Maffuid.  It had no bearing on
24    Ms. Light's employment whatsoever.  It was a one-time
25    conversation, fully within the scope of Ms. Gethings' job,
```

1    her operational responsibilities.  And, therefore, that

2    cannot be an adverse employment action or discipline.

3            Finally, Your Honor -- or not "finally" -- next,

4    the T-Eval meeting.  It seemed to me there was two

5    different claims stemming out of that.  One was the length

6    of the meeting.  It was a meeting.  It went a little

7    longer than may be typical, but employers are entitled to

8    meet with their employees for however long they went.

9    There's nothing about that meeting in terms of the length

10   that would transform it into an adverse employment action

11   or discipline.  If it was discipline, Ms. Light is a union

12   employee.  She could have asked for union representation.

13   She could have walked out.  She's been a teacher for a

14   long time.  She didn't.  It was not discipline.

15           Finally, in that point, Ms. Light challenged one

16   statement in a mid-year T-Eval evaluation.  Besides

17   classifying it as discipline, there's no evidence showing

18   that it was discipline or that it would impact any other

19   reasonable person in that situation.  In fact, Ms. Light

20   testified that she subsequently obtained a job in another

21   school, and she even testified that she wanted to come

22   back to the third grade.  A statement -- one sentence in a

23   mid-year T-Eval without even a final rating falls short of

24   discipline or adverse employment action both under state

25   and federal law.

1          The Judy Cav situation.  We already discussed

2     that a little bit in the disciplinary -- in the defamation

3     context.  Your Honor, in the disciplinary context, the

4     situation is exactly like Ms. Gethings described it on the

5     stand.  She had one teacher who was very upset, who was

6     hesitant to meet with another teacher by herself to

7     resolve the situation.  Ms. Gethings was trying to resolve

8     the situation and brought two employees, their union rep,

9     and another administrator together in one meeting.  Those

10    are the type of meetings that happen routinely across

11    workplaces both in Connecticut and across the country, and

12    there's nothing about a meeting between two employees that

13    is an adverse employment action or discipline.

14          Talking to the witness.  Again, routine email

15    from Ms. Gethings to a particular witness.  It had no

16    bearing on Ms. Light.  To the extent Ms. Bonner thought it

17    was outside of her typical investigation protocol, that

18    still does not transform it into discipline against

19    Ms. Light or an adverse employment action against Light.

20    In fact, there was no evidence that it had any impact

21    whatsoever on Ms. Light, who remained on the gardening

22    committee.

23          Next, Your Honor, statements to Tim Shortt.

24    Mr. Shortt was on the stand.  He testified that he had a

25    good relationship with Principal Gethings both before and

1    after that meeting.  He testified that people were coming

2    to him and advocating against Ms. Morrison, who was the

3    prior union rep.  We heard all about the different votes

4    for that position.

5              To the extent Principal Gethings said something

6    to the effect of, people are telling us you're with

7    Ms. Light in cahoots to get us out, she's just reporting

8    what people said.  Ms. Light presented no evidence that

9    impacted her relationship with Ms. Shortt [sic].  In fact,

10   it couldn't have because she called him as a witness

11   today -- or during this trial, rather.  She gave no

12   evidence that it impacted her relationship with

13   Ms. Short -- Mr. Short or had any other impact on her

14   overall employment.

15             Finally, the emails on the printer.  I don't

16   know what to say about that, Your Honor.  The evidence was

17   that Mr. Salem found some emails on his printer.  He

18   didn't read them.  He immediately told Ms. Light, who came

19   and picked them up.  There's no evidence tying this back

20   to Ms. Gethings or any other agent of the Board.  It's

21   just out there.

22             And so, absent any evidence tying it to either

23   Ms. Gethings or some other agent on the Board, that can't

24   be an adverse employment action or discipline under either

25   of the definitions I read before.  And, again, Ms. Light

1    has not presented any evidence of any impact on her

2    relationship with Mr. Salem or anyone else from those

3    emails being found.

4         I think Mr. Salem even testified that it was

5    before school started; right?  It was August as they were

6    preparing their classrooms.  There was just no evidence

7    that that had any sort of impact on Ms. Light's

8    employment.

9         And so, for all of those reasons, Your Honor,

10   none of those acts individually constitute an adverse

11   employment action or discipline under either federal or

12   state law.

13        Now, I know Your Honor's jury instruction is

14   going to tell the jury that she may satisfy this adverse

15   employment action if she proves she experienced a

16   combination of seemingly minor incidents that reached a

17   critical mass.  And, importantly, Your Honor is going to

18   instruct them that in order to assess the impact of these

19   more-minor incidents, you must consider whether the

20   totality of those incidents would objectively make the

21   working environment unreasonable, inferior, hostile, or

22   adverse to the employee when compared to a normal or

23   typical workplace.  That standard can't be met here for a

24   variety of reasons.

25        First off, Ms. Light put out evidence that she

1    wanted to return to the building and wanted to stay in

2    that same third grade position, which would have put her

3    back in that upper -- the big school, I guess we've been

4    calling it, where Principal Gethings was the administrator

5    in charge.  I know it's one school, two buildings, but we

6    all know from the evidence that Ms. Gethings is placed in

7    the bigger school and Ms. Light wanted to return there.

8         So it's hard for her to argue that she suffered

9    a series of -- or a combination of minor incidents that

10   really would have made the work environment objectively

11   unreasonable, inferior, or hostile, as defined under state

12   and federal law.

13        So, in short, Your Honor, there's a lot of

14   actions thrown out there that are alleged adverse

15   employment action and discipline.  They literally threw 11

16   different things out there.  None of them, individually or

17   collectively, have enough evidence where a reasonable

18   juror can find that -- an adverse employment action.

19        Lastly, Your Honor, causation.  As you know,

20   both the federal and state claims require Ms. Light to

21   show that her protected speech was a substantial

22   motivating factor in her alleged adverse employment

23   actions and discipline.  Here, there's no evidence where a

24   reasonable jury could find that any of those alleged

25   retaliatory acts were substantially motivated by her prior

1    speech.

2           Again, we kind of need to go, I guess, in order.

3    But a lot of them came up during the normal course of the

4    schoolday, right, or because of other facts that have

5    nothing to do with her protected speech.

6           The reassignment.  It's undisputed, again, that

7    her son was going into that grade and that her -- even her

8    grade level partner, who she got along with, had concerns

9    about the student coming up into that grade; right?  That

10   is what Principal Gethings made the decision on.  And she

11   testified that she made other personnel decisions, other

12   moves that year, too.  Two other ones.  It wasn't just

13   Ms. Light moving grades.  It was several other individuals

14   as well.  And I don't believe there's any evidence tying

15   that decision back to any of Ms. Light's protected speech.

16          And the same goes with all of them, Your Honor.

17   With the paraprofessional, it's undisputed.  Principal

18   Gethings was outside, observed this and, as the

19   administrator of the building, felt it was a situation she

20   needed to address.  She addressed it with both parties on

21   one occasion and that was it.  And there's no causal

22   connection between speech at a Board meeting in January,

23   for example, and an incident on the ground in May at

24   dismissal time.  COVID was impacting the schools.  There

25   was a specific process they needed to follow.  And,

1    Your Honor, that had nothing to do with and no tie back to

2    any protected speech.

3         The Judy Cav incident.  It's undisputed from the

4    record, from the transcript that Ms. Light created

5    herself, that Ms. Cav had concerns and that Ms. Gethings

6    scheduled that meeting to address those concerns.

7    Ms. Light might not like what was said in that meeting,

8    might have been uncomfortable about what Ms. Cavanaugh or

9    Principal Gethings was saying in that meeting.  But it

10   doesn't tie it back to any of her protected speech.  That

11   incident -- you know, the fact that Ms. Cav had concerns

12   is enough to break any causal connection that might even

13   be suggested by the plaintiff and, therefore, no causal

14   connection for that one.

15        With Tim Shortt, again, this was a conversation.

16   I think Mr. Shortt said it was in October of 2021 when he

17   won the second of two elections and became the union

18   steward.  That is well after any of her protected speech.

19   He did not connect it at all to Jessica Light's protected

20   speech.  Ms. Light herself has not connected the

21   discussion with Mr. Shortt to any of her protected speech.

22        The committees, Your Honor.  I don't want to

23   repeat everything I just said about all the committees,

24   but I think the same structure holds true.  Ms. Light was

25   on at least three committees.  We saw that chart; right?

1   She was on three of those committees.  She was on the PTA.

2   She was on the gardening committee.  I'm still not even

3   clear what her claim is about what happened to her on

4   those committees.  But whatever happened, she hasn't

5   established anything that links it back to any of her

6   protected speech.  There's a complete, like, absence of

7   evidence demonstrating causation.

8           The rest of them fall into the same category,

9   Your Honor.  Things that -- such as emails on the printer,

10  Ms. Alden's complaint in the mailbox.  There's nothing

11  tying that to any Board employee, Ms. Gethings, or

12  anything to do with Ms. Light's protected speech.

13          Now, the one thing I do need to address is --

14  and I realize I overlooked it when we were talking about

15  adverse employment action and discipline -- was this

16  amorphous claim about her return to work in January and

17  December -- I'm sorry, January and February of 2022;

18  right?  It's undisputed from the evidence that the

19  investigation wrapped up in December.  The reports were

20  provided at some point in December.  There's a -- a school

21  vacation happens at the end of December and January, and

22  Ms. Light's FMLA leave expired sometime in January.  I

23  don't believe we ever got an exact date, but I think all

24  the parties agree that it was extended into some point in

25  January.

1          Then the evidence demonstrates that there were

2     discussions.  Her union was involved.  HR was involved.

3     Ms. Gethings was involved.  This was a unique situation

4     because, as we heard, normally, when someone goes out on

5     maternity leave -- Principal Gethings testified -- someone

6     just swaps in.  You get a long-term sub for that classroom

7     and they continue to teach for that classroom.  Here, it

8     was a unique situation.  The kids split into two different

9     classrooms, and Ms. Light was coming back and there was

10    this overarching situation where she had been out for a

11    long time and there was efforts to bring her back to work.

12    Principal Gethings, we put the email in for Your Honor and

13    it shows the exact plan that needed to be accomplished in

14    February.  And so, while Ms. Light may have disagreed with

15    how long it took or whether she should have, you know, not

16    had to observe or complete report cards or review report

17    cards before resuming one-on-one kind of overall

18    instruction of her own class, she hasn't shown that it's

19    an adverse employment action such that it would deter

20    someone else from speaking out, engaging in their

21    protected speech.

22          Two, on that same topic, she hasn't linked any

23    causation back to her protected speech.  I mean, Taryn

24    Bonner was on the stand testifying about the process HR

25    followed to return Ms. Light to work, including dealing

1    with both unions, sending the case for a mediation, you
2    know, coming up with a plan to ease her back in. Just as
3    Mr. DeLucia said, that's appropriate. And that's not
4    unusual in the district.
5         And, Your Honor, no reasonable jury can find
6    that that situation constituted an adverse employment
7    action. And, again, you know, Ms. Light wanted to go back
8    to third grade. She's applied to go back to third
9    grade -- or she did in the summer of 2022. And I think
10   that fully undermines any sort of causal link necessary
11   for her First Amendment or 31-51q claim.
12        I don't believe I've missed any, but I think
13   Your Honor sees my point about all of those alleged
14   retaliatory acts and any sort of causal link to
15   Ms. Light's protected speech. Which, again, three Board
16   meetings: January, February, March. I know Ms. Light
17   said on the stand she wasn't sure if she spoke at the
18   February Board meeting, but it was alleged in her
19   complaint and that was what the parties, I think,
20   understood at the time. But let's take that off the
21   board. She wasn't sure she spoke there, so that can't be
22   protected speech. But the January one, it's undisputed
23   that she spoke. That's the one where she stood up, I'm
24   Jessica Light, I don't want to die. Ms. Light didn't
25   reference any conversations with Principal Gethings about

1    that one.  And the only reference to the protected speech

2    at the March or -- that same day was the email that we

3    reviewed as part of Exhibit 7; right?  Ms. Light spoke in

4    the March 22nd Board meeting, and Principal Gethings sent

5    her an email that night that responded to something they

6    had already engaged in that morning.  Fully appropriate

7    behavior by Principal Gethings, fully within the scope of

8    her job, and it doesn't demonstrate a causal link to any

9    protected speech.

10          So with that, Your Honor, again, you know, we

11   move for judgment as a matter of law on all three counts

12   for all of the reasons we set forth just now.

13          THE COURT:  Thank you.

14          All right.  Mr. Interlandi.

15          MR. INTERLANDI:  Thank you, Your Honor.  I'll

16   address these arguments as they were presented.

17          So with regard to the defamation claim, we have

18   presented evidence to support the elements of the

19   defamation claim.  Ms. Gethings made an affirmative

20   statement to Ms. Light that everyone was telling her that

21   she was the person who leaked the COVID-positive status of

22   another teacher.  She admitted on the stand today that

23   that's not true, that no one told her, in fact, that it

24   was Ms. Light.  Maybe there was rumors and innuendo.  She

25   tried to connect a Facebook post from earlier that month

1    as support for her belief or for the rumor, but it is

2    undisputed here that she mentioned Jessica to people in

3    the room.

4         Now, that's why I included the section from the

5    Restatement Second of Torts in my proposed jury

6    instruction.  But she did identify, she did publish the

7    statement about Jessica in that meeting.  So, clearly --

8    and, clearly, Jessica was identified.

9         And in terms of her reputation, outside of that

10   meeting, it continued.  So what we had is that was a

11   March 31st meeting, and then there was an April 20th

12   meeting that was supposed to be on the topic of

13   committees, and then Ms. Gethings couldn't let the

14   Facebook post go, brought up Ms. Cavanaugh multiple times

15   in an April meeting where Ms. Light's union

16   representative, Mr. Cicarella, was present.  And then when

17   they filed their retaliatory complaint, the

18   administrators, the first -- the cover page of that

19   specifically states, fourth -- sorry -- yeah.  The fourth

20   bullet point that Ms. Light "undermines administration,

21   breaches confidentiality, and creates an intentional and

22   unneeded anxieties for our families," and that is signed

23   by Mrs. Gethings and Ms. Clarino.

24         There is -- Ms. Light has testified about the

25   harm that was done to her reputation as a result of the

1    statement where she believed that Ms. Cavanaugh -- well,

2    Ms. Cavanaugh had already told her, you know, we're not

3    friends.  In that meeting, she thought they were.  She

4    offered to bring food to her after she told her that she

5    had COVID, and then brought it up there that they weren't

6    friends.

7              And then, thereafter, Ms. Light also testified

8    that there were people in the school that no longer talked

9    to her, they were afraid to talk to her, they didn't sit

10   with her at lunch.  And I think it's reasonable for the

11   jury to infer from that that Ms. Cavanaugh may have had

12   something to do with that.  Ms. Light never admitted that

13   she was the person.  She did tell Ms. Cavanaugh that she

14   was sorry she felt that way, but that it was only a rumor

15   and she wanted to repair the relationship.  But there was

16   no admission that she ever said what she claimed to have

17   said.

18             And the point about Ms. Morrison, I don't think

19   we ever argued that.  What was presented to the Court and

20   to the jury was that Ms. Morrison was present at that

21   meeting and was there on behalf of Ms. Cavanaugh, not on

22   behalf of Ms. Light.  She's also the person that

23   Ms. Gethings testified was one of the teachers who

24   forwarded her a screenshot of Ms. Light's Facebook post,

25   allegedly.

1          As it relates to the free-speech claims, I think

2     if there was ever a case where we're talking about

3     seemingly minor events, it would be this one that would

4     add up to a critical mass.

5          There's testimony from Ms. Light regarding

6     November of 2020, her speaking out at parent -- a meeting

7     that Ms. Light -- I'm sorry, Ms. Gethings was listening

8     to, and then talked to Ms. Light about her comments.

9          That carried over into January, February, March.

10    And there was -- there was public speaking at the Board of

11    Ed meeting in January.  It was alleged in February,

12    although Ms. Light testified she couldn't recall, and in

13    March.  And in March, it was the same day of the email

14    that is presented in Exhibit 7 -- the subject matter of

15    the email is 3 feet -- where Ms. Light is trying to get

16    more information about a unified plan and the distancing

17    that was required for students, particularly on how to

18    measure.

19         That led to an email a few days later that was

20    titled, Happy Friday, and the second part of that email,

21    Ms. Gethings admitted was to -- not attack, but to address

22    the social media -- I'm sorry, that's not the Board of Ed

23    meeting.  That was regarding the Facebook post.  Sorry.  I

24    got tripped up on the time frame there, Your Honor.

25         But we have the Facebook post first, which was

1    March 9, 2021, Ms. Light's comments, Ms. Light being

2    talked to about that at the T-Eval meeting on March 26th.

3    She was also told about Ms. Cavanaugh.  They have a

4    meeting on March 31th.  But in between the Facebook post

5    and the T-Eval is the March 22nd email, and the Board of

6    Education comments later on.  Ms. Gethings stated to

7    Ms. Light during those meetings that she didn't think it

8    was appropriate or that she had a right to speak.  She

9    said that.  She also said that she heard her speak many

10   times.  So she was clearly listening.

11         And, clearly, we can connect the March 2020 --

12   the March 22nd Board of Ed meeting as well as the Facebook

13   post to protected speech.  That's already been agreed upon

14   that that was protected.  And then Ms. Light [sic] now

15   doing a series of -- taking a series of actions against

16   Ms. Light that were seemingly minor, but in the aggregate

17   add up to a critical mass such that it would deter someone

18   or create a hostile environment or inferior environment.

19         Typically, T-Eval meetings that would last

20   15 minutes -- testimony was presented on that -- lasted

21   more than an hour, where Ms. Light should have had a union

22   representative present to address the concerns that the

23   administrators were bringing to her attention.

24         And then, secondly, the meeting with

25   Ms. Cavanaugh on March 31st.  That was where the

1    defamatory statement was made, among other things, and,

2    again, the accusations concerning the Facebook post.

3         The Facebook post kind of speaks for itself in

4    terms of the content in that it was for student data being

5    reported and Ms. Light making two comments that set off

6    this chain reaction of events.

7         The April committee meeting, Ms. Light responded

8    to Ms. Gethings' responses to her.  So in Exhibits 9 and

9    10 -- and those are both full exhibits -- Ms. Gethings

10   admitted or agreed on cross that she received a copy of

11   Ms. Light's response to her email response.  And that is

12   in Exhibit 10.

13        She also -- Ms. Gethings testified that she was

14   aware that Ms. Alden had filed a list of concerns.  That

15   list of concerns, the last date -- if you look at that

16   document, the real last date that Ms. Alden is complaining

17   about is December.  She held that complaint in her back

18   pocket for five months until the administrators got word

19   that Ms. Light had filed a complaint and, in line with

20   what they did, they asked Mr. Jones for -- she asked him

21   to clarify her recollection.  She got an email.

22        There was testimony about an email that she

23   received from a parent who brought bagels four months

24   earlier all of a sudden sent a lengthy email that they

25   attached to their retaliatory complaint that was filed on

1    June 7th.

2            And then they have this intervening complaint

3    from Ms. Alden.  So you have the April 30th complaint from

4    Ms. Light, the email complaint from Ms. Alden.

5    Ms. Gethings testified, I believe, that they were the only

6    two people on the email, Ms. Clarino and Ms. Gethings, and

7    Mr. Bianchine.  No one else would have had that at the

8    school.  How else would Ms. Alden know about the email?

9    And I believe her testimony was that they did bring that

10   to her attention.

11           And so that time frame now -- we're in February

12   to May, beginning of June -- we have a bunch of seemingly

13   minor incidents that are making their way and building up

14   to critical mass.

15           It's within the jury's province, Your Honor, and

16   that they can take this information.  And that is also one

17   of the proposed instructions I had to include so that they

18   understand what their role is or how to define these

19   seemingly minor events.

20           There are other things that follow.  There's the

21   tainting of the witness, which we talked about, Mr. Jones.

22   There is Mr. Shortt.  He said he felt really upset and he

23   was actually considering, you know, quitting the job and

24   his wife had to talk him out of it.

25           Mr. Salem finding the -- she's the building

1    leader.  She didn't know that he had a printer.  And this

2    is the actual -- the email that we're talking about to be

3    found on Ms. Light's former grade level partner's printer.

4    And there's really no way that it would have gotten there

5    other than the two administrators printing it and then

6    someone putting it there.

7        I just have a few more points, Your Honor.

8    There was no direct evidence that Ms. Light at all said

9    anything to anyone specifically identifying Ms. Cavanaugh

10   as someone who was out because of COVID.  At best,

11   Ms. Cavanaugh expressed a concern that -- or belief that

12   she thought it was Ms. Light.

13        And as it relates to the return to work, it

14   wasn't all nice, you know, sunshine and rainbows in

15   January and February of 2022.  January 14th, they had a

16   very long meeting.  Safeguards were discussed.  Ms. Bonner

17   testified and agreed that she was going to work like an

18   Energizer Bunny to answer Ms. Light's questions.  And what

19   happened?  A few days later, they turned around and told

20   her, get yourself back to work.

21        And, yeah, in theory, they tried to work her

22   into her job and shadow and observe.  But that's not

23   really what happened because Ms. Gethings' boss had to

24   tell her she was disappointed that this had not already

25   happened.  She had not been returned to work.  There was a

1    period -- and it's in the email -- that there would be a

2    kind of transition back, but that's not what happened.  It

3    went much longer.  And she said, get her back without any

4    further delay.  And she was returning back to two

5    people -- at least in evidence, one person -- who received

6    a verbal warning from the superintendent based on her

7    finding that Ms. Gethings exhibited poor professional

8    judgment on how she responded to an employee criticizing

9    Worthington Hooker School administration during a Board of

10   Education meeting.  Superintendent's words, not mine.  And

11   that's the same day that Ms. Gethings' boss told her, get

12   Ms. Light back to her classroom.

13          And so, for all those reasons, I think there is

14   causal link to the protected speech.  I think these minor

15   incidents add up to a critical mass and that is for the

16   jury to decide, Your Honor.

17          Thank you.

18          THE COURT:  All right.  Did you wish to have

19   some further remarks?

20          MR. MURPHY:  I did.  I apologize.  Is that okay?

21          THE COURT:  Yes.

22          MR. MURPHY:  All right.  Just briefly on the

23   defamation claim, because I think you fully heard me on

24   the retaliation claims.

25          But on the defamation claim, my argument in my

```
 1   motion is that there's no causal link between the alleged
 2   defamatory statement and harm to the reputation.  And what
 3   I heard in response was, you know, there was a meeting in
 4   April where there were additional discussions, and the
 5   union -- David was present, and then there was the
 6   submission by Principal Gethings and Ms. Clarino which
 7   they kept referring to as a retaliatory complaint, and
 8   that Ms. Cav said some things in a later meeting about her
 9   own feelings about Ms. Light -- no, I take it back.
10        The 4/20 meeting, nothing -- my point is,
11   Your Honor, there's nothing that ties any harm to the
12   defamatory statement on the -- the alleged defamatory
13   statement and the T-Eval meeting.  They keep alleging all
14   these other facts happened, but there's nothing tying it
15   to the defamatory statement.  The meeting with David and
16   Ms. Light and Ms. Gethings on 4/20 is a separate meeting.
17   It wasn't -- it had nothing -- it was about committees.
18   It had nothing to do with Ms. Gethings' statement in that
19   meeting; right?  There's no connection.
20        And then, you know, when Attorney Interlandi
21   starts talking about Ms. Cavanaugh and -- statements were
22   made in that meeting before -- I apologize -- before
23   Ms. Gethings' statements.  So there can't possibly be any
24   connection between Ms. Gethings' statements and whatever
25   feelings Ms. Cavanaugh had.
```

```
1              So I think out of everything, that is the

2    weakest one, Your Honor, and the defamation claim should

3    not go to the jury.  I feel strongly about the other ones

4    as well, but I won't repeat everything I already said.

5              THE COURT:  Okay.  Very good.  I will take your

6    remarks under advisement.

7              Did you wish to have a final?

8              MR. INTERLANDI:  Just one point, Your Honor.

9              Ms. Gethings agreed on the witness stand that in

10   that April meeting, they talked about more items than just

11   committees, including Facebook and Ms. Cavanaugh.

12             THE COURT:  All right.  Thank you.  Would you

13   care to come to chambers for our -- our chambers

14   conference room for our charge conference or would you

15   prefer to stay in the courtroom?

16             MR. MURPHY:  That would be great, Your Honor.

17             MR. INTERLANDI:  Your choice, Your Honor.  I

18   have no preference.

19             THE COURT:  All right.  Let's go back to the

20   conference room.

21                  (A brief recess was taken.)

22             THE COURT:  All right.  As you see, I've taken

23   account of your proposals.  I've tried to integrate them

24   into a draft.  I have tried to take the sense of what the

25   proposal has to offer and incorporate.  So let's go
```

```
 1    through and see what remains of issues.
 2            First of all, with respect to the verdict form,
 3    I don't think there are remaining disputes, are there?
 4            MR. INTERLANDI:  I don't think so.
 5            MR. MURPHY:  Just, I guess, the only dispute was
 6    on the Count One, I think.
 7            MR. INTERLANDI:  Yeah, there was another one.
 8            MR. MURPHY:  And Count Two as well, the
 9    substantial/motivating.  It says -- I don't know how
10    Your Honor wants to address that because that goes back to
11    the jury instructions.  But Count One, "substantial or
12    motivating factor."
13            THE COURT:  Okay.  Let's take a look in the
14    draft itself.  The -- you'll see how -- let me get to
15    that.
16            So I've changed it to be, "Protected speech is
17    the cause of the adverse action if it is a substantial
18    factor or, to put it in other words, a motivating factor
19    in the adverse action."
20            And that phrase comes directly from *Mt. Healthy
21    City School District* and is -- which is the case to which
22    most of the subsequent Second Circuit cases refer.
23            The essence of it is that "substantial" is
24    virtually synonymous with a motivating factor, not two
25    separate factors.  And I've tried to capture that.
```

1          Any problem with doing it that way?  I'm on your

2     page -- so our 9 corresponds to your page 8.  My question

3     to you is:  Is there any objection to phrasing it in that

4     fashion?

5          MR. MURPHY:  Is that -- oh, I wasn't sure if you

6     were speaking to Tony or me.

7          If it's to me, as we put in our comments last

8     night, in this case and a recent decision issued by Judge

9     Meyer by a recent -- I think it was a 2023 case by the

10    Second Circuit -- they use the phrase "substantial

11    motivating factor."  To me, that suggests something higher

12    to the jury than the phrase that says "substantial factor"

13    or "a motivating factor."

14         "Substantial" just has more heft to it, and

15    "substantial motivating factor" has more heft to it than

16    certainly the way it was originally, "substantial or

17    motivating," and I think even as it's currently put here.

18    Which kind of tracks with other retaliation claims; right?

19    We're familiar with claims under Title VII that have a

20    but-for standard other than a motivating --

21         THE COURT:  But this is not a but-for standard.

22         MR. MURPHY:  No, I know, but it's a substantial

23    motivating factor.  And I think courts have used that

24    phrase for a reason.

25         THE COURT:  What do you think is the meaning of

1    a substantial motivating factor?  Can you have a

2    motivating factor that is a -- that interferes -- a

3    motivating factor interfering with First Amendment rights?

4             MR. MURPHY:  Can you have a motivating factor

5    that's not a substantial motivating factor?

6             THE COURT:  But it's a motivating factor.  A

7    motivating factor motivating the actions in response to

8    another's First Amendment speech.

9             MR. MURPHY:  But is that actionable?  And I

10   guess that's my question.

11            THE COURT:  But my question to you is:  Is a

12   motivating factor something different than a factor which

13   causes you to take, in response to free speech, some

14   adverse action, some action?

15            MR. MURPHY:  Meaning is a motivating factor

16   greater than some action that -- I apologize if I'm not

17   understanding your question, Your Honor.

18            THE COURT:  I'm not understanding what you're

19   saying about why a motivating factor isn't a factor that

20   would demonstrate an adverse action, that wouldn't prove

21   an adverse action.

22            MR. MURPHY:  Well, I guess I'm confused why

23   courts have consistently caused it a substantial

24   motivating factor.

25            THE COURT:  Don't say "consistently," because

```
1    that's exactly what the problem is.  They're not

2    consistent.  They say -- some say "substantial" or

3    "motivating."  That's why we went back to the origins to

4    find where did this come from and used exactly the

5    language that was the genesis for all of the subsequent

6    case law describing when protected speech can be found to

7    be the cause of the adverse action.

8            MR. MURPHY:  And, in this case, Judge Meyer used

9    the substantial motivating factor, I believe, in his

10   summary judgment ruling.  And so it's already been -- that

11   standard was already laid out in our -- in our ruling on

12   our motion for summary judgment, and I assumed that would

13   carry forward through the trial as well.

14           THE COURT:  Okay.  Well, I'm not willing to add

15   an additional burden as you wish to what the protected

16   speech has to be shown as a cause of.  Because if it is a

17   substantial factor or a motivating factor -- those two

18   phrases being somewhat synonymous -- from the origins of

19   that in the Supreme Court, that was sufficient.  It wasn't

20   an additional factor, something more, a substantial, as

21   you describe it, substantial motivating factor, which can

22   be something other than substantial factor or motivating

23   factor.  I don't think that's where this phrase came from,

24   but your objection is preserved.

25           MR. MURPHY:  All right.
```

```
 1              THE COURT:  Okay.  And other than that, anything
 2    to discuss on the verdict form?
 3              MR. INTERLANDI:  I have something on the jury
 4    instructions, Your Honor.
 5              THE COURT:  Okay.  Let's stick with the verdict
 6    form.
 7              MR. INTERLANDI:  Verdict form, no, I don't have
 8    anything else.
 9              MR. MURPHY:  No, Your Honor.
10              THE COURT:  All right.  Let's go through the
11    charge page by page, and you tell me what you have to say.
12              Anything on 1?  Anything on 2?  Page 3?  Four?
13    Five?
14              I added something on 5 which I hope gives some
15    clarity or some parameters to the concept of considering
16    acts -- lesser acts.  Any problem with that?
17              MR. MURPHY:  No, Your Honor.
18              THE COURT:  Okay.
19              MR. INTERLANDI:  No, Your Honor.
20              THE COURT:  All right.  Do you have anything
21    further you want to say on causation?
22              MR. INTERLANDI:  Yes, Your Honor -- oh, no, I'm
23    sorry.  I'm on the wrong page.
24              MR. MURPHY:  I do not.
25              THE COURT:  So I'd just like to note three cases
```

1   that use the "substantial or motivating," as I alluded to

2   earlier: *Scaife v. City of Meriden*, 493 F. Supp. 3d 1.

3           MR. MURPHY:  I'm sorry.  Can you repeat that,

4   Your Honor?  I couldn't hear you.

5           THE COURT:  S-c-a-i-f-e, *Scaife v. City of*

6   *Meriden*, 493 F. Supp. 3d 1 at 13 from the District of

7   Connecticut in 2020.

8           *Zona v. Town of Stratford*, 2023 WL 6307311 --

9           MR. MURPHY:  What --

10          THE COURT:  From the Connecticut Superior Court.

11          MR. MURPHY:  What year was that case?  I

12   apologize.  2021?

13          THE COURT:  2023.

14          *Hempstead v. Department of Mental Health and*

15   *Addiction Services*, 2023 WL 473A196 from the Connecticut

16   Superior Court -- as examples of the use of the phrase as

17   we have set it out in the currently proposed charge.

18          All right.  Let's go to the next objection or

19   comment anybody has.

20          Six, 7?

21          MR. INTERLANDI:  On page 6, Your Honor, I

22   propose a statement to clarify.

23          So it was -- I requested it for the beginning of

24   the second paragraph to clarify the paragraph above

25   concerning Ms. Light's bona fide performance with the

```
 1    working relationship between her and the Board.  And I was
 2    asking for a sentence to start the second paragraph, "This
 3    means that the interference must be significant enough to
 4    impact Ms. Light's ability to perform her job duties or
 5    affect the overall working environment."
 6              THE COURT:  Okay, I saw that.  That doesn't have
 7    any case law.  I'm not aware of any case law that sets
 8    that as the standard.  Do you have something to propose?
 9              MR. INTERLANDI:  I don't have case law with me.
10    I know I got it from a case.  But I apologize, I must not
11    have footnoted it.  So, at this time, I don't have case
12    law.
13              THE COURT:  Mr. Murphy, do you have any
14    response?
15              MR. MURPHY:  Well, since Your Honor took it out,
16    I don't have any response.  I wasn't -- I don't think it
17    should be in there.
18              THE COURT:  I'm going to leave it in until you
19    persuade me it shouldn't be in or I should put it in.
20              MR. INTERLANDI:  All right.
21              THE COURT:  All right.  Let's see what's next.
22              Page 8.  We've done the
23    substantial-motivating-factor discussion.  I've added, "It
24    may not be the only factor."
25              Anything further?
```

```
 1                MR. INTERLANDI:  No.
 2                THE COURT:  On page 13 --
 3                MR. INTERLANDI:  I apologize, Your Honor.  I
 4     forgot that I had something on 10 under the first element
 5     of defamation, publication of a defamatory statement.  I
 6     felt that the second sentence could be confusing to the
 7     jury, and that's -- that sentence is, "A statement is
 8     published when it is made to another person orally, in
 9     writing, or by some other means of communication."
10                MR. MURPHY:  I'm sorry, where are we?
11                MR. INTERLANDI:  Page 10 -- I'm sorry, on 9.
12                MR. MURPHY:  I thought you were referring to the
13     Court's charge 10, but I don't know.
14                MR. INTERLANDI:  I must have gotten -- my pages
15     are different.  I apologize.
16                THE COURT:  You had wanted the altercation
17     between A and B to be there?
18                MR. INTERLANDI:  Yes.
19                MR. MEDINA:  It's at the bottom of page 9, I
20     think.
21                MR. INTERLANDI:  I apologize.  Thank you.  Yeah,
22     sorry.
23                THE COURT:  And I didn't put it in there because
24     it, A, it didn't seem to bear much relationship to the
25     facts that we have in this case, and, B, I don't really
```

1    anticipate this to be needing an example.

2            I know you found that in the restatement and

3    that's fine, but I don't think it's necessary.  If your

4    quarrel is some confusion by some other means of

5    communication, I suppose we can take that out or we can

6    rephrase since this is clearly an oral statement, "A

7    statement is published when it's made to another" --

8    "including when it's made to another person orally," and

9    just leave the rest out.

10           MR. INTERLANDI:  I think the -- yeah.  And that

11   would be acceptable.  It's just that, "made to another

12   person."  That's why I like the example below because, in

13   this case, the statement was made to Jessica, but

14   negligently, because there were people around who heard

15   what we claim is the defamatory statement.

16           And so I don't know if they're going to

17   understand the next sentence that says, "The publication

18   of a defamatory information can be done intentionally or

19   negligently so long as it is done in a manner such that in

20   the ordinary course of events, it would become

21   communicated to a third person."

22           So "communicated to," you know, I think a jury

23   can be confused with that.  And to say that someone then

24   told the third person, and the example --

25           THE COURT:  Who are you claiming is the third

1    person here?

2              MR. INTERLANDI:  There doesn't have to be a

3    communication by a third person, according to the

4    restatement.

5              THE COURT:  To.  To a third person.

6              MR. INTERLANDI:  To.  Communicated to a third

7    person.

8              THE COURT:  So your illustration isn't talking

9    about who the statement is made to.  I mean, you have A,

10   in a loud voice, accuses B of larceny.  The accusation is

11   overheard by a passerby.  And that's publication.

12             How does that fit the circumstances alleged

13   here?

14             MR. INTERLANDI:  Ms. Gethings is directly

15   accusing Ms. Light of being the person, and the people in

16   the room hear it.

17             THE COURT:  Right.

18             MR. INTERLANDI:  And so now that's published to

19   these people in the room.

20             THE COURT:  Right.

21             MR. INTERLANDI:  Here, it's saying, "In the

22   ordinary course of events, it would come to be

23   communicated to a third person."  And so that's my

24   position.  I think that's confusing to a juror because

25   they may think that the information would have to be

1    received by the person who is being defamed and then

2    communicated to another person.  And I think the example

3    clarifies that.

4            I think that's -- other than it being outside

5    and a passerby hearing it, it's essentially what the

6    situation was:  A closed-door meeting attended by five

7    people, statement was made directly to the plaintiff

8    within earshot of the other three attendees.

9            THE COURT:  So is it that you want to tell the

10   jury what your -- how your evidence fits this?  In other

11   words, here, Defendant Gethings proposed -- excuse me --

12   alleged statement to Ms. Light heard by others in the room

13   may constitute publication?  I don't understand -- I don't

14   want to make this harder than it needs to be.

15           MR. INTERLANDI:  I think --

16           THE COURT:  I also don't want to marshal the

17   evidence.

18           MR. INTERLANDI:  What if that sentence that

19   precedes what I proposed, instead of saying "communicated

20   to a third person" says "heard by a third person"?

21           THE COURT:  Do you think the confusion is

22   whether Ms. Light is the third person?

23           MR. INTERLANDI:  No.

24           THE COURT:  So the defamatory statement made

25   about Ms. Light is that which Ms. Gethings said to

```
1    Ms. Light which was heard by others?

2            Is that what you're saying?

3            MR. INTERLANDI:  Yes.  That is the publication

4    because it was done in a manner where other people heard

5    the alleged defamatory statement.  And it doesn't have to

6    be separately -- I think there could be confusion that a

7    juror would think that then that would have to be

8    communicated to some other person.

9            "Communicated" is, like, actively doing

10   something, versus "heard" is you're receiving the

11   information.  So I think that's the distinction I'm trying

12   to make.

13           THE COURT:  So if we were to simply say, "Light

14   must show Gethings published a defamatory statement about

15   Ms. Light to a third person or persons who heard it.  A

16   statement is published when it is made to another person,

17   including orally."

18           MR. MURPHY:  To me, this is the standard kind of

19   defamation language.  I don't think the jury is going to

20   be all that confused about it in the situation because we

21   had five people in the room.  I think they're all going to

22   understand who was there, who heard it.  This wasn't a

23   case about someone walking down the street and there's not

24   a dispute about who heard things.

25           MR. INTERLANDI:  I'm not saying there is.  I'm
```

1    just saying that publication, the way it's drafted, I

2    think a juror could be confused.  It was communicated --

3    she said it to Ms. Light.  She published it to the person.

4    And that's not -- and the people in the room, it wasn't

5    published to.  And so I was just looking for some example

6    or further refinement of what's here so that it's clear

7    that the publication can be made to the people who heard

8    it.

9            THE COURT:  Well, the -- it wouldn't be

10   published if it was only made to the plaintiff; right?

11           MR. INTERLANDI:  I agree.

12           THE COURT:  So ...

13           MR. INTERLANDI:  Because it says here, "A

14   statement is published when it is made to another person

15   orally."  And then they would say, well, she's the person

16   and she's, you know, accusing that did the thing.

17           THE COURT:  "Gethings published a defamatory

18   statement about Ms. Light to a third person or persons.  A

19   statement is published when it is -- "is published,

20   including when it is heard by another person."

21           Isn't that accurate?

22           MR. INTERLANDI:  Yes.

23           THE COURT:  And leave out the rest of that

24   sentence.  It's not inaccurate, I think.  I think it does

25   not run the risk of confusion.

```
 1              What do you think, Mr. Murphy?  Will that do?

 2              MR. MURPHY:  I don't have an objection to that.

 3              THE COURT:  All right.  Let's do that.

 4              And moving on.  What is your next issue?

 5              MR. MURPHY:  I don't think I have any others,

 6    Your Honor.

 7              THE COURT:  Anything further, Mr. Interlandi?

 8              MR. INTERLANDI:  Just one second, Your Honor.

 9              THE COURT:  You will see in the punitive

10    damages, I took out --

11              THE LAW CLERK:  I don't think they have that in

12    the copy they have, the permission of the punitive damages

13    at the end, because that was right before.

14              MR. INTERLANDI:  That's what I was looking for.

15              THE COURT:  So punitive damages should not

16    include the reference to financial wherewithal of the

17    defendant.  That has been found to be an instruction which

18    is erroneous, and in no small part because it is the

19    defendant's burden to show that his financial

20    circumstances warrant a limitation of the award.  The duty

21    is on the defendant to present evidence before the jury

22    renders its verdict and on appeal therefrom of his limited

23    resources if he wishes that factor to be weighed in the

24    calculation of punitive damages.

25              This comes from *Provost v. City of Newburgh* from
```

```
 1   the Second Circuit, 262 F.3d 169 from 2001.

 2            Any problem with that deletion?

 3            MR. INTERLANDI:  No, Your Honor.

 4            THE COURT:  You didn't want to take an

 5   affirmative defense with that, did you?

 6            MR. MURPHY:  No.

 7            THE COURT:  Anything else?  Let me look at

 8   your ...

 9            MR. MURPHY:  I guess I had two just questions,

10   Your Honor.  One was about the alleged defamatory

11   statement that's quoted in here on page 9 of the draft you

12   handed out to us.

13            Under Count Three, the final sentence of that

14   first paragraph says, "Ms. Light alleges that Ms. Gethings

15   stated, quote, 'I need you to know that every person said

16   that you were the source,' end quote."

17            I thought at trial Ms. Light defined it as

18   something more than that, that she read three or four

19   lines from the transcript and defined it as something

20   broader than just that.

21            THE COURT:  Okay.  I didn't --

22            MR. MURPHY:  And I apologize for not catching

23   that earlier, but ...

24            THE COURT:  I didn't realize that we had a

25   dispute over what the alleged defamatory statement was.  I
```

```
 1          should leave that up to the jury.

 2                    MR. MURPHY:  Yes.

 3                    MR. INTERLANDI:  I'm not disputing that.  I

 4          mean, that's what Judge Meyer said in his ruling.

 5                    MR. MURPHY:  Right.

 6                    MR. INTERLANDI:  And you're relating it to this.

 7          She was reading it from the transcript.

 8                    MR. MURPHY:  She's the plaintiff.  It's her -- I

 9          mean, to the extent necessary, we just strike that

10          sentence out and let the -- the jury heard what --

11                    THE COURT:  So you're content to just leave it

12          as, "According to Ms. Light, Ms. Gethings accused her of

13          leaking another teacher's COVID-positive status and did so

14          in front of other people," period.

15                    MR. MURPHY:  Why can't we just say, "Ms. Light

16          alleges that Ms. Gethings made a defamatory statement,"

17          period.  "Ms. Gethings denies liability and asserts her

18          affirmative defenses."

19                    I think Your Honor's concern was about

20          marshaling the evidence for the jury before.

21                    THE COURT:  That's why I was going to take out

22          that next sentence, which I didn't realize was being

23          disputed, and just the general subject matter of leaking

24          another --

25                    MR. MURPHY:  Oh, I -- I see what Your Honor's
```

```
1   point is.  Yes, right, take out that second sentence.

2   That's the one that I was concerned about.  Right.

3          THE COURT:  Let's do that.  Any problem with it?

4          MR. INTERLANDI:  I prefer it the way it is.

5          THE COURT:  You can argue it and as long as

6   we're leaving it to the jury to see whether the plaintiff

7   has proved that Ms. Gethings published a defamatory

8   statement to a third person identifying Light, that's up

9   to them.  Okay?

10         All right.

11         MR. MURPHY:  And one other -- my second concern

12  -- and I was thinking about this as we were talking

13  through the Rule 50 motion -- is that, you know, at the

14  pretrial conference, Your Honor, what are the alleged

15  retaliatory acts.  And now we've had evidence related to

16  the notes, for example, or the application for the third

17  grade position.  But those are not retaliatory acts and I

18  don't want the jury to be under the impression that they

19  can find liability -- find retaliation based on those

20  facts, right, or people not talking to her in the

21  cafeteria or whatever the other list of things she brought

22  up that are outside the list we talked about.

23         THE COURT:  Okay, but that's not under the

24  defamation claim.

25         MR. MURPHY:  No, no.  This is just a general
```

1   concern about the jury instructions, correct.  This is

2   under the retaliation claim.

3           THE COURT:  Let's point out exactly where this

4   issue comes up.

5           MR. MURPHY:  Well, it would be in the -- I

6   guess, for example, the first time it comes up is on

7   page 5 in connection with the 31-51q claim and the second

8   element of discipline; right?

9           The jury certainly has heard evidence of issues

10  that are --

11          THE COURT:  If we amended this to say,

12  "Incidents that are infrequent, relatively minor, or

13  unrelated"?

14          MR. MURPHY:  But how is the jury going to know

15  that the notes, for example, or the -- I mean, this is why

16  I argued against it being admitted, and Tony's spent a lot

17  of time on it today, was the application for the third

18  grade position in the summer of 2022.  My understanding is

19  it was being offered to show that her original reason for

20  moving -- Ms. Gethings' original reason for moving

21  Ms. Light from third grade to first grade wasn't true or

22  didn't have credence; right?

23          THE COURT:  Yes.

24          MR. MURPHY:  Yeah.  And -- but now, I think we

25  left -- the evidence left them under the impression that

1    they could find that that was a retaliatory act, not

2    putting her back in third grade, when that's not the case.

3            I feel like there needs to be some sort of

4    explicit instruction on that, on what the alleged

5    retaliatory acts were, or that, you know, anything that

6    occurred after, I think Your Honor said it was the Alden

7    complaint in the spring of 2022 was the last of the list

8    of retaliatory acts, and anything happening after that

9    date cannot be a basis for a verdict in favor of the

10   plaintiff on the retaliation claim.

11       THE COURT:  Okay.  We have two retaliation

12   claims.  One is a little more stringent than the other.

13   The 1983 claim is an employment action that's taken by an

14   employer that is significant enough it would deter a

15   reasonable and similarly situated person.

16           Why is it not within the jury's purview to

17   consider whether transferring a speaker, against her will,

18   to another position that is least preferred isn't

19   something that couldn't deter a reasonable and similarly

20   situated person, that is, a teacher.

21       MR. MURPHY:  Well, I think Tony is arguing --

22   and he has the ability to argue -- that that first

23   transfer from third to first is the retaliatory act.

24           THE COURT:  I thought that's what you were

25   talking about.

1          MR. MURPHY:  No.  I'm talking about today, there

2     was evidence that the following year, the summer of 2022,

3     Ms. Light applied for a second -- applied to return from

4     first grade to third grade.

5          THE COURT:  Right.

6          MR. MURPHY:  And that is what I'm concerned

7     about, that the jury is finding that is one of the

8     retaliatory acts.  Because it was very clear at the

9     pretrial conference that that is not a retaliatory act and

10    that the evidence, you know, later in this case, we

11    discussed that the evidence on that was not being offered

12    to show a retaliatory act, just to -- just about whether

13    or not the transfer from first grade to third grade a year

14    earlier was legitimate.

15         And so I can't be in the position where a jury

16    finds a retaliation verdict against us based on something

17    that's outside the scope of the alleged acts -- the

18    alleged retaliatory acts.

19         THE COURT:  So that was the basis that you

20    admitted, the subsequent application after she filed the

21    lawsuit, and your argument there was that it shows, from

22    the surrounding reasons, that her original reason wasn't

23    the real reason.

24         So why isn't Mr. Murphy right that we need to

25    clarify that the second application or the reapplication

```
 1    for the open position isn't a retaliatory act?  Is it an
 2    adverse action?
 3                MR. INTERLANDI:  I don't have --
 4                THE COURT:  Were you going to argue that it
 5    wasn't an adverse action?
 6                MR. INTERLANDI:  No, I'm not.  I don't -- so I
 7    agree that if there is a proposal for limiting language, I
 8    would be willing to entertain it.
 9                MR. MURPHY:  Can we just cut it off by date?  I
10    mean, I think the way that I understood the argument
11    was --
12                THE COURT:  That would be the way to do it.
13                MR. INTERLANDI:  Like, February, whatever that
14    date is.
15                THE COURT:  What's the date that you would
16    propose?
17                MR. MURPHY:  The return to work was in the early
18    2022; right?  And then the -- I believe the Alden note was
19    found sometime in the spring of --
20                THE COURT:  May of --
21                MR. MURPHY:  May -- that that is the last
22    retaliatory act alleged, and anything occurring after that
23    date is not an independent basis for liability.  Or
24    something that -- we have the words --
25                THE COURT:  What is the date of the end of the
```

```
 1    school year?
 2              MR. INTERLANDI:  Probably the end of June.
 3              MR. MURPHY:  Yeah, by the end of June.
 4              THE COURT:  So by the end of June of that year;
 5    right?
 6              MR. MURPHY:  I don't believe so.  I think it has
 7    to be earlier.  The Alden complaint cut it off as of that
 8    date.
 9              THE COURT:  I'm just trying to think where the
10    notes, then, would fit in analytically.
11              MR. MURPHY:  Well, those were in August of 2022.
12    And then, again, my argument is the same on that.  Those
13    are not alleged to have been retaliatory acts.
14              THE COURT:  They are alleged to be part of the
15    hostility; right?
16              MR. INTERLANDI:  Yes.
17              MR. MURPHY:  But they --
18              THE COURT:  All right.  So if we say, middle of
19    page 7 under the third element, "Ms. Light must show by a
20    preponderance of evidence that she experienced at least
21    one adverse employment action by May of 2022."
22              MR. MURPHY:  I'm more comfortable with that.
23              MR. INTERLANDI:  Can you just repeat that one
24    more time, Your Honor?
25              THE COURT:  So I'm on page 7.  I'm on the third
```

```
1    element, adverse employment action.
2                "To prove the third element of her claim,
3    Ms. Light must show by a preponderance of the evidence
4    that she experienced at least one adverse employment
5    action by May 2022."
6                MR. INTERLANDI:  That's fine with me.
7                THE COURT:  Okay?
8                MR. MURPHY:  That seems to be okay, Your Honor.
9    Thank you.
10               THE COURT:  Okay.  Should we put that date in
11   for both?
12               MR. MURPHY:  Oh, yes.
13               MR. INTERLANDI:  Yeah.
14               THE COURT:  Okay.
15               MR. MURPHY:  I --
16               THE COURT:  So under -- on page 5, should we
17   say, can be also a combination of lesser acts taken
18   before -- by May 2022?
19               MR. MURPHY:  Or can it be on page 4 in the
20   elements like we did with the first one, the Board
21   disciplined her before -- by May 2022?
22               THE COURT:  I'm sorry, page 4?
23               MR. MURPHY:  Yes, page 4.  When you list the
24   elements of a 31-51q claim, just like we did with the --
25               THE COURT:  "The Board disciplined her by
```

```
 1    May 2022"?  Is that what you're proposing?
 2              MR. MURPHY:  That was my proposal, just to keep
 3    it consistent with how it's structured in the first one.
 4    And consistent with the 1983 instruction, which is
 5    actually the second one.
 6              THE COURT:  Doesn't it fit better under the
 7    second element, discipline, page 5?
 8              MR. INTERLANDI:  I think so.
 9              THE COURT:  "'Discipline' means an adverse
10    material action taken against Ms. Light by Ms. Gethings."
11              MR. MURPHY:  By May 2022?
12              THE COURT:  Is that where we should put it, "by
13    May 2022"?
14              MR. INTERLANDI:  I think so.
15              THE COURT:  Let's do that.  I think that fits
16    better.
17              MR. INTERLANDI:  And that's consistent with the
18    placement under the 1983 claim which is a similar
19    paragraph, but the third element.
20              THE COURT:  All right.  Anything else?
21              MR. INTERLANDI:  I don't have anything further,
22    Your Honor.
23              THE COURT:  Okay.  I will make those changes.
24    We will email you a final copy, and that will be it.
25              If you wish to get further clarity about
```

1    "substantial motivated," you can look at the *Hines* case

2    that Judge Meyer cited which, in fact, cites to cases that

3    go back to *Mt. Healthy*.

4            So the Second Circuit has not considered a

5    difference, if any, between the two.  So you may be the

6    first case to do that.  Let's be exactly sure why we're

7    charging it this way to bring that up.

8            MR. MURPHY:  All right.

9            THE COURT:  Very good.  Thank you very much.  I

10   look forward to hearing your closings.

11           Anything that you need us to set up for you to

12   present your closings?

13           MR. INTERLANDI:  I don't think so.  My

14   understanding is that the podium, would we be able to turn

15   the podium to face the jurors?

16           THE COURT:  I think so.

17           MR. INTERLANDI:  And then that has a connection?

18           THE COURT:  And then with respect to using --

19   projecting exhibits?  Surely you don't want to keep

20   flipping through the book.

21           MR. INTERLANDI:  No, Your Honor.  I will not do

22   that for closings.

23           THE COURT:  I mean, it's -- we're finished.

24           (In recess, 3:49 p.m.)

25       ***** TRIAL DAY 5, August 9, 2024, BEGINS *****

```
 1              (Call to order, outside the presence of the jury,
 2      9:15 a.m.)
 3              THE COURT:  Good morning, counsel, ladies and
 4      gentlemen.  We are ready for the jury.  We are ready for
 5      the charge and we are ready for your closing arguments.
 6              MR. MURPHY:  I did have one question,
 7      Your Honor, and hopefully it won't be a big issue.
 8              But going back to the qualified immunity defense
 9      that we raised, we had put in the verdict form lines for
10      the jury to find if they find retaliatory conduct,
11      specific conduct, and Your Honor included that.  And my
12      understanding is I didn't need to include that in -- that
13      argument in my jury instructions because that's not a
14      question for the jury.
15              But my understanding -- and I also didn't
16      include it in my Rule 50 motion because, again, the
17      argument is dependent on factual findings made by the
18      jury.
19              So I just wanted to note for the record that
20      we're preserving our argument to have the Court rule on
21      our qualified immunity defense based on any factual
22      findings listed in the verdict form.
23              Does that make sense?
24              THE COURT:  That's fine.  That's the order that
25      we had intended.
```

```
 1                    MR. MURPHY:  Yes.

 2                    THE COURT:  And the purpose of the delineation

 3      of adverse acts by the jurors was to assess qualified

 4      immunity individually or as a whole.

 5                    MR. MURPHY:  Right, perfect.  We didn't discuss

 6      it yesterday, and I just wanted to make sure we were on

 7      the same understanding.

 8                    THE COURT:  That's fine.

 9                    Anything else?

10                    MR. INTERLANDI:  No, Your Honor.

11                    THE COURT:  All right.  I'll ask Ms. Lewis to

12      bring in the jurors.

13                    MR. MURPHY:  Your Honor, one final question.

14      Hopefully an easy one for you, though.

15                    Just in terms of scheduling, is it Your Honor's

16      expectation that you'll charge, we'll take a break, Tony

17      will go, we'll take another break, and then I'll go?  Or

18      play it by ear?

19                    THE COURT:  I'm thinking we'll take a break

20      after the charge, then you will proceed.  And I think you

21      can go one right after another.

22                    MR. MURPHY:  Okay.

23                    THE COURT:  I will be watching the clock and the

24      jurors to see whether we need another recess.  I'm hoping

25      that we can just do that no-more-than-two-hour chunk all
```

1    at one time, and then they will recess to go and begin

2    their deliberations and eat their lunch.

3              MR. MURPHY:  Sounds good.  Thank you.

4                      (Jury in, 9:19 a.m.)

5              THE COURT:  Good morning, ladies and gentlemen.

6    As members of the jury, you've now heard all of the

7    evidence and, at this point, I will instruct you about the

8    law that applies in this case.  You have a copy of those

9    instructions in a notebook.  You may follow along as I

10   read the instructions aloud.  You may write on your

11   copies.  You will be permitted to take them back into the

12   jury room or you can just listen.  And we do this because

13   people learn in different ways -- some learn fastest and

14   best by reading, some by listening -- and this way we do

15   it both ways to make this information as accessible to you

16   as possible.

17             My instructions will be in three parts.  I'm

18   going to discuss the general rules concerning the role of

19   the Court and the duty of the jury, then I'm going to go

20   over the issues in the case and set out the specific

21   questions that you will need to answer based on the

22   evidence at trial.  And, third, I will give you some rules

23   and guidelines for your deliberations.

24             Before we begin, I'm going to ask you to look in

25   the -- in your notebook for the document called, Jury

1    Verdict.  Make sure it is there.  And you will see as we

2    go along in these instructions how the instructions fit

3    into the verdict as a composite of your findings.

4         After I have given you the instructions, you

5    will hear the closing arguments of counsel, and then you

6    go back into your jury room to deliberate.  And then, when

7    you have finished your deliberation to the satisfaction of

8    all, you will use this verdict form to report your verdict

9    to the Court and the parties.

10        Now, as judge, I basically perform two functions

11   in the trial.  I decide what evidence you can consider, as

12   you've seen me do throughout the trial.  And, secondly, I

13   instruct you on the law that you are to apply to the facts

14   in the case.  These instructions are the governing law for

15   the case.  If any attorney states a law different from the

16   way I'm explaining it to you, please follow my

17   instructions as I give them to you now.

18        It is your duty to find from the facts all the

19   evidence -- to find the facts from all the evidence in the

20   case.  In reaching a verdict, you must carefully and

21   impartially consider all of the evidence in the case, and

22   then apply the law as I have explained it to you.

23        And you must do your duty as jurors regardless

24   of any personal likes or dislikes, opinions, prejudices,

25   sympathies.  In other words, you must decide the case

1    solely on the evidence before you, and you must do so

2    fairly and impartially.  You are, in fact, the judges of

3    the facts.

4         Now, talking about the burden of proof and

5    preponderance of the evidence, which you will concern

6    yourself with.  The plaintiff, Jessica Light, bears the

7    burden to prove her case by a preponderance of the

8    evidence as to every issue concerning whether the

9    defendants, New Haven Board of Education and Margaret-Mary

10   Gethings, should be liable to her and, if so, any amount

11   of money damages that these defendants must pay.

12        The one exception on this burden of proof is the

13   several affirmative defenses that the defendants have

14   raised to Ms. Light's claims of liability and define the

15   facts necessary to support those affirmative defenses.

16   It's the defendants that bear the burden of proof.

17        To establish a fact by a preponderance of the

18   evidence, a party must prove that the fact is more likely

19   true than not true.  A preponderance of the evidence means

20   the greater weight of the evidence.  It refers to the

21   quality and persuasiveness of the evidence, not to the

22   number of witnesses or documents presented.  If a party

23   proves a fact is more likely true than not true, even

24   slightly more true than not true, then she has proved that

25   fact by a preponderance of the evidence.

1          On the other hand, if the evidence does not

2    prove a fact is more likely true than not true or if the

3    weight of the evidence is exactly divided evenly between

4    the parties, then you must decide that fact against the

5    party who bears that burden of proof.

6          We often use the image of balance scales, and if

7    you can put the plaintiff's proof on one side and the

8    defendants' proof on the other side.  If the scales tip

9    even ever so slightly towards the plaintiff, then we say

10   she has preponderated in her proof.  Obviously, if it tips

11   toward the defendant even so lightly, then the

12   defendant -- then the plaintiff has failed to meet her

13   burden of proof.  If the scales remain in equipoise -- you

14   can't tell one way or another -- then the plaintiff has

15   failed to meet her burden of proof.

16         So in determining whether a fact has been proved

17   by a preponderance of the evidence, you may consider all

18   the testimony of all the witnesses, regardless of who

19   called them, all the exhibits received in evidence and

20   regardless of who may have presented them.

21         You may have heard of proof beyond a reasonable

22   doubt, as I mentioned when we started.  That's the

23   standard of proof for a criminal case where the government

24   has charged someone with a crime.  That requirement does

25   not apply to a civil case for money damages such as this

1    one, and you should not consider or discuss the

2    beyond-a-reasonable-doubt standard in your deliberations

3    because the proper standard here is preponderance of the

4    evidence.

5          I'll then move on to liability.  When I use the

6    term "liability," I'm referring to whether a defendant has

7    been proven to have breached a legal duty that was owed to

8    the plaintiff.  The question of liability is distinct from

9    the issue of damages, which are monies awarded to

10   compensate a plaintiff for any harms caused by a defendant

11   who has been found liable.

12         A jury cannot award any damages to a plaintiff

13   unless it first finds that the defendant has violated a

14   plaintiff's legal rights.  And, therefore, you must

15   consider the issue of liability before considering any

16   issue of damages.

17         I'm going to instruct you on damages in the next

18   section, but let's focus now only on Ms. Light's claim

19   that -- or, first, Ms. Light's claim that the New Haven

20   Board of Education violated her rights, which is Count One

21   under Section 31-51q of the Connecticut statutes.

22         Ms. Light alleges in this case that the New

23   Haven Board of Education retaliated against her for

24   exercising her rights to free speech as protected under

25   the federal and state constitutions in violation of

1    Connecticut General Statute 31-51q.  To prevail on her

2    claim, Ms. Light has the burden of proving by a

3    preponderance of the evidence the following three

4    elements:  One, that she engaged in speech protected by

5    the state or federal constitutions; two, that the Board

6    disciplined her; three, that there was a causal

7    relationship between Ms. Light's protected speech and the

8    Board's discipline.  Let me explain more about each of

9    these elements.

10           The first element, protected speech.  The

11   parties agree that this first element of this claim has

12   been satisfied and that Ms. Light's statements at the

13   Board of Education meetings and on Facebook are

14   constitutionally protected speech.  The other two elements

15   of Ms. Light's claim are in dispute.

16           To prove the second element of her claim,

17   Ms. Light must show that the New Haven Board of Education

18   disciplined her.  "Discipline" means an adverse material

19   action taken against Ms. Light by Ms. Gethings up to

20   May 2022.

21           It can also include a combination of lesser

22   facts that, in the aggregate, make the working environment

23   unreasonably inferior, hostile, or adverse to the employee

24   when compared to a typical or normal workplace.  However,

25   incidents that are infrequent and relatively minor don't

1    meet this standard.

2              If you find that Ms. Light has proven this

3    element of discipline by a preponderance of the evidence,

4    then you will proceed to the next element.  If you find

5    she has failed to prove that element, you will then enter

6    judgment for the Board on this count and proceed to the

7    next count, Count Two.

8              Causation is the third element.  Ms. Light must

9    also show that her protected speech was the cause of the

10   discipline.  The protected speech is the cause of her

11   discipline if it was a substantial factor or, to put it in

12   other words, a motivating factor in the discipline.

13             However, it need not be the only factor.

14   Ms. Light's protected speech was a motivating factor in

15   Ms. Gethings' decision to discipline her if that speech

16   played a substantial or important part in the decision.

17             A plaintiff may establish causation either

18   directly through a showing of retaliatory animus or

19   indirectly through a showing that the protected activity

20   was followed closely by the adverse action.

21             Since the plaintiff is required to prove

22   tangible proof of retaliatory animus, conclusory

23   assertions of retaliatory motive are insufficient.

24             If you find that Ms. Light has proven this

25   element by a preponderance of the evidence, then you will

1    proceed to evaluate the Board of Education's affirmative

2    defense.  If you find she has failed to prove this

3    element, you will then just enter judgment for the Board

4    on this Count One and proceed to Count Two.

5              So the affirmative defense is substantial

6    interference.  The Board of Education has advanced an

7    affirmative defense to Ms. Light's claim, that her

8    exercise of free speech rights substantially or materially

9    interfered with her bona fide job performance or the

10   working relationship between her and the Board.

11             For this affirmative defense, it is the Board of

12   Education -- not Ms. Light -- that bears the burden of

13   proof to prove the defense by a preponderance of the

14   evidence.  Moreover, you should consider this defense only

15   in the event you conclude in the first place that

16   Ms. Light has proven each of the three elements of her

17   claim of retaliation.

18             When assessing this element, you may consider

19   the extent of the disruption, if any, that you found

20   caused by Ms. Light's speech on workplace discipline,

21   harmony among coworkers, working relationships, the

22   employee's job performance, the responsibilities of the

23   employee within the agency, and whether the speech is made

24   publicly or privately.

25             If the defendant does prove by a preponderance

1    of the evidence that Ms. Light's exercise of protected

2    free speech rights substantially or materially interfered

3    with Ms. Light's job performance or with her working

4    relationship with the Board of Education, then the Board

5    will have proven its affirmative defense and you will

6    enter judgment for the Board on this count and proceed to

7    Count Two.  If you find that the Board has not proven its

8    defense by a preponderance of the evidence, you will enter

9    judgment for Ms. Light on this count and also proceed to

10   Count Two.

11        Count Two is the retaliation claim against

12   Ms. Gethings under 42 United States Code 1983.  Her claim

13   is against Ms. Gethings.  Ms. Light alleges that

14   Ms. Gethings retaliated against her for exercising her

15   right to free speech as protected by the Federal

16   Constitution, in violation of Federal Law 42, United

17   States Code Section 1983.

18        To prevail on this claim, Ms. Light must prove

19   by a preponderance of the evidence the following four

20   elements:  That Ms. Gethings acted under color of state

21   law; that Ms. Light engaged in protected speech; that

22   Ms. Light suffered one or more adverse employment actions,

23   and that there was a causal connection between Ms. Light's

24   protected speech and one or more of the adverse employment

25   actions.  Let me explain more about each of these four

```
1     elements.

2             The first and the second elements are agreed by

3     the parties to have been satisfied and proved by

4     Ms. Light.  They agree that Ms. Gethings was acting under

5     color of the authority of the State of Connecticut during

6     the events relevant to this case, and they further agree

7     that Ms. Light's statements at the Board of Education

8     meetings and on Facebook are constitutionally protected

9     speech.  So only the third and the fourth elements remain

10    in dispute.

11            The third element, adverse employment action.

12    To prove the third element of her claim, Ms. Light must

13    show by a preponderance of the evidence that she

14    experienced at least one adverse employment action by May

15    of 2022.  An adverse employment action means an action

16    that is taken by an employer against an employee that is

17    significant enough that it would deter a reasonable and

18    similarly situated person of ordinary firmness from

19    exercising his or her constitutional right to free speech.

20            If you find that an action was imposed in order

21    to retaliate against free speech and would deter a

22    reasonable and similarly situated individual of ordinary

23    firmness from exercising her constitutional right to free

24    speech, then you may conclude it was an adverse action.

25            On the other hand, harassment for exercising the
```

right of free speech is not actionable if it was unlikely
to deter a person of ordinary firmness from that exercise.
You may find that Ms. Light has satisfied this element if
she has proved that she experienced at least one
employment action of this sort.  You may also find that
Ms. Light has satisfied this element if she proves she
experienced a combination of seemingly minor incidents
that reached a critical mass.

In order to assess the impact of these more
minor incidents, you must consider whether the totality of
those incidents would objectively make the working
environment unreasonably inferior, hostile, or adverse to
the employee when compared to a typical or normal
workplace.

If you find that Ms. Light has proved this
element by a preponderance of the evidence, then you move
to the next element.  If you find Ms. Light has not proved
this element by a preponderance of the evidence, then you
will enter judgment for Ms. Gethings on this count and
proceed to Count Three.

Now, the fourth element is causation.  To prove
this fourth element, Ms. Light must show that her
protected speech was the cause of the adverse employment
action she experienced.  Protected speech is the cause of
the adverse action if it is a substantial factor or, put

1    in other words, a motivating factor in the adverse action.

2            Ms. Light's protected speech was a motivating

3    factor in Ms. Gethings' decision to take adverse action

4    against her if that speech played a substantial or

5    important part in the decision.  However, it need not be

6    the only factor.  A plaintiff may establish causation

7    either directly through a showing of retaliatory animus or

8    indirectly through the showing that the protected activity

9    was followed closely by the adverse action.  Again,

10   conclusory assertions of retaliatory motive are

11   insufficient.

12           If you find Ms. Light has proven this element by

13   a preponderance of the evidence, then you will proceed to

14   evaluate Ms. Gethings' affirmative defense.  If you find

15   that Ms. Light has not proven this element by a

16   preponderance of the evidence, then you will enter

17   judgment for Ms. Gethings on this count and proceed to

18   Count Three.

19           Ms. Light's next claim under Count Three is also

20   against Defendant Gethings.  Ms. Light alleges that

21   Ms. Gethings orally defamed her in violation of state law.

22   According to Ms. Light, Ms. Gethings accused her of

23   leaking another teacher's COVID-positive status and did so

24   in front of other people.  Ms. Gethings denies liability

25   and asserts an affirmative defense.

1          To prevail, Ms. Light has the burden of proving

2     by a preponderance of the evidence the following three

3     elements:  That Ms. Gethings published a defamatory

4     statement to a third person; that the defamatory statement

5     identified Ms. Light, and that Ms. Light's reputation

6     suffered injury as a result of the statement.  Let's go

7     into each of these elements.

8          Start with publication of a defamatory

9     statement.  To prove the first element of her claim, Ms.

10    Light must show that Ms. Gethings published a defamatory

11    statement about Ms. Light to a third person.  In other

12    words, a statement is published if it is heard by another

13    person.  A defamatory statement is a false communication

14    that tends to harm the reputation of another to diminish

15    the esteemed respect, goodwill, or confidence in which the

16    plaintiff is held to deter third persons from associating

17    or dealing with her or to excite adverse, derogatory, or

18    unpleasant feelings or opinions against her.

19          Statements claimed to be defamatory should be

20    given their ordinary meaning, which is the same meaning

21    that people of common and reasonable understanding would

22    give to them in the context and under all the

23    circumstances that were present at the time they were

24    made.

25          In determining whether a statement is

defamatory, you're not bound by the interpretation of the statement offered by the plaintiff or the defendant or any person hearing the statement.  If the meaning of the statement is unclear, it is your job as the jury to determine what meaning the statement was.

Second element of her claim, Ms. Light must prove that the statement was about her.

The third element, Ms. Light must show her reputation suffered injury as a result of Ms. Gethings' statement.  Here, the injury to Ms. Light's reputation must be of a material nature.  It must be of a pecuniary nature, meaning dealing with money.

If the plaintiff does prove that Ms. Gethings made the statement, however, she can't prevail if Ms. Gethings proved her affirmative defense that, in fact, the statement was true.

Ms. Gethings has the burden of proving that the statement was true.  To sustain her burden, Ms. Gethings must prove that the statement she made was true or substantially true as to the main charge or the gist of the statement.

Minor errors in an otherwise true statement do not make a statement false.  The statement must have been true or substantially true at the time they were made, not true at an earlier time or turn out to be true due to

1    circumstances that occurred after they were made.

2         If the defendant does prove by a preponderance

3    of the evidence that the statements she made were true or

4    substantially true at the time she made them, then she

5    prevails on her defense and your verdict should be for

6    Ms. Gethings.

7         So that concludes my instructions with respect

8    to liability.  Remember, you must first determine whether

9    Ms. Light has proven each of the elements of her claims

10   and, if you find that she has carried her burden, you will

11   consider if the defendants have proven an affirmative

12   defense they assert to each claim.

13        Let's move on to the issue of damages.  If and

14   only if you conclude that Ms. Light has proven by a

15   preponderance of the evidence that either the New Haven

16   Board of Education or Ms. Gethings are liable to her on

17   any of her claims, then you must decide how much, if any,

18   in money damages to award Ms. Light for injuries caused by

19   the unlawful conduct you found proved.

20        You should not interpret the fact that I am

21   providing you with instructions about how to calculate

22   damages as any indication that I believe Ms. Light has or

23   has not proven any of her claims.  That is exclusively

24   your province.

25        You should only award damages for those injuries

1    you find that Ms. Light has proven by a preponderance of

2    the evidence to have been proximately caused by the

3    conduct of a defendant that violated Ms. Light's rights.

4    An act or omission is a probable cause of an injury if it

5    was a substantial factor in bringing about a plaintiff's

6    injury and if the injury was a reasonably foreseeable

7    consequence of a defendant's acts or omissions.

8         Ms. Light must show that her injuries or damage

9    sustained would not have occurred without the unlawful act

10   or acts of a defendant.  If an injury was a direct or

11   reasonably probable consequence of an act or omission of a

12   defendant, then it was proximately caused by that

13   defendant's act or omission.  In other words, if that

14   defendant's acts or omissions had such an effect in

15   producing the injury that reasonable persons would regard

16   it as being a cause of the injury, then the act or

17   omission was a proximate cause.

18        You should apply your sound judgment and common

19   sense in reaching the proper amount of damages.  It is for

20   you in the exercise of your best judgment to say what is

21   just and fair compensation.

22        When assessing damages, please understand there

23   is no fixed formula for you to apply.  However, you should

24   not speculate or guess as to damages and under no

25   circumstances should you let sympathy, bias, or prejudice

1    affect your consideration of the law or the evidence.

2            The burden is on Ms. Light to prove by a

3    preponderance of the evidence each element and item of

4    damages she claims.  It is not the Board of Education's or

5    Ms. Gethings' burden to disprove them.

6            I will instruct you first on damages you might

7    award for either of the retaliation claims, and then as to

8    damages you might award in the defamation claim.

9            There are three categories of damages for you to

10    consider if you decide to award damages for the

11    retaliation claim:  Compensatory damages for economic or

12    emotional harm; two, nominal damages, and, three, punitive

13    damages.  Let me describe what each of these mean.

14            Ms. Light seeks two types of compensatory

15    damages.  She seeks damages for any economic losses.  Such

16    damages are compensation for pecuniary losses that may

17    include money actually spent on debts incurred as a result

18    of the injury, medical bills and expenses and/or lost

19    wages, earnings and benefits.

20            Second, Ms. Light seeks compensation for

21    noneconomic losses.  Such damages compensate for

22    nonmonetary injuries such as emotion pain and suffering,

23    humiliation, injury to reputation, anxiety, loss of

24    enjoyment of life and/or anguish that Ms. Light has

25    already experienced or is reasonably likely to experience

1    in the future.

2          You should award Ms. Light compensatory damages

3    for economic and noneconomic losses, so to make her whole

4    for any damages she may have suffered.  Ms. Light is not

5    required to prove losses with mathematical precision, but

6    only with as much definiteness and accuracy as

7    circumstances permit.

8          However, damages should not be based on

9    speculation or sympathy.  Your determination of

10   compensatory damages is to be what you find to be

11   reasonable in light of the evidence in this case and your

12   use of your common sense.

13         Now, we use the word "nominal damages."  If you

14   find that either of the defendants violated Ms. Light's

15   constitutional rights, but you find that she has failed to

16   prove any economic or noneconomic injury, then you must

17   award Ms. Light what we call nominal damages.  You can't

18   award both nominal and compensatory damages to her.

19   Nominal damages are awarded when a plaintiff has been

20   deprived by a defendant of a constitutional right, but has

21   suffered no economic or noneconomic damages as a natural

22   consequence of that deprivation.  And that's because the

23   fact that a person -- that a constitutional deprivation

24   occurred is in and of itself an injury to the person who's

25   entitled to enjoy that constitutional right, even if no

1    actual damages flow from deprivation of that right.

2    Therefore, if you find Ms. Light has proved no economic

3    emotional injury as a result of the defendant's conduct

4    other than a constitutional deprivation, you must award

5    nominal damages in an amount not to exceed $10.

6          And the third category is punitive damages.  If

7    you find that either the Board of Education or

8    Ms. Gethings violated Ms. Light's constitutional rights

9    and award Ms. Light either compensatory or nominal

10    damages, you may also in your discretion award punitive

11    damages if you find that Ms. Light has proved that they

12    are warranted under the standards I'm going to describe.

13          Punitive damages are awarded not to compensate a

14    plaintiff for an injury, but to punish a defendant for

15    extreme or outrageous conduct and to deter or prevent a

16    defendant and others like her from engaging in such

17    conduct in the future.

18          You may award Ms. Light punitive damages if you

19    find the facts or omissions of the defendants reveal a

20    reckless indifference to the rights of others,

21    maliciousness, or an intentional and wanton violation of

22    those rights.  An act or an omission is malicious if it is

23    prompted by ill will or spite towards Ms. Light.  An act

24    or omission is wanton if it is done in a reckless or

25    callous disregard of or indifference to the rights of

1    Ms. Light.

2          "Recklessness" is a state of consciousness with

3    reference to the consequences of one's act, but to find

4    that there must be something more than a failure to

5    exercise a reasonable degree of watchfulness to avoid

6    danger to others or to take reasonable precautions to

7    avoid injury to them.

8          Ms. Light has the burden of proving by a

9    preponderance of the evidence that the defendants acted

10   maliciously, wantonly, or recklessly with regard to her

11   rights.

12         If you find by a preponderance of the evidence

13   that the defendants acted with malicious intent to violate

14   Ms. Light's constitutional rights or unlawfully injure her

15   or that the defendants acted with a callous or reckless

16   disregard of Ms. Light's rights, then you may award

17   punitive damages.

18         An award of punitive damages, however, is

19   discretionary.  That is, if you find the legal

20   requirements for punitive damages are satisfied, then you

21   may decide in your discretion whether to award punitive

22   damages or not award them.  In exercising your discretion,

23   you should consider the underlying purpose of punitive

24   damages, to punish a defendant for outrageous conduct or

25   to deter the defendant and others from performing similar

1    conduct in the future.  Thus, in deciding whether to award

2    punitive damages and what should be the amount of those

3    punitive damages, you should consider whether defendants

4    may be adequately punished by a compensatory damages award

5    or whether the conduct is so extreme and outrageous that

6    compensatory damages are inadequate to punish defendant's

7    wrongful conduct.

8            You should also consider whether the damages

9    award is likely to deter or prevent defendants from again

10   performing such wrongful acts or whether punitive damages

11   are necessary to provide deterrence.

12           And, finally, you should consider whether

13   punitive damages are likely to deter or prevent other

14   persons from performing wrongful acts similar to those

15   that the defendants have been shown to have committed.

16           If you decide to award punitive damages against

17   either defendant for violating Ms. Light's constitutional

18   rights, you must also fix the amount of those damages.

19           Now, I want to instruct you on the damages that

20   you might award for Ms. Light's defamation claim against

21   Ms. Gethings.  There are three categories of damages for

22   you to consider if you decide to award damages for the

23   retaliation claim:  Special damages, general damages, and

24   punitive damages.  Let me describe each of them.

25           As I have previously told you, to recover for

1    defamation in this case, Ms. Light must prove to you that

2    she incurred special damages, that is, an injury or a loss

3    caused by the publication of the defamatory statement.

4    You should award Ms. Light special damages so as to make

5    her whole for any actual injuries or losses she may have

6    suffered.

7            Ms. Light is not required to prove losses with

8    mathematical precision, but only with as much definiteness

9    and accuracy as circumstances permit.  Your determination

10   of special damages is to be what you find reasonable in

11   light of the evidence in the case.

12           If you award her special damages, then you may

13   also award her general damages that she has proved by a

14   preponderance of the evidence.

15           General damages compensate the plaintiff for

16   injury to her reputation and for the humiliation and

17   mental suffering which the defamation caused her.

18           In determining the amount of general damages to

19   award for the injury to plaintiff's reputation, you should

20   consider what reputation the plaintiff had in the

21   community when the statement was made.  You should

22   consider all the circumstances surrounding the making of

23   the statement.  You may also compensate the plaintiff for

24   damages that she will be reasonably likely to incur in the

25   future.  These damages can include additional damage to

1    her reputation that occurs as a result of bringing this

2    lawsuit.

3            If you find Ms. Gethings violated Ms. Light's

4    rights and you award Ms. Light damages, you may also in

5    your discretion award punitive damages if you find that

6    Ms. Light has proved that they are warranted under the

7    standards I'll describe.

8            In order to recover punitive damages, Ms. Light

9    must prove that Ms. Gethings' defamatory statement was

10   made with actual malice.  Moreover, Ms. Light must prove

11   actual malice by clear and convincing evidence, which is

12   higher than preponderance of the evidence and which

13   denotes a degree of belief that lies between the belief

14   that is required to find the truth or existence of the

15   issuable fact in an ordinary civil action and the belief

16   that is required to find guilt in a criminal prosecution.

17           If Ms. Light has not shown by clear and

18   convincing evidence that the defamatory statement was made

19   with actual malice, you may not award punitive damages.

20           All right.  A couple more instructions for you.

21   This evidence is undisputed that Ms. Light has been

22   diagnosed with post-traumatic stress disorder, PTSD, prior

23   to any potential wrongful acts by the defendants.

24   However, if Ms. Light has proved by a preponderance of the

25   evidence that any wrongful acts of either defendant

1    substantially contributed to the worsening or

2    re-triggering of her PTSD, then Ms. Light may recover for

3    all the damages she sustained as a result, even if

4    Ms. Light's preexisting PTSD made her more vulnerable to

5    those damages or made those damages more severe.

6            All right.  At the beginning of the trial, I

7    advised you that only -- the only evidence in the case was

8    the evidence that was presented by means of witness

9    testimony and documentary exhibits that were introduced

10   during the trial.  I told you the attorneys' questions and

11   statements and arguments are not evidence.

12           The two types of evidence that you may properly

13   use in reaching your verdict, direct and circumstantial.

14   I'd like to give you an illustration of what

15   circumstantial evidence is since direct evidence is

16   self-explanatory.

17           Let's say you came in here this morning and the

18   sun was shining.  Now, you can't look out of these windows

19   during the trial to see if anything has changed.  But if

20   you saw some people coming in the courtroom with dripping

21   raincoats or wet umbrellas, you could infer without direct

22   proof that there had been a change in the weather and it

23   was now raining.  And that's all that's meant by

24   circumstantial evidence.  You may find a fact to exist

25   from other facts that you find proved.

1          The law doesn't make a distinction between

2    direct and circumstantial evidence.  It just requires that

3    your verdict be based on a preponderance of all the

4    evidence.

5          Witness credibility.  You've had the opportunity

6    to observe all the witnesses, and it is now your job to

7    decide how believable each witness was in their testimony.

8    You are the sole and exclusive judges of the credibility

9    of each witness and the importance of their testimony.

10   And, in making these judgments, you should carefully

11   scrutinize all of the testimony of each witness, the

12   circumstances under which each witness testified, and any

13   other matter in evidence that may help you decide the

14   truth and the importance of each witness's testimony.

15         So how do you determine truthfulness?  You base

16   it on what you have seen and heard.  You watched the

17   witness testify.  Everything a witness says or does on the

18   witness stand counts in your deliberation, in your

19   determination.  You use all the tests for truthfulness

20   that you would use in determining matters of credibility

21   in your everyday lives.

22         You should consider any bias or hostility the

23   witness may have shown for or against any party as well as

24   any interest the witness has in the outcome of the case.

25         You should consider the opportunity the witness

1    had to see, hear, and know the things about which he or

2    she testified, the accuracy of a witness's memory, his or

3    her candor or lack of candor, the reasonableness and

4    probability of that witness's testimony, its consistency

5    or lack of consistency, and its corroboration or lack of

6    corroboration with other credible witnesses.

7            Your verdict must be based solely upon the

8    evidence developed at this trial or the lack of evidence.

9    Bear in mind, all litigants are equal before the law.  You

10   should not, therefore, consider any personal feelings you

11   may have about the race, religion, national origin, sex,

12   age, wealth, lifestyle, or other features of the parties.

13   You have been chosen to try the issues of fact and reach a

14   verdict on the evidence presented here.  If you let

15   sympathy or prejudice interfere with your clear thinking

16   about the facts, there is a risk that you will not arrive

17   at a just verdict.

18           Now, in just a bit, we will be hearing the

19   closing arguments of counsel.  I will then give you a few

20   concluding instructions after the summations.  Please

21   remember, what the lawyers say in their closing arguments

22   is not evidence, but it is argument about what the

23   evidence shows, in their opinion.  Their credibility is,

24   of course, not an issue that should enter into your

25   decision in this case because they're not witnesses and

```
1    they don't have personal knowledge of what has happened.

2              So, at this time, we will take a brief break, a

3    15-minute break.  We will come back and you will hear the

4    arguments of counsel, starting with the plaintiff, and

5    then we will conclude with a few remaining instructions

6    and lunch.

7              Thank you very much.  You are excused.

8                   (Jury out, 10:09 a.m.)

9              THE COURT:  All right, counsel.  Anything

10   further before we recess?

11             MR. INTERLANDI:  No, Your Honor.

12             THE COURT:  All right.  We'll be back at 10:25,

13   start with the plaintiff.

14             MR. INTERLANDI:  Yes.

15             THE COURT:  Please make your arrangements to

16   rearrange the courtroom for your closings and any exhibits

17   you intend to use during your closings right now so that

18   they don't delay your closings.  You each have an hour.

19   The plaintiff may divide that hour as counsel sees fit.

20   If you want to advise me on approximately how you are

21   making that division, I will be able to guide you on when

22   you have reached that time limit.

23             MR. INTERLANDI:  Okay.

24             THE COURT:  Okay.

25                   (A brief recess was taken.)
```

1          THE COURT:  All right, counsel.  We will bring

2     in the jury, then Mr. Interlandi will proceed.

3          MR. INTERLANDI:  Yes.

4                    (Jury in, 10:30 a.m.)

5          THE COURT:  Please be seated, ladies and

6     gentlemen.  We'll proceed next with closing argument by

7     Mr. Interlandi on behalf of the plaintiff.

8          You may proceed.

9          MR. INTERLANDI:  Thank you, Your Honor.

10          Members of the jury, good morning.  As you know,

11     my name is Anthony Interlandi and I represent the

12     plaintiff, Jessica Light.  I wanted to thank you for being

13     here and thank you for your attentiveness during the week.

14     On Monday, I spoke to you and we talked about the freedom

15     of speech and the fundamental rights and civil liberties

16     that were given to us by the Founding Fathers and the

17     framers of the constitution.

18          Jessica Light has and had a right to be an

19     advocate without retaliation, without bullying, without

20     fear, without roadblocks being put in her place, without

21     having the well being poisoned.  Jessica had a right to

22     speak at public meetings and to make comments on Facebook.

23     The defendants have agreed that that conduct is protected

24     speech.

25          Jessica had a right to be in a working

1    environment that was safe for herself and for the students

2    that she taught.  She had a right to speak up about safety

3    and issues during COVID without fear of retaliation.

4    Otherwise, herself, her colleagues, her family and, most

5    importantly, her students would not be safe.

6              I'm going to give you an outline of where I'm

7    going to go with this closing statement to you.  I'm going

8    to talk a little bit about the disputed issues in the

9    case, then I'll talk about the evidence that was proven by

10   a fair preponderance of the evidence -- and, again, if you

11   recall, that is if you have the scale in front of you

12   tipping ever so slightly in one party's favor, that party

13   is successful.

14             After we talk about the evidence, I will talk to

15   you a little bit about the law, the law that Judge

16   Arterton has already discussed with you, and I will apply

17   the law with the evidence that we have shown.

18             Finally, I'll get to the damages.  Like I said

19   on Monday, once I've talked to you about the evidence and

20   shown that we've proven our claims by a fair preponderance

21   of the evidence, that would be the time when I would come

22   back to you to ask for fair compensation for the injuries

23   suffered by Jessica Light.

24             So, as you've heard, there are some issues in

25   dispute in this matter.  And what we are focusing on would

1    be discipline, adverse employment action, and a causal

2    link.  There's also a dispute about the defamatory

3    statement that was made and whether or not there was any

4    harm to Jessica's reputation.

5            I'm going to show you a timeline that we've

6    created.  The timeline will include the timeline of the

7    case with the exhibits and facts that have been presented

8    in evidence.

9            Before I get there, the defendant -- the

10   defendants are going to come to you, and what they've done

11   throughout this week is try to attack Ms. Light and show

12   you or tell you that she was a bad person, that she sent

13   text messages or messages to a friend, a close friend --

14   unguarded messages, a handful of messages that were

15   provided to the Court over many months, possibly years, of

16   communications with her friend -- that she provided

17   information by forwarding it to herself and to a friend,

18   and that she recorded meetings.

19           You heard Ms. Gethings say it was a good thing

20   that Jessica recorded those meetings, and I would agree

21   because we have them here in the case.  Jessica didn't do

22   anything that is bad.  She communicated with a friend.

23   She recorded meetings to protect herself.  She felt she

24   needed to.  They're going to tell you that she has thin

25   skin.  This is a woman that worked in the Bronx, got a

```
 1   master's at Columbia in New York City, and has worked in
 2   the New Haven Public Schools system for many, many years.
 3   She's currently working at another school that is in an
 4   area that is suffering more poverty than Hooker.
 5           They'll also tell you she has thin skin because
 6   of her past, past trauma.  But, as you saw in one of the
 7   defendants' exhibits, Ms. Light forwarded an article to
 8   her union president, an article that mentioned Jessica was
 9   outspoken.  She had spoken up for teachers' rights.  She
10   had spoken up for funding and she had spoken up on safety
11   protocols.  Could someone with such thin skin do such a
12   thing and put herself out there like that?
13           They're also going to tell you that she's still
14   employed.  So what?  She still works there.  Not at
15   Hooker, at another school.  She still makes the same
16   money.  What's the big deal?  The school that she's at
17   now, Ross Woodward, is in a different area.  It's in an
18   impoverished area.  She does not have, as she testified,
19   money for supplies for the children.  She's doing her best
20   in the situation that she's presented.
21           So let's get back to the timeline.  It all
22   starts with COVID.  We're going to flashforward to July of
23   2020 where Ms. Light's union provides a letter.
24           Oops.  Let me try to get that back.  It must
25   have timed out.
```

1              So we're back.  And this letter is letting

2      teachers know that during COVID, their speech is

3      protected.  Raising concerns about COVID is protected.

4              Next, we get into the beginning of that school

5      year.  And you heard testimony from Ms. Gethings, Jessica,

6      and others that there was discussion about whether or not

7      they should return back to in-person or have a hybrid

8      model or a remote situation.  There was differences of

9      opinion.  You heard that through testimony.  You hear

10     Jessica testify that she attended a parent meeting and

11     that Ms. Gethings listened to that meeting.  You heard

12     testimony that there was a meeting with Jessica and

13     Ms. Gethings.  And Ms. Gethings admitted when I asked her

14     on cross that she had heard -- she told Jessica, I heard

15     you speak many times.  She testified that she received a

16     message from her superiors that they needed to, get

17     yourselves together.  And she testified on that stand that

18     Jessica's speaking made her feel uncomfortable with

19     Dr. Tracey.  That's in November 2020.  The fuse is lit and

20     it's burning.

21             We move forward in our timeline to January,

22     January 2021.  This is an exhibit from the defendants,

23     Exhibit A, and the meeting -- I'm sorry, they're Board of

24     Ed meeting minutes, and these are Jessica's comments.

25             In January 2021, there was uncertainty, as you

1    can imagine.  We are less than a full year into COVID.

2    You heard testimony from Jessica as well as Mr. Shortt

3    that -- and, actually, Ms. Gethings -- there was still

4    some uncertainty, and not everyone had the same ideas

5    about returning.  There was some discord.  This is an

6    email that we presented in evidence, and that is Exhibit

7    45.  And I would recommend that you take notes when you

8    hear these exhibits being read out because, obviously, you

9    will not have this in front of you and it will be

10   important, I think, to organize exhibits.

11           This is an email that Jessica received from her

12   union representative -- specifically, David Cicarella --

13   who said in this email, "However, we all agree that an

14   essential agreement for safe school reopening is a

15   reference guide that addresses the most common operational

16   questions and scenarios."

17           Jessica's employer knew that she was an

18   advocate.  Her supervisor knew she was an advocate.  In

19   fact, the defendant, New Haven Board of Education

20   Superintendent, Dr. Tracey, put out a request for teachers

21   in the district to go speak on the school's behalf at the

22   state legislature.  And who stepped up?  Jessica Light.

23   She stepped up and provided testimony and sent that back

24   to her superiors.  And you'll find that in Exhibit 41, an

25   email of Jessica's testimony.

```
 1              Now we get to March and the Facebook post that
 2     you guys have heard so much about and the two comments
 3     that we talked about, the two comments that Ms. Gethings
 4     confirmed on the stand yesterday.  "I don't think letters
 5     were sent," by Jessica, and then Jessica, in response to a
 6     question, said, "Hooker never sent a letter."
 7              As you can see in this post -- this is a post
 8     from Melody Gallagher on March 9, 2021.  In this post,
 9     Ms. Gallagher is saying, "Apparently, these are the
10     schools that have had positive student COVID cases in New
11     Haven Public Schools since January 19th" -- which, by the
12     way, was the date of returning to in-person learning.
13              She went on to say that she believed this list
14     is to be read that if a school is listed as less than six,
15     they had positive cases that week and that may mean one,
16     two, three or four or five positive cases.  If she was
17     reading it wrong, please let her know.
18              You heard Ms. Gethings testify she saw this
19     post.  A handful of teachers saw it, too, and told her
20     about it.  She screenshotted it and sent it to her.  Not
21     one teacher from Hooker went to this post and added
22     comments to say, Melody Gallagher, you got it all wrong,
23     that's not what this means, or, hey, Jessica, you
24     shouldn't have said that, this is wrong, this is
25     misinformation, they didn't have to send the letter.
```

1          This is the post that comes up multiple times in

2    our timeline.  Our timeline proceeds and you see here in

3    Exhibit 3 an email from Ms. Gethings to the Hooker School

4    community a few days following the social media comments

5    by Jessica.  She says, "it has been brought to our

6    attention from several community members, including staff

7    and parents, that WHS," Worthington Hooker school, "is

8    being mentioned with inaccurate information."  And she

9    goes on.  The next paragraph toward the bottom of this

10   email says, "Please rest assured that if there is a COVID

11   outbreak at Worthington Hooker School, you will be

12   notified.  If a staff member contracts COVID-19 outside of

13   school, the health department determines the timing of

14   exposure based upon the staff member's last time in the

15   building."

16        When I asked Ms. Gethings on the stand

17   yesterday, she admitted that this post was about Jessica

18   Light.

19        Jessica spoke at a Board of Education meeting on

20   March 22, 2021.  At that Board of Ed meeting, Jessica was

21   looking for a unified policy for not just Hooker, but the

22   district as a whole.  And the question that she had asked

23   about 3 feet of distancing for students was just an

24   example.

25        Ms. Gethings heard her comments at the Board of

1    Ed meeting and sent her an email that evening, letting her

2    know she heard her and asking her, essentially, why didn't

3    she wait. Because, according to the defendant,

4    Ms. Gethings, they requested that Jessica get answers from

5    the school level first. The request, however, cannot and

6    should not abridge or stop Jessica from making public

7    comments, and that's exactly what she tried to do.

8            Next in our timeline is the mid-year teacher

9    evaluation, March 26th. So we have the March 9th Facebook

10   post with Jessica's two comments -- public speech -- and

11   we get to a mid-year meeting, a mid-year meeting that is

12   traditionally a 15-minute block of time. You heard

13   Jessica testify in that regard. This meeting, however,

14   lasted way longer than that. Topics included Judy

15   Cavanaugh as well as the Facebook comments.

16           We do have the transcript and it is a full

17   exhibit, Exhibit 24, of the teacher evaluation meeting

18   attended by Jessica, Defendant Gethings and Jenny Clarino.

19   Page 11 at lines 14 to 15, Ms. Gethings states to Jessica,

20   "But I do want you to know I know you won't be teaching

21   third grade."

22           You heard Jessica testify on Monday that this

23   was the first time she learned that she was going to be

24   part of a reassignment or a reshuffling of teachers. Less

25   than a month after her Facebook comments, less than a

1    month after the email that followed to the school

2    community by Ms. Gethings.

3            On page 13, Ms. Clarino told Jessica, if you had

4    to, if you choose, K, 1, or 2, you would want second

5    grade?  And Jessica responded yes.  As you've learned

6    through this trial, she was not given second grade; she

7    was given first grade.

8            Ms. Gethings, as you heard testimony from

9    herself as well as Jessica, her office is in the big

10   building and Ms. Clarino is in the little building which

11   has kindergarten through second grade.  This was a way to

12   get Ms. Light out of Ms. Gethings' hair.

13           Page 18, lines 23, over to page 19 through line

14   3, Ms. Gethings says, "I can speak to that we are

15   anticipating a written statement from Ms. Cav,"

16   Ms. Cavanaugh, "who is -- had -- feels that she has a

17   complaint about you.  And I don't think that -- I don't

18   think this has been brought to you from her because it's

19   all relatively new."

20           Finally, on page 19, lines 11 through 14,

21   Ms. Gethings says, "I saw it myself.  There was pieces

22   where you were commenting on Facebook that our school

23   didn't send out letters.  Do you know what I'm referring

24   to?"

25           Again, typically, a 15-minute meeting, mid-year

1    meeting to discuss the teacher's performance, turned into

2    something much different.

3         Next in our timeline, you'll find Exhibit 25.

4    This is the transcript of the meeting where we had present

5    Ms. Gethings, Ms. Clarino, Ms. Morrison, Ms. Cavanaugh

6    and, of course, Jessica.  And this is where we have the

7    false statement, we claim to be a false statement, made

8    about Jessica in a room where other people heard it.

9         "We hear that you're saying it wasn't you, but I

10    need you to know that every person said you were the

11    source," the source of Ms. Cavanaugh's COVID-19-positive

12    status.  From earlier in the school year, February, there

13    was testimony from Ms. Light that Ms. Cavanaugh missed

14    time.  There was also testimony from Ms. Gethings that

15    Ms. Cavanaugh missed time in February of 2021.  Every

16    person.  You heard from Ms. Gethings herself, there was

17    not one person who told her specifically, it was Jessica.

18         What you heard her testify about was

19    Ms. Cavanaugh thought it was Jessica, and there was this

20    Facebook post where she commented on it.  That's the

21    testimony.  That's the evidence.  It's undisputed that

22    this statement was said in a meeting with four other

23    people.

24         Next, we have Exhibit 4, which is a few days

25    later, okay?  The fuse was lit and Ms. Gethings was ready

1    to explode.

2            We have the Facebook -- I'm sorry.  We have the

3    T-Eval feedback.  And in the "feedback" section, you heard

4    Jessica testify that when she would apply or in the past

5    had applied for other positions, administrators at those

6    schools would review these T-Eval evaluations.  In here,

7    Ms. Gethings asked, "As we discussed in your mid-year,

8    please consider asking questions anytime you have a

9    concern.  If we do not have the answer, we will do our

10   best to attain the answer."

11           The defendants are going to argue, and they have

12   been, that this is so minor, what's the big deal?  You

13   heard the judge talk about the law.  And what we are able

14   to do is connect these minor or lesser events to establish

15   a critical mass, to establish an adverse employment

16   action.

17           We are not claiming a termination or a

18   suspension.  What we're claiming is an environment that is

19   inferior, an environment that put Jessica in fear, an

20   environment where she didn't know what was going to happen

21   next or what next accusation might come or from whom.

22           You heard Jessica testify on the stand how she

23   was feeling after each event hopeless, isolated.  She felt

24   like she couldn't talk anymore.  She went from the

25   outspoken advocate to a shell of herself, afraid to do

1    just about anything.  As you heard her husband testify,

2    the family was thriving before this.  And after, he had to

3    pick up a lot of the slack at home.

4              Now we get on to the committees.  I want you to

5    focus in on Exhibits 9 and 10.  I know it might sound

6    trivial or minor, but when you look at these documents,

7    Exhibit 9 and 10, you'll see Ms. Gethings' response to

8    Jessica's concerns, but you'll also see Jessica's response

9    which Ms. Gethings testified she received.  These

10   communications were after the April 20th meeting that the

11   parties had to discuss the committees.  And, of course,

12   other things came up as well, such as the Facebook

13   comments.

14             So Jessica gets to a point, as you heard in her

15   testimony, that she just couldn't take it and she had to

16   protect herself and she filed a complaint.  She filed a

17   complaint against her administrators.  And I want you to

18   focus in on Exhibits 5 and 38.  Thirty-eight is an email

19   string beginning with the April 30th email to HR that

20   attached the complaint that you'll see in Exhibit 5.

21   Yeah, it's-single spaced and, yeah, it's 12 pages.

22             A few weeks later, within a few weeks, Ms. Alden

23   files a list of concerns, a complaint against Jessica.

24   Paragraph 5, number 5 on page 2 of Exhibit 6 references an

25   email that Jessica's husband had sent to the

administrators at Hooker in December of 2020.  Ms. Alden
had this in her back pocket.  The administrators knew
because they told her about the email.  You can infer
that, but I believe Ms. Gethings testified as to that
fact.  How else would Ms. Alden know?  And so she waited,
and then Ms. Light filed her complaint against
Mses. Gethings and Clarino.  And then we have this list of
concerns.  And that was taken up by HR.  Again, Exhibits 6
and 7, you will see Jessica's response to every concern
set forth by Ms. Alden.  And, as you heard through
Jessica's testimony, there was no discipline received for
her, for Jessica.

You heard Ms. Maffuid on that witness stand tell
you that there was a dismissal in May of 2021 and that
Jessica needed to use the restroom.  She offered to help
so Jessica could go to the bathroom.  She testified that
it was common.  She also testified that the next day, she
was called into a closed-door meeting with Ms. Gethings,
the same person who's her supervisor still to this day.

In Exhibit 37, you'll see an email, an email
that Jessica sent to Taryn Bonner.  That email spells out
the incident regarding dismissal and how she felt and the
email, particularly, that she received from Ms. Gethings
later on that day, asking her where she was and that she
should do the dismissal according to the proper procedure,

```
1    which Jessica claimed she did.
2              So we're in our timeline.  Again, we started
3    back in July of 2020 and we're within full COVID pandemic.
4    We get to March 9, 2021, that's the Facebook post,
5    March 2022, the Board of Education meeting.  And then
6    March 26th, the teacher evaluation meeting.  March 31st,
7    the meeting with Ms. Cavanaugh where the false statement
8    is made.  April, we're talking committees.  We're also
9    still talking about the Facebook comments.  May, Phyllis
10   Maffuid and the dismissal issue and Jessica being sent an
11   email.
12             We get to June, June 7th.  The administrators
13   file a retaliatory complaint.  It includes an accusation
14   that Jessica breaches confidentiality.  They provide a
15   bunch of documentation to support their position.  That is
16   also investigated by human resources for the defendant,
17   New Haven Board of Ed.
18             So, by June 7, 2021, there are three pending
19   implants:  One against the administrators by Jessica; two,
20   Ms. Alden's list of concerns focused on Jessica, mostly as
21   a parent; three, the complaint, the retaliatory complaint
22   that the administrators filed against Ms. Light.
23             They didn't just respond to her allegations;
24   they made accusations against Ms. Light.  This is a
25   pattern.  This is an inferior workplace.  This is hostile.
```

1          In Exhibit 12, you'll see Ms. Light looking for

2     some answers.  She wants to know what's happening next.

3     Exhibit 12 is an email to Ms. Bonner.  Ms. Bonner, who's

4     on the witness stand.  She didn't agree that she used the

5     word "tainted," but she did agree that she found something

6     professionally concerning to her as it related to

7     Ms. Gethings when she contacted the witness that she would

8     have interviewed, someone that was on her witness list.  I

9     believe Ms. Gethings used the word "obstructed" on the

10    witness stand.  And then the investigation was outsourced,

11    outsourced to a law firm to do an investigation, to take

12    over the investigation.  And in this email, Jessica lists

13    the events to her that she felt was continuing

14    retaliation, and you'll see that in Exhibit 12.

15         So the school year is over, 2020/2021 school

16    year.  Jessica is in the summer months.  She's got to get

17    prepared for teaching first grade.  You hear her testify

18    that there was no help.  She had to look for it on her

19    own.  She was preparing herself to teach first grade at

20    the same school, different building, under the watchful

21    eye of Ms. Clarino.

22         You heard from Mr. Paul Salem, who is Jessica's

23    former third grade partner.  You heard that as he was

24    preparing for the new year in his classroom, getting ready

25    for the students, the third graders, he found an email, an

1    email from Jessica's husband to the administrators

2    concerning Jessica's son, Wesley.  He didn't know how it

3    got there.  People had not printed to his printer before.

4    He reached out to Jessica because he recognized the name.

5    Jessica immediately got over there and got the email.

6           This is an email that was sent to the

7    administrators.  Administrators of Hooker, not anyone

8    else.  But it ended up on Jessica's former grade level

9    partner's printer in his classroom.  The building leader,

10   Ms. Gethings, who had been from at least 2019, didn't know

11   that teachers had printers in their classrooms.

12          Jessica continues to look for answers and

13   follows up with Ms. Bonner concerning the pending

14   investigation.  Jessica asks for the timeline.  Ms. Bonner

15   replies and says, "I am interested in your thoughts or

16   suggestions on specific protective measures to support

17   your productive return to work in light of the pending

18   investigation."  That's Exhibit 11.

19          As you heard Ms. Bonner here yesterday

20   testify -- or maybe the day before -- she testified that

21   she sent an email to Jessica with a draft, Rules of

22   Engagement.  You'll find that in Exhibit 13, Plaintiff's

23   Exhibit 13, where she sent a draft.  She testified that

24   the administrators or Jessica did not sign off on this and

25   there was no rules put in place before Jessica returned to

1    teach first grade for the first time at Hooker.  Jessica

2    went into it and did the best she could.  She prepared her

3    classroom and she started teaching first grade.

4        Then you heard from Mr. Tim Shortt, a former

5    teacher at Hooker.  He testified about becoming a union

6    steward, running for that position against Ms. Morrison,

7    the same Ms. Morrison who was at the March 31, 2021,

8    meeting with Ms. Cavanaugh.  She was there on behalf of

9    Ms. Cavanaugh as Ms. Cavanaugh's union representative.

10        Mr. Shortt won the election.  He became the

11    union steward.  He testified that the administrators told

12    him they heard through the grapevine that people were

13    concerned that he was teaming up with Jessica -- and I'm

14    paraphrasing -- to take down the administration.  You hear

15    him say he was upset.  He was so upset, he considered just

16    giving it up until his wife talked him out of it.  And

17    what did he do when he got this information?  He went to

18    Jessica and told her.  He told her what the administrators

19    told him.  And this is in October of 2021.

20        So what happened to Jessica?  Did she finish

21    first grade?  Did she finish teaching?  No, at least not

22    for that year.  She had to take a leave of absence.  You

23    heard Ms. Ventura up on that stand.  You heard that she

24    took the certification letter or notice and completed it,

25    specifically the part where she entered, "Complex PTSD

being triggered by hostile work environment, increase in
anxiety, depression, intrusive thoughts, lack of sleep and
difficulty concentrating."  As a result, Jessica went out
on a period of leave pursuant to the Family and Medical
Leave Act.

But, as you heard Jessica testify, she had to
use her sick days.  Jessica testified that in total, she
used 66 sick days.  And, just for reference, Exhibit 14,
you'll find the certification that was completed by
Ms. Ventura.

As we move forward in the timeline -- everything
connecting -- there's an email.  Again, Jessica looking
for answers, looking for the status of the investigation.
When will my claims, when will my voice be heard?  She
says, "Not just each month, week, or day, but each hour,
minute of waiting is painful."  Each hour, minute of
waiting is painful.  That's in an email she sent to the HR
representative for the New Haven Board of Education.
You'll find that in Exhibit 35.

Jessica emails again.  She's looking for next
steps.  We're getting towards the end of 2021.  Her
complaint was filed on April 30, 2021.  And she sends this
email to various people, including Ms. Goldberg, the
attorney at Berchem Moses who is conducting the
investigation of Jessica's complaint against the

1    administrators.

2              Exhibit 36.  Jessica had her leave expire, but

3    it was extended, and there was testimony in that regard.

4    Exhibit 34, you'll find an email, and Exhibit 46, finally,

5    we have the official complaint reports.  That's an exhibit

6    that has been redacted.  Exhibit 46 is where Jessica

7    informs HR, among other things, "I have incurred therapy

8    bills for PTSD triggered by a hostile workplace and

9    attorney services."  And that was on December 9, 2021,

10   Exhibit 46.

11             So we get to 2022, and Jessica is not back yet.

12   She's not back because her medical treaters, the folks

13   looking and discussing issues relating to Jessica's

14   wellbeing, to Jessica's mental health, they don't feel

15   it's safe for Jessica to return to work in early 2022

16   without appropriate safeguards.

17             Ms. Ventura testified about the letter she

18   prepared and signed in Exhibit 17.  This is a letter that

19   she said she prepared in January 2022.  In this letter,

20   she says, among other things, "The increase in care were

21   made to better address her exacerbated symptomology due to

22   the experience of her work environment as harmful."

23   Increases in care.  Exacerbated symptomology.  Jessica is

24   able to resume working on a full-time basis, provided

25   appropriate safeguards are put in place.

1          So you heard about this meeting, the meeting on

2     January 14, 2021.  And there's a transcript of that, and

3     you'll find that Exhibit 27.  Ms. Mack, who's the head of

4     HR for the New Haven Board of Education, said, "But with

5     regards to your request for your restoration of your sick

6     days," 66 or more -- I'm sorry, or less at that time --

7     "sick days, returning you back to the third grade next

8     year and a restorative counsel, I have information on all

9     three of those, she says."

10          You heard Jessica testify that third grade was

11    not agreed upon and they did not agree to restore her sick

12    days.  Ms. Blatteau was the union president who took over

13    for David Cicarella.  She said, "So, as the union

14    representation for Jessica, we, you know, fully support

15    her in seeking some safeguards if she is to return to

16    work."

17          You also heard in this courtroom from

18    Mr. DeLucia, the former vice president of the union.  On

19    Monday, I told you he was going to testify and he was

20    here.  He told you that Jessica was in the heat of the

21    battle.  He was there to listen to her concerns.  He was

22    there when she was being interviewed regarding the

23    investigation with Ms. Goldberg.  He was someone who

24    listened.  He said, "So, just to make sure, if I could.

25    So, for some reason, things are delayed and we don't hear

1    back, then Jessica will not be reporting on Tuesday.  Is

2    that where we're landing here, so everybody is on the same

3    page?"  Because they couldn't agree on safeguards.  But

4    Ms. Mack said, "I don't know that our office is landing on

5    that."  And Ms. Light responded, "Well, I'm landing on

6    that right now, taking a sick day, right?  So HR does not

7    have discretion over whether or not I'm healthy enough to

8    return."  Ms. Mack said, "You're absolutely right."

9    Absolutely right.  And Ms. Light responded, "So what I'm

10   saying is that my doctors have said in order for it to be

11   healthy for me to return to work, safeguards need to be in

12   place.  So I should not legally be allowed to return to

13   work until at least some safeguards are in place, as much

14   as I would love to.  So that's where I'm landing."

15   Exhibit 27 is this transcript.

16           You heard from Dr. Levin.  She was treating

17   Jessica, managing her medication and providing some talk

18   therapy.  She testified about that.  She provided Jessica

19   with a letter, an email letter.  And that was dated the

20   same day.  Exhibit 15.  "However, since the principal" --

21   and these words are from Dr. Levin -- "since the

22   principal, who is the subject of the investigation, still

23   remains in the same position, I feel this would again

24   trigger her symptoms.  My recommendation is that Ms. Light

25   be allowed to work where she would not have contact with

1   the principal, Ms. Gethings.  If that is not possible,

2   safeguards must be put in place to prevent any retaliation

3   which might cause a recurrence or exacerbation of

4   symptoms."

5          This is in the middle of January 2022.  The

6   letter is forwarded via email -- you'll see that in

7   Exhibit 15 -- to the appropriate people at the defendant,

8   New Haven Board of Ed.

9          After that January 14th meeting, Jessica

10  provided meeting minutes.  She provided the people in

11  attendance meeting minutes of what they all spoke about.

12  She was able to do this, yes, because she did record it.

13  She sent those meeting minutes to Ms. Bonner.  She

14  followed up with Ms. Bonner and said, "Please let me know

15  if there's anything you would like to change in the

16  minutes of our meeting."  Exhibit 33.  It was a sent --

17  the original email was sent on January 16th, two days

18  after the meeting, and then the follow-up on January 18th.

19          And so what happens next?  Well, that same day,

20  a letter is drafted and signed by Lisa Mack, and it's a

21  return-to-work notice.  No safeguards are in place, but,

22  Jessica, you have to get back to work.  And you'll find

23  that in Exhibit 16.

24          The best the defendants could do was offer

25  mediation.  Ms. Bonner testified that she started that

1     process.  Exhibit 18 is an email from Ms. Bonner to James

2     Rascati and she says, "Our office would like to request

3     mediation services for three of our employees."  Jessica

4     Light, Jenny Clarino, and Ms. Gethings.

5          Mediation is unable to be scheduled.  Jessica

6     returns to work.  February 9, 2022, Exhibit 39, is an

7     email that Jessica sends to Ms. Gethings and others,

8     letting them know they had hoped mediation would be

9     scheduled before this point, could not, and she'll be

10    returning to work that Wednesday, which was February 9th.

11    That's in Exhibit 39.

12          You heard testimony from Ms. Light,

13    Ms. Gethings, Ms. Bonner, about Jessica getting back to

14    fully teaching her first grade students.  There was some

15    testimony about being eased in.  There was testimony about

16    observing or co-teaching.  It took longer.  It took longer

17    than Ms. Gethings' boss thought it was necessary to take,

18    Ms. Hannans.  You'll see that email in Exhibit 20.  She

19    said to Ms. Gethings, "Regarding Jessica, however, it is

20    very clear that you have not done this, and this is very

21    disappointing.  This process will not be delayed any

22    further."  Exhibit 20.

23          And that is dated February 25, 2022.  We're

24    still within a year of the Facebook comments in March,

25    early March of 2021.  Again, complaints were filed April,

1    May, June.  Investigation was conducted throughout the

2    summer into the fall, early winter 2021.  The

3    investigation was over.  Jessica wanted to return to work.

4    Her medical providers said, sure, with proper safeguards

5    in place.  She asked for those.  They were not given to

6    her.  She came back to work; not right away into her

7    class, not right away with her students.

8          Same date -- same date as Ms. Hannans' email,

9    February 25, 2022 -- we have a verbal warning issued to

10   Ms. Gethings, less than a year from the Facebook comments,

11   from the T-Eval meeting, from the Judy Cav meeting, from

12   the committee meeting.  Dr. Tracey, the superintendent for

13   the defendant, New Haven Board of Ed, says to

14   Ms. Gethings, "You exhibited poor professional judgment in

15   how you handled differences of opinion with an employee

16   you supervised.  You exhibited poor professional judgment

17   in how you responded to an employee criticizing the

18   Worthington Hooker School administration during a New

19   Haven Board of Education meeting.  As a seasoned

20   administrator with the New Haven Public Schools, you are

21   expected to respond to these situations responsibly and in

22   a manner consistent with our values.  It is concerning

23   that you were unable to do so in this circumstance."

24   Exhibit 48.  That's a letter dated February 25, 2022.

25   You'll see at the bottom where the CC line is, there are

1    some names.  And under those names, you see "personnel

2    file."

3            So Jessica get her first graders back.  We're

4    moving along the timeline now.  We are about a year later,

5    March 14, 2022.  One year.  She lets her supervisor know,

6    "My preference is to be in third grade.  I filled out this

7    form.  It's showing up blank."  Third grade.  Exhibit 42

8    is that email.  "I prefer third grade at Worthington

9    Hooker."

10           Before Jessica learned that there was a third

11   grade position opened, Ms. Alden's list of concerns is

12   found in a public area.  Jessica testified about that.

13   She found it in the mail area, mailroom area.  Nobody

14   knows how it got there.  Administrators at Hooker

15   investigated it, but they couldn't figure out who or how

16   or why.

17           THE COURT:  You have ten minutes left.

18           MR. INTERLANDI:  You heard testimony that, in

19   fact, there was an open third grade position.  You heard

20   testimony that Jessica applied for the position.  There

21   was testimony that she was not interviewed, she was not

22   considered, that external candidates were interviewed.

23   External candidates were offered two open third grade

24   positions -- one ESSER position, one regular position.

25   The person who accepted the ESSER position, as

1    Ms. Gethings testified, turned it down.  Nobody filled

2    that spot.  And you'll see these exhibits -- this topic,

3    I'm sorry, in Exhibits 43 and 44.

4         So Jessica doesn't get her third grade position

5    back, but what she does get is a classroom note.  "Just do

6    it.  Just leave our school.  You are toxic."  She finds

7    this, as she testified, in August 2022.  She was shocked.

8    She testified about how she felt.  She gets a second

9    letter.  This one tells her to wash her hair, to leave, or

10   just die.  It's a smaller -- it's about this big.  Exhibit

11   22 and 21.

12        Now I'd like to turn to damages.  We talked

13   about treatment, treatment from Jessica's providers.  We

14   have Nicole Ventura and we had Dr. Levin.  This is a

15   timeline of treatment of some specific dates of service.

16        So Jessica starts with Dr. Levin, as Dr. Levin

17   testified, in April 2020.  She goes on with an intake with

18   Ms. Ventura at the PTSC in March of 2021, right around the

19   same time of the Facebook comments.  And treatment

20   continues through there.  And I'll direct your attention

21   to Exhibits R and S, Defendants' R and S, where you'll see

22   there are various dates here where Jessica is expressing

23   feelings of depression, feelings of isolation, and even

24   suicidal ideation.

25        Finally, damages.  You heard Jessica testify

1    that she lost days, 66 sick days, $26,000.  You heard

2    testimony from Ms. Ventura about the medical bills from

3    the PTSC center.  Those totaled $33,000, and dramatic

4    action, as you'll see in Exhibit 29, of $1,200, totaling

5    $34,200.

6              Now, we are not claiming Dr. Levin's bills

7    because, yes, Ms. Light was treating with Dr. Berger, and

8    then she needed a new therapist to have her medication

9    managed and she did find Dr. Levin.  And so we're not

10   claiming those bills as part of the economic damages for

11   Jessica in this matter, but we are claiming the bills for

12   Ms. Ventura and the PTSC.

13             So what is fair compensation for someone who's

14   caused to suffer through daily life, depression, feeling

15   crushed, isolated?  What is fair for someone who has

16   caused -- has been caused nightmares, depression,

17   emotional distress, pain and suffering, you heard Jessica

18   testify, suicidal ideations.

19             We've talked about economic damages, noneconomic

20   damages.  It's $20 for a movie ticket.  If you add in

21   popcorn and a soda, you get up to $30 for a two-hour movie

22   for some entertainment or fun.  I would say it's worth

23   25 cents, I would argue.  Twenty-five cents a minute for

24   happiness comes out to $15 an hour.  Twenty-five cents a

25   minute, $15 an hour.  If you take the days from

1    March 26, 2021, to today, you have 1,233 days,

2    29,592 hours, multiplied by $15 an hour, and that takes

3    you to $443,880.  If you add the economic damages, that

4    takes you to $504,080.

5         Punitive damages.  The judge instructed you on

6    that.  It is your decision on what is fair.  I am asking

7    for triple damages, so if you would take the economic and

8    the noneconomic and triple that to award Jessica punitive

9    damages to deter the defendants or anyone like the

10   defendants from trampling on someone's free speech rights

11   in the future.  If teachers can't speak out about safety

12   concerns without fear of retaliation, then students can't

13   be safe in their learning environments.

14        We talked -- the judge talked to you about

15   defamation.  I talked to you a little bit about that.

16   There's evidence, testimony that Jessica had to hire a

17   lawyer.  She had increased frequency with her medical

18   appointments, as stated by Ms. Ventura.  She had increased

19   care and she had to use sick days in October, starting in

20   October of 2021.  She lost friends.  Facebook friends

21   de-friended her.  People were afraid to associate with

22   her, according to Jessica's testimony.  She felt isolated.

23        As a result of her defamation, she incurred

24   these special damages.  She also incurred harm to her

25   reputation by way of the general damages, and we're asking

1    for a year's salary in that regard, $60,000.

2    Sixty-thousand.

3         In conclusion, Ms. Light's claims are supported

4    by the evidence in this case, by a fair preponderance of

5    the evidence, tipping the scale ever so slightly in her

6    favor.

7         I hope you will have time to look at the

8    exhibits, have time to consider the testimony, and make

9    the right decision for Jessica and award her compensation

10   for this matter.

11        Thank you.

12        THE COURT:  All right, thank you.

13        So, ladies and gentlemen, we will next hear from

14   Mr. Murphy on behalf of the defendants.  While he sets up,

15   if you want to stand up and stretch and move about, feel

16   free to do that.  Do you need a brief recess?

17        Okay, you may proceed.

18        MR. MURPHY:  Excellent.  Thank you, Your Honor.

19        At the start of this case, I told you one of the

20   main themes would be oversight responsibility during an

21   unprecedented pandemic.  And then, over the course of the

22   last four days, you've heard a lot of evidence related to

23   that general theme.  We heard a little bit of background

24   about Worthington Hooker School and Margaret-Mary

25   Gethings, who's the principal of that school, right?  We

1    heard a couple -- two buildings, one school.  We heard a

2    lot about the community.  Every witness testified about

3    the strengths and the community at Worthington Hooker --

4    both Ms. Light, Principal Gethings, and even all the

5    teachers that were called by Ms. Light.

6            And then you heard from Principal Gethings about

7    some of the responsibilities that comes with being a

8    principal, right, and her having to deal with student

9    issues and staff issues and, of course, safety issues and

10   parent issues, right?  And we heard about that with

11   Ms. Light and her husband, who had concerns about a

12   teacher, emailed Principal Gethings, and she had to work

13   that through with her assistant principal, which included

14   meeting with the parents and then sharing the parents'

15   concerns with that teacher, who was Ms. Alden at the time.

16   These are all the things that Principal Gethings had to

17   deal with as being a principal at Worthington Hooker

18   School.

19           And then, as we said you would, we heard a lot

20   of evidence and testimony about COVID and how that

21   impacted public schools and specifically Worthington

22   Hooker School, right?  How all of a sudden, they're on

23   remote teaching, an unprecedented thing for all these

24   teachers and administrators who have never had to to deal

25   with that before.  All of a sudden, the New Haven Board of

1    Education and Worthington Hooker staff are trying to

2    figure out how they're going to bring the students and the

3    staff back, right?

4           And we heard a lot of testimony about once the

5    staff and the students returned to the building, how it's

6    difficult.  I think Mr. Shortt, Mr. Salem, Ms. Light, even

7    Principal Gethings talked about how that was a difficult

8    environment, and you're trying to manage all the rules

9    that Principal Gethings talks about and how they were

10   constantly changing, right?

11          And we heard testimony about how that

12   information was shared throughout the school district and

13   throughout Worthington Hooker School.  The CDC, the state,

14   the Board of Ed, the health department, there were rules

15   that they needed to follow.  These rules were changing and

16   it needed to be communicated.  And Principal Gethings

17   talked about the weekly meetings for building-level

18   principals and how she would receive information there and

19   then share it out with her staff and, ultimately, the

20   Worthington Hooker community.

21          This -- during that time, we saw documents, we

22   saw emails, and we had testimony from Ms. Gethings that

23   talked about how the Worthington Hooker community needed

24   to be patient, the Worthington Hooker community needed to

25   have teamwork and flexibility as they were navigating this

1    uncharted territory.  This is the context in which this

2    case arises.  And this is the context you need to keep in

3    mind as we're -- as you're evaluating whether Ms. Light

4    was retaliated against or defamed.

5         Now, there was evidence related to a slightly

6    different context, and opposing counsel earlier said this

7    might be viewed as an attack on Ms. Light.  But this isn't

8    an attack.  This is facts.  These are the facts that you

9    were presented with during this hearing, both in testimony

10   from the witnesses as well as the documents that you saw.

11        For example, we heard much evidence about

12   Ms. Light.  And she was, admittedly, fearful of COVID.  It

13   was an uncharted time and she was fearful early on about

14   COVID and returning to school.

15        If you look at Exhibit W, for example -- this is

16   in August of 2022 -- she says, "The stress of all of this

17   is really taking a personal toll on me.  I have had to go

18   on new anti-anxiety/depression medicines just to be able

19   to sleep.  I might just need to sit this one out."

20   Exhibit F, that same month, "I'm considering resigning."

21   And these are, of course, the text messages going back and

22   forth with Ms. Miller.

23        You know, she created a learning pod with those

24   families, and they had very strict rules and that was

25   fine.  But Ms. Light certainly had a strong reaction to

1    COVID, and that plays into this case as well.

2            You heard plenty of testimony how New Haven was

3    if not the last, very close to the end of schools that

4    returned to in-person learning.  Ms. Light had strong

5    feelings about that, and as did maybe some other people,

6    and she expressed those feelings.  She went to the Board

7    meeting, and she told you she likes to come out with a

8    catchy first statement, right, to capture the Board's

9    attention.  I'm Jessica Light.  I don't want to die.

10           And those were the types of things she was going

11   to testify about.  And she knew from all of her prior

12   experience with the Board of Ed that the Board can't

13   respond.  It's public session.  You heard Principal

14   Gethings talk about it.  I think maybe you even heard

15   Ms. Light talk about it.  People get up, they speak like

16   this to the Board, and the Board doesn't respond.  And

17   that's it.  It's just an opportunity to voice some

18   suggestions.

19           And so we heard a lot of evidence about what was

20   going on with Ms. Light and her feelings toward COVID and

21   other things.  We also heard evidence about how that

22   impacted her relationships with other people.

23           For example, in the fall of 2020, she didn't

24   want to return.  Most Worthington Hooker parents did, as

25   we heard from Principal Gethings and others.  And,

1    according to Ms. Light and according to the text messages

2    you saw earlier, they were crazy for wanting their kids to

3    return to in-person learning.  Mike Delaney, another

4    parent on the PTA with who she was having a disagreement

5    at the time, he was a jerk who she believed has gone for

6    blood against her ever since they had some sort of

7    disagreement on the PTA.

8            Now, as a union member -- and we heard plenty of

9    testimony about how Ms. Light was a union member.  And

10   teachers are entitled to a lot of rights under their

11   collective bargaining agreement -- we discussed it with

12   Mr. DeLucia when he was on the stand.  There are numerous,

13   numerous rules that relate to the working conditions for

14   teachers.  And I think he testified, you know, he had been

15   involved in a lot of grievances over violations of those

16   rules over his 17-year career.  And Ms. Light was active

17   with her union.  She appreciated her union.  As we saw

18   from that one email, she knew David Cicarella, the

19   president of her union, had her back, right, and she could

20   get up and speak and he would not let anything happen to

21   her because he had her back.  We saw that newspaper

22   article.

23           But as soon as Mr. Cicarella started disagreeing

24   with her about COVID return-to-work protocols, the

25   response changed, right?  Those text messages from the

1    fall of 2020, "Dave's response is sickening.  Could I

2    punch Dave now?  When can I run for union president?  Fuck

3    him."  And he said -- and that last comment was because he

4    made the statement that, "I would just like to thank the

5    superintendent for always have teachers' safety in mind."

6    This is the union president who had her back over the

7    years and she had a good relationship with.  But now, when

8    they disagreed, this was her reaction to him.

9                And, of course, Principal Gethings, right?  We

10   know from the text messages -- and maybe they were

11   unguarded.  Maybe they were, you know, to a friend.  But

12   they're facts.  They're facts that were presented to you

13   as the jury.  And it shows that in October of 2020 when

14   Worthington Hooker is trying to figure out, like most

15   schools across the state, how to return their students to

16   the classroom, Principal Gethings suggested putting the

17   two third grade classrooms in the gym.  Something that

18   would have seemed highly unusual before October of 2020,

19   but this is what the school had to do in October of 2020.

20   Be creative.  I think you heard Principal Gethings testify

21   that there were rules they had to follow, but then each

22   school could try and arrange those -- arrange things under

23   those rules to best fit their physical facilities, the

24   needs of the students or whatever.

25                And so Principal Gethings suggested putting two

1    third grade classrooms in a gym to learn.  And for that,

2    she was called a bitch.  And for that, Ms. Light said, I

3    think she's putting my life a risk to fix a logistical

4    problem on her end.  I mean, this is the background that

5    we come into 2020 with.  These types of comments.  And

6    those are the facts that you were presented with.

7            And then you saw some additional communications

8    and information about -- I'm sorry, some additional

9    documents about communications that the district and

10   Principal Gethings and others were making with the

11   community during that period where the students were

12   returning to work, right?  Exhibit B, you saw an email

13   from the superintendent where she was laying out some

14   thoughts to district staff, talking about the dashboard

15   they were creating and talking about how there should be a

16   chain of command, and please go to your building-level

17   principal if your concerns are not addressed, go to the

18   union, and then the union will come to us as the

19   administration.  And that's how they were trying to work

20   things through at this busy time when students were

21   returning to the building.

22           Ms. Light again disagreed with that and called

23   it a cringe-worthy email.  I mean, this is the

24   superintendent in an unprecedented time providing guidance

25   to her school community, and it's cringe-worthy.

1    Principal Gethings tried to address those same things.

2              Principal Gethings was concerned about a rumor

3    in early March going around that there were a lot of cases

4    at their school, which there weren't.  So Principal

5    Gethings, as you saw -- Exhibit I -- she sent an email to

6    her school community saying exactly that.  We report

7    cases.  Contract tracing will happen in laying out the

8    importance of all maintaining an appropriate communication

9    structure.

10             Now, against all this background, Ms. Light,

11   undisputed, gets on Facebook and made some posts.  And the

12   concern at Hooker was her comment that Hooker did not send

13   a letter, gave the strong impression that Hooker had cases

14   and were not sending a letter, which would be upsetting to

15   parents.  And you heard Principal Gethings talk about how

16   that was upsetting to parents, to think that maybe there

17   were cases and it was not being reported appropriately.

18   It caused disruption in the school environment.

19             Three days later -- not immediately, three days

20   later -- Principal Gethings sent out the email that I

21   believe you were shown earlier on March 12th of 2021.  And

22   that just, again, stressed the importance of not having

23   inaccurate information out there, and we -- and it was

24   entirely appropriate.  It didn't name Ms. Light.  It

25   didn't suggest -- it didn't name her Facebook post.  It

1    wasn't specifically directed at her and it certainly

2    wasn't any disciplinary consequence for her or an adverse

3    employment action.

4            Finally, in March -- March was a very busy time

5    in the context of this case.  And, finally, you know, we

6    saw that discussion.  You had it on your screen before.  I

7    showed it to you during evidence from March 22nd of 2021.

8    This was the day of the final Board meeting.  Ms. Light

9    has a concern.  It's 5:30 in the morning.  She emails

10   Principal Gethings.  What does Principal Gethings do?  She

11   responds immediately at 5:42, I think it was, right?  I

12   mean, within ten minutes, she responds to her, "I'll look

13   into it."

14           Ms. Light goes to the Board meeting that night.

15   And then you saw the email.  Principal Gethings sent a

16   response later that evening.  It wasn't accusatory, it

17   wasn't an attack.  It certainly wasn't discipline.  It

18   was, hey, I'm sorry if you didn't see my earlier message.

19   I'm going to look into this, we're trying to look into it.

20   We all need to be patient and see when we can get these

21   answers.  The answers that come through the weekly

22   meetings that she was talking about.  The answers that

23   come through the normal reporting structure that was in

24   place at that time to kind of facilitate the sharing of

25   information.  It wasn't -- it wasn't punitive.  It wasn't

1  disciplinary.

2          And I think in this case, you the jurors have

3  seen a lot of documents already and you're going to look

4  at them again when you return to the jury room.  And I

5  want you to look at the tone of the emails that are

6  alleged to be attacking or disciplinary or some sort of

7  personal thing against Ms. Light.  They're not.  Look at

8  the tone of those emails.  They're perfectly appropriate

9  communications from a building principal, a manager to a

10 subordinate or otherwise or to the school community.

11 They're always appropriate in tone.  They're always

12 appropriate in message.

13         So that's the context that brings us through

14 March of 2021.  As I outlined at the start of this case,

15 it's a retaliation case, right?  Ms. Light's burden, as

16 Judge Arterton has already instructed you, is to show that

17 she was retaliated against.  What that means for you the

18 jury is whether Ms. Light suffered an adverse employment

19 action under federal law or was disciplined under state

20 law.  And I know she read that, but it was a long time and

21 it was a very long instruction.  So I just want to review

22 that with you again.

23         I mean, under state law, discipline is an

24 adverse material action taken against her.  And under

25 federal law, it's an action that is significant enough

1    that it would deter a reasonable and similarly situated

2    person of ordinary firmness -- not Ms. Light, a similarly

3    situated person of ordinary firmness -- from exercising

4    his or her constitutional right.  Those standards have

5    meaning and the evidence in this case hasn't established

6    that Ms. Light was retaliated against or suffered

7    discipline under either federal or state law.

8              There was a lot of them and I have to address

9    all of them, so I'm going to.  I'm not going to show you

10   all the same exhibits that I showed you on direct, you

11   know, for example, the T-Eval.  Ms. Light claimed one

12   sentence was designed to retaliate against her and her

13   prior speech.  But when you look at that entire

14   description, it was six very positive statements and one

15   statement that I would characterize not as disciplinary,

16   not as calling her out, but just simply relating a fact,

17   she should come to the building first and we're happy to

18   work on whatever problems you have.  That email or that

19   mention in her T-Eval had no impact.  You know, I think

20   the testimony was, well, I was worried it was going to

21   impact if I apply it to other buildings, they would think

22   I was a troublemaker, or something along those lines.

23   That can't possibly be true, right, because Ms. Light had

24   been vocal on the internet at Board meetings, et cetera,

25   already.  She had this kind of -- she had plenty of public

1    information out there already.  Two, we know she

2    transferred somewhere else.  It didn't impact her ability

3    to go to a different school.  So that statement in and of

4    itself is not discipline.

5         The grade change, we didn't hear too much about

6    that from Attorney Interlandi because that was not

7    retaliation.  That was not an adverse consequence.  It's

8    undisputed her child was coming up into third grade from

9    second grade.  It's undisputed that Principal Gethings

10    thought that having a parent teaching the same grade with

11    only two classes at the time would be problematic.  And we

12    heard from Mr. Salem, who was Ms. Light's grade level

13    partner.  He himself said he approached Principal Gethings

14    and had concerns about that, it would be a difficult

15    situation for him.  And he doesn't dislike Ms. Light.  He

16    had a very good relationship with her.  And he didn't

17    dislike Principal Gethings.  He has a very good

18    relationship with her.  But he thought it would just be a

19    difficult situation.

20         So principals have the discretion to change

21    grades.  We know that.  We heard that from Principal

22    Gethings.  We heard that from Mr. DeLucia.  Ms. Light

23    herself admitted that.  She made the decision to change

24    the grades for that reason.  It had nothing to do with

25    Ms. Light's prior speech, protected speech.  Moreover,

1    it's not an adverse employment action.  Attorney

2    Interlandi tried to discount it, but it's true.  It was

3    teaching in the same building for the same pay with the

4    same benefits.  Nothing changed other than the grade

5    level.  That's not a discipline and it's not an adverse

6    employment action under either state or federal law.

7            Now, you did see some evidence about how when

8    she reapplied for that grade in -- in third grade.  That

9    application and that, you know -- those decisions cannot

10   be a basis of retaliation in this case.  That is beyond

11   that May 22nd deadline that Judge Arterton instructed you

12   about.  Your job is not to determine whether that decision

13   was retaliatory.  That is outside the scope of this case.

14   The sole grade change that is before you is the third

15   grade -- the first grade in 2021.  And that was a fully

16   appropriate decision, given the fact that her son was

17   coming to that grade.

18           And by saying it's outside the scope, I'm not

19   suggesting there was anything wrong with that.  Principal

20   Gethings explained her rationale for that.  She explained

21   the ESSER position that was an outside, not a unionized

22   position.  She explained the timeline.  That decision was

23   appropriate.  But that decision, even if you disagreed

24   with it, cannot be the basis of a retaliation claim.

25           You heard from the paraprofessional.  The claim

1    from the plaintiff is that Principal Gethings' discussion

2    with that paraprofessional was retaliation.  The evidence

3    did not show that.  The evidence showed Principal Gethings

4    was outside, she saw a situation at dismissal that she

5    thought was not following the protocols in place for

6    dismissal at that time, and she addressed it with the

7    paraprofessional the next day, and she had sent an email

8    to Ms. Light addressing it as well.  And, again, look at

9    the email.  The email is perfectly appropriate in tone and

10   message.  Ms. Light responded to it and it was a one-time

11   incident.  It's not discipline.  It's not an adverse

12   employment action.  It was something that came up within

13   Principal Gethings' operational responsibilities of the

14   building.  She addressed it like she would with anyone

15   else and they moved on.

16          We heard a little bit about committees in

17   Attorney Interlandi's closing statement.  I'm still not

18   clear what Ms. Light's claim is and how this is

19   retaliation or how this is an adverse employment action.

20   You saw the grid.  We showed it to you during witnesses'

21   testimony.  There were nine committees.  She was on three

22   of them.  She admits she was on the gardening club.  The

23   evidence showed there was one incident where an

24   administrator who was trying to get his 092, a

25   higher-level certification, had the boys club help with a

1    cleanup event.  She was never displaced from that

2    committee.  That had nothing to do with anything, and it's

3    not an adverse employment action or discipline under state

4    or federal law.

5            We heard about a signage committee, scheduling

6    committee, summer play-based opportunities.  We addressed

7    these things with you earlier.  And Ms. Light was involved

8    in many of these things.  It's still not clear how she

9    believes that these were adverse an employment action or

10   discipline either under state or federal law.

11           The SEL had 11 applications.  She wasn't chosen.

12   That's a fact.  Ms. Gethings explained her rationale for

13   that and explained why the other two individuals were

14   chosen for that position.  Again, this is something that

15   had nothing to do with any prior speech and certainly was

16   not an adverse employment action.

17           So, in short, none of these committee

18   assignments, most of which were volunteer, unpaid, not

19   even part of a teacher's normal job duties, none of the

20   decisions or none of the facts surrounding any of those

21   things constitute an adverse employment action or

22   discipline.

23           And, moreover, Attorney Interlandi showed you

24   Exhibits 9 and 10, right?  Ms. Light had concerns about

25   some of them.  She involved Dave Cicarella, who has her

1    back.  He emailed it to Principal Gethings and she

2    responded.  She laid out all of her reasons for those

3    committee issues, if you will.  And Ms. Light then

4    responded, and it is -- I mean, Principal Gethings wasn't

5    hiding the ball.  She explained absolutely, for every

6    single committee, what her reasons were for that.

7            Now we get to the conversation with Judy Cav and

8    Ms. Light, right?  The facts show -- Principal Gethings

9    testified about it, and you'll see it in the transcript.

10   You know, I certainly made the point earlier that

11   Ms. Light taped a bunch of meetings, didn't tell anyone

12   she was taping them -- not Principal Gethings, not

13   Ms. Clarino, not her union representatives, not fellow

14   teachers who were in those meetings.  No one.  But we have

15   them now and we have the transcripts.

16           And when you look at that transcript, you'll

17   see, you'll read Ms. Cavanaugh's comments and you'll see

18   exactly why they were holding that meeting.  In fact, you

19   know, the transcript shows on page 3 that Principal

20   Gethings starts out the meeting by saying, "I don't

21   anticipate anything but the most open willingness to

22   listen and to be heard and treat everyone in a way in

23   which you would want to be treated.  I know for everyone

24   who is on this call there has been a lot of thought and

25   some stress, and for that we want to try and alleviate it.

1    And I just want it known that we intentionally decided to

2    meet today so there wasn't taken any time out of your

3    class."

4          So that was the whole purpose of that meeting,

5    right, to bring two teachers together, address one

6    teacher's concerns, and to see if that can be resolved.

7    There was nothing about that meeting that was

8    disciplinary.  There was nothing about that meeting that

9    was an adverse employment action.

10          Now, we also heard some evidence and then some

11   testimony today that the investigation was too long.

12   There were three complaints or two complaints and a list

13   of concerns.  Those were sent to an outside law firm.

14   That law firm, according to the timeline presented to you,

15   took a -- took a period of months to complete their

16   investigation.  That's -- that's not linked to the Board.

17   That's not linked to Principal Gethings.  That's how long

18   an outside law firm took to do that investigation.  The

19   fact of any sort of -- what Ms. Light views as a delay

20   with that investigation can't possibly be retaliation or

21   an adverse employment action by the Board.

22          Finally, I think the final incident of

23   retaliation that Ms. Light is alleging here is something

24   to do with her return to work after she went out on leave.

25   There's a couple things I want the jury to focus on or I

1    would like all of you to focus on.

2            One is:  What was going on in the period before

3    she went on leave?  You heard a lot of testimony in this

4    case.  We didn't really hear anything about what was

5    happening in that first grade classroom from September to

6    late October when she went on leave.  Nothing.  She was

7    teaching first grade and, according to the evidence, there

8    were no major issues.  I think Ms. Gethings and Mr. Shortt

9    testified that he didn't raise any specific issues about

10   involvement in her classroom.  She was teaching, things

11   were going fine, and then she went on leave.  And then

12   when she comes back.  Yeah, there were two unions

13   involved, is what the evidence shows -- Principal

14   Gethings' and Ms. Clarino's union and Ms. Light's union --

15   and there were various discussions and various

16   back-and-forth with Ms. Bonner and Ms. Mack and

17   Mr. Cicarella and Mr. DeLucia and Ms. Coleman, who was the

18   union leader for Principal Gethings.  And there was a lot

19   of back-and-forth.

20           There was a mediation that occurred with an

21   attorney, Gregg Adler, and it didn't work out.  As

22   Mr. DeLucia mentioned, sometimes mediations don't work

23   out.  But there was a lot going on in that period of time.

24   And it's not clear to me what, if anything, is the claim

25   there.  But the evidence shows that it was a -- an

1    appropriate workplace discussion between unions, HR,

2    employees, trying to work through a return to work.

3         And then once she returns to work, you saw the

4    evidence.  We put it up when Attorney -- I mean when

5    Principal Gethings was testifying.  Principal Gethings

6    laid out a long plan for how this was going to be

7    accomplished.  It was an unusual situation -- a unique

8    situation, I think, was Principal Gethings' testimony --

9    because you had her class, Ms. Light's class split into

10   two different classes instead of the normal course where

11   someone would just come in as a long-term sub.  And so

12   that presented some issues.  There was a curriculum issue.

13   There were other things in those six or seven bullet

14   points that Principal Gethings set out that were going to

15   help facilitate Ms. Light's return.

16        At the end of that process, there was that final

17   return-to-work meeting.  Mr. DeLucia, their own witness,

18   thanked Principal Gethings in Exhibit K for holding a

19   great meeting and working with them to get this going and

20   get Ms. Light back in her own classroom.  Which, again,

21   the evidence from February through June in the classroom

22   shows that Ms. Light -- there's no evidence of significant

23   issues in her first grade classroom.  She was teaching

24   just like she was before she went on -- before she went on

25   leave.

1          So what's left?  I mean, those are the major

2    issues, I believe, that Ms. Light is claiming re -- that

3    were retaliation.  None of those events standing alone

4    constitute retaliation.

5          The emails on the printer, Mr. Salem testified

6    himself he doesn't know how they got there.  He had a

7    printer.  He wasn't aware that anyone could even print on

8    that printer.  That has nothing to do with Principal

9    Gethings.  She did not put them there, certainly not

10   intentionally or otherwise.

11         The email that -- Doug Jones.  In hindsight,

12   Principal Gethings recognizes she shouldn't have sent that

13   email.  I think Ms. Bonner testified that it was her

14   preference that witnesses don't -- Ms. Gethings should not

15   have contacted Mr. Jones.  But, again, read the email.

16   This wasn't pressuring Mr. Jones to change his testimony;

17   it was just helping to collect her recollection or refresh

18   her recollection of their prior conversation and the

19   situation involving the gardening committee.  It had no

20   bearing on Ms. Light's employment.  It certainly -- that

21   email certainly wasn't discipline for Ms. Light.

22         The statement with Tim Shortt.  That situation,

23   you heard a lot of testimony about that situation.  Tim

24   Shortt said people came to him and asked him to run

25   because they thought the current union steward was too

close to Principal Gethings.  Principal Gethings testified

that people came to her and said that he was running to

help take her down.  There was a lot of discussion at that

time, I guess, about the union steward position.  But,

again, Mr. Shortt testified it didn't impact his

relationship with Principal Gethings at all.  He worked

with her well before and he worked with her well after

that meeting.  Ms. Light, the only thing he said was he

tried to avoid her because they had a difference of

opinion and she was trying to pressure him to speak at

Board meetings.  He admitted he said that to the

investigator.  So that incident can't possibly be

retaliation or discipline for Ms. Light.

          And then the final thing on their list of

retaliatory acts was the copy of Ms. Alden's list of

concerns that was found in the little school.  Principal

Gethings testified she wasn't even there.  She was at her

kid's graduation in Rhode Island that day.  It had nothing

to do with Principal Gethings, nothing -- it simply can't

possibly be discipline or an adverse action for Ms. Light.

          And so, just like the third grade application

can't be a retaliatory act, the notes that were found in

Ms. Light's class that Ms. Light says she found in August

in her classroom also is outside the window.  Principal

Gethings testified about how she reacted when she heard

1    about those notes.  She looked into it.  She spoke with

2    the custodians.  She -- they determined who accessed the

3    buildings.  They had no idea who left those notes for

4    Ms. Light.  It certainly wasn't Principal Gethings and, in

5    fact, I think Ms. Light's own text messages said she

6    didn't think Principal Gethings did it and she didn't

7    think other individuals did it, either.  And, in fact, she

8    thought it might have been left, the first one, for the

9    paraprofessional in her classroom because it was on the

10   paraprofessional's side of the room.  Those notes are a

11   mystery.  Those notes are outside the timeline in this

12   case.  The Board and Principal Gethings and otherwise, you

13   know, do not support anything in those notes.  The content

14   is offensive.  But they weren't left there by Principal

15   Gethings, they weren't left there, and they're not

16   attributable to the Board of Education.

17          Now, in his opening statement, Attorney

18   Interlandi said, I believe he even kind of recognized,

19   that all of those incidents don't constitute retaliatory

20   acts.  So the claim is that somehow these incidents

21   together created some sort of environment that made it

22   hostile for Ms. Light and somehow in their totality

23   constitute retaliation.  But I think when you review all

24   of those specific incidents, there's no thread tying them

25   together, right?  Certain ones came up in the normal

1  course.

2        Judy Cav, for example, she said in that

3  transcript that she had concerns.  I mean, that was -- she

4  said on page 13 of that transcript, "We wouldn't be here

5  if I didn't feel that it somehow came back to you.  So I

6  was going to fill out a written formal complaint, but I

7  realized there wasn't 100 percent evidence for that, and I

8  wouldn't want to do that to a colleague."  And so that's

9  why they were meeting on that day.  That's why they were

10  discussing that.

11        I mean, same thing with the paraprofessional.

12  It was outside.  Ms. Gethings saw what was happening and

13  she addressed it.  These independent acts break any sort

14  of tie that can collectively pull them all together as

15  some sort of retaliatory act.

16        The statement with Tim Shortt was months, months

17  later, and it came because someone made a comment to

18  Principal Gethings and she addressed it with Mr. Shortt

19  when they met.  There's nothing tying all of those events

20  together to create some sort of master wave of retaliation

21  or a significant amount of events for retaliation.

22        For all those reasons, when you retire to the

23  room and assess this case further, we ask that you find

24  there was no retaliation and there was no discipline under

25  state or federal law.  There simply were no retaliatory

1    acts.

2         We also ask that you find there was no

3    causation, right?  That's the second element that Judge

4    Arterton read to you on the jury instructions.

5         Even if you believe the change from third grade

6    to first grade, for example, was an adverse employment

7    action under the law, you still have to find causation and

8    you must determine, you know, whether the totality of

9    those incidents would objectively make the working

10   environment unreasonably inferior, hostile, or adverse to

11   the employee when it comes to a typical work environment.

12   That just is not going to be met here.

13        And, moreover, for causation, Ms. Light's

14   obligation to prove that her protected activity was a

15   substantial factor, right, when Judge Arterton told you

16   about the evidentiary standard in this case, Ms. Light

17   is demonstrated to prove that her protected activity was a

18   substantial factor in any of these adverse employment

19   actions.  And that can't be met here.  I don't want to

20   repeat myself, but you know grade 3, there was no causal

21   link.  It was absolutely due to her son coming up into the

22   third grade.  The dismissal issue, there was no causal

23   link.  It was discovered in the normal course.  You know,

24   asking Doug Jones for clarification had nothing to do with

25   protected speech months earlier.

```
 1              So, for all of those reasons, we ask that you

 2      find in favor of the Board and Principal Gethings on the

 3      retaliation claims.

 4              Briefly talk about damages because Attorney

 5      Interlandi mentioned damages.  Now, we don't think -- or

 6      we think Ms. Light is not entitled to any damages in this

 7      case.  We think the evidence shows that she's not entitled

 8      to any damages.  We believe that the evidence shows there

 9      were no damages attributable to the Board of Ed.  But I do

10      want to address them briefly.

11              The money damages.  Sick days, she used them

12      under the contract.  They related to her medical condition

13      and she was out.  That's not an appropriate item of

14      damages here.

15              The insurance cost.  I think I understood the

16      claim earlier that Dr. Levin's bills are not being claimed

17      because Ms. Light had been in therapy before and she's

18      still in therapy.  Dr. Ventura -- or Ms. Ventura, excuse

19      me, she provides therapy.  Ms. Light was in therapy

20      before.  She's in therapy still.  When she saw Dr. Levin

21      for the first time, Dr. Levin said, you need to go find a

22      therapist.  That recommendation had nothing to do with the

23      actions of the Board, and so I don't believe there's any

24      difference between Ms. Ventura's bills and Dr. Levin's

25      bills.
```

```
1              Now, of course, the main item of damages here is
2    emotional distress damages.  It's undisputed Ms. Light has
3    had a very -- had trauma in her past and a complicated
4    history that was addressed by doctors in the past.  It's
5    being addressed by Dr. Levin now and it's being addressed
6    by Ms. Ventura.  But when you're considering damages, you
7    know, I'd like you to think about a few things about the
8    credibility of those healthcare providers.  And Dr. Levin
9    said Ms. Light has saw Dr. Berger before -- it's
10   undisputed -- for a period of eight years, I believe it
11   was.  And before that, others.  And Dr. Levin says
12   Ms. Light will continue to see her going forward.
13             Dr. Levin said and Ms. Ventura said that things
14   have worsened over the two years, but they didn't show you
15   how.  They didn't go through their notes and say, she was
16   doing well until this date, and then things changed and
17   this is how I changed -- I changed her medication or I
18   gave her different therapy at that time.  They didn't.
19   They just offered you conclusions.  They didn't show how
20   things have changed, nor could they, right?  We saw
21   Ms. Ventura's notes.  They're essentially blank.  There's
22   nothing on them.  She doesn't know what she talked about
23   with Ms. Light on any particular days.
24             Dr. Levin's were more detailed, but she also has
25   no ability and she didn't tell you how things changed over
```

1    the course of her treatment with Ms. Light.

2          Now, Ms. Ventura in particular, she says she's a

3    drama therapist.  She provides role-acting and

4    role-playing with her clients.  But she doesn't do that

5    with Ms. Light.  In fact, I don't think she ever explained

6    to you what she does with Ms. Light.  She says she meets

7    with her, but she didn't explain why she doesn't do drama

8    therapy or what she actually does with Ms. Light.

9          Certainly, they email a lot.  And I would

10   encourage you to look at those emails.  We submitted them.

11   It's a big stack of emails and they're in there for you to

12   review in terms of what Ms. Ventura and Ms. Light were

13   talking about.  And, again, Ms. Light -- Ms. Ventura

14   simply cannot show what she was working on with Ms. Light

15   over the course of those years or how that changed, what

16   she did to help Ms. Light when she believes things got

17   worse.

18          So, for those reasons, you know, we believe the

19   evidence hasn't demonstrated that there's any substantial

20   emotional stress that was caused by the Board of Ed or

21   Principal Gethings.

22          Now, punitive damages are designed to punish

23   employers for extreme and outrageous conduct.  That simply

24   is not the case here.  The evidence did not provide you

25   with a sufficient basis to show extreme and outrageous

1    conduct.  Instead, as I said at the start, what the

2    evidence shows is a school system trying to deal with

3    operating a school, including during a period of time when

4    things were very difficult, when the rules were changing.

5    Making decisions about staffing levels, committees, other

6    things, dismissal, that's not the type of extreme and

7    outrageous conduct that warrants punitive damages.  It

8    falls well short of any standard for punitive damages.

9            Now, finally, in this case, there is a

10   defamation claim.  It's based on a single meeting with

11   five participants in a Zoom or a telephone call, right?

12   It wasn't an in-person meeting.  We know it was some sort

13   of electronic meeting.  Those four individuals -- I'm

14   sorry.  Those five individuals were the only ones that

15   heard this alleged defamatory statement.  And what is that

16   statement?  Attorney Interlandi on his slide showed you

17   one sentence, but I believe that when Ms. Light was

18   testifying, she said it was a much larger sentence.  I

19   thought she cited the full paragraph.  "And just so you

20   know, Jessica, we spoke with Judy before and said

21   anyone -- and we can respect some people who do not want

22   their names mentioned, and they certainly deserve that --

23   not one person has said anyone besides you as being the

24   source.  We hear that you're saying it wasn't you, but I

25   need you to know that every person said you were the

1    source."  And I believe that's what Ms. Light was saying

2    was a defamatory statement, that whole paragraph, not the

3    single sentence that was cited earlier.

4            And, again, I encourage you as a jury -- you're

5    going to have all these exhibits and you have this

6    transcript.  You can look at it.  You can see

7    Ms. Cavanaugh's statements in there where she says, for

8    example, "I would hope that -- we are colleagues and I

9    would hope -- I know that you're anxious about all this

10   and the pandemic, as we all are, but I would hope that you

11   would trust me personally and professionally as well as

12   trusting our administration and the department of health

13   to do the right thing for our school and our community and

14   everyone involved."  And then she says, "As I mentioned

15   before, we wouldn't be here if I didn't feel it somehow

16   came back to you," and this and that.  And that's the

17   context where that statement is made.

18           That's a normal, routine meeting where Principal

19   Gethings was explaining the concerns that brought them

20   there, and it's not a defamatory statement.  As she said,

21   it's true or substantially true.

22           But even if you thought that was a defamatory

23   statement, Ms. Light has failed to meet her burden to

24   prove damages related to that statement.  It was five

25   people in a closed-door meeting.  We know Ms. Cav went in

1    that meeting with concerns already about Ms. Light.  We

2    know that Ms. Light believes Ms. Morrison went into a

3    meeting with concerns about Ms. Light, right?  They made

4    an issue at this trial and provided testimony that

5    Ms. Morrison somehow wasn't there as union steward for

6    her, but was just there for Ms. Cavanaugh, right?  And

7    maybe she shouldn't have been there because Ms. Morrison

8    was one of the ones who screenshotted the Facebook post

9    and sent it to Principal Gethings earlier.  And so, under

10   the plaintiff's own testimony, Ms. Morrison's reputation

11   already had been -- Ms. Morrison's view of Ms. Light had

12   already somehow veered into negative territory, right,

13   based on their own testimony.  And so their reputation,

14   their view of Ms. Light's reputation did not change.  And

15   there's no evidence before this jury that that statement

16   was somehow made outside of that closed Zoom meeting.

17          Now, there's a -- you as a jury have received a

18   lot of information about other things that have happened,

19   but none of those are directly tied back to this one

20   statement in a closed Zoom meeting, right?  And

21   Ms. Light's burden to prove that any sort of harm to her

22   reputation occurred as a result of that one defamatory

23   statement, and she has failed to meet that burden here.

24   So at the conclusion of your deliberations, we would ask

25   you to enter judgment for Margaret Mary-Gethings on that

1    claim as well.

2         I thank you for your time and attention during

3    this case and during this closing argument.  Thank you so

4    much.

5         THE COURT:  All right.  Thank you, Mr. Murphy.

6         All right.  We are concluded on the closing

7    arguments, and I have just a couple remarks left.

8         When you first return -- when you return to your

9    jury room, you should first elect one of you to act as

10   your foreperson and to preside over your deliberations and

11   be your spokesperson here in court.  Your verdict must be

12   unanimous for each of the findings that are indicated on

13   the jury verdict form that you have.

14        Until a verdict is agreed to by each juror, it

15   is not a unanimous verdict.  Your verdict should represent

16   the considered judgment of each juror.  Each of you must

17   make your own decision, but you must impartially consider

18   all of the evidence and the views of your fellow jurors.

19   That's what's meant by "deliberation."  It's your duty to

20   consult with one another and to deliberate with a view

21   towards reaching an agreement if you can do so consistent

22   with the individual judgment of each juror.

23        Now, you have the verdict form, and let me just

24   briefly show you how it tracks the work you need to do.

25        So on retaliation for Count One, the 31-51q

```
1    against the Board of Education, you will determine whether
2    you find that Plaintiff Jessica Light has proved that the
3    Board of Education disciplined her, and you have the
4    definition of "discipline" in the instructions.  And you
5    will answer yes, she did, or no, she didn't.
6              If you answer no, you are finished with Count
7    One and you just go to Count Two.  If you answered yes,
8    then you will go on and answer the question of, do you
9    find that Jessica Light proved her speech on a matter of
10   public concern was a substantial or motivating factor in
11   her discipline, referring to your finding on Count -- on
12   number 1.
13             If you answered yes to both 1 and to 2, then you
14   go on to the next question.  If you didn't answer yes to
15   both of those, you go on to the next count, which is Count
16   Two.
17             So if you found that the Board of Education --
18   you go on to the affirmative defenses and whether the
19   Board of Education has proved that Ms. Light's speech on
20   the issue of public concern substantially or materially
21   interfered with her bona fide job performance or working
22   relationship with the Board.  You answer yes or no there.
23   It's then the burden of the Board of Education to prove
24   that affirmative defense.  If your answers to this Count
25   One are yes to 1 and 2, and to number 3, the affirmative
```

defense, is no, it wasn't proved, then your verdict is for
Jessica Light.  If your answers are anything other than
that, your verdict is for the Board of Education.  In any
event, you go to Count Two.

And Count Two is the retaliation in violation of
1983, and that's against Margaret-Mary Gethings.  And you
consider whether you find that she has proved that the
defendant, Ms. Gethings, took adverse employment action
against her, and you have that definition to be applied.
If you say no, then you just go on to Count Three.  You're
done with Count Two.  If you said yes, then you need to
identify each act or acts you found to be an adverse
employment action, and you list them in the place provided
in 5.

If your answer was no to Count Four, that she
did not prove adverse employment action, you are then
going straight to Count Three.  If you find that she has
proved her protected speech was a substantial or
motivating factor in the adverse employment actions taken
by the defendant that you listed above, you will answer
yes or no.  If both of your answers to 4 and to 6 are yes,
your verdict is for Plaintiff Light.  If your answers are
otherwise, your verdict will be for the defendant and go
on to Count Three, which is the defamation claim against
the defendant, Gethings, and you start with the initial

1    question, do you find that she proved that Defendant

2    Gethings published a defamatory statement to a third

3    person?  You have the instructions on how to apply the law

4    to those facts as you find them.  If you say no, you go to

5    the end of this verdict form.  If you find -- if not, you

6    go -- keep going on to number 8, do you find that she

7    proved the defamatory statement identified her to a third

8    person?  Yes or no.  If no, you just go to the end.  If

9    yes, you go back to 9.  Do you find that Plaintiff Light

10   proved that her reputation suffered injury as a result of

11   Defendant Gethings' statement?  Yes or no.  If your

12   answers to 7, 8 and 9 are yes, then go to the next

13   question.  Otherwise, you are finished and you go to the

14   end.

15           And do you -- and this is the affirmative

16   defense.  Do you find Defendant Margaret-Mary Gethings has

17   proved that her statement was true or substantially true?

18   That's a yes or no.  If your answers to 7, 8 and 9 are yes

19   and your answer to the affirmative defense in 10 is no,

20   then your verdict is for the plaintiff.  And if your

21   answers are anything other than that, your verdict is for

22   the defendants.

23           If the verdict you decided on was for Jessica

24   Light on any of those three counts, then you go to

25   damages.  Otherwise, you go to the end of the verdict form

1    because you are finished.

2            And then we get to the damages section, with

3    Count One asking you, what compensatory damages has

4    Ms. Light proved resulted from the Board of Education's

5    violation of 31-51q?  You put the amount of economic

6    damages, if any, that you find proven.  You put the amount

7    of noneconomic damages.  And then if you found neither

8    economic nor noneconomic was proved, you must -- but you

9    found liability, you must return a nominal damages.

10            And then you get to the question of whether the

11    plaintiff has proved punitive damages are warranted

12    against the Board of Education.  You answer yes or no.

13    And then if you answer yes, you award -- you tell us that

14    you have decided to award punitive damages, remembering

15    they're discretionary.  And if you answered yes, then you

16    enter the amount of punitive damages.

17            And the same goes for the 1983 claim in Count

18    Two, what compensatory damages has she proved.  You do

19    economic or noneconomic.  If neither of those was proved,

20    you do nominal, and then you proceed to punitive damages

21    against Defendant Margaret-Mary Gethings.

22            On the defamation count, Count Three, has

23    Jessica Light proven special or pecuniary damages, money

24    damages, for Defendant Gethings' defamatory statement?  If

25    yes, you check that.  If no, you are finished.  And then

1    you go -- if you said yes, you do special damages --

2    that's the money damages -- general damages, and whether

3    you choose to award punitive damages for defamation, not

4    quantifying it.

5          When you have finished your analysis here, all

6    working together, your foreperson will sign -- check, make

7    sure that everything has been answered the way you all

8    agreed, sign the verdict form, date it, and advise the

9    court security officer, who will be outside your door from

10   now on, that you have reached a verdict.  Do not give the

11   verdict form to the court security officer.  Your verdict

12   form will be returned in open court to me when you have

13   advised that you've reached the verdict.

14         In the course of your discussion, don't hesitate

15   to reexamine your own individual views or to change your

16   opinions if the deliberations and the views of your fellow

17   jurors convince you to do so.  But don't surrender your

18   honest convictions about the facts or the weight or the

19   effect of the evidence solely because of the opinions of

20   your fellow jurors or merely to bring an end to the

21   deliberations.

22         So when you have all gone through that verdict

23   form together, reached unanimous agreement on your

24   verdict, your foreperson will fill in your answers, date

25   and sign the verdict form, and advise that you have

1    reached a verdict and we will return you to the courtroom

2    to deliver that verdict.

3         When you go into the jury room to begin your

4    deliberations, you will have the exhibits with you.  You

5    will not have a transcript of the testimony.  If you need

6    to have any of the testimony reread to you, that can be

7    done.  I will bring you back into court to hear that

8    testimony reread.  It's not an easy thing to find the

9    testimony that you are looking for, so be very specific

10   about what you are looking for, ideally giving us keywords

11   to search off of so that we can find that with as much

12   dispatch as possible.

13        Any requests to have testimony read back, any

14   questions that you have, any communications with the

15   Court, needs to be in writing and signed by your

16   foreperson.  You can use the paper in your notebooks to

17   make those notes.  If they are the notes to communicate

18   with the Court, give that note to the courtroom deputy who

19   will return it to me.  I will determine whether or not I

20   can respond just in writing on the note or whether I need

21   to bring you back in to respond to your note.  But I will

22   do it as quickly as I can, and be as specific as you can.

23        Again, remember, nothing I have said in these

24   instructions -- and nothing I have said or done during

25   trial -- has been said or done to suggest to you what I

1    think your verdict should be.  I do not have an opinion

2    because that is not my job.  That is your job.  The

3    verdict is your exclusive duty and responsibility.

4            Deliberate in the jury room only, not anywhere

5    else.  Deliberate only when all of you are present.  Turn

6    your cell phones off during your deliberations.  Don't

7    research or communicate with anybody else about this case

8    through any of the available methods.  If a jury isn't --

9    juror is not in your room but is in the bathroom or

10   something, stop your deliberations until he or she comes

11   back and don't start again without all eight of you

12   present.

13           So now it will be your task to deliberate and

14   determine the facts on the basis of the evidence as you've

15   heard and to apply the law as I've outlined it.  Render

16   your verdict fairly, uprightly, and without any prejudice.

17   Take as long as you think is necessary to fairly and

18   impartially reach your verdict.  When all of you have

19   agreed with that verdict, then your foreperson will sign

20   your verdict form reflecting that, and it will be returned

21   to the courtroom by you.  It will be read in open court by

22   your foreperson, and I will confirm with each of you

23   individually that the verdict that your foreperson read is

24   your verdict.  In that way, we ensure unanimity.

25           All right, ladies and gentlemen.  It is time for

1    your work to begin.  Thank you for your service.  We stand

2    in recess.

3            We're going to substitute your verdict form with

4    a slight correction.  That will be brought in in just a

5    moment.

6            Counsel, we're going to change the verdict form

7    to make a slight correction.  On page 2, Count Two,

8    paragraph 6, the instructions after that should be

9    corrected to say, "Your verdict is for Defendant Gethings,

10    not Board of Education."  And then under 3, defamation,

11    paragraph 10, we've left out Ms. Gethings' last name and

12    the instructions that follow paragraph 10 need to be

13    corrected to say the verdict is for Defendant Gethings.

14    We'll make those corrections and swap out the verdict form

15    with the jury and give you a copy.

16            Anything further before we recess?

17            MR. INTERLANDI:  No, Your Honor.

18            THE COURT:  All right.  I'll ask you to remain

19    either in the courthouse or be sure to give us your cell

20    number so we can text you and get you back immediately.

21    Do not go further than you can be returned immediately in

22    the event that jurors have a question or a verdict.

23            Anything else?

24            MR. INTERLANDI:  No, Your Honor.

25            MR. MURPHY:  No.

1          THE COURT:  All right.  Thank you very much.

2          (In recess, 12:35 p.m.)

3      ***** TRIAL DAY 6, August 12, 2024, BEGINS *****

4          (Call to order, outside the presence of the jury,

5      1:37 p.m.)

6          THE COURT:  All right.  Good afternoon, ladies

7      and gentlemen.  Counsel, please be seated.

8          We have a note from the jury signed by juror

9      number 3, our foreperson, indicating, "We have reached a

10     verdict."  That will be marked as Court 3, and I'll ask

11     Ms. Lewis to bring our jurors in.

12              (Jury in, 1:39 p.m.)

13         THE COURT:  Good afternoon, ladies and

14     gentlemen.  I have a note from your foreperson that you

15     have reached a verdict, a unanimous verdict.  I'll ask

16     juror number 3 to please hand the verdict form to

17     Ms. Lewis.

18         I'm going to give this back to you for one

19     clarification, and that is Count Three, the defamation

20     count.  The instructions are, "Has Light proven special

21     (pecuniary damages)?"  You say yes.  And the directions

22     say, "If you said yes to question 17, please enter the

23     amount of special and general damages."

24         "Special" is blank.  May I ask you to complete

25     that?  I'm going to give this back to you and let you make

1    that quick correction, and then we will have you back to

2    receive your verdict.

3             Thank you.

4                        (Jury out, 1:44 p.m.)

5        THE COURT:  I suppose we should recess until

6    they make that complete verdict form to return, so we will

7    stand in recess.

8                     (A brief recess was taken.)

9                     (Jury in, 1:48 p.m.)

10       THE COURT:  All right.  Has the jury now

11   completed the verdict form?  I'll ask you to hand it to

12   Ms. Lewis.

13            May I see counsel at sidebar, please?

14            SIDEBAR CONFERENCE, AS FOLLOWS:

15       THE COURT:  So my question to you is:  Do I need

16   to send the jury back again to make a correction or can we

17   do this post-verdict?  Let me tell you what the issue is.

18            The jury has to determine whether she has proved

19   pecuniary damages.  They say yes.  I sent them back to put

20   in the space for special damages, the amount they found.

21   It appears to be zero.  So do I need, in your view, to

22   perfect this to send them back or can we intuit from this

23   that yes is the answer, incorrectly, to general damages,

24   which they do award.

25            MR. INTERLANDI:  My position is to -- I would

1    have them go back.  If that is -- if that is the case,

2    then they should correct the original answer, not to

3    infer.

4              THE COURT:  All right.

5              MR. MURPHY:  That seems to make sense to me,

6    yeah.  Did Your Honor have a different way you would

7    propose doing it?

8              THE COURT:  No.

9              (Sidebar conference concluded.)

10             THE COURT:  So, ladies and gentlemen, I need for

11   you to make one more clarification for us.  On Count

12   Three, on question 17, "Has the plaintiff proved special

13   or pecuniary damages," your current response seems

14   inconsistent with the figure you have given.

15             In other words, what is left for you to do is

16   tell us whether the amount of special damages which you

17   have awarded is -- means that the plaintiff did not prove

18   special damages, pecuniary damages.

19             Am I being clear?  Do you see what the

20   inconsistency appears to be?

21             So I'm going to give this back to you and ask

22   you to make your response to the first part, question

23   number 17, consistent.

24             Okay?  Thank you very much.

25                  (Jury out, 1:52 p.m.)

```
 1              THE COURT:  In order to avoid having to

 2    potentially bring the jury back in and then have one

 3    additional correction that would be necessary for

 4    consistency, would you object to my sending a note that

 5    calls to their attention that if they answer no to special

 6    damages, they are just to go to the end of the verdict

 7    form?

 8              MR. MURPHY:  Can you repeat that, Your Honor,

 9    for Tony and me?

10              THE COURT:  No, I think this is going to be

11    fine.  They would not have -- no.  We direct them, if you

12    answered yes, enter the amount of special and general

13    damages.  If you answered no, proceed to the end of the

14    verdict form.  That means they would jump over 19 --

15    excuse me -- 18 and 19; correct?

16              MR. MURPHY:  If they answer no, that's correct,

17    they jump over 18 and 19.

18              THE COURT:  And so, if -- in order to ensure

19    that they have made 18 and 19 consistent with 17, I want

20    them to be focused on that as well.

21              MR. MURPHY:  So what's Your Honor's proposal?  I

22    lost track of that.

23              THE COURT:  To advise them in correcting their

24    response to -- in reconsidering their response to 17,

25    please note that if their answer is no, they are simply to
```

```
1    proceed to the end of the verdict form.

2              MR. INTERLANDI:  Your Honor, I think the form is

3    clear.  If they're going back to correct the answer to

4    17 --

5              THE COURT:  I know, but I didn't say go further

6    than that, and I don't know whether they have moved on

7    based on the earlier inconsistency.

8              I'll bring them back and I will tell them.  And

9    if they need to regroup again, we'll do that.

10                  (Jury in, 1:58 p.m.)

11             THE COURT:  All right, ladies and gentlemen.

12   Please be seated, and thank you for your patience.

13             Before I ask your foreperson for your final

14   verdict, I'm going to ask you to take a look at question

15   17 which asks if the plaintiff has proven the special

16   pecuniary damages, yes or no.  And then, if no, you are

17   going to take a look at what you had for special damages.

18   And you'll see the direction under the bottom of 17, "If

19   you answered no, please proceed to the end of the verdict

20   form and sign and submit it without any other answers."

21             Is your verdict form, as it currently stands,

22   consistent with that direction?

23             THE FOREPERSON:  (Nodding head.)

24             THE COURT:  Okay.  I'll ask you, then, to please

25   give it to Ms. Lewis.
```

1          All right.  I'm going to get this verdict form

2     stapled, and then I will return it to juror number 3 to

3     stand and read it in open court.

4          All right, Madam Foreperson.  Would you stand

5     and read the jury verdict that has been prepared by all of

6     the jurors, starting with Count One?

7          THE FOREPERSON:  Count One, do you find that

8     Plaintiff Jessica Light has proven that the defendant,

9     Board of Education, disciplined her?

10          Yes.

11          Do you find that Plaintiff Jessica Light has

12     proven that her speech on a matter of public concern was a

13     substantial or motivating factor in her discipline?

14          Yes.

15          Do you find that the defendant, Board of

16     Education, has proven that Plaintiff Jessica Light's

17     speech on an issue of public concern substantially or

18     materially interfered with her bona fide job performance

19     or plaintiff's working relationship with the defendant,

20     Board of Education?

21          No.

22          Count Two.  Do you find that Plaintiff Jessica

23     Light has proven that Defendant Margaret-Mary Gethings

24     took adverse employment action against her?

25          Yes.

```
 1              For question 5, we discussed the extended T-Eval
 2       conversation, not regarding Ms. Light's teaching, as well
 3       as Ms. Clarino excessively shadowing Ms. Light from August
 4       to October 2021 prior to her FMLA absence.
 5              Do you find that Plaintiff Jessica Light has
 6       proven that her protected speech was a substantial or
 7       motivating factor in the adverse employment actions taken
 8       against her by Defendant Margaret-Mary Gethings?
 9              Yes.
10              For Count Three, do you find that Plaintiff
11       Jessica Light has proven that Defendant Margaret
12       Mary-Gethings published a defamatory statement to a third
13       person?
14              Yes.
15              Do you find that Plaintiff Jessica Light has
16       proven that the defamatory statement identified Ms. Light
17       to a third person?
18              Yes.
19              Do you find that Plaintiff Jessica Light has
20       proven that her reputation suffered injury as a result of
21       Defendant Margaret-Mary Gethings' statement?
22              Yes.
23              Do you find that Defendant Margaret-Mary
24       Gethings has proven that her statement was true or
25       substantially true?
```

```
 1                  No.
 2                  And then we have damages.  For 11, what
 3       compensatory damages has Plaintiff Jessica Light proven
 4       resulted from the Defendant Board of Education's violation
 5       of Section 31-51q?
 6                      Compensatory damages, economic, 50,000.
 7                      Compensatory damages, noneconomic, 300,000.
 8                      No nominal damages.
 9                  Has Plaintiff Jessica Light proven that punitive
10       damages against Defendant Board of Education's violation
11       are warranted?
12                      Yes.
13                  Do you award punitive damages to Plaintiff
14       Jessica Light for Defendant Board of Education's violation
15       of Section 31-51q?
16                      Yes.
17                      Punitive damages, 100,000.
18                  Count Two.  What compensatory damages has
19       Plaintiff Jessica Light proven resulted from Defendant
20       Margaret-Mary Gethings' violation of 42 U.S.C. 1983?
21                      Compensatory damages, economic, 75,000.
22                      Compensatory damages, noneconomic, 350,000.
23                      No nominal damages.
24                  Has Plaintiff Jessica Light proven that punitive
25       damages against Defendant Margaret-Mary Gethings are
```

```
 1   warranted?

 2             Yes.

 3             Do you award punitive damages to Plaintiff

 4   Jessica Light for Defendant Margaret-Mary Gethings'

 5   violation of 42 U.S.C. 1983?

 6             Yes.

 7             Punitive damages, 200,000.

 8             Count Three, defamation.  Has Plaintiff Jessica

 9   Light proven special pecuniary damages for Defendant

10   Margaret-Mary Gethings' defamatory statement?

11             Yes.

12             Special damages, 10,000.

13             General damages, 15,000.

14             Has Plaintiff Jessica Light proven that punitive

15   damages against Defendant Margaret-Mary Gethings are

16   warranted?

17             No.

18             THE COURT:  All right.  I'm going to go through

19   each of the jurors.  You have heard the verdict read by

20   your foreperson, and I want you to stand and tell me if

21   this is your verdict.

22             Juror number 1, is this your verdict?

23             JUROR NUMBER 1:  Yes.

24             THE COURT:  Thank you.

25             Juror number 2, is this your verdict?
```

```
 1                    JUROR NUMBER 2:  Yes.
 2                    THE COURT:  Juror number 3, is this your
 3    verdict?
 4                    JUROR NUMBER 3:  Yes.
 5                    THE COURT:  Juror number 4, is this your
 6    verdict?
 7                    JUROR NUMBER 4:  Yes.
 8                    THE COURT:  Juror number 5, is this your
 9    verdict?
10                    JUROR NUMBER 5:  Yes.
11                    THE COURT:  Juror number 6, is this your
12    verdict?
13                    JUROR NUMBER 6:  Yes.
14                    THE COURT:  And juror number 7, is this your
15    verdict?
16                    JUROR NUMBER 7:  Yes.
17                    THE COURT:  And juror number 8, is this your
18    verdict?
19                    JUROR NUMBER 7:  Yes.
20                    THE COURT:  Thank you.  This being the unanimous
21    verdict of the jurors, the jury verdict is accepted and
22    filed.
23                    You've now done your duty.  Making decisions
24    such as you have made that deeply affect the lives and
25    interests of parties involved is not easy.  It is
```

1    important.  It is a task you've undertaken for which we

2    are very grateful because it's an important, if not

3    difficult, assignment.  And the reason that we are

4    grateful to you is simple:  We believe in a system of law

5    that places before our fellow citizens the responsibility

6    for administering justice and resolving important

7    disputes, and the system of self-government in which all

8    jurors are drawn from our community plays this central

9    role.

10            In fact, as far back as 1789, James Madison

11   recognized, in his words, "Trial by jury in civil cases is

12   as essential to secure the liberty of the people as any

13   one of the preexistent rights of nature."  So I thank you

14   very kindly for your service, and I hope that you

15   recognize the importance of it.

16            You are now discharged.  You are under no

17   obligation to discuss the case with anyone -- the parties,

18   the lawyers, the press.  You remain under a legal

19   obligation that you took in your oath back last week, week

20   before last, you do solemnly swear after your verdict has

21   been announced in court you will speak to no one

22   concerning the deliberations or the vote of the jury or of

23   any individual juror other than yourself, unless the

24   presiding judge gives you permission to do so.

25            So, at this time, I will excuse you with the

1    Court's and the parties' gratitude.  I would be happy to

2    meet you back in your jury room briefly to answer any

3    questions that you may have.

4              You are excused.

5                    (Jury excused, 2:08 p.m.)

6              THE COURT:  Counsel, are there any things that

7    immediately come to your mind that would not be included

8    in post-verdict motions that you need to discuss?

9              MR. INTERLANDI:  I don't have any, Your Honor.

10             MR. MURPHY:  Not immediately, Your Honor.  We're

11   obviously going to file -- renew our motion and file

12   something within the applicable time period to --

13             THE COURT:  Okay, great.

14             MR. MURPHY:  -- address this inconsistent and

15   concerning verdict, yes.

16             THE COURT:  And then the plaintiff will have the

17   obligation to respond in the regular time period, and you

18   will have the appropriate time to reply.

19             MR. MURPHY:  I guess -- well, one procedural

20   issue, as I think about it, Your Honor, because our

21   qualified immunity defense is still out there, and that's

22   why we have the jury specifically identify the two

23   retaliatory acts that we believe undercut their -- or

24   support, rather, their verdict on Count One and Two.  And

25   so would Your Honor prefer us to file a brief on that at

```
 1   the same time as we file our renewed Rule 50 motion and

 2   just address it all at the same time?

 3              THE COURT:  Yes, I think so.

 4              MR. MURPHY:  Okay.  I just wanted to be aware of

 5   any timelines the Court had on that.

 6              THE COURT:  All right.  Anything else?

 7              MR. INTERLANDI:  No.

 8              THE COURT:  Well, counsel, I thank you for your

 9   assistance and your cooperation throughout.  I am going to

10   answer the jury's questions, but you are excused.

11              Thank you.  We will recess court.

12              (In recess, 2:10 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                        CERTIFICATE

 2

 3           RE: LIGHT v. NEW HAVEN, ET AL.

 4               Case No. 3:22-cv-00425-JBA

 5

 6           I, Cassie Zayas, RPR, Official Court Reporter

 7   for the United States District Court, District of

 8   Connecticut, do hereby certify that the foregoing 299

 9   pages are a true and accurate transcription of my

10   stenographic notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13                          _ /s/   CASSIE ZAYAS_____

14                          Official Court Reporter
                            United States District Court
15                          915 Lafayette Boulevard
                            Bridgeport, CT 06604
16

17

18

19

20

21

22

23

24

25
</pre>