## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JESSICA LIGHT,** | : | **CIVIL ACTION NO.** |
| **Plaintiff,** | : | **3:22-cv-00425 (JAM)** |
| | : | |
| **v.** | : | |
| | : | |
| **NEW HAVEN BOARD OF EDUCATION,** | : | |
| **MARGARET-MARY GETHINGS in her** | : | |
| **individual capacity** | : | |
| **Defendants.** | : | **AUGUST 9, 2024** |

### MEMORANDUM OF LAW IN SUPPORT
### OF DEFENDANTS' RENEWED MOTION FOR A DIRECTED VERDICT

Plaintiff Jessica Light brought this lawsuit against the New Haven Board of Education (the "Board") and Margaret-Mary Gethings, the Principal of Worthington Hooker School, claiming that she was retaliated against for exercising her free speech rights when speaking at Board meetings and in a Facebook post in 2021, and that she was defamed. Plaintiff identified 11 specific instances that constituted adverse employment actions, and the Court indicated that Plaintiff would be held to that list at trial in this matter.  After a four-day trial, the jury rejected 10 of the 11 alleged adverse employment actions, finding only that Plaintiff had been retaliated against based on an approximately 90-minute meeting between Plaintiff and her Principal and Assistant Principal. The jury also based its verdict, however, on the Assistant Principal observing Plaintiff in her new 1st grade classroom four or more times between August and October 2021, before Plaintiff went on FMLA leave, which was not even on Plaintiff's list.  In addition, the jury found that Plaintiff had been defamed based on one comment Principal Gethings made in a closed Zoom meeting between Plaintiff, another teacher, their union representative, and the Assistant Principal. The jury's verdict is erroneous and

inconsistent, and without evidentiary or legal support. Based on this erroneous verdict, the jury

awarded Plaintiff $125,000 in economic damages, $650,000 in emotional distress damages,

and $300,000 in punitive damages for the retaliation claims, and $10,000 in special damages

and $15,000 in general damages on the defamation claim. The jury's economic and non-

economic damages awards significantly exceed the amounts even requested by Plaintiff and

exceed any amount that could be based on the evidence offered at trial.  Moreover, a punitive

damages award based on a single meeting and a handful of classroom observations shocks the

conscious. Finally, the jury's erroneous were caused by improper evidentiary rulings ad jury

instructions. Because allowing this verdict to stand would be a grave miscarriage of justice,

Defendants move for a directed verdict notwithstanding the jury's verdict or, in the alternative,

a new trial pursuant to Fed. R. Civ. P. 50, 59, and 60.[1]   In the alternative, Defendants seek

an order vacating the jury's damages awards, or, in the alternative, ordering a large remittitur.

## I.   <u>PROCEDURAL BACKGROUND.</u>

Plaintiff brought a four-count complaint against Defendants.  In Count One, Plaintiff

brought a Conn. Gen. Stat. § 31-51q claim against the Board, her employer.  In Count Two,

Plaintiff brought a First Amendment retaliation claim against Principal Gethings pursuant to 42

U.S.C. § 1983. In Counts Three and Four, Plaintiff brough a false light and a defamation

count against Principal Gethings.  On March 19, 2025, Judge Meyer issued a ruling on

Defendants' Motion for Summary Judgment dismissing the false light claim in its entirety and

dismissed all of the defamation count except regarding one statement allegedly made by

Principal Gethings in a March 31, 2021 meeting with Jenny Clarino, Assistant Principal at

---

[1] Defendants previously made an oral motion for a directed verdict at the close of evidence. *See* Ecf. 106.

Worthington Hooker, Plaintiff, another teacher, and the teacher's union representative.  *See* ECF 49. Judge Meyer denied the motion as to Counts One and Two.

At the July 29, 2024 pre-trial conference, Defendants' counsel noted that it was still unclear what specific acts Plaintiff believed constituted adverse employment actions under federal law and discipline under state law. In response, Plaintiff's counsel then identified 11 specific acts that Plaintiff would argue were retaliatory:

1. Reassignment from 3rd to 1st grade for the 21-22 school year (7/29/24 Tr. p. 17)[2];
2. Being excluded from and/or being taken off of certain committees (*Id.*);
3. An issue with the PTA parent teacher representative position (*Id.*);
4. Accusations or spreading rumors that Plaintiff was the source of the disclosure of Teacher X's COVID diagnosis (*Id.*);
5. Principal Gethings talking to a witness during the Board's investigation of Plaintiff's complaint (*Id.*);
6. An unidentified person allegedly leaving a copy of an email from Plaintiff's husband to their child's current teacher on a printer in Plaintiff's grade level teaching partner's classroom (*Id.* p 18);
7. An unidentified person allegedly leaving a copy of a complaint Hillarie Alden (another teacher) filed against Plaintiff in another teacher's mailbox (*Id.*);
8. The Board's human resources department telling Plaintiff to return to work in January 2022 without any remedial measures (*Id.* p. 19)
9. Principal Gethings allegedly reprimanding a paraprofessional for her taking over Plaintiff's classroom on one occasion during dismissal (*Id.* p. 20-21);
10. Principal Gethings meeting with Timothy Shortt, a teacher and the new union representative in Fall 2022 and saying that she heard Mr. Shortt was allegedly in alignment with Plaintiff (*Id.* p. 21); and
11. The length of an evaluation meeting (the TEVAL meeting) in March 2021 and the fact that Plaintiff did not have union representative present (*Id.* pg. 23).

Because it appeared that Plaintiff's counsel had left off two acts that Plaintiff previously argued were retaliatory, Defendants' counsel asked about it:

| The Court: | Why are you making this list longer, Mr. Murphy? |
| Mr. Murphy: | I don't want to be surprised next week, Your Honor. |
| The Court: | You won't be surprised because this is the list. Go ahead. |

---

[2] Relevant portions of the 7/29/24 transcript are attached as Exhibit A.

(Id. p. 20). A short time later, a similar discussion about the exact number of allegedly retaliatory acts claimed by Plaintiff occurred:

| | |
|---|---|
| Mr. Murphy: | I want to make sure you understood it.  Right now we have a list -- I counted ten, I hope that matches up with what Your Honor has. Ten things that – yes, okay.  Ten different things that potentially may be retaliatory acts either by themselves or collectively. But then I also heard that if the report's admitted it will be limited to four. I want to make sure I understood that correctly. |
| Mr. Interlandi: | Yes, Your Honor. That's what I said. |
| Mr. Murphy: | Okay. |
| The Court: | So what are you doing, withdrawing your motion to limine [to exclude the Bercham Moses report]? |
| Mr. Murphy: | No, not at all. |
| The Court: | We're going to get to that right now. |
| Mr. Murphy: | Thank you, Your Honor. I didn't mean to interrupt. I wanted to make sure we were on the same page. |
| The Court: | There are ten—I just wanted to make sure we aren't going to have any more. |

(*Id.* p. 22). At the end of that discussion, Plaintiff's counsel added an eleventh allegedly retaliatory act: Plaintiff being subjected to an unusual in length meeting with two administrators, without her union representative present. (*Id.* pg. 23).  The Court then noted that there were "eleven" allegedly retaliatory acts. (*Id.*)

Later, the parties discussed the admissibility of evidence related to Plaintiff's Summer 2022 application to return to a 3rd-grade position at Worthington Hooker and August 2022 anonymous notes, which Defendants sought to preclude from evidence:

| | |
|---|---|
| Mr. Murphy: | Your Honor, my concerns with those notes and the related argument that those notes caused her to transfer out of the school and the application for the third grade position that Ms. Light wanted, those are couched as additional incidents of retaliation. My strong concern is that they jury is going to use those to find that they were – to support a finding that there was retaliation against her. |
| The Court: | But that's not in the list [of 11 items of alleged retaliatory acts]. |
| Mr. Murphy: | It's not. |
| The Court: | So you don't have to worry about it. |

(*Id*. p. 33). However, on the verdict form the jury stated that they found the following two acts to be adverse employment actions: (1) "Extended teval conversation not regarding Ms. Light's teaching[,]" and (2) "Ms. Clarino excessively shadowing Ms. Light from Aug – Oct 2021 prior to FMLA absence," which was no on the list Plaintiff was being held to. Ecf. 110 at 2. Based on these findings, the jury award Plaintiff $75,000 in economic damages, $350,000 in non-economic damages, and $200,000 in punitive damages on Count Two. *Id*. at 5. On Count One, and awarded Plaintiff $50,000 in compensatory damages, $300,000 in non-economic damages, and $100,000 in punitive damages. *Id*. at 4. Finally, the jury found that Plaintiff had proven her defamation claim and awarded Plaintiff $25,000 in total damages. *Id*. at 6.

## II.   LEGAL STANDARD.

### A. Rule 50 Motion.

Rule 50(a) of the Federal Rules of Civil Procedure permits the entry of judgment as a matter of law if a "party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue …." If the court does not grant the motion made under Rule 50(a), a movant may file a renewed motion for judgment as a matter of law. Fed. R. Civ. P. 50(b). A trial court considering a motion under Rule 50(b) "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 16 (2d Cir. 1993). A jury verdict should be set aside when "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or where there is such an overwhelming amount of evidence in favor of the movant that

reasonable and fair minded persons could not arrive at a verdict against the movant." *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1022 (2d Cir. 1995).

B. **Rule 59 Motion.**

Rule 59 of the Federal Rules of Civil Procedure allows a district court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). The Second Circuit has held that a district court should grant a motion for a new trial when it finds that "the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992). In assessing such a motion, the "trial judge is free to weigh the evidence [it]self, and need not view it in the light most favorable to the verdict winner," and the court may grant such a motion "even if there is substantial evidence supporting the jury's verdict." *Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003). Granting of a new trial is appropriate "when the jury's verdict is against the weight of the evidence[]" and is "egregious." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998). In addition, "[i]f a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995).

C. **Rule 60 Motion.**

Rule 60(b) sets forth the grounds on which a court, in its discretion, can provide relief from a final judgment or order. *See Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). The Rule allows a court to relieve a party of a final judgment for, among other reasons, "mistake,

inadvertence, surprise, or excusable neglect" or "any other reason that justifies relief." Fed.

R. Civ. P. 60(b)(1), (6). Rule 60(b) should be read broadly to do "substantial justice," and

may be granted "upon a showing of exceptional circumstances." *Nemaizer*, 793 F.2d at 61. It

"is intended to 'cover unforeseen contingencies, intended to be a means for accomplishing

justice...'" *United States v. McDonald*, 86 F.R.D. 204, 208 (N.D. Ill. 1980) (quoting 7

Moore's Federal Practice P 60.27(2), pp. 353-354). Where, as here, there are such

"extraordinary circumstances or hardship…, Rule 60(b)(6) is to be liberally applied to

'accomplish justice.'" *Id*. (quoting 7 Moore's Federal Practice P 60.27(2), pp. 352 et seq.).

## III.   DEFENDANTS ARE ENTITLED TO RELIEF FROM THE VERDICT ON THE RETALIATION CLAIMS OR A NEW TRIAL ON THOSE CLAIMS.

Again, a court may enter judgment for a party under Rule 50(a) when if a "party has

been fully heard on an issue during a jury trial and the court finds that a reasonable jury would

not have a legally sufficient evidentiary basis to find for the party on that issue …." A court

also may a motion for a new trial under Rule 59 when it finds that "the jury has reached a

seriously erroneous result or the verdict is a miscarriage of justice." *Song*, 957 F.2d at 1047.

Similarly, under Rule 60, a Court can provide relief from a verdict for "mistake" or "any

other reason that justifies relief." Fed. R. Civ. P. 60(b)(1), (6).  For example, in *Conte v.

Emmons*, 895 F.3d 168 (2d Cir. 2018), the Second Circuit reversed a verdict finding that two

prosecutors and an investigator were liable for tortious interference based on an investigation

into the plaintiff's business when no charges ever were brought and plaintiff's business failed.

*Id*. at 170.  The jury awarded plaintiff $1,381,500 in damages, including $678,000 in punitive

damages. *Id*.  After reviewing the evidence, the Second Circuit vacated the verdict because it

could only have been "sheer surmise and conjecture," adding:

In our view, it would be to the detriment of law enforcement to accept the jury's inferential finding of a purposeful intent on this bare record. It would invite suits against prosecutors (and their staff) any time a plausible allegation that the subject of an investigation lost business as the result of a reasonably triggered investigation is coupled with some indication that the investigators were somewhat overzealous in going after the subject. The jury's intent finding that the appellants purposefully targeted particular contracts is wholly without support.

*Id*. Like in *Conte*, the jury's verdict here was based on "sheer surmise and conjecture."

As cited above in this Memorandum, it is undisputed that:

- At the pretrial conference, the Court forced Plaintiff to specify the adverse employment actions that she believed were retaliatory;
- In response, Plaintiff's counsel identified 11 allegedly retaliatory actions;
- The Court indicated that it would hold Plaintiff to that "list" of 11 actions, and that Defendants did not "have to worry" about actions not on the list;
- Count Two is only directed at Principal Gethings, as Plaintiff chose not to name Ms. Clarino as a defendant;
- The jury instructions and verdict form addressed Count Two to Principal Gethings.
- Despite being directed only to Principal Gethings, the jury based its verdict in Count Two on Ms. Clarino "excessively shadowing" Ms. Light in August to October 2021; and
- Ms. Clarino "excessively shadowing" Ms. Light is not on Plaintiff's list of 11 allegedly retaliatory acts.

Based on the Court's instruction that Defendants did not have to worry about acts not on the

list, Defendants did not call Ms. Clarino as a witness or put on any significant evidence

concerning the appropriateness of evaluations in the lower school during the start of the 21-22

school year. Similarly, Plaintiff's counsel's closing PowerPoint presentation to the jury did not

even mention Ms. Clarino's observations. *See generally* 08.09.24 Tr.,p. 836-65.[3] This is not

surprising given that it was not on the "list," was not included in Plaintiff's pre-trial papers,

and even before that was not included in Plaintiff's summary judgment papers. *See* Ecf. 28,

pg. 17.  The jury based their verdict on an issue never raised or argued by Plaintiff.

---

[3] Relevant excerpts of the 8/9/24 Transcript are attached as Ex. B.

The jury also used this improper consideration of Ms. Clarino's observations to award excessive damages to Plaintiff on Count Two.  When doing so, the jury did not allocate a certain amount of damages to either of the two acts they found to be retaliatory.  Instead, it awarded damages based on both of those acts together. *See* Ecf. 110. At this point, there is no ability to separate Ms. Clarino's observations from the TEVAL meeting for purposes of allocating damages to one or the other, and no ability to determine if the jury would have found liability based just on the TEVAL meeting, if they were instructed that they could not consider Ms. Clarino's observations on the issue of liability.  If anything, this error calls into question the jury's entire verdict, and the Court should presume that the jury would *not* have found liability based just on the TEVAL meeting, as Plaintiff represented in her opening argument, in response to Defendants' motion for a directed version, and in closing argument that she was relying on the argument that there was a "critical mass" of incidents that collectively constituted retaliation, and not that any specific act was retaliatory under the law. For example, in his closing argument, Plaintiff's counsel argued: "And what we are able to do is connect these minor or lesser events to establish a critical mass, to establish an adverse employment action." (8/19/24 Tr. pg. 847). Having rejected the other 10 allegedly retaliatory acts, the jury would not have found retaliation based just on the TEVAL meeting. Accordingly, the entire verdict on Count Two is seriously erroneous, a miscarriage of justice, and an "exceptional circumstance" that requires post-trial relief from the Court under Rule 50, 59, and 60. *Song*, 957 F.2d at 1047; *Nemaizer*, 793 F.2d at 61.[4] Specifically, the entirety of

---

[4] If they had known that the observations could have been a basis for the retaliation claims, Defendants would have moved for a directed verdict against that act at the close of evidence. They could not, however, because as noted previously they did not know this was a possible ground for the § 1983 claim based on the Court's pre-trial instructions, Plaintiff's counsel's representations, and Plaintiff's opening and closing arguments to the jury.

the verdict in Count Two must be vacated and judgment entered for Principal Gethings or

Defendants should be granted a new trial on Count Two.

The same conclusion must be reached in Count One as well. Although they were

separated on the verdict form, and § 1983 uses the term "adverse employment action" and

§ 31-51q uses the term "discipline," Plaintiff contended at the pre-trial hearing that there was

no difference between those two terms. *See* Exhibit A, p. 16 (Plaintiff's counsel stating "No, I

don't think there is any difference in adverse action versus retaliatory acts."). In addition,

Plaintiff's closing argument failed to distinguish between adverse employment actions or

discipline.  Instead, Plaintiff argued both of the retaliation claims together.  At this point,

therefore, there is no basis for the Court to find that the retaliation claim in Count One was

based on anything other than the same two acts that formed the basis of the jury's verdict on

Count Two.  In other words, because the jury rejected 10 of the 11 proposed retaliatory acts

when finding in favor of Plaintiff on Count Two, the Court must conclude that the jury did the

same in regard to Count One and only based that verdict on the same two acts it listed in

regard to Count Two. Just like with Count Two, therefore, the verdict on Count One also is

seriously erroneous, a miscarriage of justice, and an exceptional circumstance that requires

post-trial relief from the Court. *Nemaizer*, 793 F.2d at 61; *Song*, 957 F.2d at 1047.

## IV.   DEFENDANTS ARE ENTITLED TO A DIRECTED VERDICT ON THE RETALIATION CLAIMS.

Plaintiff presented a list of 11 allegedly retaliatory acts to the Court, Defendants, and

the jury. The jury rejected 10 of those 11 acts as retaliatory, and found that only one of them,

when combined with another act not on the list, constituted retaliation.  The one act from

outside the list (the Clarino observations) must be rejected as a proper ground for the verdict

for the reasons set forth above, and the one act from the list, the TEVAL meeting, cannot support a verdict under either federal or state law.  Therefore, Defendants are entitled to judgment as a matter of law notwithstanding the jury's verdict on Counts One and Two.

    A.    <u>Plaintiff was relying entirely on a combination of events to prove retaliation.</u>

To assess Defendants' arguments properly, it is important to examine the argument Plaintiff made to the Court and the jury about scope of the retaliation claims.  In recognition that "incidents that are infrequent and relatively minor[,]" Ecf. 114, pg 5, are insufficient, Plaintiff's counsel introduced Plaintiff's claims by informing the jury that this entire case was about a "*pattern* of retaliation." (8/5/24 Tr. pg. 18 (emphasis added)).  Through direct testimony from Plaintiff and her supporting witnesses, Plaintiff then presented evidence concerning all 11 of the actions on the list, attempting to prove a critical mass of incidents that together constituted retaliation. At the end of evidence, Defense counsel made an oral motion for a directed verdict under Rule 50, arguing that each of those incidents standing alone were not sufficient to meet the definition of an adverse employment action or discipline under both federal and state law.

In response to that motion, Plaintiff's counsel acknowledged that the events here were "seemingly minor[,]" but rose to the level of retaliation because they "add up to a critical mass." (8.8.24 Tr. pg. 774).[5] He further acknowledged that these "seemingly minor" events would "deter someone or create a hostile work environment or inferior environment[]" *because of* their "critical mass[.]" (*Id.* pg. 775). He even explained that he drafted the jury instructions to address this "critical mass" because "we have a bunch of seemingly minor

---

[5] Relevant excerpts from the August 8, 2024 transcript are attached as Exhibit C.

incidents that are making their way and building up to a critical mass[,]" thus recognizing that the events, in and of themselves, were insufficient to establish liability. (*Id.* pg. 777). Finally, he argued that a directed verdict was not appropriate because the "minor incidents add up to a critical mass and that is for the jury to decide, Your Honor." (*Id.* pg. 779).

Thus, Plaintiff was clear that the Rule 50 motion should be denied only because of the aggregate of events: there is no claim that any one of the events, standing alone, constituted an adverse employment action or discipline. Plaintiff previously requested such a jury charge, which the Court accepted and instructed the jury consistent with that request on both the state and federal retaliation claims. *See* Ecf. 114, pg 5, 8.[6] At closing, Plaintiff's counsel that the minor incidents raised by Plaintiff constituted a critical mass of incidents that, when taken together constitute retaliation, again admitting that the events, individually, were "minor or lesser," but asking the jury to "connect" them "to establish a critical mass, to establish an adverse employment action." *See* 8/19/24 Tr. pg. 847. As this proves, Plaintiff was only proceeding on the argument that there was a critical mass of retaliatory acts against her.

B.    Plaintiff failed to prove that she suffered a critical mass of retaliatory events.

Here, the jury found retaliation based on two events: (1) the TEVAL meeting and (2) Ms. Clarino's observations. As noted above, Ms. Clarino's observations are outside the list of

---

[6] For the § 31-51q claim, the Court instructed that discipline "can also include a combination of lesser acts that, in the aggregate, make the working environment unreasonably inferior, hostile, or adverse to the employee when compared to a typical or normal workplace. However, incidents that are infrequent and relatively minor do not meet this standard." *See* Ecf. 114, pg 5. For the § 1983 claim, the Court instructed the jury that: "You may find that Ms. Light has satisfied this [adverse employment action] element if she has proved that she experienced at least one employment action of this sort. You may also find that Ms. Light has satisfied this element if she proves she experienced a combination of seemingly minor incidents that reached a critical mass. In order to assess the impact of these more minor incidents, you must consider whether the totality of those incidents would objectively make the working environment unreasonably inferior, hostile, or adverse to the employee when compared to a typical or normal workplace." *See* Ecf. 114, pg 8.

11 actions that the Court allowed Plaintiff to proceed with and never argued by Plaintiff to be retaliatory.  Therefore, the Clarino observations cannot form part of a "critical mass" of incidents that could support the jury's verdict. Once the Court eliminates Ms. Clarino's observations as a basis for the retaliation verdicts, the TEVAL meeting standing alone, by definition, is a "minor" event like those contemplated in our precedent, and cannot establish retaliation (and one event, alone, cannot be a "critical mass").  Therefore, Defendants are entitled to a directed verdict on both Counts One and Two as no reasonable jury could find in Plaintiff's favor based on a single action under Plaintiff's theory of the case and the definitions set forth in the Court's jury instructions.

> C.    The jury could not have found a critical mass based on two incidents.

Even if the Court were to consider Ms. Clarino's observations as an appropriate ground for the retaliation verdicts, which it cannot do, those two events still cannot meet the definition of adverse employment action or discipline under the instructions given to the jury.  Both of those definitions discuss a "combination" of acts or incidents.  The jury rejected Plaintiff's arguments about 10 of the 11 allegedly retaliatory acts.  The jury then based its verdicts on two separate acts, separated by five months and conducted by different individuals: The TEVAL meeting in March 2022 with Ms. Clarino and Principal Gethings, and the observations in August to October 2022 by Ms. Clarino.  There is no pattern connecting them, and two separate events five months apart fail to meet the level necessary to support a finding of a critical mass of incidents.[7] At best, these are the exact type of "infrequent and relatively

---

[7] This conclusion is buttressed by the fact that both of those events—the TEVAL meeting and the observations— are established parts of the teacher evaluation process and normal supervisory activities.  Indeed, Plaintiff testified that observations were a part of the TEVAL process, that she had been observed before the 21-22 school year as part of the TEVAL evaluation process, that there is a mid-year TEVAL meeting as part of that process, and that

minor" events that the Court specifically instructed the jury do not meet the standard for discipline. Put differently, they are not the type of "otherwise minor incidents that occur *often and over a long period of time* may be actionable if they attain the critical mass of unreasonably inferiority." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002).[8]

Moreover, no reasonable jury could find based on the evidence that the evaluations met the Court's definition of adverse employment action or discipline based on Ms. Light's testimony, which in its entirety was the following:

> Q. So now you're teaching first grade. You mentioned observations. Who was observing you in your classroom?
>
> A. Ms. Clarino was observing me.  My students.
>
> Q. How often does an assistant principal observe the teachers in the school, in your experience?
>
> A. So, typically, you have two to maybe four observations a year.
>
> Q. How many times did Ms. Clarino observe you from the end of August to the middle of October in 2021?
>
> A. She was in my room very regularly.  And she would sit with her computer taking notes on the observation.  Or appeared to be taking notes.  She could have been doing something else on her computer.
>
> Q. When you say "regularly," are you able to provide the Court with a number of times you think that she observed you?
>
> A. I believe she observed me well over four in the first two months.
>
> Q. Did you think that was strange?
>
> A. Yes.
>
> Q. Why?
>
> A. Um, because I never received any of the written feedback from the observations.  And I felt like it's just not typical to be kind of that scrutinized that early in the year when you're trying to get your footing in

---

she had good TEVAL ratings in the past based on "lots of evaluations." *See* 8/5/24 Tr., pg 40-42, attached as Exhibit D. Thus, by Plaintiff's own testimony, both the TEVAL meeting and Ms. Clarino's observations were established parts of the teacher evaluation process.

[8] In contrast, other cases involve more than two events. *See, e.g.*, *Rackley v. Constellis, LLC*, 2024 WL 3498718, at *30 (S.D.N.Y. June 17, 2024) (finding two failures to promote, lack of email access, lack of access to breaks, and removal of firearms instructor were a critical mass of events); *Wang v. New York City Dep't of Youth & Cmty. Dev.*, 2024 WL 1174723, at *6 (S.D.N.Y. Mar. 19, 2024) (denying to dismiss retaliation claims based on a pattern of alleged conduct, including "which includes false accusations concerning Plaintiff's refusal to work or not adequately performing her work, admonition of Plaintiff in front of her colleagues, threats of discipline and disciplinary action, reassignment of Plaintiff's duties, increased workload, and refusal to provide accommodations for her disability[]").

a new position.

*See* 8.5.24 Tr. pg. 132-133.[9] Plaintiff did not connect these "strange" observations to her prior speech or any future speech. Even when viewed in Plaintiff's favor, the Court must conclude that no person of ordinary firmness, who had been observed "lots" of times in the past as part of a teacher evaluation process, would believe that Ms. Clarino's four or more observations of a teacher in a new grade level in Fall 2021 constituted an adverse employment action—especially since Plaintiff never saw Ms. Clarino's notes from the evaluations.

In addition to failing to prove adverse employment actions or discipline, Plaintiff failed to demonstrate that the August to October observations had any causal connection to Plaintiff's speech at the Board meetings in early 2022 or the March 2022 Facebook post.  The observations occurred in August to October, at least five months after the protected speech, belying any argument based on temporal proximity.  They also occurred after Plaintiff moved to a new grade that she had not taught before in a new building where Ms. Clarino was the administrator in charge. *See* 8/5/24 Tr. p.129; *see also* Ex. 24 pg. 10-18. Plaintiff does not know the normal observation schedule in the "little school," but conceded that observations are a part of the TEVAL process. *See* 8.6.24 Tr. pg 328.[10] Based on the evidence presented, it was pure speculation for the jury to conclude that there was a causal connection between Plaintiff's speech and the observations, and Defendants are entitled to a directed verdict.

D.    The TEVAL incident is insufficient standing alone to support the jury's verdicts.

In the jury instructions, the Court defined discipline under state law as "an adverse material action taken against Ms. Light by Ms. Gethings by May 2022." ECF 114, p.5.

---

[9] Relevant excerpts of the 8/5/24 Transcript at attached as Exhibit D.
[10] Relevant excerpts of the 8/6/24 Transcript are attached as Exhibit E.

Similarly, the Court instructed the jury that adverse employment action "means an action that is taken by an employer against an employee that is significant enough that it would deter a reasonable and similarly situated person of ordinary firmness from exercising his or her constitutional right to free speech." *Id*. p.8.  It is undisputed that the TEVAL meeting was between a teacher and her Principal and Assistant Principal. According to the transcript provided by Plaintiff's secret recording (Exhibit 24), and testimony from Plaintiff and Principal Gethings, it is clear that the parties discussed Plaintiff's recent performance in the classroom, her potential move to a different grade due to her child moving up to third grade, possible grade levels for Plaintiff to teach, her dyslexia (which she disclosed for the first time), Teacher X's possible forthcoming complaint about Plaintiff, Plaintiff's Facebook post, the importance of accurate information being provided to the school community, and COVID protocols.[11]  Although Plaintiff may have disagreed with the length of the evaluation meeting, there was no evidence that this violated any school policy or protocol or the teachers' union contract, that there was a time limitation for these meetings, or that Principal Gethings had any intent other than taking advantage of rare one-on-one time with one of her teachers. Moreover, the transcript demonstrates that Plaintiff was an active, equal partner in the conversation with Principal Gethings and Assistant Principal Clarino. (Ex. 24) This meeting did not impact Plaintiff's pay, schedule, or any other material term of employment, and even resulted in an

---

[11] *See, e.g,* Exhibit 24 pages 1-7 (recent performance), 7-10 (her goals), 10-18 (upcoming grade level change and Plaintiff's dyslexia), 18-59 (a freewheeling discussion of how information is disclosed, the Facebook posts and questions to the Board, COVID safety protocols, and a potential complaint by Teacher X against Plaintiff).  As the transcript further demonstrates, Principal Gethings started the portion of the conversation beginning on page 18 by stating that the "next part is uncharted conversation for you I believe and definitely for us . . . It does fall in the TEVAL piece of professionalism and we have a situation that Jenny will speak to and I have some information that we know will be sensitive to you and we want to make you aware[,]" prohibiting any conclusion that Principal Gethings was motivated by any retaliatory intent in having this conversation with her employee.

overwhelmingly positive written evaluation. (Exhibit 4)[12] In short, no person of ordinary firmness would have been deterred from additional exercises of free speech rights based on that conversation alone.  The jury did not decide that the TEVAL meeting, standing alone, met the definition of adverse employment action or discipline, and they could not have reached that conclusion based on the evidence presented and the instructions from the Court.  Thus, Defendants are entitled to a directed verdict on Counts One and Two.

## V.   **PRINCIPAL GETHINGS IS ENTITLED TO QUALIFIED IMMUNITY FROM THE ACTS FOUND TO BE RETALIATORY IN COUNT TWO.**

The Court's verdict form that required the jury to list items they found to be adverse employment actions for purposes of the § 1983 claim. The jury listed two actions. Based on those findings, the Court should find that Principal Gethings is entitled to qualified immunity.

### A. **Legal Standard.**

Under "the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate clearly established rights or if it would have been objectively reasonable for the official to believe his conduct did not violate plaintiff's rights.'" *Reuland v. Hynes,* 460 F.3d 409, 419 (2d Cir.2006) (quoting *Mandell v. Cnty. Of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003)). "A right is 'clearly established' when '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Jackler v. Byrne,* 658 F.3d 225, 242 (2d Cir.2011) (alterations in original) (quoting *Anderson v.*

---

[12] Plaintiff argued that the content of the TEVAL document was negative, retaliatory, and meant to identify her as a difficult employee.  The jury disagreed as the document itself was not found to be an adverse employment action.  This inconsistency between the jury finding the extended length of the meeting retaliatory but the document summarizing the meeting not to be retaliatory is another reason why the verdict must be vacated.

*Creighton,* 483 U.S. 635, 640 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 243 (internal quotation marks omitted). Even if neither the Supreme Court nor this Court has explicitly held a course of conduct to be unconstitutional, the law may still be considered "clearly established so long as [the Second Circuit's] decisions clearly foreshadow a particular ruling on the issue." *Tellier v. Fields,* 280 F.3d 69, 84 (2d Cir.2000) (internal quotation marks omitted). In the Second Circuit, there is a strong presumption favoring granting qualified immunity, and the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Connecticut v. Crottlr,* 346 F.3d 84, 102 (2d Cir. 2003).

**B.  Principal Gethings' conduct did not violate clearly established rights.**

As stated previously, "[t]he defense of qualified immunity shields government agents "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). A right is "clearly established" when "[t]he contours of the right [are] ... sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [T]he unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). The law must be clearly established at the time the defendant acted, not at the time of judicial review. *See, e.g.*, *Lynch v. Ackley*, 811 F.3d 569, 578 (2d Cir. 2016); *Robison v. Via*, 821 F.2d 913, 920-21 (2d Cir. 1987). Thus, a court should court should look to the following factors to determine whether right was clearly established at time defendant acted: (1) whether the right in question was defined with reasonable specificity; (2) whether the

decisional law of the Supreme Court and the applicable circuit court support the existence of

the right in question; and (3) whether under preexisting law a reasonable defendant official

would have understood that his or her acts were unlawful. *Jermosen v. Smith,* 945 F.2d 547,

550 (2d Cir. 1991); *McEvoy v. Spencer*, 124 F.3d 92, 97 (2d Cir. 1997).

For example, in *Lynch*, a police officer (and member and officer of the police union)

alleged under 42 U.S.C. § 1983 that the Chief of Police violated his First Amendment rights

by retaliating against him for various episodes of speech critical of the Chief's performance as

Chief. *Id*. at 573. The Court (Arterton, J.) initially denied the Chief's motion to dismiss on the

grounds of qualified immunity.  After discovery, the Court (Shea, J.) then denied the Chief's

motion for summary judgment, finding among other things that, although Plaintiff's speech

was protected from retaliation under the First Amendment, the Plaintiff had "raised genuine

issues of fact as to whether Ackley's conduct amounted to an adverse employment action,

whether Ackley had a retaliatory motive for taking those actions. . . ." *Id*. at 576. On appeal,

the Second Circuit reversed, finding that "there was no clear law at the time of the events

establishing that [the Chief's] conduct constituted a First Amendment violation, and we express

no view on whether [the Chief's] alleged conduct should be found to violate the First

Amendment." *Id*. Specifically, the Second Circuit concluded that there was "no clear law or

precedent" communicating to the Chief that her speech in an effort to defend herself publicly

against the plaintiff's attacks on her performance violated the plaintiff's free speech rights. *Id*.

at 579; *compare Sorensen v. City of New York*, 42 F. App'x 507, 510 (2d Cir. 2002)

(declining qualified immunity because, "[a]t the time" of the alleged conduct, "at least three

decisions in this circuit had held that a strip search of a person arrested for a misdemeanor and

awaiting arraignment was unconstitutional in the absence of a reasonable suspicion that the arrestee carried concealed weapons or other contraband."). [13]

The same conclusion reached by the Second Circuit in *Lynch* is applicable to this case. Again, the jury found the two adverse actions to be (1) extended TEVAL conversation not regarding Ms. Light's teaching, and (2) Ms. Clarino excessively shadowing Ms. Light from Aug-Oct 2021 prior to FMLA absence. *See* Ecf. 110. Even accepting Ms. Light's testimony as true that Ms. Clarino observed her 4 times or more between August and October, Plaintiff has not identified any clearly established precedent showing that such conduct would violate Plaintiff's constitutional rights. This is not surprising given Plaintiff's testimony that the observations are part of the Connecticut's teacher evaluation system and thus something every teacher participates in. *See supra* n.7. Thus, even if the observations by Ms. Clarino could be inferred to be caused by Principal Gethings, Principal Gethings would still be entitled to qualified immunity in regard to that finding by the jury. Any contrary result would have a chilling effect on employee management throughout the state, putting administrators in fear of performing the most basic of their job functions, a result that cannot stand.

Similarly, Plaintiff has not shown any clearly established precedent establishing that a Principal meeting with a teacher for an "extended" time violates that teacher's constitutional rights. Again, this is not surprising because the meeting was held pursuant to Connecticut's

---

[13] In *Barzilay v. City of New York*, 610 F. Supp. 3d 544 (S.D.N.Y. 2022), a case remarkably similar to the events here, where an EMT spoke publicly about COVID-19 safety protocols, the court concluded that the employee was speaking of a matter of public concern, thus engaging in protected speech. However, the employee's supervisor was granted qualified immunity protection for the alleged retaliation acts because it was had not been clearly established in this Circuit that the employees' speech regarding COVID-19 safety protocols was of a matter of public concern versus private concern, noting that the speech had "some flavor of a 'personal grievance.'" *Barzilay*, 610 F. Supp. 3d at 603. This decision was released July 8, 2022—after the conduct at issue here— further demonstrating that the "clearly established law" that would prevent Principal Gethings from being entitled to qualified immunity was not in place *at the time* of the conduct at issue here.

teacher evaluation program, Plaintiff had participated in such meetings before, and there was no evidence that there was any time limitation on such meeting. *See supra* n.8.  Plaintiff's inability to show any clearly established precedent applicable to this case is made even more clear when the Court considers that the meeting was held in March 2021, just two months after the students returned to in-person instruction from an unprecedented pandemic that closed in person instruction in New Haven from March 2020 to January 2021. Given the volume of topics discussed in that meeting, and their relation to the pandemic, no case clearly establishes that the length or topics of that meeting violated Plaintiff's constitutional rights.

## C. Principal Gethings' conduct was objectively reasonable.

Even if the law was clearly established at the time, it was objectively reasonable for Principal Gethings to believe that the TEVAL meeting and the observations did not violate Plaintiff's constitutional rights. Under Second Circuit precedent, qualified immunity is still warranted even though the law was clearly established if "it was objectively reasonable for [the defendant] to believe that his acts did not violate those rights." *Robison*, 821 F.2d at 921; *Sorensen*, 42 F. App'x at 509–10. At this stage, the court must determine if the defendant "adduce[d] sufficient facts such that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Robison*, 821 F.2d at 921 (cleaned up). If a defendant makes such a showing, the defendant is entitled to qualified immunity. *Id*. at 922 (finding that "no rational juror" could find defendants' actions were not "objectively reasonable" and granting summary judgment); *Myers v. Morris*, 810 F.2d 1437,

1454–57 (8th Cir. 1987) (denial of summary judgment reversed when undisputed facts showed that the existence of probable cause for an arrest warrant was at least arguable).

Here, the jury was not asked to make a finding on the issue of whether it was objectively reasonable for Principal Gethings to believe that, if there were any adverse employment actions, whether it was objectively reasonable to believe that those actions did not violate Plaintiff's constitutional rights. Instead, the jury was just asked to identify the alleged adverse employment actions that Plaintiff had proved by a preponderance of the evidence, and the question of the objective reasonableness of Principal Gethings' conduct related to those adverse employment actions was reserved for the Court. *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018)("After the factfinder's decision as to what the facts were that the officer faced or perceived, the court then may make the ultimate legal determination of whether qualified immunity attaches on those facts."). In accordance with the verdict form, the jury then found two adverse employment actions, only one of which was part of Plaintiff's case. *See* Ecf. 110.  Now, based on the evidence presented at trial, the Court must find that it in fact was objectively reasonable for Principal Gethings to (1) meet with Plaintiff for an "extended time" in a TEVAL meeting in this COVID time and (2) to the extent there was any involvement by Principal Gethings in Ms. Clarino's decision to observe Plaintiff 4 or more times in Fall 2021, for her to suggest or support that number of evaluations during that time period. The evidence from trial demonstrates that the answer to this question is yes.

Again, there was testimony from Plaintiff that the midyear TEVAL meeting and the observations were part of Connecticut's teacher evaluation process, that she was observed lots in the past, and that a midyear TEVAL meeting is part of the evaluation process. *See supra*

n.8. Plaintiff or her union never grieved either the meeting or the observations under teachers' union contract. *See* 8/5/24 Tr. p.190-91; 8/6/24 Tr. p. 246. Principal Gethings is the head administrator at Worthington Hooker, and is charged with oversight over all aspects of running the school, including addressing teacher performance. *See* 8.8.24 Tr. pg. 614. Plaintiff was moving to the little school the next school year with a grade change, where Ms. Clarino was in charge. *See* 8.9.24 Tr. pg. 650. Because of COVID the Board was not doing teacher ratings, and therefore the meetings were used for feedback on a wider range of issues. *Id.* p.650-51; *see also* id. p.703. As such, it was objectively reasonable for her to believe that the mid-year meeting and observations in Fall 2021 did not violate Plaintiff's constitutional rights.

## VI.    THE JURY'S DEFAMTION CLAIM MUST BE SET ASIDE.

The jury was instructed that, in order to "prove the third element of her [defamation] claim, Ms. Light must show her reputation suffered injury as a result of Ms. Gethings' statement." (Ecf. 114, p.10).  Even when viewing all of the evidence in a light most favorable to Plaintiff, however, there was legally sufficient evidentiary basis for the jury to find for Plaintiff on that issue.  Therefore, Principal Gethings is entitled to a directed verdict.

The defamation claim is based on one statement Principal Gethings made in the March 31, 2021 meeting. It is undisputed from the testimony that this meeting involved Principal Gethings, Ms. Clarino, Plaintiff, Teacher X, and Kathleen Morrisson, the teacher's union representative. *See* 8/6/24 Tr. p. 291, 327, 374-75. Ms. Morrison reported Plaintiff's March 8, 2021 Facebook posts to Principal Gethings, and Plaintiff believed that Ms. Morrison was not there to represent her. *Id.*; 8/8/24 Tr. pg. 632-33.  The meeting was held due to Teacher X's concerns that Plaintiff leaked Teacher X's COVID positive status to the school community. (Ex.25, pg. 4-5, 13). Teacher X told Plaintiff in that meeting it would take a while for her to

23

trust Plaintiff again. (*Id*. p.15). Plaintiff provided no evidence that Principal Gethings'
statement was repeated outside of that meeting, and Plaintiff provided no evidence that her
reputation with any of those participants was worse after Principal Gethings' statement.
Moreover, Plaintiff failed to provide any evidence that this statement was disclosed outside of
that closed meeting or had any impact on her reputation.  The jury's verdict was based solely
on speculation and Principal Gethings is entitled to a directed verdict on the defamation count.

**VII.   DEFENDANTS ARE ENTITLED TO A NEW TRIAL DUE TO IMPROPER
JURY INSTURCTIONS**.

In this case, the Court instructed the jury that "[t]o prove the third element of her
claim, Ms. Light must show that her protected speech was the cause of her discipline. The
protected speech is the cause of her discipline if it was a 'substantial factor' or to put it in other
words, a 'motivating factor' in the discipline." (Ecf. 114, p. 5, 8). This instruction was
contrary to Defendants' proposed instruction, which was "[t]he protected speech is the cause of
her discipline if it was a substantial motivating factor in her discipline." This instruction also
was contrary to the prior standard employed by Judge Meyer when ruling on Defendants'
motion for summary judgment in this matter. *See* Ecf. 49, p.14.  Finally, it is contrary to prior
cases in this Circuit. *See, e.g.*, *D'Onofrio v. Westport/Weston Health Dist.*, 2024 WL
3595920, at *6 (D. Conn. July 30, 2024)("A plaintiff must show that the protected speech was
a substantial motivating factor for the adverse employment action."); *Heim v. Daniel*, 81 F.4th
212, 222 (2d Cir. 2023)("To show causation, 'a plaintiff must show that the protected speech
was a substantial motivating factor in the adverse employment action.'"); *Specht v. City of
New York*, 15 F.4th 594, 605 (2d Cir. 2021)(applying "substantial motivating factor").

The instruction to the jury therefore allowed them to find causation based on motivating factor, rather than a "substantial motivating" factor. The fact that the jury based liability on the Clarino observations, which were not conducted by Principal Gethings and were not even argued by Plaintiff, demonstrates that the Court's instruction had prejudicial error. Accordingly, Defendants are entitled to a new trial under Rules 59 and 60.

## VIII.   DEFENDANTS ARE ENTITLED TO A NEW TRIAL DUE TO IMPROPERLY ADMITTED EVIDENCE.

Where evidence that prejudices the rights of a party has been improperly admitted, a court may order a new trial. *Lightfoot v. Union Carbide Corp.*, 901 F. Supp. 166, 169 (S.D.N.Y. 1995). "[A] motion for a new trial based on the erroneous admission of evidence is warranted only where the court made substantial errors in admitting the evidence …. Such relief is not to be granted unless the court finds that the introduction of such evidence 'was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that we are convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Ojeda v. Metro. Trans. Auth.*, 477 F. Supp. 3d 65, 77 (S.D.N.Y. 2020) (quoting *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005)), aff'd, 41 F.4th 56 (2d Cir. 2022). That standard is met here.

Plaintiff filed a pre-trial motion *in limin*ie for admission of two anonymous notes that Plaintiff testified she found in her room in August 2022. (Ecf. 70).  Defendants opposed that motion, arguing that the notes were not relevant to Plaintiff's claims for liability or damages, they would require additional evidence on collateral matters, and would be unfairly prejudicial to Defendants. (Ecf. 87) At the pretrial conference, Defense counsel noted that Plaintiff was claiming the August 2022 notes showed harm to Plaintiff's reputation for the defamation claim

based on a March 2021 statement, and there was no evidence of a causal connection. *See* 7/29/24 Tr. pg. 34. The Court seemed receptive to that argument; *id*. p. 34-37; but then reserved a ruling until trial. *Id*. At trial Plaintiff again claimed them for admission as relevant to her defamation claim. *See* 8/5/24 Tr. p. 211-13. Defense counsel again opposed the notes being admitted to evidence. *Id*. p. 216-218. The Court then noted that the time between the defamatory statement and the notes was "too attenuated to have relevance on the issue of damages." *Id*. The next day, Plaintiff again sought admission of the notes, this time arguing that they were indicative of the hostility she experienced as a result of the alleged retaliation. *See* 8/6/24 Tr. p. 345-46. Defense counsel once again objected, noting among other things that the last retaliatory act was in January 2022, there is no connection between the notes and the alleged retaliatory conduct, and they would be highly prejudicial. *Id*. p. 349-53. After a break, the Court noted the Alden complaint reflected "acute animosity" toward Plaintiff, an argument Plaintiff had not made. *Id*. 356-57. The Court then compared that complaint to the notes, finding them similar in tone. *Id*.[14] Therefore, the Court admitted them into evidence.

The Court's sua sponte comparison of those two documents, and the Court's conclusion that the notes did not unfairly prejudice Defendants is erroneous and warrants a new trial. This is demonstrated by the fact that the jury awarded emotional distress and punitive damages that have no relation to the evidence on the two acts the jury found to be adverse employment actions. The size of the jury's damages award demonstrates that they were unduly influenced by the admission of these notes, which Plaintiff never causally linked to any particular person

---

[14] Ms. Alden was not a defendant in this case, it was undisputed that Plaintiff and Ms. Alden had disputes with Ms. Alden when she was teaching their child, and that the jury rejected Plaintiff's claim that Ms. Alden's complaint was intentionally left in a colleague's mailbox.

much less the two acts they found to be adverse employment actions, which occurred one year or more before the notes were found. A new trial is warranted.

## IX.   THE DAMAGE AWARDS ON THE RETALIATION CLAIMS MUST BE SET ASIDE OR, IN THE ALTERNATIVE, REMITTED.

The jury awarded an excessive $1,100,000 in compensatory and punitive damages against a public Board of Education and a public school Principal based on one meeting and four or so observations shock the conscience, are unsupported by the record, and cannot stand.

Under Federal Rule 59(e), the Court may "grant a motion to alter or amend a judgment to correct a clear error of law or prevent manifest injustice." *Newton v. City of New York*, 171 F. Supp. 3d 156, 164–65 (S.D.N.Y. 2016) (cleaned up). Likewise, the district court may "compel[] a plaintiff to choose between reduction of an excessive verdict and a new trial[.]" *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998). Reduction of damages awarded by a jury is appropriate where (1) "the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken," or (2) "more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Kirsch v. Fleet St.*, 148 F.3d 149, 165 (2d Cir. 1998). Both situations are present here.

### A.   Compensatory Damages Must Be Remitted to Conform to the Evidence.

#### 1.   The jury's award of economic damages because the amount awarded far exceeds the amount supported by the evidence.

Despite Plaintiff asking the jury for economic damages of $60,200, which she argued she proved at trial, the jury awarded $125,000. The jury instructions, however, were explicit that economic damages "are compensation for pecuniary losses, which may include money *actually spent* on debts incurred as a result of the injury, medical bills, and expenses, and/or

27

lost wages, earnings, and benefits." ECF #114 at 13 (emphasis added). Plaintiff was clear in her request for economic compensatory damages totaling $60,200, comprised of $26,000 as compensation for lost sick days and $34,200 for medical bills.[15] *See* 8/9/24 Tr. p. 862-863. There is no basis, therefore, for the jury to award an amount greater than $60,200, much less the more than double that amount actually awarded by the jury.

Even an award of $60,200, however, is excessive based on the evidence presented. Plaintiff is only entitled to recover economic compensatory damages for which she can prove "with as much definiteness and accuracy as circumstances permit[,]" as the jury was explicitly instructed. ECF #114 at 13. "The burden of proving damages is on the party claiming them." *ALV Events Int'l v. Johnson*, 821 F. Supp. 2d 489, 494 (D. Conn. 2010). Plaintiff's claim for $26,000 for 66 sick days is speculative, at best.  Plaintiff did not offer proof that she took 66 sick days, or the per diem value of those sick days. Instead, Plaintiff just testified that the $26,000 figure was "about" what they would be worth at retirement. Tr. 8/5, 182.  She also did not prove that each sick day was used due to the conduct the jury found Defendants liable for. If anything, the evidence showed that Ventura signed the FMLA form used to take Plaintiff out of work based on all of Plaintiff's complaints (almost all of which were rejected as retaliation by the jury).  Moreover, Dr. Levin's note to the Board in January 2022 mentioned other incidents, which were found not to be retaliatory.

The evidence also does not establish a basis to award Plaintiff the full value of Ms. Ventura's bills. Plaintiff was already seeking treatment for her mental health conditions prior

---

[15] The request for $34,200 is consistent with the evidence provided by Plaintiff for her treatment from Nicole Ventura. Pl. Exh. 29. Plaintiff did not request payment of Dr. Levin's bills, which totaled $5,626.85. Tr. 8/9, 862:6-12; Ex. 31. Even if included, the total is woefully short of the $125,000 awarded by the jury.

to seeing Ms. Ventura, and Dr. Levin recommended that Plaintiff see a therapist like Ms. Ventura in 2020—well before the alleged retaliatory acts began—to continue that pre-existing therapy.[16] *See* 8/7/24 Tr. pg 516.[17]  Almost all of Ventura's notes have no information on them at all, which prevented Ventura from testifying about what was discussed at any particular session. *See* 8/7/24 Tr. p. 470.  Ventura nevertheless testified that Plaintiff's treatment extended beyond work stressors, and included issues related to her family and her husband. *Id*. p. 475-76, 479. Thus, the evidence does not support that the total of Plaintiff's medical expenses incurred in connection with Ventura were a result of the Defendants' conduct. The economic damages must be reduced to $60,200, and then further reduced or vacated  based on Plaintiff's failure to provide sufficient evidence to support an award of $60,200.

### 2. The record does not support a $650,000 emotional distress award.

The jury's award of $650,000 for emotional distress—again, far in excess of the $443,880 that Plaintiff valued her own distress at—is irreconcilable with the record and the jury's finding of retaliatory conduct. Tr. 8/9, 863-64. "While it is properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law." *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 559 (S.D.N.Y. 2012) (cleaned up). A jury "may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket." *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) (cleaned up). Instead, a plaintiff's damages must be

---

[16] Plaintiff did not seek reimbursement of Dr. Levin's bills because she was already seeing a psychiatrist before 2020 and she needed to continue that therapy.  But Plaintiff received therapy before, too, and her treatment with Ventura is a continuation of that therapy. Thus, if Plaintiff is not entitled to Dr. Berger's costs because it continues prior services, she also should not be entitled to any of Ms. Ventura's costs.
[17] Copies of the relevant portions of the 8.7.24 Transcript at attached as Exhibit F.

"reasonably related to the defendant's wrongdoing." *McIntosh v. Irving Tr. Co.*, 887 F. Supp. 662, 667 (S.D.N.Y. 1995). "A plaintiff is not permitted to throw h[er]self on the generosity of the jury. If [s]he wants damages, [s]he must prove them." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 119 (2d Cir. 2004) (cleaned up). "When reviewing the jury's verdict, courts should compare not only the plaintiff's injuries in similar cases, but also the severity of the adverse action. In this analysis, the trial judge is free to weigh the evidence and need not view it in the light most favorable to the verdict winner." *Dotson v. City of Syracuse*, 2011 WL 817499, at *14 (N.D.N.Y. Mar. 2, 2011), *aff'd,* 549 F. App'x 6 (2d Cir. 2013) (cleaned up). If "the award is so high as to shock the judicial conscience and constitute a denial of justice[,]" it must be reduced. *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003).

Such a result is necessary here because the evidence wholly fails to establish that Plaintiff suffered losses worth $650,000, let alone losses of that magnitude *because of* the conduct that the jury found to be retaliatory. Again, the jury's verdict is predicated entirely on two minor actions: (1) an extended conference, and (2) shadowing by Ms. Clarino on four or so occasions during August through October 2021, the latter of which was not even an action that the jury was permitted to find was adverse. ECF #110 at 2. The jury rejected Plaintiff's claim that another 10 actions constituted a pattern of retaliation.  This is important here because Plaintiff, her therapist, and her psychiatrist testified it was the continuing, ongoing events—most of which the jury found Defendants not liable for—that caused Plaintiff's emotional distress to increase. For example, Ms. Ventura testified that she completed the FMLA form because it was Plaintiff's "perception that she was being mistreated by her

principal, Ms. Gethings, and was not able to speak up about issues she was seeing in the school system." 8/7/24 Tr. p. 448-49. Neither she or Dr. Levin mentioned Clarino. *Id*. at 500.

Because of their focus on overall conduct, neither of her health care providers tied Plaintiff's emotional distress to just the TEVAL meeting and/or the observations. To the contrary, they tied it to some of the incidents that the jury found was not retaliatory.  For example, Ms. Ventura testified that Plaintiff's symptoms were "moderate for a good chunk" of the time she has been seeing Plaintiff, but they "did go to severe on a few occasions." *See* 8/7/24 Tr. p. 457-58.  She then testified that one example of that was in July 2021, when Plaintiff had suicidal ideations, had severe symptoms, and that this was when "it was being determined whether or not Jessica was going to be moved from third grade to first grade at Hooker"—something the jury found was not retaliation. *Id*. at 458. Similarly, Dr. Levin testified that Plaintiff told her she felt like she was systematically being pushed out, and that she reported being taken off of committees and moved from 3rd to 1st grade—incidents the jury found not to be retaliatory. *Id*. at 496, 501-502. Dr. Levin did not mention the TEVAL meeting or the observations in her direct exam or in her January 2022 letter to the school district. (Ex. 15). Instead, she again mentioned issues the jury found were not retaliatory.

Moreover, Ms. Ventura testified that she accepts what Plaintiff is telling her about events as true, and just treats Plaintiff's reaction to those perceived events. *Id*. p. 462-63.  If Plaintiff was perceiving events as retaliatory and informing Ms. Ventura that they were exacerbating her emotional distress, and the jury found that those events were not retaliatory, then Plaintiff's increased emotional distress simply cannot be attributed to Defendants. Thus, having rejected almost all of Plaintiff's theory of retaliation, no evidentiary basis exists for the

jury to conclude that the two acts found to constitute retaliation were the cause of Plaintiff's emotional distress—as opposed to, for example, non-retaliatory acts like the grade change. *See McIntosh v. Irving Tr. Co.*, 887 F. Supp. 662, 664, 669 (S.D.N.Y. 1995) (remitting emotional distress damages from $219,428 to $20,000 where "[t]he plaintiff testified to highly subjective feelings that he said he experienced during certain incidents at work").

The $650,000 award of emotional distress damages also fails to conform with the evidence related to the two incidents the jury found to be retaliatory.  For example, as noted previously the TEVAL meeting was via zoom, and the transcript shows that it was a routine conversation between a Principal, Assistant Principal, and Teacher. *See* Ex. 24. There is no yelling or offensive language depicted in transcript, and Plaintiff failed to testify about any such extreme or offensive conduct. Moreover, the observations were conducted while Plaintiff was teaching a roomful of first grade students, and she had been observed "lots" of times in the past, as noted previously. No witness testified that there was anything about these two incidents in particular that was a significant factor in Plaintiff's emotional distress—much less significant enough to award $650,000-- $200,000 more than Plaintiff requested.

Moreover, Plaintiff's health care providers stated in their January 2022 letters that it was Principal Gethings that was the cause of Plaintiff's emotional distress, and that she should be separated from Plaintiff.  It is undisputed that Plaintiff was teaching in the lower school at the time, though, and Ms. Clarino was the administrator at that school.  Neither Ms. Ventura or Dr. Levin provided any testimony tying Ms. Clarino's observations to Plaintiff's emotional distress or said that Plaintiff needed safeguards in regard to Ms. Clarino.  Finally, Plaintiff's two medical professionals and her husband testified that, even at the time of trial, she is doing

better. *See* 8/6/24 Tr. p. 414; 8/7/24 Tr. p. 516-18. This is not surprising, as she remains

employed by the Board at a new school, which she has described as a supportive environment

where her colleagues love her. *See* 8/7/24 Tr. p. 517-18.

Courts also determine the reasonableness of compensatory damages awarded by a jury

by considering "the amounts awarded in other, comparable cases." *DiSorbo*, 343 F.3d at 183.

Given the lack of precedence supporting even the finding of liability here, conducting such a

comparison is a difficult exercise. Even so, awards in which the defendants were found liable

for much more egregious conduct fall short of the excessive $650,000 awarded here. For

example, in *McInnis v. Town of Weston*, 458 F. Supp. 2d 7 (D. Conn. 2006)(Arterton, J.), a

police officer brought an age discrimination on a variety of grounds and a retaliation claim

based on two suspensions in June and July 2003. *Id.* p. 12. Plaintiff, who was still employed,

testified that he perceived numerous issues in the workplace, that it was a "living hell," that he

avoided overtime assignments, that he believed he was "in the crosshairs" of the Chief for

eventual firing, and that he was placed in a dangerous situation without backup, which put his

life in jeopardy. *Id.* p. 18. Plaintiff's psychologist also testified in regard to plaintiff's

emotional distress, and the impact it had on plaintiff's life. *Id.* p. 16-17.  The jury rejected the

plaintiff's discrimination claim, but found in the plaintiff's favor on the retaliation claim and

awarded $960,000 in compensatory damages. Your Honor ordered a remittitur from $960,000

to $150,00, however, finding that, "even considering to the fullest extent the nature and

duration of plaintiff's emotional distress, including fear of firing, risk of no backup, loss of

enjoyment of his job, and professional and personal humiliation, the jury's $860,000 award

cannot be supported by the trial evidence." *Id.* at 18.

In another telling example, *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 601 (S.D.N.Y. 2010), the jury rejected the hotel worker plaintiff's claims of discrimination based on national origin (Ecuadorian) and race (Latino) and disability (diverticulitis and diabetes). According to the Court, the jury:

> [F]ound for [the plaintiff] on just one claim: that the hotel had impermissibly retaliated against him for engaging in a protected activity (complaining about the harassment that underlay his other claims). The purported retaliation consisted of installing a hidden camera above his work station, where it remained for eight days before co-workers found and disabled it. Defendant claimed that the camera was installed to help management investigate Mendez's claims about vandalism at his work station and locker, but the jury obviously rejected that defense. For this single transgression, the jury awarded Mendez $1 million in compensatory damages and $2 million in punitive damages.

*Id*. at 580. When addressing defendants' post-trial motions, the Court reduced the $1,000,000 award to $10,000, finding that:

> The court is convinced that the jurors concluded that [the plaintiff] was miserable at work, having found some basis on which to hold Westin liable, awarded damages that were entirely out of proportion to any injury that was or could have been attributed to the retaliatory surveillance—but that were perfectly in proportion to the teasing and rudeness [the plaintiff] endured at the hands of his fellow workers and his chefs, and to the frustration he felt when his employer and his union failed to respond to his complaints in a way that he found adequate.

*Id*. at 602. Put another way, the Court determined that, having rejected almost all of Plaintiff's claims, the damages award was based on sympathy rather than "actionable misconduct." *Id*.

Here the evidence shows and verdict shows that the jury was similarly persuaded by sympathy for plaintiff, and took into account things other than actionable misconduct. One such impermissible item leading to the jury's verdict likely was the August 2022 anonymous notes that the Court allowed Plaintiff to introduce into evidence over Defendants' repeated objections. Ex. 21 and 22. Those notes could not form a basis of liability, were highly

prejudicial to Defendants, and had no probative value to the issue of damages that reasonably could have been caused by the March 2021 meeting or the August-October 2021 observations. Indeed, they were found at a time when Plaintiff had already applied for positions in another school and the second one was found on the same day Plaintiff accepted a position at another school. (Ex. Q, p.2) Just like in *Mendez*, therefore, the Court must order a new trial or remit the damages due to the lack of actionable misconduct and to keep the damages award consistent with the jury's findings on liability—which rejected almost all of Plaintiff's claims.

**B.      The Jury's Award of Punitive Damages Must Be Vacated.**

In this case, an award of punitive damages is wholly unsupported by the evidence and no reasonable juror could find that Plaintiff satisfied her burden of providing that she was entitled to punitive damages, let alone in the extensive amount awarded in connection with Counts 1 and 2. "Punitive damages are a discretionary moral judgment that the defendant has engaged in conduct that is ***so reprehensible*** that it warrants punishment." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015) (cleaned up) (emphasis added). A plaintiff must establish more than mere liability to be awarded punitive damages: she must establish that the "defendant's conduct is...motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* (cleaned up). To satisfy this standard, evidence demonstrating "a positive element of conscious wrongdoing is always required." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538 (1999) (cleaned up). A plaintiff may establish the requisite state of mind "by presenting evidence that the employer discriminated (or retaliated) against him with conscious knowledge it was violating the law, or that it engaged in ***egregious or outrageous*** conduct from which an inference of malice or

reckless indifference could be drawn." *Carrion v. Agfa Const., Inc.*, 720 F.3d 382, 387 (2d Cir. 2013) (emphasis added); *see also Arnone v. Town of Enfield*, 79 Conn. App. 501, 521 (2003) (applying similar standard in Section 31-51q claim). Accordingly, here the Court instructed the jury: "You may award Ms. Light punitive damages if you find that the acts or omissions of defendants reveal a reckless indifference to the rights of others, maliciousness, or an intentional and wanton violation of those rights." Ecf. 114, p.14. The Court also instructed that punitive damages can be awarded only when "the conduct is so extreme and outrageous that compensatory damages are inadequate to punish Defendants' wrongful conduct." *Id.* p.15.

Here, the record is devoid of any evidence from which the jury could have concluded that Principal Gethings acted in a reprehensible, egregious, or outrageous way regarding the two acts found to be retaliatory. It is undisputed the both the meeting and the evaluations were routine events in the school, and Plaintiff had attended such meetings and had many observations in the past. *See supra* n.8. Plaintiff did not present any evidence that the events in 2021 were such a departure from other such meetings or evaluations in the past, or that they were done with evil motive or were a reckless or intentional violation of Plaintiff's rights. In addition, there is simply no evidence connecting Ms. Clarino's shadowing to Ms. Gethings, and Ms. Clarino is not a defendant in this action. Regarding the TEVAL meeting, the evidence demonstrates that the meeting was part of the teaching evaluation process, and that Plaintiff has been in such meetings before. *See supra* n.8. Similarly, there were no teacher ratings being given that school year. *See* 8.9.24 Tr. pg. 650-51 Thus, the uncontroverted testimony from Principal Gethings demonstrated that the meetings were used for things other than just teacher evaluations in March 2021. *Id.* Moreover, testified that one-on-one time with the teachers she

supervised is "sacred," and she wanted to use that time to determine how she "could support Ms. Light as well as discuss ... plans to be proactive for next year[,]" and there was no intent for that meeting to be disciplinary. *See* 8/9/24 Tr. p. 651. Even during the meeting, Ms. Gethings stated that she felt that everything to be discussed was within the scope of the TEVAL meeting. Pl. Exh. 24, 18:7-15. Ultimately, the facts do not support an award of punitive damages, and the punitive damages should be vacated.

> **C.     In the Alternative, Remittitur of the Punitive Damages is Appropriate.**

Even if sufficient facts existed to justify an award of punitive damages, the jury's award of $300,000 is excessive and must be reduced. Any award of punitive damages is "a windfall to a fully compensated plaintiff[]" and courts have a responsibility to ensure that punitive damages are not excessive. *Payne v. Jones*, 711 F.3d 85, 95-96 (2d Cir. 2013) (cleaned up). "Even if there is no such thing as a *correct* amount of punitive damages, a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate." *Id.* at 93. In determining the appropriate amount of punitive damages, courts look to three factors: "(1) the degree of reprehensibility of the tortious conduct, (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 564 (S.D.N.Y. 2012) (cleaned up). The most important of these factors "'is the degree of reprehensibility of the defendant's conduct.'" *Id.* (quoting *BMW of North Am., Inc. v. Gore,* 517 U.S. 559, 575 (1996)). To characterize Ms. Gethings' conduct as reprehensible defies logic. Although the jury found that Ms. Gethings retaliated against Plaintiff by extending her TEVAL meeting to discuss matters "not regarding [her] teaching," there is simply no evidence of reprehensive conduct from Ms. Gethings.

Rather, the evidence demonstrates that Ms. Gethings was wading through uncharted territory, concerned about the Plaintiff's conduct leading parents to believe that the school was not protecting children from the COVID-19 pandemic, and was routinely trying to work collaboratively with Plaintiff to ensure that she had a positive experience at work.  Any such finding also is inconsistent with the fact that the jury rejected 10 of the 11 acts Plaintiff alleged constituted retaliation.  Allowing the jury's award of $300,000 in punitive damages to stand when it is based on a TEVAL meeting between a Principal and a teacher would have chilling effects on all Boards of Education in the state, and expose Boards and administrators to excessive awards when engaging in routine teacher evaluation meetings.

As with compensatory damages, courts generally look to other, comparable cases to determine the appropriate measure of punitive damages. To do so here is an exercise in futility: the conduct that Defendants were found liable for is so below the range of conduct defendants have been found liable for in other retaliation cases that damages awarded in those cases cannot effectively be compared to this case. In any event, even comparing punitive damage awards in other cases with adverse actions and conduct far more concerning than the conduct here, the shocking award of punitive damages awarded by the jury does not withstand scrutiny. *See*, *e.g.*, *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 566 (S.D.N.Y. 2012) (remitting punitive damages to $100,000 where the jury found that plaintiff was subjected to a racially hostile work environment where plaintiff's supervisor allowed his coworkers to use "the N word" in his presence and passed out voodoo dolls with black painted faces, one of which was later found hanging by a noose); *Vasbinder v. Scott*, 976 F.2d 118, 122 (2d Cir. 1992) (finding that punitive damages of $150,000 as to each defendant "far

exceeds what is needed to deter the defendants or similarly situated individuals" where the defendants had terminated plaintiff in retaliation for a complaint he made to the FBI raising concerns about financial improprieties, and remitting the damages to $30,000 as to one defendant and $20,000 as to the other). Where, as here, "reprehensible conduct [is] lacking[,]" courts remit "punitive damages awards to modest sums." *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 383 (D. Conn. 2016) (remitting punitive damages from $350,000 to $50,000 where defendant was found to have terminated plaintiff in retaliation for filing a CHRO complaint) (citing *Chisholm v. Memorial Sloan–Kettering Cancer Ctr.*, 824 F.Supp.2d 573, 580 (S.D.N.Y.2011) (remitting $1 million award to $50,000); *Norris v. N.Y.C. Coll. of Tech.*, 2009 WL 82556, at *7–8 (E.D.N.Y. Jan. 14, 2009) (remitting $425,000 punitive damage award to $25,000); *Lamberson v. Six W. Retail Acquisition, Inc.*, 2002 WL 59424, at *6–8 (S.D.N.Y. Jan. 16, 2002) (remitting $375,000 award to $30,000); *Fernandez v. N. Shore Orthopedic Surgery & Sports Med., P.C.*, 79 F. Supp. 2d 197, 206 (E.D.N.Y. 2000) (remitting to $50,000 where there was a low degree of reprehensibility); *Kim v. Dial Serv. Int'l, Inc.*, 1997 WL 458783, at *14–15 (S.D.N.Y. Aug. 11, 1997) (remitting $725,000 award to $25,000 where degree of reprehensibility was low), *aff'd*, 159 F.3d 1347 (2d Cir.1998).

In sum, the lack of evidence of reprehensible, willful conduct, in and of itself, is fatal to the jury's award of $300,000 in punitive damages. Thus, to the extent the Court fails to vacate the punitive damage awards in their entirety, any surviving award over a nominal sum is untenable, and the Court should remit the punitive damages accordingly.

**X.      Conclusion**

For all of the reasons set forth above, because allowing this verdict to stand would be a grave miscarriage of justice.  Accordingly, the Court should grant Defendants' motion for a directed verdict notwithstanding the jury's verdict or, in the alternative, a new trial pursuant to Fed. R. Civ. P. 50, 59, and 60.  In the alternative, the Court should vacate the jury's damages awards, or, in the alternative, ordering a large remittitur consistent with the reasoning above.

DEFENDANTS,

NEW HAVEN BOARD OF EDUCATION
and MARGARET-MARY GETHINGS

By____/s/ *Peter J. Murphy*_____
          Peter J. Murphy (ct26825)
          Shipman & Goodwin LLP
          One Constitution Plaza
          Hartford, CT  06103-1919
          Telephone: (860) 251-5950
          Facsimile: (860) 251-5316
          pjmurphy@goodwin.com
          Their Attorney