# EXHIBIT B

```
1                    UNITED STATES DISTRICT COURT
2                       DISTRICT OF CONNECTICUT
3    _____|
     JESSICA LIGHT,             | No. 3:22-cv-00425-JBA
4                    Plaintiff, |
     v.                         |
5    NEW HAVEN, ET AL.,         |
                     Defendants.|
6    _____| New Haven, Connecticut
7

8                           JURY TRIAL
                            VOLUME IV
9
     B E F O R E:
10            THE HONORABLE JANET BOND ARTERTON
11

12   A P P E A R A N C E S:
     For the Plaintiff:
13            ANTHONY J INTERLANDI, SR., ESQ.
              Monarch Law
14            363 New Britain Road, First Floor
              Berlin, CT 06037
15            860-969-2909
              Email: tony@monarchlawct.com
16
     For the Defendants:
17            PETER JOSEPH MURPHY, ESQ.
              CHELSEA McCALLUM, ESQ.
18            Shipman & Goodwin, LLP
              One Constitution Plaza
19            Hartford, CT 06103
              860-251-5950
20            Email: pjmurphy@goodwin.com
                     cmccallum@goodwin.com
21

22

23   Courtroom Deputy:              Court Reporter:
     Diahann Lewis                  Cassie Zayas, RPR
24

25            Clerk's Office:  203-773-2140
```

```
1    work at the lower building.  And we also had other things

2    that we wanted to discuss with Ms. Light together, so

3    that's why she was there.

4    Q    And at the time, how long had Ms. Clarino been with

5    you at Worthington Hooker?

6    A    That was her second year.

7    Q    Okay.  And at that time, was she in charge of the

8    little school?

9    A    Yes.

10   Q    And if Ms. Light moved to the little school, that

11   would be the building -- would that be the building

12   Ms. Clarino was in charge of?

13   A    Yes.

14   Q    Okay.  When you met with Ms. Light at that time, did

15   you know she was taping the meeting?

16   A    No.

17   Q    Were you ever informed at any of your meetings with

18   Ms. Light that she was taping the meetings?

19   A    Never.

20   Q    Ms. Light claims that T-Eval meeting was a little

21   longer than usual.  Are you aware of that?

22   A    It was.

23   Q    Okay.  And why was it a little longer?

24   A    So it's very interesting.  It wasn't just a T-Eval

25   meeting because at the time, New Haven Public Schools was
```

```
 1    not giving ratings and we were using the T-Eval, which is
 2    the teacher evaluation, to give feedback.
 3        We loved -- that's sacred time for us to have
 4    one-to-one with our teacher.  And we wanted to discuss
 5    other issues and also see how we could support Ms. Light
 6    as well as discuss our plans to be proactive for next year
 7    of changing her class and getting her training and
 8    exposure to the grade that she would be teaching.
 9    Q    All right.  Was this meeting disciplinary for
10    Ms. Light?
11    A    No.
12    Q    Okay.  And if I could show you again Exhibit 7, now
13    page 117.
14    A    Yes.
15    Q    All right.  And what is this --
16    A    So that is the feedback that was provided to her from
17    me following our T-Eval.
18    Q    Okay.  And when you see this section called Feedback
19    from Instructional Manager, how do you view the comments
20    you put in there?
21    A    I think they're very positive and very fitting to
22    capture what we -- what I was saying to Ms. Light.
23    Q    Okay.  There's some handwriting on that form.  Is
24    that your handwriting?
25    A    No.
```

1    answers; right?

2    A    Absolutely.

3    Q    But nowhere in this email did you say, please wait

4    for an answer before you talk to anyone or make any

5    comments at Board of Education meetings; right?

6    A    No.  I wouldn't have said that.  I did say I was

7    going to get an answer and, in the interim, we would

8    follow the existing.

9         And in the staff meeting, we had shared what to do as

10   we shifted from 6 feet to 3 feet.  And, again, those were

11   just recommendations.  They were not requirements.

12   Q    But I think the answer is no, right, it's not in this

13   email?

14   A    I wouldn't tell any teacher not to go to the Board of

15   Ed.  If they want to go, they can go.  But they're not

16   going to get an answer.

17   Q    Four days later, you and Ms. Clarino had a teacher

18   evaluation meeting with Jessica; right?

19   A    We had a meeting, yes, and we did some T-Eval and

20   discussed other things.

21   Q    Right, because this was dated March 22nd and the

22   T-Eval meeting is March 26th; right?

23   A    The dates are -- yeah.  I mean, if you say them, I

24   trust you.

25   Q    Thank you.

```
 1            THE COURT:  All right, counsel.  We will bring
 2    in the jury, then Mr. Interlandi will proceed.
 3            MR. INTERLANDI:  Yes.
 4                    (Jury in, 10:30 a.m.)
 5            THE COURT:  Please be seated, ladies and
 6    gentlemen.  We'll proceed next with closing argument by
 7    Mr. Interlandi on behalf of the plaintiff.
 8            You may proceed.
 9            MR. INTERLANDI:  Thank you, Your Honor.
10            Members of the jury, good morning.  As you know,
11    my name is Anthony Interlandi and I represent the
12    plaintiff, Jessica Light.  I wanted to thank you for being
13    here and thank you for your attentiveness during the week.
14    On Monday, I spoke to you and we talked about the freedom
15    of speech and the fundamental rights and civil liberties
16    that were given to us by the Founding Fathers and the
17    framers of the constitution.
18            Jessica Light has and had a right to be an
19    advocate without retaliation, without bullying, without
20    fear, without roadblocks being put in her place, without
21    having the well being poisoned.  Jessica had a right to
22    speak at public meetings and to make comments on Facebook.
23    The defendants have agreed that that conduct is protected
24    speech.
25            Jessica had a right to be in a working
```

1    environment that was safe for herself and for the students

2    that she taught.  She had a right to speak up about safety

3    and issues during COVID without fear of retaliation.

4    Otherwise, herself, her colleagues, her family and, most

5    importantly, her students would not be safe.

6              I'm going to give you an outline of where I'm

7    going to go with this closing statement to you.  I'm going

8    to talk a little bit about the disputed issues in the

9    case, then I'll talk about the evidence that was proven by

10   a fair preponderance of the evidence -- and, again, if you

11   recall, that is if you have the scale in front of you

12   tipping ever so slightly in one party's favor, that party

13   is successful.

14             After we talk about the evidence, I will talk to

15   you a little bit about the law, the law that Judge

16   Arterton has already discussed with you, and I will apply

17   the law with the evidence that we have shown.

18             Finally, I'll get to the damages.  Like I said

19   on Monday, once I've talked to you about the evidence and

20   shown that we've proven our claims by a fair preponderance

21   of the evidence, that would be the time when I would come

22   back to you to ask for fair compensation for the injuries

23   suffered by Jessica Light.

24             So, as you've heard, there are some issues in

25   dispute in this matter.  And what we are focusing on would

```
 1    be discipline, adverse employment action, and a causal

 2    link.  There's also a dispute about the defamatory

 3    statement that was made and whether or not there was any

 4    harm to Jessica's reputation.

 5             I'm going to show you a timeline that we've

 6    created.  The timeline will include the timeline of the

 7    case with the exhibits and facts that have been presented

 8    in evidence.

 9             Before I get there, the defendant -- the

10    defendants are going to come to you, and what they've done

11    throughout this week is try to attack Ms. Light and show

12    you or tell you that she was a bad person, that she sent

13    text messages or messages to a friend, a close friend --

14    unguarded messages, a handful of messages that were

15    provided to the Court over many months, possibly years, of

16    communications with her friend -- that she provided

17    information by forwarding it to herself and to a friend,

18    and that she recorded meetings.

19             You heard Ms. Gethings say it was a good thing

20    that Jessica recorded those meetings, and I would agree

21    because we have them here in the case.  Jessica didn't do

22    anything that is bad.  She communicated with a friend.

23    She recorded meetings to protect herself.  She felt she

24    needed to.  They're going to tell you that she has thin

25    skin.  This is a woman that worked in the Bronx, got a
```

1   master's at Columbia in New York City, and has worked in

2   the New Haven Public Schools system for many, many years.

3   She's currently working at another school that is in an

4   area that is suffering more poverty than Hooker.

5            They'll also tell you she has thin skin because

6   of her past, past trauma.  But, as you saw in one of the

7   defendants' exhibits, Ms. Light forwarded an article to

8   her union president, an article that mentioned Jessica was

9   outspoken.  She had spoken up for teachers' rights.  She

10  had spoken up for funding and she had spoken up on safety

11  protocols.  Could someone with such thin skin do such a

12  thing and put herself out there like that?

13           They're also going to tell you that she's still

14  employed.  So what?  She still works there.  Not at

15  Hooker, at another school.  She still makes the same

16  money.  What's the big deal?  The school that she's at

17  now, Ross Woodward, is in a different area.  It's in an

18  impoverished area.  She does not have, as she testified,

19  money for supplies for the children.  She's doing her best

20  in the situation that she's presented.

21           So let's get back to the timeline.  It all

22  starts with COVID.  We're going to flashforward to July of

23  2020 where Ms. Light's union provides a letter.

24           Oops.  Let me try to get that back.  It must

25  have timed out.

1          So we're back.  And this letter is letting

2     teachers know that during COVID, their speech is

3     protected.  Raising concerns about COVID is protected.

4          Next, we get into the beginning of that school

5     year.  And you heard testimony from Ms. Gethings, Jessica,

6     and others that there was discussion about whether or not

7     they should return back to in-person or have a hybrid

8     model or a remote situation.  There was differences of

9     opinion.  You heard that through testimony.  You hear

10    Jessica testify that she attended a parent meeting and

11    that Ms. Gethings listened to that meeting.  You heard

12    testimony that there was a meeting with Jessica and

13    Ms. Gethings.  And Ms. Gethings admitted when I asked her

14    on cross that she had heard -- she told Jessica, I heard

15    you speak many times.  She testified that she received a

16    message from her superiors that they needed to, get

17    yourselves together.  And she testified on that stand that

18    Jessica's speaking made her feel uncomfortable with

19    Dr. Tracey.  That's in November 2020.  The fuse is lit and

20    it's burning.

21         We move forward in our timeline to January,

22    January 2021.  This is an exhibit from the defendants,

23    Exhibit A, and the meeting -- I'm sorry, they're Board of

24    Ed meeting minutes, and these are Jessica's comments.

25         In January 2021, there was uncertainty, as you

1    can imagine.  We are less than a full year into COVID.

2    You heard testimony from Jessica as well as Mr. Shortt

3    that -- and, actually, Ms. Gethings -- there was still

4    some uncertainty, and not everyone had the same ideas

5    about returning.  There was some discord.  This is an

6    email that we presented in evidence, and that is Exhibit

7    45.  And I would recommend that you take notes when you

8    hear these exhibits being read out because, obviously, you

9    will not have this in front of you and it will be

10   important, I think, to organize exhibits.

11          This is an email that Jessica received from her

12   union representative -- specifically, David Cicarella --

13   who said in this email, "However, we all agree that an

14   essential agreement for safe school reopening is a

15   reference guide that addresses the most common operational

16   questions and scenarios."

17          Jessica's employer knew that she was an

18   advocate.  Her supervisor knew she was an advocate.  In

19   fact, the defendant, New Haven Board of Education

20   Superintendent, Dr. Tracey, put out a request for teachers

21   in the district to go speak on the school's behalf at the

22   state legislature.  And who stepped up?  Jessica Light.

23   She stepped up and provided testimony and sent that back

24   to her superiors.  And you'll find that in Exhibit 41, an

25   email of Jessica's testimony.

1          Now we get to March and the Facebook post that

2     you guys have heard so much about and the two comments

3     that we talked about, the two comments that Ms. Gethings

4     confirmed on the stand yesterday.  "I don't think letters

5     were sent," by Jessica, and then Jessica, in response to a

6     question, said, "Hooker never sent a letter."

7          As you can see in this post -- this is a post

8     from Melody Gallagher on March 9, 2021.  In this post,

9     Ms. Gallagher is saying, "Apparently, these are the

10    schools that have had positive student COVID cases in New

11    Haven Public Schools since January 19th" -- which, by the

12    way, was the date of returning to in-person learning.

13         She went on to say that she believed this list

14    is to be read that if a school is listed as less than six,

15    they had positive cases that week and that may mean one,

16    two, three or four or five positive cases.  If she was

17    reading it wrong, please let her know.

18         You heard Ms. Gethings testify she saw this

19    post.  A handful of teachers saw it, too, and told her

20    about it.  She screenshotted it and sent it to her.  Not

21    one teacher from Hooker went to this post and added

22    comments to say, Melody Gallagher, you got it all wrong,

23    that's not what this means, or, hey, Jessica, you

24    shouldn't have said that, this is wrong, this is

25    misinformation, they didn't have to send the letter.

```
1              This is the post that comes up multiple times in
2     our timeline.  Our timeline proceeds and you see here in
3     Exhibit 3 an email from Ms. Gethings to the Hooker School
4     community a few days following the social media comments
5     by Jessica.  She says, "it has been brought to our
6     attention from several community members, including staff
7     and parents, that WHS," Worthington Hooker school, "is
8     being mentioned with inaccurate information."  And she
9     goes on.  The next paragraph toward the bottom of this
10    email says, "Please rest assured that if there is a COVID
11    outbreak at Worthington Hooker School, you will be
12    notified.  If a staff member contracts COVID-19 outside of
13    school, the health department determines the timing of
14    exposure based upon the staff member's last time in the
15    building."
16             When I asked Ms. Gethings on the stand
17    yesterday, she admitted that this post was about Jessica
18    Light.
19             Jessica spoke at a Board of Education meeting on
20    March 22, 2021.  At that Board of Ed meeting, Jessica was
21    looking for a unified policy for not just Hooker, but the
22    district as a whole.  And the question that she had asked
23    about 3 feet of distancing for students was just an
24    example.
25             Ms. Gethings heard her comments at the Board of
```

1    Ed meeting and sent her an email that evening, letting her

2    know she heard her and asking her, essentially, why didn't

3    she wait.  Because, according to the defendant,

4    Ms. Gethings, they requested that Jessica get answers from

5    the school level first.  The request, however, cannot and

6    should not abridge or stop Jessica from making public

7    comments, and that's exactly what she tried to do.

8         Next in our timeline is the mid-year teacher

9    evaluation, March 26th.  So we have the March 9th Facebook

10   post with Jessica's two comments -- public speech -- and

11   we get to a mid-year meeting, a mid-year meeting that is

12   traditionally a 15-minute block of time.  You heard

13   Jessica testify in that regard.  This meeting, however,

14   lasted way longer than that.  Topics included Judy

15   Cavanaugh as well as the Facebook comments.

16        We do have the transcript and it is a full

17   exhibit, Exhibit 24, of the teacher evaluation meeting

18   attended by Jessica, Defendant Gethings and Jenny Clarino.

19   Page 11 at lines 14 to 15, Ms. Gethings states to Jessica,

20   "But I do want you to know I know you won't be teaching

21   third grade."

22        You heard Jessica testify on Monday that this

23   was the first time she learned that she was going to be

24   part of a reassignment or a reshuffling of teachers.  Less

25   than a month after her Facebook comments, less than a

1   month after the email that followed to the school

2   community by Ms. Gethings.

3           On page 13, Ms. Clarino told Jessica, if you had

4   to, if you choose, K, 1, or 2, you would want second

5   grade?  And Jessica responded yes.  As you've learned

6   through this trial, she was not given second grade; she

7   was given first grade.

8           Ms. Gethings, as you heard testimony from

9   herself as well as Jessica, her office is in the big

10  building and Ms. Clarino is in the little building which

11  has kindergarten through second grade.  This was a way to

12  get Ms. Light out of Ms. Gethings' hair.

13          Page 18, lines 23, over to page 19 through line

14  3, Ms. Gethings says, "I can speak to that we are

15  anticipating a written statement from Ms. Cav,"

16  Ms. Cavanaugh, "who is -- had -- feels that she has a

17  complaint about you.  And I don't think that -- I don't

18  think this has been brought to you from her because it's

19  all relatively new."

20          Finally, on page 19, lines 11 through 14,

21  Ms. Gethings says, "I saw it myself.  There was pieces

22  where you were commenting on Facebook that our school

23  didn't send out letters.  Do you know what I'm referring

24  to?"

25          Again, typically, a 15-minute meeting, mid-year

1    meeting to discuss the teacher's performance, turned into

2    something much different.

3          Next in our timeline, you'll find Exhibit 25.

4    This is the transcript of the meeting where we had present

5    Ms. Gethings, Ms. Clarino, Ms. Morrison, Ms. Cavanaugh

6    and, of course, Jessica.  And this is where we have the

7    false statement, we claim to be a false statement, made

8    about Jessica in a room where other people heard it.

9          "We hear that you're saying it wasn't you, but I

10   need you to know that every person said you were the

11   source," the source of Ms. Cavanaugh's COVID-19-positive

12   status.  From earlier in the school year, February, there

13   was testimony from Ms. Light that Ms. Cavanaugh missed

14   time.  There was also testimony from Ms. Gethings that

15   Ms. Cavanaugh missed time in February of 2021.  Every

16   person.  You heard from Ms. Gethings herself, there was

17   not one person who told her specifically, it was Jessica.

18          What you heard her testify about was

19   Ms. Cavanaugh thought it was Jessica, and there was this

20   Facebook post where she commented on it.  That's the

21   testimony.  That's the evidence.  It's undisputed that

22   this statement was said in a meeting with four other

23   people.

24          Next, we have Exhibit 4, which is a few days

25   later, okay?  The fuse was lit and Ms. Gethings was ready

1    to explode.

2         We have the Facebook -- I'm sorry.  We have the

3    T-Eval feedback.  And in the "feedback" section, you heard

4    Jessica testify that when she would apply or in the past

5    had applied for other positions, administrators at those

6    schools would review these T-Eval evaluations.  In here,

7    Ms. Gethings asked, "As we discussed in your mid-year,

8    please consider asking questions anytime you have a

9    concern.  If we do not have the answer, we will do our

10   best to attain the answer."

11        The defendants are going to argue, and they have

12   been, that this is so minor, what's the big deal?  You

13   heard the judge talk about the law.  And what we are able

14   to do is connect these minor or lesser events to establish

15   a critical mass, to establish an adverse employment

16   action.

17        We are not claiming a termination or a

18   suspension.  What we're claiming is an environment that is

19   inferior, an environment that put Jessica in fear, an

20   environment where she didn't know what was going to happen

21   next or what next accusation might come or from whom.

22        You heard Jessica testify on the stand how she

23   was feeling after each event hopeless, isolated.  She felt

24   like she couldn't talk anymore.  She went from the

25   outspoken advocate to a shell of herself, afraid to do

 1    just about anything.  As you heard her husband testify,

 2    the family was thriving before this.  And after, he had to

 3    pick up a lot of the slack at home.

 4           Now we get on to the committees.  I want you to

 5    focus in on Exhibits 9 and 10.  I know it might sound

 6    trivial or minor, but when you look at these documents,

 7    Exhibit 9 and 10, you'll see Ms. Gethings' response to

 8    Jessica's concerns, but you'll also see Jessica's response

 9    which Ms. Gethings testified she received.  These

10    communications were after the April 20th meeting that the

11    parties had to discuss the committees.  And, of course,

12    other things came up as well, such as the Facebook

13    comments.

14           So Jessica gets to a point, as you heard in her

15    testimony, that she just couldn't take it and she had to

16    protect herself and she filed a complaint.  She filed a

17    complaint against her administrators.  And I want you to

18    focus in on Exhibits 5 and 38.  Thirty-eight is an email

19    string beginning with the April 30th email to HR that

20    attached the complaint that you'll see in Exhibit 5.

21    Yeah, it's-single spaced and, yeah, it's 12 pages.

22           A few weeks later, within a few weeks, Ms. Alden

23    files a list of concerns, a complaint against Jessica.

24    Paragraph 5, number 5 on page 2 of Exhibit 6 references an

25    email that Jessica's husband had sent to the

1    administrators at Hooker in December of 2020.  Ms. Alden

2    had this in her back pocket.  The administrators knew

3    because they told her about the email.  You can infer

4    that, but I believe Ms. Gethings testified as to that

5    fact.  How else would Ms. Alden know?  And so she waited,

6    and then Ms. Light filed her complaint against

7    Mses. Gethings and Clarino.  And then we have this list of

8    concerns.  And that was taken up by HR.  Again, Exhibits 6

9    and 7, you will see Jessica's response to every concern

10   set forth by Ms. Alden.  And, as you heard through

11   Jessica's testimony, there was no discipline received for

12   her, for Jessica.

13          You heard Ms. Maffuid on that witness stand tell

14   you that there was a dismissal in May of 2021 and that

15   Jessica needed to use the restroom.  She offered to help

16   so Jessica could go to the bathroom.  She testified that

17   it was common.  She also testified that the next day, she

18   was called into a closed-door meeting with Ms. Gethings,

19   the same person who's her supervisor still to this day.

20          In Exhibit 37, you'll see an email, an email

21   that Jessica sent to Taryn Bonner.  That email spells out

22   the incident regarding dismissal and how she felt and the

23   email, particularly, that she received from Ms. Gethings

24   later on that day, asking her where she was and that she

25   should do the dismissal according to the proper procedure,

1    which Jessica claimed she did.

2            So we're in our timeline.  Again, we started

3    back in July of 2020 and we're within full COVID pandemic.

4    We get to March 9, 2021, that's the Facebook post,

5    March 2022, the Board of Education meeting.  And then

6    March 26th, the teacher evaluation meeting.  March 31st,

7    the meeting with Ms. Cavanaugh where the false statement

8    is made.  April, we're talking committees.  We're also

9    still talking about the Facebook comments.  May, Phyllis

10   Maffuid and the dismissal issue and Jessica being sent an

11   email.

12           We get to June, June 7th.  The administrators

13   file a retaliatory complaint.  It includes an accusation

14   that Jessica breaches confidentiality.  They provide a

15   bunch of documentation to support their position.  That is

16   also investigated by human resources for the defendant,

17   New Haven Board of Ed.

18           So, by June 7, 2021, there are three pending

19   implants:  One against the administrators by Jessica; two,

20   Ms. Alden's list of concerns focused on Jessica, mostly as

21   a parent; three, the complaint, the retaliatory complaint

22   that the administrators filed against Ms. Light.

23           They didn't just respond to her allegations;

24   they made accusations against Ms. Light.  This is a

25   pattern.  This is an inferior workplace.  This is hostile.

1          In Exhibit 12, you'll see Ms. Light looking for

2     some answers.  She wants to know what's happening next.

3     Exhibit 12 is an email to Ms. Bonner.  Ms. Bonner, who's

4     on the witness stand.  She didn't agree that she used the

5     word "tainted," but she did agree that she found something

6     professionally concerning to her as it related to

7     Ms. Gethings when she contacted the witness that she would

8     have interviewed, someone that was on her witness list.  I

9     believe Ms. Gethings used the word "obstructed" on the

10    witness stand.  And then the investigation was outsourced,

11    outsourced to a law firm to do an investigation, to take

12    over the investigation.  And in this email, Jessica lists

13    the events to her that she felt was continuing

14    retaliation, and you'll see that in Exhibit 12.

15         So the school year is over, 2020/2021 school

16    year.  Jessica is in the summer months.  She's got to get

17    prepared for teaching first grade.  You hear her testify

18    that there was no help.  She had to look for it on her

19    own.  She was preparing herself to teach first grade at

20    the same school, different building, under the watchful

21    eye of Ms. Clarino.

22         You heard from Mr. Paul Salem, who is Jessica's

23    former third grade partner.  You heard that as he was

24    preparing for the new year in his classroom, getting ready

25    for the students, the third graders, he found an email, an

1    email from Jessica's husband to the administrators

2    concerning Jessica's son, Wesley.  He didn't know how it

3    got there.  People had not printed to his printer before.

4    He reached out to Jessica because he recognized the name.

5    Jessica immediately got over there and got the email.

6            This is an email that was sent to the

7    administrators.  Administrators of Hooker, not anyone

8    else.  But it ended up on Jessica's former grade level

9    partner's printer in his classroom.  The building leader,

10   Ms. Gethings, who had been from at least 2019, didn't know

11   that teachers had printers in their classrooms.

12           Jessica continues to look for answers and

13   follows up with Ms. Bonner concerning the pending

14   investigation.  Jessica asks for the timeline.  Ms. Bonner

15   replies and says, "I am interested in your thoughts or

16   suggestions on specific protective measures to support

17   your productive return to work in light of the pending

18   investigation."  That's Exhibit 11.

19           As you heard Ms. Bonner here yesterday

20   testify -- or maybe the day before -- she testified that

21   she sent an email to Jessica with a draft, Rules of

22   Engagement.  You'll find that in Exhibit 13, Plaintiff's

23   Exhibit 13, where she sent a draft.  She testified that

24   the administrators or Jessica did not sign off on this and

25   there was no rules put in place before Jessica returned to

1    teach first grade for the first time at Hooker.  Jessica

2    went into it and did the best she could.  She prepared her

3    classroom and she started teaching first grade.

4            Then you heard from Mr. Tim Shortt, a former

5    teacher at Hooker.  He testified about becoming a union

6    steward, running for that position against Ms. Morrison,

7    the same Ms. Morrison who was at the March 31, 2021,

8    meeting with Ms. Cavanaugh.  She was there on behalf of

9    Ms. Cavanaugh as Ms. Cavanaugh's union representative.

10           Mr. Shortt won the election.  He became the

11   union steward.  He testified that the administrators told

12   him they heard through the grapevine that people were

13   concerned that he was teaming up with Jessica -- and I'm

14   paraphrasing -- to take down the administration.  You hear

15   him say he was upset.  He was so upset, he considered just

16   giving it up until his wife talked him out of it.  And

17   what did he do when he got this information?  He went to

18   Jessica and told her.  He told her what the administrators

19   told him.  And this is in October of 2021.

20           So what happened to Jessica?  Did she finish

21   first grade?  Did she finish teaching?  No, at least not

22   for that year.  She had to take a leave of absence.  You

23   heard Ms. Ventura up on that stand.  You heard that she

24   took the certification letter or notice and completed it,

25   specifically the part where she entered, "Complex PTSD

 1  being triggered by hostile work environment, increase in

 2  anxiety, depression, intrusive thoughts, lack of sleep and

 3  difficulty concentrating." As a result, Jessica went out

 4  on a period of leave pursuant to the Family and Medical

 5  Leave Act.

 6         But, as you heard Jessica testify, she had to

 7  use her sick days. Jessica testified that in total, she

 8  used 66 sick days. And, just for reference, Exhibit 14,

 9  you'll find the certification that was completed by

10  Ms. Ventura.

11         As we move forward in the timeline -- everything

12  connecting -- there's an email. Again, Jessica looking

13  for answers, looking for the status of the investigation.

14  When will my claims, when will my voice be heard? She

15  says, "Not just each month, week, or day, but each hour,

16  minute of waiting is painful." Each hour, minute of

17  waiting is painful. That's in an email she sent to the HR

18  representative for the New Haven Board of Education.

19  You'll find that in Exhibit 35.

20         Jessica emails again. She's looking for next

21  steps. We're getting towards the end of 2021. Her

22  complaint was filed on April 30, 2021. And she sends this

23  email to various people, including Ms. Goldberg, the

24  attorney at Berchem Moses who is conducting the

25  investigation of Jessica's complaint against the

1    administrators.

2           Exhibit 36.  Jessica had her leave expire, but

3    it was extended, and there was testimony in that regard.

4    Exhibit 34, you'll find an email, and Exhibit 46, finally,

5    we have the official complaint reports.  That's an exhibit

6    that has been redacted.  Exhibit 46 is where Jessica

7    informs HR, among other things, "I have incurred therapy

8    bills for PTSD triggered by a hostile workplace and

9    attorney services."  And that was on December 9, 2021,

10   Exhibit 46.

11          So we get to 2022, and Jessica is not back yet.

12   She's not back because her medical treaters, the folks

13   looking and discussing issues relating to Jessica's

14   wellbeing, to Jessica's mental health, they don't feel

15   it's safe for Jessica to return to work in early 2022

16   without appropriate safeguards.

17          Ms. Ventura testified about the letter she

18   prepared and signed in Exhibit 17.  This is a letter that

19   she said she prepared in January 2022.  In this letter,

20   she says, among other things, "The increase in care were

21   made to better address her exacerbated symptomology due to

22   the experience of her work environment as harmful."

23   Increases in care.  Exacerbated symptomology.  Jessica is

24   able to resume working on a full-time basis, provided

25   appropriate safeguards are put in place.

1          So you heard about this meeting, the meeting on

2    January 14, 2021.  And there's a transcript of that, and

3    you'll find that Exhibit 27.  Ms. Mack, who's the head of

4    HR for the New Haven Board of Education, said, "But with

5    regards to your request for your restoration of your sick

6    days," 66 or more -- I'm sorry, or less at that time --

7    "sick days, returning you back to the third grade next

8    year and a restorative counsel, I have information on all

9    three of those, she says."

10          You heard Jessica testify that third grade was

11   not agreed upon and they did not agree to restore her sick

12   days.  Ms. Blatteau was the union president who took over

13   for David Cicarella.  She said, "So, as the union

14   representation for Jessica, we, you know, fully support

15   her in seeking some safeguards if she is to return to

16   work."

17          You also heard in this courtroom from

18   Mr. DeLucia, the former vice president of the union.  On

19   Monday, I told you he was going to testify and he was

20   here.  He told you that Jessica was in the heat of the

21   battle.  He was there to listen to her concerns.  He was

22   there when she was being interviewed regarding the

23   investigation with Ms. Goldberg.  He was someone who

24   listened.  He said, "So, just to make sure, if I could.

25   So, for some reason, things are delayed and we don't hear

1   back, then Jessica will not be reporting on Tuesday.  Is

2   that where we're landing here, so everybody is on the same

3   page?"  Because they couldn't agree on safeguards.  But

4   Ms. Mack said, "I don't know that our office is landing on

5   that."  And Ms. Light responded, "Well, I'm landing on

6   that right now, taking a sick day, right?  So HR does not

7   have discretion over whether or not I'm healthy enough to

8   return."  Ms. Mack said, "You're absolutely right."

9   Absolutely right.  And Ms. Light responded, "So what I'm

10  saying is that my doctors have said in order for it to be

11  healthy for me to return to work, safeguards need to be in

12  place.  So I should not legally be allowed to return to

13  work until at least some safeguards are in place, as much

14  as I would love to.  So that's where I'm landing."

15  Exhibit 27 is this transcript.

16          You heard from Dr. Levin.  She was treating

17  Jessica, managing her medication and providing some talk

18  therapy.  She testified about that.  She provided Jessica

19  with a letter, an email letter.  And that was dated the

20  same day.  Exhibit 15.  "However, since the principal" --

21  and these words are from Dr. Levin -- "since the

22  principal, who is the subject of the investigation, still

23  remains in the same position, I feel this would again

24  trigger her symptoms.  My recommendation is that Ms. Light

25  be allowed to work where she would not have contact with

1  the principal, Ms. Gethings.  If that is not possible,

2  safeguards must be put in place to prevent any retaliation

3  which might cause a recurrence or exacerbation of

4  symptoms."

5          This is in the middle of January 2022.  The

6  letter is forwarded via email -- you'll see that in

7  Exhibit 15 -- to the appropriate people at the defendant,

8  New Haven Board of Ed.

9          After that January 14th meeting, Jessica

10 provided meeting minutes.  She provided the people in

11 attendance meeting minutes of what they all spoke about.

12 She was able to do this, yes, because she did record it.

13 She sent those meeting minutes to Ms. Bonner.  She

14 followed up with Ms. Bonner and said, "Please let me know

15 if there's anything you would like to change in the

16 minutes of our meeting."  Exhibit 33.  It was a sent --

17 the original email was sent on January 16th, two days

18 after the meeting, and then the follow-up on January 18th.

19         And so what happens next?  Well, that same day,

20 a letter is drafted and signed by Lisa Mack, and it's a

21 return-to-work notice.  No safeguards are in place, but,

22 Jessica, you have to get back to work.  And you'll find

23 that in Exhibit 16.

24         The best the defendants could do was offer

25 mediation.  Ms. Bonner testified that she started that

1    process.  Exhibit 18 is an email from Ms. Bonner to James

2    Rascati and she says, "Our office would like to request

3    mediation services for three of our employees."  Jessica

4    Light, Jenny Clarino, and Ms. Gethings.

5          Mediation is unable to be scheduled.  Jessica

6    returns to work.  February 9, 2022, Exhibit 39, is an

7    email that Jessica sends to Ms. Gethings and others,

8    letting them know they had hoped mediation would be

9    scheduled before this point, could not, and she'll be

10   returning to work that Wednesday, which was February 9th.

11   That's in Exhibit 39.

12         You heard testimony from Ms. Light,

13   Ms. Gethings, Ms. Bonner, about Jessica getting back to

14   fully teaching her first grade students.  There was some

15   testimony about being eased in.  There was testimony about

16   observing or co-teaching.  It took longer.  It took longer

17   than Ms. Gethings' boss thought it was necessary to take,

18   Ms. Hannans.  You'll see that email in Exhibit 20.  She

19   said to Ms. Gethings, "Regarding Jessica, however, it is

20   very clear that you have not done this, and this is very

21   disappointing.  This process will not be delayed any

22   further."  Exhibit 20.

23         And that is dated February 25, 2022.  We're

24   still within a year of the Facebook comments in March,

25   early March of 2021.  Again, complaints were filed April,

1    May, June.  Investigation was conducted throughout the

2    summer into the fall, early winter 2021.  The

3    investigation was over.  Jessica wanted to return to work.

4    Her medical providers said, sure, with proper safeguards

5    in place.  She asked for those.  They were not given to

6    her.  She came back to work; not right away into her

7    class, not right away with her students.

8         Same date -- same date as Ms. Hannans' email,

9    February 25, 2022 -- we have a verbal warning issued to

10   Ms. Gethings, less than a year from the Facebook comments,

11   from the T-Eval meeting, from the Judy Cav meeting, from

12   the committee meeting.  Dr. Tracey, the superintendent for

13   the defendant, New Haven Board of Ed, says to

14   Ms. Gethings, "You exhibited poor professional judgment in

15   how you handled differences of opinion with an employee

16   you supervised.  You exhibited poor professional judgment

17   in how you responded to an employee criticizing the

18   Worthington Hooker School administration during a New

19   Haven Board of Education meeting.  As a seasoned

20   administrator with the New Haven Public Schools, you are

21   expected to respond to these situations responsibly and in

22   a manner consistent with our values.  It is concerning

23   that you were unable to do so in this circumstance."

24   Exhibit 48.  That's a letter dated February 25, 2022.

25   You'll see at the bottom where the CC line is, there are

1     some names.  And under those names, you see "personnel

2     file."

3               So Jessica get her first graders back.  We're

4     moving along the timeline now.  We are about a year later,

5     March 14, 2022.  One year.  She lets her supervisor know,

6     "My preference is to be in third grade.  I filled out this

7     form.  It's showing up blank."  Third grade.  Exhibit 42

8     is that email.  "I prefer third grade at Worthington

9     Hooker."

10              Before Jessica learned that there was a third

11    grade position opened, Ms. Alden's list of concerns is

12    found in a public area.  Jessica testified about that.

13    She found it in the mail area, mailroom area.  Nobody

14    knows how it got there.  Administrators at Hooker

15    investigated it, but they couldn't figure out who or how

16    or why.

17              THE COURT:  You have ten minutes left.

18              MR. INTERLANDI:  You heard testimony that, in

19    fact, there was an open third grade position.  You heard

20    testimony that Jessica applied for the position.  There

21    was testimony that she was not interviewed, she was not

22    considered, that external candidates were interviewed.

23    External candidates were offered two open third grade

24    positions -- one ESSER position, one regular position.

25    The person who accepted the ESSER position, as

1    Ms. Gethings testified, turned it down.  Nobody filled

2    that spot.  And you'll see these exhibits -- this topic,

3    I'm sorry, in Exhibits 43 and 44.

4         So Jessica doesn't get her third grade position

5    back, but what she does get is a classroom note.  "Just do

6    it.  Just leave our school.  You are toxic."  She finds

7    this, as she testified, in August 2022.  She was shocked.

8    She testified about how she felt.  She gets a second

9    letter.  This one tells her to wash her hair, to leave, or

10   just die.  It's a smaller -- it's about this big.  Exhibit

11   22 and 21.

12        Now I'd like to turn to damages.  We talked

13   about treatment, treatment from Jessica's providers.  We

14   have Nicole Ventura and we had Dr. Levin.  This is a

15   timeline of treatment of some specific dates of service.

16        So Jessica starts with Dr. Levin, as Dr. Levin

17   testified, in April 2020.  She goes on with an intake with

18   Ms. Ventura at the PTSC in March of 2021, right around the

19   same time of the Facebook comments.  And treatment

20   continues through there.  And I'll direct your attention

21   to Exhibits R and S, Defendants' R and S, where you'll see

22   there are various dates here where Jessica is expressing

23   feelings of depression, feelings of isolation, and even

24   suicidal ideation.

25        Finally, damages.  You heard Jessica testify

 1   that she lost days, 66 sick days, $26,000.  You heard

 2   testimony from Ms. Ventura about the medical bills from

 3   the PTSC center.  Those totaled $33,000, and dramatic

 4   action, as you'll see in Exhibit 29, of $1,200, totaling

 5   $34,200.

 6           Now, we are not claiming Dr. Levin's bills

 7   because, yes, Ms. Light was treating with Dr. Berger, and

 8   then she needed a new therapist to have her medication

 9   managed and she did find Dr. Levin.  And so we're not

10   claiming those bills as part of the economic damages for

11   Jessica in this matter, but we are claiming the bills for

12   Ms. Ventura and the PTSC.

13           So what is fair compensation for someone who's

14   caused to suffer through daily life, depression, feeling

15   crushed, isolated?  What is fair for someone who has

16   caused -- has been caused nightmares, depression,

17   emotional distress, pain and suffering, you heard Jessica

18   testify, suicidal ideations.

19           We've talked about economic damages, noneconomic

20   damages.  It's $20 for a movie ticket.  If you add in

21   popcorn and a soda, you get up to $30 for a two-hour movie

22   for some entertainment or fun.  I would say it's worth

23   25 cents, I would argue.  Twenty-five cents a minute for

24   happiness comes out to $15 an hour.  Twenty-five cents a

25   minute, $15 an hour.  If you take the days from

1  March 26, 2021, to today, you have 1,233 days,

2  29,592 hours, multiplied by $15 an hour, and that takes

3  you to $443,880.  If you add the economic damages, that

4  takes you to $504,080.

5       Punitive damages.  The judge instructed you on

6  that.  It is your decision on what is fair.  I am asking

7  for triple damages, so if you would take the economic and

8  the noneconomic and triple that to award Jessica punitive

9  damages to deter the defendants or anyone like the

10  defendants from trampling on someone's free speech rights

11  in the future.  If teachers can't speak out about safety

12  concerns without fear of retaliation, then students can't

13  be safe in their learning environments.

14       We talked -- the judge talked to you about

15  defamation.  I talked to you a little bit about that.

16  There's evidence, testimony that Jessica had to hire a

17  lawyer.  She had increased frequency with her medical

18  appointments, as stated by Ms. Ventura.  She had increased

19  care and she had to use sick days in October, starting in

20  October of 2021.  She lost friends.  Facebook friends

21  de-friended her.  People were afraid to associate with

22  her, according to Jessica's testimony.  She felt isolated.

23       As a result of her defamation, she incurred

24  these special damages.  She also incurred harm to her

25  reputation by way of the general damages, and we're asking

 1  for a year's salary in that regard, $60,000.

 2  Sixty-thousand.

 3          In conclusion, Ms. Light's claims are supported

 4  by the evidence in this case, by a fair preponderance of

 5  the evidence, tipping the scale ever so slightly in her

 6  favor.

 7          I hope you will have time to look at the

 8  exhibits, have time to consider the testimony, and make

 9  the right decision for Jessica and award her compensation

10  for this matter.

11          Thank you.

12          THE COURT:  All right, thank you.

13          So, ladies and gentlemen, we will next hear from

14  Mr. Murphy on behalf of the defendants.  While he sets up,

15  if you want to stand up and stretch and move about, feel

16  free to do that.  Do you need a brief recess?

17          Okay, you may proceed.

18          MR. MURPHY:  Excellent.  Thank you, Your Honor.

19          At the start of this case, I told you one of the

20  main themes would be oversight responsibility during an

21  unprecedented pandemic.  And then, over the course of the

22  last four days, you've heard a lot of evidence related to

23  that general theme.  We heard a little bit of background

24  about Worthington Hooker School and Margaret-Mary

25  Gethings, who's the principal of that school, right?  We

1              CERTIFICATE

2

3        RE: *LIGHT v. NEW HAVEN, ET AL.*

4          Case No. 3:22-cv-00425-JBA

5

6        I, Cassie Zayas, RPR, Official Court Reporter

7    for the United States District Court, District of

8    Connecticut, do hereby certify that the foregoing 299

9    pages are a true and accurate transcription of my

10    stenographic notes taken in the aforementioned matter to

11    the best of my skill and ability.

12

13            _ /s/   CASSIE ZAYAS_____

14        Official Court Reporter
         United States District Court
15        915 Lafayette Boulevard
         Bridgeport, CT 06604
16

17

18

19

20

21

22

23

24

25