# EXHIBIT D

```
                    UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - x
                                 :
JESSICA LIGHT,                   :   No. 3:22CV425(JBA)
                                 :
              Plaintiff          :
                                 :
     v.                          :
                                 :
NEW HAVEN BOARD OF EDUCATION &   :
MARGARET-MARY GETHINGS, in her   :
individual capacity,             :
                                 :   New Haven, Connecticut
              Defendants         :   August 5, 2024
                                 :
- - - - - - - - - - - - - - - - x

                           JURY TRIAL
                           VOLUME I

B E F O R E:

     THE HONORABLE JANET BOND ARTERTON, U.S.D.J.,

                    and a Jury of Eight


A P P E A R A N C E S:

   FOR THE PLAINTIFF:

          MONARCH LAW
             363 New Britain Road, First Floor
             Berlin, Connecticut 06037
          BY: ANTHONY J. INTERLANDI, SR., ESQ.

   FOR THE DEFENDANTS:

          SHIPMAN & GOODWIN
             One Constitution Plaza
             Hartford, Connecticut 06103
          BY: PETER JOSEPH MURPHY, ESQ.
              CHELSEA McCALLUM, ESQ.


                                    Diana Huntington, RDR, CRR
                                    Official Court Reporter
```

```
 1   Q.   I want to make sure I understand your testimony.
 2   When you're referring to bus, are you referring to a city
 3   bus or a school bus?
 4   A.   I'm referring to school buses.  In the high schools
 5   sometimes the New Haven Public Schools will give like city
 6   bus passes, but they don't do that for Hooker because it's
 7   like elementary/middle school.
 8   Q.   So there were no yellow school buses for Hooker,
 9   right?
10   A.   Correct.
11   Q.   While you were at Davis, did you have an opportunity
12   to be reviewed, your performance reviewed by the
13   administrators?
14   A.   Yes.
15   Q.   And do you recall that process?
16   A.   Yes.
17   Q.   What do you recall about the performance review
18   process while you were at Davis?
19   A.   Um, so it involves the administrators coming into
20   your room and taking observations.  It should really be a
21   conversation around what you're doing well, what you
22   should improve.  And then at the end of it, we kind of
23   look at a rubric of how well you're doing.  And then
24   you're given a number rating.  And it went well.  I felt
25   it was a very collaborative process.
```

1   Q.   Was there a specific time in the school year where
2   the administrators gave you this performance review?
3   A.   So, at the beginning of the year we create goals of
4   what we want to get done with our students that year, how
5   much growth we want to see.  Mid-year we will have a
6   review.  And then at the end we'll have a final review.
7   Q.   And so for people who are not teachers, what does
8   mid-year mean?
9   A.   Um, usually around February, March.
10  Q.   And as a result of the mid-year meeting, do you
11  receive any sort of written documentation?
12  A.   Yes.
13  Q.   And what is -- does that have a specific name, that
14  document you receive?
15  A.   It's called a TEVAL, for teacher evaluation.
16  Q.   So your rating at Davis, do you recall the ratings
17  that you received the five years that you were a teacher
18  at Davis?
19  A.   Yeah.  So, it's a scale of 1 to 5.  I was given a 4
20  or a 5 every year.
21  Q.   And the process that you just explained for
22  performance reviews at Davis, was that similar at Hooker?
23  A.   Yes.
24  Q.   And so who did your review the first year you taught
25  at Hooker?

1  A.  Dr. Robles.
2  Q.  Do you recall the rating that was given to you after
3  your TEVAL meeting?
4  A.  A 4.
5  Q.  Were you ever in your career for this employer, the
6  New Haven Board of Ed, ever given a rating of 3 or lower?
7  A.  No.
8  Q.  And did Dr. Robles give you a performance review only
9  one time?
10 A.  Um, only one final review.  But it was from the
11 beginning to the end of the year.  So it was based on lots
12 of observations.
13 Q.  And any subsequent TEVAL meetings or TEVAL
14 documentation that you received, who was that completed
15 by?
16 A.  Ms. Gethings.
17 Q.  So let's talk about COVID.
18     Do you recall when COVID caused your school Hooker to
19 shut down?
20 A.  March of 2020.
21 Q.  Okay.  And can you walk us through the process, at
22 least in that first month in terms of what you were
23 supposed to do with your students?
24 A.  Yes.  So it was really a shock -- sorry.  It was
25 really a shock for all of us.  We were given a limited

1  component.
2  Q. How are you feeling as you approach the start of the
3  new school year as a new first grade teacher?
4  A. Um, I am trying to be as optimistic as possible, but
5  I'm quite terrified.
6  Q. Why are you terrified?
7  A. Because it's the first year in over a decade that I
8  felt like I was new at what I was doing and not an expert.
9  I didn't feel like I received a very warm welcome at the
10 Little School.  Um, I still had the lingering concerns
11 from the year before.  And all of the teachers that had
12 kind of been my friends and allies were at the Big School.
13 So my circle of people I could turn to was dwindling.
14 Q. Ms. Alden was at the Little School, right?
15 A. Yes.
16 Q. Where was Ms. Gethings' office as it relates to the
17 two buildings?
18 A. Ms. Gethings' office was in the Big School.
19 Q. And where was Ms. Clarino's office?
20 A. In the Little School.
21 Q. What was the status of the investigation of your
22 complaint in September -- I'm sorry, August of 2021?
23 A. Um, it was -- it was still ongoing.  The law firm
24 hadn't really interviewed me over the summer.
25 Q. Did you ask for any updates from Ms. Bonner?

1  to that tomorrow morning.
2           MR. INTERLANDI:  Yes.
3  BY MR. INTERLANDI:
4  Q.   Finally, I guess, I want to talk to you about your
5  damages that you're claiming in this case.
6       Have you suffered any damages as a result of the
7  conduct you're alleging was done to you by Ms. Gethings
8  and the defendant New Haven Board of Education?
9  A.   Yes.
10 Q.   What are the damages that you're alleging in this
11 case?
12 A.   My sick days which were paid for at retirement.  My
13 damages to my reputation.  I -- prior to all of this, I
14 had a therapist that I saw once a month, sometimes twice a
15 month.  Through the course of this, it became -- I started
16 having two providers and having close to ten appointments
17 a month sometimes.  These were all out-of-pocket medical
18 expenses.  At one point I fainted at school from the
19 stress, had to be taken by ambulance.
20 Q.   I would like to ask you a question about the
21 therapist.  What was the therapist's name that you said
22 you were seeing one time a month, maybe sometimes twice?
23 A.   Dr. Eric Berger.
24 Q.   And how long were you treating with Dr. Berger?
25 A.   About eight years.

1  Q. And when you mentioned earlier you lost sick days, do
2  you remember how many sick days you lost?
3  A. Sixty-six.
4  Q. Do you have an idea what the value of those 66 lost
5  sick days is?
6  A. About -- at retirement, about $26,000, based on the
7  information the union gave me at the per-day rate.
8  Q. How would you describe your last two years at
9  Worthington Hooker?
10 A. Crumbling.  Devastating.  Isolating.
11          MR. INTERLANDI:  Your Honor, I don't have any
12 further questions other than the issue that we discussed
13 earlier.
14          THE COURT:  I propose that you begin your
15 cross-examination, and we will return later on possibly
16 even on redirect.
17          You may proceed.
18
19                    CROSS-EXAMINATION
20 BY MR. MURPHY:
21 Q. Good afternoon, Ms. Light.
22 A. Good afternoon.
23 Q. A little bit earlier under questioning from your
24 attorney you mentioned you were unfriended by three
25 co-teachers at Worthington Hooker, right?

Case 3:22-cv-00425-JBA   Document 121-5   Filed 09/09/24   Page 9 of 17

190

1  you were asked about your union, a little bit about your
2  union, right?
3  A.   Yes.
4  Q.   All teachers are members of the teachers union,
5  correct?
6  A.   Yes.
7  Q.   And as a teacher who is a member of the union, you're
8  subject to a collective bargaining agreement?
9  A.   Correct.
10 Q.   And that covers things such as salary, right?
11 A.   Yes.
12 Q.   Discipline?
13 A.   Somewhat.
14 Q.   Somewhat.  There's a -- well, withdrawn.
15      There's also a grievance process within that CBA,
16 right?
17 A.   A grievance process?
18 Q.   Sure.
19      Are you familiar with the teachers union contract?
20 A.   I am familiar with the contract.  Yes.  I don't know
21 it word for word.
22 Q.   And are you familiar generally with the grievance
23 process that's in that contract?
24 A.   Um, not in the sense that you're discussing it.
25 Q.   Have you ever filed a grievance?

1  A.   No.
2  Q.   When you were teaching at Worthington Hooker, were
3  you aware that you had the opportunity to file a grievance
4  if you thought there had been a violation of the contract?
5  A.   Um, I was advised by the union to file a complaint.
6  Um, I believed that the complaint was synonymous with
7  grievance.
8  Q.   Okay.  But my question was:  Were you aware of the
9  grievance process in that document?
10           MR. INTERLANDI:  Objection, asked and answered.
11           THE COURT:  Sustained.
12  BY MR. MURPHY:
13  Q.   I don't recall if I asked you this question, I
14  apologize.  Have you ever filed a grievance when you were
15  working for the New Haven Board of Education?
16  A.   No.
17  Q.   How many teachers are there in New Haven,
18  approximately?
19  A.   Um, I would be guessing.
20           MR. INTERLANDI:  Objection.  Requires her to
21  speculate.
22           THE COURT:  Well, maybe not.
23           MR. INTERLANDI:  If he's asking if she knows.
24  He asked her how many, approximately.
25           THE WITNESS:  I would be speculating.

1  colleagues at the school, the most recent of which was on
2  the exact last day of school, the retirement party to
3  which she filed a complaint, and that matter was
4  investigated by the assistant principal. And so we are
5  claiming this as part of her damages as damage to her
6  reputation resulting from the defamatory statement that
7  was made about her in March of 2021.
8             Also, Your Honor --
9             THE COURT: Let's get some time in here. The
10 March of 2021 is when the defendant made the alleged
11 defamatory statement?
12            MR. INTERLANDI: Yes, Defendant Gethings made
13 the statement.
14            THE COURT: What is your context of when
15 Ms. Light found these notes?
16            MR. INTERLANDI: I have not gotten there yet
17 with her testimony, Your Honor.
18            THE COURT: Well, I'm asking for a proffer.
19            MR. INTERLANDI: Proffer is going to be that as
20 she was preparing for the upcoming school year, she was
21 preparing her classroom and found the two notes in August
22 of 2022.
23            THE COURT: So what is the relationship between
24 Ms. Gethings' statement of March 21, '22, and her finding
25 these nasty notes in her classroom in August of '22, five

1  months later?

2  MR. INTERLANDI: So, Your Honor, the statement
3  was made on March 31, 2021, in front of Ms. Morrison,
4  Ms. Cavanaugh, and Jenny Clarino. Jenny Clarino and
5  Ms. Gethings on or around June 7, 2021, file a retaliatory
6  complaint and a response to Ms. Light's initial complaint.
7  Part of that complaint is the issue regarding teacher acts
8  that Ms. Light defamed -- I'm sorry, that she leaked the
9  information about her COVID-positive status.

10  Obviously, now over the summer of 2021 there's
11  an investigation. It wraps up in December of 2021. But
12  before that, Ms. Light is now reassigned to go work in
13  first grade at the Little School where Ms. Alden is
14  located and Ms. Clarino is located.

15  So as we come around to January 2022, we have
16  the meeting, there's discussions. Ms. Light is back to
17  work. She's not happy about how she's being eased into
18  the role. And eventually within three to four weeks she
19  finally gets her class back.

20  There are other issues that come after that as
21  well as before. She testified about the email being
22  found. She testified about Ms. Alden, who is a second
23  grade teacher located in the Little School, about her List
24  of Concerns being found in the mail room, and the
25  retirement party on the last day of school which was in

```
 1   2022 and located in the Little School.  There is a gap
 2   from June to July.  Now we're into August.
 3              Our proffer is this is all related from the
 4   beginning of March these rumors were spread, the
 5   defamatory statement was made, and other teachers --
 6   arguably, it's not direct evidence but it's certainly
 7   circumstantial evidence of injury to her name and
 8   reputation.  Folks are telling her -- not folks, I'm
 9   sorry.  But the letters are saying "you are toxic," "leave
10   our school or just die," "Ms. Light's to-do list:  Leave
11   our school or wash your hair."  No one is sitting with her
12   at lunch.  She says hello to a colleague and they have an
13   unreasonable reaction.
14              That is our offer, Your Honor.
15              THE COURT:  So when you say that the litany of
16   bad treatment against Ms. Light includes circumstantial
17   evidence of injury to her name and reputation found in the
18   notes, how do you make that link?  It's the link to what
19   Ms. Gethings said in March, right?
20              MR. INTERLANDI:  Yes.
21              Your Honor, if I may, I want to take a look at
22   Ms. Alden's initial complaint.
23              MR. MURPHY:  While he's looking at that, can I
24   just clarify the timeline?  It's March of 2021 to August
25   of 2022.
```

1   principal, the assistant principal, union representatives,
2   Jessica Light.
3          And then we're back now in early 2022.  And
4   we're looking for safeguards to be put in place,
5   et cetera.  Ms. Alden is teaching at the Little School.
6   Ms. Clarino's office is located in the Little School.  And
7   it's our position that this is, like I said, part and
8   parcel of the timeline.  And I recognize I don't have
9   anyone saying I'm leaving that note in the office or in
10  your classroom because of the defamation because you
11  disclosed Teacher X's COVID status but, again, I do
12  believe that it is some evidence of harm to corroborate
13  her claim that there was harm to her reputation.  If I say
14  someone fights pit bulls in the street and three months
15  from now or a year from now they get an anonymous letter
16  saying that they're a bad person, I believe that should be
17  evidence of that person's reputational harm.
18         He can certainly make the argument that it's so
19  far away that how could this even be considered.  And he
20  can do that in his closing.  And he can do that on cross.
21         MR. MURPHY:  Well, that's not my only objection,
22  but it's certainly a major one.
23         THE COURT:  All right.
24         Let me hear from Mr. Murphy.
25         MR. MURPHY:  Thank you, Your Honor.

```
 1                Certainly, it's the timeliness argument.
 2                Second, just looking at what Ms. Light testified
 3   was the alleged defamatory statement, it was Ms. Gethings
 4   saying something along the lines of everyone's saying it's
 5   you.  No one has said it's anyone else.  That's the gist
 6   of that statement from that March 31, 2021, meeting.  And
 7   there's been no testimony that Principal Gethings said
 8   that again outside of that meeting or anything else.  That
 9   statement was confined to one particular meeting with
10   Judie Cavanaugh who certainly didn't want to go talking
11   about it because she was upset it was talked about in the
12   first place, right, according to the record.  And then,
13   two, the union representative.
14                This is just a huge leap to suggest that one
15   comment in a meeting about one particular issue a year and
16   five months before has some sort of connection to these
17   notes allegedly being found in Ms. Light's classroom in a
18   separate school from where she was previously -- a
19   separate building, rather.  There's just no connection
20   whatsoever.
21                It's a huge leap and would be unfairly
22   prejudicial to the defendants to admit these notes,
23   especially when I don't understand Ms. Light to even be
24   alleging that she knows who left them or that there's any
25   evidence as to who left them, whether, you know,
```

```
 1   Principal Gethings, a teacher, Ms. Light herself.  There's
 2   just no evidence anyone has left those notes there.
 3             THE COURT:  So the offer of proof is not that
 4   these notes showed how bad the atmosphere had gotten
 5   regarding Ms. Light within the school system, but that
 6   these notes were the product of Ms. Gethings' allegedly
 7   false accusation much earlier.
 8             I'm not seeing any reasonable way to draw causal
 9   connection between what Ms. Gethings -- between
10   Ms. Gethings' defamation in March of '21 as to which we at
11   least thus far have no evidence was repeated.  The
12   investigations that are being referred to are a much
13   broader complaint, as I understood it.
14             And while we are not getting into the contents
15   of the Berchem Moses report findings, the report was
16   disclosed in December of 2021, and we still have to
17   account for what happened between then and August 22.
18             Do I have my dates correct?
19             MR. INTERLANDI:  Yes, Your Honor.
20             THE COURT:  So to say that the harm from the
21   defamatory statement includes those anonymous notes seems
22   to me on the record so far is too attenuated to have
23   relevancy on the issue of damages.
24             Now, when it's presented and when the actual
25   evidence purporting to show the relationship is on, you
```

```
 1
 2                    C E R T I F I C A T E
 3
 4    RE: JESSICA LIGHT v. NEW HAVEN BOARD OF EDUCATION, ET AL.
 5                       No. 3:22CV425(JBA)
 6
 7
 8           I, Diana Huntington, RDR, CRR, Official Court
 9    Reporter for the United States District Court for the
10    District of Connecticut, do hereby certify that the
11    foregoing pages 1 through 226 are a true and accurate
12    transcription of my shorthand notes taken in the
13    aforementioned matter to the best of my skill and ability.
14
15
16
17
18                          _____/s/_____
19                    DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
20                    United States District Court
                       141 Church Street, Room 147
21                    New Haven, Connecticut 06510
                            (860) 463-3180
22
23
24
25
```