# EXHIBIT E

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                               :

JESSICA LIGHT,                 :  No. 3:22CV425(JBA)
                               :

            Plaintiff    :
                               :

        v.                :
                               :

NEW HAVEN BOARD OF EDUCATION &  :
MARGARET-MARY GETHINGS, in her  :
individual capacity,        :
                               :  New Haven, Connecticut
           Defendants   :  August 6, 2024
                               :

- - - - - - - - - - - - - - - - - x

JURY TRIAL
VOLUME II

B E F O R E:

    THE HONORABLE JANET BOND ARTERTON, U.S.D.J.,

        and a Jury of Eight

A P P E A R A N C E S:

  FOR THE PLAINTIFF:

      MONARCH LAW
          363 New Britain Road, First Floor
          Berlin, Connecticut 06037
      BY:  ANTHONY J. INTERLANDI, SR., ESQ.

  FOR THE DEFENDANTS:

      SHIPMAN & GOODWIN
          One Constitution Plaza
          Hartford, Connecticut 06103
      BY:  PETER JOSEPH MURPHY, ESQ.
          CHELSEA McCALLUM, ESQ.

                            Diana Huntington, RDR, CRR
                            Official Court Reporter

246

1    Q.    And that's the teacher's union?

2    A.    Yes.

3    Q.    You mentioned you discussed Jessica Light with

4    Attorney Chester, right?

5    A.    Correct.

6    Q.    And he advised you not to file a grievance or there

7    were no grounds to file a grievance?

8    A.    Not to file yet because he thought maybe we could

9    work this out through HR and not file the grievance

10   because the grievance can take a long time.  Especially if

11   it gets to mediation, it could be a year.

12   Q.    So ultimately the union did not file any grievance on

13   behalf of Jessica Light?

14   A.    No, we did not.

15   Q.    How many teachers approximately are in the union

16   right now?

17   A.    When I served there was roughly between 1850 and

18   1900.

19   Q.    And in the school year 2020-2021 was that about the

20   same?

21   A.    Approximately, yes.

22   Q.    What is -- are you familiar with a Connecticut

23   statute 10-151?

24   A.    I'm not sure.

25   Q.    Okay.  Are you aware -- did you become aware during

291

1        And you say we all have the best intentions.  Right?

2   A.   Yes.

3   Q.   Now, I have a few questions for you, Ms. Light, on

4   the March 31, 2021, meeting you had with Ms. Gethings,

5   Ms. Clarino, Ms. Morrison, and Judie Cav, okay?

6   A.   Okay.

7   Q.   You taped that meeting, right?

8   A.   Yes.

9   Q.   On your phone?

10  A.   Yes.

11  Q.   And you didn't tell anyone you were taping that

12  meeting?

13  A.   Correct.

14  Q.   And so as of March you were already sending emails,

15  school-based emails to your hotmail account, right?

16  A.   Yes.

17  Q.   And you were taping meetings on your phone?

18  A.   Yes.

19  Q.   And that wasn't the first meeting you had taped

20  without telling people you were taping it?

21  A.   Correct.

22  Q.   How many meetings do you think you taped without

23  telling people you were taping it?

24  A.   Um, the ones in exhibit -- the ones --

25  Q.   Several meetings, correct?

327

1  Q.    Under questioning from your attorney you identified a

2  specific sentence in the transcript that you viewed as

3  defamatory, right?

4  A.    Yes.

5  Q.    Okay.  And your defamation claim is based on a

6  comment made in a Zoom meeting, right?

7  A.    Yes.

8  Q.    Meaning you, Judie Cav, the two administrators, and

9  your union representative all participated via Zoom?

10  A.    The union steward.

11  Q.    Union steward, Ms. Morrison?

12  A.    Yes.  I wasn't aware she was coming.

13  Q.    But she appeared and she was there?

14  A.    Yes.

15  Q.    And so my question is:  No one else but you five were

16  involved in that meeting, right?

17  A.    Not to my knowledge.

18  Q.    Okay.  And to your knowledge -- withdrawn.

19        Ms. Light, you also raised some concerns on your

20  direct about observations when you were in the first grade

21  classroom at the start of the 2021-2022 school year,

22  correct?

23  A.    Yes.

24  Q.    I think you said Ms. Clarino maybe popped in your

25  classroom three or four times with her computer and took

```
 1   notes?
 2   A.   I didn't use the word "popped in."
 3   Q.   How would you describe it, then?
 4   A.   Entered and sat in the back.
 5   Q.   So she entered your classroom four times and took
 6   notes.  And you took those to be observations, right?
 7   A.   Correct.
 8   Q.   At the time you were new to the Little School?
 9   A.   Correct.
10   Q.   All right.  At the time did you know if that was
11   standard practice at the Little School?
12   A.   I know that there were other teachers new to the
13   Little School that did not have this experience.
14   Q.   When you're in your classroom you know when
15   Ms. Clarino is in your classroom, right?  Obviously.
16   A.   Yes.
17   Q.   All right.  And while you're teaching you would not
18   know if Ms. Clarino was in other classrooms, right?
19   A.   Correct.  I -- correct.
20   Q.   Ms. Light, I'd like to ask you a little bit about
21   your claim for damages in this case, a little bit about
22   your emotional distress.
23        I understand you're making a claim for emotional
24   distress damages, right?
25   A.   Correct.
```

345

1    Q.    You were asked about your salary, I believe, that it

2    remained the same or consistent and that it was governed

3    by your collective bargaining agreement.  Do you recall

4    approximately what your salary was when you transferred to

5    Ross Woodward for the start of the '22-'23 school year?

6    A.    About $60,000.

7    Q.    And what is your salary today, if you know,

8    approximately?

9    A.    Approximately the same.

10   Q.    And whose decision was it to transfer to Ross

11   Woodward?

12   A.    I made the decision in distress.

13   Q.    Do you recall any specific reasons why you were in

14   distress?

15   A.    Yes.

16              MR. INTERLANDI:  Your Honor, this is an area

17   where I'd like to revisit two exhibits that were discussed

18   yesterday.

19              THE COURT:  We'll take an early lunch.  And we

20   will be back no later than 1:00.

21                  (Whereupon the jury left the courtroom.)

22              THE COURT:  Be seated.

23              I will hear you, Mr. Interlandi.

24              MR. INTERLANDI:  Yes, Your Honor.

25              This is concerning Exhibits 21 and 22.  They

346

1    were part of our motion in limine.  They've been argued in

2    that regard.  Your Honor reserved her opinion for an offer

3    of proof yesterday.  I made that offer of proof in

4    connection with Ms. Light's claim for damages, harm to

5    reputation concerning the defamation.  But now I'd like to

6    offer those exhibits for a different purpose, which is to

7    show or support the claim that there was this toxic

8    environment, the hostility that she experienced at the

9    school as a result of the retaliation she suffered for

10   expressing her free speech.  It is alleged, it's not a

11   claim in this case but it is alleged that there was a

12   hostile environment at the school, and that is alleged in

13   the complaint in at least two areas.

14          And in addition to that, the timeline that was

15   discussed yesterday, the various items in that timeline

16   connecting from at least November 2020 through August 2022

17   when Ms. Light made the decision that she could no longer

18   take it being in the heat of the battle, she decided to

19   transfer out and go to Ross Woodward to avoid any further

20   hostility, which is what I am going to get into if I'm

21   allowed to explore that some more with her.

22          THE COURT:  So the argument that you make is

23   that 21 and 22 are relevant specifically to the

24   retaliation she experienced, not a more generalized

25   hostile environment in the school.  Do I understand you

349

1        MR. MURPHY:  I guess I'm just a little bit

2   confused, Your Honor.  I heard a lot there, but I'm not

3   sure I heard anything that lays the foundation you were

4   looking for.

5        At the pretrial conference you were very

6   specific and you made the plaintiff identify all of the

7   specific retaliatory acts that she believes the Board or

8   Principal Gethings took against her.  My recollection is

9   the last one occurred in January of 2022 and the whole

10  return to work and whether that was handle appropriately,

11  whether she had to return to her class right away or

12  whether there was an easing-in period.  These notes were

13  found in August of 2022, which is eight months after --

14  seven or eight months after the last alleged retaliatory

15  act.  There's been no connection between even that last

16  one, the return-to-work discussions with HR and the union,

17  et cetera, and the notes allegedly found in the classroom.

18  I'm just perplexed as to how this ties back in to the

19  retaliatory -- alleged retaliatory conduct.  I heard

20  several different things, you know, the bathroom, the

21  email in the printer, the List of Concerns.  Those were

22  all in 2021, right?  The List of Concerns a little bit

23  later.  The return to work January 2022.  And then all

24  these things about, you know, she used to eat lunch by

25  herself, the retirement party.  Again, those have no

1   connection to the alleged retaliatory acts either.

2           THE COURT:  When you say that, how does that

3   address the plaintiff's argument that emanating from the

4   retaliatory acts was an atmosphere of hostility which she

5   says the nasty notes were a part of?  You can argue that

6   they don't have any relationship, but why is that not for

7   the jury to decide?

8           MR. MURPHY:  Well, for the reasons I think we

9   discussed before.  One, timeliness.  Two, she has to show

10  actions by the employer.  We don't even know who left

11  these notes.  There's been no -- they're just speculative

12  where they came from.  Summer break, right before the

13  start of the school year.  Well, I take it back.  One was

14  before Ms. Light made the decision to go to Ross Woodward.

15  My understanding is she found the second one after she

16  had -- and I believe we have an email on this -- after she

17  already accepted the job.  So I think that one cannot

18  possibly -- if that's true, then it can't possibly come in

19  because she already made the decision to leave by the time

20  she found it.  I have an email, I think it was one of our

21  proposed exhibits that was objected to.

22           So I'm just --

23           THE COURT:  So we heard testimony this morning

24  from the union representative about the subject matter of

25  things that Ms. Light had come to him about.  One of the

351

1  things was fear for her safety.  If one were to take the

2  viciousness of those notes as providing a basis for fear,

3  what's the timing there?

4          MR. MURPHY:  I'm sorry, maybe I didn't catch the

5  second half of your question, Your Honor.

6          THE COURT:  What's the timing between when the

7  union rep is receiving the plaintiff's fear for her safety

8  and whether those notes were arguably part of what

9  underlay her fear for her safety?

10          MR. MURPHY:  I have no idea what was discussed

11  between her and her union rep.

12          THE COURT:  No, we had testimony today.

13          MR. MURPHY:  He said there -- and that's why I

14  objected to it.  Because without the notes I thought his

15  testimony on Ms. Light contacting him about the notes was

16  objectionable.  I feel like I'm not answering Your Honor's

17  question.

18          THE COURT:  So if in fact his testimony about

19  the notes is reflective in some way, arguendo, of her

20  concern for her safety, does that take care of at least

21  the vast remoteness that I found under 403 precluded them

22  as evidence of the impact of the defamation?

23          MR. MURPHY:  I don't think so, Your Honor.  Just

24  because she alerted her union to the fact that these notes

25  were found and she raised some concern about her safety,

1   that doesn't answer the question about whether there's any

2   particular connection to the ten or eleven retaliatory

3   acts that you made her identify at the time of this trial.

4           THE COURT:  Would you agree it satisfies the

5   chronological relationship?

6           MR. MURPHY:  Maybe I'm just misunderstanding

7   Your Honor.

8           I'm having a hard time with the chronological

9   relationship given the fact that they were found a year

10  and five months after March of 2021 and eight months after

11  the last retaliatory act, which was her interactions with

12  HR that have nothing to do with building level staff,

13  right?  It was discussions between Ms. Light, her union,

14  several union officials, and HR staff.  I don't understand

15  how that last retaliatory act eight months before the

16  notes were found has any relation to those notes.  I don't

17  think I've heard testimony from Ms. Light about that.  I

18  agree with -- I apologize, the tone of those notes, right,

19  I get why you're concerned and that Ms. Light found them

20  concerning as well.  I forgot how you just described them.

21  They're vicious I think you said.  And I get that.  I'm

22  not discounting the notes.  I'm just saying the timeline

23  is so far removed.

24          THE COURT:  You say that the notes were eight

25  months after the last retaliatory act.  And specifically

 1  what last retaliatory act are you referring to?

 2          MR. MURPHY:  I'm referring to the whole

 3  return-to-work discussion.  I think the tape recording is

 4  January 14th of -- that whole -- it's a little vague on

 5  their end, but that whole return-to-work discussion and

 6  whether she would return right to her classroom and

 7  whether safeguards were in place, et cetera.

 8          THE COURT:  And the list we're working on for

 9  this trial, are there no adverse actions that took place

10  after the return-to-work discussion?

11          MR. MURPHY:  That's my understanding,

12  Your Honor.  I'm looking at the list right now.  Yes.

13          THE COURT:  All right.

14          So I'm going to ask Mr. Interlandi if you can

15  respond to any of Mr. Murphy's arguments or analyses of

16  what we have as evidence.

17          MR. INTERLANDI:  What we have as evidence,

18  Your Honor, is an overall testimony from my client about

19  her fear, her safety.

20          THE COURT:  But we need to have a little bit

21  more proximity.  My question, Mr. Murphy says that the

22  notes were found eight months after the last identified

23  retaliatory act.  Do you agree with that?

24          MR. INTERLANDI:  Yes.

25          THE COURT:  And that last act was all the

1   didn't hear you.

2           MR. MURPHY:  Sure.  That's twice my questions

3   have been mischaracterized.  I ask that they be accurate

4   moving forward.

5           MR. INTERLANDI:  He said the word "leveraging."

6   I mean, we could have it read back.

7           THE COURT:  All right.  Let's move on.  The

8   attorneys' words or questions are not evidence, only the

9   witness's answers.

10  BY MR. INTERLANDI:

11  Q.   You had a meeting on March 31, 2021, with various

12  people.  We've talked about that already.  Why weren't you

13  aware that Ms. Morrison was going to be in attendance?

14  A.   I wasn't told that she would be in attendance.  I was

15  told it was just going to be a meeting between Ms. Cav and

16  myself and an administrator so that we could work out our

17  differences and move on.

18  Q.   Told by whom?

19  A.   Ms. Gethings.

20  Q.   Was Ms. Morrison there as your union representative

21  or Ms. Gallagher's representative?

22  A.   I've been told Ms. Cav requested her be there.

23  Q.   Did you have any union representation at this

24  meeting?

25  A.   No.

1    It was also just startling because disciplinary

2  meetings, you're required to have a union steward present.

3  So prior to the appearance of Ms. Morrison in the meeting,

4  I didn't believe the meeting was going to be disciplinary.

5  And then I believed it was.

6  Q.    Were you surprised to see Ms. Morrison?

7  A.    Absolutely.

8  Q.    Why were you so surprised?

9  A.    Had I been told that Ms. Morrison was going to be

10  there, I would have prepared more.  I would have assumed

11  it was a disciplinary meeting.  I would have requested

12  that a union representative other than Ms. Morrison would

13  be there given that she was my child's teacher.

14  Q.    Which child was she teaching at that time?

15  A.    Sebastian.

16  Q.    Was this a concern to you that she was present?

17  A.    It was a concern to me.

18  Q.    Did you raise that concern with the union president

19  or vice president?

20  A.    Um, I spoke to them after the fact.

21  Q.    You testified that you had dyslexia, you have

22  dyslexia.  I believe your testimony was that you never

23  asked for an accommodation?

24  A.    Correct.

25  Q.    Did you ever need to ask for an accommodation?

1  times where I would get upset at the amount that I was

2  having to do to run the family.  Also, I was working from

3  home now.  I was taking care of the kids at school.  I was

4  doing more of the dishes.  I was making sure her laundry

5  was done.  You know, during this --

6  Q.   Why -- I'm sorry.  Why was she unable to do that

7  stuff?

8  A.   It would pile up in our shared laundry basket.  I

9  could speculate, right, when people are depressed, they

10  take care of themself less.  What I can say is that I did

11  more laundry.

12      Usually by early November the place in the basement

13  where we hide the Christmas presents for the kids is

14  filling up.  And I think it was 2021 and possibly in 2022

15  as well, you know, we would get midway through December

16  and I would start panic buying on Amazon to make sure that

17  we had Christmas presents for the kids.

18      Jessica was really just consumed with the thoughts.

19  She would always ask you probably 20 or more times a week,

20  am I a good person?

21  Q.   How is she doing today?

22  A.   Better.

23  Q.   Why do you say that?

24  A.   I think, you know, maybe it's just getting accustomed

25  to it.  You know, there was times we thought that it was

431

1

2                        C E R T I F I C A T E

3

4   RE: JESSICA LIGHT v. NEW HAVEN BOARD OF EDUCATION, ET AL.

5                     No. 3:22CV425(JBA)

6

7

8          I, Diana Huntington, RDR, CRR, Official Court

9   Reporter for the United States District Court for the

10  District of Connecticut, do hereby certify that the

11  foregoing pages 228 through 430 are a true and accurate

12  transcription of my shorthand notes taken in the

13  aforementioned matter to the best of my skill and ability.

14

15

16

17

18                    _____/s/_____

19                    DIANA HUNTINGTON, RDR, CRR
                       Official Court Reporter
20                    United States District Court
                       141 Church Street, Room 147
21                    New Haven, Connecticut 06510
                          (860) 463-3180
22

23

24

25