# EXHIBIT F

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| JESSICA LIGHT Plaintiff vs. NEW HAVEN BOARD OF EDUCATION, ET AL Defendants. | NO: 3:22cv425(JBA) August 7, 2024 9:02 a.m. 141 Church Street New Haven, Connecticut |

DAY THREE OF JURY TRIAL

VOLUME III

B E F O R E:

THE HONORABLE JANET BOND ARTERTON, U. S. D. J.

A P P E A R A N C E S:

For the Plaintiff : Anthony J Interlandi, Sr.
Monarch Law
363 New Britain Road
First Floor
Berlin, CT 06037

For the Defendants: Peter Joseph Murphy
Chelsea McCallum
Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103

Q. What's the date that you completed this form?

A. I believe it was October 19, October 20. Signed yes.

Q. Look at page 4.

A. Okay.

Q. Was that a date that you entered?

A. Yes.

Q. What was the date?

A. October 20, 2021.

Q. Thank you. Why did you fill out this form for Ms. Light?

A. Jessica had reported it not being sustainable to remain at her place of employment due to fear of retaliation, due to fear of being ostracized.

Q. Do you have an understanding of what she felt at that time she was being retaliated for?

A. Yes.

Q. What was your understanding?

THE COURT: Sorry. Mr. Murphy is standing.

MR. MURPHY: Objection. I think the question mischaracterizes the witness's prior testimony. The witness said Ms. Light had a fear of retaliation.

THE COURT: Sustained. Would you rephrase?

BY MR. INTERLANDI:

Q. Do you have an understanding of what Ms. Light's

fear of retaliation was at that time?

A. She was being -- her perception was that she was being mistreated by her principal, Ms. Gethings, and was able to speak up about issues she was seeing within the school system. Preliminary focusing on the protocols that were not necessarily being adhered to regarding COVID 19.

Q. Did you recall a time that Jessica had to return to work?

A. Yes.

Q. Please turn to Exhibit 17 in your binder and let me know when you are there.

A. Okay.

Q. Have you seen this document before today?

A. I have.

Q. What is this document?

A. This is a document that I wrote to New Haven Public Schools Human Resources Department saying that I believe Jessica would be able to return to work full-time assuming that appropriate safeguards were put in place.

Q. Did Jessica tell you that she didn't feel safe returning to work?

A. Jessica was not confident that she would be returning to work with proper safeguards in place so she was concerned.

MR. INTERLANDI: The second page of Exhibit 268, Light 268.

MR. MURPHY: Thank you.

BY MR. INTERLANDI:

Q. And then if you go to 272 in that document at the bottom in the right hand corner is 00272. The date is July 14, 2021. Do you see that?

A. I do.

Q. Above the line that says DYS. It says overall severity. Do you see that?

A. Yes.

Q. What does that mean?

A. My perception of how a client's symptoms are impacting their day-to-day life. So there are three options mild, moderate, and severe.

Q. What does mild mean?

A. Mild is that it is less than their baseline in my opinion and they are able to function with a bit more breath.

Q. What about moderate?

A. Moderate I would consider to be their baseline of interference.

Q. And how about severe?

A. When it becomes either unmanageable or greatly significantly impacting their ability to exist day to

day.

Q. During your treatment of Jessica, did the overall severity stay the same or did it change?

A. It varied. It definitely was moderate for a good chunk, but she did go to severe on a few occasions.

Q. Do you have an opinion as to why it changed?

A. Yes. So primarily, it was her experience of either what was happening in the school when she was there. This specific time I'm seeing is July 21, 2021.

Q. Is that in the middle of the page?

A. It is. I have marked severe. She had suicidal ideations as well. If memory serves, that was during the time that it was being determined whether or not Jessica was going to be moved from third grade to first grade at Hooker.

Q. For the line that we have been talking about, which are the words there were checked off?

A. Cognition, mood, work and relationship.

MR. INTERLANDI: Thank you, Ms. Ventura. I do not have any further questions for you.

THE COURT: Cross-examination.

CROSS-EXAMINATION BY MR. MURPHY:

Q. Good morning, Ms. Ventura.

A. Good morning, Mr. Murphy.

Q. I will jump to a few points that you raised on

what specific stressors you discuss with Ms. Light on March 8, 2021?

A. No.

Q. So earlier when you testified about a note from 7-20-21, four months later, you said if memory serves, this is what we were discussing?

A. Yes.

Q. When you sit here today and look at your medical records, you wouldn't be able to determine what you discussed on 7-21-21, correct?

A. Yes, that's intentional.

MR. MURPHY: Your Honor, at this time given Ms. Light's prior testimony and Ms. Ventura's testimony today, I would like to move to have the emails between the parties be admitted as an exhibit. We would be on Z. I previously provided Attorney Interlandi with a packet of emails and I'm happy to show to the witness.

THE COURT: Attorney Interlandi, what's your position understanding that these have been I guess essentially culled from Ms. Ventura's overall record. Is that correct? In other words, we have the medical record as part and then the emails between the therapist and patient separately.

MR. INTERLANDI: They have been separated out.

THE COURT: The separated out part is Z

present and your overwhelm is justified.

Q. Then you respond by saying thank you, received, we'll talk about that tomorrow. You were providing her some feedback, right?

A. Yes.

MR. MURPHY: Based on Ms. Ventura's responses and Ms. Light's testimony of emails contained in that packet, I would move the whole thing in as Exhibit Z.

THE COURT: Hearing no objection, it is a full exhibit as redacted.

BY MR. MURPHY:

Q. Can we go back to Exhibit R please. Is it true during your treatment of Ms. Light, that you discussed the impact this case has had on her marriage?

A. Yes.

Q. At points you discussed how this case has consumed her?

A. Yes.

Q. As you sit here today, you have a good memory?

A. That's what I like to believe, yes.

Q. As you sit here today, are there other family events that you have discussed with her that are impacting her emotional state? I want to be careful I'm not asking about her childhood. I'm asking about since you have been treating her since 2021 to the present, are

there other issues besides Worthington Hooker and besides her childhood that you discussed that have an impact on her emotional state?

A. Yes.

Q. Is there anything specifically as you sit here that you recall?

A. The impact that Worthington Hooker School and her past trauma has on her current relationships whether that's with her husband, whether that's with her family, her community.

Q. And have there been specific incidents between her and her husband that you addressed that have caused her significant emotional distress?

A. Yes.

Q. Those are actions by her husband towards her?

A. Yes. Or lack thereof.

MR. MURPHY: With that, Your Honor, I don't have any other questions.

THE COURT: All right. Redirect.

MR. INTERLANDI: Yes, Your Honor.

REDIRECT EXAMINATION BY MR. INTERLANDI:

Q. Hello again. I few follow-up questions for you, Ms. Ventura.

In part of your education and training, were you ever trained to do your own independent investigation

intimate, proximate, familial.

Q. How about co-workers?

A. Yeah, of course.

Q. So if you checked off work, what would that mean specifically then?

A. On the instances that I checked off work, it was when Jessica's experience of her job was causing her significant distress.

Q. Give me one minute. During the initial assessment or initial intake, did Jessica discuss with you why she had been looking for a new therapist, someone to do therapy with?

A. Yes.

Q. Why?

A. Her previous therapist had retired.

Q. At that time, did the PTSD Center have a lot of openings for patients or was it difficult to get an appointment with you or someone else?

A. I can only speak to my own availability, but I did have availability to accept new clients at that time.

MR. INTERLANDI: I don't have any further questions for you. Thank you.

THE COURT: Anything further?

Ms. Ventura, you are excused. Please call your next witness.

A. So we're going backwards?
Q. Yeah.
A. I'm there.
Q. Is this your note from your session with Jessica on May 12, 2021?
A. Looks like it, yup.
Q. And there's a session here says psych symptom/ follow up. There's a narrative that's typed in. Do you understand that?
A. Yes.
Q. Who typed in the words that appear in the summary?
A. I did.
Q. Is this where you discussed or at least Jessica told you that she was felt like she was being systematically pushed out?
A. Correct.
Q. And when she had felt she was outspoken about COVID protocols should be in place?
A. Yes.
Q. Did she tell you anything else about how she was feeling or what she was experiencing at work during this session?
A. She said she was on certain committees and she was taken off of them. She had been a third grade

are there.

A. Okay.

Q. Do you recall writing an email for Jessica about returning to work in January 2022?

A. Yes. I have written some. I don't remember the details.

Q. Let's go to the last page of Exhibit 15. The second to last page, Light 166 to 167.

Is that an email that you sent to Jessica?

A. One second and I can turn the page. Yes.

Q. This is an email that you wrote and sent to Jessica?

A. Correct.

Q. Do you recall why you sent this to Jessica on January 14, 2022?

A. Yes. My concern was that returning back to the same situation was going to be not in her mental health interest because I felt the thing with the principal that she was having difficulty with that would retrigger her symptoms.

Q. Anything in the email that you are looking at now that you disagree with today?

A. Give me a moment.

Q. Sure.

A. No. I agree with everything still.

Q. Sitting here today, is what you put in this email on January 14, 2022 about the events that triggered Jessica's anxiety, depression and PTSD your professional opinion, based upon a reasonable degree of medical probability?

A. Can you rephrase?

Q. Is what you put in this letter, sitting here today, about the events that triggered Jessica's, anxiety, depression and PTSD, your professional opinion, based upon a reasonable degree of medical probability?

A. That these were --

Q. The events triggered Jessica's anxiety?

A. Yes, or exacerbated it, yes.

Q. Or exacerbated it. What does exacerbate mean?

A. Makes worse.

Q. The events that you are referring to were listed in that second paragraph where it says on 5-12-2021?

A. Correct.

Q. You said that she began feeling she was pushed out for being outspoken for what COVID protocols should be in place?

A. Yes.

Q. You also stated that she reported being taken off committees and having her regular third grade teaching assignment taken from her and given first grade

for which she felt ill prepared, tensions increased as she was accused of things she did not do, et cetera?

A. Correct.

Q. In your professional opinion, did the work issues that Jessica discussed with you from May 12, 2021 through December of 2022 exacerbate her pre-existing psychiatric conditions?

A. Yes.

Q. What is your opinion based upon? What factual support do you have?

A. Basically the patient's telling me what she's going through and the stressors and the difficulty because she also -- it is not just her. But also her son is in the school. She was in the position of being sensitive to protecting him from what she might consider retaliation or she thought not being liked by people because of what was going on. A lot of stress, not being able to -- very important for her to be able to speak up and be heard and the fact that again about the whole investigation thing, she felt the results nothing happened as a result of all of those things were triggering and difficult for her.

Q. Thank you. For your sessions, do you require clients to pay out of pocket or do you accept insurance or is there a mixture?

them in her life, right?

A. Correct.

Q. One more document, Dr. Levin. That's 3492 at least one more office note. 3492. Is this from a few months earlier March 2021, correct?

A. Yes.

Q. This was at the time -- let's back up. You started treating her in 2020?

A. Right.

Q. At the time you recommended she see a therapist?

A. Right.

Q. It took time to find a therapist. Did you know at some point that she wasn't really looking for a therapist?

A. There may have been time that life gets in the way and becomes hard to find a therapist.

Q. That's true. There's a time in 2020 she wasn't looking?

A. That could be. Also if someone thought they're doing okay enough.

Q. In 2021, she finds the PTSD Center in New Haven?

A. Yes.

Q. According to your notes in that middle paragraph, she reports to you she feels she can be transformative and wants say go every other week, right?

A. Correct.

Q. At the very bottom, you note under the Impression Section, currently some anxiety and mood problems persist but sleep is better. She's going to address the elephant in the room regarding her abuse at the PTSD Center in New Haven and that elephant in the room is her underlying childhood abuse, right?

A. Correct.

Q. One thing you didn't really touch on in your direct was Ms. Light's, you know, what's been going on recently with Ms. Light. I want to ask you some questions about that. You are aware that she transferred from Worthington Hooker School to Ross Woodward?

A. Yes.

Q. You are aware she transferred schools?

A. Right.

Q. In 2024, you continue to treat her. Has she reported significant issues in her life over the course of 2024?

A. Well, I mean the issue or the legal issues are obviously continuing as they do to now. The switching to a new school and the school had its own challenges because a very poor school and didn't necessarily have a lot of resources and the kids were struggling a lot. She did feel a very supportive environment, some ups and

downs about it.

Q. She actually told you her colleagues love her there, right?

A. Yes.

Q. Do you recall her telling you that she's receiving a lot of positive feedback but still feels like she's failing and drowning?

A. It's noted. I don't remember every detail but yes. She was still struggling even though it was a supportive environment but a lot of other challenges.

Q. Some of those challenges include being hospitalized?

A. That's a result of the challenges I think.

Q. Let me rephrase the question. Was Ms. Light hospitalized for a period in 2024?

A. Yes.

Q. On several occasions?

A. I think at least two.

Q. Does she tell you she was also diagnosed with Lyme disease?

A. I believe so. Again I depend on my notes to look at things. I believe so.

Q. Did she tell you that she missed a lot of time from work and that's causing her stress in the work environment?

A. I'll try. I'm known not to do anything brief, so I have a tremendous job. It is a privilege. My first responsibility is to ensure that we have a safe and orderly school and I oversee -- roughly there's about 60 employees that work at the school. We have 375 students. We have two building, two campuses. We're one school in two buildings and we service students in Grades K through eight.

I oversee teaching and learning, operations, finance, building, parental. I am a contact for parents. I work for the New Haven Board of Education and I just have the privilege of running a school and there are many, many responsibilities to it.

Q. Okay. Is staffing assignments one of those responsibilities?

A. Yes.

Q. Ensuring student safety is that one of your responsibilities?

A. Yes.

MR. MURPHY: Your Honor, I see the time.

THE COURT: Why don't you get in a couple of more questions, then we'll conclude for the day.

MR. MURPHY: Okay.

BY MR. MURPHY:

Q. What about the discipline? Are you involved

4:02 p.m.)

COURT REPORTER'S TRANSCRIPT CERTIFICATE

I hereby certify that the within and foregoing is a true and correct transcript taken from the proceedings in the above-entitled matter.

/s/ Terri Fidanza

Terri Fidanza, RPR

Official Court Reporter

INDEX

EXAMINATION

Witness Name ... Page

**NICOLE VENTURA**

DIRECT EXAMINATION BY MR. INTERLANDI.............. 436

CROSS-EXAMINATION BY MR. MURPHY.................. 458

REDIRECT EXAMINATION BY MR. INTERLANDI ........... 476

**GALE LEVIN**

DIRECT EXAMINATION BY MR. INTERLANDI.............. 482

CROSS-EXAMINATION BY MR. MURPHY................... 508

REDIRECT EXAMINATION BY MR. INTERLANDI ........... 519

RECROSS-EXAMINATION BY MR. MURPHY ................ 521

**TIMOTHY SHORTT**

DIRECT EXAMINATION BY MR. INTERLANDI.............. 524