## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JESSICA LIGHT** | **CIVIL ACTION NO:** |
| | **3:22-CV-00425 (JBA)** |
| **Plaintiff,** | |
| **v.** | |
| **NEW HAVEN BOARD OF EDUCATION &** | |
| **MARGARET-MARY GETHINGS in her** | |
| **individual capacity** | |
| **Defendants.** | |
| | **OCTOBER 21, 2024** |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' POST-TRIAL MOTIONS

Plaintiff, Jessica Light, hereby objects to the defendants' "Renewed Motion for a Directed Verdict or in the Alternative a New Trial" filed on September 9, 2024. *ECF Doc. 121.*

### I.  INTRODUCTION

The Plaintiff is a longstanding teacher with Defendant New Haven Board of Education ("Defendant NHBOE"). She filed a complaint setting forth one retaliation claim in violation of state law against Defendant NHBOE and multiple claims against her former supervisor, Defendant Margaret-Mary Gethings ("Defendant Gethings"). The claims against Defendant Gethings included retaliation in violation of the First Amendment of the United States Constitution enforceable under 42 U.S.C. §1983 as well as common law false light and defamation. In response, the defendants filed a motion for summary judgment.

With respect to Plaintiff's First Amendment claims, the defendants initially claimed, among other things, that Plaintiff did not engage in any speech as a private citizen on matters of public concern, and that all her alleged speech related to and interfered with her job duties.[1] Defendants

---

[1] Prior to trial, the defendants conceded that Plaintiff's speech was protected under the law.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

further claimed that Plaintiff did not suffer any adverse employment action or discipline, and the claims failed as a matter of law. As to Plaintiff's defamation claim, defendants asserted the defenses of truth and opinion, and claimed that any alleged defamatory statements were protected by the intracorporate communications privilege.

On March 19, 2024, Judge Meyer issued a decision granting in part and denying in part the defendants' motion. Judge Meyer denied the motion as to Plaintiff's Conn. Gen. Stat. 31-51q claim against Defendant NHBOE and the §1983 claim against Defendant Gethings. He granted the motion as to Plaintiff's false light claim against Defendant Gethings and limited the defamation claim against Defendant Gethings to a statement she made about Plaintiff during a meeting on March 31, 2021. *ECF Doc. 49.* The case proceeded to a jury trial.

## II.    <u>PROCEDURAL BACKGROUND</u>

The parties attended a pretrial conference on July 29, 2024. The Court did not instruct Plaintiff before the pretrial conference to prepare a list of retaliatory acts.[2] During the pretrial conference, the Court asked Plaintiff's counsel: "Can you tell me **what you're currently planning** to prove as the retaliatory acts?" (emphasis added) *7/29/24 Tr., p. 17: 1-2*. Counsel never conceded that other retaliatory acts did not exist, as Plaintiff experienced a barrage of retaliatory acts over a twelve-to-fourteen-month period (*i.e.,* March 2021 through May 2022). In response, Plaintiff's counsel identified the following acts:

1.  Reassigning Plaintiff from 3rd to 1st grade;
2.  Excluding and/or taking Plaintiff off certain school committees;
3.  Attempting to replace Plaintiff as the Parent-Teacher Representative of the PTA;
4.  Accusing and spreading rumors that Plaintiff was the source of the disclosure of Teacher X's COVID diagnosis;
5.  Principal Gethings speaking to a witness during the investigation of Plaintiff's complaint;
6.  A copy of an e-mail from Plaintiff's husband to Assistant Principal Clarino being left on a printer in Plaintiff's grade-level teaching partner's classroom;
7.  A copy of another teacher's complaint against Plaintiff being left near teachers' mailboxes;

---

[2] Nor did defendants file an appropriate motion to dismiss, limit or revise the Amended Complaint prior to trial.

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

8. The Board's Human Resources Department instructing Plaintiff to return to work from her approved FMLA without implementing safeguards;
9. Principal Gethings reprimanding a paraprofessional for assisting Plaintiff during dismissal;
10. Principal Gethings and Assistant Principal Clarino questioning Mr. Timothy Shortt, a teacher and union representative, with the implication he was "teaming up" with Ms. Light to take down the administration; and
11. An unusually lengthy evaluation (TEVAL) meeting in March 2021, during which Plaintiff did not have a union representative present.

*7/29/24 Tr., pp. 17-23.* When asked what he was "planning to prove," counsel gave a list off the top of his head *at that time*.

Plaintiff's case-in-chief lasted 3.5 days, including testimony from nine witnesses and forty-nine (49) exhibits. Defendants produced a single witness – Defendant Gethings – in support of their case-in-chief. At the close of evidence, defense counsel moved for a directed verdict. The Court declined to rule on the motion. Thereafter, the parties' counsel attended a lengthy charge conference and returned to their respective offices to put the final touches on their closing arguments.

The jury received the case in the late morning of Friday, August 9th. Later that day, the jury presented a note to the Court with the following questions concerning the Jury Instructions:

> Would we be able to recieve [sic] additional clarification in regards to Count 1, element 3?
> -Difference between substantially & materially?
> -What does bona fide refer to?
> -Do we have to prove workplace discipline, harmony among co-workers, working relationship, employee performance…all or one?
> -Who's included in the Board of Education?

In the afternoon of Monday, August 12th, the jury returned a verdict and listed two retaliatory acts to be adverse employment actions on the jury form. (1) "Extended teval conversation not regarding Ms. Light's teaching" and (2) "Ms. Clarino excessively shadowing Ms. Light from Aug – Oct 2021 prior to FMLA absence." *ECF Doc. 110 at p. 2.* After the four-day trial, the jury returned a verdict as follows: As to Count One, the jury awarded the Plaintiff $50,000 in compensatory damages, $300,000 in non-economic damages, and $100,000 in punitive damages. As to Count Two, the jury

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

awarded the Plaintiff $75,000 in economic damages, $350,000 in non-economic damages and $200,000 in punitive damages. The jury also found that Plaintiff had proven her defamation claim and awarded Plaintiff $25,000 in damages. *Id. at pp. 4-6.* The defendants' motion followed.

## III.   LEGAL STANDARD

### A.  FED. R. CIV. P. 50

Fed. R. Civ. P. 50(a)(2) states: "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(b), in relevant part, states: "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Judgment as a matter of law is appropriate where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable fair minded [persons] could not arrive at a verdict against [the movant]." *Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir. 1994). In considering the evidence, the Court may not weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury. *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 59 (2d Cir. 1993).

In *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir. 1993), the Court states:

These two rules read together limit the grounds for judgement n.o.v. to those specifically raised in the prior motion for a directed verdict.

The principal reason for establishing the motion for a directed verdict as a condition precedent for the motion for j.n.o.v. is to avoid making a trap of the later motion. That is, the rule gives the party against whom the motion for j.n.o.v. is made notice of defects in its proof so that it can cure them before the case goes to the jury. *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 61 (2d Cir.), *cert. denied,* 488 U.S. 852, 102 L. Ed. 2d 109, 109 S. Ct. 136 (1988).

## B.  FED. R. CIV. P. 59

"The court may only grant a new trial if, after viewing all the evidence, it has 'a definite and firm conviction that a mistake has been committed.'" *Hughes v. Town of Bethlehem*, 2015 U.S. Dist. LEXIS 59780, at \*3–7 (N.D.N.Y May 7, 2015) (citing *Cunningham v. Town of Ellicott*, 2007 U.S. Dist. LEXIS 43979, (W.D.N.Y. June 18, 2007)). The Second Circuit has emphasized "the high degree of deference accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." *Jennings v. Town of Stratford*, 263 F. Supp. 3d 391, 405 (D. Conn. 2017). A Rule 59 motion is not "a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Id.* (citing *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).

## C.  FED. R. CIV. P. 60

A motion pursuant to Rule 60 is "a mechanism for extraordinary judicial relief invoked only if the moving party demonstrates exceptional circumstances." *Apuzza v. NYU Langone Long Island*, 2024 U.S. Dist. LEXIS 130170, at \*4 (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008)). It does not allow the movant "an additional opportunity to make arguments or attempt to win a point already carefully analyzed and justifiably disposed." *Id.* at \*7 (quoting *Hamilton v. Lee*, 188 F. Supp. 3d 221, 238 (E.D.N.Y. 2016)).

## IV.  ARGUMENT

### A.  DEFENDANTS ARE NOT ENTITLED TO RELIEF FROM THE VERDICT ON THE RETALIATION CLAIMS OR A NEW TRIAL.

Defendants argue that the jury's verdict, based on evidence and testimony over the course of four days of trial, is the result of "sheer surmise and conjecture," and that the jury based its verdict on "an issue never raised or argued by Plaintiff," *i.e.* Ms. Clarino's excessive classroom observations of Plaintiff. *Defs' Mem. at p. 8*. Defendants also argue that the jury used "improper consideration of Ms. Clarino's observations to award excessive damages to Plaintiff on Count

Two." *Id. at p. 9.* Defendants further criticize the jury for issuing one award based on the two acts they found to be retaliatory.[3] *Id.*

Contrary to the defendants' argument, the jury's verdict was not based upon "sheer surmise and conjecture." The jury verdict was appropriately based upon testimony and documentary evidence. Ms. Clarino's actions are directly attributable to Defendant Gethings – her administration partner. Defendant Gethings and Ms. Clarino worked in tandem to perpetrate the scheme of retaliation and together their actions constitute the plan of Defendant Gethings, including both co-signing a "retaliatory complaint" against Plaintiff, and co-signing emails about Plaintiff and attending meetings with Plaintiff. *See Pl.'s Exs. 7, 9, 13, 23, 24, & 25*; *see also* Defs' Ex. I ("MM & Jenny").

The defendants rely on *Conte v. Emmons*, 895 F.3d 168 (2d Cir. 2018) – the facts of which are distinguishable from the present case. For starters, the plaintiff did not have legal counsel. The court discussed heightened policy concerns and rationales for law enforcement and a general fear of litigation against prosecutors and their staff. Specifically, the court concluded: "[i]n our view, it would be **to the detriment of law enforcement** to accept the jury's inferential finding of a purposeful intent on this bare record." (emphasis added) *Id.* at 173. In stark contrast, the verdict in the present case is supported by a robust record chock-full of exhibits (56 in total) and witness testimony. The evidence supports the fact that Ms. Clarino and Defendant Gethings worked together as one to execute their retaliatory agenda.

Defendants' claim that "[b]ased on the Court's instruction that Defendants did not have to worry about acts not on the list, Defendants did not call Ms. Clarino as a witness or put on any significant evidence concerning the appropriateness of evaluations in the lower school during the state of the 21-22 school year." *Defs' Mem. at p. 8.* This is a futile attempt to hide defendants' own

---

[3] The defendants failed to request such an instruction nor raise the issue in their proposed verdict form.

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

error. It is undisputed that Ms. Clarino worked closely with Defendant Gethings – almost as one. Plaintiff's counsel deposed Ms. Clarino and both parties listed her on their trial witness lists. Therefore, it is reasonable to assume defendants knew Ms. Clarino and her actions would come up during Plaintiff's case-in-chief. The testimony elicited at trial confirms Ms. Clarino's role in the retaliation. *See Chart of Trial Testimony referencing Ms. Clarino attached hereto as Exhibit A.*

In fact, defense counsel twice stated he may call Ms. Clarino. Specifically, on August 7th, he stated: "I might call Hilarie Alden and **Ms. Clorino [sic]**. I need to think about that in light of the testimony." (emphasis added) *8/7/24 Tr., p. 616:14-19.* The next day, defense counsel again made reference to Ms. Clarino as a potential witness: "Well, we have Principal Gethings and then, depending on how that goes, **potentially Assistant Principal Clarino**, and I believe that's it." (emphasis added) *8/8/24 Tr., p. 621:18-22.* These statements by defense counsel reveal that he intentionally decided not to call Ms. Clarino during his case-in-chief.

In further support of their position, the defendants argue that "Plaintiff's counsel's closing PowerPoint presentation to the jury did not even mention Ms. Clarino's observations." *Defs' Mem. at p. 8.* The defendants' argument, however, ignores the following statement during Plaintiff's closing argument: "So the school year is over, 2020-2021 school year . . . [Jessica] was preparing herself to teach first grade at the same school, different building, **under the watchful eye of Ms. Clarino."** (emphasis added) *8/9/24 Tr., p. 851.*

In addition, the defendants' "reliance" argument is misplaced. The Court never advised the jury it could only consider specific retaliatory acts. Therefore, it is reasonable to assume the jury could find retaliatory acts that were not set forth in a list compiled outside of its presence and for which it knew nothing about. During trial, the parties discussed whether a list of retaliatory acts should be included in the jury instructions. Instead, the parties agreed on a "cut-off-date." In fact, it was defense counsel's suggestion to use a "cut-off-date": "Can we just cut it off by date?" After a

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

brief discussion, defense counsel stated he was "more comfortable" with "May of 2022" as the last "adverse employment action" to be considered by the jury. *8/8/24 Tr., pp. 802-803.*

The Court's instructions to the jury contains five sections. Section II, "Liability," is separated into three subsections – one for each remaining count in Plaintiff's Amended Complaint. With regard to the second element of the state law claim alleged in Count One, the Court defined "discipline" as an "adverse material action taken against Ms. Light by Ms. Gethings by May 2022." With regard to the third element of the federal law claim alleged in Count Two, the Court stated that Plaintiff, "must show by a preponderance of the evidence that she experienced at least one adverse employment action by May 2022." The Court defined "adverse employment action" as "an action that is taken by an employer against an employee that is significant enough that it would deter a reasonable and similarly situated person of ordinary firmness from exercising his or her constitutional right to free speech." Obviously, Ms. Clarino's excessive shadowing of Plaintiff "from Aug – Oct 2021 prior to FMLA absence" occurred before the May 2022 "cut-off-date" requested by defense counsel.

The defendants try to poke further holes in the jury's verdict by assuming the "jury would *not* have found liability based on the TEVAL meeting…" (italics in original) *Defs' Mem. at p. 9.* There is no basis for calling the jury's "entire verdict" into question or requesting the Court to make an unsupported presumption contrary to the jury's conclusion. Moreover, Plaintiff's counsel never conceded any specific alleged retaliatory act was minor or lesser, and therefore, insufficient to establish retaliation on its own. At trial, Plaintiff's counsel stated: "We are not claiming a termination or suspension. What we're claiming is an environment that is inferior, an environment that put Jessica in fear, an environment where she didn't know what was going to happen next or what next accusation might come or from whom." *8/8/2024, p. 847:17-21.* A reasonable jury could

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

find – and this one did – that any of the alleged retaliatory acts was sufficient on its own to establish retaliation according to the Court's instruction.

Finally, the defendants argue for post-trial relief or a new trial as to Plaintiff's state law claim against Defendant NHBOE in Count One. Here, it is important to note that the verdict form did not require the jury to identify the specific retaliatory acts it found against Defendant NHBOE. The defendants' argument appears to be premised on a conflation of the terms "adverse employment action" (as used for §1983 claims) and "discipline" (as used for §31-51q claims). The defendants assume the jury based its verdict on the same two retaliatory acts as in Count Two (§ 1983 claim against Defendant Gethings); however, as illustrated by the Court's jury instructions and the verdict form, the defendants' argument is based upon pure speculation.

## B.  DEFENDANTS ARE NOT ENTITLED TO A DIRECTED VERDICT ON THE RETALIATION CLAIMS.

Defendants' request for a directed verdict is based on the jury's identification of two retaliatory acts in connection with Count Two, *i.e.*, Ms. Clarino's excessive shadowing of Plaintiff from August through October 2021 and the extended TEVAL meeting. *ECF Doc. 110, p. 2.* Defendants demand the Court reject Ms. Clarino's excessive shadowing as a basis for the verdict. Moreover, the defendants argue the extended TEVAL meeting cannot support the jury's verdict on its own. *Defs' Mem. at p. 10.* As a result, they assert entitlement to judgment as a matter of law notwithstanding the jury's verdict. The defendants' argument is flawed.

### 1.  Plaintiff never conceded that the alleged retaliatory acts were minor and could not stand in support of retaliation on their own.

Defendants argue that use of the phrase "pattern of retaliation" equates to deeming the acts in the pattern as minor and not sufficient to find retaliation on their own. *Defs' Mem. at p. 11.* Plaintiff's counsel stated: "You'll hear from some co-workers who will testify about specific events that *we claim were a pattern of retaliation* by Margaret-Mary Gethings." (emphasis added) *8/5/24*

*Tr., p. 18:6-8.* One cannot draw the conclusion that a single act is insufficient to support a finding of retaliation merely because Plaintiff's counsel introduced his case by referring to "a pattern of retaliation."

At the end of evidence, defense counsel moved for a directed verdict as to all counts. *8/8/24 Tr., pp. 754-771.* Specifically, he argued that elements one and four of Plaintiff's defamation claim (Count Four) were not satisfied. *Id. at pp. 755-757.* With regard to the retaliation claims, defense counsel argued that each of the alleged incidents was not an "adverse employment action" or "discipline" under the applicable statutes. *Id. at pp. 758-764.* He further argued that Plaintiff's protected speech was not a "substantial motivating factor" to the alleged adverse employment action or discipline. *Id. at p. 765.*

In response, Plaintiff's counsel argued that sufficient evidence was presented to overcome the motion and give the case to the jury. For example, he recounted the timeline of events and described how each event led to the next. *Id. at pp. 771-779.* Defendants refer to counsel's statement that "seemingly minor" events can "add up to a critical mass." Defendants assert that the use of such language constitutes an acknowledgement that the alleged retaliatory acts cannot form the basis of a finding of retaliation. *Defs' Mem. at p. 11.*

During his objection, Plaintiff's counsel further stated, "[a]s it relates to the free-speech claims, I think if there was ever a case where we're talking about **seemingly** minor events, it would be this one that would add up to a critical mass." (emphasis added) *8/8/24 Tr., p. 774.* Counsel later stated, "we have a bunch of **seemingly** minor incidents that are making their way and building up to a critical mass…And that is also one of the proposed instructions I had to include so that they understand what their role is or how to define these **seemingly** minor events." (emphasis added) *Id.* Use of the qualifier "seemingly" does not mean the acts are, indeed, minor. If so, Plaintiff's counsel would have said the "minor" acts added up to a "critical mass." Accordingly, defendants'

reliance on the narrow scope of what was said in response to their oral motion for directed verdict must fail. *See Defs' Mem. at p. 12.*

Furthermore, during his closing argument, Plaintiff's counsel stated: "**The defendants are going to argue, and they have been, that this is so minor,** what's the big deal? You heard the judge talk about the law. And what we are able to do is connect these minor or lesser events to establish a critical mass, to establish an adverse employment action." (emphasis added) *8/9/24 Tr., p. 847:11-16.* Clearly, the statement was made in response to defendants' characterization of the alleged acts as "minor." *Id.*

Next, defendants cite Plaintiff's proposed jury instructions and criticize the Court's final jury instructions. *See e.g., ECF Doc. 68-2 and 114.* These documents speak for themselves[4] and the defendants' argument is without merit. The Court's instruction concerning the "Third Element" of the § 1983 retaliation claim against Defendant Gethings states, in relevant part:

> You may find that Ms. Light has satisfied this element if she has proved . . . at least one employment action of this sort. **You may also find** that Ms. Light has satisfied this element if she proves she experienced a combination of seemingly minor incidents that reached a critical mass. In order to assess the impact of these more minor incidents, you must consider whether the totality of those incidents would objectively make the working environment unreasonably inferior, hostile, or adverse to the employee when compared to a typical or normal workplace.

(emphasis added) *ECF Doc. 114 at p. 8.* The instruction does not confirm nor require the jury to assume each individual act is "minor." On the contrary, the Court presented the jurors with two scenarios. First, the jury can find Plaintiff satisfied the third element by proving she experienced at least one adverse employment action. Alternatively, it can find the element satisfied upon a showing that "seemingly minor incidents [] reached a critical mass." Such instruction is not proof that Plaintiff conceded or acknowledged the acts are minor, but merely provides guidance should

---

[4] The instruction proposed by Plaintiff regarding "adverse employment action" under the §1983 claim stated that the "acts of retaliation must be <u>**evaluated both separately and in the aggregate**</u>, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." (emphasis added) *ECF Doc. 68-2, p. 3.*

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

an act or acts be perceived as minor.[5] Consistent with the charge, the jury found that Plaintiff

"suffered one or more adverse employment actions." *ECF Doc. 114 at p. 7; ECF Doc. 110 at p. 2.*

> **2.  Even if this Court agrees Plaintiff failed to establish a "critical mass," the Plaintiff has proven "at least one" adverse employment action sufficient for establishing retaliation.**

Defendants argue that the jury's finding of only two retaliatory acts does not amount to a

critical mass. Defendants further argue that Ms. Clarino's excessive shadowing is outside the list of

11 retaliatory acts, and therefore, it cannot form part of a critical mass. Defendants also argue that

the TEVAL meeting alone cannot support retaliation. *Defs' Mem. at pp. 12-13.* For the reasons

discussed *supra*, the Plaintiff contends that Ms. Clarino's excessive shadowing coupled with the

TEVAL meeting are sufficient to support the jury's verdict on Count Two. The jury found that

Defendant Gethings' co-administrator excessively shadowed Plaintiff in retaliation for her free

speech. The Court should not eliminate that conclusion merely because it did not appear on a list of

alleged retaliatory acts that Plaintiff's counsel was asked about during the pretrial conference.

Furthermore, the testimony and documentary evidence presented at trial support Plaintiff's

argument that Ms. Clarino and Defendant Gethings acted as one. *See Ex. A.* Based on the admitted

evidence, the jury drew its own inferences and made its own conclusions. The Court did not give

the jury a limiting instruction to confine it to a specific list of "retaliatory acts." More importantly,

the defendants did not ask for such a limiting instruction. As such, the two incidents identified by

the jury are sufficient to establish a "critical mass" and support the jury's verdict in favor of

Plaintiff on Count Two.

Even if the Court eliminates Ms. Clarino's excessive shadowing from the equation, then the

TEVAL meeting, on its own, satisfies the element of "at least one" adverse employment action.

The verdict form does not differentiate between "at least one" or "seemingly minor" incidents.

---

[5] If this was true, then the Court would have no reason to include both options in its final jury instructions.

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

Rather, it is straight forward and clear: If the jury found Plaintiff proved Defendant Gethings took an adverse employment action against her, then it was asked to "**list each act that [it] found to be an adverse employment action**." (emphasis added) *ECF Doc. 110 at p. 2.* The substance of this question came directly from defendants' proposed verdict form:

> Do you find that Plaintiff Jessica Light has proven by a fair preponderance of the evidence that her [sic] she suffered an adverse employment action by Principal Gethings?
>
> YES ____                    NO ____
>
> **If your answer is "no," then enter a verdict in favor of Principal Gethings on the Second Count on Page 4. If your answer is "Yes," then please list act or acts that you found constitute an adverse employment action, and then proceed to the next question:**
> **a.** _____
> **b.** _____
> **c.** _____
> **d.** _____
> **e.** _____

*ECF Doc. 68-5 at p. 3.*

The Plaintiff testified that TEVAL meetings typically last 15 minutes, but this particular meeting lasted more than one hour. *8/5/24 Tr., p. 75: 4-23.* Further, the administrators failed to provide Plaintiff with an opportunity to have a union representative present at the meeting to address the concerns they had about Plaintiff beyond her teaching performance for that school year. *Id. at p. 76:13-17.* Defendant Gethings stated, "I can speak to that we are anticipating a written statement from Ms. Cav who is – had - feels that she has a complaint about you, and I don't think this has been brought to you from her because it's all relatively new." *Pl.'s Ex. 24, p. 18:23-19:3.* Defendant Gethings also stated, "I saw it myself, there was [sic] pieces where you were commenting in Facebook that our school didn't send out letters. Do you know what I'm referring to?" *Id. at p. 19:11-14.* Nowhere was the TEVAL meeting, or any of other alleged acts, specifically

identified by Plaintiff or her counsel as being "minor," or insufficient to stand alone to establish retaliation. Even if this Court finds that a "critical mass" was not established, the jury's verdict, based upon testimony and evidence, found "at least one" adverse employment action sufficient for establishing retaliation.

### 3. The two incidents identified by the jury constitute adverse employment actions and also form the basis for a "critical mass."

As set forth above, the Court's instructions to the jury regarding "discipline" required for Count One and "adverse employment action" required for Count Two were clear. When asked about the TEVAL meeting, Plaintiff testified that the topics discussed included, "public speaking and [her] role on the PTA and [her] Facebook posts [], and how that reflected on [her] professionality." *8/5/24 Tr., p. 76:13-17*. Plaintiff also testified that she had never talked about anything other than her performance with any of the people reviewing her during any of her teacher evaluation meetings. *Id., p. 77:13-17*. She further testified about how the meeting, in total, made her feel, "voiceless . . . because it seemed like everything had been decided and nothing [she] said mattered." *Id., p. 86:16-17*. Defendant Gethings testified, "[s]o it's very interesting. **It wasn't just a T-Eval meeting**…We loved -- that's sacred time for us to have one-to-one with our teacher. **And we wanted to discuss other issues**…." (emphasis added) *8/8/24 Tr., pp. 650-651:20-22*. Defendant Gethings also testified, "[w]e had a meeting, yes, and we did some T-Eval **and discussed other things.**" (emphasis added) *Id., p. 703:17-20*.

Per the parties' trial testimony, the administrators discussed a variety of topics having little to do with Plaintiff's actual job performance and everything to do with her protected speech and accusations or complaints from co-workers, all without union representation. In addition, Ms. Clarino raised, for the first time, the administrators' decision to transfer Plaintiff to the little school. Such conduct made the working environment unreasonably inferior, hostile, and adverse to

Plaintiff, and would deter a reasonable and similarly situated person of ordinary firmness from exercising her constitutional right to free speech.

As Plaintiff transitioned to her new teaching assignment at the little school, she came under the watchful eye of Ms. Clarino. Plaintiff testified that Ms. Clarino's shadowing of her seemed "strange" because she "never received any . . . written feedback" from Ms. Clarino. Plaintiff further testified that "it's just not typical to be [] that scrutinized that early in the year when you're trying to get your footing in a new position." *8/5/24 Tr., p. 133: 12-19*. Plaintiff knew there were other teachers new to the little school that did not have the same experience. *8/6/24 Tr., p. 328: 5-19.* In Plaintiff's experience, an assistant principal observes teachers "two to maybe four [times] a year." *8/5/24 Tr., p. 132:22-25*.[6]

Ms. Clarino "was in [Plaintiff's] room very regularly" and "well over four [times] in the first two months [of the school year]." *Id. at p. 133:1-11.* The jury could infer that this conduct is connected to the administrators' plan to retaliate against Plaintiff for her protected speech. Contrary to the defendants' assertion, a causal connection exists between the Plaintiff's protected speech, the TEVAL meeting, and Ms. Clarino's excessive shadowing. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (concluding the "passage of only six months . . . sufficient to support an inference of a causal connection"); *see also, Thermidor v. Beth Israel Med. Ctr.*, 683 F. Supp. 403, 411 (S.D.N.Y. 1988) (proof of causal connection "has been made inasmuch as plaintiff's discharge occurred five months after his" protected activity).

In the context of our case, the summer months when school is not in session should not break the causal connection between Plaintiff's protected speech and the retaliatory conduct that followed thereafter. Clearly, Plaintiff's speech was a substantial or motivating factor for such acts,

---

[6] Defense counsel failed to object to or contest this line of questioning. In addition, he failed to call Ms. Clarino as a witness, despite her being present for nearly the entire 4-day trial (as she eye-rolled and shook her head throughout Plaintiff's case in chief). *8/5/24 Tr., pp. 110-111:8-9*.

15

as Plaintiff's public speaking and Facebook comments were addressed at the TEVAL meeting. *8/5/24 Tr., p. 76: 13-17.* Following that meeting, Plaintiff filed a complaint against the administrators, which was followed by a random complaint against her by administrator sympathizer, Hilarie Alden, and then the administrators' own "Retaliatory Complaint." During these intervening months, Ms. Bonner, New Haven Public School's Labor Relations Manager, discovered information in Misses Gethings and Clarino's retaliatory complaint that she found "professionally concerning." *8/7/24 Tr., p. 579:10-25.* Ms. Bonner also stated that she believed the investigation was tainted because "the administration had reached out" to one or more witnesses. *Id. at 580:1-8.* As a result, Defendant NHBOE hired the law firm of Berchem Moses to conduct/overtake the investigations. *Id. at p. 581:8-16.*

Plaintiff testified that she followed up with Ms. Bonner during the summer months for an update on the investigation. *8/5/24 Tr., p. 125:10-16. See also Pl.'s Ex. 12.* Plaintiff and Misses. Gethings and Clarino circulated a proposed "Rules of Engagement" prior to the start of the school year. Ms. Bonner testified that it never materialized. *8/7/24 Tr., p. 585:10-24.* Without any "rules" in place, Ms. Clarino had carte blanche to intimidate and harass Plaintiff with excessive shadowing or observations, without providing any feedback to Plaintiff. Plaintiff endured this "strange" conduct and the uncertainty of the pending investigation by Berchem Moses until she couldn't any longer and requested medical leave. Ms. Clarino's shadowing conduct – working lockstep with Defendant Gethings 6 months after their TEVAL meeting with Plaintiff – would deter a reasonable and similarly situated person of ordinary firmness from exercising her constitutional right to free speech.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

C.   **PRINCIPAL GETHINGS IS NOT ENTITLED TO QUALIFIED IMMUNITY FROM THE ACTS FOUND TO BE RETALIATORY IN COUNT TWO.**

1.   **Legal Standard**

The doctrine of qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Lilly v. Hall*, 2023 U.S. Dist. LEXIS 170660, at *9 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). In *Lilly,* a law enforcement officer retaliated against an individual who engaged in protected speech with a retaliatory traffic ticket. The Court found that the defendant was not entitled to qualified immunity and noted: "[T]he Second Circuit has expressed some doubt about the applicability of qualified immunity defenses to First Amendment retaliation claims." *Id.* at *11 (citing *Hammock v. Pierce*, 2018 U.S. Dist. LEXIS 76797, at *8-9). The Second Circuit has opined that "entitlement to qualified immunity should be resolved at the earliest possible stage in litigation." *Lynch v. Ackley*, 811 F.3d 569, 576 (2d Cir. 2016).

2.   **Defendant Gethings' conduct violated clearly established rights.**

Defendants argue that the retaliatory acts found by the jury in connection with Count Two did not violate clearly established rights. *Defs' Mem. at pp. 20-21.* As for Ms. Clarino's excessive shadowing, the defendants base their conclusion on "Plaintiff's testimony that the observations are part of the Connecticut's teacher evaluation system and thus something every teacher participates in." *Id. at p. 20.* This conclusion, however, completely disregards Plaintiff's testimony that the observations did not comport with normal protocol. As noted above, Plaintiff described the shadowing as "strange." *8/5/24 Tr., p. 133:12-19*. As for the TEVAL meeting, the defendants claim there is no clearly established precedent establishing that "a Principal meeting with a teacher for an 'extended' time violates that teacher's constitutional rights." The defendants ignore the topics discussed at the TEVAL meeting and the letter from Plaintiff's union, AFT Connecticut, which

was dated July 21, 2020, and addressed to "PreK-12 & PSRP Presidents." The letter provides, in relevant part:

> The general rule is that speech made by a citizen regarding a matter of public concern is protected by the 1st Amendment of the US Constitution as well and the Connecticut State Constitution…

> The COVID-19 pandemic is clearly a matter of public concern. The safe reopening of our public schools is also a matter of public concern. Any **citizen** speaking about these matters would correctly assert that their speech is protected by the 1st Amendment.

(emphasis on original) *Pl.'s Ex. 1.* Defendant Gethings testified that she received a copy of the letter in 2020. Moreover, the Plaintiff's TEVAL meeting in March 2021 was not merely "a Principal meeting with a teacher for an extended time," as characterized by the defendants. Much of that meeting[7] was devoted to Plaintiff's protected speech and complaints voiced about Plaintiff by at least one co-worker – Judy Cavanaugh ("Teacher X"). Plaintiff testified that the meeting, in total, made her feel, "voiceless." *8/5/24 Tr., p. 86:16-17.*

While the defendants can assert generalities such as the TEVAL meeting and excessive shadowing being performed "pursuant to the Connecticut's teacher evaluation system," a review of the testimony and evidence reveal that is not the case. In particular, the Plaintiff testified about her prior TEVAL meeting as follows:

> Q.    Who did your review for the 2019-2020 school year?
> A.    Ms. Gethings.
> Q.    Was Ms. Clarino present for that?
> A.    No.
> Q.    How long did that TEVAL meeting last?
> A.    Fifteen minutes.
> Q.    In your career teaching for the defendant New Haven Board of Education, has any TEVAL meeting lasted more than 30 minutes that you've had other than the one in March of 2021?
> A.    No.

---

[7] *See Pl.'s Ex. 24* – Transcript of TEVAL Meeting.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

*8/5/24 Tr., p. 75:4-23.* Plaintiff's prior meeting pales in comparison to her March 2021 meeting.

Similarly, the Plaintiff testified that an Assistant Principal observes teachers in the school "two to maybe four [times] a year." *8/5/24 Tr., p. 132:22-25*. She then testified that Ms. Clarino "was in [her] room very regularly" and "well over four [times] in the first two months [of the school year]." *Id.*, *p. 133:1-11*. Plaintiff "never received any of the written feedback from the observations," and "it's just not typical to be [] that scrutinized that early in the year when you're trying to get your footing in a new position." *Id., p. 133:12-19*. Testimony reveals that neither of these acts were performed in accordance with past practice or standard procedures.

Additionally, defendants' reliance on *Lynch v. Ackley*, 811 F.3d 569 (2d Cir. 2016) is misplaced. *See Defs' Mem. at pp. 19-20.* In *Lynch*, a patrolman sued the Chief of Police alleging that he spoke on eight occasions, either publicly or at union meetings, during which he criticized the Chief of Police's performance resulting in retaliation from the defendant. Plaintiff alleged, *inter alia*, that the defendant prevented him from obtaining K-9 equipment and engaged in libel. The Court held that an action may be dismissed based on qualified immunity, if at the time of the conduct there was no clearly established law that such conduct violated the plaintiff's constitutional rights. In other words, the defendant should have known the conduct was unlawful.

In our case, Defendant Gethings had a copy of the AFT letter before the March 2021 TEVAL meeting. *8/8/24 Tr., p. 678*. In fact, she gave a copy of it to her teachers in or around November 2020. *Id. at pp. 678-681*. Thus, she should have understood that it was unlawful to retaliate against Plaintiff for her public comments about COVID-19. Defendants cannot hide behind their claim that they were merely acting pursuant to Connecticut's teacher evaluation system. Here, we must examine the full discussion during the TEVAL meeting and the context in which it was presented to the Plaintiff. Interrogating and lecturing the Plaintiff about her public speaking and Facebook comments are not normal topics for discussion at a TEVAL meeting.

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

Defendant Gethings knew or should have known – based on her numerous years of experience – that a prolonged meeting under the guise of a "TEVAL meeting" that closely followed Plaintiff's Facebook comments and other public speaking was improper.

### 3. **Defendant Gethings' conduct was not objectively reasonable.**

Defendants argue that "it was objectively reasonable for Principal Gethings to believe that the TEVAL meeting and observations did not violate Plaintiff's constitutional rights." *Defs' Mem. at p. 21.* As referenced above, Defendant Gethings had extensive experience as an administrator. Yet, she admitted her intent was to discuss "other issues" at Plaintiff's TEVAL meeting in March 2021. *8/8/24 Tr., pp. 650-651:20-22.* Defendant Gethings diverged from the normal format of the meeting. In this regard, the "Verbal Warning" from Dr. Iline Tracey, Superintendent of Schools, dated February 25, 2022, is noteworthy:

- You exhibited poor professional judgment in how you handled differences of opinion with an employee you supervised.
- You exhibited poor professional judgment in how you responded to an employee criticizing the Worthington Hooker School Administrations during a New Haven Board of Education meeting.

  During our January 31, 2022 meeting, you were given an opportunity to respond to the findings, to ask questions and were advised that any similar acts in the future will not be tolerated. As a seasoned administrator with the New Haven Public Schools, you were expected to respond to these situations responsibly and in a manner consistent with our values. It is concerning that you were unable to do so in this circumstance.

*Pl.'s Ex. 48.* Defendant Gethings did not officially contest or appeal the Verbal Warning.[8] As such, Defendant Gethings' conduct was not objectively reasonable, and therefore, the necessary elements for qualified immunity are not present and she cannot evade responsibility for her misconduct.

---

[8] Furthermore, defendants failed to request the inclusion of "objective reasonableness" on the jury verdict form.

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

**D.  THE JURY'S DEFAMATION FINDING IS BASED UPON EVIDENCE AND SHOULD NOT BE SET ASIDE.**

Defendant Gethings is not entitled to a directed verdict on Plaintiff's defamation claim. It is undisputed that Defendant Gethings made the following statement about Plaintiff during a March 31, 2021 meeting: "And just so you know, Jessica, we spoke with Judy before and said anyone and we can respect some people do not want their names mentioned and they certainly deserve the respect. Not one person has said anyone besides you as being the source. We hear that you're saying it wasn't you. **But I need you to know that every person said you were the source**." Plaintiff presented evidence that allowed the jury to conclude in her favor and award damages.

For instance, the statement caused injury to Plaintiff's reputation. The administrators' "retaliatory complaint" alluded to this statement in the fourth bullet point in the cover letter, which claims Plaintiff "undermines administration, **breaches confidentiality**, and creates intentional and unneeded anxieties for our families." (emphasis added) *Pl.'s Ex. 7*. Additionally, the Plaintiff testified that her reputation with Ms. Morrison, who was present at the meeting, worsened. Specifically, Ms. Morrison was one of several people who unfriended Plaintiff on Facebook. *8/5/24 Tr., p. 115:7-22.* This occurred two months after the March 31st meeting. Consequently, the jury could have reasonably inferred that the statement injured Plaintiff's reputation among her peers. Thus, Defendant Gethings is not entitled to a directed verdict on the defamation claim.

**E.  DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL DUE TO ALLEGED IMPROPER JURY INSTRUCTIONS.**

Despite the Court's prior rejection of this argument, the defendants again argue the Court's instruction on causation is "contrary to prior cases in this Circuit." *Defs' Mem. at p. 24.* During the charge conference, the Court responded:

> So, I've changed it to be, 'Protected speech is the cause of the adverse action if it is a substantial factor, or to put it in other words, a motivating factor in the adverse action.'

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

> And that phrase comes directly from *Mt. Healthy City School District* and is –which is the case to which most of the subsequent Second Circuit cases refer.

> The essence of it is that 'substantial' is virtually synonymous with a motivating factor, not two separate factors. And I've tried to capture that.

(italics in original) *8/8/24 Tr., p. 782:16-25*. In *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), the United States Supreme Court stated: "Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' - or, to put it in other words, that it was a 'motivating factor.'"

In response to defense counsel's claim that courts "consistently" use the phrase "substantial motivating factor," the Court replied: "Don't say 'consistently,' because that's exactly what the problem is. They're not consistent. They say – some say 'substantial' or 'motivating.' That's why we went back to the origins to find where did this come from and used exactly the language that was the genesis for all of the subsequent case law describing when protected speech can be found to be the cause of the adverse action." *8/8/24 Tr., pp. 784-785:25-7*. The Court further explained: "I believe we have found the answer to 'substantial or motivating.' If you go back to 1977 to *Mt. Healthy*, you will find perhaps the first use. And it says, 'substantial or equivalent, motivating.' That's the language that's used. And although it has not been faithful yet hereto, in all decisions since then, that's what we'll use." *Id. at p. 675:14-20*. Thus, the Court carefully considered the history and language of the standard used by the Supreme Court and the instruction given in this case was not improper.

Moreover, the Court's instruction is supported by decisions from other courts in the Second District. In *Smith v. Da Ros,* 777 F. Supp. 2d 340, 352 (2011), for example, Judge Kravitz set forth the standard, which required the "protected conduct" to be a "substantial or motivating factor leading to the adverse employment action." *See also, Jolley v. Correctional Managed Health Care*,

2009 U.S. Dist. LEXIS 12567 *39 (D. Conn. January 30, 2009; Chatigny, J.) ("To prevail on a retaliation claim, an inmate must show that his protected conduct was a "substantial or motivating factor" in the alleged retaliation."). In fact, the Second Circuit explicitly identified the causation standard for a § 1983 retaliation claim as "substantial or motivating factor" in *Collymore v. New York*, 767 Fed. Appx. 42, 47 (2019).[9] Accordingly, the Court should reject the defendants' request for a new trial.

F.   **DEFENDANTS ARE NOT ENTITLED TO A NEW TRIAL DUE TO ALLEGED IMPROPERLY ADMITTED EVIDENCE.**

In August 2022, the Plaintiff found two notes in her classroom: The first note said, "Just do it. Just leave our school. You are toxic." The second note stated, "Mrs. Light's To Do List. Wash Hair. Leave or Just Die." *Pl.'s Exs. 21 and 22.* The Plaintiff filed a motion in limine seeking the admission of the notes. *ECF Doc. 70.* The Court reserved ruling on said motion until the trial. Plaintiff testified regarding the hostile environment she experienced at work from March 2021 through mid-2022, which included being removed from committees. *8/5/24 Tr., p. 173:5*; ignored at a colleague's retirement party. *Id. at p. 172:23-25*; not invited to another teacher's baby shower. *Id. at p. 173:12*; left alone during lunch. *Id. at p. 161:8-10*; finding a hard copy of Ms. Alden's "List of Concerns" in the mail room. *Id. at p. 212:21-24*; and Defendant Gethings refusal to interview her for the open third-grade position in the spring/summer of 2022. *Id. at p. 160:4-11.* The notes reflect circumstantial evidence of a continuing hostile environment that began after the administration falsely accused Plaintiff of breaching another teacher's confidence.

---

[9] Moreover, the Court should again reject the defendants' apparent "law of the case" argument:

MR. MURPHY: Did Your Honor have a chance to look at Judge Meyer's summary judgment ruling?

THE COURT: Yes, but we go back to the origins. And I think that's right. "Substantial" is the same thing as "motivating." That's what *Mt. Healthy* said.

*8/8/24 Tr., pp. 675-676: 24-3.*

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

In response to Plaintiff's offer of proof, the Court ruled as follows:

The court found a sufficiently plausible causal link between alleged retaliatory actions--which were claimed to have poisoned the waters and created a hostile working environment--and plaintiff's discovery of the notes in her classroom. First, the plaintiff recounted a number of allegedly retaliatory acts. Second, another teacher's "list of concerns" accusing plaintiff of creating the hostile environment was found by plaintiff near the teachers' mailboxes three months before the anonymous notes were discovered; and third, the content of this "list of concerns" urged defendant to remove plaintiff from the school. Collectively, these factors could permit a reasonable jury to conclude that the defendants' alleged retaliatory actions fostered a work environment which incubated the anonymous notes.

The anonymous notes are probative evidence of the plaintiff's damages. If the jury accepts--as it may--that the notes were a result of defendants' retaliatory actions, they tend to corroborate plaintiff's claims that defendants alleged wrongful conduct caused her work environment to turn hostile.

*ECF Doc. 103*. The ruling is not arbitrary or irrational. No basis exists for a new trial.

In *United States v. Monsalvatge*, 850 F.3d 483, 493 (2d Cir. 2017), the Court states:

We review a district court's evidentiary rulings over objection for abuse of discretion. *United States v. Cuti*, 720 F.3d 453, 457 (2d Cir. 2013). We review such rulings deferentially, 'mindful of [a district court's] superior position to assess relevancy and to weigh the probative value of evidence against its potential for unfair prejudice.' *United States v. Abu-Jihaad*, 630 F.3d 102, 131 (2d Cir. 2010); *see also* 11 Wright & Miller, Federal Practice and Procedure § 2885 (3d ed. 1998) (describing a district court's 'wide and flexible[] discretion' in 'questions of admissibility of evidence). Indeed, '[w]e will reverse an evidentiary ruling only for 'abuse of discretion,' which we will identify only if the ruling was 'arbitrary and irrational.'' *Abu-Jihaad*, 630 F.3d at 131 (citation omitted) (quoting *United States v. Dhinsa*, 243 F.3d 635, 649 (2d Cir.2001)).

Furthermore, there is nothing in the record remotely suggesting the jury relied upon the classroom notes. Defendants' argument is speculative at best. Therefore, the Court should deny the defendants' request for a new trial.

## G.  <u>THE DAMAGE AWARDS ON THE RETALIATION CLAIMS SHOULD NOT BE SET ASIDE OR REMITTED.</u>

A reduction in the damages awarded by the jury is inappropriate. "It is well settled that the calculation of damages is the province of the jury." *Wallace v. Suffolk County Police Department*, 2010 U.S. Dist. LEXIS 100796 *24 (E.D.N.Y. 2010) (quoting *Walz v. Town of Smithtown*, 46 F.3d

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

162, 170 (2d Cir. 1995). "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial. The decision as to whether remittitur is required is committed to the discretion of the trial judge." (internal quotations and citations omitted) *Id.* at *25.

"In reviewing a claim that the jury awarded excessive damages, [the Court] 'view[s] the evidence and draw[s] all factual inferences in favor of the [plaintiff], and accord[s] substantial deference to the jury's determination of factual issues." *Id.* (quoting *Scala v. Moore McCormack Lines*, 985 F.2d 680, 683 (2d Cir. 1993)). "A jury's award of damages should not be overturned unless it is 'so high as to shock the judicial conscience and constitute a denial of justice." *Wallace*, 2010 U.S. Dist. LEXIS 100796 at *25.

### 1.  <u>The compensatory damages are supported by the evidence.</u>

The jury awarded $50,000.00 in economic compensatory damages to Plaintiff for Count One (state law claim against Defendant New Haven Board of Education) and $75,000.00 in economic compensatory damages for Count Two (federal law claim against Defendant Gethings). *ECF Doc. 110 at pp. 4-5.* It is long established that:

> Where the defendant by his own wrong has prevented a more precise computation...the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances juries are allowed to act upon probable and inferential, as well as direct and positive proof...Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.
>
> The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.

(internal quotations and citations omitted) *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-265 (1946).

While the defendants take issue with a total economic compensatory damages award of $125,000.00, they ignore Counts One and Two are separate claims in and of themselves. The jury instructions define economic compensatory damages as "compensation for pecuniary losses, **which may includ**e money actually spent on debts incurred as a result of the injury, medical bills, and expenses, and/or lost wages, earnings, and benefits." (emphasis added) *ECF Doc. 114 at p. 13.* The jury instructions further provide:

> You should award Ms. Light compensatory damages for economic and non-economic losses so as to make her whole for any damages she may have suffered. **Ms. Light is not required to prove losses with mathematical precision**, but only with as much definiteness and accuracy as circumstances permit. However, damages should not be based on speculation or sympathy. Your determination of compensatory damages is to be what you find to be reasonable in light of the evidence in this case and your use of your common sense.

*(emphasis added) Id.* In his closing argument, Plaintiff's counsel laid out compensatory damages accordingly: "You heard Jessica testify that she lost days, 66 sick dates, $26,000. You heard testimony from Ms. Ventura about the medical bills from the PTSC center. Those totaled $33,000, and dramatic action, as you'll see in Exhibit 29, of $1,200, totaling $34,200." *8/9/24 Tr., pp. 862-863:25-5.*

While the defendants argue that Plaintiff's economic losses total $60,200.00, an award of $75,000.00 for violation of 29 USC §1983 is not unreasonable or far from $60,200.00 when one gives deference to the jurors' common sense, the fact that such amount reflects what the jurors' determined to be reasonable, the admitted evidence,[10] and the fact that Plaintiff is not required to prove damages with mathematical precision. Consistent with the Court's instruction, the determination of compensatory damages by the jury is reasonable considering the evidence and supported by common sense.

---

[10] Plaintiff testified that she hired a lawyer in the summer of 2021 and that she received a loan from her brother to pay for lawyer's services. She further testified that she paid some of the lawyer's bills herself by taking out an "extra line of credit on our home." *8/6/24 Tr., p. 372-373.*

MONARCH LAW LLC
363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037
TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039

Defendants further claim that $60,200 is excessive and/or speculative. *Defs' Mem. at p. 28.*

Yet, they ignore Plaintiff's relevant testimony concerning the valuation of her lost days:

> Q.    And when you mentioned earlier you lost sick days, do you remember how
>       many sick days you lost?
> A.    Sixty-six.
> Q.    Do you have an idea what the value of those 66 lost sick days is?
> A.    About -- at retirement, about $26,000, **based on the
>       information the union gave me at the per-day rate.**

(emphasis added) *8/5/24 Tr., p. 182:1-7.*

Defendants also seek remittitur based on their argument that Plaintiff was already seeking

treatment for her mental health conditions prior to seeing Ms. Ventura, and Dr. Levin

recommended she see a therapist before the alleged retaliatory acts began. *Defs' Mem. at p. 29.*

The defendants fail to accept the fact that Dr. Levin does not offer medication management and

talk therapy as did Plaintiff's prior treater, Dr. Berger. *8/5/24 Tr., pp, 175-176: 21-1.* Additionally,

Ms. Ventura testified that defendants' retaliatory acts caused an increase in Plaintiff's care and

frequency of visits. Specifically, she testified as follows:

> Q.    What was Jessica's exacerbated symptomatology at the time you wrote
>       this letter [January of 2022]?
> A.    Increase in anxiety, difficulty concentrating, intrusive thoughts,
>       nightmares, difficulty sleeping. A number of additional posttraumatic
>       stress symptoms.
> Q.    Did Jessica's exacerbated symptomatology continue after this letter?
> A.    Yes.
> Q.    Do you have an opinion as to why it continued?
> A.    She remained in what she perceived as a hostile work environment.
> Q.    As it relates to your continued treatment of Jessica after this letter, do you
>       have any opinion as to the cause of Jessica's exacerbated
>       symptomatology?
> A.    Yes. Her experience of her workplace being hostile.

*8/7/24 Tr., pp. 450-451.* Ms. Ventura also testified that she permitted Plaintiff to text and e-mail

her if she needed an immediate response. Initially, the messages were infrequent, but the frequency

of the messages increased because "Jessica was struggling greatly at the time and was expressing

her anxiety, her depression, her whatever she was expressing." *Id. at 452:16-20.*

Defendants further claim the evidence does not support attributing the total amount of Plaintiff's medical expenses to their alleged conduct. *Defs' Mem. at p. 28.* While Ms. Ventura's records do not contain detailed information, there is a check mark that can be placed next to "work" under a category titled "Dys" for "dysfunction." Ms. Ventura testified, "[o]n the instances that [she] checked off work, it was when Jessica's experience of her job was causing her significant distress." *8/7/24 Tr., p. 479:4-8.*

Additionally, Plaintiff testified that she originally sought out Ms. Ventura "hop[ing] to address her childhood trauma," but that didn't necessarily happen, "because the past had to take a back burner to the present [] so [she] wasn't able to address those issues because [she] needed to address the problems [she] was facing that day." When asked what was happening in the present that she was referring to, she identified "feeling like [she] lost [her] standing professionally." She stated that "abuse" by the administration gave her "feelings of depression and isolation," making her feel that she was becoming "a victim of abuse instead of a survivor of abuse for the first time in 20 years." *8/5/24 Tr., pp. 178-179.*

Dr. Levin's notes support the conclusion that Plaintiff most if not all sessions with Ms. Ventura included a discussion of Plaintiff's work environment. In her 5/15/2021 note, Dr. Levin states, "going to the PTSD Center of New Haven. Instead of talking about past sexual abuse, is now having to talk about what is happening now [i.e., work troubles]" *Defs' Ex. S, LIGHT003489.* Ms. Ventura testified there were other issues besides Worthington Hooker School and Plaintiff's childhood that they discussed, but added specifically that those discussions revolved around, "[t]he impact that Worthington Hooker School and her past trauma has on her current relationships whether that's with her husband, [] her family, her community." *8/7/24 Tr., p. 476:7-8.* The jury's award – when examined in light of the evidence presented at trial – does not shock the conscience nor constitutes a denial of justice. It is not based upon speculation and is wholly reasonable. The

Court must give substantial deference to the jury's award, and allow such award for economic compensatory damages to remain untouched.

Alternatively, if the Court determines remittitur is appropriate for Count Two, then it should recalibrate the compensatory economic damages for both counts to $60,200.00.

### 2.  **The record supports the emotional distress damages awarded by the jury.**

Like their argument concerning the awards of economic compensatory damages, the defendants lump together the jury's awards non-economic compensatory damages. The jury awarded $300,000.00 for Count One (state law claim against Defendant NHBOE) and $350,000.00 for Count Two (federal law claim against Defendant Gethings). Defendants combine the awards because it is easier for them to claim that $650,000.00 is excessive and not supported by the record. Presumably, the jury felt that Defendant Gethings' conduct did more damage to Plaintiff than Defendant NHBOE.

During his closing argument, Plaintiff's counsel provided the jury with a framework to calculate emotional distress damages:

> It's $20 for a movie ticket. If you add in popcorn and a soda, you get up to $30 for a two-hour movie for some entertainment or fun. I would say it's worth 25 cents . . . . Twenty-five cents a minute, $15 an hour. If you take the days from March 26, 2021, to today, you have 1,233 days, 29,592 hours, multiplied by $15 an hour, and that takes you to $443,880.

*8/9/24 Tr., pp. 863-864:19-4.* Such an example was merely a guide and not a boundary.

Defendants also argue that "neither of her health care providers tied Plaintiff's emotional distress to just the TEVAL meeting and/or the observations." *Defs' Mem. at p. 31.* As discussed *supra*, Plaintiff experienced a series of retaliatory acts from the Worthington Hooker School administrators. Dr. Levin and Ms. Ventura testified about Plaintiff's emotional distress arising from her workplace and feeling "pushed out." Specifically, Dr. Levin testified that Plaintiff felt "she was pushed out for being outspoken for what COVID protocols should be in place." 8/7/24

Tr., p. 501:7:22; *see also, Pl.'s Ex. 15* (e-mail regarding extension of Plaintiff's FMLA). Similarly, Ms. Ventura testified that Plaintiff's symptoms changed between moderate and severe based on "[Plaintiff's] experience of either of what was happening in school when she was there." *8/7/24 Tr., pp. 457-58.* She did not testify that this was the only time, but also stated that "she did go to severe **on a few occasions**." (emphasis added) *Id.* During cross examination, defense counsel failed to attack the opinions offered by Plaintiff's witnesses nor did he attempt to disconnect the alleged conduct from Plaintiff's timeline.

The case law cited by the defendants in support of their request is distinguishable from the facts of this case. In *McIntosh v. Irving Tr. Co.*, 887 F. Supp. 662, 667 (S.D.N.Y. 1995), the court remitted emotional distress damages from $219,428 to $20,000 where "[t]he plaintiff testified to highly subjective feelings that he said he experienced during certain incidents at work." The court further clarified that the only trial testimony came from the plaintiff, himself, and "McIntosh did not testify in any detail with respect to the magnitude or the duration of any mental distress." Furthermore, the plaintiff did not seek medical treatment for his alleged distress. In our case, the Plaintiff testified in detail regarding her emotional distress. She further testified about her extensive counseling from Dr. Levin and Ms. Ventura regarding such emotional distress, and both individuals corroborated this testimony and offered their opinions at trial.

Likewise, the defendants' reliance upon *McInnis v. Town of Weston*, 458 F. Supp. 2d 7 (D. Conn. 2006) is misplaced. In *McInnis*, the plaintiff's lawyer requested the jury to use a potential pension of $960,000 as a measure of emotional distress sustained. The court found this to be improper and unrelated to the conditions of plaintiff's employment. The result of which, the court concluded, was a shockingly disproportionate non-economic damages award which contrasted with an economic damage award of only $4,200. In our case, no such request was made of the jury and there is no claim that anything that was said during Plaintiff's closing argument was improper.

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

Defendants rely heavily on *Mendez v. Starwood Hotels & Resorts Worldwide, Inc*, 746 F. Supp. 2d 575 (S.D.N.Y. 2010) to support their argument. *Defs' Mem. at p. 34.* This case, however, is also distinguishable. For example, the court concluded:

> [T]here is no evidence-even from plaintiff-that he suffered any significant damage…Asked how he felt when he learned about the camera, Mendez testified that Starwood's invasion of his privacy added insult to the injury of the company's refusal to investigate his complaints…Plaintiff was not actually dissuaded from taking steps to protect his rights…The jury concluded that the hostility in Mendez's work environment was not attributable to any sort of actionable discrimination, and after reviewing the record, I cannot say that this conclusion was incorrect.

*Id. at 601.* This is in stark contrast to the facts in our case, where the jury found each Defendant violated Plaintiff's rights – one under state law, and the other under federal law. The record supports the jury's emotional distress award for both counts. Thus, the Court should allow the award to stand, as ordering a new trial or remittitur are improper based upon the evidence and testimony given at trial.

### 3.    **The jury's award of punitive damages should not be vacated.**

With regard to punitive damages, the Court cautioned the jury as follows: "You may award Ms. Light punitive damages if you find that the acts or omissions of defendants reveal a reckless indifference to the rights of others, maliciousness, or an intentional and wanton violation of those rights." *ECF No. 114 at p. 14.* As to Count One against Defendant NHBOE, the jury awarded $100,000.00. And in connection with Count Two against Defendant Gethings, it awarded $200,000.00. *ECF No. 110 at pp. 4-5.*

The evidence presented at trial supports the jury's awards. For instance, the defendants subjected Plaintiff to an extended meeting that, in the past and under normal circumstances, would only last fifteen minutes. Defendant Gethings and Ms. Clarino attended and controlled the meeting as a team. And they concealed the alternative purpose of this meeting, thereby preventing Plaintiff from having a union representative in attendance. During the trial, Defendant Gethings admitted

she and Ms. Clarino intended to discuss "other things." *8/8/24 Tr., p. 703:17-20.* Defendants ignore Plaintiff's testimony on this topic, as well as the excessive shadowing topic, as detailed *supra.*

Such testimony is evidence that there was nothing "normal" or "routine" with the administrators' conduct direct at Plaintiff after her public speaking, including Facebook commentary. Defendant Gethings and Ms. Clarino's actions were reprehensible, egregious and outrageous. The jury could infer that they worked together in violation of Plaintiff's free speech rights. Defendants have failed to show that the punitive damage awards are wholly without support and are a manifest injustice. Thus, the jury's punitive damage awards must not be vacated.

### 4. Remitting the punitive damage awards is inappropriate.

In the alternative, the defendants argue for a remitter. Specifically, the defendants claim "Ms. Gethings was wading through uncharted territory." *Defs' Mem. at p. 38.* The evidence presented at trial, however, contradicts such an argument. As set forth *supra,* the Plaintiff's union circulated a letter in July 2020 to teachers and union presidents. *See Pl.'s Ex. 1.* Ms. Gethings received this letter and, during trial, that she confirmed that she gave it to her teachers as a "double message" in late 2020. *8/8/24 Tr., p. 680:8-19.* Another reason the defendants' argument misses the mark is found in the Superintendent's February 2022 "Verbal Warning" letter to Defendant Gethings, which states, in relevant part: "As a seasoned administrator with the New Haven Public Schools, you were expected to respond to these situations reasonably and in a manner consistent with our values. It is concerning that you were unable to do so in this circumstance." *Pl.'s Ex. 48.* The conduct of Defendant Gethings, therefore, was reckless and intentional, in violation of the guidance she was given, and inconsistent with the expectations of her employer. "[W]here a defendant is aware that its actions violate federal law, it is not necessary that the misconduct itself be independently reprehensible or egregious." *Manzo v. Sovereign Motor Cars*, 2010 U.S. LEXIS 46036, *8 (E.D.N.Y. May 11, 2010).

In *Manzo*, *supra*, the plaintiff alleged hostile work environment and retaliation. The jury awarded only $50,000.00 in compensatory damages and awarded $200,000.00 in punitive damages. The Court rejected the defendant's request to vacate or reduce the award. *Id. at *45-46.* In *Babson v. Friendship House of W. N. Y.* 46 Fed. Appx 14 (2002), a co-worker directed sexually offensive statements, gestures, and physical overtures at the plaintiff. The plaintiff alleged that the employer ratified and accepted the co-worker's conduct and retaliated by discharging her after she reported the conduct to the Equal Employment Opportunity Commission. The plaintiff filed claims for sexual harassment, hostile work environment, and retaliation. The jury awarded compensation for "financial or economic harm or damages for lost and future income" in the amount of $46,634.75; damages for emotional distress in the amount of $31,875.00; and punitive damages, $275,000.00. The employer requested remittitur of the punitive damages arguing that there "lacked a basis in the proof." *Id. at 19.* The court exercised its discretion and disagreed with the defendant because it found the evidence presented at trial supported the punitive damages award. Thus, the court declined to reduce the award, despite a significant gap between the compensatory damages and punitive damages. *See also*, *Tse v. UBS Financial Services, Inc.*, 568 F. Supp. 2d 278 (S.D.N.Y. 2008) ($300,000.00 punitive damage award was not considered excessive, despite the finding that the case involved a low degree of reprehensibility).

Like the courts in these cases, this Court should decline the defendant's request to remit the punitive damages awards against each defendant.

## V.    <u>CONCLUSION</u>

WHEREFORE, Plaintiff respectfully requests the Court to deny the defendants' motion in its entirety.

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**

THE PLAINTIFF,
JESSICA LIGHT


By: */s/ Anthony J. Interlandi*
Anthony J. Interlandi (ct27512)
tony@monarchlaw.com


## CERTIFICATION OF SERVICE


I hereby certify that on October 21, 2024, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing as indicated below. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filings as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


*/s/ Anthony J. Interlandi*
Anthony J. Interlandi

**MONARCH LAW LLC**
**363 NEW BRITAIN ROAD, FIRST FLOOR, BERLIN, CONNECTICUT 06037**
**TELEPHONE: (860) 969-2909 • FACSIMILE: (860) 909-0039**