# EXHIBIT B

1          THE COURT:  Can you tell me what you're

2     currently planning to prove as the retaliatory acts?

3          MR. INTERLANDI:  We have the reassignment from

4     third grade to first grade.  We have exclusion and/or

5     being taken off of certain committees.  There's also the

6     PTA teacher representative position, I believe, that was

7     an issue.  We have part of it included the accusations or

8     spreading of rumors that Ms. Light was the source of

9     Teacher X's diagnosis.  There are additional issues that

10    followed or that came after the complaint which would be

11    talking to a witness during the investigation.

12         THE COURT:  Why is that a retaliatory act

13    against her?

14         MR. INTERLANDI:  Ms. Light filed a complaint --

15         THE COURT:  Right.

16         MR. INTERLANDI:  -- where she felt she was being

17    retaliated against due to her public speech in Facebook

18    and board of ed meetings.  And then along the way the

19    New Haven Board of Ed undertook the investigation and then

20    determined that either Ms. Gethings or Ms. Clarino

21    contacted a witness that was "professionally concerning" I

22    believe was the phrase used by Ms. Bonner to her.  And so

23    we feel that that was part and parcel of the pattern of

24    the retaliatory acts that started in and around February

25    to early March of 2021 and ran through to the summer of

```
 1   2021.
 2              THE COURT:  Anything else?
 3              MR. INTERLANDI:  They were -- these additional
 4   issues were raised to the Berchem Moses attorneys, the
 5   attorney who undertook Ms. Light's complaint, and that was
 6   where an email was found on another teacher's printer.  It
 7   was an email from Ms. Light's husband to Ms. Clarino.
 8   That was investigated by Attorney Goldberg.
 9              There was also Ms. Alden's list of concerns
10   which was the second in line of complaints that were
11   brought to HR's attention.  Ms. Alden's complaint was
12   found in a mailbox of another teacher's.
13              And again, it's the same argument where this
14   is -- we're talking about a five-month period, give or
15   take, of this conduct by the administrators but
16   specifically Ms. Gethings.
17              THE COURT:  Okay.  Does that complete your list?
18              MR. INTERLANDI:  Plus what I said earlier
19   concerning from the middle of December to the end of
20   January, which is Ms. Light felt a certain way after the
21   reports came out.
22              THE COURT:  But that is not a retaliatory act by
23   the defendants.  That is on her damages.  No?
24              MR. INTERLANDI:  I think it's both.  I think it
25   goes to damages.  It goes to damages because of the use of
```

1    her sick time.

2        THE COURT:  But what's the act of the defendants

3    in the December to January time period that you say

4    constitutes a retaliatory act?

5        MR. INTERLANDI:  There's the discussion of

6    returning Ms. Light in an environment where -- and it gets

7    a little muddy because of the Berchem Moses reports.  But

8    she's coming back.  She was out on FMLA for two months or

9    so, she's coming back or she's asked to come back to an

10   environment where now she feels that there are people who

11   have retaliated against her.

12       THE COURT:  You say that's a whole separate act

13   of retaliation, telling her to come back?

14       MR. INTERLANDI:  Yes.  There's a meeting.  There

15   are multiple emails that are exchanged from the middle of

16   December to the end of January of 2022.  There's a meeting

17   on January 14, as I said earlier.  And then Ms. Bonner had

18   made a promise that she would work like an Energizer Bunny

19   to look into these issues.  Within a week after that,

20   Ms. Light receives a letter saying you need to return and

21   if you don't essentially you're going to be insubordinate.

22       THE COURT:  So what you're saying is that a

23   retaliatory act that she is claiming is telling her to

24   return without the remedial measures.

25       MR. INTERLANDI:  Correct.

```
1              THE COURT:  Anything else?

2              MR. INTERLANDI:  I believe that covers it all.

3              THE COURT:  Does that help you, Mr. Murphy, in

4     focusing and narrowing?

5              MR. MURPHY:  It certainly didn't narrow the list

6     of issues, Your Honor.

7              THE COURT:  Let's work on focus.

8              MR. MURPHY:  It's slightly focused.

9              I do have one question.  There were two things

10    that were not mentioned and I don't know if those are

11    dropped or not.  Oh, no, you did mention the emails on the

12    printer, the Paul Salem issue.  One thing you didn't

13    mention was Timothy Shortt, I'm just not sure --

14             MR. INTERLANDI:  Correct.  There's actually --

15    Your Honor, I apologize.

16             THE COURT:  Why are you making the list longer,

17    Mr. Murphy?

18             MR. MURPHY:  I don't want to be surprised next

19    week, Your Honor.

20             THE COURT:  You wouldn't be surprised because

21    this is the list.

22             Go ahead.

23             MR. INTERLANDI:  Counsel brought it up earlier

24    and I should have picked up on that with Phyllis Maffuid,

25    who is a teacher's assistant, concerning her being spoken
```

 1    to about the dismissal procedure where Ms. Light needed to

 2    use the restroom.  So there's that, which I believe was in

 3    that time -- definitely was in the time frame.

 4              THE COURT:  The reprimand of her for taking over

 5    for the plaintiff is a retaliatory act for her protected

 6    speech?

 7              MR. INTERLANDI:  That is the allegation.

 8              And the other act is the discussion with

 9    Mr. Shortt about, you know, teaming up or siding with

10    Jessica Light in terms of his union activities, I believe.

11    You know, they were worried that -- I believe the

12    allegation is that the administrators approached this

13    gentleman who is a teacher and questioned him about his

14    alignment with Ms. Light.

15              THE COURT:  So questioning Mr. Shortt with the

16    implication that he's organizing with Ms. Light is a

17    retaliatory act?

18              MR. INTERLANDI:  That is the allegation.

19              THE COURT:  Okay.

20              Let's turn to --

21              MR. MURPHY:  Your Honor, I'm not sure if you're

22    attempting to move on to another issue.

23              THE COURT:  I am.

24              MR. MURPHY:  Can I briefly be heard on that

25    issue?

1           THE COURT:  Certainly.

2           MR. MURPHY:  I want to make sure you understood

3    it.  Right now we have a list -- I counted ten, I hope

4    that matches up with what Your Honor has.  Ten things

5    that -- yes, okay.  Ten different things that potentially

6    may be retaliatory acts either by themselves or

7    collectively.  But then I also heard that if the report's

8    admitted it will be limited to four.  I want to make sure

9    I understood that correctly.

10           MR. INTERLANDI:  Yes, Your Honor.  That's what I

11   said.

12           MR. MURPHY:  Okay.

13           THE COURT:  So what are you doing, withdrawing

14   your motion in limine?

15           MR. MURPHY:  No, not at all.

16           THE COURT:  We're going to get to that right

17   now.

18           MR. MURPHY:  Thank you, Your Honor.  I didn't

19   mean to interrupt.  I wanted to make sure we were on the

20   same page.

21           THE COURT:  There are ten -- I just wanted to

22   make sure we aren't going to have more.

23           MR. INTERLANDI:  Your Honor, I may have one

24   more, I apologize.  In thinking, looking back at the

25   initial complaint that Ms. Light submitted to Ms. Bonner,

1    I believe one of the acts was that she was subjected to

2    unusual, in terms of length, meeting with the

3    administrators.  Like a 90-minute meeting to talk about

4    her public speech.

5         THE COURT:  The length of the meeting is a

6    retaliatory act?

7         MR. INTERLANDI:  And she did not have a union

8    representative present.

9         THE COURT:  What's the date of that meeting?

10         MR. INTERLANDI:  I believe the date of that

11   meeting is March 26, 2021.  It may have been earlier,

12   however, Your Honor.  I can look at the complaint.

13         THE COURT:  Okay.  Eleven.

14         Now, let's talk about 69 and 75, to admit or to

15   exclude the investigative reports and the testimony by the

16   attorneys preparing those reports.  Let me hear you.

17   You've obviously briefed it.  I am familiar with that

18   sometimes in preparation for oral argument people focus or

19   change their focus of their argument.  What I am trying to

20   understand is does the defendants' motion relate -- I

21   think it does not -- just to the reports and testimony by

22   the authors of those reports?  Or is it a much broader

23   motion in limine?  Which I ask because you have so many

24   objections to plaintiff's evidence because it refers to

25   the report.

1    pain, stress, suffering, humiliation, and isolation she

2    felt as a result.

3            You will also hear from Jessica's husband,

4    David.  He'll testify about his observations of Jessica

5    before and after the retaliation and defamation.

6            You'll hear from some co-workers who will

7    testify about specific events that we claim were a pattern

8    of retaliation by Margaret-Mary Gethings.

9            You'll hear from two medical providers who will

10   come to court, testify, and offer their opinion as to

11   whether or not the defendants' conduct exacerbated any

12   underlying medical conditions that Jessica may have had at

13   that time.

14           You'll also hear from the vice president of

15   Jessica's union.  He's the former vice president of the

16   union, and he will testify about what he witnessed during

17   and after the investigation of Jessica's internal

18   complaint about the administrators at Worthington Hooker

19   School.  You will have that complaint in evidence as well

20   as the administrators' retaliatory complaint, letters,

21   emails, and medical bills.  As I said earlier, please read

22   those intently.

23           Finally, we'll present the HR representative who

24   was tasked with investigating Jessica's complaint.  We

25   expect her to testify about the process, about her

1   Q.   When you say "Central Office," what are you referring

2   to?

3   A.   The Downtown Board of Education.

4   Q.   Of which city?

5   A.   New Haven.

6   Q.   And just so that we're clear, what did Ms. Gethings

7   say to you specifically during this November meeting as it

8   related to your comments at the, I guess, New Haven Board

9   of Ed sponsored parent meeting?

10  A.   That my speaking made her look bad.  That it felt

11  like we weren't on the same team.  That even if I was

12  speaking as a parent, everybody knew who I was.  And that

13  she had gone to a principals meeting and the

14  superintendent had told the whole -- all of the principals

15  to make sure the teachers are informed so we don't have

16  this happen again.  And then pulled her and Jenny Clarino

17  aside and said, "By the way, that example I gave you was

18  you."  And they felt they were in trouble for my speaking.

19  Q.   How did it make you feel having this meeting with

20  Ms. Gethings in November 2020?

21  A.   Um, scared.

22  Q.   Why were you scared in November of 2020?

23  A.   Um, because I had a moral duty not to stop speaking,

24  but I also desperately wanted to keep good bridges with my

25  boss.  So I didn't know how I could do both.  And my job

1  A.    Targeted.   Isolated.

2  Q.    Why?

3  A.    Because when speaking to her, I had tried to explain

4  to her that there was no judgment, and I thought that we

5  had gotten on pretty okay ground.   And I felt like she was

6  painting my actions in a really negative light to the

7  whole community.   And that -- well.

8  Q.    Did she tell you how she saw your comments to that

9  Facebook post?

10  A.    At one point Jenny Clarino said she had seen them on

11  New Haven Advocates, but then I think Ms. Gethings told me

12  that teachers had texted her my comments.

13  Q.    Did she tell you which teachers texted her your

14  comments?

15  A.    I believe it was Kathleen Morrison, Meghan Rose, and

16  maybe Ms. Cav.

17  Q.    Ms. Cav?

18  A.    Cavanaugh.

19  Q.    Did you have any other feelings about what she said

20  to you regarding the Facebook comments or receiving this

21  email that went to your peers and colleagues at Hooker?

22  A.    Um, I felt isolated and, I don't know, sad.

23  Q.    Did you provide misinformation in the Facebook post

24  in March 2021?

25  A.    No.

```
 1   A.   I did.
 2   Q.   Do you recall approximately when that occurred?
 3   A.   Towards the end of March.
 4   Q.   Do you recall how long that TEVAL meeting lasted?
 5   A.   An hour and a half.
 6   Q.   Was that typical, in your experience?
 7   A.   No.  We sign up for 15-minute time slots.
 8   Q.   What do you mean you sign up?  Where do you sign up?
 9   A.   In the main office there's usually a sheet of when
10   the principals or administrators are available to meet.
11   And every 15 minutes there's a line for another person to
12   sign up.  So it would be like 1:00, 1:15.
13   Q.   Who did your review for the 2019-2020 school year?
14   A.   Ms. Gethings.
15   Q.   Was Ms. Clarino present for that?
16   A.   No.
17   Q.   How long did that TEVAL meeting last?
18   A.   Fifteen minutes.
19   Q.   In your career teaching for the defendant New Haven
20   Board of Education, has any TEVAL meeting lasted more than
21   30 minutes that you've had other than the one in March of
22   2021?
23   A.   No.
24   Q.   So you had a teacher evaluation meeting with just
25   Ms. Gethings for the 1920 school year.  Earlier you
```

1    testified about ratings.  Do you recall the rating that

2    Ms. Gethings gave you for that school year?

3    A.    Yes.

4    Q.    What was the rating?

5    A.    A 5.

6    Q.    And just remind me, what does 5 mean?  Does it have

7    any significance?

8    A.    It's the top rating.  In the comments she said my

9    classroom was the embodiment of the joy of learning.

10   Q.    And then just one year later you had another TEVAL

11   meeting with Ms. Gethings joined by Ms. Clarino, right?

12   A.    Correct.

13   Q.    And what was discussed during this teacher evaluation

14   meeting?

15   A.    Um, my public speaking and my role on the PTA and my

16   Facebook posts, um, and how that reflected on my

17   professionality.

18   Q.    So let's unpack that.

19        Let's start with the Facebook posts.  You said posts,

20   plural.  Were they talking about more than one post or

21   were they talking about the comments that were in

22   Exhibit 2?

23   A.    I think they're talking about the comments.

24   Q.    So they weren't talking about other Facebook posts

25   that you made?

1  A.   Correct.

2  Q.   I just wanted to make that clear.

3       So they talked about that.  And then you said

4  something about the PTA.  What were you referencing there?

5  A.   So they sat down at the table.  Um, Ms. Gethings

6  asked me, "So what exactly is the title of your role in

7  the PTA?  Is it teacher representative or parent teacher

8  vice president?"  And clarified my role on the PTA prior

9  to the beginning of my teacher evaluation.

10  Q.   And then you said you also discussed your public

11  speaking during this teacher evaluation meeting?

12  A.   Yes.

13  Q.   Let me just take a step back from there.

14       Have you ever, with any of the people reviewing you,

15  talked about things other than your performance during the

16  teacher evaluation meetings?

17  A.   No.

18  Q.   So she asked you about public speaking.  What

19  specifically was she talking to you about in regard to

20  your public speaking?

21  A.   Um, about how it made them feel uncomfortable.

22  Again, she talked about how she got a lot of phone calls

23  after I spoke.  And that it was causing fear in the

24  community and made them feel like I wasn't a team player

25  and I was making a tough situation tougher on them.

1    let's say they told you in April, how long would you have

2    had to get yourself ready and prepared to teach first

3    grade for the next school year?

4    A.    Not very long.  I mean, as I said here, I was willing

5    to take a summer workshop.

6    Q.    This meeting in total, how did it make you feel?

7    A.    Terrified.  Isolated.  Frustrated.  Voiceless.

8    Q.    Why did you feel voiceless?

9    A.    Because it seemed like everything had been decided

10    and nothing I said mattered.  So I was trying to come up

11    with other solutions, and none of them were taken.  I was

12    truly worried about being able to serve the students.

13    That didn't seem to be considered.  I was told that

14    Ms. Cav was going to file a complaint against me, someone

15    I thought was a friend, who hadn't said anything was

16    wrong.  So I really questioned a whole lot of how I

17    perceived the school and how others perceived me.

18    Q.    What were you frustrated about?

19    A.    I was frustrated that I knew I was -- I trusted my --

20    I knew I was right, but it didn't matter.  I was

21    frustrated that I had put in my time to New Haven Public

22    Schools and that I had always been willing to change my

23    grade or do whatever was best for the school, but I truly

24    didn't believe that this was for the betterment of the

25    student.  I thought they were just out to get me.

1   Q.   Did you save the audio file on your phone?

2   A.   Yes.

3   Q.   After you recorded it, did you do anything to alter

4   or modify the audio file?

5   A.   No.

6   Q.   Is what's shown in Exhibit 25 a transcript of the

7   audio recording that you took on March 31, 2021?

8   A.   Yes.

9   Q.   Who else was here at this meeting on March 31, 2021?

10  A.   Ms. Clarino and Kathleen Morrison, Ms. Cav, myself,

11  and Ms. Gethings.

12  Q.   So five people in total?

13  A.   Yes.

14  Q.   Why was Ms. Morrison there?

15  A.   I was not told beforehand that she was going to be

16  there, but she was the union steward for our school.

17  Q.   Why was Ms. Clarino there?

18  A.   I don't know.

19  Q.   How long did this meeting last?

20  A.   Um, I'm not sure the exact time, but quite a while.

21  Q.   What was discussed at this meeting?

22  A.   Um, Ms. Cav said that she wasn't going to file a

23  complaint against me because there was no evidence that I

24  had leaked her information, but that she did feel like her

25  privacy had been breached in some way.

1    A.    Yes.

2    Q.    Who did you file a complaint against?

3    A.    Ms. Gethings and Ms. Clarino.

4    Q.    Who did you file that with?

5    A.    HR.

6    Q.    Anyone specific in Human Resources that you filed it

7    with?

8    A.    Um, I believe I sent it to Lisa Mack.  And then Taryn

9    Bonner was assigned to investigate it.

10   Q.    Why did you file a complaint against the

11   administrators at Hooker?

12   A.    Um, because it was becoming untenable to work there.

13   Because even after the meeting with the union where we

14   tried to build bridges, it wasn't happening.  It was

15   always, well, we still have concerns, well, we still have

16   concerns.  I, um -- I felt that they were working against

17   me and just didn't want me there.  Um, the union said that

18   this would be a middle step to filing a grievance.

19   Q.    And when you were bringing these concerns to the

20   union, I think you mentioned earlier in reference to the

21   committee issue, was there someone in particular that you

22   were bringing the concerns to?

23   A.    Dave Cicarella.

24   Q.    Was there anyone else in the union leadership that

25   you communicated your concerns with as it related to your

```
 1              THE COURT:  All right.  We're going to be taking

 2    a recess at 2:45.  Possibly we can take up your issues

 3    then, probably better to do it at the end of the day.

 4              Thank you very much.  Stand in recess.

 5                   (Whereupon, a recess followed.)

 6              THE COURT:  Counsel, we will bring the jurors

 7    back in.

 8              However, I need to admonish the people who I

 9    assume are teachers or associated with teachers behind

10    defense counsel with respect to their visible responses to

11    the plaintiff's testimony during the plaintiff's

12    testimony.

13              MR. MURPHY:  I'm happy to speak with them,

14    Your Honor.  I'm not aware --

15              THE COURT:  You do not have eyes in the back of

16    your head, but there is a great deal of whispering,

17    gestures, notes, and particularly the shaking of heads

18    with respect to the plaintiff's testimony.

19              MR. MURPHY:  Understood.  Is Your Honor going to

20    speak with them or --

21              THE COURT:  Well, I thought they'd be back here

22    by now.

23              MR. MURPHY:  I don't know if they're stuck in

24    security or --

25              THE COURT:  We'll wait a minute or so.
```

1          MR. MURPHY:  I know my client is just wrapping

2     up in the bathroom.  She should be here at any second.

3          THE COURT:  If that doesn't stop, there will be

4     fewer people in the audience.

5          MR. MURPHY:  Understood.

6          THE COURT:  I want you to make crystal clear to

7     them that that kind of demonstration of their view about

8     the plaintiff or her testimony is completely unacceptable.

9          MR. MURPHY:  Agreed, Your Honor.

10          MR. INTERLANDI:  Your Honor, I have one matter I

11     want to bring to the Court's attention.

12          I'm not sure if you noticed, but I noticed the

13     Juror Number 4 in the front has fallen asleep often during

14     direct.  Just didn't know if there was a way to, I guess,

15     address that with the jurors either now or while they're

16     in recess.

17          MR. MURPHY:  I didn't notice that, Your Honor.

18          THE COURT:  I think there's another juror who

19     is --

20          MR. INTERLANDI:  The gentleman in the back.

21          THE COURT:  -- is a bit groggy as well.

22          MR. INTERLANDI:  I just wanted to bring it to

23     the Court's attention that I noticed.

24          THE COURT:  All right.  I will raise the issue

25     in general.  And I will task Ms. Lewis with going over and

1  Q.   How were you feeling at this time?  Now you've

2  submitted a complaint for what you felt you were being

3  retaliated to suppress your free speech and the false

4  statement made against you, how were you feeling, let's

5  say, now we're now late April, early May of 2021?

6  A.   Still very apprehensive.  Isolated.  Terrified.

7  Q.   So we're in the May 2021 time frame.  Earlier you

8  mentioned you are on Facebook at the time and you had

9  friends and some of them were your co-workers.  Did you

10 lose any of those co-workers as Facebook friends in or

11 around May 2021 time frame?

12 A.   Yes.

13 Q.   Do you recall which Facebook friends you lost?

14 A.   Ms. Alden.

15 Q.   Anyone else?

16 A.   Ms. Cav.

17 Q.   Ms. Cavanaugh?

18 A.   Yes.

19 Q.   So from now on we'll refer to her as Ms. Cav.

20 A.   Okay.

21 Q.   Anyone else?

22 A.   Ms. Morrison.

23 Q.   Tell me anyone else that you lost as a Facebook

24 friend.

25 A.   Um, I believe that's it.

1   A.   List of Concerns.

2   Q.   Did you file a response?

3   A.   Yes.

4   Q.   Is that response contained in Exhibit 8?

5   A.   Yes.

6   Q.   How did you feel at this time when you received a

7   complaint from your son's second grade teacher?

8   A.   Um, frustrated.  Um, voiceless.  Um, scared.

9   Q.   Were all of her concerns, Ms. Alden's concerns about

10  you about you being as a parent or were her concerns a mix

11  of you as a teacher and a parent?

12  A.   It seemed primarily about me as a parent.

13  Q.   Did there come a point in time when Ms. Gethings and

14  Ms. Clarino filed a response to your complaint?

15  A.   Yes.

16  Q.   Do you recall approximately when they responded to

17  your complaint?

18  A.   Um, June.  Mid-June.

19  Q.   Before we get to that, do you know a woman named

20  Phyllis Maffuid?

21  A.   Yes.

22  Q.   Who is Phyllis Maffuid?

23  A.   She's a paraprofessional at Worthington Hooker

24  School.

25  Q.   Is she still a para there?

1    Q.    Were you allowed to or able to do so?

2    A.    I wasn't able to do so because I only received the

3    cover of it.

4    Q.    Did you contact anyone in Human Resources about the

5    retaliatory complaint?

6    A.    Ms. Bonner.

7    Q.    Let's go to Exhibit 12 in the binder.  Let me know

8    when you're there.

9    A.    I'm here.

10   Q.    This is dated June 30, 2021.  And it appears to be an

11   email from you to Ms. Bonner.  Is this an email that you

12   sent to Ms. Bonner?

13   A.    Yes.

14   Q.    Why did you send this email to Ms. Bonner on June 30?

15   A.    Um, well, the school year had ended.  And the

16   investigation hadn't ended.  And I had a lot of concerns.

17   Q.    What were your concerns?

18   A.    Um, I was asking for a copy of the complaint they

19   filed against me so that I could respond.  And I was

20   feeling very, um, nervous about going back to school

21   without figuring -- with these lingering issues from the

22   year before.

23   Q.    Were there any issues that you had concern with as it

24   related to your own complaint that was filed in April of

25   2021?

1  A.   That I was to carry out my duties as a teacher.  You

2  know, conduct myself professionally.  Refrain from

3  discussing the investigation.  Uphold confidentiality.  Be

4  allowed to participate in school-based events.  Be mindful

5  that the administration has to observe me.  And be open to

6  feedback.

7  Q.   Did you receive a draft or a revised draft from

8  Ms. Gethings or Ms. Clarino as it relates to these rules?

9  A.   Yes.

10  Q.   Were there, like, any significant changes or was it

11  the same?

12  A.   Um, I do not remember the specific words, but the

13  change was that I was not to speak about school matters.

14  Q.   So you started working -- was there a finalized

15  draft, a finalized document that everyone agreed to?

16  A.   No.  I believe I sent Ms. Bonner a response basically

17  saying that since this is about the First Amendment and

18  being allowed to speak, I'm unwilling to waive that right.

19  Q.   So now you're teaching first grade.  You mentioned

20  observations.  Who was observing you in your classroom?

21  A.   Ms. Clarino was observing me.  My students.

22  Q.   How often does an assistant principal observe the

23  teachers in the school, in your experience?

24  A.   So, typically, you have two to maybe four

25  observations a year.

1    Q.    How many times did Ms. Clarino observe you from the

2    end of August to the middle of October in 2021?

3    A.    She was in my room very regularly.  And she would sit

4    with her computer taking notes on the observation.  Or

5    appeared to be taking notes.  She could have been doing

6    something else on her computer.

7    Q.    When you say "regularly," are you able to provide the

8    Court with a number of times you think that she observed

9    you?

10    A.    I believe she observed me well over four in the first

11    two months.

12    Q.    Did you think that was strange?

13    A.    Yes.

14    Q.    Why?

15    A.    Um, because I never received any of the written

16    feedback from the observations.  And I felt like it's just

17    not typical to be kind of that scrutinized that early in

18    the year when you're trying to get your footing in a new

19    position.

20    Q.    How were you doing emotionally at this time,

21    September-October time frame 2021?

22    A.    I'm very distressed.

23    Q.    Why?

24    A.    Um, because we never came up with the safeguards for

25    how we were to interact.  Um, it appeared that the

1    teachers so that I could learn from them.

2    Q.   How long did that last?

3    A.   Um, until after February break.

4    Q.   When is February break usually, if you recall?

5    A.   I don't know.

6    Q.   Are you okay?

7    A.   I am.

8    Q.   Did you have a meeting with the HR folks and any of

9    your union representatives in February about the plan for

10   you returning back to full teaching your original first

11   grade class?

12   A.   Um, could you clarify what you mean by "the HR

13   folks"?

14   Q.   Yeah.  Leslie Mack and Taryn Bonner.

15   A.   So in February we had a meeting with the two unions,

16   the administrators union and the teachers union,

17   Ms. Gethings, Ms. Clarino, and myself, because we were

18   attempting to come up with some sort of halfway point

19   since HR hadn't done a mediation yet.

20   Q.   And was there any resolution as you left that

21   meeting?  Was there any decision?

22   A.   Previously, Ms. Gethings had asked me to write a

23   welcome letter.  And the administrators union president

24   asked me not to send it.  I agreed.  And I was seeking to

25   be returned to my job as a teacher, and the administrators

1    whether or not to hire you or any other applicants for

2    that open third grade position at Hooker?

3    A.    Margaret-Mary Gethings.

4    Q.    Did Margaret-Mary Gethings call you or email you to

5    let you know that she was not going to give you the

6    position?

7    A.    No.

8    Q.    When did you learn that someone else got the

9    position?

10   A.    I believe I received an email to Hooker All

11   congratulating the new applicant.

12   Q.    Do you recall approximately when you got that?

13   A.    I don't.

14   Q.    How were you feeling about that at that time?

15   A.    Um, frustrated.  Um, Ms. Gethings had -- well, um, my

16   child had been in third grade and was no longer in third

17   grade which was purportedly the reason why I was moved

18   from third grade.  So now that I didn't have a child in

19   the third grade, I wanted back.  And I saw no reason why I

20   shouldn't at least get an interview.

21   Q.    And yet you're in the summer of 2022, were you

22   planning to -- even though you didn't get the third grade

23   position, were you planning to return to Hooker to teach

24   first grade?

25   A.    Um, I was planning to, but I was also kind of keeping

1    my feelers out because it had been a tough road.

2    Q.    Prior to the end of the 2021-2022 school year, did

3    co-workers talk to you at work?

4    A.    No.

5    Q.    Where do you eat lunch as a teacher at work?

6    A.    In our classrooms.  Um, I was by myself in my

7    classroom.

8    Q.    Were there times in the past where teachers would sit

9    together while they ate lunch?

10    A.    Most definitely.

11    Q.    Did you have any friends at work at that time, the

12    end of the 2021-2022 school year?

13    A.    Um, the paraprofessional that worked in my room was

14    friendly to me.

15    Q.    What was her name?

16    A.    Debbie.

17    Q.    Did you have any interactions with Ms. Alden at the

18    end of that school year, 2021-2022?

19    A.    Yes.

20    Q.    What were your interactions like with Ms. Alden

21    during that time?

22    A.    Um, at one point -- at one point we were having a

23    retirement party for the librarian and I was sitting with

24    my grade level partner.  And then Ms. Alden came up and

25    asked my grade level partner to sit with her.  And

1   everybody got up and moved, um, so that I was sitting

2   alone.

3        Um, I had mentioned to my doctors that, you know, no

4   one said hello to me.  And my doctors or my therapist was,

5   like, "Well, say hello to them first."  I said hello to

6   Ms. Alden.  And then she said, "That's the most

7   unprofessional thing I have ever heard."

8   Q.   Did you reply to her?

9   A.   I cried.

10         THE COURT:  We are in range of taking our

11  afternoon break.  I think this would be an appropriate

12  time to do that.

13         MR. INTERLANDI:  I just have a few more

14  questions in this line, Your Honor.

15         THE COURT:  All right.

16         MR. INTERLANDI:  Thank you.

17  BY MR. INTERLANDI:

18  Q.   At this time Ms. Alden and you are teaching in the

19  Little School together?

20  A.   Yes.

21  Q.   And earlier you testified about her complaint about

22  you that was titled List of Concerns?

23  A.   Yes.

24  Q.   Did any other teachers at either school, Little

25  School, Big School, during the 2021-2022 school year find

1    or receive a copy of her complaint?

2    A.    Yes.

3              MR. MURPHY:  Objection, leading, Your Honor,

4    again.

5              THE COURT:  Sustained.

6              Please rephrase.

7    BY MR. INTERLANDI:

8    Q.    Do you know if any teachers at Hooker found or

9    received a copy of the List of Concerns Ms. Alden filed

10   against you?

11   A.    Yes.

12             MR. MURPHY:  Objection, Your Honor.

13             THE COURT:  I'm going to overrule.  That does

14   not suggest the answer.  It is not otherwise leading.

15             You may ask answer.

16             THE WITNESS:  One day before school I went to

17   make copies.  Right next to the copier is the teacher

18   mailboxes.  And on the table directly below the mailboxes

19   I saw a copy of Ms. Alden's List of Concerns.

20             I immediately took it, went to my room, told the

21   union that it was in plain sight in the office.  And I

22   also noted that it did not contain my rebuttal arguments.

23   It was just her List of Concerns about me.

24             Um, I was later brought into a meeting with

25   Ms. Clarino and Pat DeLucia on Zoom and myself in person

1    where I was told that a paraprofessional had found a list

2    of complaints in her mailbox.  So I was fearful that it

3    had been in other mailboxes I didn't know about.  It

4    seemed to be around the school.

5    BY MR. INTERLANDI:

6    Q.   Did your -- did you or your husband communicate with

7    Ms. Alden during that school year via email, 2021-2022

8    school year?

9    A.   It would have been the -- wait.  Yes.

10   Q.   All right.

11   A.   Wait.  I'm confused.

12   Q.   How about the year before?

13   A.   The year before, we did.

14   Q.   Do you know if any teachers found any email

15   communications that your husband sent to Ms. Alden?

16   A.   Yes.

17   Q.   Who found email communications that your husband sent

18   to Ms. Alden?

19         MR. MURPHY:  Object on the ground of hearsay,

20   Your Honor.

21         MR. INTERLANDI:  I'm not asking her what --

22         THE COURT:  I'm going to permit that question,

23   but I don't know where you're going with it.

24   BY MR. INTERLANDI:

25   Q.   I'm just going to ask if you know who found it.

1  Q.   Why do you feel that way?

2  A.   Um, prior to my advocacy I was -- I had no problems

3  with anyone.  I never sat alone at lunch.  I was involved

4  in every committee I could possibly be involved in.  I

5  loved it there.  I was happy to be at work.  I felt

6  supported.  And after, um, I felt completely alone and,

7  you know, cried before I went to work.

8  Q.   Was your reputation harmed as you were entering the

9  end of that 2021-2022 school year?

10  A.   Yes, I think -- yes.

11  Q.   Why do you believe it was still harmed as you're

12  finishing that school year?

13  A.   Um, because nothing had improved.  People were still

14  not sitting with me, speaking to me.  The list of

15  Ms. Alden's concerns, I didn't know how widely that had

16  been spread.  Ms. Clarino did an investigation on that.

17  Q.   Was there a conclusion as it related to the

18  investigation of the finding of the List of Concerns?

19  A.   No.

20  Q.   Are there any other examples of how you believed your

21  reputation was harmed as you were leaving the end of that

22  school year?

23  A.   Um, well, the retirement party where no one would sit

24  at the same table as me.  The para that worked in my room

25  came and sat next to me.  And then I informed HR of the

1    situation.  And Ms. Clarino did an investigation of that

2    the last day of school.  So it was all the way up to the

3    very end of the school year where things were still

4    unclear and, um, I felt like I couldn't speak to anyone.

5    Um, I was no longer on any committees.  Um, I was --

6    before, teachers would come to me if they had concerns

7    about my children.  Now they didn't.  I felt like I lost

8    my reputation as a teacher, I lost my role as a parent.

9    And, yeah, the last day of school I was -- I was alone

10   cleaning up while everyone else was celebrating and happy.

11        There was a teacher who was pregnant.  They had a

12   baby shower.  They didn't invite me, but it was, you know,

13   right before school in the school building.  Yeah, it

14   never ended.

15   Q.   Did you receive any notification about the conclusion

16   of Ms. Clarino's investigation about the retirement party?

17   A.   Um, no.

18             MR. INTERLANDI:  Your Honor, I'm at a point

19   where I would like to introduce certain exhibits that were

20   part of an objection.  I'd like to make my offer.

21             THE COURT:  I'm going to ask you to skip that to

22   another area, if you can.  Okay?

23             MR. INTERLANDI:  Yes.

24             THE COURT:  We will take up the disputed

25   documents after the jury leaves and be prepared to return

1  Q.   Okay.  Was there a specific reason why you were

2  seeing Dr. Berger for eight years?

3  A.   Um, yeah.  It was maintenance for PTSD.

4  Q.   Okay.  Was there any significant trauma in your past?

5  A.   Yes.

6  Q.   What was that trauma?

7  A.   As a child I was habitually sexually abused.  Um, and

8  in 2001 my father was murdered.

9  Q.   And what did Dr. Berger do for you?  Like, what kind

10  of doctor is he?

11  A.   Um, so he prescribed medication and used talk

12  therapy.  I had been stable.

13  Q.   And did there come a time where you had to look for a

14  new therapist?

15  A.   Yes.

16  Q.   Why did you do that?

17  A.   Dr. Berger retired.

18  Q.   So he retired and did you find someone to replace

19  him?

20  A.   Yes.

21  Q.   And who did you find?

22  A.   Dr. Levin.

23  Q.   And was Dr. Levin the same type of doctor that

24  Dr. Berger was for you?

25  A.   Um, she prescribes medication and has short sessions.

1    Um, but she does not do as much talk therapy.

2    Q.    Do you recall when you started treating with

3    Dr. Levin?

4    A.    No.

5    Q.    Please turn to Exhibit 30 in your binder and look at

6    Exhibit 30.  Let me know if that refreshes your memory.

7    A.    It appears I started on April 28, 2020.

8    Q.    And how were you paying for Dr. Levin's services?

9    A.    Um, partially my health insurance, partially me.

10   Q.    And did it take you a while?  This is during COVID,

11   it appears.  Did it take you a while to find a therapist

12   after Dr. Berger closed his practice?

13   A.    Yes.

14   Q.    How long had you been looking for someone after he

15   closed his practice?

16   A.    I don't believe that there was a large gap between

17   when Dr. Berger -- my last session with Dr. Berger, but he

18   informed me that he was going to retire, like, six months

19   ahead of time.  During COVID, it was very hard to find a

20   new provider just because there was so much need.  There

21   was just wait lists.

22   Q.    And earlier we talked about you mentioned someone

23   named Nicole Ventura?

24   A.    Yes.

25   Q.    When did you start seeing Nicole Ventura?

1    A.    It varied.  So whenever my work schedule allowed, it

2    was twice a week.

3    Q.    Is Ms. Ventura a doctor?

4    A.    Um, no.

5    Q.    What is her license in?

6    A.    Um --

7    Q.    If you know.

8    A.    I don't know the letters after her name.  But she was

9    working under Dr. David Read at the PTSD center.

10   Q.    Okay.  And you continue to see or treat with

11   Dr. Levin today?

12   A.    Yes.

13   Q.    Do you continue to see or treat with Ms. Ventura

14   today?

15   A.    Yes.

16   Q.    Is Ms. Ventura still at the PTSD center?

17   A.    She recently started her own practice.

18   Q.    And so when you went to Ms. Ventura initially at the

19   PTSD center, what were you talking to her about at that

20   time?

21   A.    Um, I hoped to address my childhood trauma.

22   Q.    Were you able to do that with her?

23   A.    Somewhat, but no.

24   Q.    Why not?

25   A.    Um, because the past had to take a back burner to the

1    present.  Um, so I wasn't able to address those issues

2    because I needed to address the problems I was facing that

3    day.

4    Q.    And what was happening, as you refer to, in the

5    present?

6    A.    The feelings of depression and isolation.  Um, the

7    intrusive suicidal thoughts.  Um, feeling like I've lost

8    my standing professionally and as a mother.

9    Q.    Do you attribute those feelings to anyone or anything

10   in particular?

11   A.    Um, I believe that it was an unsafe environment at my

12   school.  Um, I believe that -- I had to make the decision

13   every morning if I valued my job over my safety.  And

14   every day that I chose to value my job over myself, it

15   diminished myself to me.  I became a victim of abuse

16   instead of a survivor of abuse for the first time in

17   20 years.

18   Q.    Since the end of the 2021-2022 school year, have you

19   talked at any Board of Education meeting?

20   A.    No.

21   Q.    Have you advocated for any changes or plans within

22   the school district?

23   A.    No.

24   Q.    Is there anything else that you used to do that

25   you're no longer able to do today?

1     will not have to go through this whole argument in front

2     of the jury, and I will be listening to see if I've heard

3     anything more that connects the nasty notes with the

4     defamatory statement a year and five months earlier.

5              Okay.  Anything else to take up?

6              MR. INTERLANDI:  I have a few, Your Honor.

7              I have a question concerning use of the

8     Berchem Moses reports for the limited purpose of

9     impeaching witnesses for statements that they provided to

10    the investigators during their interviews.  I would like

11    to use those reports for that limited purpose.  And given

12    Your Honor's ruling on the findings and the attorneys

13    testifying, I just was seeking some clarification if I

14    would be able to do so.

15             THE COURT:  So you're talking about witnesses

16    down the road.

17             MR. INTERLANDI:  Yes.

18             THE COURT:  Who are they, specifically?

19             MR. INTERLANDI:  Ms. Clarino, Ms. Gethings,

20    Ms. Maffuid, Mr. Salem, Mr. Shortt, and Ms. Alden.

21             THE COURT:  And would it be fair to say that

22    only Clarino and Gethings are party opponents?

23             MR. INTERLANDI:  I would also add Ms. Bonner to

24    the extent, I don't recall if -- actually, scratch that.

25             Ms. Clarino is not a party in the case.

```
 1              THE COURT:  She's not a party, but she is an
 2    agent of the Board of Education.
 3              MR. INTERLANDI:  Yes, I agree.
 4              THE COURT:  So she is, for the purposes of the
 5    use of her statements, a party.
 6              MR. INTERLANDI:  Yes.
 7              THE COURT:  Okay.  But these other people
 8    aren't.
 9              MR. INTERLANDI:  They are not.
10              THE COURT:  What is your intended inquiry of the
11    other people?
12              MR. INTERLANDI:  Well, Mr. Shortt and Salem are
13    my witnesses.
14              THE COURT:  Right.
15              MR. INTERLANDI:  I don't intend to ask them
16    questions about that, but if they testify in a manner that
17    is inconsistent, I would like the opportunity to use that.
18    And defense counsel has claimed I believe Mrs. Alden and
19    Maffuid as their witnesses.
20              THE COURT:  Okay.  So your purpose and your
21    anticipated proffer, I guess, is to use the statements of
22    some or all of these nonparty witnesses to impeach what
23    they are saying in their testimony here?
24              MR. INTERLANDI:  Yes, Your Honor.  If they say
25    something that is inconsistent with what they provided to
```

```
 1   going through?
 2   A.   There were some threatening notes left.  She was
 3   being bullied.
 4   Q.   Anything else?
 5             MR. MURPHY:  Your Honor, I object to that
 6   testimony.
 7             THE COURT:  Overruled.  He's just answering the
 8   question.
 9             Go ahead.
10   BY MR. INTERLANDI:
11   Q.   You said bullied.  Anything else?
12   A.   She just felt like she was being treated unfairly.
13   Q.   Do you recall by whom she felt that she was being
14   treated unfairly?
15   A.   Some staff.  Some administration.
16   Q.   Do you remember any of the administration, in
17   particular?
18   A.   She had mentioned Assistant Principal Clarino and
19   Principal Margaret-Mary Gethings.
20   Q.   As the executive vice president of the union, what
21   was your role?
22   A.   My role was to support Jessica, to try to attend any
23   meetings or hearings, and to try to bring this to some
24   kind of resolution.
25   Q.   Did there come a point in time when you became aware
```

1      Going back a second, you said you worked well with

2   Principal Gethings, correct?

3   A.   Yes.   In the past we've sat on some committees

4   together.

5   Q.   Okay.   Is it fair to say that Ms. Light was sending

6   you emails on her concerns, right?   You've testified to

7   that?

8   A.   Yes.

9   Q.   And is it fair to say you were also communicating

10   with Principal Gethings and Ms. Clarino about this issue?

11   A.   Correct.

12   Q.   By email?

13   A.   Correct.

14   Q.   Okay.   On those emails you didn't copy Ms. Light,

15   right?

16   A.   No.   They were phone conversations just trying to see

17   where we were in the process, if mediation was a

18   possibility.   I actually reached out to their union

19   president, Ms. Coleman, to see if we could work together

20   to try to get this issue resolved.

21   Q.   Right.   And there were conversations with

22   Ms. Coleman, right?

23   A.   Oh, yes.

24   Q.   How many?   More than five?

25   A.   I don't think so.   No.   Less than five.

1    Q.   At some point, as you testified before, a mediation

2    was scheduled, right?

3    A.   Correct.

4    Q.   And that was -- was that paid for by the Board?

5    A.   I think so, yes.

6    Q.   It was with a private attorney, correct?

7    A.   I forget his name.

8    Q.   Gregg Adler?

9    A.   Yes.

10   Q.   Okay.  And what was the purpose of that mediation?

11   A.   To try to come to some kind of resolution to see

12   where we could go, what next steps would be.

13   Q.   Okay.  Is it fair to say at that mediation Ms. Light

14   had concerns about Principal Gethings and Ms. Clarino but

15   Ms. Clarino and Principal Gethings also had concerns about

16   Ms. Light, and the purpose was to mediate both sides'

17   concerns, right?

18   A.   Correct.

19   Q.   And you said before you've been involved in a lot of

20   mediations through the grievance process, right?

21   A.   Yes.

22   Q.   I know it's slightly different, but mediation is

23   mediation, and oftentimes mediations don't come to a

24   conclusion, right?

25   A.   Unfortunately, yes.

```
 1   notes?
 2   A.   I didn't use the word "popped in."
 3   Q.   How would you describe it, then?
 4   A.   Entered and sat in the back.
 5   Q.   So she entered your classroom four times and took
 6   notes.  And you took those to be observations, right?
 7   A.   Correct.
 8   Q.   At the time you were new to the Little School?
 9   A.   Correct.
10   Q.   All right.  At the time did you know if that was
11   standard practice at the Little School?
12   A.   I know that there were other teachers new to the
13   Little School that did not have this experience.
14   Q.   When you're in your classroom you know when
15   Ms. Clarino is in your classroom, right?  Obviously.
16   A.   Yes.
17   Q.   All right.  And while you're teaching you would not
18   know if Ms. Clarino was in other classrooms, right?
19   A.   Correct.  I -- correct.
20   Q.   Ms. Light, I'd like to ask you a little bit about
21   your claim for damages in this case, a little bit about
22   your emotional distress.
23        I understand you're making a claim for emotional
24   distress damages, right?
25   A.   Correct.
```

1   Q.    Do you recall the next meeting that you recorded?

2   A.    My mid-year TEVAL.

3   Q.    And why did you record that?

4   A.    Um, because at this point I had already felt a lot of

5   instances of retaliation.  I had previously had meetings

6   with Ms. Gethings, um, that I felt were inappropriate.

7   And I felt that it was just, again, going to be only me

8   and Ms. Gethings in the room.  But Ms. Clarino was there.

9   Q.    You were also asked about the March 31, 2021, meeting

10  with Ms. Cavanaugh and others.  Why did you feel it

11  necessary to record that meeting?

12  A.    Because at this point things have gotten ridiculously

13  hard to manage.  Um, this is -- that was the third meeting

14  I had with Ms. Gethings about Ms. Cav.  I was -- I

15  wanted -- I wanted proof of what was happening outside of

16  my own testimony.

17  Q.    Do you recall the next meeting that you recorded?

18  A.    Um, the meeting with Ms. Gethings, Ms. Clarino,

19  myself, and the union president, I believe.

20  Q.    Do you recall the subject matter that was discussed

21  during that meeting?

22  A.    Um, the beginning of it is Ms. Gethings' explanation

23  for my removal from committees.  And then I expressed my

24  concerns.  And we were trying to come to a conclusion so

25  that I didn't have to file a complaint.

```
 1              THE COURT:  All right.  Are we finished with
 2   Ms. Light?
 3              MR. INTERLANDI:  Just some follow up, if I may.
 4              THE COURT:  Okay.
 5              MR. INTERLANDI:  Thank you, Your Honor.
 6
 7                    FURTHER REDIRECT EXAMINATION
 8   BY MR. INTERLANDI:
 9   Q.   Was Debbie your paraprofessional before you decided
10   to take the opportunity at Ross?
11   A.   Um, she was reassigned.
12   Q.   Was that before you made the decision to accept the
13   offer the Ross?
14   A.   Yes.
15   Q.   She was reassigned by whom?
16   A.   Um, administration.
17   Q.   Administration where?
18   A.   At Hooker.
19   Q.   Who was the administration at that time?
20   A.   Ms. Gethings and Ms. Clarino.
21   Q.   Did anyone in the administration investigate the
22   notes that you found in your first grade classroom in
23   August of 2022?
24   A.   I -- Pat told me that Ms. Clarino was investigating
25   and Officer Reddish would be involved.
```

```
 1   A.   Yes.

 2   Q.   You support her?

 3   A.   Yes.

 4   Q.   All right.  And I think you said before one of your

 5   roles as a husband is to want to make everything okay,

 6   right?

 7   A.   Yeah.

 8   Q.   You are a creative director?

 9   A.   Correct.

10   Q.   You're not an educator?

11   A.   No.

12   Q.   Not a certified administrator?

13   A.   No.

14   Q.   Never worked in a public school?

15   A.   Nope.

16   Q.   You testified a little bit about some meetings you

17   had regarding Wesley and Ms. Alden, correct?

18   A.   Correct.

19   Q.   And in those meetings it was you and Principal

20   Gethings and Ms. Clarino and your wife?

21   A.   Correct.

22   Q.   And then we've heard -- I know you've been here, so

23   you've heard testimony about a lot of other events at

24   Worthington Hooker, right, other meetings?

25   A.   Yes.
```

1       Q.    Did she tell you why she felt -- did she tell

2  you why she wasn't comfortable?

3       A.    Nothing had been done.

4       Q.    The other signature who else signed?

5       A.    This is Dr. David Read Johnson.

6       Q.    Why did he also sign off on that letter, if you

7  know?

8       A.    At the time that this was written, I was not

9  fully licensed.  I had my associate license so he signed

10 off because he's fully licensed.

11      Q.    I see next to your name there's the designation

12 MA and what does that stand for?

13      A.    A Masters of Arts.

14      Q.    Is there anything in this letter that you

15 disagree with today?

16      A.    No.

17      Q.    Sitting here today, is what you put in this

18 letter your professional opinion as to the exacerbation

19 of Ms. Light's symptomatology at this time?

20      A.    Yes.

21      Q.    Do you recall the time frame when you drafted

22 this letter?

23      A.    January of 2022.

24      Q.    What was Jessica's exacerbated symptomatology at

25 the time you wrote this letter?

1    A.    Increase in anxiety, difficulty concentrating,

2  intrusive thoughts, nightmares, difficulty sleeping.  A

3  number of additional posttraumatic stress symptoms.

4    Q.    Did Jessica's exacerbated symptomatology

5  continue after this letter?

6    A.    Yes.

7    Q.    Do you have an opinion as to why it continued?

8    A.    She remained in what she perceived as a hostile

9  work environment.

10    Q.    As relates to your continued treatment of

11  Jessica after this letter, do you have any opinion as to

12  the cause of Jessica's exacerbated symptomatology?

13    A.    Yes.  Her experience of her workplace being

14  hostile.

15    Q.    At any point during your treatment of Jessica,

16  did you tell her it was okay for you -- for her to send

17  you text messages or emails?

18    A.    Yes.

19    Q.    Why did you tell her that it was okay to do

20  that?

21    A.    Oftentimes with my clients I will say that they

22  can email primarily if they need space to kind of express

23  something in between sessions because I don't work 24-7

24  and that's somewhat of a journal for people.  Text

25  messages are primarily reserved for scheduling or if you

1   need immediate response from me which still could not be

2   the case.

3        Q.   Did there come a point in time in your treatment

4   of Jessica that she began to text message or email you?

5        A.   Yes.

6        Q.   And did there come a point in time when

7   the --withdrawn?

8             What was the frequency of the messages that you

9   received from Jessica in the early part of your treatment

10  from March 2021 to let's say August of 2021?

11       A.   Infrequent.  I would say primarily scheduling.

12       Q.   How about after that point around the time that

13  you wrote the FMLA certification that we talked about

14  earlier, did the frequency increase?

15       A.   I would say so, yes.

16       Q.   Do you have an understanding of why the

17  frequency of the messages increased?

18       A.   Yes.  Jessica was struggling greatly at the time

19  and was expressing her anxiety, her depression, her

20  whatever she was experiencing.

21       Q.   Did you charge Jessica?  Was Jessica charged for

22  the emails or text messages that she sent to you?

23       A.   No.

24       Q.   Do you think Jessica was emailing and texting

25  you because that was free?

1          MR. INTERLANDI:  The second page of Exhibit 268,

2     Light 268.

3          MR. MURPHY:  Thank you.

4     BY MR. INTERLANDI:

5     Q.    And then if you go to 272 in that document at

6     the bottom in the right hand corner is 00272.  The date

7     is July 14, 2021.  Do you see that?

8     A.    I do.

9     Q.    Above the line that says DYS.  It says overall

10    severity.  Do you see that?

11    A.    Yes.

12    Q.    What does that mean?

13    A.    My perception of how a client's symptoms are

14    impacting their day-to-day life.  So there are three

15    options mild, moderate, and severe.

16    Q.    What does mild mean?

17    A.    Mild is that it is less than their baseline in

18    my opinion and they are able to function with a bit more

19    breath.

20    Q.    What about moderate?

21    A.    Moderate I would consider to be their baseline

22    of interference.

23    Q.    And how about severe?

24    A.    When it becomes either unmanageable or greatly

25    significantly impacting their ability to exist day to

1    day.

2        Q.    During your treatment of Jessica, did the

3    overall severity stay the same or did it change?

4        A.    It varied.  It definitely was moderate for a

5    good chunk, but she did go to severe on a few occasions.

6        Q.    Do you have an opinion as to why it changed?

7        A.    Yes.  So primarily, it was her experience of

8    either what was happening in the school when she was

9    there.  This specific time I'm seeing is July 21, 2021.

10        Q.    Is that in the middle of the page?

11        A.    It is.  I have marked severe.  She had suicidal

12    ideations as well.  If memory serves, that was during the

13    time that it was being determined whether or not Jessica

14    was going to be moved from third grade to first grade at

15    Hooker.

16        Q.    For the line that we have been talking about,

17    which are the words there were checked off?

18        A.    Cognition, mood, work and relationship.

19            MR. INTERLANDI:  Thank you, Ms. Ventura.  I do

20    not have any further questions for you.

21            THE COURT:  Cross-examination.

22    CROSS-EXAMINATION BY MR. MURPHY:

23        Q.    Good morning, Ms. Ventura.

24        A.    Good morning, Mr. Murphy.

25        Q.    I will jump to a few points that you raised on

1    there other issues besides Worthington Hooker and besides

2    her childhood that you discussed that have an impact on

3    her emotional state?

4         A.   Yes.

5         Q.   Is there anything specifically as you sit here

6    that you recall?

7         A.   The impact that Worthington Hooker School and

8    her past trauma has on her current relationships whether

9    that's with her husband, whether that's with her family,

10   her community.

11        Q.   And have there been specific incidents between

12   her and her husband that you addressed that have caused

13   her significant emotional distress?

14        A.   Yes.

15        Q.   Those are actions by her husband towards her?

16        A.   Yes.  Or lack thereof.

17             MR. MURPHY:  With that, Your Honor, I don't have

18   any other questions.

19             THE COURT:  All right.  Redirect.

20             MR. INTERLANDI:  Yes, Your Honor.

21   REDIRECT EXAMINATION BY MR. INTERLANDI:

22        Q.   Hello again.  I few follow-up questions for you,

23   Ms. Ventura.

24             In part of your education and training, were you

25   ever trained to do your own independent investigation

1    intimate, proximate, familial.

2        Q.    How about co-workers?

3        A.    Yeah, of course.

4        Q.    So if you checked off work, what would that mean

5    specifically then?

6        A.    On the instances that I checked off work, it was

7    when Jessica's experience of her job was causing her

8    significant distress.

9        Q.    Give me one minute.  During the initial

10   assessment or initial intake, did Jessica discuss with

11   you why she had been looking for a new therapist, someone

12   to do therapy with?

13       A.    Yes.

14       Q.    Why?

15       A.    Her previous therapist had retired.

16       Q.    At that time, did the PTSD Center have a lot of

17   openings for patients or was it difficult to get an

18   appointment with you or someone else?

19       A.    I can only speak to my own availability, but I

20   did have availability to accept new clients at that time.

21           MR. INTERLANDI:  I don't have any further

22   questions for you.  Thank you.

23           THE COURT:  Anything further?

24           Ms. Ventura, you are excused.  Please call your

25   next witness.

1   Q.   Sitting here today, is what you put in this

2   email on January 14, 2022 about the events that triggered

3   Jessica's anxiety, depression and PTSD your professional

4   opinion, based upon a reasonable degree of medical

5   probability?

6   A.   Can you rephrase?

7   Q.   Is what you put in this letter, sitting here

8   today, about the events that triggered Jessica's,

9   anxiety, depression and PTSD, your professional opinion,

10  based upon a reasonable degree of medical probability?

11  A.   That these were --

12  Q.   The events triggered Jessica's anxiety?

13  A.   Yes, or exacerbated it, yes.

14  Q.   Or exacerbated it.  What does exacerbate mean?

15  A.   Makes worse.

16  Q.   The events that you are referring to were listed

17  in that second paragraph where it says on 5-12-2021?

18  A.   Correct.

19  Q.   You said that she began feeling she was pushed

20  out for being outspoken for what COVID protocols should

21  be in place?

22  A.   Yes.

23  Q.   You also stated that she reported being taken

24  off committees and having her regular third grade

25  teaching assignment taken from her and given first grade

1    Q.   What was that time frame if you can let the jury

2    know?

3    A.   Sometime beginning of September.

4         THE COURT:  What year?

5         THE WITNESS:  2021.

6    BY MR. INTERLANDI:

7    Q.   So September of 2021.  And after you were

8    elected union steward if you are at Worthington Hooker

9    School, did you have a meeting with Ms. Gethings and Ms.

10   Clorino in October 2021?

11   A.   Yeah.  That sounds right.

12   Q.   During that meeting you had with them, did they

13   mention Jessica Light to you?

14   A.   They did.

15   Q.   What did they say?

16   A.   So they said they had some concerns there were a

17   couple of teachers that had concern that Jessica and I

18   were going to try to basically take them out as

19   administrators.

20   Q.   Take them out as Ms. Gethings and Clorino?

21   A.   Yes.

22   Q.   Did you have a response to that when they told

23   you that?

24   A.   I don't remember exactly what my response was.

25   But I know my heart kind of dropped because that's not.

1    But some classes were each having their printer to be

2    able to print from their computers so that was kind of

3    nice.

4        Q.    Were teachers in other grades in that building

5    able to print to your printer in your classroom?

6        A.    Not that I'm aware of.  I never had that happen.

7        Q.    Did anyone in your experience at teaching third

8    grade at Hooker, did any of your colleagues print

9    documents or a document to your printer in your

10   classroom?

11       A.    I don't believe so, no.

12       Q.    Did Jessica Light ever tell you she was going to

13   print something from your classroom to your printer?

14       A.    No.

15       Q.    At that time, the 2020-2021 school year, when

16   you were back to in-person learning, did Jessica Light

17   have a printer in her classroom?

18       A.    I believe so.  I think so.

19       Q.    And there came a point in time when Ms. Light

20   was no longer your grade level partner; is that right?

21       A.    Mm-hmm.

22       Q.    Who became your new grade level partner?

23       A.    So at that time we had Ms. Defabio and Ms.

24   Villaneuva.

25       Q.    Did you ever find any email communications on

1    your printer that were sent from Jessica Light's husband

2    to the administrator at Hooker?

3        A.   There was papers that were on my printer, yes,

4    that were an email with her husband's name on them, yes,

5    to administration, yes.

6        Q.   Do you recall the time frame of when you found

7    those documents on your printer in your classroom?

8        A.   I believe so.  It was the end of summer that

9    following year.  So like setting up class room time

10   period.  I can't be one hundred percent sure of the day

11   that would have been.

12       Q.   Maybe it is 2021-2022 school year?

13       A.   Possibly.

14       Q.   Did you do anything when you discovered the

15   document sitting on top of your printer?

16       A.   I saw David's name.  I called her and told her

17   there's papers that have been accidentally left.  I

18   didn't think of how.  I'm not reading a document that has

19   her husband's name on it.  So I didn't think anything of

20   it.  I called her.  She came to get the papers.  That's

21   it.  I didn't read.  Not my business.

22       Q.   Where was Ms. Light, if you know, at time you

23   called her?

24       A.   Over at the other building.

25       Q.   That's the other Worthington building.  You

1    A.   I don't specifically, but I don't have any

2    reason to believe that I didn't.

3    Q.   In this email, you told her that a witness had

4    been tainted, isn't that true?

5    A.   That's what it says here.

6    Q.   You never replied to her and said I never said

7    that, correct?

8    A.   I don't recall if I responded to this particular

9    email.

10   Q.   Did you ever tell anyone there was something

11   about the investigation that you felt was professionally

12   concerning to you?

13   A.   I did.

14   Q.   Do you recall when I took your deposition

15   probably let's say February 17, 2023?

16   A.   I do.

17   Q.   You told me back then there was something that

18   you believe was professionally concerning to you.  What

19   was that?

20   A.   In Ms. Light's complaint there was several

21   examples of what she felt were retaliatory acts from the

22   administration. There was a countercomplaint or rebuttal

23   from the administration to Ms. Light's initial complaint

24   that there was -- I can't recall the name but a male

25   teacher who was identified as a witness to one of those

1    A.    Yes.

2    Q.    What was that decision?

3    A.    I was directed to reach out to legal counsel to

4    express my concern and to get feedback.

5    Q.    And then what happened next?

6    A.    I reached out to an attorney, got some feedback.

7    And that's all that happened.

8    Q.    Did you continue the investigation of Ms.

9    Light's complaint?

10   A.    Ultimately I did not.  I can't remember the

11   exact date that I stopped and someone else started.  But

12   no, I did not continue the investigation.  I didn't

13   complete the investigation.

14   Q.    Who completed the investigation?

15   A.    The district hired an outside law firm.  Berchem

16   and Moses to complete the investigation.

17   Q.    Did there come a point in time that they

18   completed the investigation?

19   A.    Yes.

20   Q.    Do you recall approximately when that occurred?

21   A.    The end of 2021.

22   Q.    Do you recall when Ms. Light filed her

23   complaint?

24   A.    Spring of 2021.

25   Q.    From the Spring of 2021 to the end of 2021, did

1    Q.    At the top of each of those, it has like a blank

2    line where it looks like someone would fill in their

3    name.  Is that what it was meant for?  For example on 9-3

4    at the top, we blank and blank the administration.  Do

5    you see that?

6    A.    I believe that was the intention.

7    Q.    Was it the intention for that to be completed by

8    Ms. Gethings and Ms. Clorino?

9    A.    Yes.

10    Q.    Did any of the parties ever sign their name to

11    these Rules of Engagement?

12    A.    From my recollection, we were unable to get an

13    agreement so, no, I don't believe any of them signed it.

14    Q.    So then the school year started without any

15    rules in place.  Is that fair to say?

16    A.    Not with any special rules that were drafted in

17    this document so no.

18    Q.    No.  But is it fair to say there were no rules

19    of engagement specific to how the parties would engage

20    with each other as they started the new school year,

21    correct?

22    A.    I would say the expectation was for them to be a

23    regular employee.  The same rule that would apply for any

24    teacher and administrator.

25    Q.    Then you state the investigation was completed

1    with teacher discipline at times?

2        A.    Yes.

3        Q.    Have you as principal of Worthington Hooker

4    School issued formal discipline to teachers?

5        A.    At Worthington Hooker School, I have not had to

6    issue formal discipline.

7        Q.    Were you a principal before you became the

8    principal of Worthington Hooker School?

9        A.    I was.

10       Q.    Where were you the principal?

11       A.    I had the privilege of being the principal at

12   Fair Haven School in New Haven as well as Sliney School

13   in Branford.

14       Q.    As the principal, have you also been involved in

15   any grievance issues with teachers?

16       A.    I have never had a grievance.

17       Q.    Fantastic.

18            THE COURT:  Why don't we stop there.

19            We'll see you back tomorrow morning at 9:00.

20   Don't discuss your testimony with anyone.  We'll wish the

21   jurors a fine evening.

22            (In the absence of the jury at 4:00 p.m.)

23            THE COURT:  Counsel, I will next hear from you

24   with respect to your responses, if any, to the charge and

25   verdict form that I scheduled under the schedule that I

1    have outlined.  How long do you think?  You may step

2    down.  How long do you anticipate if you can anticipate

3    Ms. Gethings' testimony?

4            MR. MURPHY:  I don't know.  I'm trying to be

5    as -- I'm hoping not to get to lunch tomorrow.  I don't

6    think I will be all that long with Principal Gethings

7    before lunch.

8            THE COURT:  I realize you haven't heard the

9    direct, but any idea how long your cross-examination will

10   be?

11           MR. INTERLANDI:  It really does depend.  I would

12   say about an hour, give or take, maybe less, probably

13   less, half an hour.

14           THE COURT:  All right.  And after she concludes,

15   you have no further witnesses?

16           MR. MURPHY:  I might call Hilarie Alden and

17   Ms. Clorino.  I need to think about that in light of the

18   testimony.  Given how fast we're going now, I don't

19   expect either of those witnesses to be very long.

20           THE COURT:  Have you have rebuttal witnesses?

21           MR. INTERLANDI:  I haven't made that decision

22   yet, Your Honor.

23           THE COURT:  Very well.  See you tomorrow at

24   nine.

25           (Whereupon, the above trial day concluded at

```
 1              (Call to order, outside the presence of the jury,

 2     9:03 a.m.)

 3              THE COURT:  All right.  Please be seated.

 4                   (Court reporter interruption.)

 5                   (Discussion off the record.)

 6              MR. INTERLANDI:  I would have to double-check

 7     Judge Meyer's ruling.

 8              THE COURT:  Okay, please do.  And let's keep

 9     that profound distinction at the forefront of our minds

10     for our charge conference which I presume will take place

11     this afternoon.

12              In terms of your witnesses, you all were going

13     to be considering who you would be calling today, and

14     Mr. Interlandi had not reached a decision after we

15     complete the testimony of Gethings.  Will you have -- no,

16     it's on your case.

17              MR. MURPHY:  My case, Your Honor.

18              THE COURT:  And do you have additional

19     witnesses?

20              MR. MURPHY:  Well, we have Principal Gethings

21     and then, depending on how that goes, potentially

22     Assistant Principal Clarino, and I believe that's it.

23              THE COURT:  And do you have any rebuttal that

24     you currently are prepared to announce?

25              MR. INTERLANDI:  I am not currently prepared to
```

1    A    They were countless.  She spent hours creating an

2    amphitheater.  She worked very closely with our common

3    ground teachers for classes.  She participated -- I had

4    started some cleanup days.  Her family and she was always

5    a part of the cleanup days.  She brought her classroom

6    outside to learn very often.  She wrote a grant for some

7    outdoor seating and mats.  Very active.  Very grateful for

8    what she did.

9    Q    Did you ever tell Ms. Light that she could not be

10   part of the gardening committee?

11   A    Never.

12   Q    There was a -- who is Doug Jones?

13   A    Mr. Jones is a seventh and eighth grade teacher.

14   Q    Okay.  And did he ever become involved with the

15   gardening committee in the 2021/2022 school year?

16   A    One day and done.  He -- Mr. Jones was getting his

17   administrative degree, which is called an 092, and he had

18   an obligation to do ten hours of community service.

19        At the time, it was parallel to a desperate need for

20   a spring cleanup, which typically I organized or

21   Ms. Clarino.  And we do a SignUpGenius.  Families come up

22   for both campuses.

23        So I charged him with, you take the day, you organize

24   it, get a group to volunteer to help, connect to Lowe's,

25   get some plants donated, get some leaf bags donated, have

1    Q    Are you aware that Ms. Alden submitted a list of

2    concerns about Ms. Light?

3    A    Yes.

4    Q    Okay.  And are you aware that Ms. Light alleges that

5    a copy was found in a mailbox in 2022?

6    A    Yes.

7    Q    Okay.  Did you know about that at the time, meaning

8    were you informed of that at the time?

9    A    I was informed, but not in school.

10   Q    Okay, where were you?

11   A    In Providence, Rhode Island.

12   Q    And how can you be sure of that?

13   A    It was my son's graduation.

14   Q    Okay.  And do you recall who informed you of this

15   document allegedly being found in a mailbox?

16   A    Ms. Clarino.

17   Q    Did you put that document in the mailbox?

18   A    No.

19   Q    Do you recall what steps Ms. Clarino took when she

20   was informed about Ms. Light's concerns?

21   A    Yes.

22   Q    Would she have reported that to you, as the building

23   principal?

24   A    Yes.

25   Q    Did she report that to you?

```
1    A    Yes.

2    Q    All right.  And what did she report to you?

3    A    She reported that she spoke with Ms. Light and

4    Mr. Delucia.  She looked into getting details and finding

5    out how this could be.

6         She looked at the -- talked to the Xerox copy center

7    and I believe took other steps to ensure that people are

8    not leaving documents out in the mailroom, that we're

9    following mail procedures as well as, I believe, looked at

10   the history of the document.

11   Q    Okay.  And moving on to a different topic.

12        The T-Eval meeting, did you attend Ms. Light's

13   mid-year T-Eval meeting in March of 2021?

14   A    Yes.

15   Q    All right.  And did Ms. Clarino attend, too?

16   A    Yes.

17   Q    And why did Ms. Clarino attend that T-Eval meeting

18   with you?

19   A    Ms. Clarino attended the T-Eval meeting -- that was

20   one of several that she had attended or that, simply said,

21   we intended together.

22        We work closely together and we knew that we would be

23   sharing with some teachers that their grade may be

24   changing, and we knew Ms. Light's grade was going to

25   change and that it was probable and likely that she would
```

1    work at the lower building.  And we also had other things

2    that we wanted to discuss with Ms. Light together, so

3    that's why she was there.

4    Q    And at the time, how long had Ms. Clarino been with

5    you at Worthington Hooker?

6    A    That was her second year.

7    Q    Okay.  And at that time, was she in charge of the

8    little school?

9    A    Yes.

10   Q    And if Ms. Light moved to the little school, that

11   would be the building -- would that be the building

12   Ms. Clarino was in charge of?

13   A    Yes.

14   Q    Okay.  When you met with Ms. Light at that time, did

15   you know she was taping the meeting?

16   A    No.

17   Q    Were you ever informed at any of your meetings with

18   Ms. Light that she was taping the meetings?

19   A    Never.

20   Q    Ms. Light claims that T-Eval meeting was a little

21   longer than usual.  Are you aware of that?

22   A    It was.

23   Q    Okay.  And why was it a little longer?

24   A    So it's very interesting.  It wasn't just a T-Eval

25   meeting because at the time, New Haven Public Schools was

1    questions about that, okay?

2    A    Yes.

3    Q    All right.  When during the 2020/2021 school year did

4    you start thinking about grade changes at Worthington

5    Hooker?

6    A    December.

7    Q    And is that -- why do you know that?

8    A    Because I shared it at a staff meeting.  And when you

9    make changes, it's good practice and you want to let

10   people know and you want what's best for the whole school.

11       So Ms. Clarino and I were going into our second year

12   of working together, and we were looking at some changes

13   that we would be making.  And I always am very upfront and

14   I said in a December meeting, we anticipate some changes

15   for next year's teaching.

16   Q    Okay.  And did you ultimately make some changes for

17   next year's teaching?

18   A    I did.

19   Q    Okay.  How many changes did you make?

20   A    Three.

21   Q    Okay.  And did one of those involve Ms. Light?

22   A    Yes.

23   Q    And who were the other two?

24   A    So Ms. Tortora was moved from first grade to

25   kindergarten.  Ms. Villanueva was moved from second grade

1    days she should be in certain subjects, rather?

2    A    I did.

3    Q    All right.

4    A    Or we did.

5    Q    Okay.  When you say, "we," who's "we"?

6    A    Ms. Clarino and I.

7    Q    Okay.  And then in regards to those seven bullet

8    points you listed, how did you come up with those topics

9    that you list in those bullet points?

10   A    They're just common sense of priorities that if you

11   are walking in after not being with your students, you

12   would want to know where they're reading, where they are

13   on their math levels, what they've been exposed to.

14        We had a new primary resource of i-Ready, and I

15   wanted her to meet the district coordinator and feel

16   comfortable using the math program.  I'm not sure that she

17   had had a lot of time with it.

18        I wanted her to prepare a message to families because

19   we found out that Ms. Light was returning in a very kind

20   of short notice, if you will, and we wanted to share our

21   plan of what we would be doing.

22        And, as we talked about SEL learning, that would be

23   very important to know what first graders had been exposed

24   to, what they might need.  Our "Hooker Happenings" would

25   have a wealth of information for her to get updated and

1    Mr. Delucia?

2    A    I do.

3    Q    All right.  And what is he saying to you in this

4    email?  What did you understand him to be saying to you?

5    A    He was thanking us for a great meeting.  He commented

6    that both Ms. Clarino and I were supportive and welcoming

7    and he recognized, always, that it was not easy for any of

8    us, but this was off to a great start.

9    Q    Okay.  And was this a meeting about Jessica Light?

10   A    Correct.

11   Q    And if we could go back to the first page of that

12   document.

13        All right.  And was this your response to

14   Mr. Delucia?

15   A    Yes.

16   Q    All right.  And did Ms. Light then end up teaching

17   the first grade from her return in February through the

18   end of that school year?

19   A    Yes.

20   Q    Okay.  What was your plan for her for the following

21   school year?

22   A    To remain in first grade.

23   Q    Okay.  And why was that?

24   A    Because I was not making any changes with staff and

25   for her to have -- she had had a limited time in the new

1    our two custodians, and they did not know anything about

2    the note, nor had anyone seen the note.

3    Q    Okay.  And did you ultimately become aware that

4    Ms. Light said she found a second note in her classroom?

5    A    I did.

6    Q    Okay.  And how did you become aware of that note?

7    A    Ms. Clarino.

8    Q    Okay.  And what steps, if anything, did you take

9    after Ms. Clarino informed you of that note?

10   A    Ms. Clarino -- we were informed of the note after

11   Ms. Light left the school, the day that she was

12   transferring, that it was found in her classroom.  And I

13   believe Mr. Delucia was who informed us as well.

14   Q    Okay.  Did you or Ms. Clarino ever determine where

15   that note came from?

16   A    No.

17   Q    Okay.  So, Principal Gethings, at one point, you were

18   informed that -- were you informed that Ms. Light

19   submitted a complaint to human resources?

20   A    Yes.

21   Q    Okay.  And did you ultimately submit a response to

22   that complaint?

23   A    Yes.

24   Q    Or did you submit a document in response to that

25   complaint?

1    the letter to staff at a meeting on November 2, 2022;

2    isn't that true?

3    A    I don't recall --

4              THE COURT:  I'm sorry, you have an objection?

5              MR. MURPHY:  No.

6    Q    (By Mr. Interlandi) Do you recall that I took your

7    deposition on December 19, 2022?

8    A    I do.

9              MR. INTERLANDI:  Your Honor, may I approach?

10             THE COURT:  You may.

11             THE WITNESS:  Thank you.

12   Q    (By Mr. Interlandi) Direct your attention to page 44

13   and let me know when you're there, please.

14   A    I'm there.

15   Q    Do you recall I asked at your deposition, and I said,

16   "And your testimony is that it was on November 2, 2020?"

17        And your answer was, "There was a staff meeting,

18   yes."

19        Is that true?

20   A    We gave it at a staff meeting, yes.

21   Q    So it was not on November 2nd?

22   A    I'm not sure of the date.  It was three years ago.

23   Q    But at the deposition, you told me it was

24   November 2, 2020; right?

25   A    Then that's when it was.

```
1    Q    And that would have been a remote meeting; isn't that
2    true?
3    A    I believe we were in person and outside, actually.
4    I'm not sure.  It may have been a remote meeting.
5    Q    And then you didn't give -- you didn't hand the
6    letter to anyone during that meeting; correct?
7    A    We either handed it or they had already received it
8    from their union.
9    Q    Correct, they already received it from the union, and
10   you testified at your deposition that you were sending a
11   double message; isn't that true?
12   A    I don't know if I used the "double message," but we
13   were messaging with best intention --
14           THE COURT:  If you're -- I'm sorry.  Just one
15   moment.  If you're asking what she said at her deposition,
16   read it.
17           MR. MURPHY:  Can I ask that he allow the witness
18   to finish her response before the next question?  Jumping
19   on top of her.
20           THE COURT:  Okay.
21   Q    (By Mr. Interlandi) Referring you to page 161 of the
22   deposition in front of you, and let me know when you're
23   there.
24           MR. MURPHY:  Which page?
25           MR. INTERLANDI:  161.
```

```
 1              THE WITNESS:  There.
 2    Q     (By Mr. Interlandi) Okay.  My question was, "So I
 3    just heard you say the teachers received it from the
 4    union.  Did they have this letter when the union gave it
 5    to them?"
 6          Do you see that at lines 17 to 19?
 7    A     So what are you asking me?
 8    Q     Do you see the question from lines 17 to 19 that I
 9    asked you at that deposition?
10    A     Yes.
11    Q     Okay.  And you answered, at line 20, "It was a double
12    message"; correct?
13    A     Yes.
14    Q     And you wanted to make sure everybody was aware;
15    right?
16    A     Correct.
17    Q     That not all public speech is protected by the First
18    Amendment; right?
19    A     Yes.
20    Q     And at that time, many teachers were really voicing
21    about not opening schools; isn't that true?
22          Isn't it true?
23    A     What is your question?
24    Q     Isn't it true at that time when you gave out the
25    letter, the AFT letter to send a double message, that
```

1    other teachers were really voicing not opening schools?

2    A    Some.

3    Q    Some?  So I'll direct your attention to the rest of

4    your answer.

5        It says, "It was a double message" -- from lines 20

6    to 23 -- "it was to make sure everybody is aware.  At the

7    time, there were many, not teachers from Hooker School,

8    but teachers were really voicing not opening schools."

9        You said that; right?

10   A    I did.

11   Q    Isn't it true that you had a meeting with Jessica and

12   Ms. Clarino on November 2, 2020?

13   A    I don't recall if that was the date.

14            MR. INTERLANDI:  Your Honor, may I approach to

15   give the witness the plaintiff's exhibit notebook?

16            THE COURT:  Yes.

17   Q    (By Mr. Interlandi) Please turn to Exhibit 23 in the

18   notebook in front of you, and let me know when you're

19   there.

20   A    I'm there.

21   Q    Okay.  And, earlier, you testified that at some of

22   the meetings that you had with Jessica, you learned that

23   she was recording those meetings; isn't that true?

24   A    That's correct.

25   Q    Okay.  And do you see Exhibit 23?  Have you seen this

1   A       Correct.

2   Q       You told me you didn't know that you obstructed the

3   complaint; right?

4   A       That's true.

5   Q       And then, because of sending that email, that it was

6   going to result in it having to be outsourced.  That's

7   what you told me; right?

8   A       Yes, that's -- in December, that's what I thought the

9   reason was.

10  Q       Let's talk about Facebook.

11          Are you familiar with the social media platform

12  called Facebook?

13  A       Yes, I am.

14  Q       Are you on Facebook?

15  A       Yes, I am.

16  Q       Are you friends with Jessica Light on Facebook?

17  A       No, I'm not.

18  Q       Are you friends with Jenny Clarino?

19  A       Yes, I am.

20  Q       Are you friends with Hilarie Alden?

21  A       No, I'm not, I don't think.

22  Q       You don't think so?  Are you sure?

23  A       I'm not positive.  I'm friends with her husband.  I'm

24  not sure I'm friends with her.  I'm pretty inactive on

25  Facebook.

1    answers; right?

2    A    Absolutely.

3    Q    But nowhere in this email did you say, please wait

4    for an answer before you talk to anyone or make any

5    comments at Board of Education meetings; right?

6    A    No.  I wouldn't have said that.  I did say I was

7    going to get an answer and, in the interim, we would

8    follow the existing.

9         And in the staff meeting, we had shared what to do as

10   we shifted from 6 feet to 3 feet.  And, again, those were

11   just recommendations.  They were not requirements.

12   Q    But I think the answer is no, right, it's not in this

13   email?

14   A    I wouldn't tell any teacher not to go to the Board of

15   Ed.  If they want to go, they can go.  But they're not

16   going to get an answer.

17   Q    Four days later, you and Ms. Clarino had a teacher

18   evaluation meeting with Jessica; right?

19   A    We had a meeting, yes, and we did some T-Eval and

20   discussed other things.

21   Q    Right, because this was dated March 22nd and the

22   T-Eval meeting is March 26th; right?

23   A    The dates are -- yeah.  I mean, if you say them, I

24   trust you.

25   Q    Thank you.

1    people -- it sounds familiar.

2              MR. INTERLANDI:  Your Honor, I'm about to move

3    on to another topic.  Do you want me to keep going?

4              THE COURT:  Yes, please.  We'll break at 12:15.

5    Q    (By Mr. Interlandi) Let's talk about Ms. Alden.

6         She's been here every day of the trial; right?

7    A    She has, yes.

8    Q    And you told Ms. Alden about the email that you

9    received from Mr. Bianchine; isn't that true?

10   A    Which email?

11   Q    The email that Mr. Bianchine, Jessica's husband, sent

12   to you and Ms. Clarino about Ms. Alden?

13   A    I'm certain that I would tell any teacher about a

14   parent concern or a parent email.

15   Q    And the email was from Jessica's husband to you and

16   Ms. Clarino because Ms. Clarino had asked him for an

17   update regarding Wesley and Ms. Alden; right?

18   A    We were following up on how the binder was going, how

19   the assignments were going, and checking in.  It is normal

20   protocol.  We pride ourselves on communicating with

21   parents and teachers.

22        So I don't know if that answers your question.

23   Q    It's not normal protocol for a principal and

24   assistant principal to sit in on a parent-teacher

25   conference; right?

```
1    see you back at nine o'clock tomorrow morning.

2              Thank you very much.

3                   (Jury out, 1:43 p.m.)

4              THE COURT:  All right.  Counsel, any motions or

5    anything that we need to consider before we begin our

6    charge conference?

7              MR. MURPHY:  Yes, Your Honor.  Could we just

8    take a -- maybe a ten- or 15-minute break?

9              THE COURT:  Sure.  Fifteen minutes, fine.  We'll

10   stand in recess.

11                  (A brief recess was taken.)

12             THE COURT:  All right.  Please be seated,

13   counsel.

14             I will hear counsel on motions.

15             MR. MURPHY:  I guess that would be me,

16   Your Honor.

17             On behalf of the defendants, I would move for

18   judgment as a matter of law at this time under Rule 50.

19   As Your Honor well knows, judgment as a matter of law is

20   appropriate under Rule 50 when a reasonable jury would not

21   have a legally sufficient basis to find for a party on an

22   issue.  Here, the motion is appropriate on all three

23   counts.  Taking them maybe in reverse order first,

24   Your Honor.

25             Defamation.  As Your Honor knows from our
```

```
 1   upcoming charge conference, there's four elements to a
 2   defamation claim.
 3             THE COURT:  I'm going to stop you just a moment.
 4             MR. MURPHY:  Of course.
 5                 (A brief recess was taken.)
 6             THE COURT:  Mr. Murphy, you may proceed.
 7             MR. MURPHY:  All right.  Sorry, Your Honor.  As
 8   I was saying, as Your Honor knows from the draft charge, a
 9   defamation claim has four elements.
10             Here, the evidence at trial was insufficient to
11   support elements 1 and 4.  In regards to the first
12   element, Ms. Light was required to put on evidence that a
13   reasonable --
14             THE COURT:  Can you talk a little slower?
15             MR. MURPHY:  Sure.
16             THE COURT:  Thank you.
17             MR. MURPHY:  -- a reasonable jury could find
18   that Ms. Gethings made a defamatory statement, which is a
19   false communication that tends to harm the reputation of
20   another.
21             Here, Ms. Light has identified one particular
22   comment from a meeting with Judy Cav, what we've been
23   calling the Judy Cav Meeting, and that statement from
24   Principal Gethings was merely relaying concerns that were
25   in the community.  And it's undisputed that Ms. Cavanaugh
```

1    herself felt that from the transcript that Ms. Light

2    recorded and provided that Ms. Cav thought that Ms. Light

3    may have disclosed her COVID-positive status.  So when

4    Ms. Gethings said something to the effect of, no one has

5    said it was anyone else but you, that was true at the

6    time.  And it's not a defamatory statement.

7            Second, in regards to element 4, that requires

8    Ms. Light to show harm to her reputation from the

9    defamatory statement.  And the evidence at trial,

10   Your Honor, fell short on that count.  It was -- it's

11   undisputed from the evidence that this was a closed Zoom

12   meeting.

13           There was five individuals there:  Two

14   administrators, two teachers, and a union representative.

15   There's no evidence that what that -- that that statement

16   was ever disclosed outside of that meeting or that it

17   harmed Ms. Light's reputation.

18           Now, I understand that Ms. Light presented

19   evidence in this trial concerning, you know, her belief

20   that other things were going on in regards to the school

21   community, but she never tied it back to the defamatory

22   statement.  And I think that's why Your Honor originally

23   precluded the notes that were found in the classrooms,

24   right, purportedly found in the classrooms?  Because there

25   was no evidence tying them back to the alleged defamatory

1    statement.  And we had that whole discussion.  And I think

2    that's true with all the evidence here, Your Honor.

3    There's simply no evidence.

4         And, in fact, look at the individuals who were

5    there.  Judy Cavanaugh, that transcript is replete with

6    statements from Ms. Cavanaugh talking about how they

7    weren't even that friendly beforehand, that she had

8    concerns and that she might not ever trust Ms. Light

9    again.  And those had nothing to do with Principal

10   Gethings' statement in that meeting.  And Ms. Light

11   acknowledged that, saying she would work hard to repair

12   her relationship with Ms. Cavanaugh at the end of that

13   meeting.

14        Second, Ms. Morrison.  Ms. Light has not shown

15   any impact from Ms. Gethings' statement on her

16   relationship with Ms. Morrison.  In fact, I believe I

17   heard her attorney argue this morning that Ms. Morrison

18   already had concerns about Ms. Light, and that's why it

19   was inappropriate for Ms. Morrison to even be at this

20   meeting in the first place; right?

21        And so what we have is a record with an alleged

22   defamatory statement, but no impact on Ms. Light's

23   reputation out and about in the community, which is an

24   essential element of her defamation claim.  And for that

25   reason, no reasonable jury could find in her favor on her

1  defamation claim.

2         Moving next to what we'll call the free speech

3  claims.  As Your Honor knows, it involves a claim under

4  1983 and a state law claim under 31-51q.  Both of those

5  require some sort of adverse employment action.  Under

6  1983, Your Honor is defining an "adverse employment

7  action" as something that's significant enough that would

8  deter a reasonable and similarly situated person of

9  ordinary firmness from exercising his or her

10  constitutional right.

11         And, similarly, under 31-51q, "discipline" means

12  an adverse material action taken against Ms. Light by

13  Ms. Gethings.  And in that regard, Your Honor, we need to

14  look at the list of alleged retaliatory acts; right?  The

15  alleged adverse employment actions.  Now, at the pretrial

16  conference, Your Honor made Ms. Light and her attorney

17  specify what those alleged adverse acts were or what those

18  retaliatory acts were.  And, Your Honor, the evidence

19  showed that those were not any adverse employment action

20  or discipline.  I guess I can take them in order for

21  Your Honor.  They raised a lot, so I'm going to have to

22  address a lot.

23         The reassignment from one grade to another.  It

24  was undisputed that Ms. Light's child was going into third

25  grade, the same grade that she taught.  It's undisputed

1    that her grade level partner had concerns about that and

2    he raised that to her.  It's undisputed that it's in a

3    principal's discretion to change a teacher's job.  In

4    fact, one of the witnesses called by Ms. Light had his

5    grade level changed several times, Mr. Shortt.  First,

6    second, fifth, six, I believe, and now he's on to eighth

7    grade.  There's no evidence showing that that was an

8    adverse employment action.

9              Committees.  Your Honor heard and the jurors

10   heard a lot of evidence on committees.  But these are

11   voluntary, unpaid positions.  They're not even part of the

12   job, and they can't possibly be an adverse employment

13   action for Ms. Light to either be or not be on any of

14   those various committees.  Even if that was possible,

15   Principal Gethings provided evidence -- or testimony,

16   rather, about those various committees and the reason or

17   reasons why not Ms. Light was on them.  In fact, her claim

18   about these committees isn't even very clear.  She was on

19   a lot of them.  She thought she was replaced by the

20   gardening committee, but she wasn't.  And so there's no

21   evidence that any of the committee assignments are adverse

22   employment actions or discipline.

23              Similar with the PTA rep, that's in that same

24   universe of claims, Your Honor.  Ms. Light, it's

25   undisputed, served for two years on the PTA, and then

1    Ms. Light [sic] put out a call to see if other individuals

2    were interested in serving on that PTA.  The PTA is not

3    part of a teacher's job and it can't possibly be an

4    adverse employment action.

5          THE COURT:  I think you mean Ms. Gethings put

6    out a call.

7          MR. MURPHY:  Ms. Gethings.  I apologize.

8    Ms. Gethings put out the call.

9          And just to keep going in order, I guess,

10   Your Honor.  There was an allegation that something was

11   left in a mailbox, Ms. Alden's list of concerns.  The

12   plaintiff didn't provide any sort of evidence about that.

13   Just her own testimony, I believe.  Second, there was

14   nothing connecting that back to either Ms. Gethings or any

15   agent of the Board.  There's nothing showing that that was

16   an adverse employment action taking -- or discipline

17   against Ms. Light.

18          Similarly, speaking with Ms. Maffuid, the

19   paraprofessional, it's disputed from Ms. Maffuid's own

20   testimony that she was outside with Ms. Light's class and

21   it was dismissal time.  Principal Gethings saw something

22   and she addressed it in an email to Ms. Light, and she had

23   a conversation with Ms. Maffuid.  It had no bearing on

24   Ms. Light's employment whatsoever.  It was a one-time

25   conversation, fully within the scope of Ms. Gethings' job,

1    her operational responsibilities.  And, therefore, that

2    cannot be an adverse employment action or discipline.

3         Finally, Your Honor -- or not "finally" -- next,

4    the T-Eval meeting.  It seemed to me there was two

5    different claims stemming out of that.  One was the length

6    of the meeting.  It was a meeting.  It went a little

7    longer than may be typical, but employers are entitled to

8    meet with their employees for however long they went.

9    There's nothing about that meeting in terms of the length

10   that would transform it into an adverse employment action

11   or discipline.  If it was discipline, Ms. Light is a union

12   employee.  She could have asked for union representation.

13   She could have walked out.  She's been a teacher for a

14   long time.  She didn't.  It was not discipline.

15        Finally, in that point, Ms. Light challenged one

16   statement in a mid-year T-Eval evaluation.  Besides

17   classifying it as discipline, there's no evidence showing

18   that it was discipline or that it would impact any other

19   reasonable person in that situation.  In fact, Ms. Light

20   testified that she subsequently obtained a job in another

21   school, and she even testified that she wanted to come

22   back to the third grade.  A statement -- one sentence in a

23   mid-year T-Eval without even a final rating falls short of

24   discipline or adverse employment action both under state

25   and federal law.

1          The Judy Cav situation.  We already discussed

2     that a little bit in the disciplinary -- in the defamation

3     context.  Your Honor, in the disciplinary context, the

4     situation is exactly like Ms. Gethings described it on the

5     stand.  She had one teacher who was very upset, who was

6     hesitant to meet with another teacher by herself to

7     resolve the situation.  Ms. Gethings was trying to resolve

8     the situation and brought two employees, their union rep,

9     and another administrator together in one meeting.  Those

10    are the type of meetings that happen routinely across

11    workplaces both in Connecticut and across the country, and

12    there's nothing about a meeting between two employees that

13    is an adverse employment action or discipline.

14          Talking to the witness.  Again, routine email

15    from Ms. Gethings to a particular witness.  It had no

16    bearing on Ms. Light.  To the extent Ms. Bonner thought it

17    was outside of her typical investigation protocol, that

18    still does not transform it into discipline against

19    Ms. Light or an adverse employment action against Light.

20    In fact, there was no evidence that it had any impact

21    whatsoever on Ms. Light, who remained on the gardening

22    committee.

23          Next, Your Honor, statements to Tim Shortt.

24    Mr. Shortt was on the stand.  He testified that he had a

25    good relationship with Principal Gethings both before and

after that meeting.  He testified that people were coming
to him and advocating against Ms. Morrison, who was the
prior union rep.  We heard all about the different votes
for that position.

To the extent Principal Gethings said something
to the effect of, people are telling us you're with
Ms. Light in cahoots to get us out, she's just reporting
what people said.  Ms. Light presented no evidence that
impacted her relationship with Ms. Shortt [sic].  In fact,
it couldn't have because she called him as a witness
today -- or during this trial, rather.  She gave no
evidence that it impacted her relationship with
Ms. Short -- Mr. Short or had any other impact on her
overall employment.

Finally, the emails on the printer.  I don't
know what to say about that, Your Honor.  The evidence was
that Mr. Salem found some emails on his printer.  He
didn't read them.  He immediately told Ms. Light, who came
and picked them up.  There's no evidence tying this back
to Ms. Gethings or any other agent of the Board.  It's
just out there.

And so, absent any evidence tying it to either
Ms. Gethings or some other agent on the Board, that can't
be an adverse employment action or discipline under either
of the definitions I read before.  And, again, Ms. Light

1    has not presented any evidence of any impact on her

2    relationship with Mr. Salem or anyone else from those

3    emails being found.

4            I think Mr. Salem even testified that it was

5    before school started; right?  It was August as they were

6    preparing their classrooms.  There was just no evidence

7    that that had any sort of impact on Ms. Light's

8    employment.

9            And so, for all of those reasons, Your Honor,

10   none of those acts individually constitute an adverse

11   employment action or discipline under either federal or

12   state law.

13           Now, I know Your Honor's jury instruction is

14   going to tell the jury that she may satisfy this adverse

15   employment action if she proves she experienced a

16   combination of seemingly minor incidents that reached a

17   critical mass.  And, importantly, Your Honor is going to

18   instruct them that in order to assess the impact of these

19   more-minor incidents, you must consider whether the

20   totality of those incidents would objectively make the

21   working environment unreasonable, inferior, hostile, or

22   adverse to the employee when compared to a normal or

23   typical workplace.  That standard can't be met here for a

24   variety of reasons.

25           First off, Ms. Light put out evidence that she

1    wanted to return to the building and wanted to stay in

2    that same third grade position, which would have put her

3    back in that upper -- the big school, I guess we've been

4    calling it, where Principal Gethings was the administrator

5    in charge.  I know it's one school, two buildings, but we

6    all know from the evidence that Ms. Gethings is placed in

7    the bigger school and Ms. Light wanted to return there.

8            So it's hard for her to argue that she suffered

9    a series of -- or a combination of minor incidents that

10   really would have made the work environment objectively

11   unreasonable, inferior, or hostile, as defined under state

12   and federal law.

13           So, in short, Your Honor, there's a lot of

14   actions thrown out there that are alleged adverse

15   employment action and discipline.  They literally threw 11

16   different things out there.  None of them, individually or

17   collectively, have enough evidence where a reasonable

18   juror can find that -- an adverse employment action.

19           Lastly, Your Honor, causation.  As you know,

20   both the federal and state claims require Ms. Light to

21   show that her protected speech was a substantial

22   motivating factor in her alleged adverse employment

23   actions and discipline.  Here, there's no evidence where a

24   reasonable jury could find that any of those alleged

25   retaliatory acts were substantially motivated by her prior

1    speech.

2            Again, we kind of need to go, I guess, in order.

3    But a lot of them came up during the normal course of the

4    schoolday, right, or because of other facts that have

5    nothing to do with her protected speech.

6            The reassignment.  It's undisputed, again, that

7    her son was going into that grade and that her -- even her

8    grade level partner, who she got along with, had concerns

9    about the student coming up into that grade; right?  That

10   is what Principal Gethings made the decision on.  And she

11   testified that she made other personnel decisions, other

12   moves that year, too.  Two other ones.  It wasn't just

13   Ms. Light moving grades.  It was several other individuals

14   as well.  And I don't believe there's any evidence tying

15   that decision back to any of Ms. Light's protected speech.

16           And the same goes with all of them, Your Honor.

17   With the paraprofessional, it's undisputed.  Principal

18   Gethings was outside, observed this and, as the

19   administrator of the building, felt it was a situation she

20   needed to address.  She addressed it with both parties on

21   one occasion and that was it.  And there's no causal

22   connection between speech at a Board meeting in January,

23   for example, and an incident on the ground in May at

24   dismissal time.  COVID was impacting the schools.  There

25   was a specific process they needed to follow.  And,

1  Your Honor, that had nothing to do with and no tie back to
2  any protected speech.
3          The Judy Cav incident.  It's undisputed from the
4  record, from the transcript that Ms. Light created
5  herself, that Ms. Cav had concerns and that Ms. Gethings
6  scheduled that meeting to address those concerns.
7  Ms. Light might not like what was said in that meeting,
8  might have been uncomfortable about what Ms. Cavanaugh or
9  Principal Gethings was saying in that meeting.  But it
10 doesn't tie it back to any of her protected speech.  That
11 incident -- you know, the fact that Ms. Cav had concerns
12 is enough to break any causal connection that might even
13 be suggested by the plaintiff and, therefore, no causal
14 connection for that one.
15         With Tim Shortt, again, this was a conversation.
16 I think Mr. Shortt said it was in October of 2021 when he
17 won the second of two elections and became the union
18 steward.  That is well after any of her protected speech.
19 He did not connect it at all to Jessica Light's protected
20 speech.  Ms. Light herself has not connected the
21 discussion with Mr. Shortt to any of her protected speech.
22         The committees, Your Honor.  I don't want to
23 repeat everything I just said about all the committees,
24 but I think the same structure holds true.  Ms. Light was
25 on at least three committees.  We saw that chart; right?

1    She was on three of those committees.  She was on the PTA.

2    She was on the gardening committee.  I'm still not even

3    clear what her claim is about what happened to her on

4    those committees.  But whatever happened, she hasn't

5    established anything that links it back to any of her

6    protected speech.  There's a complete, like, absence of

7    evidence demonstrating causation.

8            The rest of them fall into the same category,

9    Your Honor.  Things that -- such as emails on the printer,

10   Ms. Alden's complaint in the mailbox.  There's nothing

11   tying that to any Board employee, Ms. Gethings, or

12   anything to do with Ms. Light's protected speech.

13           Now, the one thing I do need to address is --

14   and I realize I overlooked it when we were talking about

15   adverse employment action and discipline -- was this

16   amorphous claim about her return to work in January and

17   December -- I'm sorry, January and February of 2022;

18   right?  It's undisputed from the evidence that the

19   investigation wrapped up in December.  The reports were

20   provided at some point in December.  There's a -- a school

21   vacation happens at the end of December and January, and

22   Ms. Light's FMLA leave expired sometime in January.  I

23   don't believe we ever got an exact date, but I think all

24   the parties agree that it was extended into some point in

25   January.

```
1              Then the evidence demonstrates that there were
2    discussions.  Her union was involved.  HR was involved.
3    Ms. Gethings was involved.  This was a unique situation
4    because, as we heard, normally, when someone goes out on
5    maternity leave -- Principal Gethings testified -- someone
6    just swaps in.  You get a long-term sub for that classroom
7    and they continue to teach for that classroom.  Here, it
8    was a unique situation.  The kids split into two different
9    classrooms, and Ms. Light was coming back and there was
10   this overarching situation where she had been out for a
11   long time and there was efforts to bring her back to work.
12   Principal Gethings, we put the email in for Your Honor and
13   it shows the exact plan that needed to be accomplished in
14   February.  And so, while Ms. Light may have disagreed with
15   how long it took or whether she should have, you know, not
16   had to observe or complete report cards or review report
17   cards before resuming one-on-one kind of overall
18   instruction of her own class, she hasn't shown that it's
19   an adverse employment action such that it would deter
20   someone else from speaking out, engaging in their
21   protected speech.
22              Two, on that same topic, she hasn't linked any
23   causation back to her protected speech.  I mean, Taryn
24   Bonner was on the stand testifying about the process HR
25   followed to return Ms. Light to work, including dealing
```

1    with both unions, sending the case for a mediation, you

2    know, coming up with a plan to ease her back in.  Just as

3    Mr. DeLucia said, that's appropriate.  And that's not

4    unusual in the district.

5          And, Your Honor, no reasonable jury can find

6    that that situation constituted an adverse employment

7    action.  And, again, you know, Ms. Light wanted to go back

8    to third grade.  She's applied to go back to third

9    grade -- or she did in the summer of 2022.  And I think

10   that fully undermines any sort of causal link necessary

11   for her First Amendment or 31-51q claim.

12         I don't believe I've missed any, but I think

13   Your Honor sees my point about all of those alleged

14   retaliatory acts and any sort of causal link to

15   Ms. Light's protected speech.  Which, again, three Board

16   meetings:  January, February, March.  I know Ms. Light

17   said on the stand she wasn't sure if she spoke at the

18   February Board meeting, but it was alleged in her

19   complaint and that was what the parties, I think,

20   understood at the time.  But let's take that off the

21   board.  She wasn't sure she spoke there, so that can't be

22   protected speech.  But the January one, it's undisputed

23   that she spoke.  That's the one where she stood up, I'm

24   Jessica Light, I don't want to die.  Ms. Light didn't

25   reference any conversations with Principal Gethings about

1    that one.  And the only reference to the protected speech

2    at the March or -- that same day was the email that we

3    reviewed as part of Exhibit 7; right?  Ms. Light spoke in

4    the March 22nd Board meeting, and Principal Gethings sent

5    her an email that night that responded to something they

6    had already engaged in that morning.  Fully appropriate

7    behavior by Principal Gethings, fully within the scope of

8    her job, and it doesn't demonstrate a causal link to any

9    protected speech.

10            So with that, Your Honor, again, you know, we

11   move for judgment as a matter of law on all three counts

12   for all of the reasons we set forth just now.

13            THE COURT:  Thank you.

14            All right.  Mr. Interlandi.

15            MR. INTERLANDI:  Thank you, Your Honor.  I'll

16   address these arguments as they were presented.

17            So with regard to the defamation claim, we have

18   presented evidence to support the elements of the

19   defamation claim.  Ms. Gethings made an affirmative

20   statement to Ms. Light that everyone was telling her that

21   she was the person who leaked the COVID-positive status of

22   another teacher.  She admitted on the stand today that

23   that's not true, that no one told her, in fact, that it

24   was Ms. Light.  Maybe there was rumors and innuendo.  She

25   tried to connect a Facebook post from earlier that month

1    as support for her belief or for the rumor, but it is

2    undisputed here that she mentioned Jessica to people in

3    the room.

4         Now, that's why I included the section from the

5    Restatement Second of Torts in my proposed jury

6    instruction.  But she did identify, she did publish the

7    statement about Jessica in that meeting.  So, clearly --

8    and, clearly, Jessica was identified.

9         And in terms of her reputation, outside of that

10   meeting, it continued.  So what we had is that was a

11   March 31st meeting, and then there was an April 20th

12   meeting that was supposed to be on the topic of

13   committees, and then Ms. Gethings couldn't let the

14   Facebook post go, brought up Ms. Cavanaugh multiple times

15   in an April meeting where Ms. Light's union

16   representative, Mr. Cicarella, was present.  And then when

17   they filed their retaliatory complaint, the

18   administrators, the first -- the cover page of that

19   specifically states, fourth -- sorry -- yeah.  The fourth

20   bullet point that Ms. Light "undermines administration,

21   breaches confidentiality, and creates an intentional and

22   unneeded anxieties for our families," and that is signed

23   by Mrs. Gethings and Ms. Clarino.

24         There is -- Ms. Light has testified about the

25   harm that was done to her reputation as a result of the

1    statement where she believed that Ms. Cavanaugh -- well,

2    Ms. Cavanaugh had already told her, you know, we're not

3    friends.  In that meeting, she thought they were.  She

4    offered to bring food to her after she told her that she

5    had COVID, and then brought it up there that they weren't

6    friends.

7            And then, thereafter, Ms. Light also testified

8    that there were people in the school that no longer talked

9    to her, they were afraid to talk to her, they didn't sit

10   with her at lunch.  And I think it's reasonable for the

11   jury to infer from that that Ms. Cavanaugh may have had

12   something to do with that.  Ms. Light never admitted that

13   she was the person.  She did tell Ms. Cavanaugh that she

14   was sorry she felt that way, but that it was only a rumor

15   and she wanted to repair the relationship.  But there was

16   no admission that she ever said what she claimed to have

17   said.

18           And the point about Ms. Morrison, I don't think

19   we ever argued that.  What was presented to the Court and

20   to the jury was that Ms. Morrison was present at that

21   meeting and was there on behalf of Ms. Cavanaugh, not on

22   behalf of Ms. Light.  She's also the person that

23   Ms. Gethings testified was one of the teachers who

24   forwarded her a screenshot of Ms. Light's Facebook post,

25   allegedly.

1          As it relates to the free-speech claims, I think

2     if there was ever a case where we're talking about

3     seemingly minor events, it would be this one that would

4     add up to a critical mass.

5          There's testimony from Ms. Light regarding

6     November of 2020, her speaking out at parent -- a meeting

7     that Ms. Light -- I'm sorry, Ms. Gethings was listening

8     to, and then talked to Ms. Light about her comments.

9          That carried over into January, February, March.

10    And there was -- there was public speaking at the Board of

11    Ed meeting in January.  It was alleged in February,

12    although Ms. Light testified she couldn't recall, and in

13    March.  And in March, it was the same day of the email

14    that is presented in Exhibit 7 -- the subject matter of

15    the email is 3 feet -- where Ms. Light is trying to get

16    more information about a unified plan and the distancing

17    that was required for students, particularly on how to

18    measure.

19         That led to an email a few days later that was

20    titled, Happy Friday, and the second part of that email,

21    Ms. Gethings admitted was to -- not attack, but to address

22    the social media -- I'm sorry, that's not the Board of Ed

23    meeting.  That was regarding the Facebook post.  Sorry.  I

24    got tripped up on the time frame there, Your Honor.

25         But we have the Facebook post first, which was

1    March 9, 2021, Ms. Light's comments, Ms. Light being

2    talked to about that at the T-Eval meeting on March 26th.

3    She was also told about Ms. Cavanaugh.  They have a

4    meeting on March 31th.  But in between the Facebook post

5    and the T-Eval is the March 22nd email, and the Board of

6    Education comments later on.  Ms. Gethings stated to

7    Ms. Light during those meetings that she didn't think it

8    was appropriate or that she had a right to speak.  She

9    said that.  She also said that she heard her speak many

10   times.  So she was clearly listening.

11          And, clearly, we can connect the March 2020 --

12   the March 22nd Board of Ed meeting as well as the Facebook

13   post to protected speech.  That's already been agreed upon

14   that that was protected.  And then Ms. Light [sic] now

15   doing a series of -- taking a series of actions against

16   Ms. Light that were seemingly minor, but in the aggregate

17   add up to a critical mass such that it would deter someone

18   or create a hostile environment or inferior environment.

19          Typically, T-Eval meetings that would last

20   15 minutes -- testimony was presented on that -- lasted

21   more than an hour, where Ms. Light should have had a union

22   representative present to address the concerns that the

23   administrators were bringing to her attention.

24          And then, secondly, the meeting with

25   Ms. Cavanaugh on March 31st.  That was where the

1  defamatory statement was made, among other things, and,

2  again, the accusations concerning the Facebook post.

3         The Facebook post kind of speaks for itself in

4  terms of the content in that it was for student data being

5  reported and Ms. Light making two comments that set off

6  this chain reaction of events.

7         The April committee meeting, Ms. Light responded

8  to Ms. Gethings' responses to her.  So in Exhibits 9 and

9  10 -- and those are both full exhibits -- Ms. Gethings

10 admitted or agreed on cross that she received a copy of

11 Ms. Light's response to her email response.  And that is

12 in Exhibit 10.

13        She also -- Ms. Gethings testified that she was

14 aware that Ms. Alden had filed a list of concerns.  That

15 list of concerns, the last date -- if you look at that

16 document, the real last date that Ms. Alden is complaining

17 about is December.  She held that complaint in her back

18 pocket for five months until the administrators got word

19 that Ms. Light had filed a complaint and, in line with

20 what they did, they asked Mr. Jones for -- she asked him

21 to clarify her recollection.  She got an email.

22        There was testimony about an email that she

23 received from a parent who brought bagels four months

24 earlier all of a sudden sent a lengthy email that they

25 attached to their retaliatory complaint that was filed on

1   June 7th.

2           And then they have this intervening complaint

3   from Ms. Alden.  So you have the April 30th complaint from

4   Ms. Light, the email complaint from Ms. Alden.

5   Ms. Gethings testified, I believe, that they were the only

6   two people on the email, Ms. Clarino and Ms. Gethings, and

7   Mr. Bianchine.  No one else would have had that at the

8   school.  How else would Ms. Alden know about the email?

9   And I believe her testimony was that they did bring that

10  to her attention.

11          And so that time frame now -- we're in February

12  to May, beginning of June -- we have a bunch of seemingly

13  minor incidents that are making their way and building up

14  to critical mass.

15          It's within the jury's province, Your Honor, and

16  that they can take this information.  And that is also one

17  of the proposed instructions I had to include so that they

18  understand what their role is or how to define these

19  seemingly minor events.

20          There are other things that follow.  There's the

21  tainting of the witness, which we talked about, Mr. Jones.

22  There is Mr. Shortt.  He said he felt really upset and he

23  was actually considering, you know, quitting the job and

24  his wife had to talk him out of it.

25          Mr. Salem finding the -- she's the building

1  leader.  She didn't know that he had a printer.  And this

2  is the actual -- the email that we're talking about to be

3  found on Ms. Light's former grade level partner's printer.

4  And there's really no way that it would have gotten there

5  other than the two administrators printing it and then

6  someone putting it there.

7         I just have a few more points, Your Honor.

8  There was no direct evidence that Ms. Light at all said

9  anything to anyone specifically identifying Ms. Cavanaugh

10  as someone who was out because of COVID.  At best,

11  Ms. Cavanaugh expressed a concern that -- or belief that

12  she thought it was Ms. Light.

13         And as it relates to the return to work, it

14  wasn't all nice, you know, sunshine and rainbows in

15  January and February of 2022.  January 14th, they had a

16  very long meeting.  Safeguards were discussed.  Ms. Bonner

17  testified and agreed that she was going to work like an

18  Energizer Bunny to answer Ms. Light's questions.  And what

19  happened?  A few days later, they turned around and told

20  her, get yourself back to work.

21         And, yeah, in theory, they tried to work her

22  into her job and shadow and observe.  But that's not

23  really what happened because Ms. Gethings' boss had to

24  tell her she was disappointed that this had not already

25  happened.  She had not been returned to work.  There was a

```
1     period -- and it's in the email -- that there would be a
2     kind of transition back, but that's not what happened.  It
3     went much longer.  And she said, get her back without any
4     further delay.  And she was returning back to two
5     people -- at least in evidence, one person -- who received
6     a verbal warning from the superintendent based on her
7     finding that Ms. Gethings exhibited poor professional
8     judgment on how she responded to an employee criticizing
9     Worthington Hooker School administration during a Board of
10    Education meeting.  Superintendent's words, not mine.  And
11    that's the same day that Ms. Gethings' boss told her, get
12    Ms. Light back to her classroom.
13            And so, for all those reasons, I think there is
14    causal link to the protected speech.  I think these minor
15    incidents add up to a critical mass and that is for the
16    jury to decide, Your Honor.
17            Thank you.
18            THE COURT:  All right.  Did you wish to have
19    some further remarks?
20            MR. MURPHY:  I did.  I apologize.  Is that okay?
21            THE COURT:  Yes.
22            MR. MURPHY:  All right.  Just briefly on the
23    defamation claim, because I think you fully heard me on
24    the retaliation claims.
25            But on the defamation claim, my argument in my
```

1    through and see what remains of issues.

2              First of all, with respect to the verdict form,

3    I don't think there are remaining disputes, are there?

4              MR. INTERLANDI:  I don't think so.

5              MR. MURPHY:  Just, I guess, the only dispute was

6    on the Count One, I think.

7              MR. INTERLANDI:  Yeah, there was another one.

8              MR. MURPHY:  And Count Two as well, the

9    substantial/motivating.  It says -- I don't know how

10   Your Honor wants to address that because that goes back to

11   the jury instructions.  But Count One, "substantial or

12   motivating factor."

13             THE COURT:  Okay.  Let's take a look in the

14   draft itself.  The -- you'll see how -- let me get to

15   that.

16             So I've changed it to be, "Protected speech is

17   the cause of the adverse action if it is a substantial

18   factor or, to put it in other words, a motivating factor

19   in the adverse action."

20             And that phrase comes directly from *Mt. Healthy*

21   *City School District* and is -- which is the case to which

22   most of the subsequent Second Circuit cases refer.

23             The essence of it is that "substantial" is

24   virtually synonymous with a motivating factor, not two

25   separate factors.  And I've tried to capture that.

```
 1    a substantial motivating factor?  Can you have a

 2    motivating factor that is a -- that interferes -- a

 3    motivating factor interfering with First Amendment rights?

 4            MR. MURPHY:  Can you have a motivating factor

 5    that's not a substantial motivating factor?

 6            THE COURT:  But it's a motivating factor.  A

 7    motivating factor motivating the actions in response to

 8    another's First Amendment speech.

 9            MR. MURPHY:  But is that actionable?  And I

10    guess that's my question.

11            THE COURT:  But my question to you is:  Is a

12    motivating factor something different than a factor which

13    causes you to take, in response to free speech, some

14    adverse action, some action?

15            MR. MURPHY:  Meaning is a motivating factor

16    greater than some action that -- I apologize if I'm not

17    understanding your question, Your Honor.

18            THE COURT:  I'm not understanding what you're

19    saying about why a motivating factor isn't a factor that

20    would demonstrate an adverse action, that wouldn't prove

21    an adverse action.

22            MR. MURPHY:  Well, I guess I'm confused why

23    courts have consistently caused it a substantial

24    motivating factor.

25            THE COURT:  Don't say "consistently," because
```

1    that's exactly what the problem is.  They're not

2    consistent.  They say -- some say "substantial" or

3    "motivating."  That's why we went back to the origins to

4    find where did this come from and used exactly the

5    language that was the genesis for all of the subsequent

6    case law describing when protected speech can be found to

7    be the cause of the adverse action.

8            MR. MURPHY:  And, in this case, Judge Meyer used

9    the substantial motivating factor, I believe, in his

10   summary judgment ruling.  And so it's already been -- that

11   standard was already laid out in our -- in our ruling on

12   our motion for summary judgment, and I assumed that would

13   carry forward through the trial as well.

14           THE COURT:  Okay.  Well, I'm not willing to add

15   an additional burden as you wish to what the protected

16   speech has to be shown as a cause of.  Because if it is a

17   substantial factor or a motivating factor -- those two

18   phrases being somewhat synonymous -- from the origins of

19   that in the Supreme Court, that was sufficient.  It wasn't

20   an additional factor, something more, a substantial, as

21   you describe it, substantial motivating factor, which can

22   be something other than substantial factor or motivating

23   factor.  I don't think that's where this phrase came from,

24   but your objection is preserved.

25           MR. MURPHY:  All right.

```
 1    for the open position isn't a retaliatory act?  Is it an

 2    adverse action?

 3              MR. INTERLANDI:  I don't have --

 4              THE COURT:  Were you going to argue that it

 5    wasn't an adverse action?

 6              MR. INTERLANDI:  No, I'm not.  I don't -- so I

 7    agree that if there is a proposal for limiting language, I

 8    would be willing to entertain it.

 9              MR. MURPHY:  Can we just cut it off by date?  I

10    mean, I think the way that I understood the argument

11    was --

12              THE COURT:  That would be the way to do it.

13              MR. INTERLANDI:  Like, February, whatever that

14    date is.

15              THE COURT:  What's the date that you would

16    propose?

17              MR. MURPHY:  The return to work was in the early

18    2022; right?  And then the -- I believe the Alden note was

19    found sometime in the spring of --

20              THE COURT:  May of --

21              MR. MURPHY:  May -- that that is the last

22    retaliatory act alleged, and anything occurring after that

23    date is not an independent basis for liability.  Or

24    something that -- we have the words --

25              THE COURT:  What is the date of the end of the
```

```
 1    school year?

 2              MR. INTERLANDI:  Probably the end of June.

 3              MR. MURPHY:  Yeah, by the end of June.

 4              THE COURT:  So by the end of June of that year;

 5    right?

 6              MR. MURPHY:  I don't believe so.  I think it has

 7    to be earlier.  The Alden complaint cut it off as of that

 8    date.

 9              THE COURT:  I'm just trying to think where the

10    notes, then, would fit in analytically.

11              MR. MURPHY:  Well, those were in August of 2022.

12    And then, again, my argument is the same on that.  Those

13    are not alleged to have been retaliatory acts.

14              THE COURT:  They are alleged to be part of the

15    hostility; right?

16              MR. INTERLANDI:  Yes.

17              MR. MURPHY:  But they --

18              THE COURT:  All right.  So if we say, middle of

19    page 7 under the third element, "Ms. Light must show by a

20    preponderance of evidence that she experienced at least

21    one adverse employment action by May of 2022."

22              MR. MURPHY:  I'm more comfortable with that.

23              MR. INTERLANDI:  Can you just repeat that one

24    more time, Your Honor?

25              THE COURT:  So I'm on page 7.  I'm on the third
```

1    to explode.

2            We have the Facebook -- I'm sorry.  We have the

3    T-Eval feedback.  And in the "feedback" section, you heard

4    Jessica testify that when she would apply or in the past

5    had applied for other positions, administrators at those

6    schools would review these T-Eval evaluations.  In here,

7    Ms. Gethings asked, "As we discussed in your mid-year,

8    please consider asking questions anytime you have a

9    concern.  If we do not have the answer, we will do our

10    best to attain the answer."

11            The defendants are going to argue, and they have

12    been, that this is so minor, what's the big deal?  You

13    heard the judge talk about the law.  And what we are able

14    to do is connect these minor or lesser events to establish

15    a critical mass, to establish an adverse employment

16    action.

17            We are not claiming a termination or a

18    suspension.  What we're claiming is an environment that is

19    inferior, an environment that put Jessica in fear, an

20    environment where she didn't know what was going to happen

21    next or what next accusation might come or from whom.

22            You heard Jessica testify on the stand how she

23    was feeling after each event hopeless, isolated.  She felt

24    like she couldn't talk anymore.  She went from the

25    outspoken advocate to a shell of herself, afraid to do

1            In Exhibit 12, you'll see Ms. Light looking for

2    some answers.  She wants to know what's happening next.

3    Exhibit 12 is an email to Ms. Bonner.  Ms. Bonner, who's

4    on the witness stand.  She didn't agree that she used the

5    word "tainted," but she did agree that she found something

6    professionally concerning to her as it related to

7    Ms. Gethings when she contacted the witness that she would

8    have interviewed, someone that was on her witness list.  I

9    believe Ms. Gethings used the word "obstructed" on the

10   witness stand.  And then the investigation was outsourced,

11   outsourced to a law firm to do an investigation, to take

12   over the investigation.  And in this email, Jessica lists

13   the events to her that she felt was continuing

14   retaliation, and you'll see that in Exhibit 12.

15           So the school year is over, 2020/2021 school

16   year.  Jessica is in the summer months.  She's got to get

17   prepared for teaching first grade.  You hear her testify

18   that there was no help.  She had to look for it on her

19   own.  She was preparing herself to teach first grade at

20   the same school, different building, under the watchful

21   eye of Ms. Clarino.

22           You heard from Mr. Paul Salem, who is Jessica's

23   former third grade partner.  You heard that as he was

24   preparing for the new year in his classroom, getting ready

25   for the students, the third graders, he found an email, an

1    that she lost days, 66 sick days, $26,000.  You heard

2    testimony from Ms. Ventura about the medical bills from

3    the PTSC center.  Those totaled $33,000, and dramatic

4    action, as you'll see in Exhibit 29, of $1,200, totaling

5    $34,200.

6           Now, we are not claiming Dr. Levin's bills

7    because, yes, Ms. Light was treating with Dr. Berger, and

8    then she needed a new therapist to have her medication

9    managed and she did find Dr. Levin.  And so we're not

10   claiming those bills as part of the economic damages for

11   Jessica in this matter, but we are claiming the bills for

12   Ms. Ventura and the PTSC.

13          So what is fair compensation for someone who's

14   caused to suffer through daily life, depression, feeling

15   crushed, isolated?  What is fair for someone who has

16   caused -- has been caused nightmares, depression,

17   emotional distress, pain and suffering, you heard Jessica

18   testify, suicidal ideations.

19          We've talked about economic damages, noneconomic

20   damages.  It's $20 for a movie ticket.  If you add in

21   popcorn and a soda, you get up to $30 for a two-hour movie

22   for some entertainment or fun.  I would say it's worth

23   25 cents, I would argue.  Twenty-five cents a minute for

24   happiness comes out to $15 an hour.  Twenty-five cents a

25   minute, $15 an hour.  If you take the days from

1    March 26, 2021, to today, you have 1,233 days,

2    29,592 hours, multiplied by $15 an hour, and that takes

3    you to $443,880.  If you add the economic damages, that

4    takes you to $504,080.

5           Punitive damages.  The judge instructed you on

6    that.  It is your decision on what is fair.  I am asking

7    for triple damages, so if you would take the economic and

8    the noneconomic and triple that to award Jessica punitive

9    damages to deter the defendants or anyone like the

10   defendants from trampling on someone's free speech rights

11   in the future.  If teachers can't speak out about safety

12   concerns without fear of retaliation, then students can't

13   be safe in their learning environments.

14          We talked -- the judge talked to you about

15   defamation.  I talked to you a little bit about that.

16   There's evidence, testimony that Jessica had to hire a

17   lawyer.  She had increased frequency with her medical

18   appointments, as stated by Ms. Ventura.  She had increased

19   care and she had to use sick days in October, starting in

20   October of 2021.  She lost friends.  Facebook friends

21   de-friended her.  People were afraid to associate with

22   her, according to Jessica's testimony.  She felt isolated.

23          As a result of her defamation, she incurred

24   these special damages.  She also incurred harm to her

25   reputation by way of the general damages, and we're asking