**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| JESSICA LIGHT,<br>        *Plaintiff,*<br><br>        v.<br><br>NEW HAVEN BOARD OF EDUCATION,<br>MARGARET-MARY GETHINGS in her<br>individual capacity,<br>        *Defendants.* | No. 3:22-cv-00425 (JBA) |

**RULING AND ORDER ON MOTION FOR JUDGMENT NOTWITHSTANDING**

**JURY VERDICT OR FOR NEW TRIAL**

On August 12, 2024, a jury in New Haven returned a verdict in favor of Jessica Light ("Plaintiff" or "Ms. Light"), a fifteen-year veteran public-school teacher who had spoken at school board meetings and on social media during 2020 and 2021 about school safety issues during the COVID-19 pandemic. The Defendants filed the instant motion for judgment as a matter of law or, in the alternative, for a new trial.

In 2022, Plaintiff brought suit against her employer, New Haven Board of Education ("the Board," "New Haven Public Schools," or "NHBE"), and the principal of her former school, Margaret-Mary Gethings ("Defendant" or "Ms. Gethings"), (collectively "Defendants"), alleging that they had unlawfully retaliated against her for her statements made at Board meetings and two Facebook posts about the Board's COVID policies. She also sued Ms. Gethings for defamation. The jury found for Ms. Light on all counts and awarded her substantial compensatory and punitive damages.

At the conclusion of evidence, Defendants moved for judgment as a matter of law, which the Court denied without prejudice to renewal following the return of the jury's verdict.

Defendants now renew their motion for judgment as a matter of law or, in the alternative, for a new trial or to alter or amend the judgment by vacatur or remittitur of damages. *See* Defs' Mem. in Supp. of Renewed Mot. for Directed Verdict, ECF No. 121-1 (Sept. 9, 2025) ("Mot."); Pl. Mem. of L. in Opp'n to Def. Post-Tr. Mots., ECF No. 124 (Oct. 21, 2024) ("Pl. Opp'n"); Defs' Reply to Pl.'s Opp, ECF No. 127 (Nov. 11, 2024) ("Defs. Reply").

For the reasons discussed below, the Court DENIES Defendants' motion as to Counts One and Three and GRANTS in part the motion as to Count Two, leaving a remaining award of $475,000 to Ms. Light. The Court orders a new trial as to Count Two.

# I.    INTRODUCTION

## A.  Summary of Factual Background[1]

This case arises out of the contentious issue of how to safely reopen schools during the COVID-19 pandemic. Ms. Light was a third-grade teacher at Worthington Hooker School ("WHS"), a K-8 public school in New Haven, Connecticut.[2] She was also a parent of two children, both of whom were students at WHS at the time of the events giving rise to this lawsuit.[3] In Fall 2020, Ms. Light publicly advocated both at school board meetings and on social media for a unified, district-wide reopening plan. She wanted NHBE's reopening policies to be science-based and transparent, and she was extremely concerned about the threats the disease posed to her, her students, and her family.

Almost immediately, Ms. Gethings, and vice principal, Ms. Jenny Clarino ("Ms. Clarino"), (collectively "the administrators") made clear their "preference" that Ms. Light direct her questions about reopening to the two of them before, or in lieu of, posing them in a public

---

[1] A more detail recitation of the facts is below.
[2] Trial Tr. 28, 47.
[3] *Id.* at 29 –30.

forum. At that time and thereafter, the administrators acknowledged Ms. Light's First Amendment right to speak publicly about Defendants' COVID-19 policies. While Ms. Light directed some questions to administrators, she also continued to speak about reopening policies at monthly Board meetings.

Once WHS reopened for in-person instruction in Spring 2021, the administrators began to more pointedly express their displeasure at Ms. Light publicly asking the Board questions about reopening policies instead of keeping her questions within the school's chain-of-command. During Ms. Light's annual teacher evaluation meeting in March 2021, the administrators spent more than an hour discussing Ms. Light's advocacy activities, accusing her of fomenting fear in the parent community and crediting rumors among parents that Plaintiff had leaked information that a fellow teacher, Judy Cavanaugh ("Ms. Cavanaugh"), had been diagnosed with COVID-19, which Ms. Light repeatedly denied. All the while, the administrators paid lip-service to Ms. Light's rights to speak in such forums. After that evaluation meeting, a frightened Ms. Light ceased speaking to the school board about reopening policies.[4]

Over the remainder of the school year, the relationship between Ms. Light and the administrators continued to sour. Ms. Light was taken off her extracurricular committees, including the Parent-Teacher Association. She was told she would be moved to teach first grade, which she explained would be difficult for her due to her dyslexia. Ms. Gethings held a meeting at which she endorsed the rumor that Ms. Light had disclosed Ms. Cavanaugh's COVID diagnosis. The administrators also reprimanded Ms. Light for routine other activities like asking a teacher to watch her class during dismissal while she used the restroom. Her relationships with other teachers, including her child's teacher, deteriorated. On April 30, 2021, Ms. Light filed a

---

[4] *See id.* at 87.

complaint with NHBE about the administrators' retaliatory behavior.[5] On June 7, 2021, Ms. Gethings and Ms. Clarino filed a rebuttal complaint regarding Ms. Light's allegations.[6]

During the 2021 Summer, the Board retained a private labor law firm to conduct an independent investigation of the complaints. Meanwhile, Ms. Light requested that the Board put "rules of engagement" in place to govern interactions between herself and the administrators during the upcoming school year. NHBE acknowledged her concerns but never followed through. When Ms. Light returned to school—to teach first grade, despite her disability—she found that none of her supplies had been ordered and her colleagues would barely speak to her.[7] In the first two months after the school year commenced, Ms. Clarino attended and took notes in Ms. Light's class four times or more without providing any feedback or explaining why she was repeatedly observing Ms. Light.

Ms. Light's mental health spiraled downward. Since long before the pandemic, she had suffered from Post-Traumatic Stress Disorder ("PTSD") stemming from long term childhood sexual abuse and the murder of her father when she was a teenager. Nonetheless, as a teacher, Ms. Light was consistently high functioning despite her disorder and trauma. However, according to her treating mental health providers' testimony, which was corroborated by her husband's testimony, the fear of isolation and retaliation she experienced during 2021 triggered her PTSD to the point where her anxiety and depressive symptoms were so acute she took leave under the Family Medical Leave Act (FMLA).

That winter, the law firm completed its review, and its findings caused the Superintendent of NHBE to issue a warning to Ms. Gethings about her poor handling of the

---

[5] Pl.'s Ex. 38 at LIGHT00233.
[6] Pl.'s Ex. 7 at 000102.
[7] Trial Tr. 134.

4

situation with Ms. Light.[8] As Ms. Light prepared to return from medical leave, she asked the Board for help in setting up rules governing her interactions with the administrators. The Board ignored her request. Relationships with her colleagues worsened after her return. Ms. Light was excluded from school functions, and, at one point, an e-mail written by her child's teacher to administrators criticizing Ms. Light was left on a printer where her colleagues could access it. Ms. Light applied for an open third-grade teaching position at WHS but was rejected in favor of an outside candidate, and was thus required to continue teaching first grade, despite her listing it as her second-to-last choice on annual teacher preference sheets submitted to the administrators.

At the end of the summer, as Ms. Light was setting up her classroom, she discovered two anonymous notes. One said, "You are toxic, please leave our school," and the other said, "Ms. Light's To-Do List: Wash your hair or just die." At that point, she transferred to a job teaching at another New Haven school.

### B. The Trial and Defendants' Post-Trial Motions

At the case pretrial conference, Defense counsel requested that Plaintiff's counsel specify which actions he claimed constituted unlawful retaliation. Plaintiff's counsel identified 11 acts that he planned to argue constituted unlawful retaliation.[9] Defendants never asked for any form of limiting instruction as to these 11 claims, nor did Defense counsel object to testimony outside the scope of the 11 acts. Defendants did, however, request one special interrogatory for the

---

[8] Pl.'s Ex. 48.

[9] Those eleven acts are: 1) Ms. Light's reassignment from teaching third grade to teaching first grade, 2) her exclusion from certain committees, 3) Ms. Gethings's actions regarding Ms. Light's former position on the PTA 4) the accusations against Ms. Light regarding Ms. Cavanaugh's COVID status, 5) Principal Gethings speaking to witnesses during the Board's investigation into Ms. Light's complaint, 6) an unidentified person leaving a copy of an email from Plaintiff's husband regarding their child's teacher on a printer, 7) an unidentified person leaving a copy of a complaint about Ms. Light by her child's teacher in plain view, 8) the Board compelling Ms. Light to return to work from FMLA leave without any remedial measures, 9) Ms. Gethings's reprimanding a paraprofessional after she assisted Ms. Light during dismissal, 10) Ms. Gethings allegedly meeting with a fellow teacher and new union representation regarding his support for Plaintiff, and 11) the extended teacher evaluation ("TEVAL") meeting. *See* Pretrial Tr. 17–23, ECF No. 100 (Aug. 5, 2024); *see also* Mot. 3.

verdict form: if the jury found retaliatory conduct under Section 1983, the jury was to specify which actions they found to be "adverse acts" for the purpose of establishing a factual basis for Defendant Gethings's qualified immunity defense.[10] This follows Second Circuit procedure for analyzing a qualified immunity defense. *See Jones v. Treubig*, 963 F.3d 214, 224–25 (2d Cir. 2020) ("The Second Circuit has set forth the procedure by which district courts should resolve disputes on factual issues at trial that are relevant to a qualified immunity analysis. In particular, '[i]f there are unresolved factual issues which prevent an early disposition of the defense [of qualified immunity], the jury should decide these issues on special interrogatories.'" (citing *Warren v. Dwyer*, 906 F.2d 68, 81 (2d Cir. 2003) (alterations in original)).

The jury found that Plaintiff had proven Defendants' retaliation in violation of Connecticut General Statute § 31-51q and 42 U.S.C. § 1983. The jury specifically identified two "adverse acts" for the purposes of Count Two, under Section 1983, one of which—the extended teacher evaluation ("TEVAL") meeting—was on the list of 11 that Plaintiff's counsel had specified, and evidence of the other—Ms. Clarino's observations of Plaintiff's classroom from August 2021 through October 2021—was admitted without objection. The jury also found that Ms. Gethings defamed Ms. Light when accusing her in the presence of others of leaking Ms. Cavanaugh's COVID diagnosis.

Defendants have moved under Federal Rules of Civil Procedure 50, 59, and 60(b)(6) for judgment as a matter of law notwithstanding the jury's verdict, or, in the alternative, a new trial or vacatur or remittitur of damages.

---

[10] *See* Trial Tr. 807–08 ("MR. MURPHY: [G]oing back to the qualified immunity defense that we raised, we had put in the verdict form lines for the jury to find if they find retaliatory conduct, specific conduct, and Your Honor included that . . .. THE COURT: And the purpose of the delineation of adverse acts by the jurors was to assess qualified immunity individually or as a whole. MR. MURPHY: Right, perfect.").

In their motion, Defendants make eight arguments. First, they are entitled to relief from judgment on the retaliation claims under Rule 60(b)(6) or, entitled to a new trial because one of the "adverse actions" specified by the jury was not on the list Plaintiff's counsel identified during the pretrial conference. Second, there was insufficient evidence to find Defendants unlawfully retaliated against Plaintiff. Third, Ms. Gethings is entitled to qualified immunity from the actions the jury found to constitute "adverse acts" for purposes of Section 1983. Fourth, the defamation verdict must be set aside because there was insufficient evidence of injury to reputation. Fifth, they are entitled to a new trial due to improper jury instructions regarding the causation standards for retaliation. Sixth, they are entitled to a new trial due to improperly admitted evidence— specifically, the two anonymous notes found in Ms. Light's classroom precipitating her departure from WHS. Seventh, the compensatory damages award for the state and federal retaliation claims must be set aside or remitted because the compensatory damages are so high as to shock the conscience. Eighth, the punitive damages award must be set aside or remitted.

The Court will set out a more detailed factual and procedural background, then address each of the Defendants' eight arguments.

## II.    FACTUAL AND PROCEDURAL HISTORY

### A.  Factual Background

The following evidence is presented in a light most favorable to Plaintiff as the non-moving party. *See e.g., McCarter & English LLP v. Jarrow Formulas, Inc.*, 715 F. Supp. 3d 281, 302 (D. Conn. 2024) ("In deciding a motion for judgment as a matter of law, a court must 'draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility

determinations or weigh the evidence.'" (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).[11]

*COVID Advocacy and Aftermath*

To say that the COVID-19 pandemic hit schools hard would be an understatement—and public debates around in-person versus remote instruction were particularly contentious. The teacher's union in Connecticut, AFT Connecticut, understood that its members might want to address certain public health policies. Consequently, in July 2020, it sent a letter to its members, including Ms. Light, explaining their First Amendment rights to speak as public citizens about matters of public concern, including the COVID-19 pandemic.[12]

Ms. Light considered it her duty as a parent, educator, and public citizen, to advocate for certain safe reopening policies and ask questions of the Board to ensure it was considering educators' perspectives in deciding how and when to reopen for in-person instruction.[13] She spoke at several Board meetings and parent meetings about her concerns.[14]

Ms. Gethings had also received ATF Connecticut's letter.[15] In November 2020, as debates around reopening heated up in New Haven, she held a meeting with her faculty and staff in part to explain their rights to advocate for specific policies as public citizens. Nonetheless, that same month, she and her deputy, Ms. Clarino, held a separate meeting with Ms. Light in which they explained that *her* public comments reflected poorly on Ms. Gethings as the school principal.[16] They noted her comments made it appear that Ms. Light and the administrators

---

[11] In evaluating a Rule 59 motion for a new trial, "trial judge is free to weigh the evidence [her]self and need not view it in the light most favorable to the verdict winner." *McCarter & English LLP v. Jarrow Formulas, Inc.*, 715 F.Supp.3d 281, 302 (D. Conn. 2024) (citing *Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003)).
[12] Pl.'s Ex. 1 (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Brown v. Office of Conn. State. Comptroller*, 456 F. Supp. 3d 370 (2020)).
[13] Trial Tr. 49, 53–54.
[14] *Id.*
[15] *See id.* at 677–97.
[16] *See id.* at 54.

"weren't on the same team."[17] The administrators also informed Ms. Light that they had been pulled aside at a principals' meeting with the superintendent and made to feel that they were in trouble for Ms. Light's comments.[18] The conversation "scared" Ms. Light, but she still continued to advocate for certain district-wide reopening policies because she felt it was "her duty."[19]

New Haven Public Schools eventually reopened for optional in-person instruction in early January 2021.[20] As a precaution, it was NHBE policy to send notification letters to the school community notifying it of any COVID-19 cases within that community. On March 9, 2021, an NHBE high school teacher posted in a Facebook Group for some NHBE parents called "New Haven School Advocates," discussing that policy.[21] Ms. Light, who was a member of the group, commented "I don't think letters were sent." When the fellow teacher asked Ms. Light to clarify, she said, "Hooker never sent a letter."[22]

Ms. Gethings was apparently unhappy about those Facebook comments. After that Facebook post, Ms. Gethings told Ms. Light that she was spreading inaccurate information about the school, creating a negative narrative that "was causing . . . the community to be fearful when there was nothing to be afraid of," and that she "was not operating as a good teammate."[23]

Ms. Gething and Ms. Clarino followed up on that conversation with an email to the entire staff, which read in part:

> It has been brought to our attention from several community members including staff and parents that WHS is being mentioned with inaccurate information which also includes social media. We ask that if you are aware of any negative talk or postings, to please help protect and preserve our school. We hope that people will refrain from making their own inferences and/or misrepresenting

---

[17] *Id.*
[18] *Id.*
[19] Trial Tr. 54–55.
[20] *Id.* at 47–48.
[21] *Id.* at 68; *see also* Pl.'s Ex. 2 at LIGHT0003547.
[22] Trial Tr. 68; *see also* Pl.'s Ex. 2 at LIGHT0003548.
[23] Trial Tr. 70.

our school. We must always keep in mind that we are working together and not against each other. Please rest assured that if there is a COVID outbreak at WHS, you will be notified.[24]

On the morning of March 22, 2021, by e-mail, Ms. Light requested clarification from Ms. Gethings on a particular social distancing policy that the Board planned to implement. Ms. Gethings quickly responded that she was waiting for details from the district.[25] Since the Board was meeting at noon and it would implement the policy the following day, Ms. Light decided to attend the meeting and directly ask the question herself.[26] After the Board meeting, Ms. Gethings sent Ms. Light the following email.

> Jessica,
>
> I am sorry if you didn't get my prompt response to your morning email, I responded very quickly. I assured you that I would seek an answer regarding snacks and lunch distancing which I have done. I said we need to remain patient as changes are being considering in response to the CDC new guidelines, then reviewed by [the superintendent] and our health department will advise. All of this information will be forthcoming.
>
> I feel like we can often offer you a response to some of your questions, please do not hesitate to come to us as we have encouraged you to do.[27]

In short, the administrators seemed to be growing frustrated that Ms. Light continued to publicly advocate for and question certain policies rather than keep everything "in-house." That frustration boiled over during Ms. Light's annual TEVAL meeting on March 26, 2021. Such meetings were normally 15-minutes long and, indeed, Ms. Light had signed up for a 15-minute slot, and usually were held only with the principal and the teacher.[28] But this meeting also included Ms. Clarino, and, after a brief conversation praising Ms. Light's teaching, the

---

[24] Pl.'s Ex. 3 at LIGHT000843–44.
[25] Pl.'s Ex. 7 at DEF000104.
[26] Trial Tr. 363.
[27] Pl.'s Ex. 7 at DEF000104–05; *see also* Trial Tr. 363–62.
[28] Trial Tr. 75.

administrators turned to, in the words of Ms. Gethings, the topic of Ms. Light's "professionalism," which consumed the majority of the roughly 90 minutes.[29] Ms. Light recorded the meeting on her phone and later had the recording transcribed.[30] The transcript was admitted at trial without objection.[31]

First, the administrators informed Ms. Light that they would likely transfer her to first grade from her third-grade position because one of her children would be in third grade at WHS the following year. Ms. Light testified that normally parents who were teachers would simply not have their own children in their classroom, and that there were two third-grade teachers at WHS, so it would have been possible to assign her child to the other teacher.[32] It was also extremely early in the year for teachers to be told about transfers to other grades.[33] Ms. Light expressed confusion about the change but also disclosed to the administrators that she has severe dyslexia, which would make teaching first-grade phonics extremely difficult.[34] The administrators assured her they would provide assistance over the summer with phonics instruction.

The rest of the meeting was spent discussing Ms. Light's COVID-related advocacy at Board meetings and the comments she made on Facebook. While repeatedly acknowledging her right to make such comments, the administrators claimed that she was sowing fear within the WHS team and broader community and reflected negatively on her "professionalism."[35] Toward the end of the meeting, they also raised the rumor that Ms. Light had leaked Ms. Cavanaugh's

---

[29] *Id.* at 75.
[30] *Id.* at 81; *see also* TEVAL Tr., Pl.'s Ex. 24 (hereinafter "TEVAL Tr.").
[31] Trial Tr. 81. Before trial, Defendants objected to the admission of the transcripts, arguing that they were more prejudicial than probative. Opp'n to Pl.'s Mot. *in Limine*, ECF No. 84 (July 22, 2024). The Court denied that motion without prejudice to renewal at trial. *See* Order on Mot. *in Limine*, ECF No. 92 (July 31, 2024). Defendants did not renew their motion at trial. *See* Trial Tr. 81–82.
[32] TEVAL Tr. 16–19.
[33] Trial Tr. 709.
[34] *Id.* at 82; TEVAL Tr. 11–14. TEVAL Tr. 11–12.
[35] Trial Tr. 77–78; *see also* TEVAL Tr. 18.

COVID diagnosis to parents. While Ms. Light denied the rumor in its entirety, the administrators told her that Ms. Cavanaugh would likely file a written complaint and that they would conduct a full investigation.[36]

The following week, the administrators held another meeting, this time with Ms. Light and Ms. Cavanaugh, to discuss the "leak" of Ms. Cavanaugh's COVID-19 diagnosis.[37] Kathleen Morrison, a WHS math teacher, also attended the meeting as Ms. Cavanaugh's union representative.[38] Like the TEVAL meeting the previous week, Plaintiff recorded the meeting on her phone and the transcript of that recording was admitted at trial without objection.[39] Ms. Light repeatedly denied she had shared the information,[40] and Ms. Cavanaugh acknowledged that, while she had planned to file a written complaint, she decided against it because of lack of conclusive evidence that Ms. Light had been the source of the "leak."[41] Nonetheless, Ms. Gethings then stated to the meeting attendees:

> And just so you know, Jessica [Light], we spoke with Judy [Cavanaugh] before and said anyone – and we can respect some people do not want their names mentioned and they certainly deserve that respect. Not one person has said anyone besides you as being the source. We hear that you're saying it wasn't you, but I need you to know that every person said you were the source.[42]

Ms. Gethings refused to identify any of those sources, and later acknowledged on cross-examination that no one had said such a thing directly to her.[43]

---

[36] TEVAL Tr. 44 –46.
[37] Trial Tr. 90–91.
[38] *Id.* at 73–75, 90.
[39] *Id.* at 90; Ms. Cavanaugh Meeting Tr., Pl.'s Ex. 25 (hereinafter "Ms. Cav Tr."); *see also* Marked Ex. List at 1, ECF No. 113 (Aug. 12, 2024).
[40] Ms. Cav Meeting Tr. 12, 13, 14, 15, 20.
[41] *Id.* at. 13.
[42] *Id.* at 19.
[43] *Id.*; Trial Tr. 711–12.

The day after that meeting, Ms. Light received the written portion of her annual teacher evaluation.[44] While the written comments were mostly positive and Ms. Gethings thanked Ms. Light for her efforts during a difficult time, her evaluation also noted, "[a]s we discussed in your mid-year please consider asking questions any time you have a concern, if we do not have the answer we will do our best to attain the answer."[45] Ms. Light read this as yet another warning that she should cease her public advocacy regarding COVID policies, and she was extremely concerned that a future supervisor reading that comment might interpret it as meaning Ms. Light did not respect the school chain-of-command.[46]

Ms. Light testified that, by the end of April, she felt as though she was being "pushed out" of certain extracurricular committees and passed over for certain volunteer and community opportunities she volunteered or applied for.[47] As she recounted in an email to her union representative, she was not chosen to participate in a play-based learning workshop for which she had secured the grant money; the responsibilities of her gardening committee had been taken away and assigned to another teacher's club; she was replaced as the teacher representative on the parent-teacher association ("PTA"); and the administrators declined to choose her for a school management position for which she had volunteered.[48] Around the same time, she was informed she would be officially transferred to first grade, despite her dyslexia and even though it was her second-to-last grade preference submitted to administrators.[49]

At the end of April, she filed an official complaint with NHBE, alleging Ms. Gethings and Ms. Clarino were waging a campaign of "retaliation, harassment and slander" that was

---

[44] Trial Tr. 93–94.
[45] *Id.* at 94; Pl.'s Ex. 4.
[46] Trial Tr. 94.
[47] *Id.* at 99–100; Pl.'s Ex. 9.
[48] Trial Tr. 95–101; Pl.'s Ex. 9.
[49] Trial Tr. 100–01.

preventing her "from being as effective as a teacher."[50] Toward the end of the school year, she felt "very apprehensive," "isolated," and "terrified."[51] She recalled having "increased anxiety," being "afraid to eat with co-workers" because "they would be seen negatively," and feeling as if she was "not as good of a wife and mother."[52] Ms. Light also saw around May 2021 that three of her colleagues—including Ms. Cavanaugh and Ms. Morrison—has "unfriended" her on Facebook.[53] Her husband David Bianchine testified that, over the course of the 2021 school year, his wife became withdrawn, she would smile less, and was "consumed" with "panic and anxiety."[54]

Shortly after Ms. Light filed her complaint against Ms. Gethings and Ms. Clarino, Ms. Alden, Ms. Light's child's second-grade teacher at WHS, filed a complaint against her.[55] Ms. Alden had had difficulties with Ms. Light's child related to remote schooling. However, as Ms. Light's husband testified, he had taken the lead on communicating with Ms. Alden about their child because Ms. Light, wanted to "keep things professional" between herself and the other teacher.[56]

Ms. Alden's grievances against Ms. Light seemed to echo the administrators' criticisms from the TEVAL meeting, including, "[h]aving Jessica as a colleague and also as a parent of a Hooker student has made me extremely uncomfortable, especially given her unwillingness to engage in a productive and professional rapport."[57] Ms. Alden's complaint further noted that, "[a]s a member of the NHBE and Hooker education community, Jessica has become extremely

---

[50] *Id.* at 102–105; Pl.'s Ex. 38.
[51] Trial Tr. 115.
[52] *Id.* at 108.
[53] *Id.* at 115.
[54] *Id.* at 411–12.
[55] *Id.* at 116–17.
[56] *Id.* at 119.
[57] Pl.'s Ex. 6 at DEF001840.

vocal on social media and has misrepresented our school and the protocols we have in place. . . .
I am afraid to share my opinions for fear of continued harassment and retaliation, and her
continued misrepresentation shared on social media, as well as to parents in my class."[58]

Toward the end of the school year, Ms. Light was admonished by Ms. Gethings for
asking another WHS staff member to watch her class during dismissal so she could use the
restroom.[59] Ms. Light testified that such a request was not out of the ordinary, but Ms.
Gethings's rebuke was.[60] Then, on June 7, 2021, Ms. Gethings and Ms. Clarino filed a
"retaliatory" complaint against Ms. Light with NHBE Human Resources.[61]

Over the summer, Ms. Light learned that NHBE planned to hire a law firm to perform an
independent investigation of the complaints following allegations that the WHS administration
had "tainted and or compromised" witnesses.[62] Meanwhile, Ms. Light began to prepare to teach
first grade without any help from NHBE. She attended online seminars on the science of reading,
joined Facebook groups dedicated to the topic, and purchased books to assist her self-study.[63]

As the 2021-2022 school year approached, Ms. Light emailed NHBE asking that the
Board put in place specific policies governing her interactions with Ms. Gethings and Ms.
Clarino, to ensure she could return to a safe environment when the school year began.[64] NHBE
eventually sent a draft "rules of engagement" for Ms. Light and the administrators to follow
during the school year. Ms. Light responded requesting additional "safeguards" for the
administration, including asking that, "Ms. Gethings and Ms. Clarino [] acknowledge that I have
the right as a private citizen to say anything I deem [of] public concern to the board of education

---

[58] *Id.* at DEF001840–41.
[59] Pl.'s Ex. 37 at LIGHT00225.
[60] Pl.'s Ex. 37 at LIGHT00224.
[61] Trial Tr. 669–70; *see also* Pl.'s Ex. 7 at DEF000102.
[62] Trial Tr. 126, 578–80; Pl's Ex. 12.
[63] Trial Tr. 128.
[64] *Id.* at 130; Pl.'s Ex. 11.

and to discuss my views freely with my friends and on social media."[65] The safeguards were never put in place and the rules of engagement were never agreed to.[66]

The new school year brought more irregular behavior from the administrators. From August 2021 to the middle of October 2021, Ms. Clarino entered Ms. Light's classroom and remained for part of the day at least four times.[67] During these observations, Ms. Clarino would sit in the classroom and appear to be taking notes.[68] Unlike all other observations in Ms. Light's teaching career, which normally occurred two to four times over an entire year, Ms. Light received no written feedback. The observations made Ms. Light feel as though "the administration was looking for me to do something wrong constantly in my room."[69]

Ms. Light began FMLA leave in October 2021. Her clinician described her condition necessitating the leave as, "Complex PTSD being triggered by hostile work environment, increase in anxiety, depression, intrusive thoughts, lack of sleep, and difficulty concentrating."[70] While on leave, Ms. Light was notified that the investigation into the complaints had been completed, and that the findings from the investigation justified "all of [her] fears."[71]

Following the completion of the investigation, Ms. Light prepared to return to school from leave. She asked the Board to put policies in place that would ensure her safe return, to convert her FMLA leave to paid sick leave, and to guarantee she would be able to return to teaching third grade the next year.[72] The Board agreed to none of Ms. Light's requests, and then

---

[65] Pl.'s Ex. 13 at DEF000089.
[66] Trial Tr. 131–32.
[67] *Id.* at 133.
[68] *Id.*
[69] *Id.* at 133–134.
[70] Pl.'s Ex. 14 (Cert. of Health Care Provider under FMLA) at 2–3.
[71] Trial Tr. 139–40. The jury was not given the full report. *See* Ruling on Cross Mot. *in Limine*, ECF No. 94 (July 31, 2024). However, they were shown correspondence of parties reacting to the report.
[72] Pl.'s Ex. 46.

informed her she would face discipline if she did not return to work.[73] The Board never put any rules or safeguards in place governing Ms. Light's interactions with Ms. Gethings and Ms. Clarino, despite receiving letters from Ms. Light's clinicians that such guardrails were necessary for her health and safety.[74] Ms. Light returned to work on February 9, 2022.[75]

Meanwhile, in light of the law firm's investigation results, Ms. Gethings had been issued a warning by Dr. Ilene Tracey, the superintendent of NHBE. She noted that she and Ms. Gethings had discussed that Ms. Gethings, "exhibited poor professional judgment in how [she] handled differences of opinion with an employee [she] supervised . . .. [and] how [she] responded to an employee criticizing the Worthington Hooker School Administration during a New Haven Board of Education meeting."[76]

In mid-March 2022, Ms. Light once again completed the annual preference form about grades she hoped to teach the following school year. Once again, she ranked third grade as her first preference and kindergarten as her least preferred option, with first grade as second least-preferred option.[77] While she was told she would once again be teaching first grade, she learned in June that there was an open position at WHS for a third-grade teacher. She immediately applied.[78] However, she was not invited to interview for the position and the job was given to an external candidate.[79]

At some point after she returned from FMLA leave, Ms. Light also learned that a copy of Ms. Alden's complaint about her from the previous year was on another teacher's printer. She went to the teacher's classroom—which was in a different building—and took pictures to send to

---

[73] Trial Tr. 142–44, 150; Ex. 27 at 4–5; Ex. 27 at 4–5.
[74] Pl.'s Ex. 15 at 4.
[75] Trial Tr. 155.
[76] Pl.'s Ex. 48.
[77] Trial Tr. 157.
[78] *Id.* at 158 – 59.
[79] *Id.* at 159–60.

her union and human resources.[80] The law firm that had investigated the earlier complaints was brought in again to investigate how the complaint ended up on the printer,[81] but that investigation proved inconclusive.[82]

Ms. Light's relationships with her colleagues seemed to go from chilly to toxic after her return. Whereas in previous years, she and her colleagues would eat lunch together in each other's classrooms, Ms. Light now ate her lunch alone.[83] She also did not rejoin any school committees. During a retirement party, Ms. Light was sitting with another teacher when Ms. Alden asked the teacher to sit with her instead. All other teachers near Ms. Light then also moved.[84] Ms. Light attempted to be friendly. For example, she recounted, "I said hello to Ms. Alden. And then she said, 'That's the most unprofessional thing I have ever heard.'" At trial, her lawyer asked how she replied. Ms. Light said, "I cried."[85] On the last day of school, the staff held a baby shower for another teacher and did not invite Ms. Light.

Ms. Light testified that, "prior to my advocacy I was—I had no problems with anyone. I never sat alone at lunch. I was involved in every committee I could possibly be involved in. I loved it there. I was happy to be at work. I felt support. And after . . . I felt completely alone and, you know, cried before I went to work."[86]

Nonetheless, at the end of summer 2022, Ms. Light returned to WHS to set up her first-grade classroom for the following year. She found a typed note pinned to her door that featured the Nike logo. Under the words "Just Do It," was typed "JUST LEAVE OUR SCHOOL. YOU

---

[80] *Id.* at 169–70.
[81] *Id.* at 171.
[82] *Id.* at 172.
[83] Trial Tr. 161–62.
[84] *Id.*
[85] *Id.* at 162.
[86] *Id.* at 172.

ARE TOXIC."[87] She took photographs of the note and shared it with human resources and her

union.[88] Shortly thereafter, she found a second note in one of her classroom cabinets that said

"Mrs. Light's To Do List," followed by two items, "Wash hair" and "Leave or Just die."[89] That

same day, she accepted a job teaching third grade at Ross Woodward, another public school in

New Haven.  Ms. Light was later told that Ms. Clarino carried out an investigation into who left

the notes, but that investigation was inconclusive.[90]

### B.  Procedural History

Ms. Light filed her amended complaint on March 30, 2022, before she officially left

WHS.[91] She asserted four claims. Count One alleged that the Board disciplined Ms. Light's

exercise of free speech in violation of Connecticut General Statute § 31-51q. Count Two alleged

that Ms. Gethings retaliated against Ms. Light for her exercise of free speech in violation of the

First Amendment, a claim which is actionable against Ms. Gethings individually as a local

government actor, under 42 U.S.C. § 1983. Counts Three and Four alleged common law claims

against Ms. Gethings for false light invasion of privacy and for defamation, respectively.[92]

Summary judgment was granted on the false light claim but denied as to the other three counts.

*See Light v. City of New Haven Bd. of Educ.*, 2024 WL 1199717, at *11 (D. Conn. March 19,

2024).

The trial commenced on August 5, 2024, on three counts: Count One alleged that the

Board, through Ms. Gethings, had unlawfully disciplined Ms. Light in violation of Conn. Gen.

Statute § 31-51q; Count Two alleged that Ms. Gethings had violated Ms. Light's First

---

[87] *Id.* at 359; Pl.'s Ex. 21.
[88] *Id.* at 360.
[89] *Id.* at 361–62; Pl.'s Ex. 22.
[90] Trial Tr. 388–89.
[91] *See* Am. Compl., ECF No. 6 (March 30, 2022).
[92] Joint Pre-Trial Mem. 2, ECF No. 68 (July 12, 2024).

Amendment rights enforceable under 42 U.S.C. § 1983; and Count Three alleged defamation against Ms. Gethings for her "allegedly false statement that Plaintiff disclosed [Ms. Cavanaugh]'s COVID status."[93]

During the pre-trial conference,[94] Ms. Light's counsel specified that the defamation claim was based on Ms. Gethings's statement that "Everyone's telling us it was you. You're the source of the leak," said during the March 31, 2021 meeting with five people—Ms. Gethings, Ms. Clarino, Ms. Light, Ms. Cavanaugh, and Ms. Morrison.[95] To avoid surprise at trial, Defendants' counsel requested that Plaintiff's counsel enumerate acts he planned to present as retaliatory.[96] Ms. Light's counsel enumerated eleven such acts.[97] Defendants also "reserved the right" to assert a qualified immunity defense on the § 1983 claim depending on the jury's response to a special interrogatory in Count Two, asking the jury to specify which actions they found to have violated Ms. Light's First Amendment rights.[98]

At the close of evidence, Defendants moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, arguing that the jury did not have a legally sufficient basis to find for Plaintiff on any of the three counts.[99] Defendants also objected to the use of the "substantial or motivating" causation standard in the jury instructions to evaluate whether Ms.

---

[93] *Id.*
[94] The Court has included details from the pre-trial conference and the charging conference to the extent that they are relevant to the instant motions.
[95] Pretrial Conf. Tr. 10., ECF No. 100 (Aug. 5, 2025).
[96] *Id.* at 20.
[97] *Id.* at 20–23; *id.* at 33.
[98] *Id.* at 3–4.
[99] Trial Tr. 754.

Light's speech caused the retaliatory acts.[100] By agreement, retaliatory acts to be considered were limited to those taken by Ms. Gethings prior to May 2022.[101]

After a four-day trial, the jury found that the Board had retaliated against Ms. Light in violation of § 31-51q ("Count One"), Ms. Gethings had retaliated against her in violation of 42 U.S.C. § 1983 ("Count Two"), and that Ms. Gethings had defamed her ("Count Three"). The jury awarded the following monetary damages. For Count One against the Board, the jury awarded $50,000 in compensatory economic damages, $300,000 for non-economic compensatory damages, and $100,000 in punitive damages. For Count Two against Ms. Gethings, the jury awarded $75,000 in compensatory economic damages, $350,000 in compensatory non-economic damages, and $200,000 in punitive damages. For Count Three against Ms. Gethings, the jury awarded $10,000 in special damages and $15,000 in general damages.

## III.    STANDARD OF REVIEW

### A.  Rule 50

Rule 50(a) of the Federal Rules of Civil Procedure authorizes entry of judgment as a matter of law against a party "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). If this motion is denied before the case is submitted to the jury, it may be renewed following the entry of judgment. Fed. R. Civ. Pro. 50(b). "The movant may file a renewed motion for judgment as a matter of law and may include

---

[100] *Id.* at 782–83. The Court based its wording on the standard derived from *Mt. Healthy School District.* 429 U.S. 274 (1977).

[101] *Id.* at 801–03. In the jury instructions, the second element of Count One, the 31-51q claim defined "'[d]iscipline'" as "an adverse action taken against Ms. Light by Ms. Gethings by May 2022."[101] The third element of Count Two, the § 1983 claim, required that "Ms. Light must show by a preponderance of the evidence that she experienced at least one adverse employment action by May 2022." Jury Instr. 7, ECF No. 114 (Aug. 8, 2024).

an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the

court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial;

or (3) direct the entry of judgment as a matter of law." *Id.*

A Rule 50 motion "may only be granted if there exists such a complete absence of

evidence supporting the verdict that the jury's findings could only have been the result of sheer

surmise and conjecture, or the evidence in favor of the movant is so overwhelming that

reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Kinnary v. City of

New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d

127, 133 (2d Cir. 2008) (alterations in original). "In deciding a motion for judgment as a matter

of law, a court must 'draw all reasonable inferences in favor of the nonmoving party, and it may

not make credibility determinations or weigh the evidence.'" *McCarter*, 715 F.Supp.3d at 303

(quoting *Reeves v. Sanderson Plumbing Inc.*, 530 U.S. 133, 150 (2000)). A renewed motion for

judgment as a matter of law may not be granted except to prevent "manifest injustice," which

"exists where a jury's verdict is wholly without legal support." *ING Global v. United Parcel

Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) (citing *Rothstein v. Carriere,* 373 F.3d

275, 291 (2d Cir.2004)).

### B.  Rule 59

Federal Rule of Civil Procedure 59 permits the court to grant a new trial on all or some of

the issues. "Generally, the grant of a new trial under Rule 59 is warranted only if the district

judge is 'convinced that the jury has reached a seriously erroneous result or that the verdict is a

miscarriage of justice.'" *Ramos v. Cnty. of Suffolk,* 707 F.Supp.2d 421, 427 (E.D.N.Y. 2010)

(quoting *Sorlucco v. New York City Police Dept.,* 971 F.2d 864, 875 (2d Cir.1992)). Rule 59 is

more permissive than the standard under Rule 50, in that Rule 59 permits the trial judge to weigh

the evidence herself not only in the light most favorable to the verdict winner. *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003). A court may grant such a motion "even if there is substantial evidence supporting the jury's verdict." *Id.* "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998).

Furthermore, the standard of review applied when evaluating a motion for a new trial depends on whether a party "objected contemporaneously to the purported errors." *Boateng v. BMW AG*, 753 F.Supp.3d 215, 228 (E.D.N.Y. 2024) (citing *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005)). If a claimed error was not preserved by contemporaneous objection at trial, a Rule 59 motion may be granted only if the error was "so serious and flagrant that it goes to the very integrity of the trial." *Id.*

### C. Rule 60

Defendants have also moved for relief from final judgment as to the retaliation claims under Rule 60(b)(6), which permits a court to "correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." Mot. 7 ("Where . . . there are such extraordinary circumstances or hardship, Rule 60(b)(6) is to be liberally applied to accomplish justice." (7 Moore's Federal Practice P 60.27(2), pp. 352 *et seq.*)).[102] The decision whether to grant a party's Rule 60(b)(6) motion is committed to the 'sound discretion' of the district court[.]" *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012)

---

[102] Rule 60(b)(1) allows a party to seek relief from final judgment due to "mistake, inadvertence, surprise, or excusable neglect," while Rule 60(b)(6) encompasses "any other reason justifying relief." The two, however, are mutually exclusive "such 'that any conduct which generally falls under the former cannot stand as a ground for relief under the latter.'" *See Mandala v. NTT Data, Inc.*, 88 F.4th 353, 359 (2d Cir. 2023) (quoting *Stevens v. Miller*, 676 F.3d 62, 67 (2d Cir. 2012)). The Court will thus interpret Defendants' motion as brought under Rule 60(b)(6).

(citation omitted). "The burden of proof on a Rule 60(b) motion lies with the party seeking relief." *Serrano v. Smith*, 2009 WL 1390868, at *1 (S.D.N.Y. May 13, 2009). Relief under Rule 60(b)(6) is only available in "extraordinary circumstances," for which a court may consider a wide range of factors including "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Buck v. Davis*, 580 U.S. 100, 123 (2017) (citing *Gonzales v. Crosby*, 545 U.S. 524, 535 (2005) and *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 864 (1988)).

## IV. DISCUSSION

Defendants challenge the jury's verdict on six grounds. First, they argue that the jury could not consider Ms. Clarino's classroom observations as an adverse action and, without that action, there was not a legally sufficient evidentiary basis for the jury to find that either defendant retaliated against Ms. Light for her protected speech under either § 1983 or § 31-51q.

Second, Defendants claim that Ms. Gethings is entitled to qualified immunity from any "adverse acts" found in Count Two. Third, they argue that there was no legally sufficient proof of reputational injury to support her defamation claim. Fourth, Defendants seek a new trial because the jury was improperly instructed on the causation elements of Count One and Count Two. Fifth, Defendants claim entitlement to a new trial because the Court improperly admitted two anonymous notes found by Plaintiff at WHS in August 2022. Sixth and finally, Defendants assert that the damages awards on the first two counts must be set aside as excessive or, in the alternative, remitted.

### A. Retaliation Claims

The jury identified two "adverse acts" to be in violation of § 1983: the extended TEVAL meeting and Ms. Clarino's observations of Ms. Light between August 2021 and October 2021.

24

The Defendants argue that, since the Clarino observations were not on plaintiff's counsel's list of "adverse acts" shared at the pretrial conference, the jury was not permitted to consider the observations to be adverse acts.[103] They further argue that this inappropriate finding "calls into question the jury's entire verdict" because "there is no ability to separate Ms. Clarino's observations from the TEVAL meeting for purposes of allocating damages to one or the other[] and no ability to determine if the jury would have found liability based just on the TEVAL meeting, if they were instructed that they could not consider Ms. Clarino's observations on the issue of liability."[104]

Regarding Count One, the jury was not given—nor did either party request—any special interrogatory for the jury to specify which acts they found to constitute "discipline." Nonetheless, Defendants argue that, because plaintiff's counsel "argued both of the retaliation claims together," that the jury's verdict on Count One is also a "miscarriage of justice."[105]

However, Defendants never objected to the jury instructions, any cross examination, or any argument by plaintiff's counsel on the grounds that the Court or opposing counsel was departing from the informal list of acts, which was never shared with the jury. Any argument that the jury based their verdict on conduct they were not permitted to consider was therefore waived. Defendants essentially object to the lack of instructions limiting the jury's consideration to only the eleven actions identified by Plaintiff's counsel during the pre-trial conference. Under Federal Rule of Civil Procedure 51(c)(1), a party "who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." The Second Circuit has repeatedly found that parties may not rely on

---

[103] Mot. 8–10.
[104] *Id.* at 9.
[105] *Id.* at 10.

communications between parties or with the Court other than jury instructions to constrain a jury. *See Caruso v. Forslund*, 47 F. 3d 27, 31 (2d Cir. 1995) (holding a party may not rely on submissions of proposed jury instructions); *Jarvis v. Ford Motor Co.*, 283 F. 3d 33, 57, 60 (2d Cir. 2002).

The Court may excuse a failure to object "'where the party's position has previously been made clear to the trial court and it was apparent that further efforts to object would be unavailing.'" *Emamian v. Rockefeller Univ.*, 971 F.3d 380, 387 (2d Cir. 2020) (citing *Anderson v. Branen*, 17 F. 3d 552, 55 –57 (2d Cir. 1994)). "But absent such circumstances, an objection must be lodged so as to afford the trial court 'an adequate opportunity to cure any defects in the instruction before sending the jury to deliberate.'" *Id.* (citing *Caruso*, 47 F.3d at 31).

Here, the record does not demonstrate that objections would have been futile. Indeed, the Defendants themselves successfully requested the limiting instruction that the jury may only consider actions "adverse actions" or "discipline" committed by Ms. Gethings prior to May 2022.[106]  In *Emamian*, the plaintiff challenged the verdict in part because the jury had not been instructed on punitive damages; however, the Second Circuit found any objection to the jury instruction had been waived because the party's counsel "never raised the issue during the charge conference, though counsel meticulously combed through the entire charge and fully aired numerous other objections. Nor did [] counsel object after the charge was read." *Emamian*, 971 F.3d at 387. Here, as there, the Court was clear on how it would charge the jury and used the exact limiting instruction requested by Defendants. It is thus not evident that Defendants' efforts to object—or propose—an additional instruction would have been "unavailing."

---

[106] Trial Tr. 801–03.

Furthermore, handshake agreements between counsel about what they plan to argue do not bind a jury—especially if a jury was never made aware of such agreement. In *Jarvis v. Ford*, Defendants specified their position on damages with the court prior to trial, going so far as to say the court should charge the jury a certain way. 283 F.3d at 54. Nonetheless the Second Circuit found that because the defendant "failed to alert the court to the precise nature of [its] objection and its legal grounding," the defendant had waived the objection. *Id.* at 54, 56–57 (holding Defendants failed to meet the Rule 51 standard for timely objections).

Here, Defendants could have, but did not, object to the Court's jury instructions and could have, but did not, propose jury instructions specifically based on the list of eleven potential retaliatory actions identified by Plaintiff's counsel. Any objection they had to the jury's consideration of any other action attributable to Ms. Gethings prior to May 2022 was waived.

Even if a challenging party has failed to object to a jury instruction at trial, the Court may still find for that party if there is plain error, "that is, 'if the error affects substantial rights.'" *Rasanen v. Doe*, 723 F.3d 325, 331–32 (2d Cir. 2013) (quoting Fed. R. Civ. P. 51(d)(2)). "[T]he plain error exception to Rule 51's objection requirement should only be invoked with extreme caution in the civil context. To constitute plain error, a court's actions must contravene an established rule of law, and go to the very essence of the case." *Id.* at 332 (2d Cir. 2013) (cleaned up) (citations omitted).

The Court must review under the "plain error" standard whether the jury's verdict "contravene[d] an established rule of law." *Id.* It will address each Count in turn.

### 1.  Plain Error and Count One

The jury was instructed that, to prove the Board had retaliated against her in violation of Section 31-51q, Ms. Light was required to prove that she engaged in speech protected by the

state or federal constitution, the Board disciplined her, and there was a causal relationship between her speech and the Board's discipline.[107] The parties agreed pre-trial that Ms. Light had engaged in protected speech.[108] The jury was instructed that "discipline" meant "an adverse action taken against Ms. Light by Ms. Gethings by May 2022. It can also include a combination of lesser acts that, in the aggregate, make the working environment unreasonably inferior, hostile, or adverse to the employee when compared to a typical or normal workplace."[109] No special interrogatories were requested by either party for this Count.

Defendants argue that because Plaintiff's counsel "argued both of the retaliation claims together," the arguments that apply to Count One should also apply to Count Two.[110] They also argue that "the Court must conclude that the jury . . . based [their] [Count One] verdict on the same two acts it listed in regard to Count Two."[111] But the Court must conclude no such thing. As there was no special interrogatory nor limiting instruction as to what the jury could consider "discipline" under Count One, there is no way for the Court to determine what evidence the jury based its verdict on for that Count. Specifically, there is no way for the Court to determine whether the jury was persuaded by singular acts of discipline or by "a combination of lesser acts" that created a hostile working environment for Ms. Light.[112] Because Defendants never requested an interrogatory or limiting instruction—indeed, they *suggested* the definition of "discipline" that the Court incorporated into its jury instructions—Defendants have waived any arguments regarding the absence of special interrogatories or limiting instructions. *See Thorsen v. Cnty. of Nassau*, 722 F.Supp.2d 277, 287 (E.D.N.Y. 2010) ("[I]t is extremely difficult to see 'how

---

[107] Jury Instr. 4.
[108] *Id.* at 5.
[109] *Id.*
[110] Mot. 10.
[111] *Id.*
[112] Jury Instr. 5.

holding the defendants to a jury verdict that faithfully followed an instruction and verdict form that they themselves urged upon the court could give rise to a miscarriage of justice.'" (citing *Shade v. Housing Auth. of City of New Haven*, 251 F.3d 307, 313 (2d Cir. 2001))).

The Court is left to consider whether allowing the verdict to stand on Count One would constitute "plain error" affecting "substantial rights" of the Defendant." Fed. R. Civ. P. 51(d)(2). Section 31-51q prohibits "[a]ny employer, including the state and any instrumentality or political subdivision thereof" from subjecting an employee to "discipline or discharge on account of the exercise by such an employee of rights guaranteed by the first amendment to the United States Constitution or sections 3, 4 or 14 of the article first of the Constitution of the state." Conn. Genn. Stat. § 31-51q. There has been no definitive treatment of "discipline" in Connecticut caselaw, and "discipline" likely does not extend to the full range of actions that may be characterized as "adverse actions" under 42 U.S.C. § 1983. *Light v. New Haven Bd. of Educ.*, 2024 WL 1199717, *8 (March 19, 2024) (citing *Nelson v. City Hartford*, No. 3:20-cv-221 (JAM), 2022 WL 168798, at *6 (D. Conn. 2022)). "'[T]he term 'discipline' contemplates 'an affirmative act of deprivation that diminishes the status or happiness of the recipient rather than a failure to enhance that status or happiness.'" *Mercer v. Schriro*, 337 F.Supp.3d 109, 139 (D. Conn. 2018) (citing *Burdick v. Clouet*, No. CV085006062, 2011 WL 2739557, at *7 (Conn. Super. Ct. June 14, 2011; *Bombalicki v. Pastore*, No. 378772, 2000 WL 726838 (Conn. Super. Ct. May 10, 2000) (Blue, J.)).

Affirming Judge Underhill's decision in *Brown v. Office of the State Comptroller*, 211 F.Supp.3d 455, 479 (D. Conn. 2016), the Second Circuit noted, "[a]lthough the word 'discipline' is not statutorily defined, Connecticut courts have interpreted the term to 'involve[] affirmative acts of punishment that (at least when the punishment is being inflicted) leave the recipients in a

less happy state than that which they enjoyed before the punishment began.'" *Brown v. Halpin*, 885 F. 3d 111, 118 (2d Cir. 2018) (citing *Bombalicki*, 2000 WL 726839, at \*3; *McIntyre v. Fairfield Univ.*, No. CV 020391471, 2003 WL 1090690, at \*2 (Conn. Super. Ct. Mar. 3, 2003)).

Absent any means of insight as to jurors' decision-making process, the Court determines whether there was evidence that Ms. Gethings took "affirmative act[ions] of deprivation that diminishe[d] the status or happiness" of Ms. Light, *Mercer*, 337 F.Supp.3d at 139, or punished her in a way that left her "in a less happy state than that which [she[]] enjoyed before the punishment began." *Brown*, 885 F. 3d at 118 (citations omitted). There was ample such evidence in the record, and that such actions and punishments were carried out to punish Ms. Light for her protected speech.

In examining the TEVAL meeting, for example, Ms. Gethings and her deputy, Ms. Clarino, transformed what should have been a standard 15-minute meeting into a 90-minute discussion of Ms. Light's advocacy activities. The administrators, representing Plaintiff's employer, NHBE, repeatedly told her that it was not her "place" to ask the Board questions about a unified reopening plan or to post on Facebook about the COVID-19 notification letters.[113]

Instead, according to the administrators, Ms. Light should have directed her questions privately to the two administrators.[114] Ms. Gethings also stressed that she was aware every time Ms. Light made comments at Board meetings, because she, "listen[ed] . . . every other Monday

---

[113] *See* TEVAL Tr. 20, 28, 43.
[114] *See e.g., id.* at 20 ("MS. CLARINO: [F]rom our perspective and you saw, read something on Facebook, instead of commenting publicly that Hooker didn't do something, if you could go back and do something different would it be anything? MS. LIGHT: I'm not sure. MS. CLARINO: Would you ask us? MS. LIGHT: . . . I really feel like I don't have that relationship with you. MS. CLARINO: That has nothing to do about a relationship, Jessica . . . MS. GETHINGS: We didn't have to have a relationship but you shouldn't be able to comment that we're not doing something that you think we should have done."); *Id.* at 28 ("MS. GETHINGS: We're not judging you. I'm not judging you and you do have a right and you do what you need to do. However, it does, you are correct, it makes it uncomfortable for us because it's like we are failing you, we're not providing you with the information you asked us. Well, we should, we are your first line, correct? MS. LIGHT: Right.").

30

to the Board meeting for the whole time, and I've heard you speak every time you have. I don't know that your intention is heard. And everyone knows you're Jessica Light from Worthington Hooker School and it doesn't seem like [you're] advocating for the city. It seems like you're personally talking about your experience."[115]

Similarly, in discussing Ms. Light's Facebook comments, Ms. Gethings acknowledged Ms. Light's right to make such comments, saying, "everyone has a right to speech and the right [to] oppose, the right to do whatever, but I have to say the part about Hooker didn't send letters, there is a lot to that because Hooker - - you may not agree with that, you may think differently, but frankly that isn't your place to tell everyone that we didn't send a letter and make sure a lot of stress and people saying you have [COVID-19] cases."[116]

> MS. GETHINGS: But you're not the Health Department, you're not the Superintendent - -
>
> MS. LIGHT: No, you're right, you're right.
>
> MS. GETHINGS: - - of the school.
>
> MS. LIGHT: You're right.
>
> MS. GETHINGS: And it's not your place.[117]

The administrators also used the TEVAL meeting to inform Ms. Light that they would likely transfer her to first grade from her third-grade position because one of her children would be in third grade at WHS the following year. Ms. Light testified that normally parents who were teachers would simply not have their own children in their classroom, and that there were two third-grade teachers at WHS, so it would have been possible to assign her child to the other teacher.[118] Furthermore, teachers were required to submit a sheet listing their preference for

---

[115] *Id.* at 35–36.
[116] *Id.* at 41.
[117] *Id.* at 43.
[118] *Id.* at 16–19.

which grades they wished to teach the following year, and Ms. Light had indicated first grade was her second-to-last choice[119], and it was also extremely early in the year for teachers to be told about transfers to other grades.[120]  Ms. Light expressed confusion about the change but also disclosed to the administrators that she has severe dyslexia, which would make teaching first grade phonics extremely difficult.[121] The administrators assured her they would provide assistance over the summer with phonics instruction. Yet they never did.[122]

The administrators then moved the conversation to the rumor that Ms. Light disclosed Ms. Cavanaugh's COVID diagnosis and the role that Ms. Light's Facebook comments played in that rumor. Ms. Gethings warned, "this situation is also affecting other staff people who feel it's very hard to work with you"[123]; "it makes people nervous that you're going to like come after them or not approve of something they might do, and I don't think that you would. I don't know you well, just like you said you don't have a relationship with us"[124]; and "I do think you've increased the anxiety and fear in our community by the Facebook posts and by this information that you did not agree with how it was handled and thought it should be more transparent that has directly affected our community because you didn't just think it privately. You make that publicly known."[125]

These comments about both Ms. Light's comments at Board meetings and her Facebook comments readily appear designed to deter Ms. Light from making such comments in the future. Ms. Gethings and Ms. Clarino were Ms. Light's supervisors, taking time to express displeasure

---

[119] Trial Tr. 84.
[120] *Id.* at 709.
[121] *Id.* at 82; TEVAL Tr. 11–14.
[122] *See* Trial Tr. 127–28.
[123] TEVAL Tr. 44.
[124] *Id.* at 47.
[125] *Id.* at 54.

about Ms. Light's activities and to direct her to, in the future, privately ask them questions instead of publicly raising issues regarding NHBOE's reopening policies.

Ms. Gethings ended the TEVAL meeting by telling Ms. Light that she and Ms. Clarino "will be leading" an investigation into any complaints made by Ms. Cavanaugh.[126] A reasonable juror could infer that the threat of such an investigation—especially in the face of denials from Ms. Light—further evidenced Ms. Gethings's intent to deter further advocacy. Significantly, Ms. Light testified that the TEVAL meeting made her feel, "Terrified. Isolated. Frustrated. Voiceless[,]" and that "I had always been willing to change my grade or do whatever was best for the school, but I truly didn't believe that this was for the betterment of the student. I thought [the administrators] were just out to get me."[127] After that meeting, Ms. Light ceased speaking up at school board meetings because, as she testified, "[i]t was clear that if I continued to speak, I wouldn't be in the good graces with my boss."[128]

Taken together, it was not plain error for the jury to conclude that Ms. Light was subjected to at least one act of discipline—the TEVAL meeting—in violation of § 31-51q.[129]

Finally, there was sufficient evidence in the record for the jury to have reasonably concluded that Ms. Gethings subjected Ms. Light to "a combination of lesser acts that, in the aggregate, ma[d]e the working environment unreasonably inferior, hostile, or adverse to the employee when compared to a typical or normal workplace."[130] In addition to the extended

---

[126] *Id* at 59.

[127] Trial Tr. 86.

[128] *Id.* at 87.

[129] Because Defendants have waived any arguments regarding special interrogatories to the jury as to Count One, there is no need for the Court to address whether the observations by Ms. Clarino also constituted discipline. There was sufficient evidence in the record for the Court to determine that the jury reasonably found the Board liable for unlawfully disciplining Ms. Light through "adverse material action taken against Ms. Light by Ms. Gethings by May 2022 . . . [or] a combination of lesser acts that, in the aggregate, make the working environment unreasonably inferior, hostile, or adverse to the employee when compared to a typical or normal workplace." Jury Instr. 5.

[130] Jury Instr. 5.

TEVAL meeting and the grade transfer—which clearly diminished Ms. Light's happiness at work—Ms. Light testified that Ms. Gethings, *inter alia*, removed her from certain extracurricular committees[131]; reassigned other faculty to responsibilities, such as caring for the community garden[132]; falsely stoked a rumor in front of Ms. Light's colleagues that she disclosed private medical information of another teacher[133]; did not provide the assistance with preparation for teaching first grade that she had promised[134]; and "tainted" potential witnesses to the Board's internal investigation into Ms. Light's and the administrators' complaints, resulting in the Board appointing independent counsel to complete the investigation.[135]

Under either the plain error standard or the more expansive Rule 59 standard, which permits the Court to weigh the evidence and evaluate witness credibility for itself, *Manley*, 337 F.3d at 244-45, the Court finds that evidence in the record supported the jury's verdict that the Board, through Ms. Gethings, unlawfully retaliated against Ms. Light for exercising her rights to free speech as protected under the federal and Connecticut state constitutions, in violation of Connecticut General Statute § 31-51q.[136] The Court found Ms. Light to be a credible witness, and did not find Ms. Gethings's attempted explanations of her own behavior to be persuasive.

### 2.  Plain Error and Count Two

Count Two is a different matter. The jury was instructed that, to prevail on her Section 1983 claim, Ms. Light would need to prove that (1) Ms. Gethings acted under color of state law, (2) Ms. Light engaged in protected speech, (3) Ms. Light suffered one or more adverse employment actions, and (4) there was a causal connection between her speech and one or more

---

[131] Trial Tr. 95–99.
[132] *Id.*
[133] *See id.* at 711.
[134] *Id.* at 127–28.
[135] *Id.* at 126.
[136] *See* Jury Instr. 4.

of the adverse actions.[137] The parties agreed that the first two elements were met.[138] The jury was instructed that "adverse action" meant "an action that is taken by an employer against an employee that is significant enough that it would deter a reasonable and similarly situated person of ordinary firmness from exercising his or her constitutional right to free speech."[139] The jury was told that Ms. Light could also satisfy "this element if she has proved that she experienced at least one employment action of this sort," or "if she proves she experienced a combination of seemingly minor incidents that reached a critical mass."[140]

Defendants requested that the verdict form include a special interrogatory for Count Two asking the jury to specify which actions by Ms. Gethings they found constituted "adverse action."[141] On the verdict form, the jury identified two "adverse employment actions": "Extended teval [sic] conversation not regarding Ms. Light's teaching," and "Ms. Clarino excessively shadowing Ms. Light from Aug – Oct 2021 prior to FMLA absence."[142] The parties did not request, nor did the Court provide, a special interrogatory inquiring whether Ms. Light had proven her claim by demonstrating individual adverse actions and/or by critical mass. The only finding conveyed by the jury was that both affirmative acts of the extended TEVAL meeting and Ms. Clarino's observations supported Ms. Gethings's liability for violating Ms. Light's First Amendment right.

However, there was no evidence that Ms. Gethings had personal involvement in Ms. Clarino's classroom observations. In *Tangreti v. Bachmann*, the Second Circuit held that, when claiming a Section 1983 violation, "a plaintiff must plead and prove that each Government-

---

[137] *Id.* at 7.
[138] *Id.*
[139] *Id.*
[140] *Id.*
[141] *See* Trial Tr. 189–90.
[142] Jury Verdict 2, ECF No. 110 (Aug. 12, 2024) (hereinafter "Verdict Form").

official defendant, through the official's own individual actions, has violated the Constitution. The factors necessary to establish a § 1983 violation will vary with constitutional provision at issue . . . The violation must be established against the supervisory official directly." 983 F.3d 609, 618 (2d Cir. 2020) (cleaned up) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

Both Plaintiff and Defendants neglected to discuss *Tangreti* in their initial posttrial briefing. Consequently, the Court requested supplemental briefing asking that they address the implications of *Tangreti* for the jury's verdict in Count Two.

Ms. Light argues that Ms. Gethings and Ms. Clarino "worked in tandem to perpetrate the scheme of retaliation."[143] Plaintiff points to the fact that Ms. Gethings used the word "we" to describe actions taken by herself and Ms. Clarino; that both administrators signed on to the official complaint to NHBE; and that both attended three meetings with Ms. Light—in November 2020, the TEVAL meeting in March 2021, and the meeting with Ms. Cavanaugh that same month.[144] Plaintiff argues that, unlike the defendant in *Tangreti*, Ms. Gethings had subjective knowledge of the campaign of retaliation against Ms. Light, as she and Ms. Clarino "worked together as one to advance and achieve Ms. Gethings' plan of retaliation."[145]

Whether or not the record supports that conclusion, at bottom, the record did not reflect that Ms. Gethings participated in, or, indeed, was aware of Ms. Clarino's observations of Ms. Light's classroom. She did not work in the same building where the observations occurred. WHS is comprised of two buildings that are approximately a ten minutes' walk from one another.[146] One building houses grades 3-8—called the "Big Building"—and the other—called the "Little

---

[143] Pl.'s Supp. Br. 3.
[144] *Id.* at 3–4.
[145] *Id.* (citing *Tangreti*, 983 F.3d at 612).
[146] Trial Tr. 36.

Building"—houses kindergarten through second grade.[147] Ms. Gethings's office was in the Big Building and Ms. Clarino's office was in the Little Building.[148] While Ms. Gethings repeatedly used a variant of the phrase, "two buildings, one school,"[149] she also testified that Ms. Clarino was in charge of the Little Building.[150] While there was substantial evidence that Ms. Clarino and Ms. Gethings worked closely together in general and when it came to retaliating against Ms. Light for her protected speech, there was no record evidence of any personal involvement by Ms. Gethings in this particular action by Ms. Clarino.

Plaintiff points to recent cases interpreting *Tangreti* to argue that, even without personal involvement in this particular act, that Ms. Gethings "created, promulgated and implemented" a policy or practice that caused the violation of Ms. Light's constitutional rights.[151] Plaintiff points to a line of post-*Tangreti* cases in the Second Circuit that entertain supervisory liability under Section 1983 for the creation of policies or patterns of conduct. Those cases, however, found that supervisory defendants could be liable under the Eighth Amendment for deliberate indifference claims if there is evidence that the defendants subjectively knew the risk of the particular violation and consciously disregarded that risk. *See e.g., Stone #1 v. Annucci*, No. 20-cv-1326 (RA), 2021 WL 4463033, at *9 (S.D.N.Y. Sept. 28, 2021); *Abernathy v. Comm'r of Corr.*, No. 3:20-cv-00628, *6 (VAB) (D. Conn. April 2, 2021); *Meli v. City of Burlington*, 585 F.Supp.3d 615, 638 (D. Vt. 2022).

---

[147] *Id.*
[148] *Id.* at 129.
[149] *Id.* at 643, 722.
[150] *Id.* at 650.
[151] Pl.'s Supp. Br. 6–7.

The claims and context of those cases are markedly distinct from Ms. Light's and there was no evidence that Ms. Gethings subjectively knew Ms. Clarino might, in the jury's words, "obsessively shadow" Ms. Light from August – October 2021.[152]

The Court therefore concludes that it would be plain error under *Tangreti* to sustain the jury's finding that Ms. Clarino's observations of Ms. Light—whatever her motivations—constituted an "adverse act" by Ms. Gethings. In their supplemental brief, Defendants argue that there is no way to disaggregate the role that those observations played in the jury's verdict on Count Two, nor in their allocation of economic, non-economic, and punitive damages as to that Count.[153] The Court agrees and will therefore grant the Defendants' motion for a new trial as to Count Two. A new trial is the appropriate remedy where "the jury has reached a seriously erroneous result," *see Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 202 (2d Cir. 2014), but there is "substantial evidence supporting the jury's verdict." *Manley*, 337 F.3d at 244-45. Here, the jury's verdict that Ms. Clarino's observations constituted an "adverse employment action" by Ms. Gethings was, on this record, a seriously erroneous result. But there remains substantial evidence supporting the underlying verdict against Ms. Gethings of unconstitutional retaliation.

### B.  Qualified Immunity

Because there will be a new jury factual analysis in the retrial on Count Two, the evaluation for qualified immunity purposes cannot be performed at this stage.

### C.  Defamation

The jury found that Ms. Gethings's statement "[n]ot one person has said anyone besides you as being the source. . . I need you to know that every person said you were the source,"[154]

---

[152] *See* Verdict Form 2.
[153] Defs' Supp. Br. 6–7.
[154] Pl's Ex. 25 19 (hereinafter "Ms. Cav. Meeting Tr.").

defamed Ms. Light during the March 31, 2021 meeting on Zoom to discuss the rumors that she

had disclosed Ms. Cavanaugh's COVID diagnosis. Attendees included Ms. Gethings, Ms. Light,

Ms. Clarino, Ms. Morrison, and Ms. Cavanaugh.

The jury was instructed that, to prevail on her claim, Ms. Light had to prove that: "(1)

Ms. Gethings published a defamatory statement to a third person[,] (2) The defamatory statement

identified Ms. Light[,] (3) Ms. Light's reputation suffered injury as a result of the statement."

Jury Instr. 9. Ms. Gethings asserts that Ms. Light did not prove that her reputation suffered injury

as a result of the defamatory statement.[155] *See Simms v. Seaman*, 69 A.3d 880, 894 (Conn. 2013)

(discussing the elements of defamation under Connecticut law) (citing *Gambardella v. Apple*

*Health Care, Inc.,* 969 A.2d 736, 742 (Conn. 2009).

The Court concludes that Plaintiff's evidence adequately proved each element of her

defamation claim. First, the statement that Ms. Gethings had heard from others that Ms. Light

was the source of the leak about Ms. Cavanaugh's COVID diagnosis *was* false, which she

acknowledged on cross-examination.[156]

Second, the statement specifically identified Ms. Light and was published to the third

parties attending the meeting—Ms. Clarino, Ms. Morrison, and Ms. Cavanaugh. No further proof

of publication was required. *See Simms*, 69 A.3d at 894 (Conn. 2013) (citations omitted); Jury

Instr. 10–11; *see also Chiaravallo v. Middletown Trans. Dist.*, 561 F.Supp.3d 257, 292 (D. Conn.

2021) ("[D]efamation requires merely that the offending statement be 'communicat[ed] by the

defendant to a third person.'" (citing *Handler v. Arends*, 1995 WL 107328, at *7 (Super. Ct.

---

[155] Mot. 23.

[156] Trial Tr. 711 ("Q: But not a single person actually came to you and said Ms. Light leaked Ms. Cavanaugh's COVID status; isn't that true? A: They didn't come directly to me to say that, no, those exact words."). Since the defamatory statement at issue did not involve a crime of moral turpitude, Ms. Light was required to prove actual damages. *See Gambardella.*, 863 A. 2d at 742 (Conn. App. 2005); *Skakle*, 5 F.Supp.3d at 206.

March 1, 1995) (alterations in original)); *Gambardella,* 969 A.2d at 749 (finding that a supervisor had published a defamatory statement when he repeated the statement to another employee).

Regarding reputational injury, Defendants argue that Ms. Light, "provided no evidence that Principal Gethings' statement was repeated outside of that meeting, and Plaintiff provided no evidence that her reputation with any of those participants was worse after Principal Gethings' statement. Moreover, [Ms. Light] failed to provide any evidence that this statement was disclosed" by anyone present at the meeting or that the statement had "any impact on her reputation."[157] The jury was directed that "[a] defamatory statement is a false communication that tends to harm the reputation of another; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held; to deter third persons from associating or dealing with her; or to excite adverse, derogatory, or unpleasant feelings or opinions against her."[158] That she was "unfriended" on social media by colleagues with whom she interacted every day would be an indication that her esteem with those colleagues was diminished following the March 31 meeting.

The rumor that Ms. Light had disclosed Ms. Cavanaugh's COVID diagnosis had made its way around the school prior to the March 31 meeting—indeed, it was a topic of conversation during Ms. Light's TEVAL meeting five days earlier.[159] Further, Ms. Cavanaugh explained that, despite Ms. Light's adamant denials, "[w]e wouldn't be here if I didn't feel that [the rumor] somehow came back to you. . . and I was going to fill out a written formal complaint[,] but I

---

[157] Mot. 24.
[158] Jury Instr. 10.
[159] *See e.g.,* TEVAL Tr. 44–45; 56–59.

realize that there wasn't a hundred percent evidence for that and I wouldn't want to do that to a colleague."[160] As the meeting drew to a close, Ms. Gethings added:

> MS. GETHINGS: And just so you know, Jessica, we spoke with Judy before and said anyone – and we can respect some people do not want their names mentioned and they certainly deserve that respect. Not one person has said anyone besides you as being the source. We hear that you're saying it wasn't you, but I need you to know that every person said you were the source.[161]

This discussion took place at the height of the COVID-19 pandemic, prior to when vaccines were widely available and in the midst of a public debate about how and when to safely return children to schools in a manner that was safe for both students and teachers. A rumor in March 2021 that Ms. Light had leaked a teacher-colleague's COVID-positive status to parents would go to the heart of whether a teacher could be trusted by her colleagues. In that context, Ms. Gethings, the school's principal, falsely claimed in front of three fellow teachers that multiple people had named Ms. Light as a source of the leak regarding Ms. Cavanaugh's COVID diagnosis. It was reasonable for the jury to find that Ms. Gethings's assertions would have a tendency to "diminish the esteem, respect, goodwill or confidence in which the plaintiff is held; to deter third persons from associating or dealing with her; or to excite adverse, derogatory, or unpleasant feelings or opinions against her." And this, indeed, was borne out by evidence of Ms. Light's experience with her colleagues following the March 31 meeting.

Plaintiff testified extensively that her relationships with colleagues changed in the months immediately following Ms. Gethings's defamatory statement. First, in May 2021 three co-workers had unfriended her on Facebook, including Ms. Morrison and Ms. Cavanaugh, along with her child's teacher, Ms. Alden.[162] When she returned for the 2021–2022 school year, her

---

[160] Ms. Cav Tr. 16.
[161] *Id.* at 19.
[162] Trial Tr. 115.

41

reputation appeared even more damaged. She testified, "I didn't feel welcome in terms of, like, people would walk past me. . . as they entered the building, as they walked by everyone's doors they would say hello, but they wouldn't say hello to me in my classroom which was a stark thing when it's the one missed."[163] Things did not seem to improve when she returned from medical leave. Ms. Light testified that she ate lunch by herself in her classroom when previously she and the other teachers had sat together for lunch.[164]

At a work retirement party, Ms. Light's grade partner sat next to her, when "Ms. Alden came up and asked my grade level partner to sit with her. And everybody got up and moved, um, so that I was sitting alone."[165] According to Ms. Light there was also a baby shower for another teacher held in a school building, but she was not invited.[166] She testified that, on the last day of school that year, "I felt like I lost my reputation as a teacher, I lost my role as a parent. . . . I was alone cleaning up while everyone else was celebrating and happy."[167]

Finally, there are the two notes Ms. Light found in her classroom as she was preparing for the 2022-2023 school year.[168] One taped to her door told her to "JUST LEAVE OUR SCHOOL. YOU ARE TOXIC."[169] The other, found in one of her classroom cabinets offered her a "To Do List" of "Wash hair," and "Leave or Just Die."[170] While it is unknown who left those notes,[171] they provide the jury with evidence that there were strong adverse feelings against Ms. Light within the WHS community. A reasonable juror could conclude that such toxicity was attributable at least in part to Ms. Gethings's endorsement of the rumor.

---

[163] *Id.* at 134.
[164] *Id.* at 161.
[165] *Id.* at 161–62.
[166] *Id.* at 173.
[167] *Id.*
[168] *See id.* at 359; Pl.'s Ex. 21.
[169] Trial Tr. 359.
[170] *Id.* at 361–62; Pl.'s Ex. 22.
[171] Trial Tr. 388–89.

The jury was also instructed that, when evaluating Ms. Light's injury to reputation as to the defamation Count, "the 'injury' to Ms. Light's reputation must be of a material nature and must be of a pecuniary nature, that is, dealing with money."[172] There was sufficient evidence from Ms. Light's treating mental health providers that the rumors that she had leaked Ms. Cavanaugh's COVID and the resulting deterioration of her relationship with her WHS colleagues was significant in causing Plaintiff to seek mental health care. For instance, during her meeting with Dr. Levin on March 10, 2021, prior to the rumors spread, Ms. Light rated her anxiety as "6/10," and she was looking forward to her course of care at the PTSD center in New Haven. According to Dr. Levin's notes, Ms. Light felt that her upcoming treatment for her childhood trauma could "be transformative."[173]

During her next meeting with Dr. Levin after Ms. Gethings's defamatory pronouncement, on May 12, 2021, Ms. Light rated her anxiety as "8/10." In her summary of the meeting, Dr. Levin wrote that, at work, Plaintiff, "feels [school officials] are systematically pushing her out because she has been outspoken about what COVID protocols should be in place. . . . Then they told a teacher that [Ms. Light] told everyone she had COVID (which she said she never did) which has made tensions." In her note about Ms. Light's PTSD, Dr. Levin wrote, "(Childhood sexual abuse) going to the PTSD Center of New Haven. Instead of talking about past sexual abuse, is now having to talk about what is happening now. Going weekly. Costs $175."[174] Over the next year, Dr. Levin continued to document how the perceived social isolation and ostracization in school severely harmed Ms. Light's mental health, including by triggering her post-traumatic stress disorder. Meanwhile, Ms. Light was spending significant funds at the PTSD

---

[172] Jury Instr. 10.
[173] Defs' Ex. S at 61.
[174] *Id.*

Center to cope with the fallout from Defendants' campaign of retaliation which retriggered her symptoms.[175]

Based on the evidence and reasonable inferences, the Court finds that there was ample evidence for a jury to conclude that Ms. Gethings's defamation of Ms. Light injured her personal and professional reputation, resulting in material and pecuniary injury. Defendants are not entitled to a directed verdict on the defamation claim, and the jury's verdict will not be set aside.

### D.  Jury Instructions on Causation Standards

The Defendants have renewed their argument that the jury instruction on causation was legally incorrect. For causation on both Counts One and Two, the jury was required to find that Ms. Light proved that her protected speech "was a 'substantial factor' or to put in other words, a 'motivating factor'" accounting for the "discipline" in Count One and "adverse action" in Count Two.[176] Defendants argue that they are entitled to a new trial because the instruction was contrary to the standard employed by Judge Meyer in his ruling on the motion for summary judgment and is contrary to Second Circuit law.[177] Defendants' proposed jury instructions included the "substantial motivating factor" language and they timely objected to the Court's use of "substantial or motivating factor."[178] Defendants point to three cases in this Circuit which use "substantial motivating factor" as the causation standard when evaluating retaliation cases.[179] As noted in the bench colloquy with counsel prior to charging the jury, the Court reasoned that the language "substantial or motivating" tracing back to *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), has been used repeatedly in the Second Circuit,

---

[175] *See* Pl.'s Ex. 29 (Transaction Ledger from PTSD Center); Trial Tr. 454–56.
[176] Jury Instr. 5, 8.
[177] Mot. 24.
[178] *See* Trial Tr. 782 – 85.
[179] *Id.*

including in *Heim v. Daniel*, 81 F.4th 212, 22 (2d Cir. 2023), cited by Judge Meyer in his ruling

on Defendants' motion for summary judgment.[180] *See Light* 2024 WL 1199717, at *7. In *Mt.

Healthy*, the Supreme Court evaluated a district court's causation standard applied in a First

Amendment retaliation claim by an untenured teacher who had not been rehired. Deciding what

standard the district court should have employed, it said, "[i]nitially, in this case, the burden was

properly placed upon respondent to show that his conduct was constitutionally protected, and

that this conduct was a 'substantial factor' *or to put it in other words*, that it was a 'motivating

factor.'" 429 U.S. at 287 (citing *Village of Arlington Heights v. Metropolitan Housing

Development Corp.*, 429 U.S., 252, 270-271, n. 21 (1977)) (emphasis added). The Second Circuit

has thus applied the *Mt. Healthy* "substantial or motivating" standard in evaluating First

Amendment retaliation cases. *See e.g.*, *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d

Cir. 2006); *Lewis v. Cohen*, 165 F.3d 154, 163 (2d Cir. 1999); *Sagendorf-Teal v. Cnty of

Rensselaer*, 100 F.3d 270, 274 (2d Cir. 1996).

Even the Second Circuit cases Defendants rely on, which use the merged "substantial

motivating" standard, do not distinguish between "substantial motivating" and "substantial or

motivating."[181] *See also D'Onofrio v. Westport/Weston Health District*; *Heim v. Daniel*, 81 F.4th

212 (2d Cir. 2023); *Light*, 2024 WL 1199717, at *7 (citing *Heim*, 81 F.4th at 222). The Circuit

has not drawn a substantive distinction between "substantial motivating" and "substantial or

motivating." The Court's instruction was not legally incorrect.

### E.  Admission of Two Anonymous Notes

"[A] motion for a new trial based on the erroneous admission of evidence is warranted

only where the court made substantial errors in admitting the evidence .... Such relief is not to be

---

[180] Trial Tr. 782, 805–06.
[181] *See* Mot. 26–27.

granted unless the court finds that the introduction of such evidence 'was a clear abuse of discretion and was so clearly prejudicial to the outcome of the trial that we are convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Ojeda v. Metro. Trans. Auth.*, 477 F. Supp. 3d 65, 77 (S.D.N.Y. 2020) (quoting *Nimely v. City of New York*, 414 F.3d 381, 399 (2d Cir. 2005)), aff'd, 41 F.4th 56 (2d Cir. 2022). Defendants argue that that standard was met by the Court's admission of two anonymous notes that Plaintiff testified she found in her classroom in August 2022.[182] Defendants further argue that the Court's stated rationale for admitting the notes—that they were similar in tone to Ms. Alden's complaint against Ms. Light—warrants a new trial. The need for a new trial, argue Defendants, is further evidenced by the size of the jury's emotional distress damage award, where the notes have no relation to the two adverse employment actions identified by the jury.[183]

Ms. Light testified that, from the time of her return from FMLA leave in February 2022, she was increasingly ostracized by her colleagues and treated particularly poorly by Ms. Alden.[184] The jury could have reasonably considered these notes to be further evidence of Plaintiff's diminished professional standing.

A district court may order a new trial under Federal Rule of Civil Procedure 59 if an erroneous evidentiary ruling affected a substantial right of the moving party. *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) ("[A]n erroneous evidentiary ruling warrants a new trial only when 'a substantial right of a party is affected,' as when 'a jury's judgment would be swayed in a material fashion by the error.'" (quoting *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir.

---

[182] Mot. 25.
[183] On August 8, 2024, the Court posted a docket order summarizing its reasons for admitting anonymous notes, and its rationale goes beyond the similarity in tone to Ms. Alden's complaint more than a year earlier. Order, ECF No. 103 (Aug. 8, 2024).
[184] Trial Tr. 161–62.

2007))). Although the admission of the notes may have been a close call given their anonymity, they appeared to be the final straw in Plaintiff's leaving WHS. Defendants have not demonstrated that the admission of the notes resulted in a "serious miscarriage of justice." *Ojeda*, 477 F. Supp. 3d 6 at 77. The Court denies Defendants' motion for a new trial based on improperly admitted evidence.

### F. Damages

Under Rule 59(e) of the Federal Rules of Civil Procedure, a district court has discretion to alter or amend a judgment "to correct a clear error of law or prevent manifest injustice." *Munafo v. Metro. Transp. Auth.*, 381 F.3d 99, 105 (2d Cir. 2004) (internal quotation omitted). "'This discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'" *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996)). "Courts 'are constrained to give due deference to the fact-finding role of the jury when reviewing a claim of excessive damages.'" *Thomas v. Kelly*, 903 F.Supp.2d 237, 262 (S.D.N.Y. 2012) (quoting *Gardner v. Federated Dep't Stores, Inc.*, 907 F.2d 1348, 1353 (2d Cir. 1990)); *see also Ahlf v. CSX Transp., Inc.*, 386 F.Supp.2d 83 (N.D.N.Y. 2005) ("'A jury verdict is not, certainly, something lightly to be set aside.'" (quoting *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 566 (2d Cir. 1988)). "It is well established in this Circuit that in section 1983 cases [t]he standard for appellate review of damage awards, whether compensatory or punitive, is whether the award is so high as to shock the judicial conscience and constitute a denial of justice." *Mathie v. Fries,* 121 F.3d 808, 813 (2d Cir. 1997) (internal quotation marks and citation omitted) (alteration in original).

Because the Court has ordered a new trial on Count Two, it will only consider the parties' arguments as to damages on Counts One and Three.

### 1. Compensatory Damages

#### i. Economic Damages

Defendants offer three arguments regarding compensatory economic damages, First, that the jury improperly awarded more in economic damages on the retaliation claims, $125,000, than the $60,200 that Ms. Light had requested. Second, that Plaintiff did not prove with sufficient particularity that she took 66 days of FMLA leave, that each of those days was attributable to the adverse actions found by the jury, and that the value of the sick days of $26,000 was merely an estimate. Third, that she cannot claim all of Ms. Ventura's bills as she would have sought care from Ms. Ventura anyway because of her pre-existing PTSD.[185]

The first argument is now moot, as the jury awarded $50,000 in compensatory economic damages to Ms. Light on Count One, which is below the maximum amount sought by Plaintiff. As to whether $60,200 would be excessive, that figure was a combination of Plaintiff's calculations regarding the value of her sick days at retirement and medical bills. It is "well-settled that the calculation of damages is the province of the jury." *Crawford v. City of New London*, No. 3:11-cv-1371 (JBA), 2014 WL 3895909, at *1 (Aug. 8, 2024). However, the Second Circuit "has recognized two cases in which remittitur may be appropriate," where the Court can identify evidence of discernable error in the jury's calculations or "where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded." *Id.* (citations omitted).

---

[185] Mot. at 28–29.

Defendants did not cross examine Plaintiff on her calculations regarding her sick days, and offered no specific reason why Plaintiff's figure was inaccurate beyond calling it "speculative at best."[186] "Where there is no particular discernable error, [the Second Circuit has] generally held that a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Kirsch*, 148 F.3d at 165 (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988)). Defendants have demonstrated no error in Plaintiff's calculations, and the total of $26,000 for 66 days of sick leave to be paid out at retirement hardly shocks the conscience.

Regarding her medical bills for the PTSD Center, Ms. Light's course of treatment was shaped by the campaign of retaliation waged against her by Defendants. At the beginning of March 2021, before the TEVAL meeting, Dr. Levin noted that Ms. Light was looking forward to beginning work on addressing "the elephant in the room," *i.e.* her PTSD. Yet Ms. Light instead needed to use her time and money on therapy with Ms. Ventura to address her on-going stressors from the administrators at WHS and understand how her interactions with Defendants triggered her pre-existing PTSD. It is well-established that defendants in tort actions take plaintiffs as they find them. *See Stampf*, 761 F.3d at 207 n.5 (collecting cases in which the Second Circuit has recognized the so-called "eggshell skull doctrine"). Ms. Light had dealt persistently with PTSD arising from her traumatic childhood. Nonetheless, she graduated from college and earned a master's degree, married, raised two children, and served as a leader in her school and community. Taking the evidence in the light most favorable to the non-moving party, it was Defendants' actions that re-triggered her PTSD, causing Ms. Light severe emotional distress that led to her withdrawal from her family and community. This distress required expensive and

---

[186] *Id.* at 28.

extensive mental health treatment. The Court finds no error in awarding Ms. Light $50,000 in compensatory economic damages as to Count One.

### ii. Non-Economic Compensatory Damages

The jury was instructed that, "Ms. Light seeks compensatory damages for non-economic losses. Such damages compensate for non-monetary injuries, such as emotional pain and suffering, humiliation, injury to reputation, anxiety, loss of enjoyment of life, and/or anguish, that Ms. Light has already experienced or is reasonably likely to experience in the future."[187] Defendants argue that the $650,000 total award for emotional distress damages is excessive, again only focusing on the two specific adverse actions found by the jury on Count Two.[188] Because only $300,000 of the verdict was awarded against the Board for its violation of § 31-51q, Verdict Form 4, the Court will address only whether the $300,000 awarded in non-economic compensatory damages for Count One was excessive.

The calculation of damages is the province of the jury, and courts will not "vacate or reduce a jury award merely because [the court] would have granted a lesser amount of damages." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014). The calculation of emotional-distress damages in particular, is "inherently speculative. There is no objective way to assign any particular dollar value to distress." *Id.* Even so, awards for intangible damages must be "fair, reasonable, predictable, and proportionate," and must not "shock the judicial conscience or constitute a denial of justice." *Id.* "Under Connecticut law, the relevant inquiry in determining whether an award is excessive is whether it falls within the necessarily uncertain limits of fair and reasonable compensation or whether it so shocks the conscience as to compel the conclusion

---

[187] Jury Instr. 13.
[188] Mot. at 29–35.

that it was due to partiality, prejudice or mistake." *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 190 (2d Cir. 2016).

A plaintiff's emotional testimony before a jury that evinces something beyond "garden variety" emotional distress may be sufficient to sustain an award of emotional damages, as long as that award is not so high that it shocks the conscience. *Jennings v. Town of Stratford*, 263 F.Supp.3d 391, 407 (D. Conn. 2017) (upholding a jury's emotional distress damages award in a First Amendment retaliation case where the only evidence of distress was plaintiff's "emotion[al]" testimony). Here, the jury had the opportunity to evaluate Ms. Light's testimony, and apparently found her to evince sincere emotional distress. Additionally, they evaluated the testimony of her therapist, Ms. Ventura; her husband's testimony about the emotional impact the campaign of retaliation had on Ms. Light; extensive emails between Ms. Light and Ms. Ventura in which Ms. Light in real time documented her distress after her return to school following her FMLA leave; and detailed records from Dr. Levin.

Whether emotional distress damages are excessive is assessed by looking to comparable cases if available. In *Jennings*, a court in this district upheld an emotional distress damage award of $230,000 for emotional distress in a First Amendment retaliation case, where the only evidence offered was "sincere" and "emotional" testimony from the Plaintiff. 263 F.Supp.3d at 407. In upholding the jury's emotional distress damage award, Judge Meyer referenced several cases for comparison:

> I conclude that an award of $230,000 in emotional distress damages was fair, reasonable, predictable, and proportionate in this case, and reasonably within the range found in other, more comparable cases. See *McClain v. Pfizer, Inc.*, 2011 WL 2533670, at *2 (D. Conn. 2011) (declining to disturb jury's award of $685,000 in non-economic damages for First Amendment retaliation), aff'd, 505 Fed.Appx. 59 (2d Cir. 2012); *Phillips v. Bowen*, 278 F.3d 103, 111 (2d Cir. 2002) (declining to disturb jury's award of $400,000 in

> emotional distress damages for First Amendment retaliation); *Lore v. City of Syracuse*, 670 F.3d 127, 179 (2d Cir. 2012) (declining to disturb jury's award of $150,000 in emotional distress damages for retaliation).

*Id.* Against this backdrop, the jury's emotional distress award of $300,000 is not disproportionate to other free speech retaliation cases in this Circuit, nor to the causal circumstances in this case. Given the Plaintiff's credible testimony about her profound emotional injuries, and the severity of the Defendants' actions—comprised of an aggregation of incidents over an extended period of time—the compensation for harm Defendants' actions in Count One caused the plaintiff is not "so high as to shock the judicial conscience and constitute a denial of justice." *Mathie*, 121 F.3d at 813.

### 2. Punitive Damages

The jury awarded $100,000 in punitive damages to Ms. Light on Count One. Because the Court is ordering a new trial on Count Two, Defendants' argument regarding punitive damages on that Count will not be addressed. The jury was instructed that if they found the Board liable for unlawfully retaliating against Ms. Light, "[p]unitive damages are awarded not to compensate a plaintiff for an injury but to punish a defendant for extreme or outrageous conduct, and to deter or prevent a defendant and others like her from engaging in such conduct in the future."[189] They were permitted to award punitive damages if, "the acts or omissions of defendants reveal a reckless indifference to the rights of others, maliciousness, or an intentional and wanton violation of those rights."[190] The jury was told that an act or omission was "wanton" if "in a reckless or callous disregard of, or indifference to, the rights of Ms. Light."[191] To find "recklessness," they were instructed, "there must be something more than a failure to exercise a reasonable degree of

---

[189] Jury Instr. 14
[190] *Id.*
[191] *Id.*

watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them."[192] In deciding whether to award punitive damages, the jury was directed to "consider the underlying purpose of punitive damages: to punish a defendant for outrageous conduct or to deter the defendant and others from performing similar conduct in the future."[193]

Defendants' arguments again focus on the two adverse actions identified by the jury for Count Two, and whether a reasonable juror could have found them "so reprehensible that it warrants punishment."[194] As the Court has discussed, *supra* 25–27, Defendants have waived other arguments related to the jury's action on Count One beyond the contours of the jury instructions and verdict form. The Court therefore reviews the jury's award of $100,000 in punitive damages based on evidence in the record as a whole, rather than purely based on the two actions the jury identified as adverse actions for purposes of Count Two.

"Section 31-51q explicitly authorizes punitive damages, and Connecticut courts apply the common law standard of punitive damages to determine when such damages are warranted." *McClain v. Pfizer Inc.*, 505 Fed. Appx. 59, 62 (2d Cir. 2012) (summary order) (citing *Arnone v. Town of Enfield,* A.2d 260, 280 (Conn. App. Ct. 2003)). Consistent with the jury instructions here, "[p]unitive damages are appropriate where the evidence 'reveal[s] a reckless indifference to the rights of others or an intentional and wanton violation of those rights.'" *Id.* (citing *City of West Haven v. Hartford Ins. Co.,* A.2d 988, 995 (Conn. 1992)).

First, it was clear that Ms. Gethings understood Ms. Light's free speech rights vis-à-vis the Board's COVID-19 policies. Indeed, Ms. Gethings, along with Ms. Clarino, had held an entire meeting on Zoom with faculty and staff in November 2020 discussing and reiterating the

---

[192] *Id.*
[193] *Id.* at 15.
[194] Mot. 36 (citing *Wiercinski v. Mangia 57, Inc.,* 787 F.3d 106, 115 (2d Cir. 2015) (cleaned up)).

points made in the July 2020 letter from Connecticut AFT,[195] in which the union emphasized that public school teachers had a First Amendment right to speak publicly about the issue of COVID-19 policies in schools.[196] Ms. Gethings was aware that Ms. Light was acting within her First Amendment right when she discussed reopening policies at Board meetings and on social media. Ms. Gethings also repeatedly noted during the TEVAL meeting that Ms. Light had a right to speak out at Board meetings and on social media regarding the Board's policies. Nonetheless, as discussed above, she took repeated actions to diminish Ms. Light's happiness at work in retaliation for speech that Ms. Gethings acknowledged was protected, including but not limited to transferring her to a position Ms. Light expressly did not want, which would be more difficult because of her disability; failing to help Ms. Light prepare for this role; falsely accusing her of divulging a colleague's medical information; and removing her from extracurricular activities.

A reasonable juror could find that Ms. Gethings's actions against Plaintiff were "more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them," and were, instead, evidence of her "callous disregard of, or indifference to, the rights of Ms. Light."[197]

Further, the appropriateness of the jury's award of punitive damages was buttressed by the fact that Dr. Illine Tracey, Superintendent of New Haven Public Schools issued a warning to Ms. Gethings in February 2022, reprimanding her for her treatment of Ms., Light. She wrote:

> You exhibited poor professional judgment in how you handled differences of opinion with an employee you supervised.
>
> You exhibited poor professional judgment in how you responded to an employee criticizing the Worthington Hooker School Administration during a New Haven Board of Education meeting.

---

[195] *See* Pl.'s Ex. 1.
[196] *See id.*
[197] Jury Instr. 14.

> During our January 31, 2022 meeting, you were given an opportunity to respond to the findings, to ask questions and were advised that similar acts in the future will not be tolerated. As a seasoned administrator with the New Haven Public Schools, you were expected to respond to these situations reasonably and in a manner consistent with our values. It is concerning that you were unable to do so in this circumstance.
>
> It is my hope and expectation that you will learn from this experience and that going forward you will treat all employees of the New Haven Public Schools in a professional manner.[198]

It was proper and reasonable for the jury to award punitive damages.

In the alternative, Defendants argue that the amount of punitive damages awarded by the jury is excessive and must be remitted. The Supreme Court has established three guideposts for evaluating when the amount of punitive damages crosses the line into arbitrariness, violating due process. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419-28 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-85 (1996). The first is the reprehensibility of the defendant's conduct, which the Supreme Court has characterized as "[t]he most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. The second is the "ratio between harm, or potential harm, to the plaintiff and the punitive damages award," often captured as the ratio of punitive to compensatory damages. *State Farm*, 538 U.S. at 424. And the third is "the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases," *State Farm*, 538 U.S. at 428 (quotation marks omitted), looking for comparison to "legislative judgments concerning appropriate sanctions for the conduct at issue," *Gore*, 517 U.S. at 583 (quotation marks omitted).

"To assess the degree of reprehensibility, the court must consider three 'aggravating factors': '1) whether a defendant's conduct was violent or presented a threat of violence; 2)

---

[198] Pl.'s Ex. 48.

whether a defendant acted with malice as opposed to mere negligence; and 3) whether a

defendant has engaged in repeated instances of misconduct.'" *Russo*, 419 F.Supp.2d at 154. The

first factor is inapplicable, as there was no violent conduct. As discussed above, however, there

was sufficient evidence for a reasonable juror to conclude that Defendants' conduct toward

Plaintiff was motivated by malice, or at least wanton recklessness as opposed to negligence.

In terms of proportion, the total amount of putative damages here constitutes less than

half of the compensatory damages awarded. Such ratios have not been found excessive in this

Circuit. Judge Meyer helpfully provided such an analysis in *Jennings*:

> The Court's own research . . . discloses additional examples of more
> modest awards in other First Amendment retaliation cases. *See, e.g.,*
> *Arnone v. Town of Enfield*, 79 Conn. App. 501, 831 A.2d 260 (2003)
> (award of $36,000 in punitive damages against public employer for
> First Amendment retaliation, a little less than half of compensatory
> damages); *Russo v. City of Hartford*, 419 F.Supp.2d 134, 155 (D.
> Conn. 2006) (approving of punitive damages of $75,000 against
> police chief for First Amendment retaliation, more than three times
> the amount of compensatory damages awarded); *Moskowitz v.*
> *Coscette*, 3 Fed.Appx. 1, 6–7 (2d Cir. 2001) (approving of punitive
> damages of $75,000 against individual defendant for First
> Amendment retaliation, approximately 60% of the amount of
> compensatory damages awarded)[.]

263 F.Supp.3d at 414. On Count One, the jury awarded putative damages that were 35 percent of

the compensatory damages award, well within the range accepted under *Gore*.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion for a directed verdict is DENIED and the

motion for a new trial is GRANTED on Count Two on the issue of whether Ms. Gethings

retaliated against Ms. Light in violation of 42 U.S.C. § 1983. The jury's award of $350,000 in

compensatory damages and $100,000 in punitive damages against Defendant New Haven Board

of Education was shown to be fair and reasonable and remains in place for its retaliation against

Ms. Light in violation of Conn. Gen. Stat. § 31-51q, as does its award of $10,000 in special

damages and $15,000 in general damages against Defendant Gethings for defaming the Plaintiff, for a total verdict of $450,000.

Plaintiff shall file within fourteen (14) days any motion for attorneys' fees and costs. Defendants' reply will be filed in seven (7) days. Motions for extension are discouraged.

**SO ORDERED** at New Haven, Connecticut, this 26th day of August, 2025.

/s/  Janet Bond Arterton
JANET BOND ARTERTON
UNITED STATES DISTRICT JUDGE